**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

LOUIE GOHMERT, *et al.*,

        *Plaintiffs*,

   v.

THE HONORABLE MICHAEL R. PENCE,
VICE PRESIDENT OF THE UNITED
STATES, in his official capacity,

        *Defendant*.

Civil Action No. 6:20-cv-00660-JDK

**BRIEF OF THE U.S. HOUSE OF REPRESENTATIVES AS *AMICUS CURIAE*
IN SUPPORT OF DISMISSAL**

## TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF AMICUS CURIAE ...................................................1

BACKGROUND .............................................................................................................3

    A.    The Relevant Constitutional And Statutory Scheme .................................3

    B.    The 2020 Election .................................................................................5

    C.    Plaintiffs' Suit Before This Court ..........................................................8

ARGUMENT .................................................................................................................8

    I.    Plaintiffs Lack Standing........................................................................9

        A.    Representative Gohmert Lacks Standing.....................................9

        B.    The Arizona Plaintiffs Lack Standing........................................12

    II.    The Laches Doctrine Bars Plaintiffs' Claims .........................................14

    III.    Plaintiffs Are Not Entitled To The Extraordinary Equitable Relief They Seek.....................................................................................................19

CONCLUSION..............................................................................................................22

CERTIFICATE OF SERVICE

## INTRODUCTION AND INTEREST OF AMICUS CURIAE

*Amicus curiae*, the United States House of Representatives, has a direct and immediate interest in this case.[1]  Plaintiffs ask this Court to displace Congress's longstanding role in counting the votes of the Electoral College in Presidential elections.  The unprecedented relief plaintiffs seek would invalidate the primary role of Congress in counting electoral votes—a role that Congress has played in our constitutional system for more than two hundred years and has been embodied in a federal statute since 1887.  In a radical departure from our constitutional procedures and consistent legislative practices, it would authorize the Vice President to ignore the will of the Nation's voters and to choose the winner in an election in which the holder of the office will often be a candidate, as is true in the 2020 election.  To achieve this extraordinary result, plaintiffs filed suit on the eve of the Joint Session of Congress, when electoral votes are counted, to ask this Court to strike down an Act of Congress—"the gravest and most delicate duty that this Court is called on to perform," *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (opinion of Holmes, J.).  This belated and disruptive effort to impose a novel legal rule is at odds with sound judicial process, the limited role of the Article III courts, constitutional text, and American history.

Pursuant to the Twelfth Amendment, following each Presidential election, each state's properly designated electors meet in their respective states, certify lists of all electors who voted

---

[1] The Bipartisan Legal Advisory Group (BLAG) of the U.S. House of Representatives, which "speaks for, and articulates the institutional position of, the House in all litigation matters," has authorized the filing of an *amicus* brief in this matter.  Rules of the U.S. House of Representatives (116th Cong.), Rule II.8(b), https://perma.cc/M25F-496H.  The BLAG comprises the Honorable Nancy Pelosi, Speaker of the House, the Honorable Steny H. Hoyer, Majority Leader, the Honorable James E. Clyburn, Majority Whip, the Honorable Kevin McCarthy, Republican Leader, and the Honorable Steve Scalise, Republican Whip.  Representative McCarthy and Representative Scalise dissented.

for President and Vice President, and transmit their lists to the President of the United States Senate.  After that process, "[t]he President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted."  U.S. Const. amend. XII.

This Court should reject plaintiffs' effort to overturn Congress's centuries-old role in counting electoral votes and resolving disputes about them in the constitutionally mandated Joint Session.  In 1865, Congress formalized its primacy in counting electoral votes with the passage of the 22d Joint Rule, which specified a procedure for resolving objections.[2]  Since the Presidential election of 1888, Congress has conducted the Joint Session pursuant to procedures set forth in the Electoral Count Act of 1887.  Consistent with the text of the Twelfth Amendment, the Electoral Count Act assigns a ministerial role to the Vice President as President of the Senate.  The Vice President opens the electors' certificates, but does not count the votes. Congress designed the Electoral Count Act to ensure an orderly process for it to count the electoral votes and thus enhance public confidence in Presidential elections.  Traditionally, Congress has also adopted a concurrent resolution before each such electoral count that incorporates the Electoral Count Act's provisions by reference.[3]

Plaintiffs' motion should be denied and their complaint dismissed for multiple reasons. This Court has no jurisdiction over plaintiffs' claims because plaintiffs lack standing.  Plaintiffs' delay in bringing their claims independently warrants dismissal based on the doctrine of laches. Their constitutional challenges have no merit.  And the public interest and equities cut strongly

---

[2] Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 148 (1877) (House of Representatives); *id.* at 224 (Senate).  *Compare* 3 U.S.C. § 15.

[3] *See* Dechsler's Precedents, ch. 10, § 2.6.

against a first-of-its-kind injunction that would rewrite longstanding procedural rules for Congressional vote counting and create confusion just days before the required Joint Session.

Setting aside Representative Gohmert's claims—for which he clearly lacks standing—this case is simply another attempt by defeated Arizona electoral nominees to overturn the results of the popular vote in their state. The Arizona plaintiffs have tried and failed to overturn the election in suits they filed in federal and state courts in Arizona. Thus, they now ask this Court in Texas to help them achieve what they failed to do in Arizona. This Court should reject plaintiffs' bid to overturn a cornerstone of our Nation's democratic processes.

## BACKGROUND

### A.    The Relevant Constitutional And Statutory Scheme

**1.** Every four years, voters nationwide cast their ballots in the Presidential election. *See* U.S. Const., Art. II, § 1, cl. 3; 3 U.S.C. § 1. Those votes "go toward selecting members of the Electoral College." *Chiafalo v. Washington*, 140 S. Ct. 2316, 2319 (2020). The Constitution provides that the electors are, in turn, empowered to elect the President and Vice President. U.S. Const. amend. XII. "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress[.]" U.S. Const., Art. II, § 1, cl. 2. This constitutional power to appoint electors "gives the States far-reaching authority over presidential electors." *Chiafalo*, 140 S. Ct. at 2324; *accord McPherson v. Blacker*, 146 U.S. 1, 27 (1892) (states have "broadest power of determination" over who may serve as an elector).

The Constitution also addresses the process for electoral voting: The Twelfth Amendment requires that electors "meet in their respective states," cast ballots for President and Vice President, "sign and certify" their votes, and transmit the results "sealed to the seat of

government of the United States, directed to the President of the Senate." U.S. Const. amend. XII. The Amendment further provides that "[t]he President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted." *Id.*

**2.** Consistent with these constitutional requirements, Congress has long established the process needed to carry out the Twelfth Amendment responsibilities of casting and counting electoral votes. *See generally* Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 Fla. L. Rev. 541, 551-53 (2004) (*Conscientious Congressman's Guide*) (describing historical understanding of electoral vote counting).

Although Congress had been responsible for counting electoral votes and resolving disputes about them since the early days of our Nation, the Electoral Count Act, 24 Stat. 373, 3 U.S.C. §§ 5-6, 15-18, sought to clarify—and codify—Congress's role in the wake of the disputed 1876 Presidential election. *See* Siegel, *Conscientious Congressman's Guide*, 56 Fla. L. Rev. at 547-50. For more than 130 years, the Electoral Count Act has governed the electoral voting process, and its procedures have been followed in every election since its enactment. *See* Cong. Rsch. Serv., RL32717, *Counting Electoral Votes: An Overview of Procedures at the Joint Session, Including Objections by Members of Congress* (Dec. 8, 2020), https://perma.cc/8TS3-8873.

The Electoral Count Act, as revised and in conjunction with other statutes, establishes procedures by which electoral votes must be cast and counted, culminating with the final count in the Joint Session of Congress on January 6. *See* 3 U.S.C. §§ 5-8, 15. The statute assigns primary responsibility to the states for resolving challenges to electoral slates, *id.* § 5; requires state executives to certify final vote counts and send those counts to the Archivist of the United

4

States in "a certificate of such ascertainment," *id.* § 6; specifies when electors shall meet to ensure uniformity, *id.* §§ 7-9; and provides that, during the Joint Session, the President of the Senate will open and present the vote certificates to the House and Senate for counting, *id.* § 15. The Electoral Count Act also establishes a process by which objections to slates of electors may be made and considered by Congress. *See id.* §§ 15, 17.

**3.** Under Arizona law, electors are chosen by popular vote. *See* Ariz. Rev. Stat. § 16-212(A). Then, after the "secretary of state issues the statewide canvass containing the results of" the election, the electors must "cast their electoral college votes for the [Presidential ticket that] received the highest number of votes in [the] state as prescribed in the canvass." *Id.* § 16-212(B). Indeed, Arizona law specifically prohibits the electors from voting for other candidates, stating that any "elector who knowingly refuses" to vote for the winner of the state's popular vote "is no longer eligible to hold the office of presidential elector" and shall be replaced with a qualified elector (who must vote for the ticket that won the popular vote). *Id.* § 16-212(C).[4]

**B.      The 2020 Election**

**1.** On November 3, 2020, more than 3.4 million Arizona voters participated in the general election. *See Bowyer v. Ducey*, __ F. Supp.3d __, No. CV-20-02321, 2020 WL 7238261, at *1 (D. Ariz. Dec. 9, 2020), *appeal filed*, No. 20-17399 (9th Cir. Dec. 10, 2020). After the election, all fifteen counties in Arizona performed a hand-count audit, which confirmed that there were no discrepancies with the tabulation equipment (as in the case of Maricopa County,

---

[4] Arizona law does not permit the state legislature to replace electors or appoint new ones. *See* Ariz. Rev. Stat. § 16-212(A). Rather, if an elector position becomes vacant, the "chairperson of the state committee of the political party represented by that elector shall appoint a person who is otherwise qualified to be a presidential elector." Id. § 16-212(C).

Arizona's largest county) or that, if any discrepancies existed, they were "within the acceptable margin." Ariz. Sec'y of State, *Summary of Hand Count Audits—2020 General Election* (Nov. 17, 2020), https://perma.cc/VJD8-6YL8; *see also* Ariz. Rev. Stat. § 16-602; *Bowyer*, 2020 WL 7238261, at *1. Following the audits, each county's Board of Supervisors timely canvassed the election results and transmitted them to the Arizona Secretary of State Katie Hobbs. *See* Arizona 2020 General Election County Canvass Returns, https://perma.cc/6SU9-D239; Ariz. Rev. Stat. §§ 16-642(A), 16-645(B).

On November 30, 2020, Secretary Hobbs certified the statewide canvass, reporting that President-Elect Joseph Biden had prevailed over President Donald Trump by 10,457 votes. *See* 2020 General Election Official Canvass Certification (Nov. 30, 2020), https://perma.cc/N7NT-43EP; Ariz. Rev. Stat. § 16-648. On the same day, Arizona Governor Douglas Ducey signed the state's Certificate of Ascertainment for the Biden electors. *See* Certificate of Ascertainment for Presidential Electors (Nov. 30, 2020), https://perma.cc/WQ9D-FRDF.

On December 14, 2020, pursuant to federal and state law, Arizona's electors met and cast Arizona's electoral votes for President-Elect Biden and Vice President-Elect Kamala Harris. *See* 3 U.S.C. § 7; Ariz. Rev. Stat. § 16-212; Arizona Presidential Elector Ballot Certificate of Vote (Dec. 14, 2020), https://perma.cc/KWS2-E8D6.

**2.** Before, during, and in the immediate aftermath of the general election, the Arizona state courts heard numerous challenges to the conduct of the election—all of which were rejected. The courts rejected an attempt to redo the hand-count audit. *See Arizona Republican Party v. Fontes*, No. CV2020-014553 (Ariz. Super. Ct., Maricopa Cnty. Dec. 21, 2020). The Trump Campaign dismissed its own case that had initially challenged the performance of the tabulation machines. *See Donald J. Trump for President v. Hobbs,* No. CV2020-014248 (Ariz.

Super. Ct., Maricopa Cnty. Nov. 13, 2020). The courts found no merit to challenges based on the purported misuse of "Sharpies" to fill out ballots. *See Aguilera v. Fontes*, No. CV2020-014562 (Ariz. Super. Ct., Maricopa Cnty. Nov. 30, 2020); *Aguilera v. Fontes,* No. CV2020-014083 (Ariz. Super. Ct., Maricopa Cnty. Nov. 7, 2020). And another lawsuit challenging the election results was voluntarily dismissed even before an initial hearing in court. *See Stevenson v. Ducey*, No. CV2020-096490 (Ariz. Super. Ct., Maricopa Cnty. *filed* Dec. 4, 2020).

After the electoral slate was certified, putative Republican elector Kelli Ward—who is also a plaintiff in this suit—filed an election contest challenging the statewide canvass. The trial court rejected her claims, finding no fraud, no misconduct, and no illegal votes. The court entered an order "confirming" that President-Elect Biden had won the state's electoral votes. *See Ward v. Jackson*, No. CV2020-015285 (Ariz. Super. Ct., Maricopa Cnty. Dec. 4, 2020). The Arizona Supreme Court unanimously affirmed that ruling, finding that "the challenge fails to present any evidence of 'misconduct,' 'illegal votes' or that the Biden Electors 'did not in fact receive the highest number of votes for office,' let alone establish any degree of fraud or a sufficient error rate that would undermine the certainty of the election results." *Ward v. Jackson*, CV-20-0343-AP/EL, slip op. at 6 (Ariz. Dec. 8, 2020), *pet. for cert. filed*, No. 20-809 (U.S. Dec. 11, 2020). The court therefore "confirm[ed] the election of the Biden Electors" under state law. *Id.*

At nearly the same time, Ward and others (including many of the plaintiffs here) filed suit in federal district court, alleging fraud and seeking to "decertify" Arizona's election results. The district court rejected the challenge. *Bowyer*, 2020 WL 7238261, at *16. The court found that, among other things, the plaintiffs lacked standing because they alleged only a generalized grievance, *id.* at *2-*5, and that their claims were barred by laches, *id.* at *9-*11.

7

### C.     Plaintiffs' Suit Before This Court

Plaintiffs in this suit are Louie Gohmert, United States Representative for the First Congressional District of Texas, and eleven individuals.  Compl. ¶¶ 16-17.  The individual plaintiffs are all unsuccessful electors in Arizona; they allege that they constitute a putative slate of Arizona electors that also met on December 14, 2020—and, contrary to the state's popular vote, cast electoral votes for President Trump and Vice President Pence.  *Id.* ¶ 20.  *But see* Ariz. Rev. Stat. § 16-212 (providing that electors must vote for the party of the candidate who won the statewide popular vote; failure to do so renders one ineligible to serve as an elector).  Their purported slate was not certified by the Governor and did not otherwise comply with the state statutory scheme (as enacted by the Arizona legislature) or the Electoral Count Act.

Plaintiffs waited until December 27, 2020, to file this complaint against Vice President Michael Pence.  Compl.  Plaintiffs allege that Sections 5 and 15 of the Electoral Count Act are unconstitutional because, among other reasons, the Vice President assertedly has "exclusive authority and sole discretion under the Twelfth Amendment to determine which slates of electors for a State, or neither, may be counted."  *Id.* ¶¶ 2, 3.  Plaintiffs seek emergency declaratory relief that those sections of the Electoral Count Act are unconstitutional and an injunction prohibiting Vice President Pence "from following any Electoral Count Act procedures in 3 U.S.C. §§ 5 and 15."  Doc. 2, at 3 (Mot. for Expedited Declaratory Judgment and Emergency Injunctive Relief).

## ARGUMENT

This Court should dismiss the complaint and deny the extraordinary and unprecedented relief requested:  a declaration that the Electoral Count Act is unconstitutional and an injunction that would interfere with the time-honored procedures of Congress for counting electoral votes.

Plaintiffs lack standing; their claims are barred by laches; and their legal and constitutional claims—which this Court should not reach—lack merit. At bottom, this litigation seeks to enlist the federal courts in a belated and meritless assault on longstanding constitutional processes for confirming the results of a national election for President. The Court should reject this improper and legally unfounded effort.

## I. Plaintiffs Lack Standing

"The familiar elements of standing are (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the respondent, and (3) that is likely to be redressed by a favorable judicial decision." *Shrimpers & Fishermen of RGV v. Texas Comm'n on Envtl. Quality*, 968 F.3d 419, 424 (5th Cir. 2020). The standing inquiry is "especially rigorous" when, as here, plaintiffs ask the court to declare a statute unconstitutional. *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) ("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."). Plaintiffs do not satisfy the requirements for standing.

### A. Representative Gohmert Lacks Standing

Under established Supreme Court precedent, individual legislators like Representative Gohmert lack standing to assert abstract injuries to their legislative interests. In *Raines*, the Supreme Court addressed the standing of legislators who brought suit alleging that a statute was unconstitutional because it "diluted their Article I voting power." 521 U.S. at 817 (alteration omitted). The Court held that the legislators lacked standing because their alleged injury was "wholly abstract and widely dispersed." *Id.* at 829. It was abstract because the plaintiffs had not "claim[ed] that they ha[d] been deprived of something to which they *personally* [were] entitled."

*Id.* at 821. And it was widely dispersed because the plaintiffs had "not been singled out for specially unfavorable treatment as opposed to other Members of their respective bodies." *Id.* In addition, the suit was "contrary to historical experience," and "ha[d] not been authorized" by the legislators' "respective Houses of Congress." *Id.* at 829.

Following *Raines*, courts have repeatedly rejected individual legislators' claims to standing when they are "not singled out" and when "their claim is based entirely on the loss of political power." *Blumenthal v. Trump*, 949 F.3d 14, 19 (D.C. Cir. 2020); *Chenoweth v. Clinton*, 181 F.3d 112, 115 (D.C. Cir. 1999); *Campbell v. Clinton*, 203 F.3d 19, 22 (D.C. Cir. 2000); *see also Maloney v. Murphy*, __F.3d__ , No. 18-5305, 2020 WL 7702700, *1 (D.C. Cir. Dec. 29, 2020) (reiterating that "generalized injuries claimed by legislators that are tied broadly to the law-making process and that affect all legislators equally" are "non-cognizable"). Each of these cases, like *Raines* itself, stressed "the need for the judiciary to avoid meddling in the internal affairs of the legislative branch by entertaining a lawsuit by an individual legislator whose rights could be vindicated by congressional repeal of the offending statute." *Comm. on Judiciary of U.S. House of Reps. v. McGahn*, 968 F.3d 755, 770 (D.C. Cir. 2020) (en banc) (alterations, quotation marks, and citations omitted).

Representative Gohmert's claim is even weaker than the claims to legislator standing that the Supreme Court and other courts have rejected. The complaint contains no specific allegations of injury to Representative Gohmert at all. In the motion for a preliminary injunction, Representative Gohmert asserts an interest in "vot[ing] as a Congressional Representative" under the Twelfth Amendment, which establishes procedures for the House to select a President if no candidate receives an electoral college majority. Mot. 4-5. Representative Gohmert appears to contend that the Electoral Count Act, by giving States and

10

the Senate a role in selecting the electoral college winner, makes it less likely that the House will be called upon to select the President under the Twelfth Amendment, which in turn he claims "eviscerates [his] constitutional right and duty to vote for President." Mot. 7.

This standing argument fails for several reasons. Representative Gohmert's asserted interest in voting for President under the Twelfth Amendment is "wholly abstract." *Raines*, 521 U.S. at 829. As in *Raines*, Representative Gohmert alleges the "dilution of institutional legislative power" rather than the "loss of any private right." *Id.* at 821, 826. And he alleges "no injury to [himself] as [an] individual[]" as opposed to the body in which he serves. *Id.* at 829. There is thus a "mismatch" between Representative Gohmert—an individual legislator—and the entity to whom his alleged injury belongs—the House as a whole. *See Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1953 (2019). Indeed, Representative Gohmert's asserted injury is yet more abstract than the injury rejected in *Raines*, because the gravamen of Representative Gohmert's complaint is that the Electoral Count Act diminishes the power of the Vice President, as distinct from the legislative body in which Representative Gohmert serves. *See* Compl. ¶¶ 42-44 (arguing that the Electoral Count Act violates the Twelfth Amendment by depriving the Vice President of the power to count Electoral College votes).

Representative Gohmert's asserted injury fails under *Raines* for additional reasons. It is "widely dispersed," *Raines*, 521 U.S. at 829, because it is shared by every Member of the House, each of whom is affected by the Electoral Count Act in the same way. As in *Raines*, his claims are contrary to historical practice and opposed by the House. And, also as in *Raines*, rejecting his claim to standing will not deprive him of an adequate remedy, because he may always work to repeal the Electoral Count Act through the legislative process.

Finally, Representative Gohmert's alleged injury is neither "actual" nor "imminent." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Even if—contrary to constitutional text, logic, and history—the procedures of the Congressional Joint Session were altered as Representative Gohmert seeks, he makes no plausible claim that the Presidential election would be thrown to the House under the Twelfth Amendment. Nor could he, as that remarkable outcome has not happened in nearly 200 years and there is no plausible basis for questioning the state-certified electoral votes in this Presidential election.

Representative Gohmert therefore lacks a cognizable injury and must be dismissed as a plaintiff. Because venue in this Court is supported only by Representative Gohmert's residency in this district (*see* Compl. ¶ 15), dismissal of the case on venue grounds or transfer to a more appropriate venue may be warranted. *See* 28 U.S.C. § 1406(a) (providing that the district court in "a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought").

### B. The Arizona Plaintiffs Lack Standing

The eleven plaintiffs purporting to be "Arizona Electors" (Compl. ¶¶ 17-18) also lack standing. They have not suffered an injury that is "concrete and particularized" or "actual or imminent." *Lujan*, 504 U.S. at 560. A "grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interest in the proper application of the law does not count as an 'injury in fact'" and "does not show standing." *Carney v. Adams*, — S. Ct. —, No. 19-309, 2020 WL 7250101, at *3 (U.S. Dec. 10, 2020).

The Arizona plaintiffs have merely alleged just such a generalized grievance. They assert injury from "having a competing slate of electors take their place and their votes in the Electoral College" and from the use of the Electoral Count Act at the Joint Session "to resolve the dispute

12

over which slate of Arizona electors is to be counted."  Compl. ¶¶ 57-58.  But, as Plaintiffs themselves appear to concede (*see id.* ¶ 57), they have no special status at the Joint Session. Under Arizona law, the only individuals entitled to cast electoral college votes are the electors for the "candidate for president and the candidate for vice president who jointly received the highest number of votes in this state," Ariz. Rev. Stat. § 16-212(B)—here, President-Elect Biden and Vice President-Elect Harris.  The appointment of the Biden electors was certified by Governor Ducey on November 30, and was "confirm[ed]" by the Arizona Supreme Court on December 8.  *See supra* pp. 6-7.  Thus, by binding operation of Arizona law, the Arizona plaintiffs are not "candidates for office" (Compl. ¶ 56); nor are they Presidential electors, *see* Ariz. Rev. Stat.§ 16-212(C); and they cannot assert any interests that might be available to lawful electors.  They instead stand in the same position as the other 3.4 million Arizona voters with "no particularized stake in the litigation."  *Lance v. Coffman*, 549 U.S. 437, 442 (2007).

The Arizona plaintiffs' alleged injury from the Electoral Count Act is therefore "precisely the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance in the past."  *Id.*; *see also Bowyer*, 2020 WL 7238261, at *4-*5. While plaintiffs invoke (Mot. 6) *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020) (per curiam), that case actually undermines their standing.  *Carson* held that prospective Minnesota electors had standing because Minnesota law gave them a "cognizable interest" in ensuring the integrity of an election in which they were candidates.  *Id.* at 1057.  Here, by contrast, even if their nominations rendered them "candidates" prior to the election, now that the election has occurred, Arizona law makes clear that the plaintiffs are not and may not serve as electors representing the state.  *See* Ariz. Rev. Stat. § 16-212(B)-(C).  They therefore lack any special interest in the administration of the Joint Session.

13

The Arizona plaintiffs have likewise not met their burden as to causation. To establish causation for purposes of standing, a plaintiff must show "a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. But plaintiffs acknowledge (Mot. 7) that the "Vice President did not cause [their] initial injury," which they concede "happened in Arizona." Their complaint and motion for a preliminary injunction repeatedly emphasize that their injury is caused by the "conduct of Arizona executive branch and Maricopa County officials" in certifying the election results (Compl. ¶ 57), and that they are challenging "unlawful injuries that Plaintiffs suffered in Arizona" (Mot. 7). Their true grievance is not with Vice President Pence or the functioning of the Electoral Count Act, but with the operation of Arizona law and the decisions of Arizona officials who are not parties to this suit. They nonetheless seek to establish causation (Mot. 7) on the ground that Vice President Pence may "ratify" their state-law injury at the Joint Session, but they fail to explain how any such ratification would render their state-law injury legally traceable to him.

For the same reason, an order from this Court invalidating the Electoral Count Act would provide no redress to the Arizona plaintiffs. It would have no bearing on the Arizona law that determined the slate of Biden electors to be presented to the President of the Senate at the Joint Session, and it could not require Arizona to appoint them as electors instead. *See* Ariz. Rev. Stat. § 16-212(B).

## II.    The Laches Doctrine Bars Plaintiffs' Claims

Even if plaintiffs had standing, the doctrine of laches would bar their claims. Laches bars equitable relief when a plaintiff's inexcusable delay in asserting a claim unduly prejudices the defendant. *See Save Our Wetlands, Inc. v. U.S. Army Corps of Eng'rs*, 549 F.2d 1021, 1026 (5th

Cir. 1977); *see also, e.g.*, *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998). Those criteria are plainly met here.[5]

Federal courts have long recognized that the laches doctrine bars untimely claims for equitable relief in election challenges. *See, e.g.*, *Lopez v. Hale County*, 797 F. Supp. 547, 550 (N.D. Tex. 1992) (three-judge district court) (plaintiff was "guilty of laches" in waiting until after the primary election to file suit), *aff'd*, 506 U.S. 1042 (1993); *Dulcan v. Martin*, 64 F.R.D. 327, 328-29 (D.D.C. 1974) (three-judge district court) (per curiam) ("plaintiffs have waited too long in bringing their allegations of unconstitutionality of the Act for this court to act responsibly without interfering" with upcoming election); *see also Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973) ("[T]he law imposes the duty on parties . . . to bring [their] grievances forward for pre-election adjudication. . . . [T]he failure to require prompt pre-election action in such circumstances as a prerequisite to post-election relief may permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." (internal quotation marks and citation omitted)).

---

[5] This Court may in its discretion choose to dismiss this case on laches grounds before addressing Article III jurisdiction. "[A] federal court has leeway to choose among threshold grounds for denying audience to a case on the merits." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (quotation marks omitted). Numerous courts have held that laches is one such threshold ground, and have accordingly denied claims on laches grounds without addressing standing. *See Memphis A. Phillip Randolph Inst. v. Hargett*, 473 F. Supp. 3d 789, 802 n.18 (M.D. Tenn. 2020) ("the Court can decide the applicability of laches before deciding whether it has subject-matter jurisdiction"); *Singh v. Joshi*, 152 F. Supp. 3d 112, 121 (E.D.N.Y. 2016) (because laches and standing were both threshold issues "distinct from the merits," the court may "address them in any order"); *Collins v. W. Digital Techs., Inc.*, 2011 WL 3849310, at *6 (E.D. Tex. 2011) (similar). And this Court may deny plaintiffs' request for equitable relief on laches grounds regardless of whether the Vice President invokes it. *Cf. Day v. McDonough*, 547 U.S. 198, 209 (2006).

Indeed, federal and state courts in Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin have held that laches barred post-election challenges to the 2020 Presidential election in suits filed well before this one—including in a suit brought in Arizona federal district court by the same purported Arizona Republican electors who filed suit here. *Bowyer*, 2020 WL 7238261, at *10-*11 (applying laches to lawsuit filed nearly one month after Election Day and two days after Governor certified results, where basis for claimed violations of the Electors Clause "was either known well before Election Day or soon thereafter" and "the prejudice to the Defendants and the nearly 3.4 million Arizonans who voted in the 2020 General Election would be extreme, and entirely unprecedented").[6]

Plaintiffs inexcusably delayed filing this suit—which they initiated only after the Arizona federal district court and the Arizona Supreme Court rejected other attempts to invalidate the election (including by the same Arizona plaintiffs who filed suit here). Plaintiffs filed this complaint on December 27, 2020, and effectuated service on December 29. Doc. Nos. 1, 5, 11. Plaintiffs thus waited almost an entire month after November 30, when the Arizona Secretary of State certified the election and the Secretary and Governor signed the Certificate of Ascertainment for the Biden electors; almost twenty days after December 8, when the Arizona

---

[6] *See Trump v. Wisconsin Elections Comm'n*, – F.3d. –, No. 20-3414, 2020 WL 7654295, at *3-4 (7th Cir. Dec. 24, 2020) (explaining that "[t]he President's delay alone is enough to warrant affirming" dismissal because "[a]ny claim against a state electoral procedure must be expressed expeditiously" and "[a]llowing the President to raise his arguments, at this late date, after Wisconsin has tallied the votes and certified the election outcome, would impose unquestionable harm on the defendants, and the State's voters"); *King v. Whitmer*, – F. Supp. 3d. – , No. CV 20-13134, 2020 WL 7134198, at *7 (E.D. Mich. Dec. 7, 2020), *appeal filed,* No. 20-2205 (6th Cir. Dec. 8, 2020); *Wood v. Raffensperger*, No. 1:20-CV-04651-SDG, 2020 WL 6817513, at *7-8 (N.D. Ga. Nov. 20, 2020), *aff'd on other grounds*, 981 F.3d 1307 (11th Cir. 2020); *Trump v. Biden*, No. 2020AP2038, 2020 WL 7331907 ¶ 32 (Wis. Dec. 14, 2020); *Kelly v. Commonwealth*, 240 A.3d 1255, 1257 (Pa. 2020).

Supreme Court confirmed the election of the Biden electors, *see Ward*, CV-20-0343-AP/EL, at *6; and almost two weeks after December 14, when the Biden electors voted pursuant to Arizona state law. Plaintiffs could have brought their claims weeks ago, if not earlier. *See Bowyer*, 2020 WL 7238261, at *10 ("When contesting an election, any delay is prejudicial, but waiting until a month after Election Day and two days after certification of the election is inexcusable.").

In addition, the provisions of the Electoral Count Act that plaintiffs challenge have been in force since 1887. *See* Pub. L. No. 49-90, 24 Stat. 373 (1887). Plaintiffs have thus known from the start what rules would govern the Joint Session and, to the extent they could ever have standing to bring this suit, they could have done so earlier. Representative Gohmert—who has been a Member of Congress for four previous Joint Sessions (in 2005, 2009, 2013, and 2017)— was well aware of the rules governing that proceeding and could have brought this challenge immediately after the 2020 election, if not earlier. And the putative elector plaintiffs could have filed at the same time.[7] They did not do so, attempting to reserve their claims for extreme relief sought here until the many other legal challenges to the Arizona election were explored unsuccessfully. Plaintiffs offer no justification—nor could they— for their eleventh-hour resort to this Court.

The prejudice to Congress, the states, millions of voters—and, indeed, to the Vice-President himself—that would result from entertaining plaintiffs' claims at this late date would be immense. Plaintiffs request a declaration that the challenged provisions of the Electoral Count Act are unconstitutional and that the Vice President (in his capacity as President of the Senate) "may exercise the exclusive authority and sole discretion in determining which electoral

---

[7] Presidential elector nominations were due in Arizona by August 14, 2020. *See* https://perma.cc/TJ9X-XS5Z.

17

votes to count for a given State." Compl. ¶ 73(C); *see also* Mot. 3, 27. Such relief would upend the electoral count system that has governed Presidential elections, and that has clearly defined the role and responsibilities of the President of the Senate in a manner that no prior Vice President has found objectionable, for well over a century. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam) ("This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)).

If plaintiffs obtain the relief they seek, they would drastically unsettle expectations about the Vice President's role at the Joint Session in a manner calculated to turn a ministerial duty into one fraught with peril and controversy. Moreover, their arguments could result in the disenfranchisement of millions of voters, if (as plaintiffs intend) the Vice President went on to disregard certified slates of electors or to refuse to accept any slates at all from a particular state. *Cf. Wood*, 2020 WL 6817513, at *8 ("[The] requested relief could disenfranchise a substantial portion of the electorate and erode the public's confidence in the electoral process."). Plaintiffs effectively ask this Court to turn over determination of the 2020 Presidential election in its entirety to Vice President Pence, and they would have him make that determination in the absence of any governing rules. This would create chaos at the Joint Session, present intractable conflicts of interest, and prejudice the Vice President in the execution of his duties. Plaintiffs should not be permitted, at this late date, to pursue such "extreme, and entirely unprecedented" relief. *Bowyer*, 2020 WL 7238261, at *11.

Plaintiffs' delay has also prejudiced this Court's ability to decide this case before the Joint Session on January 6. *See id.* ("[T]he challenges that Plaintiffs assert quite simply could have been made weeks ago, when the Court would have had more time to reflect and resolve the

issues."); *Dulcan*, 64 F.R.D. at 329 ("[P]laintiffs have waited too long in bringing their allegations of unconstitutionality of the Act for this court to act responsibly without interfering with the date of the November 5, 1974 election. A court must have time for study and reflection."). Courts have cautioned against "taking action in a case where the election was imminent, even where constitutional defects in the election process have already been found." *Dulcan*, 64 F.R.D. at 330; *see also Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) (per curiam) (en banc) ("Interference with impending elections is extraordinary, and interference with an election after voting has begun is unprecedented." (citing *Reynolds v. Sims*, 377 U.S. 533, 585 (1964)). "Unreasonable delay can prejudice the administration of justice by compelling the court to steamroll through delicate legal issues in order to meet election deadlines." *Bowyer*, 2020 WL 7238261, at *11 (alteration and quotation marks omitted). That principle applies with even greater force where—as here—plaintiffs' constitutional claims have profound ramifications for the Nation and yet lack any colorable support in constitutional text, precedent, or practice.

## III. Plaintiffs Are Not Entitled To The Extraordinary Equitable Relief They Seek

For the reasons noted above, the Court should not reach the merits of plaintiffs' claims. But if the Court reaches the merits, it should reject plaintiffs' erroneous arguments.

**1.** To the extent that plaintiffs contend (*see* Mot. 18-22) that the Twelfth Amendment endows the Vice President with substantive authority concerning the counting of electoral votes, that contention is belied by the Amendment's text.

The relevant portion of the Twelfth Amendment states: "The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted." The Amendment's use of the active voice and mention of the Vice

19

President in the first clause—"The President of the Senate shall … open all the certificates"—in contrast with its use of the passive voice and omission of the Vice President from the second clause—"the votes shall then be counted"—demonstrates that the Amendment assigns the Vice President the task of opening the certificates and leaves the counting of the votes to others.

In other words, the text does not say that the Vice President shall "open all the certificates *and* then count the votes."  Significantly, it separates those two actions through distinct grammatical constructions and assigns only the first of them to the Vice President.  The linguistic formulation used in the Amendment would be an extremely odd way to describe in common speech an intent for the Vice President to open the certificates *and* for him to also count the votes.  The Amendment's text thus provides no support for the claim that the Vice President has unreviewable discretion to decide which slate of electors shall be counted from each State.

This conclusion is reinforced by constitutional understandings and consistent practice, dating back to the Nation's early days, of the Vice President presiding at the Joint Session and the House and Senate themselves resolving any substantive disputes over counting electoral votes.  *See, e.g.*, Siegel, *Conscientious Congressman's Guide*, 56 Fla. L. Rev. at 551-53.  Such a "[l]ong settled and established practice [carries] great weight in a proper interpretation of constitutional provisions."  *Chiafalo*, 140 S. Ct. at 2326 (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)).  This conclusion is further supported by the structure of the Constitution, which cannot reasonably be understood to assign to the sitting Vice President the momentous decision of who shall be elected to the Presidency and Vice Presidency—offices for which he might in that very election actually be a candidate.  Granting such power to the Vice President would be at odds with the Constitution's numerous provisions designed to avoid conflicts of interest of this type and with basic principles of democratic governance.

Plaintiffs' claim (Mot. 22-23) that Congress lacks the authority to create procedures for implementing the Twelfth Amendment is equally misconceived. From the beginning of the Republic, Congress has been understood to have the power to establish the procedures for electoral vote counting, whether by resolution or by statute. *See also* U.S. Const., Art. I, § 8, cl. 18 ("Congress shall have Power … [t]o make all Laws which shall be necessary and proper for carrying into Execution … all … Powers vested by this Constitution in the Government of the United States, or in any … Officer thereof."). The Electoral Count Act is only one example of Congress's exercise of that power.[8]

To the extent plaintiffs argue that the Electoral Count Act violates the Electors Clause (Mot. 21, 22 n.3), that argument also fails. The Electoral Count Act is entirely consistent with the Electors Clause, which provides that each State shall appoint electors "in such Manner as the Legislature thereof may direct." U.S. Const., Art. II § 1, cl. 2. The Electoral Count Act is grounded in deference to the laws and procedures of the states. And any assertion that the statute deprives the Arizona legislature of its constitutionally assigned role in the process of selecting electors is incorrect: The Arizona legislature exercised its authority to create the system of popular election and gubernatorial certification that was used to appoint Arizona's electors. *Cf. Wisconsin Elections Comm'n*, 2020 WL 7654295, at *4 (rejecting a similar Electors Clause argument). The procedures followed here effectuate, rather than undermine, the Electors Clause.

---

[8] Congress's consistent practice of establishing procedures for electoral vote counting—typically based on the recommendations of a joint committee—can be traced in Hinds' Precedents of the House of Representatives ch. 59, §§ 1929, 1952 (counts of 1793-1873); *id.* at ch. 60 (counts of 1877-1905); *see also* House Practice: A Guide to the Rules, Precedents, and Procedures of the House (2017) ch. 24 §§ 1-3.

**2.** The balance of equities and the public interest strongly support denial of declaratory and injunctive relief.  Courts have repeatedly warned of the dangers of altering election rules on the eve of elections "absent a powerful reason for doing so." *Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) (citing *Purcell*, 549 U.S. at 5-6).  Principles of judicial restraint apply with special force where plaintiffs seek to alter the established rules governing the constitutionally prescribed Joint Session to count the electoral votes after millions of voters have cast their ballots and the electoral results have been duly certified.

Plaintiffs ask this Court to authorize the Vice President to ignore the will of the Nation's voters and determine the winner in an election in which he is a candidate.  Granting plaintiffs this extraordinary relief just days before the Joint Session would not only reward their inexcusably delayed filing; it would also risk upending the orderly rules that have governed Congressional counting of electoral votes for more than a century and undermining the public's confidence in the constitutionally prescribed processes for confirming—not overturning—the results of the election.

## CONCLUSION

The Court should deny plaintiffs' motion for expedited declaratory judgment and emergency injunctive relief, and dismiss plaintiffs' complaint.

Respectfully submitted,

/s/  Douglas N. Letter

| | |
|---|---|
| Caitlin Halligan (NY Bar No. 3933447) | Douglas N. Letter (DC Bar No. 253492) |
| Samuel Breidbart (NY Bar No. 5783352) | *General Counsel* |
| Adam K. Hersh (NY Bar No. 5693064) | Todd B. Tatelman (VA Bar No. 66008) |
| Max H. Siegel (NY Bar No. 5652235) | Megan Barbero (MA Bar No. 668854) |
| SELENDY & GAY PLLC | Josephine Morse (DC Bar No. 1531317) |
| 1290 Avenue of the Americas | William E. Havemann (VA Bar No. 86961) |
| New York, New York 10104 | Eric R. Columbus (DC Bar No. 487736) |
| | Lisa K. Helvin (DC Bar No. 988143) |

Michael R. Dreeben (DC Bar No. 370586)
GEORGETOWN UNIVERSITY LAW
CENTER
600 New Jersey Avenue NW
Washington, D.C. 20001

Jonathan B. Schwartz (DC Bar No. 342758)
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, DC 20515
Telephone: (202) 225-9700
Facsimile: (202) 226-1360
douglas.letter@mail.house.gov

*Counsel for Amicus U.S. House of Representatives*

December 31, 2020

## CERTIFICATE OF SERVICE

I certify that on December 31, 2020, I caused the foregoing document to be filed via the United States District Court for the Eastern District of Texas CM/ECF system, which I understand caused a copy to be served on all registered parties.

*/s/ Douglas N. Letter*
Douglas N. Letter