**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| LOUIE GOHMERT, TYLER BOWYER, NANCY COTTLE, JAKE HOFFMAN, ANTHONY KERN, JAMES R. LAMON, SAM MOORHEAD, ROBERT MONTGOMERY, LORAINE PELLEGRINO, GREG SAFSTEN, KELLI WARD and MICHAEL WARD, | Civil Action No. 6:20-cv-00660-JDK |
| Plaintiffs, | |
| v. | **(Election Matter)** |
| THE HONORABLE MICHAEL R. PENCE, VICE PRESIDENT OF THE UNITED STATES, in his official capacity, | |
| Defendant. | |

**PLAINTIFFS' REPLY IN SUPPORT OF EMERGENCY MOTION FOR
EXPEDITED DECLARATORY JUDGMENT AND EMERGENCY
INJUNCTIVE RELIEF**

Howard Kleinhendler
Howard Kleinhendler Esquire
NY Bar No. 2657120
369 Lexington Ave., 12th Floor
New York, New York 10017
Tel: (917) 793-1188
Fax: (732) 901-0832
Email: howard@kleinhendler.com

Lawrence J. Joseph
DC Bar No. 464777
Law Office of Lawrence J. Joseph
1250 Connecticut Ave, NW, Suite 700-1A
Washington, DC 20036
Tel: (202) 355-9452
Fax: 202) 318-2254
Email: ljoseph@larryjoseph.com

William Lewis Sessions
Texas Bar No. 18041500
Sessions & Associates, PLLC
14591 North Dallas Parkway, Suite 400
Dallas, TX 75254
Tel: (214) 217-8855
Fax: (214) 723-5346 (fax)
Email: lsessions@sessionslaw.net

Julia Z. Haller
DC Bar No. 466921
Brandon Johnson
DC Bar No. 491370
Defending the Republic
601 Pennsylvania Ave., NW
Suite 900
South Building
Washington, DC 20004
Tel: (561) 888-3166
Fax: (202) 888-2162
Email: hallerjulia@outlook.com
Email: brandoncjohnson6@aol.com

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

Table of Contents ................................................................................................. ii

Introduction ......................................................................................................... 4

Facts   6

Argument .............................................................................................................. 7

I.   LEGAL AND HISTORICAL BACKGROUND ........................................... 7

    A.   The Vice Presidents of the Framers' Generation Acted as Presiding Officers and Established Rules of Parliamentary Procedure ................... 7

    B.   Presidential Electoral Count Provisions .............................................. 10

        1.   The Election of 1800 ..................................................................... 10

        2.   Legislative History and Ratification. ........................................... 11

    C.   The Congress That Enacted 3 USC 5 Recognized that It Required a Constitutional Amendment but Adopted the ECA as a Shortcut Because They did not Have the Votes. ................................................. 11

        1.   History of Competing State Electoral Slates ............................... 13

            a)   Binding Law, Congressional Rule, or Unreviewable Statement of Principle/Moral Obligation? ................................. 14

    D.   Plaintiffs' requested remedy is warranted. ........................................... 16

II.   Plaintiffs are likely to prevail on the merits. ............................................ 17

    A.   The Electoral Count Act is unconstitutional. ...................................... 17

        1.   Unconstitutional laws are nullities. .............................................. 18

        2.   The Electoral Count Act violates the Electors Clause and the Twelfth Amendment. ............................................................... 18

        3.   The Electoral Count Act violates the Constitution's structural protections of liberty. ................................................... 18

        4.   The Electoral Count Act's enactment in 1887 does not create a vested right or tradition of violating the Constitution. .................................................................................. 18

        5.   The Necessary and Proper Clause does not save the Electoral Count Act ..................................................................... 20

    B.   Plaintiffs have a cause of action in this Court. .................................... 22

        1.   *Ex parte Young* applies. .................................................................. 22

        2.   The Declaratory Judgment Act and Rule 57 apply. ..................... 22

        3.   The action is not barred by laches. ............................................... 25

        4.   Transfer would be inappropriate. .................................................. 27

        5.   No absent third parties are necessary parties. .............................. 27

        6.   28 U.S.C.§ 2403(a) does not require pausing relief. .................... 28

C. This Court has constitutional and prudential jurisdiction over Plaintiffs' claims. ...................................................................29

 1. This case presents an Article III case or controversy. ..............................30

  a) The parties seek different relief. ...................................31
  b) This Court must assume Plaintiffs' merits views to assess Plaintiffs' standing to sue. ...............................32
  c) Plaintiffs suffer an injury in fact. ................................33
  d) Plaintiffs' injuries are traceable to Defendant. ............34
  e) This Court can redress Plaintiffs' injuries. .................36
  f) Plaintiffs' procedural injuries lower the constitutional bar for immediacy and redressability. ...................36
  g) This action is not moot. .................................................36
  h) This action is ripe. .......................................................37

 2. Prudential limits on Article III jurisdiction do not apply. ..........................37

  a) Plaintiffs are within the relevant zones of interests. ....................38
  b) Rep. Gohmert can press the interests of his constituents and of himself as a Texas voter. ...............39
  c) This suit is not prudentially improper as a "friendly" suit. ..........................................................................39

 3. The Speech or Debate Clause does not insulate the Vice President. ...............................................................................40
 4. Sovereign immunity does not bar this action. ...........................................40
 5. The political-question doctrine does not bar this suit. ..............................41
 6. This case presents a federal question. ......................................................41
 7. No abstention principles apply. ................................................................41

III. Plaintiffs are entitled to emergency injunctive relief. ............................................41

Conclusion .........................................................................................................................41

## <u>INTRODUCTION</u>

Plaintiffs, U.S. Rep. Louie Gohmert (TX-1), Tyler Bowyer, Nancy Cottle, Jake Hoffman, Anthony Kern, James R. Lamon, Sam Moorhead, Robert Montgomery, Loraine Pellegrino, Greg Safsten, Kelli Ward, and Michael Ward, respectfully file this reply in support of their Motion for Expedited Declaratory Judgment and Emergency Injunctive Relief ("Motion").   Neither the opposition filed by the Defendant Vice President nor the supplemental arguments filed by amici curiae briefs or would-be intervenors rebut the clear constitutional violations in Sections 5 and 15 of the Electoral Count Act of 1887, PUB. L. NO. 49–90, 24 Stat. 373 (codified at 3 U.S.C. §§ 5, 15), Plaintiffs' right to petition this Court for review of those violations, or this Court's jurisdiction to enter the requested relief.   Before addressing the substantive and procedural arguments, Plaintiffs first reiterate what their cause is about and what it is not about.

In 1787, James Madison explained that we live in a democratic republic, not a pure democracy.   That choice of government was designed by the framers of the Constitution, a visionary work that has guided this country since its inception.   The system of choosing a president by the Electoral College, and not popular vote, was the product of deep thought and conviction.   It is the law of the land.

On January 6th, a joint session of Congress will convene to formally elect the President. The defendant, Vice-President Pence, will preside.   Under the Constitution, he has the authority to conduct that proceeding as he sees fit.   He may count elector votes certified by a state's executive, or he can prefer a competing slate of duly qualified electors.   He may ignore all electors from a certain state.   That is the power bestowed upon him by the Constitution.

For over a century, the counting of elector votes and proclaiming the winner was a formality to which the prying eye of the media and those outside the halls of the government paid

no attention.   But not this time.   Plaintiff Representative Gohmert, along with 140 of his Republican House colleagues have announced that they will object to the counting of state certified electors pledged to former Vice-President Biden[1] because of the mounting and convincing evidence of voter fraud in key swing states whose combined electoral count change the election results.  Ex. B.

The Court is now asked to rule on a pressing and critical question: which set of rules does Vice-President Pence follow when confronted by these objections?   The rules set by the Constitution, or those in a simple statute, 3 USC 15, last updated in 1948 by a session of Congress long ago ended.  Plaintiffs are not asking this Court to choose a winner of the presidential contest. Nor are Plaintiffs asking the Court to rule on whether there was pervasive fraud in the swing states that are subject to objection.  Those are matters left to the January 6th joint session of Congress. The issue before this Court hinges on an obvious and elementary concept – that a federal statute cannot conflict or abrogate the United States Constitution.

In their submissions, Defendant and amici never reach this issue.  Instead, they hide behind procedural arguments such as standing, laches and other "gatekeeping" defenses that, as set forth below, are easily disposed above.  They argue that the January 6th joint session is no more than a perfunctory coronation.  A ceremony where the Vice-President is relegated to the mundane task of opening envelopes filled with electoral votes certified by state governors.  They say that the Vice President, the glorified envelope-opener in chief, has no authority to preside over anything else or to decide anything of substance or to even count the votes in those weighty envelopes.  He is only the envelope-opener.

---

[1]  Senator Josh Hawley has also pledged to object to the Biden electors in the contested states. Ex. A.

This relief sought is supported by a clear historical perspective of the role of the Vice President in the electoral process.  Below, we set forth a brief study of the background to the Vice-President's weighty and prudential powers afforded under the Constitution – the foundation of American democracy -- which unequivocally entrusts to him all the prerogatives and rights to determine what electoral votes to count or to disregard that are attendant to his role as President of the Senate.  We further explain how 3 USC 15 is unconstitutional and why it is of no force or effect whatsoever.  Finally, we discuss and dispose of the various defenses and arguments put forward by the Defendant and amici.

This country is deeply divided along political lines.  This division is compounded by a broad and strongly held mistrust of the election processes employed and their putative result by a very large segment of the American population.  The Congress is set for a showdown on January 6th with over 140 House members pledging to object to Mr. Biden's claim of victory.  By reaffirming the Constitutional prerequisites and processes for deciding the Presidential election and granting the relief requested, this Court can set the stage for a calm and permanent resolution of any and all objections and help smooth the path toward a reliable and peaceful conclusion to the presidential election process.  Accordingly, Plaintiffs' motion for declaratory and injunctive relief should be granted.

## FACTS

In addition to the opposition (ECF #18) filed by the Defendant, Vice President Michael R. Pence, the Democrat-dominated Bipartisan Legal Advisory Group ("BLAG") of the U.S. House of Representatives filed an *amicus* brief (ECF #22), with the two Republican BLAG members— the Honorable Kevin McCarthy, Republican Leader, and the Honorable Steve Scalise, Republican Whip—dissenting. *See* BLAG Br. at 1 n.1. In addition, a Texas resident— Timothy P. Dowling—

who supports former Vice President Joseph R. Biden's candidacy moved to intervene (ECF #19), also filing a motion to dismiss (ECF #20), and a Colorado elector for Mr. Biden— Alan Kennedy— moved to intervene in a unified document (ECF #15) that includes a section opposing the merits of Plaintiffs' claims.  For purposes of their Motion, Plaintiffs will treat the Dowling and Kennedy filings as *amicus* briefs opposed to Plaintiffs' Motion.  *See*, *e.g.*, *Lelsz v. Kavanagh*, 98 F.R.D. 11, 13 (E.D. Tex. 1982) (denying leave to intervene but allowing movant to file *amicus* brief). Plaintiffs reserve the right to oppose the two motions to intervene, as well as to respond to the Dowling motion to dismiss in the event that the Court grants the Dowling motion to intervene.

In the interval since Plaintiffs filed their Motion, Sen. Josh Hawley of Missouri has announced the intent to object to Biden electors  On the House side, in addition to Plaintiff Louie Gohmert ("Rep. Gohmert"), approximately 140 Republican Members of the House have announced plans to object to the Biden electors.

## ARGUMENT

## I.    LEGAL AND HISTORICAL BACKGROUND.

### A.    The Vice Presidents of the Framers' Generation Acted as Presiding Officers and Established Rules of Parliamentary Procedure

While the discussion of the Vice President's role in the Constitutional Convention and Ratification Debates is sparse, two of the most significant Framers, John Adams and Thomas Jefferson, subsequently served as Vice Presidents.  In these roles, they immediately established that the Vice President was not a merely ceremonial position, but rather an active and leading role as Presiding Officer of the Senate in establishing rules of parliamentary procedure for the new Congress.

Vice President Adams drew upon his knowledge of British parliamentary procedure in presiding over the Senate.  See Richard Allan Baker, The Senate of the United States: "Supreme

Executive Council of the Nation," 1787-1800, in 1 THE CONGRESS OF THE UNITED STATES, 1787-1989, at 135, 148 (Joel H. Silbey ed., 1991).  Vice President Jefferson, also on expert on British parliamentary procedure, authored the Senate's first manual of procedure.  See Thomas Jefferson, A Manual of Parliamentary Practice: for the Use of the Senate of the United States, in JEFFERSON'S PARLIAMENTARY WRITINGS: "PARLIAMENTARY POCKET-BOOK" AND A MANUAL OF PARLIAMENTARY PRACTICE (Wilbur Samuel Howell ed., 1988).  Thus, two of the most important men who not only wrote the Constitution, but also established and documented the Senate's first rules as Presiding Officers, did not see their role as clerks or tabulators in counting votes.  They were candidates and parliamentarians who also established the rules and processes for deciding the winner (i.e., them in both cases).  This is not a new or convenient theory.  In fact, this has been the case since the founding of the nation.

The process for electing the President was one of the most divisive of all issues debated in the Philadelphia Convention, with competing proposals for direct election, federal congressional election and state election argued.  *See* 3 Jonathan Elliot , Debates on the Adoption of the Federal Constitution 547 (James McClellan & M.E. Bradford eds., James River Press 1989) (2d ed. 1836). Sixty ballots were taken before the original 1787 Constitution was adopted, pursuant to which electors from each State, appointed by the State Legislature under the Electors Clause, elect the President; or in the event no candidate receives a majority as counted by the Vice President, the House of Representatives chooses the President by the "one vote per state delegation" rule.

U.S. CONST. art II, § 1, cl. 3, amended by U.S. CONST. amend. XII. Article II of the Constitution provides, in relevant part:

> The Electors shall meet in their respective States, and vote by Ballot for two Persons, of whom one at least shall not be an Inhabitant of the same State with themselves. And they shall make a List of all the Persons voted for, and of the Number of Votes for each; which

> List they shall sign and certify, and transmit sealed to the Seat of the Government of the United States, directed to the President of the Senate. **The President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted**.

U.S. Const., art. II, § 1, cl. 3 (amended by U.S. Const. amend. XII).  (Emphasis added)

In *The Federalist Papers,* No. 68, Alexander Hamilton provides the rationale for the unique role of Presidential Electors in electing the President of the United States.  Hamilton first explains that the choice of indirect election through electors, rather than direct democracy, because it is preferable for "[a] small number of persons, selected by their fellow-citizens from the general mass, will be most likely to possess the information and discernment requisite to such complicated investigations," and it will "afford as little opportunity as possible to tumult and disorder." Hamilton, Alexander. *The Federalist Papers,* No. 68, at 410-11 (C. Rossiter, ed. 1961).

Hamilton reasoned that the Electoral College should not meet as a national body in one place, but instead should meet and elect the President in each State:  the electors chosen in each State are to assemble and vote in the State in which they are chosen. This detached and divided construct intentionally exposes the electors to far less heats and ferments which might be communicated from them to the people than if they were all convened at one time in one place.

Nothing was more desired by the Framers than that every practicable obstacle should be opposed to cabal, intrigue, and corruption. These most deadly adversaries of republican government might naturally have been expected to make their approaches from more than one quarter -- but chiefly from foreign powers desire to gain an improper ascendant in our councils. *Id*.

If no candidate received a majority of the Electors' vote, then and only then, should the decision be made by the national legislature, namely the House of Representatives:  *Id.*

B.    **Presidential Electoral Count Provisions.**

The presidential electoral count procedures in the original Constitution are largely identical to those in the Twelfth Amendment.  These procedures – in particular those regarding the Vice President's role as Presiding Officer in counting electoral votes and the House's "one vote per state delegation" for choosing the President – were carried over into the Twelfth Amendment *verbatim* -- with one important exception.

A critical and near fatal flaw in this process became apparent immediately after the Presidency of George Washington, in the elections of 1796 and 1800, namely, that the while the original Constitutional language gave each elector two votes, "it did not allow the electors to designate one of their votes for President and one for Vice President.[2]"  As a result, "the vice presidency went to the losing Presidential candidate with the largest number of electoral votes." Richard K. Neumann, *The Revival of Impeachment as a Partisan Political Weapon*, 34 Hastings Const. L.Q. 161, 180 (2002).

1.    **The Election of 1800.**

Thomas Jefferson lost the election of 1796 to John Adams, receiving the second highest number of electoral votes.  As a result, he became President Adams' Vice President.  Jefferson ran for President again in 1800 for the Democratic-Republican Party, as the candidate for President and Aaron Burr as candidate for Vice President.  As sitting Vice President, Vice President Jefferson was also President of the Senate and Presiding Officer over the Electoral College proceedings.  As such, he was responsible for counting electoral votes for himself and competing candidates.

---

[2] *The Twelfth Amendment: A Constitutional Ticking Time Bomb*, Nathan L. Colvin & Edward B. Foley, 65 U. MIAMI L. REV. 475, 489 (2010).

2.    **Legislative History and Ratification.**

In 1803, both Houses approved the text of the Twelfth Amendment, and 13 of 17 States had ratified it by June of 1804. Foley (2010) at 490.  The Amendment provides, in relevant part:

> The Electors shall meet in their respective states and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate; -- **The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted[.]**

U.S. Const. amend. XII (emphasis added).

Commentators argue that the passive voice in the sentence "and the votes shall then be counted" means that the President of the Senate, the Vice President, has "further powers hidden in the passive voice" which today would be referenced as "discretion."  Bruce Ackerman & David Fontana, *Thomas Jefferson Counts Himself into the Presidency*, 90 VA. L. REV. at 629 (2004).

This is consistent with the Framers' original intent and their inherent bias that a presiding officer was not merely a ceremonial figure, but one that has authority to render substantive decisions in the face of disputes or other disruptions to the electoral process devolved to his mandate.

C.    **The Congress That Enacted 3 USC 5 Recognized that It Required a Constitutional Amendment but Adopted the ECA as a Shortcut Because They did not Have the Votes.**

In Section 2 of the Electoral Count Act of 1887, codified at 3 U.S.C. § 5, Congress sought to require States to resolve any disputes over the appointment of Presidential electors to avoid the necessity for Congress to do so in the 1876 election.  "What Congress wanted was for the states to

develop, or apply, their existing, more streamlined election laws to Presidential Elections." Stephen A Siegel, The Conscientious Congressman's Guide to the Electoral Count Act of 1887, 56 Fla. L. Rev. 541, 585 (2004).  Members of Congress recognized at the time that they could not require states to do so "absent a constitutional amendment." Id. at 586 (citations omitted).  Because Congress was "[u]nable to agree on any constitutional amendment," it attempted, "to remove, as far as it is possible to be done by legislation . . ., a difficulty which grows out of an imperfection in the Constitution itself.'" Id. at 658-59 (*quoting* 17 Cong. Rec. 1019 (1886) (statement of Sen. Hoar)).

This was a continuation of Congress' prior debate over the repeal of the Reconstruction-Era Twenty-Second Joint Rule of 1865 ("Joint Rule"), which had authorized either house of Congress to reject a State's electors.  Republicans had been dominant in the Reconstruction Era following 1865, but by 1875 it was "anticipated that the Democrats would control the House of Representatives for the first time in two decades," and "Senate Republicans were no longer willing to allow the House to unilaterally discard electoral votes that could turn the outcome of the election or throw the election to the House."  Nathan L. Colvin & Edward B. Foley, *The Twelfth Amendment: A Constitutional Ticking Time Bomb*, 64 U. MIAMI L. REV. 475, 499 (2010).

In the run up to the 1876 election, the Senate debated repeal or modification of the Joint Rule where the "primary disagreement" was whether Congress could adopt a rule permitting one house of Congress to reject a State's electoral votes "without a constitutional amendment," and "[t]he dividing lines were drawn between those did not believe the Constitution gave Congress a right to say whether votes shall be counted or not be counted and those who did." *Id.* at 500 (internal quotations and citations omitted).  Consequently, if Congress itself cannot determine

whether to count (or not count votes), then that function must remain with the President of the Senate.

### 1.    History of Competing State Electoral Slates

Historical precedent for dual electoral slates getting to the President of the Senate arose, before the ECA.  While the circumstances varied, in the Tilden and Hayes election of 1876 each of three states submitted two or three slates of electors with at least one each for Tilden and Hayes. There were also serious allegations of violence, voter intimidation, fraud, and corruption.

- **Florida:** Three sets of electors: (1) Hayes, from Board of State Canvassers and signed by Governor; (2) Tilden, alleging violence, voter intimidation, fraud, and discarding Tilden ballots, "the slate of Presidential electors pledged to Tilden decided to go ahead and meet as if they were the authorized Electoral College delegates from Florida," certified by Florida Attorney General; and (3) Tilden, when the Florida legislature called for a new canvas, which certified electors for Tilden and a Florida court ruling that Tilden electors were legitimate, the newly elected Democratic Governor certified third slate of electors for Tilden. Foley (2010) at 503-04.

- **Louisiana:** "The first slate of electors was for Hayes; it came from the canvassing board and was certified by the ostensible governor. The second was for Tilden, with these electors disregarding the work of the canvassing board on the ground that the board was corrupt.157 This slate was certified by a different individual who purported to be the lawful governor. The third slate was in effect a duplicate of the first." Id. at 504.

- **South Carolina:** "South Carolina submitted two slates, one for Hayes from the Board of Canvassers, certified by the governor, and another for Tilden, alleging that the Tilden electors were the rightful voters." Id.

- **Oregon:** "In Oregon, the voters had elected a postmaster general as one of Hayes's electors, a possible violation of the constitutional prohibition against federal office holders acting as electors. Because of this, the elector resigned from his office as postmaster, and Oregon law allowed the remaining electors to choose a replacement; they chose the resigned elector. The Democratic Oregon governor refused to certify this slate of electors and instead certified a slate with two Hayes electors and a Tilden elector as a replacement for the former postmaster. The secretary of state, on the other hand, submitted a certificate that contained the three original Hayes electors and noted that there was no question that the Hayes electors received the most votes on election day." *Id.* at 504-05.

As a result of this tumult, Congress found a quick fix to potential future disruptions through enactment of the ECA.

### a) Binding Law, Congressional Rule, or Unreviewable Statement of Principle/Moral Obligation?

"Whether the ECA is a statute or a joint rule enacted in statutory form is ambiguous. In truth, both theories underlay its enactment.  The difference between the two theories disappears, however, to the extent that the ECA involves political questions not subject to judicial review.  The difference between the two theories also disappears to the extent that Congress self-enforces its own internal rules."  Siegel at 565.

**Internal Rule:** "Many congressmen spoke in opposition to the ECA on the grounds that legislating the matter was an unconstitutional attempt to bind Congress's discretion. It was unconstitutional, they said, because enacting and amending legislation required Presidential approval (or an extraordinary majority in Congress), and thus improperly involved the President in implementing the rules for determining Presidential Elections.  In addition, one Congress could never bind another in this matter. Congress could govern itself, they reasoned, by enacting

concurrent rules for each vote count, or a continuing joint rule which the houses could amend at any time." Siegel at 560-61.

**Binding Legislation:** "Many other congressmen believed that electoral vote counting was a proper subject for binding legislation.  Congress's rulemaking authority governed its own proceedings, and the ECA was properly legislative because through it the two houses adopted rules to govern each other's actions.  Moreover, the power to count electoral votes was a power vested in the national government, and the Sweeping Clause allows Congress to "make all Laws which shall be necessary and proper for carrying into Execution . . . all . . . Powers vested by this Constitution in the Government of the United States, or in any Department . . . thereof."  Siegel at 561.

"Recognizing the equality of the houses of Congress, the authors of the ECA presumed that, under the Constitution, Congress could not count an electoral vote unless both the House and the Senate agreed that it should be counted.  Given the frequency of houses of Congress being controlled by different political parties, frequent tie votes and the inability to decide questions raised during the count were ever-present threats when Congress met to count electoral votes. … The ECA, in effect, arbitrated differences between the houses by "reduc[ing] to a minimum the cases where any difference [between the houses] can properly arise.'"  Stephen A Siegel, The Conscientious Congressman's Guide to the Electoral Count  Act of 1887, 56 Fla. L. Rev. 541, 557 (2004).

**Unreviewable/Unenforceable Statement of Principle/Moral Obligation:**  "These congressmen assumed that Congress's electoral count decisions were not subject to judicial review. Because they believed that '[n]o power in this Government can or ever will set aside and annul the

declaration of who is elected President . . . when that declaration is made in the presence of the two Houses of Congress.'" Siegel at 563.

"Yet, to these congressmen, an unenforceable law was better than no agreement at all.  In addition, they believed an unenforceable law was better than a joint rule because of the law's greater ability to bind Congress's conscience and create a moral obligation to abide by its terms. Congress understood that even if the ECA enacted rules of only moral obligation, it nonetheless would constrain behavior both outside and inside Congress"  Siegel at 564.  In Chris  Land & David Schultz, ON THE UNENFORCEABILITY OF THE ELECTORAL COUNT ACT, 13 Rutgers J.L. & Pub. Pol'y 340, 386 (2016),  Land and Shultz note that, while the concept of non-binding "rulemaking statutes" and "anti-entrenchment clauses" developed during the 20th Century, "a number of Congressmen stated during debate on the ECA that this measure would attempt in vain to entrench procedures that would bind future Congresses." Land at 376 (*citing* 8 CONG. REC. 164 (1878)

As stated by Sen. Augustus Garland in debate on a precursor to the ECA: "**An act passed by a previous Congress assuming to bind ... a succeeding Congress need not be repealed because it is void; and for that I reason I oppose this bill.**"  Id. (Emphasis added).

Plaintiffs could not have stated the principle any clearer.  The ECA is void and unconstitutional because a previous Congress cannot bind a succeeding one.

### D.      Plaintiffs' requested remedy is warranted.

Amicus BLAG argues that abandoning the ECA will create havoc and cast the upcoming January 6th Joint Session into turmoil.  They offer a "parade of horribles" that somehow justify continuing with a statutory scheme that flies on the face of the Constitution and the Framer's intent. They argue, "we know better" than those who framed the Constitution.  Indeed, under their casual

degradation of the Vice-President's role at the Joint Session, they may be right.  If we abandon the ECA, there is no one in charge.  And that's precisely the point.

The Constitution did not leave matters to chance.  It empowered the Vice-President to take control of the proceeding and resolve disputes.  Therefore, the remedy sought by Plaintiffs is easily crafted.  The Court should declare that:

- ECA sections 5 and 15 are unconstitutional.

- When a member of the House objects to a slate of electors or between two slates of competing electors presented for any single state, the Vice President, as President of the Senate, shall determine the dispute as he sees fit.  He may choose between competing elector slates or he may choose to disregard electors altogether from any state.

- If after all the states' electors are counted, no single candidate had 270 votes, the House shall vote for President, which each State delegation having one vote.

The sections that follow demonstrate Plaintiffs' entitlement to that relief.

## II.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS.

In evaluating a plaintiff's claim for interim or emergency relief, the first—and most important—factor is the likelihood of movants' prevailing. *Winter v. Natural Resources Def. Council, Inc.,* 555 U.S. 7, 20 (2008). As set forth in this section, Plaintiffs are likely to prevail because they are right on the merits, have a cause of action against the Defendant in this Court, and this Court has jurisdiction over Plaintiffs' claims.

### A.   The Electoral Count Act is unconstitutional.

With limited exceptions, the Defendant and *amici* rely jurisdictional and prudential gate-keeper arguments to avoid the merits.  In so doing, they largely concede the merits. *See U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 425 (5th Cir. 2014).

1.      __Unconstitutional laws are nullities.__

Neither the Defendant nor *amici* dispute that—to the extent a statute is unconstitutional—the statute is a nullity. *See* Pls.' Mot. at 18.

2.      __The Electoral Count Act violates the Electors Clause and the Twelfth Amendment.__

Neither the Defendant nor his *amici* dispute that nothing in the Constitution supports the Electoral Count Act's use of the state executive's decisions on a state's voting. *See* Pls.' Mot. at 18-22.

3.      __The Electoral Count Act violates the Constitution's structural protections of liberty.__

Neither the Defendant nor his *amici* dispute that the Electoral Count Act violates the Presentment Clause. *See* Pls.' Mot. at 22-23.

4.      __The Electoral Count Act's enactment in 1887 does not create a vested right or tradition of violating the Constitution.__

*Amicus* BLAG argues not only that the Electoral Count Act creates a "tradition" but also that "since the Presidential election of 1888 that Congress has conducted the Joint session pursuant to the procedures set forth in the Electoral Count Act of 1887."  BLAG Br. at 2. Citing *Chiafalo v. Washington*, 140 S.Ct. 2316, 2326 (2020), *Amicus* BLAG further argues that "[s]uch a long and established practice [carries] great weight in a proper interpretation of constitutional provisions." BLAG Br. at 20.  Similarly, Defendant's brief argues that the Electoral Count Act is "procedure" that "[f]ollow[s] a century of debate over the appropriate process under the Constitution for counting electoral votes and resolving any objections thereto, Congress enacted the Electoral Control Act of 1887." Def.'s Opp'n at 2.

The *Chiafalo* Court, however, held that

>        "[T]he presidential electors," one historian writes, "were understood
>        to be instruments for expressing the will of those who selected them,

> not independent agents authorized to exercise their own judgment." Whittington, Originalism, Constitutional Construction, and the Problem of Faithless Electors, 59 Ariz. L. Rev. 904, 911 (2017). And when the time came to vote in the Electoral College, all but one elector did what everyone expected, faithfully representing their selectors' choice of presidential candidate.

*Chiafalo v. Washington*, 140 S.Ct. at 2326.  Wherein Presidential Electors went against their own party candidates as individuals - despite their elected roles… and completely in opposite to the case at bar where Plaintiff Electors, unified with their Party's Presidential nominee, seek relief on the unconstitutional application of the ECA because of its direct violation of how their slate of electors' votes are to be treated under it versus the Twelfth Amendment.  The Supreme Court explained that in *Chiafalo*, "[t]he Electors' constitutional claim has neither text nor history on its side." *Id*. at 2328.  Whereas these Plaintiffs submit that both history and text of the Twelfth Amendment is on their side – which neither the House in its Amicus or the Defendant actually genuinely dispute, but instead relying heavily on the history of process since 1888[3]--while ignoring the history that led to the Congressional Amendment of the Twelfth Amendment.

The passage of time does not bar fresh challenges to the application of unconstitutional or *ultra vires* laws or regulations.  *Texas v. United States*, 749 F.2d 1144, 1146 (5th Cir. 1985). "Arbitrary [governmental] action becomes no less so by simple dint of repetition." *Judulang v. Holder*, 565 U.S. 42, 61 (2011). Mere "tradition" is no basis for preserving legal doctrines that plainly violate the Constitution.  *Compare Plessy v. Ferguson*, 163 U.S. 537, 540 (1896) with *Brown v. Bd. of Educ.*, 347 U.S. 483, 495 (1954). Defendant cannot claim "prejudice" from a suit that challenges the Electoral Count Act in the first election since that statute's enactment in 1887 where the statute could unconstitutionally affect the outcome.

---

[3]     The Electoral Count Act was amended in 1948 in its present form, but never has it been passed as a Constitutional Amendment.

5.      **The Necessary and Proper Clause does not save the Electoral Count Act.**

*Amicus* BLAG argues that the Necessary and Proper Clause authorized Congress to enact the Electoral Count Act.[4] BLAG Br. at 21.  The Twelfth Amendment is not one of the "foregoing powers" under the Clause, *id.*, and the Twelfth Amendment does not expressly vest any power in the Congress to count votes or to vote, unless and until no candidate achieves a majority of electoral votes.  *See* U.S. CONST. amend. XII. To the extent that the Constitution does vest a dispute-resolution power for the vote-counting function, that power could just as easily be assigned to the Vice President as an "officer thereof" as to Congress itself under the express terms of the Necessary and Proper Clause.  U.S. CONST. art. I, §8, cl. 18. Indeed, Vice Presidents Adams and Jefferson undertook such actions in the 1796 and 1800 elections, Bruce Ackerman & David Fontana, *Thomas Jefferson Counts Himself into the Presidency*, 90 VA. L. REV. 551, 585, 571-90 (2004), and the United States adopted the Twelfth Amendment shortly thereafter, without trimming the Vice President's responsibilities.

To contrary, as Justice Story explained, neither the original Constitution nor the Twelfth Amendment included a dispute-resolution provision:

> In the original plan, as well as in the amendment, no provision is made for the discussion or decision of any questions, which may arise, as to the regularity and authenticity of the returns of the electoral votes .... It seems to have been taken for granted, that no question could ever arise on the subject; and that nothing more was necessary, than to open the certificates, which were produced, in the presence of both houses, and to count the names and numbers, as returned.

---

[4]      The Clause provides that "Congress shall have power … [t]o make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof." U.S. CONST. art. I, §8, cl. 18.

J. Story, 3 COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1464 (Boston, Hilliard, Gray, & Co. 1833). Whatever the Vice President's dispute-resolution powers, the House's theory of dispute resolution by the House and Senate is constitutionally impossible.

Constitutional law recognizes two distinct types of unconstitutionality: "laws for the accomplishment of objects not entrusted to the government" and those "which are prohibited by the constitution." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 423 (1819). Put another way, "a federal statute, in addition to *being authorized* by Art. I, § 8, must also '*not [be] prohibited*' by the Constitution." *United States v. Comstock*, 560 U.S. 126, 135 (2010) (*quoting McCulloch*, 17 U.S. (4 Wheat.) at 421) (alterations in *Comstock*, emphasis added). Clearly, "the Constitution does not conflict with itself by conferring, upon the one hand, a … power, and taking the same power away, on the other, by the limitations of the due process clause." *Brushaber v. Union Pac. R. Co.*, 240 U.S. 1, 24 (1916).  As applied here, that means that the Necessary and Proper Clause did not authorize the joint session or the two houses, separately, to violate the Presentment Clause. *See* Pls.' Mot. at 22-23 (all votes, resolutions, and orders—except adjournments—require presentment).

The fact that Congress steadfastly believed in bicameral resolutions steadfastly until the Supreme Court resolved the issues almost 200 years into the Constitution, *INS v. Chadha,* 462 U.S. 919, 946 (1983), goes a long way to explaining how the Electoral Count Act survived 133 years:

> A close reading of *Chadha*, unavailable of course to the participants in the Electoral Count Act debates, fortifies the basic argument made by Senator George and casts further doubt upon the constitutionality of the Electoral Count Act. The *Chadha* Court carefully explained why the "one-House veto" provision of the Immigration and Nationality Act was subject to the requirements of bicameralism and presentment in Article I. The Court began by noting that whether actions taken by either House are, in law and

> fact, an exercise of legislative power depends not on their form but
> upon whether they contain matter which is properly to be regarded
> as legislative in its character and effect. The Court then described
> the one-House veto provision in that case as one that had the purpose
> and effect of altering the legal rights, duties and relations of persons,
> including the Attorney General, Executive Branch officials and
> Chadha, all outside the legislative branch[.]

Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*?, 80 N.C.L. REV. 1653, 1791 (2002).

A second factor is that the last election where the Electoral Count Act would have mattered was in 1876 (*i.e.*, more than a decade *prior* to its enactment).  It should be no surprise that Plaintiffs bring this suit now, a fortnight after an electoral vote in which the Electoral Count Act matters for the first time.  These two factors—the advent of *Chadha* in 1983 and the novelty of this pandemic election in 2020—readily answer the House's incredulity about "why now?"

### B. <u>Plaintiffs have a cause of action in this Court.</u>

Plaintiffs have a cause of action under *Ex parte Young* and the Declaratory Judgment Act.

#### 1. <u>*Ex parte Young* applies.</u>

The availability of judicial review does not hinge on the merits of an argument that government action violated a statute or the Constitution: "inquiry into whether suit lies [for judicial review] under *Ex parte Young* does not include [merits] analysis," *Verizon Md., Inc. v. Public Serv. Comm'n of Md.,* 535 U.S. 635, 636-37 (2002).  Plaintiffs allege that proceeding under the Electoral Count Act violates the Constitution, and this is all the is required for purposes of a cause of action.

#### 2. <u>The Declaratory Judgment Act and Rule 57 apply.</u>

With the advent of the Declaratory Judgment Act, 28 U.S.C. §§2201-2202 ("DJA"), equitable relief in the form of a declaration of the law is even more readily available that traditional equitable relief in the form of injunctions.  The federal-question statute, 28 U.S.C. §1331, provides subject-matter jurisdiction for nonstatutory review of federal agency action. *Califano v. Sanders,* 430 U.S. 99, 105 (1977) (1976 amendments to §1331 removed the amount-in-controversy

threshold for "any [federal-question] action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity") (*quoting* Pub. L. 94-574, 90 Stat. 2721 (1976)), and 28 U.S.C. §2201(a) authorizes declaratory relief "whether or not further relief … could be sought." *Accord Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 70-71 n.15 (1978); *Steffel v. Thompson,* 415 U.S. 452, 471-72 (1974). Since 1976, §1331 has authorized DJA actions against federal officers, regardless of the amount in controversy. *Sanders,* 430 U.S. at 105 (quoted *supra*). Declaratory relief makes it even easier for parties to obtain pre-enforcement review.[5]

Significantly, the availability of declaratory relief against federal officers predates the Administrative Procedure Act, 5 U.S.C. §§ 551-706 ("APA"), *see* WILLIAM J. HUGHES, FEDERAL PRACTICE §25387 (1940 & Supp. 1945); EDWIN BORCHARD, DECLARATORY JUDGMENTS, 787-88, 909-10 (1941), and the APA did not displace such relief, either as enacted in 1946 or as amended in 1976. *See* APA LEG. HIST., at 37, 212, 276; 5 U.S.C. §559; *Darby v. Cisneros,* 509 U.S. 137, 153 (1993) (rejecting argument that 1976 APA amendments expanded APA's preclusion of review). Thus, even if APA §10(c) precludes declaratory relief *under the APA,* 5 U.S.C. §704, suitable plaintiffs nonetheless can obtain that relief *under the DJA.*

The Fifth Circuit has identified a nonexclusive list of seven factors that a district court must consider when exercising its discretion to hear, stay, or dismiss a case brought under the DJA.

---

[5]    In 1980, Congress amended §1331 to its current form, Pub. L. No. 96-486, §2(a), 94 Stat. 2369 (1980), without repealing the 1976 amendment relied on by *Sanders* and its progeny. H.R. REP. NO. 96-1461, at 3-4, *reprinted in* 1980 U.S.C.C.A.N. 5063, 5065; *Bowen v. Massachusetts,* 487 U.S. 879, 891 n.16 (1988); *U.S. v. Mitchell,* 463 U.S. 206, 227 & n.32 (1983); *cf. Morton v. Mancari,* 417 U.S. 535, 550 (1974) (repeal by implication is disfavored). Indeed, "'repeals by implication are disfavored,' and this canon of construction applies with particular force when the asserted repealer would remove a remedy otherwise available." *Schlesinger v. Councilman,* 420 U.S. 738, 752 (1975).

> (1) whether there is a pending state action in which all of the matters in controversy may be fully litigated; (2) whether the plaintiff filed suit in anticipation of a lawsuit filed by the defendant; (3) whether the plaintiff engaged in forum shopping in bringing the suit; (4) whether possible inequities in allowing the declaratory plaintiff to gain precedence in time or to change forums exist; (5) whether the federal court is a convenient forum for the parties and witnesses; (6) whether retaining the lawsuit would serve the purposes of judicial economy; and (7) whether the federal court is being called on to construe a state judicial decree involving the same parties and entered by the court before whom the parallel state suit between the same parties is pending.

*Sherwin-Williams Co. v. Holmes Cty.*, 343 F.3d 383, 388 (5th Cir. 2003); *see also Frye v. Anadarko Petroleum Corp.*, 953 F.3d 285, 293-94 (5th Cir. 2019) (requiring actual controversy, the court's authority for declaratory relief, and the court's discretion).

Under the *Sherwin-Williams* factors, this Court should grant the requested declaratory relief:

- **Pending state action**. There is no pending state action.

- **Anticipatory suit**. The declaratory-judgment Plaintiffs did not race the Defendant to the courthouse; Defendant did not plan to sue Plaintiffs.

- **Forum shopping**. Rep. Gohmert is the lead plaintiff and has brought suit in his home district as Title 28 allows federal plaintiffs to do. Plaintiff Arizona Electors have no other ties to this forum, but their claims do not materially change the claims before this Court.

- **Possible inequities on timing and forum**. Rep. Gohmert is the lead plaintiff and has brought suit in his home district as Title 28 allows federal plaintiffs to do.

- **Federal court's convenience**. Given that Plaintiffs have sued the Vice President of the United States on a question of federal law, a state forum would not be an option.

- **Judicial economy**. There are no concerns about judicial economy because this is the only action .between the parties.

- **Federalism concerns from parallel actions**. There are no parallel state-court actions for Rep. Gohmert, and—although the Arizona Elector Plaintiffs have engaged in state-court litigation—the issues here are purely federal.

This Circuit's primary concern with declaratory-judgment actions is whether, under that the standard of *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491 (1942), "the questions in controversy between the parties to the federal suit … can be better settled in the proceeding pending in the state court." *Sherwin-Williams*, 343 F.3d at 389 (quoting *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. at 494). As indicated, this is an entirely federal action that does not raise that concern.

Under the parallel *Anadarko Petroleum* standards, declaratory relief is also appropriate under the exigent circumstances here:

- **An actual controversy is imminent**. The concern with that an actual controversy exists is easily met by the exigent circumstances of a contested election potentially being decided under an unconstitutional process as early as January 6. *See* Section II, *supra*. That does not trigger the Fifth Circuit's concern that the dispute is "not sufficiently definite and immediate to be justiciable." *Anadarko Petro. Corp.*, 953 F.3d at 293.

- **Jurisdiction**. This Court has jurisdiction for this dispute, *see* Section II.C, *supra*, and none of the concerns about superior state-court jurisdiction or burdens of factual proof for diversity jurisdiction enter into the analysis. *See id.*

- **Discretion**. Plaintiffs respectfully submit that this Court must address the constitutional concerns presented here: " flores

### 3.   The action is not barred by laches.

*Amicus* BLAG cites laches—namely, an "unreasonable, prejudicial delay in commencing suit," *Petrella v. MGM*, 572 U.S. 663, 667 (2014)—as a basis to dismiss this action or deny relief.

BLAG Br. at 14-19.  Because Plaintiffs did not have a ripe claim until December 14, 2020 and filed this action on December 27, 2020, laches presents no question of unreasonable delay. Plaintiffs' timing is measured from their claims' arising, not from the enactment of the Electoral Count Act in 1887:

> It is axiomatic that a claim that has not yet accrued is not ripe for adjudication.

*Sid Richardson Carbon & Gasoline Co. v. Interenergy Res.*, 99 F.3d 746, 756 (5th Cir. 1996). For that reason, Justice Blackmun aptly called laches "precisely the opposite argument" from ripeness. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 915 n.16 (1990) (Blackmun, J., dissenting); *accord What-A-Burger of Va., Inc. v. Whataburger, Inc.*, 357 F.3d 441, 449-50 (4th Cir. 2004) ("'One cannot be guilty of laches until his right ripens into one entitled to protection. For only then can his torpor be deemed inexcusable'") (quoting 5 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31: 19 (4th ed. 2003); *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 777 (Fed. Cir. 1995) (same); *Profitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 70 (2d Cir. 2002) (same). Because Plaintiffs could not have brought this action before the electoral college vote on December 14, 2020., this Court should reject any suggestion of unreasonable delay.[6]

---

[6]      In support of its timing argument, BLAG cites a raft of extra-Circuit district court decisions and one unreported decision from this Court. *See* BLAG Br. at 15 n.5. In *Collins v. W. Digital Techs., Inc.*, 2011 WL 3849310, 2011 U.S. Dist. LEXIS 96663, at *14 (E.D. Tex. Aug. 29, 2011) (No. 2:09-cv-219-TJW), the plaintiff waited 13 years to file suit. By contrast, Plaintiffs waited 13 days to file their Complaint.  Specifically, Plaintiffs' claims arose on December 14, 2020, and Plaintiffs filed their complaint on December 27, 2020. Comparing 13 years to 13 days is absurd. Although BLAG's citation to *Day v. McDonough*, 547 U.S. 198, 209 (2006), has higher pedigree than the other citations in BLAG's footnote, *Day* is simply inapposite to this case: "In sum, we hold that district courts are permitted, but not obliged, to consider, *sua sponte*, the timeliness of a state prisoner's *habeas* petition." *Id.*

Even if Plaintiffs had delayed bringing suit, the Defendant still would need to show *prejudice* as a prerequisite to obtaining dismissal for laches. *Envtl. Def. Fund, Inc. v. Alexander*, 614 F.2d 474, 479 (5th Cir. 1980).   The test for prejudice requires balancing the equities: "Measuring prejudice entails balancing equities." *Id.*   The Vice Presidency has not acquired a vested right to violate the Constitution because 133 have passed since Congress enacted the Electoral Count Act in 1887.   The passage of time does not bar fresh challenges to the application of unconstitutional or *ultra vires* laws or regulations. *Texas v. United States*, 749 F.2d 1144, 1146 (5th Cir. 1985).   "Arbitrary [governmental] action becomes no less so by simple dint of repetition." *Judulang v. Holder*, 565 U.S. 42, 61 (2011).   In truth, however, the Electoral Count Act has laid dormant since its enactment in 1887, and the only prior elects in which it might have mattered occurred prior to 1887 (*e.g.*, 1800 or 1876).   The Defendant cannot claim "prejudice" from a suit that challenges the Electoral Count Act in the first election since that statute's enactment in 1887 where the statute could unconstitutionally affect the outcome.

### 4.   <u>Transfer would be inappropriate.</u>

BLAG suggests that Rep. Gohmert lacks standing and that he should therefore be dismissed and the case transferred to a venue suitable to the Arizona Electors. BLAG Br. at 12. Courts do not generally dismiss plaintiffs piecemeal, and Rep. Gohmert—a Tyler resident with his principal home-state office here—satisfies the venue rules and statutes. Since only one plaintiff needs to have standing, it would be entirely possible that an out-of-state plaintiff would provide standing while an in-state resident provides venue.   But that is a mere hypothetical because Rep. Gohmert has standing. *See* Section I.C.1, *infra*.

### 5.   <u>No absent third parties are necessary parties.</u>

An *amicus* has suggested that the rival state of Arizona electors are necessary parties that must be joined under FED. R. CIV. P. 19. Dowling Br. at 6-8.   While *amicus* arguments should be

deemed waived unless raised by a party, *Christopher M. v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1293 (5th Cir. 1991) ("an issue waived by appellant cannot be raised by *amicus curiae*"), the Rule 19 necessary-party argument is meritless.

Leaving aside whether Arizona citizens are "subject to service of process" in Texas, FED. R. CIV. P. 19(a)(1) so as even to be relevant here, this Court can "accord complete relief among existing parties" with respect to declaratory and injunctive relief regarding the Electoral Count Act and the Constitution's alternate procedures. *Id.* 19(a)(1)(A).  More importantly, the rival electors cannot claim an "interest" in an unconstitutional statute:

> It is undoubtedly true that even expectancies characterized as "vested rights" under state law must fall before a court adjudication that [federal law] mandates that the expectancies not be fulfilled.

*United States v. City of Miami*, 614 F.2d 1322, 1341-42 (5th Cir. 1980) (subjective expectations on the continued adherence to past practice are not a sufficient interest). Here, as in *Miami*, "the crucial point here, to wit, that the [proposed relief] orders no relief against the [absent party]." *Id.* at 1329, Simply put, the relief requested has no legally prejudicial effect on any absent party:

> Unless the [absent party] can demonstrate that it has been ordered to take some action by the decree, or ordered not to take some action, or that its *rights or legitimate interests* have otherwise been affected, it has no right to prevent the other parties and the Court from signing the decree.

*Id.* (emphasis added). As indicated with respect to laches, *see* Section I.B.3, *supra*, there is no vested right in anyone to the continued following of the blatantly unconstitutional Electoral Count Act.

### 6. 28 U.S.C.§ 2403(a) does not require pausing relief.

Mr. Dowling argues that this Court should defer reaching the merits until Plaintiffs serve the U.S. Attorney General pursuant to 28 U.S.C.§ 2403(a).  See Dowling Br. at 8-9. That section provides as follows:

> In any action, suit or proceeding in a court of the United States to which *the United States or any agency, officer or employee thereof is not a party*, wherein the constitutionality of any Act of Congress affecting the public interest is drawn in question, the court shall certify such fact to the Attorney General, and shall permit the United States to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality. The United States shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality.

28 U.S.C.§ 2403(a) (emphasis added).  As signaled by the emphasized text, Defendant here is an officer of the United States. Moreover, Plaintiffs have served the United States Attorney for the Eastern District of Texas (ECF #5) and the United States Attorney General (ECF #10). This argument is meritless.[7]

## C.   This Court has constitutional and prudential jurisdiction over Plaintiffs' claims.

Although jurisdiction and the merits are "independent," *Howard v. Dretke*, 157 F.App'x 667, 670 (5th Cir. 2005), a plaintiff needs to be right on both issues to obtain interim relief: "Absent an adequate jurisdictional basis for the Court's consideration of the merits, there is *no likelihood* that the Plaintiff will prevail on the merits." *Herwald v. Schweiker*, 658 F.2d 359, 363 (5th Cir. 1981) (emphasis added). In this section, Plaintiffs establish this Court's jurisdiction.

---

[7]    The remaining arguments in Mr. Dowling's motion to dismiss are similarly meritless (*e.g.*, Plaintiffs do not plead a fraud count and so need not plead with particularity under FED. R. CIV. P. 9(b) and no party has requested discovery).  Moreover, to the extent he raises bases for dismissal that differ from those raised by Defendant, Mr. Dowling would need to prove—and has not—his own standing: "For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right.  Thus, … an intervenor of right must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests." *Town of Chester v. Laroe Estates, Inc.*, 137 S.Ct. 1645, 1651 (2017).

### 1.   <u>This case presents an Article III case or controversy.</u>

In a case where Plaintiffs ask an Article III court to hear a case against a federal defendant who is simultaneously a part of the Article I legislature and the Article II executive, Plaintiffs acknowledge that the jurisdictional scope of the federal judicial power under Article III is "important[t] … in maintaining separation of powers among the branches of the federal government." *In re Frazin*, 732 F.3d 313, 319 (5th Cir. 2013). It is also important for courts to "protect[] litigants," *id.,* and ultimately the judiciary's role to interpret the Constitution in properly presented cases and controversies: "The power to interpret the Constitution in a case or controversy remains in the Judiciary." *City of Boerne v. Flores*, 521 U.S. 507, 524 (1997).  By bringing a proper case or controversy under Article III, Plaintiffs present this Court not only the opportunity but also the *duty*[8] to resolve issues that other courts have not decided because those courts found those cases, by those parties, to fall outside their Article III jurisdiction under the law of those other circuits.  In some respects, this Court's opportunity and duty arise because these Plaintiffs press different claims that are justiciable, whereas other plaintiffs did not; in other respects, the law of this Circuit simply differs from the law of other circuits. *Compare*, *e.g.*, *Donald J. Trump for President, Inc. v. Sec'y Pa.*, No. 20-3371, 2020 U.S. App. LEXIS 37346, at *20 (3d Cir. Nov. 27, 2020) (candidate suffers generalized grievance from Elections Clause violations) *with LULAC v. City of Boerne*, 659 F.3d 421, 430 (5th Cir. 2011) (Rep. Gohmert has standing to vote for President under the Twelfth Amendment if the contested states' voters are constitutionally compromised); *cf. Heckler v. Mathews,* 465 U.S. 728, 739-40 (1984) (Plaintiff Arizona Electors have standing

---

[8]      "The existence of the jurisdiction creates an implication of duty to exercise it." *Howlett v. Rose*, 496 U.S. 356, 369-70 (1990) (interior quotations omitted).

either to void the rival Arizona electors' votes or to count the Plaintiff Arizona Electors' votes in their place because the latter's votes are constitutionally compromised under the Elections Clause).

While Article III jurisdiction most often involves standing—*i.e.*, a plaintiff's injury in fact, the defendant's causation or traceability, and the court's power to redress, *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561-62 (1992)—the scope of Article III extends to other overlapping issues:

> "All of the doctrines that cluster about Article III—not only standing but mootness, ripeness, political question, and the like—relate in part, and in different though overlapping ways, to … the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government."

*Allen v. Wright,* 468 U.S. 737, 750 (1984) (quoting *Vander Jagt v. O'Neill,* 699 F.2d 1166, 1178-79 (D.C. Cir. 1983) (Bork, J., concurring)). As explained in the following eight subsections, all of these Article III gate-keeping tests are met here.

### a)   The parties seek different relief.

The Defendant argues that "Plaintiffs' suit seeks to empower the Vice President to unilaterally and unreviewably decide objections to the validity of electoral votes" such that "Plaintiffs are … not sufficiently adverse to the legal interests of the Vice President." Def's Opp'n at 3. But the Defendant seeks dismissal, whereas Plaintiffs seek declaratory and injunctive relief. Moreover, Plaintiffs express no opinion on whether Defendant's actions would be unreviewable, Instead, Plaintiffs merely seek declaratory and injunctive relief against an unconstitutional statute.

This is not an instance where "the parties desire precisely the same result" so that there is no Article III case or controversy. *GTE Sylvania, Inc. v. Consumers Union of the United States, Inc.,* 445 U.S. 375, 383 (1980) (interior quotations omitted); *Moore v. Charlotte-Mecklenburg Bd. of Educ.,* 402 U.S. 47, 47-48 (1971) (*per curiam*).  The Defendant seeks the dismissal of this action, and Plaintiffs ask this Court to enter a judgment in their favor.  Even if one Plaintiff and the

Defendant were "friendly" in the sense of wanting the same thing, "[o]nly one plaintiff is needed to establish standing for each form of requested relief." *Pool v. City of Houston*, 978 F.3d 307, 312 n.7 (5th Cir. 2020) (citing *Town of Chester v. Laroe Estates, Inc.*, 137 S.Ct. 1645, 1651 (2017)). Whatever public statement one plaintiff made is not binding on the other plaintiffs, especially not a statement by one of the Arizona Electors on Rep. Gohmert.

> **b)**    **This Court must assume Plaintiffs' merits views to assess Plaintiffs' standing to sue.**

All of the briefs opposed to Plaintiffs' claims make the mistake of disputing Plaintiffs on the merits to attack Plaintiffs' standing. If that were how it works, every losing plaintiff would lose for lack of standing.

Put simply, that "confuses standing with the merits." *Initiative & Referendum Institute v. Walker,* 450 F.3d 1082, 1092 (10th Cir. 2006); *Adar v. Smith*, 639 F.3d 146, 150 (5th Cir. 2011) ("standing does not depend upon ultimate success on the merits"); *accord Lac du Flambeau Band of Lake Superior Chippewa Indians v. Norton,* 422 F.3d 490, 501 (7th Cir. 2005); *In re Columbia Gas Systems Inc.,* 33 F.3d 294, 298 (3d Cir. 1994); *cf. Cantrell v. City of Long Beach,* 241 F.3d 674, 682 (9th Cir. 2001).  Instead, federal courts have jurisdiction over a case if "the right of [plaintiffs] to recover under [their] complaint will be sustained if the ... laws of the United States are given one construction," even if the plaintiffs' rights "will be defeated if [those federal laws] are given another." *Wheeldin v. Wheeler,* 373 U.S. 647, 649 (1963) (interior quotations omitted). Accordingly, federal courts should assume *the plaintiff's* merits views in evaluating their jurisdiction to hear the plaintiff's claims: "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth v. Seldin,* 422 U.S. 490, 500 (1975); *City of Waukesha v. EPA,* 320 F.3d 228, 235 (D.C. Cir. 2003) ("one must assume the validity of a plaintiff's substantive claim at the standing inquiry"); *Adar v. Smith*, *supra* (*en banc*).

With the idea in mind that this Court should assume Plaintiffs' merits views in evaluating standing, the need to contest this election should become apparent.  The Constitution's Elections Clause and Electors Clause give state legislatures the plenary power to set election provisions, and yet—citing the COVID pandemic as either a reason or as an excuse—non-legislative actors in all the contested states systematically eroded ballot-integrity measures like signature or witness requirements and registration or mail-in deadlines to the point where Plaintiffs respectfully submit it is impossible to state who won from the mail-in votes because legal ones have been commingled with illegal ones.

Moreover, although ostensibly a question of state election law, these questions are federal the state election laws apply "not only to elections to state offices, but also to the election of Presidential electors," meaning that state law operates, in part, "by virtue of a direct grant of authority made under Art. II, § 1, cl. 2, of the United States Constitution." *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000).  Logically, "any state authority to regulate election to [federal] offices could not precede their very creation by the Constitution," meaning that any "such power had to be delegated to, rather than reserved by, the States." *Cook v. Gralike*, 531 U.S. 510, 522 (2001) (internal quotations omitted).  "It is no original prerogative of State power to appoint a representative, a senator, or President for the Union." J. Story, 1 COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 627 (3d ed. 1858).  For these reasons, any "significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring).

### c)   Plaintiffs suffer an injury in fact.

The briefs opposed to Plaintiffs argue that Plaintiffs' claimed injuries are generalized grievances insufficient for Article III.  As indicated, however, Plaintiffs here assert particularized injuries under this Circuit's Article III decisions and these Plaintiffs claims. *See* Section I.C.1,

*supra*. First, Rep. Gohmert has standing to challenge unconstitutional elector slates and to vote for President under the Twelfth Amendment as opposed to voting for objections under the Electoral Count Act. *See LULAC v. City of Boerne*, 659 F.3d at 430; *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 845 (5th Cir. 1993) (*en banc*).

This voting injury also answers BLAG's attempt to classify Rep. Gohmert's injuries under the rubric of legislative standing under *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997). Under those decisions, a legislator or legislative body would only have standing for issues within their power (*e.g.*, information to be gotten by subpoena) or if they had a working majority of the relevant number of houses to enact or block legislation. *Va. House of Delegates v. Bethune-Hill*, 139 S.Ct. 1945, 1955 n.6 (2019); *Coleman v. Miller*, 307 U. S. 433, 446 (1939). Here, Rep. Gohmert seeks to vote for President under the Twelfth Amendment rather than in dispute-resolution  proceedings for rival voter slates when the states in question have impossibly commingled the legal and illegal ballots so that it is impossible to know the result. As indicated in this section, this Circuit's voting-rights cases make clear that that is not a generalized grievance.

**d)      Plaintiffs' injuries are traceable to Defendant.**

Defendant cites *Common Cause v. Biden*, 748 F.3d 1280, 1285 (D.C. Cir. 2014), and *CastaÑon v. United States*, 444 F. Supp. 3d 118, 133 (D.D.C. 2020), for the proposition that the House and the Senate—not the Vice President—caused Plaintiffs' injuries. *See* Def.'s Opp'n at 4. Along the same lines, Defendant deems it "a walking legal contradiction" to sue "the Vice President [to establish his] discretion over the count." *Id.* Defendant's false contradiction is readily set right.

First, *Common Cause* concerned the Senate filibuster rule's blocking immigration reform sought by the plaintiffs there (*i.e.*, legislation), and *CastaÑon* sought voting rights for District of Columbia residents (*i.e.*, also a legislative issue, as well as a constitutional issue in light of the

District's unique role under the Constitution).  In those circumstances, the Vice President was not the party denying the plaintiffs' alleged rights.  Here, by contrast, Vice President Pence is the presiding officer who will invoke the constitutional Twelfth Amendment process or the statutory Electoral Count Act process.  As the presiding officer under both alternate paths, Defendant is an entirely reasonable person to seek to enjoin. *See*, *e.g.*, *Beeman v. Mays*, 163 S.W. 358, 358 (Tex. Civ. App. 1914) ("suit against appellant to enjoin him, as presiding officer, from holding an election"); 42 U.S.C. § 1988(a) (civil rights actions can incorporate state law that is not inconsistent with federal law).[9]

Second, Defendants' "walking legal contradiction" is no contradiction at all.  Through declaratory and injunctive relief, Plaintiffs ask this Court to prevent Defendant from invoking the unconstitutional Electoral Count Act. As in *OCA-Greater Houston v. Texas*, 867 F.3d 604, 613-14 (5th Cir. 2017),  Defendant cannot rely on this Circuit's *en banc* decision in *Okpalobi v. Foster* because—unlike in *Okpalobi*[10]—Plaintiffs have sued someone who implements the statute that Plaintiffs challenge. *Compare OCA-Greater Houston*, 867 F.3d at 613-14 *with Okpalobi v. Foster*, 244 F.3d 405, 415 (5th Cir. 2001) (*en banc*). (defendants had no "enforcement connection with the challenged statute").  Here, Defendant is the presiding officer of the process that Plaintiffs seek to enjoin and declare unconstitutional.  Under that circumstance, Plaintiffs have "met [the] burden under *Lujan* to show that [their] injury is fairly traceable to and redressable by the defendant[]." *OCA-Greater Houston*, 867 F.3d at 614; *see also* Pls.' Mot at 7-9 (discussing traceability).

---

[9]     While § 1988(a) most typically imports state-law procedures for survivorship or statutes of limitations for federal civil-rights claims, *see*, *e.g.*, *Jefferson v. City of Tarrant*, 522 U.S. 75, 79 (1997), nothing prevents citing state common-law cases for the proper party to sue to enjoin the operation of an unconstitutional process.

[10]     In *Okpalobi*, the plaintiffs had sued Louisiana's Governor and Attorney General to challenge a statute that empowered private parties and state courts to act. *See* 244 F.3d at 415.

e)      **This Court can redress Plaintiffs' injuries.**

As indicated in the prior section, Plaintiffs injuries are traceable to Defendant and thus also redressable by the Court because Defendant is the presiding officer of the challenged statutory process. *OCA-Greater Houston*, 867 F.3d at 613-14; *see also* Pls.' Mot at 9-10 (discussing redressability).

f)      **Plaintiffs' procedural injuries lower the constitutional bar for immediacy and redressability.**

Defendant and the amicus briefs do not dispute that the procedural injuries that Plaintiffs seek to press lower the Article III bar for immediacy of injury and redressability. *See* Pls.' Mot. at 11-12.

g)      **This action is not moot.**

"A case becomes moot only when it is *impossible* for a court to grant any effectual relief whatever to the prevailing party." *Knox v. SEIU, Local 1000*, 567 U.S. 298, 307 (2012) (internal quotations omitted, emphasis added).  The joint session will not meet until January 6, and Congress could extend its statutory deadlines, as it did in connection with the only other similarly contested election. Ch. 37, 19 Stat. 227 (1877).  Indeed, even without a new statute, the January 6 joint session could be extended further into January.

Simply put, "it ain't over 'til it's over." Jeffrey W. Stempel, *Sanctions, Symmetry, and Safe Harbors: Limiting Misapplication of Rule 11 by Harmonizing It with Pre-Verdict Dismissal Devices*, 60 FORDHAM L. REV. 257, 260 (1991) (quoting Yogi Berra).  It remains possible for this Court to enter a judgment that addresses the constitutionality of the Electoral Count Act and its application to the 2020 election.

### h)    **This action is ripe.**

It is undisputed that rival slates of electors have been submitted for an outcome-determinative number of electoral votes.  It is indisputable that at least one Representative and one Senator will, or are likely to, object to the slates from these contested states.[11] *See* Ex. A-B (Sen. Hawley plans to object); Ex. C (Sen.-Elect Tuberville); Ex. D (140 Republican House Members). The timing of future events provides no barrier to justiciability: "Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.,* 559 U.S. 662, 670 n.2 (2010).  Indeed, even without objecting Representatives and Senators, the presence of an outcome-determinative number of rival slates of electors guarantees the need for the joint session to engage in some form of dispute-resolution process, which squarely presents the question of whether that process lies under the Electoral Count Act that Plaintiffs challenge.

### 2.    **Prudential limits on Article III jurisdiction do not apply.**

In addition to Article III's jurisdictional limits, the judiciary has adopted prudential limits on standing that bar judicial review even when the plaintiff meets Article III's minimum criteria. *See, e.g.*, *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 475 (1982) (zone-of-interests test); *Secretary of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 955 (1984) (litigants must raise their own rights); *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (litigants cannot sue over generalized grievances more

---

[11]    The Senate.gov press release and the related news reports about objections next week when Congress convenes in joint session are judicially noticeable. *Concerned Citizens for Equal. v. McDonald*, 863 F. Supp. 393, 394 (E.D. Tex. 1994) (newspapers); *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005) (government website).

appropriately addressed in the representative branches).  Prudential issues are non-jurisdictional and can be waived. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). In any event, none of those prudential limits apply here.[12]

### a) Plaintiffs are within the relevant zones of interests.

The zone-of-interests test requires that a plaintiffs' claims be "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 153 (1970).  Here, Rep. Gohmert will proceed as a Member of the House of Representatives in the joint session, and he asks this Court to resolve whether the extant statutory procedure is unconstitutional (*i.e.*, he asks whether the Electoral Count Act is viable under the Twelfth Amendment and the rest of the Constitution).  That claim is squarely within the zone of the constitutional provisions that he invokes.  Similarly, the Plaintiff Arizona Electors ask to be treated fairly in the joint session, *vis-à-vis* their relative merits with the rival slate of Arizona electors.  Under the constitutional process that the Plaintiff Arizona Electors invoke, they have a chance to be counted. Under the Electoral Count Act, the Democrat majority in the House has made clear it will vote for Mr. Biden, and the Governor of Arizona has supported that position (*i.e.*, the Plaintiff Arizona Electors will not be counted under the Electoral Count Act). The Plaintiff Arizona Electors' claims thus also fall within the zone of interests of the constitutional provisions that Plaintiffs invoke.

---

[12]     Arguments not pressed by an actual party (*e.g.*, if raised solely by an *amicus*) are waived. *Christopher M. v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1293 (5th Cir. 1991) ("an issue waived by appellant cannot be raised by *amicus curiae*"); *cf. Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 97 n.4 (1991) (distinguishing jurisdictional arguments raised solely by *amicus*).]

**b)**     <u>**Rep. Gohmert can press the interests of his constituents and of
himself as a Texas voter.**</u>

In addition to his own standing as a Texas voter in the election and as a Member of
Congress in the procedures under the Electoral Count Act and Twelfth Amendment, Rep. Gohmert
has standing to raise his constituents' rights under the prudential test for third-party standing. *See
Kowalski v. Tesmer,* 543 U.S. 125, 128-30 (2004) (requiring the plaintiff to have its own Article
III standing, a relationship with the rights holder, and that some hindrance keeps the rights holder
from asserting its own rights).  The only *constitutional* and jurisdictional requirements are the
Article III requirements, with the others being prudential. *Caplin & Drysdale v. U.S.*, 491 U.S.
617, 623 n.3 (1989).  Prudential limits are generally waivable by a party, " *Bd. of Miss. Levee
Comm'rs v. EPA*, 674 F.3d 409, 417-18 (5th Cir. 2012) ("[u]nlike constitutional standing,
prudential standing arguments may be waived"); *June Med. Servs. L.L.C. v. Russo*, 140 S.Ct. 2103,
2117 (2020) ("the rule that a party cannot ordinarily rest his claim to relief on the legal rights or
interests of third parties … does not involve the Constitution's case-or-controversy requirement
… [a]nd so … it can be forfeited or waived") (interior quotations and citations omitted), and the
Defendant has waived all non-jurisdictional arguments not raised in his opposition.

**c)**     <u>**This suit is not prudentially improper as a "friendly" suit.**</u>

Citing a public statement by one plaintiff, the Defendant and his *amici* argue that that this
is a "friendly suit" that the Court should dismiss. Any bar against friendly suits in prudential, not
*jurisdictional*. *New York City Transit Authority v. Beazer,* 440 U.S. 568, 583 (1979).  As indicated
in Section II.C.1, *supra*, this action is not "friendly" in the Article III sense. To the extent that the
"friendly" remark refers to personal relationships, it would be irrelevant to this official-capacity
action: "while friendship is a ground for recusal of a Justice where the personal fortune or the
personal freedom of the friend is at issue, it has traditionally not been a ground for recusal where

official action is at issue, no matter how important the *official action* was to the ambitions or the reputation of the Government officer." *Cheney v. United States Dist. Court*, 541 U.S. 913, 916 (2004) (Scalia, J., in chambers) (emphasis in original).  But Plaintiffs seek relief that Defendant opposes, which is not "friendly" in the prudential sense.

### 3.   The Speech or Debate Clause does not insulate the Vice President.

Defendant does not dispute that the Speech or Debate Clause provides him no protection.

### 4.   Sovereign immunity does not bar this action.

*Amicus* BLAG argues that Plaintiffs have named the wrong defendant and instead should have named the House and Senate as the parties that injured Plaintiffs.  For the reasons set forth in their motion and not directly disputed by Defendant or his *amici*, *see* Pls.' Mot. at 13-14, Plaintiffs respectfully submit that they have properly invoked an *Ex parte Young* officer suit against the Vice President for the unconstitutional application of the Electoral Count Act.  To the extent that this Court disagrees, however, denial of relief or dismissal would be inappropriate. Instead, the Court should allow Plaintiffs to amend their complaint to name alternate officers such as the House and Senate parliamentarians

First, the United States has waived sovereign immunity for

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States[.]

5 U.S.C. § 702.

Second, "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." 28 U.S.C. § 1653.  If the Court finds the pleadings inadequate as the Vice

President Pence, Plaintiffs could amend their pleadings to include the United States as a defendant.
*See also* FED. R. CIV. P. 15(a)(1)(B).

### 5.     The political-question doctrine does not bar this suit.

Defendant does not dispute that the political question doctrine provides him no protection.

### 6.     This case presents a federal question.

Defendant does not dispute that this case raises a federal question within this Court's original jurisdiction under 28 U.S.C. §§ 1331 and 1343(3).

### 7.     No abstention principles apply.

Defendant does not dispute that no abstention the political question doctrine provides him no protection.

## III.     PLAINTIFFS ARE ENTITLED TO EMERGENCY INJUNCTIVE RELIEF.

Neither Defendant nor his *amici* dispute that the remaining *Winter* factors support the entry of interim relief.

## CONCLUSION

For the reasons set forth in their Motion and this reply, Plaintiffs respectfully request that the Court grant the requested relief.

Dated: January 1, 2021                    Respectfully submitted,


                                          /s/ William Lewis Sessions
Howard Kleinhendler                       William Lewis Sessions
Howard Kleinhendler Esquire               Texas Bar No. 18041500
NY Bar No. 2657120                        Sessions & Associates, PLLC
369 Lexington Ave., 12th Floor            14591 North Dallas Parkway, Suite 400
New York, New York 10017                  Dallas, TX 75254
Tel: (917) 793-1188                       Tel: (214) 217-8855
Fax: (732) 901-0832                       Fax: (214) 723-5346 (fax)
Email: howard@kleinhendler.com            Email: lsessions@sessionslaw.net


Lawrence J. Joseph                        Julia Z. Haller
DC Bar No. 464777                         DC Bar No. 466921
Law Office of Lawrence J. Joseph          Brandon Johnson
1250 Connecticut Ave, NW, Suite 700-1A    DC Bar No. 491370
Washington, DC 20036                      Defending the Republic
Tel: (202) 355-9452                       601 Pennsylvania Ave., NW
Fax: 202) 318-2254                        Suite 900
Email: ljoseph@larryjoseph.com            South Building
                                          Washington, DC 20004
                                          Tel: (561) 888-3166
                                          Fax: (202) 888-2162
                                          Email: hallerjulia@outlook.com
                                          Email: brandoncjohnson6@aol.com


                                          *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date specified below, I electronically filed the foregoing motion (together with its accompanying proposed order) with the Clerk of the Court using the CM/ECF system, which I understand to have caused the service of all parties' counsel of record.

Dated: January 1, 2021

/s/ William Lewis Sessions
William Lewis Sessions,
Texas Bar No. 18041500
Sessions & Associates, PLLC
14591 North Dallas Parkway, Suite 400
Dallas, TX 75254
Tel: (214) 217-8855
Fax: (214) 723-5346
Email: lsessions@sessionslaw.net

*Counsel for Plaintiffs*