# PLAINTIFFS' APPENDIX TABLE OF CONTENTS

Ackerman, Bruce & Fontana, David, *Thomas Jefferson Counts Himself into the Presidency*, 90 VA. L. REV. 551 (2004). — 1

Colvin, Nathan L. & Foley, Edward B., *The Twelfth Amendment: A Constitutional Ticking Time Bomb*, 65 U. MIAMI L. REV. 475 (2010). — 53

Hawley, Joshua D., *The Transformative Twelfth Amendment*, 55 WM. & MARY L. REV. 1501 (2014). — 97

Josephson, William, *Senate Election of the Vice President and House of Representatives Election of the President*, 11 U. PA. J. CONST. L. 597 (2009). — 152

Kesavan, Vasan, *Is the Electoral Count Act Unconstitutional?*, 80 N.C. L. REV. 1653 (2002). — 207

Land, Chris & Schultz, David, *On the Unenforceability of the Electoral Count Act*, 13 RUTGERS J.L. & PUB. POL'Y 340 (2016). — 318

Neumann, Richard K., *The Revival of Impeachment as a Partisan Political Weapon*, 34 HASTINGS CONST. L.Q. 161 (2007). — 345

Siegel, Stephen A., *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 FLA. L. REV. 541 (2004). — 460

**90 Va. L. Rev. 551**

**Virginia Law Review**
April, 2004

**Articles**

Bruce Ackerman [a1]  David Fontana [aa1]

Copyright (c) 2004 Virginia Law Review Association; Bruce Ackerman; David Fontana

# THOMAS JEFFERSON COUNTS HIMSELF INTO THE PRESIDENCY

|      | Introduction | 551 |
| I.   | Original Misunderstandings | 554 |
|      | A. Founding Blunders | 554 |
|      | B. A World Without Parties | 557 |
| II.  | The Vermont Precedent | 567 |
|      | A. The Rise of Party | 568 |
|      | B. Rumors and Restraint | 571 |
|      | C. Vote-Counting Day in Philadelphia | 579 |
| III. | The Election of 1800 | 581 |
|      | A. The Run-Up | 582 |
|      | B. Jefferson's Problem | 587 |
|      | C. Jefferson's Decision | 599 |
| IV.  | Jefferson in Context | 610 |
|      | A. Substance Over Form | 611 |
|      | B. Prudence and Publicity | 614 |
|      | C. Pinckney for President? | 618 |
|      | D. Jefferson and the Rule of Law | 624 |
|      | E. Dumb Luck | 625 |
| V.   | Jefferson's Ghost | 629 |
|      | A. From Cautionary Tale to Legal Precedent | 630 |
|      | B. The Gloss of 1877 | 634 |
|      | C. The 1887 Act | 640 |

**Introduction**

THE President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted." [1]

**\*552**  We last glimpsed the dangers lurking in these lines during the electoral crisis of 2000. As sitting Vice-President, Al Gore was the President of the Senate on January 6, 2001. So it fell to him to "open all the Certificates" and preside over the vote count.

What if there had still been a dispute over the electoral votes from Florida? Consider the following scenario: After much Sturm und Drang, the Florida courts decide that Gore is the winner, but the Florida legislature grants the state's twenty-five electoral votes to George W. Bush. These rival authorities transmit competing electoral college certificates to Washington D.C., ready to be opened when the moment of truth arrives. Pursuant to constitutional command, the Vice-President "open[s] all the Certificates." What happens next?

The constitutional text does not speak clearly. It authorizes the Vice-President to "open" the certificates but leaves the extent of his further powers hidden in the passive voice: "and the Votes shall then be counted."

APPENDIX - 1

These textual penumbras can be enlightened by precedents that have gone largely unnoticed for two centuries: the electoral vote disputes of 1796 and 1800. On these two occasions, John Adams and Thomas Jefferson found themselves in Al Gore's position. As Vice-Presidents in the preceding administration, they were presiding over a vote count in which they were leading candidates, and in both instances, they used their power to make rulings that favored their own election as President of the United States. This Article will present the first in-depth treatment of these precedents,[2] emphasizing the dramatic moment when Thomas Jefferson made a questionable ruling that enhanced his chances of becoming the next President of the United States, rather than John Adams or Charles Cotesworth Pinckney.

Adams's decisions in 1797 were perfectly sensible but frame an analysis of Jefferson's problematic conduct the next time around. Vermont had cast four electoral votes for Adams and his running mate Thomas Pinckney, but the legality of the state's action had been publicly impugned and privately questioned by newspapers and politicians from both political parties.

 **553** When Adams opened the formal certificates from Vermont they seemed completely regular, containing no hint of legal deficiency. Despite their facial perfection, Adams provided members of Congress a formal opportunity to challenge Vermont's four electoral votes before announcing that he had won the election by three votes over Jefferson. He declared himself President only after the Republicans remained silent.

Thomas Jefferson was remarkably aggressive as President of the Senate. Georgia's certificate--granting four electoral votes to Jefferson and four electoral votes to Aaron Burr--was constitutionally defective on its face, a deficiency that was announced on the floor of Congress and reported by leading newspapers of the day.[3] To resolve all doubts, we have located Georgia's certificate in the National Archives, and it does indeed reveal striking constitutional irregularities. Nevertheless, and in contrast to Adams, Jefferson failed to pause before counting Georgia's four electoral votes into the Republican column, declaring the final vote as if nothing were amiss.

This ruling had serious consequences. With the Georgia votes included, the official tally was Jefferson seventy-three, Burr seventy-three, Adams sixty-five, Charles C. Pinckney sixty-four, and John Jay one. To resolve this tie, the two leading candidates went to their famous runoff in the House, which was only resolved in Jefferson's favor on the thirty-sixth ballot.

Had Georgia's ballot been excluded, the vote count for Jefferson and for Burr sinks to sixty-nine each, and this would have made a big difference under the electoral ground rules framed in Philadelphia. As we will explain,[4] these rules would have admitted all five candidates into a runoff in the House. Including Adams, Pinckney, and Jay in the runoff would have dealt a serious blow to Jefferson's prospects. The Federalists would no longer have been stuck with Aaron Burr as the only alternative to their archenemy Jefferson. They could have rallied around a much more attractive "compromise" candidate: Charles Pinckney of South Carolina. Without the **554** decisive use of his power as President of the Senate, Jefferson might never have become President of the United States.

This point was appreciated by contemporaries, but has dropped out of modern constitutional consciousness.[5] After bringing this forgotten precedent into public view, we will consider its potential relevance for future Electoral College crises, using a variation on Bush v. Gore[6] as an analytic platform.

## I. Original Misunderstandings

This Part sets the stage for Jefferson's moment of truth as President of the Senate in 1801. Why did the Framers choose the sitting Vice-President to preside over the vote count in the first place? What were the rules, and animating ideals, of the Electoral College prior to enactment of the Twelfth Amendment?

### A. Founding Blunders

The vice-presidency gave the Framers a lot of problems. They believed that a backstop was needed for the President, but they **555** were hard-put to figure out what to do with him while the President was alive.[7] For want of anything better, they assigned him the largely ceremonial office of President of the Senate.

APPENDIX - 2

But, alas, this office was not entirely ceremonial, and the Framers simply did not think through the full ramifications of this point. They recognized that the Senate would generate tie votes from time to time, and expressly granted the President of the Senate a tie-breaking vote. [8] They failed, however, to consider other moments when the Vice-President might wield real power.

Their most obvious blunder involves impeachment proceedings. The Founders recognized the absurdity of allowing the Vice-President to preside over the Senate when the President was on trial for "high Crimes and Misdemeanors." [9] He was inevitably an interested party in this affair, rising to the presidency if the incumbent were convicted. Given his personal stake in the matter, it was inappropriate for him to preside over the trial as President of the Senate, and so the text explicitly designates the Chief Justice as the presiding officer. [10]

They failed, however, to consider that the Vice-President might also be impeached. Rather than designating the Chief Justice to preside over these trials as well, the text leaves this task to the President of the Senate. [11] Read literally, the Constitution seems to **556** authorize the Vice-President to preside over his own impeachment. [12]

Our present problem reflects the same sort of technical incompetence. Although the Vice-President may be perfectly acceptable as a ceremonial leader of the Senate, he is a natural candidate in the next presidential contest. It is an obvious mistake to designate him as the presiding officer over the electoral vote count. The temptations for abuse of power are too great-- especially since the textual description of the vote count procedure is so inadequate. Even if the text had been elaborated with great precision, it was still wrong to give one candidate any sort of strategic advantage over his rivals. The designation of the President of the Senate as presiding officer was nothing more than a thoughtless extension of a ceremonial post to a position of power.

If anyone had focused on the matter, the Convention could have cured the lapse easily. There was an obvious solution: The Constitution expressly replaced the Vice-President with the Chief Justice when it comes to presiding over the Senate during presidential impeachments. Just as the Chief Justice displaced him on these occasions, he could have replaced him at the electoral vote count. [13]

**557** But the Convention never spotted this problem, or its obvious cure, and the forces of intellectual inertia propelled the President of the Senate into an unsuitable role. This failure is understandable, if not precisely excusable. The Convention spent an enormous amount of time on methods for selecting the President, repeatedly failing to find a solution that commanded enduring support. Hoping to get out of Philadelphia, the delegates finally pushed the problem onto the docket of a special committee, chaired by David Brearley, charged with solving previously irresolvable issues. [14] Despite the pressures of time, the delegates did spend most of two days-- September 5 and 6, 1787--on the Brearley proposals, [15] but two days were not nearly enough to confront all the problems involved in their novel design. There were many larger questions at stake than the role of the President of the Senate. With their eyes wandering to the exits, the Framers never focused on the absurdity of their job assignment. [16]

So our problem arises as the result of technical incompetence at the Founding--which does not make it any less of a problem.


## B. A World Without Parties

To set the stage further, consider the larger structure within which John Adams and Thomas Jefferson were operating at the moment of the vote count. We must return to the original understanding of the Electoral College before the enactment of the Twelfth Amendment. This requires something more than the mastery **558** of a few antiquated rules. These rules were based on an entirely different vision of American politics, and we will not get very far without grasping how this Founding vision differs from our own.

For modern Americans, the two-party system is a pillar of democratic life. Fair competition between political parties is viewed as the great engine for disciplining despotic power. For us, an election without party competition is no election at all.

This was not so for the Founders. They equated party with faction, and thought parties an unmitigated evil. Worse yet, they did not reach this judgment after soberly considering the democratic case for party competition. Nothing resembling the modern party system had yet emerged as a historical reality. [17]

APPENDIX - 3

Nor did classical republican theory encourage the Founders to glimpse the future that lay just over the horizon. The great republican writers of the past--Aristotle and Cicero, Machiavelli and Harrington--presented very different visions of the well-ordered state. They were alike, however, in one crucial respect: Each equated party division with factional strife and deemed it the great nemesis of civilization. Republics died when leaders factionalized, with each cabal placing its narrow interests ahead of the public good. The result was an escalating cycle of instability and incivility, culminating in the despotic ascendancy of a Caesar or a Cromwell. The fundamental challenge was somehow to induce leaders to put the public good ahead of their own-- and to sustain the unity of the Commonwealth against the ever-present dangers of factional disintegration. [18]

These classical teachings resonated with the Founders' revolutionary experience. During their struggle against England, political division meant weakness before the imperial foe and bordered on betrayal: We will all hang separately if we do not hang together. This attitude, once formed and battle-hardened, was difficult to transcend.

 **\*559**  Even Madison did not attempt to do so. His work at the Constitutional Convention and in The Federalist linked party with faction, condemning it as evil. [19]  Madison's aim was to use Enlightenment political science to design a better constitutional machine to constrain the beast. [20]  Rather than organizing a sound two-party system, the Madisonian republic tried to create a space for leaders to transcend the rule of faction altogether. The Constitution's basic tactic is divide-and-conquer. By creating government on a continental scale, the Framers hoped to make it difficult to organize large parties: Rather than one or two continental groupings, there would be a host of self-interested factions pushing and shoving for power. This labile structure would make it possible for patrician civic leaders like George Washington to rise above the fray and govern in the public interest. Rather than draft a Constitution for a two-party democracy, the Framers sought to organize a non-party republic. [21]

Though this notion is strange to us, the original design of the Electoral College makes no sense without it. For us, it seems only natural for the major parties to take on the primary burden of selecting the leading candidates for the presidency, but this was a non-starter for the Framers. Rather than delegating this task to political parties, they hoped to design a scheme by which great statesmen would transcend the dynamics of faction. The model for such a leader, of course, sat before them as the presiding officer of the Constitutional Convention: George Washington. The challenge was to construct a system that would enable others like him to rise to the top.

The problem was made more acute by the nature of eighteenth-century society. Politics, much more so than now, was emphatically local. Commercial and landed elites might compete for attention in each of the states, but few local leaders would have the opportunity to prove their mettle on a national basis.

 **\*560**  As the Founders well understood, the war against England provided the revolutionary generation with exceptional opportunities to project themselves onto the continental stage. By virtue of their service in the patriots' army, Washington and others had demonstrated their republican virtue--or lack of it-- to an attentive audience in all thirteen states. The difficulties of wartime coordination also required civilian politicians to engage in extraordinary levels of interstate interaction as well as mutual assessment. But in ordinary times, would there be a steady supply of such "Continental Characters"? [22]

The more optimistic members of the Convention predicted that "Continental Characters will multiply as we more & more coalesce," [23]  but others were not so sure. [24]  Unless steps were taken, each state's electors might join together and vote for a favorite son, leading to perplexity when all the votes were counted. This is where the Founders tried to economize on the short supply of true leaders through clever institutional engineering. Why not give two votes to each elector, but allow him to cast only one for a citizen from his own state? As Gouverneur Morris explained, "one vote is to be given to a man out of the State, and as this vote will not be thrown away, y the votes will fall on characters eminent & generally known." [25]

The vice-presidency became a functional imperative at this stage in the constitutional design. If the Framers had trusted electors to ignore local favorites, they might well have dispensed with the office.  **\*561**   [26]  Instead of creating a do-nothing (and politically mischievous) President of the Senate, they could have responded to the problem of presidential death or resignation by simply designating an official--perhaps the Secretary of State, perhaps the Speaker of the House--to serve as acting President until a special election could be held. In fact, this was the method used by the Second Congress to resolve the succession problem if both the President and Vice-President died or resigned. [27]

APPENDIX - 4

The Framers' ingenious two-vote system, however, invited the creation of two distinct offices. Without the vice-presidency, electors might leave one of their ballots blank and vote the other for a native son. But with the second spot in existence, the electors would hardly let it go to waste. One can imagine the thought process: "Of course George Washington is an out-of-stater, but I might as well vote for the best man since the Constitution requires me to move beyond our favorite sons. And in any event, I did get a chance to cast a ballot for our regional favorite, the Honorable John Q. Squire, who might even have a chance to be Vice-President!" Although most Vice-Presidents would likely waste their time in office as senatorial figureheads, this was beside the point. The underlying goal was to construct a clever system for selecting a President with a broad-based reputation for political virtue. When Elbridge Gerry (himself a future Vice-President) expressed a desire to eliminate the office, another delegate--Hugh Williamson of North Carolina--responded that "such an officer as **562** vice-President was not wanted. He was introduced only for the sake of a valuable mode of election which required two to be chosen at the same time." [28]

The original design had a second clever feature. Suppose, as was the case in both 1796 and 1800, that the College contained 138 members who cast 276 votes. Under the 1787 Constitution, the top choice could become President even if his name appeared on only seventy of the 276 votes. [29] The point of the Enlightenment machine was to construct the impression that the President was a man of truly national character even if the pickings were pretty slim. A man could become President when he was the second choice of a bare majority of electors.

Even this clever expedient could sometimes fail to produce the simulacrum of a George Washington. Politics might become so state-centered that no candidate could gain even a minimal level of national support. How to proceed?

The Brearley Committee proposed a back-up procedure under which the President would be selected by the Senate from the top five vote-getters in the Electoral College. [30] But the Senate had already been granted many special powers, and granting it still more threatened to give the entire system an "aristocratic complexion." [31] This objection proved persuasive, leading to the most peculiar voting system known to our constitutional system. The Convention shifted the locus of authority from the Senate to the House, but retained the Senate's principle of equality in state voting power. For **563** presidential purposes only, each state delegation in the House would cast a single vote--Delaware's single representative and Virginia's large delegation counting equally [32] --and the balloting would proceed until a candidate received the votes of an absolute majority of the states. [33]

This transformation of the people's House into a state-centered assembly may seem odd to us, but it made quite a bit of sense within the overall Founding framework. To put the point in numerical terms: If no single candidate garnered as many as seventy of the 276 votes cast by 138 electors, this would indicate that American politics had taken an emphatically decentralizing turn. As a consequence, should not the back-up mechanism likewise decentralize by giving an equal vote to each state in the Union?

Perhaps, though, strong nationalists like Madison and Hamilton were not convinced. They tried to eliminate the back-up procedure, or at least reduce the frequency of its use. [34] These efforts were successfully resisted by the small states, which feared that electors from three or four large states might otherwise be in a position to dictate the presidential choice when a consensus candidate **564** was lacking. [35] If no national figure could gain one of the two places on a majority of the electors' ballots, the small states insisted on a runoff in the House in which each state counted equally. Under this scenario, the large states might dominate the process of nomination, but the small ones had a large say in the final decision.

All this may have seemed sensible enough, but the time devoted to hammering it out led the Convention to slight a second design issue. This did not involve the failure of a candidate of continental stature to emerge from the Electoral College, but a mathematical oddity arising from the complexities of the emerging design. Since the Founders had given each elector two votes in their desire to overcome localism, it was now mathematically possible for several candidates to turn up on a majority of ballots--indeed, two could end up in a dead heat, with each winning, say, seventy-three votes apiece. How to break this tie?

This question raises issues distinct from those involved when no presidential candidate has gained widespread support. In the no-majority case, the small states might reasonably suppose that the leader in the Electoral College would be a "favorite son" from a large state. After all, these local favorites could fish from a larger pool of electors than notables from small states, and so they would get to the top of a long list of candidates of merely local eminence. Since the small states would not play a major role in nominating candidates, it was reasonable for them to insist on greater importance in the final selection.

APPENDIX - 5

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 5

But the small states had no similar grievance when two candidates tied with the same majority vote total. Under this scenario, both candidates would have won their seventy-three votes by collecting electors from states of all sizes. In contrast to the no-majority case, there was no obvious bias against the small states in the tied-majority case. It follows that the Founders' odd voting rule--under which each state delegation in the House cast a single **\*565** ballot to select a President--was distinctly undermotivated in the tied-majority context. While it might have been sensible to give equal voting power to big Virginia and little Delaware when no candidate gained broad national support, this curious rule made little sense when two broad-based candidacies gained precisely the same number of votes.

Generally speaking, the delegates were quite skilled at identifying fine-grained issues of institutional design. Indeed, they spotted an analogous issue in an earlier debate on presidential selection, but nothing came of it. [36] If they had given themselves adequate time, some sharp-eyed delegate likely would have remarked upon the distinctive character of the tied-majority case. Time was running short, however, when the Brearley proposals came to the floor, and no one focused on the problem in the rush to resolve a host of more contentious issues. [37]

The Founders' lapse can be extenuated if we recall that they were legislating for a world without national political parties. In such a world, centuries might go by without a dead-heat between **\*566** two candidates with the national stature required to win a majority. Did not the Convention have better things to do than create wheels within wheels for dealing with such an unlikely possibility?

Rather than create an entirely new voting system for the tied-majority case, the Convention modified only one feature of its standard House runoff to take it into account. If the odd case did arise, the Constitution provides that only the two candidates locked in the tie would enter the House runoff. When all candidates fell short of a majority, however, the five leading candidates enter the runoff (even if the top two were tied).

Since this rule-within-a-rule is central to our story, the relevant constitutional text deserves careful scrutiny:

> The Person having the greatest Number of Votes shall be the President, if such Number be a Majority of the whole Number of Electors appointed; and if there be more than one who have such Majority, and have an equal Number of Votes, then the House of Representatives shall immediately chuse by Ballot one of them for President; and if no person have a Majority, then from the five highest on the List the said House shall in like Manner chuse the President. [38] Since these rules are rather complex, we explore their operation through a series of mathematical examples. Begin with the case of perfect compliance, where the electoral vote count proceeds without a legal hitch. During both the elections of 1796 and 1800, there were 138 electors casting 256 votes for President. So long as we assume perfect compliance, the operation of the runoff rules is straightforward. The magic number is seventy: "a Majority of the whole Number of Electors appointed." If the two leading candidates tie with seventy votes or more, the text requires a two-man runoff; if they get sixty-nine or less, it requires the two leaders to join in a race involving the top five candidates.

Matters get trickier when there is imperfect compliance, since there are two different ways in which a state may fail to register its electoral preferences. The first scenario arose in 1796 and involved Vermont. The problem--or so it was alleged--was that the state had failed to appoint its four electors in a legally valid fashion. As **\*567** we shall see, this charge was rejected. If the attack on Vermont had been upheld, however, the total number of electors "appointed" by the states would have amounted only to 134, not 138. This reduction, in turn, would have required a change in the "magic number" of electoral votes needed to avoid a five-candidate runoff. With only 134 electors "appointed," the constitutional majority required was no longer seventy, but sixty-eight, votes.

A different result obtains under the second scenario of imperfect compliance, which arose in 1800 and involved Georgia. This time around, nobody alleged that Georgia had failed to make a valid appointment of its four electors. The difficulty arose only at the second stage--the four electors did not cast ballots that satisfied the formal requirements laid down by the Constitution. While this might have resulted in the disqualification of the four Georgia votes, it did not require a recalculation of the "magic number." Since Georgia's electors had undoubtedly been "appointed," the number of electors from the entire Union remained at 138, and candidates required a majority of at least seventy votes to avoid a five-man runoff in the House.

APPENDIX - 6

This point would create a big problem when Jefferson presided over the electoral vote count of 1801. But we are now talking about 1787. As the days grew short in September, nobody at the Convention worried about the outside chance that an incumbent Vice-President, sitting as the President of the Senate, might manipulate an oddball rule to push himself into a House runoff with one rival rather than four. There were many more serious things to think about, as the Framers contemplated the fierce struggle for ratification that lay ahead.

## II. The Vermont Precedent

Washington's presence at the head of the Constitutional Convention assured the delegates that their larger vision of a non-party republic was a living reality. Here was a man who had proved his public spirit through years of selfless service on the battlefield. This demonstration of "public character," not any display of partisan wiles, would predictably win him a unanimous vote for the presidency. [39] Once he had set the nation on the right course, would the **\*568** constitutional machine assist his successors in sustaining his example of nonpartisan statesmanship?

Washington was grimly determined to try. He included both Hamilton and Jefferson in his first Cabinet, and desperately sought to keep these great rivals in harness. But it was not to be. By the end of his first administration, the two party leaders were already locked in highly charged ideological conflict, and by the time Washington left office, the division between Federalists and Republicans had come to dominate the political scene. [40] The ink was hardly dry on the Constitution before its fundamental political premise began to disintegrate. America was becoming a proto-modern two-party democracy, raising entirely unexpected challenges to the Founding design for a republic dominated by non-party notables. [41]

### A. The Rise of Party

Washington's Farewell Address nicely framed the transition to this new order. [42] On the one hand, it was a great act of nonpartisan statesmanship--in refusing a third term in office, Washington established a precedent against the pernicious tendency toward presidencies-for-life. On the other hand, partisan politics provided a backdrop to Washington's grave farewell. He postponed his announcement until September 17, 1796. This put the Republicans at a serious disadvantage in the presidential election campaign, as Jefferson and his supporters were not prepared to contest Washington's decision to continue in office. [43] Nevertheless, the Republicans almost managed to defeat John Adams, Washington's Vice-President and a man devoted to Washington's non-party ideal, who **\*569** was now obliged to make his way in the ascendant world of party politics.

Adams's official position as Vice-President and his past service to the country made him an obvious candidate, but Alexander Hamilton was the true leader of the Federalist Party. Hamilton attempted to manipulate the Founders' ingenious two-vote system to deprive Adams of the presidency without allowing Thomas Jefferson to take the prize. [44] His scheme involved propelling the Federalists' second candidate, Thomas Pinckney of South Carolina, [45] to first place in the Electoral College. If every Federalist elector in the north voted for both Adams and Pinckney, this would allow South Carolina to put its favorite son ahead by voting for Pinckney but not Adams. To achieve this end, Hamilton engaged in some devious maneuvers that created a problem when the time came for the President of the Senate to count the votes.

For Hamilton's scheme to succeed, he needed to convince the northern Federalists to resist the temptations of regional favoritism in their second ballot choices and cast their ballots for Pinckney as well as Adams. Professor Manning Dauer tells the story:

> [Hamilton] attempted to supply the stimulus which would cause the electors to support Pinckney. In the Boston Centinel of December 7, just as the electors were meeting, the following paragraph appeared, under a New York date line of November 26: "We have good authority to believe the election of electors in Vermont is invalid---being grounded on a Resolve of the Legislature, not a law."

> Underneath this there appeared a note by the editor declaring that it was certainly to be hoped that this would not be true. If so, it shows the "necessity of union in the electors." [46] The editor's implicit logic was clear enough. Since the race with the Republicans was going to be close, the loss of Vermont's four votes **\*570** for Adams and Pinckney might mean that the only Federalist who could beat Jefferson was Pinckney, aided by South Carolina's

APPENDIX - 7

favorite-son vote. While South Carolina's desertion of Adams might be regrettable, surely Pinckney was better than Jefferson.

Hamilton's rumor failed to generate its desired effect. [47] Despite the disheartening news from Vermont, only thirteen of Massachusetts's electors voted a straight Adams-Pinckney ticket. [48] The other three voted for Adams but then cast a ballot for regional favorites--as did ten other Federalist electors from northern states. As a consequence, Pinckney lagged far behind Adams in the electoral vote--he received only fifty-nine votes to Adams's seventy-one. This gave the vice-presidency to Jefferson, with sixty-eight votes. Jefferson's running mate, Aaron Burr, was also victimized by favorite-son voting, and gained only thirty votes. [49]

Though Hamilton's stratagem failed to produce northern solidarity for Pinckney, it did succeed in casting a shadow on the vote-counting ritual. If Vermont's four votes were ruled invalid, Adams would lose the presidency to Jefferson by a single vote, sixty-eight to sixty-seven. [50] With remarkable speed, the Framers' technical  *571  blunders were coming home to roost. It was a serious enough mistake to allow the sitting Vice-President to preside over his own election returns in the gentlemanly world of non-party notables. But this error was compounded once the vice-presidency had become swept up in the overheated context of a new and unfamiliar form of party competition. How would the system respond to the challenge?

### B. Rumors and Restraint

The four Vermont electors for President and Vice-President cast their ballots on December 7, 1796 [51] --two full months before John Adams was scheduled to preside over the vote count on February 8, 1797. As word of the Vermont votes trickled out of Montpelier to the larger world, newspapers and politicians throughout the country attacked their validity. [52] The New York Minerva & Mercantile Evening Advertiser began the controversy on November 26:

> *572  We have good authority to believe the election of Electors in Vermont is invalid--being grounded only on a Resolve of the Legislature, not a law. This is supposed to have been known to the 'Patriots,' of that State at the time. It being now too late to correct the mistake, it has leaked out in whispers. [53] Newspaper attacks on the Vermont vote continued through December. [54]

 *573  These reports contained three charges. The first denied that Vermont had enacted a valid law authorizing the procedure by which it had selected its electors. Though it was broadly recognized that Vermont had passed such a law in 1791, "We understand that the law alluded to made provision only for the election in 1792, and of course then expired." [55] The second claimed that Vermont's appointments were invalid because they were made through a "resolve" rather than a formal legislative enactment. [56] The third argued that Vermont had violated a 1792 federal statute requiring the states to appoint their electors within a period of "thirty-four days preceding the first Wednesday in December." [57]

 *574  None of these charges had legal merit. We have personally examined the Vermont archives [58] and we have determined that the 1791 statute regulating presidential electors was not a temporary measure for 1792 but a standing procedure for the indefinite future. Under its terms, Vermont's electors would be selected by a majority of the members of a "Grand Committee" consisting of "the Governor and Council and House of Representatives." [59] There  *575  is abundant evidence indicating that this procedure was followed in 1796. [60]

The distinctive character of the Vermont procedure also refutes the complaint that the electors were selected through a "resolve" rather than ordinary legislation. Since Vermont's Governor cast a ballot for the electors along with members of his council and the Vermont House of Assembly, the "Grand Committee" was not an ordinary legislative body capable of enacting statutes. The Grand Committee chose electors by means of a "resolve" because it was specifically delegated this authority by the validly enacted 1791 statute. And finally, it simply is not true that Vermont had violated the federal statute by selecting its electors

APPENDIX - 8

before the beginning of the prescribed thirty-four day period. The records reveal that the Grand Committee made its choices on November 4, 1796, thirty-three days before "the first Wednesday in December." [61]

This was not enough, however, to make the charges unimportant. The newspaper accounts were sufficient to generate a cloud of suspicion. If the Republicans had chosen to press the issue, it **\*576** would have been difficult for Adams or anybody else to respond decisively at the time of the vote count. Consider especially the first of the three complaints--that the original Vermont protocol was a one-shot regulation designed specifically for the 1792 election, without legal force for 1796. The only way to learn the truth would have been to send a messenger to Vermont to inspect all the legislative records, but a round-trip journey to Montpelier would have taken weeks. [62] All sorts of mischief might have been attempted in the meantime.

If the Republicans had raised a formal objection, therefore, Adams would have confronted a very real political problem--but not an irresolvable one. He could have responded by rejecting the Republicans' complaint on the basis of a legal presumption. After all, there was nothing formally defective on the face of Vermont's electoral documents. [63] And so the President of the Senate might announce that the state's papers were entitled to a presumption of legal regularity that could not be rebutted without a compelling showing of an underlying substantive problem. This might seem plausible, but the credibility of such a ruling would have been undercut by Adams's self-interest in the affair. Whatever he might say, and however justifiable, his ruling would have eliminated further inquiry into votes that provided his crucial margin of victory.

This would have been a particularly awkward moment for such a ruling because 1796 marked the first contested presidential election in the nation's history. There were warring political parties. If Adams counted himself into the presidency, the Constitution would be off to a very bad start, even if the country accepted the legitimacy of the outcome.

Only the self-restraint of the Republican leadership permitted the Constitution to avoid this early test of credibility. Rather than demagogue the issue, Jefferson self-consciously retired it from public view. The Vermont controversy simmered in the newspapers **\*577** throughout December, [64] and uncertainty about the Vermont vote was reflected in the ongoing informal tallies of the electoral vote. Since Jefferson was at Monticello throughout this period, [65] Madison was functioning as the operational leader in Philadelphia and regularly wrote to his chief for marching orders. His letter of Christmas Day 1796 begins with the caveat: "I can not yet entirely remove the uncertainty in which my last [letter] left the election. Unless the Vermont election of which little has of late been said, should contain some fatal vice, in it, Mr. Adams may be considered as the President elect." [66] Jefferson replied on January 16, 1797:

> I observe doubts are still expressed as to the validity of the Vermont election. Surely in so great a case, substance & not form should prevail. I cannot suppose that the Vermont constitution has been strict in requiring particular forms of expressing the legislative will. As far as my disclaimer may have any effect, I pray you to declare it on every occasion foreseen or not foreseen by me, in favor of the choice of the people substantially expressed, and to prevent the phaenomenon of a Pseudo-president at so early a day. [67] Jefferson's words were decisive: The Vermont controversy dropped from public view during the run-up to the formal vote count on February 8, with Republican newspapers conceding the victory to Adams. [68]

**\*578** Jefferson's decision adds some useful complexity to our larger story. We have stressed how the Framers' failure to anticipate the two-party system threatened to throw the constitutional system into a severe crisis. But Jefferson's letter suggests that the survival of classical republican ideals-- condemning faction, praising civic unity--tempered the very crisis that the Framers had failed to anticipate. Both Adams and Jefferson were hardly political innocents, and they were perfectly prepared to compete for power in the new partisan environment. Nevertheless, they remained powerfully attracted to the animating spirit of the Founding. When push came to shove, they sometimes--not always--managed to put these principles into practice in ways that softened the party assault on the non-party Constitution of 1787.

Jefferson's January 16 letter was one such instance. [69] There can be no doubt that he was right: The country could ill afford "the phaenomenon of a Pseudo-president at so early a day." [70]

APPENDIX - 9

**\*579**  We will return to this theme in discussing the main subject of this essay: Jefferson's use of his power as Senate President to give himself a significant advantage in the Electoral College crisis of 1801. Before turning to this forgotten story, there is an additional lesson to be learned from our prelude.


### C. Vote-Counting Day in Philadelphia

Without a doubt, most of the suspense had disappeared, but there was still a potential for intrigue on February 8, 1797, the day the votes were counted to pick the second President of the United States. Newspapers had ceased printing stories about the Vermont votes, but Adams and his supporters could not know for sure whether the Republicans were planning some last minute tricks. The stakes were enormous. If the Vermont electors had not been validly appointed, Adams would lose the state's four votes and Jefferson would become President by a margin of sixty-eight to sixty-seven. [71]


The constitutional mathematics raised a strategic question for Adams: Would he provide his political enemies an explicit procedural opportunity to raise the Vermont matter and its potentially devastating consequences? Or would he make it as hard as possible for the Republicans to mount a challenge?

The Annals of Congress describes the proceedings:

> The President of the Senate [John Adams] then thus addressed the two Houses:


> Gentlemen of the Senate, and of the House of Representatives:

> By the report which has been made to me by the tellers appointed by the two Houses to examine the votes, there are 71 votes for John Adams, 68 for Thomas Jefferson, 59 for Thomas Pinckney, 30 for Aaron Burr, 15 for Samuel Adams, 11 for Oliver Ellsworth, 7 for George Clinton, 5 for John Jay, 3 for James Iredell, 2 for George Washington, 2 for John Henry, 2 for Samuel **\*580**  Johnston, and 1 for Charles C. Pinckney. The whole number of votes are 138; 70 votes, therefore, make a majority; so that the person who has 71 votes, which is the highest number, is elected President, and the person who has 68 votes, which is the next highest number, is elected Vice President.

The President of the Senate then sat down for a moment, and rising again, thus addressed the two Houses:

> In obedience to the Constitution and Law of the United States, and to the commands of both Houses of Congress, expressed in their resolution passed in the present session, I declare that

> John Adams is elected President of the United States, for four years, to commence with the fourth day of March next; and that Thomas Jefferson is elected Vice President of the United States, for four years, to commence with the fourth day of March next. [72]

"The President of the Senate then sat down for a moment." Four years earlier, Vice-President Adams had also presided over the vote count, but the Annals of Congress contains no similar notation. [73]  Indeed, no such pause is noted in any of the first fourteen presidential vote counts. It would seem, then, that Adams's action  **\*581**  was deliberate. Only one previous scholar has explicitly noted this incident: "Mr. Adams himself could certainly not raise the question of the validity of the Vermont votes; but he seems to have given an opportunity for objections if anyone should see fit to raise them." [74]

A deflationary interpretation is available--perhaps Adams was only marking a transition between two phases of the proceeding, symbolizing that the vote count had concluded and the time had come for a final and authoritative declaration of the result. Yet this seems unlikely. Adams was no fool: By sitting down, he was putting himself at the mercy of the Republican opposition in a close election. [75]  He would not have paused unless he harbored some doubts about his authority as President of the Senate to resolve disputed issues unilaterally.

Thomas Jefferson would take a different view four years later.

APPENDIX - 10

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

### III. The Election of 1800

When John Adams opened the documents from Vermont in 1797, they were in perfect order. Thomas Jefferson faced a different situation when he opened Georgia's electoral votes in 1801: The certificate was illegal on its face. We begin by setting the problem in a larger context before focusing on Jefferson's response.

### *582 A. The Run-Up

Washington's delay in announcing his Farewell Address constrained the ferocity of party competition in 1796. With the Great Man departing the scene at the end of September, the two sides had little time to escalate their struggle to fever pitch. Four years later, partisan battle reached one of its historic highs. [76]

For both parties, the very future of the republic was at stake. For the Federalists, the Republicans were vicious factionalists who sought revolutionary upheaval along Jacobin lines. [77] For the Republicans, the Federalists were cryptomonarchists, aping English models at home and damaging the republican cause abroad. [78] Both sides reacted with extreme measures that testified to their high anxiety. Republican politicians in Kentucky and Virginia issued resolutions calling for extraordinary state actions to check the abuse of Federalist power, while Federalist judges threw Republican newspaper editors into jail for seditious libel. [79]

As the moment of electoral truth neared, the written Constitution failed to discharge its most basic function. Whatever else it may or may not accomplish, a written constitution is supposed to provide everyone with undisputable rules of the game--telling *583 them what they must do to win elections, and how to determine who has lost. When judged by this key criterion, the Philadelphia Convention was a miserable failure.

The rise of two-party competition had transformed the Framers' clever effort at institutional engineering into a constitutional nightmare. Failing to anticipate the rise of national parties, the Convention had focused on a different set of problems when designing its system of presidential selection. In the Framers' estimation, their big problem was state provincialism, and so they had developed their complex two-vote scheme to mitigate its effects. Despite the impact of political parties on the election of 1796, the system managed to operate more or less as the Framers envisioned. With second votes scattering on behalf of regional favorites, the number-two spot went to Thomas Jefferson, leader of the Republican party but also a "continental character" of the sort they wanted to guide the nation.

As the 1800 race intensified, though, the electoral system became the object of intense partisan manipulation. On the state level, parties used their political power to manipulate the process of selecting electors--shifting to legislative selection, or changing the mode of popular choice, depending on their perception of partisan advantage. [80] The Federalists attempted the same maneuver on the national level, where they were in firm control of the presidency and both houses of Congress. Under the leadership of Federalist Senator James Ross, the Senate passed a bill establishing a special committee to "inquire, examine, decide, and report upon" irregularities that might occur in connection with the electoral vote. [81] This "Grand Committee" was to include six senators, six representatives, and the Chief Justice of the United States. [82] It was *584 to meet in secret [83] and its report would serve as the "final and conclusive determination of the admissibility or inadmissibility of the votes given by the electors for President and Vice-President of the United States." [84]

Passed on a party-line vote of sixteen to twelve in March 1800, the bill would have become law but for Congressman John Marshall's intervention in the House. Speaking before a House select committee, [85] Marshall raised constitutional objections to the proposed bill. [86] His amendments stripped the Committee of its authoritative status, giving the last word to both houses of Congress, meeting separately. The Committee's rejection of a state's electoral vote would be upheld only if a majority of both houses accepted its recommendation. [87] Marshall's success in weakening the proposal angered the more extreme Federalists. His measure passed the House but was rejected on another party-line vote in the Senate--with hard-line Federalists insisting that a Committee rejection be upheld if only one house supported its recommendation. [88] This demand led to an impasse, and the Ross initiative came to nothing, leaving the President of the Senate and Congress to confront the painfully inadequate constitutional text if a vote-counting problem should arise. [89]

APPENDIX - 11

**\*585**  This ticking time-bomb was momentarily forgotten once the electoral returns started rolling in. In contrast to 1796, electors had sworn off the practice of substituting a favorite son for their party's vice-presidential candidate. With four years of battle under their belts, every elector voted a straight party-line ticket, with one exception. The Federalists wasted one of their second ballots on John Jay, giving John Adams a one-vote edge over his running mate Charles Cotesworth Pinckney, and neatly avoiding a House runoff if they won a majority.

The Republicans were less astute. All of their electors voted a straight ticket, giving Jefferson and Burr an equal number of votes and throwing the race into the House. "[A]fter the most energetic efforts, crowned with success, we remain in the hands of our enemies by want of foresight in the original arrangement" [90] --so wrote Jefferson to Monroe on December 20.

Almost two months remained before the day designated for the formal vote count, Wednesday, February 11, 1801. [91]  This was a period of feverish activity, as Republicans and Federalists prepared their forces for the looming House runoff between Jefferson and Burr. If the protagonists had been aware of a problem with Georgia's electoral votes, they would have engaged in a related round of strategic maneuvering. Without Georgia's four electors, Jefferson and Burr could only claim sixty-nine valid votes apiece. As we have explained, [92]  this would have forced them into a five-man runoff that included Adams, Pinckney, and Jay. [93]  The possibility of a five-man race should have provoked an intense round of politicking--and yet we have found absolutely no documentary evidence of any such activity. In contrast, there is voluminous evidence detailing efforts by Federalist and Republican politicians to gain support from  **\*586**  House members in the two-man race between Jefferson and Burr they believed was in the offing. [94]  The silence about the five-man possibility is deafening--no one seems to have anticipated the constitutional pitfalls awaiting Jefferson when he opened the ballots on February 11.

Our conclusion is bolstered by Jefferson's confident treatment of an administrative matter. To ensure that all the electoral votes arrived in Washington in time, the governing statutes authorized the Secretary of State, then John Marshall, to "send a special messenger" if any state's electoral certificates had not arrived by the "first Wednesday in January." [95]

The states were sending envelopes containing their ballots to Jefferson, in his capacity as President of the Senate. [96]  On December 28, he wrote Marshall that no special messengers would be required. [97]  Jefferson's confidence was perfectly understandable--as we will see, the outside of the envelope from Georgia bears no indication of the constitutional problems contained within. [98]  Moreover, it was perfectly understandable that Jefferson would go no further than the surface of the envelope, as the Constitution explicitly required him to "open all the Certificates" in full view of the House and Senate, [99] and he would have raised suspicions about ballot-tampering had he taken a peek beforehand.

The emerging situation was the mirror image of the Vermont scenario of 1797. The complaints about Vermont were raised in the newspapers long before Adams opened the envelopes. [100]  This gave the sitting Vice-President an opportunity to consider in advance how to conduct himself at the moment of truth. The potential legal  **\*587**  difficulty was made easier by the fact that the Vermont ballot was formally perfect. [101]  And strategically, the stakes had been lowered dramatically when, thanks to Jefferson's behind-the-scenes intervention, the Republicans were no longer publicly complaining about the legality of the Vermont votes. When Adams provided his political enemies with a formal opportunity to protest at the vote-counting ritual, he could be quite confident that his enemies would not exploit the situation, and if they did, that he could legally justify a decision to place the Vermont votes in his column.

Things were different in 1801. When the obvious defect in Georgia's ballot became evident on February 11, everybody would be in for a surprise, and high-stakes decisions would be required in a matter of minutes. Worse yet, the written Constitution served only to exacerbate the explosive situation. Rather than providing clear rules for resolving electoral vote problems, it explicitly handed the gavel to the worst possible presiding officer--the man with the most to gain by including Georgia's defective ballot-- and failed to provide him with any rules to govern the tough cases.

**B. Jefferson's Problem**

APPENDIX - 12

Whatever its other obscurities, Article II of the Constitution contains some plain instructions for each state's electors: "And they shall make a List of all the Persons voted for, and of the Number of Votes for each; which List they shall sign and certify, and transmit sealed to the Seat of the Government of the United States, directed to the President of the Senate." [102] Call this the electoral vote, and it is the document that created legal problems for Georgia in 1800.

A few statutory requirements are also relevant. George Washington's first election preceded the first session of Congress, but in 1792 Congress enacted a framework law for future contests. The statute instructs the "executive authority of each state" to create a second document that certifies the names of the electors who have been selected by the state. [103] Call this the certificate of ascertainment. The statute instructs the electors to enclose this certificate **588** with their electoral vote. [104] Once they have placed both documents in an envelope for delivery to the President of the Senate, they must also "certify[]" on the envelope "that a list of the votes of such state for President and Vice President is contained therein." [105]

The Georgia electors fulfilled both of these statutory requirements in 1801, but their electoral vote--the key document required by the Constitution-- dramatically fails to comply with the requirements of Article II and the norms established by the uniform practice of the states in every early election. [106] In 1796, for example, this is what Georgia's vote looked like: [107]


**\*589  Figure 1**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
As the Constitution prescribes, the upper half of the document contains "a List of all the Persons voted for, and of the Number of Votes for each." [108] The bottom half complies with the second part of the constitutional command: "which List they shall sign and certify." [109] Georgia's 1796 submission also contains a certificate of ascertainment **\*590** from the Governor certifying the four electors whose signatures appear on the electoral vote. [110]

In contrast, Georgia's envelope of 1800 contains a single sheet of paper, not the two provided by every other state. On one side of the sheet, there is a legally perfect certificate of ascertainment, signed by Governor James Jackson, identifying the state's four electors in the standard fashion. There is, however, no physically distinct electoral vote. The only indication of the electors' preferences appears on the obverse side of the certificate of ascertainment. This is what it looks like:


**\*591  Figure 2**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
**\*592**  To what extent does this primitive document satisfy the constitutional requirements? If we restrict ourselves to the four corners of the document, the answer is: not at all. To be sure, there is a "list" of four names under the headings "Jefferson" and "Burr," but there is no statement certifying that the four individuals were casting the state's electoral votes for these two candidates.

To clarify the formal deficiencies, simply measure the Georgia "vote" against the terms of the constitutional text. The Georgia document indeed contains a "List," [111] but it does not say that it represents a list of "the Persons voted for." [112] The four names appearing below "Jefferson" and "Burr" are those of the individuals certified by Governor Jackson, but the electors themselves have not "sign[ed] and certif[ied]" that the list actually represents a true statement of their preferences. [113]

These constitutional requirements are purely technical, but they are not trivial. To the contrary, when read as part of the grander constitutional scheme, they seem quite important. Immediately after the Constitution imposes elaborate formalisms on each state's electoral vote, it proceeds to a provision that should, by now, be familiar: "The President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted." [114]

Given the opacity of this provision, formalism might be just the thing needed to ensure its smooth operation. Since the text does not explicitly contemplate complex disputes over the validity of electoral votes, perhaps the best way to make it operational is to impose a crisp rule on the President of the Senate. When opening each ballot, he should assure himself that the voting

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.     13

papers comply  **\*593**  with the formal constitutional and statutory requirements. If they do, the vote "shall then be counted;" [115] if not, it should not. Any other approach threatens to involve the President of the Senate in an uncertain proceeding in which he might be an interested party. The formalist's premise of a smoothly functioning machine, moreover, was regularly fulfilled during the early years of the republic: Each state in every prior election had submitted technically perfect electoral votes and certificates of ascertainment. [116]

Yet formalism has the vices of its virtues: The disqualification of an entire state is a very serious matter. In 1800, Georgia was a frontier region without great legal sophistication. [117] If the Georgians had merely made a technical error in expressing their choice of Jefferson and Burr, would it not be wrong to disqualify them? Worse yet, the blunder had decisive national ramifications, transforming a two-man House runoff into a five-man race. Why should the nation's fate hinge on some backwoods blunder?

But was the mistake merely technical?

Viewing the matter from Washington, D.C., it would have been hard to know for sure. First of all, no other frontier state had ever made such a legal mistake. Tennessee, for example, had a much shorter history of organized government than did Georgia, but it had had no trouble complying with the explicit commands of the Constitution and the 1792 Act. Here is Tennessee's 1800 ballot: [118]

### \*594  Figure 3

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

 **\*595**  Not only did Georgia's ballot stick out like a sore thumb, but there was something particularly suspicious about it: Its electoral vote had been plastered on the backside of the certificate of ascertainment. This anomaly raises the disturbing possibility of a classic "bait and switch" operation. Under this scenario, Georgia's four electors actually did what everybody else did: They prepared a proper ballot, put it into the envelope with the certificate of ascertainment, and then signed the outside of the envelope. [119] At this point, some devious character enters the scene, removes the standard ballot, and casts four defective votes for Jefferson and Burr on the backside of the remaining certificate. He then seals the envelope and sends it on its merry way.

The missing electoral document was not only suspicious in itself. The "bait and switch" scenario put the legal deficiencies of the ersatz ballot in a new and disturbing light. Criminals do not spend much time reading the Constitution. If a fraudster had removed the genuine ballot prepared by the true electors, it is not surprising that he created a legal mess when writing up his counterfeit. On this scenario, Georgia's legal mess was the result of a fraudster's elimination of the genuine item originally prepared by the true electors.

Worse yet, Georgia was already notorious for shady dealing. In the Yazoo scandals, the state's leading politicians had sold vast tracts of public land at ridiculously low prices: "[O]nly one of the legislators voting for [the Yazoo act] had not been bribed in some way by the land companies." [120] To be sure, Georgia's voters had recently  **\*596**  swept the corrupt politicos out of office, [121] but could Jefferson, sitting from a great distance in Washington, D.C., be confident that their replacements were not playing similar games?

So much for the dark side. There were other bits of concrete evidence that pointed in a more reassuring direction. Pursuant to statutory instructions, Georgia's four electors had "certif[ied]" on their envelope to the President of the Senate "that a list of the votes . . . for President and Vice President [was] contained therein." [122] As Figure 4 suggests, these four signatures match quite well with their name-sakes on the defective ballot illustrated in Figure 2:

### \*597  Figure 4

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

The history of mankind is littered with clever forgeries, and even today, handwriting analysis is more art than science. Nevertheless, if Jefferson were to compare the ballot with the envelope, he would not detect evidence of an obvious forgery.

APPENDIX - 14

So perhaps the  **\*598**  unconstitutional Georgia ballot was indeed the result of mere legal incompetence rather than gross skullduggery.

This benign interpretation is supported by a final consideration. All through January, newspapers were reporting regularly that Jefferson and Burr had won all four of Georgia's electoral votes. [123]  Given the broad publicity, surely the Federalists would have launched a vocal protest if they thought they had really won. The election of 1800 was one of the closest, and most partisan, in American history. If any of the Georgia electors had actually voted  **\*599**  for Adams or Pinckney, common sense suggests that they never would have remained silent as they saw their votes publicly misrepresented. Once the Georgia envelope was opened, clever lawyers might debate endlessly about the possibility of a "bait and switch" operation, yet for the sober statesman, the public silence in the period leading up to February 11 might seem more eloquent than anything lawyers might say afterward.

This final point seems the most powerful argument supporting a decision to credit Jefferson and Burr with Georgia's four electoral votes in 1801. But is it sufficiently powerful to outweigh all the arguments on the other side?

This was the key question facing Jefferson as he confronted his constitutional responsibilities as Senate President. How did he respond?

### C. Jefferson's Decision

A glance at the official report of the vote count in the Annals of Congress is not the slightest bit revealing:

> Mr. Speaker, attended by the House, then went into the Senate Chamber, and took seats therein, when both Houses being assembled, Mr. Rutledge and Mr. Nicholas, the tellers on the part of this House, together with Mr. Wells, the teller on the part of the Senate, took seats at a table provided for them, in the front of the President of the Senate.

The President of the Senate, in the presence of both Houses, proceeded to open the certificates of the Electors of the several States, beginning with the State of New Hampshire; and as the votes were read, the tellers on the part of each house, counted and took lists of the same, which, being compared, were delivered to the President of the Senate, and are as follows:

| STATES. | Thomas Jefferson. | Aaron Burr. | John Adams. | Charles C. Pinckney. | John Jay. |
|---|---|---|---|---|---|
| New Hampshire- - - | - | - | 6 | 6 | |
| Massachusetts- - - | - | - | 16 | 16 | |
| Rhode Island - - - | - | - | 4 | 3 | 1 |
| Connecticut - - - | - | - | 9 | 9 | |
| Vermont - - - | - | - | 4 | 4 | |
| New York - - - | 12 | 12 | | | |
| New Jersey - - - | - | - | 7 | 7 | |
| Pennsylvania- - - | 8 | 8 | 7 | 7 | |
| Delaware - - - | - | - | 3 | 3 | |
| Maryland - - - | 5 | 5 | 5 | 5 | |
| Virginia- - - | 21 | 21 | | | |
| Kentucky- - - | 4 | 4 | | | |
| North Carolina- - - | 8 | 8 | 4 | 4 | |
| Tennessee - - - | 3 | 3 | | | |
| South Carolina- - - | 8 | 8 | | | |
| Georgia- - - | 4 | 4 | | | |
| | 73 | 73 | 65 | 64 | 1 |

**\*600**  Recapitulation of the votes of the Electors.

APPENDIX - 15

| | | | | | |
|---|---|---|---|---|---|
| Thomas Jefferson | | - | - | - | -73 |
| Aaron Burr- | | - | - | - | -73 |
| John Adams- | | - | - | - | -65 |
| Charles Cotesworth Pinckney | | | | - | -64 |
| John Jay- | | - | - | - | - 1 |

The President of the Senate, in pursuance of the duty enjoined upon him, announced the state of the votes to both Houses, and declared that Thomas Jefferson, of Virginia, and Aaron Burr, of New York, having the greatest number, and a majority of the votes of all the Electors appointed, and, being **\*601** equal, it remained for the House of Representatives to determine the choice.

The two Houses then separated; and the House of Representatives, being returned to their Chamber, proceeded, in the manner prescribed by the Constitution, to the choice of a President of the United States . . . . [124]

There is no indication of a problem with the Georgia ballot. In contrast to John Adams in 1797, Jefferson does not sit down after the vote count to give others a chance to raise an objection. [125] He immediately pushes the proceedings to the next stage: a House runoff between Burr and himself for the presidency. So far as the Annals and all of the other official versions are concerned, there was no problem with the Georgia vote.

The newspapers tell a different story. Here is the account from the Philadelphia Aurora & General Advertiser: "The Tellers declared there was some informality in the votes of Georgia, but believing them to be the true votes, reported them as such." [126] The Aurora was the leading Republican paper of the time, noteworthy for its partisanship in a partisan age. [127] Since its story cast a shadow (however slight) on Jefferson's claim to an Electoral College majority, it certainly would not have fabricated the incident out of whole cloth.

The Aurora's report was copied verbatim in Boston, New York, Philadelphia, and even Savannah, by newspapers of every political leaning. [128] At least one other paper--Boston's Mercury and New- **\*602** England Palladium--published a story that varied the language slightly: "The votes from Georgia, were rather informal--but accepted." [129] To further enhance verisimilitude, all the newspapers put a precise time on their report: "half past 3 o'clock, p.m." [130]

No newspaper explicitly described Jefferson's role in the affair. Those following the Aurora flashed a searchlight on the "tellers." It was these gentlemen, two from the House and one from the Senate, who "declared [that] there was some informality . . . but believing them to be the true votes, reported them as such." [131]

As a constitutional matter, however, the tellers lacked the authority to make a binding decision. Article II does not mention their existence, let alone vest them with any decisionmaking authority. [132] Moreover, the official proceedings did not give the last word to the tellers, but to Jefferson:

The President of the Senate, in pursuance of the duty enjoined upon him, announced the state of the votes to both Houses, and declared that Thomas Jefferson, of Virginia, and Aaron Burr, of New York, having the greatest number, and a majority of the votes of all the Electors appointed, and, being equal, it remained for the House of Representatives to determine the choice. [133] **\*603** We are now in a position to present a stripped-down version of our story:

Strong evidence demonstrates that the tellers told Jefferson (apparently loud enough for the news to get out to the public [134]) that there was a problem with the Georgia vote. Our inspection of the original documents tells us that they were right. Nevertheless, Jefferson asserted his authority, as President of the Senate, to proceed in the face of this report. He decisively resolved the issue

APPENDIX - 16

by counting Georgia's vote as part of the final tally, even though he was an interested party in the affair. Despite the extraordinary character of this action, nobody rose to protest. [135]

If we limit ourselves to strictly contemporaneous sources, this is all we are entitled to say--more than enough, as we shall see, to raise a host of historiographic and constitutional issues. Before broadening the inquiry, we trace the remarkable fate of this incident in American history. After all, it is no small thing to learn that Thomas Jefferson counted his rivals out of the race in the House runoff for the presidency. This remarkable fact, however, has somehow eluded the devoted attentions of generations of Jefferson lovers and Jefferson haters. [136] And it would have eluded our attention **\*604** as well, except for the serendipitous discovery of a remarkable book by Matthew Livingston Davis. [137] Written in 1836, Davis's two-volume Memoirs of Aaron Burr contains a graphic description of the scene:

> On the 11th of February the ballots were opened. During the performance of this ceremony a most extraordinary incident occurred. As it is known to but few now living, and never been publicly spoken of, it has been deemed proper to record it here, as a part of the history of that exciting contest.

> The Aurora of the 16th of February, 1801, remarks, that "the tellers declared that there was some informality in the votes of Georgia; but, believing them to be true votes, reported them as such." No explanation of the nature of this informality was given; nor is it known that any has ever been given since.

> . . . .

> . . . Mr. Jefferson was the presiding officer. On opening the package [of] endorsed Georgia votes, it was discovered to be totally irregular. The statement now about to be given is derived from an honourable gentleman, a member of Congress from the state of New-York during the administration of Mr. Jefferson, and yet living in this state. He says that Mr. Wells (a teller on the part of the Senate) informed him that the envelope was blank; **\*605** that the return of the votes was not authenticated by the signatures of the electors, or any of them, either on the outside or the inside of the envelope, or in any other manner; that it merely stated in the inside that the votes of Georgia were, for Thomas Jefferson four, and for Aaron Burr four, without the signature of any person whatsoever. Mr. Wells added, that he was very undecided as to the proper course to be pursued by the tellers. It was, however, suggested by one of them that the paper should be handed to the presiding officer, without any statement from the tellers except that the return was informal; that he consented to this arrangement under the firm conviction that Mr. Jefferson would announce the nature of the informality from the chair; but, to his utmost surprise, he (Mr. Jefferson) rapidly declared that the votes of Georgia were four for Thomas Jefferson and four for Aaron Burr, without noticing their informality, and in a hurried manner put them aside, and then broke the seals and handed to the tellers the package from the next state. Mr. Wells observed, that as soon as Mr. Jefferson looked at the paper purporting to contain a statement of the electoral vote of the state of Georgia, his countenance changed, but that the decision and promptitude with which he acted on that occasion convinced him of that which he (a federalist) and his party had always doubted, that is to say, Mr. Jefferson's decision of character, at least when his own interest was at hazard. [138] How much weight should be given to this astonishing account?

On its face, it is double hearsay. Davis heard the account from an anonymous New York Congressman who had heard it from Wells. There were three tellers at the proceedings: Federalist William Wells from the Senate, Federalist John Rutledge, and Republican John Nicholas from the House. Our search of the principal archives containing Davis's papers, and those of the tellers, has failed to uncover further corroboration. [139] Worse yet, Davis was a **\*606** long-time Burr loyalist and an active and life-long Jefferson-hater. [140] During his moderately successful career in New York politics, he certainly did not have a standout reputation for integrity. [141] When publishing a posthumous selection of Burr's papers, he aimed to put his hero in the best light, sometimes destroying or altering originals for this greater good. [142]

APPENDIX - 17

Nevertheless, Davis is sometimes careful in his treatment of sources. While he excludes Burr's love letters from his book, he is scrupulous enough to announce the omission in his Preface [143] --a **\*607** punctilio that other editors of the era would have considered unnecessary. A similar candor marks his report of the vote-counting episode of 1801. He does not puff up the truth value of his account, but clearly states that it is double hearsay, leaving it up to the reader to assess its ultimate validity. [144] What is more, Davis did not create the story out of whole cloth. The Aurora does say what he says it says [145] and, most crucially, our inspection of the original documents in the National Archives confirms the key fact that the Georgia ballot was legally defective, and blatantly so.

Davis goes beyond our contemporaneous sources in one important particular. While the newspapers focus on the tellers' public announcement of Georgia's deficiency, Davis highlights Jefferson's aggressive action to preempt further consideration of the matter. Should we believe Davis on this point?

Perhaps the final answer is tucked away in some forgotten archive. Until some lucky researcher hits pay-dirt, it certainly will elude us. Moreover, Davis's hearsay report does contain errors on other matters. While Federalist Senator William Wells was indeed the teller designated by the Senate, he did not discover that "the envelope was blank; that the return of the votes was not authenticated by the signatures of the electors, or any of them, either on the outside or the inside of the envelope, or in any other manner." [146] As Figure 2 demonstrates, the electors did sign their names, as required by statute, on the outside of the envelope. [147] Davis is also incorrect in asserting that the Georgia ballot "merely stated in the inside that the votes of Georgia were, for Thomas Jefferson four, and **\*608** for Aaron Burr four, without the signature of any person whatsoever." [148] As we have seen, the paper does contain signatures, but the signatories do not specify that they are casting an electoral ballot, much less certify their ballot by the standard method.

It is easy to make too much of such discrepancies, which often afflict hearsay reports as they proceed from one speaker to the next. As Senator Wells's report moved to an anonymous Congressman and then to Davis, some noise entered the signal, but not to the point of overwhelming the basic story: Georgia's ballot was obviously defective. And if this much of the message came through, one should hesitate before dismissing the further report of Jefferson's explicit ruling.

After all, the Constitution delegated to Jefferson, and only Jefferson, an affirmative role in the vote-counting ritual. [149] While it is debatable whether the text gave him the authority to make a decisive ruling, it is abundantly clear that the tellers had absolutely no authority to resolve the matter, and it was perfectly logical for them to relieve themselves of the decisional burden by handing the ballot to Jefferson. Once they had done so, no responsible presiding officer would have proceeded without examining the suspect ballot papers. Davis's report, while melodramatic, comports with the common sense of the situation. [150]

**\*609** What is more, we have uncovered another evidentiary source testifying to Jefferson's involvement. Apparently, his decisive action was memorable enough to survive as an oral tradition in Congress as late as 1876, when Senator Hannibal Hamlin recalled the event:

> [T]here was no certificate accompanying the return that the Electors met and balloted. It had nothing on its face to show that the votes were given for anybody. Clearly it did not conform to the Constitution, but it was counted as shown by the record.

> There was a tradition that the tellers handed it back to Mr. Jefferson, who returned it to them, and decided that it must be counted. [151]

In contrast to Davis, Hamlin reports the details surrounding Georgia's ballot with perfect accuracy. Despite the passage of seventy-five years, he says-- correctly--that the Georgia envelope contained a certificate of ascertainment, but that the ballot "had nothing on its face to show that the votes were given for anybody." [152] His invocation of "tradition" seems to go back to a source that is independent of Davis.

APPENDIX - 18

Of course, these two post-1801 sources contribute their confirming testimony thirty-five and seventy-five years after the fact. Nevertheless, **\*610** modern historians have entirely failed to take it into account, allowing the entire episode to fall out of sight and mind for more than a hundred years. [153]

Our story is constructed out of three categories of material. Official documents demonstrate the illegality of the Georgia ballot, and that counting them was necessary in pushing the electoral vote totals for Jefferson and Burr beyond the crucial threshold of seventy votes. They also reveal that Jefferson, "in pursuance of the duty enjoined upon him" as President of the Senate, [154] expressly found that he and Burr had gained "a majority of the votes of all the Electors appointed." [155] Only on this basis did he send the matter to "the House of Representatives to determine the choice" [156] for President in a runoff limited to two, rather than five, candidates. Contemporaneous newspaper reports establish that Jefferson did not make his decision inadvertently, but that the tellers clearly and publicly announced the defect in the Georgia vote. Subsequent hearsay accounts confirm that Jefferson made a focused and self-conscious decision about the Georgia ballot, and resolved the question in a manner that dramatized the intrinsic weakness of the Founding design.

But enough detective work. The next Part considers the larger constitutional significance of the Georgia episode. We examine this question on two fronts: first putting Jefferson's decision in its concrete historical context, and then considering its enduring implications as a precedent for future Electoral College disputes.

## IV. Jefferson in Context

So the Founders made some serious mistakes, as did Thomas Jefferson. Constitutional muckraking isn't much the fashion in these hagiographic times, but it is tough to ignore some embarrassing questions: Surely the Framers should have been clever enough to note the danger of appointing the fox to superintend the chicken coop? Surely Jefferson should have been more up-front about excluding **\*611** his Federalist rivals from the House runoff on the basis of a transparently defective ballot?

And yet, there is another side to our story. Placed in a greater historical context, Jefferson's decision may come to seem something more than a sorry tale of shabby self-dealing. Difficult though it may be to believe, Jefferson may have chosen the most statesmanlike way out of an impossible situation.

There are even extenuating circumstances surrounding the initial blunder by the Founders: It was stupid to place the President of the Senate in the chair, but the outcome in 1801 might well have been worse had the Founders made a different institutional choice in 1787. Or so we shall argue.

### A. Substance Over Form

Begin by recalling Jefferson's response to the controversy swirling around the Vermont ballot in 1796. Adams was a mere three votes ahead, and Vermont's total of four represented his margin of victory. Nevertheless, Jefferson refused to quibble his way into the presidency. Remember his words to Madison: "Surely in so great a case, substance & not form should prevail. . . . I pray you to declare it on every occasion foreseen or not foreseen by me, in favor of the choice of the people substantially expressed, and to prevent the phaenomenon of a Pseudo-president at so early a day." [157]

Jefferson's self-restraint in 1797 casts new light on his apparent self-dealing in 1801. Perhaps he was acting, in both cases, on the same principle: do not allow legal quibbling to produce "the phaenomenon of a Pseudo-president" not rooted in the "choice of the people." In 1797, this principle meant supporting Adams; in 1801, himself.

But, of course, this recharacterization begs a substantial question: How could Jefferson be so sure that the defect in Georgia's ballot was merely formal, and not the result of fraudulent misrepresentation?

The question turns primarily on the weight properly accorded a single fact: During the final run-up to the vote count, Georgia's votes for Jefferson and Burr seemed a foregone conclusion. Newspapers **\*612** around the country were regularly placing them in the Republican column without controversy. [158] Nobody in Washington had made any contrary suggestions. Given the

APPENDIX - 19

ferocity of partisan combat at the time and the closeness of the election, the deafening silence had a plain meaning: No smoke equals no fire. For a man of the world-- and Jefferson was nothing if not a man of the world--there was an obvious inference. If the Federalists weren't complaining, then there was nothing to complain about. Despite the formal deficiencies, Georgia's votes should count in the Republican column, with form giving way to substance.

Of course, Jefferson's judgment call may have been wrong, and one of us has traveled to Georgia on a factfinding mission to explore the matter further. [159] Our conclusion: The state's four electors indisputably voted for Jefferson and Burr, "to the great satisfaction of a large concourse of people assembled on the occasion." [160] This report by Governor Jackson is abundantly confirmed in local **613** newspapers. [161] There is no question about it: If Georgia's votes had not been counted in Washington, form would have indeed triumphed over substance.

We have been less successful in finding out why the Georgians failed, on this one occasion, to comply with constitutional rules consistently followed elsewhere. It is clear, however, that the Georgians had been particularly inattentive to federal requirements during the 1800 campaign. At an earlier stage, the legislature had passed a statute providing for the selection of electors as part of the general election scheduled in early October. [162] In taking this step, it violated a federal law requiring all states to pick their electors "within thirty-four days preceding the first Wednesday in December." [163] When the bill reached Governor Jackson's desk, he identified the legal problem and vetoed the plan. [164] The legislature then refused to hold an additional election within the thirty-four-day window, and chose to select the four electors itself. [165]

**614** Unfortunately, the Governor was not equally vigilant when the electors assembled before a "large concourse" to cast their ballots. Nobody intervened to correct Georgia's legal error, but there was no doubt about the underlying intent of the electors. [166] Jefferson was on solid ground in refusing to make a federal case out of frontier ineptitude.

## B. Prudence and Publicity

But Jefferson did not merely place Georgia's votes into the Republican column; he did not publicly acknowledge the existence of any sort of problem. In contrast to John Adams four years earlier, he did not give his opponents a clear opportunity to raise the issue. Instead, he immediately proceeded to cut his Federalist opponents out of the runoff. [167] Although Jefferson's decision turned out to be substantively sound, surely it was procedurally defective?

Perhaps not. Though Jefferson did not speak, the tellers announced the existence of the problem before handing him the Georgia document, and loud enough for the newspapers to carry the story throughout the land. [168] Two of the three tellers were Federalists, and one of them--if Davis is to be believed--was shocked by Jefferson's rapid disposition of the affair. [169] He certainly was in a position to stop the vote count and raise a formal objection if he chose, but he did not do so.

There is every reason to suppose that the Georgia delegation was among the members of the House and Senate whose "presence" is constitutionally required at the vote-counting ceremony. Two of these Georgians--Benjamin Taliaferro of the House and **615** James Gunn of the Senate--had been elected as Federalists. [170] Surely one or another would have protested if he believed that the electors had actually voted a Federalist ticket. No intense partisanship was required to raise this point had it been well founded.

It is wrong, then, to accuse Jefferson of exploiting his position to keep his opponents in the dark. His official silence helped conceal his ruling from posterity, but the Georgia problem was not a secret to the assembled congressmen. Jefferson had simply shifted the burden of going forward to the Federalists in the audience. If they wished to create a "Pseudo-president" by raising some legal quibbles, it was up to them to make a clear and focused objection. Jefferson certainly was not going to do anything to make their task any easier. [171]

Jefferson's silence seems particularly sensible in the context of the confused legal situation prevailing in 1801. Just the year before, Congress tried to pass a statute creating an explicit procedure for dealing with electoral vote challenges, [172] but it failed to achieve consensus, [173] leaving everybody with the painfully ambiguous words of the Constitution as a guide. The text simply does not specify who is to have the last word. Though the President of the Senate **616** "opens" the votes, he is not expressly

APPENDIX - 20

authorized to do more; though vote counting occurs in the "presence" of the two houses, they are not expressly granted any sort of decisionmaking authority, let alone decisive power. [174]

Jefferson's silence allowed everybody to resolve the matter without a heated legalistic battle. And there can be no question that the battle would have been heated. The Federalists had a clear majority in Congress. [175] This gave them an overwhelming interest in stretching the constitutional language to give the final word to the House and Senate; while Jefferson, outraged by the partisan theft of four crucial votes, would have had every incentive to insist upon an expansive reading of his own power to "open" the votes.

As the parties struggled in legal limbo, they would soon confront another danger. There was no obvious method by which to resolve their argument. They would be facing an infinite regress: On the one hand, the President of the Senate could claim the right to decide whether the President of the Senate possessed the contested power; and on the other, senators and representatives might insist that their "presence" at the vote count authorized them to override the President's ruling.

Worse yet, dispatching a factfinding mission to Georgia was not feasible. It was the dead of winter, and a snowstorm was swirling around the half-built Capitol. [176] Even during calmer weather, it would take a week or two to travel on terrible roads all the way to Augusta, the state capitol. [177] Only three weeks remained, however, before the inauguration of a new President. Time would run out **617 before a delegation could complete its factfinding mission and return with a report to the nation's capitol. [178]

With factfinding unfeasible, and the constitutional text obscure, the proceedings might have simply disintegrated amidst a cloud of bitter legalisms--the worst possible result. The nation was already in an uproar over the Electoral College tie that had thrown the presidency into the House. Confusion would have been compounded if the House runoff had been postponed indefinitely while partisans quarreled without any obvious means of closing the debate. The year 1801 marked the first time in American history that a political party was called upon to yield power to its rival. Even without a prolonged debate over Georgia, it took almost a week for the House to choose Jefferson over Burr on its thirty-sixth ballot. [179] During this short period, the country was teetering on the brink of violence. It is not at all clear whether the forces for violent resolution could have been kept in check much longer. [180]

There was a good deal of constitutional prudence in Jefferson's decision to keep silent. Any express ruling from the chair invited his opponents to initiate a counterproductive struggle between the President of the Senate and the two houses of Congress over their relative competence in the affair. In contrast, the notice from the tellers hit just the right note--placing the burden on the Federalists to raise an objection if there was any factual basis for supposing that Georgia's electors had cast their ballots for the Federalist candidates.

The wisdom of Jefferson's decision is confirmed by another pregnant silence over the next few weeks. As we have seen, leading newspapers all around the country reported the problem with **618 Georgia's ballot. [181] Yet we have found no newspaper that contained even a hint of an objection to Jefferson's resolution of the issue--and this at a time when so many other aspects of the Electoral College crisis generated ceaseless controversy. The ready acceptance of this decision testifies to Jefferson's wisdom in avoiding a grand institutional confrontation that had no easy constitutional answer.

## C. Pinckney for President?

To make a final point, suppose that Jefferson had single-mindedly pursued a formalist course. Once alerted to the problem by the tellers, he publicly inspects the documents and proclaims that the plain meaning of the Constitution requires him to disqualify the Georgia votes. [182] This would have left Jefferson and Burr with only sixty-nine votes remaining in their respective columns--one shy of the seventy needed to exclude Adams, Pinckney, and Jay from the House runoff. [183] A shift to a five-man runoff would have been legally significant, but would it have changed the final outcome?

Winning the runoff proved difficult for Jefferson even when Burr was his only opponent. Thanks to another Founding blunder, the House making the choice was the lame-duck body elected in 1798--a year when the Federalists scored significant election victories. [184] Although the party had suffered a number of defections, it still controlled the House when its members voted in ordinary fashion.

APPENDIX - 21

But the runoff was decided under special constitutional rules giving each state delegation a single vote. [185] This placed the Federalists at a strategic disadvantage--too many of their congressmen were bunched in too few states. When some Federalists defected to Jefferson, **\*619** the party could deliver only six states to Burr, while their great antagonist won the vote of eight states. This would have generated an easy victory for Jefferson but for another technical glitch by the Founders. The Constitution required the winning candidate to gain an absolute majority of all state delegations without considering the possibility that some delegations might divide equally. Had the Framers focused on this issue, perhaps they would have awarded a half-vote to each of the contending candidates. The absence of specific instructions had a devastating impact in 1801, however, when two of the states--Vermont and Maryland--split evenly and failed to cast a ballot. [186] As a consequence, Jefferson fell one vote short of the nine required, and the initial ballot resulted in a deadlock: eight for Jefferson, six for Burr, and two not voting. [187]

The second ballot revealed a drop in Jefferson's support. Eleven Federalists initially voted for Jefferson in recognition of the obvious fact that he, rather than Burr, was the Republican candidate for President. When Jefferson fell short, five of these congressmen returned to their party, giving Burr a two or three vote majority. [188] Luckily for the Republicans, this shift in individual votes did not change the balance of power in any state delegation, and the impasse continued until the thirty-sixth ballot, with the Federalists desperately searching for a few additional votes. In the words of Congressman James Bayard, a key Federalist leader, "By deceiving one Man (a great blockhead) and tempting two (not incorruptible) [Burr] might have secured a majority of the States." [189]

**\*620** Jefferson did prevail in the end, [190] but the transformation of the runoff into a five-candidate affair would have made this final victory more difficult. Burr was not the Federalists' candidate of choice--they backed him only as a last-ditch effort to stop their archenemy Jefferson. With a five-man runoff, they could back real Federalists, and this might have made a difference. As we have seen, six Federalist congressmen were unwilling to vote for Burr, but they might have been happy to vote for Adams. At the very least, their blocking coalition would have had even more staying power. [191] In addition, after fifty or sixty ballots, the exhausted House might have broken the impasse by selecting a compromise candidate from among the three remaining contenders.

At this point, the Federalists' vice-presidential candidate--Charles Cotesworth Pinckney--would have likely emerged as an exceptionally attractive dark horse. Pinckney was the sort of "continental character" the Founders envisioned as President, with a long and distinguished record of public service. He had had a fine career as a military officer during the Revolution [192] and he served as a delegate to the Constitutional Convention. [193] He also had established **\*621** a record of moderation during the 1790s--supporting his party when it came to the war with France, [194] but opposing it when it came to the oppressive Alien and Sedition Acts. [195] He would have had the wholehearted backing of the formidable Alexander Hamilton. [196] Indeed, once Adams left the scene, Pinckney became the Federalist standard-bearer for the presidential elections of 1804 and 1808. [197] Last but not least, Pinckney was a South Carolinian, making him an especially attractive compromise candidate. The bulk of Jefferson's support was in the South. [198] Had it become clear that Jefferson could never win nine state delegations, his followers **\*622** might have bitterly consented to the selection of another southerner of great distinction. [199]

All of this is sheer speculation, but Pinckney's dark-horse candidacy gains a measure of reinforcement from one of our sources. Writing thirty-five years after the event, Davis concludes his hearsay account by putting words in the mouth of Senator William Wells, one of the three tellers: "Mr. Wells further stated, that if the votes of Georgia had not been thus counted, as it would have brought all the candidates into the House, Mr. Pinckney among the number, Mr. Jefferson could not have been elected President." [200] Although Davis has been proven correct on his basic point about Georgia, his story contains too many other minor errors to justify **\*623** great confidence in this particular. [201] Nevertheless, his decision to mention Pinckney should not be discounted entirely. Whatever his other failings, Davis was politically astute. He would not have included the reference if he thought the dark-horse candidacy was a complete nonstarter.

So there it is: With Jefferson and Adams battling to a hopeless impasse in the five-candidate runoff, the third President of the United States might well have been Charles Cotesworth Pinckney.

APPENDIX - 22

Consider the resulting uproar when it was discovered, weeks later, that Jefferson actually had won all four Georgia votes, and that his constitutional punctilios as President of the Senate had led to his own defeat by Federalist partisanship in the five-man runoff. The resulting crisis would have been far worse than those occurring in the aftermath of Hayes-Tilden in 1876 or Bush-Gore in 2000. Both of these crises bitterly disappointed the losers, but they could never prove, beyond a reasonable doubt, that they had actually won the underlying electoral votes in controversy. In contrast, Jeffersonians would have been in a position to establish, to a certainty, that their candidate had been denied the presidency on a mere technicality.

Perhaps, however, the operation of a final constitutional gimmick might have saved the situation. If the House of Representatives had selected Adams or Pinckney, it would have been up to the Senate to select the Vice-President under yet another set of rules. The Constitution generally gives this office to the defeated presidential candidate with the most votes, but the Senate is authorized to choose among candidates "who have equal votes" after the President has been selected--Jefferson or Burr in this case. [202] If the Senate had sought to console Jefferson with the number two spot, a national crisis might have been avoided if Pinckney (or Adams) had responded to the subsequent news from Georgia by voluntarily **\*624** allowing the Vice-President to become the fourth President of the United States. [203]

If Pinckney or Adams refused to resign the country might, however, have found itself on the brink of civil war. Even during the two-man runoff, Republican governors were organizing military force in the event the House Federalists managed to reject Jefferson. Jefferson himself was making some very dark threats during the impasse. [204] But in the end, the Federalists chose to abandon Burr rather than push the country over the edge. Would they have shown similar restraint had their favorites remained in the running? This was a crisis the infant republic did well to avoid.

## D. Jefferson and the Rule of Law

When we first discovered Georgia's electoral ballot in the National Archives, we believed we had a first-rate scandal on our hands. The meaning of it all seemed painfully clear: Jefferson egregiously violated the express terms of the Constitution in the pursuit of overweening ambition. His presidency was born of constitutional original sin. In its own way, this was as bad as Sally Hemings.

The more we have pondered, however, the less we have been scandalized. To be sure, it is always a serious matter to ignore the rules laid down by the text, even when they are incompetently drafted. But in our constitutional tradition, the rule of rules is only one component of a more complex understanding of the rule of law. [205] Placed in full historical context, Jefferson's decision provokes renewed appreciation for the complexities of constitutional interpretation, with three distinct dimensions salient in the present case. The first --principle. As his actions in 1796 demonstrate, Jefferson was **\*625** serious about avoiding the "the phaenomenon of a Pseudo-president." [206] Invalidating the Georgia ballot on a legal technicality would have been at war with this principle. Jefferson had ample reason to believe that Georgia had in fact cast its votes for the Republican ticket. He was correct to use his power as Senate President to assure that the vote-counting ritual in Washington corresponded to the true electoral decisions made in the states. The second --prudence. Jefferson was confronting a genuinely difficult institutional question. A high-visibility ruling on the Georgia ballot would have provoked an intense struggle between the President of the Senate and the Houses of Congress over their respective constitutional prerogatives. So long as notice of the Georgia problem had been conveyed to the opposition, was it not wise for Jefferson to avoid such a counterproductive struggle if at all possible? The third --pragmatism. Strict compliance with the formal rules risked genuinely catastrophic consequences. Sending all five candidates into the House runoff could have pushed the country to the brink of civil war.

All in all, it was not the best moment for a rule of rules unvarnished by principle, prudence, or pragmatism to prevail. By recognizing this, Jefferson provides a glimpse into the meaning of constitutional statesmanship well worth bringing to light after all these years.

## E. Dumb Luck

A dose of historicism adds nuance to our earlier critique of the Founding blunder--or better, blunders--in connection with the construction of the Electoral College. Recall that the most significant mistake involved the Founders' failure to anticipate the rise of national political parties. Others were more perceptive, most notably Edmund Burke, who had already begun to reflect

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

on this great change in political practice. [207] Had the Founders been equally far- **\*626** sighted, they would never have chosen their "two-vote" scheme for the Electoral College.

Putting this big mistake to one side, it was still silly to give the sitting Vice-President a central position in the vote count. Had the Convention considered the likelihood that the President of the Senate might run for the presidency, they would have changed the text in a minute. But they did not, so they did not do so, and this failure is nothing to brag about.

Nevertheless, the Georgia episode adds an ironic gloss to this Founding blunder. To see our point, suppose that the Framers had adverted to the problem and consider how they most probably would have solved it: If the sitting Vice-President was a poor choice to supervise the ballot count, who should be his replacement?

The obvious pick was the Chief Justice--the only constitutional official possessing the impartiality required of the vote-counting job. Indeed, the Founders made this choice when confronting a similar problem in designing the impeachment process. The impeachment trial took place before the Senate, and the President of the Senate would preside unless the Convention made a special exception for his removal from the chair. The Founders spotted the absurdity of allowing the sitting Vice-President to preside over a proceeding that could make him President. Article I, Section 3 explicitly provides that "When the President . . . is tried, the Chief Justice shall preside." [208] They undoubtedly would have made an identical substitution had they focused on the identical problem raised by the vote-counting ritual.

This is the point at which our paradox emerges: Had the Founders possessed greater foresight, the result would have turned out **\*627** much worse. Jefferson's replacement as chair on February 11 would have been John Marshall, whom the Federalists had placed in office only the week before. [209] While the Founding blunder placed Jefferson in an awkward position, our ultimate conclusion is that he made the best of a bad situation--elevating substance over form and preventing a legitimation crisis of the first magnitude. In contrast, Chief Justice Marshall would almost certainly have acted differently. A confirmed Jefferson-hater, [210] he would have found himself in the delightful position of making a technically correct ruling against Georgia that favored Federalist interests. Since the Constitution explicitly requires that all the electors "sign and certify" their state's return, and clearly designate the persons they were "vot[ing] for," the formal case was open and shut: "Sorry Georgia, but you don't count (and, alas, given the execrable postal service southwards, your formal deficiency cannot be cured by March 4)." So the Chief Justice rules that the vote total stands at sixty-nine for Jefferson and Burr, one short of a majority, and the Federalists get their men into the runoff.

To be sure, Marshall was eminently capable of transcending formalism when it got in the way of his constitutional vision, but this vision certainly did not include Thomas Jefferson as President of the United States. Not even the most partisan Jeffersonian could reasonably complain if the Chief Justice, following the express commands of the Constitution, declared that there were only sixty-nine valid votes in favor of Jefferson and Burr. After all, had not the Founders put the Chief Justice in the chair precisely to assure that vote counting would proceed in strict compliance with the law?

No less important, the Jeffersonians would have been in no position to launch an effective challenge to Chief Justice Marshall's decision. The Federalists controlled both houses of Congress and would have voted down any Republican motion to overrule the **\*628** chair. [211] If the Framers had done their homework, therefore, the vote count would have provided Marshall with a splendid opportunity to enter history, slightly prematurely, as a great defender of the written Constitution--but with a very different result.

Consider a few scenarios. Suppose that, despite Chief Justice Marshall's ruling, Jefferson emerged victorious from the five-man runoff. Marshall then would have been clearly marked by Jefferson as Public Enemy Number One. With the President threatening reprisals, would Marshall have had the courage to write Marbury v. Madison? [212] Would his fellow Justices have joined him in this premeditated assault on the Jeffersonian presidency? And even if they had pushed forward, would the Supreme Court have emerged unscathed? After all, Jefferson's campaign to sweep the Federalist Justices from the Court only failed when the Senate refused to impeach Justice Samuel Chase in a very close vote. [213] Jefferson would have prosecuted this campaign even more fiercely had his great judicial antagonist sought to block his way to the presidency during the vote count controversy.

Chief Justice Marshall's prospects would have been no less grim had his ruling led to the victory of his patron Adams, [214] or his friend Pinckney. [215] At best, the Chief Justice would have tied his judicial reputation to a ruling that would have been reviled by

APPENDIX - 24

a large portion of the population; at worst, his decision of February 11 would  **\*629**  have helped precipitate a bloody conflict over presidential succession.[216]

As we contemplate these scenarios it is impossible to mistake the contribution of dumb luck to the affair--"dumb luck" in the technical sense. By "dumb" we mean that the Founders were mistaken in putting the Vice-President in a constitutional situation marked by an egregious conflict of interest; by "luck" we mean that we are all lucky that they were dumb, since if they had been smarter, things would have come out worse, possibly much worse.


### V. Jefferson's Ghost

Perhaps our discovery has historical value, but does it have enduring legal significance?

At the very least, the story serves as a cautionary tale. The republic avoided a serious crisis in 1801, yet there is no reason to rely on dumb luck when lightning strikes again. We urgently require a constitutional amendment removing the sitting Vice-President from the chair. And yet, despite the 2000 fiasco, there has been no serious effort to focus on the time bomb that might explode the next time around if the existing vote-counting process operates without judicial interference.

This failure has a single cause: the Supreme Court's unanticipated intervention in the electoral contest between George W. Bush and Albert Gore. While an Electoral College crisis is never exactly fun, 2000 was the perfect year for it to happen. The country was enjoying an unparalleled period of peace and prosperity. The leading contenders made every effort to blur their underlying disagreements. Nobody supposed that there was much at stake in the choice between Bush and Gore. If the Supreme Court had not intervened, Congress would have solved the succession problem in one way or another, but in a way that would have emphasized the obvious anachronisms and irrationalities of the existing system. As the television cameras introduced countless viewers to the arcana of the electoral count, everybody would agree on one thing--it was a clear mistake to allow Vice-President Al Gore to preside over his own contest with Bush, and we should pass a constitutional amendment to eliminate such absurdities from future contests.

 **\*630**  Judge Richard Posner is precisely wrong, then, in asserting that the looming electoral-count crisis on Capitol Hill serves as the only sound justification for the Supreme Court's decision in Bush v. Gore.[217]  The next vote-counting disaster probably will strike at a much less propitious moment in the history of the republic--a time when ideologically polarized political parties may be struggling for the White House under conditions of grave economic or international distress. At such a moment, Judge Posner's talk of crisis might have real substance. When this time comes--in 2004 or 2084--the Supreme Court may be unwilling or unable to save the day, and Americans will be forced to accept the antique legal arrangements the politicians of 2000 failed to address. Whatever the jurisprudential merits of Judge Posner's vaunted "pragmatism," his particular brand is particularly short-sighted. The election crisis of 2000 provided the "optimal" opportunity to generate the political energy needed to spur constitutional amendment. If Bush v. Gore has any sound justification, Judge Posner has not found it.[218]


### A. From Cautionary Tale to Legal Precedent

It appears then, that we are stuck with what the Founders have given us,[219]  at least until the next crisis forces the issue to the forefront of public concern. This disheartening conclusion returns us to our motivating question: Since the original constitutional structure continues to guide us, should Jefferson's decision serve as an important legal precedent in interpreting its requirements?

Begin with the case for an affirmative answer. As we have seen, the constitutional text does not clearly allocate decision-making power between the President of the Senate and the Congress. Worse yet, the text's opacity merely serves as the tip of the Founding iceberg--the sad truth is that nobody was thinking about the  **\*631**  problem in Philadelphia, and that is why the text is so unsatisfactory. Given this failure, even textualists should accord substantial weight to subsequent practice in resolving constitutional indeterminacies.[220]  Ought implies can: If you can't follow the text, you should respect the conscientious practice of leading statesmen who have attempted to make sense of textual perplexity.

The fact that Jefferson exercised the (textually arguable) authority, therefore, as Senate President on the Georgia matter seems very significant as a legal matter.[221]  What is more, Jefferson's ruling  **\*632**  might well have made a difference to the outcome--

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                                    25

one of his rivals could have emerged victorious from a five-man runoff. This greatly enhances the precedential significance of his ruling. While there have been quite a few counting controversies over the centuries, almost all of them did not make the slightest difference to the electoral outcome. [222] With the stakes nonexistent, there was no pressing reason for the participants to take the constitutional issues seriously. They were more inclined to resolve the matter quickly, so that the vote count could proceed to its predestined announcement of the victorious presidential candidate. [223] Not so in 1801, when the four Georgia votes were of the greatest strategic importance.

The fact that it was Jefferson in the chair also matters. Putting hagiography to one side, he had devoted his four years as President of the Senate to drafting that body's first set of rules for parliamentary procedure [224] --rules that continue to influence the practice of both the Senate and House of Representatives even today.

Finally, it would be wrong to dismiss and characterize Jefferson's ruling as merely self-interested. To the contrary, his decision can **\*633** be defended from the multiple perspectives of principle, prudence, and pragmatism. [225]

So it would seem that if precedent is important anywhere in constitutional law, it would be important here--where a constitutional statesman of the first rank, having spent years reflecting on matters of parliamentary procedure, makes a ruling that illuminates a constitutional question that the Framers had so evidently failed to confront, let alone resolve, with any clarity.

So much for the affirmative case for precedential significance. Are there any serious counterarguments? The most salient objection involves Jefferson's failure to announce his ruling publicly. Does not his refusal to take public responsibility for his decision undermine its enduring significance?

This objection would be compelling if the legal deficiencies of the Georgia ballot had been kept secret. If the House and Senate had been kept in the dark, this would indeed deprive Jefferson's decision of any precedential value. It would indicate that Jefferson himself believed that he was engaging in a devious maneuver that could not withstand the test of public reason.

But this is not what happened. The newspaper accounts make it perfectly clear that the tellers put the assembled House and Senate on notice of the Georgia deficiency. [226] Jefferson did not make his decision secretly. He simply shifted the burden to the senators and representatives to raise objections. While he might have gone further, in the manner of John Adams, his failure to do so was prudent under the circumstances. [227] The assembled senators and congressman had an opportunity to make an objection, and they did not make use of it.

Moreover, Jefferson publicly took responsibility for the entire vote count: "[I]n pursuance of the duty enjoined upon him," he declared that he and Burr had won "a majority of the votes of all the Electors appointed." [228] He could not make this declaration without counting the four Georgia votes in the Republican column. So the **\*634** fact that he had made a ruling on the Georgia matter was obvious to anybody interested in counting the votes--and surely the senators and congressman observing Jefferson were, like all politicians, good at vote counting. No less important, the newspapers put the country on notice of the Georgia deficiencies, and, despite the bitter partisanship of the time, nobody seems to have protested Jefferson's decision. [229]

In short, Jefferson's actions not only illuminate a constitutional question left unresolved by the original constitutional text, but they also resolved a potentially explosive problem in a manner that garnered public consent. What more can we ask of a legal precedent?

It is true, of course, that the relevant documents disappeared for more than a century before they were rediscovered. This might be important if other precedents had accumulated during the interim that were inconsistent with Jefferson's ruling. If this had occurred, it might be wiser to ignore the rediscovered early precedent rather than disturb well-established arrangements.

In the real world, however, the law remains unsettled. Apart from 1801 and 2001, there is only one other case where the powers of the Senate President posed a genuinely consequential issue. This involved the Hayes-Tilden crisis of 1877, and as we shall see, the resolution reached in 1877 should serve as a very important gloss on the meaning of 1801.

It is one thing to recognize that the decision of 1801 is not the only relevant precedent; it is quite another to say that it should not count as a precedent when the Founding machinery once again explodes in our face.

APPENDIX - 26

## B. The Gloss of 1877

The Hayes-Tilden election hit the nation at a bad time. The country was in the throes of a vicious economic depression, and the election returns threatened to inflame the passions of the recent Civil War. For the first time since 1860, the Democratic candidate, Samuel Tilden, had won the popular vote by a convincing margin of 250,000. [230] Yet his victory was jeopardized by a dispute over eighteen electoral votes from three southern states still under the **\*635** (very shaky) control of Republican Reconstruction governments. [231] If all eighteen found their way into the Republican column, Tilden would be deprived of his popular victory by a single electoral vote.

With the Democrats clamoring at the gates of power, millions of Republicans saw the impending vote count in apocalyptic terms inherited from the Civil War. For these true believers, the Democratic party was the party of treason, threatening to profane the temple of the Union--a prospect to be avoided at all costs. What is more, the antiquated electoral machinery afforded them an opportunity to bar the barbarians from the White House.

While the Democrats had won landslide victories in the House after the Panic of 1873, the Republicans remained in control of the Senate. [232] This provided them with a tempting constitutional technique for maintaining control over the presidency. Vice-President Henry Wilson had died in 1875, but the Republicans could still appoint the President Pro Tem of the Senate, who would then preside over the vote-counting ritual. [233] Their man in the chair could count the challenged Republican electors into the Hayes column while senators and representatives cheered and booed, but the Democrats could do little to change the outcome. Although the Democratic House might vote to overrule the chair, the Republican Senate would not support such a move--even if it were constitutional.

To be sure, the precedent set by Thomas Jefferson in 1801 was not widely known at the time. [234] Nevertheless, there was a good deal of respectable constitutional opinion that expansively interpreted the Senate President's power to "open" the electoral certificates, transforming it into a grander authority to resolve with some finality doubtful questions arising in the vote-counting process. Indeed, some Democrats had explicitly endorsed this view in congressional debates held before the Hayes-Tilden election revealed **\*636** its short-run partisan implications. [235] This put Republicans in the delicious position of quoting Democratic politicians while their Senate President Pro Tem pushed Hayes into the White House. [236]

Delicious but dangerous--how would the country react to such blatant partisanship? Fortunately, we will never know. In a remarkable show of political restraint, the Republican leadership refused to abuse the power of the Senate presidency for partisan ends. Instead, they reached out to House Democrats to pass the first statute in American history to regulate the vote-counting ritual. [237]

The constitutional rationale for statutory action was based on the structure of the text: "The President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted." [238] Since the last provision grants the federal government a distinct "counting power," but the preceding clauses do not clearly state how counting should proceed, Congress may enact appropriate legislation under the Necessary and Proper Clause. [239]

**\*637** This straightforward rationale provided the Republican leadership with a solid platform for constructing a far more impartial procedure, calculated to assure the country of the integrity of the selection process. The proposed statute established a fifteen-man Electoral Commission comprised of five members of the House of Representatives, five senators, and five Justices of the Supreme Court. Each house was to appoint three members from the majority party and two from the minority--leading to a five-five split in the congressional delegation. The proposed statute also named four of the five Justices--two Democrats and two Republicans--and charged them with the task of naming a fifth as potential tie-breaker. [240] Although their choice was formally open, it was perfectly obvious who they were supposed to choose: Justice David Davis of Illinois. While he had begun his career in national politics as Abraham Lincoln's campaign manager in 1860, Davis had drifted away from the party's mainstream. By 1876, he was broadly **\*638** considered to be an independent with Democratic leanings, someone who would be fair to Tilden's claim. [241]

APPENDIX - 27

All things considered, the Republicans' proposed statute made the most of the constitutional materials available. By placing the final decision in Davis's hands, the leadership had effectively eliminated the prospect of partisan self-dealing by the President of the Senate. To be sure, the statute was cleverly designed to preserve the Senate President's symbolic centrality. He was assigned the task of "open[ing]" the ballots, but should a protest be voiced from the floor, he was instructed to pass the contested ballot to the Commission and await its decision before completing the vote count. [242]  The Commission's decisions, in turn, could be overruled by a majority vote of each house of Congress acting separately, [243]  but this was unlikely given the split in party control. The danger of self-dealing posed by the Senate President had been subordinated to a Commission carefully designed to achieve an impartial result.

This fact was widely appreciated as the Senate bill made its way to the House for consideration. Just before the final vote in the House, Henry Payne, a Democratic leader and future member of the Electoral Commission, [244]  urged his skeptical colleagues to consider the alternative: Without the statute, the Senate President might fill the constitutional vacuum with "a bold and unjustifiable usurpation." [245]  Other thoughtful Democrats supported this plea. Here is Henry Watterson:

> I regard Tilden's case as a good one; but I shall vote for the bill with the full consciousness that the action of the commission may bitterly disappoint me . . . . If it does, I shall still have discharged [my] duty in that manner which was best calculated to preserve constitutional forms and keep the peace of the country at a time   **\*639**  when the Republic was menaced and the people were not prepared for war. [246]

And so a bipartisan group of leaders carried off a grand act of constitutional statesmanship, with the House joining the Senate to head off the possibility of willful abuse of power by the Senate President. This represented a remarkable act of self-restraint on the Republican side. [247]  They had sacrificed the certainty of a Hayes presidency, through manipulation by the Senate President, for a mere possibility from the Commission. But in return, they obtained a greatly enhanced sense of constitutional legitimacy for the next President of the United States.

Unfortunately, this triumph of statesmanship has been entirely lost in the fog of controversy subsequently generated by the actions of the Electoral Commission. The key to the entire plan was the appointment of Justice Davis-- the only man on the Supreme Court with a plausible claim to political neutrality. To nearly everyone's surprise, a Democratic-Greenback coalition in Illinois elected Davis to the United States Senate on January 25, just as the Electoral Commission bill was being enacted by Congress. [248]  When Davis resigned from the Commission to take his Senate seat, he was replaced by Joseph Bradley--a distinguished jurist, but one plainly associated with the Republican party. [249]  This allowed the Democrats to charge him with the rankest partisanship when he joined the seven other Commission Republicans in party-line votes in support of all eighteen of the Republican electors, over the heated dissent of the seven Commission Democrats. [250]

The Democrats' cries of pain were only to be expected. It always hurts to lose. It remains an open--and probably unanswerable -- **\*640**  question whether Bradley in fact succumbed to political pressures. Despite a vigorous effort by Charles Fairman to defend Bradley's integrity, [251]  the Commission still remains under a dark cloud in legal circles. [252]  Whatever one makes of Bradley's performance, it should not taint the statesmanship of those who created the Commission as an alternative to a ruling by the Senate President. While Bradley's decision was bound to be controversial, a blatantly partisan decision by the President Pro Tem of the Senate would have been far worse-- inflicting grievous damage on the Hayes presidency and the slow process of post-war reconciliation.

One can only hope that similar statesmanship prevails the next time around, and that a new Electoral Commission is convened to resolve the problem. The 1877 statute, however, was a one-shot deal, and when Congress finally enacted a more permanent statute, it did not entirely eliminate the risk that the Senate President might once again dominate the vote-counting ritual.

## C. The 1887 Act

Controversy over the Electoral Commission generated a decade of congressional debate, which finally gave rise to the Electoral Count Act of 1887. [253]  Operating once again under the Necessary and Proper Clause, the statute shifted a great deal of the

APPENDIX - 28

decisional burden from the President of the Senate to the two houses of Congress. Speaking broadly, if a state submits a single return, the President of the Senate counts the ballot unless objections are raised and a majority in each house votes to reject it. [254] If a state **\*641** submits two or more returns, the President's job is also straightforward if majorities of both houses agree on the ballot that should be counted. Matters get murkier when the Houses disagree. In this case, the statute instructs the President to count the ballot certified by "the executive" [255] of the state. But what should he do if "the executive" signs two or more returns?

The statute is silent, but the problem is real--especially where different members of "the executive" are elected independently. For example, Florida's Democratic Attorney General Robert Butterworth strongly supported Gore, [256] and Republican Secretary of State Katherine Harris produced opinions that notoriously favored Bush. [257] Suppose that the United States Supreme Court had remained on the sidelines and that the Florida court recount had given Gore's electors a razor-thin majority. As matters became more heated, Governor Jeb Bush may well have decided to sign this second return, but even if he refused, the Florida Supreme Court could have authorized the Attorney General to certify the return and send it on to the President of the Senate. When Senate President Al Gore opened the ballots on vote-counting day, he would have found two Florida returns signed by members of the "executive"--one for Bush and the other for Gore. Under the 1887 statute, each house must separately decide between the rival slates. **\*642** If they were to disagree--which was likely, but not certain [258] --the issue would have quickly returned to the President of the Senate. What next?

Foreseeing this scenario, one of us signed a public statement urging Congress to follow the precedent of 1877 and create a new Electoral Commission. [259] This should be the remedy of choice the next time around, but if statesmanship fails, the ghost of Thomas Jefferson will return to center stage and we shall all be obliged to conjure with the meaning of his actions on that fateful day of February 11, 1801.

Jefferson's precedent will not be squarely on point. The future President of the Senate will be required to act only after the issue has divided the House and Senate. In contrast, Jefferson resolved the Georgia matter without consulting the two houses, and we cannot know how he might have responded had one or both houses challenged his decision.

Nevertheless, there can be no denying that Jefferson did more than "open" the Georgia ballot on that fateful day. He asserted his authority to decide the merits on a contestable issue. If some future Senate President were to claim a similar authority, he or she would not be wrong in pointing to Jefferson's precedent.

If he follows Jefferson's lead, however, he cannot be allowed to go halfway. Jefferson used his power for a particular end--"to prevent the phaenomenon of a Pseudo-president." [260] This should be the touchstone for any future President of the Senate. If he abuses **\*643** his authority to create a "Pseudo-president" by blatantly political vote counting, he would be converting Jefferson's precedent into a fig-leaf for a desperate act of political usurpation.

### Footnotes

| a1 | Sterling Professor of Law and Political Science, Yale University. |

aa1   J.D. expected, Yale University, 2005; D.Phil. expected, Oxford University, 2004. The authors wish to thank Joyce Appleby, Larry Kramer, and Jack Rakove for their thoughtful remarks.

1   U.S. Const. art. II, § 1, cl. 3.

2   See infra note 5.

3   For further discussion of these matters, see infra notes 52-56 and accompanying text.

4   See infra note 30 and accompanying text.

5   The Vermont problem is mentioned in passing in a variety of sources. J. Hampden Dougherty, The Electoral System of the United States 33-34 (1906); 2 John J. Lalor, Cyclopedia of Political Science, Political Economy, and of the Political History of the United States 63, 68 (New York, Charles E. Merrill 1893); David A. McKnight, The Electoral System

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    29

of the United States 65, 260, 290 (Philadelphia, J.B. Lippcott & Co. 1878); 1 Edward Stanwood, A History of the Presidency from 1788 to 1897, at 51-52 (Charles Knowles Bolton ed., Augustus M. Kelley 1975) (1898); 16 The Papers of James Madison 152, 429 n.2 (J.C.A. Stagg et al. eds., 1989) [hereinafter Madison Papers]; 2 The Republic of Letters: The Correspondence between Thomas Jefferson and James Madison 1776-1826, at 959 n.23 (James Morton Smith ed., 1995) [hereinafter Smith]; C.C. Tansill, Congressional Control of the Electoral System, 34 Yale L.J. 511, 516 (1925); L. Kinvin Wroth, Election Contests and the Electoral Vote, 65 Dick. L. Rev. 321, 326 n.23 (1961). Professor Manning Dauer is the only scholar to explore the incident in some depth, scrutinizing some, but not all, of the reports about the Vermont issue. See Manning J. Dauer, The Adams Federalists 103-06 (1953).

Jefferson's decision in 1800 has received even less attention, even though the legal problems were more acute and the stakes were much higher. There are only a few mentions of the Georgia incident. See House Spec. Comm., Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 30 (1877) [hereinafter Counting Electoral Votes]; Dougherty, supra, at 35-36; Wroth, supra, at 326 n.23. These various sources largely cite one another. Vasan Kesavan mentions the issue more recently, citing to the preceding sources as well as to Professor Ackerman's unpublished manuscript, America on the Brink. Vasan Kesavan, Is the Electoral Count Act Unconstitutional?, 80 N.C. L. Rev. 1653, 1656 n.3, 1707 & n.230 (2002).

6     531 U.S. 98 (2000).

7    We explain later why the vice-presidency was a functional imperative, given the Framers' ingenious voting system. See infra notes 26-29 and accompanying text.

8    U.S. Const. art. I, § 3, cl. 4 ("The Vice President of the United States shall be President of the Senate, but shall have no Vote, unless they be equally divided.").

9    U.S. Const. art. II, § 4 (authorizing "remov[al] from Office" of "[t]he President, Vice President and all civil Officers of the United States... on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors").

10   U.S. Const. art. I, § 3, cl. 6 ("The Senate shall have the sole Power to try all Impeachments. When sitting for that Purpose, they shall be on Oath or Affirmation. When the President of the United States is tried, the Chief Justice shall preside: And no Person shall be convicted without the Concurrence of two thirds of the Members present.").

11   Article I, § 3, clause 4 of the United States Constitution designates the Vice-President as "President of the Senate," while Article I, § 3, clause 6 explicitly designates the Chief Justice as presiding officer "[w]hen the President... is tried" in an impeachment, yet does not expand this exception to include vice-presidential impeachments. It is true, of course, that Article I, § 3, clause 5 authorizes the Senate to choose other officers, including a President Pro Tem, and implicitly authorizes the latter to preside "in the absence of the Vice President." This provision would allow the Vice-President voluntarily to vacate his place at the podium during his impeachment trial, but nothing in the text requires this. Even if the Vice-President passed the gavel to the President Pro Tem, that senator could be a blatant partisan who might use his power either to protect or to destroy the incumbent. Rather than allowing the President Pro Tem to intervene, the Framers should have placed the Chief Justice in control of vice-presidential, as well as presidential, impeachments.

12   We are certainly not the first to make this point. See Michael J. Gerhardt, The Federal Impeachment Process: A Constitutional and Historical Analysis 64-65 (1996); Stephen L. Carter, The Political Aspects of Judicial Power: Some Notes on the Presidential Immunity Decision, 131 U. Pa. L. Rev. 1341, 1357 & n.72 (1983); Stephen Carter, The Role of the Courts in Separation of Powers Disputes, 68 Wash. U. L.Q. 669, 675 (1990); Michael Stokes Paulsen, Someone Should Have Told Spiro Agnew, 14 Const. Comment. 245, 245-46 (1997); Richard M. Pious, Impeaching the President: The Intersection of Constitutional and Popular Law, 43 St. Louis U. L.J. 859, 862 n.15 (1999). But see Akhil Reed Amar & Vikram David Amar, Is the Presidential Succession Law Constitutional?, 48 Stan. L. Rev. 113, 122 n.59 (1995) (arguing that general conflict-of-interest principles prevent Vice-Presidents from presiding over their own impeachment trials); John D. Feerick, The Vice-Presidency and the Problems of Presidential Succession and Inability, 32 Fordham L. Rev. 457, 462 & n.30 (1964) (noting that "[p]resumably" the President Pro Tem of the Senate would preside).

13   The Founders had demonstrated a general awareness of the problems of asking an official to serve as a judge in his own case. See, e.g., The Federalist No. 10, at 47 (James Madison) (Clinton Rossiter ed., 1999) ("No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity.").

APPENDIX - 30

14  Called the "Committee of Postponed Parts," the Brearley group was selected on August 31, 1787. 1 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 280 (Jonathan Elliott ed., J.B. Lippincott Co. 1941) (1836) [hereinafter Elliot]. It was composed of eleven elected members, one from each participating state. Id.

15  2 The Records of the Federal Convention of 1787, at 505-31 (Max Farrand ed., 1937) [hereinafter Farrand].

16  By far the best treatment of the Electoral College is provided by Professor Shlomo Slonim, The Electoral College at Philadelphia: The Evolution of an Ad Hoc Congress for the Selection of a President, 73 J. Am. Hist. 35 (1986). Slonim is particularly effective in demonstrating how the Electoral College cleverly solved a host of key problems at the time--most notably (1) enabling the small states and the slave states to extend to the presidency the disproportionate voting power they had won previously in the design of Congress, while (2) allowing the Convention to accommodate separation-of-powers principles. Id. at 51-58. A discussion of these dimensions is beyond the scope of this Article.

17  Even in England, the words "Whig" and "Tory" referred largely to extended groupings of elite families, locked in factional struggle for power and patronage. L.B. Namier, The Structure of Politics at the Accession of George III (1929). For an appreciation of Namier as a political historian, see Linda Colley, Lewis Namier 46-71 (1989).

18  For a penetrating survey of eighteenth-century opposition to the notion of political parties, see Richard Hofstadter, The Idea of a Party System 1-39 (1969).

19  For a general discussion on the role of faction at the time of the Founding, see Gordon S. Wood, The Creation of the American Republic 1776-1787, at 559-60 (1969).

20  See 1 Bruce Ackerman, We the People: Foundations 165-99 (1991).

21  Hofstadter, supra note 18, at 40-73; Daniel Sisson, The American Revolution of 1800, at 23-69 (1974).

22  2 Farrand, supra note 15, at 501 (remarks of James Wilson, Sept. 4, 1787).

23  Id. (remarks of James Wilson, Sept. 4, 1787); see also id. (remarks of Abraham Baldwin, Sept. 4, 1787) (discussing how "increasing intercourse among the people of the States, would render important characters less & less unknown").

24  George Mason was the most emphatic, asserting that a winner would fail to be selected "nineteen times in twenty." Id. at 500 (remarks of George Mason, Sept. 4, 1787); see also id. at 512 (remarks of George Mason, Sept. 5, 1787).

25  Id. at 512 (remarks of Gouverneur Morris, Sept. 5, 1787). Morris was Pennsylvania's representative on the Brearley Committee of Postponed Parts, which was responsible for the Electoral College plan but did not make a formal report in support of its recommendations. Since Morris's arguments mesh so tightly with the Committee's proposal, it is likely that they were broadly shared, especially since analogous points were made earlier in the Convention by other members of the Brearley Committee. See id. at 113 (remarks of Hugh Williamson, July 25, 1787); id. (remarks of Gouverneur Morris, July 25, 1787); id. at 114 (remarks of James Madison, July 25, 1787).

26  See generally Amar & Amar, supra note 12, at 113-26 (arguing that Cabinet officials should follow the Vice-President in presidential succession). In the context of our argument, the Founders could have saved the step of creating a Vice-President and gone straight to Cabinet succession.

27  The first succession statute contemplated a special election in such circumstances, designating the President Pro Tempore of the Senate to serve in the interim. Act of March 1, 1792, ch. 8, §§ 9-10, 1 Stat. 239, 240-41 (repealed 1886). In 1886, Congress passed a law removing the President Pro Tempore and the Speaker of the House from the line of succession, and placed members of the Cabinet in the line of succession. Act of Jan. 19, 1886, ch. 4, § 1, 24 Stat. 1 (repealed 1947). This statute also allowed Congress to decide whether to call a special election to pick a new President. Id. In 1947, Congress passed a new law redesigning the line of succession after the Vice-President, which also eliminated all authority for a special election. See 3 U.S.C. § 19 (2000). The Twenty-fifth Amendment, effective in 1967, provides a procedure for replacing the Vice-President in a rapid fashion, hopefully rendering unnecessary the invocation of the provisions of the 1947 statute. U.S. Const. amend. XXV.

28  2 Farrand, supra note 15, at 537.

APPENDIX - 31

29   U.S. Const. art. II, § 1, cl. 3 ("The Electors shall meet in their respective States and vote by Ballot for two Persons.... The Person having the greatest Number of Votes shall be the President, if such Number be a Majority of the whole Number of Electors appointed....") (amended 1804). The Twelfth Amendment, effective in 1804, changed this rule. U.S. Const. amend. XII ("The Electors shall meet in their respective states, and vote by ballot for President and Vice-President... they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each .... The person having the greatest number of votes for President, shall be the President.... The person having the greatest number of votes as Vice-President, shall be the Vice-President, if such number be a majority of the whole number of Electors appointed.").

30   2 Farrand, supra note 15, at 494.

31   Id. at 524 (remarks of Hugh Williamson, Sept. 6, 1787); see id. at 527 (remarks of Roger Sherman, Sept. 6, 1787); id. (remarks of George Mason, Sept. 6, 1787).

32   In 1800, for example, Virginia's population of 807,557 (and its twenty-two representatives) and Delaware's population of 64,273 (and its one representative) would each be afforded a single vote in the House runoff. U.S. Census Bureau, Historical Statistics of the United States: Colonial Times to 1957, at 13, 693 (1960).

33   The Senate retained the power to select a Vice-President. U.S. Const. art. II, § 1, cl. 3 ("In every Case, after the Choice of the President, the Person having the greatest Number of Votes of the Electors shall be the Vice President. But if there should remain two or more who have equal Votes, the Senate shall chuse from them by Ballot the Vice President.") (amended 1804). The Twelfth Amendment altered this scheme. U.S. Const. amend. XII ("The person having the greatest number of votes as Vice-President, shall be the Vice-President, if such number be a majority of the whole number of Electors appointed, and if no person have a majority, then from the two highest numbers on the list, the Senate shall choose the Vice-President.").

34   2 Farrand, supra note 15, at 513 (remarks of James Madison, Sept. 5, 1787) ("Mr Madison considered it as a primary object to render an eventual resort to any part of the Legislature improbable."). Later in the day, Madison and Williamson moved to amend the Brearley proposal to enable the Electoral College to name the President if "• of the Electors should vote for the same person." Id. at 514. In 1800, this would have permitted a presidential candidate to gain office on the basis of forty-six out of the 276 ballots cast by the electors. Hamilton would have gone further, eliminating the back-up procedure entirely and awarding the presidency to the Electoral College winner regardless of the number of his electoral votes. Id. at 525 (remarks of Alexander Hamilton, Sept. 6, 1787).

35   The anxieties of the small states served as a leitmotiv throughout the Convention's interminable discussions of the presidential selection problem. See Slonim, supra note 16, at 48-51, 55-56. Indeed, when Madison proposed to dilute the required Electoral College majority, he immediately encountered the objection that his amendment "would put it in the power of three or four States to put in whom they pleased." 2 Farrand, supra note 15, at 514 (remarks of Elbridge Gerry, Sept. 5, 1787). Madison's proposal lost by a vote of nine-to-two. Id.

36   On August 24, 1787, the Convention was considering a plan under which the President would be selected by a joint session of the House and Senate, each member casting a single ballot, and the delegates spotted a potential problem posed by a tie vote. 2 Farrand, supra note 15, at 403 ("Mr. Read moved 'that in case the numbers for the two highest in votes should be equal, then the President of the Senate shall have an additional casting vote', which was disagreed to by a general negative.").

37   The window of opportunity for issue-spotting was particularly narrow, given the proposal that came to the floor. Recall that the Brearley Committee had initially proposed that the Senate, not the House, be given the task of selecting a President under the back-up procedure. See supra note 30 and accompanying text. If the Senate had retained this task, the Convention would have had no choice but to maintain a voting rule that granted equality to each state. It was only when the Convention voted to shift the locus of selection authority to the House that new design options, and concomitant complications, arose. But this vote occurred on September 6, toward the end of the Convention's debates. Here is Madison's report of the critical colloquy:

Mr. Williamson suggested as better than an eventual choice by the Senate, that this choice should be made by the Legislature, voting by States and not per capita.

Mr. Sherman suggested the House of Reps. as preferable to "the Legislature", and moved, accordingly,

APPENDIX - 32

To strike out the words "The Senate shall immediately choose &c." and insert "The House of Representatives shall immediately choose by ballot one of them for President, the members from each State having one vote."
Col: Mason liked the latter mode best as lessening the aristocratic influence of the Senate.
2 Farrand, supra note 15, at 527.

38    U.S. Const. art. 2, § 1, cl. 3 (amended 1804) (emphasis added).

39    See James W. Ceaser, Presidential Selection 41-88 (1979).

40    For a recent blow-by-blow account of the politics of the 1790s, see Bernard A. Weisberger, America Afire: Jefferson, Adams, and the Revolutionary Election of 1800 (2000).

41    To be sure, there were many respects in which the two-party competition of the 1790s differed from that of subsequent periods. Professor Ackerman explores this matter at greater length in his other work. See Bruce Ackerman, America on the Brink: The Constitutional Crisis of the Early Republic 25-43 (2001) (unpublished manuscript) (on file with the Virginia Law Review Association).

42    A perceptive treatment of both the politics and substance of the Farewell Address is provided in Stanley Elkins & Eric McKittrick, The Age of Federalism 489-97 (1993).

43    See generally id. (discussing partisan aspects of Washington's Farewell Address).

44    The best account is provided by Dauer, supra note 5, at 92-111.

45    Not to be confused with Charles Pinckney, who ran as Adams's running mate in 1800. Thomas Pinckney had recently returned home after negotiating a popular treaty with Spain. See Frances Leigh Williams, A Founding Family: The Pinckneys of South Carolina 304-09 (1978).

46    Dauer, supra note 5, at 103.

47    Hamilton also impugned the Vermont vote in personal correspondence. On December 1, 1796, he wrote to Jeremiah Wadsworth of his plan to throw the election to Thomas Pinckney, stating that:
Judge Tichener in passing through informed me that from something which had occurred to his recollection while here he feared that the votes of Vermont would be lost for want of being warranted by a subsisting legislative Act. If so, Adams will not have sufficient votes to prevent the question going to the House of Representatives & then we can be at no loss for the result. The whole number I venture to depend on for Adams (including Vermont & two in Pennsylvania) is 73. Take off Vermont and there will be 69 which is less by one than the whole number of Electors.
It may be said that Georgia also is irregular. This I do not consider as certain. But if so at first there was time enough to discover & rectify it. Not so as to Vermont. Besides who will take care to have the necessary authentic proof from Georgia? From Vermont it can be had & our patriots are not likely to neglect it.
Letter from Alexander Hamilton to Jeremiah Wadsworth (Dec. 1, 1796), in 20 The Papers of Alexander Hamilton 418, 418 (Harold C. Syrett ed., 1974) (footnote call numbers omitted). The editor of Hamilton's papers notes that "Tichener" is Isaac Tichenor of Vermont, later a Federalist senator and then governor of the state. Id. at 419 n.3.

48    3 Annals of Cong. 1543 (1797).

49    Id. at 1543-44 (reporting entire tally).

50    If Vermont's selection of its electors had in fact been invalid, Jefferson's sixty-eight votes would have sufficed to gain him the presidency without a runoff. Without Vermont's four electors, only 134 Electors would have been validly appointed, and a majority of these amounted to sixty-eight votes. U.S. Const. art. II, § 1, cl. 3 ("The Person having the greatest Number of Votes shall be the President, if such Number be a Majority of the whole Number of Electors appointed....") (amended 1804) (emphasis added). See supra note 38 and accompanying text for further discussion.

51    The original electoral votes from Vermont state this date explicitly. For a report describing our inspection of the Vermont electoral votes, and where they can be found, see infra note 106.

52    We reviewed the following newspapers: (1) Columbian Centinel from Boston, Massachusetts: Editions from June 1796-March 18, 1797 were examined because Professor Dauer quotes this newspaper as covering the situation surrounding

the Vermont votes, Dauer, supra note 5, at 103-04; (2) South-Carolina State Gazette: Editions from July 4, 1796-February 1797 were examined because it is a southern newspaper, and a Vermont newspaper story stated that there were no problems with the Vermont votes and that it was all part of some sort of southern plot; (3) Columbian Mirror & Alexandria Gazette: Editions from October 1796-February 1797 were examined because it is another southern newspaper and one published in Thomas Jefferson's home state (Jefferson had much to gain if the Vermont votes were deemed invalid); (4) Kentucky Gazette: Editions from December 1796-March 1797 were examined to determine if there was any mention of the problems with the Kentucky electoral votes, discussed infra note 75, and also because it was another (at least quasi-) "southern" newspaper; (5) Greenleaf's New Daily Advertiser: Editions from October 1796-February 1797 were examined because its publisher, Simon Greenleaf, was a prominent Republican, see Jerome Mushkat, Matthew Livingston Davis and the Political Legacy of Aaron Burr, in 3 American Cities 109, 109 (Neil Larry Shumsky ed., 1996), and problems with the Vermont votes would have worked in favor of the Republican party; (6) Aurora & General Advertiser: Editions from June 1796-February 1797 were examined because it was printed in the capitol city at the time of the election; and (7) Gazette of the United States: Editions from June 1796-February 1797 were examined because it was the leading Federalist newspaper published in the capitol city.

[53] Minerva & Mercantile Evening Advertiser (New York), Nov. 26, 1796, at 3.

[54] On November 30, the Gazette of the United States reported that "Vermont, who has chosen electors, is to have no vote on the occasion." Gazette of the United States (Philadelphia), Nov. 30, 1796, at 3. As we have seen, Professor Dauer emphasizes a December 7 story from the Columbian Centinel. Dauer, supra note 5, at 103-04. Here is the full Centinel text:

The account received in town yesterday of the probable loss of the Vermont votes for President and Vice-President, may have an unfortunate effect on the decision of the Electors of this State. Every one feels deeply interested in the event, and the subject was yesterday discussed in the different private circles. Too many opinions have appeared to preponderate in favour of supporting Mr. PINCKNEY, at the risque of sacrificing Mr. ADAMS; but it will become the electors to consider that the voice of the people at large ought to be their guide. If we mean to make our contribution respectable in the eyes of Europeans, if we mean to prove that a republican government signifies the expression of the public voice, we must make it appear that the public voice designates the man who is to fill the first office in our government. If this is not the case, we had better at once trust all to the benevolence of Providence, for ours will become a government of chance, and of the worst kind of chance. Not only our national dignity, but all our essential interests depend upon our respective offices being filled by the men contemplated by the people; and if ever this great principle is done away, the loss of our liberties must soon follow. Besides all this, are we not to consider a little what is due to Mr. ADAMS? Will it be grateful, will it be just to act as if we looked upon him only as a convenience; that we think it will be well enough to have him for President, but as well to have any body else? More than all, and we ought seriously to weigh it, Mr. ADAMS it is ascertained by the best information from the different States, will have a greater number of votes than Mr. JEFFERSON even if Vermont is out of the question. Shall a momentary pusillanimity in Mr. ADAMS's friends put Mr. PINCKNEY in the presidential chair? Shall we by grasping at a shadow, lose the substance? No, Mr. RUSSELL, firmness is expected in the electors, and from their characters we may fairly presume they will not disappoint the public.

Columbian Centinel (Boston), Dec. 7, 1796, at 2. The Aurora & General Advertiser of December reported that "[t]he Vermont election is said to be illegal from the non-existence of any law or resolution under which the Electors could act. The law under which they voted four years ago was temporary, and from a mistaken impression that it was of a permanent nature the electors of that State find themselves unauthorized." Aurora & General Advertiser (Philadelphia), Dec. 12, 1796, at 2. On December 17, however, the Aurora wrote that "[w]e have heard no reason for setting aside the Vermont Electors, that appears of importance sufficient to produce so disagreeable an effect." Aurora & General Advertiser (Philadelphia), Dec. 17, 1796, at 2; see also Letter from Joseph Jones to James Madison (Dec. 15, 1796), in 16 Madison Papers, supra note 5, at 428, 429 ("[T]he probabi[li]ty is that if Vermont has no choice that J. will have the majority necessary to his appointm[en]t.").

Newspapers of all political persuasions reported on the problem. The "decidedly Republican" Aurora & General Advertiser, David Hackett Fischer, The Revolution of American Conservatism 419 (1965), carried the most stories, while the "moderately Republican" Kentucky Gazette, id. at 423, carried only one. Aurora & General Advertiser (Philadelphia), Nov. 29, 1796, at 2; Aurora & General Advertiser (Philadelphia), Nov. 30, 1796, at 2; Aurora & General Advertiser (Philadelphia), Dec. 12, 1796, at 2; Aurora & General Advertiser (Philadelphia), Dec. 15, 1796, at 2; Aurora & General Advertiser (Philadelphia), Dec. 17, 1796, at 2; Aurora & General Advertiser (Philadelphia), Dec. 29, 1796, at 2; Kentucky Gazette, Jan. 18, 1797, at 2.

The "decidedly Federalist" Columbian Centinel, Fischer, supra, at 414, ran a story; the "decidedly Federalist" Gazette of the United States, id. at 419, discussed Vermont; the "moderately Federalist" Columbian Mirror & Alexandria Gazette, id. at 420, carried a story, the "moderately Federalist" South-Carolina State Gazette, id. at 422, ran a story; and the

APPENDIX - 34

"very moderately Federalist" Minerva & Mercantile Evening Advertiser, id. at 417, discussed the Vermont problem. Columbian Centinel (Boston), Dec. 7, 1796, at 2; Gazette of the United States (Philadelphia), Nov. 30, 1796, at 3; Columbian Mirror & Alexandria Gazette (Boston), Dec. 27, 1796, at 3; South-Carolina State Gazette, Dec. 20, 1796; Minerva & Mercantile Evening Advertiser (New York), Nov. 26, 1796, at 3.

55    Aurora & General Advertiser (Philadelphia), Dec. 29, 1796, at 2; see 2 Smith, supra note 5, at 959 n.23; Aurora & General Advertiser (Philadelphia), Dec. 17, 1796, at 2.

56    Aurora & General Advertiser (Philadelphia), Dec. 17, 1796, at 2.

57    Act of March 1, 1792, ch. 8, § 1, 1 Stat. 239, 239; see also U.S. Const. art. II, § 1, cl. 4 ("The Congress may determine the Time of chusing the Electors...."); Aurora & General Advertiser (Philadelphia), Dec. 17, 1796, at 2 (making this argument).

58    We examined various materials in Vermont. At the State Department of Libraries, we examined: (1) compilations of laws passed by the Vermont state legislature from 1778-1799; (2) records of state legislative proceedings from 1778-1799; (3) the public papers of Thomas Chittenden, a leading figure in Vermont politics; (4) Vermont electoral statistics; (5) records of the Council of Censors, a body created by the Vermont Constitution of 1786 and charged with overseeing the legislative and executive branches of Vermont for compliance with the state Constitution; (6) editions of the Vermont Journal from January 1796-March 1797; (7) editions of the Rutland Herald from January 1796-March 1797; and (8) editions of the Vermont Gazette from January 1796-March 1797. At the Secretary of State's office in Montpelier, we searched the personal papers of prominent Vermonters from the 1790s, additional personal papers relating to the 1796 presidential electors, and records of the Governor and Council of Censors. At the Vermont Historical Society in Barre, the personal papers of additional prominent Vermonters from the 1790s were examined. Scholarship on early Vermont was also consulted. See, e.g., Roy Bearse, Vermont: A Guide to the Green Mountain State (1966); Hosea Beckley, The History of Vermont (Brattleboro, Vt., Geoge A. Salisbury 1846); Cora Cheney, Vermont: The State with the Storybook Past (1976); Charles Edward Crane, Let Me Show You Vermont (1937); Walter Hill Crockett, Vermont: The Green Mountain State (1921); Men of Vermont (Jacob G. Ullery ed., Brattleboro, Vt., Geoge A. Salisbury 1894); Perry H. Merrill, Vermont Under Four Flags (1975); Earle Newton, The Vermont Story (1949). Finally, we also consulted materials in the archival collections of John Adams (October 1796-February 1797), Aaron Burr (October 1796-February 1797), and Alexander Hamilton (October 1796-February 1797).

59    5 Journals and Proceedings of the General Assembly of the State of Vermont 1791-1792, at 82-83 (1970) [hereinafter Vermont General Assembly Proceedings] ("The bill entitled, An Act Directing the Mode of Appointing Electors to Elect a President and Vice-President of the United States, was read the second time, accepted, and sent to his Excellency and Council for revision and concurrence, or proposals of amendment."); id. at 87-88 ("The following bills returned from Council concurred, and passed into laws of this State.... An Act Directing the Mode of Appointing Electors to Elect a President and Vice-President of the United States."). The statute provides:
An Act Directing the Mode of Appointing Electors to Elect a President and Vice President of the United States. November 3d, 1791. It is hereby Enacted by the General Assembly of the State of Vermont, That the Electors for electing a President and Vice President of the United States be appointed by the ballots of the Governor and Council and House of Representatives met in grand Committee and that those persons to the number which they have right to appoint who shall have a majority of the votes of said Grand Committee shall be declared to be duly appointed Electors of this State for the purposes aforesaid.
15 Laws of Vermont 1791-1795, at 43 (1966).

60    7 Vermont General Assembly Proceedings, supra note 59, at 350 (1973) ("On motion of Mr. Farrand, Resolved, That his Excellency the Governor and Council be requested to join the House of Representatives in grand committee tomorrow afternoon, to proceed by ballot to make choice of electors, to elect the president and vice-president of the United States."); id. at 354 ("Agreeably to the order of the day, the Governor, Council and House of Assembly, joined in grand committee for the purpose of proceeding, by ballot, to the choice of electors to elect the president and vice-president of the United States.... The ballots being duly and severally taken, Capt. Elijah Dewey was declared duly elected, first; Col. Elisha Shelden, second; John Bridgman, Esq., third; and Oliver Gallup, Esq., fourth; electors to elect the president and vice-president of the United States.").
Newspaper reports confirm this. On November 7, The Rutland Herald reported that "On Friday last the following Gentleman were chosen electors for the choice of a President for the United States. ELIJAH DEWEY, ELISHA SHELDON, JOHN BRIDGMAN, and OLIVER GALLUP, E'qr's." Rutland Herald (Vermont), Nov. 7, 1796, at 3. On November 17, the Gazette of the United States ran a story under a November 7 Rutland dateline stating that "On Friday

APPENDIX - 35

last, the following gentlemen were chosen Electors for the choice of a President for the United States. Elijah Dewey, Elisha Sheldon, John Bridgman, and Oliver Gallup, Esqrs." Gazette of the United States (Philadelphia), Nov. 17, 1796, at 3. These are the four names that appear on Vermont's electoral vote.

61  Act of March 1, 1792, ch. 8, § 1, 1 Stat. 239, 239; 7 Vermont General Assembly Proceedings, supra note 59, at 350, 354 (1973).

62  Clifford L. Lord & Elizabeth H. Lord, Historical Atlas of the United States 79 (1944).

63  There was little doubt, closer to election time, that Vermont wished to cast its votes for Adams. For example, the South-Carolina State Gazette reported on November 19 that "[t]he Legislature of Vermont choose[s] the Electors for that State. That they will be true Federalists is undoubted." South Carolina State Gazette, Nov. 19, 1796.

64  See supra note 54 and accompanying text.

65  Although Jefferson was a leading contestant for the presidency in 1796, he "remained at Monticello until the twentieth of February; then rode for Philadelphia, arriving on March 2, 1797." Nathan Schachner, Thomas Jefferson 587 (1964). This means that he did not witness the vote-counting ritual in February. Indeed, Jefferson wrote a letter to Madison on January 30 with a Monticello dateline saying that he did not wish to come to Philadelphia even for the inauguration ceremonies in March (asserting that he need not attend). Letter from Thomas Jefferson to James Madison (Jan. 30, 1797), in 16 Madison Papers, supra note 5, at 479, 479. He evidently changed his mind later. There is no evidence that he was aware of Adams's precedent.

66  Letter from James Madison to Thomas Jefferson (Dec. 25, 1796), in 16 Madison Papers, supra note 5, at 435, 435.

67  Letter from Thomas Jefferson to James Madison (Jan. 16, 1797), in 16 Madison Papers, supra note 5, at 461, 461.

68  In the December 21 edition of Greenleaf's New Daily Advertiser, the Vermont votes were reported and a story with a Rutland dateline appeared stating that "[o]n Wednesday, the electors for the choice of a President and Vice-President of the United States, met in this town.--We are informed that all their votes were for the Hon. JOHN ADAMS, and the Hon. THOMAS PINCKNEY, Esqrs." Greenleaf's New Daily Advertiser (New York), Dec. 21, 1796, at 3. On December 22, the Gazette of the United States and Greenleaf's New Daily Advertiser both counted Vermont's votes for the Federalists in their electoral vote chart. Gazette of the United States (Philadelphia), Dec. 22, 1796, at 3; Greenleaf's New Daily Advertiser (New York), Dec. 22, 1796, at 3. The Aurora & General Advertiser from that day ran a story stating that "[f]rom good authority we are [unreadable word] that the Electors of the State of Vermont have voted for John Adams and Thomas Pinckney." Aurora & General Advertiser (Philadelphia), Dec. 22, 1796, at 2. The editions of the Gazette of the United States over the next two days counted the Vermont votes, and the same is true of the December 24, 1796, editions of the Columbian Centinel and Greenleaf's New Daily Advertiser. Gazette of the United States (Philadelphia), Dec. 23, 1796, at 3; Gazette of the United States (Philadelphia), Dec. 24, 1796, at 3; Columbian Centinel (Boston), Dec. 24, 1796, at 2; Greenleaf's New Daily Advertiser (New York), Dec. 24, 1796, at 3.

69  In previous correspondence with Madison, Jefferson had already suggested an unwillingness to press partisanship too far in an effort to obtain the presidency. His letter of December 17 contemplated the possibility that some of Adams's enemies in the Federalist party might seek to deprive Adams of the electoral votes that were rightly his, leading to a Jefferson-Adams dead-heat. Once again, Jefferson was explicit in his instructions: "I pray you and authorize you fully to solicit on my behalf that mr. Adams may be preferred. He has always been my senior from the commencement of our public life, and the expression of the public will being equal, this circumstance ought to give him the preference." Letter from Thomas Jefferson to James Madison (Dec. 17, 1796), in 16 Madison Papers, supra note 5, at 431, 431-32.

70  Letter from Thomas Jefferson to James Madison (Jan. 16, 1797), in 16 Madison Papers, supra note 5, at 461, 461.

71  If Vermont's 1791 electoral statute had lapsed, then it had not validly appointed its four 1796 Electors, leaving only 134 remaining in the pool. Under the Constitution, this meant that Jefferson's sixty-eight votes were sufficient for him to prevail without a runoff. See supra note 50.

72  6 Annals of Cong. 2097-98 (1797) (second emphasis added). Some of the accounts of vote-counting day in 1797 simply copy the Annals of Congress report that Adams sat for a moment. 2 Abridgment of the Debates of Congress 63 (Thomas Borden ed., New York, D. Appleton & Co. 1857); Counting Electoral Votes, supra note 5, at 15 (reporting proceedings of Feb. 8, 1797); McKnight, supra note 5, at 392; Presidential Counts, at xxii (New York, D. Appleton & Co. 1877).

APPENDIX - 36

Others are identical in substance to the Annals but provide abbreviated versions, leaving out various details. These omit any mention of Adams's momentary pause but do not contradict the fuller accounts. H. Jour., 4th Cong., 2d Sess. 685-86 (1797); S. Jour., 4th Cong., 2d Sess. 320 (1797); Presidential Counts, supra, at 6, 9; Aurora & General Advertiser (Philadelphia), Feb. 9, 1797, at 3.

[73] The various accounts of Adams's conduct in 1793 are briefer than in 1797, and it is possible that Adams indeed sat for a moment but that this action was not recorded. Counting Electoral Votes, supra note 5, at 10-11; 3 Annals of Cong. 874-75 (1793); H. Jour., 2d Cong., 2d Sess. 701-02 (1793); S. Jour., 2d Cong., 2d Sess. 485-86 (1793); 1 Abridgment of the Debates of Congress, supra note 72, at 385-86; McKnight, supra note 5, at 390-91; Presidential Counts, supra note 72, at xxii, 3. No explicit mention, however, is made of such behavior.

[74] 1 Stanwood, supra note 5, at 52.

[75] There may also have been technical problems with the Kentucky electoral votes in 1797. Several sources state that Adams announced that there was only one copy of Kentucky's electoral votes. 6 Annals of Cong. 2096 (1797); 2 Abridgment of the Debates of Congress, supra note 72, at 62; Counting Electoral Votes, supra note 5, at 14-15; McKnight, supra note 5, at 392. After inspection of the National Archives collection of electoral votes, it appears that there are, in fact, duplicate copies of the Kentucky votes in the archives, but perhaps the duplicate was missing on vote-counting day in 1797.
There was also debate about events in
Pennsylvania. Two Jefferson supporters may have been elected, but their returns were submitted late and two Federalists presented themselves as the legitimate electors. Letter from Joseph Jones to James Madison (Dec. 15, 1796), in 16 Madison Papers, supra note 5, at 428, 429 n.1. In the end, it does not appear to have mattered all that much, as one of the two Federalist electors voted for Jefferson regardless. Letter from Thomas Jefferson to T.M. Randolph (Jan. 9, 1797), in Jefferson Papers 17286-87, available at http:// memory.loc.gov/ammem/mtjhtml/mtjser1.html (on file with the Virginia Law Review Association).

[76] Walter Berns, Freedom of the Press and the Alien and Sedition Laws: A Reappraisal, 1970 Sup. Ct. Rev. 109, 111 ("With the exception of the Civil War and the periods immediately preceding and succeeding it[,]... America probably has not known a time when its politics were conducted with such vehemence and hatred.").

[77] See, e.g., Alexander DeConde, The Quasi-War 10-12, 28, 41 (1966).

[78] See, e.g., Letter from Thomas Jefferson to Phillip Mazzei (Apr. 24, 1796), in 7 The Writings of Thomas Jefferson 72, 75-76 (Paul L. Ford ed., New York, G.P. Putnam's Sons 1896) (referring to the Federalists as an "Anglican [,] monarchical, & aristocratical party"). A North Carolina newspaper put it this way:
Thomas Jefferson first drew the declaration of American independence;--he first framed the sacred political sentence that all men are born equal. John Adams says this is all a farce and a falsehood; that some men should be born Kings, and some should be born Nobles. Which of these, freemen of Pennsylvania, will you have for your President? Will you, by your votes, contribute to make the avowed friend of monarchy, President?--or will you, by neglectfully staying at home, permit others to saddle you with Political Slavery? Adams has Sons who might aim to succeed their father; Jefferson like Washington has no son. Adams is a fond admirer of the British Constitution, and says it is the first wonder of the world. Jefferson likes better our Federal Constitution, and thinks the British full of deformity, corruption and wickedness. Once more fellow citizens!
Edenton State Gazette of North Carolina, Nov. 24, 1796.

[79] This familiar story is well summarized in Weisberger, supra note 40, at 200-24.

[80] Tadahisa Kuroda, The Origins of the Twelfth Amendment 72-82 (1994).

[81] Counting Electoral Votes, supra note 5, at 18. Such irregularities included:
the constitutional qualifications of the persons voted for as President and Vice-President of the United States, upon the constitutional qualifications of the electors appointed by the different States, and whether their appointment was authorized by the State legislature or not; upon all petitions and exceptions against corrupt, illegal conduct of the electors, or force, menaces, or improper means used to influence their votes; or against the truth of their returns, or the time, place, or manner of giving their votes.
Id.

[82] Id. at 17.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

83    Id.

84    Id. at 18.

85    10 Annals of Cong. 670, 674 (1800).

86    See 2 Albert J. Beveridge, The Life of John Marshall 453-57 (1916).

87    10 Annals of Cong. 670, 674; see Counting Electoral Votes, supra note 5, at 24; Aurora & General Advertiser (Philadelphia), Feb. 19, 1800, at 2 (reprinting the bill's text in full).

88    See 2 Beveridge, supra note 86, at 456; Kuroda, supra note 80, at 80-82.

89    As sitting Vice-President, Jefferson was, of course, an interested observer, and was unimpressed by Marshall's efforts to control the Grand Committee:
[T]he bill for the election of the Pres and V P has undergone much revolution. Marshall made a dexterous manoeuver; he declares against the constitutionality of the Senate's bill, and proposes that the right of decision of their grand committee should be controllable by the concurrent vote of the two Houses of congress; but to stand good if not rejected by a concurrent vote. You will readily estimate the amount of this sort of controul. The committee of the H. of R., however, took from the Committee the right of giving any opinion, requiring them to report facts only, and that the votes returned by the states should be counted, unless reported by a concurrent vote of both Houses. In what form they will pass them or us, cannot be foreseen.
Letter from Thomas Jefferson to Edward Livingston (Apr. 30, 1800) in Jefferson Papers 18274, available at http://memory.loc.gov/ammem/mtjhtml/mtjser1.html (on file with the Virginia Law Review Association). Jefferson seems to have misread Marshall's bill, which required both houses to uphold the Committee's decision before a full rejection could occur. Jefferson asserts that the Committee's decision would be valid unless both houses affirmatively rejected their findings.

90    Letter from Thomas Jefferson to James Monroe (Dec. 20, 1800), quoted in Dumas Malone, Jefferson and the Ordeal of Liberty 496 (1962). This letter can be found at the Library of Congress, Jefferson Papers 18511 (available at http://memory.loc.gov/ammem/mtjhtml/mtjser1.html).

91    Act of March 1, 1792, ch. 8, § 5, 1 Stat. 239, 240.

92    See supra note 30 and accompanying text.

93    Id.

94    Professor Ackerman recounts their scheming at length in a forthcoming book. See Ackerman, supra note 41, at 60-132.

95    Act of March 1, 1792, ch. 8, § 4, 1 Stat. 239, 240. (empowering the Secretary of State to send a messenger to a state only if "a list of votes" had not been received by the first Wednesday in January).

96    U.S. Const. art. II, § 1, cl. 3.

97    Letter from Thomas Jefferson to John Marshall (Dec. 28, 1800), in 6 The Papers of John Marshall 45, 45-46 (Charles F. Hobson et al. eds., 1990) ("I have the honor to inform you that a list of the votes for President & Vice-president of the US. has come to my hands from every state of the union; and consequently that no special messenger to any of them need be provided by the department of state.").

98    See infra notes 122-23 and accompanying text.

99    U.S. Const. art. II, § 1, cl. 3.

100    See supra note 54.

101    Of course, Adams could not have known this in advance.

102    U.S. Const. art. II, § 1, cl. 3.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   

103    Act of March 1, 1792, ch. 8, § 3, 1 Stat. 239, 240.

104    Id.

105    Id. § 2. A further detail: The electors are actually instructed to create three copies of the relevant documents, and place them in three separate envelopes containing three superscriptions. One set is personally delivered and one is mailed to the President of the Senate; the third goes to a local federal district judge for safekeeping. Id. § 2. Likewise, the state executive is instructed to prepare three copies of the certificate of ascertainment, one copy to be included in each set of electoral documents prepared by the electors. Id. § 3.

106    We have inspected every vote certificate submitted by the state Electors in the course of the first six elections. With the exception of Georgia's in 1800, each is in perfect order. At our request, the Library of Congress has prepared a microform of these early electoral votes. See Electoral Vote Records, Film. No. 189 (on file with the Yale Law Library) [hereinafter "Electoral Vote Records" ].
       The first election, held in 1788, preceded the first session of Congress as well as the Act of 1792. New Hampshire submitted only the letter from the Electors required by Article II, with no letter from any "executive authority" as would have been required by the Act of 1792. Act of March 1, 1792, ch. 8, § 3, 1 Stat. 239, 240. Two states (Georgia and Maryland) did not send two copies of each item to the Capitol, as would later be required by the Act of 1792. Id. § 2. But in all other respects, the state documents fully comply with the rules laid down in the subsequent statute.

107    For those who find the script difficult to decipher, this document states that the Electors (whose four names appear below) met at a "place directed for the Electors to meet for the Election of President" and that "We the underwritten Electors do certify the above [four votes for Jefferson and four votes for George Clinton] to be a true" list of their votes.

108    U.S. Const. art. II, § 1, cl. 3.

109    Id.

110    We have inspected the original documents at the National Archives in Washington, D.C.

111    U.S. Const. art. II, § 1, cl. 3.

112    Id.

113    In the language of Article II and the Act of 1792, the "sign, certify, and transmit" language is modified by the pronoun "they," clearly referring to the electors. U.S. Const. art. II, § 1, cl. 3 (stating that "they [the electors] shall sign and certify, and transmit" the electoral votes) (emphasis added); Act of March 1, 1792, ch. 8, § 2, 1 Stat. 239, 239-40 (stating that the electors "shall make and sign three certificates of all the votes by them given, and [the electors] shall seal up the same certifying on each that a list of the votes of such state for President and Vice President is contained therein"). This makes perfect practical sense-- would the Framers or the authors of the 1792 Act have wanted the electors to draft and certify part of the package and have some unnamed other complete the process?

114    U.S. Const. art. II, § 1, cl. 3.

115    Id.

116    See supra note 106 and accompanying text.

117    See infra note 120 and sources cited therein.

118    This document states that:
       Pursuant to [their] duty as Electors for the State of Tennessee, having convened in Knoxville on the first Wednesday of December in the year [one thousand] eight hundred and being legally qualified, we do certify that we voted by ballot for President and Vice President of the United States. And upon counting, the votes they were as follows [three for Jefferson and three for Burr].
       The signatures of the electors appear below this statement. Electoral Vote Records, supra note 106.

APPENDIX - 39

119   The text is simplifying in one particular. Remember that the statute required the preparation of three sets of documents--two to be delivered to the President of the Senate and one to a local federal district judge. See supra note 105.

120   C. Peter McGrath, Yazoo 7 (1966). Georgia was very much a frontier state at the time, without a great deal of legal talent. See generally W.W. Abbot, The Royal Governors of Georgia: 1754-1775 (1959); T.S. Arthur & W.H. Carpenter, The History of Georgia, from Its Earliest Settlement to the Present Time (Philadelphia, Lippincott, Grambo & Co. 1852); Kenneth Coleman, The American Revolution in Georgia: 1763-1789 (1958); James F. Cook, The Governors of Georgia: 1754-1995 (1995); 2 Walter G. Cooper, The Story of Georgia (1938); 1 Warren Grice, Georgia Through Two Centuries (E. Merton Coulter ed., 1966); Amanda Johnson, Georgia as Colony and State (1938); 2 Charles C. Jones, Jr., The History of Georgia (Cambridge, The Riverside Press 1883); Spencer B. King, Jr., Georgia Voices: A Documentary History to 1872 (1966); Albert B. Saye, New Viewpoints in Georgia History 1732-1789 (1943); George Gillman Smith, The Story of Georgia and the Georgia People: 1732 to 1860 (1900).

121   McGrath, supra note 120, passim.

122   Act of March 1, 1792, ch. 8, § 2, 1 Stat. 239, 239-40.

123   There were five newspapers in Georgia at the time (the Augusta Chronicle, the Augusta Herald, the Columbian Museum & Savannah Advertiser, the Georgia Gazette, and the Louisville Gazette, the last of which became the Louisville Gazette & Republican Trumpet in April 1800), and we examined every edition of all five spanning the period of January 1800 to February 1801. We also examined editions of every newspaper in print anywhere in the country over the period of January to March 1801, as well as every edition of the Gazette of the United States published in 1800. Our conclusion: In the months leading up to the election, there was some uncertainty about the ultimate result, but as election day neared, the reports consistently indicated that Georgia would vote for Jefferson and Burr. On May 9, the Columbian Museum & Savannah Advertiser reported that Georgia would give four votes to Thomas Jefferson and four votes to Charles Pinckney in the upcoming election. Columbian Museum & Savannah Advertiser, May 9, 1800, at 2. On July 22, by contrast, the same publication reported that Georgia would give four votes each to Thomas Jefferson and Aaron Burr without explanation. Columbian Museum & Savannah Advertiser, July 22, 1800, at 3. On November 8, 1800, the Augusta Herald reported that Georgia would give four votes to Jefferson, while on November 11, 1800, the Gazette of the United States reported that Georgia would give two votes to Jefferson, two votes to Burr, two votes to Adams, and two votes to Pinckney, citing the "Columbian Mirror" as its source for the report. Augusta Herald, Nov. 8, 1800, at 2; Gazette of the United States (Philadelphia), Nov. 11, 1800. Four days later, the Gazette reported that Jefferson would receive four votes and that four votes would be "scattering." Gazette of the United States (Philadelphia), Nov. 15, 1800, at 3. But by November 19, the Louisville Gazette & Republican Trumpet reported that "it is now reduced to a certainty, that Mr. Jefferson will get the four votes of this State, for president," before repeating the names of the four electors the state legislature apparently picked originally: Morrison, Smelt, Graybill, and Lumpkin. Louisville Gazette & Republican Trumpet, Nov. 19, 1800, at 3. The Augusta Herald edition for November 26 repeated this information. Augusta Herald, Nov. 26, 1800, at 3. In its December 10 edition, the Augusta Herald discussed how each state had voted in the presidential election, and reported that Georgia had voted for Jefferson. Augusta Herald, Dec. 10, 1800, at 3. The same day, the Louisville Gazette & Republican Trumpet reported that "the State of Georgia w[ill] furnish four votes for Jefferson." Louisville Gazette & Republican Trumpet, Dec. 10, 1800, at 1. On December 26, the Gazette of the United States reported that the "Electors of President and Vice-President in the State...[of] Georgia, have given a unanimous vote for Mr. Jefferson and Mr. Burr." Gazette of the United States (Philadelphia), Dec. 26, 1800, at 3.

124   10 Annals of Cong. 1023-24 (1801).

125   None of the reports of Jefferson's actions from that day indicate that he paused or sat down. Counting Electoral Votes, supra note 5, at 30-31, 33; 10 Annals of Cong. 1023 (1801); H. Jour., 6th Cong., 1st Sess. 796-99 (1801); S. Jour., 6th Cong., 1st Sess. 124-25 (1801); 2 Abridgment of the Debates of Congress, supra note 72, at 531; McKnight, supra note 5, at 393; Presidential Counts, supra note 72, at xxii, 11, 16.

126   Aurora & General Advertiser (Philadelphia), Feb. 11, 1801, at 2.

127   Fischer, supra note 54, at 419 (identifying the Aurora as a "decidedly Republican" newspaper).

128   Columbian Centinel (Boston), Feb. 21, 1801, at 2; Columbian Museum & Savannah Advertiser, Feb. 27, 1801, at 3; Pennsylvania Gazette (Philadelphia), Feb. 18, 1801, at 2; Philadelphia Gazette & Daily Advertiser, Feb. 14, 1801, at 3; Spectator (New York), Feb. 18, 1801, at 3. The Centinel and The Philadelphia Gazette & Daily Advertiser were

APPENDIX - 40

"decidedly Federalist," Fischer, supra note 54, at 414, 419. The Spectator and the Pennsylvania Gazette were "moderately Federalist." Id. at 417, 419. The Columbian Museum and Savannah Advertiser was "very moderately Federalist." Id. at 422. Again, the Aurora was "decidedly Republican." Id. at 419.

[129]   Mercury & New-England Palladium (Boston), Feb. 24, 1801, at 2.

[130]   See supra notes 127-28.

[131]   See supra notes 126, 128.

[132]   A bill introduced on February 14, 1800, attempted to define the duties of the tellers, granting them strictly ministerial authority:

[T]o receive the certificates of the Electors from the President of the Senate, after they shall have been opened and read, and to note in writing, the dates of the certificates, the names of the Electors, the time and place of their meeting, the number of votes given, and the names of the persons voted for; and also, the substance of the certificates from the Executive authority of each state, accompanying the certificates of the Electors....

A Bill Prescribing the mode of deciding disputed elections of President and Vice President of the United States, S., 6th Cong. (1800), microformed on 6th Congress, 1799-1801: Senate Bills (Library of Congress). For reference to the date of introduction, see Counting Electoral Votes, supra note 5, at 16; S. Jour., 6th Cong., 1st Sess., 23, 31 (1800). In any event, it failed to pass Congress. Kuroda, supra note 80, at 78-82.

[133]   10 Annals of Cong. 1024 (1801) (emphasis added).

[134]   McKnight describes the likely behavior of the tellers: "We all know that the custom of the tellers at a meeting is for one to count out aloud the votes as they are given and for the others to record them; this is undoubtedly what they did here on this extraordinary and unique occasion." McKnight, supra note 5, at 292. Other sources also indicate that the tellers read the votes aloud. The analytical introduction to Presidential Counts states that "[i]n practice, the tellers have read the votes, one by one, after they have been opened or the seals broken, sometimes unbroken, by the presiding officer, or in some instances the packages with unbroken seals handed over by the presiding officer." Presidential Counts, supra note 72, at xiii.

[135]   These conclusions about the order of events are based on an extensive review of all available accounts of vote-counting day from the first election up through that of 1840, including (1) Annals of Congress (vote-counting day from 1789-1821); (2) Journal of the House of Representatives (vote-counting day from 1789-1817); (3) Journal of the Senate (vote-counting day from 1789-1817); (4) Abridgment of the Debates of Congress (vote-counting day from 1789-1801 and 1809-1841); (5) Gales & Seaton's Register of Debates in Congress (vote-counting day from 1825-1833); and (6) Counting Electoral Votes (vote-counting day from 1789-1841). Our survey extended to various secondary sources, including Dougherty, supra note 5; McKnight, supra note 5; Stanwood, supra note 5; and Presidential Counts, supra note 72.

[136]   See, e.g., John W. Burgess, The Law of the Electoral Count, 3 Pol. Sci. Q. 633 (1888); C.C. Tansill, supra note 5. There is only one scholar whose writing suggests that he may have examined the actual electoral documents in the National Archives. He does not, however, mention the legal problems with the Georgia vote, perhaps because he is not a lawyer. Kuroda, supra note 80, at 202 n.48 (1994) (including a citation to the actual Georgia electoral votes of 1800). None of the biographies of Jefferson or studies of the 1800 presidential election mentions the February 11 incident. We searched a multitude of Jefferson biographies available at the Library of Congress, and none of them contain any references to the incident. See, e.g., Joyce Appleby, Thomas Jefferson (2003); Alen Axelrod, Life and Work of Thomas Jefferson (2001); Joseph J. Ellis, American Sphinx: The Character of Thomas Jefferson (1996); Dumas Malone, Jefferson and His Time (1948); Dumas Malone, Thomas Jefferson as Political Leader (1963); Nathan Schachner, Thomas Jefferson: A Biography (1951); Weisberger, supra note 40.

[137]   Not entirely serendipitous: Professor Ackerman was preparing to write a book on the constitutional implications of the Jeffersonian "Revolution of 1800," and was systematically researching the biographies of the leading protagonists in the struggle. See Ackerman, supra note 41. There are lots of biographies of lots of protagonists, however, and it would have been easy to have missed the reference in a single tome.

[138]   2 Matthew L. Davis, Memoirs of Aaron Burr with Miscellaneous Selections from His Correspondence 71-73 (New York, Harper & Bros. 1836).

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

139     Senator Wells's papers are located at the Historical Society of Delaware in Wilmington, Delaware and at the University of Pennsylvania. Representative Nicholas's papers are located at Columbia University, the Library of Congress, and the University of Virginia. Representative Rutledge's papers are located at Duke University, the Library of Congress, and the University of North Carolina at Chapel Hill. See also Robert K. Ratzlaff, John Rutledge, Jr., South Carolina Federalist, 1766-1819 (1982) (summarizing Rutledge's political life); Patrick J. Furlong, John Rutledge, Jr., and the Election of a Speaker of the House in 1799, 24 Wm. & Mary Q., 3d ser., 432 (1967) (reproducing a letter written by Rutledge). Jefferson's papers are scattered, but most are now online, and all are indexed at the Library of Congress. Davis's papers are located at the New York Historical Society.

    We also searched archival collections for John Adams, Aaron Burr, Alexander Hamilton, Robert Goodloe Harper, Thomas Jefferson, James Madison, John Nicholas, Wilson Cary Nicholas, Charles Pinckney, Thomas Pinckney, John Rutledge, Jr., and Samuel Smith.

140     Davis was sharply critical of Jefferson's victory in 1800. See Letter from Matthew L. Davis to Albert Gallatin (Jan. 2, 1801), in Matthew Livingston Davis Papers (New York Historical Society); Letter from Matthew L. Davis to Edward P. Livingston (Feb. 4, 1804), in Matthew Livingston Davis Papers (New York Historical Society). He frequently criticized Jefferson for his "lack of good character" and "unethical impulses." See id. His strong partisanship was undoubtedly sharpened when Jefferson rejected Burr's nomination of Davis to the lucrative position of naval officer for the New York City Custom House. See Howard Lee McBain, De Witt Clinton and the Origin of the Spoils System in New York 140-44, reprinted in 28 Studies in History, Economics and Public Law 1 (1907).

141     Mushkat, supra note 52, at 107 ("Davis, as most historians view him, was a man who could never resist a shady deal or a dishonest dollar, a man whose political acumen was constantly available for sale to the highest bidder.").

142     Professor Mushkat notes that Davis "destroyed many letters that he considered damaging, altered others, and generally operated on the premise that future generations had no right to know the real Aaron Burr." Id.; see also Worthington C. Ford, Some Papers of Aaron Burr, 29 Proc. Am. Antiquarian Soc'y 43, 44-45 (1919) ("[T]he righteous indignation of every student of the Burr period is fittingly directed against [Davis]. To dip casually into a collection and select almost accidentally a few papers would be a procedure to shame a modern investigator.... He took unpardonable liberties with the text of some which he did print.").

143     Here is his statement:

    It is a matter of perfect notoriety, that among the papers left in my possession by the late Colonel Burr, there was a mass of letters and copies of letters written or received by him, from time to time, during a long life, indicating no very strict morality in some of his female correspondents. These letters contained matter that would have wounded the feelings of families more extensively than could be imagined. Their publication would have had a most injurious tendency, and created heartburnings that nothing time could have cured.

    As soon as they came under my control I mentioned the subject to Colonel Burr; but he prohibited the destruction of any part of them during his lifetime. I separated them, however, from other letters in my possession, and placed them in a situation that made their publication next to impossible, whatever might have been my own fate.

    1 Davis, supra note 138, at v.

144     Davis states that he edited Burr's papers "with the most scrupulous regard to [his] own reputation for correctness." Id. According to Davis, the Burr Memoirs "stated facts, and the fair deductions from them, without the slightest intermixture of personal feeling." Id.

145     Aurora & General Advertiser (Philadelphia), Feb. 16, 1801, at 2.

146     2 Davis, supra note 138, at 72.

147     See supra note 113 and accompanying text.

148     2 Davis, supra note 138, at 72.

149     U.S. Const. art. II, § 1, cl. 3 ("The President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted.") (emphasis added).

APPENDIX - 42

150   A final detail of Davis's account requires separate consideration. He says that, after hurriedly counting the Georgia vote into the Republican column, Jefferson "handed to the tellers the package from the next state." 2 Davis, supra note 138, at 73. It is possible (though not likely), however, that Georgia's envelope was opened last.

The electoral votes were not counted in state alphabetical order. Instead, a peculiar geographic ordering had become customary. In 1797, for example, John Adams began in the South with Tennessee and worked his way northward. Counting Electoral Votes, supra note 5, at 12-13; S. Jour., 4th Cong., 2d Sess. 320 (1797); 2 Abridgment of the Debates of Congress, supra note 72, at 62-63; Presidential Counts, supra note 72, at 9. In 1801, Jefferson began with New Hampshire and worked his way southward. Counting Electoral Votes, supra note 5, at 30, 33; 10 Annals of Cong. 1023-24 (1801); H. Jour., 6th Cong., 2d Sess. 796-98 (1801); S. Jour., 6th Cong., 2d Sess. 124-25 (1801); 2 Abridgment of the Debates of Congress, supra note 72; Presidential Counts, supra note 72, at xxii, 11, 16.

Georgia might be deemed the southernmost state on some reckonings, thereby suggesting that its envelope would have been opened last. Georgia's votes were counted last, after South Carolina's, in 1793. Counting Electoral Votes, supra note 5, at 10; H. Jour., 2d Cong., 2d Sess. 702 (1793); S. Jour., 2d Cong., 2d Sess. 485 (1793); McKnight, supra note 5, at 390-91. But in 1797, all reports except one indicate that Georgia was counted third (after Tennessee and Kentucky). Counting Electoral Votes, supra note 5, at 13; 9 S. Jour., 4th Cong., 2d Sess. 320 (1797). But see H. Jour., 4th Cong., 2d Sess. 686 (1797) (listing Georgia last). In 1805, Georgia was counted before Tennessee, Kentucky, and Ohio (which had not been in the Union for the 1800 election), and occupied this position for quite a while. Counting Electoral Votes, supra note 5, at 36; 14 Annals of Cong. 1195 (1805); H. Jour., 8th Cong., 2d Sess. 137 (1805); S. Jour., 8th Cong., 2d Sess. 453 (1805); Presidential Counts, supra note 72, at 19, 21.

Accounts dealing with February 11, 1801, disagree on the order of voting. Several sources list Georgia last in the state-by-state vote graphs. Counting Electoral Votes, supra note 5, at 30; 10 Annals of Cong. 1023 (1801); S. Jour., 6th Cong., 2d Sess. 125 (1801); 2 Abridgment of the Debates of Congress, supra note 72, at 531; Presidential Counts, supra note 72, at 11, 16. Yet others place it third-to-last, followed by Kentucky and Tennessee. H. Jour., 6th Cong., 2d Sess. 799 (1801); Stanwood, supra note 5, at 63. This placement is more consistent with Georgia's treatment in the immediately preceding and succeeding electoral counts.

151   McKnight, supra note 5, at 293.

152   Id.

153   See supra notes 5, 136.

154   10 Annals of Cong. 1024 (1801).

155   Id.

156   Id.

157   Letter from Thomas Jefferson to James Madison (Jan. 16, 1797), in 16 Madison Papers, supra note 5, at 461, 461.

158   See supra note 123.

159   Our review included an examination of the following materials: (1) the papers of eight of the most prominent Georgia political figures of the period (Georgia Historical Society, Savannah) (additionally, each of the other collections was searched for papers concerning these eight personalities); (2) every edition of every Georgia newspaper from January 1800 to February 1801 (University of Georgia Hargrett Library for Rare Books and Manuscripts, Athens); (3) records of the Georgia Senate and the Georgia House of Representatives for 1799 and 1800; and (4) a book containing the Governor's outgoing official correspondence covering the period between January 1799 and March 1801 (Georgia Department of Archives and History, Atlanta). A broad range of secondary literature was also examined. See supra note 120 and sources cited therein; see also E. Merton Coulter, Abraham Baldwin: Patriot, Educator, and Founding Father (1987); William Omer Foster, Sr., James Jackson: Duelist and Militant Statesman (1960); Harvey H. Jackson, Lachlan McIntosh and the Politics of Revolutionary Georgia (1979); George R. Lamplugh, Politics on the Periphery: Factions and Parties in Georgia, 1783-1806 (1986); Walter McElreath, A Treatise on the Constitution of Georgia (1912); Albert Berry Saye, A Constitutional History of Georgia: 1732-1968 (1970); E. Merton Coulter, Edward Telfair, 20 Ga. Hist. Q. 99 (1936); Patrick J. Furlong, Abraham Baldwin: A Georgia Yankee as Old Congress-man, 56 Ga. Hist. Q. 51 (1972); George R. Lamplugh, George Walton, Chief Justice of Georgia, 1783-1785, 65 Ga. Hist. Q. 82 (1981); George R. Lamplugh, "Oh the Colossus! The Colossus!": James Jackson and the Jeffersonian Republican Party in Georgia,

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   43

1796-1806, 9 J. Early Republic 315 (1989); Edwin Bridges, George Walton: A Political Biography (1981) (unpublished Ph.D. dissertation, University of Chicago) (on file with the University of Chicago Library).

[160] Letter from Governor James Jackson to Abraham Baldwin (Dec. 5, 1800), in Abraham Baldwin Papers (University of Georgia at Athens).

[161] On November 19, the Louisville Gazette & Republican Trumpet reported that "[i]t is now reduced to a certainty that Mr. Jefferson will get the four votes in this state for president." Louisville Gazette & Republican Trumpet, Nov. 19, 1800, at 3. Reports that Georgia voted for Jefferson and Burr appear in various editions of the Augusta Herald and the Georgia Gazette. Augusta Herald, Dec. 13, 1800, at 3; Augusta Herald, Dec. 27, 1800, at 2; Augusta Herald, Jan. 3, 1801, at 3; Augusta Herald, Jan. 17, 1801, at 2; Augusta Herald, Jan. 28, 1801, at 2; Georgia Gazette, Jan. 8, 1801, at 3.

[162] Journal of the Ga. S. 29 (Nov. 30, 1799).

[163] Act of March 1, 1792, ch. 8, § 1, 1 Stat. 239, 239.

[164] Journal of the Ga. S. 39 (Dec. 5, 1799); see also Augusta Herald, Nov. 5, 1800, at 3 (referencing this problem with the proposed law). We have been unable to identify any Georgia law enacted before 1800 that regulated the selection of presidential electors.

[165] Journal of the Ga. H.R. 62-63 (Nov. 5, 1800); Journal of the Georgia Senate 7-8 (Nov. 5, 1800). On November 18, both houses of the Georgia state legislature met and picked John Morrison, Dennis Smelt, Henry Greybill, and John Lumpkin as presidential electors. Journal of the Ga. H. R. 81 (Nov. 18, 1800); Journal of the Ga. S. 25 (Nov. 18, 1800).
There is another ambiguity. David Blackshear cast one of the electoral votes from Georgia, but he was not chosen as one of the original electors. On November 18--the day the state legislature picked Smelt, Morrison, Greybill and Lumpkin--Governor Jackson may have discovered that Lumpkin could not serve due to family illness, and he may have appointed Blackshear in Lumpkin's place. In the Abraham Baldwin Papers, there is an official gubernatorial document (complete with seal) that mentions the "executive appointment of David Blackshear as an Elector for President and Vice President in the room of John Lumpkin." James Jackson, Gubernatorial Statement (Nov. 18, 1800), in Abraham Baldwin Papers (University of Georgia at Athens). The University of Georgia archival staff seems to have dated this document November 18, but the document itself states that the Governor "caused the great seal of the said State to be put and affixed at the State House in Louisville this tenth day of December in the year of our Lord one thousand eight hundred." Id. We think the later date is more plausible, especially since the Governor's outgoing correspondence book contains a letter addressed to Lumpkin and the other three electors dated November 19, 1800. Letter to Dennis Smelt, John Morrison, Henry Gr[e]ybill, and John Lumpkin (Nov. 19, 1800), in Governor's Letter Book of Gov. James Jackson: March 25, 1800-March 2, 1801, at 141 (Ga. Dep't of Archives and History) (1940).

[166] See supra note 123.

[167] 10 Annals of Cong. 1023-24 (1801).

[168] See supra note 134 and accompanying text.

[169] See supra note 138 and accompanying text.

[170] Professor Dauer has Taliaferro listed as a Federalist. Dauer, supra note 5, at 323. The other member of the House of Representatives besides the Federalist Taliaferro, James Jones, had died before vote-counting day, but he was also a Federalist. Id. Senator Gunn, present on vote-counting day, was a Federalist. See Gunn, James, 1753-1801, at http://bioguide.congress.gov/scripts/biodisplay.pl?index=G000526 (last visited Jan. 30, 2004) (on file with the Virginia Law Review Association). A book that provides information on all senators from Georgia does not list Gunn's partisan affiliation, but does say that he engaged in a duel with arch-Republican Georgia Governor and Senator James Jackson. Josephine Mellichamp, Senators from Georgia 23 (1976).

[171] The principle of passivity established by Jefferson remains in force today. Under rules established by the Electoral Vote Count Act of 1887, the chair does not raise any questions regarding the legitimacy of electoral votes. Rather, a protest must be signed by at least one representative and one senator before its consideration will be in order. It should also be noted, however, that the Act requires the Senate President to apprise the assembled individuals of their opportunity to raise challenges. 3 U.S.C. § 15 (2000) ( "Upon such reading of any such certificate or paper, the President of the Senate shall call for objections, if any. Every objection shall be made in writing, and shall state clearly and concisely,

APPENDIX - 44

and without argument, the ground thereof, and shall be signed by at least one senator and one member of the House of Representatives before the same shall be received.").

172     See supra note 81 and accompanying text.

173     See supra note 88 and accompanying text.

174     See supra notes 114 and 149 and accompanying text.

175     The presence of a Federalist majority in the House of Representatives was demonstrated on February 9, two days prior to the vote count, when the chamber met to set the rules for the anticipated House runoff. By a vote of fifty-four to forty-five, the Federalists set a rule that the "doors of the House shall be closed during the balloting" (Rule 5th), and insisted by a vote of fifty-three to forty-seven that the House "shall not adjourn until a choice is made" (Rule 4th). See Historic Documents on Presidential Elections: 1787-1988, at 76-78 (Michael Nelson ed., 1991); see also Letter from Samuel Tyler to Gov. James Monroe (Feb. 9, 1801), in Original Letters, 1 Wm. & Mary Q., 1st ser., 99, 102 (1892) (noting that "the Feds had a majority of six votes" and had little difficulty getting their version of the rules adopted).

176     See James Rogers Sharp, American Politics in the Early Republic 267 (1994).

177     Lord & Lord, supra note 62, at 79.

178     The 1792 Act required the electors to send another envelope, containing a copy of their ballot and the certificate of ascertainment, to a local federal district judge. Act of Mar. 1, 1792, ch. 8, § 2, 1 Stat. 239, 239-40. It seems likely that these documents contained the same defects as those delivered to Washington, but we have not been able to locate them. If our suspicions are correct, a hypothetical factfinding mission would have required a good deal of time before getting to the bottom of the matter. Even had the district judge opened his envelope to find a formally perfect electoral ballot, it still would have taken too long for the mission to conclude its investigation and return to Washington before Inauguration Day.

179     10 Annals of Cong. 1028 (1801).

180     The reality of mob violence and the risk of civil war is discussed at length in Ackerman, supra note 41; see also Sisson, supra note 21, at 423-37 (providing a broad range of evidence).

181     See supra note 128 and accompanying text.

182     Note that the law required all electors to vote on the first Wednesday in December and did not provide for any sort of re-vote. Act of Mar. 1, 1792, ch. 8, § 2, 1 Stat. 239, 239-40.

183     See supra note 30 and accompanying text (describing conditions for two-candidate and five-candidate runoffs).

184     1798 was the year of an emerging conflict with France, and the Federalists utilized nationalist sentiment as a potent political weapon against the Republicans, who had been consistently pro-French in their foreign policy. See Ackerman, supra note 41, at 61-62.

185     See supra Section I.B.

186     10 Annals of Cong. 1028 (1801).

187     Id.

188     Under House rules, each member of a state delegation cast a secret ballot, and so there is no formal record of the votes of individual representatives. A Republican newspaper, however, the National Intelligencer and Washington Advertiser, published lists of the three ballots attributing votes to individual members. National Intelligencer and Washington Advertiser, Feb. 13, 1801, at 3; National Intelligencer and Washington Advertiser, Feb. 16, 1801, at 2; National Intelligencer and Washington Advertiser, Feb. 18, 1801, at 3. It reported that Jefferson won the individual vote by a margin of fifty-five to forty-nine on the first ballot, but that five defections occurred on the second and subsequent ballots. Historic Documents on Presidential Elections: 1787-1988, supra note 175, at 85-88. Given the extreme partisanship prevailing at the time, it would be a mistake to accept the Intelligencer's count as authoritative. If

APPENDIX - 45

there is any sort of bias in this report, however, it seems likely that a Republican newspaper would understate the extent of Federalist defection on the second ballot.

[189] Letter from James A. Bayard to Alexander Hamilton (Mar. 8, 1801), in 25 The Papers of Alexander Hamilton 344, 345 (Harold C. Syrett ed., 1977).

[190] Professor Ackerman provides a blow-by-blow account of Jefferson's victory in his forthcoming book. See Ackerman, supra note 41.

[191] Professor Manning Dauer's research indicates one way to assess this point, as he provides a table indicating the party affiliation of each member of the House of Representatives. Dauer, supra note 5, at 288-331. If one were to assume that all Federalists voted for the leading Federalist candidate in the five-man runoff, it is an easy matter to use Professor Dauer's data to determine how the sixteen states would have voted. The result: eight states vote Federalist (Connecticut, Delaware, Georgia, Maryland, Massachusetts, New Hampshire, Rhode Island, and South Carolina); six states vote Republican (Kentucky, New Jersey, New York, Pennsylvania, Tennessee, and Virginia), and two states are evenly split (North Carolina and Vermont). This contrasts with the real-world results in the two-man runoff--where eight states voted for Jefferson, six voted for Burr, and two split. 10 Annals of Cong. 1028 (1801).

Strict party-line voting, however, might not have prevailed if the Federalists had been afforded an opportunity to vote for a Federalist candidate, and we provide a more individualized analysis below. See infra note 199. Nevertheless, the hypothetical party-line vote provides a rough sense of the order of magnitude of the shift that would have been involved. Note, however, that the Dauer data does not yield a clear victory to the Federalist candidate: The Constitution requires a total of nine votes, and the hypothetical Federalist wins only eight. It is this conclusion that leads us to speculate about Pinckney's emergence as a compromise candidate in the text that follows.

[192] Marvin R. Zahniser, Charles Cotesworth Pinckney: Founding Father 47-70 (1967).

[193] Id. at 87-96.

[194] Id. at 136-64.

[195] Letter from William Vans Murray to John Quincy Adams (Mar, 22, 1799), in Annual Report of the American Historical Association for the Year 1912, 529, 529-30 (1914).

[196] Pinckney admired Hamilton. E.g., Letter from Charles C. Pinckney to James McHenry (Oct. 31, 1798), in George Washington Papers (Library of Congress) ("I knew that [Hamilton's] talents in war were great, that he had a genius capable of forming an extensive military plan, and a spirit courageous & enterprising, equal to the execution of it.") (on file with the Virginia Law Review Association). Hamilton conducted an aggressive campaign to elect Pinckney. He wrote letters to his comrades telling them of his decision to support the South Carolinian. See Letter from Alexander Hamilton to Theodore Sedgwick (May 10, 1800), in 24 The Papers of Alexander Hamilton, supra note 189, at 475, 475 ("I will never more be responsible for [Adams] by my direct support--even though the consequence should be the election of Jefferson.... The only way to prevent a fatal scism in the Federal party is to support G [eneral] Pinckney in good earnest.") (emphasis omitted); Letter from Alexander Hamilton to Charles Carroll (Aug. 7, 1800), in 25 The Papers of Alexander Hamilton, supra note 189, at 60, 60 ("As between Pinckney & Adams I give a decided preference to the first."). He traveled to New England and wrote to others of the support in the North for Pinckney. Introductory Note to Letter from Alexander Hamilton to Benjamin Stoddert (June 6, 1800), in 24 The Papers of Alexander Hamilton, supra note 189, at 574, 574-85; Letter from Alexander Hamilton to Charles Carroll (July 1, 1800), in 25 The Papers of Alexander Hamilton, supra note 189, at 1, 1-2; Letter from Alexander Hamilton to Oliver Wolcott, Junior (July 1, 1800), in 25 The Papers of Alexander Hamilton, supra note 189, at 4, 4-5 ("I have been in Massachusetts, New Hampshire & Rhode Island. There is little doubt of Federal Electors in all. But there is considerable doubt of a perfect Union in favour of Pinckney. The leaders of the first class are generally right but those of the second class are too much disposed to be wrong. It is essential to inform the most discreet of this description of the facts which denote unfitness in Mr. Adams. I have promised confidential friends a correct statement. To be able to give it, I must derive aid from you. Any thing you may write shall if you please be returned to you. But you must be exact & much in detail.").

[197] For a description of Pinckney's role as the Federalist standard-bearer in the 1804 and 1808 campaigns, see Zahniser, supra note 192, at 234-60.

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 46

198 In the two-candidate runoff, Jefferson won all southern states except for South Carolina. See 10 Annals of Cong. 1028 (1801).

199 A hypothetical scenario involving party-line voting in a five-candidate race was presented previously. See supra note 191. We shall now analyze the real-world voting in the two-candidate race and consider how Pinckney's compromise candidacy might have induced a swing in his direction. South Carolina consistently voted for Burr in the two-man runoff, and it seems obvious that the state would have been more than happy to shift to Pinckney, a favorite son. Pinckney also had obvious attractions for North Carolina, whose delegation was split five to five along party lines. While the state in fact cast its vote for Jefferson in the two-man runoff, Pinckney would have been a far more attractive candidate than Burr. Indeed, at least one newspaper report predicted that the state would split evenly when Burr was the only alternative. American & Daily Advertiser (Baltimore), Jan. 15, 1801, at 2. A North Carolina vote for Jefferson was hardly foreordained, especially if he had repeatedly demonstrated his incapacity to win the nine votes needed to win the presidency.

The same is true of Georgia. Benjamin Taliaferro was elected as a Federalist but often voted with the Republicans, see Dauer, supra note 5, at 315-25, and voted for Jefferson over Burr in the runoff. National Intelligencer (D.C.), Feb. 13, 1801, at 3. Nevertheless, he would have been under intense pressure from the Federalist establishment to vote for Pinckney as a compromise candidate.

With North Carolina and Georgia in his column, in addition to the block of six who voted for Burr, Pinckney would have required only one more swing vote. Potential support seems greatest from two states--Tennessee (voting one to zero for Jefferson) or Maryland (splitting four-to-four between Jefferson and Burr). Id. New Jersey was also teetering three-to-two during the Jefferson-Burr struggle, see id., and one of its Republicans, James Linn, was frequently mentioned as a potential defector to the Federalist cause. See Letter from Thomas Jefferson to James Madison (Dec. 19, 1800), in 17 Madison Papers, supra note 5, at 444, 444-45 ("It is thought by some that... Linn of N.J. will come over."); see also Morton Borden, The Federalism of James A. Bayard 88 (1955) ("Mr. Linn of [New] Jersey is... at present with us, which gives the vote of that State--but might be thrown off.") (citing Letter from John Dallas to Alexander Dallas (Jan. 15, 1801), in Alexander J. Dallas Papers (Historical Society of Pennsylvania)).

200 2 Davis, supra note 138, at 73.

201 See supra notes 146-48 and accompanying text.

202 U.S. Const. art. II, § 1, cl. 3 ("In every Case, after the Choice of the President, the Person having the greatest Number of Votes of the Electors shall be the Vice President. But if there should remain two or more who have equal Votes, the Senate shall chuse from them by Ballot the Vice President.") (amended 1804).

203 At the time, the Senate was composed of nineteen Federalists and thirteen Republicans. U.S. Bureau of the Census, Historical Statistics of the United States: Colonial Times to 1957, at 692 (1960). In contrast to the runoff in the House, each senator was to cast an individual vote. It was thus theoretically possible that the Federalists would have awarded the vice-presidency to Burr rather than Jefferson, but this seems quite unlikely.

204 See, e.g., Letter from Thomas Jefferson to James Monroe (Feb. 15, 1801), in Jefferson Papers 998, available at http:// memory.loc.gov/ammem/mtjhtml/mtjser1.html (on file with the Virginia Law Review Association). For a comprehensive examination of the explosive situation, see Ackerman, supra note 41, at 93-135.

205 But see Antonin Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175 (1989) (emphasizing the importance of rule-following in our legal tradition).

206 See supra note 157 and accompanying text.

207 See Edmund Burke, Thoughts on the Cause of the Present Discontents (1770), in 1 Select Works of Edmund Burke 69, 145-56 (Francis Canavan ed., 1999). Professor Richard Hofstadter, the most acute historian of this subject, could not find anybody in late eighteenth-century America who shared Burke's views. Hofstadter, supra note 18, at 29-35.

208 U.S. Const. art. I, § 3, cl. 6. For an explanation of this language, see William Rawle, A View of the Constitution of the United States of America 206 (Philadelphia, H.C. Carey & I. Lea 1825) ("As the vice president succeeds to the functions and emoluments of the president of the United States whenever a vacancy happens in the latter office, it would be inconsistent with the implied purity of a judge that a person under a probable bias of such a nature, should participate in the trial--and it would follow that he should wholly retire from the court."). For an echo of this sentiment, albeit in the

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

context of factional politics, see The Federalist No. 10, at 47 (James Madison) (Clinton Rossiter ed., 1961) ("No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity.").

209   See 2 Beveridge, supra note 86, at 557-58.

210   See generally James F. Simon, What Kind of Nation: **Thomas Jefferson**, John Marshall, and the Epic Struggle to Create a United States (2002) (discussing the lasting political battle between the two); **Ackerman**, supra note 41 (detailing Marshall's extraordinarily partisan conduct during February 1801).

211   This contrasts with the institutional impasse that would have resulted if the Federalist Congress had sought to overrule Jefferson's explicit ruling. See supra Section IV.B.

212   5 U.S. (1 Cranch) 137 (1803).

213   See Simon, supra note 210, at 216-19. For a recap of this event, see Ackerman, supra note 41, at ch. 5.

214   Despite his ascent to the bench, Marshall accepted Adams's request to continue serving as his Secretary of State and was discharging his office in an extraordinarily partisan fashion. In early February, the Federalists in Congress and the administration had rammed through a Judiciary Act creating a set of lower circuit courts. In his capacity as Secretary of State, Marshall played a leading role in filling these new positions with Federalist cronies, including two of his brothers-in-law--James Keith Taylor of Virginia and William McClung of Kentucky. See 2 Beveridge, supra note 86, at 560 n.2; 6 The Papers of John Marshall, supra note 97, at 78 n.2; Ackerman, supra note 41, at ch. 2.

215   Pinckney often corresponded with Chief Justice Marshall, discussing the best ways to promote Federalist interests. See, e.g., Letter from John Marshall to Charles C. Pinckney (Nov, 20, 1800), in 6 The Papers of John Marshall, supra note 97, at 16, 16-17.

216   See Ackerman, supra note 41.

217   531 U.S. 98 (2000). See generally Richard A. Posner, Breaking the Deadlock: The 2000 Election, the Constitution, and the Courts (2001) (arguing that the Supreme Court's decision was justified by pragmatic considerations of political stability).

218   In this he is not alone. See, e.g., Bush v. Gore: The Question of Legitimacy (Bruce Ackerman ed., 2002) (presenting perspectives on various justifications for the Supreme Court's decision to end the 2000 presidential election).

219   Of course, the Twelfth and Twenty-Second Amendments importantly altered the original mechanisms for presidential selection, but they do not speak to the particular issue in question here: the power of the Senate President to resolve questions arising with regard to the vote count. U.S. Const. amend. XII; U.S. Const. amend. XXII.

220   For a case study on the dangers of a misguided textualism, see Kesavan, supra note 5, at 1696-1759. Kesavan declares that the text forbids the President of the Senate from serving as the presiding officer of the vote count, despite the fact that he is the only officer explicitly mentioned by the text, and despite two centuries of unbroken practice in which he has performed this role without the slightest challenge. Instead, Kesavan disqualifies the Senate President on the basis of emanations from other constitutional clauses that do not explicitly speak to the problem. Id. at 1696-1701.
Worse yet, he does not propose a plausible presiding officer substitute, instead stating that "[t]he answer to this question is simpler than it appears: One of the senators and representatives then and there present at the electoral count." Id. at 1701. In any disputed election, however, each political party will want to have one of its own members serve as the presiding officer, and Kesavan does not say much about how best to choose among the applicants for the job. He states merely that "[e]ach parliamentary body has, almost by definition, the right to choose its presiding officer," id., but fails to consider that there are two parliamentary bodies involved and that they will predictably disagree about whether a senator or representative should take the chair.
Early commentators also discussed the subject. Chancellor Kent stated that "the president of the senate counts the votes, and determines the result, and that the two houses are present only as spectators, to witness the fairness and accuracy of the transaction, and to act only if no choice be made by the electors." 1 James Kent, Commentaries on American Law 258-59 (New York, O. Halsted 1826). He also said that the Senate President has this power "in the absence of all legislative provision on the subject." Id. at 258.

APPENDIX - 48

Much more importantly, subsequent Congresses have clearly understood the Constitution to imply that the Senate President should serve as presiding officer, owing to the fact that the Constitution commands him to open the electoral vote packages. Despite Kesavan's repeated claims to have divined the one true meaning of the "text," his interpretations seem far less plausible than those that Congress has consistently adopted over the course of two centuries.

221 The constitutional opinions of early Congresses have often been interpreted as matters of great importance. See, e.g., Bowsher v. Synar, 478 U.S. 714, 723-24 (1986) (noting that records of the early Congresses provide "'weighty evidence' of the Constitution's meaning" (quoting Marsh v. Chambers, 463 U.S. 783, 790 (1983))); Humphrey's Ex'r v. United States, 295 U.S. 602, 630-31 (1935) (looking to the laws of early Congresses for support of its decision); Myers v. United States, 272 U.S. 52, 174-75 (1926) (stating that opinions of the First Congress "have always been regarded... as of the greatest weight" in constitutional interpretation). This is hardly the place to consider, in general, when this reliance is justified as a matter of constitutional theory. It suffices to say that it is justified in the present case.

222 The principal incidents are usefully summarized in Kesavan, supra note 5, at 1679-94. Although we find Kesavan's interpretations of the Constitution unpersuasive, his piece contains an admirably exhaustive review of the relevant primary and secondary literature.

223 Indeed, on several occasions, the President of the Senate has declared the results in a manner that expressly deprived his resolution of any precedential status. The practice began in 1821. Missouri had selected its electors before it had been formally admitted as a state by Congress. When its electoral vote was opened, the propriety of counting it was challenged. In response, the President of the Senate announced that Monroe had been elected President regardless of whether Missouri's vote was counted. See Kesavan, supra note 5, at 1681-83. The Senate President finessed the matter in an identical fashion during the vote count of 1837, in which the votes of Michigan were at issue. Id. at 1685.
Vice-President Nixon took a similar approach when a late recount of the Hawaii vote revealed that the Kennedy-Johnson ticket had carried the state. As Senate President, he refused to count the earlier electoral vote that had been awarded to the Nixon-Lodge ticket on the basis of the pre-recount vote count. In counting the state's electors for his opponents, he declared that "[t]he Chair has knowledge, and is convinced that he is supported by the facts." See 107 Cong. Rec. 290 (1961). He explicitly stated, however, that he was counting these votes merely to avoid further delay, and "without the intent of establishing a precedent." Id.

224 Thomas Jefferson, A Manual of Parliamentary Practice for the Use of The Senate of the United States (D.C., Samuel Harrison Smith 1801).

225 See supra notes 205-06 and accompanying text.

226 See supra notes 126-31.

227 Even today, a challenge to an electoral vote requires at least one senator and one representative to come forward and make his objections explicit. Otherwise, the President of the Senate counts the vote. See supra note 171.

228 10 Annals of Cong. 1024 (1801).

229 See supra notes 126-31.

230 See Allan Nevins, Abram S. Hewitt 320 (1935).

231 Charles Fairman, Five Justices and the Electoral Commission of 1877, at 40-47, 57-116 (1988).

232 Democrats did not gain control of the Senate until the election of 1878. See 2 Congressional Quarterly, Guide to Congress 828 tbl. 30-1 (5th ed. 2000).

233 They selected Senator Thomas Ferry, a Michigan Republican. 1 Stanwood, supra note 5, at 388.

234 Some memory traces clearly remained, however. See supra note 151 and accompanying text.

235 See, e.g., 44 Cong. Rec. 1803 (1876) (statement of Sen. William Pinkney Whyte). Not all Democrats were in agreement, however. See, e.g., 43 Cong. Rec. 970 (1875) (statement of Sen. Bayard).

APPENDIX - 49

236  Republicans surely enjoyed reading of the views of Democratic Party Chairman Abram Hewitt, who, after the Hayes-Tilden deadlock, had been vocal in asserting that the Senate President could not decide matters himself, but rather should work with "Congress to go behind the certificate and open the same to go into the merits of all cases." Allan Nevins, Abram S. Hewitt 327 (1935).

237  The Democratic-controlled House, in response to a resolution proposed by Republican Representative George McCrary of Iowa, adopted legislation establishing a committee to consider how to resolve the situation. 44 Cong. Rec. 91-92 (1876). The Republican-controlled Senate then voted to establish its own committee. 44 Cong. Rec. 258 (1876). Starting on January 12, the two committees met together, and their collaborative efforts eventually generated the statute. 44 Cong. Rec. 613 (1877); 44 Cong. Rec. 1050 (1877).

238  U.S. Const. art. II, § 1, cl. 3.

239  U.S. Const. art. I, § 8, cl. 18. One does not need to look hard to find references to this clause as the basis for action to regulate the electoral count. 43 Cong. Rec. 974-75 (1875) (statement of Sen. Edmunds); 43 Cong. Rec. 971-73 (1875) (statement of Sen. Thurman); 10 Annals of Cong. 29-32 (1800). A decade later, the drafters of the Electoral Count Act assumed that the Necessary and Proper Clause was the part of the Constitution that gave them the authority to act. 48 Cong. Rec. 5461 (1884); Counting Electoral Votes, supra note 5, at 455 (statement of Sen. Edmunds). Consistent congressional practice of the past 125 years presupposes the Act's constitutionality, as does the recent Supreme Court decision in Bush v. Gore, 531 U.S. 98, 110-11 (2000), whose reasoning depends critically on Florida's presumed unwillingness to sacrifice the benefits provided by its electoral vote by the statute's "safe harbor" provision. Nevertheless, Vasan Kesavan urges us to reject this consistent practice in favor of an implausible interpretation of the constitutional text. Recall that the Constitution grants Congress power "[t]o make all Laws which shall be necessary and proper for carrying into Execution... all other powers vested by this Constitution in the Government of the United States." U.S. Const. art. I, § 8, cl. 18. According to Article II, officers of the government are plainly vested with the power to "open" and to "count" the electoral ballots. U.S. Const. art. II, § 1, cl. 3. Nevertheless, Kesavan asserts that it "is more than doubtful" that this grant counts as a "power" within the meaning of the Necessary and Proper Clause. Kesavan, supra note 5, at 1737.
Kesavan's comments fail to convince. He points to the fact that Article II does not explicitly use the word "power," or some verbal analogue, in granting vote-counting authority. Id. at 1735-38. But why should this verbal technicality matter? Authority to count the votes is a "power" within the ordinary meaning of the term, and Kesavan gives no special reason for a narrowing construction, especially provided the generous interpretation traditionally given to the scope of the clause. See McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316 (1819).
Kesavan adds that the constitutional concept of "power" requires that its holder have discretion in its exercise and that, in his view, the vote counters have no such discretion--they are simply to determine which votes are valid, and count only those. Kesavan, supra note 5, at 1737 n.351. Even if Kesavan were correct in viewing the power as nondiscretionary, it still remains a power, and a statute is still "necessary and proper" given the text's failure to make clear who should exercise the power in doubtful cases. In our view, it would require a far more compelling argument to override the deference that is due to the consistent practices of the Congress and the Supreme Court.

240  Act of January 29, 1877, ch. 37, § 2, 19 Stat. 227, 228.

241  Fairman, supra note 231, at 48-49; Willard L. King, Lincoln's Manager: David Davis 290-93 (1960).

242  Act of January 29, 1877, § 2, Ch. 37, 19 Stat. 227, 228-29 (1877). The case of single returns was to be handled by the two houses meeting separately, with a majority vote of each required to reject the return. Id. § 1.

243  Id. § 2.

244  Fairman, supra note 231, at 10, 47-48.

245  44 Cong. Rec. 1050 (1877).

246  Id. at 1007.

247  Unsurprisingly, the Republican rank and file was relatively unenthusiastic about ceding the power of the Senate President to a bipartisan commission. While the entire Senate voted 47 to 17 in favor of the bill, the Democrats supported it by

APPENDIX - 50

a lop-sided margin of 26 to 1, while the Senate Republicans divided narrowly with 21 in favor and 16 opposed. Id. at 913. Similarly, House Democrats voted 186 to 18 in favor while House Republicans voted against by a margin of 85 to 52, with the final count at 191 in favor and 86 opposed. Roy Morris, Jr., Fraud of the Century: Rutherford B. Hayes, Samuel Tilden, and the Stolen Election of 1876, at 218 (2003).

248     Morris, supra note 247, at 217-18.

249     Id. at 218-19.

250     See id. at 222-25.

251     Fairman, supra note 231, at 123-58.

252     See, e.g., Samuel Issacharoff, The Enabling Role of Democratic Constitutionalism: Fixed Rules and Some Implications for Contested Presidential Elections, 81 Tex. L. Rev. 1985, 2004 (2003) ("Although the Commission was seen by many to be completely fraudulent, the Democrats ultimately did accept its results, in exchange for an understanding that President Hayes would effectively end Reconstruction and would not run for re-election...."). All of the leading books by historians echo Issacharoff's comments. See Morris, supra note 247, at 222-25; Lloyd Robinson, The Stolen Election: Hayes Versus Tilden: 1876, at 164-68 (2001); C. Vann Woodward, Reunion and Reaction: The Compromise of 1877 and the End of Reconstruction (2d ed. 1966).

253     3 U.S.C. § 15 (2000).

254     Id. The "safe harbor" provision enacts into law a preference for picking electors by passing state laws governing the selection process. 3 U.S.C. § 5 (2000). This statutory provision encourages states to pass laws "prior to the day fixed for the appointment of the electors" and discusses the more favorable treatment a state abiding by that rule will receive in Congress. Id.

255     3 U.S.C. § 15 (2000) ("But if the two Houses shall disagree in respect of the counting of such votes, then, and in that case, the votes of the electors whose appointment shall have been certified by the executive of the State, under the seal thereof, shall be counted.").

256     See, e.g., Mireya Navarro, A Staunch Gore Ally Influences Florida Ballot Fight, N.Y. Times, Nov. 16, 2000, at A27; Don Van Natta, Jr. & David Barstow, Election Officials Focus of Lobbying From Both Camps, N.Y. Times, Nov. 18, 2000, at A1 ("In Volusia County, the only Florida county to complete a full hand recount, the state's attorney general, Robert A. Butterworth, placed an unsolicited phone call a week ago to elections officials, advising them that they had the legal authority to go forward with a manual recount.").

257     See, e.g., David Barstow, Data Permanently Erased From Florida Computers, N.Y. Times, Aug. 8, 2001, at A10; Richard L. Berke, 2 Sides Maneuver: Republican Rejects Offer That 2 Sides Accept a Count by Hand, N.Y. Times, Nov. 16, 2000, at A1 ("Ms. Harris... announced...that it was 'my duty under Florida law' to reject requests from several counties to update their totals.").

258     On January 3, 2001, the Republicans controlled the House of Representatives by a margin of 223 to 211, whereas the Democrats controlled the evenly-divided Senate, with Gore casting the deciding vote (and Lieberman casting one of the fifty Democratic votes). See Helen Dewar & Juliet Eilperin, Divided Congress Takes Oath with Promises of Unity, Wash. Post, Jan. 4, 2001, at A8. It would be a mistake however, to assume strict party-line voting. Representatives and senators alike would have been swayed by prevailing sentiment in their own districts, as well as their own views on the merits. After all, Gore was the clear winner in the popular vote, and it is impossible to guess how heavily public opinion would have emphasized this point if the Supreme Court had not prematurely terminated the debate.

259     See Emergency Committee of Concerned Citizens 2000, The Election Crisis, N.Y. Times, Nov. 10, 2000, at A31 ("Perhaps a bipartisan National Electoral Commission of the Congress and the Supreme Court will have to settle the matter, based on the precedent set in resolving the disputed election of 1876."). This was signed by Professor Ackerman, among others.

260     Letter from Thomas Jefferson to James Madison (Jan. 16, 1797), in 16 Madison Papers, supra note 5, at 461, 461.

APPENDIX - 51

90 VALR 551

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    52

**64 U. Miami L. Rev. 475**

**University of Miami Law Review**
January, 2010

**Symposium: How Far Have We Come Since 2000?**

Article

Nathan L. Colvin, Edward B. Foley [d1]

Copyright (c) 2010 University of Miami Law Review; Nathan L. Colvin; Edward B. Foley

# THE **TWELFTH AMENDMENT**: A CONSTITUTIONAL TICKING TIME BOMB [a1]

> In the original plan, as well as in the amendment, no provision is made for the discussion or decision of any questions, which may arise, as to the regularity and authenticity of the returns of the electoral votes . . . . It seems to have been taken for granted, that no question could ever arise on the subject; and that nothing more was necessary, than to open the certificates, which were produced, in the presence of both houses, and to count the names and numbers, as returned.

--Justice Joseph Story [1]

### *476 I. Introduction

Despite Justice Story's prescient warning, at first glance, some readers might wonder how an amendment to the Constitution that is rarely, if ever, a part of public discourse has the potential to create a national crisis in modern times. Justice Story was describing the Twelfth Amendment, which provides the constitutional framework for the selection of President and Vice President. [2] The potential for crisis comes from ambiguous constitutional text that has left modern interpreters with significant unanswered questions. There has been little legislative effort to address the problems with the text of the Twelfth Amendment, perhaps because our nation has not had a serious dispute over electoral votes reach the counting stage in Congress for over one hundred years. [3] The 2000 election never caused a serious dispute before Congress, because candidate Al Gore conceded defeat after the U.S. Supreme Court halted the recount of ballots in Florida. Thus, there was no further dispute over the winner of Florida's electoral votes by the time Gore, as President of the Senate, announced on January 6, 2001 before both **\*477** houses of Congress that George W. Bush had been elected President with a majority of electoral votes.

Consequently, the last--and indeed only--major dispute in the nation's history over the counting of electoral votes to reach Congress was the Hayes-Tilden election in 1876. Although Congress adopted a new statute, the Electoral Count Act of 1887, in the aftermath of that crisis, the Twelfth Amendment itself has never been revised to fix the defects in it.

The problems with the text of the Twelfth Amendment are twofold. First, the text of the amendment contains several ambiguities about how the process should work, particularly about how disputes regarding the validity of electoral votes should be resolved and who should resolve them. The second problem is the lack of guidance from other sources. There is little substantive case law on the subject, due in part to these ambiguities, the gravity of the topic (election of the President), and the scarcity of close presidential elections. Making matters worse, the statutory effort (the Electoral Count Act) to address the problem is inadequate, unwieldy, and arguably unconstitutional.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                                    1

Although the Supreme Court's decision in Bush v. Gore [4] averted congressional confrontation over electoral votes pursuant to the deficient framework of the Twelfth Amendment, the episode signals the possibility that a similar dispute might arise again--but this time without the saving intervention of the Supreme Court. [5]  Although the events of 2000 produced passing interest in the mechanism established by the Twelfth Amendment, since then there has been no sustained plan to prepare the nation if a dispute over electoral votes goes all the way to Congress. Nevertheless, the history of the Twelfth Amendment and the commentary on it during the nineteenth century show that the nation needs a contingency plan of this sort.

Some nineteenth-century scholarship analyzed the historical instances in which the Twelfth Amendment issues have come up, and some scholarship has dealt with the complexity and problems of the Electoral Count Act. This Article attempts to create a continuous narrative of America's electoral vote disputes and analyze the problems in the modern context. The flaws of the Twelfth Amendment are so fundamental that constitutional change is necessary. We recognize the exceedingly difficult nature of attaining a constitutional amendment, especially on a topic where either of the two major political parties will want to block any measure it perceives as disadvantageous to its interests, either short  **478**  or long term. Moreover, like putting off preparations to defend against a once-a-century category five hurricane, it is easy to postpone consideration of a constitutional amendment designed to protect against another debacle of the kind that occurred in 1876 (and did not even materialize in 2000). Still, the need for a constitutional amendment to repair the defects of the Twelfth Amendment is so great--since the magnitude of the electoral storm is so severe should another 1876 arise--that it is worth raising the point. At the same time, however, given the unlikelihood of an amendment, despite its necessity, it is also worth proposing a second-best legislative solution that would modify the Electoral Count Act.

This Article starts by analyzing the history of the Twelfth Amendment and then traces its usage and application through early American presidential elections. [6]  Next, this Article examines the election of 1876 and Congress's attempt to solve some of the problems by enacting the Electoral Count Act of 1887 (ECA), followed by a brief discussion of the ECA's inadequacy (and possible constitutional defects) [7]  in practice through the twentieth century.

This Article concludes by reemphasizing the importance of having clear procedures for dealing with disputes over electors--for fairness, reducing partisanship, and creating a result that maximizes public acceptance and confidence. While the losing side in an electoral dispute will always be disappointed with the outcome, this should not mean that the loser must feel the path to that outcome was unfair. Additionally, the current system encourages judicial intervention that is unhealthy for the Supreme Court and undesirable for the nation. To forestall this undesirable outcome and any future problems, it is necessary for Congress to address this uncertainty by adopting constitutional changes before  **479**  another electoral dispute tests the system again. If the reader is to accept these conclusions, it invites the question, should we scrap the Electoral College altogether? Rather than address that weighty (and oft-discussed) question, this Article only addresses problems posed by the text of the Constitution and assumes preservation of the present Electoral College. [8]

## II. A History of the United States Presidential Electoral System: Practice, Reform Attempts, and Flaws

Prior to ratification of the Twelfth Amendment, Congress relied on the Electoral College vote-counting procedures located in Article II of the Constitution. [9]  The Twelfth Amendment made significant changes to the procedures for casting electoral votes, but the critical ambiguous text of the original Amendment, "[t]he President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted," was preserved. [10]  While the amendment solved other problems, this sentence has been at the root of many subsequent controversies. The sentence almost suggests "a formula that forces us to suppose that according to the view of the framers of the Constitution, the question [of counting votes] was one simply of addition," [11]  and the use of the passive voice here suggests the Framers did not anticipate controversy in the electoral count. [12]  This assumption,  **480**  that the counting of electoral votes would be a ministerial duty, was shortsightedness on the part of the Framers that led to ample debate and dispute throughout the 1800s.

When a dispute arises over the validity of a state's electors, several ambiguities from this text arise. The starting issue for an analysis of electoral vote determination under the Constitution is ascertaining where the Constitution vests the power to count and/or determine the validity of votes, and this is where the first ambiguity comes from. There are four possible actors: (1) the Vice President of the United States acting as the President of the Senate, (2) the two houses of Congress acting together, (3) the two houses of Congress acting separately, and (4) the states. [13]  The text of the Twelfth Amendment is unclear on this subject,

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    2

and, throughout our history, various theories have prevailed. Early scholars generally divided the patterns into three general periods. During the first period, from 1789 to 1821, the power was generally thought vested in the states or in the President of the Senate. [14] In the second period, from 1821 to 1861, Congress generally found that there was a **\*481** casus omissus in the Constitution as to who should count the votes and what power that actor had to reject votes. [15] In the third period, from 1861 to the present, [16] Congress acted affirmatively to determine the validity of electoral votes and for the first time rejected some votes. [17]

At first, it might seem odd that three different interpretations of the same text have taken hold through history, but the Framers failed to explain the power of the President of the Senate or Congress in the process. [18] Early on, the President of the Senate would be called upon to make some judgments as presiding officer, and this might suggest that the Framers and their contemporaries thought the proper exercise of power belonged in the hands of this single individual. However, as time passed, this power increasingly tilted to Congress as a collective body.

This is not surprising given the different interpretations available. On one hand, the text "in the Presence of the Senate and House of Representatives" [19] suggests the Framers might have intended for these bodies to serve as mere witnesses to the President of the Senate's act of counting. Other interpretive approaches suggest that either the Framers did not anticipate these possibilities or would surely not have placed such power in the hands of one individual, instead intending a greater role for Congress. Additionally, the Framers must not have anticipated that they were placing an individual likely to have a conflict of interest--the Vice President of the United States--at the center of the storm. Sure enough, the sitting Vice President has been a candidate for President or Vice President, while simultaneously serving in his capacity as President of the Senate. If the Vice President's role is merely ministerial, there is not much of a conflict of interest as a practical matter; but if the Vice President's duty encompasses resolving potentially decisive controversies over which candidate gets a state's electoral votes, then the conflict is monumental. [20]

**\*482** Finally, perhaps the more important question about the Twelfth Amendment, if there was some sort of controversy in electoral votes (whether an elector has a defect or whether there are competing electors), could the Vice President or Congress--whichever is the final federal counting authority under the Constitution--go behind the certificate submitted by the state? How might the federal counting authority deal with multiple returns from a state? Congress has repeatedly considered this question, and opinions have varied. Running contrary to the notion that Congress has strong power to question the electoral returns of a state is another clause in the Constitution, which might suggest that Congress should afford strong deference to the state's submitted electors. [21] In all, one can summarize the questions about the counting power [22] as follows:

• What is the power of the President of the Senate during the proceedings?


• What is the power of Congress? Is it as a joint body or may Congress act as separate houses?

• Is vote counting a ministerial task such that the role of the vote counter is that of simply adding the vote totals?

• Under the Article II, Section 1, Clause 2 of the Constitution, what deference should be given to a state's determination of an election?

**\*483** • How should multiple slates of votes from a single state be dealt with?

• How far behind the certificate may the vote counter go (i.e., may the vote counter seek evidence of fraud, incorrect results, etc.)?

• Can constitutionally invalid (ineligible electors, voting on the wrong day, votes from a territory, etc.) votes be rejected?

• Can electoral votes subject to other defects (such as fraud, problematic voting procedures, contested elections, etc.) be rejected?

• Is there room for judicial review?

APPENDIX - 55

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   3

## A. Early Elections Under the Original Constitutional Framework

### 1. The First and Second Elections

On April 6, 1789, Congress gathered in New York City to count the first electoral votes. The election was without controversy because the country was united around the candidacy of the George Washington, but the record of the proceedings does provide some understanding of how the Framers and their contemporaries might have understood the Constitution to operate on this matter. [23]  Because the country was without a Vice President, the first order of business was to elect a member of the Senate as the President of the Senate "for the sole purpose of opening the certificates and counting the votes of the electors of the several States in the choice of a President and Vice-President of the United States." [24]  Both houses of Congress appointed members to "sit at the Clerk's table to make a list of the votes as they shall be declared." [25]  The record then shows that the President of the Senate "in [the House and Senate's] presence, had opened and counted the votes of the electors for President and Vice-President of the United States." [26]  This record might support a strong role for the President of the Senate in opening and  **\*484**  counting the votes, while the members at the clerk's table play the role of mere witnesses to his actions--keeping record of the votes.

The record for the second election suggests a slight change to this procedure with more delegation of duty from the President of the Senate. [27]  Prior to the count, Congress formed a committee to, among other items, "ascertain and report a mode of examining the votes for President and Vice-President." [28]  The committee declared that each house should appoint a "teller" to make a list of the votes as declared and deliver the results to the President of the Senate. [29]  The record shows "[t]he two Houses having accordingly assembled, the certificates of the electors . . . were, by the Vice-President, opened, read, and delivered to the tellers appointed for the purpose, who, having examined and ascertained the votes, presented a list of them to the Vice-President." [30]  The nation reelected George Washington without controversy, but the record suggests some diminished role for the President of the Senate, as the tellers seemed to play a role in the counting. [31]

### 2. Presidential Elections of 1796 and 1800

The record shows similar procedures during the next two elections, with the President of the Senate opening certificates and declaring results while the tellers made a list of the votes and delivered that list to the Vice President. [32]  A recent piece of scholarship argues that in these  **\*485**  two presidential elections, John Adams and Thomas Jefferson, as Vice Presidents presiding over the electoral vote count, "used their power to make rulings that favored their own election as President of the United States." [33]  However, the two men parted ways when it came to involving Congress in the process: according to Professors Ackerman and Fontana, while Adams gave Congress a chance to object to his ruling, Jefferson did not. [34]

In the election of 1796, reports and rumors suggested that the Vermont electors might have been constitutionally invalid. [35]  The implications were high, as without the votes, Adams would have lost the presidency to Jefferson. The Annals of Congress notes that after announcing the final count, "[t]he President of the Senate then sat down for a moment, and rising again, thus addressed the two Houses." [36]  Scholars, including Professors Ackerman and Fontana, have argued that Adams was pausing to give an opportunity for objections. [37]  Since no objection was heard, we cannot know for certain, nor can we guess, how Adams might have handled such objections.

By contrast, as Vice President, Thomas Jefferson counted votes from Georgia that some argue were facially defective in terms of the formal requirements for their submission contained in the original Article II of the Constitution. [38]  There was no allegation at the time (or subsequently) that nefarious conduct underlay the formal defect, giving Georgia's electoral votes to Jefferson and Burr rather than Adams and Pinckney. In other words, Georgia's submission was substantively accurate in naming Jefferson and Burr as the winners of its electoral votes, despite its formal defects. Still, the legal question remains whether Georgia's  **\*486**  votes can be counted, since the formal requirement protects against the possibility of fraud on other occasions. Even more, the institutional question exists: Who decides the legal question of whether Georgia's electoral votes can be counted despite their formal defect? Does Jefferson get to decide this all by himself, as President of the Senate? Even if he does, given his obvious self-interest in the particular election, should he give members of Congress the opportunity to consider the issue?

APPENDIX - 56

The available evidence suggests that the tellers (those opening the envelopes) notified Jefferson of the problem, and Vice President Jefferson "decisively" resolved the issue by counting the vote in the final tally. [39] Regardless of whether this should serve as precedent, it is clear that the text of the Constitution is extremely vague on the subject of counting Electoral College votes, and the possibility for controversy was always present. While the Constitution did not specify the exact role of the Vice President in opening and counting electoral votes from the states, the election of 1800 made evident the awkwardness of giving the Vice President the authority to resolve questions about the validity of electoral votes. [40]

3. The Grand Committee Proposal of 1800

In early 1800, to prepare for the presidential election that would take place later that year, Federalist Senator James Ross proposed a bill to create a "Grand Committee" to "inquire, examine, decide, and report **\*487** upon" electoral vote irregularities. [41] The bill was likely a partisan attempt by the Federalists to ensure victory in the upcoming presidential election. [42] Under the proposed committee each house of Congress would have selected six members, and the Chief Justice would have served as the thirteenth member and chairman of the committee. [43] The concept largely came from the Federalist senators, but the Republicans attempted to amend the bill. Interestingly, the proposed amendment by Senator Nicholas recognized many of the problems that could arise with the returns and thus indicates that Congress was well aware of these problems as early as 1800, before adoption of the Twelfth Amendment. [44] Nicholas and the Republicans largely argued against the Federalist version's delegation of the vote counting from the joint session of Congress to a committee. [45]

Republican Senator Charles Pinckney, a Framer of the Constitution, gave a strong speech in opposition that foreshadowed most of the themes for the debate that remain relevant today. The speech focused on the idea that the Constitution intended to prevent congressional interference with the presidential election, which might in turn compromise the **\*488** President's independence. [46] In the House, Federalist John Marshall raised constitutional objections and amended the bill to strip the committee of conclusive power. Instead, under Marshall's amendment, both houses of Congress, meeting separately, would have to agree that votes were invalid and should be rejected. [47] The House sent this amended bill back to the Senate, which removed many of Marshall's changes. The two houses could not agree upon amendments, and consequently the bill died. [48] Despite Pinckney and Marshall's statements and the Grand Committee Bill's defeat, clearly there was early confusion and disagreement about the power of Congress to regulate electoral vote counting.

### B. Passage of the Twelfth Amendment and Subsequent Elections

Jefferson's ruling to count Georgia's electoral votes despite their formal deficiency was not the end of that electoral count in 1800. Inclusion of Georgia's votes caused Jefferson and Aaron Burr to be tied, with even votes, so that they were the only two candidates in a runoff to be settled by the House of Representatives. (Had Georgia's votes been **\*489** excluded, the runoff would have been among the top five vote-getters, a scenario that likely would have favored the Federalists in their opposition to Jefferson.) [49] It was clear on the national level that Republicans intended Jefferson as their choice for President, while Burr was the party's choice for Vice President. [50] While the original constitutional language gave each elector two votes, it did not allow the electors to designate one of their votes for President and the other for Vice President. Gaming the electoral votes became crucial, and party leaders considered having electors in some states cast votes for Jefferson and Burr while other electors cast votes for Jefferson and another Republican candidate to give Jefferson a clear victory. [51] However, Jefferson was concerned that he might be stuck with a Federalist Vice President if Burr lost too many second votes; a similar situation had happened to the Federalists in 1796 when Adams and Jefferson were President and Vice President. [52] Consequently, party leaders changed paths, urging a vote for the entire ticket. [53] Jefferson and Burr both received seventy-three electoral votes, throwing the election to the House of Representatives. There the Federalists maintained a majority; however under the Constitution, voting to elect the President is done by state delegation, with each state having a single vote. Under this rule, neither party had a majority because some states had split delegations. [54] Given this deadlock, Republicans faced two new undesirable outcomes--the Federalists might give the presidency to Aaron Burr, or worse, they could refuse to break deadlock leaving a Federalist as Acting President. [55] Balloting appeared to stall and rumors spread of military preparations in some Republican strongholds. [56] Ultimately, some Federalists were unwilling to risk conflict or a Burr presidency, and the House selected Jefferson as President **\*490** by the thirty-sixth ballot. [57]

APPENDIX - 57

The elections of 1796 and 1800 put both major political parties on notice about this particular problem with the Constitution. The 1796 election prompted Federalist initiatives to require electors to designate the office for which they casted ballots. [58] At the same time, the chief reform goal for Republicans was to ensure that the states selected electors by general or district elections rather than by legislative appointment. [59] The Republican experiences of the 1800 election led to a strong push for constitutional amendment [60] that had picked up steam by 1803, when the Republicans maintained strong majorities in the House and Senate. [61] The House took up the amendment first, focusing primarily on the issue of designation and the number of candidates the House might consider if no candidate received a majority of votes. [62] The Senate largely debated the same issues but also considered the virtue of retaining the office of Vice President and what contingency to make in the event that the House was unable to select a candidate. [63]

In late 1803, both houses approved a final amendment that required designation of electoral votes, allowed the House to consider the three highest vote-getters if no candidate received a majority, and created a contingency if the House was unable to select a President. [64] Thirteen of the seventeen states ratified the amendment by June of 1804. [65] Notably, despite recognition during the Grand Committee debates that significant problems remained about how to deal with disputed electoral returns, Congress retained the ambiguous language that "[t]he President of the Senate shall, in the presence of the Senate and House of Representatives, **491** open all the certificates and the votes shall then be counted," [66] in the Twelfth Amendment.

Several possibilities exist for why Congress declined to fix this problem. It is clear that the country actually faced the repercussions of a lack of designation in the 1796 and 1800 elections, so the impetus for reform was much stronger on this point. Furthermore, despite strong majorities in Congress, the Republicans still had difficulty approving the amendment because of the requirement of a two-thirds majority in both houses--additional reform might have cost the Republicans votes. This might explain why the Republicans also did not pursue their prior goal to take appointment away from the state legislatures. [67] Indeed, the amendment itself was also a partisan maneuver to consolidate Republican power, and, with strong majorities, the Republicans likely were not concerned about disputed electoral returns.

1. Elections Under the New Amendment

The election of 1804 was unremarkable except to note that the record contains two different and contrary descriptions of the proceedings. [68] The election of 1808 was a slightly different story--a Representative introduced a resolution stemming from complaints by Massachusetts residents suggesting that the appointment of the Massachusetts electors was "irregular and unconstitutional." [69] The resolution called for an investigation and passed the House, however a scholar who researched further was unable to find any subsequent action. [70] Otherwise, there were no difficulties until the election of 1816. Indiana had adopted a constitution in June of 1816, but Congress did not admit the state to the Union until December 1816; despite this, the state still submitted electors. [71] The method adopted for conducting the count was not unlike the previous few electoral counts, [72] but, upon reaching Indiana's **492** votes, a member of the House rose to make the first recorded objection to accepting the submission of the electoral votes. [73] A senator motioned to allow the House of Representatives to deliberate the question. [74] Another senator seconded the motion, and the President of the Senate put the question to the members of the Senate, who agreed. [75] The votes of Indiana were inconsequential in the ultimate outcome of the election, and the House could not come to any conclusions; so the two houses joined once again to finish the counting, including Indiana's votes. [76]

A similar situation arose in the election of 1820 over the status of the State of Missouri. Missouri's standing as a free or slave state was one of the first real flash points leading up to the Civil War. Missouri had adopted a constitution in July 1820 but was not acknowledged as a state until August 1821 (after the electoral count) when the Missouri Compromise was finally accepted. [77] As Indiana did, Missouri still chose presidential electors and submitted their electoral votes to Congress; again, the votes did not affect the ultimate outcome of the election. [78] Moreover, as in the past, both houses formed a joint committee "to ascertain and report a mode of examining the votes." [79] The only difference this time was that Missouri was not yet in the Union at the time of the count. Members of the joint committee anticipated and sought to avoid the problems. Prior to the count, the joint committee submitted a resolution that essentially amounted to a waiver of the question by stating two hypothetical vote totals. [80]

APPENDIX - 58

**\*493**  The resolution was the subject of heated debate in the House. Representative Henry Clay defended the tactic by first noting that, "the Constitution was silent" on the issue. [81]  Clay characterized this move as "avoiding" the issue and the uncertain paths:

> Suppose this resolution not adopted, the President of the Senate will proceed to open and count the votes; and would the House allow that officer, singly and alone, thus virtually to decide the question of the legality of the votes? If not, how then were they to proceed? Was it to be settled by the decision of the two Houses conjointly or of the Houses separately? . . . In fact there was no mode pointed out in the Constitution of settling litigated questions arising in the discharge of this duty; it was a casus omissus. [82]

Clay understood that the question was open to many interpretations but likely could not see the two bodies reaching a resolution in this contest of dispute between slave and nonslave states. He likely thought it better to fix the problem later by legislation or an amendment to the Constitution. [83]  Clay's hope that Congress might avoid the constitutional ambiguities proved elusive. [84]  Representative John Randolph argued that even this avoidance of the issue was unconstitutional because it suggested that Congress had "the power to decide on the votes of any State." [85]  Both houses agreed on the resolution but the debate sparked again during the actual electoral count, and the houses divided to discuss the issue again. [86]  Despite the feelings of certain members of the House, the issue  **\*494**  was tabled and the two bodies joined to complete the count. The President of the Senate announced the vote in hypothetical terms as provided in the joint resolution. [87]

Although the issue of slavery overshadowed the debate, both sides acknowledged that there was a clear problem to which no clear answer existed. This dispute marks the first full debate of the issues, as well as full recognition that a casus omissus existed on the issue in the Constitution. The alternative count also marked the first time that Congress maintained some, albeit restrained, power to control and canvass electoral votes. [88]  Although Congress waived the issue, the view that there was a casus omissus with some room to influence decisions would control for the next forty years. [89]

2. Constitutional Commentators Recognize the Potential for Problems

Despite the lack of publicized controversies arising over the ambiguous language of the Constitution, the two most influential early commentators on the Constitution noted the problems created by the Twelfth Amendment. Perhaps none was as succinct as Justice Joseph Story, who suggested that the drafters of both texts seemed to take for granted that no problems would ever arise as to the regularity and authenticity of electoral returns. [90]  Chancellor Kent also summarized some of the questions:

> The Constitution does not expressly declare by whom the votes are to be counted and the result declared. In the case of questionable votes, and a closely contested election, this power may be all-important; and I presume in the absence of all legislative provision on the subject, that the President of the Senate counts the votes, and determines the result, and that the two houses are present only as spectators, to witness the fairness and accuracy of the transaction, and to act only if no choice be made by the electors. [91]

**\*495**  3. Remaining Election Disputes During the Second Period

In the election of 1836, the Indiana and Missouri question arose again. This time, Michigan submitted electors before formal admission to the Union. [92]  Because Michigan's votes did not affect the ultimate outcome, Congress adopted a resolution nearly identical to the one it used in the case of Missouri, this time apparently without much debate. [93]  There was an additional problem when allegations arose that several of the electors were ineligible because they held federal office. Henry Clay amended the normal resolution to allow the joint committee to "inquire into the expediency of ascertaining whether any votes were given at the recent election contrary to the prohibition contained in the second section of the second article of the Constitution," although the findings of the committee were not binding. [94]

APPENDIX - 59

The joint committee concluded that the electors were clearly constitutionally ineligible from casting their votes.[95] In this case, Congress declared the voting of the ineligible electors "vitiated ab initio," and the President of the Senate and tellers did not include their votes.[96] Again, it appears that these proceedings were less controversial than the previous two disputes.[97]

The election of 1856 produced a most unusual scenario. All of the votes cast were regular, but a massive snowstorm prevented Wisconsin's electors from casting their votes on the required day.[98] Congress did not seem to anticipate this issue, and the ensuing debate is worth analyzing not only to see how the role of the President of the Senate devolved, but **\*496** also the importance of the joint committee's resolution and the discussion about the counting powers.

> The Presiding Officer. Pursuant to law, and in obedience to the concurrent order of the two houses, the President of the Senate will now proceed to open and count the votes which have been given . . . .


. . . .

The Presiding Officer thereupon proceeded to open and hand to the tellers the votes of the several States . . . . Pending the count,

Senator Cass said: I suggest that it is better to read the results of the vote, and not the certificates in full, unless the reading of the certificates be called for.

The Presiding Officer. The Presiding Officer considers that the duty of counting the vote has devolved on the tellers under the concurrent order of the two houses; and he considers, further, that the tellers should determine for themselves in what way the votes are verified to them, and read as much as they may think proper to the two houses assembled.

. . . It appeared from the certificate of the electors of the State of Wisconsin that the electoral vote of that State had not been cast on the day prescribed by law.

Mr. Letcher. [Raising an objection] . . . I do not know what would be proper in a case of this sort; but I desire now to call attention to it, in order that the point may be brought to the attention of the country. A time may come when it would be a matter of importance to have these votes in regular shape. . . .

The Presiding Officer. The Presiding Officer considers that debate is not in order while the tellers are counting the votes.

Mr. Jones, of Tennessee. I suppose, Mr. President, the proper way would be for the tellers to report the facts to the convention of the two houses, and let them decide.

The Presiding Officer. The Presiding Officer so considers.

[The counting continued and the tellers reported that all certificates were regular, but Wisconsin voted on the incorrect day].[99]

From here, the debate took an interesting turn. The President of the Senate appears to have considered himself bound by two documents, the Constitution and the concurrent order of the two houses.[100] However, the concurrent resolution, as it was in the past, was written in general terms and merely described the procedures of the count. The President of the Senate appeared to act with the power of a Presiding Officer by counting **\*497** the votes and dismissing objections.[101] The Presiding Officer resisted objections and arguments until the two houses divided--there, the debate was fervent with topics covering a range of issues: the power of the President of the Senate, whether votes could be excluded, whether he could count or exclude the votes, whether the houses could do so separately or concurrently (or the House alone), and whether the penalty of complete disenfranchisement was too harsh when the people properly cast their votes.[102] The debate ran for two days, but the House could not reach an agreement; the debate closed with the President of the Senate's counting of Wisconsin's vote standing.[103] It was fortunate, once more, that Wisconsin's debatable electoral votes did not matter to determining the winner of the presidency.

APPENDIX - 60

## C. Congress Assumes a Larger Role: Adoption and Use of the Twenty-second Joint Rule

Congress continued this practice of waiving the issue and ignoring electoral disputes until 1865. [104] That year, Congress adopted a joint rule that gave it "unfettered discretion to reject electoral votes when only one house of Congress objected to receiving the votes." [105] The Twenty-second Joint Rule is the broadest reach Congress has ever asserted over the electoral count. [106] Under the rule, an objection to an electoral vote **\*498** would have the ultimate effect of a near presumption to reject that set of votes. [107] On February 4, 1865, Congress passed a joint resolution excluding the electoral votes of the southern states, including Louisiana and Tennessee, which at the time were back under Union control. [108] During the proceedings, members of Congress demanded the production of the returns of Louisiana and Tennessee, but the President of the Senate refused and stated that he would comply agreeably with "the law of the land." [109] The year 1865 marked the first time that Congress rejected the votes of a state, as well as a new period of understanding of the electoral count. [110]

The divisive exigencies of the Reconstruction Era also led to congressional rejection of votes from southern states in 1869 and 1873. [111] The election of 1872 provided particularly interesting facts. Louisiana had submitted two slates of electors: one, the result of a partial canvass by a board appointed by the Governor and another one, submitted by a rival and unofficial canvassing body. [112] Both houses separated and rejected both of Louisiana's returns. [113] The votes of Arkansas were attested to by the Secretary of State but lacked a state seal. The House voted to accept these votes, while the Senate voted to reject them; so they did not count under the terms of the then-controlling Joint Rule. [114] Commentators described the rejection of Arkansas's votes as particularly unjust. The reason for the rejection was the lack of a state seal, but it turned out Arkansas did not have a state seal, and "in twenty minutes [the Senate] disfranchised about six hundred thousand people." [115] There were also objections to the votes of Mississippi and Texas, but both houses accepted the votes. [116] Georgia's votes were challenged because they were cast for Horace Greeley, who ran for President but died in **\*499** between the popular election and the meeting of the electoral voters. [117] Objectors argued that he was not a person within the meaning of the Constitution. The Senate voted to accept the votes, but the House rejected them; so the Joint Rule required the rejection of the votes. [118]

## D. A Step Back: Repeal of the Twenty-second Joint Rule and the Ongoing Debate

By 1875, Congress apparently realized that the Twenty-second Joint Rule went a step too far and allowed for the rejection of votes with too much ease. This interpretation of congressional motive might be a bit generous, as the Republicans anticipated that the Democrats would control the House of Representatives for the first time in two decades. [119] Therefore, Senate Republicans were no longer willing to allow the House to unilaterally discard electoral votes that could turn the outcome of the election or throw the election to the House.

In 1875 and early 1876, Congress debated the necessity of making changes to the Twenty-second Joint Rule. [120] Charles Fairman's meticulous book on the Electoral Commission in the 1876 presidential election dispute contains a valuable summary of all of the important arguments and proposals. [121] The debates are important, as Fairman notes, [122] because they were conducted well before the 1876 election in an ostensible effort to remove as much partisanship as possible. [123] Additionally, the debates provide a useful illustration of the various arguments and theories foreshadowing the all-important crisis of 1876, to be discussed in the next section. As such, this section will briefly summarize the debates and proposals.

Largely, the debates were simply a continuation of the same arguments that long consumed this issue. However, the debates took place in a different context, given the recent rejection of electoral votes by Congress under the Twenty-second Joint Rule. The early debate was exclusive to the Senate, starting simply with a suggestion to amend the Twenty-second Joint Rule to prohibit a single house from rejecting a **\*500** state's electoral votes. [124] Interestingly, the primary disagreement was not about the virtue of making a change, but whether Congress could make such a change without a constitutional amendment. The dividing lines were drawn between those who did not believe the Constitution gave Congress a "right to say whether votes shall be counted or not be counted" [125] and those who did. [126]

One of the strongest opponents of congressional power on this matter made two notable proposals. First, Senator Bayard suggested that the Constitution should be amended to create a tribunal that would have all power to determine any electoral disputes. [127] Second, the Senator suggested waiting until the next session of Congress, when it seemed likely that the Democrats would control the House, which might ensure that any decision would be "non-partisan." [128] Senator Edmunds made a similar suggestion for a constitutional or statutory change that would defer the power to decide contests to some sort of bipartisan congressional committee or to a federal appeals court, with the possibility of appeal to the Supreme Court. [129] As the senators debated the virtues of the rule change that had allowed the houses to separate to deliberate disputes, one senator noted that even this suggestion was on unsettled ground. If Congress had the power to resolve disputes, might the language of the Twelfth Amendment require them to act as one joint body? [130]

 **\*501** Despite these colorful debates--or perhaps because of them--the Senate was unable to reach a resolution, but it took up the issue again in the following Congress. [131] Senator Morton introduced the same bill, and shortly thereafter the Senate repealed the Twenty-second Joint Rule. [132] The debate continued, and, for some, the possibility that a state could face disenfranchisement if the two houses could not agree in the case of competing certificates was too grim. [133] Several senators still maintained that any changes required constitutional amendment. [134]

Eventually, the president pro tempore put the question of whether the bill should pass before the Senate; the vote showed thirty-two votes to pass (including all but three Republicans) and twenty-six votes against (including all but three Democrats). [135] Disappointed by the lack of unanimity, some of the bill's supporters pushed for reconsideration, which delayed further action on the bill for several months. [136] Several senators asked to work on amendments that they hoped might achieve a greater consensus, but with the delay, the bill no longer had the same urgency and was laid to rest. [137] Despite weeks of intense debate, Congress did not pass the bill, but the Senate repealed the Twenty-second Joint Rule in 1876. [138] One senator described the debates as "strong proof of the want of direct provision in the Constitution in relation to this question of the count of the votes," [139] while a later commentator noted **\*502** that "[i]t is seldom that views so diverse have been expressed in relation to a matter that seems so simple in itself." [140]

Despite decades of debate and the strong role that Congress assumed in the period before these debates, questions about congressional power over the electoral count persisted in large regard remained unanswered. In this light, the Twenty-second Joint Rule and congressional action during this period should not be understood as authoritative precedent for several reasons. First, Republicans approved the rule during Reconstruction as a partisan tool to punish the southern states. Second, once it was clear that the Democrats would have some ability to use the rule in the House, the Senate rescinded the rule. [141] Finally, the rule had no defenders in the debates of 1875 and 1876 leading up to the election of 1876. [142]

### E. Presidential Election of 1876 and Enactment of the Electoral Count Act

1. The Election of 1876 and the Electoral Commission

The most significant historical event to expose the flaws of the Twelfth Amendment was the presidential election of 1876. The contest between Republican Rutherford B. Hayes and Democrat Samuel Tilden would bring about the most serious congressional attempt to remedy the problems with the Amendment. The election came at a tumultuous time in American history: the Democrats had been in the minority for over twenty years, and commentators noted the harsh partisanship of the race. [143] Unlike prior disputes, and despite a solid popular-vote majority for Tilden, it became clear that the outcome of the election depended on tenuous results from three states--Florida, Louisiana, and South Carolina--and the resolution of an additional issue concerning a single elector in Oregon. [144] If Hayes could hold on to all the disputed electoral votes, then he would have an electoral majority (and thus the presidency); **\*503** whereas if Tilden secured just one of the disputed electoral votes, the majority (and the presidency) would be his.

The disputes in Florida, Louisiana, and South Carolina arose as follows: In Florida, each county had a duty to conduct a canvass of votes and submit the results to the governor and the secretary of state; then a Board of State Canvassers was formed to canvass those returns. [145] Three different certificates of electors would eventually come to Congress from Florida. The first

APPENDIX - 62

certificate favored Hayes and was the result of the board's canvass; it was signed by the governor in a timely manner. [146] But in Florida, as in several other southern states, there were allegations of many improprieties surrounding the casting and counting of ballots (specifically violence, voter intimidation, and fraud). [147] Pro-Tilden Democrats objected to this first certificate on the ground that state and county canvassers had improperly discarded Democratic ballots, thereby swinging the election in Florida to Hayes. [148] In an effort to counteract this initial pro-Hayes certificate, the slate of presidential electors pledged to Tilden decided to go ahead and meet as if they were the authorized Electoral College delegates from Florida. [149] Upon the governor's refusal to certify these pro-Tilden votes, [150] the Florida attorney general submitted his own certification of them, [151] thereby creating a second certificate (albeit one of obviously questionable validity). Matters did not end there, however. The legislature passed a bill calling for a new canvass, which was later certified in favor of Tilden. [152] Additionally, a Florida circuit court ruled that the Tilden electors were the legitimate electors for Florida. [153] Relying on the new canvass and the court **504** opinion, the newly elected Democratic governor created a third certificate that essentially reaffirmed the presidential votes earlier cast by the Tilden electors on their own initiative. [154] As between the two pro-Tilden certificates, this third one had the virtue of being signed by the state's chief executive pursuant to the procedures mandated by the state's legislature and judiciary, but the second one had the virtue of its earlier timing in accordance with the Electoral College calendar established by Congress.

Under similarly complicated circumstances, including allegations of fraud and violence, Louisiana also submitted three sets of certificates to Washington. [155] The first slate of electors was for Hayes; it came from the canvassing board and was certified by the ostensible governor. [156] The second was for Tilden, with these electors disregarding the work of the canvassing board on the ground that the board was corrupt. [157] This slate was certified by a different individual who purported to be the lawful governor. [158] The third slate was in effect a duplicate of the first. [159]

South Carolina submitted two slates, one for Hayes from the Board of Canvassers, certified by the governor, and another for Tilden, alleging that the Tilden electors were the rightful voters. [160]

In Oregon, the voters had elected a postmaster general as one of Hayes's electors, a possible violation of the constitutional prohibition against federal office holders acting as electors. [161] Because of this, the elector resigned from his office as postmaster, and Oregon law allowed the remaining electors to choose a replacement; they chose the resigned elector. [162] The Democratic Oregon governor refused to certify this slate **505** of electors and instead certified a slate with two Hayes electors and a Tilden elector as a replacement for the former postmaster. [163] The secretary of state, on the other hand, submitted a certificate that contained the three original Hayes electors and noted that there was no question that the Hayes electors received the most votes on election day. [164]

As in 1796 and 1800, it appeared that the Constitution might thrust the Vice President into the center of the storm. However, President Grant's Vice President had died during his term in office, and the role of President of the Senate had shifted to the president pro tempore, a Republican. [165] Republicans controlled the Senate, while Democrats controlled the House. [166] Understandably, as it became clear that the election would be decided by these disputed votes, partisans began drawing lines. The Republicans argued for an interpretation of the Constitution that awarded the Senate president controlling power over the vote tally, while the Democrats contended the joint bodies of Congress should have such power. [167]

But before this debate could be resolved, and prior to the presidential electors casting their votes in state capitals, the Senate and House appointed two committees to investigate the vote counts in the contested states. [168] Committee members went to the states to conduct the investigations, and their findings fell along partisan lines. [169] Knowing the history of disagreement about how to resolve these disputes, both houses appointed committees to report on how Congress might reach some sort of resolution. [170]

The committees came together after the holidays and settled on the idea of a tribunal (the Electoral Commission) to investigate the disputes. [171] Various proposals for the composition of the tribunal were heard but the joint committee ultimately settled on a Commission that would contain five members from each house, and four Supreme Court Justices who would choose a

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.          11

fifth Justice to join them. [172] Any decisions **506** by a majority of the Commission would be read before the joint session and would govern unless the two houses separately concurred otherwise. [173]

Without the joint committee's proposed tribunal, it was clear that the two houses were at loggerheads. The Republicans seemingly had the upper hand, if the potentially crucial President of the Senate could exercise his judgment in Hayes's favor. But Tilden was confident that he could resist any move to compromise by asserting that he was the duly elected President--at least on the strength of Florida's votes, without regard to the other disputed states. He was prepared, if necessary, to throw the election to the Democratic-controlled House of Representatives on the ground that no candidate received a majority of the votes cast. [174] The outcome of both paths was uncertain enough that congressmen suggested various other compromises. [175] For instance, one senator introduced a constitutional amendment to give the Supreme Court jurisdiction **507** over the contest, but this amendment did not pass. [176] Both houses entertained extensive debates about the proposed Electoral Commission, which largely followed themes stretching back to the Grand Committee debates. [177] Ultimately, the bill passed the Senate with 47 votes (26 Democrats and 21 Republicans) compared to 17 nays (16 Republicans and 1 Democrat). [178] In the House, the vote was 191 in favor (159 Democrats and 32 Republicans) and 86 against (68 Republicans and 18 Democrats). [179]

The process for counting votes under the new Electoral Commission Act was relatively straightforward. The President of the Senate opened the certificates from each state and allowed for objections from senators or representatives. [180] If a state submitted only a single return, only the two houses voting concurrently could reject that return. [181] If a state submitted multiple returns, and if a member of Congress raised an objection, the question went to the Commission, whose decision was final unless overridden by a majority in each house. [182] Given the nature of the partisan split between the two houses, this effectively gave final say to the Commission. [183]

The presiding officer proceeded to open and count certificates until he reached the certificates from Florida. [184] He announced the three Florida certificates and all were objected to, at which time the certificates, accompanying papers, and objections were handed over to the Commission. **508** [185] Those making the objections had an opportunity to present their case followed by counsel for both sides. [186]

The dispute over Florida's electoral vote clearly was the decisive one, because it was here that Tilden was on strongest ground. Like Hayes, he had a certificate signed by the governor, but Tilden could claim that his certificate was superior because it was the most recent, thereby superseding the legal authority of the previous one for Hayes. The Republicans continued to argue that neither Congress nor the Commission could go beneath the face of the certificate to determine the true counting of the ballots for presidential electors. But Tilden readily could concede this point with respect to Florida: the face of his signed certificate declared him the winner. The Republicans, therefore, were left to contend that the earlier certificate was lawfully authoritative because federal law had specified a time by which the state must act, and the earlier certificate on its face complied with this deadline whereas the later one did not. [187]

The congressional members of the Commission drew their conclusions along predictable partisan lines. [188] Each of the five Justices issued their own opinions, though all were certain that Justice Bradley's opinion would carry the outcome of the Commission's decision. [189] These opinions again fell along the predictable lines, and so we will only discuss Justice Bradley's opinion.

Justice Bradley first concluded that the President of the Senate has merely ministerial powers, with no authority to conduct any investigation behind the certificates; any proper investigation "must be performed and exercised by the two Houses." [190] But, Bradley noted that the "extreme reticence" of the Constitution left serious doubt about whether Congress had any power to go behind the returns. [191] Bradley turned next to Article II of the Constitution, which appeared to ensure that the "mode of appointment belong exclusively to the State. Congress has nothing to do with it, and no control over it, except . . . to determine the **509** time of choosing the electors, and the day on which they shall give their votes." [192] Thus, Bradley concluded, the state controls all of the mechanics of the elections. [193] However,

APPENDIX - 64

this exclusive power and control of the State is ended and determined when the day fixed by Congress for voting has arrived, and the electors have deposited their votes and made out the lists and certificates required by the Constitution. Up to that time the whole proceeding (except the time of election) is conducted under State law and State authority. All machinery, whether of police, examining boards, or judicial tribunals, deemed requisite and necessary for securing and preserving the true voice of the State in the appointment of electors, is prescribed and provided for by the State itself . . . . [194]

With this timing in mind, Bradley argued that "the findings and recorded determinations of the State board or constituted authorities [should be] binding and conclusive since the State can only act through its constituted authorities[.]" [195] Addressing whether this meant that Congress must accept potentially fraudulent results in the appointment of electors, Justice Bradley concluded that Congress has no jurisdiction to do otherwise because it is entirely within the state's jurisdiction to prevent frauds. [196] Florida statute imposed a duty upon the Florida governor to certify the returns, and Justice Bradley held that the certificate must at least be prima facie evidence of a valid return. Justice Bradley summarized his conclusion as follows:

The governor's certificate is prima-facie evidence that the State canvassers performed their duty. Indeed, it is conceded by the objectors that they made a canvass and certified or declared the same. It is not the failure of the board to act, or to certify and declare the result of their action, but an illegal canvass, of which they complain. To review that canvass, in my judgment, the Houses of Congress have no jurisdiction or power. [197]

**\*510**  Thus, rejecting the initial certificate was problematic to Justice Bradley because it would require the Commission to review the performance of the Florida canvassing board. The Commission voted 8-7 against receiving any evidence in the case of the Florida electors, and therefore the governor's certificate was accepted. [198]  The Commission's results were presented to the joint session and objections were heard. [199]  The houses divided to vote on whether to accept the Commission's results, with the Senate quickly accepting the decision 44-24. [200]  The House debated the subject much more thoroughly and rejected the decision by a vote of 168-103--but because the houses disagreed, the joint session accepted the Commission's decision that the Hayes's slate of electors was proper. [201]

The Commission's Florida decision set the grounds for the Commission's analysis of the objections to the returns of the other states. The Commission, in an 8-7 decision, rejected the objections to the Louisiana certificate certified by the Republican board. [202]  The same was the case for the electors of South Carolina. [203]  Throughout the proceedings, the majority of the Commission had held that it should not "go behind the returns" but should instead accept the prima-facie-valid slate of electors. **\*511**  [204]  The application of this principle does not seem as simple in the case of Florida, where two different governors certified two different returns by two different canvasses.

The Commission's concept of a prima-facie-valid certificate may be easier to understand by looking more closely at the case of Oregon. By a vote of 8-7, the Commission held that the Hayes slate of electors, certified by the Oregon secretary of state, was proper and that the governor's refusal to sign did not void it. [205]  (This decision was accepted by the Senate and rejected by the House.) [206]  Oregon law required the secretary of state to canvass the votes for the electors in the presence of the governor, to make the list of electors, and to affix the seal of the state on the certificate. [207]  Oregon law also required both the secretary of state and the governor to sign the seal, but in this case the governor refused due to an allegedly ineligible elector. [208]  The ineligible elector had resigned his federal office after his election (a potential violation of the constitutional requirement for electors), and Oregon law gave the other electors the right to replace him. [209]  The other electors chose to fill the vacancy with that same elector, who was now eligible. [210]  These electors then recorded their votes for Hayes on the certificate and submitted it to the President of the Senate with certification from the secretary of state. [211]  The governor issued his own certificate, naming the two original Hayes electors and substituting a Tilden elector for the ineligible elector. [212]  Thus, the Commission was faced

APPENDIX - 65

with two competing returns. Arguably, under Oregon law, neither certificate was prima facie valid because neither certificate was signed by both the Secretary of State and the Governor.

Thus, the counsel for Tilden adopted Hayes's earlier argument, asserted in the prior cases, that the Commission should not go behind the certificate of the governor. [213] Unsurprisingly, counsel for Hayes characterized the argument and prior holdings differently, claiming that in each state "by its laws there is some final ministerial canvass, which, completed,  **512**  shows what the election was; and we need only to look into the laws of this State . . . to see whether the apparent canvassing board was one that had such authority under the laws of the State." [214] This argument held the day. Justice Bradley maintained that the secretary of state was the highest canvassing authority under Oregon law and that his certificate was not unlike those in Florida or Louisiana, which were approved by their canvassing boards. [215] So, the important question for the Commission was not whether the certificate was certified by the governor, but whether the certificate reflected the results reached and approved by the state's canvassing body as authorized by the laws in place in that state at the time. Declining to "go behind the returns" did not mean the Commission could not look at the state's laws and the evidence presented by the certificates themselves. Thus, if the state's highest canvassing authority approved the return, the certificate was the prima-facie-valid return from the state, and the Commission would not investigate further.

But the distinction between Oregon and Florida, it must be emphasized, cannot be made on the basis of state law alone. To be sure, Oregon law demonstrated that the governor acted unlawfully in refusing to withhold his certification. But in Florida the state legislature ordered a re-canvassing of the vote for presidential electors, the canvassing board complied, and the new governor-- pursuant to that state law--signed that state's last-in-time (and thus ordinarily most lawfully authoritative) certificate. There was no allegation that the state legislature acted contrary to state constitutional law, and, even if there were, there would be the kind of federal constitutional issues that arose in Bush v. Gore (addressed by the concurrence there) about whether the state constitution could deprive the state legislature of authority that the Federal Constitution in Article Two gave to the state legislature concerning the appointment of presidential electors. [216] Finally, there was at least some argument that the third Florida certificate (resulting from the re-canvass requested by the legislature) reflected the actual results of the election.

Thus, if the act of the Florida legislature in calling for a re-canvass was to be null and void, it must be so by virtue of federal law, not because of state law. What federal law? Bradley was not completely clear on the answer to this key question, but it appears that he argued that Article II of the U.S. Constitution constrains the authority of a state legislature to alter state law concerning the appointment of presidential  **513**  electors after the duly specified date on which they must meet. Justice Bradley addressed the question in his opinion: "The question then arises, whether the subsequent action of the courts or legislature of Florida can change the result arrived at and declared by the board of State canvassers . . . ." [217] Justice Bradley acknowledged that he originally thought a judicial modification of the canvassing board's decision in a quo warranto proceeding could supersede the board's initial determination. [218] But he changed his mind because the Florida proceeding came too late:

> If the [quo warranto] court had . . . rendered its decision before the votes of the electors were cast, its judgment, instead of that of the returning-board, would have been the final declaration of the result of the election. But its decision being rendered after the votes were given, it cannot have the operation to change or affect the vote, whatever effect it might have in a future judicial proceeding in relation to the presidential election. The judicial acts of officers de facto, until they are ousted by judicial process or otherwise, are valid and binding. [219]

It is unclear what the basis of Bradley's reasoning is or whether it makes sense (and holds together as a matter of logical analysis). Bradley, at this point in his analysis, claimed to be looking to state law to figure out the authoritative status of the canvassing board's initial determination and its relationship to the subsequent judicial reversal of it. [220] It may be true that usually under state law, the acts of de facto officers are valid, and thus the votes of presidential electors ordinarily would stand once given, even if the individual electors had no valid title to their position at the time (because the ballot count on which their supposed title rests was erroneous). But what if the state legislature wishes to deviate from this general doctrine? If Florida wants to declare null and void the official acts of individuals purporting to act as presidential electors when those individuals should not have been acting as presidential electors--and instead wishes to recognize the action of individuals who were entitled to act as presidential electors (based on a corrected proper count of the ballots)--why cannot Florida law make that determination for itself and then have that determination be binding on Congress? For Bradley's analysis to hold up at all, it must be because the Federal

APPENDIX - 66

Constitution constrains the ability of states to revise their counting of ballots for presidential electors after the individuals who initially were determined to be appointed as presidential electors have exercised the sole function of their office.

**\*514**  Bradley makes clear that his reasoning rests on federal, rather than state, law in the next portion of his analysis:

> The State may, undoubtedly, provide by law for reviewing the action of the board of canvassers at any time before the electors have executed their functions. . . . The legislature may pass a law requiring the attendance of the supreme court or any other tribunal to supervise the action of the board, and to reverse it, if wrong. . . . No tampering with the result can be admitted after the day fixed by Congress for the casting of the electoral votes [for President], and after it has become manifest where the pinch of the contest for the Presidency lies, and how it may be manipulated. [221]

Of course, nowadays the "pinch" is manifest by the morning after the citizens have cast their ballots for presidential electors, but the Framers of the Constitution (and even the Twelfth Amendment to a lesser extent) assumed that the presidential electors might on occasion exercise independent judgment about their vote for President. [222]  Therefore, it is reasonable for Bradley to want to avoid the possibility of a state institution--legislature, court, or executive--undoing the work of the state's presidential electors after the electors have voted. [223]  Bradley was emphatic on this point:

> I am entirely clear that the judicial proceedings in this case were destitute of validity to affect the votes given by the electors. Declared by the board of canvassers to have been elected, they were entitled, by virtue of that declaration, to act as such against all the world until ousted of their office. They proceeded to perform the entire functions of that office. They deposited their votes [for President] in a regular manner, and on the proper and only day designated for that purpose, and their act could not be annulled by the subsequent proceedings on the quo warranto, however valid these might be for other purposes. [224]

Thus, Bradley concluded:

> I think no importance is to be attached to the acts performed by the  **\*515**  board of canvassers after the 6th day of December, nor to the acts of the Florida legislature in reference to the canvass. In my judgment, they are all unconstitutional and void. To allow a State legislature in any way to change the appointment of electors after they have been elected and given their votes, would be extremely dangerous. It would, in effect, make the legislature for the time being the electors, and would subvert the design of the Constitution in requiring all the electoral votes to be given on the same day. [225]

Thus, according to Justice Bradley, state legislatures are incapable of error correction after that deadline, even if they are convinced that an error has been made in counting the popular votes for the state's presidential electors. In any event, whether or not Bradley's own reasoning was sound in explanation of his decisions regarding both Florida and Oregon, his rulings determined the outcome.

More importantly, even if one thinks Bradley was sound in his constitutional argument forbidding Florida to undo the ruling of its canvassing board after the presidential electors had cast their votes, the correctness of this analysis does not eliminate the structural problem of the Twelfth Amendment itself--the lack of clear guidance as to which votes to accept and the ultimate arbiter of that decision. Bradley was only a commissioner, not a member of Congress. If the House of Representatives had refused to acquiesce in Bradley's 8-7 tie-breaking vote--or if in a future comparable crisis either House refuses to accept the kind of reasoning Bradley engaged in--the defect of the Twelfth Amendment comes to the fore. Someone in Bradley's position ultimately cannot control, but can only recommend. Whichever side stands to lose from the adoption of Bradley's position, whether the Senate (and its President) or the House (and its Speaker), must agree to acquiesce in the Bradley position despite disagreeing with it. If that side chooses not to acquiesce, then there is a crisis that the Constitution as presently written has no means of averting.

APPENDIX - 67

An argument exists that the delegation of congressional power to the Electoral Commission, particularly with such strong majorities in both houses, sets a constitutional precedent concerning the power of Congress to control the counting of electoral votes. But this argument is debatable, in that an act of Congress--particularly one to avert a crisis--cannot supersede the text of the Constitution itself. The Hayes and Tilden camps were truly at loggerheads, and the prospect of civil unrest  **\*516**  or war [226] cannot be separated from the desire for peaceful resolution. [227]  Compromise was the only possible way to avert a total calamity. [228]  Indeed, if the Republicans controlled Congress by wide margins, as they had in the prior decades, it is easy to imagine a much different approach and historical precedent. Even with the Commission in place, and given that the House and Senate were controlled by different parties, it was at least theoretically conceived that either the House or the Senate could have attempted to assert constitutional authority under the Twelfth Amendment to act unilaterally on behalf of its preferred candidate (the House by claiming that neither candidate received enough undisputed votes to be elected President outright, or the Senate under its presiding officer's authority). That the dispute did not linger after the Commission's 8-7 split decision is at least some blessing.

2. The Electoral Count Act--Congress Attempts to Address the Problem

The infamous 1876 Hayes-Tilden presidential contest sparked years of congressional debate on reforming the procedures for counting presidential electors. The Electoral Count Act (ECA) of 1887, still on the books today, was the product of this debate. [229]  The ECA attempts to  **\*517**  accomplish five tasks:

> 1) give the states enough time between election day and elector balloting day to settle controversies over the appointment of their presidential electors (Section 1) [codified as amended at 3 U.S.C. § 7]; 2) encourage the states to establish mechanisms for resolving contests over the appointment of presidential electors prior to the day of elector balloting (Section 2) [codified as amended at 3 U.S.C. § 5 and known as the "safe harbor" provision]; 3) publicize and place on the record the states' determination of the outcome of their elector appointment process (Section 3) [codified as amended at 3 U.S.C. § 6]; 4) minimize congressional involvement in resolving controversies over elector appointment not authoritatively resolved by the states (Section 4) [codified as amended at 3 U.S.C. § 15]; and 5) settle procedural issues for conducting the joint session at which Congress counts the states' electoral votes (Sections 4-7) [codified as amended at 3 U.S.C. §§ 15-18]. [230]

Under the ECA, the two houses separately have control over the counting of the votes. In some respects the law does seek to tie Congress's hands and give deference to the state's election returns. [231]  The ECA provides an elaborate procedure for how objections are to be made and considered, how and which types of votes might be rejected, when those votes might be rejected, and how much, if any, deference to give to the state. [232]  Some legislators objected to conferring this power upon Congress,  **\*518**  particularly if Congress could simply reject votes if both houses were in agreement. [233]

In 120 years, the provisions of the ECA have not been battle tested, and "[d]uring the 2000 presidential election dispute, politicians, lawyers, commentators, and Supreme Court justices seemed prone to misstate or misinterpret the provisions of the law, even those provisions which were clear to the generation that wrote them." [234]  As a result, questions remain about whether the ECA is constitutional, or whether Congress is actually bound by its provisions. [235]  The ECA debate continued many of the same constitutional arguments about congressional power that were first used during the Grand Committee Bill debate in 1800. Congressmen raised an additional constitutional concern during the ECA debate: that this was "an unconstitutional attempt to bind Congress's discretion." [236]  There were two prongs to this argument: first, that the legislation required presidential approval and improperly involved the President in creating rules for determining presidential elections; [237]  second, that one Congress  **\*519**  could never bind a future Congress. [238]  Even some of the supporters of the ECA admitted they were uncertain whether the law was constitutional or binding but voted for the law because they argued it created a strong moral obligation from which a future Congress would not deviate. [239]

APPENDIX - 68

If the uncertain and tenuous relationship between the Twelfth Amendment and the Electoral Count Act is the main cause for current and future concern, a problem of almost equal magnitude is the complexity and ambiguity of the ECA itself-- particularly with respect to the situation in which multiple certificates purport to be the state's authoritative electoral votes. The ECA has language addressing this situation, but that language is maddeningly difficult to parse, is subject to competing scholarly interpretations, and is arguably incomplete in terms of the circumstances that might arise. For example, what is supposed to happen under the ECA if, as with Florida in 1877, there are two certificates signed by the state's chief "executive" and the two houses of Congress disagree as to which of these two is authoritative? [240]

### F. The Elections of 1960, 1968 and 2000: Return to Waiver of the Issue?

Unfortunately, the only instances of electoral controversy after the ECA's passage do not lend much help for determining how it works. In the 1960 election, Hawaii could have provided an interesting scenario when the state submitted three certificates to Congress. [241] Despite a Kennedy lead in early returns, the first official count gave Nixon the lead by 141 votes. [242] However, Democratic electors petitioned the courts **520** for a recount, and the request was granted on December 13. [243] While the state-court litigation was still pending, pursuant to the first official count, a slate of Nixon-Lodge electors voted on December 19 (the proper day), and this slate was certified by the acting governor of Hawaii and submitted to Congress. [244] The second certificate was a slate of Kennedy-Johnson electors who purported to cast their votes on the same day, pursuant to their own claim of authority given the pending dispute--their appointment as the state's electors was not certified by a state executive. [245] On December 30, the Hawaii court decreed that Kennedy was the proper winner of the state's electoral votes, by a margin of 115 votes. [246] Subsequently, in a third certificate, the newly elected governor of Hawaii, relying on the court's recount, certified that the Kennedy-Johnson electors who submitted their votes in the second certificate were the true electors of the State of Hawaii. [247]

These three certificates from Hawaii in 1960 bear a remarkable similarity to the three certificates from Florida in the Hayes-Tilden disputed election of 1876: one for the Republicans, and two for the Democrats. The sole Republican certificate met the congressional deadline and was signed by the governor. One of the Democratic certificates met the deadline, but was without the necessary certificate. The other had the necessary certificate, but did not meet the deadline because it purported to reflect an accurate and corrected counting of the state's ballots for its presidential electors. One might think that, based on the "precedent" from the Electoral Commission's treatment of Florida in the Hayes-Tilden dispute, the first (Republican) certificate from Hawaii would be ruled the authoritative one. But that is not what occurred. Instead, presidential candidate Nixon in his capacity as President of the Senate ruled in favor of the third certificate, the one reflecting the result of the judicial redetermination of the ballot count:

> In order not to delay the further count of the electoral vote here, the Chair, without the intent of establishing a precedent, suggests that the electors named in the certificate of the Governor of Hawaii dated January 4, 1961, be considered as the lawful electors from the State of Hawaii.

If there is no objection in this joint convention, the Chair will **521** instruct the tellers--and he now does--to count the votes of those electors named in the certificate of the Governor of Hawaii dated January 4, 1961 . . . . [248]

Ultimately, Hawaii's three electoral votes had no bearing on the ultimate outcome of the election of 1960. [249]

There were no objections, and Nixon counted the votes. [250] This is the only instance of multiple slates of electors after passage of the ECA, but without the presidency at stake the ECA was not tested. Indeed, it is arguable that Nixon's conduct with respect to Hawaii simply bypassed the ECA altogether; it seems that under the ECA, the third certificate (the one accepted by Nixon) could not have been accepted without a concurrent vote from both houses of Congress. [251] In any event, had Hawaii's electoral votes been outcome determinative to the 1960 presidential election, it is entirely unclear how a controversy over them would have played out.

APPENDIX - 69

In 1969, a Republican elector from North Carolina was "faithless"[252] and gave his vote to George Wallace instead of Richard Nixon. The governor certified the state's electoral certificate with the knowledge of the faithless elector.[253] Before the electoral count, senators introduced a memorandum recommending that the faithless elector's vote be rejected and cast according to North Carolina's popular vote.[254] A representative objected during the electoral count and presented an objection signed by several representatives and senators, marking the first and only time the ECA procedures went into effect.[255] The houses split and debated the objection but only to consider whether to reject the vote. **\*522** Several representatives argued that the vote should be excluded on various grounds-- that Congress had a constitutional duty to protect the electoral system, that the faithless vote was not "regularly given" under the ECA, or on the now-recognized constitutional principle of "one [person], one vote."[256] Those who argued against the objection did so because the vote was still "regularly given" under the ECA or because under the Constitution, the counting of the votes is only a ministerial duty.[257] Both houses rejected the objections in close votes. The debate demonstrated that many questions the ECA attempted to resolve remained unanswered--or worse yet, the enactment might have created new questions altogether.

Vice President Al Gore presided over the electoral count following the 2000 election. There was potential for objections to be raised about the electors submitted from Florida, and Democratic House members submitted twenty objections but were unable to gain the support of a single senator in order start the ECA procedures.[258] Vice President Al Gore was in the unenviable position of overruling objections that were made on his own behalf, and no precedents were set. But if he had not conceded the election after the Supreme Court's decision in Bush v. Gore, and competing slates of electors had been sent to Congress from Florida, deep problems with the ECA procedures would have been exposed. Even assuming Gore did not unilaterally assert constitutional authority as President of the Senate to determine which of the competing slate of electors should be counted, he might have cast the tie-breaking vote in his own favor on any resolution concerning presidential electors taken up by the Senate in the vote-counting process. Similarly, if the Senate and House deadlocked, the ECA (at least on one interpretation) called for the "executive" of the state to be decisive, which either would have been candidate George W. Bush's brother, Jeb, or arguably unclear if another "executive" officer (say, the state's Democratic Attorney General) asserted Gore to be the rightful winner of Florida's votes. On one interpretation of the ECA (although not the only interpretation), Florida's electoral votes would need to be discarded, with the state's entire citizenry disenfranchised, and the presidential election would be thrown to the House of Representatives on the ground that no candidate had received a majority of electoral votes. Suppose, alternatively, that the Florida Supreme Court had ordered Governor Jeb Bush to sign a certificate **\*523** in Gore's favor, and he felt obligated to comply--with the consequence that Congress received two competing certificates signed by the same governor. Could Gore have decided to break the deadlock in his favor in this circumstance? The inadequacy of the ECA procedures is seen by some as a justification for the Supreme Court's agreeing to decide Bush v. Gore.[259]

## III. Summary of the Historical Flaws and Problems

### A. Summary of the Historical Problems

The ambiguous text of the Twelfth Amendment has left us with several unclear answers to several questions. Historically speaking, the electoral disputes fall into several categories:

  • Eligibility of the electors


• Eligibility of the state to submit electors

• Whether the electors or state properly performed their duties

• Whether the electoral certificate represents the genuine election results of a state

There is still potential for such disputes. As recently as the 2000 election, multiple slates of electors or Congress contemplating rejection of a single slate of electors were both real possibilities, and members of Congress objected to counting Ohio's electoral votes in 2004.[260] While there is perhaps little concern about an ineligible state submitting electors, the concern about mixed election results in a state remains.

APPENDIX - 70

Once one or more of these disputes comes before the joint meeting of Congress, several constitutional questions have arisen about the procedures of the meeting:

> • What is the role of the President of the Senate?

• Is vote counting simply a ministerial task, or can votes be rejected?

• What level of deference should be given to a state's determination of an election?

• How far behind the certificate may the vote counter go?

• Can constitutionally invalid votes be rejected?

• Can electoral votes subject to nonconstitutional defects be rejected?

 **\*524**  • How should multiple slates of votes from a single state be dealt with?

Are there satisfactory answers to any of these questions? Is historical precedent useful? If so, which historical precedent should hold the most weight? The role (as arbiter of the validity of electoral votes) that Congress first asserted in 1861 and continued through the enactment and use of the ECA encounters several problems. First, this role runs contrary to the first period from 1789 to 1821, when many of the Framers of the Constitution were in Congress. [261]  Indeed when Congress attempted to assert such a role in 1800, Framer Charles Pinckney and future-Chief Justice John Marshall, among others, vehemently rejected the role as unconstitutional, and Congress rejected the bill. [262]  Indeed, it also runs contrary to the second period from 1821 to 1861, when Congress was unable to come to a conclusion about the ability of the body to reject electoral votes. Secondly, the historical trend that led Congress to assert such power can be attributed in part to neglect on the part of the President of the Senate, as well as a natural tendency for Congress to gradually assert itself. For instance, one scholar points to the early use of congressionally appointed tellers to assist the President of the Senate as the first step in this trend. [263]  The electoral counts, of course, occurred every four years, and as new generations of politicians took their place on Capitol Hill, precedents were easier to forget. The view that the President of the Senate retained such a level of control and power runs contrary to other conceptions of how the legislature should work and is, in a sense, quite autocratic--not to mention the now-obvious potential for conflicts of interest that can result from this type of unilateral assertion. [264]  Coinciding with the abdication of the power of the President of the Senate, it is not unexpected for members of Congress to assert a stronger role for themselves in the count and to argue for such a constitutional interpretation. [265]  Indeed, it would take an inordinate amount of  **\*525**  political willpower for a President of the Senate to reassert himself as an individual against the entire body of Congress.

Finally, some of the historical precedents are affected by the particular circumstances in which they arose. First, Congress's strong role in the electoral count came about during the Civil War and Reconstruction Eras, culminating with the enactment of the Twenty-second Joint Rule. Radical Republicans, with strong majorities in both houses, sought to penalize the southern states for rebellion and secession while retaining as much power as possible. [266]  Later, the use of the Electoral Commission is often described as a necessary compromise--attributed to the threat of turmoil, split political control in Congress, and lack of clear understanding of how the procedure should work.

## B. The ECA's Lack of Clarity and Other Problems

Even as Congress has gradually increased its power over the process (assuming the role Congress has taken in adopting the ECA is constitutional), [267]  this ascension to power leaves open the following questions:

> • Does the legislation contemplate judicial review?

APPENDIX - 71

• What constitutes a "regularly given vote"?[268]

• Is there room for interpretation in the safe-harbor statute?[269]

• The statute provides no guidance in several scenarios--how should Congress make a judgment as to which votes to count?

The ECA did not limit congressional debate about the "faithless" elector in 1969. Under one interpretation of the Act, it was inappropriate for Congress to consider this issue (because there was but a single certificate from the state, it comported with the "safe harbor" deadline, and under the relevant interpretation the electoral votes were "regularly given"); under the alternative interpretation of the ECA, it was appropriate for the two houses of Congress to at least debate whether to discard  **\*526**  the vote of a "faithless" elector. Though it was certainly intended to create a thorough and clear process for review and resolution of disputes, the ECA has left much uncertainty. It is not hard to imagine that had the dispute truly mattered in the outcome of the election, litigation would have ensued.

Whether the Supreme Court can review Congress's actions under the ECA, in counting the electoral votes or in choosing among various slates of electors, is a significant question. One of the more thorough reviews of the legislative history of the ECA reveals that Congress considered giving the Court some role in the process but rejected the idea every time, and it was clear that Congress did not think the Court had a constitutional role nor did it believe the Court should have any jurisdiction at all.[270] Senator Sherman noted at the time, "[T]here is a feeling in this country that we ought not to mingle our great judicial tribunal with political questions, and therefore this proposition has not met with much favor."[271]

## C. A New Problem: Judicial Intervention in the 2000 Presidential Election and the Political Question Doctrine

In 2000, the Supreme Court intervened in a presidential election for the first time. The decision was not without controversy and effectively ended recounts that the Florida Supreme Court deemed necessary under Florida law.[272] To this day, the decision is subject to thorough disagreement and debate from conservative and liberal legal scholars.[273] The advancement of Equal Protection Clause precedent dealing with the right to vote and election administration,[274] coupled with the uncertainty of the Twelfth Amendment suggest intervention of the Court in future cases on such grounds is possible, although uncertain.[275]

 **\*527**  Many scholars have argued that the political question doctrine suggests that the Supreme Court should not intervene in an election dispute akin to the Florida dispute in 2000.[276] Regardless of the merit of the political question doctrine arguments, it is clear that this is yet another ambiguity of the Twelfth Amendment.[277] Absent a constitutional amendment clarifying the precise jurisdictional boundary between (a) the federal judiciary, in addressing the kind of Fourteenth Amendment questions presented in Bush v. Gore, and (b) Congress and its officers, in exercising their constitutional duties under the Twelfth Amendment, there are bound to be future disputes over just how far the jurisdiction of the Court may intrude into the domain of Congress (and, conversely, just how far the political question doctrine prevents the Court from doing so). Given this inevitable turf-warfare, it is all the more reason why a constitutional amendment is necessary to remedy the defects of the Twelfth Amendment.

Scholars who have defended both the Court's decision to intervene and its rationale for ending the recount have argued that the decision was  **\*528**  "a pragmatic solution to a looming national crisis."[278] But Bush v. Gore, by its very entry into the territory, has created new uncertainties. What is the meaning and scope of the new Fourteenth Amendment jurisprudence generated by Bush v. Gore, and might it have application in disputes over future presidential elections? Next time, will the Court back away, leaving matters to Congress--or, if the Twelfth Amendment remains unfixed, will another potential crisis cause the Court to repeat the kind of intervention it undertook in Bush v. Gore? Bush v. Gore was an exercise of the Court's discretionary jurisdiction, and not a product of a statutorily specified procedure; therefore its ad hoc quality (whether or not necessary for its own occasion) calls for new rulemaking to regularize the procedure in the future.

## IV. Need for Constitutional Change to Avert Disaster

APPENDIX - 72

This history and summary of the problems in the Twelfth Amendment and in our system for addressing disputed electoral outcomes is not meant to show with certainty that crisis will one day rock the system. Indeed, if disputes like the Hayes-Tilden election of 1876 demonstrate anything, it might be the great discretion with which both sides have been able to handle tenuous situations in the past. [279] However, the preceding sections do demonstrate that the failure of the Framers to foresee electoral disputes--and the resulting ambiguity in the Constitution--has created a system wrought with unanswered questions and conflicting precedents. If history is any indication, the procedure and subsequent outcome of any future dispute that makes it to Congress will likely be determined not by any statute or constitutional text, but by the partisan makeup of both houses. Additionally, because of the underlying ambiguities, the gravity of the stakes, and the precedent of Bush v. Gore, the Supreme Court is likely to remain an unpredictable "wild-card" factor in any future electoral dispute. Both of these situations are undesirable, and politicians and scholars have recognized the problems of the ambiguity  **529**  of the Constitution on these points for two centuries. The situation is like a ticking time bomb, waiting to explode under the right set of facts, and indeed--it is easy to see from the historical examples how the bomb might have exploded already were it not for the particular context of the dispute. The problem remains and Congress should fix the text in advance of a future crisis. [280]

## A. A Florida 2000 Hypothetical Exercise

To reinforce the idea that the situation is both untenable and undesirable, it is useful to conduct a relatively simple hypothetical exercise. With the 2000 election still somewhat fresh in our collective memory, it is not hard to hypothesize how this system could have exploded in the past or might still in the future. If the Supreme Court refused to grant certiorari in Bush v. Gore, or if, as four Justices would have done, [281] the Court remanded the case to allow the recount to continue, a very different scenario was possible in the event that Al Gore won the recount. The Florida legislature, dominated by Republicans, was prepared to name George W. Bush as the proper winner and appoint a Bush slate of electors; and in all likelihood, Governor Jeb Bush also was prepared to certify that slate of electors and send it to Congress. [282] There are several  **530**  ways a competing Gore slate of electors could also have been appointed: if the Florida Supreme Court or the Florida attorney general (Gore's campaign chair) determined that the legislature's act defied Florida law, they might have certified and sent a slate of electors; or perhaps a state court might have compelled the governor to appoint a second slate. [283]

Congress, faced with these hypothetical competing slates of electors, was divided. While the Republicans controlled the House of Representatives, the Senate was split fifty-fifty; assuming purely partisan voting, Vice President Gore would have been the tie-breaking vote. [284] If Congress chose to abide by the ECA, which is a significant question on its own, several problems still arise. If two different slates were certified by the governor (which happened in the 1960 presidential election), the ECA provides no guidance for how Congress should proceed. [285] If two different authorities had certified two different slates, for example one by the governor and one by the attorney general, the ECA would require a divided Congress to accept the slate certified by the governor--unless the Senate took the position (justifiably or not) that a slate certified by the attorney general was equally authoritative under the ECA. [286] Once the two houses are in disagreement, it is not difficult to imagine the controversy extending past inauguration day, which would trigger the Twentieth Amendment and a whole host of new uncertainties. [287] Changing  **531**  the partisan makeup of Congress, by giving strong majorities to the Democrats, makes for an equally interesting and unpredictable situation if Congress was faced with only Bush electors or competing slates of electors. [288]

## B. Reform Is Necessary

Our hope is that this Article provides a thorough discussion of the constitutional ambiguities, the available interpretations and differing precedents, culminating with the Supreme Court's intervention in 2000--leading the reader to conclude that constitutional reform is necessary. The problems of the ambiguous text have arisen time and again through the course of our history, and through this discussion it should be clear that the questions remain as uncertain as ever. It is especially clear, that these issues remain relevant today, after our nation's collective experience in the 2000 election. The ambiguities of the Twelfth Amendment, together with the new precedent of Supreme Court intervention, have created a most undesirable situation--one in which the rules in advance of a 2000- or 1876-style dispute are tenuous at best. [289]  **532**  Thus, it is our hope that this Article might form the impetus for some debate about how to change the constitutional procedures for electing the President.

We recognize that such a reform is not easy, from a political standpoint or from a theoretical standpoint. Constitutional reform is difficult, and, indeed, Congress has declined the opportunity to enact a fix to the Twelfth Amendment at several moments in

APPENDIX - 73

history.[290]  The failure and inadequacy of the unwieldy ECA and Congress's previous attempt to fix the system demonstrate the difficulty of any new reforms. Nevertheless, as others have recognized in the past, it seems that the fix must be by constitutional amendment, and it should be done in advance of any future electoral disputes. Constitutional amendment is desirable over statutory reform for several reasons: First, underlying any statutory reform will be the possibility that Congress could simply ignore the statute on antibinding grounds. Second, the difficulty of passing an amendment **533** and achieving ratification will force both sides in Congress to compromise and reduce the possibility that the reform will mirror the previous partisan changes of the nineteenth century.

The most difficult question will likely be who should be the ultimate decision-maker in the event of a future electoral dispute. Several possibilities exist. Congress could identify a single federal officer, more likely the Chief Justice rather than the President of the Senate, with the unilateral authority to resolve any disputes--but it would seem doubtful that Congress would want to assign such awesome power to a single individual. Congress could try to keep an equal role for each of its two houses, but the problem then is what to do if the houses deadlock. Congress could try to leave power over these disputes with the states, but what if there is a dispute about whether a state has handled the matter according to congressionally specified procedures? Ultimately, it seems that some new institution or mechanism needs to be developed.

For instance, one of us has suggested the creation of a nonpartisan, specialized election court to be the final arbitrator of election disputes.[291]  Or, if Congress would prefer a nonjudicial final arbiter, it could create standing rules for the kind of Electoral Commission that existed for the Hayes-Tilden dispute, with these rules better crafted to avoid the problem that emerged in that one episode: the single, nonpartisan neutral on a fifteen-member body was unable to serve. (It would likely be better, for example, to have a much smaller commission, where the number of nonpartisan neutrals more closely balances the number of partisan members; consider, as a possibility, a seven-member commission, with one member appointed by each of the majority and minority parties in both houses of Congress, with three nonpartisan neutrals unanimously selected by the first four.) Once Congress agrees on an ultimate decision-maker, Congress should make that decision-maker's jurisdiction decisively clear to eliminate any possibility that some other institution could attempt to interfere with its authority. Likewise, Congress should endeavor to ensure--as far as is humanly possible--that the procedural rules under which the ultimate decision-maker operate are absolutely clear. Ideally, the clarity of these procedures will constrain future political actors: they may not like the rules (just as many now do not like the fact that the President is not directly elected by a popular vote of all U.S. **534** citizens), but they will know the rules as specified in the Constitution and must abide by them.

## V. Conclusion

When Justice Story commented on the ambiguities of the Constitution in electoral disputes, he must have presumed that questions of such grave importance would eventually be resolved. Instead, our country has embarked on a meandering journey of ad hoc approaches to resolving electoral disputes. The decision of the Supreme Court in 2000 marked only the most recent stop on this journey but was met with as much dissatisfaction as previous historic stops such as the Electoral Commission and the Twenty-second Joint Rule. Instead of waiting for the next electoral dispute and hoping that the Court or a bipartisan split in Congress might save our country, Congress should address this historic problem with an amendment to the Constitution that clearly addresses the electoral count procedures.

## Footnotes

a1    Professors Bruce Ackerman and David Fontana used the term "ticking time bomb" to describe the same problems with the original language of the Constitution's Article II that the framers of the Twelfth Amendment incorporated into the text of the Twelfth Amendment. Because we agree with their conclusion that this problem is the equivalent to a "ticking time bomb," we have decided to adopt their term. See Bruce Ackerman & David Fontana, Thomas Jefferson Counts Himself Into the Presidency, 90 Va. L. Rev. 551, 585, 629 (2004).

d1    This historical essay is a collaboration between its two authors. Nathan L. Colvin, a student at The Ohio State University Moritz College of Law, undertook research on this topic under the supervision of Professor Edward B. Foley and deserves the credit for writing the initial draft as well as undertaking revisions in response to Professor Foley's edits and inputs. The problems posed by the ambiguity of the Twelfth Amendment were addressed by Professor Foley in his contribution to the symposium for which this essay is a contribution, and he is grateful for the opportunity that symposium provided

APPENDIX - 74

to discuss the problem (and potential solutions) with other symposium participants. To the extent that this historical essay goes beyond a description of the relevant facts, and begins to evaluate those facts with an eye to identifying a particular remedy to the deficiencies of the Twelfth Amendment, the evaluative emphasis and tone is a genuinely joint voice that combines the perspectives of the two coauthors. Had either author been writing this essay on his own, the emphasis and tone likely would have been distinct from the collaborative product published here. But both authors wished to downplay their own distinctive perspectives on the topic in the interest of producing a joint work--one reason being the fact that any potential reform of the Twelfth Amendment necessarily is a pluralistic enterprise. It surely will not be possible to amend the Constitution to remedy the defects, now over 200 years old, unless citizens of different political viewpoints can come together to, first, recognize the need to adopt a solution and, then, to develop one. This essay is our offering in that spirit.

[1]   3 Joseph Story, Commentaries on the Constitution of the United States § 1464 (Boston, Hilliard, Gray, & Co. 1833). Professor Foley originally encountered Justice Story's quote while researching one of our country's earliest disputed elections, the 1792 New York gubernatorial election. See Edward B. Foley, University Distinguished Lecture at the Ohio State University: The Original Bush v. Gore: An Historical Perspective on Disputed Elections (Oct. 14, 2008) (transcript available at http:// moritzlaw.osu.edu/electionlaw/docs/post_lecture_draft05march09.pdf).

[2]   The text of the Twelfth Amendment is lengthy, but the relevant portion is included below:
The Electors shall meet in their respective states and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate;--The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted;--The person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed; and if no person have such majority, then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President.
U.S. Const. amend. XII. The remaining relevant text is in Article II Section 1 of the Constitution. Clause 2 delegates the choosing of electors to the states and provides for the qualifications of electors. Clause 4 gives Congress the power to determine the day that all states select their respective electors and the day those electors must cast their votes. Both days must be uniform for all states. Clause 5 details the qualifications to be President. U.S. Const. art. II, § 1.

[3]   As a result, nineteenth-century legal scholars did recognize the problems with the Twelfth Amendment; some twentieth-century scholars have recognized the problems, but little scholarship has been produced to trace the problems and argue for the necessity of constitutional reform. See, e.g., Laurence H. Tribe, Erog .v Hsub and its Disguises: Freeing Bush v. Gore from its Hall of Mirrors, 115 Harv. L. Rev. 170, 279 (2001) (noting the ambiguities and suggesting the questions remain unanswered today); Edward B. Foley, Voting next time--and in 2020, Election Law @ Moritz (Nov. 10, 2008), http:// moritzlaw.osu.edu/electionlaw/comments/articles.php?ID=3897 (identifying the disaster imbedded in the ambiguities of the Twelfth Amendment and arguing for the need resolve the questions).

[4]   531 U.S. 98 (2000).

[5]   See, e.g., Richard A. Posner, Breaking the Deadlock ix (2001) (defending the Court's judgment as a pragmatic approach to averting political and constitutional crisis).

[6]   Between the election of 1800 and the election of 1876 there were eleven disputes over electoral votes, and members of Congress raised twenty-one objections to the validity of the votes of different states. Throughout this time, Congress fervently debated the extent to which it had the ability to exercise power but passed no legislation. J. Hampden Dougherty, The Electoral System of the United States 105 (1906).

[7]   The discussion is brief because Vasan Kesavan has already provided a thorough analysis of the possible constitutional defects of the Electoral Count Act. See Vasan Kesavan, Is the Electoral Count Act Unconstitutional?, 80 N.C. L. Rev. 1653 (2002). Kesavan provides some summary of the history of the electoral counts with the purpose of showing the defects with the Electoral Count Act, and with this in mind, it is Kesavan's argument that the Electoral Count Act is the systemic illness in the electoral system. To that end, he proposes some revisions to the Act he argues would fit better with his understanding of the Constitution. Id. at 1811-12. We argue, instead, that the Electoral Count Act is a symptom

APPENDIX - 75

of an illness. The true illness is the ambiguity of the Twelfth Amendment, which has manifested itself in the Electoral Count Act and the historical instances of electoral disputes, including the most recent dispute over Florida in 2000. Thus, the Twelfth Amendment requires attention and remedy, and our historical analysis bears this in mind.

8     During the ratification debates, Alexander Hamilton said that the mode of electing the President was perhaps the only part of the Constitution to escape criticism. The Federalist No. 68 (Alexander Hamilton). Despite this, choosing a method of selecting a president was one of the hardest problems for the Constitutional Convention. Bruce Ackerman, The Failure of the Founding Fathers: Jefferson, Marshall, and the Rise of Presidential Democracy 27 (2005). The Convention considered various plans, including election by popular vote and parliamentary style appointment, but settled on the current system, which they adopted from the Maryland Constitution. See generally Tadahisa Kuroda, The Origins of the Twelfth Amendment 7-25 (1994); C.C. Tansill, Congressional Control of the Electoral System, 34 Yale L.J. 511, 511-14 (1925). The Electoral College was primarily a compromise between the interests of the large states and those of the small states. The constitutional debates about our electoral system were quite animated and perhaps among the most thorough in the Convention. See Kuroda, supra, at 7-8. The Framers explicitly rejected election by popular vote or selection by the national legislature--this Article will leave aside the debate about whether to change the substance of the Electoral College system. In other words, we assume for purposes of this Article that the formula for allocating the number of electoral votes should remain the same and that state legislatures should remain entitled to choosing the method by which their electors are selected. The only topic we address, thus, is the procedural one concerning how to resolve disputes that might arise over a state's electoral votes under this system. For a broader discussion on scrapping or reforming the Electoral College, see generally Ann Althouse, Electoral College Reform: Déjà Vu, 95 Nw. U. L. Rev. 993 (2001) (reviewing three of the top books concerning the Electoral College).

9     U.S. Const. art. II, § 1, cl. 3.

10     Id.; accord U.S. Const. amend. XII.

11     Dougherty, supra note 6, at 2 (quoting an earlier commentator on this point).

12     Perhaps this should not be surprising. The Framers did not anticipate, and indeed hoped to prevent, the formation of political parties. For them, George Washington was the model president. They hoped that the mechanism of the Electoral College could secure, if not exact replicas of this most virtuous model, at least sufficient facsimiles so that the president would be above partisanship. Ackerman, supra note 8, at 27-31.

Additionally, early in our history, the state legislatures directly appointed their electors to cast ballots. It is easy to understand how the Constitutional Convention might have assumed that these votes would be legal and without controversy. The Constitution provided only a few requirements for electoral votes: that the electors themselves are not in the service of the United States and that the electors cast their votes for an eligible candidate. Perhaps the Framers assumed that no state would appoint ineligible electors and no elector would vote for an ineligible presidential candidate such that the counting would truly be mere addition. Dougherty, supra note 6, at 3-4.

13     It is undeniable that each state will play a major role in determining its own electoral votes, although it is debatable just how extensive or exclusive the state's authority is in this regard relative to potential congressional actors. What is more difficult to conceive is how the states, rather than a single national actor, could exercise final authority over the accumulation of all electoral votes from the various states and thus the declaration of the presidential winner. Moreover, insofar as the national task of accumulating the electoral votes from the several states may occasionally involve a question of what alleged submission from a particular state constitutes the actual electoral votes from that state, it becomes more difficult to assert that this question must finally and conclusively be resolved by the state itself rather than any national actor. But acknowledging this point invokes the possibility of making inroads on the exclusivity of each state's ability to determine its own electoral votes. Thus, figuring out what belongs exclusively to each state, and what belongs properly to a national institution, in the counting of electoral votes is no easy matter--and indeed has perplexed many of the discussants of this topic over the decades.

14     Tansill, supra note 8, at 511; see also David A. McKnight, The Electoral System of the United States 17 (1878) ("From the time of the first Congress in 1789 to the year 1821, history shows that the unquestioned custom was for the President of the Senate to declare the votes officially, whilst Counting was, what the language of the law would seem to convey clearly enough, simply enumeration." (internal quotation marks omitted)). This period is perhaps notable because many of the Framers of the Constitution were members of Congress. The theory held until those individuals left government. See McKnight, supra, at 18.

APPENDIX - 76

15    McKnight, supra note 14, at 17 ("From 1821 to 1861 it was generally held that a casus omissus existed in the Constitution, and that no one was empowered to count; whilst Counting was used in the broader and unwarranted sense of canvassing." (internal quotation marks omitted)); see also Tansill, supra note 8, at 520-21 (noting that for the first time in 1821 Congress maintained some power to control and canvass the votes and this view was accepted in practice for the next forty years).

16    Whether this period extends to the present is a difficult question. As will be seen, Congress has not faced a serious dispute over electoral returns since 1887.

17    McKnight, supra note 14, at 19 (noting the third period has been marked by the belief that Congress has the right, as an affirmative act, to count votes and thus to determine the legality of votes); see also Tansill, supra note 8, at 522-25.

18    See William H. Rehnquist, Centennial Crisis: The Disputed Election of 1876, at 99 (2004). Chief Justice Rehnquist described the Constitution as "silent as to who would do the counting." Id.

19    U.S. Const. art. II, § 1, cl. 3.

20    See Bruce Ackerman & David Fontana, Thomas Jefferson Counts Himself into the Presidency, 90 Va. L. Rev. 551, 556 (2004) ("[T]he Vice-President ... is a natural candidate in the next presidential contest. It is an obvious mistake to designate him as the presiding officer over the electoral vote count.").

21    See U.S. Const. art. II, § 1, cl. 2 ("Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in Congress ...."). The early methods were quite diverse. In the election of 1796, six states used popular election to choose electors, while ten states gave the job to the state legislature. Some allowed the electors' votes to be split in proportion to the popular vote. Ackerman, supra note 8, at 31. The Court has interpreted this section, in the context of a state changing the method of appointing electors from election by popular vote to direct legislative appointment and suggested that it represents a strong delegation of power to the States. McPherson v. Blacker, 146 U.S. 1, 24-37 (1892) (discussing the different historical modes of appointing electors and suggesting there is no doubt that the legislature may resume appointing the electors). Some have argued that a state legislature might even appoint electors after an election has been held.

22    This list is not an exhaustive list of problems with the Twelfth Amendment as a whole. We intend to focus on the ambiguous text and counting power, but other scholars have noted other problems. For instance, some have noted that it is unclear whether rejected votes (or votes not given) should change the way the majority of votes required to be elected is calculated. For a discussion of this issue and a history of congressional practice, see Jack Maskell et al., Cong. Research Serv., Electoral Vote Counts in Congress: Survey of Certain Professional Practices (2000), available at http://wikileaks.org/wiki/CRS-RL30769. Professors Levinson and Young have devoted an article to the so-called Habitation Clause of the Twelfth Amendment, which forbids electors from casting two votes for inhabitants of the same state, and have noted that it could raise a whole host of issues. Sanford Levinson & Ernest A. Young, Who's Afraid of the Twelfth Amendment?, 29 Fla. St. L. Rev. 925 (2001).

23    Of course, there is some uncertainty in relying on the record on the counts in the first place. For instance, the record for the first two counts is only a few pages long and certainly does not include every detail about the proceedings; however, it is the best evidence available.

24    H. Subcomm. on Compilation of Precedents, Counting Electoral Votes: Proceedings and Debates of Congress Relating to Counting the Electoral Votes for President and Vice-President of the United States, H.R. Misc. Doc. No. 44-13, at 7 (2d Sess.1877) [hereinafter Counting Electoral Votes]. Counting Electoral Votes is a compilation of federal records relevant to the counting of electoral votes, starting with the debates at the constitutional convention, congressional debates about proposed and accepted statutory and constitutional changes, and records of the proceedings of each electoral count. A House select committee tasked with determining a method to resolve the Hayes-Tilden dispute commissioned the document in the winter of 1876-1877. 7 Charles Fairman, Five Justices and the Electoral Commission of 1877, at 10 (The Oliver Wendell Holmes Devise: The History of the Supreme Court of the United States, Paul A. Freund & Stanley N. Katz eds., Supp. 1988).

25    Counting Electoral Votes, supra note 24, at 7.

APPENDIX - 77

26   Id.

27   Of course, it is impossible to know with any certainty if this was not a mere change in word choice rather than a change in the proceedings.

28   Counting Electoral Votes, supra note 24, at 10.

29   Id.

30   Id.

31   See Dougherty, supra note 6, at 33. Some scholars have suggested that even this might have been a departure from the Constitution. See 2 Cyclopaedia of Political Science, Political Economy, and of the Political History of the United States 62, 63 (John J. Lalor ed., 1899) (quoting Professor Alexander Johnston's assertion that "the intention of the system of American constitutional government was that the President of the Senate should canvass the votes: in accordance with a general authenticating law, if Congress would or could pass such a law; otherwise according to his best judgment"); see also Tansill, supra note 8, at 516 (agreeing that many scholars held that Congress could pass a general law providing for the authentication of the certificates, but the sole function of counting the votes belonged to the President of the Senate). Some scholars hold that the innocent and proper appointment of the tellers was the first inroad by Congress upon the President of the Senate's counting powers. Id. (quoting Professor Johnston on this point).

32   See Counting Electoral Votes, supra note 24, at 12-13, 30. The record for the 1792 and 1800 elections describes the action in the Senate chamber as follows: "the certificates of the electors of sixteen States were, by the Vice-President, opened and delivered to the tellers appointed for that purpose, who, having examined, and ascertained the number of votes, presented a list thereof to the Vice-President." Id. at 30; accord id. at 10. It is difficult to say what the record meant by "having examined," but this account suggests an even more active role than the one envisioned by the committee and, if accurate, cuts against Professors Ackerman and Fontana's argument that Jefferson as Vice President ruled on a questionable certificate in his own favor. See infra note 33 and accompanying text. If nothing else, this might just show the danger in relying on the record since other sources suggest the Vice President opened and announced the results.

33   Ackerman & Fontana, supra note 20, at 552.

34   Id. at 601.

35   Id. at 571. The charges were (1) that Vermont did not have a valid law authorizing the selection of electors; (2) that the electors were made through a "resolve" instead of a legislative enactment; and (3) that the appointment of the electors was not within the timeline provided by federal statute. Id. at 572-73. The chargers were serious enough that the candidates (including Jefferson at home in Virginia) were aware of the reports. Professors Ackerman and Fontana thoroughly discussed the reports and found the charges did not have legal merit. Id. at 571-79.

36   6 Annals of Cong. 2097-98 (1797).

37   Ackerman & Fontana, supra note 20, at 580-81; see also Edward Stanwood, A History of the Presidency from 1788 to 1897, at 51-52 (Charles Knowles Bolton ed., rev. ed. 1928).

38   Article II requires that each state's electors "sign and certify" their votes for President. U.S. Const. art. II, § 1, cl. 3 (emphasis added). Georgia's submission simply listed the names of the state's electors, without their signatures and certifications. Ackerman & Fontana, supra note 20, at 588-98, 612-13; see also, Norman J. Ornstein, Three Disputed Elections: 1800, 1824, 1876, in After the People Vote: A Guide to the Electoral College 29, 30 (John C. Fortier ed., 3d ed. 2004).

39   Ackerman & Fontana, supra note 20, at 603. The Memoirs of Aaron Burr suggests that Jefferson was even more aggressive in his actions, though the source is at least questionable given the memoirs were written by a staunch Burr loyalist. Id. at 604-06. Interestingly, a senator described the event in a similar fashion, though seemingly as oral tradition until 1876. Id. at 609. Notably, much like post-Bush v. Gore arguments, Ackerman and Fontana argue that Jefferson's actions were prudent because they averted certain constitutional crisis:
Jefferson did not merely place Georgia's votes into the Republican column; he did not publicly acknowledge the existence of any sort of problem. In contrast to John Adams ... he did not give his opponents a clear opportunity to raise the issue.

APPENDIX - 78

....
Jefferson's silence seems particularly sensible in the context of the confused legal situation ... with the painfully ambiguous words of the Constitution as a guide....

Jefferson's silence allowed everybody to resolve the matter without a heated legalistic battle.

Id. at 614-16; see also Ackerman, supra note 8, at 71-74 ("All things considered, Jefferson's obfuscations provided the best way out of the dark situation left by the Founders.... If Jefferson had raised the issue squarely ... everybody would have confronted an infinite regress: Could the president of the Senate claim the right to decide whether the president of the Senate possessed the contested power? To which the Federalist majorities in the House and Senate would counter that their constitutionally required 'presence' at the vote count authorized them to override the president's rulings from the chair. And so forth.").

[40] Ackerman and Fontana argue that the Founders overlooked the problem of placing the Vice President in such a prominent role because they optimistically thought the republic would remain without faction. See id. at 557-67.

[41] Ackerman & Fontana, supra note 20, at 583 (internal quotation marks omitted); see also Kuroda, supra note 8, at 78; Tansill, supra note 8, at 517.

[42] See, e.g., Jean Edward Smith, John Marshall: Definer of a Nation 263-64 (1996) (noting the partisan Federalist motives behind the bill and Federalist John Marshall's opposition to it on constitutional grounds); Kesavan, supra note 7, at 1669 (noting that the Federalist's motives behind the Grand Committee bill were to ensure Jefferson's defeat); L. Kinvin Wroth, Election Contests and the Electoral Vote, 65 Dick. L. Rev. 321, 327 (1961) (discussing the partisan motivations of the Grand Committee Bill's backers).

[43] Counting Electoral Votes, supra note 24, at 17. The initial bill gave each House the power to appoint two members as tellers. The President of the Senate would open the electoral certificates so the tellers could record all of the relevant information. Then the Grand Committee, meeting in secret, could take all of the documents and determine the validity of all of the votes by majority vote. The committee had investigatory authority to subpoena witnesses and take testimony. After meeting, the committee would turn over its results as the "final and conclusive determination of the admissibility, or inadmissibility, of the votes." Kuroda, supra note 8, at 78-79 (internal quotation marks omitted).

[44] See Kuroda, supra note 8, at 79-80. Nicholas conceded that six legitimate issues might arise:

(1) whether an Elector has been appointed in a mode authorized by the Legislature of his state or not; (2) whether the time at which he was chosen, and the day on which he gave his vote were those determined by Congress; (3) whether he was not at the time, a Senator or Representative of the United States, or held an office of trust or profit under the United States; (4) whether at least one of the persons for whom he has voted is an inhabitant of a state other than his own; (5) whether the Electors voted by ballot, and signed, certified and transmitted to the President of the Senate, a list of all the persons voted for, and the number of votes for each; (6) whether the persons voted for are natural born citizens, or were citizens of the United States, at the time of the adoption of the Constitution, were thirty-five years old, and has been fourteen years resident within the United States.

Id.

[45] Kuroda, supra note 8, at 80.

[46] The speech is worth quoting because it provides an early and complete example of one point of view that various members of Congress have consistently held throughout these debates.

Knowing that it was the intention of the Constitution to make the President completely independent of the Federal Legislature, I well remember it was the object, as it is at present ... to give to Congress no interference in or control over the election of a President.... It never was intended, nor could it have been safe, in the Constitution, to have given to Congress thus assembled in convention the right to object to any vote, or even to question whether they were constitutionally or properly given. This right of determining on the manner in which the electors shall vote; the inquiry into the qualifications; and the guards that are necessary to prevent disqualified or improper men voting, and to insure the votes being legally given, rests and is exclusively vested in the State Legislatures.... To give to Congress, even when assembled in convention, a right to reject or admit the votes of States, would have been so gross and dangerous an absurdity that the framers of the Constitution never could have been guilty of. How could they expect ... that party spirit would not prevail and govern every decision? Did they not know how easy it was to raise objections ...? Or must they not have supposed that, in putting the ultimate and final decision of the electors in Congress ... they would render the President their creature ...?

Counting Electoral Votes, supra note 24, at 19-20.

APPENDIX - 79

Pinckney went on to discuss the problems of constitutional defects or double returns. For the constitutional requirements of electors, Pinckney argued that the framers left it to the State Legislatures to "perform their duties" on this point. Id. at 20. On the issue of double returns, Pinckney argued that the Grand Committee approach would actually serve as "temptation [for the minority in the state] to dispute every election, and to always bring forward double returns." Id. at 20-21.

47    Ackerman & Fontana, supra note 20, at 584.

48    Tansill, supra note 8, at 518. The primary issue was whether the consent of one or both houses was required to reject a state's votes. See Kuroda, supra note 8, at 81; Wroth, supra note 42, at 327 ("The House, less aggressively partisan than the Senate, refused to accept a measure which would permit rejection by vote of the Senate alone. The bill failed when neither House would yield.").

49    For more literature on the fascinating election of 1800 (in addition to Ackerman and Fontana's work), see Susan Dunn, Jefferson's Second Revolution (2004); John Ferling, Adams vs. Jefferson: The Tumultuous Election of 1800 (2004); Edward J. Larson, A Magnificent Catastrophe (2007).

50    This sentiment held even when the election was thrown to the House of Representatives as the Republican delegation from Burr's home state of New York continued to support Jefferson over Burr. Kuroda, supra note 8, at 103.

51    Id. at 99.

52    See id. at 108 (noting that the Federalists threw so many votes away from their choice for Vice President that Thomas Jefferson finished second).

53    Id. at 99.

54    Id. at 100.

55    Id. at 100-01. The Constitution was silent as to what should happen if the House could not select a candidate. Id. at 103. The possibility that the Federalists might stall in order to appoint one of their own as President was real, and actors on both sides were fully aware of this possibility. See generally Ackerman, supra note 8, at 36-54. John Marshall, then Secretary of State, was floated a possible replacement, and Professor Ackerman suggests that he might have actually been one of the primary protagonists behind this movement. Id. at 41-54, 80-85.

56    Id. at 105.

57    Id. (noting that rather than vote for Jefferson, many of the Federalists ultimately abstained to allow Jefferson to gain the votes of their delegations--Jefferson received no Federalist votes).

58    Id. at 109 (noting that the constitutional amendment process was active on this issue both in Congress and at the state level).

59    Id. at 110-11 (noting Republican activity in Congress and at the state level to ensure these goals).

60    Dougherty, supra note 6, at 37. Early initiatives began at both the state level and federal level in the two years directly following the election. See Kuroda, supra note 8, at 117-26.

61    Kuroda, supra note 8, at 127, 133 (noting a 96 to 38 Republican advantage in the House and a 24 to 9 advantage in the Senate).

62    For a thorough discussion and analysis of the House debate, see id. at 127-31. Federalists naturally argued that the constitutional amendment for elections was inappropriate when it was impossible to separate partisan motives from the ultimate product. Id. at 130.

63    For a thorough discussion and analysis of the Senate debate see id. at 133-43. The Federalist minority made similar arguments to maintain the status quo and were particularly concerned that the reforms would disadvantage the smaller states. Id.

APPENDIX - 80

64    See id. at 151.

65    Dougherty, supra note 6, at 26; see also Tansill, supra note 8, at 518 (noting the passage of the amendment was "really a constitutional recognition of the existence of political parties"). For discussion about ratification, see Kuroda, supra note 8, at 155-61.

66    U.S. Const. amend. XII.

67    On this point, the Republicans also did not have a partisan motive to pursue this goal as they had strong majorities in many of the states at the time. Kuroda argues that Jefferson was concerned primarily with maintaining Republican control of the federal government and was willing to abandon democratic reforms to this end. See Kuroda, supra note 8, at 171-72.

68    The description of the duties for the tellers was essentially the same as in the previous two counts, but the Senate record suggests the President of the Senate only opened the certificates and allowed the tellers to read the results and count the votes. However, the House record reports that the Vice President "open[ed] all the certificates and count[ed] all the votes." Counting Electoral Votes, supra note 24, at 36-37.

69    Kesavan, supra note 7, at 1679 (internal quotation marks omitted); see also Counting Electoral Votes, supra note 24, at 37-39.

70    Kesavan, supra note 7, at 1679-80.

71    Dougherty, supra note 6, at 40.

72    See Counting Electoral Votes, supra note 24, at 44, 46; see also Tansill, supra note 8, at 519.

73    The member addressed his objection to the Speaker of the House who retorted, "the two Houses had met for the purpose-- the single specified purpose--of performing the constitutional duty which they were then discharging, and that while so acting, in joint meeting, they could consider no proposition, nor perform any business not prescribed by the Constitution." Counting Electoral Votes, supra note 24, at 46.

74    Id.

75    Id.

76    Id. at 47. The House debate included a few points worth mentioning. First, the member who raised the objection noted that he did so because although the votes were of no consequence, "the time might arrive when it would be of the greatest importance in the election of President of the United States, and that it would be better to settle it now, when its decision would not affect the election." Id. There was some concern about whether any resolution to the question should be done jointly with the Senate, or if the House could act independently. (One member was particularly concerned that a joint resolution would suggest that the House could not act independently in the future). Id.

77    Dougherty, supra note 6, at 42. The issue was wording in the Missouri Constitution that directed the state legislature to prevent freed slaves from coming into the state. A majority in Congress would not allow admission to the Union until this provision was changed. Tansill, supra note 8, at 520.

78    Dougherty, supra note 6, at 42-43.

79    Counting Electoral Votes, supra note 24, at 51.

80    This part of the resolution read:
That if any objection be made to the votes of Missouri, and the counting or omitting to count which shall not essentially change the result of the election, in that case they shall be reported by the President of the Senate in the following manner: Were the votes of Missouri to be counted, the result would be, for A B for President of the United States, ---- votes. If not counted for A B for President of the United States, ---- votes. But in either event A B is elected President of the United States.
Id.

APPENDIX - 81

81     Id. at 52. Senator Barbour presented the resolution and noted that he considered the problem to be "a casus omissus in the Constitution," subject to remedy only by an act of Congress or an amendment to the Constitution. Id. at 49.

82     Id. at 52.

83     Id.

84     By contrast, it appears that the Senate did not debate the subject as vociferously, perhaps because it focused on the propriety of dealing with the question separate from the House. See id. at 49.

85     Id. at 51. Those in opposition essentially echoed Senator Pinckney's pleas during debate over the Grand Committee bill. Representative Trimble was of the opinion that the resolution did not give "due to State rights" and was concerned that it might be cited as precedent. Id. at 52. Representative Floyd "protested against this assumption of authority on the part of Congress." Id. The vote tally in the House was close, ninety yeas and sixty-seven nays, with members on both sides unsure about whether Congress could actually reject the votes. See id.; see also Tansill, supra note 8, at 520.

86     This time, Representative Randolph renewed his arguments with dramatic flair, suggesting that there was no such power in the Constitution to supply the defect to the casus omissus, that this would effectively boot Missouri from membership in the Union, and that it might set such a precedent that a President, "not only not worthy of being at the head of the nation, but not worthy of being at the head of a petty corporation" might manipulate the vote for his own gain. Counting Electoral Votes, supra note 24, at 54-55.

87     Id. at 56. This was not without controversy. Again members protested, demanding to know the actual vote tally. Representative Randolph offered a resolution that the election was illegal, but it was ignored. Id.

88     Tansill, supra note 8, at 520.

89     Id. at 521.

90     Story, supra note 1.

91     1 James Kent, Commentaries on American Law 277 (O.W. Holmes, Jr. ed., Fred B. Rothman & Co. 1989) (1826). Of course, Kent's view of the Vice President's power is not unanimous, and, as we will see, the power has certainly shifted with the passage of time. One scholar suggested that early precedent actually suggests quite the opposite conclusion. See 2 George Bancroft, History of the Formation of the Constitution of the United States of America 185 n.1 (New York, D. Appleton & Co. 1882) ("The vice-president was never charged with the power to count the votes. The person who counted the first votes for president and vice-president was no vice-president, but a senator elected by the senate as its officer ....").

92     Dougherty, supra note 6, at 48.

93     See Counting Electoral Votes, supra note 24, at 72-74.

94     Id. at 70. It was alleged that some of the electors were postmasters and one a pension agent. Id. at 71.

95     Id. Reporting to the Senate on the joint committee's work, Senator Grundy noted that the problems that might arise in a less obvious case:
Should a case occur in which it became necessary to ascertain and determine upon the qualifications of electors of President ... the important question would be presented, what tribunal would, under the Constitution, be competent to decide? Whether the respective colleges of electors in the different States should decide upon the qualifications of their own members, or Congress should exercise the power, is a question which the committee are of [the] opinion ought to be settled by a permanent provision upon the subject.
Id.

96     Id. at 73-74.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.     30

97    The record really does not show much dissension, but one senator did presciently ask what might happen if the outcome of the election hinged on these votes. Senator Grundy of the joint committee stated that he could not answer such a hypothetical. Id.

98    See U.S. Const. art. II, § 1, cl. 4.

99    Counting Electoral Votes, supra note 24, 87-88.

100   See id. at 89.

101   See id. at 89-91 (recording objections, including an accusation that the Presiding Officer had acted beyond his authority, as well as the Presiding Officer's responses). The presiding officer maintained that the only role in joint session was to count the votes and that any other function must be performed as separate houses. Id.

102   Id. at 93-144.

103   Id.

104   See Stephen A Siegel, The Conscientious Congressman's Guide to the Electoral Count Act of 1887, 56 Fla. L. Rev. 541, 557 (2004).

105   Id. In larger part, as with the earlier Grand Committee bill, the partisan intent of this rule was to ensure that one party (then the Federalists, now the Republicans) could control the vote counting process and to penalize southern states as needed. The full rule stated that if any question were raised,
the Senate shall thereupon withdraw, and said question shall be submitted to that body for its decision; and the Speaker of the House of Representatives shall in like manner submit said question to the House of Representatives for its decision; and no question shall be decided affirmatively, and no vote objected to shall be counted, except by the concurring votes of the two Houses.
Dougherty, supra note 6, at 78 (internal quotation marks and emphasis omitted).

106   See Tansill, supra note 8, at 522 (calling the rule the "climax of Congressional control"). Adoption of the rule was, of course, not without controversy. Senators questioned the competence of Congress "to legislate at all in reference to the counting of the votes," and "whether Congress is clothed with any power over the subject of counting of [the] electoral votes." Counting Electoral Votes, supra note 24, at 150 (statements of Senators Harris and Doolittle). Senator Doolittle described the question as "one of the most grave" that could possibly arise under the Constitution but recommended that Congress avoid the question, as it had in the past, because the result of the election did not hinge on the answer. Id. at 151-52.

107   If there was an objection to a vote, the vote could only be counted if both houses separately agreed to count the vote. See supra note 105 and accompanying text.

108   Tansill, supra note 8, at 523.

109   McKnight, supra note 14, at 310.

110   Dougherty, supra note 6, at 80; Tansill, supra note 8, at 523.

111   Several southern states were not permitted to participate in the election because their governments were not "adequately organized." There was a question about Georgia's eligibility, and a resolution provided for an "alternative count" of its votes as had been done before the Civil War. However, during the vote, objections were heard; and under the Twenty-second Joint Rule, the houses separated to resolve the issue. The House voted to reject Georgia's votes; but as a joint body, the President of the Senate ruled, much to the consternation of many members of the House, that the alternative count resolution should be followed. Dougherty, supra note 6, at 81-84.

112   Id. at 86.

113   Counting Electoral Votes, supra note 24, at 407.

114   Dougherty, supra note 6, at 86-87.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

[115] Id. at 88 (internal quotation marks omitted).

[116] The objections were that Mississippi failed to state that the electors voted by ballot and that the authenticity of the seal from Texas was uncertain. Id. at 87.

[117] Kesavan, supra note 7, at 1687.

[118] Dougherty, supra note 6, at 87-88.

[119] See id. at 92 ("It was known that the succeeding House of Representatives would be under Democratic control.").

[120] Fairman, supra note 24, at 9 (noting "the effort of Senators in February 1875, renewed in March 1876, to frame a proper measure to regulate the counting of electoral votes, including cases where conflicting returns were sent up from a State").

[121] See id. at 9-39.

[122] See id. at 9 ("It was an exercise in innocence and truth, in patriotism and faith.").

[123] One might argue, however, that Republicans were trying to act quickly before they would lose power over the issue.

[124] Fairman, supra note 24, at 10. It was recognized that simply repealing the rule was not enough, because this would not address a situation of multiple, competing returns where each house recognized a different return as valid. On this, both Republicans and Democrats agreed that further explanation was necessary. Id. at 12.

[125] Id. at 10-11 (summarizing the arguments of Senator Bayard, a leading Democrat, who thought all power in this regard belonged to the states and the role of Congress was simply to add up the votes). However, when faced with a question about competing returns, the Senator was largely evasive and unsure. Id. at 11. Notably, Senator Morton, who proposed the initial amendment changing the Twenty-second Joint Rule, also had severe doubts about Congress's power to adopt any regulating rule in the first place, but felt that changing the old rule was more important. Id. at 13 (summarizing Senator Morton's arguments).

[126] For instance, see the arguments of Senators Edmunds (a Republican) and Thurman (a Democrat). Id. at 13-14; see also id. at 26 (quoting Senator Frelinghuysen, "it seems to me that, where the Constitution commits a subject to Congress and yet leaves it so undefined, so general, we have a power according to our discretion by law to carry out the authority committed to us...." (alteration in original) (internal quotation marks omitted)).

[127] Id. at 16.

[128] Id. Senator Hamilton, a Democrat, also believed that Congress could not regulate on this point, but believed the problem should be fixed by a constitutional amendment. Id. at 19.

[129] Id. at 17-18. In response to the idea that a presidential election could be the subject of litigation, some senators suggested that it would violate the separation of powers. Id. at 18. Senator Edmunds's amendment, which would have created a committee whose conclusions would be accepted unless rejected by both houses, also failed. Id. at 19.

[130] Id. at 19 (quoting Democratic Senator Merrimon, who argued that every aspect of the electoral count required Congress to act as a joint body). But see id. at 31 (noting that Senator Merrimon later changed his mind on the subject of Congress acting as a joint body). Senator Merrimon also questioned the power of Congress to go behind the state's certificates and maintained that the states must provide for their own manner of determining the outcome of disputes. According to Senator Merrimon, Congress's only power was to reject a forged certificate or to perhaps reject a state's votes if it had not in fact held an election. Id. at 20.

[131] Id. at 22.

[132] Id.

[133] See id. at 23. One proposal suggested that in this event, the state delegations, including senators, should vote on the issue with each state having a single vote; if the delegation could not come to an agreement, that state would not have a vote. Id. This suggestion was proposed as an amendment. Id. at 25-27. Senators supported it because of the apparent

APPENDIX - 84

similarity to the Twelfth Amendment's procedure for an election thrown to the House and because it seemed to create a solution that did not appear to favor either political party. Id. at 25. However, the amendment was rejected by a fairly wide margin. Id. at 30-31. Another amendment gave the decision to the presiding officer of the Senate, the Speaker of the House, and the Chief Justice of the Supreme Court. Id. at 26-27. Another senator suggested the "spirit of the Constitution" would allow the President of the Senate to decide. Id. at 23. This was, of course, opposed because of the likelihood that he might be a candidate himself. Id. at 31-32.

[134]   See, e.g., id. at 28-29. For instance, one senator suggested that this was akin to Congress providing for a federal investigation of a state's gubernatorial election. Id. at 28. Some also maintained that the power was entirely vested in the President of the Senate. Id. Some of the senators who believed an amendment was necessary were willing to vote for this bill in the meantime. Id. at 28-30.

[135]   Id. at 35.

[136]   Id. at 35-36.

[137]   Id. at 36-37.

[138]   Siegel, supra note 104, at 558 n.92.

[139]   Dougherty, supra note 6, at 100 (quoting Senator Bayard) (internal quotation marks omitted).

[140]   Id. at 100-01.

[141]   Id. at 102 ("It was said that the inspiration of the bill was partisan and its object to forestall a free and impartial consideration of this grave matter by the next Congress, in which the House of Representatives would be under Democratic control.").

[142]   Id. at 95 ("The twenty-second joint rule had few, if any, defenders.").

[143]   The administration of the sitting President, Ulysses S. Grant, was perhaps one of the most scandalous in our history. See Rehnquist, supra note 18, at 15-32. The economy was in poor shape, and bitterness over Reconstruction created "a solid bloc of votes for the Democrats." Id. at 32. There were riots in Louisiana and rumors that thousands of persons were going to descend upon Washington D.C. for the counting of the votes. Dougherty, supra note 6, at 107. For the authoritative book on the resolution of the dispute, see generally Fairman, supra note 24. For an account more favorable to Tilden, see generally Roy Morris, Jr., Fraud of the Century: Rutherford B. Hayes, Samuel Tilden and the Stolen Election of 1876 (2003).

[144]   Fairman, supra note 24, at 40-46; Rehnquist, supra note 18, at 99.

[145]   Fairman, supra note 24, at 58-59.

[146]   Id. at 59; Dougherty, supra note 6, at 143.

[147]   Fairman, supra note 24, at 60.

[148]   See id. One account of these events, written in the early twentieth century, assessed the state canvassing board's manipulations:
On the whole, it is not improbable that an unpartisan board ... would in the end have found a small majority for Tilden. The least partisan man who witnessed the count, namely General Barlow, took that view of the case. He had gone to Florida at the request of Grant, he was a Republican, but he came to the conclusion that on the evidence the board should give Tilden a majority of from 30 to 55. He even urged one of the Republican members of the board to adopt such a course, but without effect.
Paul Leland Haworth, The Hayes-Tilden Disputed Presidential Election of 1876, at 75 (AMS Press 1979) (1906).

[149]   They did so on December 6, the date specified by Congress for the meeting of the Electoral College, and thus the same day that the pro-Hayes electors certified by the state canvassing board also met. Haworth, supra note 148, at 76-77.

[150]   Fairman, supra note 24, at 64.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   33

151   Haworth, supra note 148, at 76-77.

152   Id. at 79.

153   Id.. Similar allegations followed Florida's gubernatorial race, and the Florida Supreme Court issued a mandamus directing the canvassing board to restore certain votes. This order changed the outcome of the election and replaced the Republican governor with a Democratic governor. Id. at 77.

154   Fairman, supra note 24, at 64.

155   Dougherty, supra note 6, at 162.

156   Id. at 163-65 (noting that the objection to this slate was the canvassing board's abuse of its power by unwarranted rejection of votes).

157   "It is needless to say that the result announced by the returning board had been attained by a series of grossly partisan and illegal acts." Haworth, supra note 148, at 116. Haworth goes on to consider, however, whether this malfeasance nonetheless achieved rough justice: "Did the returning board ... merely take back stolen property? ... [Was this] one of those rare situations in which two wrongs go to make a right?" Id. at 117.

158   Dougherty, supra note 6, at 165.

159   Id. The third certificate was primarily produced out of concern that the first certificate contained a technical defect in regard to the endorsement on the envelope. Haworth, supra note 148, at 114-15.

160   Id. at 202-03. Democrats objected that South Carolina did not properly form procedures to select electors, was not a republican form of government, and that the Federal army and marshals interfered with voting. Id.

161   Fairman, supra note 24, at 43.

162   Id. at 117.

163   Id. The Chairman of the Democratic National Committee telegrammed this request to the governor, and the telegram illustrates the Chairman's hopes that the move would force Congress to "go behind" all certificates. See id. at 43.

164   Id. at 117.

165   Rehnquist, supra note 18, at 100.

166   Id.

167   See id.; Dougherty, supra note 6, at 107-08.

168   Fairman, supra note 24, at 47-48.

169   Rehnquist, supra note 18, at 113-14.

170   Fairman, supra note 24, at 47-48.

171   Id. at 48.

172   Id. at 48-49; Rehnquist, supra note 18, at 115-19. The work of the committee was fairly bipartisan, with only one member dissenting from the final report that was submitted to both houses. Dougherty, supra note 6, at 110. The dissenting member, Senator Morton, was one of the key actors in the debates about replacing the Twenty-second Joint Rule. Morton continued to doubt the power of Congress to submit any questions to another tribunal. Fairman, supra note 24, at 49. The most critical question with which the committee dealt was the ability of the Electoral Commission to "'descend below the decision of a State authority.'" Dougherty, supra note 6, at 113. Ultimately, the compromise did not clearly express whether or how far behind the results the commission would be permitted to go. The additional question raised by the committee was whether the commission was constitutional, and the dissenting member maintained the bill was unconstitutional. Id. at 114-15. Of the four Justices appointed to the commission, two were known to be Republicans

APPENDIX - 86

and two were known to be Democrats. See Rehnquist, supra note 18, at 118-19. The fifth Justice was figured to be David Davis, thought to be the most independent member of the Court at the time. Fairman, supra note 24, at 54. However, to his surprise, he was elected by the state legislature to the U.S. Senate seat for Illinois, and the Justices were left to choose a Justice known to be a stronger Republican. Dougherty, supra note 6, at 135; Fairman, supra note 24, at 54.

[173] Fairman, supra note 24, at 49.

[174] Rehnquist, supra note 18, at 116.

[175] Despite the uncertainty of either position, each of the two candidates was confident that his constitutional position was the correct one. See id. at 115-16. Still, it was not difficult to understand why both sides saw the necessity to compromise. As Senator Edmunds described the situation in a law review article, it was easy at this point in American history to see a situation whereby both Hayes and Tilden took the oath of office; both might try to command the military and executive branch offices; the legislative branch would be paralyzed; and the nation might descend once again into civil war. George F. Edmunds, Presidential Elections, 12 Am. L. Rev. 1, 3-4 (1877) ( "Without some settlement ... it was morally certain that the Senate would declare Mr. Hayes to be the lawful President, and the House of Representatives would declare that the lawful President was Mr. Tilden. In that case, each of those gentlemen would have taken the oaths of office, and attempted to exercise its duties; each would have called upon the army and the people to sustain him against the usurpations of the other ...."). Senator Merrimon, who believed Congress had no power to delegate to another tribunal, felt there was no other possibility but to accept this tribunal. Fairman, supra note 24, at 50 (quoting Senator Merrimon, "I feel constrained to yield doubts in favor of this bill. It may have the effect of preserving the life of the Republic."). Finally, if any deadlock extended past inauguration day, it was unclear what the next steps might have been. This issue was not addressed until the Twentieth Amendment. See U.S. Const. amend. XX, § 3.

[176] Rehnquist, supra note 18, at 114.

[177] See Dougherty, supra note 6, at 111-35. Most of the differences during the debate were the same as those that had been raised in the past. Some congressmen were certain the outcome would simply hinge on the opinions of the "non-partisan fifth justice." One senator took it upon himself to argue for eight hours that the counting power did not reside in the President of the Senate. Id. at 117-18. The senator relied on the text, historical practice, various unsuccessful bills, and common sense, and apparently the argument was well received. Id. at 117-23. One senator, who supported giving the Supreme Court power to determine the matter, urged his colleagues to submit a constitutional amendment to the states to remove any future embarrassment. Id. at 125. In the House, future President James Garfield, relying especially on the use of passive voice in the relevant constitutional text, made a plea for Congress to resume what he thought was its proper role--that of a mere witness to the opening and counting of the votes. Id. at 129. To do otherwise, he argued, would obliterate the constitutional safeguards and forever make Congress "a grand returning board." Id. at 129-30 (internal quotation marks omitted); see also Fairman, supra note 24, at 49-55 (summarizing some of the arguments of proponents and opponents of the Commission).

[178] Fairman, supra note 24, at 50.

[179] Id. at 53.

[180] Rehnquist, supra note 18, at 163.

[181] Dougherty, supra note 6, at 110.

[182] Id. at 111. For instance, three certificates were opened from Florida, and all three had objections so they were referred to the Commission. Rehnquist, supra note 18, at 164-65.

[183] Rehnquist, supra note 18, at 163-64; see also Dougherty, supra note 6, at 110-11.

[184] Fairman, supra note 24, at 57-58.

[185] Id. at 58.

[186] Id. For a summary of the arguments by the objectors and counsel, see id. at 58-78.

APPENDIX - 87

187    For an account of the Republican argument that emphasizes the temporal distinction between the two gubernatorially signed certificates, see Haworth, supra note 148, at 228-29.

188    For a summary of the arguments of these commission members, see Fairman, supra note 24, at 78-87.

189    Id. at 95 (noting James Garfield's diary, which mentioned that all knew Bradley held the casting vote). For summaries of the opinions of the Justices, see id. at 87-112.

190    Proceedings of the Electoral Commission and of the Two Houses of Congress in Joint Meeting Relative to the Count of Electoral Votes Cast December 6, 1876 for the Presidential Term Commencing March 4, 1877, at 1020 (1877) [hereinafter Proceedings] (statement of Justice Bradley).

191    Id. (quoting Justice Bradley).

192    Id. at 1020 (quoting Justice Bradley). Going further, Justice Bradley noted that the prohibition against federal office holders acting as electors makes clear that the Constitution intended to remove any congressional or federal influence from the process. Id. at 1021.

193    Id. at 1021.

194    Id. (quoting Justice Bradley).

195    Id. (quoting Justice Bradley).

196    Id. ("To revise the canvass of that election [of electors], as made by the State authorities, on the suggestion of fraud, or for any other cause, would be tantamount to a recanvass." (quoting Justice Bradley)). On this point, Justice Bradley drew an interesting analogy to another provision of the Constitution--Article I, Section 5, Clause 1, which states that "[e]ach House shall be the Judge of the Elections, Returns and Qualifications of its own Members ...." Justice Bradley noted that the contrast between this provision and the constitutional provisions on presidential elections weighed against giving Congress the same power over the presidential elections as it holds over its own elections. See id. at 1021-22.

197    Id. at 1023 (emphasis omitted) (quoting Justice Bradley).

198    Fairman, supra note 24, at 110. The remaining issue was a possible constitutionally ineligible elector, and Justice Bradley went against the Republicans and voted to hear some testimony on this question. Justice Bradley, again the deciding vote, concluded that the elector resigned his office before the election. Id. at 113. He also concluded that the constitutional provision "does not have the effect of annulling the vote given by one who, though disqualified, is regularly elected, and acts as an elector." Proceedings, supra note 190, at 1025. In his own notes, Justice Bradley explored this issue further. He noted that the constitutional ineligibility of an elector could create four views:
1. That his election, or appointment, is void[.]
2. That his election is only voidable, but if he act[s] as elector without a removal of the disqualification his vote will be void.
3. That his election is voidable, but if he act[s] his vote will be good--as the official act of an elector de facto.
4. That his election is neither void, nor voidable until some provision has been made by law for ascertaining and providing the ineligibility.
Fairman, supra note 24, at 121 (quoting Justice Bradley).
Justice Bradley decided that he was ultimately of the fourth view and that "until a law is passed providing a mode of ascertaining the fact of ineligibility, the issue cannot be raised when the two Houses are met .... They have no machinery for entering upon such a trial. Before their meeting they have no jurisdiction on the subject." Id. at 122 (quoting Justice Bradley). Thus, according to Justice Bradley, the houses possessed the constitutional authority to reject ineligible electors but required a statute to provide the method for making the determination.

199    Fairman, supra note 24, at 114.

200    Id. at 115.

201    Id. at 116.

APPENDIX - 88

202   Id. at 116-17. The Commission's decision was accepted by the Senate and rejected by the House. Id. at 117.

203   Id. at 119.

204   See, e.g., id. at 114, 116.

205   Id. at 117.

206   Id.

207   Id.

208   Id.

209   Id.

210   Id.

211   Dougherty, supra note 6, at 187.

212   Id. Because the two original Hayes electors refused to recognize the governor's replacement elector, the replacement elector appointed two additional replacements. The governor's replacement elector cast his vote for Tilden, while the additional replacements cast their votes for Hayes and this return ultimately went to Congress. Id. at 187-88.

213   See id. at 185.

214   Id. at 186 (quoting Mr. Evarts arguing on behalf of Hayes) (internal quotation marks omitted).

215   Id. at 197.

216   See   Bush v. Gore, 531 U.S. 98, 112-13 (2000) (Rehnquist, C. J., concurring).

217   Proceedings, supra note 190, at 1023 (quoting Justice Bradley).

218   Id. at 1024.

219   Id. (quoting Justice Bradley).

220   See id. (reviewing the powers of the board as defined by state statute).

221   Id. (emphasis added).

222   See, e.g., The Federalist No. 68 (Alexander Hamilton) ("It was equally desirable, that the immediate election should be made by men most capable of analyzing the qualities adapted to the station, and acting under circumstances favorable to deliberation, and to a judicious combination of all the reasons and inducements which were proper to govern their choice. A small number of persons, selected by their fellow-citizens from the general mass, will be most likely to possess the information and discernment requisite to such complicated investigations."); see generally Vasan Kesavan, The Very Faithless Elector?, 104 W. Va. L. Rev. 123 (2001). Indeed, the first "faithless elector" was a Federalist elector who voted for Democrat-Republican Thomas Jefferson in 1796. See id. at 124 n.5.

223   But if Bradley was right on this point, then Nixon acted unconstitutionally in permitting Hawaii's third slate of electoral votes to be counted in the election of 1960. See infra Part II.F.

224   Proceedings, supra note 190, at 1024 (quoting Justice Bradley).

225   Id. at 1025 (quoting Justice Bradley).

226   The threat of civil unrest was real. President Grant deployed federal troops to various areas to maintain peace during the counting of the votes. Ornstein, supra note 38, at 35.

APPENDIX - 89

227     Additionally, both political parties might have thought the Electoral Commission would actually award their candidate a victory. Dougherty, supra note 6, at 134.

228     As one commentator noted, the law actually captured Congress's continued uncertainty about its power. In a doubly uncertain move, Congress gave the Electoral Commission "the same powers, if any, now possessed for that purpose by the two Houses acting separately or together." Id. at 133 (internal quotation marks omitted). Here, Congress avoided conclusions about the amount (if any!) of power that Congress possessed and whether that power, if it existed, was in the two houses acting together or separately. As the commentator noted, the "outcome of practically one hundred years of discussion of a brief clause of the Constitution was a law confessedly temporary in its operation, in which the doubts of a century are crystallized into statutory form." Id. This demonstrates that at its heart, the bill was a compromise and again a waiver of an opportunity to assert the nature of congressional power over the electoral count. It might be argued that whereas before, Congress had waived the question when the outcome was not in doubt, here it waived the question and allowed an extraconstitutional body to determine the outcome of the election, going so far, as Dougherty notes, as to bind itself to the decision of that body. Id. at 134; see also E.W. Stoughton, The "Electoral Conspiracy" Bubble Exploded, 125 N. Am. Rev. 198 (1877) (noting that the Electoral Commission was a result of the unity of the leaders of the Democrats and the willingness of the Republicans to surrender political advantage in the interest of peace to stave off a situation where the President of the Senate declared Hayes President while the House of Representatives elected Tilden).

229     The statute is codified at 3 U.S.C. §§ 5-6, 15-18 (2006). The final law was the product of nearly ten years of congressional effort: Senator Edmunds introduced the first bill in 1878, and the Senate passed a similar bill three times without the House acting. Dougherty, supra note 6, at 215. The legislative history of the bill was recently and thoroughly documented elsewhere. See generally Erick Schickler et al., Safe at Any Speed: Legislative Intent, the Electoral Count Act of 1887, and Bush v. Gore, 16 J.L. & Pol. 717 (2000); Siegel, supra note 104.

230     Siegel, supra note 104, at 578-79. The Act originally gave states until "the second Monday in January" to hold the meeting of presidential electors, id. at 583, whereas today, the statute specifies "the first Monday after the second Wednesday in December," 3 U.S.C. § 7, as the date for this Electoral College meeting.

231     The strongest example of this is the so-called "safe-harbor" aspect of the statute. If a state has a law, enacted prior to the day fixed for appointing electors, that governs the "determination of any controversy or contest," and that determination is made six days before the day fixed for the meeting of the electors--Congress must accept that slate of electors. After the People Vote, supra note 38, at 5 (internal quotation marks omitted).

232     Section four of the Act, codified at 3 U.S.C. § 15, outlines the procedure:
[T]he President of the Senate shall call for objections, if any. Every objection shall be made in writing, and shall state clearly and concisely, and without argument, the ground thereof, and shall be signed by at least one Senator and one Member of the House of Representatives before the same shall be received. When all objections so made to any vote or paper from a State shall have been received and read, the Senate shall thereupon withdraw, and such objections shall be submitted to the Senate for its decision; and the Speaker of the House of Representatives shall, in like manner, submit such objections to the House of Representatives for its decision; and no electoral vote or votes from any State which shall have been regularly given by electors whose appointment has been lawfully certified to according to section 6 of this title from which but one return has been received shall be rejected, but the two Houses concurrently may reject the vote or votes when they agree that such vote or votes have not been so regularly given by electors whose appointment has been so certified.
3 U.S.C. § 15 (2006).

233     See, e.g., 17 Cong. Rec. 816 (1886) (statement of Sen. Sherman) ("That is a dangerous power. [It] allows the two Houses of Congress, which are not armed with any constitutional power whatever over the electoral system, to reject the vote of every elector of every State, with or without cause, provided they are in harmony in that matter."); see also Dougherty, supra note 6, at 235.

234     Siegel, supra note 104, at 544.

235     For a modern argument of possible constitutional defects concerning the ECA, see generally Kesavan, supra note 7. But see id. at 1660 ("The prevailing wisdom, in the Supreme Court and elsewhere, is that the Electoral Count Act is constitutional."). Ackerman and others, however, have rejected some of Kesavan's arguments. See, e.g., Ackerman &

Fontana, supra note 20, at 636 n.239 (rejecting Kesavan's arguments); Wroth, supra note 42, at 344-53 (noting that Congress has jurisdiction for the resolution of these questions but suggesting that Congress grant the federal courts the power to reach binding decisions in all controversies). For a discussion of congressional debate on this subject leading up to the passage of the ECA, see Siegel, supra note 104, at 560-68.

The weight of scholarly opinion seems to be that Congress presumptively will be inclined to follow the Electoral Count Act if a future dispute arises: to the extent that the Act provides adequate guidance and, most critically, to the extent that it is in the strategic political interest of each political party to do so. Regardless of the merits of the constitutional question, if there is sufficient political pressure on one party to abandon the procedures of the Electoral Count Act, in favor of a position based directly on their preferred interpretation of the Twelfth Amendment, the party and its members in Congress may choose that route. See Siegel, supra note 104, at 544 n.13 ("Viewed empirically, the ECA seems to be a complete success. During the hundred years before enacting the ECA, Congress frequently faced problems with electoral vote counting which, at times, dissolved into bitter wrangling and expedient solutions. These controversies occurred not only when the vote was close, as in 1877, but, more often, when the outcome did not matter in the slightest. Since the ECA's adoption, Congress's electoral vote counts have been smooth and free from conflict. Objections to counting particular votes have been dealt with in an orderly fashion and there have been no controversies over the counts." (citation omitted)).

236   Siegel, supra note 104, at 560.

237   Id. at 560-61. When Congress passed a joint resolution in 1865 stripping southern states of their right to cast electors in the presidential election, President Lincoln signed the resolution but included a message disclaiming "all right of the executive to interfere in any way in the matter of canvassing or counting electoral votes." After the People Vote, supra note 38, at 15 (internal quotation marks omitted).

238   Siegel, supra note 104, at 561; see, e.g., 8 Cong. Rec. 165 (1878) (statement of Sen. Garland) ("[A]n act passed by a previous Congress assuming to bind ... a succeeding Congress need not be repealed because it is void; and for that reason I oppose this bill."); 13 Cong. Rec. 2652 (1882) (statement of Sen. Blair) (arguing that a future Congress would not be bound by the law); see also 1 Laurence H. Tribe, American Constitutional Law § 2-3 n.1 (3d ed. 2000); Tribe, supra note 3, at 277 (stating that the ECA is "shadowed by constitutional doubt over the power of one Congress to bind its successors in such matters").

239   Siegel, supra note 104, at 563-66; see, e.g., 13 Cong. Rec. 2651 (1882) (statement of Sen. Morgan) (stating that the Senator will vote for the bill because he thinks once it is passed the men found in Congress will be more reluctant to part with a rule that previously received the sanction of the two houses and President).

240   Ackerman and Fontana raise this possibility, saying that another Electoral Commission of the kind that was created in 1877 would be necessary. Ackerman & Fontana, supra note 20, at 640-42.

241   See 107 Cong. Rec. 289 (1961).

242   Wroth, supra note 42, at 341.

243   Lum v. Bush, Civ. No. 7029 (Haw. Cir. Ct. Dec. 30, 1960), noted in 107 Cong. Rec. 290 (1961).

244   See 107 Cong. Rec. 289 (1961).

245   See id.

246   Lum v. Bush, Civ. No. 7029 (Haw. Cir. Ct. Dec. 30, 1960), noted in 107 Cong. Rec. 290 (1961); Wroth, supra note 42, at 341 (noting the state's Attorney General opposed the recount on the grounds that there was not enough time to resolve the dispute before federal law required the electors to vote).

247   107 Cong. Rec. 289-90 (1961).

248   Id. at 290 (emphasis added).

249   In this respect, Hawaii's votes differed from the combined effect of the electoral votes from Illinois and Texas, where Republicans were concerned that improper conduct by Democrats had given those states to Kennedy. In the first few days after Election Day, Nixon considered challenging the results in those two states but ultimately decided against

APPENDIX - 91

it. (It would have been necessary for Nixon to overturn the results in both states in order to prevail, and the judgment of some advisers was that challenging the result in Texas was out of reach.) Thus, no dispute over the electoral votes from Illinois and Texas reached Congress or Nixon as President of the Senate. While Professor Ackerman argues the result in Hawaii should stand as precedent for accepting late returns, see Bruce Ackerman, Anatomy of a Constitutional Coup, London Rev. of Books, Feb. 8, 2001, at 3, 6, Judge Posner maintains that Nixon's actions should not stand as precedent because Hawaii's votes did not change the outcome, and Nixon specifically said his action should not stand as precedent. Posner, supra note 5, at 135-36;

250    See Posner, supra note 5, at 135-36.

251    See 3 U.S.C. § 15 (2006).

252    A "faithless" elector votes for someone other than his party's presidential and vice-presidential candidates. After the People Vote, supra note 38, at 7.

253    Ten electors have violated their pledge and voted for a different candidate throughout history, but there has never been a concerted group of electors trying to swing the election. Id.

254    See id. at 14.

255    See id.

256    Kesavan, supra note 7, at 1693 (internal quotation marks omitted).

257    For instance, one representative argued that congressmen "are not election supervisors nor given discretion to recompute the vote received from a sovereign state. The Constitution clearly proscribes our duty as 'to count the electoral votes,' the ministerial function of a central collecting agency and a tabulating point." Id. at 1694 (citing 115 Cong. Rec. 168 (1969)).

258    After the People Vote, supra note 38, at 14-15.

259    Richard A. Posner, Law, Pragmatism, and Democracy 322, 328-40 (2003); Michael J. Glennon, Nine Ways to Avoid a Train Wreck: How Title 3 Should Be Changed, 23 Cardozo L. Rev. 1159, 1160 (2002).

260    Ohio Representative Stephanie Tubbs Jones and California Senator Barbara Boxer objected to the counting of Ohio's electoral votes using the ECA procedures. 151 Cong. Rec. H86 (daily ed. Jan. 6, 2005). The two houses split and the House voted to reject the objection 267-31. Id. at H127. The Senate rejected the objection 74-1. Id. at H128.

261    See McKnight, supra note 14, at 17 (arguing that weight should be afforded to this period because Framers such as Langdon, King, Sherman, Madison, and Pinckney were seated in Congress).

262    See supra Part II.A.3.

263    McKnight, supra note 14, at 20 (noting the step-by-step gradual abdication of duties and arguing that this was not a surprising trend given the electoral count was a mere formality during these years).

264    See id. at 21.

265    See id. ("[Congressmen] entered the halls of legislation often with no definite idea of the constitutional powers of Congress .... Impressed with a sense of their own importance, when the season of Counting had returned they were ready to adopt any system consonant with a due regard to their own unquestionable dignity."); id. at 22 ("[T]he prime cause of the final assumption of the canvassing power by Congress ... [was] the constant tendency of republican governments towards centralization."); see also The Federalist No. 71 (Alexander Hamilton) ("The tendency of the legislative authority to absorb every other, has been fully displayed and illustrated .... In governments purely republican, this tendency is almost irresistible."); Story, supra note 1, § 1432 (quoting the Federalist papers on this point with approval).

266    Many of the assertions of power by Congress came at a time of political strife. The first real extension occurred during the controversy over Missouri's admittance to the Union in 1821. Like the Twenty-second Joint Rule, the Grand Committee Bill of 1800 was an attempt by the Federalists to solidify their grasp on political power.

APPENDIX - 92

267   See supra note 235 and accompanying text (discussing objections to the constitutionality of the ECA).

268   See, e.g., John C. Fortier, The 2000 Election, in After the People Vote, supra note 38, at 37, 44 (noting that Congress must still decide whether votes were "regularly given").

269   For instance, if the Supreme Court had not ended the 2000 Florida recount, could Congress have declined to afford the Florida electors safe-harbor status if, like Vice President Nixon, Congress considered a late-arriving slate of electors to be more authoritative under state law? See, e.g., id. (noting that Congress has latitude in judging whether state law for resolving controversies was followed).

270   See Siegel, supra note 104, at 563-65 (noting that several congressmen saw electoral vote counting as a political question).

271   17 Cong. Rec. 817 (1886) (statement of Sen. Sherman).

272   For an overview of the entire body of Florida 2000 litigation, see generally Posner, supra note 5.

273   Id.; see generally The Vote: Bush, Gore & the Supreme Court (Cass R. Sunstein & Richard A. Epstein eds., 2001).

274   The Bush v. Gore per curiam opinion found an Equal Protection Clause violation, relying on precedents such as Harper v. Virginia Board of Elections, 383 U.S. 663 (1966), Reynolds v. Sims, 377 U.S. 533 (1964), Gray v. Sanders, 372 U.S. 368 (1963), and Moore v. Ogilvie, 394 U.S. 814 (1969). See Bush v. Gore, 531 U.S. 98, 105-11 (2000) (per curiam). The one person, one vote jurisprudence is a relatively new wrinkle added to all of the questions presented by the ambiguities of the Twelfth Amendment.

275   See Edward B. Foley, The Future of Bush v. Gore, 68 Ohio St. L.J. 925, 952-57 (2007) (arguing that the Court would be hard-pressed to overturn Bush v. Gore in the future). But see Richard L. Hasen, The Untimely Death of Bush v. Gore, 60 Stan. L. Rev. 1, 3 (2007) (arguing that courts have been reluctant to understand Bush v. Gore as an important precedent).

276   Professor Erwin Chemerinsky was one of the most ardent supporters of the idea that Bush v. Gore was subject to the political question doctrine. See Erwin Chemerinsky, Bush v. Gore Was Not Justiciable, 76 Notre Dame L. Rev. 1093, 1094 (2001) (arguing that Bush v. Gore was not justiciable on three grounds: (1) Bush lacked standing to raise equal protection claims, (2) the case was not ripe for review, and (3) the case was a political question). Professor Laurence Tribe initially counted himself in Professor Chemerinsky's camp. See Tribe, supra note 3, at 277-86 (arguing that there is a "powerful case" based on the text of the Twelfth Amendment for the Court to play no role but to protect Congress's decision-making function). Later, Professor Tribe backtracked slightly:
I confess ... the error of my overly mechanical formulation of the "political question" question in my first scholarly analysis of the dispute .... And I [now] offer a considerably more nuanced formulation that rejects ... my own Harvard Law Review position that the question was categorically non-justiciable, advancing instead a "political process" doctrine according to which political nonjusticiability, in an important class of instances, is akin to nonjusticiability for want of ripeness ....
Laurence H. Tribe, The Unbearable Wrongness of Bush v. Gore, 19 Const. Comment. 571, 573-74 (2002).
For a critique of Tribe's revised view, see Nelson Lund, Carnival of Mirrors: Laurence Tribe's "Unbearable Wrongness," 19 Const. Comment. 609, 616-18 (2002). For different voices expressing Tribe's earlier (but since recanted) categorical view that the entire Bush v. Gore case was nonjusticiable, see Steven G. Calabresi, A Political Question, in Bush v. Gore: The Question of Legitimacy 129 (Bruce Ackerman ed., 2002); Erwin Chemerinsky, How Should We Think About Bush v. Gore?, 34 LOY. U. Chi. L.J. 1, 16 (2002) (suggesting, rather than definitively making, this argument; an earlier piece by Chemerinsky was more definitive on the issue, so arguably he did some backtracking comparable to Tribe's).

277   Undoubtedly, the Twelfth Amendment's language on this subject is not nearly as clear as the Impeachment Clause's language is about keeping all power in Congress. See U.S. Const. art. I, § 3, cl. 6 ("Senate shall have the sole Power to try all Impeachments." (emphasis added)); see also Nixon v. United States, 506 U.S. 224, 237-38 (1993) (holding that the Impeachment Clause awards the Senate final authority to determine what it means to "try" an impeachment).

278   Posner, supra note 259, at 322, 328-40. Though he disagrees with the justification, Professor Tribe accepts the explanation of the Court's behavior as "stretching the constitutional fabric ... to protect the nation itself from being

torn apart." Tribe, supra note 3, at 284-87; see also Bush v. Gore, 531 U.S. 1046, 1047 (2002) (Scalia, J., concurring) (arguing that grant of certiorari was necessary to prevent "casting a cloud" upon the legitimacy of the election); cf. Terri Bimes, Averting Crisis: The Role of the Supreme Court Justices in the 1876 Election, 3 Election L.J. 702, 703-05 (2004) (reviewing William H. Rehnquist, Centennial Crisis: The Disputed Election of 1876 (2004) and arguing that Rehnquist sought to justify the Court's intervention in the 2000 election by implying that the Supreme Court was the natural body to turn to in order to resolve the dispute).

279    Even so, one must ask if this discretion was the product of partisan splits in Congress and the prospect of violence if Congress could not reach a compromise. Indeed, if instead only one party controlled Congress in 1877, would the two parties have even sought compromise?

280    During debate after rescinding the Twenty-second Joint Rule, one senator provided the case for resolving the issue outside the context of an election:
[W]hen [Congress] see[s] that such a contingency as this may be fraught with the consequences of revolution, [it should] provide beforehand against it. There never was a time when you could do it, when you would be less liable to the charge of any sinister influence, because it cannot change the result, it cannot determine anything except to settle the principle; and then when an occasion occurs that evil consequences may follow from settling it one way or the other, here will be a precedent showing that Congress, at a time when there was no inducement to anything but an honest and a straightforward decision of the case, maturely settled it, and settled it in such a manner that the influence of the decision will be morally binding upon our successors, and will be preserved.
Counting Electoral Votes, supra note 24, at 153 (statement of Senator Hale).

281    Bush v. Gore, 531 U.S. 98, 127 (2002) (Stevens, J., dissenting, joined by Ginsburg, Breyer, JJ.) ("[T]he appropriate course of action would be to remand to allow more specific procedures for implementing the legislature's uniform general standard to be established."); id. at 134-35 (Souter, J., dissenting).

282    Fortier, supra note 268, at 41 (stating that the Florida legislature started the process, and the Republicans argued that the Florida Supreme Court "had effectively changed the election recount law," so it was the legislature's duty to appoint a Bush slate of electors); Tribe, supra note 3, at 276 (noting that the Florida legislature gave every indication that they would take this step); see also, id. (arguing that the Bush v. Gore per curiam opinion strongly suggested the state legislature could appoint electors at any time (citing Bush, 531 U.S. at 104-)). In the wake of the 2000 election, at least one state changed its law to allow the legislature or governor to directly appoint electors in certain circumstances. See N.C. Gen. Stat. § 163-213 (2007). Federal law also allows the legislature to appoint electors if the state "failed to make a choice on the day prescribed by law." 3 U.S.C. § 2 (2006). But what exactly constitutes a failure to make a choice? There is at least arguably a distinction between, on the one hand, the state's citizenry not voting on Election Day (to which this statute obviously would apply) and, on the other, the state's dispute-resolution machinery taking extra time to determine what exactly the citizenry's voting was. See Akhil Reed Amar, Dunwody Distinguished Lecture in Law: Bush, Gore, Florida, and the Constitution (Mar. 24, 2009) (recording available at http:// streaming.video.ufl.edu/ ~law/20090324-dunwody.asx), in 61 Fla. L. Rev. (forthcoming Dec. 2009).

283    After the People Vote, supra note 38, at 16.

284    This also brings up another question: does the President of the Senate, in addition to the role of presiding officer under the Twelfth Amendment, get to cast tie-breaking votes in the Senate? Regardless, this is another example of the ill-advised choice of placing one of the likely candidates for election in such a precarious and conflicted position during the electoral count proceedings. If Vice President Gore made decisions or cast tie-breaking votes in his own favor, one can imagine the public outcry and the resulting illegitimacy of his presidency.

285    After the People Vote, supra note 38, at 16; see Fortier, supra note 264, at 45 (noting it was entirely possible that the Florida courts might have compelled the governor to submit a second slate for Gore if Gore had prevailed in the recount).

286    See After the People Vote, supra note 38, at 16. If one political party controlled both houses of Congress, then it could ignore the certification by the governor.

287    See U.S. Const. amend. XX, § 3 ("If a President shall not have been chosen before the time fixed for the beginning of his term, or if the President elect shall have failed to qualify, then the Vice President elect shall act as President until a President shall have qualified; and the Congress may by law provide for the case wherein neither a President elect nor

APPENDIX - 94

a Vice President elect shall have qualified, declaring who shall then act as President, or the manner in which one who is to act shall be selected, and such person shall act accordingly until a President or Vice President shall have qualified."). Congress has passed a statute, codified at 3 U.S.C. § 19 (2006), that creates a line of succession, starting with the Speaker of the House, in the event that by a "failure to qualify" there is no President or Vice President.

The Twentieth Amendment does not eliminate, and indeed potentially exacerbates, the problems associated with the institutional ambiguity of the Twelfth Amendment. The Twentieth Amendment seems to specify what to do if Inauguration Day arrives and a President has not been recognized as elected under the Twelfth Amendment--although the language of the Twentieth Amendment, with its apparent distinction between a President not having been "chosen" and one not having "qualified" confusing the matter, is far less than ideal to the task. But what is worse, suppose there is a dispute about whether a President has, or has not, been "chosen" or "qualified" by January 20? It is not hard to imagine the possibility. The President of the Senate might insist, either on behalf of himself under the Twelfth Amendment, or on behalf of the Senate as a body, that one candidate has indeed been elected before January 20, while at the same time the Speaker of the House might refuse to recognize the authority of the Senate president to declare the election over. The Speaker, too, could be acting on his own behalf, under the statutory line of presidential succession that arguably applies in this context under the Twentieth Amendment, or the Speaker could be asserting the institutional authority of the House of Representatives to chose a President when no candidate receives a majority in the Electoral College, which would be the case if a dispute caused the votes of a "swing state" to be discarded. From one perspective, it might be argued that the Twentieth Amendment necessarily applies in this situation, since there is a dispute over who is elected President. But from another perspective, that dispute is over, since the Senate president (the outgoing Vice President) has authoritatively ruled (at least according to him and his partisan supporters). In short, the defect of the Twelfth Amendment causes uncertainty about whether the procedures of the Twentieth Amendment have been triggered.

288     Congress could simply ignore the ECA altogether, or, assuming partisan voting within the framework of the ECA, the Democrats could refuse to afford the slate of electors protection because the Florida procedures for final determination of any controversy or contest did not play out as required under [ ] 3 U.S.C. § 5, or because the votes were not "regularly given" under 3 U.S.C. § 15. Alternatively, if a Democratic Congress was presented with Bush electors certified by the governor and Gore electors certified by another authority, could it refuse the deference that the ECA gives to the slate certified by governor under § 15? Again, arguably the votes were not "regularly given."

289     Professor Amar discussed this idea in his Dunwody Lecture, noting that the opinions of scholars over the Bush v. Gore decision center on disagreements as to what the law was on Election Day and whether the Florida Supreme Court or the U.S. Supreme Court was departing from that law. Amar argues there is a consensus against actions that appear to be changing the rules or departing from the law after an election. See Amar, supra note 282; see also Richard L. Hasen, Bush v. Gore and the Lawless Principle: A Comment on Professor Amar, 61 Fla. L. Rev. (forthcoming 2009). These same concerns about departing from the "rules" are endemic in the Twelfth Amendment and ECA, particularly for disputes that reach Congress because of the competing interpretations available to members of Congress and scholars.

290     The issue was raised preceding the passage of the Twentieth Amendment. The legislative history of the Twentieth Amendment is worthy of a separate article and will not be detailed here. Nonetheless, it is worth briefly mentioning that early in the congressional proceedings leading to the adoption of the Twentieth Amendment, it was recognized that the Electoral Count Act of 1877 was inadequate in fixing the defects inherent in the Twelfth Amendment. Specifically, at a congressional hearing on New Year's Eve in 1924, the clerk of the House of Representatives, as part of his testimony, included an address he had given during that year's presidential election on the defects inherent in the then-existing process under the Twelfth Amendment and the Electoral Count Act. See Choice of President in Event President and Vice President Shall Not Have Been Elected and Qualified--Elimination of Electoral Messengers and Incidental Expenditure Required: Hearings on H.R. 10268 and H.R. 11256 Before the H. Comm. on Election of President, Vice President, and Reps. in Cong., 68th Cong. 5-18 (1924) (statement of Hon. William Tyler Page). In that address, the clerk observed that the resolution of the 1876 election was an ad hoc endeavor, by a process that was "extra constitutional." Id. at 14. He also observed that the Electoral Count Act "[a]t best ... is open not only to serious constitutional objections but to the criticism that it leaves unsettled a number of points that in the future may easily lead to serious disputes." Id. at 13. The problem inheres in the fact that the Twelfth Amendment identifies no body, other than arguably the President of the Senate, to resolve conclusively any question concerning the counting of electoral votes, but history has prevented the Senate president as a single individual from asserting this unilateral authority. "Nothing short of a constitutional amendment can supply the omissions which time has revealed," the clerk concluded. Id. Alas, however, by the time Congress proposed the Twentieth Amendment to the states, over seven years later, the need to rectify these omissions had been overlooked once more. Instead, the Twentieth Amendment focused on what were perceived as more pressing matters, including the possible deaths of both a President-elect and Vice President-elect, and the failure of the House

APPENDIX - 95

and Senate to choose, even when the duty unquestionably falls upon them (as in the presidential election of 1824). Thus, the same need for a rectifying constitutional amendment that persisted in 1924 still exists today, despite the subsequent adoption of the Twentieth Amendment.

291    See Edward B. Foley, The Analysis and Mitigation of Electoral Errors: Theory, Practice, Policy, 18 Stan. L. & Pol'y Rev. 350, 376-81. For an example of how the election court could work in the context of a presidential election dispute, see Election Law @ Moritz, Election Court, http:// moritzlaw.osu.edu/electionlaw/electioncourt (last visited Mar. 10, 2009) (including briefs, arguments, and opinions resulting from the decision of a three-judge panel in a hypothetical McCain v. Obama 2008 dispute).

64 UMIALR 475

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

**55 Wm. & Mary L. Rev. 1501**

**William and Mary Law Review**
April, 2014

Article

Joshua D. Hawley [a1]

Copyright (c) 2014 William and Mary Law Review; Joshua D. Hawley

# THE TRANSFORMATIVE TWELFTH AMENDMENT

**Abstract**

*Scholars have long treated the Twelfth Amendment as a constitutional obscurity, a merely mechanical adjustment to the electoral college-and perhaps a less than successful one at that. This consensus is mistaken. In fact, the Twelfth Amendment accomplished one of the most consequential changes to the structure of our constitutional government yet. It fundamentally altered the nature of the Executive and the Executive's relationship to the other branches of government. The Amendment changed the Executive into something it had not been before: a political office. The presidency designed at Philadelphia was intended to be neither a policymaking nor a representative institution, but rather an apolitical office standing above partisan conflict. The Twelfth Amendment changed this design. It converted the electoral college into a form of public election, facilitating organized political competition for the presidency and linking the office to popular majorities. This revision of the electoral college had twin structural effects. First, the Amendment unified the executive branch under the political control of the President and made single-party control of the Executive a near certainty. Second, the Amendment changed the Executive's relationship to Congress by conferring on the President new warrants for political action and a representative status it had not previously enjoyed. Together, these structural changes altered the very nature of the Executive-and along with it, the meaning of "executive power."*
***1502** This Article concludes with a close analysis of the Amendment's interpretive implications for contested questions of executive power, including the President's power to remove subordinates, to conclude treaties and executive agreements, and to exercise directive authority over administrative agencies.*

**\*1503  Table Of Contents**

| | | |
|---|---|---|
| | Introduction | 1504 |
| I. | Before the Revolution: The Philadelphia Presidency | 1510 |
| A. | Mr. Madison's Project | 1511 |
| B. | Making a Patriot King | 1514 |
| II. | The Road to the Political Presidency | 1528 |
| A. | Political Potentials | 1529 |
| 1. | Politics and Structure | 1529 |
| 2. | The Crisis of 1800 | 1535 |
| B. | Reimagining the Executive | 1538 |
| III. | A Revolution in Form | 1541 |
| A. | Enter the Twelfth Amendment | 1542 |
| 1. | Debate in the House | 1544 |
| 2. | Debate in the Senate | 1549 |
| B. | Changing Structure: What the Twelfth Amendment Did | 1554 |
| 1. | Entrenching Political Competition | 1555 |
| 2. | Warranting Political Action | 1556 |
| 3. | Unifying the Executive | 1559 |
| IV. | Structural Reasoning About the Executive | 1562 |
| A. | A Brief Defense of Structural Reasoning | 1563 |

APPENDIX - 97

| | | |
|---|---|---|
| B. | Application: The Removal Power | 1566 |
| 1. | The Core Argument | 1569 |
| 2. | Cases and Controversies | 1573 |
| a. | Myers v. United | 1574 |
| b. | Humphrey's Executor | 1576 |
| c. | Bowsher v. Synar | 1577 |
| d. | Morrison v. Olson | 1578 |
| C. | Other Applications | 1581 |
| 1. | The Treaty Power | 1581 |
| 2. | Directive Authority over Administrative Agencies | 1585 |
| | Conclusion | 1586 |

**\*1504**  "The Electors shall meet in their respective states, and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President and of the number of votes for each.... The person having the greatest Number of votes for President, shall be President, if such number a majority of the whole number of Electors appointed; and if no person have such a majority, then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President."

-U.S. Constitution, Amendment XII (1804).

## Introduction

It is time the Twelfth Amendment got its due. For years, the Amendment has been regarded as a constitutional nonentity a piece of textual fiddling not worth remembering or one that, if it bears any significance at all, serves only to illustrate the irredeemable absurdity of the electoral college. [1]  Legal scholars have all but ignored the text; historians, similarly, have given it little attention. [2]  **\*1505**  The conclusion that the Amendment is inconsequential is prevalent and well- established. It is also wrong. Contrary to decades' worth of conventional wisdom, the Twelfth Amendment is in fact a transformative constitutional text that fundamentally altered the structure of American government by altering the character of the presidency and its relationship to the government's other branches. Indeed, the Twelfth Amendment is in many senses responsible for  **\*1506**  the modern separation of powers and the presidency as we know it today.

The Twelfth Amendment changed the presidency by making it into something it had not been before: a political office. This change in the basic character of the Executive is a fact long overlooked by legal scholars, but one which has major import not only for the functioning of the constitutional system, but also for the meaning of the "executive power" referenced in Article II, Section 1, [3]  as well as the other, enumerated powers of Sections 2 and 3. [4]  The Executive designed at Philadelphia was an utterly original invention, so much that the Framers reached little consensus among themselves on how precisely it would operate. [5]  What they did agree on was that the President was not to be a political actor. [6]  In the Framers' scheme, Congress was the branch that represented the people and the branch that made policy; it was Congress that stood at the center of the Madisonian plan to "refine and enlarge" popular opinion into a truly public-spirited national will. [7]

By contrast, the original Constitution cast the Executive as a check on congressional excess and as an enforcer of congressional laws. [8]  Under the direction of a single President, the executive department would supply "energy" to law enforcement and enable the national government to meet emergencies with dispatch. [9]  But beyond devising rules for consistent law administration, the President was not to advance policy on his [10]  own. [11]  No Framer imagined the President as the proponent of a legislative agenda, still less as the advocate of a particular political philosophy or spokesperson for political faction. [12]  And the Framers certainly did  **\*1507**  not envision presidential election as the signal political event of the national republic, organizing the country's politics and driving its political debate. [13]

All those things happened after Philadelphia, and all of them were made lasting by the Twelfth Amendment. The text altered constitutional structure in critical ways. By instructing electors to designate which of their ballots was cast for President, and which for Vice-President, the Amendment facilitated organized electoral competition for the presidency, connecting the office

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

to popular majorities in a way it had not been before. [14] As it made the presidency more majoritarian, this change in balloting eroded the independence of the Vice-President and denigrated that office's political significance, rendering the executive branch at once more politically homogeneous and more politically unified under presidential control. [15] Coupled with further changes that reduced the number of candidates referred to the House of Representatives in the event of a disputed election, the total effect of the Amendment was to make the presidency a more truly representative and more populist political institution. [16] And this internal change in the Executive's character worked an external shift in the Executive's structural relationship to the other branches. The presidency's new connection with the public conferred on the office new warrants for exerting political leadership and also conveyed new incentives to act and lead, as well. [17] After the Twelfth Amendment, the presidency would become and remain an active, co-equally political branch.

This mostly forgotten history has potentially broad implications for the meaning of the President's executive power and for his place in the Constitution's scheme of separated powers. This is because the content of executive authority is perhaps uniquely determined by constitutional structure. The text of Article II provides notoriously little guidance as to what executive power really consists of. Section 1's reference to "the executive power" leaves that term undefined, [18] and the list of discrete authorities conferred on the **1508** President in Sections 2 and 3 is terse, if not Delphic, and susceptible to widely divergent interpretations. [19] Justice Robert Jackson famously observed sixty years ago that "[j]ust what our forefathers did envision, or would have envisioned had they foreseen modern conditions, must be divined from materials almost as enigmatic as the dreams Joseph was called upon to interpret for Pharaoh." [20]

And indeed, the powers and responsibilities outlined in Article II may mean quite different things depending on the character of the office to which they belong. The President's power to recommend to Congress "such Measures as he shall judge necessary and expedient," [21] for instance, or to appoint officers of the United States [22] or to negotiate treaties, [23] appear in one light if exercised by an apolitical officer whose principal function is to facilitate congressional government, and in quite another if deployed by an elected representative of the people with authority to make policy and engage in political dispute.

By transforming the presidency from an apolitical office into a robustly political one, the Twelfth Amendment transformed the constitutional order. In the Parts that follow, I propose to examine this structural shift and its consequences. I begin in Part I with a fresh analysis of the Executive that the Framers actually designed, finding it to be notably different from the one legal scholars all too frequently presume them to have intended. When we set aside modernist assumptions about presidential power and resist the urge to read later constitutional developments back into the text, we discover that the Framers' Executive was an institution insulated from, rather than connected to, the people. In Part II, I trace the discovery in the 1790s of the presidency's political potential, a discovery that proved so disruptive that it threatened a constitutional crisis. That crisis led ultimately to a new conception of the presidency, developed by the Republicans and articulated by their **1509** leader, Thomas Jefferson. And it inspired a constitutional renovation in the form of the Twelfth Amendment. In Part III, I turn to the Amendment itself, describing its path through Congress and the structural change its drafters intended it to accomplish. I conclude this Part with a close analysis of the Amendment's structural effects and their consequences.

Having thoroughly analyzed the Amendment's text, history, and structural significance, I turn in Part IV to examine the Amendment's possible legal consequences by reference to one particularly enduring question of presidential power, the President's authority to remove executive officials without congressional approval. [24] The removal debate is of course longstanding, stretching back to the First Congress. [25] It remains an open-and fiercely contested-question today. It is in some sense the paradigmatic question of executive power, implicating the meaning of the Article II Vesting Clause; [26] the enumerated executive powers of Article II, Sections 2 and 3; and Congress's Article I authority to structure the executive branch. [27]

The removal debate is also at a standstill, thanks largely to the ambivalence of the 1787 text and its associated history. [28] In this sense, the removal debate represents in microcosm the signature difficulties in interpreting executive power. Structural reasoning on the basis of the Twelfth Amendment has the potential to break the logjam. And this is only one possible application of the story of the Twelfth Amendment. I conclude Part IV by looking briefly at two other applications, the President's treaty power and his directive authority over administrative agencies. No doubt still more could be named. For whatever the precise application, the core point is this: to understand America's constitutional presidency, one must understand the Twelfth Amendment.

APPENDIX - 99

**\*1510  I. Before the Revolution: The Philadelphia Presidency**

It is an oft-told story how the delegates came to Philadelphia in the summer of 1787 to save the fledgling republic. I propose to revisit Philadelphia once more, but for a limited purpose-to notice two features of the Framers' constitutional scheme that are often overlooked but are in fact critical for understanding their broader project and the Executive they crafted for it. First, the fact that the Framers' program for positive government centered on Congress, and second, that this government featured an apolitical President.

To anticipate: The Philadelphia delegates envisioned Congress as the branch to represent the people, to set national policy, and to be the center of constitutional politics. [29]  On the other hand, the Framers saw the President primarily as an officer whose purpose in the federal order was to facilitate government by legislature. [30]  The President would do this by balancing the legislative branch with his veto, as well as his appointment and treaty powers, and by providing a steady execution of Congress's laws. [31]  What the Framers did not imagine was that the President would function as a political actor. [32]  And thus while they conferred on the office significant administrative powers, they withheld full control over the administration and failed to spell out the reach or meaning of his executive authority.

This Part begins by examining the essentially Madisonian plan for constitutional reform that animated the delegates' work in 1787, a vision of deliberative majority rule centered on Congress. Bringing that project to the foreground will allow us then to turn to, and better understand, the delegates' construction of their apolitical Executive. The lesson of these labors is this: contrary to what advocates of the so-called "unitary executive" have often claimed, the Framers did not design the presidency to stand at the apex of the constitutional order. [33]  Theirs was a more modest, and more  **\*1511**  deeply ambiguous office. [34]  Yet, contrary to what others have argued, that ambiguity is best explained not by the Framers' division of executive power into "political" and "administrative" spheres, [35]  still less by any intention to leave Article II's opacities to be resolved by George Washington, [36]  but rather from the fact that the presidency's creators failed to imagine the institution for what it would shortly become: a political animal.

**A. Mr. Madison's Project**

The Framers intended their new constitutional government to be a government by legislature, with the presidency cast in a supporting role. [37]  It was James Madison who supplied the Philadelphia Convention's reform agenda and the intellectual ballast to support it. Madison's major aim was to convert the loose-knit confederal government of the Articles into a fully integrated national republic capable of protecting citizens' rights and producing sound policy. [38]  That meant reforming the legislature, first and foremost. "In a republican government, the legislative authority, necessarily, predominates," Madison explained in Federalist No. 51. [39]  Yet Madison and his allies at Philadelphia knew that government by legislature posed certain acute difficulties. [40]  Their experience with the state legislatures in the decade after independence convinced them that legislatures were susceptible to capture by organized interests bent on enacting narrow parochial agendas-the famous  **\*1512**  problem of faction. [41]  "True it is," Madison reflected in 1785, "that no other rule exists, by which any question which may divide a Society, can be ultimately determined, but the will of the majority; but it is also true that the majority may trespass on the rights of the minority." [42]  The challenge was to construct a national government that avoided the diseases of majority faction but still reflected the majority will. [43]

Madison's solution is familiar and justly celebrated. For our purposes, the critical point to note is the degree to which that solution centered on the legislature. In the now canonical Federalist No. 10, Madison explained that republics, as he defined them, had two principal advantages over democracies. [44]  First, they delegated political decision making to representative bodies. [45]  Thus freed from the need for citizens to meet and decide political matters in person, republics were able, secondly, to embrace a "greater number of citizens, and greater sphere of country." [46]  Madison's political science joined these advantages together in the design of the national legislature, as reflected in the final provisions of Article I. [47]  That Article divided the new Congress into two houses. [48]  The lower house was to be chosen by voters arranged in districts considerably larger than those used to choose delegates to the state legislatures, for Madisonian reasons: broadening the congressional electorate was meant to prevent parochial factions from controlling congressional elections. [49]  Senators were to be selected by state legislatures to guarantee

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                                    4

small states equal representation with larger ones, a feature Madison did not support, [50] but one that was nevertheless susceptible to Madisonian justification: because the pool of senatorial candidates would encompass the entire state, Senators would **\*1513** be men of high reputation, accomplished, respected, and with any luck, well- educated. [51]

If it worked properly, this new Congress would reflect the people's preferences and shape them at the same time. [52] Congress would resist popular passions even as it obeyed the people's interests, elevating factional agendas and passing enthusiasms into a broad and considered public will. [53] It would be a government by majority rule, but anti-majoritarian in character. [54] It would be, in short, a deliberative government. [55] This was the Madisonian project.

Yet Madison and his fellow delegates were mindful that popular assemblies, however well-constructed, suffered from certain incurable defects. For one thing, they were congenitally unfit for law enforcement. Madison had lamented the Articles' lack of law-enforcement authority before the Convention began. [56] And the crisis of Shay's Rebellion troubled the minds of many delegates, [57] who concluded from the federal government's inability to put down the uprising in timely fashion that the new government needed "vigor and dispatch" in law execution, as James Wilson put it. [58] Then too, all legislatures tended toward what Madison called "instability and encroachments." [59] "The preservation of Republican Government," Madison concluded, "required some expedient," some "effectual check" for balancing the legislature as a whole and supplying its defects. [60]

For this, the Framers turned to an independent executive branch separated from Congress and under the charge of a single President. [61] Proponents of the unitary Executive have been right to see in this decision a fairly momentous break with colonial-era **\*1514** practice. [62] But the Philadelphia presidency was always and ever the servant of the Framers' broader experiment in Congress-centered deliberative government. [63] They turned to an independent Executive in order to make that government work. Indeed, even as they created the presidency, the delegates held few firm convictions about how precisely that presidency should operate. Madison notoriously confessed to George Washington on the eve of the Convention that he had not given the executive department much thought. [64] And really, this should come as no particular surprise. In Madison's political science, as in the text the Framers drafted, the Executive was a secondary office.

Perhaps the most promising clue to how the Framers understood the Executive comes not in their debates about the content of executive power, which were spare and few, [65] but in the mode of election they chose for the office. From that choice we learn the following: the Executive the delegates fashioned to complete their project in congressional government was not to be a political actor, but rather an apolitical "Patriot King." [66]

## B. Making a Patriot King

Before September, the Convention considered three primary means of presidential election: by the national legislature (or a subset of it); by the people (either directly or through electors the people chose); or by one or more of the institutions of state government. [67] The most consistently popular method for the duration of the Convention's meeting was selection by Congress. [68] This was the **\*1515** approach proposed in the Virginia Plan [69] and repeatedly favored in floor votes. [70] And it might have won the day, had John Rutledge and the large states not attempted at the last minute to increase large-state influence in presidential selection. [71] That ill-timed maneuver revived small state-large state hostilities and sent the Convention into deadlock. [72] The electoral college emerged only at the Convention's end, as a compromise. [73] Yet in all the to-and-fro over presidential election, perhaps the most striking thing is what the delegates did not consider-the need to give the President democratic legitimacy. [74] Their presidency was not a representative institution.

A firm majority of delegates believed that popular election by the people was neither workable nor wise. James Wilson first moved to select the Executive by direct vote of the public on June 2, 1787, just four days after Edmund Randolph introduced the Virginia Plan and two days before the delegates had conclusively settled on a single rather than plural presidency. [75] The motion failed seven states to two. [76] Wilson and his principal allies on the issue, Gouverneur Morris and Daniel Carroll, would try again on four separate occasions over the ensuing two and one-half months, each time falling short. [77] No more than six or

APPENDIX - 101

seven delegates-from a pool of forty-two-spoke positively of popular election during debate, [78] and political scientist William Riker estimates that no more than eleven to at most seventeen delegates affirmatively supported public election at any point. [79]

**\*1516**  The reasons were various. Some delegates worried that permitting the people to vote would invite demaguery and inflame the passions of faction. "A popular election in this case is radically vicious," Elbridge Gerry warned on July 25. [80]  "The ignorance of the people would put it in the power of some one set of men dispersed throughout the Union and acting in Concert to delude them into any appointment." [81]  Charles Pinckney raised the specter of the voting public deceived "by a few active [and] designing men." [82]  Hamilton would later explain that the Convention found it "peculiarly desirable to afford as little opportunity as possible to tumult and disorder." [83]  And Madison-who at one point favored popular election at the Convention-nevertheless ultimately endorsed the alternative mode the delegates selected as likely to "render the choice more judicious." [84]

But on balance, the delegates worried more that the public simply would not have sufficient information to judge the candidates for office. Hugh Williamson of North Carolina claimed that "there was the same difference between an election in this case, by the people and by the legislature, as between an appointment by lot, and by choice." [85]  The people were too dispersed, over too many miles and states, to know much of anything about candidates from states other than their own. "There are at present distinguished characters, who are known perhaps to almost every man," Williamson said, thinking of Washington, but "[t]his will not always be the case." [86]  Most delegates agreed. [87]  George Mason summed up the prevailing thought when he remarked that "[t]he extent of the Country renders  **\*1517**  it impossible that the people can have the requisite capacity to judge of the respective pretensions of the Candidates." [88]

These two arguments in combination proved decisive. Try as Wilson and his allies might, they could not persuade the Convention to embrace election by the populace. [89]  And this tells us something quite important about the Philadelphia presidency-it was not an office the delegates believed required democratic sanction in order to be legitimate. Put another way, the role the delegates envisioned for their Executive did not require political, majoritarian warrants for action. Remarkably, not one delegate, not even the advocates of direct election, appeared to worry that the failure to give the people a vote would render the President impotent or presidential action somehow illegitimate. [90]  Of the various claims Wilson and the pro-election contingent pressed, democratic legitimacy was never one. [91]  Instead, Wilson urged public election merely to ensure that the President was sufficiently qualified, an individual of "general notoriety," [92]  or, as Morris put it, a person of "continental reputation." [93]

When the Convention finally did abandon election by the legislature in favor of the peculiar electoral college, it did so not from a desire to give the President democratic sanction, but from a concern that legislative election would frustrate the proper workings of Congress and ruin the Madisonian project of controlling faction. [94]  Gouverneur Morris formulated the decisive argument in mid-July when he claimed that "[i]f the Legislature elect, it will be the work of intrigue, of cabal, and of faction; it will be like the election of a  **\*1518**  pope by a conclave of cardinals; real merit will rarely be the title to the appointment." [95]  By "intrigue" Morris meant deal-making, horse-trading, log-rolling-the sort of factional trade-offs that regularly occurred in the formation of parliamentary cabinet governments, [96]  the sort of thing that dominated the legislatures in the states, and just what the Madisonian system was designed to prevent. [97]  This was the argument that persuaded Madison himself, initially a supporter of congressional election, to support first popular election of the President and then an electoral college. [98]  And it was the argument that carried the day in the Convention's closing weeks in September, when delegates found themselves snared in a voting cycle triggered by John Rutledge. [99]

By late summer the Convention had, in a series of votes rejecting both popular election and election by popularly chosen electors, apparently reached consensus in favor of presidential election by the legislature. [100]  But then on August 24, John Rutledge of South Carolina moved to elect the President by joint ballot of the two houses. [101]  Small states balked, fearing that votes from the large states in the House of Representatives would overwhelm their votes in the Senate, thus giving the large states control of the presidency. [102]  Suddenly neither election by legislature with joint ballot, nor election by the Senate voting singly, nor election by some type of elector could command a majority. [103]  Fearing deadlock, the delegates referred the question to the Committee on Postponed Matters on August 31. [104]

APPENDIX - 102

**\*1519**  Working over a single weekend in early September, the Committee devised the electoral college. [105]  In what would become familiar language, the Committee draft provided that "[e]ach State shall appoint in such manner as its Legislature may direct, a number of electors equal to the whole number of Senators and members of the House of Representatives to which the State may be entitled in the Legislature." [106]  The electors thus appointed were to "meet in their respective States, and vote by ballot for two persons, of whom one at least shall not be an inhabitant of the same State with themselves." [107]  The person with the most votes became President, the one with the second-most, Vice-President. [108]  In the event of a tie, the Senate would choose between the candidates. [109]  Should no contender receive a majority of votes, the Senate would choose from among "the five highest on the list." [110]

The Convention's reaction on September 4 was positive, or at least relieved. [111]  Large-state delegates were pleased with their advantage in the total number of electors, which were weighted by population. Small-state delegates secured referral to the Senate in the event of a tie or indeterminate electoral vote, rather than to the House. [112]  The only remaining hitch was the delegates' swelling concern that the Senate's legislative power-its say in treaty making and appointments and now its role in presidential election-would allow the Senate to dominate the government. [113]  The problem was neatly solved when dual motions by Hugh Williamson and Roger Sherman proposed to transfer the voting in a disputed election from the Senate to the House which, to pacify small states, would cast ballots by state delegation. [114]  The compromise took hold and the electoral college was born.

**\*1520**  One delegate to the Virginia ratifying convention would later complain that the college "seems rather founded on accident than any principle of government I ever heard of," [115]  but that assessment is perhaps too ungenerous. The plan did have an overarching principle, fully in keeping with the political science that animated the broader Madisonian project: to preserve the separation of the Executive from Congress in order to correct the defects of the legislative branch and avoid the "intrigue" and "cabal" that could wreck deliberative government. [116]  What the electoral college did not do, what in fact the delegates had no concern to do, was link the President to popular majorities. [117]

While the finalized Article II permitted the state legislatures to designate any method for choosing the electors they liked, including public voting, the actual decision on the candidates was to rest in the first place with the electors themselves, not the people, and quite possibly with the House as an ultimate matter. [118]  Madison explained to the Virginia ratifying convention that the delegates found it "impracticable to elect [the President] by the immediate suffrages of the people" and as a result believed that "the people [should] choose the electors." [119]  Hamilton elaborated the point in Federalist No. 68. It was "peculiarly desirable" in the election of the Executive, he wrote, "to afford as little opportunity as possible" to the sort of "tumult and disorder" that frequently accompanied public elections. [120]  The solution was to permit "the sense of the people [to] operate in the choice of the person to whom so important a trust was to be confided" [121]  while committing the actual power of election to "an intermediate body of electors." [122]  This arrangement would forestall the "heats and ferments" characteristic of popular voting, and prevent their "communication," like a disease, from the people to the chief executive. [123]  Indeed, most of the Philadelphia delegates  **\*1521**  expected that it was the House that would ultimately choose the President in the normal course. They saw the electoral college as a sort of presidential primary, narrowing the field, with the House making the final decision "nineteen times in twenty." [124]  Either way, the President was not in any meaningful way to be elected by the public.

In fact, the office was not designed to be politically contested at all. [125]  The mechanics of the electoral college deliberately frustrated attempts at coordinated voting. Electors were to meet on the same day to cast their ballots, but "in their respective States," [126]  meaning there would be no oppportunity for deliberation as a "college." [127]  They were to vote for two candidates and could not designate which was their first choice and which second. [128]  Once the votes were cast, the "college"-more accurately, the discrete bands of state electors-dissolved, never to assemble again. [129]  As historian Jack Rakove has observed, "few of the framers anticipated, much less intended, that the election of the president would soon emerge as the most important stimulus for political innovation and the creation of alliances running across state lines." [130]  The Philadelphia system was not built for organized political competition.

APPENDIX - 103

And all this means that the President was not meant to be a representative of the people, at least not in any direct sense. Congress was the representative branch. George Washington captured the Framers' understanding when he professed in 1790 to have "always believed that an unequivocally free and equal representation of the people in the legislature, together with an efficient and responsible executive, were the great pillars on which the preservation of American freedom must depend." [131] Convention **\*1522** attendees repeatedly referred to Congress as the people's forum and members of Congress as the people's representatives. [132] They never spoke of the President in that manner. [133] To be sure, delegates did sometimes refer to the President as a "representative," but it was as a representative of the national interest-an agent of the common good-something the Framers hoped the President would be by virtue of his independence from the Legislature, not as a popular representative of the people. [134] Madison voiced this view at the Convention when he commented that "[t]he Executive Magistrate would be considered as a national officer, acting for and equally sympathising with every part of the United States." [135] Gouverneur Morris, in defending the President's share of the treaty power, similarly called the Executive "the general Guardian of the National interests." [136] James Wilson made the same point the following year, during the ratification debates. "[B]eing elected by different parts of the United States, ... [the President] will consider himself as not particularly interested for any one of them, but will watch over the whole with paternal care and affection." [137] It was in this sense and this sense only, as a disinterested agent of the public good, that the Framers referred to the President as a "man of the people." [138] The Framers' presidency, in sum, was not a popular or majoritarian office. However they envisioned the contours of executive power, the Framers did not envision it as political authority.

**\*1523**  The ratifiers did not anticipate a political presidency either. Once the Grand Convention disbanded and the new Constitution began to circulate "out of doors," opponents objected to the presidency on multiple grounds, but the President's political character was not one of them.

Some of the Constitution's opponents objected to the President's unitary design and connection to the military. The President, Patrick Henry forecasted with his trademark melodrama, would be an "American Dictator," [139] not because he would overwhelm Congress with his political authority, but rather because he commanded the armed forces. "[T]he army will salute him monarch: your militia will leave you, and assist in making him king[:] ... and what have you to oppose this force?" Henry taunted. [140]

Other Antifederalists charged that the President was not strong or independent enough to resist the machinations of the Senate. "The executive is, in fact, the president and senate in all transactions of any importance," the Federal Farmer complained. [141] "[H]e may always act with the senate, but never can effectually counteract its views." [142] The Centinel letters argued the same point: "The President ... [will] be a mere pageant of state, unless he coincides with the views of the Senate." [143] He will "either become the head of the aristocratic junto in that body, or its minion." [144] Antifederalist criticisms were diverse, but had at least one thing in common: the failure to imagine the President as a political leader working within the Constitution's new political system. [145] As Ralph Ketcham has summarized, "There was surprisingly little concentration by the Anti-federalists on executive powers as such." [146]

**\*1524**  Of all the protagonists involved in drafting and ratification, it was Alexander Hamilton who came closest to foretelling the President's future political role. Long an advocate of executive leadership, [147] Hamilton's Federalist essays described a President who would energetically administer the government. [148] Indeed, Hamilton appeared in some passages of those famous newspaper commentaries to regard the President as a political representative of the people. One of the few outright errors in the Federalist collection comes in Federalist No. 68, in which Hamilton casually remarked that "the people of each State shall choose a number of persons as electors." [149] Of course it was up to the state legislatures, not the people themselves, to decide how the electors would be chosen. Popular election was only one of the options. Still, the slip is significant if it reveals that Hamilton thought of the President as the people's choice.

But it likely does not. In that same essay, Hamilton explained at some length the necessity of separating the election of the President from the people, the better to insulate the chief magistrate from the "heats and ferments" of popular opinion. [150] When Hamilton referred to the President as the choice of the people, not only in Federalist No. 68 but also across the series of essays focused on the Executive, he meant, once again, that the President would represent the interests of the people. [151]

APPENDIX - 104

Hamilton never advocated a political President at the Convention or during the ratification debates. He advocated political, policy-making administrators. The difference is worth noting. The man who wrote that "the true test of a good government is its aptitude **\*1525** and tendency to produce a good administration" [152] wanted a professional, and perhaps permanent, cadre of civil servants to devise policy and carry it into action. [153] These administrators would be supervised by the President, but not necessarily directed by him. [154] Hamilton apparently envisioned the President as a sort of figurehead, presiding in a politically neutral fashion over a government run by powerful administrative agents. [155] Hamilton's vision was for what historian Forrest McDonald has called "a permanent ministry independent of the president-or, as in the parliamentary system, one responsible to the legislative as well as the executive." [156] These views were out of step with the rest of the Framers to the extent Hamilton foresaw an entity other than Congress at the center of the government, and his alternative vision would soon provoke considerable strife. But at least in 1787 and 1788, it was not a vision for a political presidency. [157]

To sum up: the Framers created a constitutional system geared to produce deliberative government. [158] They placed a renovated Congress at its center and constructed an independent executive branch under the direction of a single President to balance Congress, supply its defects, and administer its laws. [159] The Article II presidency was a potent office but not, critically, a political one. [160] The President was not connected directly to the people, was not a popular representative, and lacked democratic warrants for action. [161]

These are important insights because they challenge so much of the conventional wisdom about the original Article II Executive. Proponents of the unitary Executive have placed great stock in the **\*1526** President's supposedly representative character. John Yoo has stated matter of factly that a prominent theme in the federal Constitution is that "[t]he president is seen as the representative and protector of the people," that, indeed, the presidency was meant "as not merely an executor of legislation, but as a new institution that represented the will of the people." [162] On this basis, Yoo argues for an expansive interpretation of the Vesting Clause, [163] including the right to act beyond and sometimes contrary to the letter of the law. [164] Steven Calabresi also has relied on what he calls the Framers' "deliberat[e] and self conscious[s] cho[ice] to break with th[e] post-1776 preference for weak executives" and create a "powerful, plebiscitary office." [165] He cites this claim as one reason to read the Vesting Clause to give the President control over officers within the executive branch. [166] But all this turns out to be untrue-or more accurately, it turns out to be anachronistic. The presidency would become a representative office, but the text of 1787 did not make it one. To the extent the case for the unitary Executive depends heavily, even critically, on the President's political character, the case cannot be rooted in the original Article II alone.

Some of the most prominent critics of the unitary theory have likewise assumed that the presidency is and was meant to be a representative institution, or a political office of some type. [167] Cass Sunstein and Larry Lessig began with that assumption in their seminal article, The President and the Administration, and proceeded to explain both the lack of a textual removal power and Congress's rather active involvement in administration during the 1790s on the basis of a distinction between "political" and **\*1527** "administrative" authority. [168] But as they ultimately acknowledge, this division is more nineteenth-century gloss than original understanding [169] and, in any event, misleading. [170]

Akhil Amar has recently argued that the Framers deliberately left Article II's terms opaque and its arrangement untidy in the expectation that George Washington would supply the definition of executive power through his practice as the first President. [171] Indeed, Amar goes so far as to claim that the Convention intended to delegate to Washington the authority to do so. [172] But this hypothesis is premised almost exclusively on a single comment in a private letter from Pierce Butler to a relative, [173] and as historians have long pointed out, it "hardly squares with the tangled record of proposals, tentative decisions, reconsiderations, and reversals from which the presidency finally, and belatedly, emerged." [174]

The ambiguity that attended the original Executive and early administrative practice owes less to some implicit delegation of interpretive authority to George Washington, or to a division between "political" and "administrative" power, than to the President's uncertain political status. The Framers could neglect to give the President full control over the executive branch, fail to define "executive power," and remain comfortable with significant congressional involvement in administration precisely because they did not anticipate the President acting as a political leader, and certainly not as the political leader. [175] Politics was

APPENDIX - 105

something for Congress to make and do. When the President began to engage in politics, the Founders' assignment of powers became far more contentious and their rationale for crafting Article II as they did increasingly hard to fathom. But then that is the story of the 1790s and the watershed election of 1800.

**\*1528  II. The Road to the Political Presidency**

In forging a new model of government, the Framers had hoped to settle certain political questions once and for all. Madison opined in Federalist No. 49 that after ratification, frequent appeals to the people would no longer be necessary-in fact they would be malign, insofar as they kept in dispute fundamental questions of political principle. [176]  The 1790s revealed that a great many political principles were not settled after all. [177]  Sparked by Alexander Hamilton's ambitious banking and manufacturing plans, and fanned by the revolution in France, political controversy blazed in the 1790s. [178]  That such deep and principled political disagreement would persist after the Constitution's adoption came as a shock to the decade's political actors. [179]  But perhaps more surprising still was the role the presidency played in the decade's political conflagrations. The controversies of the 1790s revealed that in designing the presidency as they did, the Framers inadvertently vested the office with sizable political potential. [180]  The structure of the branch permitted it to formulate policy and influence the legislature. [181]  Indeed, the structure of the office uniquely suited it to exercise power. These facts-unintended, unlooked for, and largely unwanted-made the presidency an engine of political strife and an object of political competition. By decade's end, contending factions schemed to gain control of the government by gaining control of the Executive.

The discovery of the Executive's political potential plunged the republic into crisis. Neither the Framers nor any other political actor had developed an account of the presidency as a political office. [182]  This proved to be a dangerous intellectual deficit. Political leaders' inability to agree on how the presidency should operate and to whom it should be accountable nearly provoked armed conflict. [183]  **\*1529**  In the end, the crisis gave way to a new conception of the presidency that would require a new constitutional amendment for its realization. [184]  This Part takes up each installment of this story in turn. I begin with the discovery of the Executive's political potential and its destabilizing consequences and then turn to the new constitutional synthesis that provided the apology for the Twelfth Amendment.

**A. Political Potentials**

1. Politics and Structure

The opening years of the 1790s destroyed any expectation that constitutional disputes were a thing of the past. There was Alexander Hamilton to thank for that. Hamilton's ambition as Secretary of the Treasury to transform America's agrarian economy into a commercialized and manufacturing powerhouse provoked fierce dissent. [185]  In a series of three reports to Congress, Hamilton proposed to charter a national bank, levy new internal taxes, and increase foreign impost revenues. [186]  His broader aims were to create a stable national currency and provide the nation's merchants access to large pools of capital. [187]  James Madison and Thomas Jefferson read in Hamilton's proposals a covert bid to convert the republic into a capitalist aristocracy. [188]  They were especially alarmed by Hamilton's enthusiasm for federal power. [189]  By the early 1790s they had assembled a robust (if minority) opposition in Congress. [190]

The train of revolution in France only heightened America's burgeoning political tension. Jefferson, in particular, sympathized with the revolutionaries and linked their struggle against monarchy to his and Madison's opposition to the Hamilton economic **\*1530**  program. [191]  The fight against Hamilton was a fight, Jefferson came to say, against "monocracy." [192]  The Jefferson-Madison alliance took to calling itself "Democratic-Republican[s]," after the name of the private societies formed in Philadelphia and elsewhere to support the French Revolution. [193]  Hamilton and his supporters, meanwhile, viewed the Republicans' sympathy for the French cause with alarm and read in their opposition to economic development a Jacobin agenda for radical social leveling. [194]  Politics was back with a vengeance.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.      10

And the second great surprise of the decade was the degree to which the executive branch was at the center of it. Though the Framers had built Congress to function as the locus of positive government, [195] already by the early 1790s the executive branch was exerting appreciable influence on congressional deliberation and policy-making. No doubt this development owed something to the personal skill of Hamilton, who creatively leveraged the resources of his Treasury post to shape Congress's work. [196] But above all, it was due to structure.

By design, the Framers gave the presidency very little authority that would stand on its own. The President shares his most weighty executive powers with Congress, at least in some manner. The President's treaty and appointments powers are divided with the Senate; [197] the veto power is subject to congressional override; [198] and even the commander-in-chief power, the most potent of the authorities spelled out in Article II, is qualified by Congress's rights to declare war, [199] to appropriate funds for the military, [200] to make rules governing the armed forces, [201] to call forth the militia, [202] and to *1531 organize, arm, and discipline the militia as Congress sees fit. [203] As for the President's remaining Article II powers-like the authority to require opinions from department heads [204] or adjourn Congress when the houses could not agree [205]-they are more nearly ministerial in character. The upshot is that the President has relatively few powers not shared with Congress, and thus relatively little room to maneuver apart from congressional cooperation. [206]

And yet, as Charles Black noticed nearly four decades ago, the Article II presidency was exceptionally well structured for the receipt and exercise of power. [207] In placing the branch under the direction of a single officer rather than several, the Constitution permitted the Executive to act with unity of purpose. [208] In freeing the President of the need to explain his decisions to a council of state, [209] or otherwise seek cabinet officers' input before acting, the Constitution allowed him to act with "dispatch." [210] By investing him with some sort of authority over cabinet ministers, [211] the document made it possible for him to develop, review, and implement policy.

Congress, by contrast, was handicapped in the exercise of power by just those mechanisms needed to avoid majoritarianism. [212] The division into two houses, each chosen by a different electorate, meant congressional leaders could not use a single majority to enact legislation; they would have to build a different coalition in each body. [213] That same division made devising a coherent policy agenda *1532 quite difficult because the two houses were elected to staggered terms, by different sets of voters, and thus populated with members who came to Congress with differing policy priorities. [214] And then there was the congressional leadership: the Constitution provided for none, certainly for none that straddled the two houses, making the inter-house coordination problem acute. [215]

In the 1790s, these structural features began to play themselves out. Lacking the institutional means to develop policy, Congress turned to the Executive for help, and did so quite early on. It was Congress that initiated Hamilton's famous troika of reports to help it craft an economic program. [216] Indeed, the First and Second Congresses made a practice of referring fiscal questions to the Treasury for counsel. [217] Hamilton skillfully drafted his replies, crafting his answers in the form of policy recommendations so as to exert maximum influence on the legislative agenda. [218] Soon Hamilton and his staff were drafting legislation and forwarding it to friendly congressmen. [219] Secretary of State Jefferson did the same (though less frequently) on matters related to his department. [220] By the time of his resignation in 1795, Hamilton was known to visit Congress in person to lobby individual members, to attend committee hearings, to speak at legislative caucuses, and even to designate the membership of the committees to which his measures would be referred. [221] "Nothing," Senator William Maclay of Pennsylvania said, "is done without him." [222]

Here again, Hamilton's unique talents and ambition surely accounted for some of these developments, but on the whole, constitutional structure drove the institutional praxis of the 1790s. [223] A constitutionally powerful but structurally disadvantaged *1533 Congress found itself turning again and again to a constitutionally weaker but structurally privileged Executive for aid in the business of governing. [224] This was not because Washington himself was committed to a political use of the presidency. On the contrary, Washington saw himself as a non-partisan figure and his office as an apolitical one. [225] He scrupulously avoided political statements, declined to lobby members of Congress, and generally refused to exercise his veto power for policy

APPENDIX - 107

reasons. [226] He considered but removed policy language in his first inaugural address. [227] And tellingly, his annual reports to Congress were almost entirely devoid of policy recommendations, providing no direct guidance for legislative programs. [228] When he permitted his deputies, principally Hamilton, to develop policy and recommend it to Congress, he arguably did not regard those policies as properly his own. [229] Instead, Washington, as President, pursued an essentially collaborative politics, not so different, as one political scientist has remarked, from the British king-in-council model. [230] This collaborative institutional behavior revealed Washington's conception of the President as a professional executor, above party and above politics, with no distinct political or programmatic agenda of his own to press. [231]

Still, the office was undeniably exerting political influence. [232] And that was unquestionably controversial. As early as Washington's first term, Madison and Jefferson grew uneasy with the influence they were surprised to find the Executive exerting on Congress. [233] In the House, Madison objected to Congress's emerging practice of **\*1534** referring policy questions to the executive branch for advice. [234] He repeatedly pressed to stop those referrals and finally succeeded in 1795. [235] Madison was even less sanguine about executive lobbying, bill drafting, and influence on the legislative calendar. Partly at Madison's behest, the Third Congress amended the House's rules to require every proposed revenue law to be debated in the Committee of the Whole; the new rules similarly forbade the House from approving any tax increase until debated on the floor. [236] The intent of both changes was to frustrate outside executive influence on the House's procedures. [237] Madison also spearheaded the creation of two standing committees to assist the House in policy development, again with the aim of countering executive pressure. [238]

In sum, although the structure of the two branches may have been familiar to political actors, [239] the practical consequences of that structure were not. On the contrary, Madison, Jefferson, and their allies blamed Hamilton for what they perceived to be a fundamental misuse of executive authority. [240]

But the effects of structure could not be denied. By the end of Washington's tenure, both Madison and Jefferson recognized the political potential Article II created in the presidency. [241] They concluded that controlling the legislature was not enough to control the government because the presidency had proved too consequential. If they wanted to direct the state, they needed to capture the Executive. [242] This was the fact of constitutional structure. It was a fact not lost on Hamilton and his Federalist cohort either. Before Washington left office, both Federalists and Republicans began assembling party organizations for the purpose of amassing enough electoral votes in the states to elevate their favored candidate. [243] Yet **\*1535** this dawning realization of the presidency's political potential and the race to capture it posed two profound problems for the constitutional order-one conceptual and one structural.

The conceptual problem was that no set of political actors had yet developed an account of the Executive and its place within the constitutional system that could explain the political potential the 1790s had made apparent, or justify using the presidency for political ends. [244] The structural problem was that Article II was not designed to permit electoral competition for the executive office. [245] If both Republicans and Federalists understood by the mid-1790s that they needed to win control of the Executive to control the government, the Constitution gave them no clear, or clearly legitimate, method for doing so. [246] These problems merged to produce the wrenching constitutional crisis of 1800.

2. The Crisis of 1800

Precisely as Article II contemplated with its provisions leaving the time and manner of selecting electors to the states, the presidential election in 1800 was more exactly a series of discrete state elections than a national one. [247] Five states that year chose their college members by popular election-Virginia, Maryland, Rhode Island, North Carolina, and Kentucky. [248] Virginia and Kentucky elected by general ticket, while the other three conducted elections in congressional districts. [249] Ten of the remaining eleven states chose electors in the state legislature; [250] Vermont, meanwhile, delegated the choice to a "grand committee" consisting of the governor, an executive council, and the state house of representatives. [251] The elections occurred at various points through the summer and fall. [252] In the run-up, both Republicans and Federalists **\*1536** organized feverishly to persuade the relevant voters to choose electors pledged to their particular candidates. [253] In hopes of making at least some

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

sort of coordinated voting possible in the electoral college, Republican congressmen caucused in May 1800 to designate their preferred candidates for President and Vice-President. [254] They settled on Thomas Jefferson and Aaron Burr. [255] Federalist congressmen, guided by Alexander Hamilton, used the same mechanism to choose incumbent John Adams as their presidential candidate and Charles Pinckney for Vice- President. [256]

But thanks to Article I's electoral college, all the planning and maneuvering and attempted coordination yielded an unexpected result. The Republicans outpolled Adams and Pinckney, who received sixty-five and sixty-four votes, respectively. [257] But, unable to know how other Republican electors had voted in other states, or indeed whether Federalist electors had (as Hamilton advised) concentrated their second votes behind Pinckney in an effort to elevate him over the Republican choice, the Republican electors failed to divert at least one of their second votes to a candidate other than Burr. [258] In so doing, they denied Jefferson an outright majority. [259] When all the ballots were counted, Jefferson and Burr had sixty-nine votes apiece. [260] According to the rules of Article II, the election moved immediately to the House of Representatives, which would decide between the top five candidates. [261] As only five candidates had received votes from the electors, all options were, so to speak, on the table. Due to a quirk of tradition, however, the new Congress with its healthy Republican majority, would not convene until after the new President was sworn in, on March 4, 1801. [262] So **\*1537** it was the expiring, Federalist-controlled Sixth Congress that held the fate of the presidency.

For thirty-five ballots cast over six days, Federalist congressmen persisted in refusing to vote for Thomas Jefferson, whom they regarded as a threat to the very existence of the republic. [263] Meanwhile, rumors raced about the capital. Members of the Pennsylvania congressional delegation each received a letter from Philadelphia Republicans, warning them that the day Congress denied Jefferson or Burr the presidency would be "the first day of revolution and Civil War." [264] Pennsylvania's Republican governor, Thomas McKean, went so far as to make preliminary preparations to mobilize his state's militia in the event the conspiratorial Federalists prevented the ascension of one of the Republican candidates. [265] Virginia's James Monroe did the same. [266]

The deep problems of the presidency's unanticipated political potential-mechanical and conceptual-were taking their toll. The mechanical design of the electoral college, which forbade discrimination between presidential and vice-presidential votes, [267] prevented electors from communicating, and referred the top five vote-getters to the House, kept Jefferson from winning the election even though he was clearly the first choice of a majority of electors. [268] Once the election devolved on the (lame-duck) House of Representatives, the conceptual problem proved just as intractable. Lacking a shared idea as to whom the President was politically accountable and why, Republicans and Federalists could not agree on which candidate the House should elect. Republicans argued that the people's choice, as reflected in the electoral college, should control. [269] Federalists **\*1538** rejected this populist theory of presidential election and seemed initially determined to choose the candidate they thought best for the Union, regardless of how the electors voted. [270]

Shaken by threats of armed conflict and the specter of disunion, and following a decisive intervention by Alexander Hamilton, who urged compromise, [271] Federalist congressmen finally relented. On February 17, 1801, the House of Representatives elected Thomas Jefferson on the thirty-sixth ballot, ten states to four, with two abstaining. [272] The Federalists' stand-down resolved the electoral crisis, but provided no answers to the emergent problem of the politicized presidency.

In the immediately following years, those answers would come from the supposed skeptics of executive power, the Jefferson-led Republicans. Over the course of the election of 1800 and the years shortly following, the Republicans developed a new account of the President's connection to the people-one that would justify fresh uses of presidential power and lead ultimately to a revised conception of the presidency as a political office. [273] But the structure of the Constitution had to be changed to make this reimagined presidency a reality. In 1803, Republicans amended Article II to more directly link the President and the people and to permit political partisans to more effectively contest presidential elections. [274]

In this way, the Twelfth Amendment reset the separation of powers and changed American government. Before we can appreciate fully the transformation it wrought, however, we must take account of the idea that supplied its logic: the Republican case for the political presidency.

APPENDIX - 109

## B. Reimagining the Executive

The Republicans developed their notion of a political Executive over time and in various forums as they struggled to capture the presidency, but it was their leader, Thomas Jefferson, who gave the **\*1539** idea mature theoretical expression in his 1801 inaugural address. [275] In those remarks, Jefferson outlined an office more populist, more politically active, and more constitutionally central than the one made in Philadelphia. [276] As of 1801, however, the presidency Jefferson described was an office founded only in speech. It would require constitutional change to become a reality.

Jefferson delivered his inaugural address on March 4, 1801 to a Senate chamber so crowded that one observer, Margaret Bayard Smith, declared she believed "not another creature could enter." [277] Jefferson's new ideas about his office were evident almost immediately. Whereas Washington and Adams had both addressed their inaugural remarks to Congress, Jefferson directed his speech to "[f]riends [and] [f]ellow [c]itizens." [278] That was no coincidence. Jefferson cast the President as an exponent and advocate of political principle. That is, Jefferson reimagined the Executive as a political actor. [279]

According to Jefferson, it was not merely the President's prerogative, but his duty to found his administration on political principles and to offer those principles to the people for their endorsement. [280] Midway through his brief address, Jefferson announced he found it only "proper" that his electorate "should understand what I deem the essential principles of our government"-and proceeded to list fourteen of them. [281] Astute listeners quickly recognized "the manifesto of the party and a declaration ... of [[Jefferson's] political creed." [282] This was quite deliberate. Jefferson believed that the President should act not as a king above party, but as a delegate of the people, chosen by them to prosecute a political agenda they approved. In his view, the presidency should be an instrument of **\*1540** popular, majoritarian self-rule. [283] A politically responsive, politically accountable Executive was the principal means by which the people exercised control over their government. [284] In keeping with this philosophy, Jefferson cast himself as the people's representative. He referred to "the post you [the people] have assigned me." [285] He asked for the public's "confidence" and for popular support against those who opposed him. [286] He concluded the address by promising to rely "on the patronage of [[the people's] good will" to perform "with obedience" the task they had assigned him, and "to retire from it whenever you become sensible how much better choices it is in your power to make." [287] This was the President as popular delegate.

For that model to work, however, presidential election had to become something it had not been for the Framers in 1787: a type of national plebiscite. The original Article II had taken care to insulate the choice of the President from the "tumult and disorder" of popular majorities. [288] Jefferson now claimed that the great purpose of presidential election was to give voice to majority opinion. Republicans in Congress had made the same argument in the throes of the 1800 election dispute, arguing as the Federalists forced ballot after ballot that a vote to deny Jefferson the presidency was a vote to usurp the rule of the people. [289] At the hands of Jefferson and the Republicans, the electoral college morphed from an independent body of leading men with the authority to select the President to a merely formal mechanism for expressing the majority's preference.

And precisely because presidential elections should be, according to Jefferson, a national plebiscite organized around the political principles the candidates espoused, public endorsement of a given candidate conferred public authority on the victor to enact his principles. [290] Thus Jefferson told his listeners that the political points he deemed "essential" and which he understood the people to **\*1541** have endorsed were principles he now intended to use "to shape [the government's] administration." [291] Put another way, the people's approval authorized the President to administer his office in a political manner, according to a particular political agenda.

With this logic, Jefferson decisively abandoned the apolitical Executive the framers crafted in Philadelphia. [292] The Jeffersonian President was no patriot king; rather, an instrument of majority rule. Indeed, for Jefferson, the election of the President, not Congress, became the primary means by which the people expressed their will in the constitutional system. [293]

Yet however compelling this vision, it found no home in the Constitution. The electoral college as Jefferson described it simply did not exist, not in 1801. He might call his own election a national plebiscite, but in fact the rules of Article II prevented the

APPENDIX - 110

public, when they were permitted to vote for electors at all, from designating which candidate they wanted for President and which for Vice-President. [294]  The electoral college thus provided no mechanism for the people to confer political approval on any specific candidate. Article II also prevented coordination between electors, which in the absence of ballot designation made organized party competition for executive offices difficult at best. [295]  In frustrating both public participation and organized electioneering, Article II forestalled just the sort of national choice between competing political principles Jefferson thought presidential election should become. If the political presidency Jefferson described was to be fact, not just rhetoric, Article II would have to change. And that is what the Twelfth Amendment did.

## III. A Revolution in Form

Most observers have missed the significance of the Twelfth Amendment because of what it did not do. It did not abolish the electoral college; it did not institute a direct national plebiscite; it  **\*1542**  did not direct the states to choose their electors by popular vote. [296]  At first glance, the Amendment seems to have done relatively little, even to be, as Bruce Ackerman has recently said, "the very opposite of a serious attempt to think the problem [of presidential selection] through." [297]

First glances can be deceiving. The Amendment in fact fundamentally altered the operation of the electoral college, and with it, the relationship between the executive and legislative branches. The Amendment accomplished this by directing electors to designate their ballots for President and Vice-President and by reducing Congress's role in presidential elections in favor of greater and more direct control by the people. The effect was to facilitate political competition for the Executive, further unify the branch under the political control of the President, and make the President the choice of popular majorities. These innovations converted the Philadelphia presidency into a political one for good, shifting the structure of the constitutional order along the way. In the end, the Republicans' Twelfth Amendment gave the President's executive powers new scope and potentially new meaning, even as it produced a different sort of politics from the one the Framers had anticipated-one no longer congressional, but centered on the President.

### A. Enter the Twelfth Amendment

The Amendment began life on October 17, 1803, when Representative John Dawson, Republican from Virginia, introduced the following resolution on the floor of the House:

> That, in all future elections of President and Vice President, the persons shall be particularly designated, by declaring which is voted for as President, and which as Vice President. [298]

De Witt Clinton, Republican from New York, introduced substantially similar language in the Senate four days later. [299]  Debate  **\*1543**  began first in the House, on October 19, [300]  and lasted for nine days, with the House voting to approve an amendment proposal on October 28. [301]  Meanwhile, Senators began debate on October 24, but kept at it only briefly before various exigencies, including the need to debate the Treaty of Paris with which President Jefferson proposed to purchase the Louisiana territory, [302]  forced delay. The Senate eventually returned to the Amendment on November 23. [303]  After a week of robust and sometimes heated debate, the Senate approved on December 2, 1803 a version different from the House's text in a modest yet, as we shall see, critical way regarding the number of candidates referred to the House in the case of a disputed election. [304]  The House ultimately accepted the Senate's version on December 8. [305]

As the Amendment cycled through Congress, debate narrowed to three major issues. First was the Amendment's leading feature, the designation of ballots for President and Vice-President. [306]  Amendment supporters in fact called the text the "designating" Amendment. [307]  Designation was not a new idea; it had previously enjoyed bipartisan support. [308]  But in the Eighth Congress, the designating principle proved controversial. Once raised, it invited two additional and difficult questions-the proper number of candidates to be referred to the House in the event of a disputed election [309]  and the status of the vice-presidency. [310]  These three issues together formed  **\*1544**  the core of congressional debate. Raised in sequence, each was logically, even inseparably, connected to the other, and by the conclusion of debate in early December, Republicans offered essentially one argument on

APPENDIX - 111

all three subjects: it was the right of popular majorities to choose the President. [311] Listening to their case, the Federalist John Quincy Adams realized that Amendment sponsors wanted to "reform [the Constitution's] federative institutions upon popular principles." [312] He was exactly correct.

1. Debate in the House

The debate began in the House with designation. [313] Dawson's terse initial draft called for ballot designation and nothing more, [314] and Republicans made their case for it first on rather technical grounds. [315] Representative John Clopton, a Republican from Virginia and one of the Amendment's primary supporters, reminded his listeners just how easy it was, in the absence of separate ballots for President and Vice-President, for the electoral college to wind up selecting as President a candidate who was the first choice of practically no one. [316] Clopton posed the hypothetical of an election between four presidential candidates in which the electors split their "first choice" votes between two candidates, while more or less uniformly giving their "second choice" votes to a third and scattering only a handful of votes to the fourth. [317] The result was that the third candidate, whom no elector wanted to be President, became President, and one of the first two candidates became Vice-President instead. [318] A mechanism so liable to malfunction, where malfunction meant failure to reflect voters' specific preferences for President and Vice-President, "cannot be expected," Clopton concluded, to "receive the public confidence." [319]

 *1545 The scenarios only became more complex and troubling when one factored in organized partisan competition for the presidency. The election of 1796 demonstrated that because the second-highest vote recipient automatically became Vice-President, the President and Vice-President might often be aligned with different parties. [320] A hostile and scheming Vice-President, however, might use his constitutional presence in the Senate to build an independent power base, allying with opposition Senators to thwart the President's agenda and create a sort of shadow government. [321] Any attempt to prevent this outcome posed additional problems. Electors who wanted to ensure that both of their party's candidates came to office, and to the specific offices for which the party had chosen them, had limited options. They could give exactly the same number of votes to their presidential and vice-presidential candidates, but that would produce the very deadlock between the top two candidates that sent the election of 1800 to the House of Representatives. [322] Alternatively, electors might toss away a handful of their second-choice votes on a candidate not from their party who had no chance of attaining any office. But this route would only be safe if electors were sure their majority was sufficiently large to prevent the other party from placing their top-finishing candidate into the vice-presidency. [323] For that matter, the majority party had to be careful who they nominated for Vice-President on their own ticket because the minority might cast a number of their second-choice votes for the majority's vice-presidential candidate and thereby make that candidate the President. [324] This last scenario is just what Republicans feared Federalists intended to do in 1804, elevating Aaron Burr over Jefferson. [325]

John Quincy Adams inadvertently summarized the mechanical case for designation when he concluded that "the present mode is too much like choice by lot." [326] One small mistake by one anonymous elector could prevent the public's clear preference for President from  *1546 claiming victory. [327] The only way to make the college accommodate specific voter preferences was to designate the ballots. [328]

Republicans were not content to rest on this argument, however. They pressed forward to link ballot designation with election by popular majority. "For, sir," John Clopton claimed, "in a Government constituted as our Government is ... all the constituted authorities are the agents of the people"-or should be-and that emphatically included the President. [329] It was inexcusable in a government founded on popular rule that the electoral college could not accurately register the people's preferences for President and Vice-President. "[T]he suffrages given for the election of those agents ought ever to be a complete expression of the public will," Clopton said, "and should ... be directed immediately to those persons in whom the Electors intend to place confidence, as their agents, in the particular offices for which the elections are made." [330]

This logic led naturally to the second major issue in debate-the number of candidates to be referred to the House in the event of a disputed election. On October 19, just two days after Dawson introduced his minimalist text, Republicans proposed to reduce the number of candidates referred from five to some smaller contingent. [331] Representative Clay proposed two; [332] the House committee appointed to consider Dawson's resolution suggested three. [333] Here too, the case could be made on mechanical

APPENDIX - 112

grounds. The original Article II provided for five candidates to be referred, but those five were candidates for both President and Vice-President; the original text did not recognize any distinction. [334] If the ballots were to be separated, the logic of Article II suggested only approximately half that number-two or three-should be referred to the House for election specifically as President, and similarly with the candidates for Vice-President. [335]

**\*1547**  But once again the Republicans quickly carried the argument onto populist terrain. They contended that reducing the number of candidates referred to the House was the only way to keep faith with the great original purpose of the Constitution, popular sovereignty. [336]  "[T]he object of the proposed amendment" was the vindication of "a fundamental principle," John Clopton argued. [337]  "It is the primary, essential, and distinguishing attribute of the Government, that the will of the people should be done; and that elections should be according to the will of the people." [338]  This was historical revisionism, but of a revealing kind. In the Republicans' retelling, the electoral college was never meant to insulate presidential election from popular choice, but rather to effectuate the public will. [339]  That meant election by the House, or any entity other than the people, ought to be an anomaly. Republican G.W. Campbell drew the threads of the argument together. [340]  It was "the duty of this House ... to secure to the people the benefits of choosing the President," he said, [341]  which implied "resorting to Legislative interposition only in extraordinary cases." [342]  Furthermore, when legislative intervention was absolutely unavoidable, as in the case of an electoral deadlock, it was essential to constrain the House's discretion as much as possible to the popular will. That is why reducing the number referred to the House was so critical. "[T]hose only should be capable of Legislative election who possessed a strong evidence of enjoying the confidence of the people," Campbell explained. [343]

The import of these linked arguments for designation and referral was not lost on Federalists, who quickly understood that Republicans were arguing for a form of majoritarian election. In what was to become a recurrent theme, Federalists accused the Republicans of seeking to denigrate the role of small states in presidential election and promote capture of the Executive by political factions. [344]  **\*1548**  Both were arguments against majoritarian election. Federalist Gaylord Griswold of New York put the small-state argument succinctly to the House on October 28. [345]  "In no other place than on this floor are the smaller States on an equal footing with the larger States in the choice of the President of the United States," he said. [346]  Separating the presidential and vice-presidential ballots would make referral to the House less common and thus diminish the small states' chances to influence the voting. [347]  Federalists deployed the same logic against reducing the number of referred candidates. [348]

The Federalists' protests on behalf of the small states were perhaps a bit disingenuous, considering so few Federalists hailed from small states themselves. [349]  But Federalists also objected to majoritarian election on a more principled ground that demonstrated they understood the systemic change Republicans hoped to achieve. Federalists argued the Republicans' amendment would politicize presidential election and foster political faction. [350]  "The present mode of bringing forward candidates" for election, Gaylord Griswold told the House, "is the least liable to call forth art, intrigue, and corruption," precisely because the electoral college made political coordination severely difficult. [351]  The Amendment, however, would facilitate organized political competition with all its pathologies. [352]  "[T]he moment the mode pointed out by this resolution is adopted," Griswold warned, "the door for intrigue and corruption is open." [353]  "[T]he power of party, influence of office, art, cunning, intrigue, and corruption" would all be deployed to win the presidency. [354]

This point brought House Federalists to the heart of their case against the Amendment. The majoritarian fevers it would unleash and the political competition it would engender would work together  **\*1549**  to bind the President to the public in a way the original Constitution did not provide, and which it was not built to accommodate. [355]  The effect would be to elevate the presidency above all other offices in the government. "But, sir, I could not then suppose, nor do I yet think," Benjamin Huger summed up for the Federalists, "that the salvation and political happiness of the Republic depends so entirely on the election of any one man as President." [356]  Republicans wanted a representative, political presidency. Federalists were not willing to go along.

With the major purposes of the Amendment now in the open, the House voted on October 28 to adopt the draft by a margin of eighty-eight to thirty-one, but not before Federalists scored a partial victory. [357]  Whether because they found the small-state

APPENDIX - 113

argument troubling or out of concern for the House's institutional prerogatives, a key group of Republicans voted to leave the number of candidates referred to the House in the case of an electoral deadlock at five rather than three. [358]

2. Debate in the Senate

It fell to Republicans in the Senate to reforge the majoritarian link between ballot designation and change in the referral number. Their effort to do so, however, brought the structural implications of the Amendment into sharper focus and prompted perhaps the most insightful argument against the proposed Amendment, one focused on its implications for the vice-presidency.

Debate re-opened in the upper chamber on November 23, 1803, and returned immediately to the referral question. [359] The Republicans were ready. When John Quincy Adams suggested that referring only three candidates to the House would diminish the small states' role, [360] Republican Samuel Smith of Maryland promptly dismissed the argument as a distraction. [361] He contended **1550** that differences between small and large states had not been a point of contention in Congress in the last ten years. [362] Moreover, there was no principled ground on which to support ballot designation but not a reduction in the House's electoral role-at least, not if one accepted that the purpose of ballot designation was to render presidential selection more public and popular. "[T]he principles correspond so exactly as to support and enforce each other," Smith insisted. [363] "It is to place the election in the hands of the people we wish to designate; it is for the same purpose we wish to keep the election out of the House of Representatives." [364] Senate Republicans explicitly and repeatedly drew the connection between reducing the House's role and majoritarian election. "[T]he number three in the amendment ... brought the election two degrees nearer the people," James Jackson asserted. [365] Senator John Taylor claimed that anything more than this number would annihilate "the elective power of the people." [366] But it was William Cocke, Republican of Tennessee, who put the finest point on the argument: the President, he said, should be a "man of the people," and that meant he ought to be chosen by the people and not the legislature. [367]

Having closed ranks on the referral question, Senate Republicans amended the draft on November 29 to refer three candidates to the House rather than five. [368] But their populist-sounding arguments prompted a fresh Federalist rejoinder. In the House, Federalists had pointed out that a more truly majoritarian form of presidential election would entrench political competition for the office, making the presidency political as a result. [369] Senate Federalists now argued that this same majoritarianism would alter the internal structure of the executive branch. Stephen Bradley of Vermont expressed the point most colorfully. Enact this Amendment, he argued, and the "Vice President would be hawked about at market, and given as change for votes for the Presidency." [370] Separating the **1551** ballots for President and Vice-President meant that in the future no Vice-President could again claim what Thomas Jefferson did in 1796-that he had been the choice for President of a very substantial portion of the electorate. Yet without the political cachet that votes for President lent, and with precious few constitutional responsibilities to fall back on, the Vice-President would become a resolutely secondary political figure. [371]

Federalists predicted this would render the executive branch more internally unified even as it fostered the presidency's political character. James Hillhouse of Connecticut developed the argument for the Federalists by way of an alternative history of the vice-presidency's original purpose. In his story, the recent factional competition for the presidency was the same political temptation the Framers constructed their system to guard against. [372] "The First Magistratcy of this nation is an object capable of exciting ambition; and no doubt it would one day or other be sought after by dangerous and enterprising men," Hillhouse said. [373] That is where the vice-presidency came in. "It was to place a check upon this ambition that the Constitution provided for a competitor for the Chief Magistrate." [374] According to Hillhouse, "once or twice there may be such an organization of party as will secure for a conspicuous character the majority of votes." [375] But that contemptible party spirit would not endure. So long as it did, the original electoral college made it likely that "men of each of the parties may hold the two principal offices of the Government" and in this way "be checks upon each other." [376]

Hillhouse's history was fictive. In fact, the Framers never contemplated the political competition for the presidency that erupted in the late 1790s. [377] But this imagined counter-narrative did draw out two important truths. The first was that the original electoral college made the executive branch something less than politically hierarchical because the Vice- President did not necessar- **1552** ily owe his station to the President's good will or to the President's party. [378] The second was that separating the ballots would destroy whatever institutional independence the vice-presidency might claim. Designation would make it very

APPENDIX - 114

unlikely that the President and Vice-President would ever be of different parties going forward and made it certain that the Vice-President would never have been anyone's first choice for President. And all this meant the Vice-President would become clearly the chief executive's political subordinate. In the age of parties and political competition, the executive branch would become unified under the control of a single party and directed entirely by a single executive officer.

Federalists forecast profound consequences. The corollary effect of demoting the Vice-President was to fix the public's eyes, as well as political competition, on the presidency. Do this, Federalists warned, and the presidency would become a populist office. "[B]y the new amendment, it would be every man to his own book," Hillhouse warned, "and every demagogue would be a leader and a champion." [379]  The Republicans, he contended, had been blinded by "idol worship" of the presidency and now would have the citizens believe "there is only one man of correct politics in the United States." [380]  He feared a popularly backed President would come to dominate the entire federal system. [381]  Samuel White, Federalist of Delaware, similarly predicted that the Republican's constitutional renovation would unleash "the licentiousness of democracy" and lead ultimately to a quasi-dictatorship. [382]  "[U]pon this designating plan the public attention will be entirely engrossed in the election of the President, in making one great man," he said. [383]  Uriah Tracy wondered "If the gentlemen wish to shake the Constitution to pieces, if majorities must decide everything, why not go at once to a simple democracy?" [384]

Tellingly, the Republicans made no effort to deny the popularizing tendency of their Amendment. Nor did they deny that the **\*1553**  Amendment would demote the vice-presidency or make the President a political actor. [385]  Instead, they defended the right of the people to control the Executive by public election. The Federalists, Republicans said, were defending rule by the minority. This was the Republicans' closing argument, and with it they indicted not just their party opponents but the original electoral college too. "Is it better that the people-a fair majority of the popular principle-should elect Executive power; or, that a minor faction should be enabled to embarrass and defeat the judgment and will of this majority?" John Taylor asked on the final day of Senate debate. [386]  William Cocke sharpened the refrain: "I say, I do not understand the principle of minorities governing majorities. The law of the minority is not the law of the Constitution, and it is not the law for me." [387]  To Federalist charges that the Amendment would destroy institutional checks within the executive branch or make the President too great a figure, the Republicans responded with more populism. "The great check imposed upon Executive power," John Taylor said, "was a popular mode of election." [388]

This was a different sort of political science than the one the Framers wrote at Philadelphia. The Republicans' President was the choice of the people, the people's representative, and the means by which the people controlled the administration of the laws. He was the creature of political competition and perhaps even the leader of a political faction. In all events, he was a political actor, empowered by the people to act on the political principles he announced to them. For all the Republicans' protests that the designating Amendment worked no great alteration in the Constitution's frame, [389]  constitutional renovation was in fact the point and the result.

The Senate voted to approve the final text of the Amendment on December 2, 1803, by a margin of twenty-two to ten. [390]  It commanded electors to "name in their ballots the person voted for as  **\*1554**  President, and in distinct ballots the person voted for as Vice-President" [391]  and further provided that in the event no candidate received a majority of the votes for President, the House would choose from among the "persons having the highest numbers not exceeding three." [392]  After brief debate, the House followed suit six days later on December 8, 1803, adopting the Senate's version. [393]  Kentucky, Virginia, North Carolina, and Ohio ratified before January. [394]  Maryland followed on January 7 and Pennsylvania on January 9. [395]  After brief but heated debate, Vermont-a small state-ratified on January 30. [396]  New York joined the affirmative tally in February, while New Jersey, Rhode Island, South Carolina, and Georgia approved the Amendment shortly thereafter. [397]  By the time every state legislature had cast its votes, the Amendment received the approval of all but four states-Delaware and three states from Federalist New England: Massachusetts, Connecticut, and New Hampshire. [398]  Secretary of State James Madison proclaimed the text adopted as the Twelfth Amendment to the United States Constitution on September 25, 1804, just in time for the presidential election. [399]

## B. Changing Structure: What the Twelfth Amendment Did

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 117 of 553 PageID #:  522

Constitutional text creates constitutional structure-or changes it, and that is what the Twelfth Amendment did. By changing the mode of executive election, the Amendment facilitated and indeed entrenched organized political competition for the presidency. This constitutional alteration in turn worked at least two additional structural changes: It conferred new warrants for political action on **1555** the President. And it unified the executive branch internally by removing the Vice- President as a possible political rival. To describe these alterations is to describe the rise of the political presidency. Together, the changes, and the presidency they created, amounted to a structural realignment of the federal system.

## 1. Entrenching Political Competition

Before the late 1790s, centrally coordinated, national competition for the executive office was unheard of and largely unimagined. After the Twelfth Amendment, it became commonplace. Directing electors to designate their ballots for President and Vice-President solved the problem of elector coordination posed by the original Article II. With electors casting one vote specifically for a presidential candidate and one for a vice-presidential aspirant, there would be no more guessing as to how many electoral votes a given candidate had at any one time, the question that had so confounded partisans in 1800. [400] Eliminating this information deficit meant parties would now be able to run presidential and vice-presidential candidates effectively on a single ticket. [401] State electors only needed to pledge their support to a given ticket before being selected. Provided they did, the electoral vote could be contested and won with no need for electors to meet in person or confer. [402]

The Amendment did not require pledged electors nor party tickets, but it made these practices effective mechanisms for capturing the presidency and powerfully encouraged parties to organize competition in this way. If the original Article II had made it difficult to win an electoral majority by coordinated campaigning, the Twelfth Amendment made it all but impossible to win without it. [403] Parties began nominating candidate tickets in 1796, when the parties' respective congressional caucuses chose the candidates. That means of selection would last until 1824, to be replaced by nominating conventions, but the institution of the party ticket endured. [404] Meanwhile, the practice of pledged partisan electors **1556** became similarly entrenched. "[T]he people do not elect a person for an elector who, they know, does not intend to vote for a particular person as President," Congressman Samuel Mitchell remarked in 1802. [405] In time, multiple states would require their electors to pledge support to a particular candidate. [406]

The Amendment worked to entrench organized competition in another way. The new text reduced the number of electoral-college ballots cast for President by half and actually made it more likely that the top-finishing candidate would not gain an outright electoral majority unless political parties actively concentrated national support behind two or three leading contenders. [407] The Amendment thus made political parties central to achieving one of its primary objectives, keeping election out of the House of Representatives. [408] As political scientist James Ceaser has observed, "[I]f parties began to disintegrate, the Twelfth Amendment ... provided a powerful new justification for recreating them." [409] This was perhaps an ironic result given that Republicans, for all their enthusiasm regarding political competition, remained ambivalent on the question of political parties as permanent institutions. A good many Republicans hoped the parties would in due course pass away. [410] But the Twelfth Amendment made this most unlikely. Instead, it provided powerful incentives for party organization and made the presidency both the subject and beneficiary of ongoing, organized political competition.

## 2. Warranting Political Action

That competition conferred on the Executive something the office had not enjoyed before: democratic warrants for political action, along with democratic incentives to act. Political competition had a democratizing effect. Whereas only five states chose their electors by popular vote in 1800, over half did by 1816, and all but one by **1557** 1828. [411] Still, even in 1804, the Twelfth Amendment fostered public-oriented political electioneering that linked the presidency to the populace in a way it had not been previously. The shift in presidential behavior that this newfound representative status authorized was observable almost immediately in Jefferson's presidency. To be sure, some of Jefferson's political practices as President predated the adoption of the Twelfth Amendment. Still, it was Jefferson's view of the Executive as a representative office that informed his new praxis, and he and the Republicans would point to the Twelfth Amendment as making their vision constitutional. [412]

Whereas Washington and Adams had studiously avoided overly political statements, especially in their inaugural addresses, [413] Jefferson made them forthrightly, even boldly. [414] He claimed to speak as a political leader. [415] He also claimed to speak as a policy leader. Neither Washington nor Adams used their annual messages to Congress to argue the merits of specific pieces of legislation, and neither attempted to influence directly the deliberations in Congress. [416] Jefferson did both. [417] In fact, Jefferson embraced political leadership of Congress of a kind that only Hamilton had ventured to try; Jefferson, however, did so as President, not as a cabinet secretary. [418] Jefferson began by deputizing a member of the Republican House caucus to act as his spokesman in that body. [419] This floor leader was a "presidential agent[], appointed by the executive, and dismissed at his pleasure." [420] Jefferson routinely communicated his wishes to the caucus, articulated legislative priorities, and suggested draft legislation. [421] His influence was so great that Federalist Timothy Pickering could remark, with only modest overstatement, that Jefferson "secretly dictates every measure which is seriously proposed and supported." [422] His practice **\*1558** would set the pattern for Presidents to come. [423] Future Executives would be more or less aggressive than Jefferson in establishing a policy agenda and advocating its passage, [424] but all would enjoy the democratic authority to do so. [425]

Jefferson also exerted greater control than his predecessors over the executive branch. [426] Washington had filled cabinet seats and other official posts on the basis of competence, character and reputation, [427] but Jefferson expressly included political allegiance as a criterion for appointment and dismissal. [428] Upon assuming office, he set about determinedly changing the complexion of the executive branch from a Federalist to a Republican hue by filling the 316 offices subject to his appointment power with Republican loyalists. [429] When asked to justify his departure from the earlier, non-partisan norm of appointment, Jefferson offered an essentially populist rejoinder. The "public sentiment [had] at length declared itself" in favor of the Republican political program through the medium of presidential election, he said. [430] "Is it political intolerance" for Republicans thus "to claim a proportionate share in the direction of public affairs?" [431] Jefferson portrayed political control of the executive branch as the means by which the people, acting through a political President, implemented the principles they preferred. [432] And once again, the democratic warrant of public approval would make the same arguments available to all future Presidents. Not surprisingly, the vast majority has followed Jefferson's practice. [433]

 **\*1559** If public approval communicated political authority to act, it also imposed political consequences for the actions Presidents took, and this made presidential election a catalytic event. A more public form of election meant that any and all presidential action would now be subject to popular judgment, just as Congress's actions were. But the President's institutional prominence and head of state status made him specially accountable for his performance and for the performance of the federal government as a whole. In the words of political scientist Stephen Skowronek, the presidential office "focuses the eyes and draws out the attachments of the people." [434] The President could be blamed for the operation of the government in a way no individual congressman could, precisely because he appeared responsible in a way no individual congressman did. As the ever-perceptive Alexis de Tocqueville observed, the Executive's "honor, property, liberty, and life stand as constant guarantees to the people that he will make good use of his power." [435] Presidential elections became a referendum on the state of the union.

Jefferson anticipated that the election of the Executive would come to work in just this manner. Presidential terms, he told a correspondent in 1805, were effectively eight years in length, "with a power to remove at the end of the first four" should the people decide, after assessing the President's performance, that he was "doing wrong." [436] Presidential election, in other words, was a form of performance review. In this way, public-style election spurred the President not just to good conduct, but to affirmative action, and not just to execute the policies Congress adopted, but to pursue his own agenda. [437]

3. Unifying the Executive

In addition to conveying new warrants for political leadership, the Amendment granted the President a freer hand in exercising political power by reducing the Vice-President to a decidedly  **\*1560** subordinate status. [438] The institutional consequences were significant. The Executive might well have become politicized, after all, without becoming politically homogeneous. Congress was a political institution, and it was anything but homogeneous: different members elected by different constituencies at different times guaranteed robust political diversity. [439] And although the Constitution vested the executive power in a single President, the document created two elective executive offices. [440] This structure made it entirely possible, as Federalist

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

congressmen in 1803 hoped, that the Vice-President would emerge as a political rival to the chief executive. [441] There is in fact ample precedent for such a development. Nearly every state in the American union operates with a politically heterogeneous executive, [442] as indeed do most other nations that employ a presidentialist system. [443] A politically independent Vice-President was a very real possibility, and might have significantly altered the practice of executive administration. [444]

But even as it politicized the executive branch, the Twelfth Amendment ruled political heterogeneity out. Separating the ballots for President and Vice-President meant that no future Vice-President would ever be able to claim that he was the choice for President of a significant segment of the public. [445] Nor would he ever likely again be the leader of a major political faction outside the President's party. [446] Although in theory electors might vote for a presidential candidate from one party and a vice-presidential candidate from another, the new political realities the Twelfth Amendment helped create made such ticket splitting improbable. [447] Parties placed their candidates before the public (or the state legislature) as pairs. Some states in the early 1800s listed the **\*1561** candidates as a pair on the ballot, as all do today, [448] and electors typically pledged themselves to party tickets. In addition, a party had every incentive to nominate its most attractive and well-known candidate for President rather than for Vice-President. [449] This practice made it unlikely that vice-presidential candidates would be sufficiently popular to win election on their own, without party backing. In turn, it was difficult for vice-presidential candidates to establish a compelling identity apart from the party apparatus. [450]

Louis Clinton Hatch once famously remarked that John Calhoun was "the only American statesman of the first or second rank who held the Vice-Presidency in the century between its occupancy by Jefferson and Roosevelt." [451] That was because the Twelfth Amendment made the vice-presidency a tertiary office, and the President the unrivaled political leader of the executive branch.

* * *

One might legitimately wonder about the counterfactual question: [452] Was the Twelfth Amendment truly necessary to the emergence of the political presidency? Or would this change in the Executive have happened anyway? Well before the adoption of the Twelfth Amendment the presidency was having political effect. Hamilton demonstrated that executive officers could influence the legislature and craft policy, [453] and Washington showed that the President could manage foreign affairs largely on his own. [454] The structure of Article II made these things possible insofar as it uniquely fitted the Executive to receive and exercise power. [455] But these early practices revealed only the political potential of the presidency; they showed that the Executive's actions carried **\*1562** political implications. They did not make the presidency a political office. For that, the Executive required some sort of democratic sanction. And this is what the Twelfth Amendment conferred.

It is entirely possible, of course, that political actors might have found some other way to confer democratic warrant on the presidency apart from the particular changes to presidential election the Twelfth Amendment made. But in any scenario, some reform of the electoral college was essential. If the President was to be connected to the people, and acquire democratic warrants for political action, the non-public election specified by the 1787 Constitution had to change. This is what the Twelfth Amendment did.

None of this is to argue that Twelfth Amendment led ineluctably to what we now call the "modern presidency." The hyperkinetic chief executive familiar to Americans of the twenty-first century is the product of multiple complex and interlocking historical events, of which the Twelfth Amendment is only one. But if the Twelfth Amendment's direct consequences were more limited, they were transformative nonetheless. The Amendment made the President a political actor. It is time to consider what that portends for constitutional law.

## IV. Structural Reasoning About the Executive

Structural changes have interpretive consequences. The Twelfth Amendment changed the available uses of the President's executive power by conferring on the office political authority and altering its relationship to Congress. And this in turn may affect our understanding of executive power. The Twelfth Amendment's renovations carry potential import for a number of separation of powers controversies. Here I focus principally on a paradigmatic one: the President's authority to remove executive

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

branch officers. By constitutionalizing the political presidency, the Twelfth Amendment implies that the President may rightfully claim political control over the executive branch. To exercise political control, he must be able to remove subordinate policy-making officers. This is the argument that can break the removal-debate logjam, and this Part explains it in some detail.

Structural arguments of the kind I make here have recently become controversial. And so I begin with a brief word about what **\*1563** sort of structural reasoning I have in mind, and then offer a brief explanation as to why this type of structural reasoning does not run afoul of John Manning's recent and well-taken critique of purposivist structural interpretation. These necessary clarifications made, I turn to apply structural reasoning to the removal debate.

## A. Brief Defense of Structural Reasoning

Interpretation by structural inference is one of the most venerable methods of constitutional reasoning in American law. [456] Chief Justice John Marshall was its earliest practitioner and perhaps its most skillful. [457] But it was Charles Black who gave the method its modern canonical expression. [458] In distinction from precedent-based reasoning and textual analysis, Black defined structural interpretation as a "method of inference from the structures and relationships created by the constitution in all its parts or in some principal part." [459] The idea was to ask not only what a specific text meant in itself but also what relationship that text bore to other texts, and what relationships those texts together created among the various branches and entities of government. [460]

That last part is central because while it is surely possible to use structural reasoning to analyze the relationship between various clauses in the Constitution in order to fix the meaning of an ambiguous passage, [461] the method's core application involves more. Structural reasoning can and should encompass the relationships between the branches and offices of government that the Constitution creates, as well as those branches' and offices' internal compositions. [462] Put another way, the structure we care about should **\*1564** include not just grammatical structure but political structure too. Charles Black said as much when he famously argued that the Supreme Court ought to have premised its judgment in Carrington v. Rash [463] on a political structure argument that emphasized political supremacy of the federal government over the state governments. [464] Chief Justice Marshall relied on the same logic of political structure to decide McCulloch v. Maryland. [465] And the modern Supreme Court reasoned from political structure to reach the anti-commandeering principle announced in Printz v. United States. [466]

Thus it is quite relevant for the interpretation of the executive Vesting Clause in Article II, Section 1, that the Twelfth Amendment confers on the President a democratic warrant to act politically. This tells us that whatever else it is, the President's "executive power" after 1804 includes a political dimension. That is, the business of administering the laws includes political administration. That fact should weigh heavily when we consider, for example, what the President must be able to do and what sort of control over the executive branch he must be able to exercise in order to "take Care that the Laws be faithfully executed." [467] It is similarly relevant that the Twelfth Amendment empowered the President to act as a policymaker vis-a-vis Congress, and that as it did so, it removed the Vice-President as an internal political rival, making the Executive as a whole politically homogeneous. [468] These facts too tell us something about what "executive power" means. I will have more to say on all of this momentarily, but the point now is that political structure matters. That is my first claim.

My second claim is that reasoning from the political structure created by the Constitution's text does not constitute an objectionable form of generality shifting. John Manning has recently pointed out that some of the Supreme Court's structural reasoning in its **\*1565** federalism and separation of powers jurisprudence looks suspiciously like the sort of purposivism the Court has rejected as a method of statutory interpretation. [469] In the statutory context, the Court has been keen to emphasize in recent years that no law pursues its ends at all costs, and that the specific means of implementation a statute's drafters select must therefore not be gainsaid by reference to broader statutory purpose. [470] Statutory directives represent bargained-for legislative compromises; to trump them by reference to purpose is to shift statutory meaning to a level of generality higher than and different from what the drafters agreed upon. Manning argues persuasively that the Court's process-based critique of generality shifting for statutory interpretation should apply to constitutional interpretation also. [471]

Interpretive inferences based on political structure, however, need not constitute generality shifting of this sort. Indeed, Manning contends that the "most promising[] way to lend determinacy to the Vesting Clauses is to read them in the light of surrounding

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 23

constitutional terms." [472]  I would add that the Article II Vesting Clause should be read in light of not only surrounding terms but also the political structures that those terms, and the Constitution as a whole, create. To make this move from semantic structure to political structure is not to fall back into purposivism. Put another way, to interpret "executive power" by reference to the structural changes the Twelfth Amendment made to the executive branch internally and the new structural relationship it created between that branch and Congress is not to announce an abstract value, like federalism or separation of powers, that stands free of any particular constitutional provision. [473]  Rather, it is to allow the political and  **\*1566**  institutional implications of one very specific constitutional provision, the text of the Twelfth Amendment, to inform the meaning of other specific provisions: the Article II, Section 1 Vesting Clause and the presidential powers enumerated in Sections 2 and 3. [474]  To that task of structural reasoning, I now turn.

## B. Application: The Removal Power

The removal debate is one badly in need of structural argument. After nearly three decades of renewed and impassioned scholarly attention, the debate is deadlocked along now familiar lines. On the one side are advocates of what has been styled the "unitary Executive," who contend that as a matter of original meaning, the Constitution gives "all of the executive power to one, and only one, person: the president of the United States." [475]  These "unitarians," as they are sometimes called, believe the executive power emphatically includes the authority to remove subordinate executive officers, a contention they support by reference to the Constitution's Article II Vesting Clause, [476]  as well as to the historical meaning of executive power and early federal practice. [477]  On the other side stand the skeptics, who argue variously that the Constitution's textual silence as to presidential removal is authoritative; [478]  that the Article II Vesting Clause conveys no substantive authority on the President apart from those powers listed in Sections 2 and 3 (which do not include removal); [479]  that the historical meaning of executive power is indeterminate or contrary to the unitarian position; [480]  that the  **\*1567**  First Congress actually separated substantial portions of the administration from presidential control, [481]  never endorsing presidential removal as a constitutional matter; [482]  and that a bevy of normative considerations counsel against vesting a power to remove in the President. [483]

The stalemate is entrenched, due largely to the profound ambiguity of Article II's text and history. Advocates of presidential removal typically rest their claims on the Vesting Clause, [484]  and they have made a strong case that it does more than merely designate the identity of the actor who will exercise the powers enumerated in Sections 2 and 3, but rather conveys some independent substantive authority to administer the laws. [485]  But "the executive power" mentioned in the Clause is undefined. As a consequence, insisting that the President alone has authority to remove any officer performing executive responsibilities because the Constitution gives all of the executive power to the President does not get one very far. [486]  It only begs the question: what does  **\*1568**  "executive power" include? Some unitarians look to the historical practice of the British Crown for the answer and argue that because the Crown held the authority to remove executive officers at will or, perhaps more precisely, to designate the length and type of tenure during which these officers would hold their posts, [487]  the Article II "executive power" can be assumed to include the same. [488]  Yet as with every argument that looks to English practice as a source of background meaning, this claim presumes that revolutionary-era Americans regarded the English experience as normative. They likely did not-at least, not uniformly. [489]

Alternatively, some advocates of removal have pointed to the decision of the First Congress to include in the bill establishing the Department of Foreign Affairs language acknowledging the right of the President to remove the department's secretary. [490]  This is the so-called Decision of 1789. [491]  But fixing the Decision's meaning is a notoriously complicated endeavor, not least because what is called "the Decision" spans multiple cycles of voting and debate across both Houses. [492]  Even the most spirited proponents of this approach must  **\*1569**  rely on inferences from scattered statements by the key voters and speculation as to those voters' true motives. [493]  In the end, it appears impossible to say with any certainty whether the determinative House members believed the Constitution vested the power of removal in the President. [494]

The removal debate is due for a structural turn. Tellingly, unitarian scholars' most powerful point is less an argument from Article II's text and history than an intuition. The intuition is that if the President is in charge of the executive branch, "[i]t would make little sense to force the President to deal with officers who fundamentally disagree with his administrative or political

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    24

philosophy." [495]  That idea turns on a certain unacknowledged conception of what presidential administration is about. To be specific: The unitarian position assumes presidential administration would be impossible, or nearly so, if the President were not able to maintain political control over the executive branch. Beneath that assumption rests a further one: that what the President does is political, that he is in fact a political actor. As it turns out, the best case for a presidential power of removal comes from the political character the Twelfth Amendment conferred on the presidency.

## 1. The Core Argument

The critical question for determining whether the President has constitutional power to remove executive officials is: What does it mean to administer the laws? This is where the Twelfth Amendment proves enlightening. The structural changes Amendment **\*1570** made supply definition to the task of law administration and by extension, definition to the content of executive power. [496]  Specifically, the Twelfth Amendment tells us that law administration now has political implications, that it is in fact a political task because the presidency is now a political office. [497]  By subjecting the Executive to organized political competition, and by connecting it to popular majorities, [498]  the Twelfth Amendment authorizes presidential administration according to political principles and for the purpose of advancing a political agenda. [499]

The President's post-Twelfth Amendment political role has significant institutional implications. Simply put, in order to impose his political principles on the administration of the laws, the President must be able to control those executive branch subordinates who occupy policy-making positions. Political control is necessary to political administration. If policy-making officials in the executive branch were insulated from the direct management of the President in the vein Alexander Hamilton imagined, for instance with a more or less permanent civil service devising policy and administering the government as figurehead chief executives came and went, [500]  the President would be institutionally unable to conform the enforcement of the law to his political priorities. The President as political administrator thus implies a reasonably close integration of the Executive and the administration.

This integration would be defeated should the President be unable to remove policy-making subordinates who refuse to comply with his wishes. This point is the true, if unacknowledged, heart of Chief Justice Taft's famous defense of presidential removal power in Myers v. United States. [501]  After holding that "[t]he vesting of the executive power in the President was essentially a grant of the power to execute the laws," [502]  Taft went on to note that the President exercises the enforcement authority with the help of numerous subordinates. [503]  The President must be able to control **\*1571** those subordinates in order to control the administration. "[T]o hold otherwise [and permit the Senate a negative on removals] would make it impossible for the President, in case of political or other difference with the Senate or Congress, to take care that the laws be faithfully executed." [504]

Though he barely acknowledged it, Taft's logic turned on the political dimensions of presidential law enforcement. If the President's responsibility were merely to administer laws Congress wrote without regard to political considerations or policy, then there would be nothing untoward in Congress insulating executive officials, including those with appreciable authority like cabinet secretaries, from direct presidential control. [505]  The President's job, after all, would be to administer the policy Congress devised. But Taft's reasoning hinged on the claim that Congress is not the only policymaker in the federal government. "The extent of the political responsibility thrust upon the President" is vast, Taft contended. [506]  And it was the President's right to "determin[e] the national public interest and [to] direct[] the action to be taken by his executive subordinates to protect it." [507]  The President was entitled to make policy judgments of his own, which meant that in cases of political disagreement with the Senate, or Congress more generally, he must be able to pursue his own political principles and not have Congress's forced upon him. [508]  James Madison invoked exactly this logic in 1834 when he defended Andrew Jackson's exercise of the removal power. If the Senate had a share in the power to remove, Madison reasoned, it could "force on the Executive Department a continuance in office, even of Cabinet officers, notwithstanding a change from a personal [and] political harmony with the President, to a state of open hostility towards him." [509]  Taft and Madison's argument **\*1572** assumed the President's political authority without inquiring as to its source. The Twelfth Amendment is that source. [510]

The argument can be extended by reference to changes the Amendment made to the internal composition of the Executive Branch. The text eliminated the Vice-President as an independent political authority and unified the executive department under the political direction of the President. [511]  Permitting Congress to place executive officers outside presidential control would

APPENDIX - 121

reverse this structural change and reintroduce political heterogeneity to the Executive. This political diversification is likely what unitarians have in mind when they argue that denying the President the power to remove would render the Executive less unitary, even though it would still leave the President as the single head of the executive branch. [512] Again, the argument is a structural one about political control and is best made from the Twelfth Amendment.

The Amendment provides at least one other reason to conclude that the President has the constitutional authority to remove policy-making executive officials. By virtue of the changes to presidential election, the presidency is now a representative office, and the President's control over the administration is one powerful means by which the people exert control over their government. [513] This reason is all the more compelling in an age when administration accounts for the vast majority of day-to-day governance. Perhaps not surprisingly, it was the populist Jefferson's central justification for presidential control of subordinate officers. [514] The "will of the nation," he contended, "calls for an administration of government according with the opinions of those elected," and that meant the President needed authority to remove those persons from whom he "could scarcely expect ... a cordial co-operation [sic]." [515]

 **\*1573**  The same point also appeared in Myers, though its true significance was obscured. "The President is a representative of the people," Taft wrote, "just as the members of the Senate and of the House are, and it may be at some times, on some subjects ... [that he] is rather more representative of them all than are the members of either body of the Legislature, whose constituencies are local and not countrywide." [516] Because the President was elected "with the mandate of the people," [517] the power of the President to remove was essential to "the plan of government devised by the framers of the Constitution." [518] Taft was wrong about the Framers-their plan of government did not include a political presidency-but right that presidential removal is, after the Twelfth Amendment, one important way of implementing the people's authority over their government.

The argument I have advanced here is structural: in sum, the political character of the presidency and its policy-making authority in relation to Congress make presidential administration a political undertaking, and the President requires the power of removal to vindicate this structurally conferred political role. [519] Moreover, removal power in the hands of a democratic and representative President is an important means by which "We the People" exercise control over the government. [520] There remains the question of precisely which executive officials the President needs to have power to remove. The argument from political structure suggests the class extends to those officials with significant policy-making authority-cabinet heads, principal deputies, and heads of agencies, at least. I turn now to briefly trace how this model might work in practice.

2. Cases and Controversies

My intention in this Section is to offer a brief overview of how the political structure argument might play out in four of the Supreme Court's seminal removal cases: Myers v. United States,  **\*1574**  Humphrey's Executor v. United States, Bowsher v. Synar, and Morrison v. Olson. In at least one case it suggests a different result; in others it would work a change in the reasoning. I will not attempt to analyze the cases in detail, but only to suggest how the structural argument might affect their resolution.

a. Myers v. United States

Chief Justice Taft, writing for the Court, concluded that the President enjoyed exclusive constitutional authority to remove executive officers of the United States, and that an 1876 act of Congress requiring Senate approval for removal of postmasters was unconstitutional. [521] Taft's voluminous opinion relied heavily on the constitutional judgment he believed the First Congress had reached in the Decision of 1789. [522] Myers also credited Congress's acquiescence to presidential removal for three-quarters of a century (until the Tenure of Office Act of 1867), and the executive branch's consistent claims that the President possessed removal authority. [523] In addition, Myers held, if somewhat obliquely, [524] that "executive power" inherently included the removal power, both by virtue of historical practice-"[i]n the British system, the Crown, which was the executive, had the power of appointment and removal" [525] -and because without the power to remove, the President could not take care that the laws be faithfully executed. [526]

The argument from political structure suggests the Myers conclusion is right, but the reasoning is in need of revision. To the extent Taft's opinion held that the Decision of 1789 represented an authoritative judgment by the First Congress on the

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

removal question, it was likely mistaken. [527]  And even if the claim were  **\*1575**  historically accurate, it is not clear from an originalist perspective why the views of a body of individuals other than the drafters and ratifiers should count as constitutionally authoritative, nor why the acquiescence of subsequent Presidents and Congresses should settle the question-unless of course these actors' views actually comported with the original meaning. [528]  If they did not comport with the original meaning, they would be irrelevant. Alternatively, if they were only one plausible interpretation of a fundamentally ambiguous meaning, they would be not legal interpretations but political constructions, which the judiciary should neither invalidate nor endorse. [529] Myers's reference to English Crown practice was similarly flawed: it is far from clear that the Constitution takes the monarch's prerogatives as a baseline. [530]

When the opinion turns to the President's need to control the administration, Myers moves to firmer ground. [531]  The structural argument would set this point in its proper context. Because the Constitution's structure makes the President a political actor, Myers should have held that his administration of the laws is a political undertaking in the broadest sense. As the people's representative, the President has the right to exercise independent policy judgment in his execution of the law and to administer the government according to his political principles. He cannot realize these rights without exercising control over policy-making subordinates. As to whether the Portland postmaster at issue in Myers counts as a policy-making official, it is sufficient to note that in 1926, the time the case was decided, regional postmasters were important political appointees with significant administrative responsibilities. [532]

This revised reasoning captures Myers's most promising insights about the President's need for political control of his administration and the office's representative character, while grounding those insights firmly in constitutional structure.

**\*1576**  b. Humphrey's Executor

In Humphrey's Executor v. United States, decided just nine years after Myers, the Supreme Court reversed course and held that Congress may limit the President's removal authority over members of independent agencies and other government officials who are not "purely executive." [533]  The question in the case was whether the Federal Trade Commission's ("FTC") founding statute, the Federal Trade Commission Act, prevented the President from removing FTC commissioners for any reason other than "inefficiency, neglect of duty, or malfeasance." [534]  The Court famously reasoned that the Commission was "a body of experts" [535] created by Congress to "carry into effect legislative policies embodied in the statute," [536] that it was "to be non-partisan" [537] and was obliged to "act with entire impartiality," [538] and therefore could not be an executive agency. [539]  Instead, the Court declared the Commission to be "quasi-judicial and quasi-legislative." [540]

The Court's refusal to locate the Commission squarely in any one branch of government has been justly criticized. [541]  The Court's claim that the Commission's expert and nonpartisan character entitled it to insulation from executive control is equally problematic. The structural argument would produce a different outcome. The Commission, as the Court admitted, administered "legislative policies"; [542] more precisely, it conducted investigations, made reports, and generally enforced the government's antitrust law. [543]  These duties made the Commission a policy-making agency, and constitutional structure therefore instructs that its members must  **\*1577**  be subject to presidential control. [544]  This same logic applies to all executive branch agencies, whether designated "independent" or not: If the agency implements policy, the President is entitled to control it through the removal power. [545]  The only executive agencies to which this conclusion would not apply are those that conduct largely judicial functions and are therefore not, strictly speaking, policy-making entities. [546]

c. Bowsher v. Synar

Bowsher v. Synar raised the question of whether Congress could invest the Comptroller General with final authority over the federal budget and simultaneously reserve for itself the power to remove the office's occupant. [547]  The Court answered in the negative based on the constitutional separation of powers doctrine, which it said prevented Congress from seizing the task of law administration. [548]  Stated in this form and at this level of abstraction, the Bowsher judgment comes dangerously close to relying on a separation of powers meta-norm not anchored to any particular text. [549]  Justice White dissented based in part on this ground. [550]

APPENDIX - 123

The structural argument developed here supplies an alternative ground for the decision-namely, that the Gramm-Rudman-Hollings Act attempted to prevent presidential removal of the Comptroller. [551] The Court's findings as to the executive, policy-making nature of the Comptroller's authority were more than enough to sustain the conclusion that the President must be able to direct the Comptroller in order to maintain control of the executive branch. [552] The Court found that the Comptroller General wielded "the ultimate authority **1578** to determine the budget cuts to be made. Indeed, the Comptroller General commands the President himself to carry out, without the slightest variation ... the directive of the Comptroller General as to the budget reductions." [553] Structure tells us that an officer with this authority must come under the direction of the President. On this reasoning, Congress may well have been entitled to retain power to remove the Comptroller for cause-the office was arguably an agent of Congress housed in the legislative branch [554] -so long as it did not deny the President's power to remove the Comptroller at will.

d. Morrison v. Olson

Finally we come to Morrison v. Olson, the Court's most recent removal case and one of its most controversial. [555] Morrison concerned the Watergate-era Ethics in Government Act, which permitted the Attorney General to seek the appointment of an independent counsel to investigate alleged misfeasance by high executive branch officials, including the President. [556] Appointment of the independent counsel was vested in a special three-judge subpanel of the U.S. Court of Appeals for the D.C. Circuit. [557] Removal was entrusted to the Attorney General alone and only for cause. [558] A seven-member majority of the Court concluded, over the lone dissent of Justice Scalia, [559] that the Act was constitutional in these particulars because the independent counsel did not interfere with "the functioning of the Executive Branch." [560] For his part, Justice Scalia contended that prosecution of crimes was the quintessential executive power and was uniformly regarded as such at the time of the founding. [561] Scalia also argued that any derogation of the President's power to remove executive branch officials would **1579** undermine the principle of separated powers, because "all of the executive power" belongs to the President. [562]

Structural reasoning based on the Twelfth Amendment suggests the Court's conclusion was likely correct, though not for the reasons it offered. Consider the Court's logic. The majority rightly acknowledged that "the functions performed by the independent counsel are 'executive' in the sense that they are law enforcement functions that typically have been undertaken by officials within the Executive Branch." [563] The Court concluded that this fact did not settle the matter, however. The majority was right about this because, contrary to the claims of Justice Scalia, [564] it does not appear that criminal prosecution has always been regarded as part and parcel of the executive power. Recent scholarship has cast doubt on Scalia's assertion that the Framers never separated prosecution from presidential control-the earliest U.S. attorneys, for instance, were not under the direct control of the President. [565] This being the case, Scalia's argument that to deny the President removal authority over a federal prosecutor is to divide the executive power [566] only begs the question.

According to the majority, the pertinent query was whether the President's lack of removal control "unduly interfere[ed] with the role of the Executive Branch." [567] The Court apparently derived this test from Nixon v. Administrator of General Services, which held that a statute violates the Vesting Clause if it "disrupts the proper balance between the coordinate branches ... [by] prevent[ing] the Executive Branch from accomplishing its constitutionally assigned functions." [568]

The Court was half right. To the extent the Morrison test valorizes interbranch balance as the sum and substance of the **1580** Constitution's separated powers, [569] it turns down a blind alley. This sort of functionalism pays far too little attention to the divisions between the branches explicitly written in the Constitution and gives far too little credence to the Constitution's command that these divisions remain permanent. [570] Nevertheless, the Court was onto something when it looked to the effect that the removal-insulated independent counsel might have on the President's capacity to execute his assigned constitutional role. As we have seen, structural reasoning tells us that the President's constitutional role is political in the broadest sense and that the President thus requires political control of the executive branch. [571] The question the Court should have asked, therefore, is whether preventing presidential removal of the independent counsel interfered with the President's ability to control his branch politically-that is, his ability to direct policy and conform law administration to his political principles. The Court should have

APPENDIX - 124

asked this question not because the Constitution commands merely functional balance between the branches, but because the Vesting Clause, interpreted in light of constitutional structure, gives the President political control of the administration. [572]

An effects test is necessary in Morrison to vindicate the President's political control of the executive branch, because it is not immediately apparent whether the independent counsel counts as policymaker in the relevant sense. If the independent counsel could be easily classed as a policy-making authority, like the Comptroller General in Bowsher, no inquiry as to effects would be necessary. And of course were Justice Scalia correct that criminal prosecution **\*1581** had always been regarded as an inherent aspect of the executive power, [573] an effects test would be similarly beside the point: the meaning of executive power would not be ambiguous, at least to this case. [574] But in the end, neither the policy-making status of the independent counsel nor the connection between executive power and prosecutorial control is clear. Consequently, the effect of the independent counsel on the President's capacity to exert political control of the executive branch should decide the case.

## C. Other Applications

### 1. The Treaty Power

The Twelfth Amendment bears on other questions of executive power. For example, it helps explain the Supreme Court's frequently repeated but never adequately justified holding that the President has sole authority to conduct treaty negotiations apart from Senate oversight and its related holding that the President may enter into treaty-like executive agreements with no Senate approval at all. [575]

The touchstone for this line of cases is the Court's famous, and famously confused, Depression-era decision, United States v. Curtiss-Wright. In 1934, Congress delegated to President Franklin Roosevelt the authority to prohibit the sale of arms to certain nations in South America. [576] The Court held that this authorization did not constitute an illegal delegation of law-making power because the delegation merely vindicated, rather than augmented, the President's independent power over foreign affairs. [577] "It is important to bear in mind that we are here dealing not alone with an authority vested in the President by an exertion of legislative power," the Court wrote in what is perhaps the decision's key **\*1582** passage, "but with such an authority plus the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations." [578] Elaborating on the point, the Court explained that in the "vast external realm" of foreign affairs, "with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation." [579]

From this premise the Court inferred that the President must have the power to negotiate treaties on his own initiative, without senatorial oversight. [580] For one thing, the President, "not Congress, has the better opportunity of knowing the conditions which prevail in foreign countries," because he enjoyed access to "confidential sources of information" simply not available to the Senate. [581] But the critical point was the President's status as "the sole organ of the nation in its external relations." [582] Given that station, the power to negotiate with foreign powers was the President's by right. [583] Thus, the Court concluded, "[i]nto the field of negotiation the Senate cannot intrude." [584]

The Court used the same logic to infer presidential authority to negotiate binding executive agreements without Senate approval. In United States v. Belmont, the Court ruled that agreements reached between the Roosevelt Administration and the Soviet Union in 1933 as part of the Administration's diplomatic recognition of the Soviet government empowered federal authorities to recover assets from American companies on the Soviet Union's behalf, even though the agreements had never been ratified by, or even submitted to, the Senate. [585] The Court characterized these executive agreements as incidental to the power of diplomatic recognition. [586] And in the move that decided the case, the Court cast the authority to recognize **\*1583** foreign nations as an exclusively presidential prerogative. [587] Recapitulating the reasoning of Curtiss-Wright, the Court in Belmont held that "[g]overnmental power over external affairs is not distributed, but is vested exclusively in the national government. And in respect of what was done here, the Executive had authority to speak as the sole organ of that government." [588] The Court broadened this logic five years later in United States v. Pink, holding that the President's power to negotiate executive

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   29

agreements stemmed not only from his right to confer diplomatic recognition but also from his authority "to determine the public policy of the United States with respect to" foreign nations, a right that was his to exercise "without consent of the Senate." [589]

As a sheer matter of Article II text and history, these conclusions are hardly obvious. Article II, Section 2 grants the President the power, "by and with the Advice and Consent of the Senate, to make Treaties," [590] but says nothing to suggest that the Senate's participation should be confined to a ratifying vote taken only after the substantive work of treaty making has finished. And Article II does not so much as contemplate executive agreements. [591] Tellingly, at the Constitutional Convention it was the Senate, not the President, that held the treaty power until the Committee of Detail proposed to divide the treaty authority between the two branches in the Convention's closing month. [592] Even then, many, and perhaps most, delegates anticipated that the Senate would remain the more important and active partner in treaty negotiations. [593]

How, then, to make sense of the Court's conclusions? One might look to early executive practice, as courts have often done and as Akhil Amar has recently advocated. [594] But that interpretive strategy, if it can truly be called interpretive, is no more persuasive **1584** in this context than on the removal question. And the Court's own attempted explanation in Curtiss-Wright is infamously convoluted. [595] That opinion claimed that the foreign affairs power belonged indivisibly to the President because the power originated not with the States, but rather was an incident of sovereignty, passing "from the Crown ... to the colonies in their collective and corporate capacity" as a result "of the separation from Great Britain." [596] This view of sovereignty has been roundly criticized, but in any event it only begs the question; even if the foreign affairs power was one that by its nature inhered only and ever in the national government, why should the Executive be the sole branch and the President the sole officer capable of its exercise? The Court's better answer has nothing to do with sovereignty, and everything to do with the political representation that follows from the Twelfth Amendment.

At one point in its opinion, the Court in Curtiss-Wright comments that the President is "a representative of the nation." [597] It is a tantalizing reference. In context, the language is largely rhetorical flourish, offered to embellish the Court's repeatedly stated and thoroughly conclusory point that the President is the nation's "sole organ" in foreign affairs. [598] But the Twelfth Amendment suggests that this reference to representation may supply a deeper logic for the Court's conclusions. The President is indeed, after the Twelfth Amendment, the nation's representative. He is connected to popular majorities, and thanks to that connection, authorized to act on behalf of the people. Ultimately, the post-Twelfth Amendment President possesses political authority, which is what the Court was gesturing toward, without ever quite grasping, in Curtiss-Wright.

The Constitution makes the President the head of state, as well as "Commander in Chief." [599] Join those constitutional designations with political authority, and the President acquires a strong claim to act as a policymaker in the realm of foreign affairs. That the President is the one and only head of state strongly suggests that a politically empowered Executive should be the principal **1585** policymaker in foreign matters and that he is uniquely empowered to, in the words of United States v. Pink, "determine the public policy of the United States" concerning foreign nations. [600] Once the President is understood in this light-as the nation's political representative-the rest of the Court's inferences seem far more plausible. If head of state status joined to political authority conveys the power to set the nation's foreign policy, then the authority to make treaties is surely an important implement for carrying that foreign policy-making power into effect. To force the President to submit to Senate oversight of treaty-making, to deny him initiative and discretion, would severely hamper his ability to "determine the public policy of the United States" [601] concerning foreign nations in a way that submitting a finalized treaty for ratification would not. Similarly, if the President is, by virtue of being the people's democratically chosen head of state, the sole representative of the nation to the outside world, then the power to recognize foreign governments would seem to be a uniquely presidential power. The ability to conclude bilateral agreements with other governments or to reach agreements that further America's international public policy follows naturally enough. The President's political status supplies the missing link in the Court's treaty-making cases. And that status is a product of the Twelfth Amendment.

2. Directive Authority over Administrative Agencies

To take a brief, final example, structural reasoning based on the Twelfth Amendment might also have something to say about the President's directive authority over administrative agencies. The Supreme Court's decisions in A.L.A. Schechter Poultry Corp. v. United States and Panama Refining Co. v. Ryan suggested that delegation of rule-making authority directly to the President violates the Constitution's separated powers, [602] while the Court's subsequent decisions indicate that such delegations

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 30

to administrative agencies, however broad, do not. [603] From these decisions, many scholars have concluded that presidential direction of **1586** administrative rule-making is unconstitutional, or at least, highly problematic. [604] The structural argument developed here suggests otherwise. If those agencies are within the executive branch [605] and engaged in policy making, presidential direction of their activity violates no constitutional norm because the President is constitutionally entitled to control the political, policy-making activity of the Executive. Or so one might argue. Whether Congress may delegate administrative authority to particular executive branch officers and prevent the President from controlling their decisions, except by removal, is a separate question, though the structural argument may well have something to say on that point also. [606]

### Conclusion

The American presidency was perhaps the Philadelphia Framers' most original composition. My argument here has been that the Twelfth Amendment fundamentally transformed that office and restructured the constitutional order in the process. I have argued that these structural changes have interpretive consequences. By altering the character of the presidency and its relationship to Congress, the Twelfth Amendment changed the meaning of executive power. After the Amendment, administration of the laws became a political task and the President a political actor. This shift, at once constitutional and political, casts new light on the removal debate, on the treaty-making power, and potentially on a series of other executive power questions. Ultimately, my argument is just this: one cannot understand the constitutional presidency and its powers without reckoning with the Twelfth Amendment.

### Footnotes

[a1]    Associate Professor of Law, University of Missouri School of Law. My thanks to Michael McConnell, John McGinnis, Jack Rakove, Carl Esbeck, Sam Bray, Will Baude, John Inazu, Eugene Volokh, Akhil Amar, and Erin Morrow Hawley for their helpful comments, criticisms, and input at various stages of this project. Thanks also to James Galbraith and Patricia Yang for first-rate research assistance and to Sarah Beason and the editors at the William & Mary Law Review for their excellent work.

[1]    Typical of this view is Steven G. Calabresi, The President, the Supreme Court, and the Founding Fathers: A Reply to Professor Ackerman, 73 U. Chi. L. Rev. 469, 475-76 (2006). Calabresi concludes the Twelfth Amendment "made one small technical change in the Founders' machinery of government" that had little practical effect. See id. On this point at least, Bruce Ackerman and Calabresi agree. See Bruce Ackerman, The Failure of the Founding Fathers: Jefferson, Marshall, and the Rise of Presidential Democracy 247 (2005) (arguing that the Twelfth Amendment "is the very opposite of a serious attempt" to solve the problems posed by the crisis of 1800). Others have called the Twelfth Amendment a "constitutional stupidity." See, e.g., Akhil Reed Amar, An Accident Waiting to Happen, in Constitutional Stupidities, Constitutional Tragedies 15, 15-17 (William N. Eskridge, Jr. & Sanford Levinson eds., 1998); see also Sanford Levinson, Framed: America's Fifty-One Constitutions and the Crisis of Governance 178-90 (2012). When they have bothered to pay attention to the Amendment at all, scholars and commentators have generally neglected to investigate what the Amendment's drafters were attempting to do, thereby missing the Amendment's true significance. See, e.g., David P. Currie, The Constitution in Congress: The Jeffersonians 1801-1829, at 40-41, 64 (2001); Garry Wills, "Negro President": Jefferson and the Slave Power 106-13 (2003)Garry Wills, "Negro President": Jefferson and the Slave Power 106-13 (2003).

[2]    Although there have been over 1,200 articles published in academic legal journals analyzing the electoral college in the context of the disputed 2000 presidential election, Journal and Article Search for Presidential Election, Westlaw Next, http://westlawnext.com (searching for "2000 presidential election" and "electoral college"), only two full-length law review articles have addressed themselves to the Twelfth Amendment. The first is Sanford Levinson & Ernest A. Young, Who's Afraid of the Twelfth Amendment?, 29 Fla. St. U. L. Rev. 925, 925-26 (2001). That article is far more interested in Bush v. Gore than in the Amendment itself, however. See id. at 955-56. More recently, David Fontana has noticed the Twelfth Amendment's significance for the modern separation of powers. See David Fontana, The Second American Revolution in the Separation of Powers, 87 Tex. L. Rev. 1409 (2009). Fontana is principally interested in the political homogeneity the Twelfth Amendment helped introduce to the executive branch, in contrast to the heterogeneity typical in many European governments and other "presidentialist" systems. Id. at 1409-10, 1418. This is an important insight. Fontana does not notice, however, that the political homogeneity the Twelfth Amendment helped produce

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.    31

is in fact only one element of the broader structural transformation the text achieved-namely, the conversion of the presidency into a political office. See *id. at 1429* (explaining that his conclusion focuses solely on the homogeneity of executive power). Nor does Fontana show any interest in the significance of the Amendment for the meaning and practice of executive power. Id. One scholar who has recognized the connection between the Twelfth Amendment and presidential practice is the political scientist Jeremy Bailey. See Jeremy D. Bailey, Thomas Jefferson and Executive Power 195-224 (2007) *Jeremy Bailey. See Jeremy D. Bailey, Thomas Jefferson and Executive Power 195-224 (2007).* But Bailey again misses the structural changes the Twelfth Amendment implemented and its central role in the rise of the political presidency. See id. at 220-24 (explaining his research in terms of the politics of character). The Amendment has received some limited scholarly attention in book form. Tadahisa Kuroda has written an admirable account of the Amendment's ratification. See generally Tadahisa Kuroda, The Origins of the Twelfth Amendment: The Electoral College in the Early Republic, 1787-1804 (1994) (examining the inception and history of the electoral college). Lolabel House made an early effort at exploring the Amendment's constitutional implications, particularly as they concern political parties. See generally Lolabel House, A Study of the Twelfth Amendment of the Constitution of the United States (1901) (unpublished Ph.D. dissertation, University of Pennsylvania) (on file with University of Michigan). More recently, Akhil Amar has recognized that the Twelfth Amendment "worked rather large changes in the basic structure of the American presidency and its relation to other parts of the American constitutional order." Akhil Reed Amar, America's Constitution: A Biography 342 (2005). Amar is mostly interested, however, in the political influence the Amendment conferred on slave states. See id. at 345-47. For his part, Bruce Ackerman understands that the election of 1800 marked a seminal moment in the development of the American presidency, see Ackerman, supra note 1, at 142-62, butgives virtually no attention, and assigns no significance, to the Twelfth Amendment. In short, the Amendment awaits a full-scale analysis of its meaning, its effects, and its radical import.

[3]     U.S. Const. art. II, § 1.

[4]     U.S. Const. art. II, §§ 2-3.

[5]     See, e.g., James Madison, Notes on the Constitutional Convention (June 1, 1787), reprinted in 1 The Records of the Federal Convention of 1787, at 64, 65-67 (Max Farrand ed., 1937).

[6]     See infra Part I.A-B.

[7]     The Federalist No. 10, at 133-34 (James Madison) (Benjamin Fletcher Wright ed., 1961).

[8]     See infra notes 56-61 and accompanying text.

[9]     See 1 The Records of the Federal Convention of 1787, supra note 5, at 64, 65-67.

[10]    I use the male pronoun generically here and elsewhere when referring to the Executive.

[11]    See, e.g., infra notes 152-57 and accompanying text.

[12]    See, e.g., infra notes 152-57 and accompanying text.

[13]    See The Federalist No. 68, supra note 7, at 373-74 (Alexander Hamilton).

[14]    See infra Part IV.C.1.

[15]    See infra Part III.A.2.

[16]    See infra Part III.A.1.

[17]    See infra Part III.B.2.

[18]    U.S. Const. art. II, § 1.

[19]    Sections 2 and 3 confer eight or possibly nine specific powers on the Executive, depending on whether one reads Section 3 's "he shall receive Ambassadors and other public Ministers" as a power or a duty. U.S. Const. art. II, §§ 2-3.

[20]    ▯ Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).

APPENDIX - 128

21    U.S. Const. art. II, § 3.

22    U.S. Const. art. II, § 2, cl. 2.

23    Id.

24    See infra Part IV.B.

25    See infra notes 475-83 and accompanying text.

26    U.S. Const. art. II, § 1.

27    U.S. Const. art. I, § 8, cl. 18.

28    See infra Part IV.

29    See The Federalist No. 10, supra note 7, (James Madison).

30    See infra notes 56-61 and accompanying text.

31    See The Federalist No. 10, supra note 7, (James Madison).

32    See, e.g., infra notes 152-57 and accompanying text.

33    See, e.g., Calabresi, supra note 1, at 479-82.

34    See The Federalist No. 68 (Alexander Hamilton).

35    Lawrence Lessig & Cass R. Sunstein, The President and the Administration, 94 Colum. L. Rev. 1, 38-39 (1994).

36    This is the claim of Akhil Amar in his recent book, America's Unwritten Constitution: The Precedents and Principles We
      Live by (2012). Amar makes this (mistaken) claim the centerpiece of his interpretation of Article II. See id. at 307-32.

37    See The Federalist No. 68, supra note 7, at 373-74 (Alexander Hamilton).

38    Jack N. Rakove, Original Meanings: Politics and Ideas in the Making of the Constitution 55-56 (1996); see also Gordon
      S. Wood, The Creation of the American Republic, 1776-1787, at 471-74 (1969).

39    The Federalist No. 51, supra note 7, at 355 (James Madison).

40    9 James Madison, Vices of the Political System of the United States, in The Papers of James Madison 352-57 (Robert A.
      Rutland et al. eds., 1975); Rakove, supra note 38, at 52-53; M. J. C. Vile, Constitutionalism and the Separation of Powers
      143-145 (1967); Wood, supra note 38, at 194-96.

41    9 Madison, supra note 40, at 354-57.

42    8 James Madison, Memorial and Remonstrance Against Religious Assessments, reprinted in The Papers of James
      Madison, supra note 40, at 295-306.

43    See 9 Madison, supra note 40, at 354-57.

44    See The Federalist No. 10, supra note 7, at 133-34 (James Madison).

45    Id.

46    Id.

47    See, e.g., Rakove, supra note 38, at 46-56; Vile, supra note 40, at 153-54.

48    U.S. Const. art. I, § 2, cl. 1.

APPENDIX - 129

49    Wood, supra note 38, at 499-506.

50    See 1 The Records of the Federal Convention of 1787, supra note 5, at 37; Rakove, supra note 38, at 170-71.

51    See 9 Madison, supra note 40, at 356-57.

52    The Federalist Nos. 10, 51, supra note 7, (James Madison).

53    9 Madison, supra note 40, at 357.

54    See Willmoore Kendall, The Two Majorities, 4 Midwest J. Pol. Sci. 317, 330-31 (1960).

55    See Rakove, supra note 38, at 44-45.

56    9 Madison, supra note 40, at 352.

57    Leonard D. White, The Federalists: A Study in Administrative History 13 (1959).

58    2 1787: Drafting the U.S. Constitution 1226 (Wilbourn E. Benton ed., 1986). The phrase became a favorite of the delegates. See, e.g., id. at 1099 (quoting Edmund Randolph).

59    Id. at 1131.

60    Id.

61    Id. at 1115.

62    See, e.g., Steven G. Calabresi & Christopher S. Yoo, The Unitary Executive: Presidential Power from Washington to Bush 31 (2008).

63    Which is not to say that the Executive was the servant of Congress, per se. The Framers were relatively clear on their desire to give the Executive independence from the legislative branch. See The Federalist No. 71, supra note 7, at 460 (Alexander Hamilton) ("[I]t is certainly desirable that the Executive should be in a situation to dare to act his own opinion with vigor and decision.").

64    9 Madison, supra note 40, at 385.

65    Rakove, supra note 38, at 256-59 (demonstrating the Framers spent little time debating the proper extent of executive power).

66    Ralph Ketcham, Presidents Above Party: The First American Presidency, 1789-1829, at 67 (1984).

67    See 1 The Records of the Federal Convention of 1787, supra note 5, at 68, 80-81.

68    See 2 1787: Drafting the U.S. Constitution, supra note 58, at 1095.

69    See id.

70    The Convention voted for legislative election no fewer than three times. William Riker has carefully tabulated and analyzed every vote on the question, as well as the attendant voting cycles. See William H. Riker, The Heresthetics of Constitution-Making: The Presidency in 1787, with Comments on Determinism and Rational Choice, 78 Am. Pol. Sci. Rev. 1 (1984).

71    See id. at 12-13.

72    See id.

73    See id. at 13-14.

74    See generally id.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

75    See 2 1787: Drafting the U.S. Constitution, supra note 58, at 1110.

76    Id. at 1111.

77    Wilson, Morris, or Carroll, or some combination thereof, moved for popular election on June 2, July 17, and three times on August 24. For an analysis of the votes, see Riker, supra note 70, at 6.

78    Those delegates were Wilson, Morris, Madison, Carroll, Dickinson, Franklin, and possibly King. See id. at 7.

79    Id.

80    2 1787: Drafting the U.S. Constitution, supra note 58, at 1153.

81    Id.

82    James Madison, Notes of the Constitutional Convention (June 1, 1787), reprinted in 2 The Records of the Federal Convention of 1787, supra note 5, at 30.

83    The Federalist No. 68, supra note 7, at 441 (Alexander Hamilton).

84    3 The Founders' Constitution 518 (Phillip B. Kurland & Ralph Lerner eds., 1987).

85    2 1787: Drafting the U.S. Constitution, supra note 58, at 1128.

86    Id.

87    See, e.g., Rakove, supra note 38, at 259-60. Charles Pinckney offered a complementary reason: the national legislature, having written the laws, would know far better than the public what qualities were needed to enforce them. 1 The Records of the Federal Convention of 1787, supra note 5, at 68 ("The National Legislature being most immediately interested in the laws made by themselves, will be most attentive to the choice of a fit man to carry them properly into execution.").

88    2 The Records of the Federal Convention of 1787, supra note 5, at 31; see also 3 The Founders' Constitution, supra note 84, at 518 ("[I]t will be found impracticable to elect [the President] by the immediate suffrages of the people. Difficulties would arise from the extent and population of the states."). In addition, there was the ever-lurking sectional divide. If the people did happen to acquire information enough to form a national majority, southern delegates feared that it would be the majority North against the minority South, on the assumption that northerners would always outnumber the free white voters of the southern slave states.See 2 The Records of the Federal Conventionof 1787, supra note 5, at 57; see also Rakove, supra note 38, at 259.

89    James W. Ceaser, Presidential Selection: Theory and Development 75 (1979).

90    Cf. id.

91    Id.

92    1 The Records ofthe Federal Convention of 1787, supra note5, at 68.

93    2 id. at 29.

94    Riker, supra note 70, at 7-14 (providing an overview of the process by which electoral college selection was chosen by the Convention).

95    2 1787: Drafting the U.S. Constitution, supra note 58, at 1126.

96    See Riker, supra note 70, at 7.

97    See Vile, supranote 40, at155-57; Kendall, supranote 54, at331-32.

98    See Riker, supra note 70, at 3-5.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

99  See id.

100  The roll call votes were 215 and 225. See 2 The Records of the Federal Convention of 1787, supra note 5, at 98, 118.

101  Id. at 401.

102  Roger Sherman, for example, argued that a joint ballot would deprive the "States represented in the Senate of the negative intended them in that house." Id. And this was indeed likely Rutledge's purpose. See Riker, supra note 70, at 12-13.

103  See 2 The Records of the Federal Convention of 1787, supra note 5, at 399 (providing data on who supported and opposed these options in roll call votes 356 and 361); see also Riker, supra note 70, at 12-13.

104  See 2 The Records of the FederalConvention of 1787, supra note 5, at 473.

105  See Shlomo Slonim, The Electoral College at Philadelphia: The Evolution of an Ad Hoc Congress for the Selection of a President, 73 J. Am. Hist. 35, 51 (1986).

106  2 1787: Drafting the U.S. Constitution, supra note 58, at 1166.

107  Id.

108  Id.

109  Id.

110  Id.

111  See id. at 1167-69.

112  See Riker, supra note 70, at 13.

113  See, e.g., 21787: Drafting the U.S. Constitution, supra note 58, at 1166-69; 2 The Records of the Federal Convention of 1787, supra note 5, at 522-24.

114  See 2 The Records of The FederalConvention of 1787, supra note 5, at 527.

115  3 The Founders' Constitution, supra note 84, at 516.

116  Morris defended the college on these terms. See 2 1787: Drafting the U.S. Constitution, supra note 58, at 1167, 1175-76; Riker, supra note 70, at 13.

117  See Ceaser, supra note 89, at 51.

118  U.S. Const. art. II, § 1, amended by U.S. Const. amend. XII.

119  3 The Founders' Constitution, supra note 84, at 518.

120  The Federalist No. 68, supra note 7, at 441 (Alexander Hamilton).

121  Id. at 440 (emphasis added).

122  Id. at 441.

123  Id.

124  2 1787: Drafting the U.S. Constitution, supra note 58, at 1167 (quoting George Mason). Hamilton was of the same view. See id., at 1176; Rakove, supra note 38, at 265-66.

125  See Ceaser, supra note 89, at 51.

APPENDIX - 132

126    U.S. Const. art. II, § 1, amended by U.S. Const. amend XII.

127    See Kuroda, supra note 2, at 23.

128    U.S. Const. art. II, § 1, amended by U.S. Const. amend XII.

129    See Kuroda, supranote 2, at 23; Jack N. Rakove, The Political Presidency: Discovery and Intervention, in The Revolution of 1800: Democracy, Race, and the New Republic 38, 50 (James Horn et al. eds., 2002).

130    Rakove, supra note 38, at 266.

131    Letter from George Washington to Catherine Macaulay Graham (Jan. 9, 1790), in 11 The Writings of George Washington 461 (Worthington Chauncey Ford ed., 1891) (emphasis added).

132    See supra notes 29, 44-55 and accompanying text.

133    See supra notes 30-32, 66-74 and accompanying text.

134    See id.

135    2 1787, Drafting the U.S. Constitution, supra note 58, at 1241. Madison repeated this view during the Virginia ratification debates. See 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 487, 494 (Jonathan Elliott ed., 2d ed. 1861).

136    2 1787: Drafting the U.S. Constitution, supra note 58, at 1268; 2 The Records of the Federal Convention of 1787, supra note 5, at 541.

137    2 The Documentary History and the Ratification of the Constitution: Ratification of the Constitution by the States, Pennsylvania 452 (John P. Kaminski & Gaspare J. Saladino eds., 2001); see also Martin S. Flaherty, The Most Dangerous Branch, 105 Yale L.J. 1725, 1805 (1996).

138    2 1787, Drafting the U.S. Constitution, supra note 58, at 1262-63(quoting James Wilson); see also Ceaser, supra note 89, at 50 ("The presidency,they thought, could be so constituted as to reach beyond the partial and selfish interests of any group within society and consult the public interest as a whole.").

139    Patrick Henry, Speeches of Patrick Henry in the Virginia Ratifying Convention, June 9, 1788, in 5 The Complete Anti-Federalist 207, 230 para. 5.16.11 (Herbert J. Storing ed., 1981).

140    3 The Founders' Constitution, supra note 84, at 513.

141    Observations Leading to a Fair Examination of the System of Government Proposed by the Late Convention; and to Several Essential and Necessary Alterations in It. In a Number of Letters from Federal Farmer to the Republican, 1787, in 2 The Complete Anti-Federalistsupra note 139, at 214, 237para. 2.8.29 (Herbert J. Storing ed., 1981) (emphasis added).

142    Id.

143    Letters of Centinel, (Oct. 1787), in 2 The Complete Anti-Federalist, supra note 139, at 142 para. 2.7.23 (emphasis added).

144    Id.

145    See Rakove, supra note 38, at 268-79.

146    Ketcham, supra note 66, at 82. Or as Jack Rakove has put it, "The experience and vocabulary of republican politics simply proved inadequate for conceiving the political dimensions of the presidency, and as a result the ratification debates had strikingly little to say about this novel institution." Rakove, supra note 129, at 39.

147    For instance, he proposed a President for life at the Convention. See 1 The Records of the Federal Convention of 1787, supra note 5, at 292.

APPENDIX - 133

148  "Energy in the Executive is a leading character in the definition of good government." The Federalist No. 70, supra note 7, at 451 (Alexander Hamilton); see also The Federalist No. 71, supra note 7, at 460 (Alexander Hamilton) ("[I]t is certainly desirable that the Executive should be in a situation to dare to act his own opinion with vigor and decision.").

149  The Federalist No. 68, supra note 7, at 443 (Alexander Hamilton).

150  See id. at 440-44.

151  See supra notes 131-38 and accompanying text.

152  The Federalist No. 68, supra note 7, at 443 (Alexander Hamilton).

153  See Jeremy D. Bailey, The New Unitary Executive and Democratic Theory: The Problem of Alexander Hamilton, 102 Am. Pol. Sci. Rev. 453, 459-61 (2008) (discussing Hamilton's view of presidential removal powers).

154  See id.

155  See id.

156  Forrest McDonald, Alexander Hamilton: A Biography 131 (1979); Bailey, supra note 153, at 460.

157  But see Steven G. Calabresi, Some Normative Arguments for the Unitary Executive, 48 Ark. L. Rev. 23, 38 (1994).

158  See supra notes 52-55 and accompanying text.

159  See supra notes 55-61 and accompanying text.

160  See supra notes 66-79 and accompanying text.

161  See supra note 66-79 and accompanying text.

162  John Yoo, The Powers of War and Peace: The Constitution and Foreign Affairs After 9/11, at 71, 96 (2005).

163  U.S. Const. art. II, § 1, cl.1.

164  See Yoo, supra note 162, at 18-19.

165  Calabresi, supra note 1, at479; see also Calabresi & Yoo, supranote 62, at 34-38.

166  See Calabresi & Yoo, supra note 62, at 4-9; see also Steven G. Calabresi, The Vesting Clauses as Power Grants, 88 Nw. U. L. Rev. 1377, 1388 (1994); Steven G. Calabresi & Saikrishna B. Prakash, The President's Power to Execute the Laws, 104 Yale L.J. 541, 570-81 (1994); Steven G. Calabresi & Kevin H. Rhodes, The Structural Constitution: Unitary Executive, Plural Judiciary, 105 Harv. L. Rev. 1153, 1178-79, 1182 n.145 (1992).

167  See Lawrence Lessig & Cass R. Sunstein, The President and the Administration, 94 Colum. L. Rev. 1, 39-41 (1994).

168  Id.

169  See id. at 42.

170  See Calabresi & Rhodes, supra note 166, at 1173.

171  Amar, supra note 2, at 313-14.

172  Id.

173  See Letter from Pierce Butler to Weedon Butler (May 5, 1788), in 3 The Records of the Federal Convention of 1787, supra note 5, at 302.

174  Rakove, supra note 38, at 244.

APPENDIX - 134

175    See supra notes 65-79 and accompanying text.

176    See The Federalist No. 49, supra note 7, at 349 (James Madison).

177    See infra Part II.A.1.

178    See infra Part II.A.1.

179    See infra Part II.A.1.

180    See infra Part II.A.1.

181    See infra Part II.A.1.

182    See supra notes 65-79 and accompanying text.

183    See infra Part II.A.2.

184    See infra Part II.A.2.

185    See Sean Wilentz, The Rise of American Democracy: Jefferson to Lincoln 43-44 (2005).

186    See id. at 44.

187    See Stanley Elkins & Eric McKitrick, The Age of Federalism 92-194 (1993); Wilentz, supra note 185, at 44.

188    See Wilentz, supra note 185, at 45.

189    See id.

190    See id. at 48.

191    See id. at 47.

192    Id.

193    See id. at 53.

194    Cf. id. at 47.

195    See supra Part I.A.

196    See Ralph Volney Harlow, The History of Legislative Methods in the Period Before 1825, at 141-43 (1917); White, supra note 57, at 56.

197    U.S. Const. art. II, § 2, cl. 2.

198    U.S. Const. art. I, § 7, cl. 2.

199    U.S. Const. art. I, § 8, cl. 11.

200    U.S. Const. art. I, § 8, cl. 12.

201    U.S. Const. art. I, § 8, cl. 14.

202    U.S. Const. art. I, § 8, cl. 15.

203    U.S. Const. art. I, § 8, cl. 16.

204    U.S. Const. art. II, § 2, cl 1.

APPENDIX - 135

205    U.S. Const. art. II, § 3.

206    Justice Jackson made this point in ▢ Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).

207    See Charles L. Black, Jr., The Working Balance of the American Political Departments, 1 Hastings Const. L.Q. 13, 17 (1974).

208    See generally The Federalist No. 70, supra note 7, (Alexander Hamilton).

209    Executive councils were a familiar feature in the states, see Rakove, supra note 38, at 269, and the working draft of what became Article II contained one until early September, when it was eliminated in committee, see 2 The Records of the Federal Convention of 1787, supra note 5, at 541-42.

210    See 21787: Drafting the U.S. Constitution, supra note 58, at 1226 (quoting James Wilson); see also id. at 1099 (quoting Edmund Randolph); The Federalist No. 70 (Alexander Hamilton).

211    U.S. Const. art. II, § 2, cl. 1.

212    See Black, supra note 207, at 16-17.

213    See id.

214    See Kendall, supra note 54, at 330-31.

215    These structural features have been thoroughly analyzed in the political science literature. See, e.g., Raymond Tatalovich & Thomas S. Engeman, The Presidency and Political Science: Two Hundred Years of Constitutional Debate 199-201 (2003).

216    See White, supra note 57, at 56.

217    See id.

218    See id.

219    See id.

220    See id. at 57.

221    Id. at 58.

222    Harlow, supra note 196, at 141.

223    See David P. Currie, The Constitution in Congress: The First Congress and the Structure of Government, 1789-1791, 2 U. Chi. L. Sch. Roundtable 161, 190 & n.196 (1995).

224    See, e.g., White, supra note 57, at 58 (describing Hamilton's role as an executive representative in Congress).

225    See Ketcham, supra note 66, at 72.

226    White, supra note 57, at 54-55, 65. There are a few exceptions to Washington's apolitical stance, but their rarity proves the rule. See id. at 57.

227    Bailey, supra note 2, at 136 (citing Fragments of a Draft of the First Inaugural Address, in George Washington Writings 702-16 (John Rhodehannel ed., 1997)).

228    Currie, supra note 223, at 188.

229    See White, supra note 57, at 54-58.

APPENDIX - 136

230  George C. Edwards III, On Deaf Ears: The Limits of the Bully Pulpit 115 (2003); see also Ketcham, supra note 66, at 89-93.

231  See Edwards, supra note 230,at 115; White, supranote 57, at 54-58.

232  See, e.g., Ketcham, supra note 66, at 91-92.

233  See White, supra note 57, at 69-70.

234  See id. at 69-72.

235  Id. at 73-74.

236  Leonard D. White, The Jeffersonians: A Study in Administrative History 1801-1829, at 46 (1959).

237  Id.

238  Id. at 46-47.

239  After all, Madison was more responsible than anyone for the final shape of the Constitution. See Rakove, supra note 38, at 35-56.

240  See Wilentz, supra note 185, at 48.

241  See Rakove, supra note 129, at 45.

242  See id.

243  See id. at 50-53.

244  See Bailey, supra note 2, at 132-33.

245  Ceaser, supra note 89, at 51.

246  Id.

247  U.S. Const. art. II, § 1, cl. 3, amended by U.S. Const. amend. XII; see Kuroda, supra note 2, at 83-98.

248  Kuroda, supra note 2, at 94-95.

249  Id.

250  See id. at 83.

251  Id. at 93-94.

252  Id. at 88.

253  See, e.g., Rakove, supra note 129, at 50-52.

254  Kuroda, supra note 2, at 87; White, supra note 236, at 53.

255  See,e.g., Kuroda, supra note 2, at87; White, supra note 236, at53.

256  Kuroda, supra note 2, at 87.

257  Id. at 102.

258  Id. at 99.

259  Ackerman, supra note 1, at 55.

APPENDIX - 137

260    Id. The official counting of those electoral votes in the U.S. Senate was controversial in and of itself-Georgia's four electoral votes were not originally included due to irregularities. See id. at 55-74.

261    See id. at 55.

262    Kuroda, supra note2, at 100; seealso Ackerman, supra note1, at 59.

263    James E. Lewis, Jr., "What Is to Become of Our Government?": The Revolutionary Potential of the Election of 1800, in The Revolution of 1800: Democracy, Race, and the New Republic, supra note 129, at 3, 9-10.

264    James Roger Sharp, American Politics in The Early Republic: The New Nation in Crisis 268 (1993).

265    Id. at 268-69.

266    Id.; see also Michael A. Bellesiles, "The Soil Will Be Soaked with Blood": Taking the Revolution of 1800 Seriously, in The Revolution of 1800: Democracy, Race, and the New Republic, supra note 129, at 59, 72.

267    U.S. Const. art. II, § 1, cl.3, amended by U.S. Const. amend. XII.

268    See Rakove, supra note 129, at 30.

269    See Joanne B. Freeman, Corruption and Compromise in the Election of 1800, in The Revolution of 1800: Democracy, Race, and the New Republic, supranote 129, at 87, 105.

270    See, e.g., Ackerman, supra note 1, at 88; see generally Lewis, supra note 263, at 13-21.

271    See Wilentz, supra note 185, at 93-94.

272    Kuroda, supra note 2, at 105.

273    See Bailey, supra note 153, at 464.

274    Kuroda, supra note 2, at149 (describing the Republican party's motivation for creating the Twelfth Amendment).

275    See 33 The Papers of Thomas Jefferson 148-52 (Barbara B. Oberg et al. eds., 2006).

276    Id. at 150-51.

277    Id. at 134 (quoting Margaret Bayard Smith in a newspaper report).

278    Id. at 148.

279    Bailey, supra note 2, at 140-45.

280    See 33 The Papers of Thomas Jefferson, supra note 275, at 150.

281    Id. at 150-51. Jefferson's points effectively repudiated the Alien and Sedition Acts and Hamilton's pro-debt and pro-manufacturing agenda, even as he praised state governments and called for a return to an agricultural economy. See Bailey, supra note 2, at 144-45.

282    Bailey, supra note 2, at 149 (quoting Alexander Baring); see also id. at 144-45; 33 The Papers of Thomas Jefferson, supra note 275, at 151 (referring to points ten, thirteen, and fourteeen).

283    Bailey, supra note 153, at 464.

284    Id. at 143-45.

285    See 33 The Papers of Thomas Jefferson, supra note 275, at 151 (emphasis added).

286    Id. at 151-52.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.     42

287    Id. at 152.

288    The Federalist No. 68, supra note 7, at 441 (Alexander Hamilton).

289    SeeKuroda, supra note 2, at 100; Lewis, supra note 263, at 15-16.

290    Ackerman, supra note 1, at 245.

291    See 33 The Papers of Thomas Jefferson, supra note 275, at 150.

292    See Ackerman, supra note 1, at 256.

293    See Bailey, supra note 153, at 464.

294    U.S. Const. art. II, § 1, cl. 3, amended by U.S. Const. amend. XII.

295    See Rakove, supra note 129, at 31.

296    See U.S. Const. amend. XII.

297    Ackerman, supra note 1, at 247.

298    13 Annals of Cong. 372 (1803).

299    Id. at 16-17.

300    Id. at 374.

301    Id. at 515-44.

302    Id. at 21-31.

303    Id. at 80-81.

304    Kuroda, supra note 2, at 140-42.

305    13 Annals of Cong. 699-776 (1803); Kuroda, supra note 2, at 147-48.

306    See Kuroda, supra note 2, at 131.

307    13 Annals of Cong. 16 (1803) (statement of Rep. Clinton); see also Kuroda, supra note 2, at 127-31.

308    Federalist congressmen proposed a designating amendment in 1798. Alexander Hamilton had been a supporter and remained one after the 1800 election. In 1802, he helped convince the New York legislature to adopt a resolution endorsing designation, along with selection of electors by popular voting in congressional districts, which was the method he had favored at the Philadelphia Convention. See Alexander Hamilton, Draft of a Resolution for the Legislature of New York for the Amendment of the Constitution of the United States, January 29, 1802, in 25 The Papers of Alexander Hamilton 512-13 (Harold C. Syrett ed., 1977); see also Kuroda, supra note 2, at 119.

309    See Kuroda, supra note 2, at 136.

310    See id. at 131.

311    See id. at 142.

312    13 Annals of Cong. 119 (1803).

313    See id. at 490.

314    See id. at 372.

APPENDIX - 139

315   See id. at 490-95.

316   See id. at 490-92.

317   Id.

318   Id. at 491.

319   Id. at 492.

320   See Bailey, supra note 2, at 197-98.

321   See id. at 199.

322   See id. at 198.

323   See id. at 199.

324   See id.

325   See id. at 199-200; Kuroda, supra note 2, at 163.

326   13 Annals of Cong. 131 (1803).

327   See id.

328   See id. at 131-32.

329   Id. at 490 (emphasis added).

330   Id.

331   See Bailey, supra note 2, at 203.

332   13 Annals of Cong. 420-21 (1803).

333   See id. at 422; Kuroda, supra note 2, at 128-30.

334   U.S. Const. art. II, § 1, amended by U.S. Const. amend. XII.

335   See 13 Annals of Cong. 421-22; Kuroda, supra note 2, at 130-31.

336   See 13 Annals of Cong. 423 (1805).

337   Id.

338   Id.

339   See id.

340   See id. at 421.

341   Id. (emphasis added).

342   Id.

343   Id.

344   See id. at 517.

345   See id. at 516-17.

APPENDIX - 140

346    Id.

347    See id.

348    See, e.g., id. at 520-27.

349    See Kuroda, supra note 2, at 110, 130-31.

350    See 13 Annals of Cong. 518 (1803).

351    Id. at 516, 518.

352    See id. at 518.

353    Id. at 516, 518.

354    Id. (statement of Rep. Griswold).

355    See id. at 533.

356    Id. at 518, 533.

357    See Kuroda, supra note 2, at 131.

358    See Bailey, supra note 2, at 205;Kuroda, supra note 2, at 129-31.

359    See Kuroda, supra note 2, at 136.

360    13 Annals of Cong. 87 (1803).

361    See id. at 87-88.

362    See id.

363    Id. at 122.

364    Id.

365    Id. at 112, 114.

366    Id. at 114-15.

367    Id. at 112.

368    See id. at 124. Debate on this point was quite thorough. See id. at 108-24.

369    See id. at 531-33.

370    Id. at 91; see also id. at 94.

371    See id. at 89-90.

372    See id.

373    Id. at 89.

374    Id.

375    Id. at 90.

376    Id.

APPENDIX - 141

377    See Ceaser, supra note 89, at 88; Rakove, supra note 129, at 39-40.

378    See Fontana, supra note 2, at 1422-23.

379    13 Annals of Cong. 129 (1803).

380    Id. at 190.

381    See id.

382    Id. at 139, 151.

383    Id. at 144.

384    Id. at 206.

385    Though they did resist a Federalist proposal, made for strategic effect, to eliminate the vice-presidency altogether. See Kuroda, supra note 2, at 134.

386    13 Annals of Cong. 180, 183 (1803).

387    Id. at 151-52.

388    Id. at 180, 183.

389    See, e.g., id. at 422-23 (statement of Rep. John Clopton).

390    Kuroda, supra note 2, at 142-43.

391    U.S. Const. amend. XII.

392    Id.

393    See Kuroda, supra note 2, at 148, 151. In this final version, vice-presidential election shifted to the Senate. See id. at 146, 148-49.

394    Id. at 156.

395    Id. at 156-57.

396    Id. at 158-59.

397    Id. at 159-60.

398    See House, supra note 2, at 58, 60-61. In New Hampshire, the legislature actually supported the Amendment. But the New Hampshire governor claimed to have a say in the state's decision and vetoed the Amendment. The legislature protested, but lacked the votes to overturn a veto. New Hampshire was thus considered not to have ratified. See id. at 60-61.

399    Id. at 61.

400    See supra Part III.A.

401    See supra Part III.

402    See Bailey, supra note 2, at 221.

403    Ceaser, supra note 89, at 105.

404    Id. at 121-27.

APPENDIX - 142

405     11 Annals of Cong. 1289-90 (1802).

406     Akhil Reed Amar & Vik Amar, *President Quayle?, 78 Va. L. Rev. 913, 925 n.47 (1992).*

407     Ceaser, supra note 89, at 105.

408     Id.

409     Id. at 106.

410     Id. at 105-06, 124-27; Wilentz, supra note 185, at 50.

411     Ceaser, supra note 89, at 20, 103 n.22.

412     Bailey, supra note 2, at 201-11.

413     See First Presidential Messages 19-29 (George N. Otey ed., 2009).

414     Bailey, supra note 2, at 213-15.

415     Id.

416     White, supra note 57, at 59.

417     White, supra note 236, at 32.

418     Id. at 551.

419     Id. at 48-51.

420     Harlow, supra note 196, at 177.

421     White, supra note 236, at 49-53.

422     Id. at 35. Buttressing Pickering's view, historian Sean Wilentz has concluded that "until the abandonment of the embargo in 1809, not a single important pieceof Jeffersonian legislation failed to pass Congress." Wilentz, supra note 185, at 137.

423     See, e.g., White, supra note 236, at 51-52.

424     Id. at 39.

425     Stephen Skowronek, The Politics Presidents Make 17-32 (1993).

426     White, supra note 236, at 551.

427     White, supra note57, at 257-59. This was a prescription Adams followed in principle, if not always in practice. Id. at 267-68, 277-80.

428     Bailey, supra note 2, at 155, 158.

429     Skowronek, supra note 425, at 72.

430     Letter from Thomas Jefferson to Elias Shipman and Others (July 12, 1801), in 9 The Works of Thomas Jefferson 272 (Paul Leicester Ford ed., 1905).

431     Id. (emphasis omitted).

432     Bailey, supra note 2, at 158-60.

433     Skowronek, supra note 425, at 17-32.

APPENDIX - 143

434    Id. at 20.

435    Alexis de Tocqueville, Democracy in America 136 (Arthur Goldhammer trans., Penguin 2004) (1835).

436    Letter from Thomas Jefferson to John Taylor (Jan. 6, 1805), in 10 The Works of Thomas Jefferson 125, supra note 430.

437    See Skowronek, supra note 425, at 26, 37, 41, 49.

438    See supra notes 370-85 and accompanying text.

439    U.S. Const. art. I, §§ 2, 3.

440    U.S. Const. art. II, §§ 1, 3.

441    13 Annals of Cong. 89-90 (1803) (statement of Sen. James Hillhouse).

442    Christopher R. Berry & Jacob E. Gersen, The Unbundled Executive, 75 U. Chi. L. Rev. 1385, 1399-1401 (2008); Fontana, supra note 2, at 1417-18.

443    See Fontana, supra note 2, at 1417-19.

444    Id. at 1423-25.

445    See Amar, supra note 1, at 168.

446    See Amar & Amar, supra note 406, at 923-24 (describing the development of the single party ticket for President and Vice-President).

447    Though a few electors ticket split through the early 1800s. See id. at 922-23.

448    Id. at 942-43 & n.85.

449    Fontana, supra note 2, at 1428-29.

450    Id. at 1428.

451    Louis Clinton Hatch, A History of the Vice-Presidency of the United States 71 (Earl L. Shoup ed., 1934).

452    See generally Niall Ferguson, Virtual History: Towards a "Chaotic" Theory of the Past, in Virtual History: Alternatives and Counterfactuals 1, 1-90 (Niall Ferguson ed., 1997) (describing "counterfactual" history).

453    See supra Part III.A.

454    See supra notes 171-75 and accompanying text.

455    See Black, supra note 207, at 17; see also discussion supra Part III.A.

456    John F. Manning, Clear Statement Rules and the Constitution, 110 Colum. L. Rev. 399, 440-43 (2010).

457    Id. at 441 n.206.

458    John Harrison, Review of Structure and Relationship in Constitutional Law, 89 Va. L. Rev. 1779, 1779-80 (2003) (reviewing Charles L. Black, Jr., Structure and Relationship in Constitutional Law (1969)).

459    Black, supra note 458, at 7.

460    Black, supra note 207, at 16-17.

461    Manning, supra note 456, at 439-40; see also Akhil Reed Amar, Intratextualism, 112 Harv. L. Rev. 747, 791-95 (1999).

APPENDIX - 144

462   See Amar, supra note 461, at 790 ("[T]he most typical forms of structural argument focus not on the words of the Constitution, but rather on the institutional arrangements implied or summoned into existence by the document-the relationship between the Presidency and the Congress, or the balance between the House and the Senate.").

463   The main issue of the case was whether Texas could forbid active-duty members of the U.S. military from establishing residency to vote in the state. 380 U.S. 89, 89-90 (1965).

464   See Black, supra note 458, at 8, 11-12.

465   17 U.S. (4 Wheaton) 316, 428 (1819); see Black, supra note 458, at 13-15; see also Amar, supra note 2, at 22-23.

466   521 U.S. 898, 918-20 (1997). I am indebted to Justice Scalia for this point.

467   U.S. Const. art. II, § 3.

468   See supra Part III.

469   See Manning, supra note456, at 440-43; John F. Manning, Federalism and the Generality Problem in Constitutional Interpretation, 122 Harv. L. Rev. 2003, 2004-08 (2009) [hereinafter Manning, Federalism and the Generality Problem]; John F. Manning, Separation of Powers as Ordinary Interpretation, 124 Harv. L. Rev. 1939, 1942-46 (2011) [hereinafter Manning, Separation of Powers as Ordinary Interpretation].

470   See, e.g., MCI Telecomms. Corp. v. AT&T Corp., 512 U.S. 218, 231 n.4 (1994) ("[The Court is] bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes"); Bd. of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp., 474 U.S. 361, 374 (1986) (same).

471   See, e.g., Manning, Federalism and the Generality Problem, supra note 469, at 2004-06; Manning, Separation of Powers as OrdinaryInterpretation, supra note 469, at 1946-49.

472   Manning, Separation of Powers as Ordinary Interpretation, supra note 469, at 2034.

473   Manning, supra note 456, at 440.

474   See Printz v. United States, 521 U.S. 898, 918-22 (1997) (stating that the Commerce Clause cannot be interpreted to permit the federal government to commandeer state officials to implement its directives because to do so would upset the structural division between federal and state sovereigns).

475   See Calabresi & Yoo, supra note 62, at 3.

476   U.S. Const. art. II § 1.

477   See, e.g., Calabresi & Yoo, supra note 62, at4-9; see also Charles Fried, Order and Law: Arguing the Reagan Revolution, 154-160 (1991); Calabresi & Prakash, supra note 166, at 599; Calabresi & Rhodes, supra note 166, at1161; Currie, supra note 223, at 195-202.

478   A. Michael Froomkin, The Imperial Presidency's New Vestments, 88 Nw. U. L. Rev. 1346, 1373 (1994).

479   Flaherty, supranote 137, at1789; Froomkin, supranote 478, at1365.

480   Flaherty, supra note 137, at 1790; Lessig & Sunstein, supra note167, at 12; Stephen Skowronek, The Conservative Insurgency and Presidential Power: A Developmental Perspective on the Unitary Executive, 122 Harv. L. Rev. 2070, 2078 (2009).

481   Lessig & Sunstein, supra note 167, at 30-33.

APPENDIX - 145

482    Edward S. Corwin, Tenure of Office and the Removal Power Under the Constitution, 27 Colum. L. Rev. 353, 360-63 (1927).

483    See Flaherty, supra note137, at 1740; Froomkin, supra note478, at 1374.

484    See, e.g., Calabresi & Prakash, supra note 166, at 570-81. The Supreme Court and various scholars have named other textual candidates. In the seminal Myers v. United States, Chief Justice William Howard Taft suggested the President's authority to remove executive subordinates was founded on his obligation to "take Care the Laws be faithfully executed."

    272 U.S. 52, 122 (1926). In 1789, James Madison argued that the power to remove was concomitant with the power to appoint, which Article II conferred on the President. See 11 Debates in the House of Representatives 868 (Charlene Bangs Bickford et al. eds., 1992). But neither of these is particularly plausible as a source of removal authority. The Faithful Execution Clause imposes a duty, rather than conferring power. See Saikrishna Prakash, Removal and Tenure in Office, 92 Va. L. Rev. 1779, 1836-37 (2006). And our Constitution clearly does not make the power to remove incident to the power to appoint. Id. at 1834. As Prakash points out, "numerous entities select various federal officials, with apparently few supposing that the selectors may remove the selected." Id. For instance, the Electoral College voters may not remove a President; "the people of a congressional district may not recall their representative"; and governors who can "appoint" replacement Senators under Article I, Section 3 have no power to remove them. Id. Prakash also persuasively shows that the appointment-based removal argument relies on assumptions about agency relationships between the President and other officials not warranted in the federal system. Id. at 1834-37.

485    See Calabresi, supra note 166, at 1388; Calabresi & Prakash, supra note 166, at 570-81(1994); Calabresi & Rhodes, supranote 166, at 1178.For the contrary view, see Curtis A. Bradley & Martin S. Flaherty, Executive Power Essentialism and Foreign Affairs, 102 Mich. L. Rev. 545, 551 (2004); Froomkin, supra note 478, at 1363.

486    Calabresi & Prakash, supra note 166, at 595-96. Calabresi and Prakash do not rest on this assertion, but go on to develop an account of executive power and presidential responsibility based on text and history. Id. at 596-97.

487    See Prakash, supra note 484, at 1820.

488    See Yoo, supra note 162, at 45, 65.

489    See Bailey,supra note 153, at 455; JackN. Rakove, Joe the Ploughman Reads the Constitution, or, The Poverty of Public Meaning Originalism, 48 U. San Diego L. Rev. 575, 592-93 (2011). The history of the framing period casts considerable doubt on the idea that the American constitution makers looked to the British experience as a ready model. Id. at 592-93. Historians emphasize that the political and military revolution that began in the mid-1770s was accompanied by an intellectual cataclysm, one that swept away political concepts inherited from the common law in favor of newly forged American variants. Id. at 589. Evidence for how the framers did or did not borrow from the British tradition of royal removal is thin. The Philadelphia debates are silent on this question, as on the content of executive power more generally. Id. at 591-92. The practices of the revolutionary era states are similarly ambiguous: four state constitutions in the revolutionary period referenced some sort of removal power, but three of the four entrusted it to the state executive acting with a council. Prakash, supra note484, at 1822. Only in Maryland couldthe governor alone suspend or remove civil officers. Id. Other state constitutions did not address the subject. Id. at 1822-23.

490    Calabresi & Yoo, supra note 62, at 35.

491    See id. at 10-36; Prakash, supra note 484, at 1827-30. See generally Saikrishna Prakash, New Light on the Decision of 1789, 91 Cornell L. Rev. 1021 (2006) (providing a general discussion of the Decision of 1789). Chief Justice William Howard Taft made the same argument in    Myers v. United States, 272 U.S. 52, 174-75 (1926).

492    To simplify, the key question is what motivated a group of fifteen Representatives who voted against removing language from one version of the bill that explicitly grounded the President's removal authority in a delegation from Congress, only to vote in favor of the final version that acknowledged the President's right to remove the Foreign Affairs Secretary but without specifying the source of that authority. The consensus view is that this faction of fifteen believed the Constitution did not unambiguously confer removal authority on the President, but thought the authority could be delegated by act of Congress under the Necessary and Proper Clause. This view was first articulated by Justice Louis Brandeis in dissent in

    Myers, 272 U.S. at 285 & n.74 (Brandeis, J., dissenting), and since reiterated by Edward Corwin, see Corwin, supra

APPENDIX - 146

note 482, at 361-62; 1 Corwin on the Constitution 332 (RichardLoss ed., 1981), and David Currie, Currie, supra note 1, at 41 & n.240, among others, see Bradley & Flaherty, supra note 485, at 662. For a detailed discussionof this voting sequence, see Prakash, supranote 491, at 1028-33; see also Corwin, supra note 482, at 360-70.

493    Prakash, supra note 491, at 1052-53, 1060.

494    Id. at 1060-61, 1072-73. For a similar conclusion, see Manning, Separation of Powers as Ordinary Interpretation,supra note 469, at 2030-32 & nn. 452-53.

495    Calabresi & Prakash, supra note 166, at 598.

496    See supra Part III.

497    See id.

498    U.S. Const. amend. XII.

499    See supra Part III.

500    See Bailey, supra note 2, at 170; see also supra notes 118-20 and accompanying text.

501    272 U.S. 52, 53 (1926).

502    Id. at 117.

503    Id. ("[T]he President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates.").

504    Id. at 164 (emphasis added).

505    Bradley & Flaherty, supra note 485, at 546; Froomkin, supra note478, at 1348-49; see also Lessig & Sunstein, supra note 167, at 5-11.

506    Myers, 272 U.S. at 133.

507    Id. at 134.

508    Id. at 164.

509    Letter from James Madison to John Patton (Mar. 24, 1834), in 9 The Writings of James Madison, 1819-1836, at 534-36 (Gaillard Hunt ed., 1910).

510    Lessig and Sunstein reach a similar conclusion on atextual grounds. The reasoning given here supplies firmer ground than their merely functional and consequentialist logic. See Lessig & Sunstein, supra note 167, at 97-98.

511    See supra notes 370-85 and accompanying text.

512    See Calabresi & Yoo, supra note 62, at 4; Calabresi & Prakash, supra note 166, at 661-65; Calabresi & Rhodes, supra note 166, at 1165-66.

513    Bailey, supra note 2, at 152.

514    Id. at 152-55.

515    Letter from Thomas Jefferson to Elias Shipman, in 9 The Works of Thomas Jefferson, supra note 430, at 270; seealso Bailey, supra note 2, at 163-64.

APPENDIX - 147

516    Myers v. United States, 272 U.S. 52, 123 (1926).

517    Id. at 123.

518    Id. at 127.

519    See supra notes 495-506 and accompanying text.

520    See supra notes 506-10, 513-19 and accompanying text.

521    Myers, 272 U.S. at 163-64, 176-77.

522    Id. at 136.

523    See id. at 136, 174-75.

524    See id. at 136 ("We have devoted much space to this discussion and decision of the question of the Presidential power of removal in the First Congress ... because of our agreement with the reasons upon which it was avowedly based.").

525    Id. at 118.

526    Id. at 122 ("[W]hen the grant of the executive power is enforced by the express mandate to take care that the laws be faithfully executed, it emphasizes the necessity for including within the executive power as conferred the exclusive power of removal.").

527    See supra notes 491-94 and accompanying text.

528    See Manning, Separation of Powers as Ordinary Interpretation, supra note 469, at 2029.

529    See Keith E. Whittington, Constitutional Construction: Divided Powers and Constitutional Meaning 154-55 (1999).

530    See supra notes 487-89 and accompanying text.

531    See Myers, 272 U.S. at 122.

532    See C. Herman Pritchett, The Postmaster General and Departmental Management, 6 Pub. Admin. Rev. 130, 133-35 (1946) (describing the responsibilities of the Postmaster General around the time of the Myers decision).

533    295 U.S. 602, 627-28, 631-32 (1935).

534    Id. at 619.

535    Id. at 625.

536    Id. at 628.

537    Id. at 624.

538    Id.

539    Id.

540    Id.

APPENDIX - 148

541   See generally Thomas W. Merrill, The Constitutional Principle of Separation of Powers, 1991 Sup. Ct. Rev. 225, 234 (analyzing the doctrinal approaches to separation of powers and critiquing the Supreme Court's recent decisions in that area).

542   Humphrey's Ex'r, 295 U.S. at 628.

543   Id.

544   See supra Part IV.B.1.

545   See supra Part IV.B.1.

546   The Court reached the same conclusion in Myers. See Myers v. United States, 272 U.S. 52, 135 (1926). Lessig and Sunstein also reach a similar conclusion, althoughon different grounds. See Lessig & Sunstein,supra note 167, at 22-32.

547   478 U.S. 714, 717 (1986).

548   Id. at 726.

549   See Manning, Separation of Powers as Ordinary Interpretation, supra note 469, at 1961.

550   Bowsher, 478 U.S. at 760 (White, J., dissenting).

551   The statute permitted removal only by congressional resolution, and only for cause. See id. at 717, 728.

552   Id. at 733.

553   Id.

554   Id. at 737 (Stevens, J., concurring).

555   487 U.S. 654, 685 (1988).

556   Id. at 660-61.

557   Id. at 661 n.3.

558   Id. at 686.

559   Justice Kennedy did not participate.

560   487 U.S. at 658, 691-93.

561   Id. at 697, 733-34 (Scalia, J., dissenting).

562   Id. at 705 (Scalia, J., dissenting).

563   Id. at 691.

564   Id. at 732-33 (Scalia, J., dissenting).

APPENDIX - 149

565    See, e.g., Harold J. Krent, Executive Control over Criminal Law Enforcement: Some Lessons from History, 38 Am. U. L. Rev. 275, 290-303 (1989); Lessig & Sunstein, supra note 167, at 15-16. But see Saikrishna Prakash, The Chief Prosecutor, 73 Geo. Wash. L. Rev. 521, 563 (2005).

566    Morrison, 487 U.S. at 732-33 (Scalia, J., dissenting).

567    Id. at 693.

568    433 U.S. 425, 443 (1977) (emphasis added). For a perceptive analysis of the Morrison decision, see Lee S. Liberman, Morrison v. Olson: A Formalist Perspective on Why the Court Was Wrong, 38 Am. U. L. Rev. 313, 327-28 (1989).

569    This is the approach, more or less, famously advocated by Peter Strauss. See Peter L. Strauss, Formal and Functional Approaches to Separation-of-Powers Questions-A Foolish Inconsistency?, 72 Cornell L. Rev. 488, 493-94 (1987); Peter L. Strauss, The Place of Agencies in Government: Separation of Powers and the Fourth Branch, 84 Colum. L. Rev. 573, 575-77 (1984). This functionalist approach was long advocated on the Supreme Court by Justice White, among others. See Bowsher v. Synar, 478 U.S. 714, 759-60 (1986) (White, J., dissenting); INS v. Chadha, 462 U.S. 919, 967 (1983) (White, J., dissenting).

570    See, e.g., Manning, Separation of Powers as Ordinary Interpretation, supra note 469, at 1979-80; see also Merrill, supra note 541, at 251. See generally M. Elizabeth Magill, Beyond Powers and Branches in Separation of Powers Law, 150 U. Pa. L. Rev. 603, 604-05 (2001) (critiquing contemporary conceptualizations of separation of powers law and advocating a new interpretation).

571    See supra Part IV.B.1.

572    See supra Part IV.B.1.

573    Morrison v. Olson, 487 U.S. 654, 732-33 (1988) (Scalia, J., dissenting).

574    John Manning disputes even this point. Manning, Separation of Powers as Ordinary Interpretation, supra note 469, at 1966 n.147 ("Even if prosecution is a quintessentially executive function, that conclusion does not preclude all congressional regulation of the way that function is implemented.").

575    See, e.g., Dames & Moore v. Regan, 453 U.S. 654, 688 (1981); United States v. Pink, 315 U.S. 203, 229-30 (1942); United States v. Belmont, 301 U.S. 324, 330-31 (1937); United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 318-29 (1936).

576    Curtiss-Wright, 299 U.S. at 311-12.

577    Id. at 321-22.

578    Id. at 319-20.

579    Id. at 319.

580    Id. at 319-21.

581    Id. at 320.

582    Id. at 319 (internal quotations omitted).

583    Id.

584    Id. (emphasis added).

APPENDIX - 150

585   301 U.S. 324, 330-31 (1937).

586   Id. at 330 ("The recognition, establishment of diplomatic relations, the assignment, and agreements with respect thereto, were all parts of one transaction, resulting in an international compact between the two governments.").

587   Id.

588   Id.

589   315 U.S. 203, 229 (1942); see also Dames & Moore v. Regan, 453. U.S. 654, 682-83 (1981).

590   U.S. Const. art. II, § 2, cl. 2.

591   U.S. Const. art. II.

592   Rakove, supra note 38, at 264-65; 2 The Records of the Federal Convention of 1787, supra note 5, at 493-95.

593   Rakove, supra note 38, at 266; 2 The Records of the Federal convention of 1787, supra note 5, at 540-41, 547-50.

594   Amar, supra note 2, at 309-19.

595   United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 316-20 (1936).

596   Id. at 316.

597   Id. at 319.

598   Id. at 319-20.

599   U.S. Const. art. II, § 2.

600   315 U.S. 203, 229 (1942).

601   Id.

602   295 U.S. 495 (1935); 293 U.S. 388, 431-33 (1935).

603   See, e.g., Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 486 (2001).

604   For a discussion, see Elena Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2319-31 (2001).

605   And every entity or agency in the government must reside within one branch. See Merrill, supra note 541, at 231.

606   Chief Justice Taft acknowledged this possibility in Myers and deutionally permissible. See Myers v. United States, 272 U.S. 52, 161 (1926).

55 WMMLR 1501

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 153 of 553 PageID #:  558

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

11 U. Pa. J. Const. L. 597

**University of Pennsylvania Journal of Constitutional Law**
February, 2009

Article

William **Josephson** [a1]

Copyright © 2009 by The University of Pennsylvania Journal of Constitutional Law; William **Josephson**

# **SENATE ELECTION** OF THE VICE PRESIDENT AND HOUSE OF REPRESENTATIVES ELECTION OF THE PRESIDENT

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | INTRODUCTION | 598 |
| | A. The Twelfth Amendment Procedures | 599 |
| | B. Presidential and Vice Presidential Terms | 609 |
| | C. Outline of Article | 612 |
| II. | SENATE VICE PRESIDENTIAL ELECTION | 613 |
| | A. Two Highest Numbers on the List | 613 |
| | B. By When Must the Senate Vote? | 614 |
| | C. Absent Senators | 618 |
| | D. Cloture | 618 |
| | E. The Vice President as President of the Senate | 618 |
| | F. Tie Senate Vote | 619 |
| | G. Which Vice President? | 621 |
| III. | HOUSE PRESIDENTIAL ELECTION | 623 |
| | A. Previous House Presidential Elections | 623 |
| | 1. 1801 House Election | 623 |
| | 2. 1825 House Election | 625 |
| | B. House Presidential Election Precedents and Issues | 626 |
| | 1. 1801 and 1825 House Presidential Election Rules | 627 |
| | 2. Analogous House Rules and Procedents | 632 |
| | a. Executive Sessions and Balloting | 632 |
| | b. Adjournments | 633 |
| | c. "Not Exceeding Three" | 633 |
| | d. Divided | 635 |
| | e. Majority | 636 |
| | f. Quorum | 637 |
| | g. Duration of House Voting | 638 |
| IV. | 2000 PRESIDENTIAL ELECTION | 640 |
| V. | ADOPTION OF HOUSE RULES | 646 |
| | A. Jurisdiction of Relevant Standing Committees of the House | 648 |
| | 1. Rules Committee | 648 |
| | 2. Committee on House Administration | 649 |
| | 3. Joint Referral | 649 |
| | B. Authorization and Appointment of Select Committee | 650 |
| | C. Legislative Commission | 650 |
| | D. Adoption of House Presidential Election Rules | 651 |
| | E. Enactment of Legislation Establishing Rules for House Presidential Elections | 652 |
| | 1. Interplay Between Statutory House Rules and House Adopted Rules | 653 |
| | 2. "Not Exceeding Three" | 657 |

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 154 of 553 PageID #: 559

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L.....

3. Divided    662

VI.    SUMMARY OF RECOMMENDATIONS    668

**\*598 I. INTRODUCTION**

This Article is the third in a study of the United States post-general election presidential and vice presidential electoral process. [1] **\*599** It examines the final stages of electing a President or Vice President if the Electoral College does not elect one or both. A possible last article in this series may discuss issues considered in the previous two and in this Article in light of the *Bush v. Gore* litigation, [2] some of the literature it has spawned, and developments subsequent to the first two articles, now a decade old. It may also address issues raised by some of the many proposed Electoral College reforms.


*A. The Twelfth Amendment Procedures*

The following briefly summarizes the Twelfth Amendment's procedures for counting votes for the presidency and vice presidency.

The Constitution [3] and the Twelfth Amendment provide, with only orthographic variations, that "[t]he President of the Senate **\*600** shall, in the Presence of the Senate and House of Representatives, open all the Certificates [of the elector votes], and the Votes shall then be counted," [4] and "[t]he Vice President of the United States shall be President of the Senate .... [except when] he shall exercise the Office of President of the United States." [5] Many Vice Presidents have performed this function, without mishap or objection, even when they were candidates for President or Vice President. [6] Robert W. Bennett appears concerned about the "awkwardness" of this, and Michael J. Glennon argues that to avoid "massive conflict of interest when the Vice President is also a candidate for President," the President *pro tempore* of the Senate should preside. [7] The same point could **\*601** be made about the Vice President if he were a candidate to succeed himself or about the President *pro tempore* if he were a presidential or vice presidential candidate. It could also be said about the Vice President presiding over a <mark>Senate election</mark> of the Vice President or about the Speaker of the House presiding over the House electing a President if he were a candidate or if it seemed unlikely that either a new President or Vice President would be chosen. But so far, history does not support Professor Bennett's, Professor Glennon's, or Mr. Kesavan's misgivings.

When the vice presidency is vacant, whether because the Vice President is acting as President, [8] has resigned, or has died, the President *pro tempore* of the Senate [9] presides. [10]

**\*602** If, after elector votes are counted, the President of the Senate declares that no presidential candidate has received a majority of those votes, the Twelfth Amendment declares that the presidential election is decided by the House of Representatives from "the persons having the highest numbers not exceeding three on the list of those voted for as President ...." The House must "choose *immediately, by ballot,* the President." [11] It votes by state delegations [12] rather than by individual **\*603** Representatives. Each state has one vote. [13] The Twelfth Amendment provides that an absolute majority, twenty-six of the now fifty states, is required to elect the new President.

The Senate enters this picture in two different situations. The Twelfth Amendment provides:

> And if the House of Representatives shall not choose a President whenever the right of choice shall devolve upon them, before the fourth day of March next following, then the Vice-President shall act as President, as in the case of the death or other constitutional disability of the President. [14]


The Twelfth Amendment also immediately thereafter provides:

> The person having the greatest number of [elector] votes as Vice-President, shall be the Vice-President, if such number be a majority of the whole number of Electors appointed, and if no person have a majority, then from the two highest numbers on the list, the Senate shall choose the Vice-President; a quorum for the purpose shall

APPENDIX - 153

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    2

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 155 of 553 PageID #:  560

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

consist of two-thirds of the whole number of Senators, and a majority of the whole number shall be necessary to a choice. [15]

The Representatives in the House are roughly [16] apportioned with respect to the states' populations. But because the House, when **\*606** electing a President under the Twelfth Amendment, votes by states, the states with smaller populations acquire disproportionate voting power. [17]

**\*607** Consequently, a President could have been elected by the 106th Congress House in 2001 with the support of House delegations from twenty-six of the twenty-eight states whose delegations had fewer than seven Representatives. [18] In that admittedly unlikely event, if all the **\*608** Representatives from those states were present and voting, a President could be elected by as few as 78 of the 435 Representatives. This could be even fewer if some members of state delegations were not present and voting, and if House rules did not regulate state delegation quorums and majorities.

These possibilities exist because (1) as we have seen, the House elects a President by an absolute majority vote of state delegations; (2) under the Twelfth Amendment, a quorum of the House for this purpose consists of "*a member* or members from two-thirds [i.e., now thirty-four] of the states"; [19] (3) there is no requirement that each state vote on each ballot; and (4) apparently there is not now, as we shall see, a constitutional or other quorum or majority requirement for the vote *within* each state's House delegation. If only one Representative is present from a state with more than one Representative, he may be able to constitutionally cast that state's vote, as he certainly can in the seven states with only one Representative, unless House rules should regulate state delegation quorums and majorities.

Because under the Twelfth Amendment, electors cast separate ballots for President and Vice President, the electors may elect either the President [20] or the Vice President [21] without electing the other, or **\*609** they may fail to elect both. [22] But since the Twelfth Amendment eliminated Senate voting for Vice President by ballot, each Senator may openly vote for a Vice President if the electors do not choose one. Thus, there is more potential political accountability than when each state's vote for President is determined by its House delegation voting by ballot and each state itself votes by ballot.

In any case, because both the House voting for President by states and senatorial voting for Vice President are constitutional and because the Fourteenth Amendment's one-person-one-vote requirement [23] applies to the states and not to the United States, these anti-majoritarian provisions must be accepted unless and until constitutionally amended.

### B. Presidential and Vice Presidential Terms

Necessary background also requires a brief discussion of presidential and vice presidential terms. The Constitution provided two-year terms for Representatives [24] and six-year terms for Senators, [25] and for the Congress to meet once each year on the first Monday in December unless otherwise provided by law. [26] The Constitution provides for the President and Vice President to hold "Office during the Term of four Years." [27]

Because the Framers could not have known if or when the Constitution would be ratified, the Constitution does not provide for a starting date. On September 13, 1788, the Continental Congress, by authority purportedly conferred by the Constitutional Convention, established that the first terms would commence on the first **\*610** Wednesday in March of 1789, and after the First Congress assembled, a joint committee determined that the terms of the first class of Senators and of all the Representatives commenced on that same day and must necessarily terminate on March 3, 1791. [28] The four-year term of the first President was also determined by the joint committee to have begun on March 4, 1789, even though President Washington did not take the oath of office until April 30, 1789. [29] The Act of March 1, 1789 confirmed this March 4 date. [30] The Twelfth Amendment gave this date constitutional status when it provided, "[a]nd if the House ... shall not choose a President ... before the fourth day of March next following, then the Vice President shall act as President ...." [31] Consequently, from 1789 through 1933 presidential, vice presidential, and congressional terms began on March 4.

APPENDIX - 154

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 156 of 553 PageID #:  561

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

Section 1 of the Twentieth Amendment [32] --which was ratified on January 23, 1933, Sections 1 and 2 thereof to take effect on the **\*611** following October 15--changed the beginning of presidential and vice presidential terms from March 4 to January 20 and the beginning of congressional terms from March 4 to January 3. Section 2 also, in effect, repealed the constitutional December congressional meeting date. This reduced the opportunities for lame duck congresses by providing for a new session of Congress to begin on January 3 of every year unless Congress appoints a different day by law.

Thus, generally the first session of each new Congress now commences at noon on January 3 of the year following a general election for President and Vice President, [33] and under present law the House and Senate meet at one o'clock in the afternoon of January 6 [34] to count the electoral votes cast for President and Vice President.

### *612 C. Outline of Article

Because little attention has been paid to the issues that may arise if the Senate elects a Vice President, this Article will first discuss that subject. It will discuss, among other issues, by what time, if any, the Senate may or must elect a Vice President, and what the Senate should do if a new President is not elected by the House by noon on January 20.

This Article will then discuss House election of the President. It will briefly review what happened in the House presidential elections of 1801 and 1825. (It will not discuss the election of 1877, because the procedure then followed is unlikely ever to be repeated.) [35] It will consider House adoption of rules of procedure or the enactment of legislation to provide such rules. If the House does not elect a President by January 20, it will discuss whether or not the House may or must continue voting for a President or, to put the same issue another way, whether or not the House may or must stop the presidential election process either before, on, or after January 20.

### *613 II. SENATE VICE PRESIDENTIAL ELECTION

The Twelfth Amendment provides with respect to <mark>Senate election</mark> of the Vice President:

> [I]f no person have a majority, then from the two highest numbers on the list, the Senate shall choose the Vice-President; *a quorum for the purpose shall consist of two-thirds of the whole number of Senators*, and a majority of the whole number shall be necessary to a choice. [36]

The Constitution originally provided that the Senate would, like the House, choose "by Ballot." The Twelfth Amendment eliminated the ballot requirement. Hence, in 1837, the only time the Senate has elected a Vice President, it acted by roll call vote. [37]

### A. Two Highest Numbers on the List

What if one or more vice presidential candidates are tied for either or both of the "two highest numbers on the list"? [38] This Twelfth Amendment formulation does not, on its face, necessarily take account of that possibility, however unlikely. This is somewhat perplexing, because the Constitution did: "But if there should remain two *or more* who have equal Votes, the Senate shall chuse from them by Ballot the Vice President." [39] The textual issues thus raised are similar to those raised by the Twelfth Amendment's "not exceeding three" formulation for the House choosing a President, except for not impliedly conferring any discretion on the Senate to consider only one **\*614** candidate. Those issues will be discussed later in this Article. [40] The Senate Rules and other contents of the Senate Manual say nothing about this issue. Arguably, because the clause refers to "numbers" not persons, if more than one candidate ties for the second-highest position, the Senate's choice is not limited to two persons.

### B. By When Must the Senate Vote?

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.          4

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 157 of 553 PageID #:  562

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L.....

Unlike the corresponding provisions for the House election of the President, neither the Constitution nor the Twelfth Amendment provide that the Senate must vote immediately after the President of the Senate declares that the electors have failed to elect a Vice President. Why not? The legislative history of the Twelfth Amendment does not shed any light on the answer to this question, and neither of the two most recent historians of the Amendment mention the issue. [41]

The 1803 Senate, whose version of the Amendment was ultimately adopted, [42] may have foreseen prolonged delays in House presidential elections in light of the 1801 experience, which required thirty-six ballots. If so, the Senate's apparent wish to await that outcome is understandable if the Senate majority is to have the opportunity of choosing (or not choosing) a Vice President compatible with the President chosen or, if no President is chosen by the House, of choosing (or not choosing) the Vice President on the ticket that received the most popular votes, or the one the Senate majority decides is most qualified to act as or to be President. [43]

 **\*615**  As we have seen, under Section 1 of the Twentieth Amendment the incumbent President's and Vice President's terms end at noon on January 20. If the House does not elect a new President by then, will the Senate elect a Vice President before noon on January 20? It should, so that the clause in § 3 of the Twentieth Amendment, "[i]f a President shall not have been chosen before the time fixed for the beginning of his term ... then the Vice President elect shall act as President until a President shall have qualified," [44] will be meaningful.

If the Senate has not elected a Vice President, does § 3 of the Twentieth Amendment apply? Probably not. Section 3 provides, in relevant part:

> [A]nd the Congress may by law provide for the case wherein neither a President *elect* nor a Vice President *elect* shall have *qualified*, declaring who shall then act as President, or the manner in which one who is to act shall be selected, and such person shall act accordingly until a President or Vice President shall have *qualified*. [45]

"Qualified" describes the presidential requirements of Article II, Section 1, clause 5: Natural-born citizen, thirty-five years old or older, fourteen years a resident, plus presumably not disabled and having taken the oath prescribed in Article II, Section 1, clause 8. [46] "[E]lect"  **\*616**  means that the electors have chosen a President or Vice President. [47] Section 3 does not cover the situation when there is no President elect or Vice President elect.


The legislative history supports the inapplicability of this aspect of § 3 of the Twentieth Amendment. The Senate resolution provided  **\*617**  that whenever the right to choose a President has devolved upon the House, and the House has not chosen a President before the time fixed for the beginning of his term, then the Vice President shall act as President, "as in the case of the death or other constitutional disability of the President." But under the corresponding provision of the House amendment (the first clause of the second sentence of § 3), a Vice President only acts as President, not only when the House has failed to choose a President before the time fixed for the beginning of his term, but also in any case where, at that time, the President has failed to qualify for any reason. The conference agreement retained the substance of the House provision with changes in phraseology. [48]

The second sentence of § 3 of the Senate resolution gave Congress the power by law to declare what officer shall act as President in a case where the election of the President has devolved upon the House and that of the Vice President has devolved upon the Senate, and neither the President nor the Vice President has been chosen before the time fixed for the beginning of their terms. The officer who acts as President will act only until the House has chosen a President or the Senate has chosen a Vice President. But the corresponding provision of the House amendment (the last clause of the second sentence of § 3) provided only for the case in which neither the President *elect* nor the Vice President *elect* have, for any reason, failed to qualify at the time fixed for beginning their terms. It then gives Congress the power by law to declare who shall act as President, or to provide the manner in which a qualified person shall be selected. The person who acts as President is to act only until a President or a Vice President has qualified. If, in such case, the Vice President *elect* should have qualified before a President has qualified, then, although he would act in place of the person acting under the law of Congress, he would do so only until the House has chosen a President and he has qualified, or until the President *elect* chosen by the electoral college has qualified. The conference agreement retained the substance of the House provision with changes in phraseology. The Conference Report also seems to assume that the Senate will not elect a Vice President until a time proximate to the expiration of the incumbent President's and Vice President's terms, which as we have seen should, but may not necessarily, be the case. [49]

APPENDIX - 156

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 158 of 553 PageID #: 563

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L.....

**\*618** *C. Absent Senators*

Under Rule VI of the Senate Rules, no Senator may be absent without leave, and the Sergeant at Arms may be directed to compel the attendance of absent Senators. [50] Under Rule XII, Senators may not decline to vote unless excused by the Senate. [51]

### D. Cloture

The only current procedure for closing debate in the Senate is the cumbersome one set forth in Rule XXII.2, [52] under which, for example, three-fifths of Senators must vote to close debate. Rule XXII.2 applies to "any measure, motion, [or] other matter pending before the Senate." [53] Although the public reaction to any attempt to delay the Senate's choice of Vice President would undoubtedly be extraordinarily negative, the possibility of filibuster exits. Even though the Senate does not constitutionally have to choose a Vice President immediately, it should amend its rules to ensure that should it ever have to do so, it can do so expeditiously, especially because under Senate Rule VIII all motions to change its standing rules are debatable, [54] and motions to change the rules are also regulated by Rule V. [55]

### E. The Vice President as President of the Senate

We have earlier discussed the issues that may be raised if the Vice President as the constitutional President of the Senate presides over the counting of elector votes. [56] Similar issues could be raised with respect to the Vice President as President of the Senate presiding over its election of a Vice President, especially if he were a candidate to succeed himself. Nothing in the Senate Rules would require the Vice President to recuse himself from presiding, though were he a candidate **\*619** he might well be well advised to do so. The Senate's rules on excusing from voting [57] and conflict of interest [58] do not apply to the Vice President, except in the latter case to the extent that she or he is the supervisor of assistants who are on the Senate payroll.

Of course, in those situations when the vice presidency was vacant, that officer would not be available to break any tied Senate vote for Vice President. [59] Nor would the Vice President be available "when he shall exercise the Office of President." [60]

### F. Tie Senate Vote

If the Senate is equally divided, can the incumbent Vice President cast the deciding vote in a ==Senate election== of a Vice President? The answer should be affirmative, because Article I, Section 3, clause 4 of the Constitution appears to admit of no exceptions. However, Lawrence D. Longley and Neal R. Pierce argue that the plain meaning of the Twelfth Amendment's language, "a majority of the whole number [of Senators] shall be necessary to a choice," precludes the possibility of the Vice President breaking a tie. [61]

But this leaves open the possibility that in such a case there would be no way to elect a new Vice President. There is doubt as to whether the Presidential Succession Act, the only possible alternative in that case, is applicable to such a failure to elect, as contrasted with the absence of an elected one. [62]

**\*620** Because public policy abhors a vacancy in office, [63] this issue should be resolved in favor of the Vice President voting, which the majority of analogous Senate precedents support. [64] The Vice President is, after all, the constitutional President of the Senate.

**\*621** *G. Which Vice President?*

We should again remember that until the Twentieth Amendment was adopted in early 1933, the terms of the new President, Vice Presdent, **\*622** and Congress began on March 4, and if the electors did not elect a President or Vice President, the Lame

APPENDIX - 157

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 159 of 553 PageID #:  564

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L.....

Duck House and Senate, respectively, would do so. [65] Thus, any Senate tie vote would have been broken by the then-incumbent Vice President.

She or he might or might not have been of the same political party as the candidates for President and Vice President who received the most popular votes, just as a majority of the Senate (and of the state delegations in the House) might or might not have been. The Twentieth Amendment ensures that, absent a legislative change, [66] the incoming Congress will elect the President or Vice President or both. But because of the constitutional delay between its convening on January 3 and the incoming President's and Vice President's terms commencing at noon on January 20, the incumbent Vice President (who could be the continuing Vice President or the incoming President) might be called upon to break any Senate tie votes for Vice President. Moreover, if only because roughly two-thirds of the Senators will not have been reelected at the same time as the presidential election, those two-thirds of Senators may not reflect the votes of the most current presidential electorate. These possibilities make it more likely that the Senate will choose a new Vice President who was not the popular vote winner, as the House so chose a President in 1825, [67] or who was not of the same political party as the President elected by the electors or by the House. [68]

## *623  III. HOUSE PRESIDENTIAL ELECTION [69]

### A. Previous House Presidential Elections

A President has been elected by the House twice since the adoption of the Constitution, once in 1801 and again in 1825. [70]

### 1. 1801 House Election

The 1801 election was governed by Article II, Section 1 of the Constitution, before the adoptions of the Twelfth, Twentieth, Twenty-third, and Twenty-fifth Amendments discussed above. Therefore, it is not a controlling precedent for the future. Nevertheless, some of what happened is instructive.

Prior to the adoption of the Twelfth Amendment in 1804, each presidential elector cast two votes, neither of which was designated for President or Vice President. The candidate receiving the highest number of votes, if that number constituted a majority of the total number of electors, was elected President; the candidate receiving the second highest number of votes was elected Vice President. If no candidate received a majority, the House elected a President from among the five candidates with the highest number of votes, with  *624  each state represented in the House casting one vote by ballot. The votes of a majority of the total number of states were necessary for election of a President.

In 1800, Thomas Jefferson and Aaron Burr tied for the highest number of elector votes. [71] This triggered Article II, Section 1, clause 3 of the Constitution, "if there be more than one who have such Majority, and have an equal Number of Votes, then the House of Representatives shall immediately chuse by Ballot one of them for President." [72] For these purposes, a majority is defined as "of the whole Number of Electors appointed." [73]

Article I, Section 4, clause 2 of the Constitution then provided that the Congress should assemble at least once in every year on the first Monday in December unless Congress appointed a different day by law. By law, the electors' votes were then to be counted on the second Wednesday in February. [74]

In the House, Representatives belonging to the Federalist Party, which opposed Jefferson's election, sought to embarrass him by voting for Burr, even though he had been the Republican "vice presidential" candidate. [75] Sixteen states were represented in the House, so a majority of nine states' votes was required for election.

Consistent with the constitutional command that the "House shall immediately choose," through six days and thirty-five consecutive secret ballots the House vote was eight states for Jefferson and six states for Burr; two states, Delaware and South Carolina, cast blank ballots; and two states, Maryland and Vermont, were "divided" because each delegation was deadlocked. [76] On the thirty-sixth ballot several Maryland Representatives and one Vermont Representative abstained, as  *625  did the Representative from Delaware. [77] Consequently, Jefferson became President, and Burr Vice President. [78]

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 160 of 553 PageID #:  565

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

### 2. 1825 House Election

The Twelfth Amendment was proposed by Congress on December 9, 1803 and proclaimed by the Secretary of State on September 25, 1804, having been ratified by the legislatures of three-quarters of the states by July 27, 1804. [79] The Twelfth Amendment made two major changes affecting House election of the President. It required the electors to ballot separately for President and Vice President, and it reduced the number of candidates from whom the House would choose a President from the top five to "not exceeding three." [80] The **\*626** Twelfth Amendment thus governed the 1825 House presidential and 1837 Senate vice presidential elections.

In 1824, four major presidential candidates came from the party that had dominated national politics since Jefferson's election in 1801. No candidate received an absolute majority of the 261 elector votes, and there were no tied elector votes. [81] On the House's first secret ballot in 1825, enough Representatives who were supporters of Henry Clay (who was not a candidate because he had the fourth (and last) highest number of elector votes (thirty-seven)) [82] voted for the candidate with the second-highest number of the elector votes, John Quincy Adams, who had eighty-four elector votes, and Adams was chosen President. [83]

### B. House Presidential Election Precedents and Issues

Four possible sources of law or rule govern House presidential elections: (1) the Constitution; (2) statutes; [84] (3) the rules of the House; and (4) precedents of the House. These precedents interpret and apply in much the same way that judicial decisions interpret and apply the Constitution, statutes, and regulations. [85]

Article I, Section 5, clause 2 of the Constitution provides, "Each House may determine the Rules of its Proceedings ...." [86] One of the **\*627** first acts of each new House is to adopt a resolution establishing rules for that House, and that resolution generally incorporates by reference all applicable provisions which constituted the Rules of the prior House. [87]

### 1. 1801 and 1825 House Presidential Election Rules

The Rules of the House do not contain any provisions for electing a President. In both 1801 and 1825, the Lame Duck Houses adopted rules for each of those presidential elections. It is clear from the House debates concerning the 1825 Rules that they were not expected to bind future Houses faced with the task of choosing a President. [88] They are, nevertheless, relevant, because tradition and precedent are very important to the House in establishing its procedures. [89]

The 1801 Rules and 1825 Rules were drafted and reported to the House by committees appointed by the respective Speakers. [90] At that time the Committee on Rules was a select committee authorized at the beginning of each House to report a system of rules for that House. [91]

The ad hoc rules adopted by the House to govern its presidential election procedures in 1801 and 1825 were substantially similar. In 1801, doors of the House were closed during balloting except against the officers of the House, [92] but in 1825 Senators were allowed. [93] The **\*628** Representatives were seated by states. [94] In 1801, the House was not to adjourn. [95] In the 1825 Rules, a motion for adjournment could be made by a state and would be decided by a majority of the states. [96] Ballot boxes were provided for the ballots of each state's delegation [97] and for the ballots of the states. [98] Each state's delegation could appoint tellers to count its ballots, [99] and tellers were appointed to count the states' ballots. [100] In 1801, the House was to "continue to ballot for a President, without interruption by other business, until it shall appear that a President is duly chosen." [101] The 1825 rule is substantially the same. [102] The Speaker declares the result, and it is communicated to the Senate, the President, [103] and under the 1825 Rules, also to the President-elect. [104]

APPENDIX - 159

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 161 of 553 PageID #:  566

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L.....

The 1825 Rules (1) repeat the Twelfth Amendment's ambiguity in case of tie elector votes, "from the persons having the highest numbers, not exceeding three"; [105] (2) inappropriately repeat the 1801 Rules' appropriate reference to "*either* ... have a majority," [106] Jefferson and Burr being the only 1801 candidates and there being three candidates in 1825; and (3) repeat the error by stating the balloting should continue, "in case *neither* ... shall receive ... a majority ...." [107]

Both the 1801 and 1825 rules substantially provide:

> All questions arising after the balloting commences, requiring the decision of the House, which shall be decided by the House, voting per capita, to be incidental to the power of choosing a President, shall be decided by States without debate; and in case of an equal division of the votes of States, the question shall be lost. [108]

**\*629**  The decision of whether or not a question is incidental to the Presidential choice power is decided by a *per capita* vote. [109]

The one important substantive difference between the 1801 and 1825 Rules is that the 1825 Rules provide for the vote of each state to be determined by "a majority of the votes given," by which it almost certainly meant, as provided almost immediately thereafter, "a majority of the whole number of votes given by such State." [110]  The former formulation could have meant a majority of those present and voting or a majority of a quorum except that the 1825 Rules, like the 1801 Rules, did not contain an explicit state delegation quorum requirement. The latter formulation also is not entirely clear. Does it mean the whole number of votes given *to* such state, in which case an absolute majority of the total number of Representatives in the state delegation would be required? If so, it would be in line with the Twelfth Amendment's requirement that "a majority of all the states shall be necessary to a choice." [111]  If that is what the latter formulation meant, it would also explain the absence of a quorum requirement. If not, the latter formulation is as, or almost as, ambiguous as the former.

Neither the 1801 Rules nor the 1825 Rules provided for a quorum of each state's Representatives. The constitutional provision that "a Majority of each [house] shall constitute a Quorum to do Business" is on its face inapplicable to the determination of a quorum within House state delegations. [112]  Arguably, 1825 Rules did not have to contain a quorum provision, if only an absolute majority of Representatives could cast each state's vote.

**\*630**  The Twelfth Amendment's quorum provision does contain an ambiguity: "A quorum *for this purpose* shall consist of a member or members from two-thirds of the states." [113]  Obviously, the presence of one Representative from the one-Representative states constitutes a quorum. Does the presence of any member from the more-than-one Representative states constitute a quorum? It does not necessarily follow from the fact that the presence of a single Representative from a one-Representative state means that other states constitutionally can be counted as present if only a single Representative is present. [114]  The pros and cons of these quorum issues were the subject of the most elaborate discussion in the *Frost Memo*, [115] and we shall return to them later. [116]

The 1825 Rules, like the 1801 Rules, say:

> [A]nd in case the votes so given shall be divided so that neither [sic] of said persons shall have a majority of the whole number of votes given by such State ... then the word "divided" shall be written on each duplicate. [117]

Reference has previously been made several times to the ambiguity introduced by the Twelfth Amendment's provision, "and if no person have such majority ["of the whole number of Electors appointed"], then from the persons having the highest numbers *not exceeding three* ... the House of Representatives shall choose immediately, by ballot, the President." [118]  The Constitution referred to "the five highest." [119]  The Twelfth Amendment's formulation implies that the House could reduce its choices to two or even one, [120] even though the intent of the Senate, which originated the limit of the House's choice to three, was clearly only to reduce the choices from five. [121]

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                9

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 162 of 553 PageID #: 567

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L.....

There are other difficulties with the "not exceeding three" formulation. What if there were one or more of the three highest? [122] Arguably, **\*631** because the clause refers to "numbers," not "Person" as in Article II, Section 1, clause 3 of the Constitution, if more than three have the highest numbers, the House's choice is not limited to three persons. [123] Why these issues were created is particularly difficult to understand, because the Constitution itself foresaw the possibility of ties by providing for two of them. [124]

Finally, what if the House does not choose a President by noon on January 20? As we have seen, [125] a Vice President, elected by the electors or, if not, hopefully by the Senate by then, will "act as President" as the Twelfth and Twentieth Amendments provide. The implication is that the House goes on trying to choose a President. This would be consistent with what both the original Constitution and the Twelfth Amendment imply by the use of the phrase "shall choose immediately" and with the 1801 [126] and 1825 [127] Rules, which both provide that the House does no other business until it elects a President. But if the House is hopelessly deadlocked, a mechanism must be provided for its ending its presidential election.

And what if the Senate should fail to choose a Vice President? As we have seen, neither the Twentieth Amendment nor the Presidential Succession Act provides a clear answer. [128]

Can any of these issues be resolved short of constitutional amendment?

**\*632** *2. Analogous House Rules and Precedents*

The immediately foregoing discussion raised the following issues: House presidential election executive sessions and state delegation balloting, House adjournments while choosing a President, "not exceeding three," quorum within House state delegations, divided House state delegations, majority voting within House state delegations, and House continuing to try to choose a President after noon on January 20. Could House rules authoritatively resolve any or all of the issues?

**a. Executive Sessions and Balloting**

The "by Ballot" requirement of the Twelfth Amendment (and of the Constitution itself) applies on its face only to the voting of the House state delegations to choose a President. By providing for ballot boxes and ballots for the votes of each state House delegation, the authors of the 1801 and 1825 Rules decided also to shield from public knowledge each Representative's vote. [129]

But it does not necessarily follow that each state's House delegation has to vote by ballot, nor that both delegation and state balloting has to take place in a House secret session pursuant to House Rule XXIX. [130] The plain meaning of Rule XXIX applies it to "confidential communications," but the Rule itself must stand for the proposition that the House determines whether or not it or its Committee of the Whole House on the State of the Union may sit in executive session. [131] House Rule XI(g)(l) regulates when a House committee may go into executive session. [132] House Rules I and IV give the Speaker control of the galleries and the Hall, and Rule V gives him power over the televising and broadcasting of House proceedings. [133] Rule IV deals with who may have access to the Hall and the galleries. [134]

Thus, it is clear that the House, like the Senate in its Rules XXIX, XXX, and XXXI, [135] can by rule decide whether or not its proceedings to choose a President should be open or closed. The 1801 and 1825 Rules, though precedents for executive sessions, are not binding on **\*633** the House. [136] One can be confident that public opinion and the press will want open House sessions. [137] Obviously, this is an appropriate subject for any House presidential election rules.

It does not necessarily follow from either the constitutional "by Ballot" requirement or the 1801 and 1825 Rules precedents that House rules should require each Representative to vote in her or his state delegation. However, one can expect substantial political and public pressures on Representatives to vote for President within their state delegations in accordance with their party affiliation, or the popular vote in their respective districts or states or in the nation regardless of their party affiliation or

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 10

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 163 of 553 PageID #: 568

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

even personal conviction. This may cause them to want to adhere to the *intra* state delegation balloting precedent. Obviously, this also is an appropriate subject for any House presidential election rules. [138]

### b. Adjournments

The House under its rules may regulate adjournments. [139] The provisions of the 1801 and 1825 Rules providing for the House to do no business other than presidential election and regulating motions for adjournment are sensible precedents that should be followed in any House rules. [140]

### c. "Not Exceeding Three"

Could the House, in the case of tied elector votes, consider more than three candidates? As we have argued in the case of the Senate in Part II.A, it could and should, and arguably, it could and should make clear its intention to do so by rule. As we have seen in Part II.A, **\*634** both the Constitution and the Twelfth Amendment provide for ties in other contexts, and why the Twelfth Amendment did not follow those precedents in this respect is unclear.

On the other hand, could the House limit its presidential candidates to two or even one? The answer, in general, should be no in light of the legislative history. [141] However, suppose it became apparent that a presidential candidate was not qualified-- for example, by age, citizenship, or inhabitance [142] --or was incompetent, or had withdrawn or died. In the case of death, no House rule would seem necessarily required because the Representatives presumably would not vote for a dead candidate. But a candidate's lack of qualifications, disability, or withdrawal raise issues that might usefully be regulated by a House rule or by legislation. [143]

**\*635** If the House interpreted "not exceeding three" as equivalent to the three "highest numbers on the list," as the Twelfth Amendment provides for Vice President and as the Constitution provided for President when the number was "five," [144] then constitutionally it would not have discretion for deciding that less than three should be candidates for President.

While "not exceeding" arguably provides the House discretion to constitutionally consider fewer than three candidates, it provides no criteria, except perhaps in the cases of lack of qualifications, death, disability, or withdrawal. Except in such cases, it is hard to imagine a House of Representatives assuming responsibility for the exercise of such discretion, if any, as "not exceeding three" may confer discretion to reduce the number of presidential candidates or eliminate any tied candidates. Politically, it is easier to envisage the House exercising any such discretion to include all tied candidates, even though that might be contrary to the intent of the Twelfth Amendment's reduction of presidential candidates from five to three and might increase the likelihood of no absolute state majority for President. Moreover, if the House attempted by rule to reduce the number of presidential candidates, a furor would almost certainly result, and as we shall see when we discuss the possibility of a legislative solution, [145] countervailing constitutional issues would be raised, and litigation would almost certainly ensue.

### d. Divided

It seems unlikely that the House would, by rule, provide that a state's vote for President would be deemed cast when there was no majority, however defined, of that state's Representatives. Section 1 of House Rule VIII provides that "[e]very member shall be present within the Hall of the House during its sittings ... and shall vote on each question put." [146] The precedents of the House are that no member can be forced to vote (or deprived of the right to vote, and members **\*636** may not vote by proxy). [147] Section 2 of House Rule VIII even regulates pairing. Because no Representative ordinarily can be forced to vote or be deprived of her or his vote, it seems problematic that the House would, by rule, compel members of a state delegation to vote for President or cast its vote for it. In the latter case, what would be the criteria for deciding for which candidate to cast a vote? This issue will be discussed further when the possibility of legislation is discussed. [148]

### e. Majority

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.  11

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 164 of 553 PageID #:  569

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

As we have seen, the 1825 Rules defined "majority" for the purposes of determining each state's vote for President as "a majority of the votes given ... and ... a majority of the whole number of votes given ...." [149] The House Rules contain many provisions defining a majority. Section 11 of House Rule XXXVIII provides:

> In all cases of ballot a majority of the votes given shall be necessary to an election, and where there shall not be such a majority on the first ballot the ballots shall be repeated until a majority be obtained; and in all balloting blanks shall be rejected and not taken into the count in enumeration of votes or reported by the tellers. [150]

The Speaker is elected by a majority, [151] and the House acts by a majority. [152]

As we have seen, the Twelfth Amendment says that "a majority of *all* the states shall be necessary to a choice." [153] Perhaps in 1825, when presumably attendance at Congress in mid-winter was uncertain, "a majority of the votes given" [154] was a pragmatic choice. But in the twenty-first century a strong argument can be made, consistent with the Twelfth Amendment's majority requirement of the total states' vote, that a majority of the whole number of each state's Representatives, possibly less vacancies, should be necessary to cast that state's vote for President.

However, the *Frost Memo* concludes:

> This is the single most important question that must be resolved in the Rules. Adopting a plurality requirement could hasten a decision by the  **\*637**  House and would be consistent with the current method of selecting electors; however, it will reverse procedures followed in 1801 and 1825 and will undoubtedly lead to a major fight on the floor, particularly if the third candidate has any significant support in the House. Nonetheless, a fight in favor of plurality voting within state delegations could be worth the battle because to require a *majority* within states would heighten the chance that no one will be elected President and that the country will be governed for four years by a Vice-President selected by the Senate. [155]

It seems clear from the context of the *Frost Memo* and Proposed Rule 5(c) of the proposed rules that Representative Frost drafted [156] that he is *not* talking about an *absolute* majority of each House state delegation, although he is aware that the Twelfth Amendment requires such a majority of all the elector votes and of all the House state delegations when they vote for the President.

The public policy choices are clear. Requiring a majority of a quorum, a majority of those present, a majority of those present and voting, an absolute majority, or an absolute majority less vacancies within the House state delegations may ensure more authoritative votes for President. On the other hand, a majority of state delegation Representatives present, or a plurality, should make a House election of a President more likely. These issues are clearly appropriate for consideration by House rules.

**f. Quorum**

The Constitution provides that "a majority of each [House] shall constitute a quorum to do business," [157] but on its face, this would not apply to each of the House state delegations voting for President.

As we have seen, neither the 1801 nor the 1825 Rules established quorums for each House state delegation. [158] The constitutional authority of the House to "determine the Rules of its Proceedings" appears unlimited. [159] The precedent established by the majoritarian requirement for each state's vote in the 1825 Rules [160] would also seem to support the House's authority by rule to provide a quorum requirement for each state's delegation. By analogy the House Rules **\*638**  contain numerous provisions establishing quorums for its committees. [161] Generally, a quorum is a majority, although in the case of the Committee of the Whole House on the State of the Union, 100 Representatives is sufficient. [162]

APPENDIX - 163

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 165 of 553 PageID #:  570

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

Consistent with the Constitution [163] and the Twelfth Amendment which requires "a quorum ... of a member or members from *two-thirds* of the States," [164] presumably so that a House vote for President would more likely be accepted as authoritative, the House should establish a high quorum requirement for each state's delegation voting for President. There should be an exception for the one- and two-Representative state delegations, for which the attendance of all Representatives should be required. What that quorum requirement should be is debatable.

As state delegations increase in size, the number of Representatives that would constitute a majority of a quorum does not increase proportionally. For example, only four Representatives would be the usual quorum, and only three the usual majority of a seven-Representative state delegation. But in the case of California, the largest state delegation in 2008 with fifty-five Representatives, a quorum would have twenty-eight Representatives, and a majority of that quorum would be only fifteen Representatives.

The higher the quorum requirement, the more likely that a state delegation's vote for President would be accepted as authoritative. Perhaps a quorum should start at two-thirds for the smaller state delegations and increase to three-quarters for the larger. Of course, if the House adopted a Rule that a majority for the purpose of casting each state's vote for president was a majority of all its Representatives, possibly less vacancies, there would be little or no need for a quorum rule.

### g. Duration of House Voting

Let us assume that the House fails to choose a President by noon on January 20. How long must it continue to try, given that under the provisions of the 1801 and 1825 Rules it cannot take up any other business? [165] Because there is no apparent limit on how long the Vice  **\*639**  President, assuming there is one, may act as President, [166] the Executive Branch can continue to function. Constitutional officers can be appointed with the advice and consent of the Senate, authorized inferior officers can be appointed, and so forth. [167] But bills for raising revenue, which must originate in the House, [168] could not be considered and passed, nor could bills passed by the Senate be considered by the House.

Accordingly, the *Frost Memo* says that any House rules for a presidential election should "do everything possible to ensure that the House will actually reach a decision and not be deadlocked." [169] Reason also requires that the House be able to determine that it is deadlocked and cannot comply with the Twelfth Amendment command that it "choose *immediately* ... [a] President." [170]

Would the House, in making a deadlock decision, vote by states? Presumably yes, if the adjournment voting precedents established by the 1801 and 1825 Rules [171] were followed. If the 1801 and 1825 Rules precedents were followed, the House would determine by a per capita vote that a deadlock vote was incidental to the power of choosing a President. Thus the vote sufficient for such a determination would be the same majority of whole number of states that is required to choose a President under the Twelfth Amendment. This would be consistent with the Twelfth Amendment's public policy in this respect. [172]

Again, it would be appropriate for the House to adopt a rule for this contingency. House Rule XIX is a precedent: a motion for the previous question "shall have the effect of cutting off all debate," [173]  **\*640**  although the "question" to which the Rule refers probably is not the question of the House choosing a President.

If the House determined that it could not choose a President, can a Vice President, only acting as President under Section 3 of the Twentieth Amendment, nominate a Vice President under Section 2 of the Twenty-fifth Amendment? Probably not. Section 1 of the Amendment applies only to the removal, death, or resignation of the President, and Section 2 applies only to the existence of a vice presidential vacancy.

### IV. 2000 PRESIDENTIAL ELECTION

There are practical consequences for these recommendations with respect to House rules. Let us take the 2000 presidential election as an example and assume that neither Governor Bush nor Vice President Gore had a majority of all the electors' votes. [174]

APPENDIX - 164

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 166 of 553 PageID #:  571

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

The political party composition of state delegations in the first session of the 107th Congress was: [175]

| STATE | REPUBLICANS | DEMOCRATS | INDEPENDENT | VACANCY |
|---|---|---|---|---|
| Alabama | 5 | 2 | | |
| Alaska | 1 | 0 | | |
| Arizona | 5 | 1 | | |
| Arkansas | 1 | 3 | | |
| California | 20 | 31 | | 1 |
| Colorado | 4 | 2 | | |
| Connecticut | 3 | 3 | | |
| Delaware | 1 | | | |
| Florida | 15 | 8 | | |
| Georgia | 8 | 3 | | |
| Hawaii | | 2 | | |
| Idaho | 2 | | | |
| Illinois | 10 | 10 | | |
| Indiana | 6 | 4 | | |
| Iowa | 4 | 1 | | |
| Kansas | 3 | 1 | | |
| Kentucky | 5 | 1 | | |
| Louisiana | 5 | 2 | | |
| Maine | | 2 | | |
| Maryland | 4 | 4 | | |
| Massachusetts | | 10 | | |
| Michigan | 7 | 9 | | |
| Minnesota | 3 | 5 | | |
| Mississippi | 2 | 3 | | |
| Missouri | 5 | 4 | | |
| Montana | 1 | | | |
| Nebraska | 3 | | | |
| Nevada | 1 | 1 | | |

APPENDIX - 165

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 167 of 553 PageID #:  572

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

| State | | | | |
|---|---|---|---|---|
| New Hampshire | 2 | | | |
| New Jersey | 6 | 7 | | |
| New Mexico | 2 | 1 | | |
| New York | 12 | 19 | | |
| North Carolina | 7 | 5 | | |
| North Dakota | | 1 | | |
| Ohio | 11 | 8 | | |
| Oklahoma | 5 | 1 | | |
| Oregon | 1 | 4 | | |
| Pennsylvania | 11 | 10 | | |
| Rhode Island | | 2 | | |
| South Carolina | 4 | 2 | | |
| South Dakota | 1 | | | |
| Tennessee | 5 | 4 | | |
| Texas | 13 | 17 | | |
| Utah | 2 | 1 | | |
| Vermont | | | 1 | |
| Virginia | 7 | 3 | 1 | |
| Washington | 3 | 6 | | |
| West Virginia | 1 | 2 | | |
| Wisconsin | 4 | 5 | | |
| Wyoming | 1 | | | |

 **\*642**  Let us also assume that: (1) each Representative would have voted by party affiliation; (2) all would have been present and voting; (3) the Vermont Independent would have voted for Vice President Gore, because he votes with the Democrats to organize the House; [176] and (4) the evenly divided states would not have cast substantive votes.

Governor Bush would have had the votes of twenty-eight House state delegations, an absolute majority, but a majority of only three, and Vice President Gore would have had the votes of eighteen states. Connecticut, Illinois, Maryland, and Nevada would not have voted because their delegations were evenly divided, but this would not have affected the outcome.

With respect to the four divided states, only the people of Nevada voted for Governor Bush. If a majority of the Representatives from each of the divided states--Connecticut, Illinois, Maryland, and Nevada--had voted in accordance with their states' popular votes, three states would have been added to the Gore vote and one, Nevada, to the Bush vote. [177]

The political party majority of eight House state delegations was different from how the people of those states voted for President. The people of five states whose House delegations had Democratic  **\*643**  Party majorities-- Arkansas, Mississippi, North Dakota, Texas, and West Virginia--voted for Governor Bush; the people of three states whose House delegations had Republican Party majorities--Iowa, New Mexico, and Pennsylvania--voted for Vice President Gore. One can imagine the political pressure on each of the Representatives from those states to vote in accordance with their district's [178] or state's popular votes.

APPENDIX - 166

**\*645** So, if those House state delegations had voted the way the people of their states had voted, Governor Bush would have added the votes of five states and lost the votes of three, and Vice President Gore would have lost the votes of three.

Finally, as the table shows, in seven state delegations--Mississippi, Missouri, New Jersey, Pennsylvania, Tennessee, Utah, and West Virginia--only one vote separated the Republican and Democratic Representatives. The people of Missouri, Tennessee, and Utah, states whose House delegations had a Republican majority of one, voted for Governor Bush, and the people of New Jersey, whose House delegation had a Democratic majority of one, voted for Vice President Gore. The West Virginia delegation consisted of two Democrats and one Republican, but its people voted for Governor Bush. The Pennsylvania delegation consisted of 11 Republicans and ten Democrats, but its people voted for Vice President Gore. [179]

We can, therefore, conclude that although House election of President Bush in 2000 was likely, House rules establishing both majority and quorum requirements and legislation dealing with the voting of the divided states might have made House choice of a President more authoritative.

Had there been a third presidential candidate who won elector votes, the situation would have been more problematic. [180]

## **\*646  V. ADOPTION OF HOUSE RULES**

Even though the electors' votes are not generally counted by Congress until January 6, the popular vote results for President and the likely elector votes are usually known immediately after Election Day in November. The actual results of the elector votes are usually known immediately or soon after the first Monday after the second Wednesday in December. [181]

Although under the Twentieth Amendment the term of the outgoing Congress does not expire until noon on January 3 of the next year, Congress usually adjourns *sine die*, i.e., terminates its session, prior to the November general election. However, the adjournment resolution usually includes a provision permitting the Congress to be recalled prior to January 3, if necessary. [182]

Thus, if the presidential election is so close (as it was in 2000) that there is a possibility that the House would choose the President, the Lame Duck House, if still in session or if called into session, could adopt rules to govern the House presidential election. Or the new House could adopt rules or amend any previously adopted rules in the few days between the commencement of a new Congress at noon on January 3 and the counting of elector votes, which usually takes place on January 6. [183]

**\*647** Even if the House had adjourned, the appropriate standing committee or committees could hold hearings on and draft proposed rules. [184]

But it would be far better for the House to consider the issues that would be raised by such rules in a detached context. House Resolution 785 [185] would have established a Select Committee on Procedures for Election of a President in the House of Representatives. It was introduced by Representative John L. Burton on September 9, 1980, and referred to the Committee on Rules. The Select Committee would have (1) investigated existing statutes, rules, procedures, and precedents relating to election of the President by the House, the extent to which existing law and precedents are appropriate for the present conduct of such elections, and changes which should be made in existing law; and (2) reported to the House concerning its investigation. The resolution would have authorized the Speaker to appoint ten members; the only criterion was that six should be members of the majority party. The committee would have been authorized to hold hearings and otherwise act during any session, recess, or adjournment of the then-present House, its authority to expire on the earlier of (a) thirty days after filing its report with the House or (b) "just prior to noon on January 3, 1981." [186] This resolution apparently sought to avoid the question of whether it would have had the effect of ousting the jurisdiction of any standing committee by providing that its "report shall be referred to the committee or committees which have jurisdiction over the subject matter thereof." [187] In 1980, the possibly significant third presidential candidacy of Representative John B. Anderson almost certainly was the impetus for the introduction of this resolution, but nonetheless no further action was taken. [188]

Similarly, on June 10, 1992, Representative Pat Roberts submitted a resolution, [189] which was referred to the Committee on House Administration, to establish a panel of constitutional experts to recommend **\*648** to the House an appropriate process for

APPENDIX - 167

Case 6:20-cv-00660-JDK  Document 33  Filed 01/01/21  Page 169 of 553 PageID #:  574

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

the selection of a President under the Twelfth and Twentieth Amendments. Presumably, Representative Roberts was motivated by the third-party candidacy of Mr. H. Ross Perot, but again no further action was taken.

### A. Jurisdiction of Relevant Standing Committees of the House

Which House committees would have jurisdiction over the drafting of such rules?

#### 1. Rules Committee

The Committee on Rules is a Standing Committee of the House with jurisdiction over the "rules and joint rules (other than [those] relating to the Code of Official Conduct) and order of business of the House," and it is authorized, specifically, "to sit and act whether or not the House is in session." [190]  Its jurisdiction includes orders relating to use of the galleries during the electoral count [191] and special orders providing times and methods for consideration of particular bills and resolutions. [192]

Rules were adopted by the Committee on Rules to regulate its own operations and establish two standing subcommittees, the Subcommittee on Legislative and Budget Process and the Subcommittee on Rules and Organization of the House. The latter is responsible, among other things, for "matters ... [concerning] relations between the two Houses of Congress, relations between the Congress and the Judiciary, and internal operations of the House." [193]  The latter subcommittee would seem to have jurisdiction of rules for the House presidential election process, but Rule 5(b)(2) authorizes the Chair of the Committee to retain whole Committee jurisdiction. [194]  If, as seems likely, the full Committee considered rules for the House presidential election, it would almost certainly hold hearings on them as **\*649** the House rules provide, [195] and as the Rules of the Rules Committee also provide. [196]

#### 2. Committee on House Administration

The House Standing Committee which has legislative jurisdiction over rules for House election of the President is the Committee on House Administration. House Rule X gives this Committee jurisdiction over measures relating to the "election of the President, Vice President ... and Federal elections generally." [197]  The rules adopted by the Committee on House Administration contain no provisions for subcommittees, but Rule 16 authorizes the Chair to appoint appropriate subunits. [198]

#### 3. Joint Referral

If issues arose as to whether or not both the Committee on Rules and the Committee on House Administration had jurisdiction over any measures or rules regarding the election of the President by the House, the House Rules appear to require the Speaker to refer a matter to all committees with jurisdiction. [199]

#### \*650 B. Authorization and Appointment of Select Committee

House Rule X, clause 6(e) authorizes the Speaker to appoint select committees ordered by the House from time to time. [200]  With the approval of the House, under House Rule X, clause 2(c), he may also appoint special ad hoc committees from the members of committees having jurisdiction over a matter. [201]  The Rules Committee's jurisdiction includes resolutions providing for the appointment of special committees. [202]

#### C. Legislative Commission

As an alternative to standing committees or special committees of the House, one could imagine establishing a commission by legislative act for the purpose of investigating and reporting to the House the rules and procedures for electing the President.

APPENDIX - 168

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 170 of 553 PageID #:  575

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L.....

Such a body's functions could extend beyond a single Congressional term. [203] Arguably, the report of a presumably highly qualified, independent, bi-partisan commission should have some authority.

### *651 D. Adoption of House Presidential Election Rules

If a resolution containing proposed House presidential election rules were reported from a committee, it may be debated in the House or in the Committee of the Whole. [204] Debates in the House would be under the one-hour rule, which generally permits every one of the 435 members who chooses to speak to do so for not more than one hour but not more than once. [205] More expeditious adoption of House presidential election rules would be facilitated by a special order or rule reported from the Committee on Rules, providing for debate on the proposed rules in the Committee of the Whole House, because in general, debate on amendments to resolutions in that Committee is permitted under the "five-minute rule." [206]

To approve new rules or amend old ones, both the House and the Committee of the Whole require a majority of votes, [207] with a quorum being present. [208] The Committee of the Whole House does not vote on the question of passage of a resolution; it reports the resolution to the House. [209]

### *652 E. Enactment of Legislation Establishing Rules for House Presidential Elections

The House, let alone one whose term is about to end when third-party candidacies or popular vote polls or both make it possible that a President may be chosen by the new House, may wish to establish rules for election of the President which represent a political consensus by engaging the Senate and the President in that effort or some of that effort. [210] Such a House may also consider the fact that the new House, which convenes on January 3, must be present at the counting of the elector votes on January 6 or thereabouts, and then might have to "immediately" proceed to the election of the President. The new House may not be able, and almost certainly will not have time, to thoughtfully consider rules for that election.

We have also seen that at least two of the issues raised by the Twelfth Amendment and the 1801 and 1825 Rules--"not exceeding three" and "divided"--may not be able to be resolved by House rules as such. [211] Could they be resolved by law?

### *653 1. Interplay Between Statutory House Rules and House Adopted Rules

Enactment of a statute purporting to establish House presidential election rules or some of them could raise an issue under Article I, Section 5, clause 2 and Article VI, clause 2 of the Constitution. The former provides, "[e]ach House may determine the Rules of its Proceedings," [212] and the latter provides, "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land." [213] *Jefferson's Manual* takes the position that laws affecting rules of House proceedings enacted by a prior Congress are not binding on a subsequent House, but such laws enacted by a present Congress are. [214] The policy basis for this distinction apparently rests on the theory that while a past House may not bind a future House, [215] a present House may bind itself. But there are examples--some provisions of the Electoral Count Act of 1887 [216] are possibly some of them, as are the legislative reorganization *655 acts, [217] reorganization acts, [218] "fast track" trade agreement authorizations, [219] and other statutes [220]--that purport to determine rules for at least some Senate or House proceedings. I have not made an exhaustive survey of such statutes.

However, the major statutes amending the standing rules of the House (and Senate) explicitly acknowledge the constitutional right of each House to determine the rules for its own proceedings and to change any such rules contained in legislation. [221] Thus, even if a present *657 vote for a statute could be said to have bound itself, logically a subsequent motion in the same House to adopt a rule inconsistent with the law would seem to be as in order, as would a subsequent motion in that House to modify or repeal a rule it had adopted during that session.

Such a statute would also be subject to repeal or amendment by the new Congress in the few days between its convening and its required counting of the electors' votes, but such repeal or amendment would be subject to signature, veto, or pocket veto

APPENDIX - 169

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 171 of 553 PageID #: 576

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L.....

by the outgoing President, who will undoubtedly be interested in the House presidential election outcome whether or not he or she is a candidate to succeed him- or herself.

Finally, as we have seen, *Jefferson's Manual* flatly asserts that no statute can preclude a subsequent House or Senate from determining the rules of its own proceedings.[222] If this is so, then these statutory acknowledgments simply state the Constitution-based rule.

Nevertheless, the existence of these House (and Senate) rule enactments implies that they serve at least a presumptive purpose. On that assumption, we consider whether legislation could resolve the "not exceeding three" and divided House state delegation issues.

### 2. "Not Exceeding Three"

As we have seen, the legislative history of the Twelfth Amendment decision to change the constitutional formulation "from the five highest on the list" to "the persons having the highest numbers not exceeding three" suggests that it was not intended to confer discretion on the House to choose from fewer than three.[223] Nor did the Twelfth Amendment enactors resolve the issue of elector tie votes among the candidates for President and Vice President, even though the Constitution had provided for the issue.[224]

**\*658** Let us assume that a law was enacted making clear that the House does not have the power to consider fewer than three presidential candidates, assuming at least three receive elector votes, and it and the Senate have the power to consider more than three or two candidates for President or Vice President, respectively, if there are ties among the highest on the list. Nothing in the Constitution, including its amendments, specifically authorizes such an enactment. Nor does anything prohibit it. Would it be constitutional? Analogous authority suggests that it would be.

In *Ex parte Yarbrough*,[225] the Court rejected the proposition "that when a question of the power of Congress arises the advocate of the power must be able to place his finger on words which expressly grant it."[226] It sustained a prosecution for conspiracy to intimidate a citizen in the exercise of his right to vote for a member of Congress:

> Because there is no *express* power to provide for preventing violence exercised on the voter[,] ... no such law can be enacted. It destroys at one blow, in construing the Constitution of the United States, the doctrine universally applied to all instruments of writing, that what is implied is as much a part of the instrument as what is expressed. This principle, in its application to the Constitution of the United States, more than to almost any other writing, is a necessity, by reason of the inherent inability to put into words all derivative powers--a difficulty which the instrument itself recognizes by conferring on Congress the authority to pass all laws necessary and proper to carry into execution the powers expressly granted and all other powers vested in the government or any branch of it by the Constitution. Article I., sec. 8, clause 18.[227]

The victim whom the defendants did "beat, bruise, wound, and maltreat"[228] was black, and the Court explicitly invoked the Fifteenth Amendment and Congress's power to enforce it by appropriate legislation.[229] But the Court also held:

> This new constitutional right was mainly designed for citizens of African descent. The principle, however, that the protection of the exercise of this right is within the power of Congress, is as necessary to the right of **\*659** other citizens to vote as to the colored citizen, and to the right to vote in general as to the right to be protected against discrimination.

> The exercise of the right in both instances is guaranteed by the Constitution, and should be kept free and pure by congressional enactments whenever that is necessary.[230]

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 19

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 172 of 553 PageID #:  577

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L.....

These principles for the protection of votes for Congress were extended to the protection of votes for President and Vice President. In *Burroughs & Cannon v. United States,* [231] the Court rejected the following argument of petitioners:

> The Constitution confers upon the State the exclusive power of appointing presidential electors ... except the time of choosing them. Having fixed the time, Congress has exhausted all of its power respecting their appointment, save the power to prevent the discriminations forbidden by the Fourteenth, Fifteenth, and Nineteenth Amendments. [232]

In upholding conspiracy indictments under the Corrupt Practices Act, [233]

> The President is vested with the executive power of the nation. The importance of his election and the vital character of its relationship to and effect upon the welfare and safety of the whole people cannot be too strongly stated. To say that Congress is without power to pass appropriate legislation to safeguard such an election from the improper use of money to influence the result is to deny to the nation in a vital particular the power of self protection. Congress, undoubtedly, possesses that power, as it possesses every other power essential to preserve the departments and institutions of the general government from impairment or destruction, whether threatened by force or corruption. [234]

The Court concluded:

> The power of Congress to protect the election of President and Vice President from corruption being clear, the choice of means to that end presents a question primarily addressed to the judgment of Congress. If it can be seen that the means adopted are really calculated to attain the end, ... the closeness of the relationship between the means adopted and the end to be attained, are matters for congressional determination alone. [235]

**\*660**  Moreover, should the House decide to consider fewer than three presidential candidates who received the highest elector votes, other than for lack of the constitutional qualifications, or should it or the Senate, respectively, not consider more than three or two qualified presidential or vice presidential candidates because of tie votes, highly undesirable litigation would almost certainly ensue. Alexander Hamilton said flatly, "The qualifications of the persons who may choose or be chosen ... are defined and fixed in the Constitution, and are unalterable by the legislature." [236]

Were the House to reject a constitutionally qualified candidate, it would in effect be impermissibly adding to the presidential or, in the case of the Senate, vice presidential constitutional qualifications. [237] Were either to do so, the candidates rejected would have recourse to the federal judiciary. [238]

**\*661**  There are no examples of the House or Senate excluding or considering excluding a presidential or vice presidential candidate who had received the requisite number of elector votes. Nor are there cases raising that issue. But such a person almost certainly has a constitutional right to be considered by the House or Senate. *Williams v. Rhodes* [239] held that new political parties have a First Amendment right, made applicable to the states by the Fourteenth Amendment, to have the same opportunity to have their presidential electors on the ballot as the established political parties. A presidential or vice presidential candidate who received the requisite number of elector votes would  **\*662**  seem to have an even stronger case for inclusion as a candidate in the House's election of a President or the Senate's of a Vice President. [240]

APPENDIX - 171

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 173 of 553 PageID #:  578

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

Thus, the Congress may, and should, consider legislating under the Twelfth Amendment that neither the House nor the Senate has the power to exclude from consideration candidates who receive sufficient elector votes so that they qualify as among the three or two highest, respectively, because of elector vote ties.


### 3. Divided

Let us assume that (1) a House state delegation quorum, if required, was present, or (2) such a House state delegation could not vote, because it could not muster a quorum, if so required, or (3) it could not vote, because it could not muster whatever majority might be required. [241] If so, what would be the rule of decision for the casting of such a vote? Could a statute deem the votes for President cast, or authorize and direct the House Speaker to cast those votes, for a House state delegation that did not vote?

 **\*663**  Again, not a word in the Constitution authorizes (or prohibits) such a law. But the situation appears to be substantively different from that discussed in the immediately preceding section of this article, "Not Exceeding Three." There, the issue was protecting candidates' rights to be considered by the House for President if they win sufficient elector votes.

House Rule VIII does assert authority to compel members to attend and to vote:

> 1. Every Member shall be present within the Hall of the House during its sittings, unless excused or necessarily prevented; and shall vote on each question put, unless he has a direct personal or pecuniary interest in the event of such question. [242]

Under House Rule XV(2) and (4), absent members may be arrested by the Sergeant-at-Arms. [243]


But compelling attendance is not compelling voting. Indeed, under House Rule XV(4) and (5)(a), ordinarily Representatives may vote "Present." [244]

Moreover, the comment to House Rule VIII(1), quoted above, states:

> It has been found impracticable to enforce the provision requiring every Member to vote (V, 5942-5948), and such question, even if entertained, may not interrupt a pending roll call vote (V, 5947) .... [245]


Nevertheless, in accordance with the plain meaning of House Rule VIII(1), quoted immediately above, and consistent with the Other Body's Rules, [246] perhaps a House Rule would be in order that compelled Representatives not only to attend, but to vote at the meetings of their respective state delegations to decide how they should vote for President. But as we shall see in a moment, such a rule, though undoubtedly useful, would not necessarily obviate the need for a law, at least in the case of the thirteen one- and two-Representative House state delegations.

 **\*664**  Returning to the question of a statute, [247] can a distinction be drawn between compelling a Representative's attendance and voting on a bill, resolution, or motion, and voting for President as part of a state delegation? The difficulty with the former is the absence of any objective criteria to determine how the compelled vote is to be cast. In the case of a Representative's compelled vote as part of her or his House state delegation's vote for President, how the people of that state voted for President could provide a rule for decision, [248] remembering that (1) under the Twelfth Amendment the states vote for President through their electors, who except in the cases of Maine, Nebraska, and faithlessness, vote unanimously; and (2) the House chooses a President by voting by states. If none of the three highest on the list won a state, there would be no decisional rule for that state's House delegation.

There is also the, admittedly expedient, argument that neither the people of any state nor that state would want to, or should, be deprived of their House delegation's vote for President because of lack of a quorum or of a majority in its delegation, particularly

APPENDIX - 172

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 174 of 553 PageID #:  579

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L.....

given the Twelfth Amendment quorum requirement of two-thirds of the States, the majority requirement of all the states for the vote, and the possible difficulty of assembling such a majority.

It may not be necessary to deal with the issue of compelling individual Representatives to vote. A statute could, in the case of a House state delegation that, for whatever reason, did not cast its vote for President, deem that state's vote cast or authorize and direct the Speaker to cast that state's vote for President in accordance with that state's popular vote, again assuming one of the three highest on the list won it. This argument would seem to be particularly compelling in the case of the vacancy, disability, or absence of a Representative from one or more of the seven one-Representative states or from one or more of the five two-Representative states, the latter of whose delegations consequently would have difficulty assembling either a quorum or a majority or both, if required to do so.

If one of the three highest on the list did not win that state's popular vote, then perhaps that state's vote should be cast for the national  **\*665**  winner of the popular vote, including the District of Columbia, because under the Twenty-third Amendment it has the number of electors to which it would be entitled if it were a state, even though, as we have seen, the District's delegate has no vote for President in the House, [249] as has been at least once proposed.

## **\*668**  VI. SUMMARY OF RECOMMENDATIONS

The Senate should consider amending its rules to eliminate the possibility of a vice presidential election filibuster.

The House should consider whether or not:

      a. it should meet in Executive Session when it chooses a President;

      b. the state delegations should vote by ballot;

      c. there should be majority or quorum rules for voting by the state delegations;

      d. it should by rule interpret "not exceeding three" to permit it to consider tied candidates and not to reject any candidates, except perhaps in the case of the lack of constitutional qualifications, or if legislation should be enacted to make it clear that that phrase does not confer discretion on the House to reject a presidential candidate, except perhaps in the foregoing cases;

      e. legislation should be enacted authorizing, for example, the Speaker to cast the votes of divided House state delegations; and if so, should the objective criteria for the casting of such votes be for the state's presidential popular vote winner, the national popular vote winner, or in the present case of Maine and Nebraska, for their winners of their congressional districts;

      f. what procedure it should follow to determine that it is deadlocked and cannot chose a President; and

      g. it should amend its rules to make applicable the procedures for invoking the powers of the Sergeant-at-Arms to compel the attendance of absent Representatives when it is choosing a President.

APPENDIX - 173

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 175 of 553 PageID #: 580

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

**\*669** The Congress should consider legislation eliminating the presidential succession gaps discussed in this Article. As Elizabeth Garrett said:

> The impetus for the Electoral Count Act was the debacle of the Hayes-Tilden election and the strong desire to avoid designing structures of deliberation and decisionmaking in an ex post way .... [250]

We have previously described the legislative process that led to the enactment of the Electoral Count Act in detail. [251] That process lasted more than a year, even though the Congress presumably had benefited from its two previous unsuccessful legislative efforts.

The issues raised and discussed in this article are substantial and of extraordinary public importance. The Senate and House of Representatives need to take the time to consider these issues and resolve them by rule wherever possible and by legislation when necessary. Such consideration should not be part of a mad partisan scramble under heavy time pressure to meet the short deadlines between a general election on the first Tuesday after the first Monday in November, the convening of the new Congress on or about January 3, and the beginning of the terms of the new President and Vice President on January 20. [252]

### Footnotes

[a1]    William **Josephson** is a retired partner of Fried, Frank, Harris, Shriver & Jacobson, LLP. The views expressed and all errors are his alone. He is most grateful to Beverly J. Ross, Esq., co-author of two prior articles about the so-called Electoral College, *infra* note 1, for her research and editorial contributions to this Article and to the two prior articles. Gratitude is also expressed to Fried Frank librarians, Margot Gee, Nancy A. Rine, Deena Subar, Sue Ann Orsini, Marcy Cabanas, and Warren Gordon. He is also grateful to his assistant, June M. Little, for research assistance, and to Susan Wilker of the Journal of Constitutional Law for marvelous editing. This article is current as of March 18, 2009.

[1]    Beverly J. Ross & William **Josephson**, *The Electoral College and the Popular Vote*, 12 J.L. & POL'Y 665 (1996) [hereinafter Ross & **Josephson**, *Popular Vote*]; William **Josephson** & Beverly J. Ross, *Repairing the Electoral College*, 22 J. LEGIS. 145 (1996) [hereinafter **Josephson** & Ross, *Repairing*].
The debate over the Electoral College continues. *See also* Christopher Anglim, *A Selective, Annotated Bibliography on the Electoral College: Its Creation, History, and Prospects for Reform*, 85 LAW LIBR. J. 297 (1993). *Compare* GEORGE C. EDWARDS III, WHY THE ELECTORAL COLLEGE IS BAD FOR AMERICA (Yale Univ. Press 2004) *with* TARA ROSS, ENLIGHTENED DEMOCRACY: THE CASE FOR THE ELECTORAL COLLEGE (World Ahead Publishing 2004).
Robert W. Bennett believes the Electoral College can be "tamed." ROBERT W. BENNETT, TAMING THE ELECTORAL COLLEGE (Stanford Univ. Press 2006). I am most grateful to Professor Bennett for reading and commenting on a draft of this Article. *The New York Times* has editorially defended, attacked, and advocated ameliorating the College. *Compare* Editorial, *The Case for the Electoral College*, N.Y. TIMES, Dec. 19, 2000, at A34, *with* Editorial, *A Really Modest Proposal*, N.Y. TIMES, Nov. 6, 2004, at A18, *and* Editorial, *Drop Out of the College*, N.Y. TIMES, Mar. 14, 2006, at A26. Most recently, the newspaper has supported the so-called National Popular Vote effort. Editorial, *Maryland Takes the Lead*, N.Y. TIMES, Apr. 14, 2007, at A14. *See infra* note 249. Recently, it called for a constitutional amendment abolishing the College without stating what would take its place. Editorial, *Flunking the Electoral College*, N.Y. TIMES, Nov. 20, 2008, at A42. It referred to the National Popular Vote effort without actually endorsing it. *Id.* The *Times* subsequently printed five letters, only one of which supported abolition, and none even referred to National Popular Vote. Letter to the Editor, N.Y. TIMES, Nov. 24, 2008, at A24.
Some recent authors' substantive positions on the College seem difficult to ascertain. *See, e.g.*, Michael Herz, *How the Electoral College Imitates the World Series*, 23 CARDOZO L. REV. 1191 (2002); Note, *Rethinking the Electoral College Debate: The Framers, Federalism, and One Person, One Vote*, 114 HARV. L. REV. 2526 (2001).
Therefore, it seems useful to repeat our comment from *Repairing*: "[W]e choose to be analysts and improvers ... not defenders or attackers." **Josephson** & Ross, *Repairing*, *supra*, at 151.

APPENDIX - 174

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 176 of 553 PageID #: 581

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

The legal status of electors, discussed in **Josephson** & Ross, *Repairing*, *supra*, at 152, and in Ross & **Josephson**, *Popular Vote*, *supra*, at notes 250 and 251, and accompanying text, has since been the subject of two articles. Vasan Kesavan, *The Very Faithless Elector?*, 104 W. VA. L. REV. 123 (2001); John A. Zadrozny, *The Myth of Discretion: Why Presidential Electors Do Not Receive First Amendment Protection*, 11 COMMLAW CONSPECTUS 165 (2003).

2

*E.g.*, Bush v. Gore, 531 U.S. 98 (2000); Bush v. Palm Beach County Canvassing Bd., 531 U.S. 70 (2000).

3

U.S. CONST. art. II, § 1, cl. 3; *see also* 3 U.S.C. § 15 (2006).

Disagreement initially existed as to whether the Vice President counts the electoral votes or only presides over the joint session of Congress and announces the result. *See* **Josephson** & Ross, *Repairing*, *supra* note 1, at 179; Ross & **Josephson**, *Popular Vote*, *supra* note 1, at 705. On September 17, 1787, the Constitutional Convention adopted an implementing resolution that provided in relevant part, "[T]he Senators should appoint a President of the Senate, for the sole Purpose of receiving, opening *and counting* the Votes for President ...." Constitutional Convention Res. adopted September 17, 1787, *reprinted in* THE CONSTITUTION OF THE UNITED STATES OF AMERICA: ANALYSIS AND INTERPRETATION, S. Doc. No. 103-6, 103d Cong., 1st Sess. 21-22 (Johnny H. Killian & George A. Costello eds. 1996), *available at* http:// www.gpoaccess.gov/constitution/pdf/con044a.pdf (emphasis added) [hereinafter KILLIAN & COSTELLO].

4

U.S. CONST. art. II, § 1, cl. 3.

5

U.S. CONST. art. I, § 3, cls. 4, 5.

6

John Adams in 1793 and 1797, Thomas Jefferson in 1801, George Clinton in 1809, John C. Calhoun in 1829, Martin Van Buren in 1837, John C. Breckinridge in 1861, Thomas C. Marshall in 1917, Charles Curtis in 1933, John N. Garner in 1937, Richard M. Nixon in 1957 and 1961, Spiro T. Agnew in 1973, Walter F. Mondale in 1981, George H.W. Bush in 1985 and 1989, Daniel Quayle in 1993, Albert Gore, Jr. in 1997 and 2001, and Richard B. Cheney in 2005. WORLD ALMANAC AND BOOK OF FACTS (2005) [hereinafter WORLD ALMANAC 2005].

Vice President Hubert H. Humphrey did not preside in 1969, and Richard B. Russell presided as President *pro tempore* of the Senate. 115 CONG. REC. 145, 171-72 & 246 (1969); SENATE MANUAL, S. DOC. NO. 106-1, 106th Cong., 1st Sess. 994 (2000) [hereinafter SENATE MANUAL]. Robert W. Bennett speculates that this was because of "conflict." BENNETT, *supra* note 1, at 202 n.65. Actually, Vice President Humphrey was in Norway in early January 1969, attending the funeral of former United Nations Secretary General Trygvie Lie as the official representative of the President of the United States. E-mail from Norman Sherman to Toni Nesbit, Assistant to the Honorable Max M. Kampelman (Aug. 4, 2006, 11:13 EST) (on file with author).

7

BENNETT, *supra* note 1, at 24-25, 29; Michael J. Glennon, *Nine Ways to Avoid a Train Wreck: How Title 3 Should Be Changed*, 23 CARDOZO L. REV. 1159, 1187-89 (2002).

Kesavan describes the conduct of Vice Presidents John Adams and Thomas Jefferson during the counting of elector votes in 1797 and 1801, respectively. Vasan Kesavan, *Is the Electoral Count Act Unconstitutional?*, 80 N.C. L. REV. 1653, 1656-57 n.3 (2002). He later argues, notwithstanding the language of the Twelfth Amendment, that 3 U.S.C. § 15 may be unconstitutional, because it makes the President of the Senate the presiding officer over the elector vote count. *Id.* at 1700. It is not clear on what constitutional prohibition he is relying. If he is relying on the absence of specific constitutional authorization for a statute specifying who will preside over the counting, then he must contend, as he tries to do, with the Twelfth Amendment's specific statement, "[t]he President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted." *Id.* at 1696-1701 (alteration in original). Someone needs to preside. If not the Vice President, acting as President of the Senate, then who? See *infra* notes 34 and 225-35 and accompanying text for arguments that should sustain the constitutionality of 3 U.S.C. § 15 in this respect.

Professor Ackerman and Mr. Fontana describe Adams's and Jefferson's actions in far greater length and with impressive historical research. Bruce Ackerman & David Fontana, *Thomas Jefferson Counts Himself into the Presidency*, 90 VA. L. REV. 551 (2004). They conclude that 3 U.S.C. § 15 is constitutional. *Id.* at 636 n.239, 640. They also conclude that both Adams and Jefferson acted properly. They dismiss Kesavan's arguments as "a case study on the dangers of a misguided textualism .... [H]is interpretations seem far less plausible than those that Congress has consistently adopted over the course of two centuries." *Id.* at 631 n.220.

8

U.S. CONST. art. I, § 3, cl. 4.

APPENDIX - 175

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 177 of 553 PageID #:  582

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

Prior to the adoption of the Twenty-fifth Amendment, the United States had no Vice President when elector votes were to be counted from 1841 to 1845, from 1850 to 1853, from 1865 to 1869, from 1881 to 1885, from 1899 to 1901, from 1923 to 1925, from 1945 to 1949, and from 1963 to 1965 because the Vice Presidents were acting as President. WORLD ALMANAC 2005, *supra* note 6.

Prior to the adoption of the Twenty-fifth Amendment, the United States had had no Vice President due to death at least four times when the elector votes were to be counted: in 1875 (Henry Wilson), 1885 (Thomas A. Hendricks), 1899 (Garret A. Hobart), and 1912 (James S. Sherman). SENATE MANUAL, *supra* note 6, at 1078, 1082, 1085, 1088. Another source says that this was also true of George Clinton (Apr. 20, 1812), Elbridge Gerry (Nov. 23, 1814), and William R. King (Apr. 18, 1853). WORLD ALMANAC 2005, *supra* note 6, at 563-64. The Senate Manual does not confirm this, but the World Almanac is confirmed by "Occasions When Vice Presidents Have Voted to Break Tie Votes in the Senate" compiled by the Senate Historical Office from a variety of sources and dated May 2003, which is on file with the author.

The United States had no Vice President when elector votes were to be counted only once due to resignation, that of John C. Calhoun in 1832. WORLD ALMANAC 2005, *supra* note 6, at 579 & n.1.

Twice for brief periods since the adoption of the Twenty-fifth Amendment on February 23, 1967, the United States has not had a Vice President: between the resignation of Vice President Spiro T. Agnew on October 10, 1973, and Gerald R. Ford's swearing in as Vice President on December 6, 1973, and between Vice President Ford's swearing in as President on August 9, 1974, and New York Governor Nelson A. Rockefeller's swearing in as Vice President on December 29, 1974. SENATE MANUAL, *supra* note 6, at 1104 n.1. But on neither occasion was the vice presidency vacant when elector votes were to be counted.

9   U.S. CONST. art. I, § 3, cl. 5.

10   S. Doc. No. 101-25 (1992), *reprinted in* FLOYD M. RIDDICK & ALAN S. FRUMIN, RIDDICK'S SENATE PROCEDURE: PRECEDENTS AND PRACTICES 1019-24 (Alan S. Frumin ed., rev. ed. 1992), *available at* http://www.gpoaccess.gov/riddick/browse.html. Mr. Riddick, the Senate Parliamentarian emeritus, states, "The Vice President or President *pro tempore*, in such a joint session is the presiding officer ...." *Id.* at 812.

11   U.S. CONST. amend. XII (emphasis added). When the Twelfth Amendment says "ballot," it means the identity of each voter is not revealed, i.e., is secret. **Josephson** & Ross, *Repairing*, *supra* note 1, at 172 nn.199-203 and accompanying text; Ross & **Josephson**, *Popular Vote*, *supra* note 1, at 677 n.61 and accompanying text; *cf.* House Rule XXXVIII, *in* CONSTITUTION, JEFFERSON'S MANUAL, AND RULES OF THE HOUSE OF REPRESENTATIVES, H.R. Doc. No. 103-342, 103d Cong., 2d Sess. 766 § 934 (1995) (first adopted in 1789) [hereinafter JEFFERSON'S MANUAL]. The ad hoc rules adopted for the House presidential elections of 1801 and 1825 provided for ballot boxes for the ballots of each state's House delegation and for the states' ballots. Rules of the U.S. House of Representatives, 6th Cong., 2d Sess. § 6 (1801), *reprinted in* MICHAEL J. GLENNON, WHEN NO MAJORITY RULES: THE ELECTORAL COLLEGE AND PRESIDENTIAL SUCCESSION app. D, at 145-47 (Congressional Quarterly Inc. 1992) [hereinafter 1801 Rules]; Rules of the U.S. House of Representatives, 18th Cong., 2d Sess. § 5 (1825) [hereinafter 1825 Rules], *reprinted in* GLENNON, *supra*, app. D, at 147-49. Professor Glennon agrees with our opinion that "ballot" means "secret," *id.* at 50-51, as does Kesavan in *The Very Faithless Elector?*, *supra* note 1, at 138. *See also* LUCIUS WILMERDING, JR., THE ELECTORAL COLLEGE 172, 182-83, 206-07 (1958); *Presidential Succession Between the Popular Election and the Inauguration: Hearing Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary*, 103d Cong., 2d Sess. 15 n.26 (1994) (statement of Ass't Att'y Gen. of the U.S. Walter Dellinger, Office of Legal Counsel, Justice Dep't) [hereinafter *Presidential Succession Hearings*]; Kesavan, *supra* note 7, at 1803 & nn.587, 588; James C. Kirby, Jr., *Limitations on the Power of State Legislatures over Presidential Elections*, 27 LAW & CONTEMP. PROBS. 495, 506 (1962).

In a July 1, 1980 memorandum to the Honorable Richard Bolling of Missouri, Chair of the House Committee on Rules, Representative Martin Frost reviewed the House's precedents and concluded, "It is clear by practice that the House has consistently interpreted 'by ballot' in the 12th Amendment to mean secret written ballot." Memorandum from Congressman Martin Frost, *printed in* 138 Cong. Rec. 15,690, 15,691, cols. 2 & 3 (1992) [hereinafter *Frost Memo*]. Representative Frost inserted this memo on June 22, 1992 because in that year there were "three contending candidates for President ...." *Id.* at 15,690, col. 1. Representative Frost acknowledged that even were "the House to adopt a rule to the contrary in 1981 [i.e., not by ballot] ... this undoubtedly would raise a major furor." *Id.* at 15,691, col. 3.

The secondary authorities are not unanimous on the issue of secret ballot. *See, e.g.*, ROBERT M. HARDAWAY, THE ELECTORAL COLLEGE AND THE CONSTITUTION: THE CASE FOR PRESERVING FEDERALISM 58 (1994). The *Frost Memo* argued "for the maximum amount of public scrutiny of the process consistent with the Constitution."

APPENDIX - 176

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 178 of 553 PageID #:  583

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L.....

*Frost Memo, supra*, at 15690, col. 1. Professor Bennett thoughtfully discusses the issues in BENNETT, *supra* note 1, at 104-05.

12    Although under the Twenty-third Amendment, the District of Columbia's three electors vote for President and Vice President, the District was not made a state for purposes of the Twelfth Amendment. Therefore, the District of Columbia's non-voting delegate to the House does not vote for President. The legislative history of the Twenty-third Amendment is clear that this treatment of the District was not an oversight but deliberate:

MINIMUM IMPACT; PRESERVATION OF ORIGINAL CONCEPT OF CONSTITUTION

The proposed amendment would change the Constitution only to the minimum extent necessary to give the District appropriate participation in *national elections. It would not make the District of Columbia a State. It would not give the District of Columbia any other attributes of a State* or change the constitutional powers of the Congress to legislate with respect to the District of Columbia and to prescribe its forms of government. *It would not authorize the District to have representation in the Senate or the House of Representatives. It would not alter the total number of presidential electors from the States, the total number of Representatives in the House of Representatives, or the apportionment of electors or Representatives among the States.* It would, however, perpetuate recognition of the unique status of the District as the seat of Federal Government under the exclusive legislative control of Congress.

H.R. REP. NO. 86-1698, at 3 (1960)H.R. REP. NO. 86-1698, at 3 (1960) (emphases added). Nevertheless, the District's three electors are electors, and thus their number adds to the majority of the whole number requirement for elector election of the President and Vice President.

13    U.S. CONST. art. II, § 1, cl. 3, *amended by* U.S. CONST. amend XII.

14    U.S. CONST. amend. XII, *superseded by* U.S. CONST. amend. XX, § 3.

15    U.S. CONST. amend. XII.

16    Under the Constitution, "Representatives ... shall be apportioned among the several States ... according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, ... excluding Indians not taxed, three fifths of all other Persons." U.S. Dep't of Commerce v. Montana, 503 U.S. 442, 444 n.1 (1992) (first two alterations in original) (quoting U.S. CONST. art. I, § 2, cl. 3). Section 2 of the Fourteenth Amendment provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." *Id.* at 444 n.1 (quoting U.S. CONST. art. XIV, § 2; *see also* 2 U.S.C. §§ 2a(a)- 2(c) (2006)(establishing the criteria for allocating the number of Representatives for each state).

The U.S. Code forbids the Bureau of the Census's use of "the statistical method known as 'sampling'" "for the determination of population for purposes of apportionment of Representatives in Congress among the several States." 13 U.S.C. § 195 (2006); *see also* Dep't of Commerce v. U.S. House of Representatives, 525 U.S. 316, 317 (1999) (holding that the Census Act prohibits the use of statistical sampling to determine the population for congressional apportionment purposes). In Utah v. Evans, 536 U.S. 452 (2002), the Court sustained the use of "hot-deck imputation" for apportionment purposes and rejected Utah's claim for an additional Representative, which would have required reducing North Carolina's House representation because the total number of Representatives is statutorily fixed at 435. *See* Act of Aug. 8, 1911, ch. 5, §§ 1-2, 37 Stat. 13-14.

On April 19, 2007, the House passed H.R. 1905, which would permanently increase the number of Representatives to 437 by giving the District of Columbia a Representative and giving Utah an elected-at-large Representative. H.R. 1905, 110th Cong. (1st Sess. 2007). On April 20, the bill was referred to the Senate Committee on Finance. On September 18, 2007, the Senate failed by a vote of fifty-seven to forty-two to close debate on this bill. Ian Urbina, *District of Columbia Voting Bill Falls Short in Senate*, N.Y. TIMES, Sept. 19, 2007, at A20. S. 150 and H.R. 157, 111th Cong. (1st Sess. 2009), the former of which has already passed the Senate, are in part to the same effect. Because the District of Columbia is not a state, *see supra* note 12, the principal purpose of these bills raises substantial constitutional issues. *See* Evan P. Schultz, *Text Here to Vote: The Push for D.C. Voting Rights Calls Up the Flaws in Constitutional Interpretation*, LEGAL TIMES, Mar. 16, 2009, at 16.

Should the House be called upon to choose a President, the number of Representatives in each state's House delegation can obviously affect the vote for President. The Framers thought that a contingent election of the President in the House, instead of in the Senate, would "lessen[] the aristocratic influence of the Senate." JAMES MADISON, NOTES OF DEBATES IN THE FEDERAL CONVENTION OF 1787, at 592 (Ohio Univ. Press 1966) (quoting Colonel George Mason); *see also* THE FEDERALIST NOS. 55, 56, 57, at 338-53 (James Madison) (Clinton Rossiter ed.,

APPENDIX - 177

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 179 of 553 PageID #: 584

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

2003) (discussing the difficulty of determining and rationalizing the number of Representatives for each state); *cf.* THE FEDERALIST NO. 66, at 399-405 (Alexander Hamilton) (Clinton Rossiter ed., 2003) (objecting to the Senate sitting as the court of impeachment since this would consolidate too much power in the Senate). The Framers also thought that the House would elect "the man who in their opinion may be best qualified for the office." THE FEDERALIST NO. 68, at 412 (Alexander Hamilton) (Clinton Rossiter ed., 2003).

Apportionment of House seats and gerrymandering can obviously affect how democratic (with a small "d") the choice of a President would be for each House state delegation. In 1789, a constitutional amendment for reapportionment was proposed by Congress as part of what later became the Bill of Rights. This amendment was not originally ratified, but it eventually became the Twenty-seventh Amendment. The unratified amendment provided:

After the first enumeration required by the first article of the Constitution, there shall be one Representative for every thirty thousand, until the number shall amount to one hundred, after which the proportion shall be so regulated by Congress, that there shall be not less than one hundred Representatives, nor less than one Representative for every forty thousand persons, until the number of Representatives shall amount to two hundred; after which the proportion shall be so regulated by Congress, that there shall be not less than two hundred Representatives, nor more than one Representative for every fifty thousand persons.

RICHARD B. BERNSTEIN & JEROME AGEL, AMENDING AMERICA: IF WE LOVE THE CONSTITUTION SO MUCH, WHY DO WE KEEP TRYING TO CHANGE IT?, app. B at 301 (1993); *see also* KILLIAN & COSTELLO, *supra* note 3, at 47 (explaining the method for electors to vote).

For discussions of the second Congress's struggle to apportion the House after the 1790 census, see David P. Currie, *The Constitution in Congress: The Second Congress, 1791-1793*, 90 NW. U. L. REV. 606, 607-15 (1996), and DAVID P. CURRIE, THE CONSTITUTION IN CONGRESS: THE FEDERALIST PERIOD 1789-1801, at 128-36 (Univ. of Chi. Press 1997) [hereinafter CURRIE, FEDERALIST PERIOD].

The history of Congress's abandoned attempts to statutorily require compact and contiguous congressional districts of equal population is recounted in *Wesberry v. Sanders*, 376 U.S. 1, 42-45 (1964) (Harlan, J., dissenting). The Supreme Court held that these statutes were not reenacted in *Wood v. Broom*, 287 U.S. 1 (1932).

Gerrymandering affects the House's choosing a President to the extent that it results, state-by-state, in more Representatives from one party than compact, contiguous, and equal population congressional districts might produce. For example, in 2003, Texas redistricted its congressional districts for the 2004 general election, which resulted in Republican candidates winning twenty-one House seats to the Democrats' eleven; prior to 2001, the Democrats had a 17-15 majority in Texas's House delegation. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 412-13 (2006); *accord* STEVE BICKERSTAFF, LINES IN THE SAND: CONGRESSIONAL REDISTRICTING IN TEXAS AND THE DOWNFALL OF TOM DELAY (2007). Texas has voted for the Republican Party candidate for President since 1980. U.S. Census Bureau, *Statistical Abstract of the United States: 2000*, 274-75 tbls.455 & 456 (120th ed. 2001) (providing information for the years 1980-96); WORLD ALMANAC 2005, *supra* note 6, at 594 (providing information for the year 2000); U.S. Nat'l Archives & Records Admin., *2004 Presidential Election, Popular Vote Totals* (2004), http://www.archives.gov/federal-register/electoral-college/2004/popular_vote.html (providing information for the year 2004). However, in 2004 President Bush's 4,527,000 Texas votes were approximately 61% of the votes cast for major political party presidential candidates. *See* U.S. Census Bureau, *Statistical Abstract of the United States: 2008*, tbl.388 (127th ed.). Republicans won 58% of the vote in statewide races against Democrats, *League of United Latin Am. Citizens*, 548 U.S. at 413, while winning 62.5% of the redistricted House seats, nearly 5% more than their showing in 2004 statewide races. *Id.*

Unfortunately, none of the Supreme Court gerrymandering opinions appear to be aware of this particularly sinister aspect of gerrymandering. David S. Wagner identifies this type of gerrymandering as an issue with respect to congressional district elector appointments using the district systems in Maine and Nebraska as examples. David S. Wagner, *The Forgotten Avenue of Reform: The Role of States in Electoral College Reform and the Use of Ballot Initiatives to Effect that Change*, 25 REV. LITIG. 575, 585 (2006). For information with respect to Maine and Nebraska's district systems, *see infra* note 178. House districts seem likely to become more and more gerrymandered until the Supreme Court finally intervenes. *See* Rachel Morris, *The Race to Gerrymander*, WASH. MONTHLY, Nov. 2006, at 15 (discussing the problems gerrymandering creates in various states).

The voluminous academic literature on gerrymandering also seems to not be aware of its consequences for a House election of a President. *E.g.*, Samuel Issacharoff, *Gerrymandering and Political Cartels*, 116 HARV. L. REV. 593 (2002) (discussing gerrymandering as a harm); Nathaniel Persily, Reply, *In Defense of Foxes Guarding Henhouses: The Case for Judicial Acquiescence to Incumbent-Protecting Gerrymanders*, 116 HARV. L. REV. 649 (2002) (identifying incumbent control of redistricting as a means to immunize districts from partisan competition); Samuel Issacharoff, Surreply, *Why*

Case 6:20-cv-00660-JDK    Document 33    Filed 01/01/21    Page 180 of 553 PageID #:  585

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

*Elections?*, 116 HARV. L. REV. 684 (2002) (highlighting the reasons why processes exist as they are despite a lack of textual justification).

An interesting note, *A New Map: Partisan Gerrymandering as a Federalism Injury*, argues "that the Court should therefore abandon its conception of partisan gerrymandering as a species of vote dilution and focus instead on the federalism injury that state legislatures inflict when they interfere with the ability of the 'People of the several states' to elect their national representatives." 117 HARV. L. REV. 1196, 1198 (2004). This argument would have been strengthened had the author also considered the consequences of gerrymandering for House elections of a President.

California Governor Arnold Schwarzenegger's ballot initiative proposal to shift the power to redraw legislative districts from the State Legislature to a panel of retired judges was defeated. John Broder, *Not on Ballot, Schwarzenegger Is Still Rebuked*, N.Y. TIMES, Nov. 10, 2005, at A1.

Bills have also been introduced in the New York State legislature to authorize or create apportionment commissions. S. 2047, A. 5413, Reg. Sess. (N.Y. 2007).

New York State Governor Eliot Spitzer proposed a State constitutional amendment "to emancipate redistricting from partisan gerrymanders." Letter from Jerry H. Goldfeder, Chair, Comm. on Election Law, Ass'n of the Bar of the City of N.Y., to Eliot Spitzer, Governor of the State of N.Y. (Jan. 7, 2008), *available at* http://www.nycbar.org/pdf/report/dpny-22644164-v1-Signed.pdf (supporting and criticizing the proposal).

The American Bar Association's House of Delegates, on February 12, 2008, approved a resolution, recommended by two ABA Sections and its Standing Committee on Election Law, urging each state to assign the redistricting process for congressional and legislative districts to independent commissions. Michael Asimow, *Section of Administrative Law and Regulatory Practice, Report to ABA House of Delegates* (2008), *available at* http:// www.abanet.org/leadership/2008/midyear/sum_of_rec_docs/hundredtwoa_102A_ FINAL.doc.

17    CHARLES L. BLACK, JR., A NEW BIRTH OF FREEDOM: HUMAN RIGHTS, NAMED AND UNNAMED 109-10 (1997).

According to the 2000 census, the mean population of the states was 5,612,436. WORLD ALMANAC 2005, *supra* note 6, at 371. Only sixteen states, slightly less than a third, had a higher population than the mean. *Id.* These states had 322 electoral votes, *id.* at 592, far more than the 268 required for a majority (the constitutionally required absolute majority of the fifty states), but only 16 states in a House election of a President. The twelve states with the largest elector votes have an electoral college majority of 271. *Id.* But these states would have only 12 votes in any House election of a President. At the inception of the United States, the five states--slightly more than a third--with the greatest number of elector votes (Virginia with 12, Massachusetts with 10, Pennsylvania with 10, and Maryland and New York with 8 each) had 48 votes, an electoral college majority. But they had only 5 votes in any House election of a President. *Id.* at 623.

Because in 1787 there was no census, Article I, Section 2, clause 3 of the Constitution apportioned the initial Representatives as indicated by the second column of the following table:

| STATE | REPRESENTATIVES | 1790 CENSUS TOTALS | POST-1790 CENSUS REPRESENTATIVES |
|---|---|---|---|
| New Hampshire | 3 | 141,885 | 4 |
| Massachusetts | 8 | 378,787 | 14 |
| Rhode Island | 1 | 68,825 | 2 |
| Connecticut | 5 | 237,946 | 7 |
| New York | 6 | 340,120 | 10 |
| New Jersey | 4 | 184,139 | 5 |
| Pennsylvania | 8 | 434,373 | 13 |
| Delaware | 1 | 59,094 | 1 |
| Maryland | 6 | 319,728 | 8 |

APPENDIX - 179

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 181 of 553 PageID #:  586

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

| | | | |
|---|---|---|---|
| Virginia | 10 | 747,610 | 19 |
| North Carolina | 5 | 393,751 | 10 |
| South Carolina | 5 | 249,000 | 6 |
| Georgia | 3 | 82,548 | 2 |
| **Totals** | **65** | | |

The source for South Carolina's 1790 Census population is WORLD ALMANAC 2005, *supra* note 6, at 622 (rounded). Otherwise, the source for the third column is RETURN OF THE WHOLE NUMBER OF PERSONS WITHIN THE SEVERAL DISTRICTS OF THE UNITED STATES 3 (1793) (Act of March 1, 1791). The source for the fourth column is SENATE MANUAL, *supra* note 6, at 1132-33.

The elector votes of the thirteen original states as provided in the Constitution totaled 91. Only 69 votes were counted in the 1788 election: 8 from New York, 7 from North Carolina, 3 from Rhode Island, and 2 from each of Maryland and Virginia not having voted. *Id.* at 1063. The mean and the median numbers of electors were seven, with a majority at forty-six. Please note in column four the extraordinary increase in Representatives of Massachusetts, New York, North Carolina, Pennsylvania, and Virginia (which included what is now West Virginia, which was not admitted to the Union until 1863) as compared to the 1787 estimate. *See* Vasan Kesavan & Michael Stokes Paulsen, *Is West Virginia Unconstitutional?*, 90 CAL. L. REV. 291, 301 (2002) (discussing the admission of West Virginia into the Union). In the 1790 census, Kentucky (73,677), Maine (96,540), Tennessee (36,000 rounded), and Vermont (85,539) were also counted. The source for Kentucky, Maine, and Vermont is RETURN OF THE WHOLE NUMBER OF PERSONS WITHIN THE SEVERAL DISTRICTS OF THE UNITED STATES, *supra*, at 3. The source for Tennessee is WORLD ALMANAC 2005, *supra* note 6, at 622.

Kentucky had two Representatives, and Tennessee and Vermont one each. SENATE MANUAL, *supra* note 6, at 1133.

[18] One vote from each of the: (1) seven one-Representative states (Alaska, Delaware, Montana, North Dakota, South Dakota, Vermont, and Wyoming); (2) six two-Representative states (Hawaii, Idaho, Maine, Nevada, New Hampshire, and Rhode Island); (3) four three-Representative states (Nebraska, New Mexico, Utah, and West Virginia); (4) two four-Representative states (Arkansas and Kansas); (5) three five-Representative states (Iowa, Mississippi, and Oregon); and (6) six six-Representative states (Arizona, Colorado, Connecticut, Kentucky, Oklahoma, and South Carolina). SENATE MANUAL, *supra* note 6, at 1132-33, col. 22 (providing the 1990 apportionment).

However, this possibility is very theoretical. Assuming that: (1) each House state delegation would have cast its ballots along party lines; (2) Connecticut and Nevada would not have voted, having equal numbers of Republicans and Democrats; and (3) the independent Representative from Vermont would have voted for the Democratic Party candidate, since he typically voted with the Democrats to organize the House, *see* 147 CONG. REC. H3 (daily ed. Jan. 3, 2001), then eight of the foregoing twenty-eight small states (Arkansas, Connecticut, Hawaii, Maine, North Dakota, Oregon, Rhode Island, Vermont, and West Virginia) would have cast their ballots for the Democratic Party candidate. *See generally* CONGRESSIONAL YELLOW BOOK (Spring 1999). Thus, in the 106th Congress, the Republicans had a majority in the House delegations of only seventeen of the smaller states. *Id.* at 928, 929, 934, 936, 940, 944-46, 955, 956, 958, 960, 966, 970, 971, 976, 982.

It would have been extremely difficult for any political party to acquire a twenty-six-state majority from only the smallest states. For example, only two of the seven-, eight-, and nine-person House state delegations had Republican majorities in the 106th Congress: Louisiana and Tennessee. *Id.* at 951, 963.

Many of the larger states--California, Massachusetts, Michigan, New York, and Texas--had more Democrat than Republican Representatives, though the balance in some was close (Illinois, New Jersey, and Pennsylvania), and Florida and Ohio had Republican majorities. *Id.* at 927-82.

[19] U.S. CONST. amend. XII (emphasis added).

[20] In the election of 1836-37, Martin Van Buren, President Andrew Jackson's second-term Vice President, was elected President with both a popular and an electoral vote majority. SENATE MANUAL, *supra* note 6, at 1070. But Richard M. Johnson, Van Buren's running mate, received one vote less than a majority of electors. *Id.* On February 8, 1837, the

APPENDIX - 180

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 182 of 553 PageID #:  587

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

Senate elected Johnson on its first roll call vote by thirty-three to sixteen. 13 REG. DEB. 738-39 (1837). Then-President *pro tempore* of the Senate, William R. King of Alabama, presided over that vote. *Id.* at 739

21  In the election of 1824, John C. Calhoun won a majority of the elector votes for Vice President, even though no presidential candidate had an elector majority. SENATE MANUAL, *supra* note 6, at 1068. Vice President Calhoun was also President Andrew Jackson's first-term Vice President. *Id.* at 1069. He resigned December 28, 1832, to become a Senator. WORLD ALMANAC 2005, *supra* note 6, at 579. Thus, he did not preside as Vice President over the counting of the elector votes in 1833, and William R. King did as then-President *pro tempore* of the Senate. SENATE MANUAL, *supra* note 6, at 992; 9 REG. DEB. 1722-23 (1833).

22  In the disputed election of 1876, William A. Wheeler was elected Vice President by exactly the same number of elector votes as Rutherford B. Hayes had allegedly garnered for President. SENATE MANUAL, *supra* note 6, at 1080.

23  🔖 Reynolds v. Sims, 377 U.S. 533 (1964); 🔖 Wesberry v. Sanders, 376 U.S. 1 (1964).

24  U.S. CONST. art. I, § 2, cl. 1.

25  U.S. CONST. art. I, § 3, cl. 1.

26  U.S. CONST. art. I, § 4, cl. 2.

27  U.S. CONST. art. II, § 1, cl. 1.

28  JEFFERSON'S MANUAL, *supra* note 11, § 6; KILLIAN & COSTELLO, *supra* note 3, at 425-26.

29  JEFFERSON'S MANUAL, *supra* note 11, § 150.

30  **Josephson** & Ross, *Repairing*, *supra* note 1, at 175 & nn.222-23; *see also* Act of March 1, 1792, ch. 8, § 12, 1 Stat. 241 (making March 4 the commencement day for the four-year terms of the President and Vice President). This Act also contains this remarkable section:
Sec. 10. *And be it further enacted*, That whenever the offices of President and Vice President shall both become vacant, the Secretary of State shall forthwith cause a notification thereof to be made to the executive of every state ... specifying that electors of the President of the United States shall be appointed or chosen in the several states within thirty-four days preceding the first Wednesday in December then next ensuing: *Provided*, There shall be the space of two months between the date of such notification and the said first Wednesday in December ....
*Id.* at 1 Stat. 240-41. The section further provides that if the notices were sent less than two months before such Wednesday and if the presidential terms were not to expire on the third day in March thereafter, then such electors would be chosen in the next year. *Id.* The history of this special elections provision is discussed in CURRIE, FEDERALIST PERIOD, *supra* note 16, at 144-46. The Second Congress and President George Washington apparently had no doubt of their constitutional authority to provide for a special presidential election, perhaps resting on the last phrase of Article II, Section 1, clause 6, "or a President shall be elected," and Article I, Section 8, clause 18, the Necessary and Proper Clause. *Hearings on H.R. 10268 & H.R. 11256 Before Committee on Election of the President, Vice President, and Representatives in Congress*, 68th Cong., 2d Sess. 18-19 (1925) [hereinafter *1925 House Hearings*]. For discussion of the Necessary and Proper Clause as authority for federal legislation with respect to presidential elections, see *infra* notes 221 & 225-34 and accompanying text.

31  U.S. CONST. amend. XII, *superseded by* U.S. CONST. amend. XX, as to the reference to the fourth day of March.

32  Section 3 of the Twentieth Amendment also provided:
If, at the time fixed for the beginning of the term of the President, the President *elect* shall have died, the Vice President *elect* shall *become* President. If a President shall not have been *chosen* before the time fixed for the beginning of his term, ... then the Vice President *elect* shall *act* as President until a President shall have qualified; and the Congress may by law provide for the case wherein neither a President *elect* nor a Vice President *elect* shall have *qualified*, declaring who shall then act as President, or the manner in which one who is to act shall be selected ....
U.S. CONST. amend. XX, § 3 (emphases added). For a discussion of the inapplicability of this provision to the failure of the House to choose a President and/or the Senate to choose a Vice President, see *infra* note 40. Section 4 of the Twentieth Amendment provides that:

APPENDIX - 181

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 183 of 553 PageID #: 588

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

The Congress may by law provide for the case of the *death* of any of the persons from whom the House of Representatives may choose a President whenever the right of choice shall have devolved upon them, and for the case of the *death* of any of the persons from whom the Senate may chose a Vice President whenever the right of choice shall have devolved upon them.

U.S. CONST. amend. XX, § 4 (emphases added). Although hearings were held in 1994, no laws implementing either of these provisions have been enacted. *Presidential Succession Hearings*, *supra* note 11 *passim*.

For the possible but doubtful relevance of the Presidential Succession Act, 3 U.S.C. § 19 (2006), see *infra* note 62 and accompanying text.

The combination of sections three and four supersedes the Twelfth Amendment's "if the House of Representatives shall not choose a President ... before the fourth day of March next following, then the Vice President shall act as President ...." U.S. CONST. amend. XX. Thus, the suggestion of Sanford Levinson & Ernest A. Young, *Who's Afraid of the Twelfth Amendment?*, that "No ... subsequent constitutional provisions have *amended* the Twelfth Amendment" is not correct. 29 FLA. ST. U. L. REV. 925, 943 n.73 (2001).

33    U.S. CONST. amend. XX, §§ 1-2.

34    3 U.S.C. § 15 (2006). For some reason, a concurrent resolution is adopted implementing the statute. *E.g.,* S. Con. Res. 1, 97th Cong., 1st Sess. (1981). Sometimes the date is changed if January 6 is a Sunday. *See infra* note 183.

The Constitution in Article II, Section 1, clause 4, authorizes Congress to "determine the Time of chusing the Electors, and the Day on which they shall give their Votes." U.S. CONST. art. II, § 1, cl.4; *see* 3 U.S.C. §§ 1, 7 (2006) (setting a November date for appointing electors and a December date to give their votes). *McPherson v. Blacker*, 146 U.S. 1, 41 (1892), held unconstitutional Michigan's legislation that purported to change this date. *Accord* Maddox v. Bd. of State Canvassers, 149 P.2d 112 (Mont. 1944).

The Twelfth Amendment, like clause 3 of Section 1 of Article II of the Constitution, directs that the elector votes be counted in the presence of the Senate and House but does not specify the day on which the counting shall take place. If the Congress can determine the time of choosing electors, the day electors vote, and, at the least, witness the counting of the electors' votes, someone must have the power to determine when the votes will be counted. If not Congress, who? If an explicit constitutional grant of authority is required, Congress's power to set a date for the counting could be based on the second substantive arm of the Necessary and Proper Clause, "other Powers vested by this Constitution in the Government of the United States." U.S. CONST. art. I, § 8, cl. 18. For a discussion of the issues thus raised, see **Josephson** & Ross, *Repairing*, *supra* note 1, at 176 and Ross & **Josephson**, *Popular Vote*, *supra* note 1, at 713 *et seq. But see* Kesavan, *supra* note 7, at 1660-62 (arguing that 3 U.S.C. § 15 is unconstitutional). Nevertheless, as Chief Justice Marshall famously said in *McCulloch v. Maryland*, even before he reached the Necessary and Proper Clause issues: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." 17 U.S. (4 Wheat.) 316, 420 (1819).

We will return to these issues when we discuss Congress's power to protect the presidential election process. *See infra* notes 225-35 and accompanying text.

35    For two quite different versions of the events of 1876-77, compare ROY MORRIS, JR., FRAUD OF THE CENTURY: RUTHERFORD B. HAYES, SAMUEL TILDEN, AND THE STOLEN ELECTION PF 1876 (2003), with WILLIAM H. REHNQUIST, CENTENNIAL CRISIS: THE DISPUTED ELECTION OF 1876 (2004), and John Copeland Nagle, *How Not to Count Votes*, 104 COLUM. L. REV. 1732 (2004) (reviewing both books).

President Grant's second-term Vice President, Henry Wilson, died on November 22, 1875. WORLD ALMANAC 2005, *supra* note 6, at 579 n.6. Therefore, no Vice President presided over the 1877 counting of the elector votes, but Thomas W. Ferry, the President *pro tempore* of the Senate, did preside. SENATE MANUAL, *supra* note 6, at 993; *accord* 5 Cong. Rec. 1195 (Feb. 1, 1877), 1703 (Feb. 20, 1877), 1888 (col. 1) (Feb. 24, 1877); *see supra* note 10.

36    U.S. CONST. amend. XII (emphasis added). Rule VI of the Senate Rules provides in subsection 1 that a "quorum shall consist of a majority of the Senators duly chosen and sworn." SENATE MANUAL, *supra* note 6, at 5. But the Twelfth Amendment's two-thirds of the whole number quorum requirement obviously overrides that, at least for purposes of the Senate vote for Vice President.

Subsection 2 of Senate Rule VI says, "No Senator shall absent himself from the service of the Senate without leave." SENATE MANUAL, *supra* note 6, at 5. Subsection 4 authorizes the Sergeant at Arms to request, "when necessary,

APPENDIX - 182

Case 6:20-cv-00660-JDK  Document 33  Filed 01/01/21  Page 184 of 553 PageID #:  589

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

to compel the attendance of the absent Senators." *Id.*; *see also* S. Doc. No. 101-25 (1992), *reprinted in* RIDDICK & FRUMIN, RIDDICK'S SENATE PROCEDURE, *supra* note 10, at 275-81 (discussing Senate precedents).

[37]   *See supra* note 20. This precedent also supports Michael J. Glennon's argument that, unlike the House presidential election proceedings in 1801 and 1825, which were held in executive session, *see infra* notes 92 and 93 and accompanying text, the Senate vice presidential election proceedings should be open. MICHAEL J. GLENNON, WHEN NO MAJORITY RULES: THE ELECTORAL COLLEGE AND PRESIDENTIAL SUCCESSION 57 (1992). Senate Rule XXI does provide for sessions with closed doors. SENATE MANUAL, *supra* note 6, at 20; *see* RIDDICK & FRUMIN, RIDDICK'S SENATE PROCEDURE, *supra* note 10, at 275-81.

[38]   U.S. CONST. amend. XII.

[39]   U.S. CONST. art. II, § 1, cl. 3 (emphasis added).

[40]   *See infra* Parts III.B.2.c & V.E.2. What if one of the two vice presidential candidates lacks the constitutional qualifications or has withdrawn, died, or become incompetent? The House Report on what became the Twentieth Amendment expressed the opinion that the Senate, *like the House,* could not vote for a dead *person* but did not express an opinion as to any of the other issues. H.R. REP. No. 72-345H.R. REP. No. 72-345, at 6, 7 (1932). *See also generally* Ross & **Josephson**, *Popular Vote*, *supra* note 1, *passim* (discussing whether or not Congress could refuse to count *elector* votes for a dead candidate). Arguably, the same considerations apply to Senators' votes for a deceased vice presidential candidate. *See infra* notes 142 and 143 and accompanying text.

[41]   DAVID P. CURRIE, THE CONSTITUTION IN CONGRESS: THE JEFFERSONIANS 1801-1829, at 39-54 (2001); TADAHISA KURODA, THE ORIGINS OF THE TWELFTH AMENDMENT: THE ELECTORAL COLLEGE IN THE EARLY REPUBLIC, 1787-1804 (1994).

[42]   KURODA, *supra* note 41, at chs. 13 & 14.

[43]   CURRIE, *supra* note 41, at 49-51. In an October 29, 1924 radio address, the then-Clerk of the House of Representatives, William Tyler Page, said:
One of the purposes of the twelfth amendment in conferring upon the Senate the power to elect a Vice President was to avoid, if possible, an interregnum in Government, which would certainly occur, however brief it might be, if the Senate postponed the election of a Vice President *until* the House *failed* to elect a President. *1925 House Hearings*, *supra* note 30, at 11-12 (emphasis added); *cf.* Laurence H. Tribe & Thomas M. Rollins, *Deadlock: What Happens if Nobody Wins*, ATLANTIC MONTHLY, Oct. 1980, at 49-50, 60-61 (digital ed. Part I at 1 & Part II at 6), *available at* http:// www.theatlantic.com/issues/80*o*ct/deadlock.htm (speculating that the Senate would elect Walter Mondale as Acting President if the 1980 presidential election had been thrown into the House).

[44]   U.S. CONST. amend. XX, § 3.

[45]   *Id.* (emphasis added).

[46]   JEFFERSON'S MANUAL, *supra* note 11, § 154; KILLIAN & COSTELLO, *supra* note 3, at 433-34; KURODA, *supra* note 42, at 79-80; JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES §§ 757-59 (1987) (1833); Bruce G. Peabody & Scott E. Gant, *The Twice and Future President: Constitutional Interstices and the Twenty-Second Amendment*, 83 MINN. L. REV. 565, 619 (1999); *cf.* Kesavan, *supra* note 1, at 126-27. The qualifications for Vice President are the same as those for President by virtue of the last sentence of the Twelfth Amendment.
The state cases supporting this construction of "qualified" are exemplified by *Toy v. Voelker*, 262 N.W. 881, 885-86 (Mich. 1935).
To these qualifications should be added the Twenty-second Amendment, prohibiting a President or Vice President from serving more than two terms, U.S. CONST. amend. XXII, § 1, and § 3 of the Fourteenth Amendment, barring anyone who has "engaged in insurrection or rebellion ... or given aid or comfort to the enemies ...." *Id.* at amend. XIV, § 3. But see, in the case of the Twenty-second Amendment, Peabody & Gant, *supra*, *passim* (arguing that the Twenty-second Amendment only applies to election, not service).
The Twelfth Amendment requirement that no elector can vote for a President and Vice President who are inhabitants of the same state does not itself appear to have been construed. U.S. CONST. amend. XII. But the use of "inhabitant" does not only relate to presidential and vice presidential qualifications. The Constitution also provides that a Senator and/or

APPENDIX - 183

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 185 of 553 PageID #: 590

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

Representative must, "when elected, be an Inhabitant of that State for which he shall be chosen." *Id.* at art. I, § 3, cl. 3; *id.* at art. I, § 2, cl. 2 (the Representative formulation is "in which," not "for which"). The Constitutional Convention history is discussed in *Schaefer v. Townsend*, 215 F.3d 1031, 1036-37 (9th Cir. 2000), *cert. denied*, 532 U.S. 904 (2001). This discussion was relied on in *Jones v. Bush*, which rejected a claim that the Texas electors should be enjoined from voting because both presidential candidate Governor George W. Bush and Vice Presidential candidate Richard B. Cheney were inhabitants of Texas. 122 F. Supp. 2d 713 (N.D. Tex. 2000), *aff'd without opinion*, 244 F.3d 134 (5th Cir. 2000), *cert. denied*, 531 U.S. 1062 (2001). Sanford Levinson--one of the counsel for plaintiffs in *Jones v. Bush*--and Ernest A. Young asked, "Does the Habitation Clause serve any worthwhile values?" Levinson & Young, *supra* note 32, at 950-54; *see also* James C. Ho, *Much Ado About Nothing: Dick Cheney and the Twelfth Amendment*, 5 TEX. REV. L. & POL. 227 (2000).

For a contrarian argument that the states may be able to add to the constitutional qualifications of Senators and Representatives--notwithstanding *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995) (holding that states could not impose term limits for members of Congress)--see John C. Eastman, *Open to Merit of Every Description? An Historical Assessment of the Constitution's Qualifications Clauses*, 73 DENV. U. L. REV. 89 (1995). However, he does not seem to understand that his opinions, if accepted, would also imply that the states could add to the constitutional qualifications for President and Vice President, which seems highly unlikely.

A United States District Court ruled that Senator John McCain, born in the then-Panama Canal Zone, is a "natural born Citizen." Robinson v. Bowen, 567 F. Supp. 2d 1144 (N.D. Cal. 2008). The history supporting this interpretation is in KILLIAN & COSTELLO, *supra* note 2. A similar suit was dismissed for lack of standing. Hollander v. McCain, 566 F. Supp. 2d 63 (D.N.H. 2008); *see also* Ted J. Chiappari & Angelo A. Paparelli, *Natural-Born Citizenship: McCain OK for Presidency?*, N.Y. L.J., Aug. 22, 2008, at 3.

In *Berg v. Obama*, a United States District Court denied plaintiff's motion for a temporary restraining order in an action alleging that then-Senator Barack Obama had lost his United States citizenship, and on October 24, 2008, the Court dismissed the complaint, largely for lack of standing. 574 F. Supp. 2d 509 (E.D. Pa. 2008); *see also* Ted J. Chiappari & Angelo A. Paparelli, *President-Elect Obama, Dual Citizenship and the Constitution*, N.Y. L.J., Dec. 30, 2008, at 3.

Minor party candidates who were under thirty-five years of age have been held in unreported cases to be ineligible to be on presidential ballots. *See, e.g.*, *McCain Wins Ballot Access Lawsuit*, BALLOT ACCESS NEWS (Richard Winger, S.F., Cal), Oct. 1, 2008, http://www.ballot-access.org/2008/100108.html#5 (describing two such unreported cases, *Jenness v. Brown*, (D. Ohio 1972) and *Cleaver v. Jordan*, (Cal. 1968), *cert. denied*, 393 U.S. 810 (1968)).

47    H.R. REP. NO. 72-345, at 6 (1932)H.R. REP. NO. 72-345, at 6 (1932) (Committee on Election of President, Vice President, or Representatives in Congress on S.J. Res. 14 which, as amended, became the Twentieth Amendment); *Presidential Succession Hearings*, *supra* note 11, at 7, 9 (testimony of Ass't Att'y Gen. Walter Dellinger); *id.* at 11 (statement of Ass't Att'y Gen. Walter Dellinger); *id.* at 41 (testimony of Akhil Reed Amar); **Josephson** & Ross, *Repairing*, *supra* note 1, at 189 n.329.

48    H.R. REP. NO. 72-633H.R. REP. NO. 72-633, 3-4 (1932) (Conf. Rep.), *reprinted in* 75 CONG. REC. 5026-27 (daily ed. Mar. 1, 1932).

49    *Id.* at 5027, para. 4 (statement of the House Managers).

50    SENATE MANUAL, *supra* note 6, at 5; *see*RIDDICK & FRUMIN, RIDDICK'S SENATE PROCEDURE, *supra* note 10, at 214-24 (detailing the Senate's right to compel attendance).

51    SENATE MANUAL, *supra* note 6, at 10; *see*RIDDICK & FRUMIN, RIDDICK'S SENATE PROCEDURE, *supra* note 10, at 968 (describing Senate "pairing" as an opportunity for absent Senators to express their positions).

52    SENATE MANUAL, *supra* note 6, at 20-22; *see*RIDDICK & FRUMIN, RIDDICK'S SENATE PROCEDURE, *supra* note 10, at 282-334 (detailing the Senate cloture procedure).

53    SENATE MANUAL, *supra* note 6, at 20-22.

54    SENATE MANUAL, *supra* note 6, at 8.

APPENDIX - 184

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 186 of 553 PageID #:  591

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L.....

55    *Id.* at 5. In 1992, Senator David Pryor expressed concern at the possibility of a filibuster with respect to any Senate vice presidential elections. 138 CONG. REC. 11872 (daily ed. May 20, 1992).

56    See *supra* notes 6 and 7 and accompanying text.

57    SENATE MANUAL, *supra* note 6, at 10 § 12.2 (Rule XII.2).

58    *Id.* at 67-71 (Rule XXXVII).

59    "The Vice President of the United States shall be President of the Senate, but shall have no Vote, unless they be equally divided." U.S. CONST. art. I, § 3, cl. 4.

60    U.S. CONST. art. I, § 3, cl. 5.

61    LAWRENCE D. LONGLEY & NEAL R. PEIRCE, THE ELECTORAL COLLEGE PRIMER 2000, at 13 (Yale Univ. Press 1999) (1996). Professor Robert W. Bennett agrees. BENNETT, *supra* note 1, at 20 nn.39-40 & 94; E-mail from Robert Bennett, Professor, to William **Josephson** (Apr. 10, 2008, 12:59 EST) (on file with author).
Kesavan also argues against the Vice President having such a vote because she or he is not a Senator. She or he could be conflicted, and the vice presidential election is not legislation. Kesavan, *supra* note 7, at 1710 n.246. However, Kesavan appears to be unaware of the Senate's precedents for vice presidential voting. *See infra* note 64 and accompanying text.

62    On its face, 3 U.S.C. § 19 was meant to provide for the removal, death, resignation, or inability of either or both a duly elected and qualified President and Vice President. This is consistent with Article II, Section 1, clause 6 of the Constitution, as well as the Act of March 1792, ch. 8, § 9, 1 Stat. 240 (1792), and the Succession Act of 1866. 3 U.S.C. § 19 (2006). The Clerk of the House of Representatives also addressed this concern in 1925. *1925 House Hearings*, *supra* note 30, at 16-18 (Radio Address of William Tyler Page).
The Act provides for the succession to the Presidency of, in order, the Speaker of the House, the President *pro tempore* of the Senate, the Secretary of State, and then other cabinet members in order of the creation of each department. 3 U.S.C. § 19(a)(1), (b), (d)(1) (2006). Very substantial doubt has been raised as to the constitutionality of this statute, insofar as it provides for the succession of the House Speaker or of the President *pro tempore* of the Senate. Akhil Reed Amar & Vickram David Amar, *Is the Presidential Succession Law Constitutional?*, 48 STAN. L. REV. 113 (1995); Scott E. Gant & Bruce G. Peabody, *Musings on a Constitutional Mystery: Missing Presidents and "Headless Monsters"?*, 14 CONST. COMMENT. 83, 87 (1997); Howard M. Wasserman, *Structural Principles and Presidential Succession*, 90 KY. L.J. 345 (2001-02). *But see* John F. Manning, *Not Proved: Some Lingering Questions About Legislative Succession to the Presidency*, 48 STAN. L. REV. 141 (1995); *cf.* Thomas H. Neale, *Election of the President and Vice President by Congress: Contingent Election*, *CRS* [Cong. Res. Service] *Report for Congress* 5-6 (Order Code RS20300 Jan. 17, 2001). Nevertheless, the doubts the Amar brothers have raised were also raised in the congressional debates on the 1792 Act, CURRIE, FEDERALIST PERIOD, *supra* note 16, at 139-44, and thereafter. *1925 House Hearings*, *supra* note 30, at 19-20.

To some extent, 3 U.S.C § 19 has been displaced by the Twenty-fifth Amendment, which provides in Section 1 that "[i]n case of the removal of the President from office or of his death or resignation, the Vice President shall become President." U.S. CONST. amend. XXV, § 2. Article II, Section 1, clause 6 of the Constitution had said only that "the Powers and Duties of the said Office [of President] ... shall Devolve on the Vice President." However, in 1841 Vice President Tyler took the position that he was President, and this precedent was thereafter followed and has now been confirmed by the Twenty-fifth Amendment. KILLIAN & COSTELLO, *supra* note 3, at 435. Those editors' suggestion that the Tyler precedent was supported by the last phrase of the clause, "or a President shall be elected," seems incorrect, because the phrase relates only to the absence of "both" the President and Vice President. A better, but not completely compelling, argument could be based on Article I, Section 3, clause 5, which makes it clear that a Vice President, exercising the Office of President, cannot also continue to be President of the Senate, presumably because of separation of powers policies.
Section 2 of the Twenty-fifth Amendment provides that when there is a vacancy in the vice presidency, the President shall nominate a Vice President. U.S. CONST. amend. XXV, § 1.

Sections 1 and 2 together make it unlikely, but not impossible, that both offices could be simultaneously vacant.*Id.* §§ 1, 2.

APPENDIX - 185

In any case, the Succession Act does not clearly apply to a failure by the House to elect a President or the Senate a Vice President by the time the new terms of those officers begin. *See supra* note 23; CURRIE, FEDERALIST PERIOD, *supra* note 7, at 294 & n.474. *But cf.*BENNETT, *supra* note 1, at 81. Neither does the Twenty-fifth Amendment. *See infra* notes 169-73 and accompanying text.

63    63C AM. JUR. 2D*Public Officers and Employees* §§ 121, 149-50 (1997). George Ticknor Curtis agrees:
The principal office of the executive department was thus provided for; but the ultimate choice of the Vice President remained to be regulated .... In the first place, it was apparent that the executive would be a branch of the government that ought never to be vacant.
2 GEORGE TICKNOR CURTIS, HISTORY OF THE ORIGIN, FORMATION, AND ADOPTION OF THE CONSTITUTION OF THE UNITED STATES 395 (1863).

64    JEFFERSON'S MANUAL, *supra* note 11, § 36 (cmt.) states:
The right of the Vice President to vote has been construed to extend to questions relating to the organization of the Senate (V, 5975), as the election of officers of the Senate (V, 5972-5974), or a decision on the title of a claimant to a seat (V, 5976, 5977).
The citations are to ASHER C. HINDS, HINDS' PRECEDENTS OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES (1907) [hereinafter HINDS' PRECEDENTS]; JEFFERSON'S MANUAL, *supra* note 11, at 17.
In recognition of the fact that after noon on January 20, 2001, Vice President Richard B. Cheney could have broken 50-50 tie votes for the organization of the Senate, 147 CONG. REC. 532-42, 548 (daily ed. Jan. 22, 2001), the Democratic and Republican Leaders of the Senate negotiated and agreed upon, and the Senate adopted, Senate Resolution 8, 107th Cong., 1st Sess. (2001). Accordingly, the senior Democratic Senator and the Democratic Leader acted as President *pro tempore* and Majority Leader, respectively, from January 3, 2001, until noon on January 20, 2001, and thereafter the senior Republican Senator and the Republican Leader acted as President *pro tempore* and Majority Leader. Shortly thereafter, however, Senator Jim Jeffords decided to become an independent and to vote with Democratic Party Senators to reorganize the Senate. *See* Wasserman, *supra* note 62, at 404 n.251.
According to the former Senate Historian, Richard A. Baker, on December 14, 1829, Vice President John C. Calhoun broke a tie vote for Senate Chaplain. Memorandum from Richard A. Baker to William **Josephson** (July 25, 2002) (on file with author). On January 13 and 25, 1832, Vice President Calhoun voted against the nomination of Martin Van Buren as Minister to Great Britain. GEORGE H. HAYNES, THE SENATE OF THE UNITED STATES: ITS HISTORY AND PRACTICE 234-35 (1960). On November 28, 1877, Vice President William H. Wheeler broke a tie on a motion to consider a Senate committee report with respect to a contested election. *Id.* at 236-37.
Vice President Millard Fillmore also broke a tie for Senate Chaplain on January 9, 1850. *Id.* at 236; *see* United States Senate, Senate Chaplain, http:// www.senate.gov/artandhistory/history/common/briefing/Senate_Chaplain.htm (last visited Feb. 28, 2008).
On July 18, 1789, Vice President John Adams cast his first Senate vote to break a tie in favor of the President's power to remove without consulting the Senate an officer to whose appointment the Senate had given its advice and consent. Henry Barrett Learned, *Casting Votes of the Vice-Presidents, 1789-1915*, 20 AM. HIST. REV. 571, 574 (1915). The Senate debate on the Twelfth Amendment apparently assumed that if there was a Vice President, he would break any tie. 13 ANNALS OF CONG. 106 (1803); CURRIE, *supra* note 41, at 52.
James C. Ho, Sanford Levinson, Ernest A. Young, and William P. Marshall each support this opinion. Ho, *supra* note 46, at 239 n.47; Levinson & Young, *supra* note 32, at 934 n.37 (option (1) of three options); William P. Marshall, *The Supreme Court*, Bush v. Gore, *and Rough Justice*, 29 FLA. ST. U. L. REV. 787, 798 & n.61 (2001). Michael J. Glennon also seems to support this opinion in *Nine Ways to Avoid a Train Wreck: How Title 3 Should Be Changed*, *supra* note 7, at 1188-89. As Hamilton observed in the first of the two justifications he offered for the vice presidency:
One is that to secure *at all times* the possibility of a definitive resolution of the body [the Senate], it is necessary that the President should have only a casting vote.
THE FEDERALIST NO. 68, at 413 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (emphasis added). *See generally*RIDDICK & FRUMIN, RIDDICK'S SENATE PROCEDURE, *supra* note 10, at 1124-26.

65    **Josephson** & Ross, *Repairing*, *supra* note 1, at 175.

66    *Id.* at 176-77.

67    SENATE MANUAL, *supra* note 6, at 1068.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    35

Case 6:20-cv-00660-JDK  Document 33  Filed 01/01/21  Page 188 of 553 PageID #:  593

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

68  The latter possibility was foreseen by Robert M. Hardaway in THE ELECTORAL COLLEGE AND THE CONSTITUTION: THE CASE FOR PRESERVING FEDERALISM, *supra* note 11, at 62, and by Robert W. Bennett in BENNETT, *supra* note 1, at 72. All of these possibilities were foreseen by Michael J. Glennon, GLENNON, *supra* note 37, at 56-57. They were also foreseen during the Twelfth Amendment debates, during which at least one Representative argued that it was better to make the wrong person President than to not have one. CURRIE, *supra* note 41, at 51 n.98.

69  American historians do not seem to have paid much attention to the variety and difficulty of the issues raised by House election of the President. For example, a standard history of the House barely mentions the subject, and does not discuss either the procedures or the issues raised by presidential voting by House state delegations. *See*GEORGE B. GALLOWAY, THE HISTORY OF THE HOUSE OF REPRESENTATIVES 7, 285 (Stanley Wise ed., 2d rev. ed. 1976) (1961); *see generally*ROBERT V. REMINI, THE HOUSE: THE HISTORY OF THE HOUSE OF REPRESENTATIVES (2006); CHARLES G. ROSE, HISTORY OF THE UNITED STATES HOUSE OF REPRESENTATIVES, 1789-94, H.R. DOC. NO. 103-324, 103d Cong., 2d Sess. (1994).
Under the original constitutional arrangement in which electors did not vote separately for President and Vice President, "It was rather expected that in the great majority of cases--'nineteen times in twenty,' one of the delegates said--there would be several candidates and that the selection from those candidates would fall to the .... House of Representatives ...." MAX FARRAND, THE FATHERS OF THE CONSTITUTION: A CHRONICLE OF THE ESTABLISHMENT OF THE UNION 137 (1921).
House presidential election has probably attracted more criticism than any other aspect of the Electoral College system. But as Professor Wechsler observed: "[S]ince the House vote by states on failure of an electoral majority is probably unchangeable alone, that feature of the system will probably remain as well, despite the weight and historicity of the objections to it." Herbert Wechsler, *The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government*, 54 COLUM. L. REV. 543, 557 (1954).

70  In 1877, technically, the electors elected the President and the Vice President. As I have said, 1877 should not be regarded as precedential. *See supra* notes 22 and 35 and accompanying text; **Josephson** & Ross, *Repairing*, *supra* note 1, at 156-57.

71  The electoral votes were 73 out of 138 for each Jefferson and Burr, 65 for Adams, 64 for Charles C. Pinkney, and one for John Jay. SENATE MANUAL, *supra* note 6, at 1064; ELECTION OF THE PRESIDENT OF THE UNITED STATES BY THE HOUSE OF REPRESENTATIVES, S. Doc. No. 227, 68th Cong., 2d Sess. 31, 33, 35 (1925) [hereinafter *1925 Senate Document*]; 10 ANNALS OF CONG. 744 (1801).

72  U.S. CONST. art. II, § 1, cl. 3.

73  *Id.*

74  Act of Mar. 1, 1792, 📖 ch. 8, § 5, 📖 1 Stat. 240.

75  CURRIE, FEDERALIST PERIOD, *supra* note 16, at 292-93. That Lame Duck House of Representatives contained 106 members, of whom 58 were Federalists and 48 were Republicans. All were present but two, one who had died and one who was ill. *1925 Senate Document*, *supra* note 71, at 31; *see also* Bruce Ackerman & David Fontana, *Thomas Jefferson Counts Himself into the Presidency*, 90 VA. L. REV. 551, 618-20 (2004).

76  CURRIE, FEDERALIST PERIOD, *supra* note 16, at 293; 5 HINDS' PRECEDENTS, *supra* note 64, § 6008 n.4. (1907).

77  CURRIE, FEDERALIST PERIOD, *supra* note 16, at 293. *1925 Senate Document*, *supra* note 71, at 36-37, attributes the breaking of the deadlock only to Maryland. The current House historian states that the South Carolina House delegation also chose not to vote. REMINI, *supra* note 69, at 72.
Jill Lepore, in *Party Time: Smear Tactics, Skulduggery, and the Début of American Democracy*, NEW YORKER, Sept. 17, 2007, at 94, reviews EDWARD J. LARSON, A MAGNIFICENT CATASTROPHE: THE TUMULTUOUS ELECTION OF 1800, AMERICA'S FIRST PRESIDENTIAL CAMPAIGN (2008), a history of the 1800 presidential election. According to Professor Lepore, Phil Lampi estimates that "around a hundred and fifty-one thousand Americans cast votes for Republicans [in that election], compared with a hundred and thirty-nine thousand for Federalists. To the extent that this serves as a proxy for a popular vote, we now know that Jefferson won." Lepore, *supra*, at 97. The American Antiquarian Society in Worcester, Massachusetts has been digitizing Mr. Lampi's work, and "A New Nation Votes: American Election Returns, 1787-1825" will be made available online. *Id.*

APPENDIX - 187

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 189 of 553 PageID #:  594

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

78 Article II, Section 1, clause 3 of the Constitution provided, "In every Case, after the Choice of the President, the Person having the greatest Number of Votes of the Electors shall be the Vice President. But if there should remain two or more who have equal Votes, the Senate shall chuse from them by Ballot the Vice President." Under the first sentence, Burr, not chosen President, would be Vice President. If (1) Jefferson and Burr had tied for greatest number of votes, but neither had had an absolute majority; (2) five candidates had been before the House; and (3) the House had chosen Adams, Pinkney, or Jay as President, then neither Jefferson nor Burr would automatically have become Vice President. Under the second sentence quoted above, the Vice President would have been chosen from between them by the Senate by ballot.

79 KILLIAN & COSTELLO, *supra* note 3, at 28 n.4. The Twelfth Amendment's provision that "no person constitutionally ineligible to the office of President shall be eligible to that of Vice President of the United States" also filled a small but important constitutional gap. Article II, Section 1, clause 5 provided only for the eligibility of the President, but because prior to the Twelfth Amendment the electors were only voting for President, this was not an oversight.

80 Thus introducing an unnecessary ambiguity, futilely noted along with other ambiguities in House debate at the time. *See* KURODA, *supra* note 41, at 147-48. The House did not attempt to fix the Senate version, at least in part because that would have meant further Senate action, risking inaction. *See* 13 ANNALS OF CONG. 679 (1803); KURODA, *supra* note 41, at 145.

81 The candidate with the highest number of elector votes for President was Andrew Jackson with ninety-nine. SENATE MANUAL, *supra* note 6, at 1068.

82 *Id.*

83 *Id.* John C. Calhoun became Vice President, because he had more than an absolute majority, 182, of elector votes for that office. *Id.* Adams appointed Clay his Secretary of State. **Josephson** & Ross, *Repairing, supra* note 1, at 158.

84 However, no statutes appear to apply.

85 1 HINDS' PRECEDENTS, *supra* note 64, §§ 187, 210; 5 HINDS' PRECEDENTS, *supra* note 64, §§ 6002, 6743-65; DESCHLER'S PRECEDENTS OF THE HOUSE OF REPRESENTATIVES, H.R. DOC. NO. 94-661, §§ 10.1, 10.2, 10.3 (1976) [hereinafter DESCHLER'S PRECEDENTS]. Before the House so acts, it is operating under the Constitution, statutes and the "common law" of parliamentary procedure. JEFFERSON'S MANUAL, *supra* note 11, § 60; 5 HINDS' PRECEDENTS, *supra* note 64, §§ 6758-60; 8 CANNON'S PRECEDENTS OF THE HOUSE OF REPRESENTATIVES § 3384 (1936) [hereinafter CANNON'S PRECEDENTS].

In matters requiring concurrent actions, the House and Senate had jointly adopted rules until 1876. JEFFERSON'S MANUAL, *supra* note 11, § 61.

No House rule or precedent can bind a subsequent House. *See* JEFFERSON'S MANUAL, *supra* note 11, § 59. Each newly elected House of Representatives adopts its own rules. *Id.* § 388.

As a continuing body, because two-thirds of Senators serve through each Congress, the Senate's rules remain in effect unless and until changed. Rule V.2, Standing Rules of the Senate, *in* SENATE MANUAL, *supra* note 6, at 5; McGrain v. Daugherty, 273 U.S. 135, 181-82 (1927).

86 U.S. CONST. art. I, § 5, cl. 2.

87 *E.g.*, H.R. Res. 5, 95th Cong., 1st Sess. (1977).

88 1 REG. DEB. 445-46 (1825). Thus, it is not clear to what weight the 1801 and 1825 Rules would be entitled, even if they were part of general parliamentary law, which they probably are not. Longley and Peirce assert that the "rules ... adopted by the House of Representatives on February 7, 1825, for the election of a president ... following the presidential election of 1824 .... would be *the governing* precedent if the House should again be called upon to elect a president, *though the House might alter the rules at any time*." LONGLEY & PEIRCE, *supra* note 61, at 206 (emphasis added). Their apparent implication that the 1825 Rules would govern unless the House acted otherwise seems inconsistent with the legislative history cited immediately above and the "common law" with respect to House rules. *See supra* note 85; *but see Frost Memo, supra* note 11, at 15690, col. 3.

89 7 CANNON'S PRECEDENTS, *supra* note 85, § 1029 ("The procedure of the House is governed in some instances by the practice of the House rather than by express rules.").

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   37

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 190 of 553 PageID #:  595

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L.....

90   10 ANNALS OF CONG. 987 (1801); *1925 Senate Document*, *supra* note 74, at 65. Each committee was composed of one Representative from each state, the rules were debated in Committee of the Whole, and then adopted by per capita votes. *Frost Memo*, *supra* note 11, at 15690, col. 3; 3 HINDS' PRECEDENTS, *supra* note 64, §§ 1982, 1984.

91   4 HINDS' PRECEDENTS, *supra* note 64, § 4321.

92   1801 Rules, *supra* note 11, § 5.

93   1825 Rules, *supra* note 11, § 3. The 1801 Rules provided for a seat for the President or President of the Senate, 1801 Rules, *supra* note 11, § 2, but not apparently during balloting. 1801 Rules, *supra* note 11, § 5. The 1825 Rules did not provide for such a seat.

94   1801 Rules, *supra* note 11, § 6; 1825 Rules, *supra* note 11, § 5, cl. 1.

95   1801 Rules, *supra* note 11, § 4.

96   1825 Rules, *supra* note 11, § 4.

97   1801 Rules, *supra* note 11, § 6; 1825 Rules, *supra* note 11, § 5, cl. 2. The *Frost Memo* incorrectly says that in 1801 no ballot boxes were provided for the ballots of the Representatives of each state. *Frost Memo*, *supra* note 11, at 15690, col. 3.

98   1801 Rules, *supra* note 11, § 6; 1825 Rules, *supra* note 11, § 5, cls. 5 & 6.

99   1801 Rules, *supra* note 11, § 6; 1825 Rules, *supra* note 11, § 5, cl. 3.

100   1801 Rules, *supra* note 11, § 6; 1825 Rules, *supra* note 11, § 5, cls. 7, 8 & 9.

101   1801 Rules, *supra* note 11, § 3.

102   1825 Rules, *supra* note 11, § 2.

103   1801 Rules, *supra* note 11, § 7.

104   1825 Rules, *supra* note 11, § 8.

105   *Id.*, § 2.

106   1801 Rules, *supra* note 11, § 7; 1825 Rules, *supra* note 11, § 7 (emphasis added).

107   1825 Rules, *supra* note 11, § 2 (emphasis added).

108   1825 Rules, *supra* note 11, § 6 (1801 Rules, *supra* note 11, § 8 contains slightly different phrasing).

109   1801 Rules, *supra* note 11, § 8.

110   1825 Rules, *supra* note 11, § 5, cl. 4. A memorandum (on file with the author) dated June 10, 1980, from the Congressional Research Service to a recipient whose identity is crossed out, states that in 1801, "in actual fact a majority decision determined each state's result ....," citing 2 JOHN BACH MCMASTER, A HISTORY OF THE PEOPLE OF THE UNITED STATES FROM THE REVOLUTION TO THE CIVIL WAR 1790-1803, at 523 (1924). The memorandum does not explicitly address the issue of a majority of the whole number, a majority of those present, or a majority of a quorum, although the implication is for the latter. Neither does Thomas H. Neale in *Election of the President and Vice President by Congress: Contingent Election*, *supra* note 62, address this issue.

111   U.S. CONST. amend. XII, § 1, cl. 3.

112   U.S. CONST. art. I, § 5, cl. 1.
In a June 7, 1986, interview with the then-House Parliamentarian, the late Mr. William Haynes Brown, and Mr. Peter Robinson, a member of his staff, Beverly J. Ross, Esq. and the author, Messrs. Brown and Robinson indicated that

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   38

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 191 of 553 PageID #:  596

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

the House would likely follow its usual majority of a quorum principle with respect to House state delegations voting. Memorandum from Beverly J. Ross, Esq., to Elia Fischer, Esq. and author (June 19, 1992) (on file with author) [hereinafter Brown Memorandum].

113   U.S. CONST. amend. XII, § 1, cl. 3 (emphasis added).

114   *See infra* Parts III.B.2.e. & V.D.

115   *Frost Memo*, *supra* note 11, at 15692, cols. 2 & 3.

116   *See infra* Parts III.B.2.e, III.B.2.f & V.D.

117   1825 Rules, *supra* note 11, § 5, cl. 4; 1801 Rules, *supra* note 11, § 6. The *Frost Memo* incorrectly states, "[t]he 1825 rules were more explicit on these points." *Frost Memo*, *supra* note 11, at 15690, col. 3.

118   U.S. CONST. amend. XII (emphasis added).

119   U.S. CONST. art. II, § 1, cl. 3.

120   The history of this phrase is well recounted in CURRIE, *supra* note 41, at 49 n.77.

121   *Id.* at 49. Excerpts from the debates on this issue are set forth at length in *1925 Senate Document*, *supra* note 71, *passim*.

122   The issue would arise with respect to the vice presidency only if there was a tie for second, because under the Twelfth Amendment the choice is made only "from the two highest numbers on the list ...." U.S. CONST. amend. XII.

123   13 ANNALS OF CONG. 671, 677-78, 680, 725, 736, 771 (1803).
John O. McGinnis suggests that had the House had to choose the President in 2000, it could have considered Ralph Nader and Patrick J. Buchanan as tied third-highest with zero elector votes. John O. McGinnis, *Popular Sovereignty and the Electoral College*, 29 FLA. ST. U. L. REV. 995, 999 n.18 (2001). He seems unaware that twelve other individuals also received a total of 613,051 votes for President, *2000 Presidential Election: Popular Vote Totals*, http://www.archives.gov/federal-register/electoral-college/2000/popular_vote.html (last visited Nov. 10, 2008), and no elector votes, not counting write-in votes (20,938) and "None of These Candidates (Nevada)" (3,315). WORLD ALMANAC 2005, *supra* note 6, at 595. The far better view is that candidates must receive at least one elector vote in order to be considered by the House.

124   U.S. CONST. art. II, § 1, cl. 3 ("[A]nd if there be more than one who have such Majority, and have an equal Number of Votes .... But if there should remain two or more who have equal Votes, the Senate shall chuse from them ....").

125   *See supra* Part II.B. H.R. Res. 10268, 68th Cong., 2d Sess. (1924), *in 1925 House Hearings*, *supra* note 30, at 1, could have filled the gap, as would have section three of the Senate Resolution with respect to what became the Twentieth Amendment, if either had been adopted.

126   1801 Rules, *supra* note 11, § 3.

127   1825 Rules, *supra* note 11, § 2.

128   *See supra* notes 32 and 62 and accompanying text.

129   *See supra* notes 97 and 98; *Frost Memo*, *supra* note 11, at 15691, cols. 1, 2 & 3.

130   JEFFERSON'S MANUAL, *supra* note 11, § 914.

131   *Id.* (cmt.).

132   *Id.* § 708.

133   *Id.* §§ 623, 682 & 684.

134   *Id.* §§ 677, 682.

APPENDIX - 190

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 192 of 553 PageID #:  597

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L.....

[135] SENATE MANUAL, *supra* note 6, at 52-55.

[136] *See supra* note 85; 3 HINDS' PRECEDENTS, *supra* note 64, § 1984 ("In the election of President by the House in 1825 there was a strong but not prevailing sentiment that the galleries should not be closed.").

[137] *Frost Memo*, *supra* note 11, at 15691, col. 1. The memorandum also argues that the ballots of each state should be made public, although it is less clear about the ballots of each Representative. *Id.* at cols. 1, 2 & 3.

[138] In 1992, Representative James Sensenbrenner, until recently Chair of the House Judiciary Committee, introduced a resolution to amend the House Rules to require that the votes of individual Representatives be recorded in open session when the House is choosing a President. H.R. Res. 472, 102d Cong., 2d Sess. (1992). It was referred to the Rules Committee, and no further action was taken.

[139] JEFFERSON'S MANUAL, *supra* note 11, § 773, cl. 4.

[140] 1801 Rules, *supra* note 11, § 4; 1825 Rules, *supra* note 11, § 4. The *Frost Memo* repeatedly emphasizes the urgency of a prompt House presidential election. *Frost Memo*, *supra* note 11, *passim*.

[141] The Senate did not consider the possibility. KURODA, *supra* note 41, at 136-38. The House ignored the issue, even though it was raised by Representative Simeon Baldwin. *Id.* at 147-48.

[142] U.S. CONST. art. II, § 1, cl. 5; *see supra* note 46..
In *Popular Vote*, we discussed in various places and at length whether or not Congress could refuse to count "unconstitutional" elector votes or elector votes for dead candidates. Ross & **Josephson**, *Popular Vote*, *supra* note 1, *passim*. Arguably, the same considerations apply to Representatives' votes for President.

[143] Congress did not count three 1872 Georgia elector votes for the late Horace Greeley. The subject is discussed in Ross & **Josephson**, *Popular Vote*, *supra* note 1, at 706-14, and in Kesavan, *supra* note 1, at 123.
James S. Sherman was elected Vice President for the thirty-first term, 1909-13, with President William Howard Taft. He died on October 30, 1912, just before the general election contested by President Taft and former President Theodore Roosevelt and won by Woodrow Wilson and his vice presidential running mate, Thomas R. Marshall. No elector votes were cast for Sherman, but the Senate Manual notes, "After the election, [Nicholas M. Butler of New York] *was selected* to receive the electoral votes of the States of Utah and Vermont owing to the death of James S. Sherman." SENATE MANUAL, *supra* note 6, at 1089 (emphasis added). Those states were the only states whose electors voted for President Taft. *Id.* Thus, the issue of elector voting for a dead vice presidential candidate did not arise.
The House Report on what became the Twentieth Amendment expressed the opinion that if a presidential candidate dies after the electors vote but before their votes are counted, the votes must be counted by Congress. H.R. REP. NO. 72-345, at 5 (1932)H.R. REP. NO. 72-345, at 5 (1932). It also expressed the opinion that if the election were thrown into the House and if the deceased's number was one of the three highest on the list, a state delegation vote cast for a dead man could not legally be counted. *Id.* at 6. It did not deal with the question of whether or not a fourth person who had received the next highest elector votes could then be considered. Its analysis was similar on the effect of the death of one of the two highest on the list for a **Senate election** of a Vice President. *Id.* at 7.
Legislation, at least in the case of death, was supported by then-Assistant Attorney General, later Solicitor General, Walter Dellinger, who agreed with the 1873 precedent that elector votes for a dead person should not be counted by Congress. *Presidential Succession Hearings*, *supra* note 11 at 17. However, Akhil Reed Amar and Walter Berns argued that elector votes for a dead person should be counted so that the deceased's vice presidential running mate could become President. *Presidential Succession Hearings*, *supra* note 11, at 23-25, 29. This opinion is also expressed in Akhil Reed Amar, *Presidents, Vice Presidents, and Death: Closing the Constitution's Succession Gap*, 48 ARK. L. REV. 215, 224-25 (1994). Neither Professor Amar nor Professor Berns expressed that opinion in the context of the House of Representatives choosing a President, which did not arise in the course of the aforementioned hearings.

[144] U.S. CONST. art. II, § 1, cl. 3.

[145] *See infra* Part V.E.3.

[146] JEFFERSON'S MANUAL, *supra* note 11, § 656.

[147] *Id.* § 658 (cmt.).

APPENDIX - 191

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 193 of 553 PageID #:  598

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

148 *See infra* Part V.E.3.

149 1825 Rules, *supra* note 11, § 5, cl. 4; *see supra* note 110 and accompanying text.

150 JEFFERSON'S MANUAL, *supra* note 11, § 934.

151 *Id.* § 312 (cmt.).

152 *Id.* § 508.

153 U.S. CONST. amend. XII (emphasis added).

154 1825 Rules, *supra* note 11, § 5, cl. 4.

155 *Frost Memo*, *supra* note 11, at 15692, col. 3 (emphasis added).

156 *See id.* at 15695, col. 1 ("The candidate receiving a *plurality* of the vote in each state caucus shall be awarded that state's vote." (emphasis added)).

157 U.S. CONST. art. I, § 5, cl. 1.

158 *See supra* notes 112 and 114 and accompanying text. A quorum is also not required by the rules proposed by the *Frost Memo*, *supra* note 11.

159 U.S. CONST. art. I, § 5, cl. 2.

160 1825 Rules § 5, cl. 4.

161 JEFFERSON'S MANUAL, *supra* note 11, §§ 52, 53, 329, 343, 409, 709, 713c.

162 House Rule XVIII.6, *in*JEFFERSON'S MANUAL, *supra* note 11, § 982.

163 U.S. CONST. art. II, § 1, cl. 3.

164 *Id.*amend. XII (emphasis added).

165 *See supra* notes 101 & 102.

166 U.S. CONST. amend. XII; U.S. CONST. amend. XX, § 3.

167 U.S. CONST. art II, § 2, cl. 2.

168 U.S. CONST. art. I, § 7, cl. 1.

169 *Frost Memo*, *supra* note 11, at 15690, col. 1.

170 U.S. CONST. amend. XII (emphasis added).

171 *See supra* notes 95 & 96 and accompanying text. The *Frost Memo*'s Proposed Rules for Election of the President in the House of Representatives (1981) are in accord. *Frost Memo*, *supra* note 11, at 15694, col. 3 (containing rule 4 of Proposed Rules).

172 Rule 6 of the *Frost Memo*'s Proposed Rules for Election of the President in the House of Representatives (1981) provides that such questions should be decided by the states without debate. It does not say by a majority of all the states. *Frost Memo*, *supra* note 11, at 15695, col. 1.

173 JEFFERSON'S MANUAL, *supra* note 11, § 804.
In 1992 Senator David Pryor suggested if (1) the 1992 presidential election were to be thrown into the House, (2) the House deadlocked, (3) the Senate failed to elect a Vice President by January 20, and (4) by implication the Speaker of the House elected on January 3 from among its Representatives did not wish to become President, assuming he

APPENDIX - 192

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 194 of 553 PageID #:  599

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

constitutionally could, *see supra* note 62, that Speaker could resign, the House could by majority vote elect from the presidential candidates a non-member Speaker who could resign as Speaker on accession to the presidency (and, it could be added that if no Vice President had been elected, appoint one subject to congressional approval under the Twenty-fifth Amendment). 138 CONG. REC. S8330 (daily ed. June 17, 1992).

174   The 2000 elector votes were 271 for Governor Bush, 266 for Vice President Gore. One elector from the District of Columbia cast blank ballots for President and Vice President, 147 CONG. REC. 164 (daily ed. Jan. 20, 2001) (corrected

proceedings of Saturday, Jan. 6, 2001). This would be an apparent violation of her pledge. 🔖 D.C. CODE § 1-1001.08(g)(2) (2005). Presumably, they would have been cast for the Democratic Party candidates who carried the District of Columbia, but the result would not have changed.

175   CONGRESSIONAL YELLOW BOOK*passim* (Spring 2001). Lawrence D. Longley and Neal R. Peirce similarly analyzed the 1948 presidential election. LONGLEY & PEIRCE, *supra* note 61, at 42-45. The then-Clerk of the House similarly analyzed the 1920 presidential election. *1925 House Hearings*, *supra* note 30, at 15-16.
One national election, even a midterm election, can dramatically change the results. While the 2004 presidential election left the House state delegations's political compositions as they were in 2000, the 2006 midterm election resulted in ten additional House delegations with Democratic Party majorities: Colorado, Connecticut, Indiana, Iowa, Minnesota (was tied), New Hampshire, North Carolina, Pennsylvania, Vermont (had an independent who voted with the Democrats to organize the House), and Wisconsin (was tied). Two state House delegations, Arizona and Kansas, moved from Republican Party majorities to tied. CONGRESSIONAL DIRECTORY FOR THE 110TH CONGRESS 9-13, 102-05 (2007), *available at* http://www.gpoaccess.gov/cdirectory/browse-cd-07.html [hereinafter CONGRESSIONAL DIRECTORY].

176   *See supra* note 18. The Republicans then had a majority of seven Representatives in the eleven-Representative Virginia delegation, so it probably would not have mattered how its Independent, Virgil Goode, Jr., would have voted. He voted that year for the Republican candidate for Speaker. 147 CONG. REC. 21 (daily ed. Jan. 3, 2001). He was elected to the 110th and 111th Congresses as a Republican. CONGRESSIONAL DIRECTORY, supra note 175, at 271.

177   WORLD ALMANAC 2005, *supra* note 6, at 595.

178   It would be beyond the scope of this study to determine how each Representative's district voted. Each state's popular vote would seem more relevant than the popular vote of any congressional district within a state. Under the Constitution and the Twelfth Amendment, the states' electors and the House state delegations vote to choose the President. This was the general idea of H.R.J. Res. 28, 108th Cong., 1st Sess. § 4 (2003). It was referred to the House Judiciary Committee's Subcommittee on the Constitution, and no further action was taken. Thomas H. Neale, CONGRESSIONAL RESEARCH SERVICE, THE ELECTORAL COLLEGE: REFORM PROPOSALS IN THE 108TH CONGRESS 6 (2005). There may be an exception to this preference in any state which might apportion elector votes by congressional districts, such as Maine and Nebraska currently do. ME. REV. STAT. ANN. tit. 21-A, §§ 802 & 805.2 (1993); 3 NEB. REV. STAT. § 32-714 (2004). Then-Senator Obama carried the second congressional district of Nebraska, whose elector will presumably vote for him. Susan Saulny, *Glory for Democrats, Riding on a Single Vote*, N.Y. TIMES, Nov. 12, 2008, at A16.
However, on August 1, 1980, Representative Robert E. Bauman, with seven cosponsors, introduced a resolution to express the "sense of the House" that each Representative should vote in any House presidential election for the candidate "who receives a majority or plurality of the popular votes cast in the individual Member's district." H.R. Res. 760, 96th Cong., 2d Sess. (1980). It was referred to the Committee on House Administration, which took no action. *But see* Gary Lee, *Foley Opposes Formula for Presidential Voting: If House Must Decide, Members Should 'Look at Circumstances' at the Time, Speaker Says*, WASH. POST, June 15, 1992, at A7 ("Some Democratic Party Leaders believe that if the presidential election is volleyed to the House, members should be required to vote for the presidential candidate representing the party popularly supported by voters in their districts.").
Laurence A. Tribe and Thomas M. Rollins discuss these and other possibilities in Tribe & Rollins, *supra* note 43, at 58-60 (digital ed. at 3-7).
Then-House Speaker Thomas S. Foley said in a June 14, 1992 interview that anticipated the three-way presidential race in 1992:
It shouldn't be said in advance by members of Congress that their vote [for President in the House] is going to be pledged on some kind of formula, which may, at the time the vote is cast, seem wrong to them--wrong from the standpoint of the country, wrong from the standpoint of giving the president-elect legitimacy of office ....

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 195 of 553 PageID #:  600

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

Suppose [the lawmaker's] district cast its vote for the candidate that ran third in both the electoral vote and the popular vote of the country. Suppose one of the candidates has a majority of the popular vote and a majority of the electoral vote as well. I think it would be difficult to explain any other vote but support for that candidate.

Lee, *supra*, at A7; *accord*, Paul Gewirtz, *House Party*, NEW REPUBLIC, July 27, 1992, at 38 ("[W]hen the House last picked the president in the 1824 election, its rules required a state delegation to decide by majority vote, with no vote to be cast if no majority was obtained." (citations omitted)).

Both Hendrik Hertzberg and Jennifer Steinhauer reported that California, by popular initiative rather than state legislative action, and North Carolina were considering apportioning their electors' votes by congressional districts, although the North Carolina legislature tabled the measure. Hendrik Hertzberg, Comment, *Votescam*, THE NEW YORKER, Aug. 6, 2007, at 21-22; Jennifer Steinhauer, *Frustrated, States Try to Change the Way Presidents Are Elected*, N.Y. TIMES, Aug. 11, 2007, at A1. Such an initiative would be of doubtful constitutionality. In the first 2000 Supreme Court presidential election decision, *Bush v. Palm Beach County Canvassing Board*, 531 U.S. 70 (2000), the unanimous Court said per curiam that the Florida Supreme Court had relied on the Florida Constitution in construing the Florida Election Code. *Id.* at 77-78. It vacated and remanded in part because "we are unclear as to the extent to which the Florida Supreme Court saw the Florida Constitution as circumscribing the legislature's authority under Art. II, § 1, cl. 2." *Id.* at 78.

Actually, the Florida Supreme Court cited three times Article I, Section one of the Florida Constitution's Declaration of Rights, *Palm Beach County Canvassing Board v. Harris*, 772 So.2d 1220, 1230, 1236 & 1239 (Fla. 2000) ("All political power is inherent in the people."), and Article VI, section one, *id. at 1230* ("Registration and elections shall ... be regulated by law."). If the Court was concerned that these provisions of the Florida Constitution were adopted by some means other than legislative enactment and, although it is awfully hard substantively to see how, that they in some way fettered the Florida Legislature's plenary United States constitutional authority to determine the manner by which electors may be appointed, *see McPherson v. Blacker*, 146 U.S. 1 (1892), its concern seems to have been unwarranted. The Florida Constitution's Declaration of Rights, an expression of public policy at that, as well as the entire Constitution, like a statute, had in fact been adopted in its entirety by the Florida Legislature. 25 FLA. STAT. 665 (1970). Nevertheless, from the Court's concern it would seem to follow that no provision of an initiative could, by itself, affect the California Legislature's decision that the State's presidential electors shall be appointed winner-take-all. CAL. ELEC. CODE § 6906 (West 1994). Terrance Sandalow, dean emeritus of the University of Michigan Law School, agrees. Terrance Sandalow, Letter to the Editor, *Graduating from the Electoral College*, N.Y. TIMES, Aug. 27, 2007, at A16 ("The proposed initiative to amend the California Constitution ... is ... plainly unconstitutional as a matter of federal constitutional law."). According to Bob Herbert, so does Harvard Law School Professor Laurence A. Tribe. Bob Herbert, *In 2008, Bush v. Gore Redux?*, N.Y. TIMES, Sept. 22, 2007, at A15 ("In Mr. Tribe's view, the 'one and only way' for California to change the manner in which its electoral votes are apportioned is through an act of the State Legislature.").

David Gringer discusses the issues, but seems unaware of the aforesaid holding in *Bush v. Palm Beach County Canvassing Board*, 531 U.S. at 77, in David Gringer, *Why the National Popular Vote Plan Is the Wrong Way to Abolish the Electoral College*, 108 COLUM. L. REV. 182, 225-26 (2008).

The development of elector unit rule voting is discussed in Matthew J. Festa, Note, *The Origins and Constitutionality of State Unit Voting in the Electoral College*, 54 VAND. L. REV. 2099 (2001).

Without considering any of the legal issues discussed above, *The New York Times* has editorially opposed the California Initiative while at the same time reiterating its support for the National Popular Vote effort as an alternative to the California initiative. *See supra* note 1 and *infra* note 249. Such an initiative, which would raise legal issues about its effectiveness, is similar, if not identical, to those described above. Editorial, *Stacking the Electoral Deck*, N.Y. TIMES, Aug. 22, 2007, at A18. *But cf.* Jennifer Steinhauer, *Leader Quits Ballot Effort by G.O.P. in California*, N.Y. TIMES, Sept. 29, 2007, at A8; *Electoral Revision Misses June Ballot*, N.Y. TIMES, Dec. 7, 2007, at A28. Such an alternative which could raise legal issues about its effectiveness is similar, if not identical, to those described in the paragraph above. The issues raised by an unsuccessful Colorado initiative that would have divided its elector votes in proportion to its popular votes are thoughtfully discussed in David S. Wagner, Note, *The Forgotten Avenue of Reform: The Role of States in Electoral College Reform and the Use of Ballot Initiatives to Effect that Change*, 25 REV. LITIG. 575 (2006). However, Wagner appears not to have focused on the significance of the Supreme Court's first 2000 presidential election opinion discussed above. Neither has Stanley Chang. Stanley Chang, Note, *Recent Development: Updating the Electoral College: The National Popular Vote Legislation*, 44 HARV. J. ON LEGIS. 205, 214-15 (2007). Supporters of such initiatives have argued, unpersuasively, that a vote of the people is an act of the legislature, as the Colorado initiative purported to provide. BENNETT, *supra* note 1, at 52, 214 n.32. For a comprehensive study of the history and law of

APPENDIX - 194

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 196 of 553 PageID #:  601

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

initiatives, see John Gildersleeve, *Editing Direct Democracy: Does Limiting the Subject Matter of Ballot Initiatives Offend the First Amendment?*, 107 COLUM. L. REV. 1437 (2007).

179   WORLD ALMANAC 2005, *supra* note 6, at 595.

180   In the twentieth century, more than two presidential candidates have won elector votes in 1912, 1924, 1948, 1960, 1968, 1972, 1976, and 1988. WORLD ALMANAC 2005, *supra* note 6, at 594. However, only in 1912, 1924, 1948, 1960, and 1968 did a third presidential candidate receive more than one elector vote. *Id.* Nevertheless, if any of those elections had been thrown into the House because no candidate had an absolute majority of elector votes, such a third presidential candidate would have been one of the three whom the House could have chosen as President. Moreover, if there had been more than one such presidential candidate and if they had tied elector votes, the issues raised by "not exceeding three" might also have arisen.

Assuming that in the 2000 presidential election the voters for third party candidate, Patrick J. Buchanan, would have voted for Governor George W. Bush and those who voted for Ralph Nader would have voted for Vice President Al Gore, Florida's and New Hampshire's electors would have voted for Vice President Gore, instead of Governor Bush. WORLD ALMANAC 2005, *supra* note 6, at 595. Voters in Iowa, New Mexico, Oregon, and Wisconsin narrowly voted for Vice President Gore. *Id.* Even if the Buchanan votes had been added to Governor Bush's totals, the addition of the Nader votes to Vice President Gore's would have confirmed his winning of these states' elector votes. *Id.*

In 2002, two groups created separate vote-swapping websites under which Buchanan or Nader voters in "swing" states could agree with Bush or Gore voters, respectively, in "safe" states to vote for Bush or Gore, as the case may have been, in return for safe state voters voting for Buchanan or Nader. *See* Porter v. Bowen, 496 F.3d 1009, 1012-13 (9th Cir. 2007). The California Secretary of State's successful effort to close these sites was held to violate the First Amendment. *Id.* at 1027.

181   3 U.S.C. § 7 (2006).

182   *E.g.*, H.R. Con. Res. 531, 108th Cong., 2d Sess. (2004). Also, the President "may, on extraordinary Occasions, convene both Houses, or either of them ...." U.S. CONST. art. II, § 3, cl. 1.

183   *See* 3 U.S.C. § 15 (2006). In 1996, Congress extended the date to January 9, 1997. Act of Oct. 11, 1996, § 2, Pub. L. No. 104-296, 110 Stat. 3558. In 1988, it advanced the date to January 4, 1989. Act of Nov. 9, 1988, Pub. L. No. 100-646, 102 Stat. 3341. And in 1984 the date was extended to January 7, 1985. Act of Oct. 9, 1984, Pub. L. No. 98-456, 98 Stat. 1748.

184   House Rule XI, cl. 2(m)(1)(A), *in* JEFFERSON'S MANUAL, *supra* note 11, § 718. This is a relatively new change in the House Rules. *Id.* § 589 (cmt.). Such hearings could not be held during joint sessions. House Rule XI, cl. 2(i), *in* JEFFERSON'S MANUAL, *supra* note 11, § 710. JEFFERSON'S MANUAL section LI asserts that, constitutionally, congressional committee jurisdiction ends when the constitutional term ends. JEFFERSON'S MANUAL, *supra* note 11, § 589; 4 HINDS' PRECEDENTS, *supra* note 64, § 4545.

185   H.R. Res. 785, 96th Cong., 2d Sess. (1980).

186   *Id.* § 5(c).

187   *Id.* § 6(c).

188   WORLD ALMANAC 2005, *supra* note 6, at 593.

189   H.R. Res. 478, 102d Cong., 2d Sess. (1992)

190   House Rule X, cl. 1(m), *in* JEFFERSON'S MANUAL, *supra* note 11, § 682a.

191   4 HINDS' PRECEDENTS, *supra* note 64, § 4327; JEFFERSON'S MANUAL, *supra* note 11, § 220.

192   4 HINDS' PRECEDENTS, *supra* note 64, § 4326. *See generally* STANLEY BACH & STEVEN S. SMITH, MANAGING UNCERTAINTY IN THE HOUSE OF REPRESENTATIVES: ADAPTATION AND INNOVATION IN SPECIAL RULES (1988); Gerald B.H. Solomon & Donald R. Wolfensberger, *The Decline of Deliberative Democracy in the House and Proposals for Reform*, 31 HARV. J. ON LEGIS. 321 (1994).

APPENDIX - 195

Case 6:20-cv-00660-JDK  Document 33  Filed 01/01/21  Page 197 of 553 PageID #:  602

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

193    RULES    OF    THE    COMMITTEE    ON    RULES,    Rule    5(a)(1)(B),    109th    Cong.
154    (1st    Sess.    2005),    *available    at*    http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?
dbname=109_cong_house_committee_prints&docid=f:22112.pdf [hereinafter HOUSE COMMITTEES RULES].

194    *Id.* at Rule 5(b)(2).

195    *See generally* House Rule XI, cl. 2(g)(2), *in*JEFFERSON'S MANUAL, *supra* note 11, § 708.

196    *See generally*HOUSE COMMITTEES RULES, *supra* note 193, Rule 3 at 152-54.

197    House Rule X, cl. 1(h)(12), *in*JEFFERSON'S MANUAL, *supra* note 11, § 677a. This jurisdiction was exercised prior to
the 1947 reorganization of the Congress by the Committee on Election of President, Vice President, and Representatives
in Congress. *Id.* at §§ 677a & 677e (cmts.); *see* 4 HINDS' PRECEDENTS, *supra* note 64, §§ 4299-304; 7 CANNON'S
PRECEDENTS, *supra* note 85, § § 2023-28. Then-House Parliamentarian Brown indicated that a meeting to elect a
President is a constitutional function of the House over which the Committee on House Administration would assert
jurisdiction. Brown Memorandum, *supra* note 112, at 2.

198    Rule 16 of the Rules of the Committee on House Administration, *in*HOUSE COMMITTEES RULES, *supra* note 193,
at 115.

199    House Rule X provides in Clause 1: "[A]ll bills, resolutions, *and other matters* relating to subjects within the jurisdiction
of any standing committees as listed in this clause *shall* ... be referred to those committees ...." JEFFERSON'S
MANUAL, *supra* note 11, § 699 (emphases added). Clause 5 states in relevant part:
(a) Each bill, resolution, *or other matter* which relates to a subject listed under any standing committee named in clause
1 shall be referred by the Speaker in accordance with the provisions of this clause.
(b) Every referral of any matter under paragraph (a) shall be made in such manner as to assure to the maximum extent
feasible that *each* committee which has jurisdiction under clause 1 over the subject matter of any provision thereof will
have responsibility for considering such provision and reporting to the House with respect thereto.
*Id.* § 700. House Rule X clause 5(c) provides:
In carrying out paragraphs (a) and (b) with respect to any matter, the Speaker shall designate a committee of primary
jurisdiction; but also may refer the matter to one or more additional committees, for consideration in sequence (subject
to appropriate time limitations), either on its initial referral or after the matter has been reported by the committee of
primary jurisdiction; or may refer portions of the matter to one or more additional committees (reflecting different
subjects and jurisdictions) for the consideration only of designated portions ....
*Id.*

200    *Id.* at § 701e. Then-House Parliamentarian Brown thought there was a good possibility that the Speaker would choose
to appoint a balanced bipartisan committee rather than refer the special rules matter to one or more of the politically
imbalanced standing committees. He referred to "the tradition of greater consultation with the minority party in times
of crisis." Brown Memorandum, *supra* note 112, at 3.
Whether or not such a tradition survives is another question. *See generally* Charles Babington, *Scorched-Earth Politics:
How Can Shutting Congressional Democrats Out of Legislation Be Good Government?*, WASH. POST NAT'L WKLY.
ED., Jan. 5-11, 2004, at 22; Editorial, *Time Out--How House Republicans Stopped the Clock to Avert Embarrassment*,
SYRACUSE POSTSTANDARD, Apr. 3, 2004, at A6; Ronald Goldfarb, *The End of Civility?*, WASH. LAWYER, Feb.
2004, at 30.

201    JEFFERSON'S MANUAL, *supra* note 11, § 700.

202    7 CANNON'S PRECEDENTS, *supra* note 85, § 2049.

203    JEFFERSON'S MANUAL, *supra* note 11, § 589 (cmt.). The Commission on Administrative Review in the House of
Representatives was established by H.R. Res. 1368, 94th Cong., 2d Sess. (1976). The Legislative Branch Appropriation
Act, Pub. L. No. 94-440, § 101, 90 Stat. 1439, 1448 (1976), enacted "permanent law" with respect to the Commission.
The Commission submitted its final report to, and terminated during, the 95th Congress on December 31, 1977.

APPENDIX - 196

204 "Committee of the Whole," as used in the text, refers to "the Committee of the Whole House on the state of the Union" and not to "the Committee of the Whole House which considers private [bills]" only. House Rule XXIII, *in*JEFFERSON'S MANUAL, *supra* note 11, § 869; *cf. id.* § 752.

205 House Rule XIV, cls. 2 & 6, *in*JEFFERSON'S MANUAL, *supra* note 11, §§ 758, 762.

206 House Rule XXIII, cl. 5(a), *in*JEFFERSON'S MANUAL, *supra* note 11, § 870; DESCHLER'S PRECEDENTS, *supra* note 85, § 5.6; 4 HINDS' PRECEDENTS, *supra* note 64, § 4916. This rule permits five minutes of debate by an amendment's proponent, five minutes from one opponent, and five minutes on each of a limited number of pro forma amendments. House Rule XXIII, cl. 5(a), *in*JEFFERSON'S MANUAL, *supra* note 11, § 870, which are devices for extending debate. *Id.* § 873a.
A resolution establishing presidential election rules could be reported to the Committee of the Whole under an open rule, i.e., a special order reported by the Rules Committee and adopted by the House permitting amendments to the resolution, a closed rule precluding any amendments, or a partially closed rule, i.e., one which restricts the number of amendments and substantive alterations which may be offered. *See, e.g.,* DESCHLER'S PRECEDENTS, *supra* note 85, § 5.6.

207 JEFFERSON'S MANUAL*supra* note 11, § 508; *cf.* House Rule XXIII, *in*JEFFERSON'S MANUAL, *supra* note 11, § 877.

208 A quorum of the House is a majority of its members. U.S. CONST. art. I, § 5, cl. 1; United States v. Ballin, 144 U.S. 1, 6 (1892). A quorum in the Committee of the Whole House on the State of the Union is one hundred members. House Rule XXIII 2(a), *in*JEFFERSON'S MANUAL, *supra* note 11, § 863.

209 *Cf.* House Rule XXIII 7, *in*JEFFERSON'S MANUAL, *supra* note 11, § 875. After the Committee of the Whole rises and its chair reports to the Speaker, the House must approve each amendment reported by the Committee of the Whole, and the resolution or bill itself may then be open to amendment by members of the House, 8 CANNON'S PRECEDENTS, *supra* note 85, § 2419, unless limited by special order.

210 The 38th Congress in 1865 adopted the Twenty-second Joint Rule, which provided that questions about counting certified elector votes would be decided by separate concurring votes of each House. However, they relied on a separate joint resolution not to count elector votes from Louisiana and Tennessee, submitted to President Lincoln who approved it, though he subsequently disclaimed "all right of the Executive to interfere in any way in the matter of canvassing or counting electoral votes ...." COUNTING ELECTORAL VOTES, H.R. MISC. DOC. NO. 13, at 229-30 (1876); *See* L. Kinvin Wroth, *Election Contests and the Electoral Vote*, 65 DICK. L. REV. 321, 328-29 n.34 (1961).
A joint resolution "is a bill so far as the processes of the Congress in relation to it are concerned. With the exception of joint resolutions proposing amendments to the Constitution, all these resolutions are sent to the President for approval and have the full force of law." JEFFERSON'S MANUAL, *supra* note 11, § 397 (citations omitted). Seth Barrett Tillman, *A Textualist Defense of Article I, Section 7, Clause 3: Why* Hollingsworth v. Virginia *was Rightly Decided, and Why* INS v. Chadha *was Wrongly Reasoned*, 83 TEX. L. REV. 1265 (2005), discusses the constitutional amendment exception. Despite this exception, President Lincoln "[a]pproved" the Joint Resolution that proposed what became the Thirteenth Amendment. George P. Fletcher, Introduction, *Lincoln and the Thirteenth Amendment*, ORG. OF AM. HISTORIANS MAG. OF HIST., Jan. 2007, at 52, 54-55. The 1877 Electoral Commission was created by the Act of Jan. 29, 1877, 19 Stat. 227. *See* Samuel T. Spear, *Counting the Electoral Votes*, 15 ALB. L. J. 156, 159 (1877)*Counting the Electoral Votes*, 15 ALB. L. J. 156, 159 (1877).
Indeed, President Ulysses S. Grant also called for a legislative solution. 5 CONG. REC. 24 (1877); *see* Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 FLA. L. REV. 541, 585 n.276 (2004).

Of course, the Electoral Count Act of 1887 was enacted. Act of Feb. 3, 1887, ch. 90, 24 Stat. 373 (codified at 3 U.S.C. §§ 5- 7, 15-18 (2006)).

211 *See supra* Parts III.C.2.c-d.

212 U.S. CONST. art. I, § 5, cl. 2.

213 *Id.* at art. VI.

APPENDIX - 197

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 199 of 553 PageID #:  604

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L.....

214  JEFFERSON'S MANUAL, *supra* note 11, §§ 59-60. It is not clear that Stephen A. Siegel has made this distinction in Siegel, *supra* note 210, at 546.

215  *See supra* note 85.

216  Act of Feb. 3, 1887, 24 Stat. 373 (codified at 3 U.S.C. §§ 2, 5– 7, 15-18 (2006)). For examples, the provision in 3 U.S.C. § 15 that two tellers shall be appointed by the House to make a list of the electors' votes, or the provision in 3 U.S.C. § 16 that if the counting of electors votes shall not have been completed before the fifth calendar day after the first joint session for that purpose, no recess may be taken by the House. "It may be noted that, in the 91st Congress, a law specifying that the counting of electoral votes for President and Vice President should be conducted in a joint session was made a joint rule of the two Houses by its incorporation by reference in a concurrent resolution." DESCHLER'S PRECEDENTS, *supra* note 85, § 5.3.

For a lengthy analysis of the Electoral Count Act, *see* Ross & **Josephson**, *Popular Vote*, *supra* note 1, at 704-40. In light of the presidential election of 2000, the year 2000 Supreme Court cases-- *Bush v. Palm Beach County Canvassing Bd.*, 531 U.S. 70 (2000) and *Bush v. Gore*, 531 U.S. 98 (2000)--and the subsequent literature, another look needs to be taken at all aspects of the Act. *See* Richard D. Friedman, *Trying to Make Peace with* Bush v. Gore, 29 FLA. ST. U. L. REV. 811, 860-67 (2001); Glennon, *supra* note 7; Kesavan, *supra* note 7; Eric Schickler et al., *Safe at Any Speed: Legislative Intent, the Electoral Count Act of 1887, and* Bush v. Gore, 16 J.L.& POL. 717 (2000); Siegel, *supra* note 210. Such a look is beyond the scope of this article, but those Supreme Court justices who referred to the right of the Florida State Legislature to appoint electors, *see* *Bush v. Gore*, 531 U.S. at 104, appear not to have considered the substantive implications of the beginning phrase of 3 U.S.C. § 5: "*If* any State shall have provided, by laws enacted *prior* to the day fixed for the appointment of the electors ... such determination ... shall govern." 3 U.S.C. § 5 (2006) (emphasis added). But Justice Rehnquist's concurrence in *Bush* does touch upon the implications. *Bush*, 531 U.S. at 113. Nor did they apparently consider the implication of "on a subsequent day" in 3 U.S.C. § 2. These statutes were first enacted as part of the 1887 Electoral Count Act as one of a comprehensive series of elector vote counting rules, presumably pursuant to Congress's power and duty to count the elector votes. U.S. CONST. art. II, § 2, cl. 3; U.S. CONST. amend. XII.

Moreover, the main holding in *McPherson v. Blacker*, 146 U.S. 1 (1892), which the Supreme Court cited in *Bush*, 531 U.S. at 104, stands only for the proposition that neither the Constitution nor the Fourteenth Amendment prohibit a state legislature from changing the way electors are appointed *prior* to the day of their appointment. *McPherson*, 146 U.S. at 38-39. It is not in the authority of a state legislature to change the method of appointment thereafter. Indeed, Professor Friedman has argued that had the Florida legislature purported to do so, its effort would have violated Section 1, clause 4 of Article II of the Constitution, "[t]he Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States," and the Fourteenth Amendment's Due Process Clause. Friedman, *supra*, at 817-23, 817 n.19, 838-40, 839 n.104 (citing *Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir. 1995) for the latter proposition, but not citing its complicated subsequent history, *e.g.*, *Roe v. Alabama by and Through Evans*, 52 F.3d 300 (11th Cir. 1995); *Roe v. Alabama*, 68 F.3d 404 (11th Cir. 1995), *cert. denied sub nom. Davis v. Alabama*, 516 U.S. 908 (1995)). Professor Friedman also argues that 3 U.S.C. § 2 "cannot reasonably be understood to have meant that if the state holds an election on Election Day ... then the Legislature may step in and choose a slate of electors without regard to what happened on Election Day." *Id.* at 816. Kirby, *supra* note 11, at 497 n.24, makes the same point. *Cf.* BENNETT *supra* note 1, at 51 n.31. Chang, *supra* note 178, at 228, seems unaware that the Florida Legislature was apparently prepared to cast its elector votes regardless of the outcome of any recount. "Whenever any State has held an election for the purpose of choosing electors, and has failed to make a choice on the day prescribed by law, the electors may be appointed *on a subsequent day* in such manner as the legislature of such State may direct" (emphasis added). 3 U.S.C. § 2 (2006). But if Congress may determine the time of choosing electors, which unlike the day they vote need not be uniform throughout the United States, may it not determine the times, unless the use of "time" in the singular is substantive? On the other hand, in 3 U.S.C. § 2 Congress was not determining another time, but seemingly delegating its authority to do so to the state legislatures. This does raise issues about its constitutionality. Some states constitutionally prohibit retroactive state laws. *See* 2 NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 41:3, at 383-84 & n.9 (6th ed. 2001). Florida is not one of them, except as we shall see, *infra*, with respect to certain criminal statutes, but retroactivity is justiciable otherwise. *E.g.*, Old Port Cove Holdings v. Old Port Cove Condominium Ass'n One, 986 So. 2d 1279 (Fla. 2008) (holding that a statute relating to the rule

APPENDIX - 198

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 200 of 553 PageID #: 605

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

against perpetuities is not retroactive); 🔖 Florida Hospital Waterman v. Buster, 984 So. 2d 478 (Fla. 2008) (allowing a retroactive ballot initiative amending 🔖 Florida Constitution); Smiley v. Florida, 966 So. 2d 330 (Fla. 2007) (allowing retroactive application of statute abrogating common law duty to retreat violates the Florida Constitution Article X, Section 9, which provides, "Repeal or amendment of a *criminal statute* shall not affect prosecution or punishment for any crime previously committed"). There is also the U.S. Constitution's ex post facto law prohibition in Article 10, Section 10. U.S. CONST. art. 1, § 10. That was very early construed in 🔖 Calder v. Bull, 3 U.S. (3 Dall.) 386, 390 (1798), perhaps wrongly, *see* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 10-2 (2d ed. 1988), to apply only to criminalization of what previously was not criminal.

Also, query whether a state legislature's act with respect to appointing electors would be a law for either of these purposes. For examples, Article III, Section 8(a) of the Florida Constitution requires gubernatorial approval of a bill passed by the legislature before it "shall become a law." FLA. STAT. ANN. § 677 (1970). So does 🔖 Article 4, Section 7 of the New York Constitution.

Perhaps a better argument against post-presidential popular election state legislative appointment of electors would be based on the Privileges and Immunities Clause of the Fourteenth Amendment. *See* U.S. CONST. amend XIV, § 1.

Despite its emasculation in the 🔖 Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 78-79 (1873), there are "Incentives for Bringing the Privileges or Immunities Clause to Life." TRIBE, *supra*, at 1312; *see* Tony Mauro, *Shotgun Wedding: Liberals. Teamup with NRA in Gun Case*, LEGAL TIMES, Feb. 23, 2009, at 1. The right to vote for national officers was one of the privileges and immunities listed in 🚩 Twining v. New Jersey, 211 U.S. 78, 97 (1908).

In 🔖 Oregon v. Mitchell, 400 U.S. 112, 138-41 (1970), Justice William O. Douglas, concurring and dissenting in part, advanced a citation-packed equal protection argument, stating that the right to vote "is a civil right of the highest order." 🔖 Id. at 139. He presumably would have disagreed with the first sentence of this quotation from the per curiam opinion in *Bush v. Gore*:

The individual citizen has no federal constitutional right to vote for electors for the President of the United States unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the electoral college .... History has now favored the voter, and in each of the several States the citizens themselves vote for Presidential electors. When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental ....

🔖 531 U.S. at 104.

The Court was laying the basis for its own equal protection argument and, in the next breath, quoted an 1874 Senate Report whose substantive relevance is questionable that asserted that state legislatures can resume the power. *Id.* Nevertheless, the Court's ultimate recognition of this fundamental right may have implications for its future protection. *See generally* TRIBE, *supra*, at §§ 7-5 & 7-6 and authorities cited throughout.

217 *E.g.*, Legislative Reorganization Act of 1970, Pub. L. 91-510, 84 Stat. 1140; Legislative Reorganization Act of 1946, Pub. L. 601, 60 Stat. 812. The Legislative Reorganization Act of 1946 purports to amend House Rules X and XII to establish procedures for standing committees, and to provide for hearings and reports of the House Appropriations Committee. *Id.* §§ 133, 139.

218 *E.g.*, Reorganization Act of 1977, Pub. L. 95-17, 91 Stat. 29. Section 908 of the Reorganization Act of 1977 (codified at 5 U.S.C. § 908 (2006)), is substantively the same as Section 101 of the Legislative Reorganization Act of 1946. *See infra* note 221.

219 Section 1103(d) of the Omnibus Trade and Competitiveness Act of 1988, Pub. L. 100-418, 102 Stat. 1131-32 (codified at 19 U.S.C. § 2903 (2006)), is substantially the same as section 101 of the Legislative Reorganization Act of 1946.

220 *E.g.*, Honest Leadership and Open Government Act of 2007, Pub. L. 110-81, 121 Stat. 735.Section 306, 121 Stat. 754, and Section 555, 121 Stat. 774, are substantially the same as Section 101 of the Legislation Reorganization Act of 1946. The former Act's extensive changes to the Senate and House Rules are described in Nicholas G. Karambelas, *The Honest Leadership and Open Government Act of 2007*, WASH. LAWYER, Dec. 2007, at 31.

221 Section 101 of the Legislative Reorganization Act of 1946 provides:
The following sections of [the Title 1--Changes in Rules of Senate and House] are enacted by the Congress:

APPENDIX - 199

(a) As an exercise of the rule-making power of the Senate and the House of Representatives, respectively, and as such they shall be considered as part of the rules of each House, respectively, or of that House to which they specifically apply; and such rules shall supersede other rules only to the extent that they are inconsistent therewith; and

(b) With full recognition of the constitutional right of either House to change such rules (so far as relating to the procedure in such House) at any time, in the same manner and to the same extent as in the case of any other rule of such House.

§ 101, 60 Stat. at 814. Similar provisions with respect to the House were enacted in §§ 101(2), 241(2), and 251(2) of the Legislative Reorganization Act of 1970, 84 Stat. 1143, 1172-73. Twenty-six years ago, the House Rules Committee said: To the extent that the House chooses to enact any rule into law, it places itself in the constitutionally unacceptable position of requiring the consent of the other body and of the President to directly modify or repeal that rule.

Since the enactment of the Congressional Budget and Impoundment Act of 1974 (Public Law 93-344) statutory adoption of rules has become increasingly common, but traditionally such rules carry a disclaimer relating to the rulemaking power of each House similar to the one contained in that Act (§ 904). The committee has previously reported to the House (H. Rept. 97-809, Part 2)H. Rept. 97-809, Part 2) that it views the authority of each House to "determine the rules of its proceedings" to be constitutionally grounded and considers the power of each House to modify rules it has chosen to enact in statutory form to be unaffected by whether that statute carries such a disclaimer. Nevertheless, the language is customary and the committee believes that unnecessary doubts are invited by proposing rules in statutory form, particularly in the absence of such a disclaimer.

H.R. REP. NO. 98-257H.R. REP. NO. 98-257, 98th Cong., 1st Sess. pt. 3, at 5 (1983).

In Jeffrey A. Meyer, *Congressional Control of Foreign Assistance*, 13 YALE J. INT'L L. 69, 98 n.140 (1988), the author provides a description of the above report, supplemented by an abbreviated quotation, and raises a concern that the inclusion of House rules in a statute might waive the House's unilateral right to change them. The concern is not warranted by the above complete text of the pertinent paragraphs of the report, which acknowledges that disclaimers are effective to obviate any such concerns.

The Federal Contested Election Act, 2 U.S.C. §§ 381-96 (2006), applies only to an election "to choose a Representative in, or Delegate or Resident Commissioner to, the Congress." *Id.* § 381. Many, if not most, of its provisions could have been adopted as House rules. The Senate has no such rules, whereas the House has had statutory contest procedures as early as the Fifth Congress in 1798. S. REP. NO. 91-546, 91st Cong., 1st Sess. at 1 (1969). Indeed, presumably in deference to the House, the Senate Report substantially excerpted H.R. REP. NO. 91-569H.R. REP. NO. 91-569, 91st Cong. 1st Sess., at 2-3 (1969). The Act does not contain any acknowledgement of the House's right by unilateral action to change those provisions that could have been adopted by a House Rule. Professor Lawson writes:

Thus, a literal reading of the Sweeping Clause [the Necessary and Proper Clause] does not include the power to implement the various functions conferred on the individual houses of Congress.

There is some reason, however, to avoid this literal reading. The Sweeping Clause speaks of powers "*vested by this Constitution in the Government of the United States*." There are, strictly speaking, no such powers. The Constitution does not ever grant powers to the "Government of the United States" as a unitary entity; all powers are granted to specific federal institutions, such as Congress, the House, the Senate, the President, the Vice President, the Chief Justice, and the federal courts. The best reading of the Sweeping Clause is thus to treat the phrase "the Government of the United States" as meaning "principal institutions of the Government of the United States," which would certainly include the constitutionally created House and Senate. On this understanding, Congress could, by statute, implement the various powers granted to the individual houses.

Gary Lawson, *Burning Down the House (and Senate): A Presentment Requirement for Legislative Subpoenas Under the Orders, Resolutions, and Votes Clause*, 83 TEX. L. REV. 1373, 1386 (2005); *cf.* Gary Lawson & Patricia B. Granger, *The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause*, 43 DUKE L.J. 267 (1993). For discussion of the Necessary and Proper Clause as authority for federal legislation with respect to presidential elections, *see infra* notes 225-35 and accompanying text.

222    *See supra* note 214.

223    *See supra* note 80.

224    "[I]f there be *more than one* who have such Majority, and have an *equal* Number of Votes, then the House of Representatives shall immediately chuse by Ballot one of them for President; ... But if there should remain two *or more* who have equal Votes, the Senate shall chuse from them by Ballot the Vice President." U.S. CONST. art. II, § 1, cl. 3 (emphases added).

225    110 U.S. 651, 658 (1884); *accord Ex parte* Siebold, 100 U.S. 371 (1879). *See* Kucinich v. Texas Democratic Party, No. 08-5038, 2009 U.S. App. LEXIS 6084, at 11 (5th Cir. Mar. 24, 2009) (upholding presidential primary candidate

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.    49

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 202 of 553 PageID #: 607

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

oath to support party's presidential candidate); Ray v. Blair, 343 U.S. 214, 230 (1952) (5-2 decision) (holding that an elector pledge to vote for party's presidential candidate not unconstitutional).

226    *Yarbrough*, 110 U.S. at 658.

227    *Id.*

228    *Id.* at 656.

229    *Id.* at 664.

230    *Id.* at 665.

231    290 U.S. 534 (1934).

232    *Id.* at 536.

233    Act of Feb. 28, 1925, ch. 368, tit. III, 43 Stat. 1070 (codified at 2 U.S.C. §§ 241-48 (2006)), *repealed by* Campaign Communications Reform Act, Pub. L. 92-225, § 405, 86 Stat. 20 (1972).

234    *Burroughs*, 290 U.S. at 545. The Court discussed and quoted with approval *Ex parte* Yarbrough, 110 U.S. 651, 651 (1884). *Burroughs*, 290 U.S. at 545-47; *cf.* Oregon v. Mitchell, 400 U.S. 112, 139 & n.5 (1970) (Douglas, J., concurring and dissenting) (quoting *Ex parte* Yarbrough).

235    *Burroughs*, 290 U.S. at 547-48 (citing Stephenson v. Binford, 287 U.S. 251, 272 (1932)); TRIBE, *supra* note 216, §13-10 ("Although the Constitution does not explicitly concede Congress dominion over the qualifications of voters in presidential and vice presidential elections, the Court has nonetheless ruled that Congress possesses the same powers over such elections that it enjoys with respect to congressional elections." (footnote omitted)); *see also* Dan T. Coenen & Edward J. Larson, *Congressional Power Over Presidential Elections: Lessons Learned from the Past and Reforms for the Future*, 43 WM. & MARY L. REV. 851, 887-908 (2002) (describing the implied congressional power to regulate presidential elections); *cf.* Kirby, *supra* note 11, at 499-500 ("[N]o congressional exercise of [the fourteenth, fifteenth, and nineteenth amendments] has yet directly conflicted with state regulation of appointment of presidential electors."). For a most thoughtful discussion of the Necessary and Proper Clause, see Randy E. Barnett, *Necessary and Proper*, 44 UCLA L. REV. 745 (1997).

236    THE FEDERALIST NO. 60, at 369 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Although not completely clear, the context suggests that Hamilton was talking about the qualifications of Representatives. U.S. CONST. art. I, § 2, cl. 2. His view was upheld in Powell v. McCormack, 395 U.S. 486, 550 (1969), which held that when "judging the qualifications of its members Congress is limited to the standing qualifications prescribed in the Constitution." The same reasoning should apply to the qualifications for President and Vice President. U.S. CONST. art II, § 1, cl. 5; U.S. CONST. amend. XII. The only *Federalist* discussion of the President's constitutional qualifications appears to be in THE FEDERALIST NO. 64 (John Jay), *supra*, at 391, but in the context of the treaty power.

237    In distinguishing between (1) the House's purported general power by majority vote to exclude a newly elected Representative--which the Court rejected--and (2) the House's constitutional power to expel a Representative by a two-thirds vote, U.S. CONST. art. I, § 5, cl. 2, *Powell* indicated that in the former case the House was impermissibly trying to add to the Constitution's qualifications for Representative. 395 U.S. at 537-40; *see also* U.S. CONST. art. I, § 2, cl. 2; Powell, 395 U.S. at 551 (Douglas, J., concurring) ("Up to now the understanding has been quite clear to the effect that [Congress's] authority [to deviate from or alter the qualifications for membership as a Representative] does not exist.").

238    In United States v. Smith, 286 U.S. 6 (1932), Justice Brandeis held:
As to the construction to be given to the rules affects persons other than members of the Senate, the question presented is of necessity a judicial one. Smith asserts that he was duly appointed to office, in the manner prescribed by the Constitution. The Senate disputes the claim. In deciding the issue, the Court must give great weight to the Senate's

APPENDIX - 201

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 203 of 553 PageID #:  608

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

present construction of its own rules; but so far, at least, as that construction was arrived at subsequent to the events in controversy, we are not concluded by it.

*Id.* at 33 (citation omitted); *accord* 🔖 *Powell*, 395 U.S. at 512-16 (concluding that the Court has jurisdiction to entertain suits regarding the seating of Congressmen); DESCHLER'S PRECEDENTS, *supra* note 85, § 5.4 (acknowledging the Court's decisions as its jurisdiction and the justiciability of the House's unsuccessful effort to exclude Representative Powell).

239   🔖 393 U.S. 23 (1968); 🔖 *id.* at 38-39 (Douglas, J., concurring); 🔖 *id.* at 41 (Harlan, J., concurring). Despite the uncertainty expressed in BENNETT, *supra* note 1, at 128-29, the rule of *Williams v. Rhodes* appears to retain its vitality. 🔖 Anderson v. Celebrezze, 460 U.S. 780, 805-06 (1983) (holding that Ohio's filing deadline for independent candidates for the office of President of the United States could not be justified by the state's asserted interest in protecting political stability); 🔖 Lee v. Keith, 463 F.3d 763, 765 (7th Cir. 2006) (holding that Illinois state election regulations operated unconstitutionally to burden the freedom of political association guaranteed by the First and Fourteenth Amendments); 🔖 Libertarian Party of Ohio v. Blackwell, 462 F.3d 579, 582 (6th Cir. 2006) (using the analytical framework set forth in 🔖 *Anderson v. Celebrezze*, 460 U.S. 780, to invalidate particular Ohio election regulations); 🔖 Duke v. Smith, 13 F.3d 388, 392 (11th Cir. 1994) (finding that the Presidential Candidate Selection Committee violated the plaintiff's First and Fourteenth Amendment rights by excluding the candidate from the Presidential Primary Ballot); 🔖 Duke v. Cleland, 5 F.3d 1399, 1405 (11th Cir. 1993) (quoting approvingly the analytical framework posited in 🔖 *Anderson*, 460 U.S. 780);Nader 2000 Primary Comm., Inc. v. Hechler, 112 F. Supp. 2d 575, 580 (S.D.W.Va. 2000) (ordering Secretary of State to certify plaintiffs as third-party nominees for the offices of President and Vice President); 🔖 Nader 2000 Primary Comm., Inc. v. Hazeltine, 110 F. Supp. 2d 1201, 1209 (D.S.D. 2000) (declaring a South Dakota election statute unconstitutional as applied to the supporters of and independent candidates for President of the United States); Campbell v. Hull, 73 F. Supp. 2d 1081, 1094 (D. Ariz. 1999) (enjoining defendant from enforcing section of election law that required signors of nomination petition not be members of qualified political parties); 🔖 Duke v. Connell, 790 F. Supp. 50, 51 (D.R.I. 1992) (granting plaintiff's order compelling Secretary of State to place his name on the ballot as a candidate); Buchanan v. Secretary of State, 616 N.W.2d 162 (Mich. 2000) (denying otherwise legitimate third-party presidential and vice presidential candidates claim for relief due to mootness); Robert Yablon, Comment, *Validation Procedures and the Burden of Ballot Access Regulations*, 115 YALE L.J. 1833 (2006) (detailing the efforts of third-party candidates in challenging state ballot access laws during the 2004 presidential campaign).

240   Nevertheless, one of the options for the Proposed Rules for the Election of the President By the House of Representatives (1981) would have eliminated any third candidate if no candidate had received a majority of the states on the first ballot. *Frost Memo*, *supra* note 11, at 15695, col. 1 (*Option A*: Rule 5(f)). No consideration was apparently given to an elector tie vote or to the possibility that there could be more than three candidates because of elector vote ties.

241   The issues discussed in this section are unlikely to arise in any Senate vote for Vice President. As we have seen, under the Twelfth Amendment, "a majority of the whole number [of Senators] shall be necessary to a choice." U.S. CONST. amend. XII. Thus, the Senators vote individually and not by state delegations.
Moreover, the Senate Rules appear to be stricter than the House's about Senators voting. Unlike, as we shall see, in the House Rules, they contain no provision for voting "present." Moreover, under Senate Rule 12.1:
When the yeas and nays are ordered, the names of Senators shall be called alphabetically; and each Senator shall, without debate, declare his assent or dissent to the question, unless excused by the Senate ....
SENATE MANUAL, *supra* note 6, at 12. Senate Rule 12.2 provides:
When a Senator declines to vote on the call of his name, he shall be required to assign his reasons therefor, and having assigned them, the Presiding Officer shall submit the question to the Senate: "Shall the Senator for the reasons assigned by him, be excused from voting?" which shall be decided without debate ....
*Id.* Senate Rule 12.3 provides that a Senator "may decline to vote ... on any matter when he believes that his voting on such a matter would be a conflict of interest." *Id.* It is difficult to imagine what might be such a conflict in a vote to choose a Vice President unless the Senator or a close family member were a candidate. Unlike Section 2 of House Rule VIII, which regulates pairing, JEFFERSON'S MANUAL, *supra* note 11, § 660a, pairing in the Senate is informal. RIDDICK & FRUMIN, RIDDICK'S SENATE PROCEDURE, *supra* note10, at 968-70.

APPENDIX - 202

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 204 of 553 PageID #: 609

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

242    JEFFERSON'S MANUAL, *supra* note 11, §§ 656-57.

243    *Id.* §§ 768-70. The context is the absence of a House quorum upon a call of the House. Any House rules for presidential elections should probably make explicit the procedures for invoking the powers of the House Sergeant-at-Arms for compelling in that situation the attendance of absent Representatives.

244    *Id.* §§ 773 & 774.

245    *Id.* § 672 (citations are to HINDS' PRECEDENTS, *supra* note 64).

246    *See supra* note 241.

247    House Rule X, cl. 1 (j)(11) gives the Committee on the Judiciary legislative jurisdiction with respect to "attendance of members ...." JEFFERSON'S MANUAL, *supra* note 11, § 679a (citing 4 HIND'S PRECEDENTS, *supra* note 64, § 4077 and 6 HIND'S PRECEDENTS, *supra* § 65. However, a statute that in addition compelled voting for President might also come within the jurisdiction of the Committee on House Administration. *See supra* note 197.

248    *See supra* note 178.

249    On June 3, 1980, Representative Joel Pritchard of Washington introduced a sense of the House resolution that "the Members should choose as President the person having the greatest number of popular votes in the November 1980 election of a President." H.R. Res. 694, 96th Cong., 2d Sess. (1980). It was referred to the Committee on House Administration, which took no action. This is consistent with the argument of BENNETT, *supra* note 1.
Akhil Reed Amar and Vikram David Amar argue that state legislatures are free to name their electors in accordance with the winner of the national popular vote or to direct that its electors be bound or pledged to vote in accordance with the direct popular national presidential vote. Akil Reed Amar & Vikram David Amar, *How to Achieve Director National Election of the President Without Amending the Constitution: Part Three of a Three-part Series on the 2000 Election and the Electoral College*, FIND LAW'S WRIT, Dec. 28, 2001, http:// writ.news.findlaw.com/amar/20011228.html. This may not be correct, because it does not seem to take into account several provisions of the Fourteenth Amendment. *See* Coenen & Larson, *supra* note 235, at 885-87 (arguing that Section 5 of the Fourteenth Amendment would not permit Congress to take such action); Friedman, *supra* note 216, at 824-26 (discussing the invalidation of the Florida Supreme Court's manual recount order in *Bush v. Gore* on Fourteenth Amendment grounds); Kirby, *supra* note 249, at 496 (discussing Fourteenth Amendment limitations upon state legislatures that have directed that presidential electors be appointed by popular election); Peter M. Shane, *Disappearing Democracy: How* Bush v. Gore *Undermined the Federal Right to Vote for Presidential Electors*, 29 FLA. ST. U. L. REV. 535, 537-38 (2001). *But see* Wechsler, *supra* note 69, at 549 (suggesting that Section 2 of the Fourteenth Amendment "has proved unworkable in practice"). Neither does it take

account of 2 U.S.C. § 6 (2006) or the Voting Rights Act of 1965, 42 U.S.C. §§ 1973a(c), 1973c (2006), where applicable. National Popular Vote was also supported by Michael Waldman, *Majority Rule at Last: How to Dump the Electoral College Without Changing the Constitution*, WASH. MONTHLY, Apr. 2008, at 18, but he seems unaware of its flaws as discussed *infra*.
The California Legislature passed Assembly 2948 (Cal. 2006), which would have awarded that state's elector votes to the winner of the National Popular Vote. Rick Lyman, *Innovator Devises End Run Around Electoral College*, N.Y. TIMES, Sept. 22, 2006, at A18. Governor Arnold Schwarzenegger vetoed this bill on September 30, 2006 stating that, "I cannot support [increasing California's relevancy in presidential campaigns] by giving all our electoral votes to the candidate that a majority of Californians did not support." Veto message from Arnold Schwarzenegger, Governor of California, to Members of the California State Assembly (on file with author); *see Veto in California on Electoral College*, N.Y. TIMES, Oct. 3, 2006, at A17.
The California Senate passed National Popular Vote in summer 2007, *National Popular Vote Bills*, BALLOT ACCESS NEWS (Richard Winger, San Francisco, CA), July 1, 2007, http://www.ballot-access.org/2007/070107.html#9. The California Assembly did the same on June 30, 2008, but the Governor was expected to veto it, having vetoed the same bill in 2006. *National Popular Vote Plan Bills*, BALLOT ACCESS NEWS, Aug. 1, 2008, http://www.ballot-access.org/2008/080108.html #4. Efforts to bypass this veto by initiative seem to have faltered and would probably have been unconstitutional. *See supra* note 178.
The Maryland Legislature passed H.R. 148, "Presidential Elections--Agreement Among the States to Elect the President by National Popular Vote" (2007), *available at*. http://mlis.state.md.us/2007RS/bills/hb/hb0148t.pdf, and the Senate Bill 634, *available at* http:// mlis.state.md.us/2007RS/bills/sb/sb0634t.pdf. On April 10, 2007, Governor Martin T. O'Malley signed the Act. *The New York Times* editorially supported Maryland's action. Editorial, *Maryland Takes the Lead*, N.Y.

APPENDIX - 203

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 205 of 553 PageID #:   610

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

TIMES, Apr. 14, 2007, at A14. The Maryland statute is also discussed this in Jon S. Cardin, *The National Popular Vote*, WASH. LAWYER, Dec. 2007, at 36. *But see* William **Josephson**, *Letters to the Editor*, *Voting Reform: Another Remedy*, WASH. LAWYER, Dec. 2007, at 5.

The June 1 edition of *Ballot Access News* reported that a Colorado House of Representatives committee killed a National Popular Vote bill. *Anti-Electoral College Bills*, BALLOT ACCESS NEWS (Richard Winger, San Francisco, CA), July 1, 2006, http://www.ballotaccess.org/2006/060106.html#7. In 2007 the Arkansas House and the Colorado Senate voted for the National Popular Vote initiative, as did a North Carolina Senate committee. *See* Margaret Lillard, *N.C. Senate Panel OKs Presidential Popular Vote Plan*, ASSOCIATED PRESS, May 7, 2007.

The Hawaii Governor vetoed a National Popular Vote bill, SB 2898, on April 22, 2008, *National Popular Vote Bills*, BALLOT ACCESS NEWS (Richard Winger, San Francisco, CA), May 1, 2008, http://www.ballot-access.org/2008/050108.html#7, but the Legislature overrode it on May 1, *Legislative Vote, National Popular Vote*, BALLOT ACCESS NEWS, June 1, 2008, Vol. 1, at 2.

Montana and North Dakota have rejected National Popular Vote. Brian Charlton, *Hawaii House Avoids Override Vote on Electoral College Bill*, SEATTLE POST-INTELLIGENCERRR, May 3, 2008.

On January 13, 2008, New Jersey enacted National Popular Vote in Pub. L. 2007, s.334. *See* E-mail from Abbe Gluck, Esq., Special Counsel to New Jersey Att'y Gen., to Devi Kawalek and William **Josephson** (March 11, 2008 11:17 EST) (on file with author). *Ballot Access News* reports that the Washington State Senate passed a National Popular Vote bill on January 12, and on January 29, the West Virginia bill died in committee. *National Popular Vote Plan Bills*, BALLOT ACCESS NEWS (Richard Winger, San Francisco, CA), Mar. 1, 2008, http:// www.ballot-access.org/2008/030108.html#5. The Illinois Governor signed HB 1685, a National Popular Vote bill, into law on April 7, 2008. *National Popular Vote Bills*, BALLOT ACCESS NEWS (Richard Winger, San Francisco, CA), May 1, 2008, http://www.ballot-access.org/2008/050108.html#7. The Vermont Governor vetoed a National Popular Vote bill on May 16, 2008. *Legislative News*, BALLOT ACCESS NEWS (Richard Winger, San Francisco, CA), June 1, 2008, http:// www.ballot-access.org/2008/060108.html#4. On May 27, 2008, the Rhode Island Legislature passed one, *id.*, but the Governor vetoed it. *National Popular Vote Plan Bills*, BALLOT ACCESS NEWS (Richard Winger, San Francisco, CA), Aug. 1, 2008, http://www.ballot-access.org/2008/080108.html#4.

The Massachusetts Legislation passed HB 678, but adjourned on August 1, 2008, without voting to send the bill to the Governor. *National Popular Vote Plan Bills*, BALLOT ACCESS NEWS (Richard Winger, San Francisco, CA), Sept. 1, 2008, http://www.ballotaccess.org/2008/090108.html#2.

The Maryland legislation provides for electors to be nominated by political parties and for "a vote for the candidates for the President and Vice President of a political party shall be considered to be and counted as a vote for each of the presidential electors of the political party nominated ...." H.R. 148, 424th Leg. (Md. 2007). These electors, who may have been elected to vote for Maryland's popular vote winner, are then purportedly required to "cast their votes for the candidates for President and Vice President who received a plurality of the votes cast in [the State of Maryland] the National Popular Vote Total ...." *Id.*

However, it is not clear that a state's law that purports to bind its electors even in accordance with *its own* popular vote is constitutional. *See* Ray v. Blair, 343 U.S. 214, 231 (1952) (5-2 decision); Opinion of the Justices No. 87, 34 So. 2d 598 (Ala. 1948); Ross & **Josephson**, *Popular Vote*, *supra* note 1, at 694-98. *Compare* Amar, *supra* note 143, at 219, 230, *with* Akhil Reed Amar & Vik Amar, *President Quayle?*, 78 VA. L. REV. 913, 944 n.88 (1992), *and* Vikram David Amar, *The People Made Me Do It: Can the People of the States Instruct and Coerce Their State Legislatures in the Article V Constitutional Amendment Process?*, 41 WM. & MARY L. REV. 1037, 1089 n.233 (2000). A fortiori, it is not clear that a law requiring electors to vote otherwise would be valid. Stanley Chang seems unaware of the issues raised by efforts to bind elector votes. Chang, *supra* note 178, at 213. David Gringer is aware of the issues, but appears to dismiss them. Gringer, *supra* note 178, at 187 & n.33.

No National Popular Vote elector voting enforcement mechanism is provided. The argument that electors have constitutional discretion has never been authoritatively rejected. Congress has always counted the votes of so-called faithless electors, including in 1969 when the issue was extensively debated in the Senate. *See* Ross & **Josephson**, *Popular Vote*, *supra* note 1, at 730-37.

The Maryland statute purports to enter Maryland into an agreement among the states to elect the President by National Popular Vote. Under the U.S. Constitution, interstate compacts generally have to be approved by Congress. U.S. CONST. art. I, § 10, cl. 3. This agreement does not so provide. Chang, *supra* note 178, at 213, states, "The constitutionality of the NPV interstate compact has not been definitively established," but discusses only the arguments for its constitutionality.

*See* Virginia v. Tennessee, 148 U.S. 503, 524 (1893) (stating that Congress need not consent to states' agreements making minor adjustments to boundaries). Gringer thinks that the constitutional difficulties can be avoided if Congress approves a National Popular Vote interstate compact, apparently even if it is signed by fewer than the three quarters of the states required to ratify a constitutional amendment. Gringer, *supra* note 178, at 226-27; *see* U.S. CONST. art. V.

APPENDIX - 204

Case 6:20-cv-00660-JDK  Document 33  Filed 01/01/21  Page 206 of 553 PageID #: 611

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

Article 4 of the purported agreement says that any member state may withdraw but not if it does so "six months or less before the end of a President's term ...." Because the Constitution in Article II, Section 1, clause 2 gives each state legislature seemingly plenary power to determine how that state's electors shall be appointed, it is not clear that the power to withdraw could be so limited. McPherson v. Blacker, 146 U.S. 1, 35 (1892).

Indeed, as we have seen, there is a dictum in the per curiam opinion in *Bush v. Gore* that implies that a state legislature can cast elector votes even after electors have been chosen by a state's popular vote. 531 U.S. 98, 104 (2000). This dictum also may call into question the constitutionality of that section of the Electoral Count Act of 1887, codified in 3 U.S.C. § 5, that purports to say that a state cannot change its rules in mid-election. *See supra* note 216.

What if another state, a party to the agreement, breaks it? Can its agreement be enforced? If so, by whom? Where? Again, no enforcement mechanism is provided.

In a close election, the popular vote totals in many states may be disputed. What if these disputes remain unresolved by the time the states' electors are to meet to cast their votes?

By the Twenty-third Amendment, the District of Columbia was given three presidential elector votes. But the legislative history is crystal clear the Congress did not intend for the District to be considered a state for any purpose. *See supra* note 12. Moreover, Congress did not bind the District's electors, though it did permit them to pledge their votes. D.C. CODE ANN. § 1-1001.08(g) (2008); Ross & **Josephson**, *Popular Vote*, *supra* note 1, at 697-98. Yet, provision is made in the purported agreement for the District to join it. This is another issue of which Chang, *supra* note 178, at 212, seems to be unaware.

Plurality is the winning standard under the purported agreement. Many commentators believe that if National Popular Vote became the standard, there would be many more candidates and reduced pluralities. Most popular vote proposals, therefore, have required a plurality of at least forty percent. Lincoln's and Clinton's first-term percentages were just under and just over forty percent, respectively, though each won comfortable elector vote majorities. *See* WORLD ALMANAC 2005, *supra* note 6, at 594.

Because, as we have seen, the Constitution gives only the states' legislatures the power to appoint electors, the purported agreement's provision that the winning popular vote candidate can appoint electors under certain circumstances is of doubtful constitutionality. U.S. CONST. art. II, § 1, cl. 2.

Gringer, *supra* note 178, at 183, 187-219, 227-29, adds to the foregoing arguments against National Popular Vote arguments that it would violate sections two and five of the 1965 Voting Rights Act, as amended, 42 U.S.C. § § 1973, 1973c (2006).

Because in the overwhelming number of presidential elections the popular vote winner has also won a comfortable elector majority, the National Popular Vote proposal would make more sense if it were limited to (1) elections in which no presidential candidate has an elector majority, thus avoiding presidential elections by the gerrymandered House or (2) to that case *and* to the case in which the National Popular Vote winner also has a substantial plurality. Also, the purported agreement among the states does not appear to serve any useful purpose.

*Taming the Electoral College* contains the best case for National Popular Vote. BENNETT, *supra* note 1. Professor Bennett and I believe that it might be possible to draft a National Popular Vote proposal that avoids at least some of the above flaws.

250 Elizabeth Garrett, *Institutional Lessons from the 2000 Presidential Election*, 29 FLA. ST. U. L. REV. 975, 986 (2001).

251 Ross & **Josephson**, *Popular Vote*, *supra* note 1, at 722-24.

252 Editorial, *If the House Picks the President*, N.Y. TIMES, June 11, 1992, at A22.

A somewhat related issue also cries for congressional action: the possibility that a catastrophe might befall the House that coincides with House election of a President.

The Constitution provides differently for the filling of Senate and House vacancies. Under the Seventeenth Amendment, "the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct." U.S. CONST. amend. XVII. However, with respect to the House, "When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies." U.S. CONST. art. I, § 2, cl. 4. The amendment of 2 U.S.C. § 8 in 2005, Act of Aug. 2, 2005, Pub. L. 109-55, § 301, 19 Stat. 508, § 8 simply provided that "the *time* for holding elections ... to fill a vacancy ... *may* be prescribed by the laws of the several States ...." (emphases added).

As amended, 2 U.S.C. § 8(b) provides that when the Speaker of the House "announces that vacancies in the representation from the States in the House exceed 100[,]" "extraordinary circumstances" have occurred. The executive authority of the

APPENDIX - 205

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 207 of 553 PageID #:  612

SENATE ELECTION OF THE VICE PRESIDENT AND..., 11 U. Pa. J. Const. L....

respective states "shall" issue writs of election to take place generally not later than forty-nine days after the Speaker's announcement. The political parties are to nominate candidates not later than ten days after the Speaker's announcement, unless the state provides for primaries or other methods of nomination.

The flaws in these provisions include the absence of any requirement that the Speaker make the announcement and the assumption that there will be a Speaker who can do so. Obviously, should the extraordinary circumstances occur during the time the House is to elect a President, whether or not it will be reconstituted in time depends on how the states' executives decide to implement the "not later than 49 days" requirement.

Presumably, if the Senate needs to be reconstituted, the states' executives will do so in time for the Senate to elect a Vice President who can then act as President. *See supra* Part II.

For a discussion of the legal issues, see Paul Taylor, *Alternatives to a Constitutional Amendment: How Congress May Provide for the Quick, Temporary Filling of House Member Seats in Emergencies by Statute*, 10 J. L. & Pol'y 373 (2002).

For a discussion of the politics of the enactment of Public Law 109-55, see Avi Klein, *Death Wish: If terrorists attack Congress, America could have no legislative branch. House Republicans are fine with that*, WASH. MONTHLY, Nov. 2006, at 19.

11 UPAJCL 597

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

## 80 N. C. L. Rev. 1653

**North Carolina Law Review**
June, 2002

**Article**

Vasan Kesavan[a1]

Copyright © 2002 North Carolina Law Review Association; Vasan Kesavan

## IS THE ELECTORAL COUNT ACT UNCONSTITUTIONAL?

This Article takes on one of the most unasked questions of Bush v. Gore-- whether the Electoral Count Act, the federal statutory scheme at issue in that case, is constitutional. Enacted in 1887 and hardly discussed for the past 114 years, the Electoral Count Act sets forth complicated regulations for counting (and not counting) electoral votes. This Article argues that Section 15 of Title 3 of the United States Code, the heart of the Electoral Count Act, is unconstitutional.

Since 1800, Congress has attempted to enact legislation regulating the electoral count, finally succeeding in 1887. This Article traces these principal congressional efforts to regulate the electoral count and the surrounding constitutional text and structure to show why the Electoral Count Act is unconstitutional. The Electoral Count Act may seem like a good statutory scheme to deal with the problems of the electoral count, but not every good statutory scheme is a constitutional one. Some problems may only be remedied by constitutional amendment, not by statute. Anyone who wishes to argue that the Electoral Count Act is constitutional bears a very high burden of proof.

| | |
|---|---|
| Introduction | 1655 |
| I. The History of the Electoral Count | 1663 |
| A. Congressional Efforts to Regulate Presidential Election and the Electoral Count | 1664 |
| 1. Act of March 1, 1792 | 1664 |
| 2. The Grand Committee Bill of 1800 | 1669 |
| 3. The Twenty-second Joint Rule of 1865 | 1675 |
| 4. The Electoral Count Act of 1887 | 1677 |
| B. The Problems of the Electoral Count | 1678 |
| 1. The Massachusetts Incident of 1809 | 1679 |
| 2. The Indiana Incident of 1817 | 1680 |
| 3. The Missouri Incident of 1821 | 1681 |
| 4. The Postmaster and Michigan Incidents of 1837 | 1683 |
| 5. The Wisconsin Incident of 1857 | 1685 |
| 6. The Greeley Incident and the Other Incidents of 1873 | 1687 |
| 7. The Hayes-Tilden Incident of 1877 | 1688 |
| 8. The Hawaii Incident of 1961 | 1691 |
| 9. The Bailey Incident of 1969 | 1692 |
| II. The Argument Against the Constitutionality of the Electoral Count Act | 1694 |
| A. The Textual Argument | 1696 |
| 1. Some Basics: Who, What, When, and Where? | 1696 |
| a. Who Is the Presiding Officer of the Electoral Count? | 1696 |
| b. Who Opens the Electoral Certificates and Counts the Electoral Votes? | 1701 |
| c. What Is Counting and What Is To Be Counted? | 1711 |
| d. When Is the Counting Done? | 1717 |
| e. Where Is the Counting Done? | 1720 |
| 2. Where Is the Font of Power? | 1729 |
| a. The Necessary and Proper Clause | 1731 |
| b. The Electoral College Clauses | 1743 |

APPENDIX - 207

c. Textual Arguments from Negative Implication ........................... 1747
3. The Intratextual Argument ......................................................... 1748
a. The Times, Places, and Manner Clause .................................... 1749
b. The House Judging Clause ........................................................ 1752
4. Conclusions ................................................................................. 1758
B. The Structural Argument ............................................................ 1759
1. Five Principles of Presidential Election .................................... 1759
a. The Anti-Senate Principle ........................................................ 1759
b. The Anti-Congress Principle .................................................... 1764
c. The Anti-President Principle ..................................................... 1767
d. The Pro-States and Pro-State Legislatures Principle ............... 1769
e. The Pro-Electors Principle ....................................................... 1774
2. Principles of Rule-Making and Law-Making ............................ 1779
a. The Anti-Binding Principle of Rule-Making ........................... 1779
b. The Chadha Principle of Law-Making ..................................... 1787
3. Conclusions ................................................................................. 1793
III. What Should We Do If Electors Go Bananas? ............................ 1793
A. Answers to the Paradigm Problems of the Electoral Count ....... 1795
1. The Problems of the Electoral Certificate ................................. 1795
a. The Unsigned, Uncertified, or Unsealed Electoral Certificate Problem .... 1795
b. The Puerto Rico, or Unrepublican, Electoral Certificate Problem ........ 1796
c. The Number of Electoral Votes Problem .................................. 1797
d. The Multiple Electoral Certificates Problem ........................... 1799
e. The Misdated Electoral Certificate Problem ............................ 1799
f. The Elector Ineligibility Problem ............................................. 1802
2. The Problems of the Electoral Vote .......................................... 1804
a. The Faithless Elector Problem .................................................. 1804
b. The Presidential or Vice Presidential Ineligibility Problem .... 1805
c. The Inhabitants of the Same State Problem ............................. 1805
3. Conclusions ................................................................................. 1808
B. The Twentieth Amendment ........................................................ 1808
C. Revising the Electoral Count Act .............................................. 1811
Conclusion ........................................................................................ 1812

**\*1655  Introduction**

Bush v. Gore[1] is history. We all have plenty to think about. So here are four questions that are well worth considering before Election Day 2004, or at least January 6, 2005, the date specified by federal law for counting electoral votes.[2] What if an elector votes for a presidential or vice presidential candidate who is not a natural born citizen, at least thirty-five years of age, and who has not been a resident of the United States long enough? What if an elector who is constitutionally ineligible to be an elector votes? What if an elector votes for inhabitants of her state for both President and Vice President? What if two sets of electors from the same state both claim that they are the lawfully appointed electors of the state?

**\*1656**  The first three of these questions might seem downright outlandish, and prior to the presidential election of 2000, the fourth was too. Now is a good time to remember that these four questions were not at all outlandish in the spring of 1800 when America faced her first electoral crisis of "Jefferson v. Adams."[3] These four  **\*1657**  questions were the paradigm problems of the electoral count debated in the Sixth Congress.[4] Federalist Senator Ross of Pennsylvania firmly stated that "such cases might happen and were very likely to happen."[5] Democrat-Republican Senator Pinckney of South Carolina, more sanguine, stated that these cases "may not happen once in a century."[6] In addition to these four problems of the electoral count, a fifth problem has proved much more likely throughout history: What if an elector is "faithless" and votes for a President or Vice President in contravention of the popular vote?[7]

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    2

**\*1658**  What does the Constitution say about these potential problems? The relevant text of the Constitution simply provides that "[t]he President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted."[8] It ought to be obvious that the Constitution does not provide any answers to these tricky problems of the electoral count.[9] The Framers and Ratifiers simply did not contemplate the possibilities of unconstitutional or faithless electoral votes.

The critical question is whether we can fix the casus omissus of the Constitution short of constitutional amendment. The counting of the electoral votes is no trivial matter. It is the critical step in the election of the President and Vice President. As one leading scholar has stated, it seems to be "the magic, formal moment of vesting in which the winning candidate is elected as 'President.'"[10] Some might quibble with this formalist point, but at the founding, when there were no telegraphs, telephones, or television, and when electoral  **\*1659**  votes were more secret, there was no way of knowing the identity of the winning candidates until the electoral votes were formally counted. Recent history should be a powerful reminder of the significance of the electoral count. One key lesson of the presidential election of 2000 is that the President-elect is not elected by "We the People" on election day, or even by the electors on the day they cast their votes, but by the joint convention of the Senate and House of Representatives on the day the electoral votes are formally counted.

The counting function appears to be a ministerial duty of tabulation imposed by the Constitution because each of the electoral colleges meet in their respective states instead of at some central location. Conventional wisdom holds that the joint convention of the Senate and House of Representatives does the counting, and not the President of the Senate, but this is not at all clear from the text of the Electoral College Clauses. But does the counting function subsume the power not to count? What about unconstitutional votes? What about faithless votes?

As is now somewhat well known, Congress has answered the question whether the counting function subsumes the power not to count affirmatively. The relevant statute is the Electoral Count Act of 1887,[11] presently codified at 3 U.S.C. §§ 5-6, 15-18. The heart of the Electoral Count Act is undisputedly 3 U.S.C. § 15, a complicated provision that sets forth rules for counting (and not counting) electoral votes. In a nutshell, this section provides that in a case of single returns, the joint convention may only reject electoral votes that are not "regularly given" if both Houses of Congress concur.[12] In a case of multiple returns from the same state, this section provides that the joint convention may only accept electoral votes as "regularly given" if both Houses of Congress concur (with a few important wrinkles to be discussed later).[13] The meaning of the phrase "regularly given"[14] in § 15 is far from clear. The precedents of the electoral count, however, strongly suggest that the joint convention will not count unconstitutional votes, and possibly not faithless votes either.

While 3 U.S.C. § 15 sets forth the rules for counting (and not counting) electoral votes, 3 U.S.C. § 5, the specific federal statutory provision at issue in Bush v. Gore, sets forth the so-called "safe  **\*1660**  harbor" provision for counting electoral votes with respect to a state's determination of any controversy or contest concerning the appointment of its electors.[15] Bush v. Gore indicates that there must be nine votes on the Supreme Court for the proposition that 3 U.S.C. § 5 is constitutional. Although neither party briefed or argued the constitutionality of this provision of the Electoral Count Act, each of the Justices must have reached an independent, antecedent determination that 3 U.S.C. § 5 passes constitutional muster.[16] Curiously, Bush v. Gore, for all that it did address regarding presidential election, did not address the heart of the Electoral Count Act-- 3 U.S.C. § 15. Only Justice Breyer, with Justices Stevens and Ginsburg concurring, even mentioned this key section, and he did so approvingly.[17] The prevailing wisdom, in the Supreme Court and elsewhere, is that the Electoral Count Act is constitutional.[18]

 **\*1661**  Yet there has been virtually no scrutiny of this conventional wisdom in the wake of Bush v. Gore. One of the most unasked questions regarding the presidential election of 2000 is whether the federal statutory scheme at issue in that case is constitutional.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

This Article argues that the Electoral Count Act, specifically 3 U.S.C. § 15, is unconstitutional. The Electoral Count Act violates the text and structure of the Constitution in multiple ways. For example, where is the font of express or implied power to pass the Electoral Count Act? Where does Congress have the power to regulate the manner of presidential election? Where do the Electoral College Clauses provide for bicameralism in counting electoral votes? What gives the 49th Congress the authority to bind future Congresses and joint conventions in counting electoral votes?

More generally: What gives the joint convention the power to judge the validity of electoral votes? The counting function seems to be arithmetic and ministerial. If the joint convention could judge electoral votes, it could reject enough votes to thwart the electors' will or trigger a contingency election for President in the House of Representatives and for Vice President in the Senate, thereby arrogating to the two Houses of Congress the power to appoint the Nation's two highest executive officers.[19] The tight margin of the **\*1662** presidential election of 2000--in both the popular vote and electoral vote--demonstrates that these possibilities are not necessarily remote. In a close presidential election, every electoral vote counts. As Chancellor Kent put the point in his treatise on the Constitution first published over 175 years ago, "In the case of questionable votes, and a closely contested election, this [counting] power may be all-important."[20] As bizarre as it may seem, the joint convention must count the electoral votes-- including unconstitutional or faithless votes. As unfortunate as it may be, a solution to the problem of unconstitutional or faithless electoral votes requires constitutional amendment. The constitutional infirmities of the electoral count are yet additional reasons to scrap the Electoral College mode of presidential election altogether.

This Article proceeds in three parts. Part I presents the history of the electoral count, addressing the principal congressional efforts to regulate presidential election and the electoral count, and the actual problems of the electoral counts from the Founding to today. Part II contains the constitutional argument against the constitutionality of Electoral Count Act and sets forth "interpretivist" arguments from constitutional text and structure.[21] Part III considers **\*1663** what should happen if the Electoral Count Act is unconstitutional, and electors go bananas and cast unconstitutional or faithless votes. This Part suggests answers to the paradigm problems of the electoral count and considers where we should go from here.

## I. The History of the Electoral Count

The history of the electoral count is woefully understudied.[22] This is especially problematic because "[d]isputes concerning presidential electors and their votes are more common than one may think."[23] Although the electoral count's history does not directly (or necessarily) bear on the constitutionality of the Electoral Count Act, it is worth studying for at least a few reasons. First, there is much we can learn about our electoral past. Given the risk that history might repeat itself, the history of the electoral count furnishes important precedent for future electoral disputes, in much the same way as cases furnish precedent for future cases.[24] Second, participants in the Electoral Count Act debates referred to the history of the electoral **\*1664** count in debating the constitutionality of the Electoral Count Act. A familiarity with the history of the electoral count better informs these legislative debates. Third, participants in the Electoral Count Act debates referred to the history of the electoral count-- and specifically the actual problems of the electoral count--in debating the necessity and expediency of the Electoral Count Act. A critical examination of this history better affords a basis to assess whether the Electoral Count Act is necessary and expedient to address these historical problems and whether there may be other non-statutory solutions.

This Part seeks to fill this void in scholarship and proceeds in two sections. The first section summarizes four principal congressional efforts-- three successful, one not--to regulate presidential election and the electoral count, including the Act of 1792, the Grand Committee Bill, the Twenty-second Joint Rule, and finally the Electoral Count Act. The second section summarizes the actual problems of the electoral count. In the course of fifty-four electoral counts in the history of the Republic, there have been only a dozen or so problems of the electoral count, most of which occurred in the nineteenth-century.[25]

## A. Congressional Efforts to Regulate Presidential Election and the Electoral Count

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   4

### 1. Act of March 1, 1792

On March 1, 1792, the Second Congress passed "An Act relative to the election of a President and Vice-President of the United States and declaring the officer who shall act as President in case of vacancies in the offices both of President and Vice-President."[26] The Act thus regulated presidential election and presidential succession, the latter pursuant to Article II, Section 1, Clause 6.[27]

 **\*1665**  The Act did a number of things with respect to presidential election. Sections 1 and 2 of the Act, pursuant to Article II, Section 1, Clause 4,[28] established the time of choosing the electors by the States as thirty-four days before their meeting, and the day on which the electors were to give their votes as the first Wednesday in December of each presidential election year.[29] Section 1 also clarified Article II, Section 1, Clause 2[30] by providing that each state shall appoint a number of electors equal to the number of Senators and Representatives to which the state is entitled at the time when the President and Vice President to be chosen would come into office.[31]

Section 2 also clarified Article II, Section 2, Clause 3[32] by specifying the manner of certifying and transmitting the electoral certificates to the President of the Senate. It provided that the electors in each state shall make and sign three electoral certificates--one to be sent by messenger appointed by a majority of the electors, a second by post to the President of the Senate, and the third to be delivered to the judge of the district in which the electors in each state  **\*1666**  shall assemble.[33] Section 3 further specified the manner of certifying and transmitting the electoral certificates, but well beyond the text of Article II, Section 2, Clause 3. It provided that

> the executive authority of each State shall cause three lists of the names of the electors of such State to be made and certified and to be delivered to the electors on or before the said first Wednesday in December; and the said electors shall annex one of the said lists to each of the lists of their votes.[34]

These provisions of sections 2 and 3 are noteworthy because the Electoral College Clauses do not expressly grant Congress the power to specify the manner of certifying or transmitting the electoral certificates. Interestingly, a draft of Article II, Section 1, Clause 4 at the Philadelphia Convention of 1787 provided that "[t]he Legislature may determine the time of choosing the Electors, and of their giving their votes; and the manner of certifying and transmitting their votes--But the election shall be on the same day throughout the U--States."[35] The italicized language was inexplicably dropped by the time the Framers referred the draft Constitution to the Committee of Style and Arrangement.[36] It is a slippery exercise to infer the meaning of this clause from language rejected in predecessor drafts. Perhaps the Framers intended to deny Congress the power to legislate on the manner of certification and transmission of electoral votes. Or perhaps the Framers intended that Congress could enact  **\*1667**  these sections either pursuant to Article II, Section 1, Clause 4 itself or pursuant to the Necessary and Proper Clause.[37]

In any case, it is difficult to see how section 3 and its modern codification at 3 U.S.C. § 6 are constitutional, strictly speaking. When section 3 of the Act of 1792 was read in the House of Representatives, Representative Niles, joined by Representative Hillhouse, objected to it on constitutional grounds, questioning Congress's ability to impose duties on the executive authority of each state and calling the section "degrading to the Executives of the several States."[38] Speaker Sedgwick responded that "if Congress were not authorized to call on the Executives of the several States, he could not conceive what description of persons they were empowered to call upon,"[39] and Representative Niles's motion to strike the clause was negatived.

Democrat-Republican Senator Charles Pinckney, a Framer and leading delegate to the South Carolina ratifying convention, probably would have agreed with Representative Niles's constitutional objection. In a speech before the Senate in March of

APPENDIX - 211

1800, Senator Pinckney observed that the Act of 1792 may "in one or two particulars of no importance" go "farther than the Constitution warrants," though he did not identify any particular sections.[40] In modern constitutional parlance, the duties imposed on State Executives by section 3 of the Act of 1792 and 3 U.S.C. § 6, do not seem quite like "purely ministerial reporting requirements,"[41] but those who have a broader view of "executive commandeering" are unlikely to question seriously the constitutionality of section 3 of the Act of 1792 and 3 U.S.C. § 6.[42]

Other provisions of the Act of 1792 are much less questionable. Section 4 provided that if the electoral certificate of a state shall not have been received at the Seat of Government by the first Wednesday in January, then the Secretary of State shall send a special messenger to the district judge of the State who held one of the three electoral *1668 certificates.[43] Section 5 provided that Congress shall be in session on the second Wednesday in February for the purpose of opening the electoral certificates and counting the electoral votes.[44] Section 6 provided that if the President of the Senate were absent when the electoral certificates arrived, they would be given to the Secretary of State for safekeeping, to be delivered as soon as practicable to the President of the Senate. Section 7 provided for the compensation of messengers who would carry one of the three electoral certificates from each of the states to the Seat of Government at the rate of twenty-five cents a mile. Section 8 prescribed a $1,000 penalty (no small sum in those days) for messengers who failed to perform the service.[45]

Whatever we think about the constitutionality of section 3 of the Act of 1792, the Act did not in any way assert any congressional control over the electoral count itself. As one early scholar of the Electoral Count Act noted, "There is no attempt here, legislatively, to interpret the Constitution, or devise any counting machinery other than that which appears on its face, or establish any rule for its action. *1669 It was assumed that the Constitution interprets itself, and executes itself by its own provisions."[46]

## 2. The Grand Committee Bill of 1800

In early 1800, the Federalist-controlled Sixth Congress attempted to regulate the electoral count.[47] The impetus for the regulation was plainly corrupt: The upcoming presidential election between President and Federalist John Adams and Vice President and Democrat-Republican Thomas Jefferson commanded the nation's attention, and the Federalist-controlled Congress desired to deal Vice President Jefferson's electoral chances a "crippling blow."[48] Historian John Bach McMaster explained that

> [t]he leaders of the [Federalist] party were determined that, if the presidential election could not be carried by fair means, it should by foul. Adams's electors might be defeated in the Legislatures and at the poles [sic], but the votes of the Jefferson electors should, if possible, be thrown out by Congress. With this for its purpose, an electoral-count bill appeared in the Senate.[49]

On January 23, 1800, Federalist Senator James Ross moved "[t]hat a committee be appointed to consider whether any, and what, provisions ought to be made by law for deciding disputed elections of President and Vice President of the United *1670 States, and for determining the legality or illegality of the votes given for those officers in the different States" and that the committee be authorized to report a bill.[50] This motion was the subject of significant debate, much of which we shall uncover in Part II. On February 14, 1800, Senator Ross reported "A bill prescribing the mode of deciding disputed elections of President and Vice-President of the United States."[51] This bill is commonly known as the "Grand Committee" Bill.[52]

As its shorthand name suggests, this bill featured the appointment of a "Grand Committee" on the day before the second Wednesday in February. This Committee would have thirteen members: six Representatives chosen by ballot in the House, six Senators chosen by ballot in the Senate, and the Chief Justice of the United States who was to act as chairman (if the Chief

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Justice were absent then the next most senior Justice would attend).[53] This committee was to have power to examine, and finally to decide, all disputes relating to the election of President and Vice President including the:

> power to inquire, examine, decide, and report upon the constitutional qualifications of the persons voted for as President and Vice-President of the United States; upon the constitutional qualifications of the electors appointed by the different States, and whether their appointment was authorized by the State Legislature or not; upon all petitions and exceptions against corrupt, illegal conduct of the electors, or force, menaces, or improper means used to influence their votes; or against the truth of their returns, or the time, place or manner of giving their votes.[54]
>
> **\*1671**  The committee was "to sit with closed doors." It was to have the "power to send for persons, papers, and records to compel the attendance of witnesses,"[55] and its report was to be made "on the first day of March next after their appointment." This report was to be "a final and conclusive determination of the admissibility or inadmissibility of the votes given by the electors for President and Vice-President of the United States."[56]

Republican Senator Charles Pinckney delivered a "closely reasoned attack"[57] on the Grand Committee Bill, which occupies some twenty-one pages in the Annals of Congress.[58] It is not surprising that Senator Pinckney led the effort in the Senate against the Grand Committee Bill. Some historians place him as the campaign manager in South Carolina for Democrat-Republican and Vice President Thomas Jefferson, who had everything to lose with the passage of the Grand Committee Bill.

In his introductory remarks, Senator Pinckney described the Grand Committee Bill as more dangerous than the Alien and Sedition Acts of 1798 because, unlike the latter, the former was perpetual.[59] Relying on his experience as a Framer and a leading delegate at the South Carolina ratifying convention, Senator Pinckney forcefully articulated his principal objection to the bill:

> Knowing that it was the intention of the Constitution to make the President completely independent of the Federal
>   **\*1672**  Legislatures, I well remember it was the object, as it is at present not only the spirit but the letter of that instrument, to give to Congress no interference in, or control over the election of a President. It is made their duty to count over the votes in a convention of both Houses, and for the President of the Senate to declare who has the majority of the votes of the Electors so transmitted. It never was intended, nor could it have been safe, in the Constitution, to have given to Congress thus assembled in convention, the right to object to any vote, or even to question whether they were constitutionally or properly given. . . . To give to Congress, even when assembled in convention, a right to reject or admit the votes of States, would have been so gross and dangerous an absurdity, as the [F]ramers of the Constitution never could have been guilty of. How could they expect, that in deciding on the election of a President, particularly where such election was strongly contested, that party spirit would not prevail, and govern every decision?[60]

According to Senator Pinckney, the animating principle of the Electoral College Clauses was to remove Congress from the business of electing the President as much as possible. Despite Senator Pinckney's strong and well reasoned objections, many of which we shall uncover in Part II, in the course of the argument against the constitutionality of the Electoral Count Act, the Senate passed the Grand Committee Bill by a "strict party vote"[61] of sixteen to twelve on March 28, 1800.[62]

Three days later the bill reached the House. In the House, Federalist Representative John Marshall--soon to be Chief Justice Marshall--broke with his party, and much to the Federalists' dismay, lobbied very hard against the Grand Committee Bill.[63] He was  **\*1673**  appointed chairman of a select committee to redraft the bill. Marshall reported the Senate bill in the House of Representatives on April 25, 1800 with significant amendments.[64] Under the amended bill, the committee's report was not to be the final and conclusive determination on the electoral votes. Instead, this determination would devolve upon the two Houses

APPENDIX - 213

after receiving the committee's report. The House bill provided that, upon objection to any elector's vote in a joint meeting of the two Houses, the vote was to be counted unless the two Houses, meeting separately, concurred in rejecting it. Indeed, as we shall see, the Electoral Count Act bears significant resemblance to this amended bill.[65]

These amendments "gutted" the Grand Committee Bill.[66] The Senate considered this amended bill on May 8, 1800, and rejected the House amendments by a "strict party vote."[67] The Senate then passed an amendment striking out the word "rejecting" and inserting the word "admitting." The effect of this change was to create a "one-House veto" over electoral votes. When the two Houses could not agree on the amended bills, the bill died.[68] According to John Marshall scholar Albert J. Beveridge, if Marshall had not waged his campaign against the Grand Committee Bill, the election of Thomas Jefferson would have been impossible.[69]

It is extremely difficult to see how the original Grand Committee Bill was constitutional.[70] In addition to the constitutional argument that will be explored in detail in Part II, there are at least four additional attacks on this bill. First, what gives Congress the  *1674  authority to delegate the counting function to a committee, if Congress has counting authority at all?[71] Second, what gives Congress the authority to take the Chief Justice (or other Justices) away from her judicial duties?[72] Third, what gives Congress the authority to delay the counting of the electoral votes in violation of the immediacy principle of the Electoral College Clauses?[73] Fourth, what gives Congress the authority to secretly count electoral votes in violation of the publicity principle of the Electoral College Clauses?[74]

In sum, one should seriously doubt the constitutionality of the Grand Committee Bill. It is far from clear that Representative John Marshall's amendments removed the multiple constitutional infirmities. Arguably, the failure of the Second Congress to address congressional regulation of the electoral count after significant constitutional debate suggests the unconstitutionality of the Grand Committee Bill; Senator Pinckney certainly thought so.[75]

### *1675  3. The Twenty-second Joint Rule of 1865

The third principal congressional effort to regulate the electoral count came sixty-five years later in 1865.[76] On January 30, 1865, the House of Representatives passed a resolution now commonly referred to as the "Twenty-second Joint Rule." A few days later, on February 6, 1865, after minor amendment, the Senate passed the House resolution. Sparsely attended Houses of Congress passed the Twenty-Second Joint Rule with no debate.[77] As Dean Wroth has observed, it was "a political measure, passed and used by Republican majorities of both Houses to assure control over the votes of the recently rebellious southern states."[78] The purpose of the Twenty-Second Joint Rule was thus to exclude the electoral votes of putative states as needed, not to exclude the electoral votes of electors. It provided in relevant part:

> If, upon the reading of any such certificate by the tellers, any question shall arise in regard to counting the votes therein certified, the same, having been stated by the Presiding Officer, shall be submitted, first by the President of the Senate to that body, and then by the Speaker to the House of Representatives, and no question shall be decided affirmatively, and no vote objected to shall be counted, except by the concurrent votes of the two houses, said votes of the two houses to be reported to and declared by the Presiding Officer, and upon any such question there shall be no debate; and any other question pertinent to the object for which the two houses are assembled may be submitted and determined in like manner.[79]  *1676  As the text of the Joint Rule indicates, "no vote objected to shall be counted, except by the concurrent votes of the two houses." Any Member of Congress could object to an electoral vote for any reason, and each House was to have a "one-House veto" as to which votes were to be counted.[80] Thus, each House could, by rejecting enough votes, trigger a contingency election in the House

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   8

of Representatives for the President and in the Senate for the Vice-President.[81] As we shall see shortly, even the Electoral Count Act does not go this far.

A report by the House Committee on Privileges and Elections in 1874 called the Twenty-Second Joint Rule "the most dangerous contrivance to the peace of the nation that has ever been invented by Congress."[82] Indeed, the consensus view during the Electoral Count Act debates was that the Twenty-Second Joint Rule was unconstitutional.[83] Unsurprisingly, scholars who have studied the  **\*1677**  Rule have identified it as the apex of congressional control over the electoral count.[84] Simply put, the Twenty-second Joint Rule was unconstitutional.[85]

### 4. The Electoral Count Act of 1887

The legislative history of the Electoral Count Act of 1887 is complex, and much of this history has been well catalogued elsewhere.[86] The heart of the Electoral Count Act is currently codified at 3 U.S.C. § 15, titled "Counting electoral votes in Congress."[87] This section sets forth a complicated set of provisions for counting electoral votes.

Two noticeable differences exist between the Electoral Count Act and the Twenty-second Joint Rule. First, the Electoral Count Act is a law and not a joint rule. Second, the Electoral Count Act does not have the "one-House veto" provision of the Twenty-second Joint Rule. It is not clear that these two significant changes cure the constitutional infirmities of the Twenty-second Joint Rule.

Charting the basic workings of the Electoral Count Act is a good place to begin. The Act provides for the reading of the electoral votes by state and the objection to an electoral vote. Unlike its predecessors, the Electoral Count Act requires an objection to an electoral vote to have the signature of at least one Senator and at least one Representative.[88] After all the objections to the electoral votes from a state have been received and read, the Senate and the House of Representatives withdraw for separate deliberations.  **\*1678**  Unless there is a case of "double returns," the applicable provision is as follows:

> [N]o electoral vote or votes from any State which shall have been regularly given by electors whose appointment has been lawfully certified to according to section 6 of this title from which but one return has been received shall be rejected, but the two Houses concurrently may reject the vote or votes when they agree that such vote or votes have not been so regularly given by electors whose appointment has been so certified.[89]

In the case of "double returns" with "more than one return or paper purporting to be a return from a State,"[90] the applicable statutory provision is considerably more complex. The joint convention first looks to see if the state has determined the controversy, and if it has, that determination is binding.[91] If, however, there should be multiple state authorities which claim to have decided the controversy, then the two Houses of Congress, acting separately, must decide concurrently which set to count. If the two Houses disagree, then the Electoral Count Act provides that "the votes of the electors whose appointment shall have been certified by the executive of the state, under the seal thereof, shall be counted."[92] The Electoral Count Act does not address what happens if the same executive authority certifies different electors or if multiple executive authorities certify different electors.

### B. The Problems of the Electoral Count

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Fortunately, Senator Ross's doomsday prediction in the Sixth Congress that the thorny problems of the electoral count "might happen, and were very likely to happen"[93] has not been borne out in  **\*1679**  the course of two hundred and thirteen years of the Republic. There have been a dozen or so problems of the electoral count and consequent challenges to electoral votes, almost all of which occurred in the nineteenth-century. This section summarizes the historical problems of the electoral count.

### 1. The Massachusetts Incident of 1809

The first congressional objection to the votes of electors occurred in the electoral count of 1809.[94] On December 26, 1808, Representative Barker introduced a memorial from some disgruntled inhabitants of Hanover, Massachusetts that the appointment of Massachusetts electors was "irregular and unconstitutional"[95] relative to the Massachusetts Constitution, and praying that Congress look into the matter during the electoral count. When a resolution was called to appoint a committee of the House to investigate, Representative Randolph spoke in very strong terms against it:

> He said it appeared to him that, under color of redress of grievances, the resolution might go in a very alarming and dangerous manner to enlarge the sphere of action of the General Government at the expense of the dearest rights of the States. In what manner, asked he, is the General Government constituted? We, as one of the branches of the Legislature, are unquestionably the judges of our own qualifications and returns. The Senate, the other branch of the Legislature, is in like manner the judge without appeal of the qualifications of its own members. But with respect to the appointment of President on whom is that authority devolved in the first instance? On the electors, who are to all intents and purposes, according to my apprehension, as much the judges of their own qualifications as we are of ours . . . .[96]

Representative Rowan also spoke strongly against the resolution. He thought that "Congress did not possess a superintending power over the acts of the States in general cases" and doubted that Congress had any power in this case; he recommended that the petitions of the Massachusetts citizens not be placed on the files of the House "because they related to a subject on which the House had no power to legislate."[97] The resolution passed nevertheless, but  **\*1680**  there is no record that anything further was done. No one objected during the electoral count, and all Massachusetts electoral votes were counted.

### 2. The Indiana Incident of 1817

The second congressional objection to the votes of electors occurred in the electoral count of 1817.[98] On February 11, 1817, the two Houses gathered in the House of Representatives. During the electoral count, Representative Taylor, "compelled" to speak "by his sense of duty,"[99] objected to the counting of the electoral votes from Indiana because the Indiana electors were elected before Indiana joined the Union. The Speaker of the House interrupted him and stated that, when assembled in joint convention, the two Houses "could consider no proposition, nor perform any business not prescribed by the Constitution."[100] Accordingly, the Senate withdrew to its chamber by their unanimous consent. Representative Taylor then repeated his argument that, because the Indiana electors were chosen before Indiana was admitted into the Union, "the votes of that State were no more entitled to be counted than if they had been received from Missouri or any other Territory of the United States."[101] In his view, the votes of the Indiana electors were "illegal."[102]

Although Representative Taylor did not refer to it, the improper appointment of the Indiana electors was in violation of section 1 of the Act of 1792. However, the votes of Indiana's electors were cast after Indiana was admitted into the Union. Indiana was admitted into the Union as the nineteenth State effective December 11, 1816. This date was after the date set by Congress for the meeting of the electoral colleges but before the date set by Congress for the electoral count.

APPENDIX - 216

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.          10

Representative Cady countered. He

> thought that the matter had been settled by the admission of Senators and Representatives from Indiana to their seats, and that it was too late on that account to question her right to participate in the election of President; and that from the moment the constitution of the State was assented to, she  **\*1681**  was entitled to all the privileges of an independent member of the Union.[103]

A joint resolution to settle the question was indefinitely postponed by the House of Representatives.[104] The Senate re-entered the House Chamber and the electoral count resumed. According to the record of congressional debate, "[n]o one appeared to question the power of Congress to reject the vote of Indiana if that State was not a State in the Union at the time the electoral votes were cast."[105] In the end, the votes of Indiana's three electors were counted.

### 3. The Missouri Incident of 1821

The third congressional objection to the votes of electors occurred in the electoral count of 1821.[106] In early February of 1821, Congress passed a resolution appointing a joint committee "to ascertain and report a mode of examining the votes for President and Vice-President of the United States, and of notifying the persons elected of their election."[107] On February 13, 1821, the Senate resolved that if any objection was made to the electoral votes of Missouri and if the result of the electoral count did not turn on counting or omitting the Missouri votes, then the President of the Senate would announce the winners of the presidential and vice presidential electoral vote, plus a conditional tally--that is to say, if Missouri's votes were counted, the tally would be x; if Missouri's votes were not counted, the tally would be y. In the Senate, a "long debate" took place on this resolution and four Senators strongly opposed it "principally for the reason that it was not competent in the Senate to decide such a question in anticipation."[108]

When the resolution was read in the House of Representatives, Representative Randolph stated he would rather have seen no votes counted at all than a "special verdict" announced:

>  **\*1682**  He could not recognize in this house or the other house, singly or conjointly, the power to decide on the votes of any State. . . . He maintained that the electoral college was as independent of Congress as Congress of them; and we have no right, said he, to judge of their proceedings. . . . Suppose a case, in which some gentlemen of one house or the other should choose to turn up his nose at the vote of some State, and say that if it be so and so, such a person is elected; and if so and so, what-you-call-'im is elected--did not everybody see the absurdity of such a proposition?[109] Representative Floyd also objected to the special verdict. He stated,

> If they had any power over the votes of Missouri at all, it was when her votes were first received; but no such power existed. He protested against this assumption of authority on the part of Congress, and wished to show his disapprobation of the resolution in the strongest manner.[110]

Representative Rhea agreed, finding that the Constitution was not designed to be expedient and that "it was not in the power of this House, or of both Houses, by resolution, to remedy a defect in the Constitution."[111]

APPENDIX - 217

Soon afterwards, during the electoral count, Senator Livermore objected to the electoral votes from Missouri because Missouri was not a State of the Union. He was right. Missouri was admitted into the Union as the twenty-fourth State effective August 10, 1821. In the House, Representative Floyd submitted a resolution "[t]hat Missouri is one of the States of this Union, and her votes for President and Vice-President of the United States ought to be received and counted."[112]

After extended comments by Representatives Randolph and Archer against the resolution on the ground that it was not within the power of the House, a motion to table the resolution passed, and the Senate reassembled in the House Chamber for the electoral count.[113] The President of the Senate proceeded to announce the result of the vote conditionally, as provided in the Senate resolution:

> The whole number of electors appointed by the several States was 235. One elector in each of the States of Pennsylvania, Tennessee, and Mississippi having died before the meeting of the electoral college of which he was a **\*1683** member, made the whole number of votes actually cast 232, including the vote of Missouri, of which 117 make a majority; or, excluding the vote of Missouri, 229, of which 115 make a majority; but in either event James Monroe is elected President, and Daniel D. Tompkins, Vice-President.[114]

When Representative Floyd asked the President of the Senate if Missouri's votes were in fact counted, the joint convention broke into disorder. Representative Randolph tried to speak but was pronounced out of order by the Speaker of the House. The President of the Senate concluded and the Senate withdrew to its Chamber.[115]

Thereafter, Representative Randolph introduced two resolutions in the House declaring that the electoral count was illegal. The first resolution provided that the electoral votes of Missouri were counted. The second resolution provided

> [t]hat the whole number of electors appointed, and of votes given for President and Vice-President, has not been agreeably announced by the presiding officer of the Senate and House of Representatives, agreeably to the provision of the Constitution of the United States, and that therefore the proceeding has been irregular and illegal.[116]

As he was putting his resolutions into writing, the House voted to adjourn and did not act upon either resolution.[117]

### 4. The Postmaster and Michigan Incidents of 1837

The fourth congressional objection to the votes of electors occurred during the electoral count of 1837.[118] The electoral count of 1837 actually involved two separate incidents: the Postmaster Incident and the Michigan Incident. In late January of 1837, the Senate and the House of Representatives resolved to appoint a joint committee "to ascertain and report a mode of examining the votes of President and Vice President of the United States, and of notifying **\*1684** the persons of their election."[119] Senator Grundy, who was one of three Senators on the joint committee, reported to the Senate on February 4, 1837 that some electors may have been constitutionally ineligible to be electors because "no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an elector."[120] He reported that Isaac Waldron, an elector from New Hampshire, was the "president of a deposit-bank at Portsmouth, and was appointed and acting as pension-agent, without compensation, under the authority of the United States" and the two North Carolina electors held the "offices of deputy postmasters under the General Government."[121] In addition, the appointment of three other electors (from New Hampshire, Connecticut, and North Carolina, respectively) was in question.[122] The Committee concluded that the Electoral Incompatibility

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Clause "excludes and disqualifies deputy postmasters from the appointment of electors; and the disqualification relates to the time of the appointments, and that a resignation of the office of deputy postmaster after his appointment as elector would not entitle him to vote as elector under the Constitution."[123]

The Senate took no further action on the issue. Debate in the House of Representatives was minimal. One Representative pointed out that all of these electors probably resigned from their offices before the day on which they cast their votes,[124] but was quickly corrected by another who noted that the ineligibility under the Electoral Incompatibility Clause extended to the time of the appointment.[125] These issues were not raised during the electoral count, and all of these electoral votes were counted.

The Michigan Incident was similar to the Indiana and Missouri Incidents. Michigan was admitted into the Union as the twenty-sixth State effective January 26, 1837. This date was after the date Congress set for the meeting of the Electoral Colleges, but before the date Congress set for the counting of electoral votes. On February 4, 1837, the Senate proposed a resolution to count Michigan's electoral votes in the same manner as Missouri's. Senator Norvell objected to  **\*1685**  this resolution, arguing that the Michigan question was exactly the same as that of the Indiana Incident.[126]

Senator Calhoun also opposed the resolution, stating that "Michigan was a State de facto at the time she formed her constitution; and if her electors were not legally appointed, neither were her Senators, who were admitted upon this floor."[127] The Senate adopted this resolution by a vote of thirty-four to nine.[128] The House adopted the same resolution on February 6, 1837, although Representative Crary of Michigan also "thought the position of his State was analogous to that of Indiana, and that her vote should be received and counted."[129]

On February 8, 1837, the President of the Senate announced the result of the electoral count in the same way as in the Missouri Incident. Martin Van Buren of New York was declared the President-elect.[130] If Michigan's votes were counted, he had 170; if not, he had 167 votes. In either event, Martin Van Buren had a majority of the whole number of electors appointed. However, a different situation presented itself in the case of the Vice President-elect. Richard M. Johnson of Kentucky had the most electoral votes. If Michigan's votes were counted, he had 147 votes; if not, he had 144 votes. In either event, he did not have the requisite majority to be the Vice President-elect, and thus, the choice devolved upon the Senate.[131] The Senate elected Johnson as Vice President.

### 5. The Wisconsin Incident of 1857

The fifth congressional objection to the votes of electors occurred during the electoral count of 1857.[132] In the election of 1856, the five electors of the State of Wisconsin did not cast their votes on the day prescribed by federal law because of a snowstorm.[133] The President of the Senate counted Wisconsin's electoral votes over the objections of both Representatives and Senators assembled in  **\*1686**  convention.[134] When Representative Lechter objected to Wisconsin's electoral votes and moved to exclude them, the presiding officer (the President of the Senate) simply stated that no debate was in order when the votes were being read by the tellers or even after they were finished.[135] When Senator Crittenden then asked the presiding officer, "Do I understand the Chair to decide that Congress, in no form, has power to decide upon the validity or invalidity of a vote?,"[136] the presiding officer replied that it was his constitutional duty to announce the result of the electoral count and that "[w]hat further action may be taken, if any further action should be taken, will devolve upon the properly-constituted authorities of the country-the Senate or House of Representatives, as the case may be."[137]

While the final result did not turn on the decision to count Wisconsin's electoral votes, several Members of Congress were concerned that the decision to count Wisconsin's electoral votes would set a dangerous precedent.[138] According to Senator Pugh, unlike the Missouri Incident which was "never likely to happen again," the Wisconsin Incident "may occur one hundred

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.      13

times again, if the Government should stand that many years."[139] Senator Crittenden made the point that the electoral votes of Wisconsin were not really "votes" at all, by stating: "Here is a vote tendered us from a State given on another day. We call it a vote in common parlance; but in the constitutional sense is it a vote at all? Is it not merely null? Unquestionably, it seems to me, it is null and void."[140] This statement attracted considerable support. Almost every Member of Congress who spoke on the subject agreed that the votes of Wisconsin should not have been counted.[141]

**\*1687**  Ultimately, resolutions were introduced in each House of Congress that Wisconsin's electoral votes were null and void and ought not to have been included in the electoral count, but these resolutions failed.[142]

### 6. The Greeley Incident and the Other Incidents of 1873

The sixth congressional objection to the votes of electors occurred during the electoral count of 1873.[143] In the election of 1872, three Georgia electors cast votes for Horace Greeley of New York. Greeley had died after the November popular election but before the electors met in the electoral colleges. These three electors voted for Greeley anyway, feeling bound by the wishes of their constituents. Senator Hoar objected to these three votes and stated that they could not be counted because Greeley was not a "person" within the meaning of the Constitution when the electors voted.[144] Representative Banks objected on the basis that "we have no power to decide on the eligibility of any man voted for for President."[145] The question of whether to count these votes was a very close one. The House voted 101 to 99 (with forty not voting) not to count the Greeley votes.[146] The Senate voted forty-four to nineteen to count them.[147] Because the two Houses did not concur, the Greeley votes were not counted pursuant to the Twenty-second Joint Rule.[148]

The electoral count of 1873 presented at least three other important challenges to electoral votes. First, two objections were made to Mississippi's electoral votes. The Mississippi electors did not certify that they voted by ballot.[149] One of the electors from that state, A.T. Morgan, was absent and the electors appointed an alternate, J.J. Spellman. Spellman's appointment was not signed by the Governor of Mississippi as required by the laws of that state.[150] The House and the Senate voted to count all Mississippi electoral votes, including Spellman's.[151]

**\*1688**  Second, Senator Morton objected to Georgia's votes for a different reason. Apparently two votes were cast for Charles J. Jenkins of Georgia for President, and five votes for Alfred H. Colquitt of Georgia for Vice President.[152] This vote distribution revealed a mathematical certainty: at least one of the electors from that State had violated the constitutional requirement that he vote for at least one person who is not an inhabitant of his State.[153] Because the objection was made after the electoral votes from Georgia were read, the Chair decided that it came too late and no decision was made on this objection.[154]

Third, two objections were made to Texas's electoral votes. The executive authority of Texas had failed to certify that its electors were properly appointed. Moreover, four of the electors (less than a majority of those elected) themselves appointed four persons to take the place of four elected, but absent, electors.[155] Nonetheless, both the House and the Senate voted to count all of Texas's electoral votes.[156]

### 7. The Hayes-Tilden Incident of 1877

The seventh and most important objection to the votes of electors occurred during the electoral count of 1877--the "never again" incident that directly led to the passage of the Electoral Count Act roughly a decade later. Undoubtedly, the electoral count of 1877 is the most objectionable electoral count in history, having been described by one of our leading scholars as "the most violent, fraudridden, and tumultuous in history."[157]

APPENDIX - 220

In 1876, Democrat Samuel J. Tilden squeaked out a majority of the total number of popular votes for President, defeating Republican Rutherford B. Hayes by just 250,000 votes.[158] Hayes, however,  **\*1689**  claimed a one-vote majority of the electoral votes with 185 votes to Tilden's 184. The problem was that rival Republican and Democratic state governments in three states-- Florida, Louisiana, and South Carolina--each had sent rival electoral certificates to Congress, presenting the standard case of "double returns" from these states.[159]

After mediation failed, Congress created an "Electoral Commission" to resolve the disputed double returns from these states.[160] This Commission was to consist of fifteen persons: five Senators, five Representatives, and five Justices of the Supreme Court. As ought to be apparent, the Commission has some very eerie similarities to the Grand Committee of 1800. The plan was to appoint seven Republicans and seven Democrats; the fifteenth person would be a Justice of the Supreme Court picked by the other four "partisan" Justices. Justice David Davis, an Independent, initially received the nod to be this fifteenth person, but he declined the offer after the Illinois Legislature appointed him to fill a vacancy in the Senate. Justice Joseph P. Bradley, a Republican, then received the thankless job.

**\*1690**  Interestingly, the Commission was to have "the same powers, if any, now possessed . . . by the two Houses."[161] The Commission was only to have jurisdiction over the cases of double returns; objections to electoral votes in cases of single returns would be handled as later provided by the Electoral Count Act (the two Houses, meeting separately, would need to concur to reject a vote). The decisions of the Commission, like that of the Grand Committee, were to be final, but with one exception: the two Houses could overturn the decision of the Commission if they so concurred.[162]

Given the political composition of the Commission, it is not surprising that the Commission secured a victory for Hayes. In each case of double returns, the Commission voted eight to seven to count the votes of the Republican electors by a strict party vote, with Justice Bradley casting the decisive vote in each case. This perceived partisanship had huge political costs. The Democrats controlled the House of Representatives and threatened a filibuster to delay the counting of electoral votes. A constitutional crisis loomed: if no President was elected by March 4, 1877, then the Presidential Succession Clause might kick in.[163]

The famous "Compromise of 1877," announced on March 1, 1877, served to avert this crisis. Southern Democrats would proceed with the formal counting of the electoral votes, allowing Republican Hayes to be elected President, but would extract several substantial concessions from him. Among other things, congressional Republicans, speaking for Hayes, agreed to cease federal military support for the Reconstruction governments of the South, sealing the end of Reconstruction. The upshot of the Hayes-Tilden Incident is that Hayes became President although he was the clear loser in the popular vote and the likely loser of the electoral vote.[164]

**\*1691  8. The Hawaii Incident of 1961**

The eighth congressional objection to the votes of electors occurred during the electoral count of 1961.[165] This incident, involving the validity of the electoral certificate(s) of Hawaii, was the most significant problem of the electoral count of the twentieth century, and the one most relevant given recent history.

The initial election results in Hawaii showed Republicans Richard M. Nixon and Henry Cabot Lodge as the winners of the popular vote for President and Vice President. A slate of Nixon-Lodge electors was appointed on November 16, 1960, certified by the acting Governor of Hawaii on November 28, 1960. A recount was ordered to begin on December 13, 1960. On December 19, 1960, a slate of Nixon-Lodge electors cast their votes for President and Vice President.[166] This electoral certificate was previously certified by the Acting Governor of Hawaii.[167] However, on December 19, 1960, a slate of Kennedy-Johnson electors also cast their votes for President and Vice President, without any previous certification from the executive authority

APPENDIX - 221

of Hawaii.[168] On December 30, 1960, the Circuit Court of the First Judicial Circuit of the State of Hawaii determined that the Kennedy-Johnson electors won the popular vote in Hawaii.[169] A few days later, on January 4, 1961, the newly-elected Governor of Hawaii certified the electoral certificate of the Kennedy-Johnson electors.[170] The Administrator of General Services received this certification on January 6, 1961--the day of the electoral count.

During the electoral count, President of the Senate Richard Nixon stated that "[t]he Chair has received three certificates from persons claiming to be the duly appointed electors from the State of Hawaii."[171] These three certificates were (1) the Nixon-Lodge electoral certificate of December 19, 1960, certified by the executive authority of Hawaii as of November 28, 1960; (2) the Kennedy-Johnson electoral certificate of December 19, 1960; and (3) the Kennedy-Johnson electoral certificate of December 19, 1960, certified by the newly-elected executive authority of Hawaii as of January 4, 1961.[172] After these three electoral certificates were opened and read, **\*1692** Nixon stated that "[t]he Chair has knowledge, and is convinced that he is supported by the facts" that the third electoral certificate "properly and legally portrays the facts" with respect to the popular election in Hawaii.[173] Accordingly, he stated that

> [i]n order not to delay the further count of the electoral vote here, the Chair, without the intent of establishing a precedent, suggests that the electors named in the certificate of the Governor of Hawaii dated January 4, 1961, be considered as the lawful electors from the State of Hawaii.[174]

No one objected and all three of Hawaii's electoral votes were counted.[175]

### 9. The Bailey Incident of 1969

The ninth and most recent congressional objection to the votes of electors occurred during the electoral count of 1969.[176] It was well known before the joint convention convened for the purposes of the electoral count that Dr. Lloyd W. Bailey, a Republican elector from North Carolina, had been "faithless" in giving his two electoral votes--instead of following the popular vote for Richard M. Nixon for President and Spiro Agnew as Vice President, Dr. Bailey voted for George C. Wallace for President and Curtis Lemay as Vice President. The Governor of North Carolina certified the state's electoral certificate with knowledge of Dr. Bailey's faithlessness.

A few days before the electoral count, some Senators, led by Senator Muskie (who was then running for Vice President), introduced a memorandum in the Senate recommending that Dr. Bailey's vote be rejected, and that it be recast in accordance with the popular vote in North Carolina.[177] This memorandum announced the authors' intention to object to the vote of North Carolina on January 6, 1969.[178] During the electoral count on January 6, 1969, Representative O'Hara objected to the electoral votes of North  **\*1693**  Carolina and presented a written objection signed by him and Senator Muskie in which thirty-seven Representatives and six Senators joined.[179] The objection proposed simply that Dr. Bailey's vote be rejected (and not recast in accordance with the popular vote in North Carolina).[180]

The debate in each House of Congress was extensive, with over forty Representatives and over twenty-five Senators speaking on the objection. The House of Representatives debated the objection for a full two hours--the maximum time allowed by the Electoral Count Act. The rationale in the House for sustaining the objection and rejecting Dr. Bailey's vote was mixed. Some Representatives argued that only Congress could check faithless electors.[181] Representative Edmondson stated that the "power of Congress to count the electoral vote" is "the only constitutional power specifically granted to anybody [sic] or agent to protect the electoral system against arbitrary or unlawful action to thwart the popular will of the people of the States in electing the President of the United States."[182] Other Representatives argued that Dr. Bailey's faithless vote was not "regularly given"

APPENDIX - 222

within the meaning of the Electoral Count Act.[183] Yet others rested their justification to sustain the objection on more lofty constitutional arguments of "one man, one vote"[184] and "justice."[185]

The Representatives who spoke against the objection were more unified. They argued that Congress had no power not to count Dr. Bailey's faithless vote because that power was not within the meaning of the Electoral Count Act,[186] or because Congress had no such power under the Constitution.[187] Representative Rarick put the latter point best:

> **\*1694**  Under the Constitution and our oath of office we, as Congressmen, are not election supervisors nor given discretion to recompute the vote received from a sovereign state. The Constitution clearly proscribes our duty as "to count the electoral votes," the ministerial function of a central collecting agency and a tabulating point.[188]

Ultimately, the House of Representatives voted to reject the objection, but not by an overwhelming margin. The vote was 170 to 228, with thirty-two not voting and four not yet sworn.[189] Among the Representatives voting for the objection were future Presidents George H.W. Bush and Gerald R. Ford.[190] The Senate debate was similar but briefer. Ultimately, the Senate also voted to reject the objection not by an overwhelming margin. The vote was thirty-three to fifty-eight, with seven not voting and two live pair.[191] Because both Houses of Congress did not vote to sustain the objection and reject Dr. Bailey's vote, the vote was counted.

## II. The Argument Against the Constitutionality of the Electoral Count Act

In Part I, we examined the principal congressional efforts to regulate the electoral count. The fact that Congress did not pass the Electoral Count Act until 1887, and only after several failed attempts to enact legislation regulating the counting of electoral votes is (perhaps surprisingly) of minimal consequence in assessing the constitutionality of the Electoral Count Act.[192] The better clue relates  **\*1695**  not to timing, but to tone. As we saw somewhat in Part I and as we shall see in more detail in this Part, the constitutionality of legislation regulating the counting of electoral votes was controversial from the start. In particular, the constitutionality of the Electoral Count Act was considered and debated by several Congresses that considered such legislation in the Reconstruction Era. This level of extended debate should raise a red flag as to the possible unconstitutionality of the Electoral Count Act.

An 'interpretivist' resolution of the constitutionality of the Electoral Count Act must, however, be based on arguments from constitutional text and structure. This Part sets forth these two arguments. The textual argument carefully parses the words of the Electoral College Clauses, and shows how the Electoral Count Act clashes with the Constitution. In addition, the textual argument, unlike conventional 'clause-bound' textual arguments, examines the text of the Constitution as a coherent whole, invoking a host of other clauses, in order to squeeze yet additional meaning from the Electoral College Clauses, and shed additional light on the unconstitutionality of the Electoral Count Act. The structural argument identifies a number of structural principles of the Constitution that relate to presidential election and to legislation, and shows how the Electoral Count Act violates these principles.

Anyone who wishes to argue that the Electoral Count Act is constitutional bears a high burden of proof, in light of the arguments presented, and in light of the asymmetry of constitutional proofs. In order to prove that a statute is unconstitutional, one need only find one reason why a statute is unconstitutional, whereas in order to prove that a statute is constitutional, one must defend a statute against all possible constitutional attacks and find that there is no possible reason why a statute is unconstitutional.[193] There is more than one reason why the Electoral Count Act is unconstitutional.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**\*1696  A. The Textual Argument**

**1. Some Basics: Who, What, When, and Where?**

The relevant clause of the Twelfth Amendment provides that "[t]he President of the Senate shall, in the presence of the Senate and  **\*1697**  House of Representatives, open all the certificates and the votes shall then be counted."[194] Careful parsing of these twenty-seven words yields surprisingly rich clues into the mode and manner of the electoral count. These words and the rest of the Twelfth Amendment (and their counterparts in the original Constitution) are, not surprisingly, woefully understudied.[195] As Professors Levinson and Young recently put it, "[t]he Twelfth Amendment is a Rodney Dangerfield of the Constitution: it gets no respect."[196] At the same time, these words of the Twelfth Amendment are incredibly important in assessing the constitutionality of the Electoral Count Act: the Constitution is supreme to conflicting federal statutory law.[197] In order to determine whether the Electoral Count Act is constitutionally permissible, we must examine the Constitution itself.

This sub-section addresses the following five basic questions relating to counting electoral votes: (1) Who is the presiding officer of the electoral count? (2) Who opens the electoral certificates and counts the electoral votes? (3) What is counting and what is to be counted? (4) When is the counting done? (5) Where is the counting done?

**a. Who Is the Presiding Officer of the Electoral Count?**

The relevant clause of the Twelfth Amendment provides that "[t]he President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted."[198] This clause does not explicitly answer the question of who is the presiding officer during the electoral count.[199] Because the President of the Senate is the only named individual in the clause, it may be tempting to conclude that the President of the Senate is the presiding officer of the electoral count, but this is far from clear. There are three possibilities with respect to the President of the Senate: (1) the President of the Senate shall be the presiding officer of the electoral count; (2) the President of the Senate may be the presiding officer of the electoral count; and (3) the President of the Senate shall not be the presiding officer of the electoral count.

As a textual matter, nothing in the clause suggests that the President of the Senate shall be the presiding officer of the electoral count.[200] As a structural matter, the President of the Senate is the presiding officer of the Senate, not the presiding officer of the joint convention of Senators and Representatives (or the joint assemblage of the Senate and House of Representatives), which needless to say is not the Senate. It seems only logical that there must be a presiding officer of the electoral count. Every parliamentary body needs a presiding officer in order to function smoothly.[201] What then is the answer to the constitutional question?

If historical practice is any guide, the President of the Senate or the President pro tempore shall be (or at least may be) the presiding officer of the electoral count. One of these two officers has been the presiding officer of every electoral count since the beginning of the Republic--before and after the adoption of the Electoral Count Act. Not surprisingly, 3 U.S.C. § 15 provides that

> Congress shall be in session on the sixth day of January succeeding every meeting of the electors. The Senate and House of Representatives shall meet in the Hall of the House of Representatives at the hour of 1 o'clock in the  **\*1698**  afternoon on that day, and the President of the Senate shall be their presiding officer.[202] This unbroken historical practice is entitled to great weight in constitutional interpretation.[203]

This is not to say, however, that historical practice necessarily settles the meaning of the Electoral College Clauses. The text of the Constitution is the first-best and hence authoritative source of constitutional meaning, not extra-textual sources of constitutional

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    18

meaning. To the extent that the text of the Constitution is clear, it may not be trumped by extra-textual history. The Electoral College Clauses are not quite as ambiguous as they may appear when we read the Constitution as a coherent whole. Although it may seem bizarre, it may be downright unconstitutional for the President of the Senate to be the presiding officer of the electoral count upon a closer reading of the text of the Constitution.[204]

No less than the Office of President of the United States is at stake during the electoral count. Likewise, no less than the Office of President of the United States is at stake during presidential impeachment. Yet, with respect to the latter, the Senate Impeachment Clause carefully provides that "[w]hen the President of the United States is tried, the Chief Justice shall preside," not the President of the Senate.[205] Should the electoral count be any different when no less may be at stake?

The Senate Impeachment Clause demonstrates that the Framers were quite sensitive to the obvious conflict of interest problem when they focused on it.[206] To be sure, the Framers did not focus on the  **1699**  similar but less obvious conflict of interest problem when drafting the Electoral College Clauses. But the Framers did seem to understand and appreciate the general conflict-of-interest problem. When the Framers discussed direct presidential election by Congress, they considered and agreed to a joint ballot procedure that would require a majority of Senators and Representatives who are present considered together, in lieu of one that would require the concurrence of the two Houses of Congress voting separately.[207] James Wilson, supporting the joint ballot procedure, suggested that the Senate might have a conflict of interest problem, remarking that "as the President of the Senate was to be the President of the U--S. that Body in cases of vacancy might have an interest in throwing dilatory obstacles in the way, if its separate concurrence should be required."[208] If this interest were true of the Senate, it would be particularly true of the Vice President.

More generally, the founders likely understood that the Vice President would oftentimes be a candidate for President or Vice President in the next election. During the Electoral Count Act debates, Senator Hoar, discussing the mood at the founding, stated:

> The President of the Senate would almost always be and would be expected to be one of the chief candidates for the presidential office. He would have been one of the two principal candidates four years before, and it was the fashion of those days very much more than of these to continue the same person in public trusts and in political candidacy, and several times in our history the Vice-President of the United States has succeeded to the Presidency, Adams to Washington, Jefferson to Adams, Van Buren to Jackson.[209]

Even if the Framers and Ratifiers of the original Constitution did not understand that the Vice President would be a candidate for President or Vice President in the next election, the Framers and Ratifiers of the Twelfth Amendment--which overwrote the relevant  **1700**  provision of the original Constitution--understood the conflict-of-interest problem well, especially given the imbroglio of the electoral count of 1801 where Vice President and presidential candidate Thomas Jefferson not only presided over the electoral count but also assumed the counting function.[210] It is thus possible to say that the conflict-of-interest principle applies to the Twelfth Amendment if not to the original Constitution.

There is no evidence from the Electoral College Clauses that the President of the Senate shall be the presiding officer of the electoral count. In the absence of such evidence, the Senate Impeachment Clause supplies a strong argument that the President of the Senate shall not be the presiding officer of the electoral count. The difference--and perhaps the constitutionally significant difference--between presidential impeachment and counting electoral votes may be that the Vice President necessarily has a conflict of interest in the former because the Vice President is to act as President,[211] whereas the Vice President does not necessarily have a conflict of interest in the latter because the Vice President may or may not be a candidate in the next presidential or vice presidential election. Nevertheless, the better reading of the Electoral College Clauses, when read in light of the Senate Impeachment Clause and of conflict-of-interest principles generally, is that the Vice President, the President of

APPENDIX - 225

the Senate, shall not be the presiding officer of the electoral count.[212] The Electoral Count Act may be unconstitutional for this reason alone.[213]

**\*1701**  If the President of the Senate shall not be the presiding officer of the electoral count, who then is the presiding officer? The answer to this question is simpler than it appears: One of the Senators and Representatives then and there present at the electoral count. Each parliamentary body has, almost by definition, the right to choose its presiding officer and other officers from one of its own, at least in the absence of any explicit declaration to the contrary.[214] Whether Congress may exercise this choice on behalf of the joint convention of Senators and Representatives is an entirely different question, and one to be discussed later.[215]

### b. Who Opens the Electoral Certificates and Counts the Electoral Votes?

With respect to who does the opening of electoral certificates and the counting of electoral votes, the relevant clause of the Twelfth Amendment provides that "[t]he President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted."[216] The critical question to ask is whether the counting function belongs to the President of the Senate or to the Senate and House of Representatives. The interpretive stakes are high: If the counting function belongs to the President of the Senate, the Electoral Count Act is unconstitutional because it vests the counting function in the two Houses of Congress, and under the Constitution, Congress may not strip the President of the Senate of her constitutional duty.[217]

**\*1702**  We begin with the first part of the clause: "The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates."[218] It is clear that the opening of the certificates function belongs to the Vice President, who is the President of the Senate.[219] The Constitution provides no wiggle room: the President of the Senate shall open all the certificates, not some.[220]

**\*1703**  The counting function is, however, noticeably ambiguous: "[t]he President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted." There are two plausible readings of this oddly phrased text employing the passive voice.[221] The counting function may be read as one vested in the President of the Senate, or jointly in the Senate and House of Representatives.[222] If the President of the Senate is to count the votes, the clause easily could have been written to provide that "[t]he President of the Senate shall . . . open all the certificates and **\*1704**  shall then count the votes."[223] If the Senate and House of Representatives are to count the votes, the clause easily could have been written to provide that "[t]he President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted by the Senate and House of Representatives."[224]

The text does not equally support these two plausible readings once we escape a narrow "clause-bound" interpretivism. When read in light of the conflict-of-interest principle of the Senate Impeachment Clause, the better answer (again, but by no means an unassailable one) is that the counting function of the Electoral College Clauses is vested in the Senate and House of Representatives, not the President of the Senate. To be sure, the Constitution does not explicitly address how the Senate and House of Representatives is to exercise the counting function--by the two Houses acting separately **\*1705**  in their corporate capacities, or by the two Houses acting conjointly as one "House" of Senators and Representatives.[225] In addition, when we consider early state constitutions,[226] we see that early state constitutions did not vest the counting of electoral votes in any one person.[227]

**\*1706**  The history, however, undercuts these fundamental textual and structural considerations. The Framers clearly thought that the counting function was vested in the President of the Senate alone. In a unanimous resolution attached to the final

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   20

Constitution, the Framers described the procedures for electing the first Chief Executive, recommending in relevant part "that the Senators should appoint a President of the Senate, for the sole Purpose of receiving, opening and counting the Votes for President."[228] The records of the First Congress confirm this construction. On April 6, 1789, Senator John Langdon was elected as President of the Senate "for the sole purpose of opening and counting the votes for President of the United States."[229] This early practice should be of limited precedential value, however, because they relate to the creation of the Government of the United States before a President and Vice President were ever elected.

The dangers of this initial construction soon appeared when Presidents of the Senate were also candidates for President or Vice President. In the electoral count of 1797, President of the Senate John Adams purportedly counted "improper votes" from Vermont,  **\*1707**  and in the electoral count of 1801, President of the Senate Thomas Jefferson purportedly counted dubious electoral votes from Georgia.[230] By 1800, some members of the Senate of the Sixth Congress interpreted the counting language as vesting the counting function in the "members composing" the Senate and the House of Representatives,[231] and to the extent there is any difference, Senator Pinckney interpreted the counting language as vesting the counting function in "Congress."[232]

The Twelfth Amendment, adopted in 1804, did not resolve the textual ambiguity between the first two readings of the counting function. In fact, it contains language identical to that found in Article II, Section 1, Clause 3. However, as Dean Wroth has suggested, it is arguable that, with the later precedents, the Twelfth Amendment changed the original understanding of the counting function, shifting this function from the President of the Senate to the Senate and House of Representatives.[233] But early commentators on  **\*1708**  the Constitution, such as Chancellor James Kent and Professor William Duer, writing in the wake of the Twelfth Amendment, thought that the counting function still belonged to the President of the Senate.[234]

The Wisconsin Incident of 1857[235] probably stands as a paradigm case in support of the proposition that the counting function belongs to the Senate and House of Representatives and not to the President of the Senate. During the Wisconsin Incident, Senator Pugh noted the obvious conflict-of-interest problem if the President of the Senate had sole responsibility for counting, calling it a "power higher than the veto."[236] During the Electoral Count Act debates, Senator Bayard keenly observed that the President of the Senate "cannot even count" the electoral votes; that "[h]e cannot even inspect them, except in the incidental and casual manner that is implied by the fact that his hand shall open the sealed envelope which contains the list of the electoral vote."[237] Representative Caldwell recalled the President of the Senate's unsuccessful attempts to assume the counting function in the Wisconsin Incident of 1857 and the Hayes-Tilden Incident of 1877,[238] and described the primary purpose of the Electoral Count Act as "decid[ing], first, that the power to count the vote is not in the President of the Senate."[239]

 **\*1709**  The best interpretation as a matter of text and the better interpretation as a matter of history is that the counting function is vested in the Senate and House of Representatives. This does not answer, however, whether the counting function is delegable. The relevant text of the Constitution is best read to exclude counting by unnamed agents, notwithstanding general constitutional limits to the delegation of powers. The consensus view of the Members of Congress during the Electoral Count Act debates was that the counting function is not delegable.[240] Moreover, the related textual considerations of the "when" and "where" of counting electoral votes strongly militate against the delegation of the counting function to unnamed agents-- including coordinate branches of government such as the federal judiciary.[241]

A final consideration is whether the President of the Senate has a vote in the counting function when questions arise. Although the counting of electoral votes takes place in the presence of the President of the Senate, the President of the Senate participates no more in the counting function than she participates in trial of impeachment--in neither case does the Vice President have a vote.[242] The Constitution carefully circumscribes the participation of the Vice President in the business of the Senate: "The Vice President of the United States shall be President of the Senate, but shall have no Vote,  **\*1710**  unless they be equally divided."[243] The joint convention of the Senate and House of Representatives--assembled for the purpose of the electoral count--is most

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

decidedly not the Senate. To be sure, the Electoral Count Act provides that, upon any objection to an electoral vote, the Senate shall separately withdraw to consider the objection.[244] Notwithstanding constitutional objections to this bicameralism,[245] neither textual nor structural reasons suggest that the President of the Senate's tie-breaking vote in the Article I business of the Senate applies to any Article II business of the Senate in counting electoral votes.[246]

### *1711  c. What Is Counting and What Is To Be Counted?

Two significant and interrelated questions remain. First, what is counting? Second, what is to be counted? Again, the relevant constitutional text provides that "[t]he President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted."[247] As has been documented extensively, the word "shall" is a word of obligation.[248]  *1712  The Electoral College Clauses do not say "and the Votes may then be counted."

Ardent textualists will readily notice two points. First, what is the significance of the difference between "Certificates" and "Votes" ? The Constitution says that only the "Votes" are to be counted. Second, what is the significance of the word "all" and its selective use and seeming disuse? The Constitution says that "all" of the certificates are to be opened but does not say that "all" of the votes shall then be counted. Are these subtle textual distinctions a grant of power to the counting agent not to count all votes?

The ultimate question is whether counting is, on balance, a ministerial or judicial act. If counting is a ministerial act, it is one of ascertainment and aggregation--Congress is simply a "central collecting agency" and a "tabulating point."[249] This view has some support in the purpose of the Electoral College Clauses. There would be no need for Congress to aggregate electoral votes if the electors met at some central location, but it was precisely to avoid the potential for cabal and corruption that the Electoral Colleges Clauses provide that the electors should meet in their respective states.[250] We shall call this the "thin" conception of the counting function.[251]

 *1713  If counting is a judicial act, then Congress sits as a court of sorts--a "court of last resort"[252]--checking the actions of electors in the electoral colleges. We shall call this the "thick" conception of the counting function. As Professor Spear nicely summarized, counting, "in so far as it is a mere enumeration and aggregation of units, is a purely ministerial act; but, in so far as it involves any judgment as to what votes shall be counted, it is a judicial, or, at least, quasi judicial act."[253] Clearly, there is no clean break between the "thin" and "thick" conceptions of the counting function. Even the "thin" conception requires some ascertainment of what is to be counted.[254]

The debates over the drafting of the Electoral College Clauses at the Philadelphia Convention of 1787 suggest that the Framers had the ascertainment issue in mind. The Framers rejected a proposal by James Madison and Hugh Williamson to insert the phrase "who shall have balloted" after the word "Electors." The purpose of this proposal was "so that the non voting electors not being counted might not increase the number necessary as a majority of the whole--to decide the choice without the agency of the Senate."[255] John Dickinson successfully moved to insert after "Electors" the word "appointed." Thus, under the Electoral College Clauses, the requisite number of electoral votes needed for victory is "a Majority of the whole Number of Electors appointed."[256] This drafting history suggests that the Framers considered the possibility that there might not be a "vote"--but only if an elector shall not have balloted. They did not consider the possibility that an electoral vote might be unconstitutional. While silence is difficult to interpret, the Framers'  *1714  probable conception of the counting function was more "thin" than "thick."

Members of Congress have debated the nature of the counting function intensely over the past 210 years. The issue was first debated during the Missouri Incident. Representative Clay stated his belief that counting necessarily involved judging:

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

In a case of votes coming forward which could not be counted, the Constitution was silent; but, fortunately, the end in that case carried with it the means. The two Houses were called on to enumerate the votes for President and Vice-President; of course they were called on to decide what are votes.[257]

This was a fairly "thick" conception of the counting function. Representative Randolph disagreed. "'Your office,' said he, 'in regard to the electoral vote is merely ministerial. It is to count the votes, and you undertake to reject votes.'"[258] Representative Archer, responding to Representative Randolph's argument, thought that counting could not exist without judging:

He was a little surprised . . . that the House had no power to pass any judgment on any return. He always thought that, wherever was lodged the power to receive a return, there was also a power to pass judgment on the validity of that return. Suppose any Territory not within the limits of the United States at the time, Florida, for example, to send votes here for electors; was there no authority by which these votes could be rejected? Suppose a State entitled to twenty-seven votes should send thirty-seven votes, would any gentlemen contend that there was no power in this House to judge of the proper number?[259]

This is not necessarily a "thick" conception of counting at all; as we shall see, many of Representative Archer's concerns come before Congress meets for the purpose of the electoral count. For instance,  **\*1715**  prior to the electoral count, each House of Congress would have resolved whether or not to recognize Florida as a member of the Union in considering whether to seat any of Florida's Senators or Representatives.

During the Wisconsin Incident, Representative Marshall also advocated a "thick" conception of the counting function. He bluntly asked, "What is to count? What faculty does it involve? I say not only the faculty of enumerating, but the faculty of judging whether it is a vote or not."[260] In a speech directed to the President of the Senate during the electoral count, Representative Marshall sought to justify his conception of the counting function upon the textual distinction between the word "Certificates" and the word "Votes":

Whether that is a vote or not must depend upon the determination of this convention, and if you will regard the verbiage of the Constitution, you will find that your function goes no further than to open the certificates. The language of the Constitution is that "the President of the Senate, in the presence of the House of Representatives, shall open all the certificates," and then the phraseology changes, and proceeds, "and the votes shall be counted," not by you, but by us; and whenever a vote is challenged, this is the time, and this the only place, where a determination can be formed whether it is a vote.[261]

This argument does not withstand a close examination of the Electoral College Clauses. The Constitution employs the word "Certificates" instead of "Votes" for a simple reason. Each of the Electoral Colleges sends a "List" (now two lists with the adoption of the Twelfth Amendment)--which contains the "Votes" of the electors--to the President of the Senate. The Constitution requires that each "List" be signed and certified by the electors in each State; when the "List" is so signed and certified, it becomes a "Certificate." Thus, the contradistinction between "Certificates" and "Votes" is of little interpretive value.

Other Members of Congress agreed with Representative Marshall. For example, Representative Orr asked, "Does not the requisition to be present at the counting necessarily carry the right to  **\*1716**  determine what votes offered are legal, and what votes may be void, as an inseparable incident to the power of counting?"[262] He concluded that the "Constitution makes us the

APPENDIX - 229

managers or canvassers to count the electoral votes, and in doing so gives us the power to say whether a vote presented is or is not legal."[263] Those who advocated a "thin" conception of the counting function were in the minority. Senator Toucey put the point best in his statement that "[t]he whole proceeding of counting is based on the idea merely of disclosing to the public in a safe, authentic way, the actual state of the vote; and when that is ascertained truly, the President who is chosen by that vote is President, let Congress do what it may."[264]

Finally, the nature of the counting function occupied a prominent position in the debates over the Electoral Count Act. The positions taken are well summarized by the statements of Senator Edmunds, who supported the Electoral Count Act, and Senator Bayard, who opposed it. Senator Edmunds was of the view that a vote

> must mean a legal vote, a vote which is in accordance with the provisions of the Constitution of the United States and in accordance with the laws which have existed for so many years respecting the method by which and the time within which the vote of each State is to be expressed and returned.[265]

Senator Bayard pointed out the implications of Senator Edmunds's view. He asked:

> Were the two houses of Congress ever intended to become the judges of the electoral vote of the people of this country? Apparently by the Constitution their duties would seem to be of a ministerial character only. They were to stand by and witness the counting, and their presence in that way as witnesses was supposed to be a security. Now you change this from a merely ministerial power into a judicial power of the very gravest and most important character. Is there a warrant for that in the Constitution of the United States?[266] **\*1717**  In sum, there is considerable historical support for both the "thin" and "thick" conceptions of the counting function. An answer to the scope of Congress's counting power is informed by the "when" and "where" of counting, issues which we shall take up next.

#### d. When Is the Counting Done?

The Electoral College Clauses contain an immediacy principle and for good reason. The relevant text of the Constitution provides that once the President of the Senate has opened all of the Certificates, "the votes shall then be counted."[267] This is the immediacy principle of the Electoral College Clauses. Another part of this clause reinforces this immediacy principle. In case of electoral deadlock, the House of Representatives is to "immediately" choose the next President from those on the list.[268]

The word "immediately" has special significance in the Electoral College Clauses.[269] According to Senator Pinckney, the word "immediately" in this Clause means "instantly, and on the spot, without leaving the House in which they are then assembled, and without adjournment."[270] He explained that the word was inserted to guard against the possibility of domestic intrigue and foreign influence at the Seat of Government of the United States:

> [T]he election by the House of Representatives taking place immediately after the votes have been opened and counted, that body would go to the election free and uninfluenced [by leaders of domestic intrigue and foreign emissaries], as they ought. And is not this, sir, safer; is it not better than that the smallest delay should take place in determining it? . . . [I]t will be less dangerous to the public interest, that even one who may not be the most qualified of the five, should be elected, than that Congress should adjourn to deliberate on it, and thus expose themselves, and the best interests of their constituents, to the secret and artful attacks that will be made on their integrity.[271]
> **\*1718**  At the Philadelphia Convention of 1787, James Wilson echoed Senator Pinckney's observation and his

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.       24

underlying rationale. He noted that "if the election be made as it ought as soon as the votes of the electors are opened & it is known that no one has a majority of the whole, there can be little danger of corruption."[272] In a letter to the Washington Federalist, "Horatius" advised that

[t]he choice is required to be immediately made, in order that the result may be declared in the presence of the Senate, and to prevent the possibility of intrigue and corruption. The choice must be therefore made before the house adjourns or disperses, and after the convention of the Senate and House of Representatives terminates, the house cannot at a future day act upon this subject.[273]   **\*1719**  The immediacy principle implies that the counting agent may not delay in counting the electoral votes. The "then" requirement militates against the deliberative aspects of counting and the judging of the electoral votes. After all, judicial determinations take time.

The Electoral Count Act does not violate the immediacy principle. 3 U.S.C. § 17 puts strict time limits on the electoral count: when the two Houses separate to debate an objection to an electoral vote, each Member of each House may only speak once on the objection for a maximum of five minutes, and total debate in each House is limited to two hours.[274] Although this provision does not violate the immediacy principle, it is patently unconstitutional--Congress may not bind by statute either House in the rules of its proceedings.[275] As we shall see next, the "then" requirement also has  **\*1720**  an implication for where the counting (and any potential judging) of electoral votes takes place.

### e. Where Is the Counting Done?

The Electoral College Clauses provide that the lists of electoral votes from the several states are to be "directed to the President of the Senate"[276] and that "[t]he President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted."[277] These clauses are the font of two mutually reinforcing "where" principles: the publicity principle and the unicameralism principle.

The publicity principle is easy to identify. The President of the Senate is not supposed to open all of the certificates behind closed doors, but is only to do so "in the presence of the Senate and House of Representatives."[278] Although this phrase does not necessarily modify the subsequent vote counting phrase as a grammatical matter, the Constitution almost certainly requires that the counting of the votes take place in an equally public manner.[279] Moreover, there is an  **\*1721**  excellent functional reason why the Senate and the House of Representatives are required to be present for the electoral count: if there should be no winner under the electoral college mode of presidential and vice presidential election, the duty of choosing the President devolves upon the House of Representatives, and the duty of choosing the Vice President devolves upon the Senate.[280]

Under the publicity principle, the secret proceeding contemplated by the Grand Committee Bill would have been grossly unconstitutional.[281] During the Wisconsin Incident of 1857, Senator Thompson thought the idea of the publicity principle "was that we were not to go into executive session, nor, by some secret cabal or clandestine arrangement, get together here and have a coup d'etat, and make a President."[282] Thus, the elections of 1801 and 1825, in which the House of Representatives chose the President in closed-door proceedings, were also grossly unconstitutional.[283]

 **\*1722**  The publicity principle probably extends to the choosing of a President and a Vice President in case of electoral deadlock as well. Although the Constitution does not explicitly specify, it probably requires that the House of Representatives

APPENDIX - 231

"immediately" choose the President in the presence of the Senate,[284] and that the Senate "immediately" choose the Vice President in the presence of the House.[285] This mode of presidential and vice presidential selection maximizes legitimacy.

The question is what the publicity principle implies for the judging of electoral votes. A narrow view of the publicity principle is that the Members of Congress come together to ensure the proper aggregation of the electoral votes. During the Wisconsin Incident of 1857, Representative Orr urged a broader view, arguing that the publicity principle is the font of congressional power to reject "illegal" electoral votes:

> Suppose the result of the election would depend on the vote of [Wisconsin]: how would it be possible to declare who was elected until it had been decided whether or not that vote was to be received? Who is to decide that? The Constitution and the laws require that the two houses shall  **\*1723**  meet in joint convention, and that the votes of the electors of the several States shall be opened and counted before them. This, in my judgment, confers upon them the power to determine whether a vote be valid or invalid. Otherwise it is a mere farce if they are called on only to witness the counting. The counting might just as well be done by the Vice-President or the President of the Senate, without the presence of the two houses. But it is to guard against an illegal vote being counted that the two houses are required to be assembled together.[286]

This brings us to the second "where" principle: unicameralism. The Constitution requires that the two Houses of Congress come together for the purpose of opening all the electoral certificates and counting the electoral votes. This practice has been followed for all of our electoral count history. In the first and second presidential elections, the Senate and the House of Representatives assembled in the Senate Chamber for the opening and counting of the electoral votes, and in all subsequent elections, the Senate and the House have assembled in the House Chamber.[287]

The unicameralism principle suggests that any power to judge electoral votes is vested in the one body which is present when the electoral certificates are opened and when the electoral votes are counted[288] and is to be resolved on a per capita vote basis.[289] The  **\*1724**  Electoral Count Act violates the unicameralism principle because it provides that, upon objection to an electoral vote in the joint assembly, the two Houses of Congress shall separate and independently decide on the legality of that electoral vote,[290] thereby giving equal weight to the decision of the Senate and House of Representatives. One implication of the unicameralism ("where") principle and the immediacy ("when") principle is that the resolution of any electoral count questions cannot be vested in any judicial tribunal. Senator Morton put this point nicely in debates over the Electoral Count Act:

> Then and there. You cannot refer to any other tribunal; you cannot get the case before the Supreme Court of the United States or before any special court to be created for that purpose. These votes are then to be opened, and then and there they are to be counted.[291]

The secret drafting history of the Constitution suggests the unicameralism principle. When the Committee of Eleven proposed the electoral college mode of presidential election, the draft provided that, "The President of the Senate shall in that House open all the certificates; and the votes shall be then & there counted" by the Senate.[292] This clause was later amended to include the phrase "in the presence of the Senate and House of Representatives" and the "& there" language was dropped.[293] However, there is very little reason to suppose that the counting was not to occur in that single body of Senators and Representatives.[294]

 **\*1725**  There is ample historical support for the unicameralism principle. In the Sixth Congress, Representative and Framer Albert Gallatin moved to amend the Grand Committee Bill to provide that any decision on the legality of an electoral vote

APPENDIX - 232

would be made by a majority of the Members of Congress then present at the electoral count.[295] After a long debate, this motion fell just two votes shy of passing.[296] Senator Baldwin, in his remarks on January 23, 1800, recognized that the Senators and Representatives would "me [e]t together in one room" to receive the electoral votes and "to judge only of its authentication."[297] Senator Pinckney, in his remarks on March 28, 1800, also recognized the unicameralism principle, but nevertheless argued that Congress had no power to reject electoral votes.[298] Other senators also supported the unicameralism principle. The preamble of their proposed alternative to the Grand Committee Bill provided that the Senators and Representatives assembled for the purpose of the electoral count form a single tribunal, with the number of Senators and Representatives from each state equal to the number of electors from each state.[299]

 **\*1726**  In later years, those who have supported congressional control over electoral votes have voiced the unicameralism objection to the Electoral Count Act. For example, during the Missouri Incident, Representative Archer, emphasizing the "then" immediacy requirement of the electoral count, stated:

> He was opposed to this House undertaking to proceed in any manner as to the legality of the electoral votes. He could recognize no power in the House of Representatives on this subject separate from the Senate. . . . Does it not follow that the votes must be counted in the presence of the two Houses? For what purposes do they assemble together unless it be to determine on the legality of the votes. If not for this purpose, the joint meeting is for form and show and nothing else. We must, in my apprehension, determine the question in joint meeting, and in no other way.[300]


However, Senator Rufus King disagreed, stating that he was "opposed to the settlement of any litigated question in joint meeting, where the Senate, as a body, would be lost; and argued that whenever any such should arise, it would be always proper that the two Houses should separate."[301]

During the Wisconsin Incident, Senator Pugh made a strong argument in favor of the unicameralism principle. He believed that the joint convention was the proper forum to settle the Wisconsin problem because:

> The whole number of Senators and Representatives taken together is equal to the whole number of electors in all the colleges. It is exactly the same body of men in number, equal to all of them. All the States, if they had voted there yesterday through their Senators and Representatives, would have exercised the precise power which they exercised in the election of President.[302]  **\*1727**  Even if the joint convention was a single tribunal--a court of last resort, according to Senator Pugh--the question remained as to how the voting should take place within the joint convention. Senator Pugh stated his belief that the voting should be per capita.[303] Representative Orr, speaking before the House of Representatives, concurred: "Who was to decide on the validity of the challenged vote? The two [H]ouses in joint convention by a per capita vote."[304] However, the textual argument against this position is that the Electoral College Clauses provide that the counting take place "in the Presence of the Senate and House of Representatives"--not "in the Presence of Senators and Representatives," suggesting that the counting function is to be exercised by the Senate and the House of Representatives acting separately in their corporate capacities, not by Senators and Representatives acting together in a single corporate capacity.


Representative Orr, however, offered one additional structural argument in support of the per capita vote in the joint convention, an argument that answers Senator King's objection during the Missouri Incident that the power of the Senate would be "lost" in the joint convention. He pointed out that the "[s]enatorial electors" in the electoral colleges "possess[ed] no power or dignity

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

superior to those representing the congressional districts."[305] Given this observation, the per capita vote made perfect sense: the Senate would have the same power in the joint convention that the senatorial electors had in the electoral colleges.

During the Electoral Count Act debates, Senator Thurman succinctly expressed the unicameralism principle: "The Constitution is 'and the votes shall then be counted;' that is, shall be counted right there, in the presence of the two [H]ouses. That is what the Constitution requires . . . . They are not to be counted elsewhere.  **\*1728**  They are to be counted then and there."[306] Several years later, Senator George made a particularly compelling structural argument for unicameral action in judging electoral votes. His argument was that the counting function "is not a legislative function which ought to be considered separately by the two Houses, but it is rather in the nature of a judicial function,"[307] and therefore the two Houses of Congress "should adopt that form in the performance of that [judicial] duty which would enable us to discharge it."[308] Invoking the image of a court, he stated:

> Why, certainly, sir, it would be an anomaly in jurisprudence, it would be an anomaly surely in Anglo-Saxon jurisprudence, that for the ascertainment of a single fact, the rendering of an operative judgment upon the ascertainment of a fact should be committed to two separate tribunals, each acting independently of the other, and each having a veto upon the other. By that sort of tribunal no judicial function has ever been performed. We require unanimity in juries, that twelve men shall agree to a verdict, but they are one body; they consult and confer with each other, and they arrive at a conclusion as the result of that conference; but nobody ever proposed to have two juries to try a case. We have a court sometimes composed of an even number of judges, and the result may be a division between the judges, and there may be a provision or there may be none, for one or the other to rule the case; but it has never been that two courts having equal power can be charged with the determination of the same case.[309]

Under Senator George's structural analogy, the number of jurors in the single body is precisely equal to the number of electors. This argument has some intuitive appeal. Indeed, the Democratic House of Representatives in 1884 passed a substitute version of the Electoral Count Act bill, which provided for the unicameral resolution of issues during the electoral count on a per capita vote basis, but the Democratic Senate did not agree.[310] This is not to say that the unicameralism principle was uncontroversial. During the Electoral Count Act debates, there were Members of Congress who strongly objected to the unicameralism principle,[311] and who believed that the  **\*1729**  counting function should be exercised by the two Houses acting separately in their corporate capacities.[312]

In sum, the unicameralism principle makes better sense, especially as a matter of immediacy, publicity, and jury-like structure. As we shall soon see, the unicameralism principle also avoids the presentment problem of the Electoral Count Act.[313]

## 2. Where Is the Font of Power?

As we have seen, the Electoral College Clauses are best interpreted as vesting the counting function in the joint convention and not the President of the Senate. Let us assume for present purposes that Congress may by law bind the joint convention in counting electoral votes--this assumption, as we shall see, is no small assumption.[314] Where is the font of power to pass the Electoral Count Act? In a Constitution of enumerated and hence limited powers,[315]  **\*1730**  we must ask ourselves under what clause or clauses Congress has the express or implied power to pass the Electoral Count Act. A dedicated constitutionalist cannot escape from asking this most basic question of the Electoral Count Act.

There is, of course, no express power enabling Congress to pass the Electoral Count Act.[316] There must therefore be some implied power enabling Congress to pass the Electoral Count Act; otherwise, it must be unconstitutional. There are only two

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

options: the Necessary and Proper Clause[317] and the Electoral College Clauses themselves.[318] Will either of these clauses bear the constitutional load?

#### *1731  a. The Necessary and Proper Clause

The first possible font of congressional power to pass the Electoral Count Act is the Necessary and Proper Clause. The Necessary and Proper Clause provides that Congress shall have power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."[319] Scholars are split as to whether the Necessary and Proper Clause is a font of power for the Electoral Count Act.[320]

A careful parsing of the Necessary and Proper Clause reveals that there are three prongs of power. Under the Clause, Congress has power for carrying into execution (1) "the foregoing Powers," (2) "all other Powers vested by this Constitution in the Government of the United States," and (3) "all other Powers vested by this Constitution . . . in any Department or Officer thereof."[321] Which of these three prongs of the Necessary and Proper Clause will support Congress's power to enact the Electoral Count Act?

We begin with the first prong. The phrase "foregoing Powers" obviously refers to the seventeen enumerated powers of Article I,  *1732  section 8,[322] and the Electoral College Clauses of the original Constitution are not "foregoing Powers" in any way given their placement in Article II. The first prong of the Necessary and Proper Clause will not suffice as a font of power for the Electoral Count Act.

Let us, for the moment, skip over the second prong and consider the third prong. The question is whether Congress (more precisely, the assemblage of the Senate and House of Representatives for the purposes of the electoral count) is a "Department [of the United States]" whose members are "Officer[s] [of the United States]."[323] The answer to this question is "No." Congress is not a "Department" and the Members of Congress are not "Officer[s]" within the meaning of the Necessary and Proper Clause.

It is well settled that the Members of Congress are not "Officers of the United States."[324] The best textual argument for this proposition is that Members of Congress are not subject to impeachment by the House of Representatives and conviction by the Senate because they are not "civil Officers of the United States."[325] Furthermore, the Ineligibility Clause of Article I, Section 6 provides that "no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office."[326] Thus,  *1733  the Members of Congress are not "Officer[s]" within the meaning of the Necessary and Proper Clause.

The question remains whether Congress is a "Department [of the United States]" within the meaning of the Necessary and Proper Clause, even if Members of Congress are not "Officer[s] [of the United States]" within the meaning of the same. This is a trickier question, but not one without an answer. The word "Department" in the Necessary and Proper Clause has a technical, term of art meaning. It does not refer to the generic legislative, executive, and judicial departments of the United States--as used in The Federalist[327] or in the early United States Reports[328]--but only refers to the specific executive and judicial departments of the United States. The Constitution itself suggests as much. The word "Department" does not appear elsewhere in Article I (which appertains to the legislative department in the colloquial sense) but in the Necessary and Proper Clause; the word does appear in two other clauses--the Opinion Clause[329] and the second part of the Appointments Clause[330]--which refer to "executive Departments" and "Heads of Departments" respectively. Nowhere is the word "Department" used in the Constitution to refer to the legislative, executive, or judicial department in the colloquial sense.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                29

There are at least a few other considerations which militate against finding that Congress is a "Department" within the meaning of the Necessary and Proper Clause. First, it would be very strange **\*1734** (but perhaps not unthinkable) for Members of Congress not to be "Officer[s]," but for Congress to be a "Department" within the meaning of the Necessary and Proper Clause. The logical argument is that "If Department, then Officer" is true, then "If not-Officer, then not-Department" is also true. The Necessary and Proper Clause ostensibly relates to "Officers" who are "Officers of Departments" who are, in turn, "Officers of Departments of the United States," or simply "Officers . . . of the United States." Second, if Congress is a "Department" within the meaning of the Necessary and Proper Clause, then Congress would be able to legislate with respect to itself on matters concerning its own powers.[331] Such legislation flies in the face of constitutional text. The Rules of Proceedings Clause makes explicit that "[e]ach House may determine the Rules of its Proceedings."[332] Congress may not therefore enact rules of proceedings for Congress or each House thereof by statute.[333] Such legislation also violates constitutional structure. The separation of the two Houses of Congress in the exercise of its powers--in a word, bicameralism--is a critical structural feature of Article I designed to check legislative tyranny.[334] Moreover, constitutional structure suggests that Congress may not bind itself or future Congresses in the exercise of its own powers.[335] Third, the prevailing interpretation of the third prong of the Necessary and Proper Clause appears to be that it only refers to the executive and judicial departments of the United States.[336] Thus, Congress (more precisely, the assemblage of the **\*1735** Senate and House of Representatives for the purposes of the electoral count)[337] is not a "Department" whose members are "Officers" within the meaning of the Necessary and Proper Clause. The third prong of the Necessary and Proper Clause also will not suffice as a font of power for the Electoral Count Act.[338]

Only the second prong of the Necessary and Proper Clause remains: Congress shall have power "[t]o make all Laws which shall be necessary and proper for carrying into Execution . . . all other Powers vested by this Constitution in the Government of the United States."[339] The question is thus whether the counting function is one **\*1736** of the "Powers vested by this Constitution in the Government of the United States."

The textual evidence strongly militates against such a finding. Consider again the text of the Electoral College Clauses: "The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted."[340] Obviously, the Electoral College Clauses do not employ the word "Power," unlike two other clauses outside of Article I, section 8 which do employ the word "Power" with respect to Congress--the Treason Clause and Territories Clause.[341] Moreover, the text and tenor of the Electoral College Clauses suggest duty and not discretion implied by the word "Power"--hence the use of the word "shall," and more interestingly, the use of passive voice.

There are, however, several clauses outside of Article I, section 8 where Congress has "Power" in the Article I, section 8 sense of the word, but which do not employ the word "Power." But these clauses make clear that Congress has legislative power by employing the phrase "may by law" or the phrase "shall by law" or their close variants. In the original Constitution, we need only to look to the Times, Places, and Manner Clause,[342] Presidential Succession Clause,[343] the second part of the Appointments Clause,[344] the Jury **\*1737** Trial Clause,[345] and the Full Faith and Credit Clause[346] as examples of the former; and to the Census Clause,[347] the Congress Meeting Clause,[348] and the first part of the Appointments Clause[349] as examples of the latter. But, unlike these several clauses, there is no "may by law" or "shall by law" provision modifying the counting function.[350]

When the Constitution commits "Power" to Congress outside of Article I, Section 8, it says so. It is more than doubtful that the seven word phrase "and the votes shall then be counted" is one of the "Powers vested by this Constitution in the Government of the United States" within the meaning of the Necessary and Proper Clause.[351] As **\*1738** a matter of principled textual interpretation, the second prong of the Necessary and Proper Clause also will not suffice as a font of power to enact the Electoral Count Act.

APPENDIX - 236

\*\*\*

What about the historical interpretation of the Necessary and Proper Clause? To be sure, the questions of whether the counting function is one of the "Powers vested by this Constitution in the Government of the United States" within the meaning of the Necessary and Proper Clause and whether the Necessary and Proper Clause is the font of power for congressional regulation of the electoral count has been the subject of significant debate by Members of Congress. These questions were controversial from the first.

The Senate of the Sixth Congress first debated these questions in considering the Grand Committee Bill.[352] After Federalist Senator Ross moved to appoint a committee authorized to report a bill, Senator Brown disagreed. He "was of opinion that this was a subject on which Congress had no right to legislate. When the Constitution undertook to make provisions on a subject, if they were found incomplete, or defective, they must be remedied by recommending an amendment to the Constitution."[353] Federalist Senator Dexter expressed no doubt that the Necessary and Proper Clause authorized legislation on the subject. "The law now proposed," said Dexter, **\*1739** "appears to be necessary to carry into effect the power of appointing the President; it is therefore clearly Constitutional."[354] His argument may be that just as certain powers may give rise to implied powers, certain duties may give rise to implied powers reasonably necessary to give effect to those duties.

Was Senator Dexter correct? Is there a "power of appointing the President" in the Electoral College Clauses? So too Federalist Senator Livermore "never felt less doubt on any subject that the one now under consideration: the Constitution has given many directions to the appointment of the President, some of which he read."[355] Unfortunately, the recorded debate does not indicate what provisions Senator Livermore read--perhaps for good reason. There is nothing in the Electoral College Clauses that suggests that Congress has any power to regulate the electoral count. Senator Baldwin, who was a Framer at the Philadelphia Convention, disagreed with the Federalists on virtually every point. In a detailed speech, much of which we shall uncover in the course of the structural argument, Senator Baldwin stated that the Federalists' efforts to regulate the electoral count "must be made by proposing an amendment to the Constitution to that effect; and that they could not be made by law, without violating the Constitution."[356] In other words, there was no express or implied power in the Constitution to regulate the electoral count by law. Senator Baldwin took particular issue with Senator Dexter's conception of the Necessary and Proper Clause. Senator Baldwin explained that the Necessary and Proper Clause

> speaks of the use of the powers vested by the Constitution--this resolution relates to the formation of a competent and essential part of the Government itself: that speaks of the movements of the Government after it is organized; this relates to the organization of the Executive branch, and is therefore clearly a Constitutional work, and to be done, if at all, in the manner pointed out by the Constitution, by proposing an article of amendment to the Constitution on that subject.[357]

Senator Baldwin's statement is a particularly fine textual meditation based on the word "vested" in the Necessary and Proper Clause. If we look intratextually, we see that the word "vested" appears alongside the word "Power" in each of the Vesting Clauses of **\*1740** Articles I, II, and III.[358] If the second prong of the Necessary and Proper Clause is a placeholder of sorts for the legislative, executive, and judicial powers of the United States read as a whole, then the second prong cannot support the Electoral Count Act. The Electoral College Clauses are not a part of the legislative power or the judicial power, and as Senator Baldwin keenly observed, they are not a part of (and are antecedent to) the executive power.

The Necessary and Proper Clause resurfaced some twenty years later in the regulation of the electoral count. In December of 1820, approximately two months before the electoral count of 1821, Senator Wilson introduced a resolution entitled, "Attempt to Remedy the Uncertainty as to Counting the Electoral Vote by Legislation."[359] He discussed the Necessary and Proper Clause as the font of congressional power to regulate the electoral count and stated that

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

> Congress has unquestionably the power, under the last clause of the eighth section of the first article of the Constitution, and he thought they ought to exercise it by vesting the authority to decide upon doubtful, disputed, or unlawful votes, either in the President of the Senate, the Senate itself, the House of Representatives, or the two houses conjointly or separately.[360]

This statement reflects some serious problems with the scope of congressional power to regulate the electoral count under the Necessary and Proper Clause. Even if Congress may enact counting legislation under the Necessary and Proper Clause vesting the "counting power" in both Houses of Congress (conjointly or separately), how may Congress vest such power in either House alone? And how may Congress vest such power in the President of the Senate, possibly expanding the constitutional duties of the Vice President? The Committee of the Judiciary, which considered Senator Wilson's resolution, seemed to think that counting legislation was constitutional but merely inexpedient, and hence Senator Wilson's resolution was not acted upon.[361]

 **\*1741**  Little was said about the application of the Necessary and Proper Clause to counting electoral votes in the years immediately following 1820. Senator Van Buren introduced a bill in the Senate in 1824 that was very similar to the Electoral Count Act.[362] Senator Macon did not think that this bill was necessary or constitutional and argued that "Congress had no power to legislate upon the subject" of Senator Van Buren's bill.[363] This bill passed the Senate but the House never considered it.

During the Wisconsin Incident of 1857, Senator Hunter invoked the Necessary and Proper Clause as the font of power "to regulate by law the details of the mode in which the votes are to be counted."[364] But Senator Collamer expressed his serious doubts that Congress could legislate on the Wisconsin problem: "I very much doubt whether the [F]ramers of the Constitution ever intended to leave the subject of the presidential election to the House of Representatives, or the Senate, or either, or both of them."[365] This statement echoes Senator Wilson's observations on the scope of congressional power to regulate the electoral count under the Necessary and Proper Clause.

During the Electoral Count Act debates, the Members of Congress repeatedly pointed to the Necessary and Proper Clause as the font of power to pass the Electoral Count Act. It does appear that these Members of Congress relied on this clause as the font of power to pass the Electoral Count Act.[366] As Professors Issacharoff,  **\*1742**  Karlan, and Pildes conclude, "A majority of Congress was persuaded by the argument that the Act was permitted under the Necessary and Proper Clause to give substance to the provisions of the Twelfth Amendment."[367]

There were, of course, those who disagreed with this interpretation of the Necessary and Proper Clause. For example, Representative Browne explicitly denied that the counting function was a "power" in the Article I, Section 8 sense of the word-- a point that would implicitly apply to the word "power" in the Necessary and Proper Clause as well:

> The [F]ramers of the Constitution withheld from Congress the power to interfere with this count; they withheld it by not committing the power to do it. When the Constitution confers a power it does so in express words, as Congress shall have power to borrow money, collect taxes, regulate commerce, coin money, and the like. By no words, by no implication, has the power been given Congress to settle questions concerning the electoral count.[368]
>  **\*1743**  And Senator Wilson made known his belief that "defects in the Constitution of the United States can not be remedied by acts of Congress."[369] At a minimum, several Members of Congress, including those who voted for the Electoral Count Act, had significant doubts with respect to its constitutionality.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

The Necessary and Proper Clause is not a font of power for the Electoral Count Act. The counting function is neither one of the "foregoing Powers," nor "Powers vested by this Constitution in the Government of the United States," nor "Powers vested by this Constitution . . . in any Department or Officer [of the United States]" within the meaning of the Necessary and Proper Clause. Put differently, congressional regulation of the electoral count, however "necessary," is not "proper"--and hence not within Congress's domain or jurisdiction--within the meaning of the Necessary and Proper Clause.[370] In case there should be any doubt on this point, the structural argument makes clear that doubt should be resolved against Congress in the specific context of presidential election.[371] The Electoral Count Act treads on terribly thin textual ground vis-à-vis the Necessary and Proper Clause, and to the only remaining possible font of implied power, we now turn.

**b. The Electoral College Clauses**

The second possible font of congressional power to enact the Electoral Count Act is the Electoral College Clauses themselves. There are at least two historical precedents for this supposition. First, the First Congress encountered the very tricky problem of specifying the oath or affirmation for state legislators and officers under the **\*1744** Oath or Affirmation Clause.[372] None of the three prongs of the Necessary and Proper Clause was thought to apply. The Oath or Affirmation Clause is not a foregoing power or one of the powers vested by the Constitution in the government of the United States, and state legislators and officers are by definition not officers of the United States. The First Congress simply concluded that the Oath or Affirmation Clause was "self-executing," and prescribed an oath or affirmation for these persons anyway.[373] Second, much later, the Supreme Court affirmed Congress's ability to enact legislation under the Fugitive Slave Clause which appears to be self-executing.[374] The rationale for this decision was that the Fugitive Slave Act is a "direct implementation" of the Fugitive Slave Clause and therefore does not go beyond the provisions of the clause.[375]

What does this mean for the Electoral Count Act? Two questions arise: whether some congressional regulation of the electoral count may be sustained under the Electoral College Clauses and whether the Electoral Count Act may be sustained under the Electoral College Clauses.[376]

**\*1745** Article II, Section 1, Clause 3 and the Twelfth Amendment seem to be at least as self-executing as the Oath or Affirmation Clause or the Fugitive Slave Clause. Indeed, Article II, Section 1, Clause 3 is by far the longest "clause" in the original Constitution, containing approximately 290 words, compared to the next longest clause with approximately 165.[377] These two clauses look more like technical rules than the open-textured provisions such as the Privileges and Immunities Clause, Due Process Clause, and Equal Protection Clause of the Fourteenth Amendment.[378] These two clauses could hardly be more prolix for constitutional provisions. Professor Gardner offers the following account:

> Presumably, these detailed instructions reflect society's determination that the use of the particular process set forth will assure a result sufficiently accurate to justify society's consent to the winner . . . . This provision of the Constitution is unusual: it is rare for the people to dictate in such detail the manner in which they would like things done. More typical is article I, section 4, governing congressional elections . . . .[379]

In addition to this point of prolixity, consider also that the Electoral College Clauses, and especially the Twelfth Amendment, contain no special provision empowering Congress to enforce it by appropriate legislation, in contrast to a host of other (and admittedly later) amendments to the Constitution.[380]

Apparently, the Second Congress did not think that Article II, Section 1, Clause 3 was fully self-executing given the regulations on the manner of certifying and transmitting electoral votes.[381] However, it is unclear whether the Second Congress based these regulations on the implied power of Article II, Section 1, Clause 4 and or of Article II, Section 1, Clause 3. Recall that the draft

APPENDIX - 239

of Article II, Section 1, Clause 4 at the Philadelphia Convention provided that "[t]he Legislature may determine the time of choosing the electors, and of their giving their votes; and the manner of certifying and transmitting their votes--But the election shall be on the same day throughout the  **\*1746**  U--States"[382] and that the italicized language was inexplicably dropped.[383] To be sure, regulations on the manner of certifying and transmitting their votes do not support regulations on the electoral count.

The problem of binding future joint conventions aside,[384] some congressional regulation of the electoral count may easily be supported under the Electoral College Clauses. For example, a regulation providing that the joint convention count electoral votes in the alphabetical order of States in the Union probably would be constitutionally acceptable. The real issue is whether Congress had the legislative authority to pass the Electoral Count Act in the first place.

The Electoral Count Act goes well beyond the text of the Electoral College Clauses. The Electoral Count Act is by no means a "direct implementation" of the Electoral College Clauses. During the Electoral Count Act debates, Senator Jones made the argument from prolixity that Congress did not have the power to legislate:

> That [second] article provides the mode and manner of returning and counting that vote. If it was intended that Congress should exercise authority over this subject by general legislation, why is it that the Constitution, instead of giving as in other cases a general power to Congress, has anticipated such legislation by a lengthy provision specifying particularly the manner in which the voice of the electors shall be ascertained? It was not the intention of the Constitution to leave to Congress the power to determine how the President and Vice-President should be elected. This is clearly indicated by the express words of the first section of the second article.[385]

It is more than doubtful that the Electoral Count Act could be sustained as a direct implementation of the Electoral College Clauses. If the Electoral Count Act passes constitutional muster as a direct implementation of the Electoral College Clauses, it is most difficult to see what would constitute an indirect--and constitutionally-impermissible--implementation of those clauses.

### \*1747  c. Textual Arguments from Negative Implication

Two textual arguments from negative implication cast additional doubt upon any font of congressional power for the Electoral Count Act, and particularly the implied font of congressional power of the Electoral College Clauses itself. When the Constitution contemplates a legislative role for Congress with respect to the Presidency, it says so--twice.

First, consider Article II, Section 1, Clause 4 which provides that "[t]he Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States."[386] This clause contains the sole grant of power to Congress in the Electoral College Clauses. The argument from negative implication gains momentum when we remember that the Electoral College Clauses were drafted as a whole. Indeed, the original draft of Article II, Section 1, Clause 4 was a part of Article II, Section 1, Clause 3 which contains the counting function.[387] There is little reason to believe that the omission of any express legislative power in Article II, Section 1, Clause 3 was accidental.

Senator Eaton made much of the negative implication during the Electoral Count Act debates:

> Turn over to paragraph 3 of the same section and what do you find there? The only power that Congress has is here: "The Congress"--may do what? After the state has done its duty, "The Congress may determine"--what? "The time of choosing the electors and the day on which they shall give their votes; which day shall be the same throughout the United States." That is all the power. The very keeping of that power excludes every other idea of power. Every other idea of power belongs to the states, is in the states.[388]  **\*1748**  Second, consider the Presidential Succession Clause of Article II which provides that

APPENDIX - 240

[i]n Case of the Removal of the President from Office, or of his Death, Resignation, or Inability to discharge the Powers and Duties of the said Office, the Same shall devolve on the Vice President, and the Congress may by Law provide for the Case of Removal, Death, Resignation or Inability, both of the President and Vice President, declaring what Officer shall then act as President, and such Officer shall act accordingly, until the Disability be removed, or a President shall be elected.[389]

This clause too was placed alongside the Electoral College Clauses in the Framers' draft Constitution and was later rearranged by the Committee of Style.[390] There is little reason to believe that the omission of any express legislative power in Article II, Section 1, Clause 3 was accidental.

The prolix Electoral College Clauses provide that "the Votes shall then be counted"--not, "the Votes shall then be counted as Congress may by Law have directed." The Framers could have so provided but they did not.

### 3. The Intratextual Argument

There is more to the textual argument against the Electoral Count Act than the sparse words of the Electoral College Clauses-- much more. An Article II-centric focus on presidential election is too narrow. We can squeeze yet more meaning from the Electoral College Clauses and Congress's role in presidential election when we consider the text of the Constitution as a coherent whole. When we do so, we see that Congress has a role in presidential election, but Congress has a role in congressional elections as well. We may obtain important clues about Congress's role in presidential election by comparing and contrasting it with Congress's role in congressional elections. This intratextual analysis reveals two arguments that strongly militate against the constitutionality of the Electoral Count Act. These two arguments relate to two clauses in Article I: the Times, Places, and Manner Clause and the House Judging Clause.

### *1749  a. The Times, Places, and Manner Clause

When the Constitution contemplates a "regulating" role for Congress in elections, it says so. The Times, Places, and Manner Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."[391]

The Times, Places, and Manner Clause is the font of significant congressional power over congressional elections--so significant that Alexander Hamilton devoted three essays of The Federalist to the clause in order to defend it from criticism from Anti-Federalists and Federalists alike.[392] Indeed, several State ratifying conventions proposed amendments to the Constitution to amend the Times, Places, and Manner Clause so as to eliminate the proviso empowering Congress to regulate congressional elections.[393]

Importantly, no such clause empowering Congress to regulate presidential election appears in Article II. A careful reading of the Electoral College Clauses reveals an important point. As we have seen, Article II, section 1, clause 4 provides that "[t]he Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States."[394] This clause supplies the only grant of power to  **1750**  Congress in presidential election and the clause empowers Congress only with respect to "Time." The Constitution itself fixes the "Places" with the electors "meet[ing] in their respective States."[395] What about "Manner" ? In stark contrast to congressional election, Congress

APPENDIX - 241

has no power with respect to the "Manner" of presidential election. Article II, section 1, clause 2 provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." Interestingly, Alexander Hamilton's private, unadopted draft of the Constitution provided that "[t]he Legislature shall by permanent laws provide such further regulations as may be necessary for the more orderly election of the President, not contravening the provisions herein contained,"[396] but no such provision was the subject of recorded debate at the Philadelphia Convention of 1787.

What does the Times, Places, and Manner Clause mean for the Electoral Count Act? The implications of the intratextual argument are incredibly straightforward. There is little reason to suppose that the word "Manner" in the Times, Places, and Manner Clause has a substantially different meaning from the word "Manner" in Article II, Section 1, Clause 2.[397] Whatever the scope of Congress's power to prescribe the manner of congressional elections, Congress has no such power in presidential election.

The marked silence of the founding generation on the issue of presidential election in contrast to congressional election strongly suggests that they understood presidential election to be free from congressional regulation. Unsurprisingly, the intratextual argument featured prominently in the constitutional debate over the Grand Committee Bill. In March of 1800, Senator Pinckney seized the intratextual argument from the Times, Places, and Manner Clause in his lengthy speech against the Grand Committee Bill. Read carefully his intratextual argument:

> Let us for a moment compare [the Times, Places, and Manner Clause] with the directions of the Constitution **\*1751** respecting the Electors of a President, and then permit me to call your attention to the remarkable difference there is between them, and the reasons for this difference.

> By the Constitution, Electors of a President are to be chosen in the manner directed by the State Legislatures-- that is all that is said. In case the State Legislatures refuse to make these directions there is no power to compel them; there is not a single word in the Constitution which can, by the most tortured construction, be extended to give Congress, or any branch or part of our Federal Government, a right to make or alter the State Legislatures' directions on this subject. The right to make these directions is complete and conclusive, subject to no control or revision, and placed entirely with them, for the best and most unanswerable reasons.[398]

Senator Pinckney argued that the Grand Committee Bill was unconstitutional because it was an impermissible congressional regulation of the manner of presidential election. If Senator Pinckney is correct, it follows that the Electoral Count Act is also unconstitutional. Senator Pinckney is correct. Congressional regulation of the electoral count is a regulation on the manner of presidential election. The two key sections of the Electoral Count Act-- 3 U.S.C. § 5 and 3 U.S.C. § 15--regulate the manner in which the acts of the electors will be given effect.

The intratextual argument also has powerful implications for the question of whether there is a font of power for Congress to enact the Electoral Count Act. Imagine for a moment that the amendments proposed by several state ratifying conventions eliminating the proviso of the Times, Places, and Manner Clause empowering Congress to regulate congressional elections[399] had been adopted. There would be no question that Congress would then have zero power over the manner of congressional election. The power to implement this amended Times, Places, and Manner Clause is not a "Power vested in this Constitution in the Government of the United States" under the Necessary and Proper Clause. In other words, Congress derives its sole power to regulate congressional elections from the proviso of the Times, Places, and Manner Clause. Congress **\*1752** may not claim that the Necessary and Proper Clause is the font of power for regulating the manner of presidential election.

APPENDIX - 242

In sum, the intratextual argument from the Times, Places, and Manner Clause makes clear that Congress has near zero power over the manner of presidential election and raises serious doubts as to Congress's font of power to enact the Electoral Count Act.

**b. The House Judging Clause**

When the Constitution contemplates a judging role for each House of Congress in elections, it says so. The House Judging Clause provides that "[e]ach House shall be the Judge of the Elections, Returns and Qualifications of its own Members."[400] The House Judging Clause is the font of awesome powers and duties. Under this clause, each House is a judicial tribunal with the judicial power to investigate the elections of its Members,[401] and has the duty to refuse to seat members who are constitutionally ineligible to the office of Representative or Senator.[402]

Importantly, no such clause appears in Article II concerning presidential election.[403] The negative implication is made more stark by the fact that the House Judging Clause was considered immediately after the drafting of the Electoral College Clauses at the Philadelphia Convention of 1787, but no Framer thought to extend the principle of the House Judging Clause to presidential election.[404]

What does the House Judging Clause mean for the Electoral Count Act? The negative implication of the House Judging Clause is that the joint convention does not have the authority to judge the elections, returns, and qualifications of electors. The joint convention is not a judicial tribunal with the power to investigate the manner of appointment and qualifications of electors, and may not refuse to count electoral votes contained in authentic electoral certificates for  **\*1753**  reasons relating to the manner of appointment or qualifications of electors.[405]

These conclusions find support in the purpose of the House Judging Clause. Justice Story, in his Commentaries on the Constitution of the United States, explained that the power to judge the elections, returns, and qualifications of the members of each House must be lodged somewhere in order to safeguard the liberties of the people.[406] The only question was where to place such a power. Justice Story concluded that the power is best lodged in the body whose elections, returns and qualifications are to be judged and not in some other body. "If lodged in any other, than the legislative body itself," wrote Justice Story,

> its independence, its purity, and even its existence and action may be destroyed, or put into imminent danger. No other body, but itself, can have the same motives to preserve and perpetuate these attributes; no other body can be so perpetually watchful to guard its own rights and privileges from infringement, to purify and vindicate its own character, and to preserve the rights, and sustain the free choice of its constituents.[407]

The House Judging Clause strongly suggests that the power to judge the elections, returns, and qualifications of electors is committed to the individual electoral colleges who compose their own "Houses," but we need not decide this in order to conclude that the power most emphatically does not belong to Congress.[408] On Justice  **\*1754**  Story's logic, the power, if vested in Congress, would risk the "independence" and "purity" of the electoral colleges, and "put [them] into imminent danger." Note too how the House Judging Clause eschews bicameralism, with each House of Congress acting independently of the other, only with respect to its own Members.

The intratextual argument from the House Judging Clause enjoys a rich pedigree in the constitutional debates over Congress's ability to regulate the electoral count. As early as 1800, Senator Baldwin, a Framer at the Philadelphia Convention of 1787, made precisely this intratextual argument in his speech against the Grand Committee Bill. "[W]hat are the questions which can arise on the subject intrusted to [electors], to which they are incompetent, or to which Congress is so much more competent?," he asked.[409] One set of questions were "[t]hose which relate to the elections, returns, and qualifications of their own members,"

and on this issue he concluded, "[S]hall these be taken away from that body [of electors], and submitted to the superior decision and control of Congress, without a particle of authority for it from the Constitution?"[410] Senator Baldwin clearly invoked the language of the House Judging Clause to make the intratextual argument, for the phrase "elections, returns and qualifications" appears but once in the Constitution.

During the electoral count of 1857, Senator Collamer expressed very serious constitutional doubts about whether the two Houses of Congress could by joint resolution express any opinion that the electoral votes of the State of Wisconsin were null and void because these votes had been given on a day different from that prescribed by law.[411] He "very much doubt[ed] whether the [F]ramers of the Constitution ever intended to leave the subject of presidential election to the House of Representatives, or the Senate, or either, or both of them."[412] Evidently pointing to the House Judging Clause, he stated, "The Constitution vested in each house the power to decide upon the election of its members; it provided carefully that it would not trust to the two houses to elect a President."[413]

In May of 1874, the House Committee on Privileges and Elections employed the intratextual argument in a lengthy report *1755 supporting a proposed amendment to the Constitution. The proposed amendment provided for the abolition of the Electoral College mode of presidential election in favor of direct, popular election and empowered Congress "to provide for holding and conducting elections of President and Vice-President, and to establish tribunals for the decision of such elections as may be contested."[414] In a section of the report captioned "Congress is not a Canvassing Board," the report provided in relevant part:

> The proposition that Congress has power to sit as a canvassing board upon the electoral votes of the States, admitting or rejecting them for reasons of its own, subverts the whole theory by which their appointment was conferred upon the States; makes Congress the judge of the election and qualifications of President and Vice-President, and, by the operation of the twenty-second joint rule, gives that power to each house separately, as in case of its own members. There is no such express power given to Congress in the Constitution, nor is it necessary to carry out any express power therein given, and its exercise would be in direct conflict with the known purpose of the [F]ramers to make the executive and legislative departments as nearly independent of each other as possible.[415]

The intratextual argument from the House Judging Clause did not lose any vigor in the Electoral Count Act debates. Senator Burnside put the intratextual point bluntly, stating that

> it was never the intention of the [F]ramers of the Constitution to make Congress the judge of the qualifications of the electors. If it had been so, the Constitution would have distinctly stated it. It makes each house the judge of the qualifications of its own members in express terms, but it does not imply even that Congress has any right to judge of the qualifications of the electors.[416]

So too Senator Edmunds made the intratextual argument, but a considerably more complex one. He pointed to the Vesting Clause of Article III[417] and three clauses of Article I--the House Judging Clause, the House Expulsion Clause,[418] and the Senate Impeachment *1756 Clause[419]--as the sole grants of "judicial power" to individual Houses of Congress, and concluded that "no judicial power is invested in either or both Houses of Congress that is not especially named and imputed to them as such and in such terms."[420]

Importantly, as the foregoing statements suggest, the intratextual argument is not just a narrow textual point from negative implication. The intratextual argument gains its strength from the context of its application. The House Judging Clause merely

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.        38

makes explicit an implicit idea that a body has judicial power over the privileges of its own members.[421] The important question for present purposes is whether Congress has judicial power over the privileges of non-member electors, especially in light of the "known purpose of the [F]ramers to make the executive and legislative departments as nearly independent of each other as possible."[422]

In sum, the intratextual argument from the House Judging Clause strongly suggests that Congress has no judicial power over the elections, returns, and qualifications of electors.

***

The intratextual arguments from both the Times, Places, and Manner Clause and the House Judging Clause are textual arguments from negative implication. These two clauses carefully empower Congress and each House of Congress, respectively, in congressional elections, and the Electoral College Clauses contain no analogues concerning presidential election. As a brute textual matter, the intratextual argument raises doubt as to Congress's ability to regulate the manner of presidential election and to judge the elections, returns, and qualifications of electors.

 **1757**  Of course, textual arguments from negative implication need to be applied sensitively and contextually in order to avoid wooden readings of the Constitution.[423] A sensitive and contextual interpretation of the intratextual argument reveals a strong case against Congress's ability to regulate the manner of presidential election and to judge the elections, returns, and qualifications of electors. As a matter of sensitive interpretation, the intratextual arguments from negative implication deserve special weight given the prolixity of the Electoral College Clauses, relative to other clauses of Article II which mark the grand contours of executive power, and more importantly, relative to the clauses of Article I which empower Congress in congressional elections. It hardly seems that the Framers simply forgot to draft clauses in Article II analogous to the Times, Places, and Manner Clause or the House Judging Clause, or understood Article II impliedly to contain such congressional power over presidential election.

As a matter of contextual interpretation, we should be especially chary of Congress's role in presidential election. The intratextual argument deserves special weight in light of the structural features of presidential election, namely the repudiation of Congress in the process of presidential election.[424] As we shall see, the Framers instituted an electoral college mode of presidential election as a replacement for the election of the President by the Congress. The Elector Incompatibility Clause also expresses the anti-Congress principle in presidential election by prohibiting Members of Congress from even serving as electors.[425] As Senator Wilson put the point, "When the [F]ramers of the Constitution expressly prohibited Senators and Representatives from appointment as electors, they clearly indicated their purpose to exclude them from all power in or over the matter of the election of a President by the electors appointed by the States."[426]

 **1758**  In sum, the intratextual argument, when interpreted sensitively and contextually, strongly militates against the constitutionality of the Electoral Count Act.

### 4. Conclusions

Taken together, the textual arguments--traditional and intratextual--expose the unconstitutionality of the Electoral Count Act. What may seem to be expedient is not necessarily what is constitutional. First and foremost, the textual argument makes clear that there is no source of power, express or implied, for Congress to pass the Electoral Count Act. A careful analysis of the Necessary and Proper Clause and the Electoral College Clauses reveals that neither clause supports Congress's power to enact the Electoral Count Act. In the absence of an implied grant of power to Congress to enact such a statute, the Electoral Count Act is unconstitutional. Anyone who wishes to argue that the Electoral Count Act is constitutional must grapple with the threshold question of whether and where Congress has the power under the Constitution to enact such a statute. Other textual arguments

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   39

relate to specific provisions of the Electoral Count Act. The constitutionality of the "Presiding Officer Clause" of 3 U.S.C. § 15 is in serious doubt given conflict-of-interest principles relating to the vice presidency. The constitutionality of 3 U.S.C. § 17 is beyond all serious doubt. This provision, which limits (or purports to limit) the proceedings in each House of Congress in debating objections to electoral votes, is patently unconstitutional. Other textual arguments are holistic, even quasi-structural. The nature of the counting function by the counting agent is more "thin" than "thick," relating more to the ascertainment and aggregation of electoral votes, than to the judging of electoral votes. The bicameral counting procedure of 3 U.S.C. §15 violates the unicameralism principle of the Electoral College Clauses. And the intratextual argument from the Times, Places, and Manner Clause and the House Judging Clause strongly militates against the constitutionality of the Electoral Count Act, at least to the extent that the counting agent is to judge electoral votes contained in authentic electoral certificates.

These textual arguments must also be considered in light of great care that the Framers took to remove Congress as much as possible from the business of electing the President. The fact that Congress has thrice failed to pass constitutional amendments giving Congress "power to provide for holding and conducting the elections of President and Vice President and to establish tribunals for the  **1759**  decision of such elections as may be contested"[427] is another clue that militates against the constitutionality of the Electoral Count Act. Moreover, these three attempts at constitutional amendment occurred in the 1880s, just a few years before Congress passed--with no enabling constitutional amendment--the Electoral Count Act in 1887.

## B. The Structural Argument

In addition to textual argument, the interpretivist resolution of the Electoral Count Act is based on a structural argument. The structural argument illuminates a number of important themes that emerge from the Constitution as a whole.[428] In the present context, the structural argument provides some of the most satisfying arguments that the Electoral Count Act is unconstitutional. This section proceeds in three sub-sections. The first sub-section presents five principles of presidential election. The second sub-section presents two principles of rule-making and law-making. The final sub-section assesses the conclusions of the structural argument.

### 1. Five Principles of Presidential Election

### a. The Anti-Senate Principle

First and foremost, the Constitution mistrusts the Senate in the process of presidential election. This is the anti-Senate principle of presidential election. The Electoral Count Act is unconstitutional because the Senate has equal agency with the House of Representatives in counting electoral votes. As we have seen, in a single return case, the joint convention may not reject electoral votes without the concurrence of the Senate, and in a multiple return case, the joint convention may not accept electoral votes without the concurrence of the Senate.[429] And as Representative Caldwell explained during the Electoral Count Act debates:

> The separate concurrent action of both Houses provided for in the bill preserves the constitutional identity, rights, and dignity of each. This concession of each House to the other of equal and concurrent power to decide on informalities and  **1760**  illegalities appearing on the face of returns, upon objection of a Senator or Representative, is necessary to the determination of results.[430]

Whatever may be said about the involvement of both Houses of Congress in the process of counting electoral votes, it is clear that the Senate as a separate and distinct body is to have no agency in electing the President. The Electoral College Clauses make clear that the Senate and the House of Representatives are not created equally in the process of presidential election. Under the original Constitution and the Twelfth Amendment, if the electors shall have failed to make a choice, the House of

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Representatives chooses the President, not the Senate. Under the Twelfth Amendment, if the electors shall have failed to make a choice, the Senate only chooses the Vice President.[431]

The logic behind the anti-Senate principle of presidential election is incredibly clear once we consult the entire text of the Constitution and its legislative history. Under the Constitution, the Senate assumes, in addition to its equal share of the Article I legislative power, three distinct powers. First, the Senate has judicial power as a court of impeachment for the President, Vice President, and all civil Officers of the United  **\*1761**  States.[432] Second, the Senate shares executive-legislative power with the President in the business of treaty-making.[433] Third, the Senate shares executive power with the President in the business of appointing Officers of the United States.[434] It is important to remember that the Committee of Eleven's Report of the Electoral College Clauses at the Philadelphia Convention provided that, if the electors failed to make a choice, the Senate would elect the President and the Vice President. The House of Representatives was to have no role whatsoever. The Report provided in relevant part:

> [A]nd they shall make a list of all the persons voted for, and of the number of votes for each, which list they shall sign and certify and transmit sealed to the Seat of the[] Genl. Government, directed to the President of the Senate-- The President of the Senate shall in that House open all the certificates; and the votes shall be then & there counted. The Person having the greatest number of votes shall be the President, if such number be a majority of that of the electors; and if there be more than one who have such a majority, and have an equal number of votes, then the Senate shall immediately choose by ballot one of them for President: but if no person have a majority[,] then from the five highest on the list, the Senate shall choose by ballot the President. And in every case after the choice of the President, the person having the greatest number of votes shall be vice-president: but if there should remain two or more who have equal votes, the Senate shall choose from them the vice-president.[435]

The Framers feared that the totality of these powers was simply too much. They feared that the Senate, already powerful, would become a dangerous aristocracy, and that the President, already dependent on the Senate in treaty-making and appointments, would be a mere creature of that body.[436] Consequently, on September 6,  **\*1762**  1787, on a motion by Roger Sherman, the Framers rejected the contingent election of the President and Vice President by the Senate, providing instead for the choice by the House of Representatives.[437] This change passed by a vote of ten to one.[438]

In The Federalist No. 66, Alexander Hamilton explained the logic for this change in the context of the balance of powers between the House of Representatives and the Senate, carefully struck by the Constitution:

> [T]o secure the equilibrium of the national House of Representatives, the plan of the convention has provided in its favor several important counterpoises to the additional authorities to be conferred upon the Senate. The exclusive privilege of originating money bills will belong to the House of Representatives. The same house will possess the sole right of instituting impeachments; is not this a complete counterbalance to that of determining them? The same house will be the umpire in all elections of the President  **\*1763**  which do not unite the suffrages of a majority of the whole number of electors; a case which it cannot be doubted will sometimes, if not frequently, happen. The constant possibility of the thing must be a fruitful source of influence to that body.[439]

As this passage demonstrates, it was simply beyond question at the founding that the Senate as a separate and distinct body would have any agency in the process of presidential election.[440] St. George Tucker, in his canonical "American Blackstone," first published in the wake of the constitutional crisis of the presidential election of 1800, summarized the anti-Senate principle of presidential election thus:

APPENDIX - 247

> [The Senate's] exclusion from any participation in the election of a president, is certainly founded upon the wisest policy: being associated with him in the exercise of his most important powers, and being chosen for a much longer period than the representatives, the presumption of undue influence, where the contest might be between a president in office, and any other person, would be altogether unavoidable.[441]

The anti-Senate principle of presidential election was not lost in the Electoral Count Act debates. Senator Bayard thought it dispositive in urging the repeal of the Twenty-second Joint Rule.[442] "I do not think," said Bayard, "that anywhere in the Constitution can be found language in any degree constituting the Senate of the United States a factor or an actor in the election of the President of the United States."[443] He asked, "But will any Senator show me any clause of the Constitution, any implication which can be argued from any clause of the Constitution, which gives the Senate one particle of lawful power in controlling the choice of a President or a Vice-President of the United States?"[444] Senator Whyte thought the anti-Senate principle so strong an objection to the Electoral Count Act that he stated, "I would rather vote for a bill leaving it to the House of Representatives to interfere than a bill which provided that the  **\*1764**  Senate should have anything to do with the election of President of the United States."[445]

The Electoral Count Act, like the Twenty-second Joint Rule, violates the anti-Senate principle of presidential election. The involvement of the Senate as a separate and distinct body in the process of counting electoral votes runs seriously afoul of constitutional structure. The equal agency of the Senate with the House of Representatives in the Electoral Count Act impermissibly infringes upon the constitutional prerogatives of the House of Representatives in "umpir[ing]" presidential election, and consequently, unduly strengthens the powers of the Senate in presidential election. Moreover, the equal agency of the Senate violates the Framers' deliberate choice to exclude the Senate altogether from the process of presidential election.

This is not to say that the anti-Senate principle of presidential election requires that Senators must not participate in counting electoral votes. There is a constitutionally significant difference between the Senate as a separate and distinct body, and Senators as members of a joint convention of Senators and Representatives, where Representatives greatly outnumber Senators. The counting function is committed to the joint convention and all questions of the electoral count must be resolved by it on a per capita basis, not by two separate and distinct legislative bodies.

### b. The Anti-Congress Principle

Second, the Constitution mistrusts Congress in the process of presidential election. This is the anti-Congress principle of presidential election. The joint convention violates the anti-Congress principle to the extent that it rejects electoral votes contained in authentic electoral certificates as not "regularly given."[446] Two parts of the Electoral College Clauses carefully reflect the anti-Congress principle of presidential election.

First, the electoral college mode of presidential election itself is an instantiation of the anti-Congress principle. We should remember that of all the methods to elect the President considered by the Framers the one most emphatically rejected was election of the President by the legislature.[447] The Framers rejected the  **\*1765**  parliamentary system for good reason: to create an independent and firm Executive.[448]

The Electoral College Clauses further reflect the rejection of the parliamentary system. In the event the electors fail to make a choice, Congress does nothing in choosing the President or Vice President. In such a case, the House of Representatives chooses the President and the Senate chooses the Vice President.[449] There is no possible instance in which the two Houses

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

of Congress act concurrently in choosing the President or Vice President.[450] Representative Randolph seized upon this point during the Missouri Incident:

> What was the theory of this Constitution? It is that this House, except upon a certain contingency, has nothing at all to do with the appointment of President and Vice-President of the United States. What was to be the practice of the Constitution, as now proposed? That an informal meeting of this and the other house is to usurp the initiative, the nominative power, with regard to the two first officers of the Government, in despite and contempt of their decision. Is there to be no limit to the power of Congress? no mound or barrier to stay their usurpation? Why were the electoral bodies established?[451]  **\*1766**  Indeed, if we look at the Constitution as a whole, we see that it is a clause-by-clause rejection of the parliamentary system.[452] The clear constitutional baseline is that congressional election of the President is prohibited. The concurrence of the House of Representatives and the Senate required by the Electoral Count Act runs afoul of constitutional structure.[453] The fact that Congress does not elect the President or Vice President, however, does not necessarily mean that Congress shall have no role in judging electoral votes.

Second, the Elector Incompatibility Clause provides that "no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector."[454] The Elector Incompatibility Clause is a substantial structural guarantee of independence from Members of Congress. The clause "is a provision which goes . . . to show how extremely guarded the Constitution is in preventing the members of Congress from having any agency in the election, except merely in counting the votes."[455] When Members of Congress are prohibited from even giving electoral votes, what gives them the constitutional authority to judge electoral votes? But again, the fact that Members of Congress are prohibited from even giving electoral votes does not necessarily mean that Members of Congress shall have no role in judging electoral votes.

 **\*1767**  The anti-Congress principle should bear on the overall interpretation of the Electoral Count Act. The anti-Congress principle stands for the thinnest conception of congressional regulation in counting electoral votes. As Senator Pinckney explained:

> How could [the Framers] expect, that in deciding on the election of a President, particularly where such election was strongly contested, that party spirit would not prevail, and govern every decision? Did they not know how easy it was to raise objections against the votes of particular elections, and that in determining upon these, it was more than probable, the members would recollect their sides, their favorite candidate, and sometimes their own interests? Or must they not have supposed, that, in putting the ultimate and final decision of the Electors in Congress, who were to decide irrevocably and without appeal, they would render the President their creature, and prevent his assuming and exercising that independence in the performance of his duties upon which the safety and honor of the Government must forever rest?[456]

Simply put, the joint convention may not judge the acts of electors--that is, their electoral votes.

### c. The Anti-President Principle

Third, the Constitution does not provide any role for the President in the process of presidential election. The Electoral Count Act, however, did involve the President. The Electoral Count Act is a law, not a rule of proceeding like the Twenty-second Joint Rule. Laws require bicameralism and presentment to the President, whereas rules (including joint rules) do not.[457] The Electoral Count  **\*1768**  Act was presented to and approved by President Cleveland. Is it not absurd to give the President an agency in counting the electoral votes of her successors? During the Wisconsin Incident of 1857, Senator Pugh objected to a

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   43

mere joint resolution stating that Wisconsin's electoral votes should not have been counted because it would require presentment to the President. "Now, confessedly," said Pugh, "the President has nothing to do with counting the votes for his successor."[458] Whether President Cleveland's approval of the Electoral Count Act presents an incurable constitutional problem of the past for the Electoral Count Act is beyond the scope of the present analysis.

What is important for present purposes, however, is that a law cannot be repealed without presentment to and approval by the President, or by a two-thirds super-majority of both Houses of Congress. This is a constitutional problem for the Electoral Count Act because the President has a significant agency in the law of the status quo. During the Electoral Count Act debates, Senator Hager put this point best:

> But, as I said suppose this bill becomes a law signed by the President, how are you to get rid of it in the future? If it is binding upon the Senate and House that meet next it requires, in order to repeal it, not only the vote of the Senate and the House, but the approval of the President. Thus the President enters into the consideration, when the Constitution never contemplated any such thing. It is a duty imposed entirely upon the Senate and House of Representatives; and if you pass this bill in order that it may be a law it requires the approval of the President, and hereafter to repeal it and get rid of it also requires the approval of the President, so that a future Senate and a future House of Representatives may be entirely under the control of the President of the United States. . . . Did the [F]ramers of the Constitution contemplate any such state of things as that when the twelfth article of amendment was adopted? It was the intent that the people should control the election of the President, and not the President of the United States. . . . The President has nothing to do with it.[459] *1769 To be sure, the President has an agency in presidential succession under the Presidential Succession Clause,[460] but the President is behind a veil of ignorance when it comes to presidential succession--unlike presidential election.

### d. The Pro-States and Pro-State Legislatures Principle

Fourth, the Constitution trusts the states and state legislatures in the process of presidential election. This is the pro-states and pro-state legislatures principle of presidential election. This principle makes clear that Congress has no role over some of the problems of the electoral count.

Let us once again turn to Senator Pinckney's famous speech against the Grand Committee Bill. Invoking the Tenth Amendment, Senator Pinckney argued that the Grand Committee Bill trampled on the rights of the states: he considered the right of the states to be free from congressional interference in the election of the President as sacred as the right of the states to be free from congressional interference in matters of religion and the press.[461] Senator Pinckney then observed:

> This right of determining on the manner in which the Electors shall vote; the inquiry into the qualifications, and the guards necessary to prevent disqualified or improper men voting, and to insure the votes being legally given, rests and is exclusively vested in the State Legislatures. If it is necessary to have guards against improper elections of Electors, and to institute tribunals to inquire into their qualifications, with the State Legislatures, and with them alone, rests the power to institute them, and they must exercise it.[462]

Nearly three-quarters of a century later, the House Committee on Privileges and Elections in 1874 similarly reported:

> *1770 It will thus be seen that the mode of choosing the electors is placed entirely beyond the power and jurisdiction of the National Government; and whatever disorders, irregularities, or failures in the appointment of

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                44

electors may occur in any of the States, they are entirely without remedy or redress upon the part of the Government of the United States.[463]

How did Senator Pinckney and the House Committee on Privileges and Elections reach this conclusion? The italicized words ought to provide a strong clue. Senator Pinckney expressly invoked the Times, Places, and Manner Clause in his argument against the Grand Committee Bill,[464] and the use of the word "mode" by the House Committee on Privileges and Elections is merely a synonym for the word "Manner" in the Times, Places, and Manner Clause.

As we saw earlier, the intratextual implications of the Times, Places, and Manner Clause are potentially powerful. In sum, with respect to presidential election, the Constitution fixes the "Place" (with the electors meeting in their respective states), empowers Congress to fix the "Time," and empowers the state legislatures to determine the "Manner." Unlike Article I, the state legislatures have the final word on that important subject; Congress has no power to determine on the "Manner" of presidential election.

But what is the breadth of power textually committed to state legislatures in presidential election? Does the word "Manner" in the Times, Places, and Manner Clause include the power to investigate the qualifications of electors? To determine an answer to this question, let us begin by looking to The Federalist No. 59 in which Alexander Hamilton brilliantly defends the Times, Places, and Manner Clause, which was the subject of much criticism by both Federalists and Anti-Federalists alike. Hamilton correctly notes "that there were only three ways in which this power could have been reasonably modified and disposed: that it must either have been lodged wholly in the national legislature, or wholly in the State legislatures, or primarily in the latter and ultimately in the former."[465] Consider Alexander Hamilton's justifications for reposing ultimate power over congressional elections in Congress:

> If the State legislatures were to be invested with an exclusive power of regulating these [House of Representatives] elections, every period of making them would be a delicate  **\*1771**  crisis in the national situation, which might issue in a dissolution of the Union, if the leaders of a few of the most important States should have entered into a previous conspiracy to prevent an election.[466]

Two points should become immediately apparent. First, as the italicized word indicates, Alexander Hamilton read the "Manner" in the Times, Places, and Manner Clause as a type of regulation by the state legislatures. This ought to come as no surprise given the text of that clause which provides that "Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."[467]

Second, what is sauce for the goose is sauce for the gander. Hamilton's defense of the Times, Places, and Manner Clause is no less applicable to presidential election. When we consult the Electoral College Clauses, we see textually that the "Manner" of appointing electors is vested wholly in the state legislatures; it is not vested primarily in the state legislatures and ultimately in the Congress. If Congress had a role in regulating presidential election, Hamilton likely would have said so in The Federalist No. 68.

What does all of this mean for questions of the electoral count? As Senator Pinckney and the House Committee on Privileges and Elections in 1874 noted, state legislatures might have jurisdiction (perhaps exclusive jurisdiction) to decide on questions with respect to the validity of an elector's appointment.[468] Dean Wroth adopts this view. He has written that "[t]he plain implication of the original scheme is that the states in their control of the manner of appointment were to provide for the settlement of whatever controversies might arise. . . . Local authorities would naturally resolve any contest."[469]

APPENDIX - 251

The problem with this view is that it reads into the Times, Places, and Manner Clause some judicial power to look into the qualifications of  **\*1772**  an office holder. This would analogously imply that Congress has the judicial power to look into qualifications of Members of Congress because Congress has the ultimate control over the "Manner" of congressional election. The problem with this view is that such a power of Congress stands in seemingly direct violation of the power vested in each House of Congress to judge the qualifications of its members under the House Judging Clause.[470]

It is also difficult to see how state legislatures (and their tribunals) would have exclusive jurisdiction to settle whatever controversies might arise in the appointment of electors; the proper appointment of electors is very clearly a federal question which may be adjudicated by federal courts.

The most important problem, however, is a temporal one. Given the immediacy principle of the Electoral College Clauses,[471] there is simply no time to investigate--by the state legislatures and their tribunals or by federal courts--the validity of an elector's appointment once the electoral votes are being counted. Indeed, the better reading of the Electoral College Clauses may be that federal courts are vested with the judicial power to inquire into the proper appointment of electors between the "time of chusing the Electors" and "the Day on which they shall give their Votes." The problem here is that Members of Congress are not supposed to know who the electors in each state are in advance of the meeting of the electoral colleges, so that the electors may be as free and detached as possible. Moreover, Congress could easily make the time of choosing the electors the same day on which the electors shall give their votes,[472] leaving no time for the judicial investigation of electors' appointments.

Finally, in addition to the argument made by Senator Pinckney and the House Committee on Privileges and Elections in 1874, there is a broader argument that Congress should have no role in regulating presidential election. In reviewing Hamilton's justification for the Times, Places, and Manner Clause, we see that there could be no analogous "delicate crisis in the national situation"[473] if the state legislatures had the last word on determining "Manner." This is because our Constitution ensures that we will never be without a President.

One view is that the Electoral College Clauses were carefully crafted to provide for the election of a President should the states fail  **\*1773**  in performing their constitutional duties. For example, Dean Wroth has written:

> The method for electing a President may be contrasted with the provisions for congressional elections. In the latter instance, as Hamilton pointed out in the Federalist, Congress must have ultimate control over the manner of election of its own members, lest the states, by refusing to elect Congressmen, cause the whole structure to fall. In the case of the presidency, since the House was ready to carry out the election if the states failed, congressional control was not only undesirable but unnecessary.[474]

Dean Wroth is clearly alluding to the provision of the Electoral College Clauses which empowers the House of Representatives to choose the President in case of electoral deadlock. While Dean Wroth is correct in his intuition that we will not be without a President, he is incorrect as a matter of text. The choice of President by the House of Representatives is not unconstrained, but is limited--to five persons by the original Constitution and now three persons by the Twelfth Amendment. If no states appoint electors and hence no electors vote, the House of Representatives could not elect a President (nor the Senate a Vice President).

In the case posited by Dean Wroth, however, it may be that under the original Constitution, the Presidential Succession Clause of Article II would kick in to ensure that we are not without a President.[475] This was the view of "Horatius" in a letter to the Washington Federalist on January 6, 1801--just five weeks before the troublesome election of then Vice-President Thomas Jefferson by the House of Representatives. In Horatius's view, the case of no election of President and Vice President by the electors fit squarely within the "removal" provision of the Presidential Succession Clause:

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    46

The words used here [in the Presidential Succession Clause] are comprehensive enough to embrace every vacancy, and if they are construed not to embrace the case of removal by virtue of the constitutional terms of the offices of President and Vice-President, they will not embrace the vacancy most probable to happen, while they are admitted to embrace vacancies that are very improbable.[476]  **\*1774**  We need not overly concern ourselves with the scope of "removal" in the Presidential Succession Clause because the Twentieth Amendment removes any ambiguity.[477] A critic would argue that this reading of the Presidential Succession Clause does not remove Congress from the business of electing the President when the states fail to fulfill their constitutional duties. Indeed, the Presidential Succession Clause explicitly invites Congress to legislate on the subject of presidential succession. However, under that clause, Congress specifies who shall act as President until a special, intervening presidential election, and not who is President as under the Electoral College Clauses. Moreover, prospective legislation under the Presidential Succession Clause--enacted behind a veil of ignorance well before any constitutional crisis--provides a much more legitimate solution than allowing the House of Representatives to choose the President based on the circumstances at hand, when party spirit is likely to govern the choice.

### e. The Pro-Electors Principle

Fifth, the Constitution trusts electors in the process of presidential election. More precisely, the Constitution trusts electors with the last word on the persons receiving votes--period. This is the pro-electors principle of presidential election. The Electoral Count Act is unconstitutional to the extent that the joint convention may reject electoral votes in authentic electoral certificates as not "regularly given."[478] In other words, the joint convention may not examine the contents of electoral certificates and reject electoral votes because of the persons receiving votes.

As a structural matter, the electoral colleges constitute a separate and coordinate branch of the Government of the United States[479] (although as an "architextural" matter,[480] the electoral colleges occupy textual space in Article II along with the executive branch of the Government of the United States). What gives Congress or the joint convention the authority to judge electoral votes?

 **\*1775**  The electoral colleges are inferior neither to Congress nor to the joint convention. The numbers suggest as much: the number of electors is equal to the number of Senators and Representatives.[481] As a separate and coordinate branch of government, the electors should have interpretive authority of the Constitution with respect to the powers committed to them.[482] The founding generation understood that electors would be among the most virtuous citizens of the Republic.[483] The electors in the electoral college "houses" do "meet" and deliberate like Members of Congress.[484] They probably  **\*1776**  enjoy the same privileges and immunities as Members of Congress, including immunity from arrest and freedom of speech and debate.[485]

Importantly, the electors also enjoy considerable structural independence from Congress. Electors receive no compensation from Congress for their federal service, nor has any Congress, to my knowledge, ever compensated electors for such service.[486] Electors are also not subject to impeachment by the House of Representative or conviction by the Senate because they are not "civil Officers of the United States."[487]

The structural coordinacy of electors and their structural independence is destroyed if Members of Congress may second-guess the electors' judgments. Unlike inferior courts whose decisions may be judged by the Supreme Court,[488] the electors are not inferior to the joint convention of Senators and Representatives and may not be judged by them. As Representative Randolph

APPENDIX - 253

put the point in 1821, "[T]he electoral college was as independent of Congress as Congress of them; and we have no right, said he, to judge of their proceedings."[489]

A simple counterfactual underscores the structural principles of coordinacy and independence. Imagine that the Framers gave Members of Congress, instead of electors, the choice of electing the President and Vice President. Would there be any question that Members of Congress would have the last word on the persons voted for in the presidential and vice presidential election? Would the Chief Justice of the United States refuse to administer the presidential oath or affirmation if the Members of Congress acted unconstitutionally? Would that matter?

 **\*1777**  There is considerable historical support for the pro-electors principle of presidential election. Senator Baldwin, in his remarks against the Grand Committee Bill in January of 1800, succinctly observed

> that the Constitution in directing Electors to be appointed throughout the United States equal to the whole number of the Senators and Representatives in Congress, for the express purpose of entrusting this Constitutional branch of power to them, had provided for the existence of as respectable a body as Congress, and in whom the Constitution on this business has more confidence than in Congress.[490]

Senator Baldwin's statement highlights two important points: in absolute terms, the Constitution trusts electors, and in relative terms, the Constitution trusts electors more than Members of Congress.

Senator Baldwin then posed a powerful counterfactual: What if the Constitution had provided that the electors meet at some central location instead of meeting in their respective states?[491] The answer was obvious--the electors, not some other body, would resolve the problems of the electoral count.[492] It therefore followed, according to Senator Baldwin, that the joint convention of Senators and Representatives had no additional power to judge electoral votes just because the electors meet in their respective states and not at some central location. He stated, "It having been deemed more safe by the Constitution to form them into different Electoral colleges, to be assembled in the several States, does not at all alter the nature or distinctness of their powers, or subject them any more to the control of the other departments of the Government."[493] In his closing remarks, he observed that:

> **\*1778**  [A]ll the questions which had been suggested were as safely left to the decision of the assemblies of Electors as of any body of men that could be devised; and that the members of the Senate and House of Representatives, when met together in one room, should receive the act of the Electors as they would the act of any other Constitutional branch of the Government, to judge only of its authentication, and then to proceed to count the votes, as directed in the second article of the Constitution.[494]

This statement underscores the critical distinction in the problems of the electoral count. The joint convention of Senators and Representatives should "judge only of [the] authentication" of the acts of electors (that is, their electoral certificates), but not judge the acts of electors (that is, their electoral votes).[495]

Senator Pinckney, in his lengthy speech against the Grand Committee Bill in March of 1800, elaborated on the pro-electors principle of presidential election in the specific context of the presidential ineligibility problem of the electoral count--that is, the elector who votes for a President who is not constitutionally qualified. He believed that virtuous electors simply would not vote for a President of doubtful constitutional qualifications given the "immense power" of the President.[496] If they did, however, he had a forcible answer:

APPENDIX - 254

It is true they, as well as any other Constitutional branch of this Government acting under that instrument, may be guilty of taking unconstitutional or corrupt steps, but they do it at their peril. Suppose either of the other branches of the Government, the Executive, or the Judiciary, or even Congress, should be guilty of taking steps which are unconstitutional, to whom is it submitted, or who has control over it, except by impeachment? The Constitution seems to have equal confidence in all the branches on their own proper ground, and for either to arrogate superiority, or a claim to greater confidence, shows them in  **\*1779**  particular to be unworthy of it, as it is in itself directly unconstitutional.[497]

In sum, in the process of presidential election, the Constitution trusts electors with the last word on the persons receiving votes. The joint convention does not sit in judgment of the acts of electors--that is, their electoral votes. At a minimum, the point is a relative one: the Constitution trusts electors more than Members of Congress. It is thus unconstitutional for the joint convention to reject electoral votes contained in authentic electoral certificates--even when those electoral votes are unconstitutional.

## 2. Principles of Rule-Making and Law-Making

The Electoral Count Act violates two critical structural principles of our Constitution: the anti-binding principle of rule-making and the Chadha principle of law-making. These structural arguments create a rather compelling case that the Electoral Count Act is unconstitutional.

### a. The Anti-Binding Principle of Rule-Making

The anti-binding principle of rule-making prevents one Congress from binding another with respect to the rules of proceedings.[498] Moreover, one Congress cannot bind each House of Congress in a current Congress (let alone that of future Congresses) with respect to the rules of proceedings. Article I, Section 5, Clause 2 expressly reflects this principle by providing that "[e]ach House may determine  **\*1780**  the Rules of its Proceedings."[499] Indeed, as a formal matter, the rules of proceedings in the House of Representatives expire at the end of the term of each House and are re-enacted by the next House.[500] (In contrast, the rules of proceedings in the Senate do not expire because the Senate is a continuing body.[501])

The Electoral Count Act clearly violates the anti-binding principle of rule-making. The Electoral Count Act is a law of proceeding for the electoral count, not a rule of proceeding like the Twenty-second Joint Rule.[502] As such, the Electoral Count Act  **\*1781**  impermissibly binds the actions of future joint conventions. During the Electoral Count Act debates, Members of Congress naturally recognized that the Electoral Count Act would be used to bind the actions of future joint conventions by settling questions of counting electoral votes in advance.[503] Indeed, in describing Congress's motivation in passing the Electoral Count Act, Professors Issacharoff, Karlan, and Pildes state that "Congress needed a binding rule, because the previous approach of counting electoral votes under a joint procedural rule that could be revoked by either house had led to the rule being revoked whenever one house disapproved of the results it would produce."[504]

Two sections of the Electoral Count Act--3 U.S.C. §§ 5 and 15-- impermissibly bind (or purport to bind) the joint convention in counting electoral votes. The former section, the one at issue in Bush v. Gore, provides:

If any State shall have provided, by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such State, by judicial or other methods or procedures, and such determination shall have been made at least six days before the time fixed for the meeting of the electors, such determination made pursuant to such law so existing

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

on said day, and made at least six days prior to said time of meeting of the electors, shall be conclusive, and shall govern in the counting of the electoral votes as provided in the Constitution, and as hereinafter regulated, so far as the ascertainment of the electors appointed by such State is concerned.[505]

The latter section, as we have seen, binds the joint conventions with an intricate set of rules for counting electoral votes.[506] This **\*1782** section binds the joint conventions with even the most minor of rules, including a rule that "certificates and papers shall be opened, presented, and acted upon in the alphabetical order of the States, beginning with the letter A."[507] Thus, unless the Electoral Count Act is repealed or amended, future joint conventions could not proceed with counting electoral votes in reverse alphabetical order of states in the Union without acting illegally.

Two constitutional problems should be apparent. First, Congress might not have the authority to determine the rules of proceedings for its joint convention. The joint convention is decidedly not Congress, but a distinct parliamentary body with constitutionally-assigned functions.[508] Indeed, under our Constitution, Congress may not even determine the rules of proceedings of the House of Representatives or the Senate.[509] It would seem to follow that the joint convention has the constitutional prerogative to determine the rules of its proceedings when it meets once every four years. Second, even if Congress may bind its joint convention, Congress may not bind the joint convention of future Congresses in the exercise of constitutionally-assigned functions.

The anti-binding principle of rule-making should be a conclusive structural argument that the Electoral Count Act is unconstitutional. It is a formalist argument, however, and undoubtedly will be criticized as such.

Consider the writings of one of our leading constitutional scholars on the very question of the anti-binding principle, and in the very context of counting electoral votes. Professor Amar, in an essay on presidential succession originally prepared and submitted as testimony before the Senate Judiciary Subcommittee on the Constitution on February 2, 1994, recommended that "Congress should provide by statute that an electoral vote for any person who is dead at the time of the congressional counting is a valid vote, and will be counted, so long as the death occurred on or after Election Day."[510] Recall the Greeley incident of 1872[511]--the specific case that **\*1783** Professor Amar sought to remedy by statute.[512] To be sure, Professor Amar defended his proposal against the formalist argument of the anti-binding principle of rule-making:

> Spoilsports might argue that, strictly speaking, any legislation passed today could not conclusively bind a future result-oriented Congress, which would be free to replace the earlier law after [President-elect] Smith's death but before the official vote counting in Congress. (One Congress cannot generally bind a successor Congress.) And worrywarts might fret over whether our proposed legislation should be enacted as a law rather than a joint or concurrent resolution, since it seeks to regulate how votes will be counted in Congress itself. (Sections 15 through 18 of Title 3, however, do provide a clear precedent for regulating congressional vote-counting by law.) The spoilsports and worrywarts largely miss the point. The key function of our proposed legislation is to serve as a precommitment and focal point. With our proposed legislation on the books, it will be much more difficult, politically, for a future result-oriented Congress to change the rules and discount the votes for Smith. The principled precedent will be our legislation, not the Greeley affair. Citizens, pundits, reporters, and politicians will be able to point to the plain language, in black and white, in the United States Code, answering the question of the hour. Any deviation from this clear focal point will obviously smack of changing the rules in the middle of the game--indeed, after the game has ended.[513]

APPENDIX - 256

Call me a worrywart, but not a spoilsport. Indeed, if we are to "take text and structure seriously" and not follow "free-form" methods of constitutional interpretation,[514] call me a worrywart again. Professor Amar's statement leaves little doubt that the Electoral Count Act is formally unconstitutional. But does worrywart formalism make the Electoral Count Act any less unconstitutional? **1784** Is the Electoral Count Act a "law" that only has political but not legal force?

More recently, the anti-binding problem of rule-making is coming to the fore in the burgeoning literature on Bush v. Gore. Scholars from both sides of the political aisle have taken notice of the point (at least in passing) in their discussions of 3 U.S.C. § 5, the so-called "safe harbor" provision. In an article published after the case, Professor Tribe, a member of Vice President Gore's legal team, states, "There is no constitutionally prescribed method by which one Congress may require a future Congress to interpret or discharge a constitutional responsibility in any particular way."[515] And in a very brief discussion of 3 U.S.C. § 15, he states, "It is true that even that procedure, untested in the 114 years during which it has been in place, was shadowed by constitutional doubt over the power of one Congress to bind its successors in such matters."[516]

Likewise, in a forthcoming article, Professor Lund, a defender of Bush v. Gore and a proponent of Bush- pere states:

> This statute, 3 U.S.C. § 5, purports to bind Congress in exercising its constitutional duty to count electoral votes. I doubt that this can constitutionally be accomplished by a statute. Each house of Congress has the authority to determine its own rules of proceeding, and it is far from clear that a statute can override that authority. But even if 3 U.S.C. § 5 is unconstitutional in this sense, that has no bearing on the legal issues that arose in Bush v. Gore.[517]

Not surprisingly, the anti-binding principle of rule-making featured prominently in the Electoral Count Act debates. Several Senators made the point that Congress cannot bind the joint convention,[518] and that even if Congress could bind its joint **1785** convention, Congress cannot bind future joint conventions. Senator Hager put the latter point best. The counting of electoral votes was a self-executing constitutional duty, and according to Senator Hager, "[W]e cannot here establish a rule by which we dictate to another Congress how they shall perform a constitutional duty."[519] He believed that neither the Twenty-second Joint Rule nor the Electoral Count Act would have "any binding force upon the Congress that must act in this matter under the Constitution."[520] He colorfully continued:

> Can you say, sir, that you may limit your powers or add to them by any legislation here? Can you bind your successors in any matter of constitutional legislation? Turn to the powers that Congress has. Congress may "lay and collect taxes, duties, imposts, and excises." You might just as well undertake to pass a law here pointing out how Congress shall levy taxes and imposts, as to undertake to regulate them in the performance of a constitutional duty in regard to this matter. As well might one supreme court undertake to bind their successors as for one Congress to undertake to bind their successors. It cannot be done either by legislation or by any rule that you may see fit to adopt. I admit that there is an imperfection in this part of the Constitution as to how the joint body when assembled together shall proceed to act and determine the result of the election. But as the duty is imposed upon the Senate and the House of Representatives it is for them and each body that is called upon to act in that capacity to regulate rules for themselves.[521]

Thus, the joint convention was to determine the rules of its own proceedings. But Senator Hager advanced a fallback position. He reluctantly admitted that Congress could regulate the proceedings of its own joint convention by law, but strenuously maintained that Congress could not regulate the proceedings of future joint conventions. He stated:

> **1786** I admit we could pass a law here to regulate the election if we were to act in the matter. If we were to meet next week to count the electoral vote we could by the concurrence of both houses pass a law to regulate

APPENDIX - 257

our action in the matter; but we cannot, I say, pass a law to regulate the action of a future House or future Senate when they meet to perform a constitutional duty.[522]

Senator Hager thus concluded that the Electoral Count Act bill "will be clearly unconstitutional."[523] Other Members of Congress made similar statements.[524]

 **\*1787**  In sum, the Electoral Count Act violates the anti-binding rule of rule-making because it is a law and not a rule. Ironically, the Electoral Count Act would be closer to constitutionality if it were a rule like the Twenty-second Joint Rule. If, however, the Electoral Count Act were repealed and readopted as a joint rule, the constitutional problem would remain whether Congress may bind the joint convention. Constitutional structure strongly suggests that the joint convention has the constitutional prerogative of determining the rules of its own proceedings.[525]

### b. The Chadha Principle of Law-Making

The Electoral Count Act's requirement that the two Houses of Congress concur in rejecting electoral votes in the single return case and to accept electoral votes in the multiple returns case is strange and complicated.[526] This requirement is by design-- recall that one purpose of the Electoral Count Act was to eliminate the "one House veto" of the Twenty-Second Joint Rule. Senator Morton, the original sponsor of what was to become the Electoral Count Act, stated,

> If we are to have a rule at all, if Congress is to interfere, let it be upon the ground on which a law is passed or a resolution is passed. It requires the vote of the two houses to pass a law, no matter how small or unimportant that law may be.[527]  **\*1788**  Ironically, the concurrence of the two Houses raises significant constitutional problems. Consider one of the most important structural features of Article I:

> Every Order, Resolution, or Vote, to Which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two[-]thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill.[528]

When the two Houses of Congress concur in rejecting or accepting electoral votes, the vote is not presented to the President-- and, as we have seen, for good reason.[529] The question is whether this lack of presentment is constitutional.

Scholars who have addressed this presentment problem in the wake of INS v. Chadha[530] have doubted the existence of a presentment problem in the Electoral Count Act because the concurrent action of the two Houses in counting electoral votes is not legislative in nature.[531] Clearly, the counting of the electoral votes is not legislative in nature.[532] However, this conclusion does not dispose  **\*1789**  of the Chadha problem. Contrary to what Professor Ross and Mr. Josephson have suggested, the Presentment Clause is not solely about legislative action.[533]

The text of the Presentment Clause itself suggests as much. The single exception identified in the clause--"except on a question of Adjournment"[534]--is not legislative but procedural in nature. If the Presentment Clause is only about legislative action, why

APPENDIX - 258

does the clause specify this non-legislative exception?[535] There are at least two other exceptions to presentment in the non-legislative context, each with a strong justification. Presentment is not required when Congress proposes amendments to the Constitution under Article V,[536] or when Congress removes an office-holding disability under Section 3 of the Fourteenth Amendment because, in each case, the two-thirds vote requirement is precisely that needed to override a **\*1790** presidential veto under the second part of the Presentment Clause.[537] Clearly, the Electoral Count Act lacks this justification: a simple majority vote of each House is sufficient to reject an electoral vote. Moreover, the Impeachment Clauses furnish an important background lesson. Impeachment is a paradigmatic non-legislative activity and presentment in case of impeachment would be silly--much like the case of counting electoral votes. The impeachment powers are finely wrought and intended to avoid concurrent action of the two Houses: only the House may institute an impeachment;[538] only the Senate may try one;[539] and a two-thirds super-majority of Senators is required for a conviction of impeachment.[540]

This presentment problem was raised at least once during the Electoral Count Act debates as an argument against its constitutionality. Senator George called the presentment problem a "conclusive objection" to separate action of the two Houses.[541] "[I]t is impossible," said Senator George, "to escape from the express language of the Constitution that 'every order,' not every bill, not every act, not every statute, but every 'order,' every 'resolution,' every 'vote,' in the language of the Constitution, to which the concurrence of the two Houses is necessary, shall be presented to the President for his signature."[542] Senator Hoar responded that the Presentment Clause only related to legislative matters.[543]

  **\*1791**  A close reading of Chadha, unavailable of course to the participants in the Electoral Count Act debates, fortifies the basic argument made by Senator George and casts further doubt upon the constitutionality of the Electoral Count Act. The Chadha Court carefully explained why the "one-House veto" provision of the Immigration and Nationality Act was subject to the requirements of bicameralism and presentment in Article I.[544] The Court began by noting that "[w]hether actions taken by either House are, in law and fact, an exercise of legislative power depends not on their form but upon 'whether they contain matter which is properly to be regarded as legislative in its character and effect."[545] The Court then described the one-House veto provision in that case as one that "had the purpose and effect of altering the legal rights, duties and relations of persons, including the Attorney General, Executive Branch officials and Chadha, all outside the legislative branch,"[546] which was the first of a series of four arguments in the Court's conclusion that the provision was subject to the bicameralism and presentment requirements of Article I.[547]

The counting (and not counting) of electoral votes by a simple majority of the two Houses of Congress, acting separately and concurrently, sounds like an action that has "the purpose and effect of altering the legal rights, duties and relations of persons . . . outside the legislative branch,"[548] if there ever was one. This bicameral procedure in counting electoral votes would therefore require presentment. Even if the counting of electoral votes is more properly described in the first instance as a "judicial act," this conclusion would not be changed under the Chadha Court's conception of legislative power.[549] If the Electoral Colleges Clauses require (or permit) bicameralism but not presentment in counting electoral votes, the Court simply did not mention it.[550]

  **\*1792**  Furthermore, if the two-House veto provision of the Electoral Commission of the Hayes-Tilden Incident of 1877--which enabled the two Houses of Congress to overturn the findings of that commission without presentment--is constitutionally problematic under Chadha[551] as Professor Tribe has recently suggested,[552] it would surely seem to follow that the two-House veto provision of the Electoral Count Act--which enables the two Houses of Congress to overturn the "findings" of electors without presentment--is equally if not more constitutionally problematic under Chadha.[553]

We must interpret exceptions to the Presentment Clause faithfully. The word "every" in the Presentment Clause means every and not some. Under our Constitution, there is no other instance where a simple majority of both Houses of Congress may affect the legal rights, duties, and relations of persons outside the legislative branch without presentment to the President. There

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

is no textual or structural reason why the counting function of the Electoral College Clauses should constitute an exception to this important constitutional rule, especially when the stakes are an entire branch of government. The bicameral procedure for counting electoral votes in the Electoral Count Act is unconstitutional under the Chadha principle of law-making.

There is, however, a solution to the presentment problem in counting electoral votes: the unicameralism principle avoids the **\*1793** presentment's problem entirely. The Presentment Clause cannot be said to apply to the joint convention of Senators and Representatives assembled for the purpose of the electoral count, where neither the Senate nor the House of Representatives acts in their corporate capacity.

### 3. Conclusions

The structural argument reveals that the Electoral Count Act is unconstitutional, at least it if it is anything more than merely precatory. As a prima facie matter, the Electoral Count Act, to the extent that it is a law that has legal force, clearly violates the anti-binding principle of rule-making. This is perhaps the strongest structural argument against the constitutionality of the Electoral Count Act. In addition, the Electoral Count Act is also unconstitutional in its potential operation in counting electoral votes. The bicameral procedure of 3 U.S.C. § 15 violates the anti-Senate principle of presidential election, the Chadha principle of law-making, and the anti-President principle of presidential election. Finally, to the extent that the joint convention rejects electoral votes contained in authentic electoral certificates as not "regularly given,"[554] the Electoral Count Act violates the anti-Congress principle of presidential election, the pro-states and pro-state legislatures principle of presidential election, and the pro-electors principle of presidential election.

### III. What Should We Do if Electors Go Bananas?

Assume that the Electoral Count Act is unconstitutional as argued in Part II. What happens if electors go bananas and vote for Professor Paulsen's dog, Gus, as President?[555] What happens if electors go bananas and also vote for Dean Ely's dog, Portland, as Vice President?[556] To make things even worse, suppose there is a case of double (or more) such returns from the same state?

**\*1794** The Electoral Count Act sounds like a good statutory scheme to deal with these and less preposterous problems, but needless to say, not every good statutory scheme is a constitutional one.[557] An argument that the Electoral Count Act is unconstitutional may (sadly) not be enough. The critic would argue that we deserve to know what should happen when inauthentic electoral certificates are transmitted to the seat of government, or when authentic electoral certificates containing unconstitutional or faithless electoral votes are transmitted to the same. Of course, with or without the Electoral Count Act, the potential problems of the electoral count remain.

This Part seeks to placate the critic and provide answers to these questions. This Part proceeds in three sections. The first section addresses the paradigm problems of the electoral count and provides (or at least suggests) answers in the absence of the Electoral Count Act. As we shall see, the Electoral Count Act is not necessary to address any of the potential problems of the electoral count that may arise because the Constitution itself (implicitly) provides answers (however undesirable they may be). The second section argues that the Twentieth Amendment, adopted in 1933, provides a constitutional solution to the thorniest problem of the electoral count--the problem of presidential or vice presidential ineligibility. Given the Twentieth Amendment, the Electoral Count Act is not needed to address this potential problem of the electoral count. Finally, the third section considers where we should go from here in revising the current statutory scheme, assuming that some statutory scheme relating to counting electoral votes would be constitutional.

**\*1795  A. Answers to the Paradigm Problems of the Electoral Count**

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    54

In Part I, we examined the paradigm problems of the electoral count as experienced in the electoral counts in the history of our Republic. It is now time to provide (or at least suggest) some answers. The paradigm problems fall easily into two categories: (1) problems relating to the electoral certificate, and (2) problems relating to the electoral vote. The paradigm problems within each category are not of equal difficulty. Let us consider the paradigm problems in some rough order of increasing difficulty within each category.

### 1. The Problems of the Electoral Certificate

The problems of the electoral certificate share two distinguishing characteristics. First, they are antecedent to the problems of the electoral vote. Second, they, as a prima facie matter, do not require any knowledge of the persons receiving votes, and may therefore be resolved without ever looking at the names of the persons receiving votes. In sum, the problems of the electoral certificate relate to judging the authenticity or validity of the acts of electors, whereas the problems of the electoral vote relate to judging the acts of electors--that is, their electoral votes.

#### a. The Unsigned, Uncertified, or Unsealed Electoral Certificate Problem

A first problem of the electoral certificate relates to the three simple elements of the electoral certificate that attest to its authenticity. Suppose a state should transmit an electoral certificate to the seat of government that is not (i) signed, (ii) certified, and (iii) sealed. The result would be that the joint convention must not count the electoral votes in this electoral certificate.

The relevant clause of the Twelfth Amendment provides that "[the Electors] shall sign and certify, and transmit sealed to the seat of government of the United States, directed to the President of the Senate"[558] the electoral certificate. Under even the "thinnest" conception of the counting function, the joint convention must judge the authenticity of the electoral certificate, distinguishing between what is merely the legal equivalent of a Publishers Clearinghouse sweepstakes entry and what is a bona fide electoral certificate. Indeed, the word "certify" in the Twelfth Amendment is a signal of **\*1796** legal significance.[559] The rejection of inauthentic electoral certificates preserves authenticity in the process of presidential election. The Electoral College Clauses contain an authenticity principle for good reason: authenticity is the principal safeguard to the risk of cabal and corruption in the election of the President.[560]

#### b. The Puerto Rico, or Unrepublican State, Electoral Certificate Problem

A second problem of the electoral certificate relates to the authenticity of its sender. Suppose Puerto Rico should transmit an electoral certificate to the seat of government. Or suppose that an unrepublican State should transmit an electoral certificate to the seat of government.[561] Obviously, the result would be that the joint convention must not count the electoral votes contained in this electoral certificate.

The Constitution makes clear that only states and the District of Columbia are entitled to appoint electors,[562] and are thereby entitled to transmit electoral certificates. The political branches of the federal government have the right to recognize states in the Union.[563]

**\*1797** We have seen this problem before as well as its resolution. The Thirty-eighth Congress resolved not to count the electoral votes from eleven Southern States.[564] When Congress sent the resolution to President Lincoln for his signature, he replied in the third person:

> The joint resolution entitled "Joint resolution declaring certain States not entitled to representation in the electoral college" has been signed by the Executive in deference to the view of Congress implied in its passage and presentation to him. In his own view, however, the two Houses of Congress, convened under the twelfth article of

APPENDIX - 261

the Constitution, have complete power to exclude from counting all electoral votes deemed by them to be illegal; and it is not competent for the Executive to defeat or obstruct that power by a veto, as would be the case if his action were at all essential in the matter. He disclaims all right of the Executive to interfere in any way in the matter of canvassing or counting electoral votes, and he also disclaims that, by signing said resolution, he has expressed any opinion on the recitals of the preamble or any judgment of his own upon the subject of the resolution.[565]

President Lincoln's reply suggests that Congress's power not to count electoral votes is quite broad, but we should be careful not to take it out of context of the Northerners' (Republicans') exclusion of Southern senators, representatives, and electors pursuant to the Guarantee Clause of Article IV, Section 4.

### c. The Number of Electoral Votes Problem

A third problem of the electoral certificate relates to the aggregate number of electoral votes in the electoral certificate. Suppose a state should transmit an electoral certificate to the seat of government that contains more electoral votes than the number of electors to which that state is then entitled.[566] During the Electoral Count Act debates, Senator Frelinghuysen distinctly noted this possibility that "[a] State may claim a larger representation than has been assigned her and may appoint more electors than she is entitled **\*1798** to, and all their votes may be returned."[567] His answer was clear: "[I]f a State should send as votes a larger number than it was entitled to . . . it would be a direct violation of the Constitution and an act of revolution for any one to count them."[568] The result would be that the joint convention must not count the electoral votes in this electoral certificate.[569]

Translated into a counterfactual: Suppose Florida's electoral certificate on January 6, 2001 contained twenty-six votes instead of the twenty-five votes to which Florida was then entitled. The State of Florida would be disenfranchised in the presidential election.

It may be tempting to conclude that the joint convention must exclude one of the twenty-six votes, but which one? Must they exclude a randomly selected vote? It hardly seems more constitutional to exclude a randomly selected vote than to exclude all votes. What about a particular vote? In order to exclude a particular vote, the resolution of this problem would require knowledge of the persons voted for, thereby transforming a problem of the electoral certificate (a problem of judging the authenticity of the acts of electors) into a problem of the electoral vote (a problem of judging the acts of electors). And which vote would be excluded? There is no constitutional requirement that all electoral votes in an electoral certificate must be given for the same person.[570] The joint convention may not exclude a particular electoral vote without affirmatively voting against a person voted for--an action that goes well beyond judging the authenticity of the acts of electors.

### *1799  d. The Multiple Electoral Certificates Problem

A fourth problem of the electoral certificate relates to the aggregate number of electoral certificates (returns) from a putative state. Suppose two or more sets of electors from the same state should transmit an electoral certificate to the seat of government. Recall the Hayes-Tilden Incident of 1877.[571] One and only one of the following two propositions must be true as a matter of logic: (1) one of the electoral certificates is authentic and all others are not; or (2) none of the electoral certificates are authentic. Needless to say, the result would be that all of the electoral votes contained in the authentic electoral certificate must be counted and all of the electoral votes contained in the inauthentic electoral certificates must not be counted.

The multiple returns problem may seem complicated, but it is not analytically different from the Puerto Rico problem of the electoral certificate. The authentic electoral certificate (if any) is one from the state; the others, insofar as the Constitution is concerned, are merely legally equivalent to Publishers Clearinghouse sweepstakes entries transmitted to the seat of government

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

by non-states. If multiple state authorities should claim to be the lawful authority of a state, the joint convention must choose which state government is the lawful one, but, importantly, this choice is no more difficult than the choice (previously) made by each House in deciding to seat Members of Congress from a putative state, or the choice made by the President when she sends in the troops under the Guarantee Clause to protect one of multiple authorities that request the interposition of military force.[572] Most importantly, the multiple returns problem is one of the electoral certificate and not of the electoral vote and should be treated as such. The joint convention should be able to determine which electoral certificate contains the legitimate set of electors without examining the names of the persons receiving votes.

### e. The Misdated Electoral Certificate Problem

A fifth problem of the electoral certificate relates to its date. Suppose a state should transmit an electoral certificate to the seat of government that contains electoral votes given on a day different  **\*1800**  from that specified by federal law for the giving of electoral votes.[573] Recall the Wisconsin Incident of 1857[574] and the Hawaii Incident of 1961.[575] The result would be that the votes contained in this certificate must not be counted by the joint convention, except perhaps in one narrow circumstance to be discussed shortly.

Article II, Section 1, Clause 4 provides that "[t]he Congress may determine the Time of chusing the electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States."[576] This is a rule, inasmuch as the Constitution's requirement that the President be thirty-five years of age upon entering office is a rule;[577] this is not a standard. It may be tempting to conclude that the joint convention could exercise discretion as to whether to count electoral votes given on a day different from that specified by federal law, especially in cases of force majeure such as the Wisconsin Incident of 1857. Indeed, the Constitution, to the extent that it is to be interpreted against the background of the common law, might recognize an exception for force majeure.[578] This one narrow circumstance aside, however, the language of the Constitution is unmistakably clear--adherence to the date chosen is mandatory. More importantly, the requirement that electoral votes be given on the same day throughout the Union is a particularly important part of the authenticity principle of the Electoral College Clauses.[579] The joint convention has the duty to support the  **\*1801**  authenticity principle of the Electoral College Clauses, not the power to exercise its discretion in the matter.

Translated into the past: Wisconsin's electoral votes in 1857 (perhaps) should not have been counted and Hawaii's electoral votes in 1961 should not have been counted. Translated into a counterfactual: Florida's electoral votes in 2001-- if given on a day other than December 18, 2000--should not have been counted,[580] though Justice Ginsburg in Bush v. Gore implied otherwise.[581]

### \*1802  f. The Elector Ineligibility Problem

A sixth problem of the electoral certificate relates to the qualifications of the electors. Suppose that an electoral vote is given by an elector who is constitutionally ineligible to the office of elector.[582] Recall the Postmaster Incident of 1837.[583] The result would be that the votes of an elector who is constitutionally ineligible to hold the office of elector must be counted.

The joint convention may not judge the manner of appointment or qualifications of electors.[584] Once the vote of a constitutionally ineligible elector is transmitted in the electoral certificate, that vote is final and must be counted. A congressional analogy is illuminating. Imagine that a Representative-elect does not meet the constitutional qualifications prescribed by the House Qualifications Clause.[585] The Representative is seated, performs legislative business, and is only subsequently expelled from the House. Are the votes of this Representative any less valid?[586]

APPENDIX - 263

Most importantly, the elector ineligibility problem is impossible to resolve without knowing the persons voted for and the joint convention may not judge the acts of electors. In particular, the votes of a constitutionally-ineligible elector must be counted because of the anonymity principle of the Electoral College Clauses.

The Electoral College Clauses protect the anonymity of electors in two important ways: (i) voting in the Electoral Colleges shall be by ballot, and (ii) the electoral certificate shall contain lists of the  **\*1803**  persons voted for, signed and certified by the electors as a whole.[587] The votes of individual electors are not to be known in order to preserve the independence of the electors and the President. Senator Pinckney put these points brilliantly in the specific context of the elector ineligibility problem:

> [H]ow are [sic] Congress . . . to proceed to find how these unduly or disqualified Electors voted, particularly if they should belong to a State having a number of Electors? As the Constitution directs they are to vote by ballot, the votes of the election ought to be secret. You have no right to require from an Elector how he voted, nor will you be able to know for whom he did vote, particularly if in the return from that State different candidates have been voted for. In this dilemma, I ask, what is to be done? You cannot discover for whom this disqualified or improperly returned Elector voted; and you would not certainly, in a State having sixteen or twenty-one votes, reject the whole, because one or two illegal votes have been supposed to be given.[588]

Of course, it is possible to determine the persons voted for by a constitutionally-ineligible elector in a case of mathematical certainty--when all of the electoral votes for President or Vice President are given for the same person. But, as we have seen, there is no constitutional requirement that all electoral votes must be given for the same person.[589] A non-constitutional common practice of "winner-take-all" voting in the electoral colleges that makes mathematical certainty the norm and not the exception does not change the answer to this constitutional question.

### \*1804  2. The Problems of the Electoral Vote

The problems of the electoral vote share two distinguishing characteristics: they are problems subsequent to the problems of the electoral certificate and they require knowledge of the persons for whom the votes are cast. These problems relate to judging the acts of electors.

### a. The Faithless Elector Problem

Suppose that an electoral vote is faithless--that is, in contravention of the known popular vote. Recall the Bailey Incident of 1969.[590] The result would be that the votes of faithless electors must be counted.

Again, the joint convention may not judge the acts of electors. Moreover, there is no constitutional requirement of faithfulness.[591] Frankly, it is shameful that 174 Representatives (including future Presidents George H.W. Bush and Gerald R. Ford) and thirty-three Senators who took an oath or affirmation to support the Constitution voted not to count Dr. Bailey's faithless vote. The answer to the faithless elector problem does not depend on whether state laws purporting to bind electors to vote in accordance with the popular vote are constitutional.[592] Once the faithless vote is transmitted in the electoral certificate, that vote is final and must be counted.

### \*1805  b. The Presidential or Vice Presidential Ineligibility Problem

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    58

Suppose that an electoral vote is for a dead person--that is, in violation of the Presidential or Vice Presidential Eligibility Clauses.[593] Recall the Greeley incident of 1873.[594] The result would be that the votes for a dead presidential or vice presidential candidate must be counted.[595]

The joint convention may not judge the acts of electors. This answer applies with equal force to the other qualifications of the Presidential and Vice Presidential Eligibility Clauses--natural born citizen, thirty-five years of age, and fourteen years a resident within the United States.[596] The presidential or vice presidential ineligibility problem is perhaps the thorniest problem of the electoral count.

### c. The Inhabitants of the Same State Problem

Suppose that an elector votes for inhabitants of her state for both President and Vice President--that is, in violation of the Twelfth Amendment.[597] This is the hypothetical Bush-Bentsen problem--recall that Republican Vice President George H.W. Bush and Democrat Senator Lloyd Bentsen were both inhabitants of the State of Texas in the presidential election of 1988.[598] The Bush-Bentsen  **\*1806**  problem appears to have actually occurred once in our history--in the presidential election of 1872--but was discovered too late in the electoral count for any debate.[599] During the Wisconsin Incident of 1857, Representative Humphrey Marshall pointed to the Bush-Bentsen problem as the paradigm case for congressional power to exclude unconstitutional electoral votes. The Bush-Bentsen problem is undoubtedly the least discussed problem of the electoral count in the Electoral Count Act debates or in the legal academy, and yet the trickiest problem of all.

There are only four possible answers for the joint convention to deal with the Bush-Bentsen problem during the electoral count: (1) count both votes, (2) reject both votes, (3) count the vote for President and reject the vote for Vice President, or (4) count the vote for Vice President and reject the vote for President. It is not at all difficult to winnow the set of answers by eliminating answer number four--the Office of President is simply more important than the Office of Vice President.[600] This argument, however, would have been impossible before the adoption of the Twelfth Amendment which requires electors to cast "distinct ballots" for President and Vice President and to prepare "distinct lists" of the persons voted for as President and Vice President.[601] Assuming that the Twelfth Amendment did not expand the range of possible answers to the Bush-Bentsen problem, we may further winnow the set of answers by eliminating answer number three. This leaves us with the rather  **\*1807** binary choice of counting both electoral votes for Bush and Bentsen or rejecting both electoral votes for Bush and Bentsen. Which is the correct answer?

The Bush-Bentsen problem is not different in kind than the other two problems of the electoral vote. The joint convention must count both votes for Bush and Bentsen. The joint convention may not judge the acts of electors--period. There are two additional points to consider. First, the anonymity principle of the Electoral College Clauses indicates that the Bush-Bentsen problem is uniquely directed to electors, not to the joint convention.[602] It would be impossible for the joint convention to even detect the Bush-Bentsen problem, except in rarest cases of mathematical certainty. Second, the Presidential and Vice Presidential Eligibility Clauses do not require that the President and Vice President be inhabitants of different states. The command of the Electoral College Clauses is violated the moment a Texas elector votes for both Bush and Bentsen, but the Presidential and Vice Presidential Eligibility Clauses are not violated if Bush becomes President and Bentsen becomes Vice President. We might therefore think about the Bush-Bentsen problem in a broader context, just as we might think about presidential impeachment in a broader context.[603] The command of the Electoral College Clauses probably was inserted to enhance the legitimacy of presidential election by lessening the probability that the ultimate choice would be made by the House of Representatives, but the Framers thought that most presidential elections would be decided by the House anyway.[604]

**\*1808  3. Conclusions**

What shall we make of this rearrangement of the deck chairs on the Titanic? The problems of the electoral certificate relate to judging the authenticity of the acts of electors, whereas the problems of the electoral vote relate to judging the acts of electors. The Constitution trusts the joint convention to do the former, but not the latter.

The counting function inherently requires some sort of a rule of recognition for deciding what is to be counted and what is not (this is the "thinnest" conception of judging). The President of the Senate receives a lot of mail, and the joint convention must be able to decide what mail contains an authentic electoral certificate and must be counted, and what mail contains the legal equivalent of a Publishers Clearinghouse sweepstakes entry and must be discarded. The Constitution specifies the criteria for authenticity and trusts the joint convention to judge the authenticity of the acts of electors. Moreover, the problems of the electoral certificate may be resolved without any knowledge of the persons receiving votes. We should therefore be less suspicious of undue interference or manipulation by the joint convention because the joint convention could (and should) be behind a veil of ignorance as to the problems of authenticity of the acts of electors.

The problems of the electoral vote are of a fundamentally different order. The rule of recognition does not address these problems which require knowledge of the persons voted for in the presidential election in order to be solved. The threat of undue interference or manipulation by the joint convention is hence more pressing. The Constitution does not trust the joint convention to judge the acts of electors, but plainly contemplates that the electors shall have the last word on who shall receive votes.

## B. The Twentieth Amendment

Although the joint convention may not solve problems of the electoral vote, we are not resigned to the possibility of unconstitutional Presidents or Vice Presidents (if electors do truly go bananas). It turns out that We the People remedied (without really knowing it) the thorniest problem of the electoral count--the **\*1809** presidential or vice presidential ineligibility problem-- with the adoption of the Twentieth Amendment in 1933. Section 3 of that amendment provides:

> If, at the time fixed for the beginning of the term of the President, the President elect shall have died, the Vice President elect shall become President. If a President shall not have been chosen before the time fixed for the beginning of his term, or if the President elect shall have failed to qualify, then the Vice President elect shall act as President until a President shall have qualified; and the Congress may by law provide for the case wherein neither a President elect nor a Vice President elect shall have qualified, declaring who shall then act as President, or the manner in which one who is to act shall be selected, and such person shall act accordingly until a President or Vice President shall have qualified.[605]

Section 3 contains a "textually demonstrable commitment"[606] of power to Congress to remedy the situation when electors go bananas: "Congress may by law provide for the case wherein neither a President elect nor a Vice President elect shall have qualified . . . ."[607] The text of this section of the Twentieth Amendment does not declare who decides whether the President-elect or Vice President-elect have failed to qualify or when they shall have qualified. Constitutional structure strongly suggests that neither the President nor Congress makes these determinations.[608] These determinations seem very much like judicial ones subject to the province of the judicial department.[609] These determinations are surely no less **\*1810** justiciable than deciding whether a Representative-elect has met all of the qualifications set forth in Article I, Section 2, Clause 2.[610]

The Twentieth Amendment provides a constitutional solution to the presidential or vice presidential ineligibility problem of the electoral vote. The Twentieth Amendment guarantees that we will not be without a constitutionally-qualified President when electors go bananas.[611] What does the Twentieth Amendment mean for the counting of electoral votes? The Twentieth Amendment "preempts" the joint convention in judging the acts of electors. The joint convention must count electoral votes contained in authentic electoral certificates.

APPENDIX - 266

There is an important difference between the constitutional solution provided by the Twentieth Amendment and any rough-and-ready solution that may be provided by the joint convention. Take a much less silly case than Professor Paulsen's Gus-the-Dog hypothetical.[612] Imagine that in the next presidential election a majority of the whole number of electors appointed vote for presidential candidate Smith. Smith is exactly thirty-four years of age as of noon on January 20, 2005, the date fixed by the Constitution for the beginning of the next presidential term,[613] and is therefore not constitutionally-qualified to be President.[614] If the joint convention rejected these electoral votes for thirty-four year old Smith as not "regularly given," the joint convention would trigger a contingency election in the House of Representatives, and Smith would be excluded from the Office of President for the next four years. But if these unconstitutional electoral votes were counted, then Smith's running-mate (who we will assume is constitutionally-qualified to be Vice President) would simply act as President, until Smith shall have qualified for the Office of President on January 20, 2006. To be sure, **\*1811** this hypothetical situation could never apply to the cases when electors really go bananas--when they vote for dead persons or law professors' dogs as President or Vice President. The important point for present purposes is that the joint convention must count electoral votes contained in authentic electoral certificates because the Twentieth Amendment carefully prescribes the result when the electors shall have made an unconstitutional choice.

## C. Revising the Electoral Count Act

Assume that Congress may by law bind the joint convention and future joint conventions in counting electoral votes, and that Congress has the font of implied power to enact such a law. In other words, assume that some electoral count act is constitutional. If we are to revise the Electoral Count Act to make it constitutional (and better), what should it look like?[615]

The Electoral Count Act should be revised in the following ways. First, some Senator or Representative then and there present at the electoral count shall be the presiding officer of the joint convention, not the Vice President as the President of the Senate. Second, the quorum for the joint convention shall be two-thirds of the total number of Senators and Representatives, keeping in spirit with the Constitution's requirement that a quorum in the House of Representatives for choosing the President be a Member or Members from two-thirds of the states.[616] Third, the phrase not "regularly given" shall be narrowly construed only to include problems of the electoral certificate and to exclude problems of the electoral vote, clarifying that the joint convention may judge the authenticity of the electors' acts, but not the electors' acts themselves. Fourth, any and all objections in counting electoral votes shall be addressed by the joint convention voting on a per capita basis, thereby avoiding the presentment problem of the Electoral Count Act. Fifth, the proceedings of the joint convention shall be public. Sixth, in the event the electors fail to make a choice for President or Vice President, the choice of the President by the House of **\*1812** Representatives and the choice of the Vice President by the Senate shall be made in the presence of the joint convention.

## Conclusion

Just because a certain constitutional problem is peculiar and rare is no reason to ignore it--especially when the stakes are an entire branch of government. To borrow the words of Senator Morton describing the Twenty-second Joint Rule, the Electoral Count Act is a "a torpedo planted in the straits with which the ship of state may at some time come into fatal collision."[617] When this happens, it will happen, by definition, at a worse time. We should be thinking about the constitutionality of the Electoral Count Act now--well in advance of a constitutional crisis--when the political facts of the moment are least likely to distort our considered legal judgment. Both Houses of Congress should immediately hold hearings on the constitutionality of the Electoral Count Act and perhaps on the desirability of the electoral college mode of presidential election more generally.

Consider that we came perilously close to facing the constitutionality of 3 U.S.C. § 15 head on just a short while ago. Imagine the following hypothetical:

APPENDIX - 267

The Supreme Court does not intervene in Bush v. Gore on December 10, 2000 or on December 12, 2000. The recount in Florida proceeds. A slate of Bush-Cheney electors, appointed by the Florida Legislature on December 12, 2000, gives its votes on December 18, 2000. This electoral certificate is certified by Florida Secretary of State Katherine Harris. The recount in Florida proceeds. Vice President Gore and Senator Lieberman are declared the winners of the popular vote for President and Vice President respectively. A slate of Gore-Lieberman electors, appointed under Florida election law, gives its votes on some day after December 18, 2000, but before January 6, 2001. And now the important twist--this electoral certificate is also certified by Florida Secretary of State Katherine Harris.

The joint convention convenes on January 6, 2001 for the purpose of counting the electoral votes. The electoral count proceeds smoothly until Vice President Gore opens both certificates from the State of Florida and hands them to the teller for reading, when the joint convention borders on disorder. Objections are made, received, and read before the joint convention by Vice President Gore. Some objections state that this is a case of single returns, and pointing to **1813** 3 U.S.C. § 5, state that the electoral votes contained in the Bush-Cheney electoral certificate must be counted, unless both Houses concur in rejecting them. Some objections state that this is a case of single returns, and pointing to the precedent of Hawaii in 1961, state that the electoral votes contained in the Gore-Lieberman electoral certificate must be counted unless both Houses concur in rejecting them. Some objections state that this is a case of double returns, and pointing to § 15, state that none of the electoral votes contained in either the Bush-Cheney or Gore-Lieberman electoral certificates must be counted unless the two Houses concur in accepting one of them. Both Houses will likely not concur, with the House controlled by the Republicans and the Senate evenly split among Republicans and Democrats (put aside, for the moment, the legal fiction of Vice President Gore breaking any tie in the Senate in favor of himself and the Democrats). If none of Florida's electoral votes are counted, the result of the electoral count will likely be 268 votes for Vice President Gore and Senator Lieberman and 246 votes for Governor Bush and Mr. Cheney. Gore and Lieberman will not have a majority of the whole number of electors appointed if Florida's twenty-five electors are counted as properly appointed electors, but will comfortably have more than a majority of the whole number of electors appointed if Florida's twenty-five electors are not counted. The Senate and House immediately withdraw to decide on the objections not at all knowing what will happen when they reconvene. What result?

We need not wait for the Supreme Court to decide the constitutionality of the Electoral Count Act in a moment of constitutional crisis. Members of Congress take an oath or affirmation to support the Constitution. A conscientious legislator should vote to repeal the Electoral Count Act and a conscientious President should sign such legislation. This will not be enough. The problems of the electoral count are festering sores in our Constitution. A very conscientious legislator should vote to propose a constitutional amendment to solve the problems of the electoral count once and for all.

Footnotes

a1  Vice President, Francisco Partners. J.D., Yale Law School, 2001; B.A.S., B.S., B.A., University of Pennsylvania, 1995. For their helpful comments and suggestions, thanks to Bruce Ackerman, Akhil Amar, Robert Bennett, Steven Calabresi, Joel Goldstein, Neal Katyal, Kumar Kesavan, Jennifer Koester, Michael Paulsen, Nick Rosenkranz, Stephen Siegel, Laurence Tribe, and John Yoo. I also wish to thank Professor Ellen Peters for supervising the initial drafting of this Article in her federalism seminar at Yale Law School in the fall of 1999, a year before Bush v. Gore, and the editors of the North Carolina Law Review for their excellent editing. The author disclaims any prescience in writing about the Electoral Count Act.

1  531 U.S. 98 (2000) (per curiam).

2  See 3 U.S.C. §15 (2000) ("Congress shall be in session on the sixth day of January succeeding every meeting of the electors.").

3  The presidential election of 1800 and the electoral count of 1801 were truly a constitutional crisis of the first magnitude, leading to the adoption of the Twelfth Amendment in 1804. The electoral count on February 11, 1801 was inconclusive because there were two persons who had the requisite majority of the whole number of electors appointed. (The original Constitution did not require or even permit electors to cast separate votes for President and Vice President). Democrat-Republican and then-Vice President Thomas Jefferson and Democrat-Republican Aaron Burr each received seventy-three votes; Federalist and then-President John Adams and Federalist Charles C. Pinckney received sixty-five and sixty-four votes, respectively; Federalist John Jay received one vote.

APPENDIX - 268

The choice of President thus devolved on the House of Representatives. U.S. Const. art. II, §1, cl.3 provides:

The Person having the greatest Number of Votes shall be the President, if such Number be a Majority of the whole Number of Electors appointed; and if there be more than one who have such Majority, and have an equal Number of Votes, then the House of Representatives shall immediately chuse by Ballot one of them for President.... But in chusing the President, the Votes shall be taken by States, the Representation from each State having one Vote....

The House, controlled by Federalists, was forced to choose between Democrat-Republicans Jefferson and Burr. On February 11, the House balloted nineteen times with no success: each time eight states voted for Jefferson, six for Burr, and two were divided. On February 12, the House balloted nine times with no success; on February 13, once; February 14, four times; and February 16, once. On February 17, after another such round, the House chose a President-elect on the thirty-sixth round of balloting: ten states voted for Jefferson, four for Burr and two did not vote. For the basic facts of the election of 1800 and the electoral count of 1801, see Bernard A. Weisberger, America Afire: Jefferson, Adams, and the Revolutionary Election of 1800, at 227-77 (2000).

To complicate this saga further, Democrat-Republicans Jefferson and Burr only had a majority of the whole number of electors appointed because Vice President Jefferson, presiding over the electoral count, decided to count four "improper" votes from the State of Georgia in favor of Jefferson-Burr. See infra note 230 and accompanying text. Without these votes, Jefferson and Burr would have had sixty-nine votes each, exactly one half and not a majority of the whole number of electors appointed, and the choice of President would have devolved on the House of Representatives. But importantly, the original Constitution provided that "if no Person have a Majority, then from the five highest on the List the said House in like Manner chuse the President." U.S. Const. art. II, §1, cl.3 (emphasis added). There is little doubt that the Federalist-controlled House would have elected Federalists John Adams and Charles C. Pinckney as President and Vice President, respectively.

Perhaps most intriguingly, the Federalist-controlled Legislature of Maryland, aware of the popular support for Democrat-Republicans Jefferson-Burr,

seriously contemplated that the legislature should repeal the law under which the electors were chosen by the people, and should choose them by the legislature; and this on the avowed ground that it was necessary to defeat the candidate whom it was supposed that the majority of the people preferred.

House Special Committee, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 443 (1877) [hereinafter Counting Electoral Votes] (remarks of Sen. Anthony). This should sound familiar. This action was not carried out, but had it been, Maryland's ten electoral votes would have been given solely to Federalists Adams and Pinckney, instead of having been given equally to Jefferson and Adams. Adams would have received 70 votes; Pinckney 69 votes; Jefferson 68 votes; Burr 68 votes; and Jay 1 vote. Adams and Pinckney would have become President and Vice President respectively. According to Senator Anthony, "[T]he election would have been strictly and unquestionably legal and constitutional." Id. This point is subject to serious debate today. There may be a constitutional right to vote for presidential and vice presidential electors, at least in some cases. See U.S. Const. amend. XIV, §2; U.S. Const. amend. XXIV; Michael C. Dorf, We Need A Constitutional Right To Vote in Presidential Elections (Dec. 13, 2000), at http:// writ.findlaw.com/dorf/20001213.html (on file with the North Carolina Law Review). But see Bush, 531 U.S. at 104 ("The State, of course, after granting the franchise in the special context of Article II, can take back the power to appoint electors.") (citation omitted). The presidential election of 1800 and the electoral count of 1801 is currently the subject of a fascinating, timely, and forthcoming book by Professor Bruce Ackerman. Bruce Ackerman, America on the Brink: The Constitutional Crisis of the Early Republic (forthcoming 2002) (on file with the North Carolina Law Review). For two rich discussions of the election of 1800, see generally Joanne B. Freeman, The Election of 1800: A Study in the Logic of Political Change, 108 Yale L.J. 1959 (1999); John J. Janssen, Dualist Constitutional Theory and the Republican Revolution of 1800, 12 Const. Comment. 381 (1995). For a recent book-length treatment, see Weisberger, supra.

[4]     For specific reference to these four questions, see, for example, 10 Annals of Cong. 29 (1800) (remarks of Sen. Ross); id. at 131 (remarks of Sen. Pinckney); id. at 133 (remarks of Sen. Pinckney).

[5]     Id. at 29.

[6]     Id. at 132.

[7]     Thankfully, the problem has been a very small one, with approximately a dozen electors of over 25,000 casting votes in opposition to the wishes of the voters in the course of 213 years. See Beverly J. Ross & William Josephson, The Electoral College and the Popular Vote, 12 J.L. & Pol. 665, 667 (1996). There is no consensus on the exact number of faithless electors since the Founding. The paradigm case is that of Samuel Miles, a Federalist elector from Pennsylvania, who in 1796, just eight years after the adoption of the Constitution and in the third presidential election, voted for Democrat-Republican Jefferson instead of Federalist Adams. This action prompted a Federalist voter to exclaim: "Do I chuse Samuel Miles to determine for me whether John Adams or Thomas Jefferson

APPENDIX - 269

shall be President? No! I chuse him to act, not to think." E. Stanwood, A History of the Presidency 51 (August M. Kelley Publishers 1975) (1928).

The faithless elector problem was of particular concern in the presidential election of 2000: Any two faithless votes by Bush electors would have thrown the election into the House of Representatives, and any three faithless votes would have thrown the election to former Vice President Gore. Going into December 18, 2000 (the date specified by federal law for the giving of electoral votes by the electors), the expected electoral count was 271 votes for Bush and 267 votes for Gore. The final electoral count for President was 271 votes for Bush and 266 votes for Gore. See 147 Cong. Rec. H44 (2001). One Gore-Lieberman elector from the District of Columbia, protesting the District's lack of statehood, refused to cast her votes for President and Vice President. See Charles Babington, Electors Reassert Their Role; Bush Wins Vote; Protest Costs Gore, Wash. Post., Dec. 19, 2000, at A1. For additional discussion of the faithless elector problem, see infra notes 176-191, 590-592 and accompanying text.

8   U.S. Const. amend. XII. The only differences between this text of the Twelfth Amendment and the text of the original Constitution are in punctuation and capitalization. See U.S. Const. art. II, §1, cl.3 ("The President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted."). The Twelfth Amendment rewrote U.S. Const. art. II, §1, cl.3, but not two other clauses that relate to the Electoral College mode of presidential election, U.S. Const. art. II, §1, cls.2, 4. For ease of exposition, I will variously refer to these clauses as the "Electoral College Clauses."

9   As Justice Joseph Story described:

In the original plan, as well as in the amendment, no provision is made for the discussion or decision of any questions, which may arise, as to the regularity and authenticity of the returns of the electoral votes, or the right of the persons, who gave the votes, or the manner, or circumstances, in which they ought to be counted. It seems to have been taken for granted, that no question could ever arise on the subject; and that nothing more was necessary, than to open the certificates, which were produced, in the presence of both houses, and to count the names and numbers, as returned.

3 Joseph Story, Commentaries on the Constitution of the United States §1464, at 327 (1833) [hereinafter Story's Commentaries]; see also 17 Cong. Rec. 815 (1886) (remarks of Sen. Sherman) (discussing specific problems of the electoral count); 18 Cong. Rec. 50-51 (1886) (remarks of Rep. Adams) (same).

10   Akhil Reed Amar, Presidents, Vice Presidents, and Death: Closing the Constitution's Succession Gap, 48 Ark. L. Rev. 215, 217 (1995).

11   Act of Feb. 3, 1887, ch. 90, 24 Stat. 373 (codified as amended at 3 U.S.C. §§5-6,15-18 (2000)).

12   See 3 U.S.C. §15 (2000).

13   See id.

14   Id.

15   Id. §5.

16   Needless to say, this assumes that each of the Justices was doing his or her job, and not violating his or her oath to support the Constitution, see U.S. Const. art. VI, cl. 3, which is an assumption that may beget controversy, depending on one's jurisprudential (political?) preferences.

17   See 531 U.S. 98, 153-54 (2000) (Breyer, J., dissenting) ("[T]he Twelfth Amendment commits to Congress the authority and responsibility to count electoral votes. A federal statute, the Electoral Count Act, enacted after the close 1876 Hayes-Tilden presidential election, specifies that, after States have tried to resolve disputes (through 'judicial' or other means), Congress is the body primarily authorized to resolve remaining disputes."); id. at 155 (Breyer, J., dissenting) ("Given this detailed, comprehensive scheme for counting electoral votes [3 U.S.C. §15], there is no reason to believe that federal law either foresees or requires resolution of such a political issue by this Court."). Others have similarly argued that the "political question doctrine," see, e.g., Baker v. Carr, 369 U.S. 186, 217 (1962), counsels (if not requires) that the Supreme Court should not have entered the fray in the presidential election of 2000. See, e.g., Laurence H. Tribe, Erog v. Hsub and Its Disguises: Freeing Bush v. Gore from Its Hall of Mirrors, 115 Harv. L. Rev. 170, 276-87 (2001); id. at 277 n.433 (citing argument made by Professors Charles Fried and Einer Elhauge in Brief of the Florida Senate and House of Representatives as Amici Curiae in Support of Neither Party at 7, Bush v. Palm Beach County Canvassing Bd., 531 U.S. 70 (2000) (No. 00-836)); Rachel E. Barkow, More Supreme than Court? The Fall of the Political Question Doctrine and the Rise of Judicial Supremacy, 102 Colum. L. Rev. 237, 273-300 (2002). Whether Bush v. Gore presented a non-justiciable political question is beyond the scope of this Article.

APPENDIX - 270

18  Only a handful of scholars have addressed the constitutionality of the Electoral Count Act since its initial adoption more than one hundred and twenty years ago. Professor Spear, writing in 1877, concluded that the Electoral Count Act of 1877 was unconstitutional. See Samuel T. Spear, D.D., Counting the Electoral Votes, 15 Alb. L.J. 156, 156-61 (1877). Professor Burgess, writing in 1888, concluded that the Electoral Count Act of 1887 was constitutional. See John W. Burgess, The Law of the Electoral Count, 3 Pol. Sci. Q. 633, 653 (1888). More recently, Professor Ross and Mr. Josephson have apparently concluded that the Electoral Count Act is constitutional. See Ross & Josephson, supra note 7, at 704-40.

Two other scholars have obliquely addressed the constitutionality of the Electoral Count Act in recent years. Professor Glennon, in his primer on the Electoral College, somewhat casually concludes that the Electoral Count Act is constitutional. See Michael J. Glennon, When No Majority Rules: The Electoral College and Presidential Succession 35-43 (1992). Professor Amar, in an article on presidential succession, assumes that the Electoral Count Act is constitutional in the course of proposing an improvement to the process of presidential election. He suggests that "Congress should provide by statute that an electoral vote for any person who is dead at the time of the congressional counting is a valid vote, and will be counted, so long as the death occurred on or after Election Day." Amar, supra note 10, at 222.

Most recently, after Bush v. Gore, several commentators have assessed the constitutionality of the Electoral Count Act, but only in passing. See, e.g., Samuel Issacharoff et al., When Elections Go Bad: The Law of Democracy and the Presidential Election of 2000, at 98 (2001) ("Questions about the constitutionality of the Electoral Count Act have been raised but never fully addressed."); Dan T. Coenen & Edward J. Larson, Congressional Power Over Presidential Elections: Lessons from the Past and Reforms for the Future, 43 Wm. & Mary L. Rev. 851, 860-71, 909-16 (2002) (concluding that the Electoral Count Act is constitutional and that congressional power to enact such legislation should support national-ballot and voting equipment legislation); Jesse H. Choper, Why the Supreme Court Should Not Have Decided the Presidential Election of 2000, at 15 (stating that "the Electoral Count Act is not free of certain ambiguities and possible constitutional problems") (unpublished manuscript, on file with the North Carolina Law Review), available at http:// papers.ssrn.com/abstract =281869.

19  For an excellent articulation of this point, see 17 Cong. Rec. 1059 (1886) where Sen. Wilson stated:

Can we conclude that the [F]ramers of our Constitution, when they conferred on the respective Houses of Congress these extraordinary powers, intended to invest them with the still more extraordinary power of rejecting the votes of electors appointed by the several States, and thereby creating by themselves and for themselves the contingency which alone gives them the right and power to elect a President and Vice-President?

See also 18 Cong. Rec. 74 (1886) (remarks of Rep. Baker) (similar).

Early commentators on the Constitution, writing in the wake of the electoral crisis of 1800-01, were quick to point out the evils of presidential election by the House of Representatives. See, e.g., 1 St. George Tucker, Blackstone's Commentaries with Notes of Reference to the Constitution and Laws of the Federal Government of the United States and of the Commonwealth of Virginia, app. at 327 (1803) [hereinafter Tucker's Commentaries]. St. George Tucker stated:

Then, indeed, intrigue and cabal may have their full scope: then, may the existence of the union be put in extreme hazard: then might a bold and desperate party, having the command of an armed force, and of all the resources of government, attempt to establish themselves permanently in power, without the future aid of forms, or the control of elections.

Id.; see William Alexander Duer, Course of Lectures on the Constitutional Jurisprudence of the United States 82 (Lenox Hill Pub. & Dist. Co. 1971) (1843) [hereinafter Duer's Commentaries] (noting that "on one memorable occasion... much riotous and violent conduct was exhibited in the House of Representatives, when, upon an equality of electoral votes between two of the persons voted for, the choice devolved upon that body"); 1 James Kent, Commentaries on American Law *279 [hereinafter Kent's Commentaries] ("All elections by the representative body are peculiarly liable to produce combinations for sinister purposes.").

20  Kent's Commentaries, supra note 19, at *276.

21  The methodological approach taken in this Article--one that places almost exclusive reliance on constitutional text and structure and one that may be described as "interpretivist" or "originalist"--may be criticized by some as out of touch with the subject matter. The arguments run as follows: the electoral college mode of presidential election has worked in ways never contemplated by the Framers and Ratifiers--with the advent of political parties, not to mention the perfunctory role of electors themselves in presidential election. Indeed, one might say that the electoral college mode of presidential election has (ironically or not) worked in a way positively antithetical to the original expectations of the Framers and Ratifiers. Moreover, as we shall see, the constitutional lacunae seem to be especially large when it comes to the thorny issues of the electoral count--these issues were under-specified from the start. And so the argument concludes that constitutional meaning should be determined by subsequent practice--what works, or has been accepted as if valid--more than by constitutional text and structure. Nevertheless, this Article's methodological approach does yield (I submit) a definitive result as to the constitutionality of the Electoral Count Act. It is rather difficult to see why non-constitutional developments

APPENDIX - 271

in electoral politics relating to presidential election--however stark when compared to the Founding--create congressional power to regulate the electoral count when none existed. In any case, this Article's methodological approach is far from useless even for those who choose to ignore its results. See Akhil Reed Amar, A Neo-Federalist View of Article III: Separating the Two Tiers of Federal Jurisdiction, 65 B.U. L. Rev. 205, 207-08 n.7 (1985) (discussing the value of "interpretivist" methodology whether or not one subscribes to its results).

[22] The vade mecum in the study of the history of the electoral count is a House Special Committee report issued after the Hayes-Tilden presidential election of 1872. See Counting Electoral Votes, supra note 3; see also 3 Hind's Precedents of the House of Representatives of the United States 209-67 (Alfred C. Hinds ed., 1907) (discussing the electoral counts of 1789 to 1905). Two scholars have also nicely summarized the relevant history. See generally C.C. Tansill, Congressional Control of the Electoral System, 34 Yale L.J. 511 (1924-25); L. Kinvin Wroth, Election Contests and the Electoral Vote, 65 Dick. L. Rev. 321 (1961).

[23] John Harrison, Nobody for President, 16 J.L. & Pol. 699, 699 (2000).

[24] Indeed, Bush v. Gore provides two excellent examples. For references to the Hayes-Tilden Incident of 1877, see infra notes 157-64 and accompanying text. For references to the Hawaii Incident of 1961, see infra notes 165-75 and accompanying text.

[25] As of 1886, Senator Sherman observed that "[s]ince [the Founding] there have been eleven cases of disputes as to electoral votes, and twenty-one objections have been made to the electoral votes of different States, presenting a great variety of questions," though he did not elaborate. 17 Cong. Rec. 815 (1886).

[26] Act of Mar. 1, 1792, ch. 8, 1 Stat. 239. For the relevant part of the act relating to presidential election, see Counting Electoral Votes, supra note 3, at 9.

[27] U.S. Const. art. II, §1, cl.6 provides:
In Case of the Removal of the President from Office, or of his Death, Resignation, or Inability to discharge the Powers and Duties of the said Office, the Same shall devolve on the Vice President, and the Congress may by Law provide for the Case of Removal, Death, Resignation or Inability, both of the President and Vice President, declaring what Officer shall then act as President, and such Officer shall act accordingly, until the Disability be removed, or a President shall be elected.
With respect to presidential succession, the Act provided that, after the Vice President, the President pro tempore and the Speaker of the House of Representatives would next be in line to act as President. For a strong and persuasive claim that this mode of presidential succession is unconstitutional because Members of Congress are not "Officer[s]" within the meaning of the Presidential Succession Clause, see Akhil Reed Amar & Vikram David Amar, Is the Presidential Succession Law Constitutional?, 48 Stan. L. Rev. 113 (1995).

[28] See U.S. Const. art. II, §1, cl.4 ("The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States.").

[29] For the modern codification, see 3 U.S.C. §1 (2000) ("The electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President."); id. §7 ("The electors of President and Vice President of each State shall meet and give their votes on the first Monday after the second Wednesday in December next following their appointment at such place in each State as the legislature of such State shall direct.").

[30] U.S. Const. art. II, §1, cl.2 provides:
Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

[31] A proviso to section 1 provided: "That where no apportionment of Representatives shall have been made after any enumeration, at the time of choosing electors, then the number of electors shall be according to the existing apportionment of Senators and Representatives." For the modern codification, see 3 U.S.C. §3.

[32] See U.S. Const. art. II, §2, cl.3 ("And they shall make a List of all the Persons voted for, and of the Number of Votes for each; which List they shall sign and certify, and transmit sealed to the Seat of the Government of the United States, directed to the President of the Senate.").

[33] For the modern codification, see 3 U.S.C. §11 and 3 U.S.C. §9, which provides:

APPENDIX - 272

The electors shall make and sign six certificates of all the votes given by them, each of which certificates shall contain two distinct lists, one of the votes for President and the other of the votes for Vice President, and shall annex to each of the certificates one of the lists of the electors which shall have been furnished to them by direction of the executive of the State.

34   For the modern codification, see 3 U.S.C. §6.

35   See 2 The Records of the Federal Convention of 1787, at 529 (Max Farrand ed., 1911) [hereinafter Farrand] (emphasis added); see also David P. Currie, The Constitution in Congress: The Second Congress, 1791-1793, 90 Nw. U. L. Rev. 606, 617-18 (1996) (noting this point). Alexander Hamilton's draft of the Constitution contained a broader grant of law-making power. See 3 Farrand, supra, at 624 ("The Legislature shall by permanent laws provide such further regulations as may be necessary for the more orderly election of the President, not contravening the provisions herein contained.").

36   Contrary to Professor Currie's view, see Currie, supra note 35, at 617-18, this language was not dropped by the Committee of Style, but was dropped by the Framers themselves. See 2 Farrand, supra note 35, at 573 (draft Constitution referred to Committee of Style and Arrangement) ("The Legislature may determine the time of chusing the Electors and of their giving their votes--But the election shall be on the same day throughout the United States.").

37   These two possible fonts of power for the Electoral Count Act are discussed in Part II.A.2 infra.

38   3 Annals of Cong. 279 (1791).

39   Id. at 279.

40   10 Annals of Cong. 134 (1800).

41   See Printz v. United States, 521 U.S. 898, 936 (1997) (O'Connor, J., concurring) (suggesting that "purely ministerial reporting requirements imposed by Congress on state and local authorities" may be constitutionally valid).

42   See, e.g., id. at 939 (Stevens, J., dissenting); id. at 970-71 (Souter, J., dissenting); id. at 976-77 (Breyer, J., dissenting); Saikrishna Bangalore Prakash, Field Office Federalism, 79 Va. L. Rev. 1957, 1990-2007 (1993) (presenting extensive early historical evidence of "executive commandeering").

43   The modern codification provides:
When no certificate of vote and list mentioned in sections 9 and 11 of this title from any State shall have been received by the President of the Senate or by the Archivist of the United States by the fourth Wednesday in December, after the meeting of the electors shall have been held, the President of the Senate or, if he be absent from the seat of government, the Archivist of the United States shall request, by the most expeditious method available, the secretary of state of the State to send up the certificate and list lodged with him by the electors of such State; and it shall be his duty upon receipt of such request immediately to transmit same by registered mail to the President of the Senate at the seat of government.
3 U.S.C. §12 (2000). Additionally:
When no certificates of votes from any State shall have been received at the seat of government on the fourth Wednesday in December, after the meeting of the electors shall have been held, the President of the Senate or, if he be absent from the seat of government, the Archivist of the United States shall send a special messenger to the district judge in whose custody one certificate of votes from that State has been lodged, and such judge shall forthwith transmit that list by the hand of such messenger to the seat of government.
Id. §13.

44   For the modern codification, see 3 U.S.C. §15 ("Congress shall be in session on the sixth day of January succeeding every meeting of the electors.").

45   For the modern codification (with the same $1,000 penalty), see 3 U.S.C. §14 ("Every person who, having been appointed, pursuant to section 13 of this title, to deliver the certificates of the votes of the electors to the President of the Senate, and having accepted such appointment, shall neglect to perform the services required from him, shall forfeit the sum of $1,000.").

46   Spear, supra note 18, at 158.

47   For an easily accessible account of this history, see David P. Currie, The Constitution in Congress: The Federalist Period, 1789-1801, at 288-291 (1997).

APPENDIX - 273

48  Jean Edward Smith, John Marshall: Definer of a Nation 263 (1996).

49  2 John Bach McMaster, A History of the People of the United States: From the Revolution to the Civil War 462 (1928); see id. at 463 ("The purpose of this shameful bill was plain to all."); see also 2 Albert J. Beveridge, The Life of John Marshall 452-53 (1916) (describing Federalist effort to regulate electoral count as "in reality a high-handed attempt to control the [coming] presidential election, regardless of the votes of the people"); Wroth, supra note 22, at 326 & n.24 (describing Federalist effort to regulate electoral count as "a last ditch effort to stem the tide of Jeffersonian Republicanism").

50  6 Annals of Cong. 29 (1800).

51  Counting Electoral Votes, supra note 3, at 16.

52  Historian Albert Beveridge writes that the bill was "aimed particularly at the anticipated Republican presidential majority in Pennsylvania which had just elected a Republican Governor over the Federalist candidate." 2 Beveridge, supra note 49, at 463. It should come as no surprise that the losing Federalist candidate was Senator Ross of Pennsylvania, the principal proponent of the Grand Committee Bill.

53  The idea for a committee of thirteen may have its roots in a proposal by Elbridge Gerry at the Philadelphia Convention of 1787 who proposed that, in case of electoral deadlock, "the eventual election should be made by six Senators and seven Representatives chosen by joint ballot of both Houses." 2 Farrand, supra note 35, at 514. This proposal failed by a vote of two to eight. Id. Note that Gerry's proposal decidedly favors the House of Representatives--the People's branch of the national legislature--both in committee representation and committee election given the joint ballot procedure. Under a joint ballot, the Members of the House of Representatives, at the founding, would be entitled to sixty-five of ninety-one votes. For a mathematical depiction of Gerry's thinking, see id. at 99 (proposing the selection of President by a randomly chosen subset of members of Congress taken together).

54  Counting Electoral Votes, supra note 3, at 18. The one exception to this grant of power was that
no petition, or exception, shall be granted, allowed, or considered by the sitting grand committee which has for its object to dispute, draw into question the number of votes given for an elector in any of the States, or the fact whether an elector was chosen by a majority of votes in his State or district."
Id. In other words, the Grand Committee was not to judge the elections or returns of the electors.

55  Id. at 17.

56  Id. at 18.

57  Tansill, supra note 22, at 517.

58  See 10 Annals of Cong. 126-46 (1800). In his remarks opposing the Grand Committee Bill, Senator Pinckney described it thus:
[W]hat is the mode [of electing President] proposed by this bill? That the Senate and House of Representatives of the United States shall each of them elect six members, who with a chairman, to be appointed by the latter from a nomination of the former, would form a grand committee who should, sitting with closed doors, have a right to examine all the votes given by the Electors in the several States for President and Vice President, and all the memorials and petitions respecting them; and have power finally to decide respecting them, and to declare what votes of different States shall be rejected, and what admitted; and, in short, that this committee, thus chosen, and sitting with closed doors, shall possess complete, uncontrollable, and irrevocable power to decree, without appeal from their decision, who has been returned, and who shall be proclaimed President of the United States.
Id. at 129. Professor Ross and Mr. Josephson suggest that, given the length of Senator Pinckney's speech, it was not extemporaneous. See Ross & Josephson, supra note 7, at 711 n.252.

59  10 Annals of Cong. 126. Recall that the Alien and Sedition Acts were set to expire on June 25, 1800 and March 3, 1801 respectively. See Alien Act of June 25, 1798 §6, 1 Stat. 570, 572; Sedition Act of July 14, 1798 §4, 1 Stat. 596, 597.

60  10 Annals of Cong. 130. Senator Pinckney also observed that the Framers "well knew, that to give to the members of Congress a right to give votes in this election, or to decide upon them when given, was to destroy the independence of the Executive and make him the creature of the Legislature." Id. at 131. The potential for party spirit in Congress to dominate the choice of President was well recognized. In the Second Congress, Speaker of the House Sedgwick "descanted on the pernicious consequences which might result from the collision of parties, and the working of passions in the breasts of men whose ardor would probably be excited to the greatest

APPENDIX - 274

degree" if the House of Representatives were to choose the President. 3 Annals of Cong. 278 (1791). During the Wisconsin Incident of 1857, Senator Collamer made similar remarks. See Counting Electoral Votes, supra note 3, at 132-33 (remarks of Sen. Collamer).

[61] 2 Beveridge, supra note 49, at 454.

[62] 10 Annals of Cong. 146.

[63] See 2 Beveridge, supra note 49, at 455. ("In these cloak-room talks, Marshall, to the intense disgust and anger of the Federalist leaders, was outspoken against this attempt to seize the Presidency under the forms of a National law."); Smith, supra note 48, at 264 ("Marshall worked the cloakrooms and corridors assiduously, voicing his objections and lining up the opposition vote.").

[64] See Counting Electoral Votes, supra note 3, at 23-26.

[65] See Part I.A.4 infra.

[66] Smith, supra note 48, at 264.

[67] 2 Beveridge, supra note 49, at 456.

[68] See Wroth, supra note 22, at 327 ("The House, less aggressively partisan than the Senate, refused to accept a measure which would permit rejection by vote of the Senate alone.").

[69] 2 Beveridge, supra note 49, at 456. Thomas Jefferson, for his part, was less than fully appreciative of John Marshall's efforts, suggesting that the Marshall amendments did not make the Grand Committee Bill constitutional. In a private letter, he wrote:
Marshall made a dexterous manoeuver; he declares against the constitutionality of the Senate's bill, and proposes that the right of decision of their grand committee should be controllable by the concurrent vote of the two [H]ouses of [C]ongress; but to stand good if not rejected by a concurrent vote. You will readily estimate the amount of this sort of controul.
Id. (quoting Letter from Thomas Jefferson, to Robert Livingston (Apr. 30, 1800)).

[70] The amended Grand Committee Bill largely parallels the Electoral Count Act. See Part I.A.4 infra.

[71] Apparently, John Marshall also questioned Congress's ability to delegate authority to the Grand Committee. 2 Beveridge, supra note 49, at 457 (citing Letter from Speaker Sedgwick, to Sen. Rufus King (May 11, 1800)).

[72] The Constitution carefully circumscribes the Chief Justice's judicial duties under Article III, with one exception. See U.S. Const. art. I, §3, cl.6 ("The Senate shall have the sole Power to try all Impeachments. When sitting for that Purpose, they shall be on Oath or Affirmation. When the President of the United States is tried, the Chief Justice shall preside....").
It might be argued that the Chief Justice's role in the Grand Committee is quasi-judicial and that the foregoing clause invites the Chief Justice to play a special role with respect to the Presidency. For an expression of this claim, see Amar, supra note 10, at 223 n.16. Notably, however, the Framers rejected other non-judicial roles for the Chief Justice and other Justices of the Supreme Court. See, e.g., 2 Farrand, supra note 35, at 75, 298 (rejecting participation in "[r]evisionary power" or veto power); id. at 342 (rejecting participation in "Council of State" or Privy Council).

[73] See text accompanying infra notes 267-74.

[74] See text accompanying infra notes 276-86.

[75] Senator Pinckney remarked:
Were not the then Executive, and a number of the members of both Houses, members of the Convention which framed the Constitution; and if it intended to give to Congress, or to authorize them to delegate to a committee of their body, powers contemplated by this bill, could the Congress or the President of 1792, have been so extremely uninformed, and indeed ignorant of its meaning and of their duty, as not to have known it?
10 Annals of Cong. 136 (1800). However, it must be noted that, during the debate over the Act of 1792, Speaker of the House Sedgwick did mention the possibility of a "contested election" and "left it to the consideration of the Committee" to address the solution. See 3 Annals of Cong. 279 (1791).

[76] Three other interim and unsuccessful congressional efforts to regulate the electoral count deserve brief mention. First, on December 12, 1820, Senator Wilson submitted a resolution entitled Attempt to Remedy the Uncertainty as to Counting the Electoral Vote by

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Legislation. See Counting Electoral Votes, supra note 3, at 48. Second, on March 4, 1824, Senator Van Buren--soon to be President Van Buren in 1837--reported a bill similar to Representative John Marshall's Grand Committee Bill. This bill passed the Senate on April 19, 1824, but died without having been considered by the House of Representatives. See id. at 57-60; see also Spear, supra note 18, at 158 (describing the historical background); Wroth, supra note 22, at 327 (same). Third, on May 10, 1828, Representative Wilde moved a resolution entitled "A Proposition to Inquire into the Legality of the Certificates of the Votes of the Previous Presidential Election." Counting Electoral Votes, supra note 3, at 63-65.

77   See Spear, supra note 18, at 158; Wroth, supra note 22, at 328 n.33.

78   Wroth, supra note 22, at 328; see also Tansill, supra note 22, at 522 ("[T]he occasion for this assertion of jurisdiction was the breach between the Executive and Congress relative to the reconstruction of the southern states.").

79   Counting Electoral Votes, supra note 3, at 148 (House version); see also Tansill, supra note 22, at 523 (describing the surrounding history); Wroth, supra note 22, at 328 (citing same passage).

80   Sen. Morton offered an analysis:
Under the rule as it now exists, when the votes for President and Vice-President are counted, any formal objection, no matter how trifling or insufficient or even contemptible in its character, has the effect to separate the two houses, and they are to vote upon this objection, and unless both houses concur in voting it down the electoral vote of that State is lost. In that way, by the dissent of either house, any State may be disfranchised; the vote of the State of New York or of Indiana may be rejected by the most foolish and trivial objection unless both houses shall concur in voting down that objection. The vote of every State may be rejected in this way.
Counting Electoral Votes, supra note 3, at 444.

81   A report by the Committee on Privileges and Elections in 1874 stated: "Here is a powerful temptation to the House of Representatives by non-concurrence to throw the election into its own body, and thus, perhaps, secure the election of a candidate who may have been overwhelmingly beaten at the polls." Counting Electoral Votes, supra note 3, at 417.

82   Id.

83   See, e.g., id. at 444 (remarks of Sen. Morton) ("[T]he existence of this rule imperils the peace of the nation and subjects the Government to great danger.... It requires no argument, therefore, to prove the absurdity, the unconstitutionality, and the danger of this rule."); id. (remarks of Sen. Bayard) ("I have for a long time been of opinion that the constitutionality of this rule altogether may well be doubted."); id. at 472 (remarks of Sen. Bayard) ("That such a rule was without constitutional warrant, I cannot doubt; and I do not think I am going too far when I say that the unconstitutionality of that rule is generally admitted."); id. at 526 (remarks of Sen. Morton) ("It was absurd, wickedly and dangerously unconstitutional."); id. at 540 (remarks of Sen. Maxey) ("It is a blot upon the mode and manner of counting the votes of the electoral college. It gives to either [H]ouse of Congress the right to stab to the death a sovereign State of this Union."). Sen. Bayard remarked:
Then, under the maleficent working of a rule adopted without regard to the Constitution, under the assumption of powers utterly unwarranted by the two [H]ouses of Congress, there came the assumption of a veto power by either branch of Congress, in silence, without debate, without reason, to throw out the electoral vote and disfranchise one or more communities at will.
Id. at 665.

84   See Tansill, supra note 22, at 522 ("In 1865, the climax of congressional control [over the electoral vote] was reached,...."); Wroth, supra note 22, at 328 ("Congress asserted total power over the electoral vote with the adoption of the Twenty-second Joint Rule in 1865.").

85   The "one-House veto" of the Twenty-second Joint Rule bears a remarkable resemblance to the scheme held unconstitutional in INS v. Chadha, 462 U.S. 919, 959 (1983) (holding a "one-House veto" provision unconstitutional).

86   In a nutshell, the precursor bill to the Electoral Count Act was introduced in the Republican Senate in May 1878. "Spurred by two close presidential elections, the Senate repassed the bill three times in the next decade, but each time could not win the agreement of the House." Wroth, supra note 22, at 334 (footnotes omitted). The two Houses of Congress finally agreed in 1887, after "the passions of Reconstruction had cooled." Id. For a comprehensive summary of the legislative history of the Electoral Count Act, see Ross & Josephson, supra note 7, at 722-30, and Wroth, supra note 22, at 334-35.

87   3 U.S.C §15 (2000).

APPENDIX - 276

88     Id. ("Every objection shall be made in writing, and shall state clearly and concisely, and without argument, the ground thereof, and shall be signed by at least one Senator and one Member of the House of Representatives before the same shall be received.").

89     Id. (emphasis added). Note that the referred to section 6, 3 U.S.C. §6 (2000), is the modern codification of section 3 of the Act of 1792.

90     3 U.S.C. §15.

91     Id. §5 ("Determination of controversy as to appointment of electors") provides:

If any State shall have provided, by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such State, by judicial or other methods or procedures, and such determination shall have been made at least six days before the time fixed for the meeting of the electors, such determination made pursuant to such law so existing on said day, and made at least six days prior to said time of meeting of the electors, shall be conclusive, and shall govern in the counting of the electoral votes as provided in the Constitution, and as hereinafter regulated, so far as the ascertainment of the electors appointed by such State is concerned.

92     Id. §15.

93     6 Annals of Cong. 29 (1800); Counting Electoral Votes, supra note 3, at 16.

94     Counting Electoral Votes, supra note 3, at 37-42.

95     Id. at 37-38.

96     Id. at 38.

97     Id. at 39.

98     See id. at 44-47.

99     Id. at 46.

100     Id.

101     Id. at 47.

102     Id.

103     Id.

104     Id. When Representative Sharp offered the joint resolution, Representative Bassett objected, stating that the resolution should not be joint because a joint resolution might establish a precedent which would "deprive [the] House of one of its powers, by permitting the Senate to participate in this question." Id. at 47. There is no record of any Representative supporting this erroneous view. There is no textual reason to conclude that the House has judicial power during the electoral count but that the Senate does not, or vice versa.

105     Id.

106     See id. at 48-56.

107     Id. at 48 (Senate Resolution); id. at 51 (House Resolution).

108     Id. at 49.

109     Id. at 51.

110     Id. at 52.

111     Id.

112     Id. at 53.

APPENDIX - 277

113    Id. at 50-53.

114    Id. at 50. As this pronouncement makes clear, the electoral count of 1821 is unique for another reason: this was the first (and only) time when electors who were appointed died before the meeting of the electoral colleges. It appears that the President of the Senate miscalculated the number necessary for a majority of the votes. The Electoral College Clauses provide that the needed majority be "a majority of the whole number of Electors appointed." U.S. Const. amend. XII (emphasis added); see U.S. Const. art. II, §1, cl.3. Thus, the correct majority was either 116 or 118 votes, depending on the exclusion or inclusion of Missouri.

115    Counting Electoral Votes, supra note 3, at 56.

116    Id. (emphasis added).

117    Id. at 56.

118    See id. at 70-76.

119    Id. at 70 (Senate Resolution).

120    U.S. Const. art. II, §1, cl.2.

121    Counting Electoral Votes, supra note 3, at 71 (remarks of Sen. Grundy).

122    See id. (noting that "five or six votes only would in any event be abstracted from the whole number").

123    Id.

124    Id. at 73 (remarks of Rep. Cambreling).

125    Id. (remarks of Rep. Thomas).

126    Id. at 72 (remarks of Sen. Norvell). Senator Lyon agreed and "contended that Michigan was as much entitled to count her vote as was the State of Indiana." Id. Senator Clay disagreed. Id.

127    Id. (second emphasis added).

128    Id.

129    Id. at 73.

130    Id. at 75.

131    Id. at 75-76.

132    See id. at 86-144.

133    See, e.g., id. at 117 (remarks of Sen. Seward) (referring to "accidental delay produced by the interposition of Providence preventing the vote being cast at the prescribed time").

134    Id. at 87-89.

135    Id. at 89.

136    Id.

137    Id.; see also id. ("The Presiding Officer would state that, the votes having been counted and announced, the functions of the two houses, assembled for the purpose of counting the votes, are discharged.").

138    See, e.g., id. (remarks of Rep. Marshall); id. (remarks of Sen. Toombs); id. at 90 (remarks of Sen. Butler); id. at 110 (remarks of Sen. Nourse).

APPENDIX - 278

139    Id. at 137 (remarks of Sen. Pugh).

140    Id. at 131.

141    Senators Hale and Houston were the sole exceptions in the Senate. Senator Hale urged that Wisconsin's votes should be counted because the people of Wisconsin ought not to be disenfranchised because of an "accident" of their agents. His cry was very much one of substance over form. See id. at 119. Senator Houston argued that any resolution that Wisconsin's votes should not have been counted was unconstitutional. In his view, the electoral count of 1857 was "good, constitutional, and lawful." Id. at 122-23.

142    See id. at 132 (proposed joint House and Senate resolution); id. at 144 (House).

143    See id. at 357-408.

144    Id. at 366.

145    Id. at 368.

146    Id.

147    Id. at 377.

148    Id. at 380. The Greeley precedent almost certainly affected the electoral vote of 1912. In that year, the defeated Republican candidate for Vice President died before the meeting of the electoral colleges, and the pledged electors voted for someone else. See 115 Cong. Rec. 148 (1969) (remarks of Rep. McCulloch).

149    See Counting Electoral Votes, supra note 3, at 380.

150    See id.

151    Id.

152    Id.

153    Id.

154    Id. at 380-81.

155    Id. at 382-83.

156    Id. at 389.

157    Michael W. McConnell, The Forgotten Constitutional Moment, 11 Const. Comment. 115, 127 (1994).

158    For an excellent summary of the incident, see McConnell, supra note 157, at 127-33. For the principal historical scholarship on this incident, see Charles Fairman, Five Justices and the Electoral Commission of 1877 (Paul A. Freund & Stanley N. Katz eds., 1988); Eric Foner, Reconstruction: America's Unfinished Revolution 1863-1877, at 575-87 (1988); Paul Leland Haworth, The Hayes-Tilden Disputed Presidential Election (1906); Keith Polakoff, The Politics of Inertia: The Election of 1876 and the End of Reconstruction (1973). For a discussion of this incident by those who have written on the Electoral Count Act, see, for example, Glennon, supra note 18, at 16-17, and Wroth, supra note 22, at 331-34 & 331 n.46 (collecting other sources).

159    There was a problem with one electoral vote from Oregon as well: one of the Oregon electors for Hayes was a postmaster, and was therefore ineligible to the office of elector, see U.S. Const. art. II, §1, cl. 2. Oregon's Democratic Governor, refusing to certify the electoral certificate, struck the name of the postmaster-elector for Hayes and substituted that of an elector for Tilden, who received the next most votes. This account is briefly recollected in Harrison, supra note 23, at 700 n.2 (citing Ari Hoogenboom, The Presidency of Rutherford B. Hayes 30-31 (1988)).

160    During the Electoral Count Act debates, at least one Senator noted that the Electoral Commission of 1877 was constitutionally suspect, though he noted that it was "a wise solution to a great difficulty." See 17 Cong. Rec. 817 (1886) (remarks of Sen. Sherman). In his book on Reconstruction, Professor Bruce Ackerman calls this Electoral Commission "extraconstitutional." 2 Bruce Ackerman, We

APPENDIX - 279

the People: Transformations 247 (1998). Perhaps this is a clever attempt to avoid calling it "unconstitutional." Other scholars have firmly taken the position that the Electoral Commission was unconstitutional. I agree. See, e.g., Harrison, supra note 23, at 700 n.3 ("Under now-current separation of powers doctrine the commission was almost certainly unconstitutional. Its members exercised significant government power but were not appointed consistently with the Appointments Clause, as Buckley v. Valeo says they should have been.") (citation omitted); Tribe, supra note 17, at 278 & n.438. Professor Tribe states:

Today, of course, the service on such a body by members of Congress would be understood to violate the separation of powers as construed by Buckley v. Valeo, and the reservation of a veto power in Congress acting by anything less than full legislation presented to the President for signature or veto would be understood to violate the nonparliamentary structure of our government.

(citation omitted) (citing INS v. Chadha, 462 U.S. 919, 959 (1983)).

161   Act of Jan. 29, 1877, ch. 37, §2, 19 Stat. 227, 229; see Wroth, supra note 22, at 331.

162   This "two-House veto" provision is constitutionally problematic. See INS v. Chadha, 462 U.S. 919, 944-51 (1983); Tribe, supra note 17, at 278 (noting same point).

163   See text accompanying infra note 476.

164   The modern view is that Samuel Tilden should have garnered the electoral votes of Florida, thus giving him a several vote majority of the electoral votes. See, e.g., C. Vann Woodward, Reunion and Reaction: The Compromise of 1877 and the End of Reconstruction 19 (2d. ed. 1966); Jerrell H. Schofner, Florida Courts and the Disputed Election of 1876, 48 Fla. Hist. Q. 26, 46 (1969); Jerrell H. Schofner, Florida in the Balance: The Electoral Count of 1876, 47 Fla. Hist. Q. 122, 148-50 (1968).

165   See 107 Cong. Rec. 288-91 (1961).

166   See id. at 289.

167   See id.

168   See id.

169   See id. at 290.

170   See id. at 289-90.

171   Id. at 289.

172   Id. at 289-90.

173   Id. at 290.

174   Id. (emphasis added).

175   The result of the electoral count did not even come close to turning on the legal status of Hawaii's three electoral votes. Democrats Kennedy and Johnson prevailed in the electoral count by a margin of eighty-four votes. See id. at 291.

176   See 115 Cong. Rec. 9-11 (1969); id. at 146-72 (House debate); id. at 209-46 (Senate debate); see also Glennon, supra note 18, at 37-40 (discussing history); Ross & Josephson, supra note 7, at 731-37 (same).

177   See 115 Cong. Rec. 11.

178   Interestingly, the memorandum cited the Necessary and Proper Clause, U.S. Const. art. I, §8, cl.18, as the font of power to pass the Electoral Count Act. See 115 Cong. Rec. 11.

179   See id. at 146.

180   See id.

181   See, e.g., id. at 147 (remarks of Rep. Wright) (stating that Congress has "the legal and constitutional power, and indeed the duty, to prevent faithless electors from corrupting the election of a President"); id. at 158 (remarks of Rep. Corman) (stating that "Congress

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.      74

sits as a court of last resort"); id. at 170 (remarks of Rep. O'Hara) ("Only the Congress can see to it that the elector respects his obligations....").

[182]   Id. at 148.

[183]   See, e.g., id. at 169 (remarks of Rep. Schwengel).

[184]   See, e.g., id. at 146-47 (remarks of Rep. Wright); id. at 158 (remarks of Rep. Rodino).

[185]   See id. at 165 (remarks of Rep. Hosmer).

[186]   See, e.g., id. at 151 (remarks of Rep. Anderson) (arguing that Electoral Count Act was "intended to circumscribe to the very narrowest limits the power of the Congress to do anything other than to certify the results in the States"); id. at 168 (remarks of Rep. Fish).

[187]   See, e.g., id. at 148-49 (remarks of Rep. McCulloch) (arguing that electors are independent under the Electoral College Clauses and concluding that Congress could not "tamper" with Dr. Bailey's vote). Representative Poff argued that
[i]f the Congress can look behind the solemn certificate of the Chief Executive of a State, reject that certificate and by a simple majority vote decide what electoral votes were "regularly given" and which were given irregularly, then the Congress can expropriate from the people their power to elect their President.
Id. at 157; see also id. at 162 (remarks of Rep. Henderson) (arguing that Congress's role is like a local board of elections whose "function is solely to receive the votes, count them, and certify the result... not to determine whether votes were properly cast"); id. at 164 (remarks of Rep. Eckhardt) (stating that it was "beyond question in the Constitution... that the joint session of the House and the Senate has no power whatsoever other than to hear the returns of the electors read"); id. at 166-67 (remarks of Rep. Fountain) (calling Congress "powerless").

[188]   Id. at 168.

[189]   Id. at 170.

[190]   For Representative Gerald Ford's statement in support of the objection, see id. at 163-64.

[191]   Id. at 246.

[192]   The converse is not true. See, e.g., Harmelin v. Michigan, 501 U.S. 957, 980 (1991) (opinion of Scalia, J.) (stating that "[t]he actions of the First Congress... are of course persuasive evidence of what the Constitution means") (citations omitted); Powell v. McCormack, 395 U.S. 486, 547 (1969) ("[T]he precedential value of these cases tends to increase in proportion to their proximity to the Convention in 1787."); Wisconsin v. Pelican Ins. Co., 127 U.S. 265, 297 (1888) (stating that an act "passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument,...is contemporaneous and weighty evidence of its true meaning"). Even then, however, a statute is only presumed to be constitutional.

[193]   This part presents, in my view, many if not most of the arguments against the constitutionality of the Electoral Count Act. There may be others.

[194]   U.S. Const. amend. XII. The only differences between the text of the Twelfth Amendment and the text of the original Constitution are in punctuation and capitalization. See U.S. Const. art. II, §1, cl.3.

[195]   No full-scale law review article dissects the text of the Twelfth Amendment. Two recent articles explore the so-called "Habitation Clause" of the Twelfth Amendment which provides that Electors must not vote for a President and Vice President of the same state as themselves. U.S. Const. amend. XII ("The Electors shall meet in their respective states and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves;...."); see James C. Ho, Much Ado About Nothing: Dick Cheney and the Twelfth Amendment, 5 Tex. Rev. L. & Pol. 227 passim (2000); Sanford Levinson & Ernest A. Young, Who's Afraid of the Twelfth Amendment?, 29 Fla. St. U. L. Rev. 925, 932-54 (2001).

[196]   Levinson & Young, supra note 195, at 925.

[197]   See U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof... shall be the supreme Law of the Land....") (emphasis added); Marbury v. Madison, 5 U.S. (1 Cranch) 137, 180 (1803).

APPENDIX - 281

198    U.S. Const. amend. XII.

199    This simple point was not lost during the Electoral Count Act debates. See, e.g., 17 Cong. Rec. 865 (1886) (remarks of Sen. Morgan) ("We frequently hear it stated that the President of the Senate is the president of the joint meeting. If he is, it is only by reason of some rule or agreement between the two Houses. The Constitution is silent upon that point. The Constitution speaks of no officer who is to preside over the joint meeting.").

200    But see Counting Electoral Votes, supra note 3, at 541 (remarks of Sen. Maxey) ("By the Constitution [the President of the Senate] is the presiding officer over the joint assemblage of the Senate and the House.").

201    Cf. 17 Cong. Rec. 865 (remarks of Sen. Morgan) (discussing presiding officer of the electoral count) ("To be a house in parliamentary law and in constitutional law it must be organized under the presidency of its rightful officer.").

202    3 U.S.C. §15 (2000) (emphasis added).

203    See, e.g., Walz v. Tax Comm'n, 397 U.S. 664, 678 (1970) (stating that "an unbroken practice... is not something to be lightly cast aside" in constitutional interpretation); The Pocket Veto Case, 279 U.S. 655, 689 (1929) (stating that a "[l]ong-settled and established practice is a consideration of great weight in a proper interpretation" of the Constitution); cf. Marsh v. Chambers, 463 U.S. 783 (1983) (holding that legislative prayer, which began in the First Congress, is constitutional).

204    This statement may be surprising, but I ask the reader to suspend his or her skepticism.

205    U.S. Const. art. I, §3, cl.6. But this clause is not nearly as careful as it should be--the Framers forgot to specify that the Vice President cannot preside at her own impeachment trial, leaving the matter to necessary implication. For thoughtful commentaries, see Joel K. Goldstein, Can the Vice President Preside at His Own Impeachment Trial?: A Critique of Bare Textualism, 44 St. Louis U. L.J. 849 (2000); Michael Stokes Paulsen, Someone Should Have Told Spiro Agnew, 14 Const. Comment. 245 (1997).

206    See The Federalist No. 10, at 47 (James Madison) (Clinton Rossiter ed., Mentor 1999) (1961) ("No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment and, not improbably, corrupt his integrity."); William Rawle, A View of the Constitution of the United States of America 206 (1825) ("As the vice president succeeds to the functions and emoluments of the president of the United States whenever a vacancy happens in the latter office, it would be inconsistent with the implied purity of a judge that a person under a probable bias of such a nature, should participate in the trial, and it would follow that he should-- wholly to retire from the court."); 2 Farrand, supra note 35, at 493.

207    See 2 Farrand, supra note 35, at 401-03.

208    Id. at 402-03; see also id. at 403 (remarks of James Madison) (supporting the joint ballot procedure and observing in passing that "[t]he President of the Senate also is to be occasionally President of the U.S.").

209    17 Cong. Rec. 1019 (1886).

210    See supra note 3 and text accompanying infra note 230.

211    See U.S. Const. art. II, §1, cl. 6; U.S. Const. amend. XXV, §1.

212    An interesting question arises whether a Senator or Representative--who may also be a presidential or vice presidential candidate-- may be the presiding officer of the electoral count, even though the Vice President shall not be. The better answer is "Yes." Before opening the electoral certificates and inspecting the electoral votes, the identities of the presidential or vice presidential candidates are (at least theoretically) unknown, and hence it would be impossible to know which Senators or Representatives to exclude from the presiding officer's chair. The argument is that the Constitution implicitly assumes that the Vice President--more than any other person present at the electoral count--would be a presidential or vice presidential candidate, and hence makes the Vice President uniquely ineligible to be the presiding officer. As a prudential matter, of course, the presiding officer should be someone who is not known to be a presidential or vice presidential candidate.

213    There is one more reason why the "Presiding Officer Clause" of 3 U.S.C. §15 may be unconstitutional. That clause provides that "the President of the Senate shall be their presiding officer." 3 U.S.C. §15 (2000) (emphasis added). What gives Congress the authority to super-add to the Vice President's duties specified by the Constitution? See, e.g., U.S. Const. art. I, §3, cl.4 ("The Vice President of the

APPENDIX - 282

United States shall be President of the Senate, but shall have no Vote, unless they be equally divided."); U.S. Const. art. II, §1, cl.6 ("In Case of the Removal of the President from Office, or of his Death, Resignation or Inability to discharge the Powers and Duties of the said Office, the Same shall devolve on the Vice President...."); U.S. Const. amend. XXV, §1 (similar); U.S. Const. amend. XII ("The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted."). If Congress may add to the Vice President's duties, why not the President's duties or the Chief Justice's duties? If "shall" means "must," the Presiding Officer Clause of the Electoral Count Act would seem to be, strictly speaking, unconstitutional.

214    Compare U.S. Const. art. I, §2, cl.5 ("The House of Representatives shall chuse their Speaker and other Officers."), and U.S. Const. art. I, §3, cl.5 ("The Senate shall chuse their other Officers, and also a President pro tempore, in the Absence of the Vice President, or when he shall exercise the Office of President of the United States."), with U.S. Const. art. I, §3, cl.4 ("The Vice President of the United States shall be President of the Senate, but shall have no Vote, unless they be equally divided.").

215    See infra notes 498-525 and accompanying text.

216    U.S. Const. amend. XII.

217    Others have made this obvious point. See, e.g., 17 Cong. Rec. 1059 (1886) (remarks of Sen. Wilson) (arguing that the counting function is vested in the President of the Senate and that the Necessary and Proper Clause "does not confer on Congress the power to assume unto itself the duty which the Constitution imposes on that officer"); 18 Cong. Rec. 74 (remarks of Rep. Baker) ("If the Constitution... does... by fair implication, vest in the President of the Senate the power and duty not only to open, but also to count, the votes, then Congress can not, by this or any other legislation, take away or transfer to any other person or officer that power and duty."); Paulsen, supra note 205, at 245 (noting that each House of Congress may not use the Rules of Proceedings Clause to strip the Vice President of constitutional duties); Spear, supra note 18, at 156 ("The Constitution says that 'the votes shall then be counted,' and if this mandate be addressed to the President of the Senate, that ends the question so far as the counting is concerned. The Constitution has then trusted him with the whole power, and any legislation to direct him, would be an impertinent intrusion upon his prerogative."); cf. Harrison, supra note 23, at 703 ("Neither House nor Senate is given any authority over the President of the Senate when it comes to opening the certificates, and Congress by statute may no more control the exercise of this constitutionally granted authority than it may tell the President whom to pardon.").

218    U.S. Const. amend. XII.

219    See U.S. Const. art. I, §3, cl.4 ("The Vice President of the United States shall be President of the Senate, but shall have no Vote, unless they be equally divided."). It does appear that the President pro tempore acted in place of the Vice President in at least the electoral counts of 1809, 1825, 1857, 1877, and most recently 1969 when Vice President Hubert H. Humphrey "recused" himself from the electoral count.

220    There is the rather tricky question whether the President of the Senate must open all certificates in a case of multiple returns from the same state, as in the Hayes-Tilden incident of 1887, or in a case of a return from a putative state (say for example, a certificate from Puerto Rico). The best answer is that the opening-of-the-certificates function contains no power of discretion because any discretion in the opening of certificates would interfere with the counting-of-electoral-votes function. Translated into the recent past: if two certificates had come from Florida during the electoral count of 2001, the Vice President could not, constitutionally speaking, have refused to open both of them.

In a recent essay, Professor Harrison takes a contrary view on the specific question of multiple (putative) electoral certificates. In his view, "[t]he certificates that the President of the Senate is to open, however, are those of the electors, not those of non-electors. Hence in order to know which certificates to open, the President of the Senate must know which of competing slates of electors were validly appointed." Harrison, supra note 23, at 702-03. This is a clever (and obvious) textual argument. He continues: "If the Twelfth Amendment is assumed to be a dispute resolution mechanism, a natural reading of it thus indicates that in one especially important context the dispute is to be resolved by a single individual." Id. at 703. The vice of this reading, as Professor Harrison acknowledges, is that one person has the power to resolve at least one kind of dispute in presidential election, a conclusion that is generally to be avoided. Indeed, he acknowledges in his very next paragraph that "[i]t would be much easier to believe that this important decision was vested in a collective body, were there not serious problems with the operation of the collective body, the joint session of Congress (if it is to be called that)." Id. Notwithstanding the latter "problems" (which are overstated in my view), Professor Harrison ignores the point that in the case of multiple putative electoral certificates, the opening of the certificates function interferes with the counting-of-electoral-votes function. The former enables the latter; the former is more of an "exercise" whereas the latter is more of a "function." Moreover, the former is simply less important than the latter--a President and Vice President elect are determined after the electoral

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.    77

votes are actually counted, not when the electoral certificates are opened. The better answer, I submit, is that the President of the Senate has discretion in the opening-of-electoral-certificates function only if she also has the counting-of-electoral-votes function, and even then, that discretion would follow as a matter of the latter function, not the former.

This scenario of multiple putative electoral certificates was the subject of discussion during the Electoral Count Act debates, given the cases of double returns in the electoral counts of 1873 and 1877. For statements that the President of the Senate has no discretion in opening the certificates in the case of multiple returns, see, for example, Counting Electoral Votes, supra note 3, at 446-47 (remarks of Sen. Bayard); id. at 449-50 (remarks of Sen. Thurman). But see id. at 454 (remarks of Sen. Morton) (arguing that President of the Senate's discretion in opening certificates "shows the necessity for an amendment of the Constitution").

221    "The famous phrase of the Constitution 'the votes shall then be counted' has been like an apple of discord almost since the beginning of Government." J. Hampden Dougherty, The Electoral System of the United States 254 (1906); see also Albert J. Rosenthal, The Constitution, Congress, and Presidential Elections, 67 Mich. L. Rev. 1, 27 (1968) (noting that the passive voice of this phrase breaks one of the "cardinal rules of draftsmanship"); Tribe, supra note 17, at 279 ("The Framers should have listened to the time-honored injunction to avoid the passive voice. 'Shall be counted'--by whom?").

During the Electoral Count Act debates, Representative Herbert carefully examined the grammar of this patch of constitutional text: Here is a duty imposed upon the President of the Senate. He shall, in the presence of the Senate and House of Representatives, open the certificates. Then the first person is dropped and the third person is taken up; there the sentence changes its construction; there the duty imposed upon the President of the Senate ceases, and afterwards a new part of speech is used--the third person is adopted, and a verb relating to a noun in the third person, "the votes," employed, and a new duty imposed by the words, "and the votes shall then be counted."

18 Cong. Rec. 75 (1886).

222    The ambiguity is well-evidenced in the congressional debate over the electoral count. See, e.g., Counting Electoral Votes, supra note 3, at 48 (remarks of Sen. Wilson) ("It is not said who shall count the votes, nor who shall decide what votes shall be counted."); id. at 451 (remarks of Sen. Frelinghuysen) ("So when the Constitution says the vote shall be counted, it says that a decision shall be made by some one, and it must be made either by the presiding officer of the Senate or by the Senate and House, who are required to be present."); see also Spear, supra note 18, at 156 (noting a similar point).

223    This obvious point was made during the Electoral Count Act debates. See, e.g., 18 Cong. Rec. 46 (remarks of Rep. Dibble).

224    These are the two most obvious readings, but there are at least four other readings. A third reading is that the Clause is simply silent as to who shall count the votes and that Congress may specify the counting agent.

A fourth reading, suggested by Representative Dibble during the Electoral Count Act debates, is that the counting function is split between the House of Representatives and the Senate: the House is to count the presidential votes and the Senate the vice presidential votes, because, in case of deadlock, the House chooses the President and the Senate the Vice President. See 18 Cong. Rec. 46. There is no textual or historical support whatsoever for this reading. Moreover, this reading would have been impossible before the adoption of the Twelfth Amendment which required Electors to cast separately marked votes for President and Vice President, and it is unlikely that the Twelfth Amendment added to the evident textual ambiguity.

A fifth reading, suggested by Senator Thompson during the electoral count of 1857, makes even less sense. He suggested that the counting function is vested solely in the Senate, with the House only present as witnesses. See, e.g., Counting Electoral Votes, supra note 3, at 126 ("The Constitution, in my judgment, is that these votes are to be returned to us and counted by us, and the House of Representatives are admitted to be present at the count to prevent a combination, a clandestine operation, a secret session, a coup d'etat."); id. at 130 ("When we are counting the votes, (for the President of the Senate only counts them in his official capacity, and in the session of the Senate, because he cannot count them as a private individual,) it is improper for the House members to be anything but listeners."); id. at 136 ("The members of that House of Representatives are to sit by, and whether we put them in the gallery, or the reporters' desks, or in niches--wherever they are placed they are to look on.").

Finally, a sixth reading, suggested by Senator Call in 1876, is equally nonsensical. He suggested that the counting function is vested solely in the House of Representatives, because the Constitution vests in that body the duty to choose the President in case there is no winner in the Electoral College mode of presidential election, see U.S. Const. amend. XII, and only that body may determine whether there is such a winner. See 17 Cong. Rec. 1061 (1886); see also id. at 1019 (remarks of Sen. Hoar) (acknowledging and dismissing as incorrect this view of the counting function).

225    The Constitution only requires that the Senate and House of Representatives, as separately organized bodies, be present as witnesses for the opening of electoral certificates and (probably) the counting of electoral votes (to the extent that the "in presence of the Senate and House of Representatives" phrase modifies the counting phrase, "the votes shall then be counted," see infra notes 278-86

APPENDIX - 284

and accompanying text), but does not address whether the counting of electoral votes is to be done by the Senate and House of Representatives as such or by Senators and Representatives on a per capita vote basis (equivalent to the Senate and House of Representatives voting by joint ballot). Other scholars have noted similar points. See, e.g., Tribe, supra note 17, at 279 ("Is any such [counting] authority reposed instead in one or another House, or in the two Houses acting concurrently, or in the two Houses acting as a single organ even though not precisely as the Congress of the United States?"); and Harrison, supra note 23, at 703. Professor Harrison states:

How is the joint session [of the Senate and House of Representatives] to make decisions? The Constitution provides no explicit rule, and certainly does not indicate that the House and Senate are to be put together into one body that will act by majority vote. Rather, the two chambers appear to retain their separate identities: the certificates are to be opened in the presence, not of the Senators and Representatives, but of the Senate and the House.

Id. For various textual and largely structural reasons, I conclude that the counting of electoral votes is to be done by joint ballot of Senators and Representatives. See infra notes 291-313 and accompanying text (discussing unicameralism principle); infra notes 429-45 and accompanying text (discussing anti-Senate principle of presidential election); infra notes 526-53 and accompanying text (discussing Chadha principle of law-making).

226   For a classic use of early state constitutions to inform the meaning of provisions in the Constitution, see The Federalist No. 47, at 271-76 (James Madison) (Clinton Rossiter ed., Mentor 1999) (1961) (surveying the early state constitutions in discussing the separation of powers).

227   During the Electoral Count Act debates, Senator Hoar made this point, though he did not cite specific provisions from early state constitutions. See 17 Cong. Rec. 1019. For specific provisions, see, for example, the constitutions of the following states:

Delaware: "A president or chief magistrate shall be chosen by joint ballot of both houses, to be taken in the house of assembly, and the box examined by the speakers of each house in the presence of the other members...." Del. Const. of 1776, art. 7 (emphasis added). Maryland:

That a person of wisdom, experience, and virtue, shall be chosen Governor,... by the joint ballot of both Houses (to be taken in each House respectively) deposited in a conference room; the boxes to be examined by a joint committee of both Houses, and the numbers severally reported, that the appointment may be entered....

Md. Const. of 1776, art. XXV (emphasis added). Massachusetts:

The selectmen of the several towns shall preside at such meetings impartially, and shall receive the votes of all the inhabitants of such towns, present and qualified to vote for senators, and shall sort and count them in open town meeting, and in presence of the town clerk, who shall make a fair record, in presence of the selectmen, and in open town meeting, of the name of every person voted for, and of the number of votes against his name....

Mass. Const. of 1780, pt. 2, ch. 1, §II, art. II. Also Massachusetts:

Those persons who shall be qualified to vote for Senators and Representatives...shall... give in their votes for a Governor to the Selectmen, who shall preside at such meetings; and the Town Clerk, in the presence and with the assistance of the Selectmen, shall, in open town meeting, sort and count the votes, and form a list of the persons voted for, with the number of votes for each person against his name;....

Mass. Const. of 1780, pt. 2, ch. 2, §I, art. III (emphasis added). Vermont:

[A]t the opening of the General Assembly, there shall be a committee appointed out of the Council and Assembly, who, after being duly sworn to the faithful discharge of their trust, shall proceed to receive, sort, and count, the votes for the Governor, and declare the person who has the major part of the votes, to be Governor, for the year ensuing.

VT. Const. of 1777, ch. 2 §XVII (emphasis added). Virginia:

A Governor, or chief magistrate, shall be chosen annually by joint ballot of both Houses (to be taken in each House respectively) deposited in the conference room; the boxes examined jointly by a committee of each House, and the numbers severally reported to them, that the appointments may be entered....

Va. Const. of 1776, cl. 29 (emphasis added). Other early state constitutions providing for the election of the executive authority by the legislature (for example, Georgia, North Carolina, New Jersey, Pennsylvania, and South Carolina) or by direct popular election (for example, New York) did not address the counting of such votes. See, e.g., Ga. Const. of 1777, art. XXIII; N.C. Const. of 1776, art. XV; N.J. Const. of 1776, art. VII; Pa. Const. of 1776, §19; S.C. Const. of 1776, art. III.

228   2 Farrand, supra note 35, at 666; see also Burgess, supra note 18, at 647 ("The [F]ramers of the constitution undoubtedly meant that the president of the Senate should count the electoral votes....").

229   1 Annals of Cong. 16-17 (Joseph Gales ed., 1789).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.          79

230    See Tansill, supra note 22, at 516; Wroth, supra note 22, at 326 n.23; see also Counting Electoral Votes, supra note 3, at 116 (remarks of Sen. Reid) ("It has often happened that the Vice-President is a candidate for re-election; and we can scarcely suppose that the Constitution intended to confer on him the power of declaring himself elected by the votes he may count, without an appeal from his decision."). For more on the history of self-counting, see Counting Electoral Votes, supra note 3, at 533 (remarks of Sen. Morton) (presenting history of self-counting in 1797, 1801, 1821, 1837, 1841, and 1861); Harrison, supra note 23, at 703 n.12 (providing more examples).

231    See 10 Annals of Cong. 120 (1800). The bill stated:
And the constitution of the United States having directed that "the President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates, and that the votes shall then be counted," from which the reasonable inference and practice has been, that they are to be counted by the members composing the said Houses, and brought there for that office, no other being assigned them; and inferred the more reasonably, as thereby the Constitutional weight of each State in the election of those high officers is exactly preserved in the tribunal which is to judge of its validity: the number of Senators and Representatives from each State, composing the said tribunal, being exactly that of the Electors of the same State....
Id. (emphasis added).

232    3 Farrand, supra note 35, at 386 (remarks of Sen. Pinckney, Mar. 28, 1800) ("It is made their [Congress's] duty to count over the votes in a convention of both Houses, and for the President of the Senate to declare who has the majority of the votes of the Electors so transmitted.") (emphasis added). Indeed, there is an important difference between the "Congress" and the "Senate and the House of Representatives." The word "Congress" necessarily implies the two Houses of Congress acting independently in their corporate capacities, whereas the text of the Constitution is more ambivalent--allowing for the two Houses of Congress acting independently in their corporate capacities or for the two Houses of Congress acting conjointly in one common capacity.

233    See Wroth, supra note 22, at 327 & n.28 (examining language of implementing Act of Twelfth Amendment, Act of March 26, 1804, ch. 50, 2 Stat. 295, and language used in the electoral count of February 13, 1805).

234    Chancellor Kent stated:
I presume, in the absence of all legislative provision on the subject, that the President of the Senate counts the votes, and determines the result, and that the two houses are present only as spectators, to witness the fairness and accuracy of the transaction, and to act only if no choice be made by the electors.
2 Kent's Commentaries, supra note 19, at *276-77; see Duer's Commentaries, supra note 19, at 88-89 (similar). Note that Chancellor Kent seems to believe that Congress may by law take the counting function away from the President of the Senate; the source of Congress's power to do so is unclear. The question of Congress's source of power to enact legislation regulating the counting function is discussed in Part II.A.2 infra.

235    See supra notes 132-42 and accompanying text.

236    Counting Electoral Votes, supra note 3, at 135. Representative Humphrey Marshall stated his belief that "I am sure that the duty of determining whether a vote shall be counted belongs to the Senate and House, and not to the President of the Senate." Id. at 96; see also id. at 113 (remarks of Sen. Butler) (noting obvious conflicts of interest problem). However, as late as the Wisconsin Incident of 1857, some Members of Congress believed that the President of the Senate had the sole power to decide what to count and what not to count. See, e.g., id. at 134 (remarks of Sen. Stuart).

237    Id. at 445 (remarks of Sen. Bayard).

238    See 18 Cong. Rec. 30 (1886) (remarks of Rep. Caldwell); see also 17 Cong. Rec. 815 (1886) (remarks of Sen. Sherman) (noting the President of the Senate's attempt to assume the counting function in the electoral count of 1857); 18 Cong. Rec. 75 (remarks of Rep. Herbert) (noting the President of the Senate's attempt to assume the counting function in the electoral count of 1877).

239    18 Cong. Rec. 30.

240    For the historical view, see, for example, Counting Electoral Votes, supra note 3, at 445 (remarks of Sen. Bayard) ("That you could not delegate that power to another body I cannot doubt."); id. at 531 (remarks of Sen. Boutwell) ("Congress must exercise the power and perform the duty, and it is not possible under the Constitution to transfer it to anybody else."); 18 Cong. Rec. 51 (remarks of Rep. Adams) ("I can not conceive that any statute can take away from either of these two legislative bodies the power to come to a yes or no on any question relating to the business they then have in hand under the provisions of the Constitution.").

APPENDIX - 286

The scholarly view also supports the non-delegation of the counting function. See, e.g., Ross & Josephson, supra note 7, at 715 ("We agree with Pinckney that the Grand Committee procedure proposed in 1800 was unconstitutional because we do not believe Congress could delegate its joint power to count to a committee of selected members."); Spear, supra note 18, at 157 (observing that if the counting power is lodged in the two Houses of Congress, Congress cannot delegate the counting power to a committee "any more than it can establish a commission to levy taxes, or declare war").

241    See text accompanying infra notes 267-313.

242    But cf. Rawle, supra note 206, at 206. Rawle argued that:
It is not stated in the Constitution whether the president of the senate is on the trial of an impeachment restricted, as in legislative cases, to the casting vote. As he is constituted one of the judges by being appointed to preside without any restriction, the fair inference would be, that he is entitled to vote like the other judges, but on the trial last mentioned of a judge of the Supreme Court, the vote of the vice president does not appear in the printed journal.
Id.

243    U.S. Const. art. I, §3, cl. 4.

244    See 3 U.S.C. §15 (2000).

245    See infra notes 287-313, 526-53 and accompanying text.

246    As a related matter, it is not at all clear that the Vice President may cast a tie-breaking vote in a contingency election for Vice President in the Senate should there be no winner under the electoral college mode of vice presidential election. U.S. Const. amend. XII provides: The person having the greatest number of votes as Vice-President, shall be the Vice-President, if such number be a majority of the whole number of Electors appointed, and if no person have a majority, then from the two highest numbers on the list, the Senate shall choose the Vice-President; a quorum for the purpose shall consist of two-thirds of the whole number of Senators, and a majority of the whole number shall be necessary to a choice.

Some scholars have suggested that the Vice President could cast such a tie-breaking vote. See, e.g., Ho, supra note 195, at 239 n.47; Levinson & Young, supra note 195, at 934 n.37. At least one scholar has raised the possibility that the Vice President could not cast such a tie-breaking vote. See Akhil Reed Amar, President Thurmond? (Nov. 2, 2000), at http://slate.msn.com/? id=1006401 (on file with the North Carolina Law Review).

There are some very good reasons to seriously doubt that the Vice President could cast such a tie-breaking vote. As a textual matter, the Vice President is not a "Senator" and the Twelfth Amendment ostensibly requires a majority of the whole number of Senators--today, fifty-one Senators. If there is no majority of Senators in a contingency election for Vice President in the Senate, the Senate would have to choose again. Note that the same is true in the House of Representatives where there is no arbiter to cast a tie-breaking vote. If there is no majority of states in a contingency election for President in the House of Representatives, the House would have to choose again. We have seen this done before: In the contingency election for President in 1801, the House of Representatives completed thirty-five rounds of balloting before choosing a President, see supra note 3.

More generally: The Framers generally understood and appreciated the conflict of interest problems of the Vice Presidency, see supra notes 204-13 and accompanying text. It is worth hesitating before concluding that one person has the power to determine an election, particularly (but not only) when that one person would be likely to benefit from the decision. While it is true that other Senators may have conflict of interest problems because they too could be candidates for Vice President, it is one thing to say that a Senator may vote for himself or herself along with other Senators, and quite another to give the decisive vote to one man or woman. The Vice President's tie-breaking vote is decisive in a way that the votes of Senators are not. Interestingly, when the Framers contemplated direct presidential election by Congress, they rejected without discussion giving the Vice President a tie-breaking vote. See 2 Farrand, supra note 35, at 403 ("Mr[.] Read moved 'that in case the numbers for the two highest in votes should be equal, then the President of the Senate shall have an additional casting vote,' which was disagreed to by a general negative.").

Finally, if the rule is that the Vice President's power to cast tie-breaking votes only applies to Article I business (legislation and the internal matters of the Senate, including the election of Senate officers and the appointment of Senate committees) and not to Article II or Twelfth Amendment business, then it would also follow that the Vice President would not have a tie-breaking vote under the Treaty Clause or the Appointments Clause, which both appear in Article II. See U.S. Const. art. II, §2, cl. 2. This appears to be the case, reinforcing the arguments above. It is not possible for the Vice President to cast a tie-breaking vote with respect to treaties which require a two-thirds majority of Senators, see id., but it is possible for the Vice President to do so with respect to presidential nominations under the Appointments Clause, which only require a majority of Senators. Notwithstanding, Alexander Hamilton intimated early on that the Vice President could not cast a tie-breaking vote on presidential nominations under

APPENDIX - 287

the Appointments Clause. See The Federalist No. 69, at 389 (Alexander Hamilton) (Clinton Rossiter ed., Mentor 1999) (1961) ("In the national government, if the Senate should be divided, no appointment could be made; in the government of New York, if the council should be divided, the governor can turn the scale and confirm his own nomination."). The lack of mention of the Vice President is surprising given that he discussed the Vice President (and her tie-breaking vote) in the immediately preceding essay, see The Federalist No. 68, at 47 (Alexander Hamilton) (Clinton Rossiter ed., Mentor 1999) (1961), but perhaps he thought that the Vice President would not necessarily act in accordance with the President's interests (recall that prior to the development of the party system, the Vice President was merely the runner-up in the presidential election and oftentimes the chief opponent of the President). Only once in our nation's history, to my knowledge, has a Vice President cast a tie-breaking vote on a presidential appointment. In 1832, President Andrew Jackson nominated Senator Martin Van Buren as ambassador to Great Britain. The Senate split evenly, and Vice President Calhoun broke the tie by voting against President Jackson's nomination. See Vice Presidents of the United States, Martin Van Buren (1833-1837), at http://www.senate.gov/learning/stat_vp8.html (last visited Apr. 17, 2002) (on file with the North Carolina Law Review). Vice President Calhoun's negative vote was unnecessary of course, as a tie vote is widely considered to be defeated, though some accounts treat his vote as the "deciding vote." See, e.g., id.

247    U.S. Const. amend. XII (emphasis added).

248    See Robert N. Clinton, A Mandatory View of Federal Court Jurisdiction: Guided Quest for the Original Understanding of Article III, 132 U. Pa. L. Rev. 741, 782 & n.147 (1984) (stating that the Framers used "shall" as a word of obligation and "may" as a word of discretion and providing numerous examples in the Constitution); see also 2 Farrand, supra note 35, at 485-86 (stating that the Framers carefully distinguished between the words "ought," "shall," and "may" in the drafting of the Full Faith and Credit Clause, U.S. Const. art. IV, §1). Indeed, the Electoral College Clauses make the point amply: the word "shall" is used some eighteen times and the word "may" is used once. See U.S. Const. art. II, §1, cl.4 ("The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States.") (emphasis added).

249    115 Cong. Rec. 168-69 (1969) (remarks of Rep. Rarick during the Bailey Incident of 1969).

250    See, e.g., The Federalist No. 68, supra note 246, at 380 ("Nothing was more to be desired [in the use of the Electoral College mode of presidential election] than that every practicable obstacle should be opposed to cabal, intrigue, and corruption."); 4 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 122 (Jonathan Elliot ed., 2d ed. 1836) [hereinafter Elliot's Debates] (remarks of William Davie at North Carolina ratifying convention) ("He is elected on the same day in every state, so that there can be no possible combination between the electors."). At the North Carolina ratifying convention, James Iredell remarked:
Had the time of election been different in different states, the electors chosen in one state might have gone from state to state, and conferred with the other electors, and the election might have been thus carried on under undue influence. But by this provision, the electors must meet in the different states on the same day, and cannot confer together. They may not even know who are the electors in the other states. There can be, therefore, no kind of combination. It is probable that the man who is the object of choice of thirteen different states, the electors in each voting unconnectedly with the rest, must be a person who possesses, in high degree, the confidence and respect of his country.
4 id. at 105. Sen. Rufus King later remarked:
[M]embers of the General Convention... did indulge the hope, by apportioning, limiting, and confining the Electors within their respective States, and by the guarded manner of giving and transmitting the ballots of the Electors to the Seat of Government, that intrigue, combination, and corruption, would be effectually shut out, and a free and pure election of the President of the United States made perpetual.
3 Farrand, supra note 35, at 461 (Mar. 18, 1824); see also 1 Kent's Commentaries, supra note 19, at *280 ("These electors assemble in separate and distantly detached bodies, and they are constituted in a manner best calculated to preserve them free from all inducements to disorder, bias, or corruption.").

251    Professor Amar has suggested, albeit in passing, that the counting function is ministerial. See Amar, supra note 10, at 229 ("In counting votes, Congress performs in effect a ministerial function, registering the will of the voters in the electoral college.").

252    115 Cong. Rec. 158 (remarks of Rep. Corman during the Bailey Incident of 1969).

253    Spear, supra note 18, at 156.

254    See id. (noting that the counting function "must, to some extent, be judicial, in order that it may be ministerial and declarative. It is not possible to count,... without deciding what shall be counted").

APPENDIX - 288

255    2 Farrand, supra note 35, at 515.

256    U.S. Const. art. II, §1, cl.3; U.S. Const. amend. XII.

257    Counting Electoral Votes, supra note 3, at 52 (1821). Just two years later, Senator Benton observed:

Two questions of great delicacy now present themselves:

1. If electors are not appointed according to the Constitution, can their votes be counted?

2. If objected to, who shall judge them?

It is the duty of the two houses of Congress to count the votes. Can they count unconstitutional votes? If they cannot, shall they not judge every vote before it is counted?

Id. at 57 (1823).

258    Id. at 54.

259    Id.

260    Id. at 142.

261    Id. at 89. Representative Marshall misquoted the constitutional text. He also did not notice the textual significance in the use and seeming disuse of the word "all." In a later remark, he came close: "The President of the Senate has to open all the certificates, and then his function is performed; and after all the certificates have been opened, the counting of the votes is then to commence and be concluded." Id. at 95 (emphasis in original).

262    Id. at 140; see also id. at 112 (remarks of Sen. Toombs) ("When we are called upon to see these votes counted, it becomes our first duty to know what are the votes to be counted.").

263    Id. at 140.

264    Id. at 134.

265    Id. at 456; see also id. at 531 (remarks of Sen. Boutwell) (stating his belief that "the counting of the votes, in the language of the Constitution, means something more than a mere examination of the certificates returned from the electors of the respective States").

266    Id. at 523 (remarks of Sen. Bayard).

267    U.S. Const. amend. XII (emphasis added).

268    Id.

269    The word "immediately" is rare in the original Constitution, and is used in only one other clause of the original Constitution. See U.S. Const. art. I, §3, cl.2 ("Immediately after they shall be assembled in Consequence of the first Election, they shall be divided as equally as may be into three Classes.").

270    See 10 Annals of Cong. 137 (1800).

271    See id. at 138 (emphasis added). The Twelfth Amendment, adopted in 1804, also contains a requirement that the House of Representatives shall "immediately" choose a President. However, the Twelfth Amendment seems to significantly soften--and perhaps quash--Senator Pinckney's immediacy principle. The Twelfth Amendment, unlike the original Electoral College Clauses, provides that "if the House of Representatives shall not choose a President whenever the right of choice shall devolve upon them, before the fourth day of March next following, then the Vice-President shall act as President, as in the case of the death or other constitutional disability of the President." U.S. Const. amend. XII, amended by U.S. Const. amend. XX, §3. Federal law, at the time of the adoption of the Twelfth Amendment, specified that the counting of electoral votes would take place on the second Wednesday in February. Thus, the Twelfth Amendment seems to countenance up to two weeks of deliberation by the House of Representatives. William Alexander Duer made the point that

[a]lthough the Constitution directs that when no person is found to have a majority of the Electoral votes, the choice shall be immediately made by the House of Representatives, yet it is not held obligatory upon that House to proceed to the election directly upon the separation of the two Houses; but that it may proceed either at that time and place, or omit it until afterwards. This construction

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

was adopted before the [Twelfth Amendment], and there can now be no doubt of its correctness, as the amendment expressly declares the choice of the House to be valid, if made before the fourth of March following the day on which the Electoral votes are counted. Duer's Commentaries, supra note 19, at 89-90.

If we read the immediacy principle as loosely as Professor Duer suggests, the current Constitution seems to countenance exactly seventeen days of deliberation by the House of Representatives. See U.S. Const. amend. XX, §1 (“The terms of the President and Vice President shall end at noon on the 20th day of January, and the terms of Senators and Representatives at noon on the 3d day of January,...and the terms of their successors shall then begin.”).

It should be noted that the Twelfth Amendment does not specify when the Senate shall choose the Vice President should the choice devolve upon it. Could it be that the framers of the Twelfth Amendment simply forgot to add comparable language for the Senate? See also 1 Kent's Commentaries, supra note 19, at *278 (“The [C]onstitution does not specifically prescribe when or where the [S]enate is to choose [V]ice-[P]resident, if no choice be made by the electors; and, I presume, the [S]enate may elect by themselves, at any time before the fourth day of March following.”). It goes without saying that the current Constitution seems to countenance exactly seventeen days of deliberation by the Senate. See U.S. Const. amend. XX, §1.

272    2 Farrand, supra note 35, at 502.

273    Horatius, The Presidential Knot, Wash. Federalist, Jan. 6, 1801 [hereinafter Horatius Letter]. I am grateful to Professor Ackerman for providing me with a copy of Horatius's letter. Professor Ackerman believes that “Horatius” is John Marshall, a conclusion which he (tentatively) reaches based on a computer analysis of Marshall's writings (performed with his linguist friend, Roger Shuy), and based on other “old-fashioned circumstantial evidence,” including a snippet from Marshall historian Albert J. Beveridge. See Email from Bruce Ackerman to Vasan Kesavan (Apr. 17, 2002) (on file with author).

274    3 U.S.C. §17 (2000) provides that

When the two Houses separate to decide upon an objection that may have been made to the counting of any electoral vote or votes from any State, or other question arising in the matter, each Senator and Representative may speak to such objection or question five minutes, and not more than once; but after such debate shall have lasted two hours it shall be the duty of the presiding officer of each House to put the main question without further debate.

275    See U.S. Const. art. I, §5, cl.2 (Rules of Proceedings Clause) (“Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two[-]thirds, expel a Member.”). Anyone who wishes to argue that the Electoral Count Act is constitutional faces the most difficult task in justifying the constitutionality of 3 U.S.C. §17.

During the Electoral Count Act debates, Senator Christiancy noted the constitutional problem. “I notice,” said Christiancy, that this bill, which it is proposed to make an act of Congress, provides for the length of the time that any Senator or Representative may speak when the Senate is acting separately and the House is acting separately. I wish to know if that is not trenching upon the constitutional power of each house to make its own rules to regulate its own proceedings.

Counting Electoral Votes, supra note 3, at 688 (1876). Senator Thurman responded to the point with an entirely unconvincing answer: The joint rule heretofore adopted prohibited all debate, and it seems to have been held good. No question was ever made in respect of that rule. If we have the right to legislate upon this subject, as I think we have--and this whole bill goes upon that foundation--then I think we have a right to regulate the mode of procedure so that it shall not be defeated, as it otherwise might be, by the consumption of time in speaking.”

Id. Senator Edmunds, for his part, rightly noted that “[t]hen you might pass a law as to all bills.” Id.

276    U.S. Const. art. II, §1, cl.3. This language is likely a vestige of early drafts of the Electoral College Clauses which vested the choice of a President and Vice President in case of electoral deadlock in the Senate. See, e.g., 2 Farrand, supra note 35, at 497-98. There is a reasonable functional explanation as to why the Framers kept this requirement. The Framers believed that the Senate would be in almost constant session anyway, unlike the House of Representatives. See, e.g., id. at 274 (remarks of George Mason) (observing that Senators “will probably settle themselves at the seat of Govt.” unlike Representatives “chosen frequently and obliged to return frequently among the people”); id. at 523 (remarks of James Wilson) (“The Senate, will moreover in all probability be in constant Session.”); id. at 537 (remarks of George Mason) (supporting privy council of six members to the President on basis that it would “prevent the constant sitting of the Senate which he thought dangerous”); id. at 639 (remarks of George Mason) (referring to “long continued sessions of the Senate”); George Mason, Objections to the Constitution of Government Formed by the Convention (1787), reprinted in 2 The Complete Anti-Federalist 11 (Herbert J. Storing ed., 1981) (referring to Senate as “a constant existing Body almost continually sitting”); Essay XVI of Brutus (Apr. 10, 1788), reprinted in id. at 444 (stating that Senators “will for the most part of the time be absent from the state they represent” and that Senators will be inhabitants of the “federal city”).

APPENDIX - 290

277   U.S. Const. art. II, §1, cl.3.

278   U.S. Const. amend. XII (emphasis added). Interestingly, an early draft of the Electoral College Clauses at the Philadelphia Convention provided that "[t]he President of the Senate shall in that House open all the certificates; and the votes shall be then & there counted." 2 Farrand, supra note 35, at 497-98 (emphasis added).

279   Indeed, the secret drafting history of the Constitution shows that when the "in presence" phrase was agreed to, it was inserted after the word "counted" in the draft of the Electoral College Clauses, thus modifying both the opening of certificates and the counting of votes. See 2 Farrand, supra note 35, at 518, 526. When the report was produced, however, the text was re-ordered and read: "The President of the Senate shall in the presence of the Senate and House of Representatives open all the certificates & the votes shall then be counted." Id. at 528; see also Counting Electoral Votes, supra note 3, at 451 (1875) (remarks of Sen. Frelinghuysen) ("The Constitution says that the votes shall then in the presence of the Senate and House of Representatives be counted."); 1 Tucker's Commentaries, supra note 19, app. at 327 ("The certificates... are to be publicly opened, and counted in the presence of the whole national legislature:...."); Horatius Letter, supra note 273 ("The constitution has enjoined that the certificates of the electors shall be opened, and their votes counted in the presence of the Senate, and House of Representatives.") (emphasis in original); 18 Cong. Rec. 45 (1886) (remarks of Rep. Dibble) (noting that the counting of electoral votes takes place in the presence of the Senate and House of Representatives).

280   See U.S. Const. amend. XII. For an eloquent expression of this point, see 18 Cong. Rec. 30 (remarks of Rep. Caldwell).

281   For an eloquent expression of the publicity principle, see 10 Annals of Cong. 145 (1800) where Senator Pinckney remarked:
Give, however, the power of deciding on their votes, and of rejecting or receiving them, as they please, to thirteen men, all of the same political description, all wishing the same men, sitting with closed doors, and whose deliberations are removed from the public eye, and you will find it difficult to avoid just suspicion; your jealous citizens will remember that secrecy always accompanies corruption, and that even if this committee were to act in the most honorable manner, yet still that the friends of the candidate whose votes have been refused, if such refusal cost him his election, will never cease to suspect that all has not been fair, and that some improper reason had influenced the decision.

282   Counting Electoral Votes, supra note 3, at 126 (1857); see also id. at 452 (remarks of Sen. Frelinghuysen) ("Why, sir, are the House and the Senate present? It is because they represent the sovereignty of the Government at that most critical moment when the executive power is to be transmitted, and they are there that the transmission may be under their watchful guardianship.").

283   Professor Glennon seems to think that closed proceedings are constitutionally permissible, but not constitutionally desirable. See Glennon, supra note 18, at 48 (discussing question of "Open or Closed Proceedings?"). This is a seriously flawed reading of the Electoral College Clauses, which emphasize publicity, and of the original Constitution in its entirety, which emphasizes the same. See, e.g., U.S. Const. art. I, §5, cl. 3 (Journal of Proceedings Clause); U.S. Const. art. I, §7, cl. 2 (Veto Clause); U.S. Const. art. I, §9, cl. 7 (Receipts and Expenditures Clause); U.S. Const. art. II, §2, cl. 1 (Opinion Clause); U.S. Const. art. II, §2, cl. 3 (Commissions Clause); U.S. Const. art. III, §3, cl. 1 (Treason Clause); see also Harrison, supra note 23, at 705 (noting that "a public occasion for the [electoral] count will inspire public confidence in the probity of the process"); cf. Pa. Const. of 1776, §13 ("The doors of the house in which the representatives of the freemen of this state shall sit in the general assembly, shall be and remain open for the admission of all persons who behave decently, except only when the welfare of this state may require the doors to be shut.").

284   See, e.g., 10 Annals of Cong. 137 (remarks of Sen. Pinckney) (describing immediacy principle as "instantly, and on the spot, without leaving the House in which they are then assembled, and without adjournment") (emphasis added); 2 Farrand, supra note 35, at 518-19 (describing motion of James Madison that, in case of electoral deadlock, two-thirds of Senators be present in presence of the Senate and the House of Representatives to choose the President; motion passed by a vote of six to four and was subsequently rendered moot by motion to vest choice of President in case of electoral deadlock in House of Representatives); Horatius Letter, supra note 273 ("The choice is required to be immediately made, in order that the result may be declared in the presence of the Senate, and to prevent the possibility of intrigue and corruption.").
Although the Twelfth Amendment relaxed the immediacy principle (giving the House of Representatives additional time to choose a President in case of electoral deadlock, see supra note 271), it is much less clear that it also relaxed the publicity principle. It appears that the House of Representatives chose the President in the presence of the Senate in 1801 and 1825. See 1 Kent's Commentaries, supra note 19, at *277 (noting that the Senate was "admitted to be present as spectators"); Duer's Commentaries, supra note 19, at 90 (similar).

APPENDIX - 291

285     This principle was violated in the electoral count of 1837. The Senate chose the Vice President because of electoral deadlock but did so in the Senate Chamber and not in the presence of the House of Representatives in joint convention.

286     Counting Electoral Votes, supra note 3, at 90 (emphasis added); see also id. at 114 (remarks of Sen. Butler) ("The Senate of the United States is called into the other house as a corporate body, an imposing corporate body, to be a witness to the election of the Chief Magistrate of this country, and to see that the votes are counted fairly."); id. at 452 (remarks of Sen. Frelinghuysen) (supporting amendment to Twenty-second Joint Rule) ("Why, sir, are the House and the Senate present? It is because they represent the sovereignty of the Government at that most critical moment when the executive power is to be transmitted, and they are there that the transmission may be under their watchful guardianship.").

287     Under the current Electoral Count Act, the President of the Senate and Members of Congress are to meet in the Hall of the House of Representatives. See 3 U.S.C. §15 (2000). During the Wisconsin Incident of 1857, Senator Thompson declared his belief that the intent of the Framers was to make the House of Representatives present as witnesses in the Senate Chamber. See Counting Electoral Votes, supra note 3, at 126.

288     In congressional debate, this one body has been repeatedly referred to as a "convention" or a "joint convention" of the two Houses, although the Constitution does not employ this word. There were, of course, those who disagreed with this term. See, e.g., Counting Electoral Votes, supra note 3, at 111 (remarks of Sen. Stuart).

289     The unicameralism principle, without more, does not require that the counting function be exercised by the Senators and Representatives in the unicameral body on a per capita vote basis. The Senate and House of Representatives could, presumably without undue trouble, organize themselves and vote as separate bodies while convened together in one room. For present purposes, I define the unicameralism principle as counting electoral votes on a per capita vote basis (equivalent to the Senate and House of Representatives voting by joint ballot), thereby giving Representatives a decisive advantage over Senators in resolving disputes in the counting of electoral votes. As we shall see presently, this conception of the counting function makes better sense of constitutional structure.

290     3 U.S.C. §15.

291     Counting Electoral Votes, supra note 3, at 529. Also, Senator Boutwell remarked that:
There can be, under the Constitution, no tribunal to decide that or any other question arising in the course of counting the votes, because it is a duty imposed upon the two [H]ouses of Congress. They alone can perform it, and they have not the power to transfer its performance to anybody else.
Id. at 531.

292     2 Farrand, supra note 35, at 497-98 (emphasis added).

293     See id. at 528.

294     As a background principle, it might be said that the Framers shied away from separate action by the two Houses in electing the President when both Houses were involved. Before the Framers agreed to the electoral college mode of election, the President was to be elected by the Legislature--not the two Houses of Congress acting separately--but by joint ballot. 2 Farrand, supra note 35, at 401-03. The rationale was to avoid the "[g]reat delay and confusion [which] would ensue if the two Houses shd [sic] vote separately, each having a negative on the choice of the other." Id. at 402 (remarks of Nathaniel Gorham).
The Framers thought that a joint ballot was particularly important in one other area. Both the draft of the Constitution referred to the Committee of Style and its report provided for the appointment of the Treasurer of the United States by joint ballot of the Congress. See id. at 570 (draft referred to Committee of Style) (stating that Congress shall have power "[t]o appoint a Treasurer by joint ballot"); id. at 594 (report of Committee of Style) (first provision of precursor to U.S. Const. art. I, §8) ("The Congress may by joint ballot appoint a treasurer."). This provision was subsequently deleted on September 14, 1787, just three days before the Philadelphia Convention of 1787 completed its business. See id. at 614.

295     Specifically,
A motion of Mr. Gallatin was under consideration to insert, instead of the principle that in cases of doubt the Houses should divide to their respective Chambers to consider the qualification or disqualification of a vote or votes, from their joint meeting, if such question should arise at counting the votes, the following words: "And the question of the exception shall immediately, and without debate, be taken by yeas and nays, and decided by a majority of the members of both Houses then present."

Counting Electoral Votes, supra note 3, at 26 (emphasis added).

296    Id. During the Electoral Count Act debates, Representative Adams made note of Representative Gallatin's motion in 1800 in support of his argument for unicameral action. See 17 Cong. Rec. 51 (1886) (remarks of Rep. Adams).

297    Counting Electoral Votes, supra note 3, at 16.

298    See 10 Annals of Cong. 139 (1800) ("Congress shall not themselves, even in joint convention, have the smallest power to decide on a single vote."); id. ("[H]ow utterly unconstitutional it would be for Congress, either acting in their separate chambers or in convention, to attempt to assume to themselves the power to reject a single vote.").

299    See 10 Annals of Cong. 120.

300    Counting Electoral Votes, supra note 3, at 54; see also id. at 52 (remarks of Rep. Henry Clay) (implying joint action by the two Houses because the two Houses might disagree if they met separately and "then the votes would be lost altogether").

301    Id. at 49.

302    Id. at 137. Senator Cass presented the argument against the unicameralism principle:
I wish to submit a single remark to the President and to the Senate, for I do not consider that this convention can be addressed. We can take no vote. How are we to vote? Per capita or by States? Are we to vote as representatives of the people or representatives of States? If we cannot vote here, we cannot discuss. The only thing which remains for us to do, if there are insuperable difficulties in the way, is to adjourn immediately to our respective halls. Then let the Senate or the House of Representatives bring up the matter for action. By the present proceeding we are overturning the Government--we are making this a national convention.
Id. at 91. Senator Toucey remarked that "[i]f there is to be any action, or deliberation with a view to action, the two houses must separate, deliberate, and act separately." Id. at 121.

303    Id. at 137.

304    Id. at 140. Representative Humphrey Marshall--Justice John Marshall's cousin--agreed:
We have a constitutional duty to see that the count is properly made, and a separate resolution passing from this House to the Senate, and from the Senate back to this House, does not, according to my view, meet the requirements of the Constitution. The examination must be made, and the proclamation must be made, in the presence of the two houses.
Id. at 141.

305    Id. at 140.

306    Id. at 465.

307    17 Cong. Rec. 2429 (1886) (remarks of Sen. George).

308    Id.

309    Id.

310    See 15 Cong. Rec. 5460-68, 5547-51 (1884); 16 Cong. Rec. 1618 (1885).

311    See, e.g., 17 Cong. Rec. 1058 (remarks of Sen. Evarts) (stating that the joint convention would be "wholly an unconstitutional assemblage" and that "I can find no ground to support this extra assemblage of the two Houses voting per capita"); Representative Caldwell remarked:
It will be perceived that this bill is not predicated upon the idea of throwing the two Houses into convention and merging the smaller body, the Senate, into the larger body, the House of Representatives, and voting per capita. It is submitted that no constitutional warrant can be found for such an idea.
18 Cong. Rec. 31 (1886). Representative Herbert remarked:
The words are not in the presence of the members of the Senate, or in the presence of the members of the House of Representatives, but in the presence of the Senate, which can only mean the organized Senate, and the House of Representatives, which can only mean the organized House of Representatives.
Id. at 75.

APPENDIX - 293

312   For example, Representative Caldwell stated that

the action of the two Houses shall be separate and concurrent upon all questions of contest arising under the count, but joint as to results, thus preserving the dignity and rights of the two bodies by conceding to each equal and concurrent powers in counting and judging of the validity of electoral votes without merger of the lesser body into the numerically greater.

18 Cong. Rec. 31. Addtionally,

[t]he separate concurrent action of both Houses provided for in the bill preserves the constitutional identity, rights, and dignity of each. This concession of each House to the other of equal and concurrent power to decide on informalities and illegalities appearing on the face of returns, upon objection of a Senator or Representative, is necessary to the determination of results.

Id.; see also id. at 50 (remarks of Rep. Adams) ("[M]y theory is that the two Houses of Congress, acting each in its own individual capacity, each voting by itself, have absolute control of the entire subject.").

313   See infra notes 526-53 and accompanying text.

314   For the structural argument that Congress may not bind the joint convention in counting electoral votes, much less future joint conventions, see infra notes 498-525 and accompanying text.

315   See, e.g., McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 405 (1819) ("This government is acknowledged by all to be one of enumerated powers."); Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176 (1803) ("[T]hat those limits may not be mistaken, or forgotten, the constitution is written.").

316   This easy textual point was, of course, made during the Electoral Count Act debates. For example, Senator Jones remarked that

[t]he authority proposed to be given to the Senate and House of Representatives by this bill cannot surely be derived from any of the express powers of the Constitution. There is not a word said in the article which contains the delegated powers on this subject of counting the electoral votes. All that the Constitution says in regard to the electoral vote is to be found embodied in the second article. Counting Electoral Votes, supra note 3, at 596.

317   U.S. Const. art. I, §8, cl.18.

318   The most recent scholars to address the Electoral Count Act state that "Congress probably has the power, when explicit constitutional requirements are violated, not to count elector votes" because Members of Congress take an oath or affirmation to support the Constitution. Ross & Josephson, supra note 7, at 713. This argument does not support the constitutionality of the Electoral Count Act unless the Oath or Affirmation Clause is the font of power for the Electoral Count Act--an interpretation that is devoid of any textual, historical, or structural support.

It is also not at all clear whether Ross and Josephson believe that the Oath or Affirmation Clause is the font of congressional power or congressional duty to reject unconstitutional electoral votes. Their foregoing statement suggests the former, but two other statements suggest the latter. See id. ("Depending on the type of constitutional requirement and whether rejection of the vote would change the result of the election, Congress might have a duty, under the oath of office to which its members swear, to reject an elector vote that does not conform to the Constitution."); id. at 739 ("Under the oath each member takes, Congress must uphold constitutional requirements for presidential elections, particularly those that lie at the heart of the constitutionality of the process.") (emphasis added). If the Oath or Affirmation Clause is the font of congressional duty to reject unconstitutional electoral votes, they cannot be correct that that duty possibly turns "on the type of constitutional requirement and whether the rejection of the vote would change the result of the election." The duty to support the Constitution is absolute, not conditional.

Moreover, the argument from the Oath or Affirmation Clause has almost no historical support: only one Member of Congress, to my knowledge, pointed to the Oath or Affirmation Clause as a font of congressional power over the electoral count. See Counting Electoral Votes, supra note 3, at 142 (remarks of Rep. Marshall) ("You are under oath to support the Constitution, and you cannot count a vote which violates that instrument, and is a breach of the privileges of the electoral colleges."). The argument has even less textual support: when we consult the text of the Oath or Affirmation Clause, we see that Members of Congress take an oath or affirmation to support the Constitution, but so do members of the state legislatures and executive and judicial Officers of the United States and of the several states. U.S. Const. art. VI, cl. 3. Indeed, Senator Pinckney pointed to the oaths or affirmations taken by members of the state legislatures and state executives to argue against any congressional power to judge electoral votes. See, e.g., 10 Annals of Cong. 131 (1800) ("Is not the Constitution the supreme law of the land, and must not the State Legislatures conform their directions in the appointment of Electors to the directions of the Constitution?"). Senator Pinckney also remarked:

Another serious objection to this bill, or to the exercise of this power, either by Congress or committee, is, that the Executives of the States and the State Legislatures are equally bound with Congress, by oath, "to support the Constitution;" it is an oath they all take at the commencement of each new Legislature.

APPENDIX - 294

Id. at 144-45. The important point is that there is no textual justification for supposing that the Oath or Affirmation Clause gives Congress any special constitutional duty in the counting of the electoral vote. Cf. U.S. Const. art. I, §3, cl.6 ("The Senate shall have the sole Power to try all Impeachments. When sitting for that Purpose, they shall be on Oath or Affirmation.").

319  U.S. Const. art. I, §8, cl.18.

320  Compare Burgess, supra note 18, at 646 (concluding that the Necessary and Proper Clause is the font of power for the Electoral Count Act), with Ross & Josephson, supra note 7, at 714-15 (reaching opposite conclusion).

321  As a matter of grammar and punctuation, it is arguable that there is no standalone second prong of the Necessary and Proper Clause, and that the second prong and third prong together constitute one prong.

322  U.S. Const. art. I, §8, cls.1-17; see also INS v. Chadha, 462 U.S. 919, 983-84 (1983) (White, J., dissenting) (stating that "the Necessary and Proper Clause vests Congress with the power 'to make all laws which shall be necessary and proper for carrying into Execution the foregoing powers [the enumerated powers of §8]'") (alteration in original).

323  Technically, the third prong of the Necessary and Proper Clause refers to "Department" or "Officer" and not to "Department of the United States" or "Officer of the United States." The phrase "of the United States" is fairly and necessarily attributed to both given the last word in the clause "thereof." See U.S. Const. art. I, §8, cl. 18 (stating that Congress shall have power "[t]o make all Laws which shall be necessary and proper for carrying into Execution... all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof"). At least one scholar agrees that the word "Officer" in the Necessary and Proper Clause is "a synonym for the term of art 'Officer of the United States.'" Steven G. Calabresi, The Political Question of Presidential Succession, 48 Stan. L. Rev. 155, 161 (1995).

324  See, e.g., Laurence H. Tribe, American Constitutional Law §4-17, at 290 (2d ed. 1988); Amar & Amar, supra note 27, at 114-17 (presenting textual proof); Calabresi, supra note 323, at 158-63 (same); Vasan Kesavan, The Very Faithless Elector?, 104 W. Va. L. Rev. 123, 133 n.46 (2001) (same).

325  See U.S. Const. art. II, §4 ("The President, Vice President, and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors."). For early statements supporting this point, see, for example, 4 Elliot's Debates, supra note 250, at 33 (remarks of Gov. Samuel Johnston at North Carolina ratifying convention); id. at 34 (remarks of Archibald Maclaine at North Carolina ratifying convention); id. at 127 (remarks of James Iredell at North Carolina ratifying convention).

326  U.S. Const. art. I, §6, cl. 2 (emphasis added); see also 2 Farrand, supra note 35, at 492 ("The last clause rendering a Seat in the Legislature & an office incompatible was agreed to nem: con:.") (emphasis added).

327  See, e.g., The Federalist No. 49 (James Madison) (entitled "Method of Guarding Against the Encroachments of Any One Department of Government by Appealing to the People Through a Convention"); The Federalist No. 49, at 282 (James Madison) (Clinton Rossiter ed., Mentor 1999) (1961) (describing "perfectly co-ordinate" legislative, executive, and judicial departments); see also Steven G. Calabresi & Kevin H. Rhodes, The Structural Constitution: Unitary Executive, Plural Judiciary, 105 Harv. L. Rev. 1153, 1156 n.6 (1992) (noting similar point).

328  See, e.g., Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304, 329 (1816) (Story, J.) ("The object of the constitution was to establish three great departments of government; the legislative, the executive, and the judicial departments."); Ware v. Hylton, 3 U.S. (3 Dall.) 199, 272-73 (1796) (Iredell, J.) (referring to the "Legislative, Executive, and Judicial Departments" and the "Legislative department"); Calder v. Bull, 3 U.S. (3 Dall.) 386, 398 (1789) (Iredell, J.) (referring to "a government, composed of Legislative, Executive and Judicial departments").

329  U.S. Const. art. II, §2, cl. 1 ("[The President] may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices ....").

330  U.S. Const. art. II, §2, cl. 2 ("[B]ut the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.").

APPENDIX - 295

331   Such legislation is to be sharply distinguished from legislation enacted pursuant to Congress's enumerated powers operating on, for example, the federal government (including Congress) as well as the governments of the several States as well as the people (citizens and aliens) of the United States.

332   U.S. Const. art. I, §5, cl. 2.

333   For a contrary view taken in passing, see Calabresi, supra note 323, at 160 n.31 (noting that the "Necessary and Proper Clause empowers Congress to carry into execution its own powers, including the rule-making powers of both Houses").

334   See, e.g., The Federalist No. 51, at 290 (James Madison) (Clinton Rossiter ed., Mentor 1999) (1961) ("In republican government, the legislative authority necessarily predominates. The remedy for this inconveniency is to divide the legislature into different branches; and to render them, by different modes of election and different principles of action, as little connected with each other as the nature of their common functions and their common dependence on society will admit."); 1 Farrand, supra note 35, at 254 (similar); 2 Story's Commentaries, supra note 9, §§547-557, at 27-36 (discussing importance of bicameralism in constitutional structure); see also INS v. Chadha, 462 U.S. 919, 947-51 (1983) (same).

335   See infra notes 498-525 and accompanying text.

336   See, e.g., Gary Lawson & Patricia B. Granger, The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause, 43 Duke L.J. 267, 274 n.23 (1993) (reading third prong of the Necessary and Proper Clause as giving Congress power to pass laws "'horizontally' to implement the constitutionally vested powers of federal executive and judicial officers"); William Van Alstyne, The Role of Congress in Determining Incidental Powers of the President and of the Federal Courts: A Comment on the Horizontal Effect of the Sweeping Clause, 40 Law & Contemp. Probs., 102, 107-120 (1976).

337   Although this body is technically not "Congress," the argument that this body is not a "Department" whose members are "Officer[s]" within the meaning of the Necessary and Proper Clause is largely analogous to the argument set forth above concerning Congress. The members of this body are the Members of Congress, and this body is not an executive or judicial department of the United States whose officers (with the exception of the President and Vice President) are appointed pursuant to the Appointments Clause, U.S. Const. art. II, §2, cl. 2.

338   Professor Rosenthal believes the Necessary and Proper Clause is the font of congressional power not to count the electoral votes of faithless electors. See Rosenthal, supra note 221, at 32. His fatal mistake is that he believes that Members of Congress are "Officers of the United States." See id. ("The power to count electoral votes is a power vested in the President of the Senate and the members of both [H]ouses of Congress, all of whom are officers of the United States.").

Similarly, during the Electoral Count Act debates, Senator Edmunds believed that Congress was a "Department" within the meaning of the Necessary and Proper Clause. His words leave no doubt on this construction:

The Constitution of the United States vests powers and duties in all the three great departments of the Government. It then provides that Congress shall have the power to pass all laws necessary to carry into effect the provisions of the Constitution and the powers invested in any of its several departments.

... [I]f under your general power of regulation which the Constitution gives you of carrying into effect its powers you may provide how the Supreme Court shall exercise its functions, how the Executive shall exercise his functions carrying out the duties that the Constitution has imposed upon him, may you not also do the same thing when, assuming that to be the true construction of the Constitution, the two houses are to meet and witness the counting of these votes and to decide upon them? It seems to me that no man can considerately answer that question in the negative.

Counting Electoral Votes, supra note 3, at 455.

339   Again, this begs the question whether there is a standalone second prong of the Necessary and Proper Clause. See supra note 321. The only power vested by the Constitution in the "Government of the United States" as an undifferentiated whole (in contrast to powers vested in specific parts thereof) is that (arguably) under the Guarantee Clause. See U.S. Const. art. IV, §4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence."). Nonetheless, for present purposes, I assume that there are other "Powers vested by this Constitution in the Government of the United States" that are not "Powers vested by this Constitution... in any Department or Officer [of the Government of the United States]." U.S. Const. art. I, §8, cl. 18.

APPENDIX - 296

340    U.S. Const. amend. XII (emphasis added).

341    See U.S. Const. art. III, §3, cl.2 (Treason Clause) ("The Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted.") (emphasis added); U.S. Const. art. IV, §3, cl.2 (Territories Clause) ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States....") (emphasis added).

342    See U.S. Const. art. I, §4, cl. 1 (Times, Places, and Manner Clause) ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.") (emphasis added).

343    See U.S. Const. art. II, §1, cl. 6 (Presidential Succession Clause) ("Congress may by Law provide for the Case of Removal, Death, Resignation or Inability, both of the President and Vice President, declaring what Officer shall then act as President....") (emphasis added).

344    See U.S. Const. art. II, §2, cl. 2 (Appointments Clause) ("[B]ut the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.") (emphasis added).

345    See U.S. Const. art. III, §2, cl. 3 (Jury Trial Clause) ("[B]ut when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.") (emphasis added).

346    See U.S. Const. art. IV, §1 (Full Faith and Credit Clause) ("And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.") (emphasis added).

347    See U.S. Const. art. I, §2, cl. 3 (Census Clause) ("The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct.") (emphasis added).

348    See U.S. Const. art. I, §4, cl. 2 (Congress Meeting Clause) ("The Congress shall assemble at least once in every Year, and such Meeting shall be on the first Monday in December, unless they shall by Law appoint a different Day.") (emphasis added).

349    See U.S. Const. art. II, §2, cl. 2 (Appointments Clause) ("[The President] by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law....") (emphasis added).

350    Another example that does not neatly fit into the "may by law" or "shall by law" categories is the Congress Compensation Clause. U.S. Const. art. I, §6, cl. 1 ("The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States.") (emphasis added).

351    Nevertheless, a few scholars recently describe the counting phrase of the Electoral College Clauses as the "congressional counting power," see Coenen & Larson, supra note 18, at 909-16, or the "counting power," see Barkow, supra note 17, at 278-79, 284, 286, 288 (2002). This phraseology is wrong, at least insofar as the word "Power" is used in the Constitution. The word "power" implies discretion to do or not do something. The Electoral College Clauses are devoid of "power"; they direct the counting agent to count what-are-the-electoral-votes and not to count what-are-not-the-electoral-votes-- nothing less and nothing more. (The scope of what-are-the-electoral-votes is discussed in Part III infra.) The phraseology is also odd considering that Professors Coenen and Larson acknowledge that "[t]here is not... a congressional power to count votes; there is a congressional duty," Coenen & Larson, supra note 18, at 910, emphasizing the word "shall" and the passive voice of the phrase "be counted" in the text of the counting phrase, see id. at n.298. Notably, Professors Coenen and Larson reject the argument that the counting phrase of the Electoral College Clauses is one of the "Powers vested by this Constitution in the Government of the United States," U.S. Const. art. I, §8, cl. 18, and hence not within the meaning of the Necessary and Proper Clause:

We would reject this first argument on the theory that the vesting of a duty, particularly one as important as determining the identity of our President, inescapably carries with it the grant of a "power" in the sense that the word is used in the Necessary and Proper Clause. Indeed, we think that there is a strong a fortiori argument to be made here. If Congress can do anything appropriate to carry into effect powers it may (but need not) exercise, does it not logically follow that it can do anything appropriate to carry out those powers it has no choice but to wield? The recognition of the existence of less urgently needed powers logically dictates the recognition of more urgently needed powers as well.

APPENDIX - 297

Coenen & Larson, supra note 18, at 910 (footnotes omitted). This argument fails to persuade for at least a few reasons. First, this argument overlooks the linguistic meaning of the word "Power" as employed in the Necessary and Proper Clause and the rest of the original Constitution. Second, this argument does not grapple with the argument that Congress may not legislate with respect to itself under the Necessary and Proper Clause, see text accompanying supra notes 331-38. Third, this argument mischaracterizes the Necessary and Proper Clause as a broad-based grant of power to carry into effect all duties imposed on Congress, or for that matter, on the executive and judicial departments of the federal government. If Congress "can do anything appropriate to carry into effect powers it may (but need not) exercise," Coenen and Larson, supra note 18, at 910 (emphasis added), what about Congress doing anything appropriate to carry into effect those "powers" (read duties) that the executive and judicial departments possess but have no choice but to wield?

352    See 10 Annals of Cong. 29-32 (1800).

353    Id. at 29.

354    Id. at 30.

355    Id.

356    Id. at 32.

357    Id. (emphasis added).

358    See U.S. Const. art. I, §1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.") (emphasis added); U.S. Const. art. II, §1, cl.1 ("The executive Power shall be vested in a President of the United States of America.") (emphasis added); U.S. Const. art. III, §1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.") (emphasis added).

359    Counting Electoral Votes, supra note 3, at 48.

360    Id.

361    Id. (remarks of Sen. Smith, member of Committee of the Judiciary) (reporting "[t]hat the committee have had the resolution under their consideration, and are of opinion that it is inexpedient at this time to legislate on this subject").

362    Id. at 57-58.

363    Id. at 58.

364    Id. at 129.

365    Id. at 132.

366    See, e.g., 15 Cong. Rec. 5461 (1884) (remarks of Rep. Springer) ("If Congress may make all laws which are necessary to carry into effect the powers granted by the Constitution, it may make such laws as it may deem necessary to carry out that express provision of the Constitution, to count the votes for President and Vice-President."). Senator Sherman argued:
Congress has undoubted power under the residuary clause in the Constitution giving powers to Congress to pass all laws suitable and necessary to carry into execution the express grants of power. Here is a provision in the Constitution for the election of electors, and therefore the mode and manner by which the votes of electors may be counted may be pointed out, but Congress shall not provide that the votes shall not be counted, because the Constitution says that the votes shall be counted then and there.
17 Cong. Rec. 817 (1886); see 18 Cong. Rec. 30 (1886) (remarks of Rep. Caldwell) ("This bill is to prescribe the mode in which this count shall be made, and supply the omission that exists[,] under the first article of the Constitution, which gives Congress all power to make all laws necessary to carry out these provisions."); id. at 74 (remarks of Rep. Baker) ("It is conceded that [the Necessary and Proper Clause] is a delegation to Congress of power to provide for carrying into effect the power to open and count the votes of the electors lodged in the President of the Senate."). Representative Eden remarked:
In providing by law a method to insure a fair count of the electoral vote we need exercise no doubtful powers. The Constitution requires the vote to be counted. I assume that Congress has the authority under the Constitution to pass all laws necessary to carry into effect that mandate of the Constitution.

APPENDIX - 298

Id. at 50. Representative Herbert made the point that

[T]he Constitution vests in the Federal Government the power to count the votes; and the exercise of that power is a Federal function, to be controlled by the Federal Government.... A power has been given, and it is perfectly plain that the Constitution vests in Congress the power to enact what legislation is necessary and proper to carry out the purposes of the provision granting the power. Id. at 75.

367    Issacharoff et al., supra note 16, at 98.

368    15 Cong. Rec. 5465; see also 18 Cong. Rec. 45 (remarks of Rep. Dibble). Representative Dibble, carefully parsing the Necessary and Proper Clause, stated:

It is true there is a clause which says that Congress has the right to pass all laws necessary to carry out certain powers; but those powers are defined. It has the power to carry out its own express grants of power. It has the right to pass laws concerning any act of the Federal Government; but the election of a President is not an act of the Federal Government, but is the action of the State Government. It has the right to pass laws concerning what any Federal officer shall do or what any Federal department shall do; but there its power is exhausted. So that Congress has no power in relation to the electoral vote except to count, in the sense of enumeration. Id.

369    17 Cong. Rec. 1058; see also id. at 1059 (arguing that "a power vested by the Constitution [cannot] be divested by legislative action"). Senator Ingalls fervently stated in words that ring true today:

Careful consideration of this subject will convince any thoughtful student of the Constitution that the scheme which has been devised and which now remains in our organic law is fatally defective, and that nothing can be done by way of legislation to cure the inevitable evils by which it is surrounded, and the more we proceed by legislation to patch, to bridge over apparent difficulties, to abbreviate the number of perils which surround it, by so much we retard and delay the exercise of the power which the people must ultimately be called upon to perform in adopting some system that shall remove the perils in which it is now environed. Id. at 1026.

370    For an illuminating discussion of the "jurisdictional meaning" of the word "proper" in the Necessary and Proper Clause, see Lawson & Granger, supra note 336, at 297-326.

371    See infra notes 428-554 and accompanying text.

372    See U.S. Const. art. VI, cl. 3 ("The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution....").

373    See David P. Currie, The Constitution in Congress: The First Congress and the Structure of Government, 1789-1791, 2 U. Chi. L. Sch. Roundtable 161, 169-71 (1995); see also Kent Greenfield, Original Penumbras: Constitutional Interpretation in the First Year of Congress, 26 Conn. L. Rev. 79, 111-15 (1993) (building on Professor Currie's then-unpublished manuscript).

374    U.S. Const. art. IV, §2, cl.3 provides:

No Person held to Service or Labour in one State, under the Laws thereof, escaping into another, shall, in Consequence of any Law or Regulation therein, be discharged from such Service or Labour, but shall be delivered upon Claim of the Party to whom such Service or Labour may be due.

Id.; see Prigg v. Pennsylvania, 41 U.S. (16 Pet.) 539, 596-97 (1842) (holding that the Fugitive Slave Act of 1793 was constitutional).

375    See Printz v. United States, 521 U.S. 898, 909 (1997). But oddly, and in what is a most tortured interpretation of the Constitution, the Supreme Court has held that legislation which is not a "direct implementation" of the Fugitive Slave Clause--that is, legislation that goes beyond the substance and procedure of the clause--is a constitutional exercise of congressional power under the Full Faith and Credit Clause which provides that "Congress may by general Laws prescribe the Manner in which such Acts, Records, and Proceedings shall be proved, and the Effect thereof." U.S. Const. art. IV, §1; see Printz, 521 U.S. at 909 n.3 (1997) (citing California v. Superior Court of Cal., San Bernardino Cty., 482 U.S. 400, 407 (1987)).

376    Indeed, Professor Currie has suggested that some congressional regulation of the electoral count may be supported on this "implicit" view of the Electoral College Clause. See Currie, supra note 35, at 620 n.73.

377    See U.S. Const. art. I, §2, cl.3.

APPENDIX - 299

378    See U.S. Const. amend. XIV, §1.

379    James A. Gardner, Consent, Legitimacy and Elections: Implementing Popular Sovereignty Under the Lockean Constitution, 52 U. Pitt. L. Rev. 189, 229 (1990).

380    See U.S. Const. amend. XIII, §2; U.S. Const. amend. XIV, §5; U.S. Const. amend. XV, §2; U.S. Const. amend. XVIII; §2; U.S. Const. amend. XIX, § 2; U.S. Const. amend. XXIV, §2; U.S. Const. amend. XXVI, §2.

381    See supra notes 32-34 and accompanying text.

382    2 Farrand, supra note 35, at 529 (emphasis added).

383    See supra note 36 and accompanying text.

384    See infra notes 498-525 and accompanying text.

385    Counting Electoral Votes, supra note 3, at 596-97.

386    U.S. Const. art. II, §1, cl.4.

387    See 2 Farrand, supra note 35, at 497-98.

388    Burgess, supra note 18, at 636 (emphasis added). Senator Jones made a similar point:
       This clause shows that they weighed this subject with great care, and that they thought it necessary not to leave to Congress any implied power over the election of President.
       Now, sir, the power to decide whether the votes of two or ten States shall or shall not be counted is a far more important and delicate power than that given to Congress in express terms to fix the time of choosing the electors. And am I not warranted in saying that, if the Constitution intended that Congress should have any more extended power than is conferred by this clause, it would have said so in plain language?
       Counting Electoral Votes, supra note 3, at 597.

389    U.S. Const. art. II, §1, cl.6.

390    See 2 Farrand, supra note 35, at 573 (draft referred to the Committee of Style); 2 id. at 598-99 (report of the Committee of Style).

391    U.S. Const. art. I, §4, cl.1 (emphasis added).

392    For example, Alexander Hamilton wrote:
       This provision has not only been declaimed against by those who condemn the Constitution in the gross; but it has been censured by those who have objected with less latitude and greater moderation; and, in one instance, it has been thought exceptionable by a gentleman who had declared himself the advocate of every other part of the system.
       The Federalist No. 59, at 330 (Alexander Hamilton) (Clinton Rossiter ed., Mentor 1999) (1961). See generally The Federalist Nos. 59-61 (Alexander Hamilton) (discussing the regulation of congressional elections).

393    E.g., 3 Elliot's Debates, supra note 250, at 661 (Virginia ratifying convention) ("Congress shall not alter, modify, or interfere in the times, places, or manner of holding elections for senators and representatives or either of them, except when the legislature of any state shall neglect, refuse, or be disabled, by invasion or rebellion, to prescribe the same."); see 2 id. at 552 (Maryland ratifying convention) (similar); 2 id. at 545 (Pennsylvania ratifying convention) (similar); 3 id. at 246 (North Carolina ratifying convention) (similar).

394    U.S. Const. art. III, §1, cl. 4 (emphasis added). This clause may be the font of congressional power to regulate the manner of presidential election. For example, Professor Amar has suggested that, pursuant to this clause and general "electioneering" rules, "Congress could prohibit--either directly, or through conditional funding rules for any party that seeks federal election funds-- any direct effort to lobby electors between Election Day and Electoral College Meeting Day by anyone other than the candidates themselves, or their direct agents." Amar, supra note 10, at 231 n.22. Such laws further the independence of electors and moreover do not operate on electors directly. But the existence of a constitutional power in one direction does not imply the existence of a power in the equal-and-opposite direction.

APPENDIX - 300

395    U.S. Const. amend. XII; U.S. Const. art. II, §1, cl.3.

396    3 Farrand, supra note 35, at 624 (emphasis added).

397    Cf. U.S. Term Limits v. Thornton, 514 U.S. 779, 827 (1995) (holding that neither Congress nor the States may alter the constitutional qualifications for congressional office).

398    10 Annals of Cong. 128-29 (1800).

399    See, e.g., 2 Elliot's Debates, supra note 250, at 552 (Maryland ratifying convention); 2 id. at 545 (Pennsylvania ratifying convention); 3 id. at 246 (North Carolina ratifying convention); 3 id. at 661 (Virginia ratifying convention).

400    U.S. Const. art. I, §5, cl.1.

401    See, e.g., Barry v. United States ex rel. Cunningham, 279 U.S. 597, 613 (1928) (holding that the Constitution confers upon Congress certain powers that are "judicial in character," including the "power to judge of the elections, returns and qualifications of its own members," and "[i]n exercising this power, the Senate may, of course, devolve upon a committee of its members the authority to investigate and report; and this is the general, if not the uniform, practice").

402    See U.S. Const. art. I, §2, cl.2 (House Qualifications Clause); U.S. Const. art. I, §3, cl.3 (Senate Qualifications Clause); U.S. Const. art. VI, cl.3 (Oath or Affirmation Clause).

403    At least one other scholar has noted this obvious point. See Harrison, supra note 23, at 702.

404    See 2 Farrand, supra note 35, at 502-03.

405    For additional discussion, see infra notes 582-89 and accompanying text.

406    See 2 Story's Commentaries, supra note 9, §831, at 294-95.

407    2 id. §831, at 295.

408    Representative Randolph clearly made the point that each of the Electoral Colleges retained the power to judge the qualifications of electors in the Massachusetts Incident of 1809. See text accompanying supra note 96. The point was also suggested during the Postmaster Incident of 1837, which squarely presented the elector ineligibility problem of the electoral count. See supra notes 118-25 and accompanying text. Senator Grundy raised the issue thus:
Should a case occur in which it became necessary to ascertain and determine upon the qualifications of electors of President and Vice-President of the United States, the important question would be presented, what tribunal would, under the Constitution, be competent to decide? Whether the respective colleges of electors in the different States should decide upon the qualifications of their own members, or Congress should exercise the power, is a question which the committee are of opinion ought to be settled by a permanent provision upon the subject.
Counting Electoral Votes, supra note 3, at 71; see also id. at 73 (remarks of Rep. Thomas) (reporting to the House of Representatives that the joint committee "had proposed a remedy, by either giving the power to reject to the college or to Congress, as might be deemed most expedient"). For the structural argument supporting the power of each Electoral College "House" to judge the qualifications of Electors, see infra notes 479-97 and accompanying text.

409    10 Annals of Cong. 31 (1800).

410    Id.

411    Counting Electoral Votes, supra note 3, at 132.

412    Id.

413    Id. (emphasis added).

414    Id. at 409.

APPENDIX - 301

415    Id. at 418 (emphasis added).

416    Id. at 658.

417    U.S. Const. art. III, §1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.").

418    U.S. Const. art. I, §5, cl.2 ("Each House may determine the Rules of its Proceedings, Punish its Members for disorderly Behavior, and, with the Concurrence of two[-]thirds, expel a Member.").

419    U.S. Const. art. I, §3, cl.5 ("The Senate shall have the sole power to try all Impeachments. When sitting for that Purpose, they shall be on Oath or Affirmation. When the President of the United States is tried the Chief Justice shall preside....").

420    17 Cong. Rec. 1063-64 (1886) (remarks of Sen. Edmunds); see also 18 Cong. Rec. 45 (1886) (remarks of Rep. Dibble) ("There [referring to House Judging Clause] you find judicial power of a certain kind expressly granted to the two Houses of Congress, making an exception to the general provision which confines judicial power to the Supreme Court and the subordinated Federal courts."); id. at 46 (remarks of Rep. Dribble) (noting the absence of language analogous to the House Judging Clause in the Electoral College Clauses).

421    See 2 Farrand, supra note 35, at 503 (remarks of James Wilson) ("[He] thought the power involved, and the express insertion of it needless. It might beget doubts as to the power of other public bodies, as Courts &c. Every Court is the judge of its own privileges.").

422    Counting Electoral Votes, supra note 3, at 418.

423    See Akhil Reed Amar, Some Opinions on the Opinion Clause, 82 Va. L. Rev. 647, 653 n.30 (1996); Akhil Reed Amar & Neal Kumar Katyal, Executive Privileges and Immunities: The Nixon and Clinton Cases, 108 Harv. L. Rev. 701, 702-08 & n.6 (1995). For a classic exposition of the expressio unius principle of textual interpretation, see The Federalist Nos. 32, 83 (Alexander Hamilton).

424    See supra note 60 and accompanying text; infra note 447 and accompanying text.

425    See U.S. Const. art. II, §1, cl.2 ("[B]ut no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.").

426    17 Cong. Rec. 1059 (1886) (remarks of Sen. Wilson).

427    Counting Electoral Votes, supra note 3, at 345-57 (Senate); id. at 408-44.

428    For an extensive classic discussion of this species of constitutional argument, see generally Charles L. Black, Jr., Structure and Relationship in Constitutional Law (1969). For a pithy modern discussion, see Philip Bobbitt, Constitutional Fate: Theory of the Constitution 74-92 (1982).

429    See Part I.A.4 supra.

430    18 Cong. Rec. 31 (1886) (emphasis added).

431    The Senate has exercised this function only once in our history. In the electoral count of 1837, the Senate elected Richard M. Johnson as Vice President. See supra note 127 and accompanying text. Note that the Senate's role in choosing the Vice President was even more circumscribed under the original Constitution, further removing the Senate from the business of electing the nation's two top executive officers. Article II, Section 1, Clause 3 provided that
[i]n every Case, after the Choice of the President [by the House of Representatives], the Person having the greatest Number of Votes of the Electors shall be the Vice President. But if there should remain two or more who have equal Votes, the Senate shall chuse from them by Ballot the Vice President.
U.S. Const. art. II, §1, cl.3.

432    See U.S. Const. art. I, §3, cl.6 ("The Senate shall have the sole Power to try all Impeachments."); see also The Federalist No. 66, at 370 (Alexander Hamilton) (Clinton Rossiter ed., Mentor 1999) (1961) (referring to the Senate as a "court of impeachments").

APPENDIX - 302

433   See U.S. Const. art. II, §2, cl.2 ("[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two[-]thirds of the Senators present concur."). To be sure, the founding generation seriously debated whether the treaty-making power was executive, legislative, or neither. For one view, see The Federalist No. 75, at 419 (Alexander Hamilton) (Clinton Rossiter ed., Mentor 1999) (1961) ("The power in question seems therefore to form a distinct department, and to belong, properly, neither to the legislative nor to the executive.").

434   U.S. Const. art. II, §2, cl.2.

435   2 Farrand, supra note 35, at 497-98 (emphasis added).

436   For a classic statement to this effect, see id. at 522 where James Wilson remarked:
They will have in fact, the appointment of the President, and through his dependence on them, the virtual appointment to offices; among others the offices of the Judiciary Department. They are to make Treaties; and they are to try all impeachments. In allowing them thus to make the Executive & Judiciary appointments, to be the Court of impeachments, and to make Treaties which are to be laws of the land, the Legislative, Executive & Judiciary powers are all blended in one branch of the Government.... [T]he President will not be the man of the people as he ought to be, but the Minion of the Senate. He cannot even appoint a tide-waiter without the Senate.
See also, e.g., id. at 501 (remarks of Charles Pinckney) (objecting to the Report because "it threw the whole appointment in fact into the hands of the Senate" and "makes the same body of men which will in fact elect the President his Judges in case of an impeachment"); id. (remarks of Hugh Williamson) (noting "objection to such a dependence of the President on the Senate for his reappointment"); id. at 502 (remarks of James Wilson) (suggesting that the contingent election should be made by Congress and not the Senate because "the House of Reps. will so often be changed as to be free from the influence & faction to which the permanence of the Senate may subject that branch"); id. at 511 (remarks of Charles Pinckney) (objecting to Report because "the dispersion of the votes would leave the appointment with the Senate, and as the President's reappointment will thus depend on the Senate he will be the mere creature of that body"); id. (remarks of John Rutlidge) (objecting to Report because "[i]t would throw the whole power [of presidential election] into the Senate"); id. at 512 (remarks of George Mason) (objecting to Report because "[i]t puts the appointment in fact into the hands of the Senate" and that "[t]he great objection with him would be removed by depriving the Senate of the eventual election"); id. at 512 (remarks of Hugh Williamson) ("Referring the appointment to the Senate lays a certain foundation for corruption & aristocracy."); id. at 513 (remarks of Governor Randolph) ("He dwelt on the tendency of such an influence of the Senate over the election of the President in addition to its other powers, to convert that body into a real & dangerous Aristocracy"); id. (remarks of John Dickinson) ("[He] was in favor of giving the eventual election to the Legislature, instead of the Senate--It was too much influence to be superadded to that body "); id. at 515 (remarks of George Mason) ("As the mode of appointment is now regulated, he could not forebear expressing his opinion that it is utterly inadmissible. He would prefer the Government of Prussia to one which will put all power into the hands of seven or eight men, and fix an Aristocracy worse than absolute monarchy."); id. at 522 (remarks of Elbridge Gerry) (proposing eventual election of President to be made by Congress and not Senate so as to "relieve the President from his particular dependence on the Senate for his continuance in office"); id. at 522 (remarks of Gouverneur Morris) (supporting Gerry's proposal because "[i]t would free the President from being tempted in naming to Offices to Conform to the will of the Senate, & thereby virtually give the appointments to office, to the Senate"); id. at 524 (remarks of Hugh Williamson) ("The aristocratic complexion [of the Senate] proceeds from...the mode of appointing the President which makes him dependent on the Senate.").

437   See id. at 527 ("To strike out the words 'The Senate shall immediately choose &c.' and insert 'The House of Representatives shall immediately choose by ballot one of them for President, the members of each State having one vote.'").

438   Id.

439   The Federalist No. 66, supra note 432, at 371-72 (Alexander Hamilton).

440   See also 4 Elliot's Debates, supra note 250, at 122 (remarks of William Davie at North Carolina ratifying convention) ("[The President] is perfectly independent of [the Senate] in his election."); Letter from James Madison to George Hay (Aug. 23, 1823), reprinted in 3 Farrand, supra note 35, at 458 ("The Agency of the H. of Reps. was thought safer also than that of the Senate, on account of the greater number of its members.").

441   1 Tucker's Commentaries, supra note 19, app. at 328.

442   Counting Electoral Votes, supra note 3, at 444.

APPENDIX - 303

443    Id.

444    Id. at 445.

445    Id. at 538.

446    3 U.S.C. §15 (2000).

447    See 2 Farrand, supra note 35, at 497-502. A few years later, Senator Pinckney remarked:
He remembered very well that in the Federal Convention great care was used to provide for the election of the President of the United States, independently of Congress; to take the business as far as possible out of their hands.... Nothing was more clear to him than that Congress had no right to meddle with it at all; as the whole was entrusted to the State Legislatures, they must make provision for all questions arising on the occasion.").
10 Annals of Cong. 29 (1800).

448    See, e.g., 2 Farrand, supra note 35, at 103 (remarks of Gouverneur Morris) ("Of all possible modes of [presidential] appointment that by the Legislature is the worst. If the Legislature is to appoint, and to impeach or to influence the impeachment, the Executive will be the mere creature of it."); 10 Annals of Cong. 131 (remarks of Sen. Pinckney) (stating that Framers "well knew, that to give to the members of Congress a right to give votes in this election, or to decide upon them when given, was to destroy the independence of the Executive, and make him the creature of the Legislature"); Kent's Commentaries, supra note 19, at *279 (noting that legislative selection of the President "would have rendered him too dependent upon the immediate authors of his elevation to comport with the requisite energy of his own department; and it would have laid him under temptation to indulge in improper intrigue, or to form a dangerous coalition with the legislative body...."); 3 Story's Commentaries, supra note 9, §1450, at 313-14.

449    See U.S. Const. amend XII. For an eloquent expression of this point, see 18 Cong. Rec. 46 (1886) (remarks of Rep. Dibble).

450    See also Letter from James Madison to Henry Lee (Jan. 14, 1825), reprinted in 3 Farrand, supra note 35, at 464 ("If, in the eventual choice of a President, the same proportional rule had been preferred [as in the Electoral Colleges], a joint ballot by the two [H]ouses of Congress would have been substituted for the mode which gives an equal vote to every State, however unequal in size.").

451    Counting Electoral Votes, supra note 3, at 54.

452    The single clause which best expresses this separation-of-powers vision is U.S. Const. art. I, §6, cl.2 ("[N]o Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office."). For a rich discussion of this clause's significance as a repudiation of the parliamentary system, see generally Steven G. Calabresi & Joan L. Larsen, One Person, One Office: Separation of Powers or Separation of Personnel?, 79 Cornell L. Rev. 1045 (1994). See also Amar & Amar, supra note 27, at 118-25 (providing additional discussion of separation-of-powers structure of Constitution).

453    One corollary of this argument is that if there is no power for concurrent action then it follows a fortiori that there is no power for either House of Congress alone. For example, Senator Wilson remarked:
[I]f no such power rests with the two Houses for concurrent action, how much more preposterous does it seem to be to claim that it rests with either House alone, and especially with the House of Representatives, with which body to elect a President abides in the event of a failure of the electors to elect?
17 Cong. Rec. 1059 (1886).

454    U.S. Const. art. II, §1, cl.2.

455    10 Annals of Cong. 131 (1800); see also 17 Cong. Rec. 1059 (1886) (remarks of Sen. Wilson) ("When the [F]ramers of the Constitution expressly prohibited Senators and Representatives from appointment as electors, they clearly indicated their purpose to exclude them from all power in or over the matter of the election of a President by the electors appointed by the States."); 18 Cong. Rec. 46 (remarks of Rep. Dibble) ("The idea was that the President must go into office without being under any obligation of any sort to the National Legislature, and the [F]ramers of the Constitution went so far as to provide even that a member of Congress should not be an elector-- that to be a member of either House of Congress should be a disqualification.").

456    10 Annals of Cong. 130-31. Professor Harrison recently put the point in the context of old and recent history:

APPENDIX - 304

As the experiences of 1876-1877 and 2000 indicate, giving Congress power to resolve an electoral dispute is very close to giving it power to choose the President; indeed, electoral disputes could be trumped up for that very purpose. It is unlikely that the Constitution allows through the back door what it bars the front door against.

Harrison, supra note 23, at 705.

457    U.S. Const. art. I, §7, cl.2 provides that:

Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two[-]thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two[-]thirds of that House, it shall become a Law.

See also U.S. Const. art. I, §7, cl.3 (similar).

458    Counting Electoral Votes, supra note 3, at 135.

459    Id.; see also id. at 523 (remarks of Sen. Bayard) ("[F]or this is not a law for to-day only; it is to become a settled rule, a fixed rule, requiring for its repeal the assent of a majority of each house and the President of the United States.").

460    U.S. Const. art. II, §1, cl.6.

461    10 Annals of Cong. 127 ("[The States] supposed they had placed the hand of their own authority on the rights of religion and the press, and the as sacred right of the States in the election of the President.").

462    Id. at 130 (emphasis added). Senator Pinckney largely dismissed problems with respect to the validity of an Elector's appointment. In answering an objection that Electors might be appointed in violation of the Elector Incompatibility Clause, he stated, "[W]here is the necessity of this bill? Is not the Constitution the supreme law of the land, and must not the State Legislatures conform their directions in the appointment of Electors to the directions of the Constitution?" Id. at 131; see also id. at 132 ("Why this anxiety, why these unnecessary efforts to take from the State Legislatures their exclusive and most valuable right?").

463    Counting Electoral Votes, supra note 3, at 414 (emphasis added).

464    10 Annals of Cong. 128.

465    The Federalist No. 59, supra note 392, at 330 (Alexander Hamilton).

466    Id. at 365 (emphasis added).

467    U.S. Const. art. I, § 4, cl.1 (emphasis added).

468    Senator Pinckney had a much broader conception of the judicial power of State Legislatures, including the power "to insure the votes being legally given." See text accompanying supra note 462. However, it is especially hard to see how state legislatures have any jurisdiction over questions with respect to an elector's vote (whether, for example, that vote is constitutional or not). The "Manner" power of state legislatures is textually limited to the appointment of electors. Moreover, electors, once selected, are arguably independent of state legislatures.

469    Wroth, supra note 22, at 324.

470    U.S. Const. art. I, §5, cl.1.

471    See supra notes 269-74 and accompanying text.

472    During the debate on the Act of 1792, Representative White expressed his wish that this be done "[i]f it had been possible." 3 Annals of Cong. 278 (1791).

473    The Federalist No. 59, supra note 392, at 333 (Alexander Hamilton).

474    Wroth, supra note 22, at 325.

APPENDIX - 305

475    U.S. Const. art. II, §1, cl.6.

476    Horatius Letter, supra note 273; see also id. (observing that the word "removal" "comprehends the case where neither the electors nor the [H]ouse of [R]epresentatives shall elect a successor to the President whose time expires by virtue of the constitutional limitation").

477    For the relevant text of the Twentieth Amendment, see text accompanying infra note 605.

478    3 U.S.C. §15 (2000).

479    Elsewhere, I have set forth a proof for the proposition that Electors occupy a "public Trust under the United States" because they are not Members of Congress, Members of the several State Legislatures, Officers of the United States, or Officers of the several States. See Kesavan, supra note 324, at 128-35; cf. 18 Cong. Rec. 30 (1886) (remarks of Rep. Caldwell) (stating that "the elector is a Federal functionary, as much so as a Senator or Representative").

480    See generally Akhil Reed Amar, Architecture, 77 Ind. L.J. (forthcoming 2002).

481    See U.S. Const. art. II, §1, cl.2.

482    For similar statements with respect to constitutional interpretation by the President, see Michael Stokes Paulsen, The Merryman Power and the Dilemma of Autonomous Executive Branch Interpretation, 15 Cardozo L. Rev. 81 passim (1993); Michael Stokes Paulsen, The Most Dangerous Branch: Executive Power to Say What the Law Is, 83 Geo. L.J. 217 passim (1994). For a similar statement with respect to constitutional interpretation by Congress, see Neal Kumar Katyal, Legislative Constitutional Interpretation, 50 Duke L.J. 1335 passim (2001).

483    For example, John Jay argued:
As the select assemblies for choosing the President, as well as the State legislatures who appoint the senators, will in general be composed of the most enlightened and respectable citizens, there is reason to presume that their attention and their votes will be directed to those men only who have become the most distinguished by their abilities and virtue, and in whom the people perceive just grounds for confidence.... If the observation be well founded that wise kings will always be served by able ministers it is fair to argue that as an assembly of select electors possess, in a greater degree than kings, the means of extensive and accurate information relative to men and characters, so will their appointments bear at least equal marks of discretion and discernment.
The Federalist No. 64, at 359 (John Jay) (Clinton Rossiter ed., Mentor 1999) (1961); see 10 Annals of Cong. 30-31 (1800) (remarks of Sen. Baldwin) ("Experience had proved that a more venerable selection of characters could not be made in this country than usually composed that electoral body."). To be sure, this understanding began to change in the first decade after the founding. See, e.g., Stanwood, supra note 7, at 51.

484    See, e.g., U.S. Const. amend. XII ("The Electors shall meet in their respective states, and vote by ballot for President and Vice-President....") (emphasis added); The Federalist No. 68, supra note 246, at 380 (Alexander Hamilton) ("It was equally desirable that the immediate election should be made by men most capable of analyzing the qualities adapted to the station and acting under circumstances favorable to deliberation, and to a judicious combination of all the reasons and inducements which were proper to govern their choice.") (emphasis added). Hamilton further argued:
[A]s the electors, chosen in each State, are to assemble and vote in the State in which they are chosen, this detached and divided situation will expose them much less to heats and ferments, which might be communicated from them to the people, than if they were all to be convened at one time, in one place.
Id. (emphasis added); cf. Vikram David Amar, The People Made Me Do It: Can the People of the States Instruct and Coerce Their State Legislatures in the Article V Constitutional Amendment Process?, 41 Wm. & Mary L. Rev. 1037, 1089 n.233 (2000) ("[T]he electoral college, like Congress and an Article V proposing convention, is truly a national group whose existence owes entirely to the Constitution. On the other hand, the electoral college does not 'meet' and deliberate like Congress or an Article V proposing convention.").

485    See U.S. Const. art. I, §6, cl.1 ("They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech of Debate in either House, they shall not be questioned in any other Place."). For a claim that the President enjoys similar privileges although the Constitution does not so textually specify, see Amar & Katyal, supra note 423, at 702-08.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

486   The Framers briefly considered the compensation of electors. See 2 Farrand, supra note 35, at 73 ("Mr. Williamson moved that the Electors of the Executive should be paid out of the National Treasury for the Service to be performed by them. Justice required this: as it was a national service they were to render. The motion was agreed to nem.-con."). The provision was inexplicably dropped on subsequent debate.

487   See Kesavan, supra note 324, at 133 & n.46.

488   See U.S. Const. art. III, §2, cl. 2 ("In all other cases before mentioned, the supreme Court shall have appellate jurisdiction, both as to law and fact....").

489   Counting Electoral Votes, supra note 3, at 51 (emphasis added).

490   10 Annals of Cong. 30 (1800).

491   The Framers considered and rejected this idea. See 2 Farrand, supra note 35, at 525; id. at 526 ("Mr. Spaight said if the election by Electors is to be crammed down, he would prefer their meeting altogether and deciding finally without any reference to the Senate and moved 'That the Electors meet at the seat of the General Government.'"). This motion failed with all States in the negative except North Carolina. Id. Senator Baldwin, a Framer, no doubt remembered this history.

492   Senator Baldwin argued:
If this body of the Electors of all the States had been directed by the Constitution to assemble in one place, instead of being formed into different Electoral colleges, he took it for granted none of the questions on which this [Senator Ross's] resolution has been brought forward, would have occurred; every one would have acknowledged that they were to be settled in that assembly.
10 Annals of Cong. 31.

493   Id. at 31-32.

494   Id. at 32.

495   This critical distinction in the problems of the electoral count is explained in Part III.A infra.

496   Senator Pinckney argued:
Who, when he reflects on the immense power the President possesses, can suppose that any man, honorably selected by his fellow-citizens as an Elector, could for a moment be so lost to a sense of his own and his country's welfare, as to vote for a man as the Supreme Executive, whose citizenship or residence were doubtful, and who were not of sufficient age?
10 Annals of Cong. 132.

497   Id. at 31 (emphasis added).

498   For a brilliant article on this general (and generally neglected) subject, see Paul W. Kahn, Gramm-Rudman and the Capacity of Congress to Control the Future, 13 Hastings Const. L.Q. 185 (1986). A starting point is Blackstone's maxim: "Acts of Parliament derogatory from the power of subsequent Parliaments bind not." 1 William Blackstone, Commentaries *90. For an extensive collection of British sources on this point, see Brett W. King, Deconstructing Gordon and Contingent Legislative Authority: The Constitutionality of Supermajority Rules, 6 U. Chi. L. Sch. Roundtable 133, 188 n.248 (1999).
Professor Kahn's argument is that there are two types of statutes: "first-order rules" and "second-order rules." The former type addresses behavior directly, and includes most laws; the latter type addresses other rules, imposing burdens on constitutionally assigned functions (for example, legislation), and necessarily raises questions as to what Congress may accomplish by statute versus by constitutional amendment. According to Kahn, the Balanced Budget and Emergency Deficit Control Act of 1985, popularly known as Gramm-Rudman, is a second-order rule, and therefore raises interesting and significant constitutional problems. He further argues that a future Congress's freedom to repeal a second-order rule does not cure the constitutional infirmities of such legislation. See Kahn, supra, at 190-204.

499   U.S. Const. art. I, §5, cl.2. Professor Kahn usefully relates that "the House [of Representatives] has taken the position that it is free to abandon statutory provisions that purport to regulate internal House procedures." Kahn, supra note 498, at 226. He discusses an early precedent within the first decade after the founding concerning a subject relevant to the one at hand: determining the outcome of disputed congressional elections. He observes:

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

When Congress passed in 1797 a statute designed to regulate disputed elections, members in the House objected to the statute as an infringement on each house's rules powers. The statute was defended as legitimate because it did not prescribe rules for the House but rather procedures binding on the general public, outside of Congress. The House later adopted the position that no power constitutionally committed to one House by the Constitution could be abridged by an earlier statute.
Id. at 226 n.149 (citing 7 Annals of Cong. 683-84 (1797) (statement of Rep. Sitgreaves); 1 American State Papers Class 10, No. 99, 5th Cong., 2d Sess. 159-60 (1797); 36 Cong. Rec. 231-35 (1902) (contested election statute); Cong. Globe, 35th Cong., 1st Sess. 725-34 (1858) (same)).

500    See Catherine Fisk & Erwin Chemerinsky, The Filibuster, 49 Stan. L. Rev. 181, 245 n.373 (1997) (citing Rules of the House of Representatives, H.R. Doc. No. 103-342, at 768 (1995)); see also Gojack v. United States, 384 U.S. 702, 706 n.4 (1966) ("Neither the House of Representatives nor its committees are continuing bodies.").

501    See Julian Eule, Temporal Limits on the Legislative Mandate: Entrenchment and Retroactivity, 1987 Am. B. Found. Res. J. 379, 408; Fisk & Chemerinsky, supra note 500, at 245 n.375 (citing Senate Comm. on Rules & Admin., Standing Rules of the Senate, S. Doc. No. 102-25, at 4 (1992)).

502    There should be no question that the Electoral Count Act is a law that regulates a particular proceeding. To be sure, Members of Congress identified it as a "permanent rule" or "fixed rule" during the Electoral Count Act debates. See, e.g., Counting Electoral Votes, supra note 3, at 520 (1876) (remarks of Sen. Bayard) (referring to "framing of such a permanent rule in the shape of law upon this subject as would be satisfactory to the American people"); id. at 523 (remarks of Sen. Bayard) ("[F]or this is not a law for to-day only; it is to become a settled law, a fixed rule, requiring for its repeal the assent of a majority of each house and the President of the United States."); 18 Cong. Rec. 30 (1886) (remarks of Rep. Caldwell) ("This bill is to prescribe the mode in which this count shall be made...."); id. at 49 (1886) (remarks of Rep. Eden) ("The object of the bill of the Senate is to fix certain rules by which the two Houses shall be governed in counting the electoral vote."); id. at 50 (similar). Not surprisingly, some Members of Congress put the terms "law" or "joint rule" on the same constitutional plane in discussing the counting of electoral votes. See, e.g., 17 Cong. Rec. 815 (1886) (remarks of Sen. Sherman) (noting that "this most important duty of counting the electoral vote... is now without law or rule to govern the mode and manner of its procedure"); 18 Cong. Rec. 30 (1886) (remarks of Rep. Caldwell) ("Congress may provide by law or joint rule the manner of counting the [electoral] vote."); id. at 46 (1886) (remarks of Rep. Dibble) ("[I]t is competent for Congress, by statute or by joint agreement, joint resolution, or joint rule, to name individuals to exercise the duty of making the [electoral] count.").

503    See, e.g., 18 Cong. Rec. 30 (remarks of Rep. Caldwell) ("[T]his bill if passed will be an authoritative expression of the Constitution erected into law in advance of any complication which may again arise, as it has in the past, as to the counting the electoral votes of the States and the declaration of the result."); id. ("The passage of this bill will settle all the questions which have arisen from time to time as to the electoral count.").

504    Issacharoff et al., supra note 18, at 97 (emphasis added). For expressions of this concern during the Electoral Count Act debates, see 17 Cong. Rec. 815 (remarks of Sen. Sherman), id. at 2427 (remarks of Sen. Hoar), and 18 Cong. Rec. 50 (remarks of Rep. Eden).

505    3 U.S.C. §5 (2000) (emphasis added).

506    See Part I.A.4 supra.

507    3 U.S.C. §15.

508    Even if one believes that the counting function is committed to Congress and not to the joint convention, it is not at all clear that one Congress may bind itself in advance with respect to rules of proceedings of the electoral count. For a thoughtful discussion of one Congress binding itself with respect to rules of proceedings of legislation, see John O. McGinnis & Michael B. Rappaport, The Constitutionality of Legislative Supermajority Requirements: A Defense, 105 Yale L.J. 483, 506 n.109 (1995).

509    See supra notes 498-501 and accompanying text.

510    Amar, supra note 10, at 222.

511    See supra notes 143-48 and accompanying text.

512    See, e.g., Amar, supra note 10, at 218-19, 226-27, 228-29.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

513     Id. at 227 (emphasis added); cf. Harrison, supra note 23, at 714 (discussing ad hoc solutions to problems of the electoral count and describing the strength of having a rule, even if not the right one, as "enabl [ing] the country to avoid total political gridlock or even violence").

514     See generally Laurence H. Tribe, Taking Text and Structure Seriously: Reflections on Free-Form Method in Constitutional Interpretation, 108 Harv. L. Rev. 1221 (1995) (criticizing the "free-form" method of constitutional interpretation as an assault on the coherent and constrained character of the legal enterprise and calling for a method that is attentive to the "stubborn truths" of text, history, and structure).

515     Tribe, supra note 17, at 267 n.388 (citing 1 Laurence H. Tribe, American Constitutional Law §2-3, at 125-26 n.1 (3d ed. 2000)). The Gore legal team did not make this argument in any of the briefs filed in Bush v. Gore.

516     Id. at 277.

517     Nelson Lund, The Unbearable Rightness of Bush v. Gore, 23 Cardozo L. Rev. (forthcoming 2002) (manuscript at 61 n.140, on file with the North Carolina Law Review) (citation omitted). For an extended discussion of the point with respect to 3 U.S.C. §5, see Michael J. Glennon, Nine Ways to Avoid a Train Wreck: How Title 3 Should Be Changed, 23 Cardozo L. Rev. (forthcoming 2002) (manuscript at 9-15, on file with the North Carolina Law Review).

518     On the former point that Congress cannot bind the joint convention by law or joint rule, Senator Stockton remarked:
        If a constitutional amendment is not necessary, then those two bodies there assembled have the power to regulate the way they shall count the vote, and if they have not the power it certainly does not exist in these two bodies sitting before the Congress meets, before the body to whom the Constitution of the United States has committed the power to count the next vote of presidential electors has convened. At a session before they are elected, you are here making laws to prevent them from doing that which was committed to them alone, and not to you, by the Constitution of the United States.
        Counting Electoral Votes, supra note 3, at 500; see also id. at 515 (remarks of Sen. Stockton) ("The truth is and the honest truth is that the twenty-second joint rule ought never to have been passed. The whole power rested in the joint assembly when it met.").

519     Id. at 510 (remarks of Sen. Hager).

520     Id.

521     Id. (emphasis added).

522     Id. (emphasis added). Senator Hager also remarked:
        I am satisfied that we cannot bind our successors by any legislation in regard to a constitutional duty that they have to perform. They themselves must judge how they shall perform it; and you might as well undertake to dictate that they should do it in a particular way to accomplish a particular result as to undertake to say that they shall do it according to the provisions of this bill.
        Id.

523     Id. at 511.

524     Senator Sherman argued:
        Sir, if we put our joint rule, the whole of it, in the form of law, the Constitution gives to each house the power to make rules for its own government and the power to make joint rules for the government of the two houses. That is a constitutional power, and this Forty-third Congress cannot deprive the next Congress of the power of making rules for the government of either house or for the government of either house. There the constitutional privilege overrides all your laws.
        Id. at 516 (remarks of Sen. Sherman). Senator Boutwell stated:
        Here is a duty imposed upon Congress by the Constitution; it is a duty to be exercised at stated periods. The provision of the Constitution does not operate upon every Congress, but it operates upon particular Congresses. Now, can a Congress to which or upon which the provision of the Constitution does not attach at all legislate and bind the conscience and the judgment of a Congress that is to perform a duty imposed by the Constitution especially upon itself? I have great doubt upon that point, whether, if the exigency should arise when it would be thought desirable, so desirable as to be expedient, for one branch or the other of Congress to disregard the law, (and that would be just the exigency when probably the law should be observed,) we should not find one body or the other willing to take the responsibility and, upon the argument that could be presented, to go to the country for justification.
        Id. at 531. Senator Ingalls remarked:

APPENDIX - 309

I shall be instructed far beyond my expectations if some great constitutional lawyer... can assure me how any legislative enactment that we may adopt now or at any time can in any manner whatever bind that great political tribunal which is to meet to declare the result of the presidential election in 1888.... [W]hether the President of the Senate is to count the vote, whether the vote is to be counted by the Senate and House of Representatives separately or jointly, whether it is to be counted by the tribunal proposed by the Senator from Ohio, the fact still remains that the vote is to be counted, and that no act can be passed by any antecedent Congress that can deprive either of the persons or any of those great constituent bodies of the powers that they possess and which they are directed to exercise under and by virtue of the twelfth article of the amendments to the Constitution.

17 Cong. Rec. 1025 (1886).

[T]he real question will arise when the two Houses meet here to pass upon the electoral votes in the next Presidential election; and those Houses, in my judgment, when they meet here to discharge a duty which is expressly imposed upon them by the Constitution, will not be bound by the action of the Senate and House of the Forty-ninth Congress and the President, when he signs this bill, if it shall pass. It is their duty, conferred on them by the Constitution, to count the votes. If for any reason whatever a single return shall appear to both Houses of Congress to be an invalid return they have the right so to determine; and if they do so determine, that vote will not be counted, however many statutes we may pass like this.

18 Cong. Rec. 51 (1886); see also id. at 51-52 (remarks of Rep. Adams) (similar).

525  The critic would argue (persuasively) that the joint convention should not waste time determining the "shape of the table" on the important day of the electoral count. The two Houses of Congress are free to create a joint rule purporting to bind the joint convention. But the requirement of formalism remains. As the first matter of business, the joint convention should (and will in all likelihood) formally adopt the joint rule as its rule of proceeding.

526  See 3 U.S.C. §15 (2000).

527  Counting Electoral Votes, supra note 3, at 453.

528  U.S. Const. art. I, §7, cl.3.

529  See supra notes 457-60 and accompanying text (presenting structural argument of anti-President principle in presidential election).

530  462 U.S. 919, 958 (1983) (holding that section of Immigration and Nationality Act authorizing one House of Congress, by resolution, to invalidate decision of Executive Branch to allow a particular deportable alien to remain in the United States is unconstitutional, because such action is legislative and is therefore subject to the bicameralism and presentment requirements of Article I of the Constitution).

531  See, e.g., Glennon, supra note 18, at 43 ("While such an action is technically within the scope of the Chadha test, it is doubtful that the Constitution requires that a congressional objection be presented to the president" because the counting of electoral votes is not a "lawmaking function."); Ross & Josephson, supra note 7, at 727 n.317 ("The suggestion that Congress cannot exercise its counting function bicamerally without presidential action is probably not well taken. The [Presentment Clause] has been interpreted to refer only to legislative action. Whatever the houses are doing when they are counting electors' votes, they are not enacting laws.") (citations omitted).

532  During the Electoral Count Act debates, some Members of Congress made this point. Senator George made this point with ample frequency. See, e.g., 17 Cong. Rec. 1063 (1886) (stating that "whoever does determine what votes shall be counted performs a judicial act"); id. at 2429 (1886) ("What kind of business is [counting electoral votes]? It certainly is not legislative business. It is the ascertainment of a fact and a very important fact to this country."); id. (stating that counting electoral votes "is not a legislative function which ought to be considered separately by the two Houses, but it is rather in the nature of a judicial function"). Senator Hoar also made the point that counting electoral votes was not a legislative act. See, e.g., id. at 1020 (remarks of Sen. Hoar) (judicial act). Senator Edmunds stated that "this act of receiving and counting these votes is not a legislative act, and I say with equal emphasis that, in my opinion, it is not a judicial act, because the Constitution of the United States has not imputed any such judicial power to either or both of the Houses." Id. at 1064. In his view, the counting of electoral votes "is an administrative act, the same sort of administrative act that every State which existed at the time of the formation of the Constitution imputed to its executive and election officers in the canvassing and return of votes and in the final ascertainment of them by some body, for the institution of every officer of a State from a justice of the peace or an overseer of the poor up at least to its governor." Id.

533  See Ross & Josephson, supra note 7, at 727 n.317 ("The [Presentment] Clause has been interpreted to refer only to legislative action.").

APPENDIX - 310

534   U.S. Const. art. I, §7, cl.3.

535   It is arguable that the exception was inserted to simply clarify the meaning of the clause or out of an abundance of caution. See generally Akhil Reed Amar, Constitutional Redundancies and Clarifying Clauses, 33 Val. U. L. Rev. 1 (1998) (asserting that "[a] considerable number of constitutional clauses are redundant in a certain sense; they illuminate and clarify what was otherwise merely implicit"). The secret drafting history of the Presentment Clause suggests otherwise. For example, the Committee of Style inexplicably dropped the italicized language in the proposed clause:
Every order, resolution or vote, to which the concurrence of the Senate and House of Representatives may be necessary (except on a question of adjournment and in the cases hereinafter mentioned) shall be presented to the President for his revision; and before the same shall have force, shall be approved by him, or, being disapproved by him, shall be repassed by the Senate and House of Representatives, according to the rules and limitations prescribed in the case of a bill.
2 Farrand, supra note 35, at 569 (emphasis added); see 2 id. at 594. During the Electoral Count Act debates, Senator Hoar asserted that "[t]here are all through the Constitution, among the powers of these two Houses, powers which require the concurrence of the two Houses for their exercise, but which, not relating to legislation, are never held to require the assent of the President or to be presented to the President," but failed to present any examples other than Article V. 17 Cong. Rec. 2429.

536   See INS v. Chadha, 462 U.S. 919, 955 n.20 (1983); Hollingsworth v. Virginia, 3 U.S. (3 Dall.) 378, 381 (1798).

537   Senator George made precisely this response to Senator Hoar during the Electoral Count Act debates with respect to the Article V presentment question. See 17 Cong. Rec. 2429. Senator Hoar then asked if "the joint rules of the two Houses must be presented to the President because to their validity they require the concurrence of the two Houses?" Id. Senator George, relying upon the Rules of Proceedings Clause, responded that each House, in addition to making its own rules, "may also make rules besides its own separate rules for its joint action with the House, and in the same way the House may perform that function, and in that way reach joint rules." Id.

538   See U.S. Const. art. I, §2, cl.5 ("The House of Representatives shall chuse their Speaker and other Officers; and shall have the sole Power of Impeachment.").

539   See U.S. Const. art. I, § 3, cl. 6 ("The Senate shall have the sole Power to try all Impeachments.").

540   See id. ("And no Person shall be convicted without the Concurrence of two[-]thirds of the Members present.").

541   See 17 Cong. Rec. 2428-29. Professor Ross and Mr. Josephson note that Representative Adams also addressed the presentment problem in Electoral Count Act debate in the House of Representatives in late 1886, but I fail to find any such evidence. See Ross & Josephson, supra note 7, at 727 n.317 (citing 18 Cong. Rec. 51-52 (1886) (remarks of Rep. Adams)).

542   17 Cong. Rec. 2428-29.

543   See id. at 2429 ("[The Presentment Clause] never has been held anywhere, so far as I know, to apply to anything but legislative matters which are to take effect upon the people by the authority of the Congress. There are all through the Constitution, among the powers of these two Houses for their exercise, but which, not relating to legislation, are never held to require the assent of the President or to be presented to the President.").

544   See 462 U.S. at 952-58.

545   Id. at 952 (emphasis added) (citation omitted).

546   Id.

547   See id. at 956-57.

548   Id. at 952.

549   See id. at 957 n.21 (discussing Justice Powell's position that the one-House veto provision is a "judicial act" and concluding that "[w]e are satisfied that the one-House veto is legislative in purpose and effect and subject to the procedures set out in Art. I").

550   In a footnote, the Court identified one exception to the Presentment Clause, and suggested another. See id. at 955 n.20. The exception was for the proposal of constitutional amendments by two-thirds of both Houses of Congress under Article V. Id. (citing Hollingsworth v. Virginia, 3 U.S. (3 Dall.) 378 (1798)). The Court then suggested that "[o]ne might also include another 'exception' to the rule that

APPENDIX - 311

Congressional action having the force of law be subject to the bicameral requirement and the Presentment Clauses" by pointing to the Rules of Proceedings Clause, U.S. Const. art. I, §5, cl. 2, as giving to each House "the power to act alone in determining specified internal matters." Chadha, 462 U.S. at 955 n.2. The Court was careful to note that "this 'exception' only empowers Congress to bind itself and is noteworthy only insofar as it further indicates the Framers' intent that Congress not act in any legally binding manner outside a close circumscribed legislative arena, except in specific and enumerated instances." Id. (emphasis added). Actually, the Court incorrectly framed the point: the Rules of Proceedings Clause does not apply to "Congress" but each House of Congress. The important point is that the Court nowhere suggested that any rule-making authority of Congress could be used to affect the legal rights, duties, and relations of non-Members of Congress without presentment to the President. See also McGinnis & Rappaport, supra note 508, at 495 n.60 (stating that "when the [ Chadha] Court stated that the Rules of Proceedings Clause gave Congress the power to 'bind itself,' it meant simply that the rules were binding on members of Congress as opposed to individuals or institutions outside Congress").

551     See supra note 162 and accompanying text.

552     See Tribe, supra note 27, at 278 & n.438.

553     Indeed, the argument is an even stronger one to the extent that electors in the electoral colleges constitute a separate and co-ordinate branch of the federal government, see Kesavan, supra note 324, at 131-35, unlike the Electoral Commission of 1877 which was a quasi-legislative body largely drawn from Members of Congress.

554     3 U.S.C. §15 (2000).

555     See Michael Stokes Paulsen, Is Bill Clinton Unconstitutional? The Case for President Strom Thurmond, 13 Const. Comment. 217, 222 (1996).

556     For Portland's claim to fame in the legal academy, see, for example, John Hart Ely, On Constitutional Ground 399 n.251 (1996); John Hart Ely, Standing to Challenge Pro-Minority Gerrymanders, 111 Harv. L. Rev. 576, 581-84 (1997); John Hart Ely, Another Spin on Allegheny Pittsburgh, 38 UCLA L. Rev. 107, 108 n.6 (1990). Dean Ely's other dog, Buffo, featured prominently in some of his earlier work, see, e.g., John Hart Ely, Democracy and Distrust 182 (1980), where she almost became Secretary of Agriculture, but Dean Ely informs me that Buffo has since "passed on to the other side." See Email from Dean John Hart Ely, to Vasan Kesavan (Mar. 2, 2001) (on file with author).

557     See, e.g., Clinton v. City of New York, 524 U.S. 417, 421 (1998) (holding cancellation procedures in the Line Item Veto Act unconstitutional under the Presentment Clause); Printz v. United States, 521 U.S. 898, 935 (1997) (holding interim provisions of the Brady Handgun Violence Prevention Act unconstitutional as violating the "constitutional system of dual sovereignty"); New York v. United States, 505 U.S. 144, 149 (1992) (holding the "take title" provision of the Low-Level Radioactive Waste Policy Amendments Act unconstitutional under the Tenth Amendment); INS v. Chadha, 462 U.S. 919, 957-58 (1983) (holding a "one-House veto" provision of the Immigration and Nationality Act unconstitutional under the Presentment and Bicameralism Clauses). By citing these cases, I do not mean to signify my agreement or disagreement with their holdings. Cf. Chadha, 462 U.S. at 944 ("[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution. Convenience and efficiency are not the primary objectives--or the hallmarks--of democratic government....").

558     U.S. Const. amend. XII.

559     See, e.g., 2 Oxford English Dictionary 1054 (2d. ed. 1989) (defining "certify" as "[t]o declare or attest by a formal or legal certificate").

560     See, e.g., The Federalist No. 68, supra note 246, at 380 (Alexander Hamilton) ("Nothing was more to be desired [in Electoral College mode of presidential election] than that every practicable obstacle should be opposed to cabal, intrigue, and corruption."). Senator King remarked:
[M]embers of the General Convention... did indulge the hope, by apportioning, limiting, and confining the Electors within their respective States, and by the guarded manner of giving and transmitting the ballots of the Electors to the Seat of Government, that intrigue, combination, and corruption, would be effactually shut out, and a free and pure election of the President of the United States made perpetual.
3 Farrand, supra note 35, at 461 (remarks of Sen. Rufus King).

APPENDIX - 312

561    See, e.g., 18 Cong. Rec. 31 (1886) (remarks of Rep. Caldwell) ("Suppose some State should enthrone a king, constitute a house of lords, and they should appoint electors, and send up but one return properly certified and finally determined as required under the second section of the bill proposed by the minority. Shall an American Congress count such a vote?").

562    See U.S. Const. art. II, §1, cl.2 (States); U.S. Const. amend. XXIII, §1 (District of Columbia).

563    See generally Luther v. Borden, 48 U.S. (7 How.) 1 (1849) (holding that the recognition of a state government lies with Congress, not the courts); see also U.S. Const. art. IV, §3 ("New States may be admitted by the Congress into this Union...."); U.S. Const. art. IV, §4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.").

564    See Counting Electoral Votes, supra note 3, at 147-49 (House); id. at 149-223 (Senate and House); see also Wroth, supra note 22, at 328-29 n.34.

565    Counting Electoral Votes, supra note 3, at 229-30; see also Wroth, supra note 22, at 328-29 n.34.

566    See U.S. Const. art. II, §1, cl.2; 3 U.S.C. §3 (2000). For ease of exposition, I will simply refer to electoral votes instead of two distinct lists of electoral votes for President and Vice President, respectively.

567    Counting Electoral Votes, supra note 3, at 451.

568    Id.

569    This counting principle does not hold in the equal-and-opposite direction: a state may transmit an electoral certificate containing less electoral votes than the number of electors to which that state is then entitled, and these votes must be counted by the joint convention. Indeed, the Framers contemplated that electors would be appointed but would not give votes. See 2 Farrand, supra note 35, at 515 (rejecting the motion of James Madison and Hugh Williamson "to insert after 'Electors' the words 'who shall have balloted'" so that the non voting electors not being counted might not increase the number necessary as a majority of the whole.").

570    The choice is reserved to the states. For example, only Maine and Nebraska have proportional voting instead of "winner-take-all" voting in their electoral colleges. See Me. Rev. Stat. Ann. tit. 21-A, §805.2 (West 1993); Neb. Rev. Stat. §32-714 (1998). But even in "winner-take-all" states, the possibility looms that faithless electors will give votes in contravention of the popular vote. See supra notes 7, 176-91 and accompanying text; infra notes 590-92 and accompanying text.

571    See supra notes 157-64 and accompanying text.

572    See U.S. Const. art. IV, §4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.") (emphasis added).

573    See 3 U.S.C. §7 (2000) ("The electors of President and Vice President of each State shall meet and give their votes on the first Monday after the second Wednesday in December next following their appointment at such place in each State as the legislature of such State shall direct.").

574    See supra notes 132-42 and accompanying text.

575    See supra notes 165-75 and accompanying text.

576    U.S. Const. art. II, §1, cl.4 (emphasis added). Admittedly, there is nothing in the Electoral College Clauses that expressly provides that the electors shall date the electoral certificate, but the requirement is fairly subsumed by that of certification. See U.S. Const. amend. XII ("[The Electors] shall sign, and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate.") (emphasis added). Who ever heard of a legal certificate without a date?

577    See U.S. Const. art. II, §1, cl.5.

578    During the Electoral Count Act debates, Representative Dibble thought otherwise:

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.    

[A]s in the election of any of us, if a man who is a voter does not go to the polls on election day and within the hours fixed by law and cast his vote, the vote is lost, and it makes no difference whether he was sick, or whether he was prevented from casting his vote by some necessity, or mischance, or design, or whether his vote might have changed the complexion of the election; his vote is lost if his right to vote is not exercised on the day designated.

18 Cong. Rec. 46 (1886) (remarks of Rep. Dibble).

579   See, e.g., 2 Farrand, supra note 35, at 500 (remarks of Governor Morris) ("As the Electors would vote at the same time throughout the U.S. and at so great a distance from each other, the great evil of cabal was avoided. It would be impossible to corrupt them."); 4 Elliot's Debates, supra note 250, at 122 (remarks of William Davie at North Carolina ratifying convention) ("He is elected on the same day in every state, so that there can be no possible combination between the electors."). At the North Carolina ratifying convention James Iredell remarked:

Had the time of election been different in different states, the electors chosen in one state might have gone from state to state, and conferred with the other electors, and the election might have been thus carried on under undue influence. But by this provision, the electors must meet in the different states on the same day, and cannot confer together. They may not even know who are the electors in the other states. There can be, therefore, no kind of combination. It is probable that the man who is the object of choice of thirteen different states, the electors in each voting unconnectedly with the rest, must be a person who possesses, in high degree, the confidence and respect of his country.

Id. at 105.

580   One leading scholar agrees. See Michael W. McConnell, Two-and-a-Half Cheers for Bush v. Gore, 68 U. Chi. L. Rev. 657, 676 n.93 (2001). After quoting the Constitution's provision that the "Day [for giving electoral votes] shall be the same throughout the United States," see U.S. Const. art. II, §1, cl.4., Professor McConnell concludes, "December 18 was so designated by statute. It would be unconstitutional for Congress to allow the electors from a single state to give their votes on a later date." Id. (emphasis added). He then discusses the Hawaii Incident of 1961, see supra notes 165-75 and accompanying text, and concludes, "That should not be treated as a precedent. In that election, the votes of Hawaii were not necessary to the result, and on the suggestion of the losing candidate, Vice President Richard Nixon, in his capacity as President of the Senate, were recognized as a courtesy." McConnell, supra, at 676 n.93. This is not to say that December 18, 2000 was a magic point in time for the electoral count of January 6, 2001. Political difficulties aside, there is no reason why Congress could not have amended 3 U.S.C. §7 to provide that electors shall give their votes on a date later than December 18, 2000 and, if needed, amended 3 U.S.C. §15 to provide that the joint convention shall count their votes on a date later than January 6, 2001. Both dates, of course, could be no later than January 20, 2001 at the time of noon, when the terms of the President and Vice-President expired. See U.S. Const. amend. XX, §1. The important point is that the Constitution demands that electoral votes be given on the same day throughout the Union--not forty-nine states on December 18, 2000 and one state on some other date. When Congress could have amended 3 U.S.C. §7 is a more difficult question. The spirit of the Constitution suggests that, in order to minimize undue congressional interference and manipulation in presidential elections, Congress could not amend 3 U.S.C. §7 after the electors shall have given their votes on December 18, 2001 pursuant to then-existing federal law.

581   See Bush v. Gore, 531 U.S. 98, 144 (Ginsburg, J., dissenting) ("But none of these dates [including December 18, 2000, the date set by 3 U.S.C. §7 (2000)] has ultimate significance in light of Congress' detailed provisions for determining, on 'the sixth day of January,' the validity of electoral votes.").

582   There are only two clauses that specify the qualifications of electors. See U.S. Const. art. II, §1, cl.2 ("[B]ut no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector."). U.S. Const. amend. XIV, §3 provides:

No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds in each House, remove such disability.

583   See supra notes 118-25 and accompanying text.

584   See supra notes 400-22 and accompanying text (presenting intratextual argument from House Judging Clause).

585   See U.S. Const. art. I, § 2, cl. 2.

APPENDIX - 314

586    Cf. The Federalist No. 53, at 303 (James Madison) (Clinton Rossiter ed., Mentor 1999) (1961) (suggesting that the votes of an "illegitimate member" of Congress would be valid before that member is "dispossessed" of his or her seat).

587    U.S. Const. amend. XII states that:
The Electors shall meet in their respective States and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate.
Id. (emphasis added).

588    10 Annals of Cong. 144 (1800). During the Electoral Count Act debates, Senator Sherman also discussed the elector ineligibility problem and the consequent difficulty of rejecting a "part" of the electoral votes contained in an authentic electoral certificate. See 17 Cong. Rec. 815-16 (1886).

589    See supra note 570.

590    See supra notes 176-91 and accompanying text.

591    See Ray v. Blair, 343 U.S. 214, 232 (1952) (Jackson, J., dissenting) (explaining that the original understanding is that electors "would be free agents, to exercise an independent and nonpartisan judgment as to the men best qualified for the Nation's highest offices"); The Federalist No. 68, supra note 246, at 380 (Alexander Hamilton); Amar, supra note 10, at 230 ("The Constitution plainly contemplates that, at least formally, the electors must themselves decide upon their votes."). It is an open question whether the original understanding of 1787-1788 is the right original understanding on the requirement of faithfulness. The Twelfth Amendment significantly rewrote the Electoral College Clauses and that amendment was adopted in part with the intention of vindicating majoritarian popular will. See Lolabel House, Twelfth Amendment of the Constitution of the United States 20-40 (1901) (unpublished Ph.D. dissertation, University of Pennsylvania). More importantly, it does not follow that if there is no constitutional requirement of faithfulness that there is a constitutional requirement of faithlessness (that is, absolute discretion). It is an open question whether state laws that purport to bind electors to vote in accordance with the popular vote are constitutional. Compare, e.g., Amar, supra note 10, at 219 ("[T]he constitutionality of [elector-binding] laws seems highly dubious if we consult constitutional text, history, and structure."), with Vikram David Amar, The People Made Me Do It: Can the People of the States Instruct and Coerce Their State Legislatures in the Article V Constitutional Amendment Process?, 41 Wm. & Mary L. Rev. 1037, 1089 n.233 (2000) (describing the question as an "open one").

592    See Ross & Josephson, supra note 7, at 690-91 (providing examples of elector-binding laws).

593    See U.S. Const. art. II, §1, cl.5 ("No Person except a natural born Citizen... shall be eligible to the Office of President; neither shall any Person be eligible to that Office who shall not have attained to the Age of thirty five Years, and been fourteen Years a Resident within the United States."); U.S. Const. amend. XII ("But no person constitutionally ineligible to the office of President shall be eligible to that of Vice-President of the United States.").

594    See supra notes 143-48 and accompanying text.

595    As a prudential matter, Professor Amar has stated that "[Congress] should simply count the votes of a dead man as if he were alive." Akhil Reed Amar, Presidents Without Mandates (With Special Emphasis on Ohio), 67 U. Cin. L. Rev. 375, 388 (1999).

596    U.S. Const. art. II., §1, cl. 6; U.S. Const. amend. XII; see also Ross & Josephson, supra note 7, at 706-07 (suggesting that Greeley precedent applies to entirety of Presidential Eligibility Clause).

597    See U.S. Const. amend. XII ("The Electors shall meet in their respective states and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves.").

598    Senator Ross misstated the problem in the Sixth Congress when he asked, "Suppose they should vote... for two persons who were both citizens of the same State...?" 10 Annals of Cong. 29 (1800); see also Counting Electoral Votes, supra note 3, at 451 (remarks of Sen. Frelinghuysen) (making same mistake). There is no constitutional requirement that an elector shall not vote for two persons of the same state--the constitutional requirement is that an elector shall not vote for two persons of the same state as herself. Translated

APPENDIX - 315

into the recent past: Electors from forty-nine states could constitutionally vote for both George Bush as President and Lloyd Bentsen as Vice President; only Texas electors could not.

The Bush-Bentsen problem resurfaced in the presidential election of 2000. See Jones v. Bush, 122 F. Supp. 2d 713, 715 (N.D. Tex. 2000), aff'd, 2000 U.S. App. LEXIS 34148 (5th Cir. Tex. Dec. 7, 2000), cert. denied, 531 U.S. 1062 (2001) (dismissing suit by three registered voters in Texas who alleged that Richard B. Cheney was an "inhabitant" of Texas and that, under the Twelfth Amendment, Texas electors were prohibited from voting for both George W. Bush and Richard B. Cheney). For two recent discussions in the legal literature of this (putative) problem, see Ho, supra note 195, passim, and Levinson & Young, supra note 195, at 932-54.

599   See text accompanying supra note 154.

600   Under our Constitution, we are never without a President, but we may be without a Vice President. See U.S. Const. amend. XXV, §§1-2. Moreover, the President, unlike the Vice President, wields the power of an entire branch of Government. See U.S. Const. art. II, §1, cl.1 ("The executive Power shall be vested in a President of the United States of America."). At least two commentators seem to agree that electoral votes for President are to be preferred to those for Vice President. Levinson and Young argue that:
Common-sensically, the correct outcome is most certainly [to count the electoral votes for President and throw out the electoral votes for the Vice President], since it would seem obvious that preferences for President should be preferred over preferences for Vice President.... But this answer is hardly the only plausible resolution, and it is certainly not derived from the barebones text [of the Twelfth Amendment].
Levinson & Young, supra note 195, at 935 n.37.

601   See U.S. Const. amend. XII.

602   See supra notes 587-88 and accompanying text (discussing anonymity principle of Electoral College Clauses).

603   See, e.g., Akhil Reed Amar, An(Other) Afterword on the Bill of Rights, 87 Geo. L.J. 2347, 2358-59 (1999) (criticizing application of "blinkered textualism" to standard for presidential impeachment and arguing that presidential impeachment requires a higher standard than that for judges or cabinet officers, although the Constitution lumps presidential impeachment with all other impeachments).

604   See, e.g., 2 Farrand, supra note 35, at 500 (remarks of George Mason) ("[N]ineteen times in twenty the President would be chosen by the Senate."); id. at 512 (remarks of George Mason) ("[I]t will rarely happen that a majority of the whole votes will fall on any one candidate."); The Federalist No. 66, supra note 432, at 372 (Alexander Hamilton) ("The same house [House of Representatives] will be the umpire in all elections of the President which do not unite the suffrages of the majority of the whole number of electors; a case which it cannot be doubted will sometimes, if not frequently happen."). But see 2 Farrand, supra note 35, at 501 (remarks of Abraham Baldwin) ("The increasing intercourse among the people of the States, would render important characters less & less unknown; and the Senate [under the Constitution as adopted and amended, the House of Representatives] would consequently be less & less likely to have the eventual [presidential] appointment thrown into their hands."). History has proved Mr. Baldwin to be correct.
Alexander Hamilton, for his part, probably did not think the Bush-Bentsen requirement to be all-important. His private, unadopted draft of the Constitution contains a provision providing that electors "shall proceed to vote by ballot for a President, who shall not be one of their own number, unless the Legislature upon experiment should hereafter direct otherwise." 3 Farrand, supra note 35, at 622-23 (emphasis added).

605   U.S. Const. amend. XX, §3 (emphasis added).

606   Baker v. Carr, 369 U.S. 186, 217 (1962).

607   U.S. Const. amend. XX, §3. Section 3 of the Twentieth Amendment embarrassingly does not specify who shall act as Vice President when electors go bananas. The Twenty-fifth Amendment only complicates this problem: "Whenever there is a vacancy in the office of the Vice President, the President shall nominate a Vice President who shall take office upon confirmation by a majority vote of both Houses of Congress." U.S. Const. amend. XXV, §2. The spirit of section 3 of the Twentieth Amendment suggests that this person is to act as Vice President until a Vice President shall have qualified.

608   See supra notes 400-24 and accompanying text (presenting intratextual argument of House Judging Clause); supra notes 447-56 and accompanying text (presenting structural argument of anti-Congress principle of presidential election); supra notes 457-59 and accompanying text (presenting structural argument of anti-President principle of presidential election).

APPENDIX - 316

609     See also Amar, supra note 10, at 222-23 & 231 n.22 (noting that question of whether presidential or vice presidential candidate dies or becomes incapacitated shortly before election day is a judicial question).

610     See Powell v. McCormack, 395 U.S. 486, 516-49 (1969).

611     There is one truly exceptional situation that the Twentieth Amendment solves that the joint convention could not. Imagine that all of persons voted for by the electors for President and Vice President were unconstitutional. Even though the joint convention could pursuant to the Electoral Count Act reject enough of these unconstitutional votes to trigger contingency elections for President in the House of Representatives and for Vice President in the Senate, the House and the Senate would be required to choose the President and Vice President, respectively, from a list of unconstitutional candidates.

612     See Paulsen, supra note 555, at 222.

613     See U.S. Const. amend. XX, §1 ("The terms of the President and Vice President shall end at noon on the 20th day of January, and the terms of Senators and Representatives at noon on the 3d day of January, of the years in which such terms would have ended if this article had not been ratified; and the terms of their successors shall then begin.").

614     See U.S. Const. art. II, §1, cl.5.

615     Other commentators have taken initial stabs at this question. See Glennon, supra note 517; L. Kinvin Wroth, Election 2000: The Disease and the Cure, Vt. B.J. 53, 53-54 (2001); L. Kinvin Wroth, Congress Can Clean Up Its Electoral Act, Chi. Sun-Times, Jan. 5, 2001, at 31.

616     See U.S. Const. amend. XII; see also 2 Farrand, supra note 35, at 518 (describing James Madison's motion at the Philadelphia Convention that a quorum in the Senate for choosing the President in a contingent election be two-thirds of the Members).

617     Counting Electoral Votes, supra note 3, at 525.

80 NCLR 1653

**End of Document**             © 2020 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX - 317

**13 Rutgers J. L. & Pub. Pol'y 340**

Rutgers Journal of Law & Public Policy
Fall, 2016

Chris Land [a1]  David Schultz [aa1]

Copyright © 2016 Rutgers Journal of Law & Public Policy; Chris Land, David Schultz

# ON THE UNENFORCEABILITY OF THE ELECTORAL COUNT ACT

## I. INTRODUCTION

*"It is much more material that there be a rule to go by than what the rule is; that there may be a uniformity of proceeding in business not subject to the caprice of the Speaker or captiousness of the members."* [1]

It goes without saying that the rules that govern how our country elects a president each quadrennium are something that should be as clear as possible and accepted as binding by all. Otherwise, an incipient constitutional crisis is born.

The value of rules and procedures are most evident when an issue is hotly contested, when consequences are uncertain, and when the stakes are at their highest. From our country's first constitutional crisis in the 1800 election through the imminent 2016 contest, presidential contenders have been highly motivated to seek every advantage possible, and in the **\*341** event of a disputed election result, each candidate would have irresistible motives to attempt to trade on ambiguities and flaws in the counting process.

Procedure is a funny thing. Invariably hidden among substantive decision-making the vast majority of the time, the means used to navigate inflexion points are largely an afterthought. When consequences are most uncertain, however, and stakes at their highest, the adaptability and flaws of our procedural frameworks are mercilessly laid bare.

A hidden imperfection for the first one hundred years of the Republic, the 1876 presidential election exposed our Constitution's original failure to provide a framework for resolving electoral disputes, bringing about a constitutional crisis in a bitterly contested post-Civil War climate. After employing a constitutionally unique Electoral Commission to award a disputed Electoral College majority to Rutherford Hayes, Congress agonized over the creation of a procedural framework for ten years--finally passing the Electoral Count Act in 1887. [2] The Act placed on a statutory footing the method of appointing state electors, the form in which votes were to be submitted, and most importantly, a number of restrictive procedures that both Houses of Congress were required to follow when tabulating the results. [3]

The Electoral Count Act was then consigned to the dustbin of history by everyone except the most astute election law scholars until the United States again faced a razor-thin presidential contest in 2000. While scrutiny of the Act by the United States Supreme Court in *Bush v. Gore* [4] largely centered on the timing of certification to receive "safe harbor" deference, [5] procedural objections that took place in Congress during the subsequent count gave rise to a number of key constitutional questions that have somehow evaded the academy [6] over the past **\*342** fifteen years. Whether the 2016 presidential election will provide an opportunity to resolve these questions is not presently known. However, in a political era that is highly partisan and polarized, [7] and with only a handful of states really being contested in the presidential race, [8] a close and disputed election in one state could expose flaws in the Act far more intense and consequential than 2000.

Largely unique among the United States Code and other congressional procedures, [9] the Act purports to restrict the authority of both the House of Representatives and Senate to control their internal discretion and procedures during the quadrennial count. The Supreme Court, however, has historically held that Article I, Section 5's constitutional grant that "[e]ach House may

APPENDIX - 318

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 320 of 553 PageID #:  725

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. & ...

determine the Rules of its Proceedings ...” [10]  represents the plenary power of each House to govern its internal parliamentary activities-- including adjournment, amendment, and debate. [11]  As a result, an irreducible conflict centered on non-delegation, entrenchment, and the separation of powers lies in wait between the Electoral Count Act and the Houses' independent Article I procedural authority.

 **\*343**  In order to test the limits of this conflict, this article will first consider the important threshold question of whether the institution that actually counts electoral votes is a constitutionally unique entity or merely a simultaneous meeting of the House and Senate. Neither a plain-text reading of the Constitution, nor congressional intent support the Joint Session reading. Part III will then examine the Electoral Count Act's (“ECA”) genesis and relevance through the 1876 election, analyzing the 1877 Electoral Commission's role, and contending that this mixed-branch commission was a permissible exercise of the Rules Clause at the outer limits of congressional delegation.

Part IV will then consider the core issue of whether sections 15 through 18 of the ECA are unenforceable in light of non-delegation doctrine, the Rules Clause, and our system of separated powers. Finally, Part V will proceed to assess the justiciability of these issues in the context of the upcoming 2016 presidential election, arguing that they must be within reach of our federal courts. This article thus contends that the ECA unconstitutionally impinges on Congress's internal procedural authority and is unenforceable, adding ever more uncertainty to an electoral system that has already engendered three constitutional crises in our Nation's history.

## II. WHAT INSTITUTION COUNTS OUR ELECTORAL VOTES?

It is necessary that we first outline the framework provisions that govern the counting of Electoral College results and the institutions textually charged with this duty. Amendment XII governs the formal process of electing our chief executive. [12] Before its adoption in 1804 following the aftermath of the 1800 Jefferson-Burr tie, [13]  Article II governed this process.  **\*344** Consequently, Amendment XII provides that “[t]he President of the Senate [the sitting Vice President] shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted.” [14]

A number of critical constitutional questions can be raised from this provision. The President of the Senate obviously plays an important role in the count, but does this authority extend to the power to make parliamentary rulings? Does he or she have substantive decision-making authority over which votes should be counted, [15]  or is this textually demonstrable power merely ministerial, with validity determined by the houses individually or as a group? [16]  Additionally, and most crucially for our discussion, is the body assembled to count the votes a unique constitutional entity, that is, a “Joint Session of Congress” with independent procedural authority imbued on this body, or is it merely the House of Representatives and Senate assembled in the same place and retaining their individual powers?

 **\*345**  If this quadrennial count was intended by the Founders to be a separate institution, with members of Congress and the Vice President serving as ex officio [17]  members, then it undoubtedly would have a great deal of procedural freedom to develop a new method for counting presidential results, making many of the issues discussed *infra* superfluous. [18]  Viewing the House and Senate as ex officio members of a Joint Session is supported by some evidence from the 1787 Constitutional Convention, which, in an early version, drafted this key provision to read “[t]he President of the Senate shall *in that House* open all the certificates, and the votes shall be then and there counted.” [19]  Representative (and Founder) [20]  Albert Gallatin similarly made a motion in the Sixth Congress to provide that any decision on the legality of electoral votes would be made by a majority of Representatives and Senators present--removing any distinction between the Houses. [21]  In  **\*346**  1886, a year before the passage of the ECA, Sen. James George also remarked that counting

> is not a legislative function which ought to be considered separately by the two Houses, but it is rather in the nature of a judicial function; ... it would be an anomaly surely in Anglo-Saxon jurisprudence, ... [that] the rendering of an operative judgment upon the ascertainment of a fact should be committed to two separate tribunals [(the House and the Senate)], each acting independently of the other, and each having a veto upon the other. [22]

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 321 of 553 PageID #:  726

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. &...

Consequently, if the House and Senate are classified as a constitutionally independent Joint Session, this body likely has the authority to develop special, binding procedures for counting electoral votes--e.g., the ECA. This stems from the Rules Clause, inherent legislative authority, [23] and that the observation that our Constitution is largely silent on the detailed method to be used. Congress is also granted the express authority "[t]o make all laws which shall be necessary and proper for carrying into execution ... and all other powers vested by this Constitution," including the ex officio authority delegated to Congress to count electoral returns. [24]

This view, however, fails to consider important textual evidence. No clear indication exists providing that a Joint Session or convention [25] is to count the votes; quite the opposite  **\*347**  in fact, as the House and Senate are individually named in the counting provisions contained in Article II [26] and Amendment XII. [27]  Secondly, and perhaps most crucially, Clauses 3 and 4 of this Amendment also provide that the House and Senate shall separately elect the President and Vice President in the event of an Electoral College tie, or if the second place finisher in the House vote fails to attain a majority of votes, respectively. [28]  Evidence cited *supra* from Rep. Gallatin's motion that purported to grant the Houses, as a corporate body, the joint authority to judge the validity of electoral votes was also expressly rejected by the Federalist Congress in 1801. [29]  Congressional interpretation of this provision throughout the history of our nation has also affirmed this provision to mean that both the House and Senate are largely separate entities.

The Supreme Court has recognized that both the President and Congress infrequently rely on past practices or interpretations as justification for their authority, in areas of textual obscurity. [30]  In this way, the "gloss which life has written upon them [the words of the Constitution]," can make "a systematic, unbroken ... practice, long pursued" worthy of great deference by the Supreme Court, as long as it otherwise comports with the text of the Constitution. [31]  Both the ECA and  **\*348**  its forerunner, the Electoral Commission Act of 1877, [32]  exclusively refer to both the Senate and House as separate organs, [33]  providing that in the event of a properly raised [34]  parliamentary objection during the actual count, the Houses must withdraw to their chambers to separately decide its merits. [35]

Based on this gloss [36] and the 117-year lifespan of the ECA as a framework for finalizing presidential elections in Congress, as well as the textual indications discussed *supra*, the House and Senate would likely be viewed, for constitutional purposes, as separate bodies with independent authority meeting together to count the certificates of vote submitted by the states for President and Vice President.

It is important to also note briefly that the ECA may have a grave constitutional defect even if an independent body exists that is empowered to make rules for counting the votes. Section 17 of the ECA provides that "the two Houses separate to decide upon an objection." [37]  This provision--other than affirming the principle that the Houses are actually meeting together as separate entities--could represent an unconstitutional delegation of the Joint Session's authority. [38]  In this narrow  **\*349**  context, this analysis does not consider collateral questions on whether counting was originally envisioned by the Constitution to be a ministerial act, [39]  or even if the President of the Senate may have a role in deciding the fate of individual returns. [40]  Nevertheless, this article will proceed under the assumption that both the Constitution and established historical practice views the House and Senate as separate constitutional entities in the count.

## III. TILDEN OR BLOOD: THE ELECTORAL COMMISSION AND THE LIMITS OF DELEGATION

### A. THE 1876 ELECTION

Constitutions regulate the day-to-day workings of government, but the inherent value of our system of separated powers is perhaps best displayed when out-of-the-ordinary events appear, placing stress on institutional actors and exposing flaws in inflexion points of decision-making. Chief among the small handful of constitutional crises that our nation has experienced are the 1876 and 2000 presidential elections, both of which largely centered on the disputed electoral votes of the state of Florida. [41]

With an election grounded in lingering feelings of sectionalism and the bitter legacy of the Civil War, [42]  neither Democratic candidate Samuel Tilden, nor Republican  **\*350**  Rutherford Hayes were particularly enthusiastic to become chief executive in

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    3

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 322 of 553 PageID #:  727

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. &...

1876. [43]  Election night saw many observers predicting a Democratic victory, and early returns from both New York and Ohio confirmed that Tilden was the frontrunner. [44]  Nevertheless, Democratic leaders D.A. Magone and Sen. William Barnum sent out panicked telegrams to the *New York Times* office at approximately 3:45am on Wednesday, November 8, 1876 asking for the latest electoral vote estimate. [45]  Curious as to why Democratic officials were worried in spite of favorable predictions made across the board, the Republican-leaning *Times* informed their party's leadership, who immediately wired field agents in Florida, South Carolina, Louisiana, and Oregon--all of which had to be won in order to elect a Republican to the presidency--"urging them to hold their States--[and] that the election depended on it." [46]  With an Electoral College majority at 185 votes in 1876, [47]  Tilden banked 184 votes and Hayes stood at 163 after election night. [48]  As a result, Democrats only needed to win one state or disqualify a single elector, which would throw the election into a Democratic  **\*351**  House of Representatives and quickly make Tilden President-Elect. [49]

Reconstruction-era Republican governors heavily controlled the election apparatus in Florida, Louisiana, South Carolina, and Oregon and "the only way the Democrats could influence an official was to buy him"--and hope to not be outbid. [50]  In the weeks after the election, Republican "visiting statesmen" from northern states went south to help officials "oversee" canvassing, and by December 1876, Florida, Louisiana, South Carolina, and Oregon each submitted multiple sets of electoral votes to Congress for consideration, with at least one Democratic and Republican slate from each state. [51]  As a result, both Hayes and Tilden independently had a claim to the presidency that was backed by dozens of potentially fraudulent certificates of vote. [52]

While Congress was preparing to meet to conduct the count, this fact became widely known and Candidate Hayes asserted that the Constitution granted the (Republican) President Pro Tempore of the Senate [53]  the sole authority to determine which returns to count. [54]  Tilden feverishly disagreed, arguing that never before had this officer been permitted to decide upon disputed electoral votes, and that the decision had been previously made in Congress through an objection from the floor. [55]  Tilden felt that the best strategy to ensure he won the Presidency was to make no concessions and allow Congress  **\*352**  to count the vote regularly, throwing out the disputed states. [56]  Because no candidate had a majority, a Democratic House would elect him president before Republicans took control on March 4, 1877. [57]

Nevertheless, even though congressional leaders of both parties felt strongly that their respective candidates should be elected, they also agreed that productive steps should be taken to resolve the crisis before open conflict erupted. [58]  As a result, President Grant and the House and Senate approved the creation of a statutory commission in the Electoral Commission Act by wide majorities in January 1877. [59]  The Commission was composed of five House members, five Senators, and five Supreme Court justices, split evenly on party lines, with the four justices named specifically in the Act electing a fifth justice--widely acknowledged to be "independent" and "apolitical" David Davis. [60]  Most importantly, the Act provided that the Commission's recommendations disposing of the disputed votes must be accepted as binding by the House and Senate. [61]  Unknown to Congress at the time of passage, however, Davis was appointed to the U.S. Senate by the Illinois Legislature--as a Republican-- the day before the Commission was created, giving him the opportunity to demur from this partisan affair. [62]  Democrats became furious at this turn of events because each of the remaining justices that could fill the seat were Republican. Justice Joseph Bradley soon replaced Davis, and predictably the Commission voted 8-7 along party lines to grant each of Louisiana, South Carolina, Oregon, and Florida's disputed electoral votes to Hayes. [63]

**\*353**  With House rules much different than today, [64]  Democrats caused "wild disorder" during the count on March 1, 1877, successfully disrupting floor proceedings and blocking consideration of the Electoral Commission report--even to the extent that, "for hours Speaker Randall could not even make himself heard." [65]  Southern Democrats were then reportedly promised by Republican leaders in a backroom deal that Reconstruction and the federal troops stationed throughout the South would be withdrawn in exchange for allowing Hayes to be placed in the White House. [66]  As a result, Democratic leaders began to allow Randall's "determined, arbitrary, and dictatorial" parliamentary tactics to bring an end to debate and other dilatory motions made from the floor. [67]  After eighteen hours of wild controversy, the Commission report was finally adopted, giving Hayes the narrowest winning margin in Electoral College history--185 to 184. [68]

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.          4

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 323 of 553 PageID #:  728

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. &...

**\*354  B. A SEPARATION OF POWERS PERSPECTIVE ON THE ELECTORAL COMMISSION**

The Rules Clause of Article I grants each House of Congress a wide remit to establish, modify, and amend the rules of procedure they will employ to carry out their constitutional lawmaking duty. [69]  The idea that a legislative body has inherent plenary control over its own procedures has deep roots in British constitutional traditions, [70]  initially born of the desire of the House of Commons to stand alone from the House of Lords in the fourteenth and fifteenth centuries and develop rules diverging from royal tradition. [71]  Based on this spirit, the Rules Clause "vest[s] control over ... key procedural elements of the enactment process in each House at any point in time." [72]

Within this textual grant of power, Congress has near-absolute authority, granting each chamber the freedom to take different approaches to similar procedures. For example, Article I, Section 7, Clause 2 provides that every bill shall "pass" the House of Representatives and Senate. [73]  However, both the House and Senate take varying perspectives on what counts as passage, with the House sometimes employing the "deem and  **\*355**  pass" method, [74]  and the Senate relying on the sixty-vote cloture requirement as a de facto threshold for passage. [75]  The House and Senate also take much different approaches to determining the presence of a quorum. [76]  Article I expressly defines a quorum as a majority of Representatives and Senators respectively and requires that all bills pass both the House and Senate before delivery to the White House for signature or veto (bicameralism and presentment). [77]  Nevertheless, something less than a voting quorum frequently passed legislation in the late 19th century and was held constitutional. [78]  Differing procedures also exist regarding length of debate [79]  and  **\*356**  suspension of the rules. [80]  Embracing these nuances, federal courts have given each House of Congress, as a separate constitutional actor, a wide berth in reviewing their specific rules of procedure, as long as they comport with other textual requirements of the Constitution. [81]

It follows that Congress' use of the Electoral Commission as a fact-finding tool in the midst of the 1876-77 constitutional crisis is likely a valid exercise of the Rules Clause, while also representing the outer limit of potential congressional delegation in this area. The Commission's mandate was to hear testimony from counsel representing Tilden and Hayes, to gather evidence pertaining to the validity of electoral votes from the disputed states, and to issue a final report. [82]  Pursuant to this mission, the Electoral Commission was little more than a fact-finder operating on behalf of Congress, in much the same way that committees routinely operate. Committees allow Congress to solve the collective-action problems normally encountered when dealing with large groups of people, allowing legislators to also gain specialized knowledge in a policy area, making the legislative process more effective. [83]  However, it  **\*357**  could be argued that, from a constitutional perspective, the Electoral Commission was doing something more significant than gathering facts or taking testimony--it was performing a judicial-like function in passing upon the validity of votes integral to the function of another coordinate branch and resolving a dispute between adverse parties. [84]  Could this added feature mean the Commission was unconstitutional?

Not all instances of a body of Congress acting in a quasi-judicial role are unconstitutional. In 1989, Mississippi federal district judge Walter Nixon was serving a felony sentence for perjury but had nevertheless refused to resign his office after congressional leaders warned him that impeachment and removal were imminent. [85]  The House of Representatives unsurprisingly impeached him, and the charges were dutifully sent to the Senate for trial. [86]  The Senate, pursuant to its rules, appointed an Impeachment Trial Committee to "receive evidence and take testimony," holding four days of hearings, during which ten witnesses were called. [87]  The Committee then presented the Senate with a complete transcript of the proceeding, reported the uncontested facts, and summarized the contested issues for the full body to make a final determination of Nixon's fate. [88]  Subsequently removed from office by the requisite two-thirds majority, Nixon brought a federal suit, claiming that because the Senate had "the sole Power to try all Impeachments," [89]  use of the word "try" meant that a judicial-like fact-finding proceeding was required before the full Senate,  **\*358**  and that the body had unconstitutionally delegated this textual demand to the Impeachment Trial Committee. [90]

The Supreme Court, agreeing with the D.C. District Court and Court of Appeals below, found that this controversy was moot-- the Senate had the "sole" power of impeachment, and commiserate with this plenary grant of power, [91]  the Senate is free to define "try" in any manner it chooses, [92]  including the use of a committee to carry out the fact-finding function. [93]  Justices Blackmun and White, as part of a unanimous Court, specifically emphasized that the use of a committee to carry out part of the

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                     5

impeachment process was a permissible exercise of the Rules Clause, as long as the Senate as a whole had the final word. [94] The Senate's ultimate control over this process was likely dispositive, since much in the same way federal magistrate judges often first issue reports and recommendations in federal civil suits that are later reviewed by a district judge, [95] senators had the opportunity to conduct a de novo review of the record made by the Impeachment Trial Committee and had a final, independent say in removing Nixon from his position as a judicial officer of the United States.

*Nixon* stands for the proposition that the Senate has broad leeway in trying impeachments as a legislative body, even though this is a quasi-judicial function. This case accentuates **\*359** both the freedom and the limitations placed on Congress' power to delegate pursuant to the Rules Clause. Both the House and Senate are inherently free to use any method of internal delegation they think prudent or well-adapted to aid the execution of their constitutional responsibilities, but the individual Houses, as corporate bodies, must maintain the final authority to approve or reject a decision. [96] Even though the House and Senate may change how they interpret and accomplish these tasks, it may not surrender ultimate control to another entity, either internal or external of Congress. Therefore, the Senate may not delegate its authority to conduct impeachment trials to the House, nor would the House be permitted to allow the Senate to elect a president in case of no candidate receiving a majority. These duties are textually conferred by the Constitution to each house, in the same way that both the House and the Senate are given the independent authority by the Rules Clause to determine how they will conduct business. [97]

As a result, the Impeachment Trial Committee utilized by the Senate and the 1876 Electoral Commission are both within Congress' power of delegation and rulemaking, but simultaneously stands for the outer boundary of this authority. Any transfer of dispositive control or influence on procedure matters wholly internal to the House or Senate to an actor outside the membership of the House or Senate, respectively, would fundamentally impinge the procedural sovereignty vested in each house by the Rules Clause. In this way, Justice Souter's *Nixon* concurrence noted that some procedures employed by Congress could potentially act beyond the scope of their **\*360** constitutional authority, requiring judicial intervention to return the separation of powers to its previous state. [98]

## IV. THE PROCEDURAL PROVISIONS OF THE ELECTORAL COUNT ACT

### A. THE 2000 ELECTORAL COUNT

As polls closed across Florida on the evening of November 7, 2000, many news organizations quickly predicted that Vice President Al Gore would be awarded Florida's twenty-five [99] electoral votes, based on exit polling and turnout. [100] This prediction was later reversed in favor of Texas Governor George W. Bush, and later declared too close to call in the early hours of November 8, with Gore trailing Bush by approximately 1,784 votes. [101] The weeks that followed saw recounts in four Florida counties and numerous lawsuits challenging the counting methods utilized to determine voter intent. [102] The Florida Supreme Court eventually decided these challenges against Governor Bush, prompting his legal team to seek certiorari in the U.S. Supreme Court days before the ECA's safe harbor [103] deadline--a point in which deference would be granted to the election results certified by Florida's (Republican) Secretary of **\*361** State six days prior to the nationwide meeting of the Electoral College in December. [104]

Many were in front of their televisions on December 12, 2000 when the United States Supreme Court finally put a period on the contest. In a deeply polarized 5-4 decision, justices held that the diverging tabulation standards being used in Florida's recounts were an equal protection violation and that insufficient time before the safe harbor deadline existed to make changes to the counting standards [105] --effectively granting Bush victory because of his marginal lead in the vote totals.

However, the election's true legal coda did not occur until three weeks later, on January 6, 2001. Congress, meeting to count the nation's electoral votes pursuant to the Twelfth Amendment, had the task of opening the electoral certificates of vote from each of the fifty States and the District of Columbia. Members waited with baited breath as President of the Senate Al Gore and congressional vote-tellers worked their way through the alphabet down to Florida. [106] As one of the tellers remarked that "this is the one we have all been waiting for," [107] Gore dutifully read the certificate from Florida that sealed his 271-266 defeat in the Electoral College.

APPENDIX - 323

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 325 of 553 PageID #:  730

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. &...

At that moment, Rep. Alcee Hastings (D-FL) rose to object to the inclusion of the Sunshine State's twenty-five electoral votes, seeking to offer a formal challenge to their validity based on the litigated counting irregularities and alleged **\*362** electoral fraud. [108] Seventeen other objections and points of order were made by House members in the ensuing minutes, ranging from challenging the presence of a quorum, [109] moving to withdraw the House of Representatives from the count to hold a formal debate on voting irregularities, [110] and even **\*363** remarkably attempting to overturn the parliamentary rulings of Vice President Gore on the previous motions by appealing to the full membership of the House and Senate. [111]

Each was overruled perfunctorily, with Gore meekly advising each that "reading the Electoral Count Act as a coherent whole" [112] required that he overrule each objection because they were not seconded by a senator, in writing, pursuant to the statutory requirements of the ECA. [113] Beyond the political fervor in the air of the Hall of the House of Representatives on this day, and Democratic expressions of "solidarity" [114] with Vice President Gore, these overruled objections give rise today to the fundamental question of whether the ECA is constitutionally enforceable in light of the Rules Clause, entrenchment, and the doctrine of non-delegation.

### \*364  B. NON-DELEGATION DOCTRINE

Leaders of large organizations are busy people. They frequently have large staffs, however, enabling them to delegate many of the tasks for which they are formally responsible by allowing others to act with their authority. When all authority is concentrated in one individual, this arrangement is perfectly acceptable because the executive cannot arrogate further powers--he/she possesses them already. In a system of separated powers, however, when governmental authority is divided as a structural protection, delegation to another constitutional actor can result in controversy over the propriety of government action and an imbalance of authority.

James Madison noted in *Federalist No. 51* that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." [115] Affirming the importance of these structural protections, Madison further established that:

> the great security against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department, the necessary constitutional means, and personal motives, to resist encroachments of the others ... [also] to divide the legislature into different branches; and to render them by different modes of election, and different principles of action, as little connected with each other, as the nature of their common functions. [116]

Non-delegation doctrine holds that "[o]ur Members of Congress could not, even if they wished, vote all power to the President and adjourn *sine die* [indefinitely]," [117] even though it might be more efficient in a time of crisis. Changes to our separation of powers may only be made via constitutional amendment or an unlikely radical shift in the Supreme Court's **\*365** jurisprudence. [118] As a result, the legislative and other functions of Congress are divided and entrenched both within our all-too-familiar three branches of government, [119] but also within Congress itself.

The structural feature of this internal separation of powers promotes accountability in that "when decisions are properly made in [the right House of] Congress, electoral controls on individual members" [120] are extremely powerful, allowing the public to readily identify where decisions that affect their lives are being made. This horizontal division of powers among the House and Senate represents the Founders' belief that Congress was more likely to aggrandize power than any other entity in the Federal Government. [121] Even though Congress works together as a bicameral body to enact legislation, a number of tasks exists that are unicameral, for example, origination of revenue legislation in the House of Representatives (Article I, Section 7, Clause 1), impeachment and trial (House: Article I, Section 2, Clause 5; Senate: Article I, Section 3, Clause 6-7), treaty ratification (Article II, Section 2, Clause 2), and officer confirmation (Article II, Section 2, Clause 2-3). Based on one interpretation of the Orders, Resolutions, and Votes Clause, [122] it is even conceivable that one House of Congress may independently enact legislative vehicles with the **\*366** force of law after an express delegation through bicameralism and presentment. [123] These powers were

APPENDIX - 324

Case 6:20-cv-00660-JDK  Document 33  Filed 01/01/21  Page 326 of 553 PageID #:  731

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. &...

allocated in large part based on the Founders' considerations of institutional competence, [124] the need to satisfy both large and small states at the founding, [125] and the belief that no one actor should possess the entirety of the national legislative power. [126]

In *INS v. Chadha*, the Supreme Court considered a provision in the Immigration and Nationality Act that permitted either the House or Senate to individually abrogate a deportation suspension order of the Attorney General via ordinary resolution. [127] The Court subsequently held that this veto was sufficiently legislative (i.e., individual modification of immigration law--not unlike a private bill) to mandate passage via bicameralism and presentment. [128] Consequently, the Nationality Act provision authorizing this one-House action was an unconstitutional delegation by both the President and Congress. [129] Similarly, the Court held in *Clinton v. City of New*  **\*367**  *York* that the Line Item Veto Act's grant of authority to the President to cancel individual appropriations was defective because President Clinton had "effectively amended an act of Congress by repealing a portion of it." [130]

These cases establish that the Supreme Court has been careful to restrain Congressional actions to change the internal composition of its powers, whether an external delegation (the President), or an internal shift (one House veto). One commentator has carried this conclusion further, noting that "all the separation of powers cases seem to go against Congress." [131] One area the Court has been reluctant to journey into, however, are internal Congressional rules, as each House is issued a near-plenary grant of authority by the Constitution to set the procedures under which it will operate. [132] The Rules Clause is granted near-absolute deference because judicial review of congressional procedures has historically been limited to the narrow situations when *"its rules ignore constitutional restraints* or violate fundamental rights." [133]

## **\*368  C. RULEMAKING STATUTES**

*"I'll let you write the substance, you let me write the procedure, and I'll screw you every time*." [134]

One of the reasons the Supreme Court found the legislative veto unconstitutional in *Chadha* was that the statute improperly allowed one legislative institution to act without the required consent of other players through bicameralism and presentment. [135] Based on the principles set forth in in this case, as well as *Clinton* and *Nixon*, the "single, finely wrought and exhaustively considered" [136] framework of our constitutional design means the powers of the House and Senate cannot be transferred, altered, diminished, or increased. The House cannot demand a vote on a Supreme Court nominee, nor could the Senate impeach and try an officer by itself. Most importantly, it follows that neither house can transfer or limit control of its internal, enumerated Rules Clause authority.

Let us consider the Electoral Commission Act of 1877 and the Electoral Count Act of 1887. Section 2 of the 1877 Act provided that the Electoral Commission's report disposing of the controversial certificates of vote was privileged-- requiring that after the Commission's decision had been made, "such decision shall be read and entered in the journal of each house, and the counting of the votes shall proceed in conformity therewith, unless, upon objection made thereto in writing by at least *five Senators and five members of the House of Representatives*." [137] The Act provided that "no debate shall be allowed and no question shall be put by the presiding officer, except to either house on a motion to withdraw," and,

> **\*369**  [T]hat when the two houses separate to decide upon an objection that may have been made to the counting of any electoral vote or votes from any State ... each Senator and Representative may speak to such objection or question ten minutes, and not oftener than once; but after such debate shall have lasted two hours, it shall be the duty of each house to put the main question without further debate. [138]

The ECA mirrors many of the same provisions used by the Electoral Commission. First, in order to receive objections, any motion made during the count must be presented in writing and signed by both a Senator and Representative. [139] Similarly, section 17 provides that no debate shall occur in the main assembly, and that both members of the house and senators cannot speak for longer than five minutes after withdrawing from the count to consider the objection, and that the "main question" of upholding or sustaining the objection is to be put to each individual house after two hours of debate. [140] Finally, section 18

APPENDIX - 325

Case 6:20-cv-00660-JDK  Document 33  Filed 01/01/21  Page 327 of 553 PageID #:  732

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. &...

of the ECA provides that neither debate nor motions shall be entertained, except on a motion to withdraw--provisions nearly identical to the 1877 Commission Act. [141]

**\*370**  Congressional rulemaking statutes, like the ECA, are uncommon, but not unheard of in the United States Code. [142] Numerous frameworks enacted by Congress delineate a special procedure for the House or Senate to follow in considering particularly controversial areas of policy. [143]  Naturally, this legislation serves a valuable collective action benefit, allowing the procedural statute to serve "a coordinating function between the two Houses, announcing focal points (such as numerical deadlines) so that legislators from one house may shape their behavior." [144]  In this way, when considering policy areas of great sensitivity or complexity, Congress has attempted to minimize initial disagreements over how a decision is to be made, [145] allowing it to focus instead on substantive policy, much like the ECA has sought to streamline the inherently political process of ratifying the winner of a presidential election.

Rulemaking statutes are not the "silver bullet" they were intended to be, however. From the first procedural statute  **\*371** enacted as part of the Reorganization Act of 1939 through the Trade Promotion Authority passed in 2015, [146] most procedural provisions [147] --other than the ECA-- found in the U.S. Code include an anti-entrenchment provision that specifically states that the enacted procedure is promulgated pursuant to the Rules Clause of the Constitution, and that *either house is free to follow, modify, or ignore the statutory procedure at any time without further action or amendment to the statute.* [148]  In this way, these rules are "essentially hortatory or directory; they have no legal effect on the rule-prescribing power of the houses" whatsoever. [149]

*Metzenbaum v. FERC* [150]  addressed the nature of these procedural statutes, in a controversy where the plaintiffs asked the D.C. Circuit to invalidate a statute enacted in violation of an earlier rulemaking provision contained in the Alaska Natural Gas Transportation Act. The reviewing court held that the two houses retained completed control over their own rules-- *especially* in situations when an earlier provision enacted as statutory law purported to entrench itself. [151]  No such provision exists in the ECA, and yet this act was nevertheless enforced as  **\*372**  absolutely binding in the face of sustained House objections during the January 6, 2001 count.

Similarly, long standing precedent of both houses recognizes that rulemaking statutes are generally hortatory. Persuasive authority used by the House Parliamentarian to advise the Speaker states that the House of Representatives has previously deferred to procedural statutes enacted in the same session of Congress. [152]  This reasoning is presumably rooted in the fact that a provision is more normatively legitimate when it has been expressly ratified by the members of the current legislature. Likewise, while the Reorganization Act of 1946 [153]  broadly establishes committee jurisdiction and other procedural rules in statute, the Senate has acknowledged that it is authorized by the Rules Clause to change procedures enacted in this statute via a simple one-house resolution because they govern operations that are wholly internal to Congress. [154]

Custom and usage [155]  of the Houses also emphasizes that Congress has ignored "statutized" rules in the past when found to be cumbersome or inexpedient. Speaker James Orr ruled in 1858 that a statute providing that Congress would consider bills appropriating funds to claimants who were victorious in the newly established Court of Claims was unenforceable and that claims bills would no longer be placed on the House Calendar. [156]  Two years later, a Member-elect objected to the adoption of House rules before the Clerk of the House and members were  **\*373**  sworn, citing a 1789 statute [157]  that required that oaths be the first order of business after an organizational session was convened. [158]

Over a century later, Rep. Trent Lott reportedly objected to consideration of additional aid to the Nicaraguan Contras in 1986 on the basis that the resolution failed to comply with an existing statute providing for fast-track procedures for international aid. [159]  Speaker Tip O'Neill issued a parliamentary ruling that stated that the rule reported out by the House Committee on Rules and accepted by the full body had abrogated the prior statute. [160]  Five years before, the House ignored the Alaskan Natural Gas Transportation Act's statutory procedure [161]  for approval of a regulatory waiver, prompting review by the D.C. Circuit in *Metzenbaum*. [162]

APPENDIX - 326

Case 6:20-cv-00660-JDK    Document 33    Filed 01/01/21    Page 328 of 553 PageID #:  733

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. &...

## D. THE UNENFORCEABILITY OF THE ELECTORAL COUNT ACT'S PROCEDURAL PROVISIONS

Let us now return to our preliminary question of whether the Electoral Count is comprised of two separate constitutional institutions or a unique Joint Session of Congress. If a Joint Session existed, Congress would be free, as ex officio members **\*374** of this separate constitutional organ,[163] to enact rules governing its operations because none exist in the Constitution. Because no unique body exists, the Electoral Count is merely a meeting of the House of Representatives and Senate in the same room. As a result, the House and the Senate, as the same entities, are still bound by the other textual requirements of the Constitution, one of which requires that the House and Senate have absolute authority over their own internal procedures, a provision not suspended during the hours in which Congress ratifies the election of our next president. This plenary authority requires that the House and Senate be free to debate, make motions, and withdraw from the count at any time as they wish, the ECA notwithstanding, subject, of course, to motions passing by the requisite majority of that house.

The inclusion of anti-entrenchment provisions in the Congressional Review Act, Nuclear Waste Policy Act, the Reorganization Acts of 1939[164] and 1946, the Congressional Budget Impoundment and Control Act of 1974,[165] and the majority of other rulemaking statutes allows either House of Congress to ignore its own mandate, and is fully compliant with the Rules Clause because each House still maintains the absolute authority to determine their individual rules of procedure. Instead, lacking this provision, the ECA purports to entrench itself, violating the Rules Clause and improperly involving another legislative chamber and the President.

Integral to the non-delegation doctrine is that fact that another constitutional actor cannot have dispositive control over another institution's textually enumerated authority. Because the ECA is statutory law subject to bicameralism and presentment, requiring the President's approval improperly delegates to our chief executive a veto over internal Congressional procedures which our separation of powers **\*375** prohibits.[166] More importantly, pursuant to Vice President Gore's interpretation of the ECA in 2001,[167] the Senate has dispositive control, vis-à-vis the House, over whether an objection to Florida's electoral votes was debated, the determination of the presence of a quorum in the House during the meeting, and even the power of the House to independently leave the count. Such a result is inconsistent with the Rules Clause and runs counter to most other statutory rule-making provisions, and in any event, is clearly unenforceable based on the parliamentary traditions of both houses.

Rigid enforcement of the Electoral Count Act's provisions by a member of one house (e.g., President of the Senate Al Gore) against members of another house (e.g., the House objectors) therefore improperly delegates procedural control of a standalone House of Congress to the other chamber--abrogating the fundamental individual constitutional prerogatives[168] of both the House and the Senate. Moreover, the ECA cannot be amended or ignored by one House of Congress alone since any scenario requires the involvement of another actor-- short of a constitutional crisis, that is.[169]

Enforcement of the ECA's procedures also impermissibly entrenches these measures, as individually applied to either the House or Senate.[170] A basic principle of constitutional law, one **\*376** of "the most familiar and fundamental principles, so obvious as rarely to be stated,"[171] is that "one legislature may not bind the legislative authority of its successors."[172] Each sequential legislature has equal lawmaking authority, and statutes purporting to limit changes that future lawmakers can make or requiring a supermajority for amendment, can be repealed entirely by ordinary statutes by a simple majority, the text of the original law notwithstanding.[173] It follows from this proposition that legislatures are free to adopt new rules of procedure at the opening of a session or subsequently during a session depending on preexisting rules.[174] Though less clear to nineteenth century legislators, because rule-making statutes were largely foreign to them, a number of Congressmen stated during debate on the ECA that this measure would attempt in vain to entrench procedures that would bind future Congresses.[175] As Vice President Gore restricted the ability of the House to exercise its vested Article I procedural rights, this action effectively entrenched the text of a statute above the Constitution, limiting the authority of the House to unilaterally change this onerous limitation,[176] because it must gain the assent of both the Senate **\*377** and the executive, itself a violation of the non-delegation doctrine.[177] For many Members of Congress who voted for the ECA in 1887, an unenforceable law was better than no law[178] because it would at least create a reference point that might allow Congress to avoid a repeat of the 1877 saga. However, in this case, an unenforceable law might actually be *worse* than no law at all.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.          10

## V. JUSTICIABILITY AND THE 2016 ELECTION

Split governments are exceedingly common in the United States, with either the Republicans or Democrats frequently controlling one House of Congress and the other party controlling the White House and the remaining chamber or some combination of one or more of these bodies. One party has only controlled all three constitutional lawmaking entities--the Presidency, the House, and Senate--for six of the last sixty-one years since 1955. Usually a recipe for political compromise or deadlock, the Electoral Count Act could instead turn this separation of political power into a lurid constitutional nightmare.

Imagine this scenario: the Senate flips to narrow Democratic control in the November 2016 elections [179] and the Democratic nominee runs an incredibly close race with the Republican contender and is leading in the Electoral College with Florida's votes again hotly disputed. In this way, the Democrats now control the Senate [180] *and the Vice Presidency* [181] **\*378** while the Republican candidate's party continues to control the House. The count is tied up in Florida's courts, and as a result, the Florida Attorney General and Secretary of State independently certify two certificates of vote, one Republican and one Democratic. [182] Therefore, the actions of Congress will be dispositive in deciding which slate of electors to validate.

Vice President Joe Biden naturally seeks to take advantage of every opportunity to award the Democratic candidate the disputed electors, while the Republican House wants to debate the subject, or better still, obstruct the count long enough to throw the election into the House, pursuant to Clause 3 of Amendment XII. [183] Vice President Biden, based on the precedents [184] set by the 2001 count, refuses to entertain House Members' motions to adjourn or withdraw from the count to hold a debate, [185] and no Democratic or Republican senator offers to concur--similar to 2001 when no Democratic senator could be found to second the House Members' objections. House Members, with the election genuinely in dispute, leave the count in protest and Vice President Biden awards the electors to the Democratic candidate. With its **\*379** General Counsel in tow, the House, meeting down the corridor in Statuary Hall in the Capitol, passes a resolution [186] that disclaims the authority of the ECA and the Senate to bind its internal procedural discretion, and authorizes a lawsuit [187] to challenge the Vice President and the Senate's unilateral actions. A constitutional crisis over the enforceability of the ECA's procedural provisions is born.

Few expected an obscure voting mechanism in South Florida and equal protection doctrine to decide the 2000 election. If the political history of our country teaches us anything, it is that flaws in our election system eventually are exposed--and what can happen will eventually happen. The parties are incredibly motivated to use whatever means at their disposal to win an election, especially the Presidency, and our election law framework must be robust enough to account for every risk. Returning to our hypothetical, the General Counsel of the House of Representatives quickly scribbles out a motion for injunctive relief on a notepad and then walks across Constitution Avenue to the federal district court. Quickly passed upward, will the Supreme Court even reach the merits of the House's claim that the Act and the actions of the Senate are unenforceable?

The seminal doctrine governing controversies that involve a political question is the familiar case of *Baker v. Carr*. [188] In this case, the Warren Court laid out six criteria for **\*380** determining whether the Court should reach the merits of a question or abstain from entering the political "thicket." [189] The *Baker* doctrine is a monument to judicial restraint, and consequently, the federal judiciary is hesitant to intervene in a controversy when the coordinate constitutional actors involved "possess ample political resources with which to protect their interests." [190]

Any possible institutional dispute between the House and Senate during an Electoral Count would not likely be resolved by normal political processes because this question would fundamentally be a challenge over the inherent powers of the Houses and the enforceability of the ECA--i.e., a classic affirmation of the Court's role "to say what the law is." [191]

In *Chadha,* the House of Representatives, arguing that a one-house legislative veto was constitutional, stated that the Supreme Court's review--of a procedure internal to Congress--was beyond the reach of the courts because the legislative process was textually committed to Congress, a coordinate political department, and that this case was fundamentally "an assault on the legislative authority [of Congress] to enact" the provision, citing the first, and most commonly used, *Baker* factor. [192] The Burger Court, however, disagreed, finding that the separation of powers dispute inhering among the Executive and Congress rendered this case a justiciable political question, and that "if this [argument] turns the question into a political **\*381** question, virtually

APPENDIX - 328

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 330 of 553 PageID #: 735

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. &...

every challenge to the constitutionality of a statute would be a political question," also remarking that "no policy underlying the political question doctrine suggests that Congress or the Executive ... can decide the constitutionality of a statute." [193]

When the Court decided similar separation of powers issues in *Bowsher v. Synar* and *Clinton v. City of New York*, no non-justiciable political issues were found, in spite of the lead role granted to Congress in these areas. [194] The remaining *Baker* factors militate in favor of review as well, since the standards for reviewing the ECA are well-defined (constitutionality/ enforceability and the Rules Clause) (factor 2), separation of powers disputes are classically judicial (factors 3-4), and finally, because a judicial decision is critical to decide the presidency (factors 5-6).

In addition to the *Baker* factors, the Court's previous reticence to examine internal Congressional matters must also be weighed. In *Field v. Clark*, the Court established the "enrolled bill rule," which held that courts will not look beyond the text of a bill and the signature of the presiding officers to examine possible procedural defects in passage, for example, whether a tax provision really passed both chambers, or was mistakenly inserted by just one and sent to the President. [195] Similarly, in *Ballin*, justices examined the constitutionality of House rules meant to defeat the disappearing quorum, and found that the Rules Clause was ambiguous in this area--delegating this issue to the House's discretion. [196] The *Nixon* Court also relied on this deferential doctrine to say that the method employed by the Senate to "try" a judge during impeachment proceedings was exclusively an issue for our upper chamber. [197]

**\*382** The Court's deference in this area is not absolute, especially when an inter-branch controversy, [198] much like our hypothetical, is raised. Our case would involve both vertical and horizontal separation of powers issues, as between the House and Senate horizontally and among Congress and the President. In 1932, the Court considered the validity of an officer's appointment after the Senate confirmed a nominee and subsequently asked President Hoover to return the nomination for reconsideration in *United States v. Smith*. [199] The Hughes Court recognized that "[i]n deciding the issue, [we] must give great weight to the Senate's present construction of its own rules" authorizing the Senate to demand reconsideration. [200] Nevertheless, this controversy was found justiciable, even though reconsideration was an internal procedural matter, because "the construction to be given to the rules affects persons other than members of the Senate" [201] --separation of powers and Appointments Clause grounds. [202] Our 2016 hypothetical would be an analogous controversy.

The 1892 *Ballin* quorum decision also established boundaries on the Court's "expansive" deference [203] to the internal workings of Congress, stating that Congress "may not by its rules ignore constitutional restraints." [204] In the same way, the Rules Clause expressly grants absolute procedural freedom to each House of Congress, and the ECA's procedural limitations, combined with the actions of the Senate in our **\*383** hypothetical enforcing them, acts to patently ignore this constitutional restraint on regulations limiting the Houses' authority.

Most importantly, it is also important to acknowledge, from a pragmatic perspective, that if a constitutional crisis in the 2016 election occurred, only the federal courts would likely be detached and respected enough to be capable of resolving the crisis-- short of an unlikely Congressional compromise--and that much like *Bush v. Gore*, some institution must be universally accepted by all parties in our government to have the last word. While our federal judiciary would normally be reticent to insert themselves into such a contested political issue, failure to do so in this scenario would lead to the collapse of workable government. Accordingly, understanding the separation of powers concerns inherent in this case and the nature of the constitutional issues raised by the ECA, it is likely that review of the Act's procedural provisions would be a justiciable question in this unique setting.

## VI. CONCLUSION

*"It is the height of folly to shut our eyes to this danger .... The only safe solution to this problem is their removal by a constitutional amendment that shall make plain and simple every step in the process, both State and national".* [205]

Individuals experiencing a major transition in their lives often find similarities reminding them of the past in their new environments, underscoring the force of the popular expression, "the more things change, the more they stay the same." [206] So it is with our system of electing a president. It is not an accident that a heated dispute surrounding the Electoral Count Act erupted

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 12

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 331 of 553 PageID #:  736

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. &...

during the 2001 Electoral Count or that three of the United States' major constitutional crises centered on disputed elections. A lack of detail surrounding the procedures to be used in electing a president is perhaps the greatest failing of the Founders.

**\*384**  Alexander Hamilton noted in 1788 that selection of a chief executive was "almost the only part of the system, of any consequence, which has escaped without ... the slightest mark of approbation from its opponents." [207]  In spite of this optimism, through the decisions and compromises of 1800, 1876-1877, and 2000, we have inherited an electoral system that places a premium on ambiguity and *ad hoc* fixes. After the 1800 election uncovered a fatal defect in Article II, Amendment XII was ratified--allowing electors to vote separately for president and vice president, but failing to detail the specific procedure Congress should use to tabulate this choice. This ambiguity laid the seeds for crisis in 1876-1877 when the State of Florida and four others submitted multiple (likely fraudulent) certificates of vote, leaving Congress to hurriedly cobble together an ad hoc Electoral Commission to resolve this dispute, in the midst of many calling for "Tilden or Blood!" [208]  Congress then agonized for ten years over an effective policy alternative to this chaos, finally enacting the Electoral Count Act in 1887. However, as the 2000 election has shown, this Act contains numerous ambiguities and constitutional defects itself, laid bare by the procedural objections raised in the Hall of the House of Representatives during the Electoral Count on January 6, 2001.

A basic framework of election law entrenches two key principles. [209]  First, the system establishes a structure through which the mechanics of an election can operate, indicating decision-making points for candidates and robustly accounting for all possible alternatives. [210]  This principle, above all, ensures fairness and predictability in our system of laws, with both winner and loser accepting the validity of the process, even if they are disappointed with the result. Election jurisprudence, secondly, must protect the procedural equality of voters, ensuring both a meaningful right to cast a vote and the  **\*385**  unshakable assurance that his/her choice will be weighed the same against all others. [211]

Through perpetuating the ambiguities inherent in our presidential election system and raising numerous constitutional concerns, the procedural provisions of the ECA fall short of these ideals. The ECA's procedural mandate to the House and Senate fails to respect the notion of political equality. Our "finely wrought" Congressional system mirrors the interests and rights of the people and States, [212]  and a statute that impermissibly deprives one Congressional actor, that is, the House or Senate depending on the circumstances, of its procedural prerogatives lessens the ability of our representatives to influence the machinery of government in the manner intended by the Constitution. Fundamentally, the fatal flaw of the ECA's procedural provisions is its simultaneous delegation of the rostrum during the Electoral Count to the President of the Senate, while simultaneously providing no means for the House (or potentially the Senate) to assert its independent constitutional prerogatives.

Unlike the hopes of Thomas Jefferson, [213]  a candidate engaged in a heated dispute over a state's electoral votes cannot be assured of an orderly or predictable process during the Electoral Count because the ECA's procedural mandate strips each House of Congress of its procedural authority, unconstitutionally countermanding the text of the Rules Clause.

Some might believe that an unenforceable law is better than no law at all. [214]  However, in the context of resolving a contested presidential election, an unenforceable law inevitably leads to chaos since candidates and their surrogates [215]  will not hesitate to challenge the validity of a 117-year old statute that is facially unenforceable. A strong procedural framework seen to  **\*386**  be fair and known to have teeth is the best prophylactic against chaos.

Understanding the Supreme Court's recent separation of powers formalism, [216]  the ECA today represents "a torpedo planted in the straits with which the ship of state may at some time come into a fatal collision." [217]  A procedural framework that respects our system of separated powers, affirms the institutional prerogatives of Congress, and comports with the text of the Constitution must give rise to procedures that can withstand the stiffest challenge during a contested election, when both the stakes are paramount and legal creativity is high. Improving the ECA now and allowing our policymakers to negotiate changes in the best interests of the country "when the political facts of the moment are least likely to distort our considered legal judgment" [218] is crucial.

A familiar national discussion has existed for a long time on whether the Electoral College should be discarded in favor of popular election--making the Congressional count moot. [219]  However, if we choose to retain this system, the Electoral Count Act should be discarded, and a new constitutional amendment ratified establishing a clear, scrupulously detailed method for

APPENDIX - 330

counting electoral votes in Congress, addressing the procedural posture of the Houses, and outlining how disputes will be resolved.

Shortly after his narrow victory was ratified by the Electoral Commission in 1877, President-Elect Rutherford Hayes remarked that "[b]efore another Presidential Election, this whole subject ... ought to be thoroughly considered, and a radical change made. It is probable that no wise measure can be **\*387** devised which does not require an amendment of the Constitution."[220]

Over a century later, the heightened threshold for a constitutional amendment will allow the country to arrive at a true national consensus, and put an end-- at long last--to a hovering uncertainty that continues to linger over our presidential elections and a history of untimely constitutional crises.

### Footnotes

a1   Deputy Legislative Counsel, Nevada Legislature; University of Minnesota Law School, J.D., *cum laude*; Institute of Advanced Legal Studies, University of London, LL.M., *with distinction*; Florida State University, B.S., *summa cum laude*.

aa1   Professor of Political Science, Hamline University; Adjunct Professor of Law, University of Minnesota Law School.

1   CONSTITUTION, JEFFERSON'S MANUAL, AND RULES OF THE HOUSE OF REPRESENTATIVES, H. DOC. NO. 111-157, at 129 (2011) (quoting Thomas Jefferson).

2   24 Stat. 373 (codified at 3 U.S.C. §§ 1- 21 (2011)).

3   *Id.*

4   531 U.S. 98 (2000).

5   *Id.* at 113.

6   *See* Vasan Kesavan, *Is the ECA Unconstitutional?*, 80 N.C. L. REV. 1653, 1719 (2002) (arguing that the Electoral Count is meant to be a ministerial duty and that neither House has the authority to judge validity). Kesavan devotes one sentence to the issue of whether the ECA's procedural provisions are enforceable. *See also* Aaron-Andrew P. Bruhl, *Using Statutes to Set Legislative Rules: Entrenchment, Separation of Powers, and the Rules of Proceedings Clause*, 19 J.L. & POL. 345 (2003) (omitting any discussion of the Electoral Count Act or the 2000 election).

7   *See generally* SARAH BINDER, STALEMATE: CAUSES AND CONSEQUENCES OF LEGISLATIVE GRIDLOCK (2003) (discussing the rise of partisan gridlock and politics in America and Congress); THOMAS E. MANN AND NORMAN J. ORNSTEIN, IT'S EVEN WORSE THAN IT LOOKS: HOW THE AMERICAN CONSTITUTIONAL SYSTEM COLLIDED WITH THE NEW POLITICS OF EXTREMISM (2012) (same).

8   *See e.g.*, STACEY HUNTER HECHT & DAVID SCHULTZ, PRESIDENTIAL SWING STATES: WHY ONLY TEN MATTER (2015) (establishing that the presidential race has effectively been reduced to contests in ten or so states).

9   *See* Part IV(c) *infra* for analogous provisions and discussion about why the Electoral Count Act does not have an anti-entrenchment provision.

10   U.S. CONST. art. I, § 5, cl. 2.

11   *See* Eric A. Posner & Adrian Vermeule, *Legislative Entrenchment: A Reappraisal*, 111 YALE L.J. 1665, 1683 (2002).

12   U.S. CONST. amend. XII.

13   Art. II states that electors should "vote by ballot for two persons," unaware of the likelihood that the Presidential and Vice Presidential candidates of a party were likely to get the same number of votes. In the previous elections in 1792

APPENDIX - 331

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 333 of 553 PageID #: 738

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. &...

and 1796, the Vice Presidential vote was split, which did not occur in 1800. *See, e.g.,* Sanford Levinson & Ernest A. Young, *Who's Afraid of the Twelfth Amendment?*, 29 FLA. ST. L. REV. 925, 928-30 (2002) (outlining the 1800 crisis). *Accord* TADAHISA KURODA, THE ORIGINS OF THE TWELFTH AMENDMENT: THE ELECTORAL COLLEGE IN THE EARLY REPUBLIC, 1787-1804 (1994). A Democratic-Republican elector was reportedly given the task of abstaining from voting for Aaron Burr to prevent a tie, but failed to do so. Joshua D. Hawley, *The Transformative Twelfth Amendment*, 55 WM. & MARY L. REV. 1535-42 (2014) (discussing 1800 and arguing that the adoption of this amendment infused the presidency with a political character that absent from the original text of Article II).

14    U.S. CONST. amend. XII, cl. 2.

15    *See infra* note 41 and accompanying text.

16    A number of theories about where this authority lies were offered by Members of Congress in the ten years between the 1877 Electoral Commission and the passage of the ECA, namely: (1) the President of the Senate; (2) the House (Presidential Electoral votes only) and the Senate (Vice Presidential votes); (3) the House and Senate as a corporate body with each member having one vote; (4) the House and Senate with each chamber having one vote; (5) no one, until Congress appoints a counter by concurrent resolution or legislation (the accepted proposal, e.g., the ECA). *See* Stephen A. Siegel, *The Conscientious Congressman's Guide to the ECA of 1887*, 56 U. FLA. L. REV. 542, 551-52 (2004). The second proposal seemingly strikes the best balance between efficiency and a robust framework that respects the institutional powers of each House. This method is also supported by Amendment XII's division of authority among the House and Senate in case of a tie.

17    Ex officio refers to an authority exercised "by virtue or because of an office." *Ex Officio*, BLACK'S LAW DICTIONARY 267 (3d pocket ed. 2006).

18    This authority could even be contextually drawn from the Rules Clause, U.S. CONST. art. I, § 5, cl. 2, which grants both the House and Senate the plenary power to craft their own procedures. In this way, it would be a stretch to argue that the Constitution had created an independent constitutional organ and had failed to give it the power to establish parameters of operation. The Supreme Court has also recognized that legislative bodies possess significant inherent authority to exercise the functions necessary for their operations. *See* 🚩 Buckley v. Valeo, 424 U.S. 1, 127-28 (1976); 📘 Watkins v. United States, 354 U.S. 178, 187 (1957) (describing the subpoena and contempt process as inherent legislative powers first recognized in the British House of Commons and Lords' "absolute and plenary authority over their privileges."); SEC v. Comm. on Ways and Means, No. 14-MC-193, 2015 U.S. Dist. LEXIS 154302 (S.D.N.Y. Nov. 13, 2015); Comm. on the Judiciary v. Miers, No. 08-CV-409, 558 F. Supp. 2d 53 (D.D.C. Jul. 31, 2008).

19    Max Farrand, *The Records of the Federal Convention of 1787*, 25 HARV. L. REV. 198, 529 (1911) (book review) (emphasis added). *See also* Kesavan, *supra* note 6, at 1723-24 (arguing that the Electoral Count is meant to be a ministerial duty and that neither House has the authority to judge returns' validity); Albert J. Rosenthal, *The Constitution, Congress, and Presidential Elections*, 67 MICH. L. REV. 1 (1968).

20    *See* 📘 Marsh v. Chambers, 463 U.S. 783, 790 (1983) (finding that "substantial weight" should be given to interpretations of the Constitution by the first Congresses composed of Founding-era members).

21    *See* SUBCOMM. ON COMPILATION OF PRECEDENTS, COUNTING ELECTORAL VOTES, H.R. MISC. DOC. NO. 44-13, at 26 (1877); Kesavan, *supra* note 6, at 1725.

22    17 CONG. REC. 2429 (1886) (remarks of Sen. James Z. George).

23    *See supra* note 16 and accompanying text.

24    U.S. CONST., art. I, § 8, cl. 18.

25    In Germany, the *Bundesversammlung* (Federal Convention) elects the Federal President and is a special constitutional entity comprised of the *Bundestag* (the lower House of Parliament) and delegates nominated by *Lander* (state) governments. *See* GRUNDGESETZ [GG] [BASIC LAW], at art. 54, cl. 1-4, *translation at* http://www.gesetze-iminternet.de/englisch_gg/index.html.

APPENDIX - 332

26    U.S. CONST. art. II, § 1, cl. 3 ("The President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates ....").

27    U.S. CONST. amend. XII, cl. 2 ("The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted ....").

28    U.S. CONST. amend. XII.

29    SUBCOMM. ON COMPILATION OF PRECEDENTS, COUNTING ELECTORAL VOTES, H.R. MISC. DOC. NO. 44-13, at 26 (1877). This motion would hardly have been dispositive had it been carried, however. Congress is a legislature of enumerated powers, and any authority assumed must stem from an express or implied power, meaning that Marshall's Supreme Court would have had the last word in 1801.

30    *See, e.g.,* Medellín v. Texas, 552 U.S. 491, 531 (2008); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610-11 (1954) (Frankfurter, J., concurring).

31    *See* *Youngstown,* 343 U.S. at 610-11.

32    Act Creating an Electoral Commission, 19 Stat. 227 (1877).

33    *See* Electoral Count Act, 3 U.S.C. §§ 2- 7 (2011).

34    An objection seconded by at least one senator and representative. *See* 3 U.S.C. § 15; *see also* Part IV *infra*.

35    *See* 3 U.S.C. §15.

36    Admittedly, the Supreme Court could theoretically use this doctrine to hold the ECA binding on both Houses, and outside the remit of the Rules Clause, because the ECA has been in place and largely obeyed by Congress since 1887. *See* Part V *infra*. However, it would be hard to square this with the Constitution's textual grant in the Rules Clause and Non-Delegation Doctrine, since bicameralism and presentment would involve the President in an area committed to Congress by the Constitution.

37    3 U.S.C. § 17.

38    In this context of a Joint Session, this result follows because the House and Senate are individually empowered by the Electoral Count Act to make final--and possibly conflicting--decisions on the objection. In the event the House and Senate came to opposite conclusions, the governor of the disputed state would cast the deciding vote. *See* 3 U.S.C. § 15; Edward B. Foley, *2016: How John Kasich Could End Up Picking the Next President*, POLITICO, Mar. 20, 2016, http://www.politico.com/magazine/story/2016/03/the-bizarre-130-year-old-law-that-could-determine-our-next-president-213645 (observing that the text of the Electoral Count Act is "bizarre," "tangled," and "unintelligible.").

39    This theory relies on the definition and context of the word "count," and early 19th century counts. *See generally* Kesavan, *supra* note 6, at 1711-17.

40    *See* U.S. CONST., amend. XII; Eric Schicker, Terri Bimes & Robert W. Mickey, *Safe at Any Speed: Legislative Intent, The ECA of 1887, and Bush v. Gore,* 16 J.L. & POL. 717, 735-36 (2000).

41    *See* WILLIAM REHNQUIST, CENTENNIAL CRISIS, 4 (2004). The 1800 election also meets this criteria. *Id.*

42    *See id.* at 86.

43    Walker Lewis, *The Hayes-Tilden Election Contest,* 47 A.B.A. J. 36, 36 (1961).

44    REHNQUIST, *supra* note 41, at 94.

45    Lewis, *supra* note 43, at 37.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    16

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 335 of 553 PageID #:  740

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. &...

46 *Id.* Modern analysis speculates that "without the strenuous adjustments" made by Republicans shortly after the election, at least one of these states would have gone Democratic--electing Tilden. *Id.* The nature of these adjustments can only be speculated, but it likely involved at least some amount of selective counting by canvassing boards, ballot-box tampering, or similar fraud. *See id.* at 37-38.

47 The total number of electors in the Electoral College is a function of the number of states in the union and their populations. *See* U.S. CONST. art. II, § 1, cl. 2 ("Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector."); Norman R. Williams, *Reforming the Electoral College: Federalism, Majoritarianism, and the Perils of Subconstitutional Change,* 100 GEO. L.J. 173 (2011).

48 Lewis, *supra* note 43, at 38.

49 *See* U.S. CONST. amend. XII.

50 Lewis, *supra* note 43, at 37.

51 *Id.*

52 *See* REHNQUIST, *supra* note 41, at 101-12.

53 As mentioned *supra,* the Vice President, in his ex officio role as President of the Senate, is constitutionally charged with presiding over the count. However, the Vice Presidency was vacant from 1875-77, so this responsibility would have fallen on Sen. Thomas Ferry in his role as President Pro Tempore of the United States Senate. *See Ferry, Thomas White,* BIOGRAPHICAL DIRECTORY OF THE U.S. CONGR., http://bioguide.congress.gov/scripts/biodisplay.pl?index=F000095 (last visited Jan. 23, 2016).

54 *See* Part II *supra.*

55 Lewis, *supra* note 43, at 163.

56 REHNQUIST, *supra* note 41, at 116.

57 *Id.*

58 *Id.*

59 Act Creating an Electoral Commission, 19 Stat. 227 (1877).

60 Lewis, *supra* note 43, at 39.

61 *Id.* This provision also likely would have been unenforceable.

62 *Id.* at 40.

63 Lewis, *supra* note 43, at 163, 167. For an additional viewpoint of the proceedings of the Electoral Commission, *see* J. HAMPDEN DOUGHERTY, THE ELECTORAL SYSTEM OF THE UNITED STATES 136-213 (1906) (recounting the proceedings of the Electoral Commission).

64 For example, the filibuster and disappearing quorum were common tactics used by the minority party until Speaker Thomas Reed largely curtailed these practices in the early 1890s and began to impose the procedural controls marked by the rise of the Committee on Rules and a strong speakership. *See, e.g.,* ROBERT REMINI, THE HOUSE: A HISTORY OF THE HOUSE OF REPRESENTATIVES 245 *et seq.* (2006).

65 Lewis, supra note 43, at 167.

66 *See, e.g.,* ROY MORRIS, FRAUD OF THE CENTURY: RUTHERFORD B. HAYES, SAMUEL TILDEN, AND THE STOLEN ELECTION OF 1876 (2004).

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 17

67    Lewis, *supra* note 43, at 167. Rep. Blackburn of Kentucky remarked, "Mr. Speaker, the end has come .... Today is Friday. Upon that day the Savior of the world suffered crucifixion between two thieves. On this Friday constitutional government, justice, honesty, fair dealing, manhood, and decency suffer crucifixion amid a number of thieves." *Id.*

68    *Historical Election Results,* NAT'L ARCHIVES & REC. ADMIN., http://www.archives.gov/federal-register/electoral-college/votes/index.html (last visited May 7, 2016).

69    *See* U.S. CONST. art. I, § 5, cl. 2.

70    John C. Roberts, *Entrenchment of Ordinary Legislation: A Reply to Professors Posner and Vermeule,* 91 CAL. L. REV. 1773, 1790 (2003).

71    *See also supra* note 16 and accompanying text.

72    Roberts, *supra* note 70, at 1794.

73    U.S. CONST.

74    *See* WALTER J. OLESZEK, CONG. RESEARCH SERV., "SELF-EXECUTING RULES" REPORTED BY THE HOUSE COMMITTEE ON RULES (2006), http://usgovinfo.about.com/library/PDF/self_executing.pdf (updated Dec. 21, 2006). This method avoids a formal vote on the underlying legislation, and the legislation is "deemed" passed by a favorable vote on the resolution reported by the House Rules Committee that establishes the time allocated for debate, number of amendments, allowable points of order, and other parameters of debate. *See also* Ronald J. Krotoszynski, *Deconstructing Deem and Pass: A Constitutional Analysis of Enactment of Bills by Implication,* 90 WASH. U.L. REV. 1071, 1072-78 (2013).

75    *See, e.g.,* MARTIN B. GOLD, SENATE PRACTICE AND PROCEDURE 33-64 (2013).

76    Article I provides that "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members, and a Majority of each shall constitute a Quorum to do Business ...." U.S. CONST. art. I, § 5, cl. 1. However, the House interprets this provision as requiring positive action from the floor. *See* Stanley Bach, *The Nature of Congressional Rules,* 5 J.L. & POL. 725, 727-29 (1989). The presiding officer of the Senate may only ascertain the presence of a quorum after cloture on a piece of legislation has been invoked--otherwise the Secretary of the Senate must call the roll after a motion suggesting the absence of a quorum. *Id.*

77    *See* U.S. CONST. art. 1 at § 5, cl. 1; § 7, cl. 2.

78    *See, e.g.,* United States v. Ballin, 144 U.S. 1 (1892) (discussing the "disappearing quorum" and the frequent tactic used by minorities at that time to be present in the Hall of the House of Representatives but fail to vote. Speaker Thomas Reed subsequently ordered the Clerk of the House to record non-voting members as present and the Supreme Court accepted this as constitutional, even though only a minority of the full House had actually voted.).

79    *See generally* Gold, *supra* note 75.

80    *See* R.K. Gooch, *The Legal Nature of Legislative Rules of Procedure,* 12 VA. L. REV. 527, 538 (1926).

81    *See, e.g.,* *Ballin,* 144 U.S. at 5 ("[T]here should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained. But within these limitations all matters of method are open to the determination of the House .... The power to make rules is not one which once exercised is exhausted. It is a continuous power, always subject to be exercised by the House, and within the limitations suggested, absolute and beyond the challenge of any other body or tribunal."); NLRB v. Canning, 134 S. Ct. 2550, 2574 (2014); Yellin v. United States, 374 U.S. 109, 114 (1963); Bach, *supra* note 72, at 730 (noting that "the Supreme Court has been reluctant to entertain challenges to these interpretations and superimpose its own judgments"); Gregory Fredrick Van Tatenhove, *A Question of Power: Judicial Review of Congressional Rules of Procedure,* 76 KY. L.J. 597 (1987).

APPENDIX - 335

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 337 of 553 PageID #: 742

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. &...

82 *See* U.S. ELECTORAL COMM., PROCEEDINGS OF THE ELECTORAL COMMISSION (1877), http:// books.google.com/books? id=DBJCAAAAIAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false.

83 *Watkins*, 354 U.S. at 200 (observing that committees "act as the eyes and ears of the Congress in obtaining facts upon which the full legislature can act."); *see also* Adrian Vermuele, *The Constitutional Law of Congressional Procedure*, 71 U. CHI. L. REV. 361, 382 (2004).

84 *See supra* note 15.

85 Nixon v. United States, 506 U.S. 224, 226 (1993).

86 *Id.* at 226-27 (1993).

87 *Id.* at 227.

88 *See* REPORT OF THE IMPEACHMENT TRIAL COMMITTEE ON THE ARTICLES AGAINST WALTER L. NIXON, S. DOC NO. 164, 101ST CONG., 1ST SESS., at 18-19 (1989).

89 U.S. CONST., art. I, § 3, cl. 6.

90 *Nixon*, 506 U.S. at 229 (recounting Petitioner's argument that "'Try' means more than simply 'vote on' or 'review' or 'judge.' In 1787 and today, trying a case means hearing the evidence, not scanning a cold record.").

91 *Id.* at 235-36. The Justices of our Supreme Court are even subject to this power.

92 *Id.* at 230.

93 Interestingly, the Senate only uses this committee method during the trial of inferior officers. During the impeachment of President Clinton in 1999, the full Senate acted as both a fact-finder and jury. *See generally* IMPEACHMENT OF PRESIDENT WILLIAM JEFFERSON CLINTON: CONSTITUTIONAL PROVISIONS; RULES OF PRACTICE AND PROCEDURE IN THE SENATE WHEN SITTING ON IMPEACHMENT TRIALS, S. DOC. 106-2, 106th Cong., 2d Sess. (1999).

94 Nixon v. United States, 506 U.S. 224, 250 (1993) (Blackmun & White, JJ., concurring).

95 *See, e.g.*, 28 U.S.C. § 636 (B)(1)(A-B) (2009) (outlining the authority of a federal magistrate judge).

96 *See generally Nixon,* 506 U.S. 224 (1993).

97 U.S. CONST. art. I, § 5, cl. 2. *See, e.g.*, U.S. CONST. art. I, §, cl. 6 (impeachments tried by the Senate); amend. XII (the House elects a president in the absence of an Electoral College majority). *See also* INS v. Chadha, 462 U.S. 919, 959 (1983) ("With all the obvious flaws of delay, untidiness, and potential for abuse, we have not yet found a better way to preserve freedom than by making the exercise of [legislative] power subject to the carefully crafted restraints spelled out in the Constitution.").

98 *Id.* at 253-54 (Souter, J., concurring) (stating that "a coin toss" or "summary determination that an officer of the United States was simply 'a bad guy'" might warrant review).

99 For comparison, Florida only had four electors in the 1876 presidential contest. Charles Fairman, *Five Justices and the Electoral Commission of 1877*, at 57-58, *in* VII HISTORY OF THE SUPREME COURT OF THE UNITED STATES (Paul A. Freund & Stanley N. Katz, eds. 1988).

APPENDIX - 336

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 338 of 553 PageID #:  743

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. &...

100    *See e.g.,* Steve Bickerstaff, *Counts, Recounts, and Election Contests: Lessons from the Florida Presidential Election*, 29 FLA. ST. L. REV. 425, 434 (2001).

101    David Barstow & Don Van Natta, Jr., *Examining the Vote; How Bush Took Florida: Mining the Overseas Absentee Vote*, N.Y. TIMES (July 15, 2001), http://www.nytimes.com/2001/07/15/us/examining-the-vote-how-bush-took-florida-mining-the-overseas-absentee-vote.html.

102    *See* Bickerstaff, *supra* note 98, at 435.

103    3 U.S.C. § 5 (2011).

104    Schicker, *supra* note 40, 720-22 (2000). The Electoral College met in its respective locations in each of the fifty states on Dec. 18 that year. *Id.*

105    Bush v. Gore, 531 U.S. 98, 111 (2000). Interestingly, the United States Supreme Court did not even need to grant certiorari because the Florida Legislature intended to convene shortly before the safe harbor deadline to award the state's electors to Bush. *See* Ronald Brownstein, *Florida Lawmakers Cite Broad Powers to Award Electors to Bush*, L.A. TIMES (Nov. 28, 2000), http://articles.latimes.com/2000/nov/28/news/mn-58208. Since *Bush v. Gore* is today seen as an example of a politically polarized judiciary and the opinion is widely believed to have little precedential value, allowing Florida's democratically elected representatives to solve this issue may have been a more prudent course.

106    *See* 147 CONG. REC. H30 (daily ed. Jan. 6, 2001) (outlining the events of the 2001 electoral vote count).

107    *Id.* at H34 (statement of Rep. Chaka Fattah (D-PA)).

108    *Id.*

109    *Id.* at H32 (statements of Rep. Ted Deutsch (D-FL) and Vice President Al Gore)
       Mr. DEUTSCH. 'Mr. Vice President, there are many Americans who still believe that the results we are going to certify today are illegitimate.' The VICE PRESIDENT. 'The gentleman will suspend. If the gentleman from Florida has a point of order, he may present the point of order at this time. Otherwise, the gentleman will suspend.' Mr. DEUTSCH. 'Mr. Vice President, I will note the absence of a quorum and respectfully request that we delay the proceedings until a quorum is present.' The VICE PRESIDENT. 'The Chair is advised by the Parliamentarian that section 17 of title 3, United States Code, prescribes a single procedure for resolution of either an objection to a certificate or other questions arising in the matter. That includes a point of order that a quorum is not present. The Chair rules, on the advice of the Parliamentarian that the point of order that a quorum is not present is subject to the requirement that it be in writing and signed by both a Member of the House of Representatives and a Senator. Is the point of order in writing and signed not only by a Member of the House of Representatives but also by a Senator?' Mr. DEUTSCH. 'It is in writing, but I do not have a Senator.' The VICE PRESIDENT. 'The point of order may not be received.'
       *See also id.* at H35-36, 47.

110    *Id.* at H35 (statements of Rep. Cynthia McKinney (D-GA) and Vice President Al Gore)
       Ms. McKINNEY. 'Mr. President, I object to Florida's electors, and in view of the fact that debate is not permitted ... and pursuant to title 3, I move that the House withdraw from the joint session in order to allow consideration of the facts surrounding the slate of electors from Florida.' The VICE PRESIDENT. 'The Chair will remind the Members of the joint session that even though a Member's motion may affect only one House, the statutory principle of bicameral signatures must, nevertheless, be applied. The gentlewoman will suspend. Reading sections 15 through 18 of title 3, United States Code, as a coherent whole, the Chair holds that no procedural question is to be recognized by the presiding officer in the joint session unless presented in writing and signed by both a Representative and a Senator. Is the gentlewoman's motion in writing and signed by a Member and a Senator?'
       Ms. McKINNEY. *'Mr. President, the motion is in writing, it is at the desk, and because it involves the prerogatives of the House, therefore Senate assent is not required.'* The VICE PRESIDENT. *'The Chair will advise the gentlewoman respectfully that reading* sections 15 *through* 18 of title 3, U.S. Code, *as a whole, the Chair holds that no procedural question, even if involving only one House of Congress, is to be recognized by the presiding officer in the joint session, unless presented in writing and signed by both a Representative and a Senator.* Because the gentlewoman's motion is not

APPENDIX - 337

Case 6:20-cv-00660-JDK  Document 33  Filed 01/01/21  Page 339 of 553 PageID #:  744

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. &...

signed by a Senator, on the basis previously stated, the motion may not be received. The Chair thanks the gentlewoman from Georgia.' (emphasis added).

111   *Id.* at H36 (statement of Rep. Alcee Hastings (D-FL)) ("Mr. President, point of order. Would the President advise whether or not there is an opportunity to appeal the ruling of the Chair?"). Appealing the ruling of a presiding officer is a rarely-used, last-ditch motion in parliamentary procedure.

112   3 U.S.C. §§ 15-18 (2011).

113   *See, e.g.*, 147 CONG. REC. H35 (daily ed. Jan. 6, 2001) (ruling of President of the Senate Al Gore).

114   *Id.*

115   THE FEDERALIST NO. 51 (James Madison).

116   THE FEDERALIST NO. 47 (James Madison).

117   Mistretta v. United States, 488 U.S. 361, 415 (1989) (Scalia, J., dissenting).

118   *See generally* Patrick M. Garry, *The Unannounced Revolution: How the Court Indirectly Effected a Shift in the Separation of Powers*, 57 ALA. L. REV. 689 (2006).

119   Admittedly, Congress delegates some policymaking authority in permitting agency regulations and other aspects of administrative law. However, as the Supreme Court has noted, Congress must provide a broad "intelligible principle"

for agencies to promulgate binding rules, thereby fulfilling its policymaking role. *See* Mistretta, 488 U.S. at 372. Otherwise, an unconstitutional delegation has occurred. *See Id.*

120   *See* George I. Lovell, *That Sick Chicken Won't Hunt: The Limits of a Judicially Enforced Non-Delegation Doctrine*, 17 CONST. COMMENT. 79, 83 (2000). For example, members of the public might be more likely to hold their Congressperson accountable for a tax increase, or their Senator for an unpopular Supreme Court justice. *See also* James O. Freedman, *Delegation of Power and Institutional Competence*, 43 U. CHI. L. REV. 307, 325 (1976).

121   *See* Freedman, *supra* note 118, at 309; *infra* note 126.

122   U.S. CONST. art. I, § 7, cl. 3.

123   This theory persuasively argues that this clause is currently interpreted by the federal courts in a duplicative manner when compared with the Bicameralism and Presentment Clause, art. I, § 7, cl. 2, and that the original meaning of this Clause should be read in light of British parliamentary taxation practices and contextual evidence from the Founding era. *See generally* Seth Barrett Tillman, *A Textualist Defense of Article I, Section 7, Clause 3*, 83 TEX. L. REV. 1263 (2005).

124   *See* Powell v. McCormack, 395 U.S. 486, 532, 535 (1969).

125   FARRAND, *supra* note 19 at 177-80.

126   This belief was underscored by the fact that many of the Framers believed that late eighteenth century state legislatures enacted far too many illconsidered laws. *See, e.g.*, THE FEDERALIST NO. 62 (James Madison) ("the facility and excess of law-making seem to be the diseases to which our governments are most liable."); THE FEDERALIST NO. 73 (Alexander Hamilton) ("The propensity of the legislative department to intrude upon the rights, and to absorb the powers, of the other departments, has been already suggested and repeated; the insufficiency of a mere parchment delineation of the boundaries of each, has also been remarked upon; and the necessity of furnishing each with constitutional arms for its own defense, has been inferred and proved.").

127   *See* INS v. Chadha, 462 U.S. 919, 923-29 (1983).

128   *Id.* at 951.

APPENDIX - 338

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 340 of 553 PageID #: 745

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. &...

129     *Id.* (holding that "[t]he Constitution sought to divide the delegated powers of the new Federal Government ... to assure, as nearly as possible, that each branch of government would confine itself to its assigned responsibility. The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted.").

130     Clinton v. City of New York, 524 U.S. 417, 436 (1998). *See also* Garry, *supra* note 116, at 716.

131     Garry, *supra* note 116, at 717. A recent notable case where Congress prevailed in a separation of powers case is *NLRB v. Canning*, 134 S. Ct. 2550 (2014) (finding that the Senate's own definition of 'recess' was dispositive to whether the Recess Appointments Clause was triggered).

132     *See supra* part III(b); United States v. Nixon, 506 U.S. 224, 250 (1993) (Blackmun & White, JJ., concurring) ("the Constitution itself ... provides the Senate ample discretion to determine how best to try impeachments."); *see also* Chris Land, *That's Not What I Bargained For: Legislative Materials, Comparative Intent, and the Nature of Statutory Bargains*, 17 EUR. J.L. REFORM 424 (2015) (discussing the comparative effect of legislative procedure on statutory interpretation outcomes).

133     United States v. Ballin, 144 U.S. 1, 5 (1892) (emphasis added).

134     *Regulatory Reform Act: Hearing on H.R. 2327 Before the Subcomm. on Admin. Law and Gov't Relations of the House Comm. on the Judiciary*, 98 CONG. REC. 312 (1983) (statement of Rep. John Dingell).

135     INS v. Chadha, 462 U.S. 919, 959 (1983) ("There is no support in the Constitution or decisions of this Court for the proposition that the cumbersomeness and delays often encountered in complying with explicit constitutional standards may be avoided, either by the Congress or by the President.").

136     *Id.* at 951.

137     Act of January 29, 1877 Creating an Electoral Commission, § 2, 19 Stat. 227 (1877) (emphasis added).

138     *Id.* at §§ 3-4.

139     3 U.S.C. § 15 (2011) (providing that "[u]pon such reading of any such certificate or paper, the President of the Senate shall call for objections, if any. Every objection shall be made in writing, and shall state clearly and concisely, and without argument, the ground thereof, and shall be signed by at least one Senator and one Member of the House of Representatives before the same shall be received. When all objections so made to any vote or paper from a State shall have been received and read, the Senate shall thereupon withdraw, and such objections shall be submitted to the Senate for its decision; and the Speaker of the House of Representatives shall, in like manner, submit such objections to the House of Representatives for its decision.").

140     Unsurprisingly, the ECA is also dangerously unclear as to what would happen if the House and Senate deadlocked. Use of the conference committee model would potentially be an option, but again this would be yet another issue that would have to be resolved by Congressional leaders in the midst of a hotly contested political environment.

141     It is patently apparent, as a matter of basic parliamentary privilege, that Vice President Gore improperly refused to entertain a motion for the House to withdraw/adjourn that was offered during the January 2001 count. *See* Electoral Count Act of 1887, 24 Stat. 373 (current version at 3 U.S.C. §5 (2011); CONSTITUTION, JEFFERSON'S MANUAL, AND RULES OF THE HOUSE OF REPRESENTATIVES, H. DOC. NO. 113-181, at 413 (2015) (asserting that a motion to adjourn is highly privileged, and even takes precedence over other motions that "affect[] the rights of the House collectively, [or] its safety, dignity, and the integrity of its proceedings.").

142     *See, e.g.,* Constitution, Jefferson's Manual, and Rules of the House of Representatives, H. Doc. No. 113-181, at 1125-1305 (2015); Gold, *supra* note 75, at 4-5; *see also* Steven S. Smith, Call to Order: Floor Politics in the House and Senate (1989) (discussing the use and importance of floor rules to structure Congressional debates).

APPENDIX - 339

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 341 of 553 PageID #:  746

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. &...

143   *See, e.g.*, Defending Public Safety Employees' Retirement Act, 129 Stat. 319 (2015) (containing the "fast-track" Trade Promotion Authority that establishes limited procedures for Congressional disapproval of executive trade agreements); Congressional Review Act, 110 Stat. 847 (1994) (codified at 📄 5 U.S.C § 802(c) (2009)) (noting that thirty senators must sign a motion placing a joint resolution on the calendar of the Senate to disapprove an agency rule); Nuclear Waste Policy Act of 1982, 96 Stat. 2201 (1982) (codified *at* 42 U.S.C. § 10135(d) (2010)) (providing procedures for Congress to disapprove of the siting of a nuclear waste repository).

144   Adrian Vermeule, *The Constitutional Law of Congressional Procedure*, 71 U. CHI. L. REV. 361, 428 (2004).

145   *See* Elizabeth Garrett, *The Purposes of Framework Legislation*, 14 J. CONTEMP. L. ISSUES. 717, 734 (2005).

146   Reorganization Act of 1939, Pub. L. No. 76-19, 53 Stat. 561, 564.

147   A handful of other rule-making statutes do not have anti-entrenchment disclaimers. *See, e.g.*, Aviation Investment and Reform Act, Pub. L. No. 106-181, § 106(c), 114 Stat. 61 (2000); Treasury, Postal Service, and General Government Appropriations Act, Pub. L. No. 104-52, § 632(c), 109 Stat. 468 (1996); Commercial Space Launch Act Amendments of 1988, Pub. L. No. 100657, 📄 § 5(a), 📄 102 Stat. 3900; *see also* Bruhl, *supra* note 6, at 363.

148   *See, e.g.*, Defending Public Safety Employees' Retirement Act of 2015, Pub. L. No. 114-26, 129 Stat. 319, 355; Trade Act of 2002, Pub. L. No. 107-210, 116 Stat. 933, 1016 (codified at 📄 19 U.S.C. § 3805 (2011)); Congressional Review Act, Pub. L. 104-121, 110 Stat. 871 (1996) (codified at 📄 5 U.S.C. § 802(g) (2009)); Nuclear Waste Policy Act of 1982, 42 U.S.C. § 10135 (d)(1)(b) (2010); Trade Act of 1974, Pub. L. 93-618, 88 Stat. 1978, 2001 (codified at 📄 19 U.S.C. § 2191(a) (2014)).

149   Vermeule, *supra* note 117, at 428. Practice in the states also supports Congress' view. *See* Bruhl, *supra* note 6, at 367 n.98 (providing examples of hortatory procedural statutes from Georgia, Iowa, California, and Massachusetts).

150   📄 Metzenbaum v. FERC, 675 F.2d 1282 (D.C. Cir. 1982).

151   📄 *Id.* at 1287.

152   *Hinds' Precedents of the House of Representatives*, vol. 1, § 245 (Washington, D.C.: Government Printing Office, 1907).

153   Legislative Reorganization Act of 1946, Pub. L. No. 79-601, 60 Stat. 812 (codified as amended in various sections at 28 U.S.C.).

154   *See* S. RES. 274, 96th Cong. (1979); Bruhl, *supra* note 6, at 366; S. REP. NO. 107-139 at 54 (2002) (stating in a report of the Senate Committee on Finance on the Trade Act of 2002 that the disclaimer clause found in the Bill "simply confirms what is the case under Article I, section 5, clause 2 of the Constitution of the United States [the Rules Clause] .... Because the rules of proceedings in each House are determined by that House and do not require the consent of the other Chamber, each House may change its rules independently of the will of the other Chamber.").

155   This term refers to the internal precedents, traditions, and interpretations of a legislative body's own rules that are later relied upon as persuasive authority.

156   4 HINDS' PRECEDENTS 143, § 3298.

157   Act of Sept. 24, 1789, 1 Stat. 23 (1789).

158   1 HINDS' PRECEDENTS, *supra* note 149, § 245.

159   132 CONG. REC. H1848 (daily ed. Apr. 16, 1986).

160   *Id.* (recounting Speaker O'Neill's remarks that "[t]he House is not operating under that statute, and that statute does acknowledge that the House has the constitutional right to change the procedure at any time under its rulemaking authority. The Committee on Rules and the House have changed the procedure."); *see also* 133 CONG. REC. 1189-90

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    23

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 342 of 553 PageID #:  747

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. &...

(daily ed. Mar. 11, 1987) (statement of Rep. Trent Lott) ("Mr. Speaker, what in heaven's name is going on around this House that we can't abide by our own process and rules we established, by law, just five months ago, for dealing with this issue .... The only way prescribed by that law that the aid could not be released would be by the enactment of a joint resolution of disapproval.); Jeffrey A. Meyer, *Congressional Control of Foreign Assistance*, 13 YALE J. INT'L L. 69, 99 (1988).

[161]  Alaska Natural Gas Transportation Act of 1976, Pub. L. 94-586, 90 Stat. 2903, 2909 (codified as amended at 15 U.S.C. § 719f(d)(5)(B) (2011)).

[162]  Metzenbaum v. FERC, 675 F.2d 1282,1284-86 (D.C. Cir. 1982).

[163]  This scenario is much like the German Federal Convention. *See supra* note 25.

[164]  Reorganziation Act of 1939, Pub. L. No. 76-19, 53 Stat. 561. The act was the first use of statutory legislative rule-making and employed an unconstitutional legislative veto. *Id.*

[165]  2 U.S.C. §§ 634- 645(a) (2009). This provision, known as the "Budget Act" is the modern framework for the adoption of an annual budget to govern congressional appropriations.

[166]  *See* SUBCOMM. ON COMPILATION OF PRECEDENTS, COUNTING ELECTORAL VOTES, H.R. MISC. DOC. NO. 44-13, at 229-30 (1877); Siegel, *supra* note 16, at 561.

[167]  Again, Gore's January 6th ruling requiring a senator to sign a motion to withdraw from the count appears to be irreconcilable with section 5 of the ECA (providing that either House may withdraw without the consent of the other).

[168]  147 CONG. REC. H35 (daily ed. Jan 6, 2001) (objection of Rep. Cynthia McKinney).

[169]  This is perhaps the greatest flaw of the ECA. Changes would require the acquiescence of the President of the Senate during the count that the ECA is hortatory, or a statutory amendment achieved through bicameralism and presentment.

[170]  Requiring the consent of another actor in amending rules that are subject to a lower internal threshold (e.g., a motion to waive or amend the rules of the House or Senate made by one of the members of the body and approved by that House). *But see* Bruhl, *supra* note 6, at 355-77 (asserting that the entrenchment of legislative rules is not burdensome because of Rules Clause authority to abrogate, but incorrectly failing to observe that the ECA has been enforced against the House of Representatives without any measures to change this provision short of the concurrence of the Senate or an amendment to the ECA).

[171]  Roberts, *supra* note 66, at 1777 (citing Charles A. Black, Jr., *Amending the Constitution: A Letter to a Congressman*, 82 YALE L.J. 189, 191 (1972)).

[172]  United States v. Winstar Corp., 518 U.S. 839, 872 (1996) (citing 1 WILLIAM BLACKSTONE, COMMENTARIES 90 (1765)).

[173]  *See* Posner & Vermeule, *supra* note 11, at 1695-96. *See generally* John C. Roberts & Erwin Chemerinsky, *Entrenchment of Ordinary Legislation: A Reply to Professors Posner and Vermeule*, 91 CAL. L. REV. 1775 (2003).

[174]  *See* Posner & Vermeule, *supra* note 11, at 1683; CONSTITUTION, JEFFERSON'S MANUAL, AND RULES OF THE HOUSE, *supra* note 138; GOLD, *supra* note 75.

[175]  8 CONG. REC. 164 (1878) (statement of Sen. Augustus Garland) (noting in debate on a precursor to the ECA that "an act passed by a previous Congress assuming to bind ... a succeeding Congress need not be repealed *because it is void*; and for that I reason I oppose this bill") (emphasis added); *see also* Siegel, *supra* note 16, at 560.

[176]  Consequently, to avoid encountering one or more non-delegation issues, the House or Senate could only overturn this interpretation through the courts. This is because, for the reasons discussed *supra*, a re-interpretation of the Electoral Count Act and the Rules Clause by the President of the Senate would impermissibly grants him or her control over

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 343 of 553 PageID #:  748

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. &...

house procedure. Additionally, any amendment to the Electoral Count Act would have to follow the normal process of bicameralism and presentment. In this setting, a constitutional amendment might be most appropriate.

177   *See* Posner & Vermeule, *supra* note 11, at 1699.

178   Siegel, *supra* note 16, at 564.

179   *See, e.g.*, Nate Cohn, *Republicans Risk Five Key Senate Races With Supreme Court Stance*, N.Y. TIMES (Feb. 15, 2016), http://www.nytimes.com/2016/02/16/upshot/supreme-court-vacancy-looms-over-five-key-senate-races.html?partner=rss&emc=rss&_r=0.

180   Control of the U.S. Senate would flow to the Democratic Party at the beginning of the 115th Congress on January 3, 2017 before the certificates of vote from the Electoral College are counted. *See* 2 U.S.C. §§ 1, 7 (2009).

181   The term of the President and Vice-President does not expire until noon on January 20 of each quadrennium. *See* U.S. CONST. amend. XX.

182   3 U.S.C. § 5 (2011) (requiring that Congress grant deference to electoral votes submitted by a state's governor by a prescribed deadline). This is nearly the same scenario that happened in 2000. This argument, however, assumes that the Florida Legislature did not act unilaterally to award the state's electors to a candidate, as the Florida Legislature considered in 2000. *See supra* note 103. An interesting argument can be made that this provision also governs the procedure by which electoral votes are counted in Congress, treading on the houses' procedural sovereignty. If this section was found to be procedural (vs. substantive), it would likely be unenforceable as well.

183   U.S. CONST. amend. XII, § 1, cl. 3.

184   *See* DESCHLER'S PRECEDENTS, H. DOC. 94-661, 94TH CONG., 2D SESS. (1994). These parliamentary rulings are persuasive authority, as presiding officers are generally free to rule as they wish and can be overruled by an appeal from the floor, although Vice President Gore ruled that appeals were not permissible during the 2001 count. *See* 147 CONG. REC. H36 (daily ed. Jan. 6, 2001).

185   Again, the text of the Act, at § 5, states that a motion to withdraw does not require the concurrence of a senator, however, the 2001 count places the practical validity of this provision in question as Vice President Gore ignored it.

186   The institutional standing of Congress as a whole is unchallenged. *See generally* ALISSA M. DOLAN & TODD GARVEY, CONG. RESEARCH SERV., CONGRESSIONAL PARTICIPATION IN ARTICLE III COURTS: STANDING TO SUE (2014). However, the individual standing of one House, though itself an independent Art. I organ, has not been resolved by the Supreme Court, though it is likely that standing exists if an ordinary resolution is based manifesting assent. *See id.* at 13-14; United States House of Representatives v. Burwell, 130 F. Supp. 3d 53 (D.D.C. Sept. 9, 2015) (holding that the House of Representatives, as a whole, has standing to bring an action for non-appropriation against the executive).

187   It is generally assumed that one house of Congress may authorize a lawsuit on its behalf through an ordinary resolution. *See* Memorandum Opinion, *Burwell*, No. 14-CV-1967, 2015 U.S. Dist. LEXIS 119712, at *45-54 (D.D.C. Sept. 9, 2015) (holding that "disregard for that reservation [appropriation power] works a grievous harm on the House, which is deprived of its rightful and necessary place under our Constitution. The House has standing to redress that injury in federal court.); DOLAN & GARVEY, *supra* note 183.

188   Baker v. Carr, 369 U.S. 186 (1962).

189   *Id.* at 217, 330. The six *Baker* factors are: (1) "textually demonstrable constitutional commitment of the issue to a coordinate political department;" (2) "a lack of judicially discoverable and manageable standards for resolving it;" (3) "the impossibility of deciding without an initial policy determination of a kind clearly for non-judicial discretion;" (4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 344 of 553 PageID #:  749

ON THE UNENFORCEABILITY OF THE ELECTORAL..., 13 Rutgers J. L. &...

branches of government;" (5) "an unusual need for unquestioning adherence to a political decision already made;" and (6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Id.*

190   Jonathan L. Entin, *Separation of Powers, the Political Branches, and the Limits of Judicial Review*, 51 OHIO ST. L.J. 175, 209 (1990).

191   NLRB v. Canning, 134 S. Ct. 2550, 2560 (2014) (quoting Marbury v. Madison, 5 U.S. 137 (1803)).

192   INS v. Chadha, 462 U.S. 919, 941 (1983).

193   *Id.*

194   *See* Bowsher v. Synar, 478 U.S. 714 (1986); Clinton v. City of New York, 524 U.S. 417 (1998).

195   Field v. Clark, 143 U.S. 649, 672 (1892).

196   United States v. Ballin, 144 U.S. 1, 6 (1892).

197   Nixon v. United States, 506 U.S. 224, 235-36 (1993) (White & Blackmun, JJ., concurring).

198   An inter-branch dispute exists because Congressional actions affect the appointment of an executive branch officer, i.e. the President, in much the same way as United States v. Smith. United States v. Smith, 286 U.S. 6 (1932) (Brandeis, J.).

199   *Smith*, 286 U.S. 6.

200   *Id.* at 33. *See also* Gregory Fredrick Van Tatenhove, *A Question of Power: Judicial Review of Congressional Rules of Procedure*, 76 KY. L.J. 597, 609-10 (1987).

201   *Smith*, 286 U.S. at 33.

202   *Id.*

203   *See* John C. Roberts, *Are Congressional Committees Constitutional?*, 52 CASE W. RES. L. REV. 489, 532 (2001).

204   United States v. Ballin, 144 U.S. 1, 5 (1892).

205   *See* DOUGHERTY, *supra* note 63, at 402 (quoting Sen. Henry L. Dawes in 1876).

206   Quote widely attributed to Jean-Baptiste Alphonse Karr, LES GUÊPES (Jan. 1849).

207   THE FEDERALIST NO. 68 (Alexander Hamilton).

208   ROY MORRIS JR., FRAUD OF THE CENTURY, at picture 23 (2004).

209   *See* John Copeland Nagel, *The Appearance of Election Law,* 31 J. LEGIS. 37, 38 (2004).

210   *Id.*

211   *Id.*

212   This duality is reflected in our Electoral College system, in which voters select a slate of electors who in turn vote on a state-weighted basis for President and Vice President.

213   *See supra* note 1 and accompanying text.

APPENDIX - 343

214      Siegel, *supra* note 16, at 564.

215      Members of Congress in this case.

216      *See* Garry, *supra* note 118, at 717.

217      Kesavan, *supra* note 6, at 1812 (quoting HOUSE SPEC. COMM., COUNTING ELECTORAL VOTES, H.R. MISC. DOC. 44-13, at 443 (1877) (remarks of Sen. Oliver Morton)).

218      *Id.*

219      *See, e.g.*, Derek T. Muller, *Invisible Federalism and the Electoral College*, 44 ARIZ. ST. L. REV. 1237 (2012); Norman R. Williams, *Reforming the Electoral College: Federalism, Majoritarianism, and the Perils of Subconstitutional Change*, 100 GEO. L.J. 173 (2011).

220      RUTHERFORD BIRCHARD HAYES, DIARY & LETTERS OF RUTHERFORD BIRCHARD HAYES: NINETEENTH PRESIDENT OF THE UNITED STATES 70-71 (D. MCKAY CO. 1964).

13 RUJLPP 340

**End of Document**      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**34 Hastings Const. L.Q. 161**

**Hastings Constitutional Law Quarterly**
Winter 2007

Article
Richard K. Neumann Jr. [a1]

Copyright (c) 2007 Hastings College of the Law; Richard K. Neumann Jr.

# THE REVIVAL OF IMPEACHMENT AS A PARTISAN POLITICAL WEAPON

**Contents**

| | |
|---|---|
| I. | Introduction |
| II. | The Adoption and Meaning of Constitutional Provisions on Impeachment |
| III. | The Evolution of Impeachment Practice |
| | A. The First Two Impeachments: Blount and Pickering |
| | B. The Chase Impeachment, Its Context, and Its Aftermath |
| | C. Between Chase and Johnson |
| | D. Johnson |
| | E. The Era of Nonpartisanship and Bipartisanship |
| | 1. Bellknap to Hoover |
| | 2. 1937 |
| | 3. Ritter |
| | 4. Judicial Impeachments After Ritter |
| | 5. Nixon and Agnew |
| | F. The Revival of Impeachment As a Partisan Political Weapon |
| | 1. The Fortas and Douglas Investigations: The Beginning of the Struggle for the Supreme Court |
| | 2. Clinton |
| IV. | The Future of Partisan Impeachments and Threats of Impeachment |
| | A. Thomas |
| | B. Evidentiary Burdens in the House and Senate |
| | C. The Effect of Party Insecurity on the Partisan Use of Impeachment |
| V. | Conclusion |

**\*162 I. Introduction**

Impeachment--the procedure through which the House of Representatives accuses and then prosecutes a federal official in the Senate with the aim of removing him or her from office--has historically had either of two purposes. One has been to oust in a nonpartisan or bipartisan manner a corrupt official who abuses power and thereby damages the country. The other has been to inflict, for partisan reasons, a political blow on an official whose conduct the impeaching Representatives simply dislike. Because the second purpose is much less acceptable, the impeaching Representatives attempt to disguise their purpose even when voting on strictly party lines. Together, these two purposes represent the dual personality of impeachment.

Beginning soon after the formation of the federal government, impeachment was used as a partisan political weapon. After the failed impeachment of President Andrew Johnson in 1868, a long period of largely nonpartisanship and bipartisanship in impeachments ensued. [1] But since 1968, some elements in the Republican Party have been willing to use impeachment as a partisan weapon; to inflict political damage on their opponents and as part of a campaign to control the Supreme Court and the lower federal courts. For example, in 1969, Republican President Richard Nixon's Administration built a case against Justice Abe Fortas that it would have submitted to the House of Representatives for impeachment if Fortas had not made that unnecessary

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 1

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 347 of 553 PageID #:  752

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

by resigning. [2]  Then, in 1970, Nixon's Administration built an impeachment case against Justice William O. Douglas. Gerald Ford, then House Republican Minority Leader, introduced an impeachment resolution on the floor of the House. But House Democrats outmaneuvered Ford by creating a committee to investigate the charges, which found no grounds for impeachment. [3]  Abundant historical evidence demonstrates that the Nixon Administration's purpose in each instance was to create a Supreme Court vacancy for Nixon to fill. [4]

Those events were seen at the time as aberrations peculiar to the Nixon Administration. But in 1997, House Republican Majority Whip Tom DeLay began threatening to impeach judges who decided cases  *163  contrary to his beliefs. "I advocate impeaching judges who consistently ignore their constitutional role, violate their oath of office and breach the separation of powers," wrote DeLay in the New York Times. "The framers provided the tool of impeachment to keep the power of the judiciary in check." [5] "The judges need to be intimidated," DeLay said a few months later; "[t]hey need to uphold the Constitution;" if they don't, "we're going to go after them in a big way." [6]

In 1998, House Republicans impeached President Bill Clinton. This was the second time that a president, and the first time that an elected president, had been impeached. In the trial that followed, the House impeachment managers failed to persuade even a simple majority of the Senate to convict, much less the two-thirds required by the Constitution. [7]

In 2005, former House Speaker Newt Gingrich wrote that "the Ninth Circuit judges who found the motto 'one nation under God' unconstitutional could be considered unfit to serve and be impeached." [8]  Republican Representative Tom Feeney, a co-sponsor of a House resolution that would denounce judges who cite foreign law in interpreting U.S. law, said that a judge who persisted in citing foreign sources may be subject to the "ultimate remedy" of impeachment. [9]

Later in 2005, after Congressional Republicans enacted legislation intended to cause federal courts to order the reinsertion of Terri Schiavo's feeding tube, some Republicans threatened to impeach the judges who declined to do so. DeLay, who had become House Majority Leader, cautioned that "[t]he time will come for the men responsible for this to answer for their behavior." DeLay went on to complain of what he called "an arrogant and out of control judiciary that thumbs its nose at Congress and the president." [10]  Senator Tom Colburn's chief of staff told a meeting of Jerry Falwell and other activists, "I'm in favor of mass impeachment if  *164  that's what it takes." [11]  Similarly, DeLay talked of Congress removing judges who lacked "good behavior." [12]

Still later in 2005, some Republicans began to threaten to impeach Justice Anthony Kennedy. [13]  At the time, Republicans had become increasingly nervous that Kennedy, like Justices Harry Blackmun, Lewis Powell, John P. Stevens, Sandra Day O'Connor, and David Souter before him, [14]  was evolving from the right wing toward the center or further. This evolution had been evidenced by his opinions for the Court holding unconstitutional the imposition of the death penalty on a defendant who committed the crime while under the age of eighteen, [15]  the criminalization of gay or lesbian sex, [16]  the prohibition of local governments from enacting ordinances protecting gays and lesbians from discrimination, [17]  and the incorporation of prayer into a public school graduation, [18]  as well as his concurrence in decisions holding the execution of a mentally ill murderer to be unconstitutional [19]  and reaffirming a constitutional right to abortion. [20]

This might seem like the talk of Jacobins. But the Republican use of impeachment--actual impeachment against Clinton in 1998-1999, threatened impeachment to create Supreme Court vacancies in the Nixon Administration, and threatened impeachment to intimidate judges more recently--is well supported by precedent in American history.

Historically, there have been four great confrontations between or among branches of the federal government: (1) the struggle between the Federalist-dominated judiciary on one hand, and the Jefferson  *165  Administration and Jeffersonian Congress on the other in the early years of the nineteenth century; (2), from 1865 to 1869, the confrontation between President Andrew Johnson and the Radical Republican Congress over Reconstruction; (3) the conflict, which peaked in 1937, between the Administration of Franklin D. Roosevelt and a Supreme Court that repeatedly struck down his New Deal legislation as unconstitutional; and (4) the on-going struggle, which began in 1968, in and between the two elected branches on several issues but, most particularly, over the composition of the Supreme Court. Impeachment as a highly partisan exercise of legislative

APPENDIX - 346

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 348 of 553 PageID #:  753

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

power, in which one branch of government attacks another, played a central role in all of these confrontations except the struggle between Roosevelt and the Supreme Court.

This article compares the use of impeachment in each of these confrontations as well as other uses of impeachment. Part II describes how delegates at the Constitutional Convention understood English impeachment and why they drafted the constitutional impeachment provisions as they did. Part III explains how, from the first impeachment in 1797 through the trial of Andrew Johnson in 1868, impeachments, actual and threatened, were based on reasoning and rhetoric very much like those expressed and acted upon by Republicans since the Fortas episode in 1969. Part III also explains how, after 1868, a parallel tradition of impeachment evolved through mundane procedures--nonpartisan and bipartisan-- for separating corrupt judges from their constitutional lifetime tenure, and how impeachment practice is now evolving further to incorporate both the partisan and the nonpartisan. Parts IV and V consider the effects of the re-emergence of partisan impeachment since 1969. Part IV explores whether the use of impeachment and impeachment threats as a partisan political strategy is likely to continue. Part V concludes that, despite its superficial strategic appeal, partisan political impeachment for the most part fails to produce the results its advocates seek.

Some of what occurred during earlier eras of partisan impeachment will seem familiar to us today. For example, during the Adams and Jefferson Administrations, attack politics like those we experience now, including accusing political opponents of treason and near-treason, dominated the political culture, and partisan impeachments were an inherent part of that culture. [21] Some historical figures, on the other hand, behaved in surprising ways. Chief Justice John Marshall, for example, feared impeachment by Thomas Jefferson's party in Congress. Marshall routinely behaved in ways that would violate modern judicial ethics, and **166** would have been required, under modern conflict-of-interest law, to recuse himself from some of the foundational cases in constitutional law. [22] Jefferson's letters to his subordinates during the most partisan disputes of his Presidency reveal obsessions on his part similar to those expressed by President Nixon on the White House Watergate tapes (though without Nixon's dishonesty, vulgarity, and lack of imagination). [23] And during the trials of Aaron Burr, Jefferson invented transactional immunity, by plea bargaining directly with some potential witnesses and by providing the prosecutor with blank signed presidential pardons to be given to any witness the prosecutor wished separately to immunize. [24] Several decades later, immediately before President Andrew Johnson was impeached, he tried to form a large army unit that would bypass the ordinary chain of command and be answerable personally to him so that he could use it against his political opponents if he wished. [25]

Some aspects of the Clinton impeachment have not commonly been understood. For example, the procedural safeguards observed by the House Judiciary Committee and the special prosecutors to prevent partisanship in the impeachment of President Nixon were ignored during the Clinton impeachment. [26] The evidence of a right-wing campaign to destroy the Clinton Presidency, beginning almost immediately after his inauguration in 1993 and culminating in impeachment in 1998, is abundant, though much of it became available only after Clinton left office. [27] And the evidence that Justice Clarence Thomas committed perjury during his confirmation hearings compares favorably with the perjury case against Clinton. [28]

Compared with the past, the political context in which we live today is not quite what it appears to be. Although the Republicans controlled both Houses of Congress almost continually from 1995 to 2007, they did so through margins that are razor-thin by historical standards--thinner by far than those of any other party during any period of comparable length in American history. [29] For example, in the elections that produced the Senate that confirmed Chief Justice John Roberts in 2005 and Justice Samuel Alito in 2006, more votes were cast for Democratic candidates than for **167** Republican candidates. In essence, the public voted for a Democratic Senate but got a Republican one. [30] Party insecurity produced by situations like this has a substantial role in encouraging partisan impeachments. The Jeffersonians who impeached Justice Chase, the Radical Republicans who impeached Andrew Johnson, and the Republicans who impeached Clinton were all new to power, insecure about their ability to hold on to it, and driven to use what power they had while they had it. In contrast, the Democrats in the constitutional confrontation of 1937 had some of the most massive congressional majorities in American history, could look toward the future with confidence that problems could be solved without assaults on individual judges, and therefore did not consider impeaching anybody.

## II. The Adoption and Meaning of Constitutional Provisions on Impeachment

APPENDIX - 347

Historically, impeachment had a significant role in the diminution of monarchical power in England and imperial power in the American colonies. In England, impeachment was a tool through which "Parliament, after a long and bitter struggle, made ministers chosen by the King accountable to it rather than the Crown." [31] In the struggle between monarch and legislature, "Parliament indulged in the fiction that the King could do no wrong but was mislead by his ministers." [32] Against that background, impeachment was understandably considered by the drafters of the Constitution to be an ordinary political device, consistent with reasonable government.

Although the House of Commons was at times eager to use impeachment as a weapon to depose officials it did not like, or even to punish private citizens who held no office, it tended not to impeach "without evidence of some wrongdoing, negligence, or betrayal of public trust." [33] If the House of Commons set the bar of impeachment any lower there was no chance of conviction in the House of Lords, where "proceedings were more often than not fair, dignified, and learned," though **168** there were ample instances of abuse. [34] For example, the House of Commons impeached an Anglican priest named Sacheverell, who held no government office but criticized the Glorious Revolution of 1689 from the pulpit. [35] The public reaction was so negative that the Whigs, who prosecuted Sacheverell, were turned out in favor of the Tories. [36]

In the colonies, impeachment, like the common law jury, acquired an honorable reputation because it offered a tool for resistance to the Crown. Although not legally authorized to do so, colonial assemblies at times impeached offensive colonial officials. The impeachments might have been technically without effect, but they represented such an extreme form of protest that the impeached officials often resigned or the Crown withdrew them. [37] The last of the colonial impeachments occurred in 1774, the year before Lexington and Concord, when the Massachusetts General Court--a legislature, despite its name-- impeached the Crown's chief justice in the colony [38] for "obeying a directive from the crown," which began the collapse of British government in Massachusetts. [39]

During the Revolution of 1775-1783, the new state governments began to use impeachment as a vehicle to remove officials for routine abuse of their offices. [40] Having used it as a tool of rebellion, "the Revolutionaries had absorbed impeachment into a republican system" and made it an ordinary facet of government. [41] At this point impeachment had already acquired its dual personality: it could be a non-partisan device for removing officials or it could be a partisan political weapon. At the time the Constitutional Convention met in Philadelphia in 1787, most of the thirteen original states had impeachment provisions in their own constitutions. [42] The constitutional provisions spread to newly admitted states and were frequently used. "From 1776 to 1805, New Jersey had nine [impeachment] trials, Vermont six, Massachusetts and Pennsylvania four apiece, South Carolina and Kentucky three each, Tennessee two . . ., and **169** Georgia one." [43] Today, every state constitution except Oregon's contains impeachment provisions. [44]

When the Constitutional Convention met in Philadelphia, British impeachment abuses were on the delegates' minds, [45] and they methodically added restrictions to prevent such abuses. For example, in England, a judgment of conviction on an impeachment could include criminal penalties, including imprisonment, [46] but at the Constitutional Convention, the delegates limited the judgment of conviction to "removal from office, and disqualification to hold and enjoy any Office of honor, Trust, or Profit under the United States." [47] Although in England anybody except a member of the royal family could be legislatively tried and punished through impeachment, [48] the Constitutional Convention limited the jurisdiction of impeachment to "[t]he President, Vice President and all civil Officers of the United States." [49] And while the House of Lords could convict by a simple majority, [50] the Constitutional Convention decided to permit conviction in the Senate only by a two-thirds super-majority. [51] The Constitutional Convention also rejected some other aspects of English impeachment. For example, the head of state is impeachable in the United States (the president), [52] but was not in England (the monarch). [53] And **170** although the English monarch could pardon an impeachment conviction, [54] the American president cannot. [55]

Perhaps the most perplexing issue for the delegates concerned a definition of the offenses for which a "civil Officer" could be impeached. There was no limitation in English law: anything could be an impeachable offense. [56] The delegates vacillated on this issue. On August 20, 1787, the Committee of Five recommended that officials be removable through impeachment

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 4

Case 6:20-cv-00660-JDK    Document 33    Filed 01/01/21    Page 350 of 553 PageID #:  755

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

for "neglect of duty malversation or corruption." [57]  On September 8, when it was proposed to limit impeachment to cases of treason or bribery, George Mason objected that:

> Treason as defined in the Constitution [58]  will not reach many great and dangerous offences. Hastings [59]  is not guilty of Treason. Attempts to subvert the Constitution may not be Treason as above defined. As bills of attainder which have saved the British Constitution are forbidden, [60]  it is the more necessary to extend the power of impeachments. [61]

Mason moved to add "maladministration" as an impeachable offense. [62]  James Madison countered that "[s]o vague a term will be equivalent to a tenure during pleasure of the Senate." [63]  Mason "withdrew 'maladministration' [and] substitute[d] 'other high crimes [and] misdemesnors [sic] ag[ainst] the State,'" and the amended motion was adopted by a vote of eight states to three. [64]  Almost immediately, the  **\*171**  delegates voted to change "State" to "United States . . . in order to remove ambiguity." [65]  The result was the list of impeachment grounds in the Constitution today: "Treason, Bribery, or other high Crimes and Misdemeanors." [66]

The phrase "high Crimes and Misdemeanors" was not invented in Philadelphia. It had been part of English impeachment practice for centuries, having first appeared as a ground for impeachment in 1386. [67]  It was the ground for the Warren Hastings impeachment, [68]  which was contemporaneous with the Constitutional Convention. [69]  And it accounted for twenty-six of the fifty-six [70]  English impeachments from 1642 to the time of the Constitutional Convention. [71]

But the phrase did not come into the Constitution with its meaning clear. Part of the problem was contextual: in this new form of government, what characteristics would make a crime "high?" The English impeachment precedents provide no clear guidelines, and the words were often used as rhetoric rather than to communicate actual meaning. "Sometimes the English cases seem to prove too much, treating as 'high Crimes and Misdemeanors' petty acts of maladministration which no sensible person could think impeachable offenses in a president, or in anybody." [72]  This seems nonsensical until one recalls that at that time the modern parliamentary method of dislodging an unacceptable minister--the vote of no confidence--had not yet been invented, and the English Parliament was reduced to using accusatory formats to remove appointees of the Crown. [73]

The Constitutional delegates did not work out a definition in Philadelphia. Their drafting style, which produced by far the shortest constitution of any modern country, was to sketch out a general outline, add a few specifics about which they felt strongly, and leave it to  **\*172**  interpretation to fill in the rest. But a consensus of scholars [74]  and the federal impeachment precedents agree that, as Michael Gerhardt puts it:

> The phrase "other high Crimes and Misdemeanors" consists of technical terms of art referring to "political crimes" . . . [which] were not necessarily indictable crimes. Instead, "political crimes" consisted of the kinds of abuses of power or injuries to the Republic that only could be committed by public officials by virtue of the public offices or privileges they held. Although the concept "political crimes" uses the term "crimes," the phrase did not necessarily include all indictable offenses. Nor were all indictable offenses considered "political crimes." [75]

A second part of the problem is that over time words tend to acquire new meanings. The drafters did not require "high felonies or misdemeanors," although the modern ear might hear something like that when "high Crimes or Misdemeanors" is said. It was not unknown in the eighteenth century to refer to crimes less serious than felonies as misdemeanors. Blackstone did. [76]  But modern criminal codes, with finely worked out differentiations among degrees of criminality, came only later, giving us today the impression that a misdemeanor could only be a crime. At the time of the Constitutional Convention, "demeanor" meant what it still means today on elementary school report cards: behavior. "Misdemeanor" was misbehavior. [77]  Sound evidence that this is what the delegates meant in Article II appears in the Article III provision creating lifetime tenure for federal judges: "The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour." [78]  Even though a misdemeanor in the

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                5

criminal sense would always be a low offense and never a "high" one, twentieth century folklore assumed that "high crimes and misdemeanors" was a quaint way of saying "felonies and misdemeanors"--which would limit impeachment to crimes. That, however, has never been true.

**\*173** A third part of the problem is the appearance, although not necessarily the reality, of textual inconsistency. The grounds for impeachment--"Treason, Bribery, or other high Crimes and Misdemeanors"--are set out in Article II of the Constitution,[79] which creates and governs the executive branch. The sentence begins "The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of," and then the grounds are given.[80] Placement of this sentence in Article II and the manner in which officials are listed both suggest that it applies only to the executive branch, and that judges are not "civil Officers." Article III, the Judicial Article, provides that "Judges . . . shall hold their Offices during good Behaviour."[81] If judges have "Offices," they might reasonably be considered "civil Officers" and subject to the same impeachment grounds as other impeachable officials, despite the placement of the Impeachment Clause in Article II. In fact, when judges have been impeached, the House of Representatives always accuses them of bribery or other high crimes and misdemeanors.[82]

What then does the phrase "during good Behaviour" mean in Article III? The drafters intended "Misdemeanor" in the Impeachment Clause to mean the opposite of "good Behaviour,"[83] and treason, bribery, and high crimes are, of course, all bad behavior by any form of measurement. But, it has often been argued that judges can be impeached and removed on lesser grounds than would be needed to remove a president or a vice president.

Both structural and textual justifications have been offered to support this view. One structural justification is that the removal of a president--though not of a lesser executive official--disrupts the country, which would care less about removal of a Supreme Court Justice and hardly care at all when a lesser judge is removed. Another structural justification is that federal judges have life tenure and can be removed from office only by impeachment, while presidents and vice presidents serve four-year terms; presidents are subject to term limits under the Twenty-second Amendment; and other executive branch officers can be dismissed by the president. Gerald Ford, among others, made this argument during his unsuccessful **\*174** attempt to have Justice Douglas impeached.[84] The textual justification is that the Impeachment Clause in Article II (the Executive Branch Article) requires especially egregious misbehavior ("high . . . Misdemeanors") and not just misbehavior, which is all Article III (the Judicial Article) requires. There is no way to know whether the Framer left a loose end or made a conscious distinction. The records of the Constitutional Convention contain no debate on the subject. It is true that two judges (Archbald and Ritter)[85] have been impeached and removed for conduct that was only partly criminal. But that proves little. It is easy to imagine noncriminal conduct that could quickly lead to impeachment of a president, such as a flat-out refusal to do the job combined with a refusal to resign from it.

Even with the limitations imposed by the Constitutional Convention, impeachment remained a partisan political weapon as well as a means of removing the unfit from office. In The Federalist, Alexander Hamilton described impeachment as "a method of NATIONAL INQUEST [sic] into the conduct of public men."[86] Because the circumstances of such an inquest cannot be predicted in advance, impeachment "can never be tied down by . . . strict rules, either in the delineation of the offense by the prosecutors [House managers who prosecute impeachments] or in the construction of it by the judges [Senators who decide both law and fact] as in common cases serve to limit the discretion of courts in favor of personal security."[87] This is exactly the justification Congress would offer if it were to respond to criticism over its failure, explained in Part IV(B) of this article, to adopt burdens of production and persuasion.[88]

Hamilton, in fact, frankly admitted that impeachment would be seen as a partisan political weapon. Because a bill of impeachment would allege "abuse or violation of some public trust," it would be political by nature, its prosecution, as Alexander Hamilton explained:

> [W]ill seldom fail to agitate the passions of the whole community, and to divide it into parties more or less friendly or inimical to the accused. In many cases it will connect itself with the pre-existing factions, and will enlist all their animosities, partialities, influence, and interest on one side or on the other; and in such cases there will always be the greatest danger that **\*175** the decision will be regulated more by the comparative strength of parties than by the real demonstrations of innocence or guilt.[89]

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 6

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 352 of 553 PageID #:  757

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

## III. The Evolution of Impeachment Practice

From the first impeachment in 1797 to the most recent one in 1998-1999, impeachment practice has gradually evolved, although in the process it has, in recent decades, circled back toward its starting point. The most recent impeachment (Clinton) has more in common with some of the earliest impeachments (Blount and Chase) and with the 1868 impeachment of Andrew Johnson than it does with any of the impeachments that occurred between 1868 and 1998. During those 130 years impeachments were mostly nonpartisan or bipartisan-- although since 1968 some threatened impeachments and attempts at impeachment have been extremely partisan.

### A. The First Two Impeachments: Blount and Pickering

In the early years of the federal government, "Congress briefly experimented with using impeachment to remove political opposition." [90]  The first three impeachment trials all fit this pattern.

Senator William Blount of Tennessee was the first person impeached by the House. Blount was elected to the Senate in 1796 and took his seat in March 1797. [91]  "In the fall of 1796 Blount secretly plotted with frontiersmen and Eastern speculators to wrest Louisiana"--the huge territory later purchased by Jefferson, not the modest-sized modern state--"from Spain in order to open the Mississippi Valley to settlers eager to purchase acres of his vast land holdings." [92]  To accomplish this, Blout organized a private expedition into Spanish territory west of the Mississippi River, [93]  and hoped for aid from the British, who at the time were fighting a war against Spain in Europe. [94]  In July 1797, evidence of the plot became public, and immediately the Senate, on its own initiative,  **\*176**  expelled him. [95]  At the same time, the House separately impeached him. [96]  The impeachment trial, however, did not begin until December 1798. [97]  Those managing the case against Blount lost interest in prosecuting the case until the election of 1800 approached.

Blount's conspiracy seemed to have had two purposes. First, Blount simply hoped to make money in land sales. [98]  Second, many Westerners, as those who lived in Kentucky and Tennessee were called at the time, viewed such an expedition with sympathy. [99]  Western ambitions looked across the Mississippi, where the vacuum of weak Spanish administration seemed to invite American infiltration. [100]  In politics, the Jeffersonian party represented, among other groups, these Western interests, while the Federalists, who controlled all branches of the federal government, were hostile to them. At various times, the Jeffersonians were called the Anti-Federalists, the Democratic-Republicans, and the Republicans--even though they were the ancestors of what we now call the Democratic Party. All these names can be confusing to the modern reader. Here, it will be called the Jeffersonian party. What matters most in this context, and what is most easily remembered today, is that it was led by Jefferson. Blount started out as a Federalist but switched to the Jeffersonian party shortly before his election. [101]

To modern sensibilities, Blount's conspiracy seems like a fantasy, but intrigues like his were not rare in the Mississippi Valley of his time. [102]  It was a frontier, without settled borders. [103]  The governments that claimed the land were far away, and they had few, if any, forces on site to enforce their claims. [104]  People on the frontier were not shocked at Blount's actions; in  **\*177**  fact, after leaving the Senate he was popular, even revered in Tennessee. [105]  But a Senator should not have done it: his conspiracy could be imputed internationally to the United States government, giving Spain solid grounds for grievance.

The Federalists in the House of Representatives continued to prosecute the impeachment case against Blount even though the Senate had expelled him. Their motives were not to remove him from the Senate (he was no longer there) but to disqualify him from taking any future seat in Congress or any other position in the federal government. [106]  The Federalists also wanted to establish the principle that anybody, even someone not currently holding any office, could be so disqualified. The English House of Commons could impeach its own members and members of the House of Lords, as well as citizens holding no office at all, [107]  but the words of the Constitution--"The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment . . . and Conviction . . . ." [108]  --limited that expansive concept of the impeachment power.

APPENDIX - 351

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 353 of 553 PageID #:  758

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

Short, capsule descriptions of the Blount impeachment tend to treat it as a simple, though odd, case in which Blount's conduct and status were the only issues. [109] The picture presented is of a somewhat confused, if not naive Senate, in the early days of the Republic, trying earnestly to resolve an ambiguity in the Constitution on the question of whether a legislator could be impeached and convicted. In-depth scholarly analysis, on the other hand, tends to treat it as an example of one party (in this case, the Federalists) using impeachment as a calculated partisan political weapon against the other party. [110]

The roll call votes in the Senate certainly support the scholarly analysis. There were a number of them in 1798 and 1799, some procedural and others substantive. Of twenty-seven Federalist Senators, twenty-five voted against Blount most of the time; eighteen of them voted against him **178 all of the time. [111] Of eleven Senators from the Jeffersonian party, eight voted for Blount most of the time. [112]

Perhaps even more corrobative are the other things Congress was doing while it was impeaching Blount. In July 1798, Congress passed the Sedition Act "subjecting all Americans (but especially newspaper editors) to prison terms for libeling the President and Congress." [113] And "[t]he same two [Federalist] congressmen who actively managed the Blount impeachment trial . . . were in the forefront of the drive for the Sedition Act. In the newspaper campaign for its passage, Federalist editors concentrated on Jefferson, Madison, and Gallatin as traitorous Americans . . . ." [114] This was an era of hardball politics not unlike our own. The Sedition Act criminalized the Federalists' adversaries by turning criticism of the Federalists into a crime. It certainly reflected the Federalists' "disposition to interpret political opposition as treason." [115] The first person convicted under the Sedition Act served a year in prison for publishing the opinion that President Adams was "swallowed up in a continual grasp for power, in an unbounded thirst for ridiculous pomp, foolish adulation, and selfish avarice." [116]

There is some evidence that the Federalists tried to use the Blount impeachment for similar ends. Federalist Senator Jacob Read introduced a resolution that would end the Blount impeachment trial with a finding that a Senator is not liable to impeachment more "than any citizen of the United States not a member of either House of Congress." [117] In other words, every ordinary citizen (and every Senator) could be impeached [118] and punished, on conviction, by "disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States." [119] Although that would have been unconstitutional, as the Constitution limits the reach of impeachment to "[t]he President, Vice President and all civil Officers of the United States," [120] the Federalists had nothing to fear except popular opinion. They controlled the federal judiciary as well as Congress, and the Sedition Act -- **179 also plainly unconstitutional--was eagerly enforced by the courts. The point of impeachment would thus not be limited to removing undesirable people from office. It would be extended to preventing undesirable people from ever assuming office. Candidates for any federal office from the Jeffersonian party could be eliminated from the ballot in this way. [121] Jefferson and Madison were sufficiently worried about this prospect to write anxious letters to each other immediately after the Read resolution was introduced. [122]

The Federalists did not bring the Read resolution to a vote. "Presumably the Federalists thought it unwise to confront the American people with a declaration of the absolute immunity of senators from impeachment, coupled with the universal liability of private citizens to exclusion from office by that process." [123] The Read resolution, enunciating a doctrine of universal impeachment, represents not what the Federalists succeeded in doing, but instead what at least a faction within them would have liked to have done, if they had thought they could get away with it.

In the impeachment trial, Blount's lawyers offered several defenses: that he was no longer a Senator; that Senators are not "civil Officers" [124] subject to impeachment; that whatever he did was not done in the execution of his official duties--and that therefore he was not within the jurisdiction of an impeachment proceeding. [125] In response, the House managers made Senator Read's argument: "That all persons, without the supposed limitation [to President, Vice President, and civil Officers of the United States], are liable to impeachment." [126]

Certainly, there was no nonpartisan reason to prosecute an impeachment, since Blount was no longer in office. One of the House managers, James A. Bayard, who was "in the forefront of the drive for the Sedition Act," [127] made it clear in his closing

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   8

argument to the Senate that the real purpose of the Blount impeachment trial was to establish the principle of universal liability to impeachment and disqualification from future office-holding:

> **\*180**  Let us suppose that a citizen, not in office, but possessed of extensive influence, arising from popular arts [ability to speak to the people], from wealth or connexions, actuated by strong ambition, and aspiring to the first place in the Government, should conspire with the disaffected of our own country, or with foreign intriguers, by illegal artifice [criticizing the president and Congress, which were crimes under the Sedition Act], corruption, or force, to place himself in the Presidential chair. I would ask, in such a case, what punishment would be more likely to quell a spirit of that description, than absolute and perpetual disqualification . . . . [128]

John Adams, the president and a Federalist, had a year left in his term of office and was not confident of reelection. At the time these words were spoken, Madison held no federal office, [129] though, nine years later, he was elected president, succeeding Jefferson. Jefferson was in federal office, although Brant speculates that if impeached before the next election, he might have resigned to avoid a trial, and thus these words were aimed at him as well as Madison. [130] Jefferson was vice president and heard Bayard's speech in the Senate chamber, where he was presiding [131] (before vice presidents became so busy that they delegated this duty [132] to others). The Federalists controlled all three branches of government, and Jefferson was vice president only because he lost the presidential election of 1796 to John Adams. Until the Twelfth Amendment was adopted in 1803, the vice presidency went to the losing presidential candidate with the largest number of electoral votes. [133]

According to Brant, "[h]ere was a clear revelation of Federalist party strategy to control the presidential election of 1800 by combining impeachment with the Sedition Act": prosecuting anti-Federalist editors under the Sedition Act while threatening anti-Federalist candidates with impeachment, whether or not they were currently "civil Officers." [134] Melton, who wrote the most exhaustive study of the Blount impeachment, holds a similar view, though less vividly expressed. [135] He reports that, "[d]uring the proceedings against Blount, the Federalists had never  **\*181** concealed their desire to establish impeachment as a weapon that could reach any person, public or private, and deprive him of office; on the contrary, they were quite vocal about it." [136] Because the Constitution does not limit impeachment to criminal acts, Congress could permanently disqualify from federal office any citizen whose politics Congress did not like. [137] "With this power a determined Congress could virtually guarantee permanent Federalist ascendancy." [138]

There is much plausibility in these theories, but perhaps one exaggeration. Universal impeachment was probably only a strategy preferred by a faction within the Federalist Party. The Federalist Party was not monolithic. Like most political parties, it had both extremist and moderate elements. The moderates tended to cluster around Adams and Alexander Hamilton. [139] The extremists--called High Federalists [140] --were owners of substantial property, who also felt they owned the government; they considered democracy "to be the government of the worst," in the words of George Cabot. [141] Among their leaders was Justice Samuel Chase, [142] whom the Jeffersonians later impeached for expressing and acting on exactly that sentiment from the bench. [143] Hoffer and Hull, who wrote the most thorough study of the uses of impeachment just before and after adoption of the Constitution, concluded that although the Federalists used the Blount impeachment as a partisan political weapon against Jefferson's party, it was an aberration and not part of a grand strategy. [144] Perhaps the strongest evidence is that the Blount experience was not repeated. The House made no serious efforts to impeach Jefferson, Madison, or other prominent members of their party.

 **\*182**  At the end of Blount's impeachment trial, "[t]he plan failed, obviously because a count of heads in the strongly Federalist Senate showed that fewer than two thirds were brave enough to go through with it" [145] --probably because of popular hostility already building up over the Sedition Act. A motion to dismiss for lack of jurisdiction was approved by a vote of fourteen to eleven. [146] Although scholars disagree about the exact party division in the vote, [147] they agree that "a composite portrait of the senator who wanted to assert Senate jurisdiction over Blount shows him to be a Federalist from the Northeast." [148]

APPENDIX - 353

Blount's impeachment is remembered for establishing that a legislator is not subject to impeachment. [149] But it did not actually do that. The grounds in the motion to dismiss were not specified, and a Senator could have voted for it on the theory that Senators are not impeachable or on the theory that private citizens are not impeachable (Blount no longer being a Senator). [150] Nor was Blount's impeachment needed to establish the unimpeachability of legislators. The Constitution had done that already. Article II, Section 4 makes liable to impeachment the president, vice president, "and all civil Officers of the United States." Article I, Section 6, forbids appointment of a Senator or Member of the House of Representatives to "any civil Office under the Authority of the United States" while still serving in Congress. Thus, a legislator cannot be a "civil Officer" since they are prohibited from assuming "any civil Office."

In the 1800 election, Jefferson was elected president, defeating the incumbent Federalist John Adams, and Jefferson's party took over both Houses of Congress. [151] In its last weeks in office, the lame-duck Federalist Congress created sixteen new judgeships as well as a number of justices of the peace, by passing the Judiciary Act of 1801 (sometimes called the Midnight Judges Act). [152] These judgeships and other reforms in the statute,  **183**  such as the elimination of circuit-riding by Supreme Court Justices, were needed, but the Federalists' dominant purpose was to appoint as many of their own people to the bench as possible before the Jefferson Administration took office. [153] This was a court-packing plan packaged as a reform to enhance judicial efficiency, a tactic that Franklin Roosevelt tried unsuccessfully in 1937. The statute was also intended to deprive Jefferson of a Supreme Court appointment; it reduced the Court from six Justices to five, effective with the next vacancy. [154]

In his last hours in office, by candlelight on the night before Jefferson took the presidential oath, Adams signed commissions appointing Federalists to the positions created by the Judiciary Act of 1801. [155] Madison, Jefferson's new Secretary of State, refused. to turn over these commissions to the appointees, [156] setting in motion the train of events that led to Marbury v. Madison. [157] Even without these appointments, the Federalists had a solid grip on the judiciary, occupying virtually every federal judgeship, although they had lost the two elected branches. [158]

The Federalists used their grip in partisan ways. While acting as trial judges when riding circuit, Justices William Patterson and James Iredell of the Supreme Court "made partisan statements from the bench" in trials of members of Jefferson's party under the Sedition Act, [159] doubtless for the purpose of inflaming juries. Although every Justice on the Supreme Court was a Federalist, Samuel Chase, in particular, was "intensely partisan." [160] He was so partisan, in fact, that the Supreme Court's August 1800 term had to be postponed because Chase was out of town campaigning for the reelection of Adams as president. [161] The Sedition Act expired in 1801, [162] but "nearly all the men who had ruthlessly enforced [it] were still on the  **184**  bench." [163] Jefferson and his party felt under attack from "an antagonistic and politically active judiciary," [164] and they counter-attacked.

Just as the Federalists had used impeachment as a partisan political weapon, so, too, would Jefferson's party--but this time to dislodge Federalists from the judicial branch. [165] John Randolph, [166] a leader among Jefferson's party in the House of Representatives, initially "popularized the idea that the lower house could define impeachable offenses as it wished" [167] --a concept later pushed aggressively by Gerald Ford, Bob Barr, [168] and Tom DeLay. When trying to get William O. Douglas impeached in 1970, Ford, then House Minority Leader, claimed that "an impeachable offense is whatever a majority of the House of Representatives considers it to be at a given moment in history; conviction results from whatever offense or offenses two-thirds of the other body [the Senate] considers to be sufficiently serious to require removal of the accused from office." [169] During the Clinton impeachment, DeLay, the House Majority whip, took the same position: that a high crime or misdemeanor is "whatever a majority of the House of Representatives considers it to be at a given moment in history." [170]

There was ambivalence in Jefferson's party about using impeachment against the judiciary, [171] but by 1804, Jefferson had become "the nominal leader of the most sweeping impeachment movement in American history." [172] According to Dumas Malone, the most prominent of Jefferson's biographers:

> [p]olitical enemies of Jefferson in his lifetime and numerous later writers contended that he planned a 'campaign' against the judiciary from the very start, but that as a cautious politician, he put this into effect only step by step

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.     10

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 356 of 553 PageID #:  761

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

lest he jeopardize the  **185**  popularity of his party. It seems more likely that he took one step without being sure of or necessarily committed to the next one. [173]


Ten days after taking office as president, Jefferson said of the Federalists, "The principal of them have retreated into the judiciary as a stronghold, the tenure of which makes it difficult to dislodge them." But he did nothing in particular to plan a strategy of impeachment, leaving that to members of his party in Congress. [174]  One of them, Congressmen (later Senator) William Branch Giles, wanted to abolish the entire judicial branch and create a new one, without any judges belonging to the Federalist Party. Jefferson, according to Malone, "never advocated that degree of demolition." [175]

John Pickering was a Federalist and a district court judge in New Hampshire. [176]  He had written New Hampshire's state constitution in 1784. [177]  But even before Jefferson was elected president, Pickering had become undeniably incompetent due to drunkenness and insanity [178]  and "was making a daily spectacle of himself on the bench." [179]  The Federalists themselves had actually managed to remove him from the courthouse temporarily. Using a provision in the Judiciary Act of 1801, [180]  the circuit court had delegated a circuit judge to substitute for Pickering on the ground that he was incapacitated. But when the Jeffersonians repealed the Act, they "inadvertently forced Pickering to resume his position." [181]  The last straw was a case in which the owner of a ship seized by the government sued for its return, which Pickering ordered. "When the district attorney reminded him that he had heard no witnesses for the Government, Pickering jeeringly replied: 'You may bring forty thousand and they will  **186**  not alter the decree.'" [182]  In 1804, the House impeached him, and the Senate convicted. [183]

It was a strange impeachment, and some basic ingredients of a trial were missing. Pickering did not attend the proceedings, and nobody appeared to represent him. [184]  Federalist Senators conducted his defense. [185]  When Pickering was served with Senate subpoenas, he "demanded 'trial by battle' and challenged Jefferson to a duel." [186]  Pickering's son submitted a petition arguing that his father was "insane, his mind wholly deranged," and thus "incapable of corruption of judgment, not subject to impeachment, . . . and his disorder has baffled all medical aid." [187]

Pickering should have been removed from the bench. But he also fit conveniently within the agenda of the Jeffersonian party. When Jefferson became president in 1801, "the national judiciary, one hundred per cent Federalist, amounted to an arm of that party." [188]  If removing Federalists was the goal, Pickering seemed a good place to start because it was impossible to defend him. [189]  There were only about two dozen federal judges at the time, [190]  and none of them was truly obscure.

In the House and Senate, the Federalists, now a minority, fought back bitterly. [191]  The House voted to impeach by forty-five to eight, and all of the nay votes were Federalists. [192]  The Senate convicted nineteen to seven on a straight party-line vote and then voted twenty to six to remove Pickering. [193]  **187**  What should have been nonpartisan and a sad duty was instead a vitriolic pitched battle--not because of anything peculiar to Pickering, but because of what the political parties had to gain or lose on the outcome. Jefferson "rewarded three of the principal prosecution witnesses with lucrative posts," and appointed the local federal prosecutor-- the one who initially alerted Jefferson about Pickering--to Pickering's judgeship. [194]  Pickering was merely a trial court judge, but both parties saw him as first blood in a campaign to oust Federalists from the judiciary. Hoffer and Hull call Pickering's impeachment a "dress rehearsal" for the impeachment of Federalist Supreme Court Justice Chase. [195]  In fact, in the same month Pickering was convicted (December 1804), Chase was impeached by the House. [196]


## B. The Chase Impeachment, Its Context, and Its Aftermath

By December 1804, the Jeffersonians had held the elected branches for almost four years. Why did they wait so long before convicting Pickering and impeaching Chase? There are two reasons. The simpler one is that for the first two years it would not have been possible to get a conviction in the Senate. After the elections of 1800, the Jeffersonians lacked the two-thirds majority needed to convict if the voting followed party lines. After the elections of 1802, however, the Senate could much more easily support a conviction, with twenty-five Jeffersonians and only nine Federalists (73.5%). In fact, from March 1803,

APPENDIX - 355

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 357 of 553 PageID #:  762

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

when the Congress elected in 1802 was sworn in, until the end of Jefferson's Presidency, his party's strength in Congress was overwhelming. [197]

**\*188  Table 1**

**Congressional Party Divisions After the Elections of 1798 Through 1808**

|  | 1798 | 1800 | 1802 | 1804 | 1806 | 1808 |
|---|---|---|---|---|---|---|
| Senate [198] |  |  |  |  |  |  |
| Jeffersonians | 10 | 17 | 25 | 27 | 28 | 27 |
| Federalists | 22 | 15 | 9 | 7 | 6 | 7 |
| Vacant |  | 2 |  |  |  |  |
| House [199] |  |  |  |  |  |  |
| Jeffersonians | 46 | 68 | 103 | 114 | 116 | 92 |
| Federalists | 60 | 38 | 39 | 28 | 26 | 50 |
| Vacant |  | 1 |  |  |  |  |

The more complex reason is that the Jeffersonians, like the Federalists, were divided into extremists and moderates, and as long as the judiciary did not interfere with Jefferson's goals, he was himself instinctively a moderate. [200] And the Supreme Court had not interfered. A good illustration would be the companion cases of Stuart v. Laird [201] and Marbury. Decided six days apart, Stuart and Marbury together constitute the Supreme Court's reaction to the Jeffersonians' treatment of the Judiciary Act of 1801. The Court held in Stuart that Congress could constitutionally repeal the Act and thus abolish the judgeships the Act created and terminate the appointments of the judges involved (all Federalists), despite the Constitution's guarantee [202] of lifetime tenure for federal judges. Although in Marbury, the Court postulated in dicta that as long as the Act was in effect, the executive branch was required to deliver the paperwork needed by nominated and confirmed judges so they could  **\*189**  assume their offices, and that a Cabinet officer such as the Secretary of State could be compelled by mandamus to do so, the Court refused to grant a writ of mandamus because the statute providing the Court with original (as opposed to appellate) jurisdiction was unconstitutional. The Supreme Court thus surrendered to the Jeffersonians on the point of the lawsuit, even if Marshall used the occasion to enunciate judicial power to mandamus Cabinet officers and to nullify congressional statutes inconsistent with the Constitution. This was "exceptionally adroit" on Marshall's part, "leaving no target for [Jeffersonian] retaliation beyond frustrated rhetoric." [203]

Jefferson was outraged. On the day Marbury was decided, he wrote that the Federalists "have retired into the Judiciary as a stronghold . . . and from that battery, all the works of" his party "are to be beaten down and erased." [204] To some extent, this was an exaggeration. Unlike the Supreme Court of the 1930s, which struck down New Deal legislation vitally important to the Administration of Franklin D. Roosevelt, [205] the Court had not in Marbury held unconstitutional a statute enacted by a Jeffersonian-dominated Congress. The statute struck down in Marbury was an obscure provision of the original Judiciary Act of 1789. [206] And in earlier decisions, the Supreme Court [207] and Justices of the Supreme Court, sitting as circuit judges, [208] had assumed they could hold federal statutes unconstitutional. In Marbury, Marshall only enunciated that power more clearly and supported it with extensive arguments. There is some historical evidence that what so angered Jefferson and his party was not the assertion of a power of judicial review of legislation for constitutionality, but instead Marshall's assertion, in dicta, that if the Court had actually had jurisdiction, it would have had the power to order a Cabinet officer, through mandamus, to take action the Court considered legally required. [209] That might seem today to be the reaction of politicians who think of themselves as imperial and beyond objective constraints such as those embodied in law. But the Federalist judiciary had so abused its power under the Sedition Act that the mandamus discussion in Marbury could have been perceived as laying a foundation for future abuses. Marbury was thus seen by Jefferson and his  **\*190**  allies, and could still be seen today, as "one of the most flagrant specimens of judicial activism." [210]

Against this background, Pickering was impeached and convicted because the radical and moderate Jeffersonians came to agreement, although based on different reasoning. On ideological grounds, the radicals were willing to impeach any Federalist judge whose conduct was egregious enough to make a conviction feasible. The moderates, on the other hand, could not imagine leaving a judge as incompetent as Pickering on the bench; they might have felt the same way even if he had been a Jeffersonian. Why, then, were the radicals able to get Chase impeached?

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    12

Case 6:20-cv-00660-JDK    Document 33    Filed 01/01/21    Page 358 of 553 PageID #:  763

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

Of the first three impeachment defendants, Blount, Pickering, and Chase, "Chase was clearly the most partisan."[211] He lectured jurors on why Jefferson and his party were evil. He helped arrange an indictment under the Sedition Act and then made out-of-court statements that the defendant should be convicted, after which he presided over the defendant's trial.[212] Although he signed the Declaration of Independence and was second only to John Marshall as an intellectual leader of the Supreme Court,[213] Chase was a generally abusive judge as well. "Essentially a bully, he loved nothing better than insulting witnesses and lawyers with sarcasm, knowing they dare not reply in kind."[214]

> He acted as though virtually everyone brought before him on a criminal charge was guilty. He did not truly accept the adversarial process in criminal trials [and] was impatient with defense counsel not just because they represented radicals and democrats, but because he had not [really accepted] the idea of defense counsel conducting the defendants' cases.[215] Because Chase's "turbulent disposition made him an ally who often proved more of a liability than an asset," Washington nominated him for a Supreme Court vacancy only when he could not get others to take the job--the Supreme Court had very little prestige in the 1790s--and the Senate "reluctantly confirmed his appointment."[216] Eventually, Chase became "the most hated member of the Federal judiciary."[217] Oddly **\*191** enough, Chase had opposed adoption of the Constitution while a member of the Maryland Convention called to consider whether to ratify it.[218]

Chase was accused of misconduct not in the Supreme Court, but instead while riding circuit and presiding as a trial judge (at the time, a significant part of a Supreme Court Justice's work).[219] The articles of impeachment alleged that in one case he tried to persuade a jury to convict and refused to allow defense counsel to argue the law. The articles alleged that in another case, he refused to excuse a juror who admitted prejudging the defendant guilty; excluded evidence illegally; harassed defense counsel; and otherwise acted improperly. In a third case, the articles alleged that he pressured a grand jury to indict and, when they did not, pressured a district attorney to prosecute anyway. In a fourth case, the articles alleged that he made a partisan political speech from the bench to a grand jury,[220] The last was the immediate provocation for the impeachment.[221] Chase had lectured the grand jurors that, among other things, allowing all white males to vote was "mobocracy"; that the Jefferson Administration held "unfairly acquired power"; and that it was evil to repeal the Judiciary Act of 1801.[222]

On five of the eight articles of impeachment, a Senate majority voted to acquit.[223] On the remaining three, only a simple majority voted to convict, not the two-thirds constitutionally required[224] --"thanks in part to a few" from Jefferson's party "who consistently sided with the Federalists. Chase thus escaped . . ., but the episode had a sobering effect on him, and **\*192** he was never the same man afterwards."[225] All of the Federalist Senators voted not guilty on every impeachment article.[226] On each article, at least six members of Jefferson's party--and often more--voted to acquit.[227]

The House managers were furious at the result. Senator John Quincy Adams (John Adams' son and a future president) wrote that he "had some conversation . . . with Mr. Madison, who appeared much diverted at the petulance of the managers on their disappointment."[228] Back in the House, John Randolph introduced an amendment to the Constitution that would provide for removal of judges by a simple majority in each House of Congress; another manager introduced a Constitutional amendment that would permit a state legislature to recall and replace a Senator.[229] But this was venting and came to nothing.[230]

What caused the defections in the Senate is not clear. Most scholars ascribe at least part of it to senatorial resentment at the conduct of the House managers--especially Randolph--both during the impeachment trial, and in another controversy involving land in Georgia and unrelated to Chase.[231] Randolph had bragged that this was to be his impeachment to accomplish,[232] and his "invective, his dramatic but often irrelevant harangues"[233] unsettled the Jeffersonian moderates in the Senate. Other causes might have been sympathy for an "old and feeble" revolutionary, however obnoxious he might have been;[234] uncertainty about whether what Chase had done was really illegal at the time;[235] and ambivalence by Jefferson and his party as they became comfortable in power and came to **\*193** experience judicial opposition more as a receding nuisance than a threat, due to the judicial self-restraint (compared to the late 1790s) superintended by Marshall.[236] Perhaps most importantly, Jefferson took

APPENDIX - 357

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 359 of 553 PageID #:  764

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

no public position on whether Chase should be impeached or convicted, and he did nothing to persuade Senators to vote one way or the other. [237]

Irving Brant concluded that "Chase had made himself unfit for his position," [238] and Raoul Berger considered Chase to be "an implacably prejudiced judge" and his acquittal to be "a miscarriage of justice." [239] The evidence easily supports Berger's opinion. If a modern judge were to behave as Chase did, it would cause a bipartisan uproar. However, the historical evidence also supports a contrary opinion. Our sensibilities today are more refined than those of Chase's contemporaries and measured against his contemporaries, he was a severely flawed but not incompetent judge. Remembering that, as a tribunal, the Senate was hostile to Chase to begin with, one is tempted to conclude that the acquittal had little to do with the merits of the case against him. The Jeffersonian party was using impeachment as a partisan political weapon, and the real issues in Chase's trial were not limited to his conduct. Aside from the power struggle between two political parties and the dispute about whether a party victorious at the polls could reach into the judiciary through impeachment and threaten judicial independence, perhaps the most important (and least understood) issue was whether people were tired of hyper-partisanship and wanted politics to operate in a more civilized way. [240] Even within Jefferson's party, there was some fear that overreaching might lead to defeat at the polls, [241] and that if the Federalists ever regained Congress, they would again use impeachment as a partisan political weapon unless some limits were observed in the meantime. [242]

Afterward, Jefferson grumbled that "impeachment is not even a scarecrow." [243] But despite Chase's acquittal, Jefferson had won at least part of his point--not as much as he wanted, but probably as much as he needed.

 **\*194**  Jefferson had challenged [the Federalist judicial] arrogance and humbled it. Chase's lawyers had pleaded for mercy. Marshall, appearing for the defense, had seemed frightened. Not until the impeachment of Chase had Federalist politicians conceded openly that prostitution of the judiciary to the purposes of party was even questionable . . . . But when Jefferson challenged these practices in the impeachment of Chase, the defense had been forced to admit their impropriety . . . . [and the result lifted the judiciary] above the hog wallow of politics to the decent dignity it has since maintained. [244] When Chief Justice John Marshall testified, his answers showed "a desire to please the prosecution." [245] He had reason to be afraid. If the Senate convicted Chase, Marshall could have been the next impeached. [246] The radical Jeffersonians thus got exactly the scene they wanted: a frightened John Marshall, currying their favor in an attempt to avoid being himself purged.

History concentrates on federal impeachment. But Hoffer and Hull collected extensive evidence showing widespread use of impeachment in state legislatures during Adams and Jefferson's time. [247] At the time, the states were treated as the basic unit of sovereignty, and the federal government was a novel contraption to hold the states together. For that reason, state impeachments were at least as immediately significant as the federal ones. The use of state impeachments as partisan political weapons was so widespread that "[t]he same characteristics that were coming to mark major electoral campaigns--hoopla, press coverage, popular rhetoric preached to the mass of voters--appeared at the trial of [state] impeachments . . . . Conviction was rare in such carnival cases because the objective of proving a charge became less important than the objective of discrediting an entire party." [248] And, both state legislatures and state judiciaries were getting worn out from these struggles. [249] "No officeholder,  **\*195**  whatever his status, was truly safe from impeachment" when the opposing party controlled the legislature. [250]

The Pennsylvania legislature's impeachment, conviction, and removal from office of a state court judge named Alexander Addison in 1803 is often considered a rehearsal for the Pickering and Chase impeachments. [251] The same key elements were present: a Federalist judge who used his office for partisan purposes, a Jeffersonian majority in the legislature, and a Federalist minority that unanimously defended its judge. [252] Moreover, the Pennsylvania Jeffersonians were, like the party in Congress, split between radicals and moderates. [253] And Addison, like Chase, liked to lecture juries on politics: for example calling protests against the Sedition Act "a declaration of war against the government of the United States." [254] Although, under Pennsylvania law, a judge could be removed by the Governor without a trial on demand of both Houses of the legislature (a procedure called a joint address), [255] the radical Jeffersonians preferred impeachment because the joint address procedure, though simpler, was not sufficiently accusatory and did not provide the same opportunities to flail and embarrass the Federalists. [256] Addison was

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.   14

convicted because even the moderates thought him incorrigible: after the state supreme court had held that Addison could not legally prevent judges over whom he presided from charging grand juries, he did so anyway. [257]

Another Pennsylvania impeachment started in the spring of 1804, [258] about the same time that Pickering's impeachment began in Washington, and the result in the state senate predicted the verdict in Chase's trial. Three state supreme court judges--Edward Shippen, Jr., Thomas Smith, and Jasper Yeats--all Federalists, were impeached for imprisoning a litigant for thirty days on the ground of contempt, for reasons that were **196** arguably partisan. [259] The remaining state supreme court judge, a Jeffersonian, specifically requested that he too be impeached because, although not involved in the contempt ruling, he agreed with it. [260] That should have been a signal to the radicals in the legislature that they had gone too far. The Jeffersonians ignored the hint and through joint address asked the Governor to remove the Jeffersonian judge, which the Governor refused to do. [261] In January 1805--after Pickering had been convicted and Chase had been impeached, and just before Chase's trial--the state senate acquitted the three Federalists. [262] Just as it would happen a few weeks later in Chase's trial in Washington, a majority, but not the two-thirds needed, voted to convict. [263] Moderate Jeffersonians defected, and although the reasons are not clear, the extreme positions taken by the impeachers were a factor. [264]

The Chase impeachment trial was presided over by Vice President Aaron Burr, who at the time was under indictment in two states for the murder of Alexander Hamilton, [265] leading to contemporary jokes about the judge being tried by the murderer, rather than the other way around. [266] Burr, a fugitive in fear of extradition, had not presided over the Senate since Hamilton's death. [267] To induce Burr to return to Washington and preside favorably, both the extremists and the moderates in Jefferson's party flattered him with attention. The Jefferson Administration gave government jobs to Burr's relatives and friends, and Jeffersonian Senators asked New Jersey to drop the murder indictment. [268] The motives of the extremists were obvious, but those of the Administration were not. Channing concluded that Jefferson was trying to increase the odds of conviction, while Richard Ellis thought the opposite. [269]

**197**  No one took any action to impeach Burr. He belonged to Jefferson's party, which had no intention of impeaching its own vice president. [270] The Federalists, with only about a quarter of the seats in each House of Congress, [271] had no hope of winning anything in either chamber. Jefferson's party pointedly did not renominate Burr for vice president, although Burr's murder of Hamilton was not the only reason. The original constitutional plan for electing presidents and vice presidents called for electors to cast two votes for president; the candidate with the largest electoral vote became president, and the runner-up became vice president. [272] This was perhaps the only truly naive provision in the Constitution, and it was replaced in 1804, through the Twelfth Amendment, with the system used today. In the first two presidential elections, 1788 and 1792, political parties did not participate, and Washington was unanimously elected president and John Adams vice president. Both were Federalists. The 1796 election produced a president (Adams) and vice president (Jefferson) of opposing political parties because presidential and vice presidential candidates did not run together on tickets.

In 1800, to avoid this kind of result, the parties ran tickets, Jefferson's party supporting him for president and Burr for vice president. Because there was no way to vote separately for vice president, every one of Jefferson's electors voted for both him and Burr for president, producing a tie and throwing the election into the House of Representatives. [273] The House that decided the election was not the newly elected one, dominated by Jeffersonians, but instead the lame-duck Federalist House, whose leaders plotted to stop Jefferson by electing Burr. [274] The task of electing a president after the Electoral College fails to do so no longer falls on a lame-duck House because the Twentieth Amendment moved the beginning of presidential terms of office from March 4 to January 20 and the beginning of congressional terms of office from March 4 to January 3--the latter in part to prevent a lame-duck House from choosing a president. [275] When the House elects a president, voting is tallied by states, each state having one vote. Although the Federalists had a majority of the membership of the House, they did not control a majority of state **198** delegations in the House. [276] After thirty-five ballots produced exactly the same tally--eight states for Jefferson, six for Burr, and two split and not voting, thus failing to give any candidate a majority--a few of the Federalists gave up and allowed Jefferson to be elected. [277]

Two aspects of this fiasco forever poisoned Jefferson's view of Burr. First, the flaws in the original system of electing presidents required that when a party ran presidential and vice presidential candidates as a ticket, at least one of that party's electors had

APPENDIX - 359

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 361 of 553 PageID #: 766

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

to vote for someone other than the vice presidential nominee, or a tie would result. Some electors who planned to do that were dissuaded on assurances from the Burr camp that other electors would do so. [278]  The primitive communications of the time mostly accounted for this lack of coordination, but it also appeared that Burr was manipulating the situation to his own advantage. Second, once the election was thrown into the House, Burr did not take himself out of the contest, even though Jefferson was the party's nominee for president and the voters who chose Jeffersonian electors thought they were electing Jefferson. [279]  Had Burr announced that under no circumstances would he take the presidential oath of office, the Federalist effort to elect him would have been futile. Burr's refusal to make such an announcement led Jefferson to conclude that Burr had conspired with the Federalists. Jefferson never wavered from the belief that a conniving and self-dealing Burr had almost succeeded in helping the Federalists steal an election from him. We have no way of knowing whether Burr actually did what Jefferson thought he did, [280]  though Burr's later behavior as vice president seemed consistent with Jefferson's interpretation of the election fiasco. "It was common knowledge in Washington that Burr was trying to build a following loyal to him alone, and his rulings from the chair favorable to the defense in the Pickering trial gave further evidence of his lack of scruples in making overtures to the enemy for support." [281]

The Chase trial ended three days before Burr's term of office expired. [282]  Immediately afterward, Burr absconded into the frontier  **199**  territories, apparently on a scheme not unlike Blount's. [283]  Burr's conspiracy was particularly far-fetched. He tried to induce the then westernmost states and territories to secede from the Union and then invade Mexico. [284]  Burr intended to take most of what Jefferson had just acquired for the United States in the Louisiana Purchase. [285]  When he was caught by federal marshals two years later, he was taken to Richmond and tried in a courtroom presided over by Chief Justice John Marshall, who was riding circuit. [286]  Burr was acquitted of treason in "one of the most spectacular trials in American history." [287]  Marshall both judged the admissibility of evidence and instructed the jury according to a controversial definition of treason "that essentially forced the jury to acquit Burr." [288]  The jury foreman--who was Marshall's brother-in-law--announced the verdict thus: "Burr is not proved guilty under this indictment by any evidence submitted to us. We therefore find him not guilty." [289]  Burr and his lawyers angrily protested the form of the verdict and demanded that in the record it be reduced to "Not guilty." [290]  Then a member of the jury said:

> he would produce the same verdict if called upon to decide a second time. He said that every member of the jury knew that the verdict was not phrased in the usual form but that they had all wanted it that way. . . . And so the original Burr verdict entered the record: an announcement by the jury that, in effect, it considered him a guilty man but was unable to pronounce him so because the rulings by the Chief Justice. [291]

Actually, there were two trials. In the second, which immediately followed the treason proceeding, Burr was acquitted of the crime of waging war against a friendly nation, Spain, which still claimed territories bordering the United States. [292]  As in Marbury v. Madison, Marshall's goal  **200**  in both trials was to craft rulings that advanced judicial power without provoking impeachments or constitutional amendments that would humble the judiciary, while. Jefferson tried to defeat what he perceived to be the partisanship of Federalists, like Marshall, secure in the judicial branch. The result set precedents that influenced the near-impeachment of Richard Nixon as well as the impeachment and trial of Bill Clinton.

This was "the last major episode in the conflict between the executive and judicial branches during Jefferson's presidency" [293] -- the earlier battles having included the repeal of the Judiciary Act of 1801, [294]  the Marbury litigation, and the Chase impeachment. In both Houses of Congress, a party-line vote brough about the repeal of the 1801 Judiciary Act. [295]  Immediately afterward, the Jeffersonian Congress restructured the Supreme Court's schedule, delaying the Court's next session for fourteen months so that the Court would not have an opportunity to declare the repeal unconstitutional until after it had taken effect. [296]  In the end, the Court held the repeal to be constitutional in a decision dated six days after Marbury. [297]  As Marbury itself was being litigated, the Federalists panicked, fearing that "all members of the [Supreme] Court would be impeached." [298]  The Court's decision to adjudicate Marbury--the rough equivalent of today's granting of a writ of certiorari--infuriated the Jeffersonians and hastened the repeal of the Judiciary Act of 1801. [299]  Before the Court decided the case, Jefferson "had determined to ignore a writ of mandamus should one be issued," and afterward he "took great pains . . . to deny that Marshall's dictum had any force in

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   16

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 362 of 553 PageID #:   767

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

law. It stood in his mind as a bald assertion of illegal power by an arrogant judge . . . ."[300] It must have been obvious to Marshall that "[i]f he were to issue a mandamus, he would have no way to enforce it, and it would be ignored by the executive branch."[301]

Jefferson desperately wanted his former vice president convicted, and was convinced that the Federalists, through Marshall, were contriving to  **201** acquit Burr to embarrass the Administration.[302] "In fact, the President appears to have hoped to use any acquittal of Burr as grounds to either impeach Marshall or to introduce a constitutional amendment to allow the President and Congress to remove federal judges."[303] Jefferson also considered the Burr trial to be part of a personal struggle between himself and Marshall.[304] "It is difficult to overstate the personal animus that Jefferson and Marshall appeared to hold for one another . . . ."[305]

We will probably never know what caused their mutual animosity. Marshall fought in Washington's army during the Revolution and shared in its privations at Valley Forge and elsewhere, while Jefferson stayed home. Beveridge, one of Marshall's biographers, believed that Marshall's antipathy for Jefferson began then.[306] But no evidence supports that.[307] Another theory has it that Jefferson disliked Marshall because Marshall married the daughter of a woman Jefferson had once courted. But this theory, too, lacks evidence.[308] During the 1800 election, Marshall wrote that Jefferson's "foreign prejudices" in favor of everything French, for example, "seem to me totally to unfit him" for the Presidency.[309] After Jefferson and Burr tied in the electoral college, Marshall, unlike other Federalists, declined to take sides between Jefferson and Burr.[310] Although Marshall wrote in a private letter that he considered Burr to be a "still greater danger than even . . . Mr. Jefferson," he added that "I cannot bring myself to aid Mr. Jefferson."[311] When the election of 1800 was thrown into the House and stalemated there, a rumor circulated that Marshall had written an opinion to the effect that the Chief Justice (himself) should succeed to the Presidency if the stalemate were to continue.[312] Although the effect of this rumor on Jefferson hardly needs to be imagined, Jefferson and Marshall already had low opinions of each other before 1800.

 **202**  The most likely explanation is that Marshall and Jefferson became political adversaries because of their differing political beliefs when parties formed in the 1790s, and that the conflicts during Jefferson's Presidency caused mutual suspicion to deepen into something close to hatred.[313] As president and chief justice, they were, after all, the highest government officials of antagonistic political parties, during a period in which politics was intensely personal and people assumed the worst character in their opponents. "The relatively small and closed political communities of Washington and Virginia did not keep personal secrets well, so Marshall and Jefferson certainly knew what one thought of the other."[314] The steady reporting of each insult to the insulted may have deepened the feeling of grievance on both sides. If their personal rivalry predated the 1790s, it might have come, at least in part, from over twenty years of lawsuits that grew out of a 1773 inheritance in which Jefferson had an interest and Marshall represented various parties, to Jefferson's dissatisfaction.[315] Jefferson and Marshall were in fact cousins.[316]

Both Marshall and Jefferson behaved in surprising ways during this confrontation. For example, Marshall taunted Jefferson by dining with Burr and his lead defense lawyer at the latter's home immediately after releasing Burr on bail.[317] Today, that would require a judge to recuse himself under the federal judicial conflict-of-interest statute.[318] Even in the context of his era, Marshall was remarkably casual about judicial proprieties. By modern standards, Marshall would have been required to recuse himself from adjudicating Marbury v. Madison. Marshall was Adams's last Secretary of State.[319] "Until nine o'clock of the night before Jefferson's inauguration, Adams continued to nominate officers, including judges, and the Senate to confirm them. Marshall, as Secretary of State, signed and sealed the commissions."[320] Under the modern conflict-of-  **203** interest statute, Marshall would be disqualified not only because of the appearance of partiality,[321] but also because, in the words of the modern statute, he "served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy."[322]

In fact, when Marshall signed the commissions, he was both Secretary of State and Chief Justice. The Senate confirmed his nomination for Chief Justice on January 27, 1801.[323] On February 4, Marshall received his own commission for that position, and on the same day he took the Supreme Court bench and presided.[324] Nonetheless, Adams asked Marshall to continue to serve as Secretary of State until the end of the Adams Administration, a month later.[325] (The same thing had happened once before. John Jay was both Secretary of State and Chief Justice for six months during the Washington Administration.)[326] After

APPENDIX - 361

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 363 of 553 PageID #: 768

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

working--as Secretary of State-- into the evening of March 3, 1801, to pack the judiciary with Federalists, Marshall--as Chief Justice--administered the oath of office to Jefferson at noon the next day. [327] Adams had "taken the four o'clock stage out of town that morning." [328]

These were the "midnight judgeships" at issue in Marbury. When James Madison, Jefferson's Secretary of State, assumed office the following day, he found on his desk--which had been Marshall's desk until midnight the evening before--four undelivered commissions for Federalists nominated and confirmed by the Senate as justices of the peace in the District of Columbia. Madison refused to turn them over to their intended recipients, and they sued to get the commissions that would have allowed them to take office. [329]

**\*204** Under modern standards, Marshall also should have recused himself in another landmark case, Martin v. Hunter's Lessee, [330] which held that treaties entered into by the federal government supervene state law, and that state courts must obey the Supreme Court in matters of federal law. Marshall and his brother owned some of the land at issue in the litigation. [331] The case came before the Supreme Court twice. The first time, Marshall did recuse himself, [332] and the Supreme Court, in an opinion by Justice Story, issued an order that the Virginia courts refused to obey. Marshall then wrote a petition for a writ of error--similar to, but not the same as the modern petition for certiorari--to get the case back into the Supreme Court. The modern federal judicial conflict-of-interest statute requires a judge to recuse himself where "he served as a lawyer in the matter in controversy," [333] or where he, or a person within a scope of relationships that includes brothers, has "an interest that could be substantially affected by the outcome of the proceeding." [334] In the second appeal, Story again wrote the Court's opinion. Marshall not only participated in the Court's decision, but he wrote a memorandum on which Story relied. [335]

Compared to Marshall's participation in the adjudication of Marbury and Martin v. Hunter's Lessee, Abe Fortas's offenses [336] were but a trifle. On the one hand, Fortas resigned from the Supreme Court after being threatened with impeachment for creating an appearance of impropriety, even though there was no evidence that any of his judicial decisions had been improperly influenced. Marshall, on the other, sat in judgment on the legality of his own actions as Secretary of State. In Marbury, he refers to himself in the third person: "Mr. Marbury, then, since his commission was signed by the President, and sealed by the secretary of state, was appointed . . . ." [337] That he was not impeached--though the radicals in Jefferson's party, and perhaps Jefferson, too, would have been delighted to **\*205** do so--speaks volumes about the casual judicial standards prevailing at the time.

For his part, Jefferson "lost control of himself for a season." [338] He sent a steady stream of correspondence to the lead prosecutor, George Hay, [339] "pepper[ing] Hay with instructions," [340] that look like micro-management, but on closer examination see to reflect obsession. "Stop . . . citing Marbury v. Madison as authority," commanded Jefferson; "I have long wished . . . to have the gratuitous opinion in that case . . . denounced as not law." [341] And, along the way, Jefferson seems to have invented transactional immunity as American criminal procedure now understands it--something only a head of state could have contracted for before the development of judicially enforceable plea bargaining agreements.

> On the eve of the trial, Jefferson forwarded to Hay a sheaf of blank pardons he had signed. Hay was instructed to fill them out **\*206** "at discretion, if [he] should find a defect of evidence, and believe that this would supply it." This was a carte blanche for the prosecuting attorney to grant presidential pardons in order to secure testimony against Burr. [342] Jefferson also "took the extraordinary step of interrogating one of the key witnesses, of striking a plea bargain with him that exchanged a pardon for testimony, and then of instructing the prosecutor on how to examine him at trial." [343]

To aid in his defense, Burr moved [344] for an order compelling production of a letter written to Jefferson by General Wilkinson, as well as Jefferson's response and other documents. [345] The motion required only the documents and not Jefferson's personal appearance in court. [346] Although Jefferson's appearance might have been needed to supply the evidentiary foundation for the letter's receipt into evidence, Burr did not insist on that, as long as the papers were delivered and the Government would stipulate to their foundation. [347] "Burr sought a subpoena duces tecum, not a subpoena ad testificandum." [348] Jefferson did

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 18

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 364 of 553 PageID #:  769

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

not refuse to supply the papers, [349] although twentieth-century advocates for what has now become the doctrine of executive privilege [350] --among them President Nixon's **\*207** lawyers--later claimed otherwise. [351] Instead, Jefferson warned that the letter, in particular, could involve "state secrets," and asked Hay to prevent disclosure of those parts of the letter not material to the issues. [352] In court, Hay offered to supply the entire letter to Marshall; argued that a subpoena would therefore be unnecessary; and asked Marshall to redact that which was not material in order to protect state secrets. [353] Marshall, in turn, committed himself to redact anything "which it would be imprudent to disclose . . . if it be not immediately and essentially applicable to the point." [354] When the government produced the documents Burr wanted, [355] "both Burr and Marshall considered the subpoena satisfied." [356] In the second trial, Burr made another motion regarding a different letter, and this time Jefferson's position hardened somewhat: he submitted a redacted copy of the letter, and a certificate explaining his reasons for the redactions. [357] Again, Burr and Marshall "appear to have let the matter drop." [358]

In the most extreme claims of executive privilege, such as those vigorously asserted by Richard Nixon, a president refuses to submit evidence for judicial review. The Supreme Court, however, relying in part on Marshall's rulings in the Burr trial, held in United States v. Nixon that generalized claims of executive privilege that do not identify specific risks to the country are overcome by, among other things, a grand jury subpoena. [359] When, at the Supreme Court's direction, Nixon complied with such a subpoena, the audiotapes he turned over persuaded even the leaders of his own party that he could not defend against impeachment, and he resigned. [360]

John Yoo argues that the Nixon Court misinterpreted both Jefferson's positions and Marshall's rulings. [361] In a letter to Hay, Jefferson offered to provide the documents at issue in Burr's trial, while in principle **\*208** "[r]eserving the necessary right of the president of the United States, to decide, independently of all other authority, what papers coming to him as president the public interest permits to be communicated." [362] Jefferson sent this letter after the Government argued and submitted the issue to Marshall for decision. [363] Hay then read Jefferson's letter into the record in open court, [364] which might have been what Jefferson wanted. Marshall decided that documents in a president's possession could be subpoenaed, but he added a qualification ignored by the Nixon court. Marshall held that if a president's "duties as chief magistrate demand his whole time for national objects . . . at the time when his attendance on a court is required, it would . . . rather constitute a reason for not obeying the process of the court than a reason against its being issued." [365] In other words, the judiciary has a right to issue such a subpoena, and the president has a right to ignore it. Marshall might have been looking ahead to the type of problem that supposedly later caused President Andrew Jackson to remark, after Worcester v. Georgia, [366] that "John Marshall has made his decision; now let him enforce it." Although some historians doubt that Jackson actually said that, [367] "the evidence is that if Jackson did not say [it], he certainly meant it." [368] In any event, it was the State of Georgia, not Jackson, who would have to comply with the Supreme Court's judgment, and Georgia did ignore it, which is the point of the supposed Jackson quote. [369]

At the time of the Burr trial, and for some decades afterward, the popular prestige of the Supreme Court was so low that a president would suffer little harm from ignoring a Supreme Court decision. Because Federalists initially dominated the judiciary and misused it for partisan political purposes--such as in prosecutions under the Sedition Act--much of what the judiciary did was suspect in the popular mind. Part of Marshall's genius was that he understood this and crafted decisions so that they simultaneously claimed the largest reasonable amount of judicial power while giving his enemies the smallest objective grounds for grievance. The best known example is Marbury. There, Marshall claimed **\*209** the Court's power to issue binding orders to executive branch officials and the power to render statutes unenforceable if inconsistent with the Constitution, while at the same time holding that the Court lacked the jurisdiction to order Jefferson's Secretary of State to turn over a commission to one of Adams's midnight judges. And, in Burr, he held that a president, unlike a monarch, is subject to the process of a court, but that Jefferson need not obey that process if he did not want to. After the prestige and moral authority of the Supreme Court had grown to what it is today, the Nixon court labored under no such disability and held, [370] while misciting Burr, that a president must obey a valid subpoena. "Marshall always managed to cloak his personal feelings toward Jefferson behind an elaborately constructed screen of impartial-sounding arguments that invariably ended up leaving him no choice but to align himself with the other side. . . . If Hamilton came at you with a saber, Marshall preferred the stiletto." [371]

What Jefferson asserted more passionately was a privilege not to testify himself--a privilege similar to the one that President Clinton later claimed with as much vigor as Nixon asserted executive privilege. [372] "To comply with such calls," Jefferson

APPENDIX - 363

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 365 of 553 PageID #:  770

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

wrote to the federal prosecutor, "would leave the nation without an executive branch" because any litigant could haul a president away to some far part of the country. [373] But here, too, Jefferson claimed a right smaller than one that a later president in trouble would like to have had. Jefferson offered to testify "by way of deposition." [374] In other words, he thought he should not have to go to Richmond, but easily volunteered to put himself under oath if the lawyers **\*210** and, presumably, the judge would come to him in Washington. Previously, the federal prosecutor had conceded that Jefferson could be subpoenaed to testify but had argued that he could not be subpoenaed duces tecum and thereby required to supply the letter. [375] Marshall decided that Jefferson was subject to both forms of subpoena, [376] but in a later ruling added that "[i]n no case of this kind would a court be required to proceed against the president as against an ordinary individual." [377] In any event, the subpoena, as issued, required only production of the documents; it specifically provided that Jefferson need not come to court himself. [378]

President Clinton asserted a right not to be required to defend a private lawsuit while in office on the ground that the burdens of a litigant, including the burden of being deposed, would interfere with the duties of the Presidency. But the Supreme Court held in Clinton v. Jones, [379] relying in part on Marshall's rulings in Burr, [380] that a person can be both a president and a private litigant at the same time. As a result, the lawyers and the judge went to Washington so that Clinton could testify in a deposition-- just as Jefferson had volunteered to testify--and that testimony led to Clinton's impeachment. [381]

In each of its first three uses, impeachment served as a partisan political weapon. For a time afterward, a truce seemed to make further use of that kind unnecessary. Although the judiciary remained vaguely Federalist in its outlook, it abandoned much of the partisan behavior that so incited the Jeffersonians, [382] and Jefferson's presidential successors, James Madison and James Monroe, were not innately hostile to the judiciary. [383] The Chase impeachment, though unsuccessful, may have had an effect on the federal judiciary similar to the one that the 1936 election and Franklin D. Roosevelt's court-packing proposal may have had on the Supreme Court **\*211** in 1937: it may have persuaded judges to avoid confrontation with the other two branches. [384] Both the Chase impeachment and the Roosevelt court-packing plan certainly had a boomerang effect: each seemed, to a crucial body of less partisan or nonpartisan thought, to have gone too far. Moreover, Jefferson's party so dominated elections after 1800 that it controlled the executive and legislative branches for a generation. After Jefferson left office it became a consensus party and absorbed a fair amount of the Federalist thought. [385] When Monroe ran for reelection as president in 1820, the Federalist Party had nearly disappeared, nobody was left to oppose him, [386] and the period became known as the Era of Good Feeling. Thus, impeachment fell temporarily into disuse because the Chase trial had left an unpleasant memory on all sides, and because, for a time afterward, nobody needed impeachment as a partisan political weapon.

Chase's chief defense counsel during the Senate trial was Luther Martin, one of the leading lawyers in the country and a delegate to the Constitutional Convention--though he refused to sign the Constitution because he had come to oppose the document the Convention produced. Later, Martin became chief defense counsel in Aaron Burr's trials and argued several cases to the Supreme Court, including the losing side in M'Culloch v. Maryland. [387] He was also an alcoholic. Some years after Chase's impeachment, Martin tried a case while drunk before Chase, who was riding circuit. "I am surprised that you can so prostitute your talents," Chase said from the bench. "Sir, I never prostituted my talents except when I defended you and Colonel Burr," replied Martin, who then faced the jury and said: "A couple of the greatest rascals in the world." [388]

Adams and Jefferson both died on July 4, 1826--50 years to the day after the Declaration of Independence was purportedly signed. Adams and Jefferson were not only the second and third presidents. They were also, respectively, the chair of the committee appointed by the Continental Congress to draft a document declaring independence, and the author of the first draft of that document. [389] In 1776, Adams was considered to have had **\*212** the more prestigious assignment: not only did he chair the committee, but he was also expected to steer the proposal through the Congressional debate. [390] Jefferson was like the junior professor who gets stuck writing a faculty committee report, although he did such a good job of it that, in historical memory, his role almost completely eclipses Adams's. Adams later recalled that he insisted that Jefferson write the draft because, among other things, Jefferson was the better writer. [391]

When we read the Declaration's text today, we are reading Jefferson's words, as altered by other people. Jefferson wrote the draft in a few days, and Adams and Benjamin Franklin marked it up, changing, for example, Jefferson's "sacred & undeniable truths" to "self-evident truths." [392] Then, the Continental Congress debated the document line-by-line and deleted about a quarter of

APPENDIX - 364

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 366 of 553 PageID #: 771

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

Jefferson's draft, while he seethed. [393]  For decades afterward, he felt the grievance of an author who thinks his best work has been mangled through the editing of others. [394]  The great scene, where all the Members of the Continental Congress signed the Declaration, did not happen on July 4, 1776--and as it has been depicted in paintings, it probably did not happen at all. On July 2, Congress voted, in principle, to declare independence. On July 4, Congress approved, as amended, the document that would communicate that declaration, and sent it out to a printer, although approval was not unanimous until the New York delegation received instructions from home on July 15, and most Members signed it on August 2. [395]

None of this denies Jefferson the achievement of converting what could have been a mere statement of governmental separation into a profound expression of what would in later years become the American idea of a polity: "that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness" (surely, the first time in history that the possibility of being happy became a political issue); "[t]hat to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed."

When it was learned that both men had died on the same day, and on the fiftieth anniversary of the supposed signing of the Declaration, much of the public saw in the event, in the words of John Quincy Adams--John  **213**  Adams's son, the sixth president of the United States and a member of Jefferson's political party--the "visible and palpable marks of Divine favor." [396]

The Adams-Jefferson friendship, begun in 1776, had withstood Adams's defeat of Jefferson in the presidential election of 1796, but each was so offended by the conduct of the other in 1800 and 1801 that they broke it off. [397]  In 1811, after Jefferson had left politics, Benjamin Rush, who also signed the Declaration, visited Adams and provoked him into saying, "I always loved Jefferson, and still love him." [398]  Rush made sure that Jefferson learned of this remark, and Jefferson wrote to Rush, "This is enough for me. I only needed this knowledge to revive towards him all the affections of the most cordial moments of our lives." [399]  Adams wrote to Jefferson, "You and I ought not to die before we have explained ourselves to each other." [400]  Thereafter, living 500 miles apart, Adams and Jefferson communicated often through letters that constitute "one of the most remarkable literary exchanges in American history." [401]  They argued as friends about philosophy, metaphysics, religion, science, political theory, and history--until they died on the same Fourth of July. [402]

## C. Between Chase and Andrew Johnson

The Chase trial was such a disagreeable and convoluted affair, tying up the Senate and preventing legislation, that one Senator wrote that "[a]ll parties appear to wish it had never been commenced--I believe we shall not hear of another very soon." [403]  Twenty-five years passed before the House impeached another federal officeholder.

James H. Peck, a district court judge in Missouri, was impeached in 1830 [404]  after sustained lobbying by a lawyer he had held in contempt. [405]  A substantial part of Peck's docket was made up of lawsuits to settle ownership of individual parcels within the Louisiana Purchase. The land had been subject to three sovereignties (France, Spain, and the United  **214**  States) as well as three different land tenure regimes, and in many cases nobody really knew who owned what. [406]  In the first such lawsuit to go to trial, Peck had made rulings suggesting that he was likely to decide most of these cases contrary to the interests of certain claimants, who happened to be wealthy and influential. [407]  The lawyer involved had represented the losing party in that lawsuit and had appeared in a third of the cases yet to be tried. [408]  Upset with the outcome of the first trial, the attorney published an article criticizing Peck's rulings. On the ground that the article misrepresented what Peck had decided, [409]  Peck held the lawyer in contempt, had him incarcerated for twenty-four hours, and suspended him from practice in his court for eighteen months. [410]  The ostensible controversy was whether Peck had abused his power, but the subtext was the desire of influential and worried claimants to replace Peck with a judge more to their liking. [411]

For the first time in a Senate impeachment trial, the House managers were a bipartisan group--four Democrats and one Federalist. [412]  By this time, Jefferson's party had evolved into the Democratic Party; Andrew Jackson, considered the first Democratic president, held that office from 1829 to 1837. The Democrats dominated the Senate, with thirty-six of forty-eight seats. [413]  Twenty-one Senators voted to convict: eighteen Democrats, two Whigs, and a Federalist. Twenty-two Senators voted

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   21

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 367 of 553 PageID #:  772

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

to acquit: fifteen Democrats, three Whigs, two National-Republicans, and two Federalists. [414] Although powerful interests worked to oust Peck, they were economic interests and not partisan ones.

Not only were the Peck impeachment and trial nonpartisan, they were also principled. Economic interests, which considered the accused judge inconvenient, did not succeed in replacing him with someone more pliable. At the same time, Peck had vindictively abused the contempt power, and the law was immediately changed to prevent similar abuses in the future. Future President James Buchanan led the House managers in the impeachment process. Like the managers in the Chase impeachment, **\*215** Buchanan returned to the House upset with the result. Unlike them, he did not introduce legislation to punish the Senate or make it easier to remove judges. Instead, he introduced legislation, still in effect today, restricting federal civil contempt to conduct that more directly disrupts a court and its authority. [415]

In 1862, West H. Humphreys was impeached and convicted. [416] A federal district judge in Tennessee, Humphreys joined the rebellion after the Civil War began and accepted a Confederate judgeship without bothering to resign from the federal bench. [417] The fourteen other federal judges who joined the Confederacy had resigned from the federal bench. [418] In fact, Humphreys was "the only officer of the U.S. government who failed to resign after shifting his allegiance to the Confederacy during the Civil War." [419] A person in rebellion against the federal government cannot be allowed to continue to hold a federal judgeship, and when the Union armies recaptured Tennessee, Lincoln would not have been able to appoint a replacement judge unless the Senate removed Humphreys from office. [420] He is the only impeachment defendant ever to be convicted by a unanimous vote in the Senate. [421]

During the period between the Chase impeachment and President Johnson's impeachment in 1868, at least two and perhaps four federal judges resigned to avoid impeachment trials. William Stephens, a district court judge in Georgia, resigned in 1818 after a House Judiciary Committee investigation into allegations, which are not specified in the records available today. [422] Thomas Irwin, a district judge in Pennsylvania, resigned in 1859 during an impeachment investigation by the House Judiciary Committee, also into allegations not specified in the records now available. [423] Replacements for two other judges were appointed in the **\*216** context of impeachment investigations, but it is not clear whether the vacancies came about through death or resignation. A judge replacing Peter B. Bruin of a Mississippi territorial court was appointed after the House in 1808 authorized an investigation into allegations of drunkenness and neglect of duty. [424] The president appointed another replacement judge in 1841, to fill the Louisiana district court judgeship held by Philip K. Lawrence, after a select House committee recommended impeachment on grounds of drunkenness, corruption, and abuse of power. [425] During the same period, ten other judges were investigated, or referred for investigation, by House committees without resulting impeachments. [426] In all fourteen of these proceedings, the sketchy records available do not contain any suggestion that the House utilized impeachment as a partisan political weapon.

Although the period from 1805 to 1862 might seem to be one in which the impeachment clauses in the Constitution were forgotten--with only Peck's impeachment getting to the Senate in half a century--the picture looks very different when one compares the number of House impeachment investigations of federal judges, for example, with the size of the federal judiciary at the time. Because the federal judiciary was tiny compared with today's bench, a handful of investigations could have a substantial impact. During the first decade of the nineteenth century, the House conducted impeachment investigations involving 13% of the judgeships **\*217** judgeships, and during the 1820s, the House investigated 11% of the judgeships. [427] Except for the 1870s, when 11% of the judgeships again were investigated, the figures for the other decades in the nineteenth century never exceed 6%. [428] But by modern standards, that was still high. In the 1920s and 1930s, the House investigated, respectively, 4% and 3% of the judiciary. [429] In every other decade of the twentieth century, the rate was less than 1%, and in several decades it was zero. Although it is startling to contemplate decades in which one in every eight federal judgeships was involved in an impeachment investigation, it is also startling to contemplate decades in which the House did not investigate anybody, though it is difficult to believe that corruption during those periods had become extinct. Certainly, these figures illustrate how erratically impeachment and impeachment investigations have been used--or, more accurately, overused in some periods and underused in others.

**D. Johnson**

APPENDIX - 366

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 368 of 553 PageID #: 773

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

Although Abraham Lincoln is universally considered the greatest president in American history,[430] his reelection in 1864 was very much in doubt. The Civil War was marked with numbers of deaths unprecedented in warfare as technology outpaced the ability of field commanders to use new weapons decisively. Many newspapers mocked Lincoln as a tyrant for suspending the writ of habeas corpus and as an ineffectual Commander in Chief who could not find a way to end the war. Battles like Antietam, where the two sides together suffered 3,600 deaths and over 17,000 wounded in a single day, staggered the public.

Lincoln did win the 1864 election, but only because he finally found generals who could win, beginning with the capture of Atlanta in September 1864.[431] Uncertain of victory in June 1864, Lincoln and his Republican Party decided to call its national ticket Unionist, and in order to appeal to non-abolitionists in border states, nominated Andrew Johnson, a Southern Democrat with a long record favoring slavery, for vice president.[432] Lincoln also hoped that having a Southern Democrat as vice **\*218** president would be useful in persuading the South to reconcile with the North. When Johnson's state, Tennessee, seceded from the Union in 1861, Johnson, then a Senator, refused to secede with it. When Union troops occupied most of Tennessee, Lincoln appointed Johnson military Governor of the state, and Johnson was most conspicuous as a Southerner loyal to the Union.[433]

Before the war, Johnson owned slaves.[434] In personality, he was the opposite of Lincoln in virtually every respect. Johnson thought and spoke belligerently; could not tolerate disagreement; resented everything that could conceivably be thought of as a slight; and was unable to find common ground with or inspire others, listen with an open mind, or think in subtleties and nuances.[435] When he and Lincoln were inaugurated in March 1865, Johnson was drunk.[436] Five weeks later, John Wilkes Booth shot Lincoln in Ford's Theater, and Johnson became president, inheriting nearly the entirety of Lincoln's second term. "By any measure, he was truly the wrong man, in the wrong place, at the wrong time. His presidency was a catastrophe."[437] For both political and personal reasons, Johnson was in constant conflict with Congress from the day he took the presidential oath until the day he left office. He vetoed twenty-one bills compared to thirty-six vetoes exercised by all the presidents who preceded him combined, and Congress overrode fifteen of his vetoes, more than any other president before or afterward.[438]

The Republicans were an insecure party, founded only six years before Lincoln became president. He was elected in 1860 with only 40% of the popular vote because the Democrats split and ran three separate tickets. During and shortly after the Civil War, the Republicans were a majority party only because whites in the Confederate states were not voting because their states had seceded and were not readmitted for some time after the end of the war. The party had been founded for the purpose of abolishing slavery. A natural extension of that purpose would be to make freed slaves citizens with the right to vote, and they would likely vote for the Republican Party that had freed them. If that did not happen, the Republicans would revert to a minority party because the substantial **\*219** number of Northerners who were Democrats greatly exceeded the few white Southerners who considered themselves Republicans.

In two of the eleven Confederate states--South Carolina and Mississippi-- African Americans had been a majority of the population in the 1860 census, although in that year they were still slaves.[439] In five more-- Virginia, Georgia, Alabama, Florida, and Louisiana--African Americans had been between 43% and 49% of the population.[440] After the Confederacy surrendered in 1865 and the rebellious states began to rejoin the Union, the white vote in many of those states was depressed, as many white voters had not yet been requalified to vote. As they were requalified, the surge in Republican Congressional seats during and after the war would be drastically reversed unless African Americans in the same states were freely voting. The results of Congressional elections preceding the 1868 Johnson impeachment illustrate the point.[441]

**\*220** Table 2

**Congressional Party Divisions After the Elections of 1856 Through 1866**

|  | 1856 | 1858 | 1860 | 1862 | 1864 | 1866 |
|---|---|---|---|---|---|---|
| Senate[442] |  |  |  |  |  |  |
| Republicans | 20 | 26 | 31 | 33 | 39 | 57 |
| Democrats | 41 | 38 | 15 | 10 | 11 | 9 |
| Unionist | 3 | 9 | 4 |  |  |  |
| Other | 5 | 2 |  |  |  |  |
| Vacant |  |  | 1 |  |  | 2 |

APPENDIX - 367

House [443]

| | | | | | | |
|---|---|---|---|---|---|---|
| Republicans | 90 | 116 | 108 | 86 | 136 | 173 |
| Democrats | 132 | 83 | 44 | 72 | 38 | 47 |
| Unionist | | | | 26 | 25 | 18 |
| Other | 15 | 39 | 5 | 2 | 1 | 4 |
| Vacant | | | | | | 2 |

For both parties, the struggle over who would vote in the South was a struggle not just for principles but also for power. Through violence, fraud, and repressive state statutes enacted soon after the war, white Southerners were preventing African Americans from voting. The Union army still occupied much of the South, and Congressional Republicans intended to use it to guarantee that African Americans could vote. Johnson, a racist, opposed this. In one message to Congress, he called African Americans unfit to be voters, "corrupt in principles and enemies of free institutions," and "inferior." [444]

The result was a struggle between Johnson, who was still a Democrat and who favored readmitting the rebellious states more or less unconditionally, and Congress, which was dominated by Radical Republicans determined to change the South fundamentally in order to protect newly freed slaves. Johnson frustrated congressional goals at every opportunity. [445] In 1866, Johnson vetoed the Civil Rights Bill, a veto Congress overrode. [446] The bill extended citizenship to freed slaves and **221 guaranteed them the right to vote, make contracts, sue, and testify. [447] Johnson also opposed adoption of the Fourteenth Amendment. [448] He and his Democratic allies tried to demonize his opponents in Congress by calling them Radical Republicans; but they wore the phrase as a badge of honor. [449]

In 1866, Congress reduced the number of Supreme Court Justices to eight, apparently to deprive Johnson of an opportunity to fill a vacancy [450] -- roughly the reverse of Franklin Roosevelt's court-packing plan. [451] To prevent Johnson from replacing Radical Republican officers in the executive branch with persons more amenable to his philosophy, Congress passed the Tenure of Office Act in 1867. [452] The act provided that no executive branch official confirmed by the Senate could be dismissed during the term of the president who appointed him and for thirty days after that term ended without the consent of the Senate. [453] If a president dismissed an official covered by the Act without the Senate's consent, the president was guilty of a crime punishable by imprisonment for up to five years as well as a fine. [454] The Act also declared that such a dismissal would be considered a "high misdemeanor"--clear warning of what Congress intended to do if Johnson removed any of his Cabinet members from office.

Johnson inherited his Cabinet from Lincoln. Congressional Republicans intended to limit Johnson's power by restricting his ability to replace subordinates. They were most concerned about Edwin Stanton, Lincoln's and Johnson's secretary of war and the leading Radical in the Cabinet, whose department controlled the Union army still in the South. Stanton was a complex person who had Lincoln's trust and Johnson's **222 respect but did not believe he needed to take orders from Johnson. [455] The Tenure of Office Act made him unsuperviseable. Because Lincoln appointed Stanton during his first term, Johnson argued, as a matter of ordinary statutory interpretation, Stanton was not protected by the Act. [456]

"The whole Cabinet, especially Stanton, called the act unconstitutional and advised Johnson to veto it," which he did, on the ground that a president cannot satisfy his constitutional duty to faithfully execute the law if he is prevented from dismissing unsatisfactory subordinates. [457] Congress overrode his veto by very large margins in both Houses. [458] The Tenure of Office Act was a large step in the direction of parliamentary government, in which the executive branch as a whole (a Cabinet) and individuals within the executive branch (a minister, for example) serve at the pleasure of the legislative branch. The Act did not give Congress the power to remove officials, although Congress could have used the power of impeachment for that purpose, as the British House of Commons did until it acquired the power of removal through a vote of no confidence.

Johnson knew the Tenure of Office Act was unconstitutional, but he made that point in a manner guaranteed to inflame Congress. First, in summer 1867, Johnson suspended Stanton, which the Act permitted him to do when Congress was not in session, and he appointed General Ulysses S. Grant as acting secretary of war. [459] Both the North and Congressional Republicans viewed Grant as the general who had saved the country, but he was far less of a Radical than Stanton. The Act gave the Senate the authority to disallow a suspension when it came back into session. When the Senate reconvened on January 13, 1868, it did so. [460] Grant immediately resigned as Acting Secretary, and gave the office keys back to Stanton, who barricaded himself there for weeks. [461]

APPENDIX - 368

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 370 of 553 PageID #:  775

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

**\*223**  Johnson then tried to create an army unit, located in and around Washington, that he could control directly himself. On February 6, Johnson ordered Grant, who had reverted to his role as the highest general in the army, to form an Army of the Atlantic under the command of General William T. Sherman. [462]  Sherman was a solid racist and sympathetic to Southern whites despite his tactics during the war. [463]  On February 13, Johnson sent the Senate a nomination to promote Sherman to the rank of General of the Army, the same rank as Grant's. [464]  "Sherman was thunderstruck" and declined the command. [465] He wrote to his brother, a Republican Senator from Ohio, that "[t]he President would make use of me to begat violence." [466] On February 21, Johnson fired Stanton. [467]

Three days later, the House impeached Johnson by a vote of 126 to 47. [468]  With one exception, the articles of impeachment charged him with violating the Tenure of Office Act. [469]  The exception accused him of trying "to impair and destroy the regard and respect of all the good people of the United States for the Congress . . . and to excite the odium and resentment of all good people of the United States against Congress" and of "mak[ing] and deliver[ing], with a loud voice, certain intemperate, inflammatory, and scandalous harangues [with] loud threats and bitter menaces . . . against Congress" and the statutes it had recently enacted. [470]

**\*224**  Radical Republicans in the House had been itching to impeach. They actually tried to impeach Johnson in 1867, but failed by a vote of fifty-seven to one hundred and eight. [471]  And on January 30, 1868--a little more than three weeks before they actually did impeach Johnson--the House ordered an impeachment inquiry concerning a Supreme Court Justice who could not, from the evidence before the House, be identified. [472]  The totality of the evidence, in fact, was the following paragraph published in a newspaper story:

> At a private gathering of gentlemen of both political parties, one of the justices of the Supreme Court spoke very freely concerning the reconstruction measures of Congress, and declared in the most positive terms that all these laws were unconstitutional, and that the court would be sure to pronounce them so. Some of his friends near him suggested that it was quite indiscreet to speak so positively, when he at once repeated the views in a more emphatic manner. [473]

This was hardly an impeachable offense. If it were, Justice Scalia would have been impeached after he publicly took a position concerning the 2004 Pledge of Allegiance case before it had been argued in the Supreme Court. [474]  Even if a Justice had in fact prejudged an issue in this way, the proper remedy would have been recusal from cases where that issue arose. No such cases had reached the Supreme Court, and thus no opportunity to recuse had arisen. But the House voted to investigate anyway, by a vote of ninety-seven to fifty-seven. [475]  On June 18--after Johnson had been acquitted in the Senate--the relevant House committee asked for authorization to terminate the investigation into the unidentified Supreme Court Justice. [476]  The House agreed by voice vote and without debate. [477]  The available records do not reveal whether the committee was unable to learn the Justice's identity (thought to be Justice Stephen Field), [478]  or the accuracy of the newspaper story, or whether, after Johnson's acquittal, the House had tired of impeachment, or whether the  **\*225**  House was no longer worried about whether Reconstruction legislation might be declared unconstitutional.

Johnson's Senate trial began on February 25. [479]  Johnson's lawyers provided several key defenses: (1) that the Tenure of Office Act was unconstitutional; (2) that it did not protect Stanton (who was appointed during Lincoln's first term); (3) that Johnson fired Stanton to test the constitutionality and interpretation of the statute in court; and (4) that the impeachment article that complained about his views of Congress violated his First Amendment rights. [480]  In May, the trial adjourned for a few weeks to permit Senators to attend the Republican Convention, which nominated Grant for president. [481]  On May 26, the Senate reconvened and acquitted Johnson by a vote of thirty-five for conviction to nineteen against, one vote short of the two-thirds necessary to convict. [482]  All the votes to convict were Republican, although seven Republicans voted to acquit. [483]  "The closeness of the vote may be deceiving," according to Trefousse, a leading historian of Johnson's impeachment. "Considerable evidence exists that other senators [who voted to convict] stood ready to vote for acquittal [instead] if their votes had been needed." [484]

APPENDIX - 369

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 371 of 553 PageID #:  776

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

Johnson's impeachment is remembered as the ultimate use of the procedure as a partisan political weapon. It took to extremes tendencies that dominated three of the five impeachments that preceded it. And some of the participants had much to gain personally from the outcome. Throughout, everyone expected Grant to be a candidate for president in 1868. Because Johnson became president on Lincoln's death, and because no procedure existed for filling a vice-presidential vacancy (later supplied by the Twenty-Fifth Amendment), under the law of presidential succession at the time, the president pro tempore of the Senate, Benjamin Wade, would become president if Johnson were convicted. Although the propriety of Wade's sitting with the other Senators as a judge in Johnson's trial was questioned at the time, he was permitted to do so. [485]  When a president is impeached, the chief justice presides at the Senate trial, and Chief Justice Salmon Chase did so in this instance, even though it was well **226** known that he wanted to run for president. [486]  Chase had even tried to outmaneuver Lincoln and gain the presidential nomination in the 1864 Republican Convention. [487]

It was obviously in Wade's interest that Johnson be convicted because that would make Wade president immediately. But it was in Grant's and Chase's interest that he be acquitted. If Wade became president, he would be in a much stronger position to win the 1868 presidential election. But at the same time, both Grant and Chase had to avoid alienating the Radicals because neither could be nominated for president by the Republican Party if the Radicals opposed them. It is unclear how many of the seven Republicans who voted to acquit Johnson did so in order to prevent Wade from gaining this advantage. If that was their motive, they would have needed to hide it because Wade would remain a powerful Senator with whom they would have to work. [488]  Similarly, it is unclear to what extent House Republicans who voted to impeach Johnson were motivated by a desire to give Wade a position of strength over Grant and Chase in the 1868 presidential election.

Later in 1868, after his acquittal, Johnson tried but failed to get the Democratic nomination for president. [489]  He returned to Tennessee and failed to be elected Senator in 1869. [490]  He ran unsuccessfully for other offices until he was elected Senator and returned briefly in 1875 to the body that nearly convicted him seven years before. [491]  He died later that year. [492]

Grant was elected president as a Republican in November 1868. Immediately after taking office, he asked Congress to repeal the Tenure of Office Act. Johnson was no longer president, and both Grant and Congress thought similarly about Reconstruction. Instead of completely repealing the act, Congress rewrote it by deleting the punishments for a president's violation of the act but preserving the Senate's power to overrule a president's dismissal. [493]  In 1872, Congress enacted another statute providing that certain postal officials, including some local postmasters,  **227**  could be dismissed only with the consent of the Senate. [494]  In 1887, Congress repealed the Tenure of Office Act in its entirety.

The postal statute remained in place until 1926, when it came before the Supreme Court in an appeal by a dismissed postmaster in Myers v. United States. [495]  The Solicitor General did not defend the statute but instead argued that it was unconstitutional-- a rare event in the history of the Solicitor General's office. [496]  Chief Justice Taft wrote the Court's seventy-two page opinion, which struck down the statute as a violation of the Separation of Powers doctrine.

### E. The Era of Nonpartisanship and Bipartisanship

After 1868 and through the 1980s, most impeachments were nonpartisan, although beginning in 1968, extremely partisan impeachments were threatened and occurred.

### 1. Belknap to Hoover

Secretary of War William Belknap resigned in 1876, "two hours before the House voted to impeach him" for corruption in office. [497]  By a vote of thirty-seven to twenty-nine, the Senate concluded that it still had jurisdiction, despite his resignation. [498]  Belknap refused to defend himself, [499]  perhaps because his lawyers predicted from the jurisdictional vote that the two-thirds majority needed for conviction would not materialize. That is exactly what occurred, though most of the Senate thought him guilty. [500]  It is impossible to know from the vote how many of the Senators voting to acquit did so because Belknap had already resigned. [501]

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.          26

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 372 of 553 PageID #: 777

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

In 1872, the House voted to impeach Mark Delahay, a district court judge in Kansas, for drunkenness and corruption.[502] But he resigned before **228 the House could present articles of impeachment to the Senate.[503] Almost the same thing happened after the House impeached George English, a district court judge in Illinois, except that English resigned at the beginning of his Senate impeachment trial--after the House had presented the impeachment articles--on charges of corruption, favoritism, and abuse of power; the House managers withdrew the articles of impeachment.[504]

Charles Swayne, a district court judge in Florida, was impeached in 1904, which the Florida state legislature had twice petitioned the House to do.[505] He was a Republican, appointed by Republican President Benjamin Harrison.[506] Politically, Florida was a Democratic state at the time. The House that impeached Swayne included 207 Republicans and 178 Democrats, and the initial vote to impeach was 198 to 61, suggesting bipartisanship.[507] But after the impeachment vote the House appointed a committee to draft articles of impeachment--an odd and no longer used procedure, which has the defect of asking Representatives to vote for an accusation in principle and then approve the wording of it later.[508] When the articles of impeachment eventually were submitted to the House, the votes on each article of impeachment were much closer--165 to 160, 162 to 138, and 159 to 136-- and had become partisan, most of the yeas being Democratic and most of the nays being Republican.[509] In the Senate, Swayne was acquitted, and none of the articles got even a majority of the votes, much less the two-thirds required for a conviction.[510]

The articles accused Swayne of improprieties involving railway travel, filing false expense accounts, not living inside his judicial district (which the law, at that time, required), and improperly sentencing people for **229 contempt of court.[511] These are too insignificant to motivate a state legislature to petition Congress twice to remove a federal judge. None of the impeachment scholars who has written about Swayne has fully considered the position of a Republican federal judge in a Southern state with a large African-American population[512] During the last decade of the nineteenth century and the first decade of the twentieth. Henry Cabot Lodge's National Election Bill[513] failed of enactment in 1890, and Southern whites escalated the disenfranchisement of African-American voters through intimidation and fraud and eventually through new statutes and state constitutional provisions that made it extremely difficult if not impossible for African-Americans to vote in the South[514] until passage of the Voting Rights Act in 1965.[515] When African Americans were able to vote in the South, they largely voted Republican. The closest any impeachment scholar comes to recognizing this context is a single comment by Bushnell--not mentioning race or the final loss of rights gained during Reconstruction--that Harrison had nominated Swayne "to ensure swift and firm hearing of cases stemming from election frauds in Florida . . . allegedly committed by the Democratic party,"[516] and because he had enforced the law, "the impeachment of Judge Swayne was made a party issue by Democrats."[517]

**230 In some sense Democrats used impeachment as a political weapon against Swayne. Democrats had looked hard for pretexts to oust a judge who had offended them by enforcing the law in political cases. But this was not of the same character as the impeachments of Blount, Pickering, Chase, Johnson, or Clinton. Swayne was an obscure trial judge in what was then almost an entirely rural state. Democrats were trying neither to wound the Republican Party nationally nor win a national political or constitutional confrontation.

Robert Archbald of the U.S. Commerce Court (which existed for only three years)[518] was impeached in 1912 and convicted by the Senate in 1913. "Archbald's case . . . followed the modern model of a largely nonpartisan impeachment" after he was accused of a wide range of corruption.[519] In the 1930s, Jacobus tenBroek wrote an article trying to show, among other things, that the Archbald impeachment was an attempt by President William Howard Taft's enemies to embarrass Taft because "the Democrats persistently voted against Archbald, and they were continuously supported by the Progressives and the adherents of Theodore Roosevelt"[520] right after Taft was defeated for reelection by Woodrow Wilson, a Democrat, and Roosevelt, a third-party candidate. The numbers can be looked at as tenBroek describes them, but that presents a misleading picture. First, the Senate trial began on December 3, 1912,[521] a month after Taft was soundly defeated. Second, the votes for conviction were overwhelming. The Senate convicted Archbald on five articles of impeachment by votes of sixty-eight to five, sixty to eleven, fifty-two to twenty, sixty-six to six, and forty-two to twenty, acquitting him of other charges.[522] And third, only five Senators voted on every charge to acquit; one was a Democrat, and two were the Senators from Archbald's home state.[523] Every other Senator thought he was guilty of at least one of the charges.

APPENDIX - 371

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 373 of 553 PageID #:  778

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

**\*231**  Harold Louderback, a district court judge in California, was impeached in 1932 and acquitted by the Senate in 1933. The House investigating committee recommended censure rather than impeachment, but the House voted to impeach anyway. [524] Of the five articles of impeachment, four failed to get even a simple majority in the Senate, and the fifth failed for lack of a two-thirds majority. [525]  The San Francisco Bar Association had asked the House to investigate Louderback for corruption in the appointment of receivers in bankruptcy cases. [526]  Democratic Senators were split between conviction and acquittal, and Republicans mostly voted for acquittal. [527]

Several other federal judges resigned during this period to avoid impeachment. Charles Sherman, an Ohio district court judge, resigned in 1873 during an impeachment investigation in the House on charges of corruption. [528]  Richard Busteed, a district court judge in Alabama, resigned in 1875 after the House Judiciary Committee recommended impeachment for failing to hold court regularly and for manipulating his judgeship for self-enrichment. [529]  Edward Durrell, a Louisiana district court judge, resigned after the House Judiciary Committee recommended impeachment in 1875 for irregularities in supervising bankruptcy cases. [530]  Cornelius Hanford, a district court judge in Washington State, resigned in 1912 during a House investigation into allegations of corruption and drunkenness. [531]  Daniel Wright of the Supreme Court of the District of Columbia resigned in 1914 during a House Judiciary Committee subcommittee impeachment investigation on corruption and miscellaneous other charges. [532]  And Francis Winslow, a district court judge in New York, resigned in 1929 on the day a House Judiciary Committee subcommittee was to begin impeachment hearings on allegations of corruption. [533]

In 1921, the House referred to the Judiciary Committee an impeachment resolution accusing Kenesaw Mountain Landis, a district judge in Illinois, of "neglecting his official duties for another gainful  **\*232**  occupation not connected therewith." [534] In 1920, Landis had accepted a job as the first Commissioner of baseball--which paid $50,000 a year compared to a federal judge's $7,500 salary [535] --and did not think he needed to resign from the bench. After a public outcry, and after an impeachment investigation began, Landis rethought that position and resigned from the less lucrative and, some would say, the less intriguing of the two jobs. [536]

From 1931 until he left office in March 1933, Herbert Hoover was probably the most reviled of all presidents, and his handling of the Great Depression was widely felt to have exacerbated a national disaster with enormous human suffering. Millions of people who had lost their jobs were reduced to living in shacks or tents in communities of the homeless called Hoovervilles. At no other point in American history have so many people felt that they were being personally and directly harmed by the failures of a single president. The enduring image of the Great Depression is one of destitute people selling apples on street corners. Hoover was so isolated from what was happening that he actually believed that these people were doing well financially, that they had not become unemployed as factories and other businesses went bankrupt--but instead, in Hoover's words, had "left their jobs for the more profitable one of selling apples." [537]

Even though the economy was in free fall from late 1931 through the end of Hoover's term, no one seriously thought of impeaching him. He could not have been convicted. Although the Democrats controlled the House of Representatives during this period, the Republicans barely held onto the Senate. [538]  There is no evidence that the Democrats even considered using impeachment as a political tactic to harass and embarrass Hoover and his party in preparation for the 1932 elections, as the Republicans in 1998 and 1999 used impeachment to harass and embarrass Clinton and the Democrats. In December 1932, a lone Congressman moved for Hoover's impeachment. A month earlier, Franklin D. Roosevelet had overwhelmingly defeated Hoover, but Hoover's term still had four months to run because the Twentieth Amendment, shortening the  **\*233**  time between election and inauguration, had not yet been adopted. The House quickly and overwhelmingly rejected the motion. [539]

In the years since 1868, impeachment had largely lost its political purpose and was used primarily to remove from office deeply unsatisfactory officials. By the 1930s, impeachment had become so nonpartisan that its use as a political weapon seemed to have left everyone's consciousness.

2. 1937

Sometimes, the thing that is most revealing is what did not happen, like the dog that did not bark, [540] or the impeachment that was never attempted or threatened.

APPENDIX - 372

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 374 of 553 PageID #:  779

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

In 1928, Hoover was elected president in a landslide. The Great Depression began the following year. By November 1932, when Franklin D. Roosevelt defeated Hoover in an even bigger landslide, the economy had collapsed. The week before Roosevelt's inauguration in March 1933, virtually every bank in the United States was closed, and commerce was being conducted by barter. In Roosevelt's first administration, a massive amount of legislation was enacted in attempts to restore prosperity and to stabilize capitalism by adopting the types of social insurance that had long ago been enacted in nearly every advanced European country.

This New Deal resulted from a massive political realignment. The Democrats, who had been a minority party since the Civil War, suddenly became the majority party and remained so for the next two generations. The size and speed of this political tidal wave can be seen in the results of Congressional elections from 1928 through 1938. [541]

**\*234  Table 3**

**Congressional Party Divisions After the Elections of 1928 Through 1938**

|  | 1928 | 1930 | 1932 | 1934 | 1936 | 1938 |
|---|---|---|---|---|---|---|
| Senate [542] | | | | | | |
| Democrats | 39 | 47 | 59 | 69 | 76 | 69 |
| Republicans | 56 | 48 | 36 | 25 | 16 | 23 |
| Farmer-Labor | 1 | 1 | 1 | 1 | 2 | 2 |
| Progressive | | | | 1 | 11 | |
| Independent | | | | | 1 | 1 |
| House [543] | | | | | | |
| Democrats | 164 | 216 | 313 | 322 | 334 | 262 |
| Republicans | 270 | 218 | 117 | 103 | 88 | 169 |
| Farmer-Labor | 1 | 1 | 5 | 3 | 5 | 1 |
| Progressive | | | | 7 | 8 | 2 |
| American-Labor | | | | | | 1 |

The numbers in Table 3 understate Democratic strength because the third-party Senators and Representatives nearly all voted enthusiastically for New Deal legislation. At times, political change happened so fast that party divisions in Congress changed every few weeks. For example, in the November 1930 elections the Republicans retained the House of Representatives by two seats. But before the first day the newly elected Congress convened, nineteen Representatives-elect had died. In special elections to replace them, fourteen of these seats changed hands, producing a Democratic majority in the House not reflected in Table 3.

Roosevelt viewed the Supreme Court with suspicion even before he was elected president. In the 1932 election campaign, he feared that, even if he won, the Republican Party would continue to control the Court. [544] Republican presidents concerned with property rights had nominated seven of the nine Justices then on the Court. Although two of those seven had joined the progressive wing (Harlan Fiske Stone and Benjamin Cardozo), one of the Justices nominated by a Democratic president had become viscerally and reflexively right-wing (James McReynolds). The senior Justice, Willis Van Devanter, had been nominated by William Howard  **\*235**  Taft. In four years as president, Taft had appointed a total of six Justices--more than any other president except George Washington, who appointed the entire first Supreme Court, and Franklin Roosevelt, who was president for longer than anyone else. [545]

Taft had had a profound influence on the entire federal judiciary, and he would rather have been chief justice than president, as he admitted while appointing Chief Justice Edward D. White. [546] At the 1912 Republican Convention, Taft and his campaign manager had asked Warren Harding to make the speech nominating Taft for reelection. [547] After Harding was himself elected president in 1920, Taft successfully lobbied to be appointed chief justice. [548] (Taft is the only person to have headed both the executive and judicial branches of the federal government.) While chief justice, Taft persuaded Harding to nominate Pierce Butler as associate justice. [549] Butler "had the distinction of voting to overturn sixty-nine federal statutes after Franklin D. Roosevelt became president." [550] Taft "then strategized with Butler and the White House staff on how to get Butler confirmed by the Senate." [551] When the next Supreme Court vacancy appeared, Taft dissuaded Harding from appointing Learned Hand. [552]

APPENDIX - 373

While chief justice, he constantly badgered presidents and attorneys general on whom to appoint to any vacancy on any federal court. [553] His only significant failure was when, out of office, he opposed Woodrow Wilson's nomination of Louis Brandeis. [554]

Well aware of all this, Roosevelt and the Democrats viewed the Supreme Court as Jefferson and his allies had viewed the Court and the federal judiciary of their time: as a fortress into which a party soundly defeated in elections had retreated. By 1935, four Justices--James **236** McReynolds, George Sutherland, Pierce Butler, and Willis Van Devanter--consistently voted to strike down New Deal statutes as unconstitutional. Later, they became known collectively as the Four Horsemen of the Apocalypse. [555] Three Justices--Louis Brandeis, Benjamin Cardozo, and Harlan Fiske Stone--generally voted to sustain New Deal legislation. The swing votes belonged to Owen Roberts and Chief Justice Charles Evans Hughes, both of whom frequently sided with the Four Horsemen in 1935 and 1936.

More than any other before or since, this was the Supreme Court that most clearly deserved the designation of "judicial activist." In not much more than a year, it struck down the Railroad Pension Act, [556] the National Industrial Recovery Act (the NIRA, but more commonly known by the initials of the agency it authorized, the National Recovery Administration or NRA), [557] the Frazier-Lemke Farm Mortgage Act, [558] section five of the Federal Home Owner's Loan Act, [559] the Agricultural Adjustment Act (the AAA), [560] the Bituminous Coal Conservation Act, [561] and the Municipal Bankruptcy Act. [562]

The weakest New Deal legislation--both constitutionally, and logically--were some of the emergency bills written and enacted quickly **237** after Roosevelt's inauguration in 1933. Typically, the Four Horsemen voted solidly against New Deal legislation and picked up one or both of the swing votes, although with some of the emergency legislation, like the NRA, the Justices' vote to nullify was unanimous. The NRA was clearly beyond the constitutional power of Congress to legislate. It was also dreadful economic policy. The NRA was designed to raise industrial wages for those who were employed. At a time of epidemic business failures and consequent unemployment, its effect--had it been permitted to continue--would have been to drive even more companies out of business and put even more people out of work while raising the prices of goods and services that consumers already could not afford to buy. The AAA had similar defects in regard to food and agriculture. It is fashionable today among neoclassical economists to blame Roosevelt for this, but economic knowledge in the 1930s was so primitive (even the available economic statistics could not meet modern standards for accuracy), and the Great Depression was so cataclysmic and unprecedented, that the only thing Roosevelt could do was to try several different approaches simultaneously to see which would work. In retrospect, what did work was not regulation of wages and production but instead simple government spending through the Works Progress Administration, the Civilian Conservation Corps, and similar programs, which gave people employment and money to create demand for goods and services. What finally ended the Depression was the largest government spending program in history: the Second World War. But, during the Depression nearly everyone feared that if the government spent too much, it would collapse into insolvency.

New Deal legislation of a more permanent nature was more thoroughly thought out than the NRA and the AAA. Much of it had been proposed before Roosevelt became president and had been refined through years of vetting by legislators and academics associated with the Progressive movement that preceded the New Deal. These more carefully written statutes not only accomplished their goals more effectively, but were easier to defend constitutionally. An example was the statute authorizing the Tennessee Valley Authority, which would build dams on the Tennessee River and generate affordable electricity for the middle South, and which the Court did sustain. [563]

But the distinction between emergency legislation meant to stimulate the economy and legislation meant to permanently reform and modernize capitalism is apparent only now in hindsight. Almost nobody understood it at the time. The first wave of New Deal legislation to reach the Supreme **238** Court was made up primarily of emergency statutes, and the Court's reaction was startling. On Black Monday, May 27, 1935, the Court unanimously struck down, on constitutional grounds, legislation in three separate cases. It seemed as though no part of the New Deal was safe. Every time the Justices took the bench to announce any decision involving a statute enacted after Roosevelt's inauguration, the country anxiously waited to find out which part of the New Deal would be struck down or allowed to survive. When Wall Street "stockbrokers heard that Hughes was reading the opinion in Ashwander," on the constitutionality of the Tennessee Valley Authority, "they jumped to the conclusion that it was adverse to the government and began buying utility stocks as fast as they could get their orders filled. . . . Later, when it appeared that the Administration had been sustained, they made frantic efforts to get rid of the stocks they had bought less than an hour earlier." [564]

APPENDIX - 374

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 376 of 553 PageID #: 781

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

Roosevelt was convinced that unless something changed drastically and quickly the entire New Deal--including aspects of government we take for granted today, such as social security--would be struck down by the Supreme Court as unconstitutional, making recovery from the Depression and a modernized capitalism impossible. Essential elements of the New Deal--such as the Social Security Act, [565] the National Labor Relations Act, [566] the Banking Act of 1935, [567] and the Securities Exchange Act of 1934--were being litigated in the lower courts and had not yet reached the Supreme Court. After a Cabinet meeting in December 1935, Harold Ickes, Roosevelt's Secretary of the Interior, wrote in his diary, "Clearly, it is running in the President's mind that substantially all of the New Deal bills will be declared unconstitutional by the Supreme Court. This will mean that everything that this Administration has done of any moment will be nullified." [568] Roosevelt considered several options, among them limiting the Court's jurisdiction by statute, amending the Constitution to provide the federal government with the powers the Court had held it lacked, and amending the Constitution to create a procedure through which Congress could reenact nullified statutes and constitutionalize them. [569] The Depression had already brought the National Socialist Party to power in Germany and had brought Fascist and Communist parties near power **239** elsewhere in Europe. [570] When Roosevelt first explained to a meeting of Cabinet officials and Congressional leaders what he intended to do about the Supreme Court, he said: "When I retire to private life on January 20, 1941, I do not want to leave the country in the condition Buchanan left it to Lincoln [on the eve of the Civil War]." [571]

On January 20, 1937, Roosevelt was inaugurated for his second term as president. On February 5, he asked Congress to enact legislation to make the judiciary generally more efficient, one aspect of which--treated as a minor one in Roosevelt's message--would be to add an additional Justice to the Supreme Court whenever an existing Justice passed the age of 70. [572] Roosevelt's slyness in packaging the court-packing plan in a proposal on judicial efficiency was quickly seen as deceptive. The whole proposal was really intended to achieve a single goal: Roosevelt needed at least a three-vote margin in the Supreme Court. If the number of Justices remained at nine, he would have been satisfied with six-to-three votes in his favor, but he viewed five-to-four victories as, in his own words, "too uncertain." [573]

Almost a quarter-century before, McReynolds himself had proposed the concept on which Roosevelt's court-packing plan was based. In Justice Department files, Administration lawyers had found a forgotten proposal drafted by McReynolds in 1913 or 1914, when he was Woodrow Wilson's Attorney General. [574] The McReynolds plan would have applied to the lower courts and not to the Supreme Court, but the idea was the same: when a federal judge did not retire at a stipulated age, the president could appoint another judge to supplement and in some ways supplant the one who would not retire. [575] Homer Cummings, Roosevelt's attorney general, recommended it to Roosevelt, who loved the irony of using McReynolds' own idea against the Four Horseman. [576] A "seething rage had been building in Roosevelt for a long time." [577] Even though he had won massive electoral landslides, everything he had accomplished was being **240** dismantled by a handful of unelected judges. Perhaps his outrage and the pleasure of the irony is why neither Roosevelt nor Cummings noticed that the court-packing plan was crude, impractical, and certain to offend most people's sense of what is fair and appropriate. [578]

Rejiggering the number of Supreme Court Justices to gain a partisan advantage had a great deal of historical precedent. In the Constitution's first century, politicians continuously fiddled with the size of the Court so they could pack it:

> John Adams, as his Presidency came to an end, had Congress pass a law to reduce the size of the court from six to five members, to take effect when the next vacancy occurred, so that Thomas Jefferson, his successor, would not have an opportunity to fill a vacancy. When Jefferson was President, he was able to make appointments by having the Court restored to six justices and then raised to seven. In 1837, the Court was increased to nine. In 1863, to prevent the Court from blocking Lincoln's war policies, the Court was increased to ten, to, in effect, pack the Court in Lincoln's favor. In 1866, when there were two vacancies . . ., the Congress reduced the Court's membership from ten to eight so that President Andrew Johnson might not be able to fill the two empty seats. In 1869, the eight-man Court had one vacancy. It also [had held] unconstitutional the Legal Tender Act, by which the Union had financed the Civil War. Congress increased the Court's size to nine, giving President Ulysses S. Grant two appointments . . . . As soon as his two appointees took their seats on the Court, the Court voted again on the Legal Tender Act and approved it. [579] The primary difference between all these precedents and Roosevelt's plan was the formula for increasing the size of the Court, which McReynolds had unwittingly supplied. But Roosevelt's plan stunned Congress and the public. After intense political maneuvering, it died through a procedural vote in the Senate in July 1937--a humiliation for a president who had just won an historic landslide, and whose party had huge majorities in both Houses of Congress. Roosevelt personally suffered a loss of public trust and credibility

APPENDIX - 375

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 377 of 553 PageID #:  782

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

because the court-packing plan was widely seen as reflecting bad political judgment, disingenuousness, and an appetite for power in conflict with the checks and balances inherent in the Constitution.

But Roosevelt ultimately got what he wanted, even if he appeared to lose. Folklore has it that Hughes and Roberts were so intimidated by the **\*241** 1936 Democratic landslide, or by the court-packing plan, or both, that they switched sides and began voting with Brandeis, Cardozo, and Stone--the "switch in time that saved nine." The switch is generally thought to have begun when Roberts changed his position on whether a government could constitutionally require employers to pay a minimum wage. In the spring of 1936, the Court had struck down a New York statute requiring employers to pay a minimum wage to women. [580] The statute was not part of the New Deal, but the Court's reasoning replicated the rationale in some of its decisions striking down New Deal legislation. In the fall, the Court had granted certiorari to review a nearly identical Washington State statute. The case was argued in December 1936, and the Justices first discussed it in conference around the turn of the year. The Court again reconsidered the case in conference on February 6, the day after Roosevelt's court-packing proposal was sent to Congress. [581] In both conferences--before and after the court-packing plan had been announced--Roberts voted to sustain the Washington statute. [582] The decision was announced on March 29. [583] More cases quickly followed in which the Court sustained the **\*242** National Labor Relations Act [584] and the Social Security Act [585] in April and May 1937. From then on, "the Supreme Court upheld every New Deal statute that came before it." [586]

The switch alone would not have been enough to satisfy Roosevelt or to persuade Congress that the crisis had passed. Van Devanter announced his retirement in May 1937. [587] He was able to do so only because a few months earlier Congress had enacted a statute guaranteeing retiring Justices for the rest of their lives their salary at the time of retirement, in lieu of a pension. [588] The bill had been introduced in 1935 but failed on the floor of the House. [589] The Administration wanted this bill to pass [590] but failed to make it a priority. When Roosevelt announced the court-packing plan, Hatton Sumners, the chair of the House Judiciary Committee, resuscitated the retirement bill and got it enacted at warp speed. Sumners was joined by other legislators who opposed packing the Court and wanted a different solution. [591] The bill cleared the House five days after Roosevelt's **\*243** announcement of the court-packing plan, and the Senate passed it soon thereafter; Roosevelt signed it into law on March 1 [592] -- a little more than three weeks from resuscitation to presidential signature.

Van Devanter timed his retirement announcement for the morning of the day on which the Senate Judiciary Committee was to vote on the court-packing plan. His announcement helped persuade some members of the committee that the Court need not be packed. [593] Whether because of Van Devanter's retirement or not, the committee voted to recommend that the Senate not approve the plan. [594] Sutherland's retirement the following January, [595] created a second vacancy for Roosevelt to fill. Eventually, Roosevelt appointed a total of eight Supreme Court Justices and promoted a ninth to Chief Justice. [596] Supreme Courts that have left their mark on history are usually known by the name of the Chief Justices who led them--the Marshall Court, the Taney Court, the Warren Court, the Rehnquist Court, and so on. The only exception is the one Roosevelt appointed, which we know as the Roosevelt Court.

Remarkably, in this titanic clash between the Supreme Court and the most popular president since 1820, no one seems seriously to have contemplated using impeachment as a partisan political weapon. There is no evidence that anyone in the Roosevelt Administration or in Congress looked for impeachable misdeeds in the public acts of Justices, as the Jeffersonian party did in the first decade of the nineteenth century, or in their private lives, as the Nixon Administration was to do in 1969 and 1970. [597] None of the leading studies of the court-packing controversy [598] or of the doctrinal evolution of the Supreme Court in the 1930s [599] mention **\*244** any interest in impeachment. Nor do any of the standard histories of the New Deal. [600]

Nobody was interested in impeaching even McReynolds, who nursed scores of hatreds and, like Chase, had alienated through his own intemperate behavior a great many people. If the House had impeached McReynolds, some would have defended him out of duty or for political reasons, but none would have done so out of personal loyalty to him or out of respect for him or his work. It was in his nature to abuse those around him. During the Harding Administration, Justice Clarke expressed a desire to resign partly because "McReynolds had made life on the Court almost unbearable for him by his incessant insolence and personal insults." [601] McReynolds detested virtually all ethnic groups other than his own. [602] He despised Brandeis and

APPENDIX - 376

Cardozo because they were Jewish, and "there is no official photograph of the Court in 1924, because McReynolds would not sit next to Brandeis as protocol required." [603] He especially hated Roosevelt and vowed, "I'll never resign as long as that crippled son-of-a-bitch is in the White House." [604] But after Roosevelt was reelected in 1940, McReynolds finally gave up and announced his retirement eleven days after Roosevelt took the presidential oath of office for an unprecedented third time. [605] No Justice attended McReynold's funeral, [606] although several went to the funeral of his messenger, an African-American who for many years had suffered with great dignity through McReynolds's racist tirades.

Of the four great confrontations among the branches of the federal government, [607] the battle between Roosevelt and the Supreme Court is the only one in which none of the political branches reached instinctively for **245** impeachment as a partisan weapon. One reason was that the events of 1937 occurred deep in the era of almost purely nonpartisan and bipartisan impeachment. A second was that Roosevelt's personal political style was not confrontational. He preferred to lead through flanking maneuvers, goading the public in whatever direction he wanted to go while pretending to follow the consensus he was building. He believed that winning by defeating others was costlier and more distasteful than winning by following an indirect path to his goal. A third reason was that the Democratic landslide of 1936 was massive, the most lopsided since 1820 both in popular votes and in the composition of Congress; it has not been equaled since then. A party in so enviable a position can afford to have the confidence that its problems can be solved without attacking individuals.

In the end, Roosevelt got what he wanted, although historians disagree about how it happened. Some believe that the election, or the court-packing plan, or both, influenced Roberts and, to a lesser extent, Hughes in how they voted, thus causing an abrupt change in constitutional law. [608] Others argue that, even before the election in November 1936 and Roosevelt's presentation of the court-packing plan in February 1937, the Court had been evolving toward what we now think of New Deal and post-New Deal jurisprudence. [609] It is true that some ingredients of the post-1937 doctrine on government regulatory powers appear in embryonic form in some pre-1937 cases. But the rationalizations in judicial opinions are often justifications for what judges want to do rather than their real reasons for deciding, and one of the more effective methods of justifying a court's decision is to write the opinion so that it appears to be grounded in past practice as much as possible. Academically formalistic analysis is thus a limited and only partially reliable tool for discovering what judges are really up to. Moreover, Roberts never satisfactorily explained the 180-degree somersault he made between the two state minimum wage cases, and even he might not fully have understood why he did what he did. Perhaps the most we can know is that the timing proves that Roberts could **246** not have been influenced by the court-packing plan, which was announced after he stated his position in conference, and that he might have been influenced by the election, which happened before he did so.

It is plain, however, that the effect of the retirement bill has been underestimated. Van Devanter and Sutherland hinted that they would have retired immediately after it became law. But to avoid giving the impression that the court-packing plan had intimidated them, they delayed their retirements. [610] The Court might have been "nine old men," as it was pejoratively dismissed at the time, [611] but the power the Four Horsemen exercised had obscured the fact that at least some of them were very fatigued old men.

3. Ritter

Halsted Ritter, a Republican lawyer in Colorado, moved to Florida in 1925. [612] Four years later, Republican Presdient Calvin Coolidge nominated him for a district court judgeship in Florida. [613] A Republican-dominated Senate confirmed him. Apparently his appointment annoyed Florida politicians and the Florida Bar. Florida was a predominantly Democratic state with memories of the Reconstruction. The annoyance stemmed from having a Republican with no roots to Florida--a "carpetbagger" in Southern speech-- appointed to the federal bench. In 1933, only four years after Ritter assumed the bench, the House began an impeachment investigation. [614] In 1936, Ritter was impeached for allegedly denying a plaintiffs' motion to dismiss their own lawsuit; awarding excessive fees in the same case to his former law partner, who immediately gave money to Ritter; evading income tax; and practicing law while a federal judge. [615] In an overwhelmingly Democratic House, the vote to impeach was 181 to 146. [616] Almost all the votes for impeachment were Democratic. [617] Sixty-three Democrats and eighty-one Republicans voted against impeachment. [618] It appears that Republicans were united against **247** impeachment, but Democrats were free to vote one way or the other, though most voted to impeach.

APPENDIX - 377

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 379 of 553 PageID #:  784

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

Ritter was acquitted of all the articles of impeachment that charged him with criminal activity and was convicted only of the article that alleged that his conduct, as set forth in the other articles, had brought his court "into scandal and disrepute." [619]   On all the articles of which he was acquitted, at least a simple majority--but not a two-thirds majority--voted for conviction. [620]   On each article, most Republicans voted to acquit. [621]   On three articles, almost as many Democrats voted to acquit as to convict. [622]   On the other four articles, Democrats voted to convict by sizeable majorities. [623]

TenBroek argued that the Ritter impeachment could have been motivated by partisan political motives because Ritter was acquitted of the articles charging criminal conduct but convicted of discrediting his court, and because the Ritter trial preceded by ten months Roosevelt's court-packing proposal. [624]   To justify his unsuccessful attempt to get Justice Douglas impeached, [625] Gerald Ford repeated this theory, arguing that in the Ritter impeachment "the criminal charges were admittedly thin," that Ritter was a conservative Republican, and that the impeachment occurred "in the context of F.D.R.'s effort to pack the Supreme Court with Justices more to his liking." [626]

That theory cannot be substantiated by the facts. First, the Senate vote to convict on the first and most important article alleging corruption was fifty-five in favor and twenty-nine against [627] --one vote shy of the two-thirds needed to convict. The tally on the scandal-and-disrepute article was fifty-six to twenty-eight to convict, or exactly two-thirds. A single vote differentiates the two articles of impeachment. On all but one of the other articles, a majority voted to convict. [628]   The straightforward explanation is that one or more Senators thought Ritter was guilty of the corruption alleged in the other articles, but not of the corruption alleged in the first article, and joined in voting to convict on the scandal-and-disrepute article.

 **\*248**  Second, the chronology shows no connection between Ritter and the controversy over the Supreme Court and the New Deal. The first efforts in the House to investigate Ritter began in May and June 1933, [629] at a time when the Supreme Court had not (and could not have) decided any New Deal cases, as Roosevelt and the first New Deal Congress had taken office only a few months earlier. Ritter was impeached by the House in March 1936, [630] and convicted by the Senate in April 1936. [631]   When the Supreme Court invalidated the National Industrial Recovery Act in 1935, [632] Roosevelt expressed his annoyance to the press, [633] and the reaction to those comments was so hostile that Roosevelt said virtually nothing else critical of the Supreme Court until early 1937 [634] --a period that includes the entire time during which Ritter was being impeached and tried. Roosevelt maintained this near silence even from January to June 1936, a time when the Court delivered a string of decisions attacking the New Deal. [635]   During the 1936 presidential election campaign, Roosevelt never mentioned the Supreme Court because he feared that any criticism on his part of the judiciary would permit the Republicans to convert the core election issue from economic recovery into preservation of constitutional checks and balances, which the Republicans were eager to do. [636]   During a period when Roosevelt was afraid even to criticize the Supreme Court in public, it could hardly be true that the Democrats were impeaching and removing an obscure federal judge to bully the Supreme Court.

Moreover, most of Roosevelt's closest advisors were astounded when he proposed his court-packing plan in February 1937--ten months after Ritter had been removed from office. [637]   Congress reacted similarly. James MacGregor Burns, one of the most perceptive Roosevelt scholars, concluded that Roosevelt contemplated doing something about the  **\*249**  Supreme Court as early as 1935 but told only those few people needed to draft the legislation. [638]   Cummings, Roosevelt's attorney general, drafted the plan in secret and without the knowledge of Roosevelt's usual advisors. [639]   When Roosevelt announced the court-packing proposal at a meeting of Cabinet officers and congressional leaders, "the congressional delegation sat as if stunned." [640]   Not only had there been no prior serious congressional interest in impeaching the judiciary, but Roosevelt's plan failed mostly because it surprised and appalled many in Congress. The Senate Judiciary Committee report rejecting the proposal is unique for the rhetoric with which legislators derogated a measure behind which a president of their own party had placed his prestige: the court-packing plan was "an invasion of judicial power such as has never been attempted in this country" [641]   (which was not actually true); [642] it would lead to "the very thing against which the American colonies revolted, and to prevent which the Constitution was in every particular framed"; [643] and "[i]t is a measure which should be so emphatically rejected that its parallel will never again be presented to the free representatives of the free people of America." [644]   These were the same Senators who convicted Ritter.

APPENDIX - 378

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 380 of 553 PageID #:  785

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

Third, Roosevelt's troubles were not with the lower judiciary, but with the Supreme Court, which had been declaring unconstitutional significant parts of the New Deal. Roosevelt never showed any interest in packing the lower judiciary, and never needed to because the constitutionality of any important federal statute would be decided only in the Supreme Court anyway. Ritter himself never held any New Deal legislation to be unconstitutional.

Fourth, given the relatively large number, historically, of federal judges who had resigned in the preceding years during House impeachment investigations for corruption, [645] or who had not resigned and been impeached, [646] there seems to be nothing special or different about Ritter's situation that would suggest to a Supreme Court Justice that Ritter's impeachment was aimed at the Supreme Court. Not counting those on **250** senior status, there were over two hundred federal judges in 1936, [647] and Ritter was an obscure trial judge in what was in 1936 a backwater rural state. None of the leading studies of the court-packing controversy [648] even mentions Ritter.

Finally, the most realistic explanation is that Ritter's appointment irritated people who were locally important in Florida. that they watched him carefully for misbehavior, and that he obliged them by misbehaving. Although the Democrats had a 322 to 103 majority in the House [649] --one of the largest in history--the vote to impeach Ritter was 181 to 146. [650] And although in the Senate the Democrats had a sixty-nine to twenty-five majority [651] --also one of the largest in history--the vote on the only article on which Ritter was convicted was fifty-six to twenty-eight. [652] On most of the other six articles, the margin was much closer. [653]

### 4. Judicial Impeachments After Ritter

Several judges resigned during or just before impeachment investigations. In 1939, Martin T. Manion, Chief Judge of the Second Circuit, was accused of corruption by Manhattan District Attorney Thomas E. Dewey, who demanded that the House impeach. Manson resigned within days, before the House could authorize an investigation. [654] Ferdinand A. Geiger, a district court judge in Wisconsin, resigned in 1939 after House Judiciary Committee hearings on his dismissal of a grand jury before it could issue findings in a major antitrust case. [655] John P. Nields, a district court judge in Delaware, was the subject of House Judiciary Committee hearings on unspecified charges in May 1941; he retired in October of that year. [656] Albert W. Johnson, a Pennsylvania district court judge, resigned in 1945 after a House Judiciary subcommittee recommended impeachment for bribery. [657] The subcommittee found that his decisions were "commonly sold for all the traffic would bear." [658]

**251** Otto Kerner, a court of appeals judge in the Seventh Circuit, was convicted and sentenced to prison for corrupt activities while he was Governor of Illinois before his appointment to the federal bench; he resigned his judgeship before entering prison, avoiding almost certain impeachment. [659] This was the first time a federal judge had been convicted while still holding office; he resigned only after he had exhausted all of his appeals. [660] Robert F. Collins, a district court judge in Louisiana, was convicted in 1991 of bribery, conspiracy, and obstruction of justice, and sentenced to six years and ten months in jail. [661] Although he was imprisoned in 1991, Collins did not resign from the bench (and continued to draw his judicial salary) until 1993. At that point, the chair and the ranking minority member of the House Judiciary Committee jointly introduced a resolution to impeach him. [662] On the other hand, Robert P. Aguilar, a district court judge in California, was convicted in 1990 of disclosing a wiretap, and obstruction of justice, and sentenced to six months imprisonment; in 1993, the Ninth Circuit affirmed the wiretap disclosure conviction, reversed the obstruction of justice conviction, and remanded for resentencing. [663] The House received a resolution to impeach him in 1993 but did not act upon it. [664] Aguilar took senior status in 1996. [665]

Harry E. Claiborne, a district court judge in Nevada, was convicted in a criminal trial of tax evasion. [666] He was sentenced to two years of imprisonment but refused to resign his judgeship, drew his full salary for the two years spent in prison, and threatened to sit behind the bench again and try cases as soon as his imprisonment ended. [667] This was the first time a federal judge had been incarcerated while still holding office. He was impeached by the House [668] and convicted by the Senate [669] in 1986. [670]

**252** Alcee L. Hastings, a district court judge in Florida was indicted for bribery but acquitted. [671] The Judicial Conference certified to the House that there might be grounds to impeach Hastings. [672] Despite Hastings' claims that his prosecution

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 381 of 553 PageID #: 786

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

and impeachment were motivated by racism, the House voted 413 to 3 to impeach. [673] The Senate committee charged with examining the evidence was less persuaded. The Democratic committee chair and Republican vice chair both argued against conviction because of ambiguities and gaps in the evidence. [674] In 1989, the Senate convicted Hastings on the impeachment articles that charged him with conspiring to solicit a bribe, lying under oath, and fabricating evidence. [675] Hastings later ran for election to the House of Representatives and won. [676]

Walter L. Nixon, a district judge in Mississippi, was convicted of perjury in a criminal trial and sentenced to five years in prison. [677] Like Claiborne, he refused to resign after his conviction. [678] And, like Claiborne, he was impeached (in 1988) and convicted (in 1989) while still in prison. [679] Like Hastings, Nixon had been nominated for the bench by a Democratic president, impeached by a Democratic House, and convicted by a Democratic Senate. [680]

By 1974, impeachment had become so non-partisan that Raoul Berger could write that it "has sunk in this country to the ouster of dreary little judges for squalid misconduct." [681]

5. Nixon and Agnew

On June 17, 1972, a security guard at the Watergate complex in Washington noticed a burglary in progress and called police, who arrested **253** five men inside the offices of the Democratic National Committee. [682] The Committee to Re-Elect the President, which was coordinating the reelection campaign of Richard Nixon, had hired them. Six days later, Nixon and H.R. Haldeman, his principal aide, had a private conversation in the Oval Office in which they strategized about how to hide White House involvement in the burglary (this later became known as "the cover-up"). After the burglars were convicted, and before they were to be sentenced, one of them wrote a letter to the trial judge, John Sirica, saying that the burglars had been paid off to keep silent about the White House's role ("the hush money"). Three days later, Sirica read the letter into the record in court before sentencing the burglars to long prison terms, which he offered to reduce if they cooperated with a grand jury investigation of the cover-up.

Because of public suspicion that Nixon's Justice Department could not be relied upon to investigate crimes that might have been committed in the White House, Attorney General Elliot Richardson appointed Archibald Cox, a former Solicitor General, as a special prosecutor with his own independent staff on May 18, 1973. On July 13, Alexander Butterfield, Nixon's former appointments secretary, testified to a Senate committee investigating the Watergate burglary and cover-up, that Nixon had ordered a voice-activation audiotaping system installed in the Oval Office and that the system recorded every conversation there since 1971. [683] On July 23, 1973, Nixon refused to turn over any of these recordings to the Senate committee or to Cox. Cox later subpoenaed certain recordings from the White House. Nixon offered instead to let an elderly Senator listen to the tapes and summarize their contents for Cox. On October 19, 1973, Cox refused and said that he would seek judicial enforcement of his subpoena. A day later, on Saturday, October 20, Nixon ordered Richardson to fire Cox and abolish the office of special prosecutor; Richardson refused and resigned instead. Within minutes, Nixon ordered Deputy Attorney General William Ruckelshaus to do what Richardson would not, but he, too, refused and resigned. Solicitor General Robert Bork then became Acting Attorney General and, obeying Nixon's orders, fired Cox, abolished the office of special prosecutor, and had the FBI lock up the office and its records ("the Saturday night massacre").

**254** Public and congressional outrage was so overwhelming ("the firestorm") that impeachment resolutions were introduced in the House, and Nixon was forced to back down and appoint another special prosecutor, Leon Jaworski. By then, the term "Watergate" had expanded in everyday speech to include allegations about other burglaries, fraudulent political campaign practices, income tax evasion by Nixon, stealing government money to improve his private residences in California and Florida, and the use of the FBI, IRS, and other federal agencies to harrass political opponents and cover up illegal White House activities. On March 1, 1974, a grand jury supervised by Jaworski's office indicted John Mitchell, Nixon's Attorney General at the time of the Watergate burglary, H.R. Haldeman and John Ehrlichman, the most important people on Nixon's White House staff, and other White House aides. In these indictments, Nixon was named as an unindicted co-conspirator, which did not become public until later that summer. Jaworski decided not to indict Nixon because he was not sure he could indict a sitting president. [684]

On July 24, 1974, the Supreme Court affirmed the lower courts' orders commanding Nixon to surrender the tapes sought by Jaworski and earlier by Cox. [685] On July 27, 29, and 30, the House Judiciary Committee voted to recommend to the

APPENDIX - 380

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 382 of 553 PageID #:  787

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

House that it impeach Nixon on three articles of impeachment. On August 5, the White House released transcripts of the June 23, 1972, conversation and two others between Nixon and Haldeman showing that the White House directed the Watergate burglary and that Nixon directed the cover-up and ordered the FBI not to investigate the burglary ("the smoking gun"). Nearly all the Republicans on the House Judiciary Committee who had voted against the obstruction of justice article of impeachment announced that they would reverse their votes. [686]  "By early August, Nixon lost almost all Republican support in Congress . . . ." [687]  On August 7, Republican leaders in the House and Senate went to the White House, told Nixon that he would certainly be impeached and would probably be convicted, and implored him to resign. [688]  On August 9, Nixon resigned, preventing his certain  **255**  impeachment. [689]  On September 8, Gerald Ford, who had succeeded to the presidency on Nixon's resignation, granted a pardon for "all offenses against the United States" committed by Nixon while he was president.

The first article of impeachment approved by the House Judiciary Committee charged Nixon with obstruction of justice for lying and making deceptive statements and causing others to lie and make deceptive statements to federal law enforcement personnel and in court; withholding evidence; interfering with federal law enforcement investigations; paying hush money to witnesses; misusing the CIA to obstruct justice; leaking information gathered by federal law enforcement personnel to people under criminal investigation; and deceiving the public about investigations of the Watergate burglary. [690]  The committee vote in favor of this article was twenty-seven to eleven. [691]  Democrats voted for it, twenty to zero, and Republicans voted against it, six to eleven [692] --although after the smoking gun tapes became public a few days later, ten of the eleven Republicans who opposed it announced that they would reverse their positions and vote to impeach. [693]

The second article of impeachment charged Nixon with abuse of power for using the IRS, FBI, Secret Service, CIA, and "a secret investigative unit within the office of the President, financed in part with money derived from campaign contributions" to violate the constitutional and statutory rights of citizens. [694]  The committee vote in favor of this article was twenty-eight to ten. [695]  Democrats voted for it, twenty-one to zeron, and Republicans voted against it, seven to ten. [696]  The Republicans who reversed their votes on the first article declined to do the same on the second. [697]

The third article of impeachment charged Nixon with contempt of Congress for disobeying Congressional subpoenas. [698]  The committee vote  **256**  in favor was twenty-one to seventeen. [699]  Democrats voted for it, nineteen to two, and Republicans voted against it, two to fifteen. [700]  (The committee rejected other articles on income tax evasion and the bombing of Cambodia secretly and without Congressional authorization). [701]

Separately from all this, in 1973, about two weeks before Vice President Spiro Agnew resigned and pleaded nolo contendere to criminal charges of receiving bribes, [702] he asked the House to begin an impeachment inquiry against him on the claim that he could not be prosecuted criminally while still vice president. [703]  The House ignored this request, [704] which was a tactical feint to delay a criminal indictment.

Although the Nixon near-impeachment may be remembered in some extremist right-wing circles as a wound, it was non-partisan in every conceivable sense. Individual members of the House Judiciary Committee imposed on themselves the extraordinarily high evidentiary burden of clear and convincing evidence, and in some cases, the higher burden of proof beyond a reasonable doubt. [705]  In the initial committee votes, a significant bloc of Republicans voted, with Democrats, for impeachment. After the smoking gun tape transcripts were released, all but one of the remaining Republicans deserted Nixon, and Republican leaders of both Houses of Congress went to the White House, advised Nixon that he would be impeached by an overwhelming vote in the House, and asked him to resign, which he did.

## F. The Revival of Impeachment as a Partisan Political Weapon

By the 1950s, historical memory treated the Andrew Johnson impeachment as an aberrational abuse of power, regrettable no matter how badly Johnson himself had behaved. Then-Senator John F. Kennedy's 1955 book Profiles in Courage described Senator Edmund G. Ross's deciding vote against convicting Johnson as an act of heroism. [706]  Impeachment had been utilized so long for the sole purpose of ousting corrupt office holders, that its other use--as a political weapon during  **257**  periods of political crisis--had been forgotten or considered an artifact of past and less civilized times. In the mid-1950s, billboards urging

"Impeach Earl Warren" began proliferating along rural highways, at least some of them paid for by the John Birch Society, [707] and in 1957 the Georgia State House of Representatives passed a resolution petitioning Congress to impeach not only Chief Justice Warren, but also Justices Black, Frankfurter, Douglas, Clark, and Reed. [708] But these instances were seen at the time as marginal and irrelevant, rather than as beginnings of the revival of impeachment as a partisan political weapon.

1. The Fortas and Douglas Investigations: The Beginning of the Struggle for the Supreme Court

Brown v. Board of Education [709] began a long process through which the vacating and filling of seats on the Supreme Court became an interminable focus of partisan political fighting. At one point, during the first Nixon Administration, confirmation struggles and attempted impeachments were joined into a single battlefield. Brown and its progeny infuriated most of the white South, and in the 1950s and 1960s, it could be dangerous to be a federal judge in a Southern state enforcing desegregation law. [710] And the Supreme Court angered other constituencies as well through a wide range of decisions [711] concerning reapportionment, [712] criminal procedure, [713] obscenity, [714] civil rights, [715] the relationship between government and religion, [716] and eventually abortion. [717] The Republican  **\*258** Party developed a strategy to build an electoral majority by converting Southern whites from Democrats into Republicans. [718]

The first Supreme Court confirmation battle in the style with which we have now become accustomed--antagonistic interest groups researching the nominee's background for any conceivable damaging information, unfriendly Senators cross-examining the nominee while supporters complain that the nominee is being persecuted, and people on both sides spinning the facts rather than exploring them with an open mind--occurred in 1968 [719] when President Lyndon Johnson nominated Associate Justice Abe Fortas to replace retiring Chief Justice Earl Warren. The model for attacking the nominee was set by Republicans and right-wing Southern Democrats in the 1968 Senate Judiciary Committee. [720] Democrats and interest groups allied with them learned from that experience and used similar techniques in a muted way in the later confirmation hearings of Clement Haynsworth, G. Harrold Carswell, William Rehnquist, and then more aggressively against, Robert Bork and Clarence Thomas.

The Senate had many times before rejected Supreme Court nominations. The earliest Senate rejection had been of George Washington's nomination of John Rutledge. Although Rutledge had chaired the Committee on Detail, which wrote the first draft of the Constitution at the Constitutional Convention, the Senate refused to confirm him as Chief Justice because he had made a speech opposing the Jay Treaty with France. [721] Jefferson wrote that "[t]he rejection of Rutledge by the Senate is a bold thing, for they cannot pretend to have any objection to him"--one of the outstanding lawyers in the country--"but his disapprobation of the Treaty. It is, of course, a declaration that they will have none but tories . . . ." [722]

 **\*259** In all, "33 of the 148 nominees for the highest court [now 150 nominees, including John Roberts and Samuel Alito] have either been rejected by a vote of the Senate, had the voting on their nomination repeatedly postponed or filibustered into nonexistence or eventually bowed out." [723] In fact, during the nineteenth century over a third of those nominated to the Court failed to achieve confirmation. [724] Among the casualties was Roger Taney, who was rejected by the Senate when nominated by Andrew Jackson to be an Associate Justice. The reason was purely political: as Secretary of the Treasury, Taney had approved Jackson's withdrawal of federal deposits from the Bank of the United States [725] --an issue about which virtually no one at the time had feelings that could be described as moderate. Actually, the Senate did not reject the nomination on an up-or-down vote. It moved the nomination off its agenda and then voted to abolish the vacant seat in a bill that failed enactment in the House [726] and surely would have been vetoed by Jackson. When Chief Justice Marshall later died, Jackson nominated Taney again, and he was confirmed. [727] "[S]enators often admitted to political motives when they opposed a nominee." [728] President Tyler nominated six men to the Supreme Court, only one of whom was confirmed. [729] Although some nominations in  **\*260** the twentieth century had been controversial, (most notably Woodrow Wilson's nomination of Louis Brandeis in 1916) [730] at the time of the Fortas nomination in 1968, the most recent rejection of a nominee by the Senate had been that of John J. Parker, who was nominated by Herbert Hoover in 1930. [731]

But the events of 1968 started an era of confirmation battles in a long-running war for control of the Supreme Court. The earlier rejections and controversies had been episodic, many of them having unique dynamics. From 1968 on, each nomination became either a battle or a truce in a war over the Court that sometimes spilled over into impeachment or attempted impeachment. That

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.          38

is not to say that every impeachment or attempted impeachment after 1968 was a partisan political attack. The impeachments of Judges Claiborne, Hastings, and Walter Nixon, and the near-impeachment of President Richard Nixon were all nonpartisan or bipartisan.[732] In 1968, however, the United States entered an era in which impeachment could be used as a partisan political weapon in a long and not-yet-ended struggle.

Fortas was considered at the time to have a brilliant legal mind, but he was not an unblemished nominee. While on the Court, he had advised President Johnson "on national policy and had even done some behind-the-scenes lobbying on the president's behalf."[733] Justice Frankfurter, had done similar things for President Franklin Roosevelt,[734] and later Chief Justice Warren Burger tried to give advice to President Nixon.[735] Only much later did it become apparent how deeply Fortas's advice had created conflicts of interest. Fortas had also accepted speaking fees paid by some prominent businessmen recruited by his former law partner, Paul Porter; apparently neither Fortas nor Porter worried that the contributors sat on the boards of a number of corporations which might some day be parties before the Supreme Court.[736] Although this could sound like carelessness or corruption, it was not; no one told Fortas who the contributors were.[737] Moreover, judges must recuse themselves from cases involving former **\*261** clients and law firms, as well as friends and political allies,[738] and Fortas did so routinely.[739]

But the timing of his nomination--a promotion from his Associate Justice position to be Chief Justice of the Supreme Court--infuriated Republicans, who hoped to win the 1968 presidential election and have a president of their own party choose the next chief justice.[740] In confirmation hearings, they cross-examined Fortas in a way that nonstop television coverage today would make impolitic. "Mallory, Mallory," Senator Strom Thurmond shouted at Fortas, referring to a case[741] decided by the Supreme Court while Fortas was still a lawyer in private practice and with which he had no connection of any kind, "I want that word to ring in your ears--Mallory."[742] When Fortas's nomination got to the Senate floor, the Republicans filibustered it; cloture votes failed; and Fortas asked that the nomination be withdrawn.[743] Two months later, a Republican, Richard Nixon, was elected president.

When in 2004 and 2005, Senate Democrats considered filibustering a few nominees to the Courts of Appeals, Republicans claimed that no one had ever filibustered a judicial nominee in the Senate. But the truth is that, in 1968, the Republicans filibustered Fortas's nomination, and everyone at the time considered what was happening to be a filibuster. After the first day, the headline in the New York Times began "Critics of Fortas Begin Filibuster . . . .,"[744] and the Washington Post headline read "Fortas Debate Opens With A Filibuster."[745] The first words of the Washington Post story were: "A full-dress Republican-led filibuster broke out in the Senate yesterday against a motion to call up the nomination of Justice Abe Fortas **\*262** for Chief Justice of the United States."[746] When the motion to end debate failed, the New York Times headline began "Senate Bars Move to End Filibuster . . . ."[747] The historians who have studied the Fortas nomination uniformly agree that it was filibustered.[748] And Senator Robert Griffen, the Republican floor manager of the opposition to Fortas justified what he was doing as having historical precedent: "it has not been unusual for the Senate to indicate its lack of approval for a nomination by just making sure that it never came up for a vote on the merits."[749]

According to Nixon's own legal counsel, John Dean, Nixon began looking for ways of creating Supreme Court vacancies in 1969 soon after being sworn in as president.[750] Nixon was in the same position Roosevelt had been in 1937. Each wanted a Court that would decide cases differently, and each wanted to appoint Justices to cause that result. But Nixon and Roosevelt used very different strategies. Roosevelt chose a variation of the traditional rejiggering of the number of Justices, which had occurred several times in the nineteenth century.[751] Nixon tried to smear Justices in an effort to get them to resign or to serve as a basis for impeachment. According to Dean, Nixon ordered his Justice Department to use its resources to accomplish that purpose.[752]

In the spring of 1969, a Life magazine reporter began looking into a questionable relationship Fortas had with a businessman named Wolfson. The reporter approached Will Wilson, Assistant Attorney General and chief of the Justice Department's Criminal Division, who years later told Bruce Murphy he had been "excited about the prospect. I knew what kind of potential coup we had . . . we wanted Fortas off the Court."[753] The Justice Department then began a high priority investigation of its own,[754] and secretly gave the magazine essential elements of the story that was **\*263** eventually published.[755] Nixon was kept informed throughout.[756] According to John Ehrlichman, one of his closest aides, "Nixon cleared his desk of other work

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.      39

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 385 of 553 PageID #: 790

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

to focus on getting Fortas off the Court." [757]   To get Fortas to resign without being impeached, John Mitchell, Nixon's Attorney General, secretly gave Chief Justice Earl Warren evidence not published in Life. [758]

The Justice Department eventually leaked that evidence to the press. [759]   To further intimidate Fortas, the Department convened a grand jury to investigate whether Fortas's wife, Carol Agger, and Fortas's former law partner and best friend, Paul Porter, should be indicted for obstruction of justice over subpoenaed documents that had been mislaid in an unrelated case years earlier (even though the Department had previously decided that Agger and Porter were not at fault). [760]   Fortas resigned. By that point, congressional antipathy was building. [761]   Had Fortas remained on the bench, impeachment resolutions almost certainly would have been introduced on the House floor, [762]  and referred to the House Judiciary Committee for investigation. Senator James O. Eastland, [763]  a Mississippi Democrat and segregationist who was content with the treatment Fortas received when nominated to be Chief Justice in 1968, chaired the Senate Judiciary Committee. But, the House Judiciary Committee was chaired by Representative Emanuel Celler, [764]  a New York City Democrat who was the opposite of Eastland in every respect except party affiliation. Although differences in the membership of the two committees were not as stark as the differences between their chairs, the House Judiciary Committee, then as now, is larger, so that the personalities of individual members leave less of an imprint on its proceedings. Due to its larger size, the House Judiciary  **\*264**  Committee apportions more of its work into subcommittees, which gives added power to the committee chair to control the flow of business.

The House committee would not have abused Fortas as the Senate committee had. On the other hand, an investigation involving Fortas would not have ended as quietly as the one that, a short while later, would involve Justice Douglas. [765]   It would have gone on very publicly and painfully for months while Republicans tried to read nefarious intent into every ambiguity in the evidence, and while Fortas, who seemed to lack the ability to make his own case except legalistically, would have looked more and more disingenuous. The House probably would not have impeached Fortas, and the Senate certainly would not have convicted him. There was no evidence of the kind of corruption that had been essential in every other instance of a Senate conviction. Moreover, Democrats controlled both Houses of Congress. Although party realignment in the South had only just begun and a significant bloc within the Democratic majorities was still made up of right-wing Southerners, it would have been extraordinarily difficult in the Senate to collect the constitutionally required two-thirds majority needed to convict. But the humiliation of a public impeachment investigation would almost certainly have led Fortas to do later what he actually did earlier: resign.

The Fortas incident must be included among the impeachments that did not run their full course because they were aborted by the accused's resignation. And it would be an understatement to say that it must also be included among instances of impeachment's used as a partisan political weapon. Throughout, the Republicans were determined to get Fortas off the Court for partisan political reasons, and they were turning to an impeachment investigation at the moment when his resignation made it unnecessary.

Although Fortas's relationship with Wolfson was questionable, it was not illegal at the time. [766]   Nixon's own Justice Department could find no violation of law. [767]   Wolfson controlled a nonprofit foundation, and Fortas had accepted a $20,000 consulting fee from the foundation while the SEC  **\*265**  was investigating Wolfson. [768]   In compensation for helping the foundation plan its public service activities, Fortas was to receive the same amount annually, as long as he or his wife lived. [769]   But when Wolfson's legal problems deepened, or, more precisely, when it finally dawned on Fortas that a Supreme Court Justice should not be accepting money from an entity controlled by a person being investigated by a law enforcement agency, [770]  Fortas returned the $20,000 he had already received and cancelled his consulting contract with Wolfson's foundation. [771]   Moreover, Fortas did nothing to help Wolfson escape his legal difficulties, which ended in imprisonment. [772]

Although the Republicans did everything they could to force Fortas off the Court, Fortas, like Chase and Andrew Johnson, had faults that seemed to conspire with his enemies to do him in. Certainly money mattered enough to him that he took it when he should not have. [773]   Fortas had lived very well on his income as a named partner in one of the country's leading law firms, [774]  but, when he became a Supreme Court Justice, his income shrank to a fraction of what it had been. [775]

Fortas hurt himself in three ways. First, Fortas never seemed to understand that judges, unlike lawyers, do not sell their professional time. Although part of what it takes to succeed as a lawyer is knowing how to bill clients, leaving the practice of law often means leaving that mentality behind. Second, like so many lawyers who come to grief in Washington, Fortas assumed that if a position is legally arguable, it will for that reason alone satisfy politicians and the public. He never understood that it would

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    40

appear corrupt for a Justice earning $39,500 a year to accept a lifetime income from a private source of an additional $20,000 a year, even if legal **\*266** devices like recusal were sufficient to avoid any genuine harm. [776] He also never understood that, although the money Wolfson paid him might have been consistent with his billing rates in private practice, it looked like a gross overpayment--one intended to secure special treatment for Wolfson--when compared to Fortas's judicial salary.

And third, although Fortas could strategize with exceptional skill in the narrow confines of litigation, [777] he, like many other lawyers, was a mediocre strategist in the broader world. Lawyers, especially litigators, usually feel that they get results by sharing as little information as possible with adversaries and third parties, and by putting a self-serving spin on the information they do share. Throughout all of his troubles in 1968 and 1969, Fortas's instinctive reaction was to do exactly that, and it created a convincing impression that he was hiding something and being disingenuous. [778] Even in the final days before he resigned, Fortas could not understand how much he was being hurt in this way. The lifetime payments feature of the consulting contract was the fact most damaging to Fortas. When John Mitchell learned of it, he was overjoyed. [779] At the time Fortas resigned, the nature of the consulting contract had not yet become public knowledge. But the Nixon Administration knew of it, had informed Chief Justice Warren about it, and could tell the public about it at any time. [780] Fortas sought Justice Hugo Black's advice, and explained everything to him. "After he heard about the lifetime nature of the Wolfson contract, Black recognized what had to be done. Tell the press yourself, he advised Fortas. After all, the initial payment had been returned and the agreement had been cancelled." [781] That was Fortas's last opportunity to appear forthright and honest. He refused.

To fill the vacancy created by Fortas's resignation, Nixon nominated Clement Haynsworth, Chief Judge of the Fourth Circuit. [782] The civil rights and labor movements, initially suspicious, mobilized to oppose the nomination. [783] "Senators who opposed Haynsworth on ideological grounds, as well as those Democrats furious about the Fortas affair, could **\*267** point to two cases of apparent conflict of interest," in which Haynsworth, while on the Court of Appeals, had participated even though he had undisclosed personal interests and probably should have recused himself. [784] At the time, the ABA Canons of Judicial Ethics required recusal in such circumstances, but the federal judicial conflict-of-interest statute did not. (As a result of this and the Fortas and Douglas controversies, the statute was rewritten later into the form today at ⬜ 28 U.S.C. § 455.) [785] Most federal judges at the time followed the Canons, although they were stricter, and it reflected badly on Haynsworth's character that he did not do so. [786] Haynsworth, in essence, could not pass the standards that Fortas had been held to, [787] and the Senate rejected him by a vote of fifty-five to forty-five. [788] After the Haynsworth defeat, Nixon told one of his aides, "I want you to go out this time and find a good federal judge further south and further to the right" of Haynsworth. [789] The result was the nomination of G. Harrold Carswell.

Carswell was not qualified for the Supreme Court. He had been a mediocre district court judge whose annual output of published opinions averaged less than 16 pages, [790] and who was reversed 58% of the time when his decisions were appealed. [791] He had been promoted to the Court of Appeals only six months before Nixon nominated him for the Supreme Court. [792] Dean Louis Pollack of the Yale Law School told the Senate Judiciary Committee that Carswell had "more slender credentials than any Supreme Court nomination put forth in this century." [793] Professor William **\*268** Van Alstyne of Duke, a Haynsworth supporter, told the Judiciary Committee that "[t]here is, in candor, nothing in the quality of [Carswell's] work to warrant any expectation whatever that he could serve with distinction on the Supreme Court." [794] Nixon's own aides felt the same way. [795] Senator Hruska, the floor manager of the Carswell nomination, made the most memorable--but not the only--argument that Carswell's mediocrity was a virtue: "there are a lot of mediocre judges and people and lawyers. They are entitled to a little representation, aren't they, and a little chance. We can't have all Brandeises and Frankfurters and Cardozos and stuff like that there." [796]

There was speculation at the time that Nixon nominated Carswell both out of annoyance over Haynsworth's rejection, [797] and as a cynical tactic to set up a claim, after Carswell's likely rejection, that the Senate, so long as it was controlled by the Democratic Party, could never be fair to a white Southern nominee. (Haynsworth was from North Carolina and Carswell from Florida.) Carswell had helped convert a public golf course into a private club at which only whites could play. [798] And, while running for the state legislature in 1948, Carswell made a racist speech that included comments like "I yield to no man . . . in the firm, vigorous belief in the principles of White Supremacy, and I shall always be so governed," [799] and "I believe that segregation

APPENDIX - 385

of the races is proper and the only practical and correct way of life in our states." [800]  At his confirmation hearings, Carswell disavowed the speech. [801]  The Senate rejected him by a vote of fifty-one to forty-five. [802]

A day later, Nixon told the press, "[W]ith the Senate as presently constituted[,] I cannot successfully nominate to the Supreme Court any Federal appellate judge from the South who believes as I do in the strict  **\*269**  construction of the Constitution." [803] These were code words meaning that Nixon could not successfully nominate a Southerner hostile to Brown and its progeny. In fact, there were five judges on the Fifth Circuit-- Griffin B. Bell, John R. Brown, Richard T. Rives, Elbert P. Tuttle, and John Minor Wisdom [804] --whose reputations were so commanding that they could have been confirmed for the Supreme Court as easily as Lewis Powell later was. Burke Marshall, Assistant Attorney General in the Kennedy Administration and later on the law faculty at Yale, said that Brown, Rives, Tuttle, and Wisdom "have made as much of an imprint on American society and American law as any four judges below the Supreme Court have done on any court." [805]  But Nixon would nominate none of them, even though Brown, Tuttle, and Wisdom were Republicans, [806] because all five were in the habit of voting to enforce Brown. Instead, Nixon nominated Harry Blackmun of the Eighth Circuit, [807] a Minnesotan who at the time gave no indication of the kind of Justice he would later become. [808]  The Senate confirmed Blackmun unanimously. [809]

Carswell's nomination was defeated on April 8, 1970. [810]  On April 12, Republican House Minority Leader Gerald Ford announced that the House would investigate Justice William O. Douglas with a view toward impeachment. [811]  Of all the Justices on the Supreme Court, Douglas irritated the Republicans most deeply. He voted against their principles more regularly than other Justices; he wrote books and articles they considered offensive; and he had been married four times to successively younger women. [812]  His most recent book at the time, Points of Rebellion, contained sentences like "We must realize that today's establishment is the new George III." [813]

Douglas's vulnerability was that he had accepted $12,000 a year over six years for serving as the president of a nonprofit foundation--an arrangement that Republicans claimed replicated Fortas's. [814]  Much of the  **\*270**  foundation's income came from a mortgage on a Las Vegas hotel and casino, and the foundation's primary benefactor owned stock in three Las Vegas casinos, [815] all of which allowed Republicans to claim falsely that Douglas was consorting with gamblers and gangsters. [816] But there were fundamental differences between Douglas's situation and Fortas's. Fortas's consulting contract did not actually seem to require that he do much work, while "Douglas actually ran the [foundation that paid him] and took an active role in the implementation of its very tangible and highly praised programs in the United States and Latin America." [817]  Moreover, the $12,000 salary was not really a salary at all. Originally, the foundation had offered Douglas a $20,000 salary, which he refused because he did not want to be paid. [818]  "He then was voted a salary of $12,000 plus expenses," which were to be significant because the work involved travel, "but he refused to collect expenses and said that he would treat the salary (after income tax) as an expense account." [819]  Although the foundation used a small portion of the salary to purchase an annuity for Douglas, [820] he worked almost for free, and the foundation's correspondence with him suggests that the foundation's board felt guilty or embarrassed because of his generosity. [821]  In 1969, because of Fortas's troubles, Douglas resigned as president of the foundation. [822]

With help from the White House and from Will Wilson, the same Assistant Attorney General who had coordinated building the case against Fortas, [823]  Ford "accumulate[d] a mound of information on Douglas." [824]  Nixon directly encouraged Ford. [825] "From the beginning," according to John Ehrlichman, one of the president's closest aides, "Nixon was interested in getting rid of William O. Douglas. . . . John Mitchell had  **\*271**  begun to gather information about Douglas's nonjudicial sources of income, and some of it looked hopeful." [826]  "A loosely organized impeach-Douglas effort was organized in the House," led by Ford and two other senior Republican Congressmen, "with the single goal of filing articles of impeachment against Douglas during the 1970 congressional term." [827]  Not long afterward, Wilson himself resigned over allegations that he helped a former client who was being investigated by the Justice Department and the SEC. [828]  Mitchell was later convicted and imprisoned in the Watergate scandal. [829]

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 388 of 553 PageID #:  793

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

Eventually, Ford took the House floor to accuse Douglas of being a "well-paid moonlighter" as a foundation president; [830] of having voted on the Court in a case where a publisher that had once paid him $350 was a party; [831] of having done some work for an organization Ford considered subversive, [832] the Center for the Study of Democratic Institutions, [833] (even though Chief Justice Warren Burger, a Nixon appointee, had worked for the same organization, as had William Buckley, the conservative writer, and some Senators and other people whose views were not controversial [834]); of having written Points of Rebellion; and of having published a chapter of it in a magazine Ford considered pornographic [835] (even though the book's publisher had licensed the magazine to publish the chapter without telling Douglas about it until after the fact, a common practice in the publishing industry). [836]

While Ford was making this speech, he was outmaneuvered procedurally by Democratic Representative Andrew Jacobs, Jr., a Douglas supporter, who went into the well of the House and filed a resolution to impeach Douglas. [837] Ford wanted a select committee designated because **\*272** that would cause his own resolution to be "referred automatically to the House Rules Committee, chaired by a Mississippi segregationist." [838] But Jacobs' resolution called for referral to the Judiciary Committee, where Celler would control procedure. Because Jacobs filed first, his resolution took priority. [839]

Celler appointed a subcommittee consisting of himself, two other Democrats, and two Republicans. [840] The subcommittee produced a 924-page report that found the allegations against Douglas to be groundless. [841] All three Democrats voted to that effect. [842] One of the Republicans criticized the subcommittee but conceded that Douglas had committed no impeachable offense. [843] The remaining Republican neither joined the majority nor dissented. [844] Ford and his allies later called the subcommittee investigation a "travesty" and a "whitewash." [845] Will Wilson, who as Assistant Attorney General had helped assemble the case against Douglas, remembered things differently. "Ford took the material we gave him and screwed it up," Wilson said later: "Ford blew it." [846]

The Douglas investigation occurred in 1970. In 1973, Spiro Agnew resigned the vice-presidency and was convicted of taking bribes while a state official. Under the Twenty-Fifth Amendment, Nixon nominated and Congress confirmed Ford to replace Agnew as vice president. When Nixon later resigned in 1974, Ford became president. During all this, Douglas's health deteriorated, and in 1975 he resigned from the Supreme Court. [847] Ironically, Ford nominated Douglas's successor, John P. Stevens, then a judge on the Seventh Circuit. Still more ironically, Stevens became a leader of the liberal bloc on the Supreme Court.

The war in which the Fortas and Douglas incidents were the first battles continued through the defeated nomination of Robert Bork in 1987, [848] and the confirmation of Clarence Thomas in 1991. Eventually, the **\*273** war broadened, and Republicans used impeachment as part of a partisan attack on a Democratic president.

2. Clinton

While complicated events are happening, we are least able to understand what is really going on and why. Only afterward-- with historical distance--does the big picture emerge, and causation can be discussed meaningfully. History does not merely reconstruct the knowledge that people in the past had about what they lived through. It discovers what they could not have realized at the time.

Bill Clinton had sex with Monica Lewinsky and lied about it to the public and under oath. The question here is not whether that merited impeachment and conviction. Reasonable people can differ about that. The argument in favor of the impeachment's appropriateness is that perjury is a felony, and that a president who commits perjury deserves impeachment and removal because the known example of a high official committing perjury corrodes the public's confidence in government as well as the public's own commitment to honesty. [849] As we shall see in Part IV(A) of this article, this argument has the potential of boomeranging back onto those who make it.

There are three arguments against the appropriateness of Clinton's impeachment. First, not every felony is a high crime or misdemeanor, [850] and felonies outside the scope of impeachable offenses include those that do not damage the integrity of

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    43

government or the political system in substantial ways. For example, income tax evasion has not been considered an impeachable offense. In 1974, the House Judiciary Committee, including all of its Republican members, voted not to recommend impeaching Richard Nixon for tax evasion, even though a taxpayer signs every tax return, at the bottom of Form 1040, "[u]nder penalties of perjury . . . ." A second argument is that other presidents have told, encouraged, or helped others to tell much more damaging lies that have not led to impeachment, such as lying to create a basis for a war in which thousands die and in which the national interest is substantially harmed. [851]  According to this argument, the absence of an oath to tell the  **\*274**  truth in these situations is more than compensated for by the injury to the integrity of government and the national interest. A third argument is that impeachment is not the only method Congress has of sanctioning a president. One or both Houses of Congress have censured other presidents, [852] and in both Houses attempts were made (and defeated) to censure Clinton. [853] By extension, this argument would also posit that, if both Houses of Congress had voted to censure Clinton, that would have been a rebuke more satisfying to the public than to have the House impeach him and the Senate acquit him.

This Article does not analyze or choose among these arguments. That has been done amply elsewhere. Instead, the question here is whether the Republicans merely reacted to the misdeeds of an office holder, or whether they set Clinton up so they could impeach him to gain political advantages, or more precisely, whether some Republicans set him up and others impeached him to gain political advantages.

Richard M. Scaife has a large fortune that he inherited from the Mellon banking family and from oil interests. [854] Over decades, he gave between $200 million and $300 million to right-wing organizations, and, though almost unknown to the public, he was considered one of the essential figures "in building the modern conservative movement." [855] Beginning with Clinton's 1992 campaign for president, and continuing throughout his first term in office, Scaife and others financed a campaign to destroy Clinton's political viability. Perhaps the best known person in this campaign was David Brock, a journalist who had written a book extraordinarily hostile to Anita Hill, the witness who almost cost Clarence  **\*275**  Thomas his confirmation to the Supreme Court. [856] Brock later repented his role in the campaigns against Clinton and Hill, and he apologized to both of them. [857] "[I]n its secretiveness and in its single-mindedness [and] also in its lack of fidelity to any standard of proof, principle, and propriety," wrote Brock in retrospect about the early campaign against Clinton, "there was no precedent in modern American politics" [858]

Scaife invested a substantial amount of money in trying to prove that Bill and Hillary Clinton "were leaders of a criminal syndicate" and had murdered a White House aide named Vince Foster "to cover up their crimes in Whitewater, a failed real estate deal." [859] (Investigations by two different independent counsels later showed that the Clintons had done none of this.) In 1999, Scaife told a magazine that Clinton "can order people done away with at his will . . . there must be 60 people [associated with Clinton] who have died mysteriously." [860] Over the years, Scaife had given the right-wing magazine for which Brock wrote, The American Spectator, about $6 million, and he subsequently used the magazine as a front to operate something he called the Arkansas Project, which used private investigators to scour the state for evidence of crimes he believed Clinton must have committed while governor. [861]

Theodore Olson, the second President Bush's Solicitor General from 2001 to 2004, gave legal advice to the Arkansas Project. [862] At one point, Brock asked Olson to read a draft article, written by another journalist, that argued that Foster had been murdered. Brock opposed publishing the article because it lacked evidence. He hoped that Olson would back him up, but was surprised at Olson's response. "Ted . . . told me bluntly . . . that while he believed . . . that Foster had committed suicide, raising questions about the death was a way of turning up the heat on the [Clinton] administration until another scandal was shaken loose, which was the Spectator's mission." [863] Olson also wrote articles for the magazine under a fictitious by-line accusing the Clintons of committing various crimes and comparing President Clinton to Don Corleone of the Godfather films. [864]

**\*276**  In 1994, Brock himself wrote the original article portraying Bill Clinton "as a sexually voracious sociopathic cipher" and Hillary Clinton "as a foulmouthed, castrating, power-mad harpy, joined together in a sham power marriage." [865] Brock interviewed some Arkansas state troopers, who told salacious stories about the Clintons. The stories were later discredited because some of the troopers wanted and accepted money for talking to journalists; [866] the troopers retracted much of what they said when put under oath in depositions; [867] and in Brock's own words later, "[n]one of the trooper allegations that could be independently checked turned out to be true." [868]

APPENDIX - 388

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 390 of 553 PageID #:  795

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

One of the troopers, however, described an incident in which he accompanied a woman named Paula to Clinton's hotel room, and that she told the trooper she was willing to be Clinton's "regular girlfriend." [869] Some time later, a person named Paula Jones announced that she was the Paula described in Brock's article, and that the article had portrayed her inaccurately and damaged her reputation. Normally such an accusation would result in a defamation action against Brock and The American Spectator. But that did not happen. According to Brock, Jones did not sue him because "a conniving cadre of right-wing lawyers and operatives was secretly calling the shots in the Jones case to forward [their] own political agenda of undermining the Clinton presidency, which meant leaving me out of it." [870] Jones's original Arkansas lawyer lacked the skills and resources to litigate her case. He found help in "the Landmark Legal Foundation, a right-wing public-interest law firm generously funded by Richard Mellon Scaife." [871] The retainer agreement between Jones and her original lawyer gave the lawyer a share of any royalties Jones might later gain from a book or movie about her story. [872] And Jones's sister told the media that Jones had told her, "Whichever way it goes, it smells money" or "Whichever way it goes, it smells big money" (depending on the journalist reporting). [873] Later, Jones was represented by lawyers supplied by the **\*277** Rutherford Institute, which also benefited from donations by Scaife. [874] In the background, a small group of lawyers who called themselves "the elves," did some of the legal work without publicly acknowledging their involvement; one of them was Ann Coulter. [875]

Eventually, Jones's lawsuit was dismissed for lack of evidence on a summary judgment motion. [876] But the dismissal came only after her Jones's lawyers deposed Clinton about Monica Lewinsky. "One of the secret legal strategists for Paula Jones" told David Brock years before that deposition "that the purpose of the sexual harassment suit was to probe Clinton's consensual sex life through the deposition process, and then to question Clinton under oath about it," and thus, according to Brock, "the Jones case had become a vehicle to create a crime where one may not have otherwise existed." [877]

In January 1994, after the Independent Counsel Act had expired and had not yet been reenacted by Congress, Attorney General Janet Reno, using her inherent authority as chief official in the Department of Justice, appointed Robert B. Fiske [878] as a special prosecutor to investigate allegations that Clinton had had Vince Foster murdered, and had committed various kinds of fraud while governor of Arkansas and an investor in a real estate development called Whitewater. Fiske, a Republican and a retired federal judge with a national reputation for nonpartisanship, "was a reviled figure in the conservative movement, dating back to the days when he sat on an American Bar Association review panel that gave Robert Bork a low rating and damaged his confirmation prospects in the Senate." [879] When Fiske, after an investigation, issued a report concluding that Foster had committed suicide because of untreated depression, rightists determined to prove that Foster had been murdered began lobbying for his dismissal. "From the moment that Fiske issued his findings . . ., Republican leaders and influential **\*278** conservatives began maneuvering to eliminate him." [880] Shortly afterward, Congress reauthorized the Independent Counsel Act, which had the effect of terminating the appointments of special prosecutors who had been appointed during the period between the Act's expiration and its reauthorization. Because Fiske had already concluded the Foster matter and had done a great deal of investigation in the Whitewater matter, the logical step would have been to appoint Fiske as an independent counsel under the Act to finish the job. That did not happen. Instead, Kenneth Starr was appointed in Fiske's place with authority to reopen the Foster issue.

**\*279** Under the Independent Counsel Act, [881] a unique three-judge panel called the Special Division appointed the independent counsel. In **\*280** assigning judges to the Special Division, the Act instructed the Chief Justice of the Supreme Court that "priority shall be given to senior circuit judges and retired justices" of the Supreme Court. [882] A senior federal judge is one who is semi-retired. In 1992, Chief Justice William Rehnquist ignored this provision and assigned Judge David Sentelle to preside over the Special Division. [883] Not only was Sentelle not semi-retired, he was 48 years old at the time, and had been on the federal bench for only seven years. [884] Before becoming a judge, Sentelle had devoted a great deal of time and money campaigning and raising money for Republican candidates for political office, and he was a protégé of right-wing Republican Senator Jesse Helms. [885]

On June 30, 1994, Fiske issued his report concluding that Foster's death was a suicide and not murder. [886] On the same day, Clinton signed into law the reenactment of the Independent Counsel Act. [887] The next day, Janet Reno, filed a motion asking the Special Division to appoint Fiske as independent counsel so that he could finish the job he started as special prosecutor. [888] That afternoon, Senator Lauch Faircloth spoke on the Senate floor in favor of replacing Fiske, whom Faircloth believed had

APPENDIX - 389

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 391 of 553 PageID #:   796

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

been too lenient with Clinton. [889]  Senators Faircloth and Helms both represented North Carolina, where Sentelle had been active politically in the Republican Party before accepting an appointment to the D.C. Circuit. On July 14, Helms, Faircloth, and Sentelle met for lunch. [890]  When this later became public, all of them at first denied they discussed whom to appoint as independent counsel, but Sentelle later admitted that it "may" have come up in conversation. For years afterward, the three insisted that they talked mostly about the conditions of their prostates. [891]

On August 5, the Special Division replaced Fiske and appointed Kenneth Starr, a judge on the D.C. Circuit from 1983 to 1989 and the first  **281**  President Bush's Solicitor General from 1989 to 1993. [892]  In removing Fiske, the Special Division stated that he had a conflict of interest because Reno initially appointed him. [893]  But Starr's conflicts of interest were much larger. Starr had been Solicitor General throughout the Administration of the first President Bush, whom Clinton defeated for reelection (which had the effect of ousting Starr from the second-most important position in the Justice Department). Starr had given strategic advice to Paula Jones's lawyers in her lawsuit against Clinton, [894]  and his law firm "was negotiating a highly sensitive legal settlement" with officials of the Resolution Trust Corporation, whom Starr would later investigate in connection with Whitewater. [895]  The replacement made even less sense given that Fiske, as a former U.S. Attorney, possessed extensive experience both prosecuting and defending white-collar criminal cases, [896]  while Starr had virtually no criminal litigation experience. The Special Division's objections to Fiske thus appeared to be contrived.

When the media reported the Sentelle-Helms-Faircloth lunch, there was an uproar. "The timing of the lunch suggested that the senators were lobbying Sentelle to dump Fiske--which the judge promptly did." [897]  Five former presidents of the American Bar Association joined in asking Starr to resign as independent counsel, which he refused to do. [898]  Because of the Republican campaign to appoint politically reliable judges, the federal judiciary has become more politically partisan than at any other time since the judicial domination by the Federalists at the end of the eighteenth century and the beginning of the nineteenth. [899]  According to Michael J. Luttig, formerly a judge on the Fourth Circuit (appointed by the first President Bush):

> Judges are told, "You're appointed by us to do these things." So then judges start thinking, Well, how do I interpret the law to get the result that the people who pushed for me to be here want me to get? . . . I believe that there's a natural temptation to line up as political partisans that is reinforced by the political process.  **282**  And it has to be resisted, by the judiciary and by the politicians. [900]  As a lawyer in the Justice Department, before his own appointment to the bench, Luttig prepared Clarence Thomas to testify at the hearings on his nomination to the D.C. Circuit and his later nomination to the Supreme Court. [901]

Starr reopened the question of how Vince Foster had died, and his staff investigated everything all over again. In October 1997, he issued a report finally concluding that Fiske had been right all along, and that Foster had committed suicide. Later, Starr also reported that there was insufficient evidence that the Clintons had done anything criminal in the Arkansas Whitewater development, or in the 1993 firing of White House travel office employees, or in the mishandling of FBI files. [902]  But by then, these accusations were no longer needed because Starr had Monica Lewinsky instead.

Congressman Bob Barr, a Republican member of the House Judiciary Committee, campaigned to have Clinton impeached. [903]  In June 1997, he wrote a letter to Congressman Henry Hyde, chair of the Judiciary Committee, insisting that the Committee begin an impeachment investigation. [904]  On November 5, 1997--at a time when no one in Congress had ever heard of Monica Lewinsky-- Barr, joined by eighteen other Republican co-sponsors, introduced a resolution in the House that would direct the House Judiciary Committee to determine whether Clinton should be impeached for "engag[ing] in a systemic effort to obstruct, undermine, and compromise the legitimate and proper functions and processes of the executive branch." [905]  The language was purposefully elastic. Some Republicans were determined to find a cause to impeach Clinton, but were not quite sure what that cause would be.

Throughout 1997, right-wing agitation for impeachment built up based on claims that Clinton had murdered Vince Foster and had won the 1996 election through fraud. [906]  The editorial page of the Wall Street  **283**  Journal twice published articles demanding that Clinton be impeached because, among other things, he had "met with drug dealers . . . and mobsters" [907]  and

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 392 of 553 PageID #:   797

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

stolen the 1996 election. [908]   Regnery Publishing, the leading publisher of right-wing political literature, published a novel called The Impeachment of William Jefferson Clinton, written by the editor of The American Spectator. All of this occurred before the name Monica Lewinsky reached any news source. According to David Brock, the former right-wing journalist,

> the Republican right . . . continued to maintain that the Clinton scandals represented a wide pattern of vague criminality by the first couple, and therefore that it was only a matter of time until the truth would be revealed, the Clinton administration would be brought down, and the world would be set right again. They seemed to believe this, or at least they asserted it, all the more intensely the more they failed to prove any of it, and they went around the bend as the promised indictments never came. [909]   At one point, Brock's home answering machine told callers to leave a message because "I'm out trying to bring down the president." [910]

As a White House intern assigned one day to deliver some papers to the president, Lewinsky surprised Clinton by showing him her underwear. This began a series of furtive encounters that reflected poorly on both participants. Lewinsky confided what was happening to Linda Tripp, a Pentagon employee, who secretly tape-recorded her telephone conversations with Lewinsky-- itself a crime under Maryland law. Tripp in turn told Starr's Office of the Independent Counsel about the Clinton-Lewinsky affair and claimed that Clinton was trying to get Lewinsky a private industry job as the price of Lewinsky's silence. [911]   Tripp needed a lawyer to assist her in negotiations with Starr and to defend her against a potential Maryland prosecution. Ann Coulter helped her find one. [912]

On January 16, 1998, without Clinton's knowledge, the Special Division expanded Starr's jurisdiction to include any criminal liability Clinton might have had because of his behavior with Lewinsky. [913]   Under  **284**  the statute, an independent counsel who wanted expanded jurisdiction had to request it from the Attorney General, who was required to "give great weight to" the independent counsel's recommendation, and if the Attorney General, so deferring to the independent counsel, "determine[d] that there are reasonable grounds to believe that further investigation is warranted," the Special Division was required to ("shall") grant the request. [914]   This deference, both direct and indirect, to the independent counsel meant that any arguable request for expanded jurisdiction was likely to be granted. Nothing in the public record suggests that Starr informed the Attorney General or the Special Division that he had simultaneously been working with Paula Jones's lawyers to set a trap for Clinton at his January 17th deposition, before his jurisdiction had been expanded to include the Lewinsky matter.

In fact, Starr had been looking for sexual misbehavior by Clinton long before his jurisdiction was expanded to include Lewinsky, and before any of the perjury and alleged evidence tampering that later formed the basis for the impeachment had even happened. [915]   In other words, Starr was using the law enforcement power of his office to try to produce material that could be used politically to embarrass Clinton even if Clinton had not yet violated the law. Starr also did not tell the Special Division that, as a private lawyer, he gave strategic advice to Paula Jones's lawyers, one of whom "had billed Jones $975 [in lawyer time] for consultations with [Starr] on six occasions in 1994." [916]

**285**  On January 17, 1998, a day after the Special Division expanded Starr's jurisdiction, Clinton testified at a deposition in Jones's lawsuit. [917]   Linda Tripp had told Jones's lawyers about Monica Lewinsky, and they asked Clinton whether he had sex with Lewinsky or been alone with her; Clinton answered in the negative. [918]   That was a lie. Because Clinton was under oath, it was also perjury. Lewinsky had previously signed an affidavit denying that she had had sex with Clinton. Clinton's lawyers, unaware of its falsity, put the affidavit into evidence at the deposition, while Clinton, who knew the falsity of its contents, watched silently. [919]   This was later to form part of the basis for the impeachment articles alleging obstruction of justice. The issue of whether Clinton had had sex with someone other than Jones, however, was not naturally part of the Jones lawsuit, although the right-wing backers of Jones's lawsuit had paid money and supplied lawyers so they could put Clinton under oath and ask exactly these kinds of questions. [920]

On August 17, 1998, Clinton testified again, this time to Starr's grand jury: [921]

> [Starr] called the President to testify before the grand jury to ask him whether he had lied in his deposition. The aim was to put him in the position of having to confess to possible perjury, or to commit a fresh perjury by denying he

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.          47

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 393 of 553 PageID #:  798

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

had lied. The tactic ingeniously created a more formal and imposing setting than a discovery deposition in a defunct civil case, one in which the President's denials of wrongdoing would seem more grave and culpable. Ordinary defendants sidestep traps like the one the OIC set for Clinton by invoking their Fifth Amendment privilege not to incriminate themselves: but for political reasons, as [Starr] knew, the President could not "take the Fifth."

[Thus,] the point of calling Clinton to the grand jury was not to investigate an ordinary crime: it was . . . to produce a public spectacle of a president defying the rule of law by testifying falsely under oath. [922]   *286  On September 9, Starr delivered two van loads of evidence to the House along with what he called a "referral" [923]  alleging that Clinton "obstructed justice in the Clinton v. Jones lawsuit by lying under oath and concealing evidence of his relationship with Lewinsky [and] lied under oath and obstructed justice during the grand jury investigation." [924]  The referral then listed what it called "eleven possible grounds for impeachment." Starr thus asked the House to impeach Clinton. [925]  Neither Cox nor Jaworski had done that with Nixon. Cox was fired before he could do anything, and Jaworski turned his evidence over to the House Judiciary Committee without any recommendation. [926]  The referral's description of the events between Clinton and Lewinsky was widely reprinted in the press and on the Internet.

Clinton came across not as a cunning seducer and monster of predation but as an awkward and guilt-stricken overgrown adolescent, Lewinsky as a sexually aggressive and experienced but also touchingly insecure young woman. Starr meanwhile came across as a Puritan pornographer, obsessed with sex and the destruction of the President. Most readers were horrified at the brutal invasion of the lovers' privacy, and the dumping of the details into the public domain. Their horror grew as it became apparent [that Starr] had subpoenaed family members to inform on their sources; bookstores to inform on their customer's reading habits; the Clinton's lawyers, closest aides, and even their Secret Service guards to reveal the most intimate aspects of their personal lives; Lewinsky's family, closest friends, and former lovers to reveal what she had told them, and her psychiatric records and personal computer files. . . . Not to catch a master terrorist, a drug boss, or a Mafia chieftain, but a hapless schmo with a sexual secret. [927]

In October, investigators from the House Judiciary Committee started searching through the files physically located in Starr's office looking for evidence that Starr's staff might have inadvertently not sent to the House along with Starr's referral.

 *287  Rummaging through Starr's file cabinets, the House lawyers discovered interviews with Monica Lewinsky's hairdressers, childhood friends, and college lovers. There were files [on] Kathleen Willey's dentist [Clinton was alleged to have made a pass at Willey], her mail carrier, the woman who had bought her house, and the funeral home director who had buried her late husband. Starr's investigators had tracked down Vernon Jordan's chauffeur [Jordan was alleged to have tried to get a job for Lewinsky in exchange for her silence] and at least three people who worked at a Parcel Plus store near the Watergate where Lewinsky would go to log onto the Internet. They had scanned Lewinsky's library records at the Pentagon (where she had checked out just one book) and seemingly quizzed almost everyone who had ever worked in the Clinton White House, including the painters, the custodians, the men who washed the Oval Office windows, and the doorman who talked about the weather with the president every day.

None of this Starr had included in the . . . boxes of evidence he had shipped to Congress . . . . House investigators counted more than 320 grand jury transcripts or FBI interviews . . . that never made their way to Capitol Hill. There seemed to be virtually no tip, lead, or rumor that had not found its way to the prosecutors, and they had wandered down numerous undisclosed rabbit trails searching for misconduct by Clinton and his allies. The Democratic lawyers finally concluded that Starr must not have sent all this because it would prove to be powerful evidence of how overzealous his pursuit of the president had become. [928]  Starr's staff investigated a total of twenty-one women whom the staff suspected might have been connected with Clinton sexually. [929]  But there was no real evidence that Clinton, or anyone acting on his behalf, had tried to tamper with Lewinsky as a witness. "No one ever asked me to lie," she testified, "and I was never promised a job for my silence." [930]

APPENDIX - 392

On November 19, Starr testified at a House Judiciary Committee hearing and argued that Clinton should be impeached. [931] Although the Committee had not yet examined the evidence--at the time they had only read Starr's referral and heard his arguments in favor of impeachment--the Republican members of the Committee, including Chairman Henry Hyde, **288** gave Starr a standing ovation at the end of his testimony. [932] The spontaneity of this gesture revealed not only the depth of the Republicans' partisanship but also their obliviousness to the impression of partisanship that their behavior was creating in the public mind.

Clinton's standing in the polls took a dip in August, [933] when he testified before Starr's grand jury and immediately afterward made a statement on national television that many thought insincere. But from that point on, as the partisanship of the Republicans alienated portions of the public, Clinton's approval ratings were nearly always favorable and continually grew stronger, [934] in spite of (or perhaps because of) what the public saw the Republicans doing in the House Judiciary Committee, on the floor of the House, and in the Senate. On December 15, four days before the House impeached Clinton, a Washington Post/ABC News poll found 60% of the public against impeachment and 39% in favor, while by 57% to 36% the public favored a congressional resolution censuring Clinton. [935]

The public seemed to take a sophisticated view of impeachment, close to that of the drafters of the Constitution. [936] The polls revealed that the public saw what Clinton had done--both adultery and perjury--as wrongs committed by Clinton as a private person, not as an officeholder, and certainly not involving the abuse of official power. Though Clinton deserved some type of punishment, removal from office seemed to the public to be unrelated to the offense. Republican arguments interpreting the phrase "high Crimes and Misdemeanors" came off as formalistic and appeared to ignore the policy purposes behind the impeachment provisions in the Constitution, which the public seemed to sense intuitively. That is why part of former Senator Dale Bumpers's argument to the Senate on Clinton's behalf during the impeachment trial resonated so thoroughly. Before entering politics, Bumpers had litigated hundreds of divorce cases in rural Arkansas. "In all those divorce cases," he told the Senate:

> **289** I would guess that in eighty percent of contested cases, perjury was committed. . . . Do you know what it was about? Sex. Extramarital affairs. But there is a very big difference between perjury about whether there was marital infidelity in a divorce case and perjury about whether I bought the murder weapon. . . . And to charge somebody with the first and punish them as though it were the second stands our sense of justice on its head. [937]

At the center of the effort in the House to impeach Clinton had been Tom DeLay, then the Republican House Whip and later the House Majority Leader. Beginning in August 1998, before Starr delivered his referral to the House, DeLay organized an effort, which he and his staff called "The Campaign," to get Clinton impeached.

> In a conference room in the Capitol . . . [DeLay's staff] flood[ed] House Republicans with information and provid[ed] a central booking agency for members who shared DeLay's conviction and were willing to go public with calls for Clinton to resign. . . . A "message of the day" would be sent to every Republican member's office to keep up the pressure. Sample press releases would be written for other Congressmen to release in their own names . . . .

. . . .

. . . DeLay [used] a network of conservative talk shows and party fund-raisers to generate pressure within the GOP. He would go on as many as ten radio talk shows a day, and his staff would blast-fax talking points and tip sheets to perhaps two hundred such programs at a time, revving up the conservative audiences that would then turn up the heat on their local congressmen. [938] That pressure could be substantial because most Republican Representatives were out of touch with the mainstream of public sentiment.

APPENDIX - 393

From the time the Republicans took control of the House after the 1994 elections, their majorities had been among the smallest in American history. In fact, the Democratic majorities in the House for nearly all of the period from 1932 through 1994 were enormous compared to the tiny margins available to the Republicans after 1994. [939] The Republicans ran the House as though they had massive public support, which they did not. **\*290** They tended to get their news from The Washington Times [940] and Fox News. [941] Exposed to a narrow range of opinion, they expected the world to conform to their views, and did not feel obligated, as generations of politicians before them had, to find practical solutions that worked and could satisfy a broad political consensus. They were not afraid of losing general elections because their districts had been gerrymandered to have Republican majorities, even if there were more Democrats than Republicans in the national population. What a Republican incumbent could be afraid of was losing a primary election to an even more right-wing challenger who might be supported and bankrolled by the very constituents that DeLay had aroused to badger their Representatives into voting for impeachment. [942]

Before Starr testified, the Committee sent Clinton a demand that he answer eighty-one questions that the Republicans claimed were necessary to the Committee's investigation. Few, if any, of the questions were **\*291** investigatory. The first was: "Do you admit or deny that you are the chief law enforcement officer of the United States?" [943]

No congressional judiciary committee could have been in any doubt about the answer to this question (and a number of the others). Its purpose was to taunt Clinton and to generate an answer that would enable Republicans to proclaim that Clinton admitted being the chief law enforcement officer of the land but still himself committed a felony. In 1974, if the Democratic majority on the House Judiciary Committee had tried to send similar questions to Richard Nixon, the Republican minority would have erupted in protests that the majority was behaving in a partisan manner. It was to avoid any conceivable appearance of partisanship that the 1974 committee majority treated Nixon and his advocates with solicitous respect and treated the idea of impeachment as a regrettable duty, to be undertaken only if absolutely unavoidable.

Throughout the proceedings in the House Judiciary Committee and on the floor of both the Senate and the House, Republicans refused to call the subject of the proceedings "President Clinton" or "the President" or "Bill Clinton"--which was the only name by which the public knew him. Instead, Republicans referred to him as "William Jefferson Clinton," enunciating each syllable in the tone that a bailiff might use while reading aloud an indictment during an arraignment in a criminal courtroom. The purpose was to de-legitimize Clinton by treating him as though he were nearly already convicted and not a real president. This tactic appeared to have an opposite effect on those of the public who noticed it. The Republicans, carried away with their own partisanship, appeared to be the ones treating the office of the presidency with disrespect.

On almost entirely party-line votes, the House Judiciary Committee recommended four articles of impeachment on December 11 and 12. [944] On December 19, 1998, the House adopted two of the four articles, charging Clinton with perjury before the grand jury, and with obstruction of justice by concealing evidence in the Paula Jones litigation. [945] The perjury article was adopted 228 to 206 [946] on a nearly party-line vote, with only 5 Democrats voting yea and only 5 Republicans voting nay. [947] The **\*292** obstruction of justice article was adopted by a vote of 221 to 212 [948] --an extraordinarily close vote and again nearly party-line, only 5 Democrats voting yea and 12 Republicans voting nay. [949] During the debate, Democrats protested that the impeachment was a "partisan railroad job," [950] and that it was hypocrisy to impeach a Democratic president for perjury after a Republican secretary of defense had been indicted for perjury and then pardoned by the first President Bush. [951]

Some in the House Republican leadership, especially Tom DeLay, believed that impeachment would enable them to make large gains in the November 1998 congressional elections, because the elections would occur after the initial House Judiciary Committee meetings on impeachment were nationally televised. In congressional elections occurring in a president's sixth year, the party not in control of the White House has traditionally gained House seats--often in large numbers. At that point in a presidency, an Administration's mistakes could look bigger than they did earlier while the president himself could appear less attractive than he once was. This happened to Woodrow Wilson (whose party lost twenty-two House seats in 1918), Franklin Roosevelt (seventy-two seats in 1938), the Roosevelt/Harry Truman Administration (fifty-four seats in 1946), Dwight Eisenhower (forty-eight seats in 1958), the John F. Kennedy/Lyndon Johnson Administration (forty-five seats in 1966), and the Richard Nixon/Gerald Ford Administration (forty-eight seats in 1974), though sometimes the damage could be lighter as with Warren Harding/Calvin Coolidge (eight seats in 1926) and Ronald Reagan (five seats in 1986). [952] In 1998, Republican ambitions were not as big as the historical average, but Republicans were nevertheless confident nonetheless of gains. On the

APPENDIX - 394

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 396 of 553 PageID #:  801

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

day of the election, Republican House Speaker Newt Gingrich predicted his party would pick up twenty seats at the expense of the Democrats. [953]

Instead, the Republicans lost five seats because the Republican campaign to impeach Clinton had alienated voters. [954] The Republicans retained control of the House, but more people actually voted for Democratic House candidates than for Republican House candidates. This was the only time since Baker v. Carr rationalized House voting in 1962 by **\*293** requiring that legislative districts be of equal size [955] that the party that lost the popular vote won a majority of the seats in the House. [956] The Republicans won a majority only because of intense gerrymandering that was not possible before the invention of computers.


**Table 4**

**Congressional Party Divisions after the Elections of 1996 and 1998 Together with Popular Vote for House Candidates in the Same Elections**

|  | 1996 | 1998 |
|---|---|---|
| Senate Seats [957] |  |  |
| Democrats | 45 | 45 |
| Republicans | 55 | 55 |
| House Seats [958] |  |  |
| Democrats | 206 | 211 |
| Republicans | 228 | 223 |
| Others | 1 | 1 |
| House Popular Vote [959] |  |  |
| Democratic | 48.5 | 48.9 |
| Republican | 48.9 | 47.9 |

When the articles of impeachment were considered by the House on December 19, the Republican leadership refused to allow a vote on a motion that would express the sense of Congress that Clinton had "dishonored" the Presidency and "deserves[] the censure and condemnation of the American people and the Congress," which Clinton would have had to acknowledge by his signature on the resolution. [960] Peter Baker, who published the most exhaustive history of the Clinton impeachment, wrote that "DeLay . . . crushed the possibility of a censure vote on the floor." [961] On February 12, a few minutes after the Senate acquitted Clinton, a Democratic Senator and a Republican Senator moved a similar censure resolution in the Senate. Even though a fifty-six to forty- **\*294** three majority voted to consider the resolution, it failed because it was made outside the process for ordinary business, which requires a two-thirds majority to suspend temporarily the Senate rules. [962] If it had not been necessary to suspend the rules, the resolution obviously would have been adopted.

Everything changed when the House managers appeared in the Senate to present their case. After the mob psychology that dominated their party in the House, the impeachment managers were stunned by the calm skepticism of a number of Republican Senators, who could not be disciplined by their party leadership the way that House Members could, as well as by the imperviousness to persuasion on the part of every single Democratic Senator. This should not have been a surprise to the House managers. Conviction in an impeachment trial requires a two-thirds majority in the Senate. Nothing about the Senate of 1998 and 1999, and nothing about the articles of impeachment, or the evidence behind them, could have supported any rational hope that Senators would have been more enthusiastic about convicting Clinton than the House of Representatives had been about impeaching him.

On January 7, 1999, the Senate trial began. [963] Moderate Republican and Democratic Senators, with support from Senate Republican Majority Leader Trent Lott, proposed that after four days of hearing arguments and debate, the Senate would take a straw vote, and if that vote showed that the two-thirds majority needed to convict was unreachable, the Senate would table the impeachment articles and instead consider censuring Clinton. [964] "However, a powerful backlash from strongly conservative Republicans forced Lott to abandon the plan." [965]

APPENDIX - 395

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 397 of 553 PageID #:  802

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

On January 27, Senator Robert Byrd made the impeachment equivalent of a motion to dismiss for failure to state a claim on which relief can be granted, and forty-four Senators (all Democrats) voted to dismiss the articles of impeachment. [966] A Senator who believes that neither article states an impeachable offense will not later vote to convict, no matter how amply later evidence supports the allegations in that article. If forty-four Senators take the position that the allegations in the impeachment articles, **295** even if they are later proved with evidence, would not constitute grounds for conviction, then the largest number who could vote to convict after hearing the evidence would be fifty-six--far less than the sixty-seven votes needed for a conviction. It thus became clear that Clinton could not be convicted. [967]

Between February 1st and 3rd, Lewinsky, Vernon Jordan, and Sidney Blumenthal [968] were deposed, so that any Senator who wanted to could watch their testimony on videotape. [969] This produced nothing new. The House impeachment managers wanted Lewinsky to testify on the Senate floor, but the Senate rejected that plan by a thirty to seventy vote. The thirty aye votes were all Republican but included virtually no senior Republicans. [970] Throughout the trial, it was the Republican House managers who wanted to put as much testimony as possible before the Senate (and national television audiences), while Clinton's lawyers and Senate Democrats argued that little or no evidence was necessary because the House had not alleged grounds for conviction. This was the inverse of what happened in past impeachments, where the defendant has usually insisted that the House prove its case factually. [971]

On February 12, the Senate acquitted Clinton. [972] On neither article did even a simple majority of the Senate vote to convict. On the perjury article, forty-five Senators voted to convict, and fifty-five voted to acquit. [973] On the obstruction of justice article, the Senate split evenly, fifty Senators voting to convict and fifty to acquit. [974] Of the three high-profile partisan impeachments to go to a Senate trial--Chase, Johnson, and Clinton--here the prosecution from the House fared the worst. In the Chase trial, 56% of the Senate voted to convict on one of the articles. [975] In the Johnson trial, 65% of the Senate voted to convict. [976] By contrast, the best the House managers could get in the Clinton impeachment was 50% on one article and 45% on the other.

**296** On June 30, 1999, the Independent Counsel Act expired. It has not been reenacted. [977]

Michael Gerhardt, the leading legal scholar on impeachment, wrote shortly after the Clinton trial:

> [I]f a majority vote by the Senate to convict both Chase and Johnson could not save either's impeachment from being regarded as illegitimate, the absence of a majority vote in the Senate [against] Clinton (coupled with other criticisms of it) could be viewed as an even rounder rejection of the legitimacy of the House's case. [978] That may be evidence of the House Republicans' partisanship, but it may also be evidence of how much their partisanship blinded them to political realities. In both the Chase and Johnson impeachments, the impeaching political party started with more than a two-thirds majority in the Senate--ample votes, in other words, to convict. In the Chase impeachment, all the Federalists voted to acquit on the important articles, but that would not have been enough: Chase was saved by defections among Jeffersonians who knew their party had overreached. [979] The same thing happened in the Johnson trial. There, Republicans in the Senate had more than a two-thirds majority, the Democrats all voted against impeachment, and Johnson was acquitted only because of the defections of Republicans troubled by what their party was doing. [980] In 1999, Republicans started with only fifty-five of one hundred Senators. To win, they would have to keep all of those votes and persuade at least twelve Democrats to join them. But the partisanship of the House not only failed to persuade a single Democrat to vote to convict, but it also, as in the Chase and Johnson trials, caused defections from their own party.

Elsewhere, Gerhardt has written that "[i]t is tempting but misguided to dismiss President Clinton's impeachment and acquittal as having been driven largely by partisanship." [981] His reasoning appears to have been that "Democrats arguably acted throughout the proceeding in at least as partisan a fashion as their Republican counterparts." [982] But nonpartisanship and bipartisanship are possible only when the party with greater legislative power makes room for it. In 1974, many, though not all, Republicans were **297** eventually able to see that their own president should be removed from office only because the Democratic majority conducted the impeachment inquiry in a nonpartisan manner. Because in 1998 and 1999, the majority Republicans acted in a highly partisan manner from the start, and because the impeachment was the culmination of many years of campaigning to de-

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 398 of 553 PageID #:  803

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

legitimize Clinton and smear him and his family, it is not surprising that Democrats did not approach the issues with completely open minds. The record actually demonstrates that many Democrats did seek to compromise, which the Republicans rejected-- for example the Democratic proposals to censure Clinton. In both the House and Senate, a very large proportion of Democrats made it clear that they were disgusted both with Clinton's behavior and with the Republican impeachment movement.

Individual members of the House Judiciary Committee did not impose on themselves in 1998 an evidentiary burden,[983] such as the clear and convincing evidence standard used by most Committee members during the Nixon impeachment hearings in 1974.[984] The 1998 Committee did not form a bipartisan impeachment staff, which the 1974 Committee did when investigating Nixon. In 1974, the "staff conducted a neutral, behind-closed-doors investigation and then presented Committee members in closed sessions with evidence and legal analysis in a nonjudgmental fashion," while in 1998, the Committee's "deliberations were marked from the outset by open partisan conflict."[985] In 1974, Leon Jaworski, as special prosecutor, merely turned his evidence over to the Committee.[986] Because the evidence was so massive, Jaworski had to add a report that summarized it, but he first showed the report to the federal judge who tried all the Watergate criminal cases to make sure that it did nothing other than summarize the evidence and was devoid of conclusions and recommendations.[987] But in 1998, Starr "actively participated in the Committee's impeachment hearings, strongly advocating President Clinton's impeachment."[988] Unlike Cox and Jaworski, who "[w]hile investigating Nixon . . . avoided any partisan political activities," Starr and his investigation "acquired overtones of political motivation."[989]

 **\*298**  Benjamin Wittes, a journalist, interviewed Starr at length after he resigned as independent counsel.[990] Primarily on the basis of these interviews, Wittes concluded that Starr had not set out to destroy Clinton's Presidency but instead had conceived of his role as that of a "truth commission."[991] Starr told Wittes that the Independent Counsel Act required him to assume that role. But the statute assigned to an independent counsel the responsibilities of determining whether evidence would support a criminal conviction and, if it would, prosecuting to obtain that conviction; these are the functions of a prosecutor, not a grand inquisitor. The principal author of the Act, Samuel Dash, has written that "an independent counsel . . . is no more and no less than a federal prosecutor in the U.S. Department of Justice," with the sole exception that an independent counsel makes prosecutorial decisions without answering to the Attorney General.[992] Starr actually hired Dash to advise him and his staff about the Act. But when Starr appeared before the House Judiciary Committee and advocated impeachment, Dash resigned in a letter that told Starr "you have violated your obligations under the independent counsel statute and have unlawfully intruded on the power of impeachment, which the Constitution gives solely to the House."[993]

What Starr said to Wittes has a very low degree of historical probativeness. It is part of the historical method that we view with relentless skepticism what people say to justify their actions, and that we instead draw inferences primarily from what people do and from what they say when they are not trying to justify themselves.[994] Starr initially was appointed to investigate whether the Clintons had committed crimes in connection with the Whitewater real estate investment. In 1997, Starr had his office draft a 100-page referral recommending that Clinton be impeached over Whitewater, but he decided not to send it to the House because he was not confident of his evidence.[995] Starr also (re)-investigated the death of Vince Foster, allegations about personnel practices in the White House travel office, the disposition of FBI files, and every conceivable allegation about Clinton's sex life. Each investigation lasted years, either because of an inability on the part of Starr and his staff  **\*299**  to reach closure on anything or because the real purpose was to keep Starr's office in operation until something impeachable could be found. Then, when Clinton finally perjured himself about Lewinsky in the Jones deposition, Starr and his staff suddenly gained speed that they had never shown before. From the date of the deposition to the date Starr referred the matter to the House, his investigation of the Lewinsky matter was completed in by far the shortest period of time for anything he investigated as independent counsel.

In 1974, individual members of the House Judiciary Committee worked hard and earnestly to develop an evidentiary standard that would identify behavior justifying impeachment. Members disagreed with each other about what that test would be, but nearly all focused on some version of a profound abuse of presidential power that damages the country. For example, the ten Republicans on the 1974 Judiciary Committee who initially voted against impeachment but reversed themselves after the smoking gun tapes were released signed a joint statement in which they said, among other things, that "the Framers . . . intended that the President should be removable by the legislative branch only for serious misconduct dangerous to the system of government established by the Constitution."[996] One of those ten was Trent Lott. But in 1998, as Senate Majority Leader, he took the position that impeachment would be justified if a president's "bad conduct" put the presidency in "disrepute."[997] And in 1998, many other Republicans reverted to the formula used by Ford when he tried to have Douglas impeached--that "an

APPENDIX - 397

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 399 of 553 PageID #: 804

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

impeachable offense is whatever a majority of the House of Representatives considers it to be at a given moment in history" [998] -- which is not how Republicans insisted that Nixon be judged.

One of the leading scholars of the Johnson impeachment, Hans Trefousse, considers the Clinton and Johnson impeachments to be essentially parallel:

> In both cases, tremendous party pressure brought about the indictment; in both cases, the real cause of the impeachment did not appear to be the ostensible one [recited in the impeachment articles]; and in both cases, the President's bitter opponents . . . **\*300** particularly Kenneth W. Starr and his supporters in 1998, had been pursuing the President for a long time. [999] Even Richard Posner called it part of "the Republicans' war against Clinton." [1000]

### IV. The Future of Partisan Impeachments and Threats of Impeachment

Certainly, nonpartisan and bipartisan impeachments will continue. Occasionally, though infrequently, it will be necessary to impeach a corrupt official who refuses to resign. Will impeachments and threats of impeachment continue to be used in partisan political manner, as they have since 1969? To explore that question, it is helpful to consider the relevance of the rhetoric on perjury used during the Clinton impeachment to another dispute involving testimony by a federal official. In so doing, it will be helpful to look at the rules (or lack thereof) on evidentiary burdens in impeachments in the House and Senate and the effect of party insecurity on the use of impeachment and threats to impeach.

### A. Thomas

"There is no excuse for perjury. Never, never, never," Kenneth Starr told Diane Sawyer in a television interview during the Clinton impeachment. [1001] Before the House Judiciary Committee, Starr argued that:

> [N]o one is entitled to lie under oath simply because he or she does not like the questions or because he believes the case is frivolous, or that it is financially motivated or politically motivated. . . .

History and practice support the conclusion that perjury is a high crime and misdemeanor. Perjury has been the basis, as the committee knows, for the removal of several judges. As far as we know, no one has questioned whether perjury was a high crime or misdemeanor in those cases. . . . And the House manager's report in the impeachment of Judge Walter Nixon, for perjury, stated, "It is difficult to imagine an act more subversive to the legal process than lying from the witness stand." **\*301** Witnesses tell the truth. It doesn't matter what the underlying subject matter is. Once you are in court under oath, you tell the truth. That is the way judges look at the world, and perhaps that is why no judge being subjected to an impeachment for perjury has dared suggest don't worry about it, it's not an impeachable offense. [1002]

During the Senate Judiciary Committee hearings on his nomination to the Supreme Court, Clarence Thomas made numerous statements of fact, under oath, that were viewed by many as not believable. For example, he testified that he did not know until shortly before the hearings that a friend of his, Jay Parker, represented the South African government by lobbying against sanctions that had been imposed because of that government's racist practices known as apartheid. [1003] The media immediately afterward reported that when Thomas was Chairman of the Equal Employment Opportunity Commission he argued with employees there and defended Parker's lobbying on behalf of the South African government, and one of those employees contacted the Judiciary Committee to give the same account. [1004]

Thomas denied under oath that he had prepared for the hearings in the manner customary for nominees to high-stakes positions, with extensive coaching on what to say and how to say it. [1005] Given the importance of this nomination to the first President

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 54

Bush's administration, many saw Thomas's claim as inherently incredible. Before the hearings, according to Andrew Peyton Thomas, who has written the only full-length biography of Clarence Thomas:

> Thomas . . . spent large blocs of time viewing videotapes of the Bork and Souter hearings, studying them and taking notes. . . . [Thomas also prepared extensively through] "murder boards." Held in Room 180 of the Old Executive Office Building, the mock hearings featured lawyers from the White House and Justice Department seated around a large, horseshoe-shaped conference table. Thomas held the seat of honor in the middle.  **\*302** The panel bombarded him with hostile questions, mining his writings for the most offensive passages. . . . These verbal sparring matches were intended not only to help him anticipate likely questions, but to deaden the pain that these assaults would inflict on his pride and, possibly, to his reputation. [1006]

On the issue of abortion and the precedential value of Roe v. Wade, [1007] Thomas testified as follows:

> Senator Hatch: Have you made up your mind, Judge Thomas, on how you will vote when abortion issues are before the Court as a Justice on the Court?

Judge Thomas: . . . I don't sit on any issues, on any cases, that I have prejudged. [1008]

Senator Metzenbaum: [Do] you believe that the Constitution protects a woman's right to choose to terminate her pregnancy[?]

Judge Thomas: . . . I have no reason or agenda to prejudge the issue . . . . [1009]

Senator Leahy: So it would be safe to assume that when [Roe] came down--you were in law school, you were in law school, where recent case law is often discussed--that Roe v. Wade would have been discussed in the law school while you were there.

Judge Thomas: . . . Because I was a married student and I worked, I did not spend a lot of time around the law school doing what the other students enjoyed so much, and that is debating all the current cases and all of the slip opinions. My schedule was such that I went to classes and generally went to work and went home.

Senator Leahy: Judge Thomas, I was a married law student who also worked, but I also found, at least between classes, that we did discuss some of the law, and I am sure you are not suggesting that there wasn't any discussion at any time of Roe v. Wade?

Judge Thomas: Senator, I cannot remember personally engaging in those discussions.

. . . .

 **\*303**  Senator Leahy: Have you ever had discussion of Roe v. Wade, other than in this room, in the 17 or 18 years it has been there?

Judge Thomas: Only, I guess, Senator, in the fact in the most general sense that other individuals express concerns one way or the other, and you listen and you try to be thoughtful. If you are asking me whether or not I have debated the contents of it, that answer to that is no, Senator.

. . . .

Senator Leahy: . . . Have you made any decision in your own mind whether you feel Roe v. Wade was properly decided or not, without stating what that decision is?

Judge Thomas: I have not made, Senator, a decision one way or the other with respect to that important decision. [1010]

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    55

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 401 of 553 PageID #:  806

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

Senator Brown: I would be interested to know if in your own mind you have come to a decision on the right to terminate a pregnancy. I am not asking what that decision is, but I would like to know within your own mind if you are at a point where you have decided that.

Judge Thomas: . . . I have no agenda. I am open about that important case. . . . [1011] "No one believes that," wrote one author in a typical response to Thomas's testimony. [1012] When Administration lawyers prepared Thomas for his testimony, [1013] he told them that he had no position on abortion and had never discussed it with anyone, even his wife. [1014] Even the Administration lawyers did not believe him. [1015] Roe has been, by far, the most divisive Supreme Court case, and abortion the most divisive constitutional issue, in recent decades, and it seemed that a Supreme Court nominee who claimed to have no position on Roe or abortion and further claimed not to have discussed the case or the issue was either unqualified for the Court or lying.

The format of a congressional hearing is not conducive to determining specific facts such as whether Thomas was telling the truth. Investigation before a hearing often does not reveal issues that arise for the first time during the hearing--a process that, compared with discovery in civil **304** litigation, is inadequate. Statements made during a hearing are not fully investigated afterward or before the committee makes a decision. Witnesses are questioned by politicians who lack questioning skills, are often unprepared, and frequently engage in rhetorical posturing rather than a methodical search for truth. Each questioner is limited to a short time, such as ten minutes, which prevents any searching inquiry. Witnesses are allowed to testify to any "fact" they please, even if they have no first-hand knowledge of it and are only guessing--or hoping--that it is true. And questioners are allowed to ask questions designed to elicit such testimony. In general, in a congressional hearing the rules of evidence that govern every trial court are ignored.

Despite all this, some evidence immediately began to appear suggesting that Thomas did have a position on Roe and abortion, and had previously expressed it. Much more evidence might exist, but the committee did not conduct an exhaustive inquiry to locate it. The evidence that appeared during the hearings included a report, signed by Thomas, recommending, among other things, that the Administration nominate Supreme Court Justices who would vote to overrule Roe, [1016] as well as a speech in which Thomas praised an article that argued that the natural law philosophy Thomas subscribes to creates a constitutional right to life and that all abortion is unconstitutional. [1017] Thomas testified that he had not read the passages in the report that discussed Roe. [1018] He also testified that he did not intend to endorse the article's position on abortion, even though the article was titled The Declaration of Independence and the Right to Life: One Leads Naturally to the Other, and even though Thomas said in the speech that the article, "on the Declaration of Independence and the meaning of the right to life[,] is a splendid example of applying" natural law. [1019]

After the hearings, it was reported that "Paul Weyrich [the founder of the Heritage Foundation and an influential right-wing activist] remembered that Thomas had expressed an opinion on . . . abortion in prior meetings with him. He found Thomas's lack of candor 'disingenuous' and 'nauseating.' A man of probity . . ., Weyrich seriously considered withdrawing his support of Thomas [but was talked out of it on the argument] that Thomas's responses were cagey but not false." [1020] Even **305** Thomas's own mother told reporters that he had told her he was opposed to abortion. [1021]

Nine months after being sworn in as a Supreme Court Justice, Thomas joined a concurring and dissenting opinion by Rehnquist, [1022] as well as a concurring and dissenting opinion by Scalia in the same case, [1023] both of which argued that Roe was wrongly decided. "We think," the Rehnquist opinion posited, "that the Court was mistaken in Roe . . . . In our view, authentic principles of stare decisis do not require that any portion of the reasoning in Roe be kept intact." [1024] The Scalia opinion derided the majority's reaffirmation of the essence of Roe as "outrageous." [1025] These positions, taken so soon after Thomas's confirmation hearings, created further doubts about his testimony's truthfulness. In another case, [1026] Thomas wrote a dissent filling forty pages in the official reporter. [1027] The first sentence, speaking of Roe, stated: "In 1973, this Court struck down an Act of the Texas Legislature that had been in effect since 1857, thereby rendering unconstitutional abortion statutes in dozens of States. . . . As some of my colleagues on the Court, past and present, ably demonstrated, that decision was grievously wrong." [1028] He then cited to then-Justice Rehnquist's dissent in Roe [1029] and to Justice White's dissent in a companion case, decided the same day as Roe. [1030] In every other case in which the constitutional right established in Roe, or the parameters of that right, has been at issue, Thomas has voted against it. [1031] The uniformity and comprehensiveness of these views, and

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    56

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 402 of 553 PageID #: 807

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

the unqualified language with which Thomas has expressed them, and subscribed to others' expression of them, suggest that they were not arrived at after Thomas's confirmation testimony.

 **\*306** After these hearings ended, a separate controversy arose, and the committee held a second round of hearings. Anita Hill had been a lawyer supervised by Thomas first at the Department of Education and then at the Equal Employment Opportunity Commission. Hill testified that at the Department of Education Thomas pressured her to date him, which she refused to do because he was her supervisor. She further testified that during conversations ostensibly about her work assignments he subjected her to sexual monologues.

> Ms. Hill: He spoke about acts that he had seen in pornographic films involving such matters as women having sex with animals, and films showing group sex or rape scenes. He talked about pornographic materials depicting individuals with large penises, or large breasts involved in various sex acts.

On several occasions, Thomas told me graphically of his own sexual prowess. Because I was extremely uncomfortable talking about sex with him at all, and particularly in such a graphic way, I told him that I did not want to talk about these subjects. . . . My efforts to change the subject were rarely successful. [1032] Hill testified that after some time at the Department of Education Thomas's behavior seemed to end. However, when Thomas became Chairman of the EEOC, she transferred to a job there, which Thomas offered to her. After some time at the EEOC, Thomas's discussions of sex "began again:" [1033]

> Ms. Hill: The comments . . . ranged from pressing me about why I didn't go out with him, to remarks about my personal appearance. . . .

He commented on what I was wearing in terms of whether it made me more or less sexually attractive. The incidents occurred in his inner office at the EEOC.

One of the oddest episodes I remember was an occasion in which Thomas was drinking a Coke in his office, he got up from the table, at which we were working, went over to his desk to get the Coke, looked at the can and asked, "Who has put pubic hair in my Coke?"

On other occasions, he referred to the size of his own penis as being larger than normal and he also spoke on some occasions **\*307** of the pleasures he had given women with oral sex. . . . I began to feel severe stress on the job.

. . . .

In February 1983, I was hospitalized for 5 days on an emergency basis with acute stomach pain which I attributed to stress on the job.

In the spring of 1983, an opportunity to teach at Oral Roberts University opened up. . . . I agreed to take the job, in large part, because of my desire to escape the pressures I felt at the EEOC due to Judge Thomas.

When I informed him that I was leaving in July, I recall that his response was that now, I would no longer have an excuse for not going out with him. . . . [1034] Thomas then testified:

> Judge Thomas: I would like to start by saying unequivocally, uncategorically that I deny each and every single allegation against me today that suggested in any way that I had conversations of a sexual nature or about pornographic material with Anita Hill, that I ever attempted to date her, that I ever had any personal sexual interest in her, or that I in any way ever harassed her. [1035]

APPENDIX - 401

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 403 of 553 PageID #:  808

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

Several employees and former employees of the EEOC testified on Thomas's behalf. The heart of their testimony would not have been admissible in a court of law. Some were allowed to testify that they had never seen Thomas behave as Hill had described and believed him incapable of it. [1036] Others testified to their own speculation that Hill was merely projecting her feelings onto Thomas and that she only testified as she did because her supposed sexual interest in him had not been reciprocated. [1037]

The Republicans claimed the Hill could not have been telling the truth because she did not file a complaint against Thomas; she followed him to a second job; and she spoke with him by telephone several times after leaving that job. Hill responded that she did those things because she  **\*308**  "hoped to maintain a professional relationship, for a variety of reasons." [1038] She claimed that she "could not afford to antagonize a person in such a high position." [1039] Virtually all the empirical research on the question shows that large numbers of victims of sexual harassment react just as Anita Hill said she did. [1040]

Three witnesses testified that, during the time when Thomas supervised her, Hill told them she was being sexually harassed, and a fourth testified that Hill had told him the same thing after she left the EEOC. [1041] One of these witnesses was a partner in a Wall Street law firm, another was an administrative law judge, and a third was a law school professor. Although one of the witnesses appeared somewhat shaken during cross-examination, collectively the four of them established that, before Thomas was nominated to the Supreme Court, Hill had told others that he had harassed her.

The media had already begun to report Thomas's interest in pornography, [1042] and later journalists documented it thoroughly, together  **\*309**  with Thomas's habit of talking about sex in ways that were entirely consistent with the conversations Hill had described. [1043] About two years before Thomas was nominated to the Supreme Court, for example, the former corporation counsel of the District of Columbia had seen Thomas "checking out pornographic videos." [1044]

Two other people offered to testify in corroboration of Hill's story. One "was willing to testify that [Thomas] had virtually auditioned female employees to play the role of a potential mate." [1045] The other, Angela Wright, was willing to testify that Thomas had behaved similarly to her, discussing her anatomy and making comments like: "You need to be dating me." [1046] A third person was willing to testify that Wright had told her of the harassment contemporaneously with the time Wright claimed it happened, "which on occasion had reduced Wright to tears." [1047] Wright, employed at the EEOC as a publicist, had been fired because she neglected to invite a key person to a press conference. [1048] But Thomas and his backers implied that she had been fired because of character defects instead. [1049] Although Wright had been previously fired from other jobs and had a reputation for tempestuousness, [1050] that alone does not mean that Thomas did not harass her. The committee, under intense Republican pressure, decided not to call either Wright or her corroborating witness, although Republicans implied publicly that Wright had backed out. [1051] The corroborating witness, who would have testified that Wright contemporaneously told her of the harassment, later said, "These people didn't want to hear from us. . . . Thomas's supporters didn't want another woman, especially one with some of the same looks, age, and brains, telling a similar story as Anita Hill." [1052]

The committee rushed through the sexual harassment hearings in three days, October 11 through 13, 1991--a Friday, Saturday, and Sunday. The  **\*310**  Senate voted two days later, on October 15, to confirm Thomas's nomination by a vote of fifty-two to forty-eight. [1053] Of the 115 Justices who have served on the Supreme Court, only one was confirmed by a closer vote: Stanley Matthews, by a 24-23 vote, in 1861. [1054] Many of the Senators who voted against Thomas believed that he lied under oath during the Judiciary Committee hearings. Garry Wills, normally the soberest and least excitable of commentators, wrote: "Now we have a perjurer on the bench." [1055]

To salvage Thomas's reputation, David Brock was commissioned to write an article portraying Hill as emotionally unstable for The American Spectator [1056] --the same magazine that later acted as a front for Richard Scaife's Arkansas Project. [1057] The article grew into a book called The Real Anita Hill. [1058] The public perception of Hill was substantially influenced by what Brock wrote, although all of his claims have since been refuted, [1059] and Brock later confessed that--in his own words--"I was a liar and a fraud in a dubious cause"; that "Hill's testimony was more truthful than Thomas's flat denials"; that to protect Thomas he and others engaged in "smears, falsehoods, and cover-ups"; and that he had "falsified the historical record." [1060] "I no longer believed in my own book," he wrote in 2002. [1061] He found reading Hill's own book about the Thomas hearings [1062]

APPENDIX - 402

to be "too painful" because he finally understood how, having "attacked her, wrongly, as a liar[,] I made this woman's life a living hell." [1063]

Perjury is a fertile field for future impeachments because of the opportunities to put ambitious people under oath. In part, this is because of the increased use of litigation as a weapon of partisan politics. And in part it is because of the confirmation battles that have come to accompany Supreme Court nominations, where a nominee testifies under oath and can be put to a choice between fudging the truth and risking a seat on the Supreme Court. Because there is no statute of limitations on impeachments, no official confirmed after testifying about disputed facts at  **311**  a confirmation can feel immune from a later impeachment inquiry. And because of the Clinton impeachment, the perjury issues raised by the Thomas confirmation hearings will not fade from memory for a very long time.

After Robert Bork's 1987 Supreme Court nomination failed in the Senate, and after Anthony Kennedy and David Souter were confirmed without having built reputations among right-wing interest groups, and then started evolving into, respectively, a swing vote and a liberal on the Court, it became clear to the lawyers who screened judicial nominations in the first President Bush's administration that to get the kind of Supreme Court nominee they wanted through the Senate of 1991, they needed a "black Bork" who would divide Democrats in general and African-Americans in particular. [1064]  According to David Brock, "as early as 1981--ten years before he was appointed, when he was scarcely thirty--a number of colleagues recalled [Thomas] setting his sights on" the Supreme Court seat to which he was eventually nominated. [1065]  Others also recounted similar conversations in which the young Clarence Thomas described an ambition to sit on the Supreme Court. [1066]  According to Brock, Clarence Thomas worked with administration lawyers to develop the "black Bork" strategy and "was really the only" nominee who had the basic qualifications of race and ideology to fulfill it. [1067]

Justice Thomas has since then been inseparably associated with the impression that he was nominated only because he satisfied this unique political strategy, and with the suspicion that he committed perjury [1068]  in order to gain his confirmation. Electoral fortunes swing from one side of the political spectrum to the other inevitably and unpredictably, while competition between political parties often leads one party to adopt the other's tactics. Just as the Jeffersonian party adopted the impeachment tactics of the Federalists and the modern Democrats adopted the  **312**  confirmation hearing tactics pioneered by the Republicans, nothing other than self-restraint can prevent the Democratic Party from using impeachment, or the threat of impeachment, as a partisan political weapon in the way Republicans have. If the Democrats ever adopt the Republican strategy of threatening to impeach and, on occasion impeaching, to gain political advantage, the suspicion of perjury would make Justice Thomas, at least in the abstract, vulnerable indefinitely. If the Democrats feel they must be able to fill his seat, as the Republicans felt they must be able to fill the seats of Justices Fortas and Douglas, the suspicion of perjury may again become a public issue, all the more so because the Republicans built an association of impeachment with perjury through the Clinton impeachment.

Can a person be impeached for private acts not committed in any official capacity? That issue was settled, at least in part, through the impeachment trial of Judge Claiborne in 1986. Claiborne had earlier been criminally convicted for filing false tax returns. The House then impeached him and the Senate convicted him of the purely private acts of making false statements on tax returns and of the mixed, private and public, act of bringing his court into disrepute through his own criminal conviction. [1069]

Can a person be impeached for acts committed before taking the oath of office? In his Treatise on Federal Impeachments, Simpson considered this question and concluded that "if the offense is directly connected with the attainment of the office he occupies while impeached, as a violation of the Corrupt Practices Act in relation to his nomination or election . . ., the impeachment ought to prevail." [1070]  But Simpson also proposed the corollary that, "if the offense were the subject of consideration, and the facts in regard to it were substantially known at the time of his election, or appointment and confirmation, it should not again be brought forward." [1071]  However, the reason Simpson offered for the corollary shows that it was not intended to limit the original conclusion:

> It is within the memory of all of us [or was within memory in 1916, when Simpson wrote these words] that a candidate for president was charged with and admitted during the campaign the commission by him of a grave moral offence in his early life, yet, because during the years thereafter, he lived a life "void of  **313**  offence towards God and towards man," he was wisely elected by the people, and became one of the best of our presidents. [1072]

APPENDIX - 403

The issue did arise in the Archbald impeachment in 1912, although Simpson believed that "the matter cannot be said . . . to have been decided in that case."[1073]  Among other things, Archbald was "charged with offences alleged to have been committed while a district judge, though at the time of his impeachment he was a circuit judge."[1074]  The Senate acquitted him of those charges but convicted him of others. On the charges that pre-dated Archbald's appointment to the Circuit bench, "some of the votes for acquittal were because the offences were not deemed serious enough; some because the Senators were not certain" that he could be convicted for acts pre-dating his current office and did not feel it necessary to settle the question "in view of the respondent's conviction on other articles; and some of the Senators did not think he could properly be tried upon such charges."[1075]  In any event, all the acts alleged to have occurred before Archbald became a circuit judge involved financial corruption as a district judge, and none of them helped him obtain, or could have helped him obtain, the position he had when impeached.[1076]

It is that aspect of the Thomas perjury controversy that will keep it alive. Because of the closeness of his confirmation vote--fifty-two to forty-eight-- there will always be a suspicion that Thomas obtained his seat on the Supreme Court through perjury that swung the balance. Perjury during a Supreme Court confirmation hearing, especially perjury by the nominee himself, corrupts government far more than perjury in a deposition in a private lawsuit.[1077]

## B. Evidentiary Burdens in the House and Senate

Not only has impeachment been used as a partisan political weapon in times of great conflict between branches of the federal government (except in 1937) but members of the House and Senate have refused to adopt evidentiary rules applicable to impeachment that would inhibit its partisan use. The common law mind cannot manage fact-finding without assigning  **\*314** burdens requiring parties to introduce evidence of a specified degree of persuasiveness. In fact-finding throughout the common law world, a party that does not carry its evidentiary burden loses. Both the House and the Senate have refused to adopt these kinds of evidentiary burdens for impeachment.

How much evidence is needed to justify a decision to act? In courts, that depends on the nature of the decision under consideration. To justify requiring a person to defend against a criminal accusation, the evidentiary burden is probable cause to believe that the defendant has committed the crime specified in an indictment or information. This is a comparatively light burden equaling "a reasonable ground for belief of guilt."[1078]  At trial, however, the defendant can be convicted only if the evidence rises to proof beyond a reasonable doubt. This is the highest evidentiary burden known to the law, but it is notoriously difficult to define. One of the better attempts appears in a typical jury instruction:

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.[1079]

Between these two are the evidentiary burdens used in civil cases. On most issues, a plaintiff will prevail at trial if the finder of fact is persuaded by a preponderance of the evidence, which means "the greater weight of evidence, evidence which is more convincing than the evidence which is offered in opposition to it."[1080]  A few civil issues, however, require clear and convincing evidence, which the Supreme Court has defined as evidence that makes a factual proposition "highly likely."[1081]  The law tends to require clear and convincing evidence in a few non-criminal situations, where the consequences can be particularly grave, such as involuntary commitments[1082]  and disbarments.

The House of Representatives has never adopted an evidentiary standard that must be satisfied before the House will impeach. Because  **\*315**  impeachment by the House is an accusation, vaguely analogous to a grand jury's indictment in a criminal case, the lower evidentiary burdens of probable cause and preponderance of the evidence might seem at least superficially attractive

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.              60

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 406 of 553 PageID #: 811

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

in the House. However, an impeachment ties up both the House and the Senate, distracting them enormously from legislative business. Additionally, if the person impeached is an elected president (one who did not succeed to the office through the death, resignation, or disability of a prior President), an impeachment is an attempt to nullify a democratically held election. For these reasons, when voting on the articles of impeachment against President Richard Nixon, most of the members of the House Judiciary Committee individually announced that they adhered to the burden of clear and convincing evidence. [1083] Some even thought they should not impeach a President unless persuaded beyond a reasonable doubt. [1084] But those sentiments are not binding on future judiciary committees or on the House, and they were ignored when the House Judiciary Committee voted to recommend impeachment and the House voted to impeach Bill Clinton.

The Supreme Court has held that the Senate has unlimited discretion to try an impeachment case any way it pleases. [1085] When the Senate chooses to invoke it, Senate Impeachment Rule XI permits testimony to be heard and evidence received by a committee of Senators, "who shall report to the Senate in writing a certified copy of the transcript of the proceedings and testimony had and given before such committee." [1086] The rule's purpose is to make it possible for the Senate to dispose of impeachments without allowing them to dominate the Senate chamber for weeks at a time while evidence is being taken.

After having been convicted based on a transcript generated in this way, Walter Nixon, the third of the trio of judges impeached in the 1980s, challenged his conviction in federal court. On the theory that the concept of a trial necessarily involves direct observation of witnesses by the trier of fact, Nixon argued that Rule XI violates the Impeachment Trial Clause's [1087] provision that "[t]he Senate shall have the sole Power to try all Impeachments." [1088] After dismissing this theory based on its interpretation **316** of the provision in the Impeachment Clause, [1089] the Supreme Court held that conduct of an impeachment trial is beyond judicial review. [1090] An inevitable corollary is that the House has unlimited discretion to conduct an impeachment inquiry in any way it pleases, and that this too is beyond judicial review.

The Senate has never held itself to any particular evidentiary burden of persuasion, [1091] and the result is that each Senator applies whatever burden of persuasion the Senator prefers--or no burden at all. Harry Claiborne, the first of the trio of judges impeached in the 1980s, moved in his Senate trial for a determination that proof beyond a reasonable doubt is the standard of persuasion in an impeachment trial. [1092] The Senate had never imposed this requirement on itself before, and the only authorities Claiborne was able to offer in support of his position were individual and personal statements made by four Senators while the House was considering impeaching President Nixon. [1093] The House managers prosecuting Claiborne in the Senate opposed the motion and took the position that the appropriate burden of persuasion in an impeachment trial is proof by a preponderance of the evidence. [1094] But the House managers made no motion to that effect, and so the only question before the Senate was whether the burden of persuasion was proof beyond a reasonable doubt, which Claiborne's motion had put into issue. By a vote of seventy- **317** five to seventeen, the Senate denied the motion. [1095] Of the four Senators quoted by Claiborne's lawyers, two were still in the Senate at the time. [1096] One voted against Claiborne's motion, and the other did not vote. [1097]

At various other times, individual Senators and House managers prosecuting impeachments in the Senate have argued in favor of using each of the evidentiary burdens that could be used in court to support a judgment: preponderance of the evidence, clear and convincing evidence, and proof beyond a reasonable doubt. [1098] Because the Senate has never adopted an evidentiary standard in impeachment proceedings, each Senator is free to use any standard he or she wants. Even the denial of Claiborne's motion does not prevent a Senator from adhering to a standard of proof beyond a reasonable doubt, or from persuading other Senators to do so in a future impeachment trial. The burden of proof, as Senator Rudman said in the Hastings trial, "is what is in the mind of every Senator. If you want to use clear and convincing, preponderance, if you want to use beyond a reasonable doubt, I think it is what everybody decides themselves." [1099]

Courts use evidentiary burdens to regulate decision-making--to reduce the chances of arbitrary and inconsistent judgments and to subject all litigants with similar types of issues to the same rules. Without uniform evidentiary requirements, analysis of the evidence in an impeachment trial becomes nothing better than rhetoric. A Republican Representative or Senator who wants to oust a Democratic office holder, for example, will argue for impeachment or conviction because the evidence satisfies a preponderance standard. When the situation is reversed, and the office holder under attack is a Republican, that same Representative or Senator may insist that impeachment requires clear and convincing evidence and that conviction requires proof beyond a reasonable doubt.

APPENDIX - 405

Nothing in the Constitution requires either the House or the Senate to consider evidence at all, much less subject it to burdens of persuasion. The Senate, however, has generally expected an impeachment to be supported by evidence. Similarly, with three exceptions, the House has always received sworn testimony and other evidence, and made findings of fact on that evidence before impeaching. [1100] One of the exceptions occurred because the person being impeached (Claiborne) preferred for tactical **\*318** reasons, to get to a Senate trial as quickly as possible. [1101] Another exception (Johnson) came about because there was no dispute about whether the core fact-- his firing of Stanton--had occurred. The third exception arose in the Clinton impeachment, where the "failure of the House to undertake any independent fact-finding . . . provided a basis upon which the House's impeachment judgment could be attacked as partisan or unfair." [1102]

### C. The Effect of Party Insecurity on the Partisan Use of Impeachment

When the Jeffersonians impeached Chase and when the Radical Republicans impeached Johnson, both were insecure political movements--new to power, not certain how long they would be able to hold on to it, and driven to use what power they had while they had it. In 1937, the Democrats neither considered, nor threatened impeachment for several reasons, one of which was that the Democratic landslide of 1936 was the most lopsided since 1820, both in popular votes and in the composition of Congress, and it has not been equaled since then. [1103] A party in that situation is less impatient about winning its victories as fast as possible. It can look toward its future with confidence that problems can be solved with the passage of time rather than by assaults on individual office holders, fueled by impatience to get quick results.

Even though the Republicans controlled both Houses of Congress almost continuously from 1995 to 2007 and have controlled the executive branch since 2001, their margin of power throughout that period, measured by seats held in Congress and by the popular vote in congressional and presidential elections, has been the thinnest in American history over any comparable period.

The Senate that confirmed the nominations of Chief Justice John Roberts and Justice Samuel Alito consisted of fifty-five Republicans, forty-four Democrats, and one Independent who caucused with the Democrats. The Republicans claimed that the will of the people gave them the power to **\*319** confirm these nominations. But measured by total popular vote, the Democrats actually won the elections that produced that Senate. [1104] (Because Senators serve six-year staggered terms and only one-third of the Senate is selected in an election, it takes three elections to produce any given Senate.)

### Table 5

### Popular Vote Through Which the 100 Senators in the 109th Congress Were Elected [1105]

|  | Popular Vote | | | Senators Elected |
| --- | --- | --- | --- | --- |
| Election | Democratic | Republican | Democrats | Republicans |
| 2000 | 35,773,958 | 35,773,720 | 17 | 14 |
| 2002 | 19,873,164 | 21,566,016 | 12 | 22 |
| 2004 | 44,010,807 | 39,920,562 | 15 | 19 |
| Totals | 99,657,929 | 97,260,298 | 44 | 55 |

The public thus voted for a Democratic Senate but got a Republican one. In individual elections, the disparity can be especially deceptive. In 2004, the Republicans gained four Senate seats, from fifty-one to fifty-five, and 2004 was thus considered a Republican victory. But in that year, as Table 5 shows, the Democrats received over four million more votes than the Republicans did. That was possible because the Senate is constitutionally gerrymandered: each state, regardless of size, sends two Senators to Washington. And Republicans have an advantage, though not a commanding one, in small states. Wyoming and California, for example, are equally represented in the Senate, even though California's population **\*320** is sixty-nine times the size of Wyoming's. [1106] Wyoming's Senator Enzi, a Republican, got 133,710 votes in his last election, while California's Senator Boxer, a Democrat, got 6,955,728 votes.

The Republicans controlled the Senate from 1981 until 1987 [1107] as a result of a 1980 electoral fluke in which, despite getting nearly three million fewer votes than the Democrats, [1108] they gained twelve seats by winning an unusually large number of

APPENDIX - 406

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 408 of 553 PageID #:  813

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

extremely close races. Most of the Republicans who won those races were defeated when they came up for reelection in 1986, and the Senate then reverted to the Democrats. The Republicans controlled the Senate from 1995 to 2007, except for a year and a half in 2001-2002. [1109] During those periods, they never had more than fifty-five seats and, at times, had to get by with only fifty seats (out of one hundred), relying upon the Republican vice president to cast tie-breaking votes. [1110] By contrast, from 1959 to 1981 and from 1987 to 1995, when the Democrats controlled the Senate, they never had fewer than fifty-four seats, and their average during those periods was sixty seats. For ten years, from 1959 to 1969, they never had fewer than sixty-four seats, a huge difference in a legislative body of one hundred members. Viewed thus in historical perspective, Republican control of the Senate has been by thin margins-- sometimes extraordinarily thin ones.

That is even truer in the House, as Table 6 shows. The Republicans controlled the House from 1995 to 2007 but never during that time had more than 232 seats, while the Democrats never had less than 203 seats.  **\*321**  (The Independent listed under "other" in Table 6 caucuses with the Democrats.) Never before in American history has a party controlled the House continually through six consecutive elections by such razor-line margins, without ever achieving numerical dominance. In contrast, when the Democrats controlled the House from the 1954 election to the 1994 election, they never had less than 232 seats, and had as many as 291, 292, and 295 seats (which constitutes two-thirds of the House) at times when the Republicans had only 144, 143, and 140 seats. [1111]

**\*322  Table 6**

**Party Divisions in the House of Representatives After the Elections of 1970 Through 2004 Together with Popular Vote for House Candidates in the Same Elections**

|  | 1970 | 1972 | 1974 | 1976 | 1978 | 1980 | 1982 | 1984 | 1986 Seats [1112] |
|---|---|---|---|---|---|---|---|---|---|
| Democrats | 255 | 242 | 291 | 292 | 277 | 242 | 269 | 253 | 258 |
| Republicans | 180 | 192 | 144 | 143 | 158 | 192 | 166 | 182 | 177 |
| Others |  | 1 |  |  |  | 1 |  |  |  |
| Popular Vote Percentage [1113] |  |  |  |  |  |  |  |  |  |
| Democrats | 53.4 | 51.7 | 57.6 | 56.2 | 53.7 | 50.4 | 55.3 | 52.3 | 54.6 |
| Republicans | 45.1 | 46.4 | 40.6 | 42.1 | 44.9 | 47.9 | 43.1 | 46.8 | 44.5 |
|  | 1988 | 1990 | 1992 | 1994 | 1996 | 1998 | 2000 | 2002 | 2004 |
| Seats |  |  |  |  |  |  |  |  |  |
| Democrats | 260 | 267 | 258 | 204 | 206 | 211 | 212 | 204 | 202 |
| Republicans | 175 | 167 | 176 | 230 | 228 | 223 | 221 | 229 | 232 |
| Others | 1 | 1 | 1 | 1 | 1 | 2 | 1 | 1 |  |
| Popular Vote Percentage |  |  |  |  |  |  |  |  |  |
| Democratic | 53.4 | 52.9 | 50.9 | 45.4 | 48.5 | 48.9 | 46.8 | 45.0 | 46.8 |
| Republicant | 45.5 | 44.9 | 45.5 | 52.4 | 48.9 | 47.8 | 47.0 | 49.6 | 49.4 |

When the Republicans took over the House in the 1994 election, they received a majority of the popular vote for House candidates. But in the  **\*323**  five elections since then, the Republicans have been unable to get as much as 50% of the popular vote. They actually lost the popular vote while retaining the House in 1998--the only time that has happened since Baker v. Carr rationalized House popular voting by requiring that legislative districts be of equal size. [1114]  In 1996 and 2000, the House popular vote was nearly a tie, the parties being separated by less than half a percentage point. In contrast, when the Democrats controlled the House during the period shown in Table 6, they routinely won between 50% and 58% of the popular vote, and never less than 50%. The Republicans have been able to pick up and hold seats through relentless computer-aided gerrymandering. For example, in 2004 the Democratic popular vote grew by nearly two percentage points and the Republican popular vote fell very slightly. This should have translated into an increase in the Democratic seats in the House. But the opposite happened. [1115]  The Republican gains, however, were achieved entirely in Texas, where a court had drawn the congressional districts after the 2000 census because the legislature and the Governor could not agree on a redistricting plan. After taking control of the Texas legislature in 2002, the Republicans redrew the congressional districts again through a plan conceived of and coordinated by the House Majority Leader Tom DeLay. [1116]  Because of the DeLay redistricting plan, the Republicans picked up five House seats in Texas alone, while in the other forty-nine states together the Republicans lost two seats. [1117] From 1995 to 2007, Congress was more rightist, but not much more so than it has been in the past. Until the 1980s a significant number of Democrats were right-wing and a smaller but substantial group of Republicans were, by current standards, liberal. For

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 409 of 553 PageID #:  814

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

example, the Congress with which John F. Kennedy began his presidency in 1961 [1118] was on many issues controlled by right-wing Democrats, several of whom chaired key committees and subcommittees through seniority. Many of them had opinions about African Americans that could be described in family newspapers only through euphemisms. They [1119] and others like them have  **\*324**  disappeared from the Democratic Party. In the same Congress were a number of Republicans who were so committed to civil rights, environmental protection, and measures to help the poor that they would be considered liberal today. They [1120] and others like them have virtually disappeared from the Republican Party. Consolidating all right-wing legislators in the Republican Party has created a coherent and disciplined bloc. But even with that advantage, the Republicans have not been able to produce a commanding majority when they have won elections. In three of the four presidential elections since and including 1992, the Republican candidate got fewer popular votes than the Democratic candidate, even though the Republicans won one of the elections in which they lost the popular vote. [1121]

**\*325  Table 7**

**Popular Vote in Presidential Elections 1992 Through 2004 [1122]**

| Election | Democratic | Republican | Others |
|----------|-----------|------------|--------|
| 1992 | 44,857,747 | 38,798,913 | 20,943,706 |
| 1996 | 47,401,898 | 39,198,482 | 9,789,438 |
| 2000 | 50,996,062 | 50,465,169 | 4,141,789 |
| 2004 | 58,894,584 | 61,872,711 | 1,451,863 |

Never has the post-New Deal Republican Party won a decisive popular mandate or achieved the status of a permanent majority party, which the Democrats enjoyed for so long and which, if they had it, would allow the Republicans to govern with a confident view of the future. This is a deeply frustrated party that has not achieved its goals. That frustration--combined with the insecurity of governing with such thin margins--appears to have produced a party psychology similar to that of the Radical Republicans of 1868, in which some elements of the party instinctively look for reasons to impeach or threaten to impeach.

**V. Conclusion**

Impeachment will be suspect as long as politicians are able to use it as a partisan weapon. Certainly, impeachment must exist because there is no other way to remove an unfit president, vice president, or federal judge. And certainly it will always have political ramifications because removal of a president, a vice president, or a justice of the Supreme Court has political implications--and sometimes removal of a lower federal judge does as well. It is a political issue, for example, whether the country would suffer more from the continuation in office of a given official or from that official's removal. But because even that seemingly neutral question is so easily distorted by partisanship, it will be possible to manipulate impeachment for partisan political ends unless Congress imposes on itself the self-discipline inherent in burdens of production and persuasion.

Michael Gerhardt has pointed out that the Clinton impeachment illustrates "the vulnerability of the federal judiciary to political retaliation"  **\*326**  because "some of the most important factors that helped Clinton survive the threat of removal (i.e., public support and media scrutiny) are absent from lower federal judges' impeachment proceedings . . . about which the public is largely indifferent." [1123] That might or might not be true if the impeachment is motivated by widely reported cases such as the Ninth Circuit's decision in the Pledge of Allegiance case or the decisions of several federal judges not to order the reinsertion of Terri Schiavo's feeding tube. [1124]

Is the partisan use of impeachment or impeachment threats an effective political strategy? Of the four great confrontations between or among branches of the federal government--from 1801 to 1808, from 1865 to 1868, in 1937, and since 1968--partisan political impeachment and impeachment threats played an important role in three of them. However, despite the appeal of a strategy that attempts to drive political opponents from office through an accusatory procedure, or threatens to do so in order to intimidate them, partisan political impeachment and impeachment threats generally fail to produce results.

Military people sometimes say that the long way around is often the shortest way there. Frontal assaults--attacks directly on an adversary's position, like Picket's charge at Gettysburg--tend to succeed only when the attacker has overwhelming superiority of force. The long way around might be envelopment through an adversary's rear, for example, or slow attrition from the sides.

An impeachment, or a threat of impeachment, is a frontal assault. The Chase, Johnson, and Clinton impeachments all failed for lack of an overwhelming superiority of force, and in each of them the attackers overestimated their forces in part because they underestimated the extent to which moderates of their own party would desert them. In a strategic sense, the Clinton impeachment was particularly unproductive because even if moderates had not defected, the necessary two-thirds to convict in the Senate would still have been impossible, and the House leadership could have foreseen that even before the House voted to impeach.

When the Federalists impeached Blount, they succeeded only in teaching the Jeffersonians how to use impeachment as a political weapon against Chase. When the Jeffersonians then impeached Chase, they made themselves look like extremists. The judiciary eventually became at least nominally Jeffersonian primarily because the short life expectancy of the era offered frequent opportunities to replace Federalists through death and new appointments, although the Jeffersonian party itself became less  **\*327**  Jeffersonian as time passed, absorbing some of the sensibilities of the moderate branch of the Federalist Party. The Radical Republican impeachment of Andrew Johnson also accomplished virtually nothing. Within a year, Grant, who shared Congress's view of Reconstruction, replaced Johnson through the electoral process. In historical memory, the Johnson impeachment allowed the enemies of the Radical Republicans to portray them as oppressive and power-obsessed, rather than as principled politicians whose goal was to complete the liberation of African-Americans. In both instances, the long way around would have been to take advantage of other forces already in motion. After 1937, when no one considered impeachment, Roosevelt got a New Deal Supreme Court despite the failure of his court-packing plan. There, the long way around was deceptively simple and involved taking advantage of the fact that two of the Four Horsemen wanted to retire, and routine legislation let them do it with a reasonable income. As for the Republicans, all their impeachment tactics and strategies have produced only a single gain--a Supreme Court vacancy (Fortas's), in 1969. Everything since then has damaged their credibility.

### Footnotes

a1    Professor of Law, Hofstra Law School. I am grateful for the valuable and kind help of librarians Connie Lenz and Jennifer Wagner as well as the careful work of research assistants Elizabeth Brehm, Rachel Cherny, Marissa Goodman, and Janet Shin.

1    See infra text accompanying notes 497-705.

2    See infra text accompanying notes 732-781.

3    See infra text accompanying notes 811-846.

4    See infra text accompanying notes 707-718, 740, 750-758, 823-826.

5    Tom DeLay, Letter to the Editor, Impeachment Is a Valid Answer to a Judiciary Run Amok, N.Y. Times, April 6, 1997, at A18.

6    Joan Biskupic, Hill Republicans Target "Judicial Activism," Conservatives Block Nominees, Threaten Impeachment and Term Limits, Wash. Post, Sept. 14, 1997, at A1.

7    See infra text accompanying notes 849-997.

8    Newt Gingrich, Winning the Future: A 21st Century Contract with America 78 (2005) (referring to  Newdow v. United States Cong., 328 F.3d 466 (9th Cir. 2003), rev'd sub nom.  Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1 (2004)).

9    Linda Greenhouse, Rehnquist Resumes His Call for Judicial Independence, N.Y. Times, Jan. 1, 2005, at A10.

10    Id.; see also Jonathan Ringel, 11th Circuit's Birch Keeps Them Guessing, Fulton County Daily Rep., Apr. 11, 2005 (discussing how Judge Birch was "the subject of impeachment calls from angry lawmakers").

11    Ruth Marcus, Booting the Bench: There's New Ferocity in Talk of Firing Activist Judges, Wash. Post, Apr. 11, 2005, at A19; see also Nina J Easton, Rift Emerges in GOP after Schiavo Case, Boston Globe, Apr. 9, 2005, at A1.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    65

12 Jason DeParle, In Battle to Pick Next Justice, Right Says Avoid a Kennedy, N.Y. Times, June 27, 2005, at A1.

13 Ann Althouse, Innocence Abroad, N.Y. Times, Sept. 19, 2005, at A25 (noting that Kennedy "endured calls for his impeachment" because he cited foreign law); DeParle, supra note 12 ("[S]ome notable conservatives are calling for his impeachment."); Jesse J. Holland, DeLay Criticizes Justice Kennedy, 'Activist' Republican Judges, Associated Press, Apr. 21, 2005, available at http://www.law.com/jsp/article.jsp?id=1113987908498; Dana Milbank, And the Verdict on Justice Kennedy Is: Guilty, Wash. Post, Apr. 9, 2005, at A3; Marcus, supra note 11 ("What started as 'Impeach Earl Warren'... has now become 'Impeach Tony Kennedy' ....").

14 See Jon D. Hanson & Adam Benforado, The Drifters: Why the Supreme Court Makes Justices More Liberal', Boston Rev., Jan.-Feb. 2006, available at http://bostonreview.net/BR31.1/hansonbenforado.html.

15 Roper v. Simmons, 543 U.S. 551 (2005).

16 Lawrence v. Texas, 539 U.S. 558 (2003).

17 Romer v. Evans, 517 U.S. 620 (1996).

18 Lee v. Weisman, 505 U.S. 577 (1992).

19 Atkins v. Virginia, 536 U.S. 304 (2002).

20 Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833 (1992).

21 See infra Parts III(A)-(B).

22 See infra Part III(B).

23 See infra Part III(B).

24 See infra Part III(B).

25 See infra Part III(D).

26 See infra Parts III(E)(5), III(F)(2), and IV(B).

27 See infra Part III(F)(2).

28 See infra Parts III(F)(2) and IV(A).

29 See infra Part IV(C).

30 See infra Part IV(C).

31 Raoul Berger, Impeachment: The Constitutional Problems 1 (1973); see, e.g., id. at 2-3, 7-53. Berger's analysis of impeachment history in general has been criticized, sometimes with sound reason. See, e.g., Peter Charles Hoffer & N.E.H. Hull, Impeachment in America, 1635-1805, at 266-70 (1984). Where his views are idiosyncratic, they are ignored here or are reported along with contrary opinions.

32 Berger, supra note 31, at 2.

33 Hoffer & Hull, supra note 31, at 6.

34 Id.

35 Id. at 7-8.

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 412 of 553 PageID #:  817

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

36      Id.

37      Id. at 6-56.

38      Id. at 49-55.

39      Id. at 59.

40      Id.

41      Id.

42      Id. at 64, 68.

43      Id. at 77; see also id. at 78-95.

44      Keith A. Scarborough, Comment, "The Awful Discretion": The Impeachment Experience in the States, 55 Neb. L. Rev.
        91, 91 n.2 (1975); see also N.E.H. Hull & Peter Charles Hoffer, Historians and the Impeachment Imbroglio: In Search
        of a Serviceable History, 31 Rutgers L.J. 473, 481-82 (2000); Impeachment can still play an important role in state
        government. See Robert Jerome Glennon, Impeachment: Lessons from the Mecham Experience, 30 Ariz. L. Rev. 371
        (1988); Scarborough, supra at 93.

45      See The Federalist No. 65 (Alexander Hamilton).

46      Hoffer & Hull, supra note 31, at 97; Michael J. Gerhardt, The Lessons of Impeachment History, 67 Geo. Wash. L. Rev.
        603, 605 (1999).

47      U.S. Const. art. I, § 3, cl. 7.

48      Hoffer & Hull, supra note 31, at 4-5; Gerhardt, supra note 46, at 605.

49      U.S. Const. art II, § 4. It was not immediately clear what categories of persons in the pay of the United States were "civil
        Officers," except that military officers were not included. The first impeachment decided whether a Senator is a "civil
        officer." See infra text accompanying notes 91-150.

50      Hoffer & Hull, supra note 31, at 97; Gerhardt, supra note 46, at 605.

51      U.S. Const. art. I, § 3, cl. 6.

52      U.S. Const. art. II, § 4.

53      Gerhardt, supra note 46, at 605. This is different from a bill of attainder, which the U.S. Constitution forbids in Article
        I, Section 9. A bill of attainder punishes a specific person through a statute--for example, Congress passing a statute
        requiring that the artist sometimes known as Prince shall pay a fine of a million dollars unless he uses, for the rest of
        his life, a first and a last name. An impeachment, on the other hand, is a trial conducted by a legislature. Because the
        English Parliament refused to limit its jurisdiction to officeholders and to pre-defined offenses, and because English
        impeachments could lead legislatively to criminal penalties, the House of Commons was free to impeach, and the House
        of Lords to convict and imprison, an ordinary person for using only one name, even if no one had previously thought that
        wrong. No English impeachment had ever gone anywhere near such an extreme, but the delegates to the Constitutional
        Convention instinctively distrusted this kind of open-ended power in English government.

54      Id.

55      U.S. Const. art. II, § 2, cl. 1.

56      Gerhardt, supra note 46, at 605.

57      James Madison, The Writings of James Madison, Volume IV 244 (Gaillard Hunt ed., 1903).

APPENDIX - 411

Case 6:20-cv-00660-JDK  Document 33  Filed 01/01/21  Page 413 of 553 PageID #:  818

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

58    "Treason against the United States shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort." U.S. Const. art. III, § 3, cl. 1. Mason spoke on the grounds for impeachment on September 8, 1787, and the definition of treason had been settled on August 20. Madison, supra note 57, at 246-52, 407 (detailing the proceedings on Aug. 20 and Sept. 8, 1787).

59    Warren Hastings, Governor General of the East India Company, whose tortuously complicated impeachment trial lasted from 1788 to 1795. Hoffer & Hull, supra note 31, at 96-97.

60    U.S. Const. art. I, § 9; supra note 53 (discussing bill of attainders).

61    Madison, supra note 57, at 407 (chronicling the events of Sept. 8, 1787).

62    Id.

63    Id.

64    Id.

65    Id. at 409.

66    U.S. Const. art. II, § 4.

67    Charles L. Black, Jr., Impeachment, a Handbook 49 (1974); Alexander Simpson, Jr., A Treatise on Federal Impeachments 86 (1916) (Partially published in two parts as Alex Simpson Jr., Federal Impeachments, 64 U. Pa. L. Rev. 651, 803 (1916); citations here are to the book rather than to the articles, which are incomplete).

68    P.J. Marshall, The Impeachment of Warren Hastings, at xiv (1965).

69    Simpson, supra note 67, at 167.

70    Of the remaining impeachments, eighteenwere for "high treason," and eight used a combination of the two phrases, leaving only four impeachments based on grounds that did not make their way into the Constitution. Id. at 117-67.

71    Id.

72    Black, supra note 67.

73    See Berger, supra note 31, at 2.

74    Black, supra note 67, at 35, 39-40; Hoffer & Hull, supra note 31, at 101; Charles E. Hughes, The Supreme Court of the United States 19 (1928); John R. Labovitz, Presidential Impeachment 27-31 (1978); 2 Joseph Story, Commentaries on the Constitution of the United States §§ 796-800 (Melville M. Bigelow ed., 1891); John D. Feerick, Impeaching Federal Judges: A Study of the Constitutional Provisions, 39 Fordham L. Rev. 1, 47-58 (1970); Paul S. Fenton, The Scope of the Impeachment Power, 65 Nw. U. L. Rev. 719, 726-28 (1970); Gerhardt, supra note 46, at 609-10.

75    Gerhardt, supra note 46, at 610 (footnotes ommitted).

76    4 William Blackstone, Commentaries on the Laws of England 5 n.6 (1769).

77    Berger, supra note 31, at 53-102.

78    U.S. Const. art. III, § 1.

79    U.S. Const. art. II, § 4.

80    Id.

81    U.S. Const. art. III, § 1.

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 414 of 553 PageID #:  819

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

82    See Emily Field Van Tassel & Paul Finkelman, Impeachable Offenses: A Documentary History from 1787 to the Present passim (1999).

83    See supra text accompanying notes 77-78.

84    116 Cong. Rec. 11913-14 (1970); Van Tassel & Finkelman, supra note 82, at 59.

85    See infra text accompanying notes 518-523, 612-653.

86    The Federalist No. 65, at 381 (Alexander Hamilton) (Isaac Kramnick ed., 1987).

87    Id. at 398.

88    See infra text accompanying notes 1071-1092.

89    The Federalist No. 65 (Alexander Hamilton), supra note 86, at 380-81.

90    Van Tassel & Finkelman, supra note 82, at 10.

91    Id. at 86.

92    Buckner F. Melton, Jr., The First Impeachment: The Constitution Framers and the Case of Senator William Blount 3 (1998); see also Eleonore Bushnell, Crimes, Follies, and Misfortunes: The Federal Impeachment Trials 26-27 (1992); David P. Currie, The Constitution in Congress: The Federalist Period 1789-1801, at 275-76 (1997).

93    Bushnell, supra note 92; Van Tassel & Finkelman, supra note 82, at 87.

94    Bushnell, supra note 92, at 27; Melton, supra note 92; Van Tassel & Finkelman, supra note 82, at 87.

95    The expulsion was an exercise of the Senate's power to expel a Member for misconduct under U.S. Const. art. I, § 5, cl. 2, and had nothing to do with impeachment.

96    House Comm. on the Judiciary, 93d Cong., Impeachment: Selected Materials 125-28 (Comm. Print 1973) [hereinafter Impeachment: Selected Materials]; Currie, supra note 92, at 277; Van Tassel & Finkelman, supra note 82, at 86.

97    Irving Brant, Impeachment: Trials and Errors 27 (1972).

98    Van Tassel & Finkelman, supra note 82, at 87.

99    Id.

100    Id. France was the first European power to claim the Louisiana territory. Melton, supra note 92, at 69. In 1763, Spain acquired it. Id. Westerners feared that, to get French aid in their war against England, the Spanish would redeed Louisiana back to the French. Van Tassel & Finkelman, supra note 82, at 87. That later happened, and when the French treasury needed replenishing to support Napoleon's wars, the French sold Louisiana to Jefferson, who by then had become President.

101    Melton, supra note 92, at 76-77.

102    Id. at 78-93.

103    Id.

104    Id.

105    Id. at 37, 235.

106    Currie, supra note 92, at 280; Hoffer & Hull, supra note 31, at 151.

107    Hoffer & Hull, supra note 31, at 4-5; Gerhardt, supra note 46.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.    

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 415 of 553 PageID #:  820

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

108    U.S. Const. art. II, § 4.

109    See Van Tassel & Finkelman, supra note 82, at 86-90.

110    Brant, supra note 97, at 24-45; Hoffer & Hull, supra note 31, at 151-63; Melton, supra note 92, at 104-74.

111    Melton, supra note 92, at 273-74. Congressional records were not well kept at the time, and not all tallies are included.
       Id. at 273.

112    Id. The total number of Senators listed exceeds the membership in the Senate during the period because of changes in
       personnel due to the 1798 elections.

113    Brant, supra note 97, at 33.

114    Id.

115    Bushnell, supra note 92, at 26.

116    Brant, supra note 97, at 46.

117    Id. at 28; Hoffer & Hull, supra note 31, at 158; Melton, supra note 92, at 170.

118    Currie, supra note 92, at 279.

119    U.S. Const. art. I, § 3, cl. 7.

120    U.S. Const. art. II, § 4.

121    Hoffer & Hull, supra note 31, at 158.

122    Brant, supra note 97, at 30-31.

123    Id. at 31; accord Hoffer & Hull, supra note 31, at 158.

124    U.S. Const. art. II, § 4.

125    Brant, supra note 97, at 36.

126    Id. at 37; see also Hoffer & Hull, supra note 31, at 158; Melton, supra note 92, at 210. The House managers also argued
       that a Senator is a civil Officer, but they "placed all their emphasis upon the first point" that anybody can be impeached.
       Brant, supra note 97, at 37. The details can be found in Brant, supra note 97, at 37-39, and Melton, supra note 92, at
       210-14.

127    Brant, supra note 97, at 33.

128    Id. at 44; Melton, supra note 92, at 211.

129    Brant, supra note 97, at 44.

130    Id.

131    Hoffer & Hull, supra note 31, at 181.

132    See generally U.S. Const. art. I, § 3, cl. 4.

133    See U.S. Const. art. II, § 1, cl. 3; see also U.S. Const. amend XIX.

134    Brant, supra note 97, at 44.

135    Melton, supra note 92, at 237.

APPENDIX - 414

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 416 of 553 PageID #: 821

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

136     Id.; see also Hoffer & Hull, supra note 31, at 158.

137     Disqualification from future federal office is one of the punishments that stem from an impeachment conviction, but it is not automatic. After convicting, the Senate votes separately on collateral punishments. During this vote, a simple majority is sufficient (rather than the two-thirds needed to convict). Sometimes, a convicted official is removed from his current office but not barred from future federal offices. That happened after the convictions of Ritter and Hastings. See infra text accompanying notes 612-653, 671-676; see also Van Tassel & Finkelman, supra note 82, at 158, 173.

138     Melton, supra note 92, at 211; see also Hoffer & Hull, supra note 31, at 151.

139     Jean Edward Smith, John Marshall: Definer of a Nation 252 (1996).

140     Richard E. Ellis, The Jeffersonian Crisis: Courts and Politics in the Young Republic 53-54, 57-58 (1971); Smith, supra note 139, at 234.

141     Ellis, supra note 140, at 53.

142     Id. at 54.

143     See infra text accompanying notes 211-246. Cabot's family was the Boston Cabots, who, according to Massachusetts folklore, spoke only to the Lodges, who spoke only to God.

144     Hoffer & Hull, supra note 31, at 162-63.

145     Brant, supra note 97, at 45.

146     Currie, supra note 92, at 280-81; Melton, supra note 92, at 232; Van Tassel & Finkelman, supra note 82, at 86-87.

147     Compare Melton, supra note 92, at 231-32, with Bushnell, supra note 92, at 36. Congressional record-keeping then was much more haphazard than it is now.

148     Bushnell, supra note 92, at 36; see also Melton, supra note 92, at 231-32.

149     Van Tassel & Finkelman, supra note 82, at 88.

150     Bushnell, supra note 92, at 16; Melton, supra note 92, at 232.

151     Donald Grier Stephenson, Jr., Campaigns and the Court: The U.S. Supreme Court in Presidential Elections 243 (1999).

152     Brant, supra note 97, at 47; Noble E. Cunningham, In Pursuit of Reason: The Life of Thomas Jefferson 248 (1987); Ellis, supra note 140, at 32; Robert M. Johnstone, Jr., Jefferson and the Presidency: Leadership in the Young Republic 171-72 (1978); 4 Dumas Malone, Jefferson and His Time 113 (1970); Van Tassel & Finkelman, supra note 82, at 91.

153     Cunningham, supra note 152; Ellis, supra note 140, at 15; Johnstone, supra note 152; 4 Malone, supra note 152.

154     Cunningham, supra note 152; Johnstone, supra note 152; 4 Malone, supra note 152.

155     Brant, supra note 97, at 47; 4 Malone, supra note 152, at 113-14; Van Tassel & Finkelman, supra note 82, at 91.

156     Brant, supra note 97, at 47.

157     5 U.S. (1 Cranch) 137 (1803).

158     4 Malone, supra note 152, at 114.

159     Hoffer & Hull, supra note 31, at 190.

160     Van Tassel & Finkelman, supra note 82, at 10.

APPENDIX - 415

161    William H. Rehnquist, The Impeachment Clause: A Wild Card in the Constitution, 85 Nw. U. L. Rev. 903, 905 (1991).

162    Melton, supra note 92, at 237.

163    Brant, supra note 97, at 58.

164    Bushnell, supra note 92, at 25; accord 4 Malone, supra note 152, at 114.

165    Bushnell, supra note 92, at 44-45.

166    John Randolph is not to be confused with Edmund Randolph, a delegate to the Constitutional Convention, and Attorney General and Secretary of State in George Washington's Administration. Edmund Randolph was widely respected for, among other things, his nonpartisanship.

167    Hoffer & Hull, supra note 31, at 189.

168    Bob Barr, High Crimes and Misdemeanors: The Clinton-Gore Scandals and the Question of Impeachment, 2 Tex. Rev. L. & Pol. 1, 9-20 (1997).

169    116 Cong. Rec. 11913-14 (1970); Van Tassel & Finkelman, supra note 82, at 59. See infra text accompanying notes 823-846.

170    Van Tassel & Finkelman, supra note 82, at 9.

171    Hoffer & Hull, supra note 31, at 206.

172    Id. at 182.

173    4 Malone supra note 152, at 115-16.

174    Id. at 116.

175    Id.; see also id. at 472.

176    Johnstone, supra note 152, at 180; Melton, supra note 92, at 238.

177    Ellis, supra note 140, at 69.

178    Johnstone, supra note 152, at 180; Van Tassel & Finkelman, supra note 82, at 91. In 1794, when he was Chief Justice of the New Hampshire State Supreme Court, he had nearly been removed from office by the state legislature for similar reasons. Hoffer & Hull, supra note 31, at 207.

179    Brant, supra note 97, at 48.

180    A modern replica of the statute can be found at 28 U.S.C. § 372.

181    Ellis, supra note 140, at 70.

182    Claude G. Bowers, Jefferson in Power: The Death Struggle of the Federalists 270 (1936); Ellis, supra note 140, at 70.

183    David P. Currie, The Constitution in Congress: The Jeffersonians 1801-1829, at 23-31 (2001); Impeachment: Selected Materials, supra note 96, at 129-31; Van Tassel & Finkelman, supra note 82, at 93-94.

184    Brant, supra note 97, at 49; accord Ellis, supra note 140, at 72; Melton, supra note 92, at 238.

185    Brant, supra note 97, at 49.

186    Hoffer & Hull, supra note 31, at 212.

APPENDIX - 416

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 418 of 553 PageID #:  823

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

187    Brant, supra note 97, at 49; Currie, supra note 183, at 25; Hoffer & Hull, supra note 31, at 214; Van Tassel & Finkelman, supra note 82, at 95-96.

188    4 Malone, supra note 152, at 458; accord Van Tassel & Finkelman, supra note 82, at 91.

189    Bushnell, supra note 92, at 44-45; Van Tassel & Finkelman, supra note 82, at 91.

190    Emily Field Van Tassel, Resignations and Removals: A History of Federal Judicial Service--and Disservice--1789-1992, 142 U. Pa. L. Rev. 333, 370 (1993).

191    Bowers, supra note 182, at 270-71; Brant, supra note 97, at 49-57; Cunningham, supra note 152, at 273; Hoffer & Hull, supra note 31, at 208-19.

192    Bushnell, supra note 92, at 45.

193    Brant, supra note 97, at 56; Bushnell, supra note 92, at 52; Johnstone, supra note 141, at 182; Van Tassel & Finkelman, supra note 82, at 91. On the motion to convict, all the yeas were from Jefferson's party, and all the nays were cast by Federalists, but on the subsequent motion to remove Pickering from office, one Federalist switched and voted yea. Van Tassel & Finkelman, supra note 82, at 92. Seven Senators (five of them Jeffersonians) attended the trial but declined to vote, perhaps uncomfortable convicting a person in an accusatory procedure for acts that seemed to be caused by insanity. Ellis, supra note 140, at 74; Johnstone, supra note 152, at 181-82.

194    Ellis, supra note 140, at 75; Johnstone, supra note 152, at 182.

195    Hoffer & Hull, supra note 31, at 206; accord Bowers, supra note 182.

196    Melton, supra note 81, at 240; Van Tassel & Finkelman, supra note 82, at 101. Chase and Jefferson had been two of the three members of the committee that drafted the Northwest Ordinance. Caleb Perry Patterson, The Constitutional Principles of Thomas Jefferson 162 (1953).

197    See infra tbl. 1.

198    Party Division in the Senate, 1789-Present, http:// www.senate.gov/pagelayout/history/one_item_and_teasers/ partydiv.htm (last visited Apr. 18, 2007) [hereinafter Senate Party Divisions].

199    Party Divisions of the House of Representatives (1789 to Present), http://clerk.house.gov/art_history/house_history/ partyDiv.html (last visited Apr. 17, 2007) [hereinafter House Party Divisions].

200    Ellis, supra note 140, at 19-35, 83-95. Hamilton, Marshall, and Adams all agreed with this assessment. Id. at 26-27. "[A]lmost all key appointments on the federal level during Jefferson's administrations went to people who were aligned with the moderates..., while the radicals were generally proscribed." Id. at 234. "None of the judges that Jefferson appointed to the Supreme Court did anything to weaken the independence or influence of the national judiciary or to espouse a radical brand of Jeffersonianism." Id. at 241.

201    5 U.S. (1 Cranch) 299, 308 (1803).

202    U.S. Const. art. III, § 1.

203    Leonard W. Levy, Original Intent and the Framer's Constitution 77 (1988).

204    Ellis, supra note 140, at 44.

205    See infra text accompanying notes 556-570.

206    Judiciary Act of 1789, ch. 20, § 13, 1 Stat. 73.

207    Hylton v. United States, 3 U.S. (3 Dall.) 171 (1796).

208    Hayburn's Case, 2 U.S. (2 Dall.) 409 (1792).

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 419 of 553 PageID #: 824

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

209    See Ellis, supra note 140, at 65-66; 1 Charles Warren, The Supreme Court in United States History, 1789-1835, at 232, 244, 248 (2d ed. 1926).

210    Levy, supra note 203, at 75.

211    Melton, supra note 92, at 240.

212    Hoffer & Hull, supra note 31, at 228-32.

213    Ellis, supra note 140, at 76; 4 Malone, supra note 152, at 464.

214    Bowers, supra note 182, at 273.

215    Hoffer & Hull, supra note 31, at 232.

216    Ellis, supra note 140, at 76-77.

217    Id. at 79.

218    Levy, supra note 203, at 65.

219    Van Tassel & Finkelman, supra note 82, at 102. "At this time, and for many years thereafter, the justices of the Supreme Court... performed two separate roles. For a small part of the year, they were appellate judges sitting together in [the national capital]. But for the rest of the year they were circuit justices assigned to" one or another region of the country. William H. Rehnquist, Grand Inquests: The Historic Impeachments of Justice Samuel Chase and President Andrew Johnson 21 (1992).

220    1 Trial of Samuel Chase, an Associate Justice of the Supreme Court of the United States, Impeached by the House of Representatives for High Crimes and Misdemeanors before the Senate of the United States 5-9 (1970) (1805) [hereinafter Trial of Chase]; Bushnell, supra note 92, at 60-61; Ellis, supra note 140, at 77-80; Hoffer & Hull, supra note 31, at 236-37; Van Tassel & Finkelman, supra note 82, at 103-07.

221    Ellis, supra note 140, at 79-80; Johnstone, supra note 152, at 183.

222    Ellis, supra note 140, at 79-80; Johnstone, supra note 152, at 183.

223    2 Trial of Chase, supra note 220, at 485-93; Bushnell, supra note 92, at 84-85; Van Tassel & Finkelman, supra note 82, at 102.

224    2 Trial of Chase, supra note 220, at 485-93; Bushnell, supra note 92, at 85; Van Tassel & Finkelman, supra note 82, at 102.

225    Melton, supra note 92, at 241. "Chase... never again dashed off a vitriolic political charge for a grand jury or used a courtroom as a forum for his politics." Hoffer & Hull, supra note 31, at 254; accord Bowers, supra note 182, at 292; Ellis, supra note 140, at 105.

226    Bushnell, supra note 92, at 85; Ellis, supra note 140, at 101.

227    Brant, supra note 97, at 82; Bushnell, supra note 92, at 85-86.

228    Bushnell, supra note 92, at 86.

229    Id.; Edward Channing, The Jeffersonian System, 1801-1811, at 122 (1906); Ellis, supra note 140, at 106-07; Hoffer & Hull, supra note 31, at 254. Until the Seventeenth Amendment in 1913, Senators were elected by state legislatures, rather than by the people directly. U.S. Const. art. I, § 3, cl, amended by U.S. Const. amend. XXI.

230    Channing, supra note 229; Hoffer & Hull, supra note 31, at 254.

231    Bowers, supra note 182, at 291; Bushnell, supra note 92, at 87; Ellis, supra note 140, at 83-95, 103-04; Hoffer & Hull, supra note 31, at 254; Michael J. Gerhardt, Chancellor Kent and the Search for the Elements of Impeachable Offenses,

74 Chi.-Kent L. Rev. 91, 105 (1998). The Senate verdict "wreck[ed] the political future of John Randolph," the most visible of the House managers. Channing, supra note 229.

232   Ellis, supra note 140, at 106; Johnstone, supra note 152, at 186.

233   Johnstone, supra note 152, at 186.

234   Bowers, supra note 182, at 291.

235   Ellis, supra note 140, at 102.

236   Id. at 102-03.

237   Cunningham, supra note 152, at 274; Ellis, supra note 140, at 104; Johnstone, supra note 152, at 183-84.

238   Brant, supra note 97, at 59.

239   Berger, supra note 31, at 224.

240   Hoffer & Hull, supra note 31, at 260.

241   Id. at 254.

242   Id. at 262.

243   7 The Writings of Thomas Jefferson 256 (H.A. Washington ed., 1859); 10 The Writings of Thomas Jefferson 170 (Paul Leicester Ford ed., 1905).

244   Bowers, supra note 182, at 292.

245   Leonard Baker, John Marshall: A Life in Law 434 (1974); accord Hoffer & Hull, supra note 31, at 260; David Robarge, A Chief Justice's Progress: John Marshall from Revolutionary Virginia to the Supreme Court 277-78 (2000). Contra Smith, supra note 139, at 344-45.

246   Baker, supra note 245 at 432. Or at least among the next impeached. Hoffer & Hull, supra note 31, at 190.

247   See Hoffer & Hull, supra note 31, at 78-95, 146, 164-77, 191-205, 219-27, 256-61; see also Brant, supra note 97, at 60.

248   Hoffer & Hull, supra note 31, at 261.

249   Id.

250   Id. at 262.

251   Johnstone, supra note 152, at 180; 4 Malone, supra note 152, at 459.

252   4 Malone, supra note 152, at 459. Federalists cast all the votes to acquit. Hoffer & Hull, supra note 31, at 204.

253   Hoffer & Hull, supra note 31, at 192.

254   Id. at 196-97.

255   Id. at 197. Some other states provided for removal by joint address, as well as by impeachment. Id. at 197; 4 Malone, supra note 152, at 462. The Jeffersonians in Congress liked to propose it, Ellis, supra note 140, at 72, although the Federalist minority there was still large enough to prevent adoption of a constitutional amendment. 4 Malone, supra note 152, at 462.

256   4 Malone, supra note 152, at 459.

257   Channing, supra note 229, at 113-14; Ellis, supra note 140, at 164; Hoffer & Hull, supra note 31, at 196.

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 421 of 553 PageID #: 826

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

258    Ellis, supra note 140, at 168.

259    Channing, supra note 229, at 114; Ellis, supra note 140, at 165-66; Hoffer & Hull, supra note 21, at 189, 221; 4 Malone, supra note 152, at 474.

260    Channing, supra note 229, at 114; Ellis, supra note 140, at 168; 4 Malone, supra note 152, at 474.

261    Ellis, supra note 140, at 168-69; 4 Malone, supra note 152, at 474.

262    Ellis, supra note 140, at 169-70; 4 Malone, supra note 152, at 474.

263    Channing, supra note 229, at 114; Hoffer & Hull, supra note 31, at 226; 4 Malone, supra note 152, at 474.

264    4 Malone, supra note 152, at 474.

265    Ellis, supra note 140, at 92; Van Tassel & Finkelman, supra note 82, at 103; John C. Yoo, The First Claim: The Burr Trial, United States v. Nixon, and Presidential Power, 83 Minn. L. Rev. 1435, 1437 (1999).

266    4 Malone, supra note 152, at 476; Yoo, supra note 265, at 1439.

267    Bowers, supra note 182, at 278, 366-67; Channing, supra note 229, at 123; Ellis, supra note 140, at 92.

268    Channing, supra note 229, at 123-24; Ellis, supra note 140, at 92-93, 106.

269    Channing, supra note 229, at 123-24; Ellis, supra note 140, at 92-93.

270    Van Tassel & Finkelman, supra note 82, at 103.

271    See Stephenson, supra note 151, at 243-44.

272    U.S. Const. art. II, § 1, cl. 3.

273    2 Albert J. Beveridge, The Life of John Marshall 532-33 (1916); 3 Malone, supra note 152, at 492-502; Robarge, supra note 245, at 231.

274    Cunningham, supra note 152, at 232; 3 Malone, supra note 273, at 497-504.

275    S. Rep. No. 72-26, at 5 (1932)S. Rep. No. 72-26, at 5 (1932).

276    Cunningham, supra note 152, at 232; 3 Malone, supra note 273, at 502.

277    Cunningham, supra note 152, at 235-37; Joseph J. Ellis, American Sphinx: The Character of Thomas Jefferson 175 (1997); 3 Malone, supra note 273, at 504; Robarge, supra note 245, at 232.

278    Cunningham, supra note 152, at 231.

279    Id. at 232-33; J. Ellis, supra note 277; 3 Malone, supra note 273, at 498.

280    3 Malone, supra note 273, at 498.

281    Johnstone, supra note 152, at 190; accord Ellis, supra note 140, at 47-48.

282    4 Malone, supra note 152, at 458.

283    Yoo, supra note 265, at 1439-41.

284    Cunningham, supra note 152, at 286-88; Johnstone, supra note 152, at 191.

285    Cunningham, supra note 152, at 290.

286    Baker, supra note 245, at 448-518; 3 Beveridge, supra note 273, at 274-545 (1919); Robarge, supra note 245, at 280-82; Smith, supra note 139, at 348-74; Francis N. Stites, John Marshall: Defender of the Constitution 97-109 (1981). After the acquittal, "Burr retired to a life of exile and dissipation." Stites, supra, at 108.

287    Stites, supra note 286, at 97; accord Yoo, supra note 265, at 1439.

288    Robarge, supra note 245, at 281; accord Channing, supra note 229, at 167; Cunningham, supra note 152, at 293-94.

289    Bowers, supra note 182, at 422 (emphasis added); Baker, supra note 245, at 514; Cunningham, supra note 152, at 294; Robarge, supra note 245, at 281.

290    Baker, supra note 245, at 515; Bowers, supra note 182, at 422-23.

291    Baker, supra note 245, at 515.

292    Yoo, supra note 265, at 1446.

293    5 Malone, supra note 152, at 309.

294    Johnstone, supra note 152, at 172.

295    Id. at 175.

296    Ellis, supra note 140, at 59; Johnstone, supra note 152, at 175; 4 Malone, supra note 152, at 145.

297    Stuart v. Laird, 5 U.S. (1 Cranch) 299, 308 (1803); Marbury v. Madison, 5 U.S. (1 Cranch) 137, 153 (1803).

298    Brant, supra note 97, at 47.

299    Ellis, supra note 140, at 44; Johnstone, supra note 152, at 172-75.

300    Johnstone, supra note 152, at 179.

301    4 Malone, supra note 152, at 148.

302    3 Beveridge, supra note 273, at 385 (1919); Smith, supra note 139, at 360; Yoo, supra note 265, at 1441-42. "[T]he chief reason for Federalist attachment to Burr, despite the fact that he killed Hamilton, was antipathy to Jefferson." 5 Malone, supra note 152, at 302.

303    Yoo, supra note 265, at 1441-42.

304    Baker, supra note 245, at 477; Smith, supra note 139, at 365; Yoo, supra note 265, at 1442.

305    Yoo, supra note 265, at 1442.

306    1 Beveridge, supra note 273, at 126, 145.

307    Robarge, supra note 245, at 46 n.27; Smith, supra note 139, at 63-64, 549 n.197.

308    Robarge, supra note 245, at 160-61.

309    2 Beveridge, supra note 273, at 537.

310    Id. at 537-41; Robarge, supra note 245, at 231.

311    2 Beveridge, supra note 273, at 538; Robarge, supra note 245, at 231.

312    2 Beveridge, supra note 273, at 541-43; 3 Malone, supra note 152, at 496; Robarge, supra note 245, at 231-32.

313    Robarge, supra note 245, at 160-61, 278-79.

APPENDIX - 421

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 423 of 553 PageID #: 828

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

314    Id. at 279.

315    1 Malone, supra note 152, at 441-45; Robarge, supra note 245, at 162.

316    Johnstone, supra note 152, at 176; Patterson, supra note 196, at 25, 123; Robarge, supra note 245, at 160.

317    Johnstone, supra note 152, at 206; 5 Malone, supra note 152, at 302; Robarge, supra note 245, at 281; Yoo, supra note 265, at 1444.

318    28 U.S.C. § 455(a) (2007) ("Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.").

319    Baker, supra note 245, at 331-60; 2 Beveridge, supra note 273, at 485-564; James F. Simon, What Kind of Nation: Thomas Jefferson, John Marshall, and the Epic Struggle to Create a United States 102-03 (2002); Smith, supra note 139, at 268-81.

320    2 Beveridge, supra note 273, at 560; accord Channing, supra note 229, at 117; Ellis, supra note 140, at 32.

321    See 28 U.S.C. § 455(a).

322    Id. § 455(b)(3).

323    Baker, supra note 245, at 354; Robarge, supra note 245, at 234.

324    Baker, supra note 245, at 355.

325    2 Beveridge, supra note 273, at 558-59.

326    Id. at 559.

327    Baker, supra note 245, at 359-60; 2 Beveridge, supra note 273, at 562; Cunningham, supra note 152, at 239; Ellis, supra note 277, at 174; Simon, supra note 319, at 137, 173-75.

328    Ellis, supra note 277, at 170; accord Baker, supra note 245, at 359. It is not stated how a stage coach would have been navigated before dawn in an era without electric lights, although, according to the National Aeronautics and Space Administration, the moon had been full three and a half days earlier, in the afternoon on February 28. See Moon Phases: 1801 to 1900, http://sunearth.gsfc.nasa.gov/eclipse/phase/phases1801.html (last visited Apr. 17, 2007).

329    Marbury v. Madison, 5 U.S. (1 Cranch) 137, 137-38 (1803); Channing, supra note 229, at 117; Ellis, supra note 140, at 39, 43. A justice of the peace was not an Article III judgeship with lifetime tenure. When the Supreme Court finally decided the case, Marbury's five-year term of office was nearly half over. Marbury, 5 U.S. (1 Cranch) at 154, 162; 4 Malone, supra note 152, at 145. The Federalists had created thirty justices of the peace for the District of Columbia, id., at a time when Washington and Georgetown were villages, Ellis, supra note 277, at 171-73, which suggests that these positions were sinecures to reward the party faithful.

330    14 U.S. (1 Wheat.) 304 (1816).

331    Simon, supra note 319, at 268.

332    Id. at 269.

333    28 U.S.C. § 455(b)(2) (2007).

334    Id. § 455(b)(4), (5)(iii).

APPENDIX - 422

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 424 of 553 PageID #:  829

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

335    Simon, supra note 319, at 270.

336    See infra text accompanying notes 733-739, 766-781.

337    Marbury v. Madison, 5 U.S. (1 Cranch) 137, 162 (1803) (emphasis added).

338    Channing, supra note 217, at 166.

339    Two decades later, Hay was appointed a U.S. district court judge by John Quincy Adams, the sixth President and John Adams's son. 5 Malone, supra note 152, at 310. During the crisis over the 1800 election, when a rumor circulated that Marshall thought himself entitled to the Presidency, Hay, under a pseudonym, wrote an open letter in protest to Marshall, "which was copied far and wide" in pro-Jeffersonian newspapers. 2 Beveridge, supra note 273, at 542-43. "I understand that you, Sir ... have given an opinion in exact conformity with the wishes of your party," wrote Hay, daring Marshall to "come forward and defend it." Id. at 542. Marshall said nothing. Id. at 543.
Burr's defense team "outnumbered and outweighed" the three prosecutors. 5 Malone, supra note 152, at 310. Among Burr's lawyers were Luther Martin, the attorney general of Maryland who also defended Chase in his impeachment trial, and Edmund Randolph, former Governor of Virginia, the first Attorney General of the United States, and a Secretary of State in the Washington Administration. Bowers, supra note 182, at 275, 279, 286, 403-04; 5 Malone, Second Term, supra note 152, at 310; Smith, supra note 139, at 90, 112. When Jefferson went into politics in 1774, he turned his law practice over to Randolph, and when Randolph was elected Governor of Virginia in 1786, he turned it over to Marshall. Smith, supra note 139, at 90-91. "Bizarre as it may seem, Jefferson's law practice ultimately became John Marshall's." Id. at 91.

340    Smith, supra note 139, at 361. The letters are published at 10 The Writings of Thomas Jefferson 394-409 (Paul Leicester Ford ed., 1905).

341    Smith, supra note 139, at 361. Those few of Jefferson's letters to Hay that were intended to be read into the record in Marshall's court appear as measured and precise position-taking by a very intelligent and careful President. The rest-- the overwhelming bulk of the correspondence--are intense venting by a President focused on Burr's trial to the point of obsession. According to Dumas Malone, Jefferson's leading biographer, "[s]trongly partisan expressions are rare in Jefferson's public utterances, which were characteristically measured and restrained. When he used extreme language it was nearly always in a private communication to someone of whose loyalty to the party or to him personally he had no doubt." 5 Malone, supra note 152, at 304. Given Jefferson's historical image and his accomplishments in fields as disparate as architecture, agronomy, education, and political philosophy, the effect of these letters on the modern reader is not unlike the effect President Nixon's obscenities and paranoia, captured on audiotapes, had on his supporters (although, throughout his correspondence with Hay, Jefferson retains a mind and character many, many times the value of Nixon's).

342    Smith, supra note 139, at 360.

343    Yoo, supra note 265, at 1442.

344    Although he had assembled a team of first-class lawyers, Burr made the motion and took the lead himself in arguing it. United States v. Burr, 25 F. Cas. 30, 30 (C.C.D. Va. 1807) (No. 14,692d) ("Mr. Burr then addressed the court."); United States v. Burr, 25 F. Cas. 187, 190 (C.C.D. Va. 1807) (No. 14,694) ("Colonel Burr renewed his application for the production of the two letters ...."; "Mr. Burr said he could not be satisfied with a copy of part of the letter."); Yoo, supra note 265, at 1447.

345    Baker, supra note 245, at 477; 3 Beveridge, supra note 273, at 433, 443; Cunningham, supra note 152, at 291; Smith, supra note 139, at 362, 638; Stites, supra note 286, at 105; Yoo, supra note 265, at 1446-47. Although the sources speak of one letter, and sometimes two, from Wilkinson to Jefferson, three such letters at issue, although not simultaneously. They are reprinted at Yoo, supra note 265, at 1474-77.

346    Yoo, supra note 265, at 1447.

347    Burr, 25 F. Cas. at 30-31 (No. 14,692d); Burr, 25 F. Cas. at 190 (No. 14,694); Baker, supra note 245, at 477-78; Cunningham, supra note 152, at 291-92; Yoo, supra note 265, at 1447; 5 Malone, supra note 152, at 321.

APPENDIX - 423

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 425 of 553 PageID #: 830

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

348    Yoo, supra note 265, at 1447.

349    Cunningham, supra note 152, at 292.

350    The term "executive privilege" was unknown before the Eisenhower Administration. Mark J. Rozell, Executive Privilege: The Dilemma of Secrecy and Democratic Accountability 44 (1994). George Washington was the first President to claim an embryonic form of executive privilege, although Washington did not articulate the doctrine we have now become familiar with. See Saikrishna Bangalore Prakash, A Critical Comment on the Constitutionality of Executive Privilege, 83 Minn. L. Rev. 1143, 1177-85 (1999) (explaining the Washington precedents).

351    Raoul Berger, Executive Privilege: A Constitutional Myth 188-89 (1974).

352    Burr, 25 F. Cas. at 31 (No. 14,692d). Throughout the trial, an extensive correspondence occurred between Jefferson and Hay. To carry these letters between Washington and Richmond, Jefferson used a courier, rather than the postal system. Yoo, supra note 265, at 1443.

353    United States v. Burr, 25 F. Cas. 187, 190 (C.C.D. Va. 1807) (No. 14,694); Stites, supra note 286, at 106; Yoo, supra note 265, at 1448, 1457-58.

354    Burr, 25 F. Cas. at 37 (No. 14,692d).

355    Id. at 69-70.

356    Yoo, supra note 265, at 1453.

357    Id. at 1462.

358    Id. at 1463.

359    United States v. Nixon, 418 U.S. 683, 707-08, 713-15 (1974), (relying in part on United States v. Burr, 25 F. Cas. 187, 190-92 (C.C.D. Va. 1807) (No. 14,694)).

360    See infra text accompanying notes 683-690.

361    Yoo, supra note 265, at 1448, 1460-65.

362    United States v. Burr, 25 F. Cas. 55, 65 (C.C.D. Va. 1807) (No. 14,693) (emphasis added).

363    Baker, supra note 245, at 484-85; Smith, supra note 139, at 364-65; Yoo, supra note 265, at 1450.

364    United States v. Burr, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (No. 14,692d).

365    Id. at 34.

366    31 U.S. 515 (1832).

367    Robarge, supra note 245, at 299; Smith, supra note 139, at 518.

368    Baker, supra note 245, at 745.

369    Robarge, supra note 245, at 299; Smith, supra note 139, at 518.

370    United States v. Nixon, 418 U.S. 683, 714-16 (1974).

371    Ellis, supra note 277.

APPENDIX - 424

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 426 of 553 PageID #:  831

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

372    Since 1993, the Clinton and George W. Bush Administrations have made wide claims of executive privilege--arguably wider than anything claimed by the executive branch since the Nixon Administration. Mark J. Rozell, Executive Privilege Revived?: Secrecy and Conflict during the Bush Presidency, 52 Duke L.J. 403 (2002); Mark J. Rozell, Executive Privilege and the Modern Presidents: In Nixon's Shadow, 83 Minn. L. Rev. 1069, 1117-25 (1999); Mark J. Rozell, A Response to Professor Johnsen, 83 Minn. L. Rev. 1191, 1191-94 (1999). Contra Dawn Johnsen, Executive Privilege since United States v. Nixon: Issues of Motivation and Accommodation, 83 Minn. L. Rev. 1127, 1130-33 (1999).

373    Baker, supra note 245, at 485; 5 Malone, supra note 152, at 322; Akhil Reed Amar & Neal Kumar Katyal, Executive Privileges: The Nixon and Clinton Cases, 108 Harv. L. Rev. 701, 718 (1995); Yoo, supra note 265, at 1450-53. This was a personal rivalry, as well as a difference of opinion about constitutional law. "Who was more powerful? ... Who could command the other's presence? Since 1801, when Thomas Jefferson had become President and John Marshall had become Chief Justice, they had been heading toward this confrontation." Baker, supra note 245, at 477.

374    United States v. Burr, 25 F. Cas. 55, 69 (C.C.D. Va. 1807) (No. 14,693). Hay put this letter into the record in open court.

375    Id. at 63.

376    Id.

377    Id. at 192.

378    The following appeared in the subpoena: "The transmission to the Clerk of this Court of the original letter of General Wilkinson and of copies duly authenticated of the other papers and documents ... will be admitted as sufficient observance of the process, without the personal attendance of any or either of the persons therein named." Johnstone, supra note 152, at 203.

379    520 U.S. 681 (1997) (relying in part on United States v. Burr, 25 F. Cas. 30 (C.C.D. Va. 1807) (No. 14,692d)).

380    Id. at 693-94, 703-04. And, as in United States v. Nixon, the Clinton Court once again misinterpreted Burr. It is literally true, that "Chief Justice Marshall ... ruled that a subpoena duces tecum could be directed to the President." Id. at 703-04. However, Marshall also ruled that a President has a right to ignore such a subpoena. See Yoo, supra note 265, at 1466-68.

381    See infra text accompanying notes 917-920.

382    Johnstone, supra note 152, at 208.

383    Robarge, supra note 245, at 284-85.

384    See Hoffer & Hull, supra note 31, at 257.

385    Robarge, supra note 245, at 293. Even during Jefferson's Administrations, the radicals in his party were complaining of this tendency to co-opt the Federalists by absorbing some of their ideology. Ellis, supra note 140, at 236.

386    Robarge, supra note 245, at 293. One elector in the electoral college voted against Monroe on the sole ground that only George Washington should have the honor of a unanimous election.

387    17 U.S. (4 Wheat.) 316 (1819).

388    Paul Stephen Clarkson & R. Samuel Jett, Luther Martin of Maryland 280 (1970).

389    Ellis, supra note 277, at 48-49.

390    Id. at 49.

391    Cunningham, supra note 152, at 46-47.

APPENDIX - 425

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 427 of 553 PageID #: 832

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

392   Id. at 47; Ellis, supra note 277, at 50.

393   Cunningham, supra note 152, at 47; Ellis, supra note 277, at 50.

394   Ellis, supra note 277, at 60.

395   Cunningham, supra note 152, at 47; Ellis, supra note 277, at 50.

396   Cunningham, supra note 152, at 349.

397   Id. at 329.

398   Id. at 330.

399   Id.

400   Simon, supra note 319, at 294.

401   Cunningham, supra note 152, at 331.

402   Id. at 331; Ellis, supra note 277, at 235-51.

403   Cunningham, supra note 152, at 274; Ellis, supra note 140, at 103.

404   Impeachment: Selected Materials, supra note 96, at 136-39; Van Tassel & Finkelman, supra note 82, at 107-14.

405   Bushnell, supra note 92, at 93-96; Van Tassel & Finkelman, supra note 82, at 108.

406   Bushnell, supra note 92, at 91-92.

407   Id. at 92-93.

408   Id. at 92-96.

409   Id. at 93-95, 100.

410   Brant, supra note 97, at 122; Bushnell, supra note 92, at 93; Van Tassel & Finkelman, supra note 82, at 108.

411   Bushnell, supra note 92, at 92, 96-97.

412   Id. at 14.

413   Id. at 14, 98.

414   Id. at 14.

415   18 U.S.C. § 401 (2007); see also Bushnell, supra note 92, at 112.

416   Bushnell, supra note 92, at 14; Impeachment: Selected Materials, supra note 96, at 140-42; Van Tassel & Finkelman, supra note 82, at 115.

417   Brant, supra note 97, at 129.

418   Van Tassel, supra note 190, at 408 (Appendix Table 1).

419   Van Tassel & Finkelman, supra note 82, at 11.

420   Id. at 116.

421   On articles 1 and 5 of the impeachment, the Senate vote was thirty-nine to nothing to convict, while on other articles there were scattered votes to acquit. Id. at 115. Instead of simply charging Humphreys with accepting a Confederate

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 428 of 553 PageID #: 833

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

judgeship, the articles of impeachment also alleged, as separate grounds for removal, advocating secession from the Union, opposing federal authority, failing to hold court, and so on. Id. at 117-19.

422    Joseph Borkin, The Corrupt Judge: An Inquiry into Bribery and Other High Crimes and Misdemeanors in Federal Courts 200, 247 (1962); 3 Asher C. Hinds, Hinds' Precedents of the House of Representatives § 2489; (1907-08).

423    Borkin, supra note 422, at 235; 3 Hinds, supra note 422, § 2500.

424    Borkin, supra note 422, at 225; 3 Hinds, supra note 422, § 2487.

425    Borkin, supra note 422, at 200-01, 237; 3 Hinds, supra note 422, § 2494.

426    Harry Innis, a district court judge in Kentucky, in 1808; Harry Toulmin, a Mississippi territorial court judge, in 1811-12; Mathias B. Tallmadge, a district court judge in New York, in 1818-19; William P. Van Ness, a district court judge in New York, in 1818-19; Charles Tait, a district court judge in Alabama, in 1822-23; Joseph L. Smith, a Florida territorial court judge, in 1825-26; Buckner Thurston, a circuit judge in the District of Columbia, in 1825 and again in 1837; Alfred Conkling, a district court judge in New York, in 1829-30; Benjamin Johnson, an Arkansas territorial court judge, in 1833; and John C. Watrous, a district court judge in Texas, after a series of investigations from 1852 to 1860. Borkin, supra note 422, at 227, 234-36, 248-54; 3 Hinds, supra note 422, §§ 2488-99.
From the sketchy records now available, it is hard to tell which of these judges had done nothing wrong and which had behaved in troubling but not impeachment-worthy ways. Judges are in the constant business of making people unhappy-- usually losing litigants but also, at times, their lawyers as well-- and it takes only one Representative to introduce an impeachment resolution that the rest of the House, without any knowledge of the merits, might be persuaded to refer to a committee. In Watrous's case, we know that the House Judiciary Committee more than once recommended that he be impeached, but the House never did so, apparently on the ground that the conflicts of interest alleged did not rise to the level of impeachable offenses. 3 Hinds, supra note 422, §§ 2495-99.
Reminiscent of Blount in 1797 and Burr in 1807, the accusation against Innis in 1808 was of a "[p]lot with Spain to seduce Kentucky from the Union." Borkin, supra note 422, at 234-35.

427    Van Tassel, Resignations, supra note 190.

428    Id. at 370-71.

429    Id. at 371.

430    Historians poll each other on this frequently, and Lincoln is always at the top of every poll. See Henry J. Abraham, Justices, Presidents, and Senators: A History of the U.S. Supreme Court Appointments from Washington to Clinton 373-76 (1999).

431    See T. Harry Williams, Lincoln and His Generals (1952); T. Harry Williams, McClellan, Sherman and Grant (1962).

432    Van Tassel & Finkelman, supra note 82, at 222.

433    Bushnell, supra note 92, at 128; Van Tassel & Finkelman, supra note 82, at 222.

434    Van Tassel & Finkelman, supra note 82, at 222.

435    See Michael Les Benedict, The Impeachment and Trial of Andrew Johnson 5 (1973).

436    Van Tassel & Finkelman, supra note 82, at 222.

437    Id.

438    Id. at 223.

439    1 Historical Statistics of the United States: Earliest Times to the Present, 1-213 (Susan B. Carter et al. eds., millennial ed. 2006) [hereinafter Historical Statistics].

440    Id.

APPENDIX - 427

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 429 of 553 PageID #:  834

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

441    See infra tbl 2.

442    Senate Party Divisions, supra note 198.

443    House Party Divisions, supra note 199.

444    Benedict, supra note 435, at 75.

445    Gerhardt, supra note 231, at 103.

446    James E. Sefton, Andrew Johnson and the Uses of Constitutional Power 130-31 (1980)Power 130-31 (1980).

447    Id. at 130; Hans L. Trefousse, Impeachment of a President: Andrew Johnson, the Blacks and Reconstruction 26 (1999).

448    Trefousse, supra note 447, at 28-29; Gerhardt, supra note 231, at 103.

449    Benedict, supra note 435, at 8.

450    Trefousse, supra note 447, at 43. The Radical Republicans had some other problems with the Supreme Court. In March 1868, Congress took the extraordinary step of abolishing the Court's jurisdiction to decide appeals growing out of the Habeas Corpus Act of 1867. Ex parte McCardle, 74 U.S. 506, 508 (1869); see also Stanley I. Kutler, Judicial Power and Reconstruction Politics (1968).

451    See infra text accompanying notes 571-578.

452    Tenure of Office Act, ch. 154, 14 Stat. 430 (1867) (amended 1869, repealed 1887).

453    Id.

454    Id. On the history of the Act, see James Hart, Tenure of Office under the Constitution: A Study in Law and Public Policy 230-32 (1930).

455    Fletcher Pratt, Stanton: Lincoln's Secretary of War ix (1953). See generally Benjamin P. Thomas & Harold M. Hyman, Stanton: The Life and Times of Lincoln's Secretary of War (1962).

456    Trefousse, supra note 447, at 45.

457    Sefton, supra note 446, at 149.

458    Id.

459    Labovitz, supra note 74, at 57; Trefousse, supra note 447, at 99; Van Tassel & Finkelman, supra note 82, at 224.

460    Bushnell, supra note 92, at 136; Labovitz, supra note 63, at 57; Trefousse, supra note 447, at 125.

461    Trefousse, supra note 447, at 125-27. Though it is hard for us to imagine today, the federal government in 1868 was so small that the War Department, the predecessor to the Department of the Army, could be administered from office space with a single door.

462    Benedict, supra note 435, at 100; B.H. Liddell Hart, Sherman: Soldier, Realist, American 409-10 (1930); Trefousse, supra note 447, at 128.

463    Michael Fellman, Citizen Sherman: A Life of William Tecumseh Sherman 242-43 (1995) (quoting Sherman, in a letter to a Radical Republican: "I am not yet prepared to receive the negro on terms of political equality ...."); James Merrill, William Tecumseh Sherman 142 (1971) (Sherman, in a letter to his wife: "Niggers won't work unless they are owned ...."); Geoffrey Perret, Ulysses S. Grant: Soldier and President 413 (1997) ("Sherman did not believe in Reconstruction.... He opposed nearly every Reconstruction measure.").

464    Benedict, supra note 435, at 100; Trefousse, supra note 447, at 128.

APPENDIX - 428

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 430 of 553 PageID #:  835

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

465    Benedict, supra note 435, at 100; accord Hart, supra note 462; Trefousse, supra note 447, at 128.

466    Benedict, supra note 435, at 100.

467    Id.; Bushnell, supra note 92, at 137; Trefousse, supra note 447, at 133-34; Van Tassel & finkelman, supra note 82, at 224.

468    Bushnell, supra note 92, at 137; Labovitz, supra note 74, at 57.

469    Brant, supra note 97, at 137; Labovitz, supra note 74, at 58-59; 1 Trial of Andrew Johnson, President of the United States, Before the Senate of the United States, on Impeachment by the House of Representatives for High Crimes and Misdemeanors 6-10 (1868) [hereinafter Trial of Andrew Johnson]; Van Tassel & Finkelman, supra note 82, at 227-36.

470    A. Johnson Impeachment Articles, http:// www.vw.vccs.edu/vwhansd/HIS269/Documents/ImpeachArticles.html (last visited Apr. 21, 2007); see also Brant, supra note 97, at 137; Van Tassel & Finkelman, supra note 82, at 232; see also Labovitz, supra note 74, at 61.

471    Labovitz, supra note 74, at 49-56; Trefousse, supra note 447, at 98-114.

472    3 Hinds, supra note 422, § 2503.

473    Id.

474    See Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1 (2004); Charles Lane & David Von Drehle, Is Scalia Too Blunt To Be Effective? Justice Out of Case About Which He Cares, Wash. Post, Oct. 17, 2003, at A27.

475    3 Hinds, supra note 422, § 2503.

476    Id.

477    Id.

478    Brant, supra note 97, at 137.

479    Trefousse, supra note 447, at 151.

480    Sefton, supra note 446, at 177.

481    Trefousse, supra note 447, at 170.

482    Brant, supra note 97, at 137; Trefousse, supra note 447, at 170-71.

483    Bushnell, supra note 92 at 159-60.

484    Trefousse, supra note 447, at 169.

485    Bushnell, supra note 92, at 139; Jonathan Turley, Senate Trials and Factional Disputes: Impeachment as a Madisonian Device, 49 Duke L.J. 1, 87 n.412 (1999).

486    Turley, supra note 485, at 87 n.412.

487    Id. at 90 n.426.

488    Benedict, supra note 435, at 126-43; Van Tassel & Finkelman, supra note 82, at 227.

489    Benedict, supra note 435, at 183; Bushnell, supra note 92, at 160.

490    Bushnell, supra note 92, at 160.

491    Benedict, supra note 435, at 183; Bushnell, supra note 92, at 160.

APPENDIX - 429

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 431 of 553 PageID #:  836

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

492    Bushnell, supra note 92, at 160.

493    Tenure of Office Act, ch. 10, 16 Stat. 6 (1869) (repealed 1887).

494    17 Stat. 284 (1872), reenacted 19 Stat. 80 (1876).

495    272 U.S. 52 (1926).

496    Rehnquist, supra note 219, at 265.

497    Report of the Nat'l Comm'n on Judicial Discipline & Removal, 152 F.R.D. 265, 296 (1993); see also Van Tassel & Finkelman, supra note 82, at 12; Turley, supra note 485, at 53-56.

498    Van Tassel & Finkelman, supra note 82, at 192.

499    Bushnell, supra note 92, at 177; Turley, supra note 485, at 55.

500    Turley, supra note 485, at 55.

501    Black, supra note 67, at 51.

502    Judicial Discipline & Removal, 152 F.R.D. at 296; Borkin, supra note 422, at 201, 229; 3 Hinds, supra note 422, §§ 2504-05; Van Tassel & Finkelman, supra note 71, at 119-23; Turley, supra note 485, at 58.

503    Judicial Discipline & Removal, 152 F.R.D. at 296; Borkin, supra note 422, at 201, 229; 3 Hinds, supra note 422, §§ 2504-05; Van Tassel & Finkelman, supra note 82, at 119-20; Turley, supra note 485, at 58.

504    Borkin, supra note 422, at 203-04, 231-32; 6 Cannon's Precedents of the House of Representatives §§ 544-47 (1935) [hereinafter Cannon's Precedents]; 3 Deschler's Precedents of the House of Representatives, ch. 14, § 16 [herinafter Deschler's Precedents]; Van Tassel & Finkelman, supra note 82, at 144-52; Turley, supra note 485, at 58.

505    Bushnell, supra note 92, at 191; Turley, supra note 485, at 63.

506    Bushnell, supra note 92, at 191-92; Jacobus tenBroek, Partisan Politics and Federal Judgeship Impeachment since 1903, 23 Minn. L. Rev. 185, 188 (1938-1939).

507    Bushnell, supra note 92, at 192-93.

508    As a result of the problems caused by this procedure in the Swayne impeachment, it was replaced in 1912, during the Archbald impeachment, with the practice of having the committee report at the same time both a recommendation to impeach, and the draft articles of impeachment which, if the House were to vote for impeachment, would be forwarded to the Senate. See Labovitz, supra note 74, at 114 n.34.

509    Bushnell, supra note 92, at 193.

510    Id. at 212; Van Tassel & Finkelman, supra note 82, at 124-25.

511    Bushnell, supra note 92, at 193.

512    The Florida population was 42% African-American in the 1890 census and 44% African-American in the 1900 census. 1 Historical Statistics, supra note 439. Only five states--Alabama, Georgia, Louisiana, Mississippi, and South Carolina-- had, by percentage, larger African-American populations. Id. at 1-180 to 1-379.

513    See Henry Cabot Lodge, The Federal Election Bill, 151 N. Am. Rev. 257 (1890) "The Southern Democrats declare that the enforcement of this or any other law will cause social disturbance and revolutionary outbreaks. As the negroes now disenfranchised certainly will not revolt because they receive a vote, it is clear, therefore, that this means that the men who now rule in those States will make social disturbances and revolution in resistance to a law of the United States." Id. at 259.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.    

514  See V.O. Key, Southern Politics in State and Nation (1949); J. Morgan Kousser, The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910 (1974); Michael Perman, Struggle for Mastery: Disfranchisement in the South, 1888-1908 (2001); Thomas Adams Upchurch, Legislating Racism: The Billion Dollar Congress and the Birth of Jim Crow (2004); C. Vann Woodward, The Strange Career of Jim Crow (1955).
The Jim Crow codes deprived Southern African Americans of equal participation in nearly every aspect of modern life. Until the Civil Rights movement began after World War II, the Supreme Court held them to be constitutional. See
🚩 Plessy v. Ferguson, 163 U.S. 537 (1896).

515  🔲 42 U.S.C. §§ 1971-🔲 1973i (2007).

516  Bushnell, supra note 92, at 191-92.

517  tenBroek, supra note 506.

518  Van Tassel & Finkelman, supra note 82, at 132.

519  Turley, supra note 485, at 64-65; see also Bushnell, supra note 92, at 217-42; Van Tassel & Finkelman, supra note 82, at 132-52.

520  tenBroek, supra note 506, at 191. TenBroek was an unusual and interesting person. He was on the political science faculty at the University of California at Berkeley. Although not a lawyer, he had a deep effect on several aspects of mid-twentieth century constitutional scholarship, and, at one time, students in law school constitutional law courses would have been familiar with his work. Perhaps his most valuable book was Equal Justice: The Origins of the Fourteenth Amendment (1969). He was also the founder of the National Federation of the Blind and was an early and still cherished advocate for the rights of the disabled. See Floyd Matson, Blind Justice: Jacobus tenBroek and the Vision of Equality (2005).

521  Bushnell, supra note 92, at 220.

522  Id. at 237-38; Van Tassel & Finkelman, supra note 82, at 133.

523  Bushnell, supra note 92, at 239.

524  Id. at 245; Van Tassel & Finkelman, supra note 82, at 152.

525  Van Tassel & Finkelman, supra note 82, at 152-53.

526  Bushnell, supra note 92, at 246-47.

527  tenBroek, supra note 506, at 198.

528  Borkin, supra note 422, at 202, 245; 3 Hinds, supra note 422, § 2511.

529  Borkin, supra note 422, at 202, 226; 3 Hinds, supra note 422, § 2512.

530  Borkin, supra note 422, at 201-02, 230; 3 Hinds, supra note 422, §§ 2506-09.

531  Borkin, supra note 422, at 203, 232-33; 6 Cannon's Precedents, supra note 504, §526.

532  Borkin, supra note 422, at 203, 257; 6 Cannon's Precedents, supra note 504, § 528.

533  Borkin, supra note 422, at 255-57; 6 Cannon's Precedents, supra note 504, § 550.

534  6 Cannon's Precedents, supra note 504, § 535.

535  Jonathan Fraser Light, The Cultural Encyclopedia of Baseball 179 (1997); David Pietrusza, Judge and Jury: The Life and Times of Judge Kenesaw Mountain Landis 195 (1998). The impeachment resolution alleged that the Commissioner's

APPENDIX - 431

salary was $42,500, 6 Cannon's Precedents, supra note 504, § 535, but baseball historians presumably know more about such things than contemporary Congressmen did.

536   Pietrusza, supra note 535, at 196-208; 6 Cannon's Precedents, supra note 504, § 535.

537   3 Herbert Hoover, The Memoirs of Herbert Hoover: The Great Depression 195 (1952).

538   See infra tbl.3.

539   6 Cannon's Precedents, supra note 504, § 541; 3 Deschler's Precedents, supra note 504, § 14.3; Turley, supra note 485, at 76 n.364.

540   "Is there any other point to which you wish to draw my attention?"

   "To the curious incident of the dog in the night-time."

   "The dog did nothing in the night-time."

"That was the curious incident," remarked Sherlock Holmes.... "Obviously the midnight visitor was someone the dog knew well."
Arthur Conan Doyle, Silver Blaze, in 1 The Complete Sherlock Holmes 413-15 (Jeffrey Broesche ed. 2003).

541   See infra tbl. 3.

542   Senate Party Divisions, supra note 198.

543   House Party Divisions, supra note 199.

544   Joseph Alsop & Turner Catledge, The 168 Days 15 (1938).

545   Abraham, supra note 430, at 377-81; C. Herman Pritchett, The Roosevelt Court: A Study in Judicial Politics and Values, 1937-1947, at 17 (1948).

546   1 Henry F. Pringle, The Life and Times of William Howard Taft 535 (1939).

547   David H. Burton, Taft, Holmes, and the 1920s Court 113-14 (1998); Robert K. Murray, The Harding Era: Warren G. Harding and His Administration 12 (1969); Francis Russell, The Shadow of Blooming Grove: Warren G. Harding and His Times 229 (1968); Paul Simon, Advice and Consent: Clarence Thomas, Robert Bork, and the Intriguing History of the Supreme Court's Nomination Battles 225 (1992).

548   Pritchett, supra note 545, at 17-18; Simon, supra note 530, at 227.

549   David J. Danelski, A Supreme Court Justice Is Appointed 41-55, 87 (1964); Russell, supra note, at 507 n.5; Simon, supra note 530, at 227; Eugene P. Trani & David L. Wilson, The Presidency of Warren G. Harding 49 (1977).

550   Trani & Wilson, supra note 549.

551   Simon, supra note 530, at 227.

552   Id..

553   Id. at 226-28; see also Russell, supra note at 507 n.5.

554   Pringle, supra note 546, at 955.

555   G. Edward White, The Constitution and the New Deal 19 (2000).

556   R. R. Ret. Bd. v. Alton R. Co., 295 U.S. 330 (1935).

APPENDIX - 432

557     A.L.A. Schecter Poultry Corp. v. United States, 295 U.S. 495 (1935) (the "sick chicken" case).

558     Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555 (1935).

559     Hopkins Fed. Sav. & Loan Ass'n v. Cleary, 296 U.S. 315 (1935).

560     United States v. Butler, 297 U.S. 1 (1936). Actually, the Court held that the tax at the heart of the AAA was unconstitutional (rather than the entire statute), but without the tax, the AAA was an empty shell. Before the AAA was enacted, Brandeis told Administration officials privately that he thought the bill would be economically destructive. Through Adolf Berle, Brandeis wrote to Roosevelt and threatened--in Brandeis's words--"to hold the government's control legislation unconstitutional from now on" if it continued to reward large businesses and farmers at the expense of smaller economic actors (the NRA case had not yet reached the Supreme Court). Marian C. McKenna, Franklin Roosevelt and the Great Constitutional War: The Court-Packing Crisis of 1937, at 128-30 (2002). In the summer of 1934, Administration officials visited Brandeis on Cape Cod, where he was vacationing, and tried to persuade him that the AAA should be sustained when eventually litigated in the Supreme Court. Under the conflict-of-interest statute in effect today, all of this would have required Brandeis's recusal from Butler, the AAA case. See 28 U.S.C. § 455(a). Brandeis was quiet on the bench when Butler was argued and in conference when it was considered. McKenna, supra, at 133. He wrote no opinion, only signing Stone's dissent from the decision to hold the AAA tax unconstitutional. The only plausible explanation for this mute about-face would be a realization on Brandeis's part that he had said too much earlier, and that if he voted with the majority, the Administration would complain that he had been behaving and thinking unjudicially, which was true. Id.

561     Carter v. Carter Coal Co., 298 U.S. 238 (1936).

562     Ashton v. Cameron County Water Improvement Dist., 298 U.S. 513 (1936).

563     Ashwander v. Tenn. Valley Auth., 297 U.S. 288 (1936).

564     McKenna, supra note 560, at 189 n.28.

565     ch. 531, 49 Stat. 620 (1935).

566     ch. 372, 49 Stat. 449 (1935).

567     ch. 614, 49 Stat. 684 (1935).

568     William E. Leuchtenburg, The Supreme Court Reborn: The Constitutional Revolution in the Age of Roosevelt 95 (1995) (quoting Ickes's diary).

569     Id.; McKenna, supra note 560, at 165-75.

570     The Fascist government in Italy and the Communist government in the Soviet Union predated the Depression.

571     Leonard Baker, Back to Back: The Duel between FDR and the Supreme Court 10 (1967); Leuchtenburg, supra note 568, at 109.

572     Message from the President of the U.S. Transmitting a Recommendation to Reorganize the Judicial Branch of the Fed. Gov't, H.R. Doc. No. 75-142 (1937).

573     Alsop & Catledge, supra note 544, at 209.

574     Id. at 33; Baker, supra note 571, at 134; Leuchtenburg, supra note 568, at 120.

575     Alsop & Catledge, supra note 544, at 33.

APPENDIX - 433

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 435 of 553 PageID #: 840

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

576    Id. at 33-36; Baker, supra note 571, at 134; McKenna, supra note 560, at 256-57, 268-69; Stephenson, supra note 151, at 312.

577    McKenna, supra note 560, at 263.

578    See infra text accompanying notes 600-605.

579    Baker, supra note 571, at 133-34.

580    Morehead v. New York ex rel. Tipaldo, 298 U.S. 587 (1936).

581    Alsop & Catledge, supra note 544, at 139-40; Baker, supra note 571, at 175-76; McKenna, supra note 543, at 414.

582    Alsop & Catledge, supra note 544, at 140-41; Baker, supra note 571, at 176; McKenna, supra note 560, at 414.

583    W.    Coast Hotel v. Parrish, 300 U.S. 379 (1937). After Felix Frankfurter was appointed to the Supreme Court, he heard from Roberts an explanation for this about-face that Frankfurter urged Roberts to commit to writing. In the resulting memorandum, Roberts claimed that in Tipaldo, the state of New York had not asked the Court to overrule an earlier case, Adkins v. Children's Hospital, 261 U.S. 525 (1923), that held minimum wage legislation unconstitutional, and that as long as Adkins was good law, Roberts felt compelled to follow it, even though he thought it should be overruled. Although New York had not done so in its brief or in oral argument, it did in its certiorari petition take the position that the circumstances prevailing in 1936 "call for a reconsideration of the Adkins case." Barry Cushman, Rethinking the New Deal Court: The Structure of a Constitutional Revolution 96 (1998) (quoting the petition). The New York statute had been enacted during the Depression, but the Washington statute dated from 1913. Id. West Coast Hotel was an appeal from a decision of the Washington State Supreme Court holding that Adkins had been impliedly overruled by later decisions of the U.S. Supreme Court. But in the Supreme Court, the State of Washington did not argue that Adkins should be overruled or treated as though it had already been overruled. Id. Thus, the explanation Roberts gave in the memorandum is not entirely consistent with the procedural facts. And, a year after West Coast Hotel, Roberts joined in Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), to overrule a much older and more widely followed precedent, Swift v. Tyson, 41 U.S. 1 (1842), even though none of the parties had briefed, argued, or in any other way raised the issue of whether Swift should be overruled. Moreover, overruling was not the only way around Adkins. A judge who cannot distinguish into oblivion a precedent he does not wish to follow has not learned some basic analytical skills taught beginning in the first year of law school. Cushman argues that Roberts might have been willing to vote to overrule Adkins in Tipaldo except that he was under the impression that the votes to do so were lacking at the time because Hughes had not said he would, and that the Tipaldo fiasco, for which the Court was severely criticized at the time, was thus the result of miscommunication between Hughes and Roberts. Cushman, supra, at 100-03. Although this has a ring of human realism to it, particularly because Tipaldo was decided "[a]t the end of the most fractious and exhausting term of Hughes' tenure," id. at 103, it is only a possibility for which there is no direct evidence. The memorandum Roberts wrote at Frankfurter's suggestion is not persuasive, both because of the inconsistencies mentioned above and because of general principles of historical analysis. Careful historians are usually not persuaded by what people say to justify their actions. We learn more about why people have acted from the nature of their actions and the context in which they acted and from what they have said in unguarded circumstances. It is not that historical figures should be assumed to lie about their motivations (though some do lie). The problem is that the urge to rationalize and justify one's own behavior can cause anyone to lose insight about themselves or not develop it. This is especially true of people who are worried about how they will be remembered by history, and it may be even more true of lawyers and judges, whose everyday business is rationalizing and justifying.

584    Wash., Va. & Md. Coach Co. v. NLRB, 301 U.S. 142 (1937);    Associated Press v. NLRB, 301 U.S. 103 (1937); NLRB v. Friedman-Harry Marks Clothing Co., 301 U.S. 58 (1937); NLRB v. Fruehauf Trailer Co., 301 U.S. 49 (1937); NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1 (1937).

585    Helvering v. Davis, 301 U.S. 619 (1937);    Charles C. Stewart Mach. Co. v. Davis, 301 U.S. 548 (1937); Carmichael v. S. Coal & Coke Co., 301 U.S. 495 (1936).

APPENDIX - 434

Case 6:20-cv-00660-JDK    Document 33    Filed 01/01/21    Page 436 of 553 PageID #:  841

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

586    Leuchtenburg, supra note 568, at 220.

587    Alsop & Catledge, supra note 544, at 208; Stephenson, supra note 151, at 160.

588    Act of March 1, 1937, ch. 21, 50 Stat. 24 (current version at 28 U.S.C. § 371 (2007)); see also David N. Atkinson, Leaving the Bench: Supreme Court Justices at the End 3-4 (1999); Charles Evans Hughes, Autobiographical Notes of Charles Evans Hughes 302-04 (David J. Danelski & Jos. S. Tulchin eds., 1973); Baker, supra note 571, at 229; Stephenson, supra note 151, at 160. Previously, Congress had granted pensions to Supreme Court Justices but could reduce them, as it did with Holmes after he retired, cutting his pension in half for the sake of economy. Hughes, supra, at 303; McKenna, supra note 560, at 35.

589    Cushman, supra note 583, at 15.

590    Leuchtenburg, supra note 568, at 281.

591    Cushman, supra note 583, at 15; McKenna, supra note 560, at 335.

592    Alsop & Catledge, supra note 544, at 77; Cushman, supra note 583, at 15; McKenna, supra note 560, at 335.

593    Atkinson, supra note 588, at 105; Baker, supra note 571, at 229; McKenna, supra note 560, at 454-60.

594    Alsop & Catledge, supra note 544, at 209.

595    Atkinson, supra note 588, at 106; Hiughes, supra note 588, at 302.

596    Leuchtenburg, supra note 568, at 154.

597    See supra text accompanying notes 211-242; infra text accompanying notes 732-781, 811-846. Bills were introduced to alter the jurisdiction of the Court and in other ways limit its ability to declare statutes unconstitutional, but never passed in either the House or the Senate. See Cushman, supra note 583, at 12.

598    Alsop & Catledge, supra note 544; Baker, supra note 554; Leuchtenburg, supra note 568; McKenna, supra note 560. The Leuchtenburg and McKenna studies are more thoroughly researched than the others.

599    Cushman, supra note 583; Leuchtenburg, supra note 568; White, supra note 555.

600    See Anthony J. Badger, The New Deal: The Depression Years, 1933-1940 (1989); James MacGregor Burns, Roosevelt: The Lion and the Fox (1956); Paul Conklin, The New Deal (1967); Kenneth S. Davis, FDR: The New Deal Years 1933-1937, A History (1986); Kenneth S. Davis, FDR: Into the Storm 1937-1940, A History (1993); Daniel R. Fusfield, The Economic Thought of Franklin D. Roosevelt and the Origins of the New Deal (1956); William E. Leuchtenburg, The FDR Years: On Roosevelt and His Legacy (1995); William E. Leuchtenburg, Franklin D. Roosevelt and the New Deal, 1932-1940 (1963); John Major, The New Deal (1967); Ronald A. Mulder, The Insurgent Progressives in the Senate and the New Deal (1979); Arthur M. Schlesinger, The Politics of Upheaval, 1935-1936 (1960); Arthur M. Schlesinger, The Coming of the New Deal, 1933-1935 (1959).

601    Danelski, supra note 549, at 42.

602    Dennis J. Hutchinson & David J. Garrow, Foreward to John Knox, The Forgotten Memoir of John Knox, at xx (Dennis J. Hutchinson & David J. Garrow eds. 2002).

603    Id. at xix.

604    Leuchtenburg, supra note 568, at 121.

605    Atkinson, supra note 588, at 113.

606    Id. at 112.

607    See supra text following note 20.

APPENDIX - 435

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 437 of 553 PageID #:  842

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

608   This view is common among the historians cited in note 600, including Leuchtenburg, supra note 568, and, to a lesser extent, McKenna, supra note 560.

609   Cushman, supra note 583; White, supra note 555; Richard D. Friedman, Switching Time and Other Thought Experiments: The Hughes Court and the Constitutional Transformation, 142 U. Pa. L. Rev. 1891 (1994). For a debate between the two sides in this controversy, see Laura Kalman, The Constitution, the Supreme Court, and the New Deal, 110 Am. Hist. Rev. 1052 (2005), available at http:// www.historycooperative.org/journals/ahr/110.4/ kalman.html; William E. Leuchtenburg, Comment on Laura Kalman's Article, 110 Am. His. Rev. 1081 (2005), available at http:// www.historycooperative.org/journals/ahr/110.4/leuchtenburg.html; G. Edward White, Constitutional Change and the New Deal: The Internalist/Externalist Debate, 110 Am. Hist. Rev. 1094 (2005), available at http:// www.historycooperative.org/journals/ahr/110.4/white.html.

610   Baker, supra note 571, at 229; Cushman, supra note 583, at 230-31; Hughes, supra note 588, at 303.

611   See, e.g., Drew Pearson & Robert S. Allen, The Nine Old Men (1936).

612   Bushnell, supra note 92, at 269.

613   Id.

614   Id.

615   Id. at 271.

616   Id. at 272.

617   Id.

618   Id.

619   Van Tassel & Finkelman, supra note 82, at 158, 165-67.

620   Id. at 158.

621   tenBroek, supra note 506, at 200.

622   Id.

623   Id.

624   Id. at 198-204.

625   See infra text accompanying notes 811-846.

626   116 Cong. Rec. 11914 (1970); Van Tassel & Finkelman, supra note 82, at 59.

627   Van Tassel & Finkelman, supra note 82, at 158-60.

628   Id. at 158.

629   3 Deschler's Precedents, supra note 504, §18.1.

630   Id. §§ 18.5-.10; Van Tassel & Finkelman, supra note 82, at 159.

631   3 Deschler's Precedents, supra note 504, §§ 18.17-.18.

632   A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935) (the "sick chicken" case).

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 438 of 553 PageID #:  843

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

633    William E. Leuchtenburg, When the People Spoke, What Did They Say?: The Election of 1936 and the Ackerman Thesis, 108 Yale L.J. 2077, 2079-81 (1999).

634    Id. at 2081-87.

635    See Ashton v. Cameron County Water Improvement Dist., 298 U.S. 513 (1936) (invalidating the Municipal Bankruptcy Act); Carter v. Carter Coal Co., 298 U.S. 238 (1936) (invalidating the Bituminous Coal Conservation Act); Jones v. SEC, 298 U.S. 1 (1936) (comparing the SEC to the Star Chamber); United States v. Butler, 297 U.S. 1 (1936) (invalidating the Agricultural Adjustment Act).

636    Leuchtenburg, supra note 633, at 2084-96.

637    Burns, supra note 600, at 295.

638    Id. at 293.

639    Alsop & Catledge, supra note 544, at 25-37; Samuel Hendel, Charles Evans Hughes and the Supreme Court 249 (1951); McKenna, supra note 560, at 268-69, 281.

640    Burns, supra note 600, at 294.

641    S. Comm. on the Judiciary, Reorganization of the Fed. Judiciary, S. Rep. No. 75-711, at 11 (1937)S. Rep. No. 75-711, at 11 (1937) [hereinafter Reorganization of the Fed. Judiciary].

642    See infra text accompanying note 598.

643    Reorganization of the Fed. Judiciary, supra note 641, at 15.

644    Id. at 23.

645    See supra text accompanying notes 505-527.

646    See supra text accompanying notes 528-536.

647    See 84 F.2d v-x (1936); 15 F. Supp. v-x (1936).

648    Alsop & Catledge, supra note 544; Baker, supra note 571; Leuchtenburg, supra note 568; McKenna, supra note 560.

649    See supra text accompanying note 543.

650    Van Tassel & Finkelman, supra note 82, at 158.

651    See supra text accompanying note 542.

652    Van Tassel & Finkelman, supra note 82, at 158.

653    Id.

654    Borkin, supra note 422 at 27-29, 38-82.

655    Id. at 232.

656    Id. at 240.

657    Id. at 41-86; 3 Deschler's Precedents, supra note 504, § 14.10.

658    H.R. Rep. No. 79-1639 (1946)H.R. Rep. No. 79-1639 (1946).

APPENDIX - 437

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 439 of 553 PageID #:  844

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

659   Report of the Nat'l Comm'n on Judicial Discipline & Removal, 152 F.R.D. 265, 326 (1993). "This appears to be the first time a sitting judge was effectively forced from office as the result of a criminal conviction." Id.

660   Van Tassel, Resignations, supra note 190, at 337, 392.

661   United States v. Collins, 972 F.2d 1385, 1395 (5th Cir. 1992).

662   Judicial Discipline & Removal, 152 F.R.D. at 300; Van Tassel, Resignations, supra note 190, at 338.

663   United States v. Aguilar, 994 F.2d 609 (9th Cir. 1993).

664   Judicial Discipline & Removal, 152 F.R.D. at 300.

665   922 F. Supp. XXIII (1996).

666   Judicial Discipline & Removal, 152 F.R.D. at 327.

667   Van Tassel, Resignations, supra note 179, at 337.

668   Impeachment of Judge Harry E. Claiborne, H.R. Rep. No. 99-688 (1986)H.R. Rep. No. 99-688 (1986).

669   Proceedings of the U.S. Senate in the Impeachment Trial of Harry E. Claiborne, S. Doc. No. 99-48 (1986).

670   See Bushnell, supra note 92, at 289-306.

671   Judicial Discipline & Removal, 152 F.R.D. at 326.

672   Id. at 327.

673   Mary L. Volcansek, Judicial Impeachment 107 (1993); see also Impeachment of Judge Alcee L. Hastings, H.R. Rep. No. 100-810 (1988)H.R. Rep. No. 100-810 (1988).

674   Volcansek, supra note 673, at 114.

675   Id. at 115; see also Bushnell, supra note 92, at 307-14.

676   Volcansek, supra note 673, at 116.

677   Report of the Nat'l Comm'n on Judicial Discipline & Removal, 152 F.R.D. 265, 327 (1993).

678   Id.

679   Id. at 140; see also Impeachment of Walter L. Nixon, Jr., H.R. Rep. No. 101-36 (1989)H.R. Rep. No. 101-36 (1989); Bushnell, supra note 92, at 307, 314-18.

680   Bushnell, supra note 92, at 318.

681   Berger, supra note 31, at 3.

682   All the published accounts of the Watergate scandal support, without exception, the narrative in this and the following paragraphs. See Marlyn Aycock et al., Cong. Quarterly, Watergate: Chronology of a Crisis (1999); Fred Emery, Watergate (1995); Stanley I. Kutler, The Wars of Watergate: The Last Crisis of Richard Nixon (1992); Michael Schudsen, Watergate in American Memory: How We Remember, Forget, and Reconstruct the Past (1993).

683   "Nixon Bugged Himself" was the New York Post headline the next day. The headline alone occupied almost the entire first page of the newspaper.

684   Leon Jaworski, The Right and the Power: The Prosecution of Watergate (1976); see also Watergate Special Prosecution Force, Report (1975).

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   94

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 440 of 553 PageID #:  845

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

685    United States v. Nixon, 418 U.S. 683 (1974); see also Philip Allen Lacovara, United States v. Nixon: The Prelude, 83 Minn. L. Rev. 1061 (1991).

686    See Impeachment of Richard M. Nixon, President of the U.S., Rep. of the Comm. on the Judiciary of the House of Representatives, H.R. Rep. 93-1305, at 359-528 [hereinafter House Jud. Comm. Rpt. on Nixon].

687    Michael J. Gerhardt, The Federal Impeachment Process: A Constitutional and Historical Analysis 55 (2d ed. 2000).

688    See id.

689    3 Deschler's Precedents, supra note 504, ch. 14, § 15; Van Tassel & Finkelman, supra note 82, at 11.

690    House Jud. Comm. Rpt. on Nixon, supra note 686, at 1-3.

691    Id. at 335; Van Tassel & Finkelman, supra note 82, at 259.

692    Compare House Jud. Comm. Rpt. on Nixon, supra note 686, at 335 (comparing to the party affiliation listed at ii).

693    Id. at 359-528.

694    Id. at 3-4.

695    Id. at 336; Van Tassel & Finkelman, supra note 82, at 259.

696    House Jud. Comm. Rpt. on Nixon, supra note 686, at 336 (comparing to the party affiliation listed at ii).

697    Id. at 359-60.

698    Id. at 4.

699    Id. at 337; Van Tassel & Finkelman, supra note 82, at 259.

700    House Jud. Comm. Rpt. on Nixon, supra note 686, at 337 (comparing to to the party affiliation listed at ii).

701    Id. at 217-26, 338-39; Van Tassel & Finkelman, supra note 82, at 259.

702    See Richard M. Cohen & Jules Witcover, A Heartbeat Away: The Investigation and Resignation of Vice President Spiro T. Agnew (1974).

703    3 Deschler's Precedents, supra note 504, ch. 14, § 14.17.

704    Id.

705    See infra text accompanying notes 982-984, 1071-1092.

706    John F. Kennedy, Profiles in Courage 115-38 (1955).

707    Bruce H. Kalk, The Carswell Affair: The Politics of a Supreme Court Nomination in the Nixon Administration, 42 Am. J. Legal Hist. 261, 263 (1998); William G. Ross, Attacks on the Warren Court by State Officials: A Case Study of Why Court-Curbing Movements Fail, 50 Buff. L. Rev. 483, 506 (2002).

708    Ross, supra note 707, at 506 n.114.

709    347 U.S. 483 (1954); see also Brown v. Bd. of Educ. (Brown II), 349 U.S. 294 (1955).

710    See Frank T. Read & Lucy S. McGough, Let Them Be Judged: The Judicial Integration of the Deep South (1978).

711    See Lucas A. Powe, Jr., The Warren Court and American Politics (2000).

APPENDIX - 439

712   See e.g., Reynolds v. Sims, 377 U.S. 533 (1964); Baker v. Carr, 369 U.S. 186 (1962).

713   See, e.g., Miranda v. Arizona, 384 U.S. 436 (1966); Escobedo v. Illinois, 378 U.S. 478 (1964); Gideon v. Wainwright, 372 U.S. 335 (1963); Mapp v. Ohio, 367 U.S. 643 (1961).

714   See, e.g., Stanley v. Georgia, 394 U.S. 557 (1969).

715   See, e.g., Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241 (1964).

716   See, e.g., Sch. Dist. v. Schempp, 374 U.S. 203 (1963); Engel v. Vitale, 370 U.S. 421 (1962).

717   See Roe v. Wade, 410 U.S. 113 (1973).

718   See Joseph A. Aistrup, The Southern Strategy Revisited: Republican Top-Down Advancement in the South 8-9 (1996); Numan V. Bartley & Hugh D. Graham, Southern Politics and the Second Reconstruction (1975); Reg Murphy & Hal Gulliver, The Southern Strategy (1971); Kevin P. Phillips, The Emerging Republican Majority (1970).

719   Before 1968, only one Supreme Court nominee in the twentieth century, John J. Parker in 1930, had been rejected by the Senate. Norman Vieira & Leonard Gross, Supreme Court Appointments: Judge Bork and the Politicization of Senate Confirmations 44-45 (1998).

720   The parties have realigned since then, and right-wing Southern legislators are now Republicans.

721   Abraham, supra note 430, at 54; J. Myron Jacobstein & Roy M. Mersky, The Rejected: Sketches of the 26 Men Nominated for the Supreme Court but Not Confirmed by the Senate 8-9 (1993).

722   Jacobstein & Mersky, supra note 721, at 8 (quoting Jefferson's words).

723   Joshua Spivak, Opinion: Judicial Nomination: Battles Are Not New, Nat'l L.J., Mar. 7, 2005, at col. 1. Different commentators report different numbers because sometimes there is ambiguity about whether a nomination should be counted as having actually been made or whether it has been truly rejected. For example, Washington nominated William Paterson for the Supreme Court in 1793. Paterson co-authored the Judiciary Act of 1789, and "the first nine sections of the seminal statute, establishing federal district and circuit courts, were in Paterson's handwriting." Abraham, supra note 430, at 57. But when nominated, Paterson was still a Senator in the Congress that created the positions of Justices on the Supreme Court. The Constitution established the Court in Article III, section 1, but the Judiciary Act of 1789 created the individual jobs. And Article I, section 6, of the Constitution provides that "No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created... during such time." When Washington realized his mistake, he quickly withdrew Paterson's nomination. Id.; Jacobstein & Mersky, supra note 721, at 171. Many failed nominations are withdrawn when the impossibility of their being approved by the Senate becomes clear. A commentator could reasonably count Paterson's as a failed nomination, or not. As soon as Paterson's Senate term ended four days after Washington's initial attempt to nominate him, Washington sent his name to the Senate again, and the Senate immediately approved. Abraham, supra note 430, at 57; Jacobstein & Mersky, supra note 721, at 171.

724   Spivak, supra note 723, at col. 1.

725   Abraham, supra note 430, at 74; Jacobstein & Mersky, supra note 721, at 28-29.

726   Abraham, supra note 430, at 75; Jacobstein & Mersky, supra note 721, at 30.

727   Abraham, supra note 430, at 75; Jacobstein & Mersky, supra note 721, at 30.

728   David Greenberg, Filibustering Judicial Appointments Is Unprecedented?, Hist. News Net., May 6, 2005, available at http:// hnn.us/articles/11754.html.

APPENDIX - 440

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 442 of 553 PageID #:  847

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

729    Jacobstein & Mersky, supra note 721, at 35-41.

730    Abraham, supra note 430, at 136-37.

731    Id. at 30-31.

732    See supra text accompanying notes 666-705.

733    James F. Simon, In His Own Image: The Supreme Court in Richard Nixon's America 102 (1973).

734    Justices Brandeis and Douglas, and Chief Justices Fred Vinson and Roger Taney had also quietly given advice to Presidents while serving on the Supreme Court. Bruce Allen Murphy, Fortas: The Rise and Ruin of a Supreme Court Justice 593 (1988).

735    John Ehrlichman, Witness to Power: the Nixon Years 131-33 (1982).

736    Murphy, supra note 734, at 499-500.

737    Laura Kalman, Abe Fortas: A Biography 351 (1990).

738    28 U.S.C. § 455 (2007).

739    Kalman, supra note 737, at 352.

740    Simon, supra note 733; Melvin Small, The Presidency of Richard Nixon 166 (1999).

741    Mallory v. United States, 354 U.S. 449 (1957).

742    Murphy, supra note 734, at 426; see also Kalman, supra note 737, at 340; Robert Shogan, A Question of Judgment: The Fortas Case and the Struggle for the Supreme Court 170 (1972). Thurmond was so excited that the transcript misses some of what the videotape recorded. Compare the words in the text with those in Nominations of Abe Fortas and Homer Thornberry: Hearings Before the S. Judiciary Comm., 90th Cong. 191 (1968) (statement of Sen. Strom Thurmond, Member, S. Judiciary Comm.) [hereinafter Nominations of Fortas and Thornberry].

743    Murphy, supra note 734, at 522-27.

744    Fred P. Graham, Critics of Fortas Begin Filibuster, Citing 'Propriety,' N.Y. Times, Sept. 26, 1968, at A1.

745    Robert C. Albright, Fortas Debate Opens With A Filibuster, Wash. Post, Sept. 26, 1968, at A1.

746    Id.

747    Graham, supra note 744.

748    Stephenson, supra note 151, at 185; Artemus Ward, Deciding to Leave: The Politics of Retirement from the Supreme Court 173 (2003). Even the Senate website says that the Fortas nomination was filibustered. Supreme Court Nominations, (1789-present), http:// www.senate.gov/pagelayout/reference/nominations/Nominations.htm (last visited Apr. 21, 2007).

749    George J. Mitchell, The Not-So-Secret History of Filibusters, N.Y. Times, May 10, 2005, at A17.

750    John W. Dean, The Rehnquist Choice: The Untold Story of the Nixon Appointment That Redefined the Supreme Court 3-5 (2001).

751    See supra text accompanying note 578.

752    Dean, supra note 750, at 5-6.

APPENDIX - 441

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 443 of 553 PageID #:  848

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

753    Murphy, supra note 734, at 551; see also Kalman, supra note 737, at 362; Murphy, supra note 734, at 549; Shogan, supra note 742, at 226.

754    Murphy, supra note 734, at 551.

755    Id. at 553; Small, supra note 740, at 167. Without the evidence supplied by the Justice Department, Life did not have enough material to publish a story at all. Kalman, supra note 737, at 364; Murphy, supra note 734, at 553, 555.

756    Murphy, supra note 734, at 554; see also Kalman, supra note 737, at 362-63.

757    Ehrlichman, supra note 735, at 116.

758    Atkinson, supra note 588, at 141; Dean, supra note 750, at 9; Ehrlichman, supra note 735, at 116; Kalman, supra note 737, at 368; Murphy, supra note 734, at 562-63; Shogan, supra note 742, at 248-49; Simon, supra note 733; James F. Simon, Independent Journey: The Life of William O. Douglas 396 (1980) [hereinafter Simon, Independent Journey].

759    Murphy, supra note 734, at 566-75.

760    Dean, supra note 750, at 10.

761    See Murphy, supra note 734, at 566.

762    In the short period between the publication of the Life article and Fortas's resignation, one Congressman "announced that he had [already] prepared articles of impeachment." Id.

763    Nominations of Fortas and Thornberry, supra note 742, at ii.

764    Murphy, supra note 734, at 566; Shogan, supra note 742, at 262.

765    See infra text accompanying notes 837-846.

766    Abraham, supra note 430 at 10.

767    Shogan, supra note 742,, at 263. In March 2007, Kenneth Starr argued a case before the Suprene Court even though Starr is the dean of the Pepperdine University School of Law and Pepperdine employs Justices Antonin Scalia and Samuel Alioto Jr. to teach in the school's overseas summer programs. Tony Mauro, High Court Advocate Ken Starr Is Justices' Summer Employer, Legal Times, March 26, 2007. A Justice who accepts even short-term employment from an entity supervised by a lawyer who appears before the Justice could reasonably be said not only to have violated the federal judicial conflict-of-interest statute, 28 U.S.C. § 455, but also to have put what Fortas did into perspective.

768    Kalman, supra note 737, at 322-25; Simon, supra note 733; Simon, Independent Journey supra note 758, at 395.

769    Kalman, supra note 737, at 323-24; Murphy, supra note 734, at 195-97; Simon, supra note 733.

770    Fortas's law clerk played a significant role in awakening him to this problem. Kalman, supra note 737, at 325; Murphy, supra note 734, at 208-09.

771    Murphy, supra note 734, at 209. Fortas waited some time before returning the fee. In the interim, Wolfson was indicted, and his health and that of his wife deteriorated. Kalman, supra note 737, at 360; Murphy, supra note 734, at 209. Fortas told his law partner, Paul Porter, that he delayed returning the money because he did not want to "kick this guy in the teeth under these circumstances ...." Murphy, supra note 734, at 209. Finally, in December 1966, Fortas sent Wolfson a check for $20,000 to avoid the income tax liability that would accrue on January 1, 1967. Id.

772    Kalman, supra note 737, at 369; Shogan, supra note 742, at 263.

773    Murphy, supra note 734, at 196.

774    Arnold, Fortas & Porter, now Arnold & Porter.

APPENDIX - 442

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 444 of 553 PageID #:  849

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

775   Shogan, supra note 742, at 192-93.

776   Murphy, supra note 734, at 197, 593.

777   See, e.g., Richard K. Neumann, Jr., On Strategy, 59 Fordham L. Rev. 299, 310 n.28 (1990) (explaining how Fortas devised a winning litigation strategy that forestalled a legal challenge to Lyndon B. Johnson's eighty-seven-vote primary victory in the 1948 Texas election for the U.S. Senate).

778   Kalman, supra note 737, at 365; Shogan, supra note 742, at 236.

779   Kalman, supra note 737, at 367.

780   Murphy, supra note 734, at 562-63.

781   Id. at 565.

782   Shogan, supra note 742, at 270.

783   Abraham, supra note 430, at 10-11; Shogan, supra note 742, at 270.

784   Small, supra note 740, at 168; see also Shogan, supra note 742, at 270-71; Simon, Independent Journey, supra note 758, at 400-01; Vieira & Gross, supra note 719, at 46.

785   See Richard K. Neumann, Conflicts of Interest in Bush v. Gore: Did Some Justices Vote Illegally?, 16 Geo. J. Legal Ethics 375, 380-81 (2003).

786   Id. In a law school graduation speech in 1975, which was also published as a law review article, Haynsworth said that a lawyer "serves his clients without being their servant... the lawyer must never forget that he is the master... It is for the lawyer to decide what is morally and legally right... the lawyer must serve the client's legal needs as the lawyer sees them, not as the client sees them. During my years in practice, I never had any problem in this respect, although some lawyers today say they do." Clement F. Haynsworth, Jr., Professionalism in Lawyering, 27 S.C. L. Rev. 627, 628 (1976).

787   Abraham, supra note 430, at 10.

788   Id.; Shogan, supra note 742, at 271; Small, supra note 740, at 168.

789   Small, supra note 740, at 168.

790   Ross, supra note 707, at 262.

791   Jacobstein & Mersky, supra note 721, at 152.

792   Abraham, supra note 430, at 11.

793   Nomination of George Harrold Carswell to be Assoc. Justice of the Supreme Court of the U.S.: Hearings Before the Senate Comm. on the Judiciary, 91st Cong. 238-54 (Comm. Print 1970); see also Abraham, supra note 430, at 12.

794   Abraham, supra note 430, at 12.

795   See, e.g., Small, supra note 740, at 169 (quoting William Safire ("[the nomination was] one of the most ill-advised public acts of the early Nixon Presidency")); Ross, supra note 707, at 282 (quoting Jeb Stuart Magruder ("few of us thought he was qualified") and Clark Mollenhoff ("[I] wouldn't have defended him under any circumstances")).

796   Small, supra note 740, at 169; see also Abraham, supra note 430, at 11-12; Shogan, supra note 742, at 272.

797   Abraham, supra note 430, at 11.

798   Id.; Shogan, supra note 742, at 272; Vieira & Gross, supra note 719, at 47.

799   Abraham, supra note 430, at 11.

APPENDIX - 443

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 445 of 553 PageID #:  850

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

800    Small, supra note 740, at 169; see also Shogan, supra note 742 at 271-72.

801    Abraham, supra note 430, at 11.

802    Id. at 12; Dean, supra note 750, at 21; Simon, Independent Journey, supra note 758, at 403; Small, supra note 740, at 170; Vieira & Gross, supra note 719, at 47.

803    Abraham, supra note 430, at 12; Small, supra note 740, at 170.

804    See Read & McGough, supra note 710.

805    Jack Bass, John Minor Wisdom and the Impact of Law, 69 Miss. L.J. 25, 26-27 (1999) (quoting Burke Marshall).

806    Id. at 38, 52, 54.

807    Abraham, supra note 430, at 13; Shogan, supra note 742, at 273.

808    Murphy, supra note 716, at 580; Small, supra note 740, at 171.

809    Abraham, supra note 430, at 13; Brant, supra note 97, at 92.

810    Small, supra note 740, at 170.

811    Id.

812    Id.

813    Simon, Independent Journey, supra note 758, at 402.

814    Id. at 392; Small, supra note 740, at 170.

815    Simon, Independent Journey, supra note 758, at 392.

816    See id. at 404.

817    Id. at 397.

818    Brant, supra note 97, at 95.

819    Id.

820    Assoc. Justice William O. Douglas: Final Rep. of the Special Subcomm. on H.R. Res. 920 of the Comm. on the Judiciary, 91st Cong. 236-49 (Comm. Print 1970) [hereinafter Final Report].

821    Id. at 245, 248.

822    Simon, Independent Journey, supra note 758, at 404.

823    Murphy, supra note 734, at 579.

824    Simon, Independent Journey, supra note 758, at 398; see also Murphy, supra note 716, at 579; Small, supra note 740, at 170.

825    Ehrlichman, supra note 735, at 122; Small, supra note 740, at 168. "Ford had been working privately on the case before the administration asked him to take the lead." Small, supra note 740, at 170.

826    Ehrlichman, supra note 735, at 116.

827    Simon, Independent Journey, supra note 758, at 401.

APPENDIX - 444

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 446 of 553 PageID #:  851

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

828    Id. at 580.

829    Id.

830    116 Cong. Rec. 11916 (1970). Ford also mentioned Bugsy Siegel, Meyer Lansky, and Ice Pick Willie Alderman, id., none of whom had any connection with Douglas. Final Report, supra note 820, at 176; Simon, Independent Journey, supra note 758, at 404.

831    116 Cong. Rec. 11915 (1970). The article was on folk singing. Id.; Simon, Independent Journey, supra note 758, at 404.

832    116 Cong. Rec. 11918 (1970).

833    Brant, supra note 97, at 96; Simon, Independent Journey, supra note 758, at 405.

834    Brant, supra note 97, at 96.

835    116 Cong. Rec. 11915-16 (1970); Simon, Independent Journey, supra note 758, at 404-05.

836    Brant, supra note 86, at 98; Final Report, supra note 820, at 172-74.

837    Simon, Independent Journey, supra note 758, at 405.

838    Brant, supra note 97, at 90; see also Simon, Independent Journey, supra note 758, at 405.

839    Brant, supra note 97, at 90; Simon, Independent Journey, supra note 758, at 405.

840    Brant, supra note 97, at 90; Simon, Independent Journey, supra note 758, at 409; see also Final Report, supra note 820, at III.

841    Final Report, supra note 820; see also Brant, supra note 97, at 89; 3 Deschler's Precedents, supra note 504, §§ 14.14-.16; Simon, Independent Journey, supra note 758, at 409.

842    Brant, supra note 97, at 91; Simon, Independent Journey, supra note 758, at 409.

843    Final Report, supra note 820, at 351-52.

844    Brant, supra note 97, at 91; Simon, Independent Journey, supra note 758, at 409.

845    Simon, Independent Journey, supra note 758, at 405.

846    Murphy, supra note 734, at 579.

847    Atkinson, supra note 588, at 146-49.

848    See Vieira & Gross, supra note 719, at 3-181.

849    See, e.g., William J. Bennett, The Death of Outrage: Bill Clinton and the Assault on American Ideals (1998); Ann Coulter, High Crimes and Misdemeanors: the Case against Bill Clinton (1998); David P. Schippers, Sell Out: The Inside Story of President Clinton's Impeachment (2000).

850    See supra text accompanying notes 74-78.

851    The Iraq War that began in 2003 is not the only set of facts to meet this description. Congress was deceived into passing the Tonkin Gulf Resolution of 1965, which was claimed to be the legal justification for the Vietnam War. Eric Alterman, When Presidents Lie: A History of Official Deception and Its Consequences 160-237 (2004); Joseph C. Goulden, Truth Is the First Casualty: The Gulf of Tonkin Affair, Illusion and Reality (1969); Edwin Moise, Tonkin Gulf and the Escalation of the Vietnam War (1996).

852    Both Houses passed resolutions condemning John Tyler and James Polk--the latter for, in Congress's words, "a war unnecessarily and unconstitutionally begun by the President of the United States." Van Tassel & Finkelman, supra note

82, at 203. And the Senate censured Andrew Jackson for removing the government's deposits from the Bank of the United States. Id. at 201-02, 204-20; see also Michael J. Gerhardt, Putting the Law of Impeachment in Perspective, 43 St. Louis U. L.J. 905, 927-28 (1999).

853    The Impeachment and Trial of President Clinton: The Official Transcripts from the House Judiciary Committee Hearings to the Senate Trial 451, 467 (Merrill McLoughlin ed., 1999) [hereinafter Impeachment and Trial of President Clinton]. When these motions were made, they were objected to on the grounds that they amounted to unconstitutional bills of attainder. That is wrong both precedentially and analytically. The precedents are in the preceding footnote. The analytical reasons are explained at Gerhardt, Impeachment Process, supra note 687, at 186-87.

854    David Brock, Blinded by the Right 79 (2002).

855    Id. at 80; see also Joe Conason & Gene Lyons, The Hunting of the President 107 (2000).

856    See David Brock, The Real Anita Hill: The Untold Story (1993); see also infra text accompanying notes 1049-1056.

857    Brock, supra note 854, at 295-98, 321-22, 326.

858    Id. at 129.

859    Id. at 189.

860    Id. (alteration in original) (quoting Scaife).

861    Id. at 193-214.

862    Id. at 205-07.

863    Id. at 206.

864    Id. at 210.

865    Id. at 151.

866    Id. at 154.

867    Id. at 323-24.

868    Id. at 157.

869    Id. at 152.

870    Id. at 179.

871    Id.

872    Id. at 185; Michael Isikoff, Uncovering Clinton: A Reporter's Story 49, 179 (1999); Jeffrey Toobin, A Vast Conspiracy 25 (1999).

873    Brock, supra note 854, at 185.

874    Brock, supra note 854, at 184; Toobin, supra note 872, at 134-36.

875    Brock, supra note 854, at 180-83; Conason & Lyons, supra note 855, at 302; Toobin, supra note 872, at xi, 41, 136. At the time, Coulter had just begun to work also as a political commentator and had not yet published High Crimes and Misdemeanors: the Case against Bill Clinton (1998); Slander: Liberal Lies about the American Right (2002); Treason: Liberal Treachery from the Cold War to the War on Terror (2003); How to Talk to a Liberal (If You Must): The World According to Ann Coulter (2004); and Godless: The Church of Liberalism (2006).

876    Jones v. Clinton, 990 F. Supp. 657 (E.D. Ark. 1998), appeal dismissed, 161 F.3d 528 (8th Cir. 1998).

APPENDIX - 446

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 448 of 553 PageID #: 853

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

877    Brock, supra note 854, at 307; see also Toobin, supra note 872, at 393.

878    Toobin, supra note 872, at xvii; Van Tassel & Finkelman, supra note 82, at 267.

879    Brock, supra note 854, at 190.

880    Conason & Lyons, supra note 855, at 132.

881    28 U.S.C.A. §§ 591-99 (West 2007). Although the authority to appoint new independent counsel expired when the Act was not reauthorized in 1999, the remainder of the Act continued in effect so that independent counsels already appointed could finish their work. See id. § 599.

The Act was adopted in 1978 because the Watergate special prosecutors had gotten their authority from executive department orders and regulations and hence were vulnerable to being fired, as Cox was, by the people they were investigating. See supra text accompanying notes 683-684. During the Reagan and Bush Administrations, independent counsels investigated and prosecuted Republicans in the executive branch. Because of that, Republicans in Congress "mounted an attack on the statute so fierce that they succeeded in blocking its re-authorization even though Republicans comprised a minority of Congress." Samuel Dash, Independent Counsel: No More, No Less a Federal Prosecutor, 86 Geo. L.J. 2077, 2079 (1998). Then, as soon as an opportunity arose to investigate Clinton, Republicans reversed their position and "enthusiastically joined with then reluctant Democrats in Congress to pass the independent counsel Reauthorization Act of 1994... so that an independent counsel would be available to investigate the President's involvement in the Whitewater matter." Id.

It is an indication of the deterioration of political behavior in the last several decades that the Independent Counsel Act was originally needed because Republican partisanship had threatened to overwhelm prosecutorial integrity in the Nixon Administration and that the Act was then destroyed by the Republican partisanship that infected Kenneth Starr's work as independent counsel. To illustrate this, it is enough to observe that permanent independent special prosecutors-- ready to prosecute government officials and employees when a regular prosecutor would have a conflict of interest or be politically suspect--have been in operation in Sweden and Finland for hundreds of years without any controversy over whether their behavior has been infected by partisanship. The Swedish justitiekansler (JK) was created in 1713, and the first Swedish justitieombudsman (JO) in 1809 (there are now four). (Finnish law has historically derived from Swedish law and has adopted the same institutions.) The JK and JO primarily do other work, but when needed, they prosecute or supervise prosecution in situations where U.S. law has allowed ad hoc appointment of special prosecutors (under the Attorney General's inherent authority) or independent counsel (under the Independent Counsel Act from 1978 to 1999 and under the Attorney General's inherent authority since then). The Swedish legislation uses the terminology that American law has historically used: a special prosecutor (särskild åklagare). And the Swedish media use the same term to refer to independent counsel acting as special prosecutors in the United States, as in this headline in a story about independent counsel Patrick Fitzgerald's investigation of the Bush Administration's involvement in the Valerie Plame affair: "Särskild åklagare utreder läckor från Vita huset" ("Special Prosecutor Investigates Leaks from the White House"). Sveriges Radio, Dec. 31, 2003, http://www.sr.se/ekot/arkiv.asp? DagensDatum=2003-12-31&Artikel=345885 (last visited Apr. 21, 2007).

"When acting as a special prosecutor, a Justitieombudsman may prosecute an official who, in disregard of the obligations of his office or commission, has committed a criminal offense...." 6 § Lag med instruktion för Riksdagens Ombudsmän [JO-instruktionen] [Law with Instructions for the Riksdag's Ombudsmen] [1986:765], available at http://www.jo.se. "A Justitieombudsman has a duty to commence and prosecute legal proceedings that the Committee on the Constitution has decided to institute against a Minister pursuant to § 12:3 of the Instrument of Government...." Id. § 10. "The Justitiekansler may, as a special prosecutor, begin prosecutions against government employees who have committed criminal acts in disregard of the obligations of their office or commission." 5 § Lag om justitiekanslerns tillsyn [Law on the Justitiekansler's Authority] [1975:1339], available at http:// www.justitiekanslern.se. "No special prosecutor other than the Justitiekansler or a Justitieombudsman may begin or continue a prosecution in the Supreme Court." 7 ch. 8 § Lag om ändring I rättegångsbalken [Law Amending the Procedure Code] [SFS 2001:280], available at http:// 65.95.69.3/ SFSdoc/01/010280.pdf.

882    28 U.S.C. § 49(c) (expired 1999).

883    Conason & Lyons, supra note 855, at 131.

APPENDIX - 447

884    Id. The pathologists Fiske consulted told him that the evidence was so unequivocal that it was "one of the easiest cases" in their experience. Benjamin Wittes, Starr: A Reassessment 83 (2002) (quoting Fiske).

885    Brock, supra note 854, at zx; Conason & Lyons, supra note 837, at 131; see also Toobin, supra note 872, at 70.

886    Toobin, supra note 872, at 71.

887    Id. at 71-72.

888    Conason & Lyons, supra note 855, at 132.

889    Toobin, supra note 872, at 73.

890    Id. at 72.

891    Conason & Lyons, supra note 855, at 132-33.

892    Toobin, supra note 872, at xiii, 72; Van Tassel & Finkelman, supra note 82, at 267.

893    In re Madison Guar. Sav. & Loan Ass'n, No. 94-1, 1994 WL 913274, *1 (D.C. Cir. Aug. 5, 1994).

894    Conason & Lyons, supra note 855, at 357.

895    Id. at 195-96.

896    Toobin, supra note 872, at 71.

897    Id. at 73.

898    Conason & Lyons, supra note 855, at 132.

899    See supra text accompanying notes 151-371; see also Cass R. Sunstei et al., Are Judges Political? An Empirical Analysis of the Federal Judiciary (2006).

900    Deborah Sontag, The Power of the Fourth, N.Y. Times Mag., Mar. 9, 2003, at 38; see also Sunstein et al., supra note 899.

901    Andrew Peyton Thomas, Clarence Thomas: A Biography 319, 354-56 (2001).

902    Peter Baker, The Breach: Inside the Impeachment and Trial of William Jefferson Clinton 24, 33, 38, 94, 107-08, 127, 140, 170, 172, 200 (2000); Susan Schmitt & Michael Weiskopf, Truth at Any Cost: Ken Starr and the Unmaking of Bill Clinton 8-12, 94-95, 101, 134, 145-48, 153-56, 191, 226-27, 246, 276 (2000).

903    Barr, supra note 168.

904    Brock, supra note 854, at 299.

905    H.R. Res. 304, 105th Congress (1997).

906    Brock, supra note 854, at 300-01.

907    Mark Halprin, Impeach, Wall St. J., Oct. 10, 1997, at A22.

908    Paul Gigot, A Stolen Election, Wall St. J., Oct. 17, 1997, at A22.

909    Brock, supra note 854, at 285.

910    Id. at 186.

911    Schmitt & Weiskopf, supra note 902, at 17-20.

APPENDIX - 448

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 450 of 553 PageID #:  855

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

912    Schmitt & Weiskopf, supra note 902, at 35-36, 45.

913    Office of the Indep. Counsel, Appendices to the Referral to the U.S. House of Representatives Pursuant to Title 28, U.S. Code, Section 595(c), Part 1, H.R. Doc. No. 105-311, at 6-7 (1998) [hereinafter Indep. Counsel Appendecies]; Toobin, supra note 872, at xx.
Whoever drafted the Special Division's order--whether it was Starr's office or the Special Division itself--tried to hide the fact that the real target was Clinton. The order expanded Starr's jurisdiction to "whether Monica Lewinsky or others suborned perjury, obstructed justice, intimidated witnesses, or otherwise violated federal law...." Indep. Counsel Appendecies, supra, at 6 (emphasis added). Starr later admitted that it was unwise for him to have asked for an enlarged jurisdiction. John Rogers, Starr Has Mixed Feelings for Clinton, AP Online, Sept. 16, 1999; Kenneth Starr, What We've Accomplished, Wall. St. J., Oct. 20, 1999, at A26. He did not admit that his own partisanship undermined the credibility of his investigation, or that he had collaborated with Paul Jones's lawyers to set a trap for Clinton.

914    28 U.S.C. § 593(c) (1994); see also Ken Gormley, An Original Model of the Independent Counsel Statute, 97 Mich. L. Rev. 601, 662-65 (1998); Karen A. Popp, The Impeachment of President Clinton: An Ugly Mix of Three Powerful Forces, 63 L. & Contemp. Probs. 223, 228-31 (2000).

915    See Bob Woodward & Susan Schmidt, Starr Probes Clinton Personal Life, Wash. Post., June 25, 1997, at A1 (Starr's office and FBI agents working under the office's direction "have questioned Arkansas state troopers in recent months about their knowledge of any extramarital relations Bill Clinton may have had while he was Arkansas governor... including Paula Corbin Jones.").

916    Conason & Lyons, supra note 855, at 357.

917    Toobin, supra note 872, at xx.

918    Schmitt & Weiskopf, supra note 902, at 35-36, 45, 48.

919    Id. at 47-48.

920    See supra text accompanying notes 869-877.

921    Baker, supra note 902, at 427; Toobin, supra note 854, at xxi; Van Tassel & Finkelman, supra note 82, at 270. Clinton testified at the White House, and on videotape, which was later shown to the grand jury. Van Tassel & Finkelman, supra note 82, at 270.

922    Robert W. Gordon, Legalizing Outrage, in Aftermath: The Clinton Impeachment and the Presidency in the Age of Public Spectacle 97, 105 (Leonard V. Kaplan & Beverly I. Moran eds., 2001).

923    Baker, supra note 902, at 427; Toobin, supra note 872, at xxi; see also Referral from Indep. Counsel Kenneth W. Starr in Conformity with the Requirements of Title 28, U.S. Code, Section 595(c), H.R. Doc. No. 105-310 (1998).

924    Van Tassel & Finkelman, supra note 82, at 272.

925    Toobin, supra note 872, at 328-29; Van Tassel & Finkelman, supra note 82, at 273.

926    Toobin, supra note 872, at 328.

927    Gordon, supra note 922, at 106-07.

928    Baker, supra note 902, at 137.

929    Id. at 138.

930    Id. at 325.

931    Id. at 429; Toobin, supra note 872, at xxii.

932    Baker, supra note 902, at 174.

APPENDIX - 449

933   Polling data from the period are compiled on the Polling Report website at http://www.pollingreport.com/wh-hstry.htm. See Molly W. Andolina & Clyde Wilcox, Public Opinion: The Paradoxes of Clinton's Popularity, in The Clinton Scandal and the Future of American Government 171 (Mark J. Rozell & Clyde Wilcox eds., 2000).

934   Id. The only serious exception was the polls taken for Fox News, which purported to show the public disapproved of Clinton in virtually every poll Fox took from August 1998 until the end of Clinton's Presidency, even though every other organization's polls, except in August 1998, showed the exact opposite. See infra note 941.

935   Baker, supra note 902, at 224.

936   See supra text accompanying notes 62-78.

937   Toobin, supra note 872, at 381.

938   Baker, supra note 902, at 45, 179.

939   See infra text accompanying notes 1093-1106.

940   The Washington Times was created in 1982 by the Rev. Sun Myung Moon, and has been heavily subsidized by his organizations, to present right-wing views in competition with The Washington Post. A typical Washington Times story on the Clintons claimed that Hillary Clinton is bisexual, and that Bill and Hillary Clinton "have had a pact for decades: He gets to fool around with women, and she gets to fool around with women (plus the occasional man like Vince Foster)." Jack Wheeler, Harry Potter and Bill Clinton, Wash. Times, June 30, 2004, at A17. The Washington Times has frequently been challenged as deliberately inaccurate for political purposes, distorting facts to favor Republicans and harm Democrats. See Dante Chinni, The Other Paper: The Washington Times's Role, Colum. Journalism Rev., Sept.-Oct. 2002; Allen Freedman, Washington's Other Paper: Is the Time Right for the Times?, Colum. Journalism Rev., Mar.-Apr. 1995.

941   The Fox News Channel was created by Rupert Murdoch, who owns the largest media empire in the world. Murdoch hired as Fox News's chief executive officer Roger Ailes, a media strategist to the presidential campaigns of Richard Nixon (1968), Ronald Reagan (1984), and George Bush (1988). Ken Auletta, Vox Fox: How Roger Ailes and Fox News Are Changing Cable News, The New Yorker, May 26, 2003, at 58. According to former employees of Fox News, news writers and reporters receive a daily memo instructing them on what to say about particular stories, often before the staff has investigated those stories. Outfoxed: Rupert Murdoch's War on Journalism (Carolina Productions 2004). "I've never heard of any other network or any legitimate news organization doing that," said Walter Cronkite, the anchor for CBS Evening News from 1962 to 1981, who believes Fox News is "a far right-wing organization." Id. A former Fox News reporter told Greenwald that his supervisors made it clear to him that Fox is not "a news gathering organization so much as a proponent of a point of view," and that "any ad-lib that made the Democrats look stupid or made the Republicans look smart would get an 'attaboy,' a pat on the back, a wink and a nod." Id. According to another former Fox News staffer, "[w]atching Fox News at the end of [the] Clinton [administration], where it was all attack mode... and then Bush takes power" in January 2001 "and they're like lap dogs. It was like night and day. It was a party line shift." Id. Although Fox News adopted a deferential tone toward the White House after Bush's inauguration, the network's attitude toward the Clintons did not change. "Guess who's giving sympathy to illegal immigrants linked to terrorists," said a Fox News announcer in a typical story on Feb. 11, 2003, as footage of Hillary Clinton appeared on the screen: "You're looking at her." Auletta, supra.

942   Baker, supra note 902, at 225.

943   Id. at 251, 443.

944   Impeachment of William Jefferson Clinton, President of the U.S., Rep. of the Comm. on the Judiciary to Accompany H.R. Res. 611, H.R. Rep. 105-830, at 2, 128-134; Baker, supra note 902, at 430.

945   Baker, supra note 902, at 430, 438-42; Turley, supra note 485, at 96-98.

946   144 Cong. Rec. H12040 (daily ed. Dec. 19, 1998).

947   Toobin, supra note 872, at 367; Turley, supra note 485, at 97 n.463.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 452 of 553 PageID #: 857

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

948    144 Cong. Rec. H12041-12042 (daily ed. Dec. 19, 1998).

949    Toobin, supra note 872, at 367; Turley, supra note 485, at 98 n.464.

950    Impeachment and Trial of President Clinton, supra note 853, at 174 (quoting Congressman Jerrold Nadler).

951    Id. at 170, 175.

952    House Party Divisions, supra note 199.

953    Baker, supra note 902, at 435.

954    Toobin, supra note 872, at 344.

955    369 U.S. 186, 192-95, 237 (1962).

956    1 Historical Statistics, supra note 439, at 5-193.

957    Senate Party Divisions, supra note 198.

958    House Party Divisions, supra note 199.

959    1 Historical Statistics, supra note 439, at 5-193.

960    Baker, supra note 902, at 251, 443.

961    Id. at 229.

962    Id. at 411-12, 444-45.

963    Id. at 431; Toobin, supra note 872, at xxii; Turley, supra note 485, at 101.

964    Charles Tiefer, The Senate Impeachment Trial for President Clinton, 28 Hofstra L. Rev. 407, 414 (1999).

965    Id.

966    Baker, supra note 902, at 360; Susan Low Bloch, A Report Card on the Impeachment: Judging the Institutions That Judged President Clinton, 63 L. & Contemp. Probs. 143, 143-155 (2000); Tiefer, supra note 964, at 415.

967    Baker, supra note 902, at 361; Turley, supra note 485, at 106.

968    Blumenthal was a Clinton advisor accused of trying to smear Lewinsky.

969    Baker, supra note 902, at 432; Tiefer, supra note 964, at 416.

970    Tiefer, supra note 964, at 416.

971    Id. at 425-26.

972    Toobin, supra note 872, at xxii.

973    145 Cong. Rec. S1458 (daily ed. Feb. 12, 1999); Baker, supra note 902, at 438-42.

974    145 Cong. Rec. S1458-1459 (daily ed. Feb. 12, 1999); Baker, supra note 902, at 438-42.

975    Van Tassel & Finkelman, supra note 82, at 102.

976    Id. at 226.

977    See supra note 881.

APPENDIX - 451

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 453 of 553 PageID #:  858

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

978     Michael J. Gerhardt, The Historical and Constitutional Significance of the Impeachment and Trial of President Clinton, 28 Hofstra L. Rev. 349, 368 (1999).

979     See supra text accompanying notes 227-242.

980     See supra text accompanying notes 482-488.

981     Gerhardt, supra note 687, at 175.

982     Id. at 176.

983     Gerhardt, supra note 978, at 369.

984     See supra text accompanying note 705; infra text accompanying note 1077.

985     Fred H. Altshuler, Comparing the Nixon and Clinton Impeachments, 51 Hastings L.J. 745, 746 (2000); see also id. at 747-48.

986     Id. at 747.

987     Baker, supra note 902, at 62.

988     Altshuler, supra note 985, at 746-47; see also id. at 748.

989     Van Tassel & Finkelman, supra note 82, at 268.

990     Wittes, supra note 884, at viii.

991     Id. at xi-xii, 26-28. The phrase "truth commission" is Wittes's, but Starr agreed with the concept and did not disagree with the phrase. Id. at 212 n.69.

992     Dash, supra note 881, at 2081; see also Wittes, supra note 884, at 46-47, 66.

993     The Testing of a President; Letter of Resignation From Ethics Adviser, and Starr's Letter in Response, N.Y. Times, Nov. 21, 1998; see also Wittes, supra note 884, at 164-65.

994     See supra last five sentences of note 566.

995     Wittes, supra note 884, at 171-172, 207 n.27.

996     House Jud. Comm. Rpt. on Nixon, supra note 686, at 365.

997     Juliet Eilperin & John F. Harris, House GOP Pushes Wide Clinton Probe; President Wants Time and Subject Limits, Wash. Post., Sept. 30, 1998, at A1.

998     116 Cong. Rec. 11913-11914 (1970); Van Tasssel & Finkelman, supra note 82, at 9, 59.

999     Trefousse, supra note 447, at x.

1000    Richard A. Posner, An Affair of State: The Investigation, Impeachment, and Trial of President Clinton 260 (1999).

1001    Gordon, supra note 922, at 108.

1002    Impeachment Inquiry: William Jefferson Clinton, President of the U.S., Hearing before the House Judiciary Comm. Pursuant to H.R. Res. 581, Appearance of Indep. Counsel, 105th Cong. 18, 30, 113 (Comm. Print 1998).

1003    Nomination of Judge Clarence Thomas to be Assoc. Justice of the Supreme Court of the U.S., Hearings before the Senate Judiciary Comm., 102d Cong., Part 1 253-54, 381-82, 481 [hereinafter Thomas Hearings, Part 1].

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 454 of 553 PageID #: 859

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

1004    Id. at 381-82, 481; see also Timothy M. Phelps & Helen Winternitz, Capitol Games: Clarence Thomas, Anita Hill, and the Story of a Supreme Court Nomination 68, 82-84, 89-90, 116-17, 146 (1992).

1005    Thomas Hearings, Part 1, supra note 1003, at 260-61, 610-11.

1006    Thomas, supra note 901, at 354-55.

1007    410 U.S. 113 (1973).

1008    Thomas Hearings, Part 1, supra note 1003, at 172-73 (emphases added).

1009    Id. at 180 (emphases added).

1010    Id. at 222-23 (emphases added).

1011    Id. at 244 (emphasis added).

1012    James M. Wall, Hidden Treasures: Searching for God in Modern Culture 109 (1997).

1013    See supra text accompanying note 999.

1014    Thomas, supra note 901, at 355.

1015    Id.

1016    Thomas Hearings, Part 1, supra note 1003, at 129-131.

1017    Id. at 127-129, 146

1018    Id. at 129-130.

1019    Id. at 128, 146, 389.

1020    Thomas, supra note 901, at 376-77.

1021    Jane Meyer & Jill Abramson, Strange Justice: The Selling of Clarence Thomas 55 (1994).

1022    Planned Parenthood of Se. Penn. v. Casey, 505 U.S. 833, 944 (1992) (Rehnquist, J., concurring in part, dissenting in part).

1023    Id. at 979 (Scalia, J., concurring in part, dissenting in part).

1024    Id. at 953-54 (Rehnquist, J., concurring in part, dissenting in part).

1025    Id. at 981 (Scalia, J., concurring in part, dissenting in part).

1026    Stenberg v. Carhart, 530 U.S. 914 (2000).

1027    Id. at 980-1020 (Thomas, J., dissenting).

1028    Id. at 980.

1029    Roe v. Wade, 410 U.S. 113 at 171-78 (Rehnquist, J., dissenting).

1030    Doe v. Bolton, 410 U.S. 179, 221-23 (1973) (White, J., dissenting).

APPENDIX - 453

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 455 of 553 PageID #:  860

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

1031  See ☐ Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320 (2006); Voinovich v. Women's Med. Prof'l Corp., 523 U.S. 1036 (1998) (Thomas, J., dissenting from denial of certiorari); ☐ Lambert v. Wicklund, 520 U.S. 292 (1997); Leavitt v. Jane L., 518 U.S. 137 (1996); ☐ Janklow v. Planned Parenthood, Sioux Falls Clinic, 517 U.S. 1174, 1176 (1996) (Thomas, J., joining Justice Scalia's dissent to denial of certiorari).

1032  Nomination of Judge Clarence Thomas to be Assoc. Justice of the Supreme Court of the U.S., Hearings before the Senate Judiciary Comm., 102d Cong., Part 4 38 [hereinafter Thomas Hearings, Part 4].

1033  Id. at 38-39.

1034  Id. at 39.

1035  Id. at 157. Thomas repeated the denials at other points in his testimony. See, e.g., id. at 6, 162-63, 185, 201, 218.

1036  Id. at 337-515; see also Fed. R. Evid. 404 ("Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion," with exceptions not relevant here).

1037  Thomas Hearings, Part 4, supra note 1032, at 354-56; see also Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

1038  Thomas Hearings, Part 4, supra note 1032, at 105.

1039  Id.

1040  U.S. Merit Sys. Prot. Bd., Sexual Harassment in the Federal Workplace: Trends, Progress, and Continuing Challenges 29 (1995) ("The single most common response of employees who are targets of sexual harassing behaviors... has been, and continues to be, to ignore the behavior or do nothing"); Nina Burleigh & Stephanie B. Goldberg, Breaking the Silence: Sexual Harassment in Law Firms, 75 A.B.A. J. 46, 48, 51 (1989) ("[O]ne of the reasons women lawyers don't report harassment is that they feel inadequate for not being able to cope with it on their own.... A lot of women won't object to harassment because they're afraid of alienating their mentors."); Louise F. Fitzgerald et al., Why Didn't She Just Report Him? The Psychological and Legal Implications of Women's Responses to Sexual Harassment, 51 J. Soc. Issues 117 (1995); Louise F. Fitzgerald, Science v. Myth: The Failure of Reason in the Clarence Thomas Hearings, 65 S. Cal. L. Rev. 1399 (1992); Joanna L. Grossman, The Culture of Compliance: The Final Triumph of Form Over Substance in Sexual Harassment Law, 26 Harv. Women's L.J. 3, 23-26, 51-57 (2003); Joanna L. Grossman, The First Bite is Free: Employer Liability for Sexual Harassment, 61 U. Pitt. L. Rev. 671, 723-28 (2000); James F. Gruber & Michael D. Smith, Women's Responses to Sexual Harassment: A Multivariate Analysis, 17 Basic & Applied Psych. 543 (1995); James E. Gruber, How Women Handle Sexual Harassment: A Literature Review, 74 Soc. Sci. Res. 3 (1989); James E. Gruber & Lars Bjorn, Women's Responses to Sexual Harassment: An Analysis of Sociocultural, Organizational, and Personal Resource Models, 67 Soc. Sci. Q. 814 (1986); Linda Hamilton Krieger, Employer Liability for Sexual Harassment-Normative, Descriptive, and Doctrinal Interactions: A Reply to Professors Beiner and Bisom-Rapp, 24 U. Ark. Little Rock L. Rev. 169, 175-84 (2001); David E. Terpstra & Douglas D. Baker, The Identification and Classification of Reactions to Sexual Harassment, 10 J. Org. Behav. 1, 12 (1989). For the reasons the Republicans argued, Andrew Peyton Thomas, however, believes that Hill was not credible; although his citations are confused, it appears that he was relying in part on David Brock's book, which Brock later repudiated, and on rumor disseminated by the Republicans. See Thomas, supra note 901, at 392, 447, 634.

1041  Thomas Hearings, Part 4, supra note 1032, at 273-333.

1042  Steven Roberts, The Crowning Thomas Affair, U.S. News & World Rep., Sept. 16, 1991 (describing how he liked to watch "x-rated movies").

1043  Meyer & Abramson, supra note 1021, at 55 ("By the time he reached Yale Law School, Thomas was known for not only for the extreme crudity of sexual banter, but also for avidly watching pornographic films and reading pornographic magazines, which he would describe to friends in lurid detail."). See Brock, supra note 854, at 237-38, 242-45.

1044  Meyer & Abramson, supra note 1021, at 330, 335 (1994); see also id. at 327-31.

APPENDIX - 454

Case 6:20-cv-00660-JDK Document 33 Filed 01/01/21 Page 456 of 553 PageID #: 861

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

1045    Id. at 333.

1046    Thomas, supra note 901, at 402.

1047    Meyer & Abramson, supra note 1021, at 330, 335; see also id. at 327-31.

1048    Thomas, supra note 901, at 266.

1049    Meyer & Abramson, supra note 1021, at 321-27; Thomas, supra note 901, at 438.

1050    Thomas, supra note 901, at 265.

1051    Meyer & Abramson, supra note 1021, at 342-43. Contra Thomas, supra note 901, at 442.

1052    Meyer & Abramson, supra note 1021, at 343.

1053    Id. at 348.

1054    Supreme Court Nominations (1789-present), supra note 748.

1055    Simon, supra note 530, at 142 (quoting Garry Wills).

1056    Brock, supra note 854, at 87-120.

1057    See supra text accompanying notes 861-862.

1058    Brock, supra note 856.

1059    See Meyer & Abramson, supra note 1021.

1060    Brock, supra note 854, at 247-48.

1061    Id. at 295.

1062    Anita Hill, Speaking Truth to Power (1997).

1063    Brock, supra note 854, at 295.

1064    Id. at 89.

1065    Id. at 18, 151.

1066    Thomas, supra note 901, at 179-80, 208, 316, 318-19.

1067    Brock, supra note 854, at 89.

1068    Under the federal perjury statute, "[w]hoever... having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify... truly... willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true... is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 1621(1) (2007). Any congressional committee, and "[a]ny member of either House of Congress" is authorized to administer oaths to witness testifying before any body of Congress. 2 U.S.C. § 191 (2007).

Lying under oath before a congressional committee will support a conviction for perjury. United States v. Debrow, 346 U.S. 374 (1953); United States v. Norris, 300 U.S. 564 (1937).

1069    See supra text accompanying notes 666-670.

1070    Simpson, supra note 67, at 60.

Case 6:20-cv-00660-JDK  Document 33  Filed 01/01/21  Page 457 of 553 PageID #:  862

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

1071  Id. at 61.

1072  Id. This kind of circumlocution was a Victorian device for avoiding mentioning sex. Simpson was referring to Grover Cleveland, who was accused of having fathered a child out of wedlock but was nevertheless twice elected President. His political opponents chanted, "Pa! Pa! Where's my Pa? Gone to the White House--hah, hah, hah!"

1073  Id.

1074  Id.

1075  Id.

1076  Id. at 207-13 (emphasis added).

1077  See Gerhardt, supra note 231, at 120 n.134.

1078  Ybarra v. Illinois, 444 U.S. 85, 91 (1979).

1079  Fed. Judicial Ctr., Pattern Criminal Jury Instructions, at Instruction 21.

1080  Hale v. Dep't of Transp., FAA, 772 F.2d 882, 885 (Fed. Cir. 1985).

1081  Colorado v. New Mexico, 467 U.S. 310, 316 (1984).

1082  Addington v Texas, 441 U.S. 418 (1979).

1083  Labovitz, supra note 74, at 192-93; Stanley N. Futterman, The Rules of Impeachment, 24 U. Kan. L. Rev. 105, 136 (1975); Ronald D. Rotunda, An Essay on the Constitutional Parameters of Federal Impeachment, 76 Ky. L.J. 707, 719 (1987-88).

1084  House Jud. Comm. Rpt. on Nixon, supra note 686, at 359, 377, 380-81.

1085  Nixon v. United States, 506 U.S. 224, 238 (1993).

1086  Senate Impeachment Rule XI, in Senate Manual, S. Doc. No. 101-1, 186 (1989).

1087  U.S. Const. art. I, § 3, cl. 6.

1088  Nixon, 506 U.S. at 228.

1089  Id. at 229-33. The Impeachment Trial Clause does impose three requirements on the Senate. First, each Senator must take an oath or affirmation to try the case faithfully. Second, the Impeachment Trial Clause requires that "[w]hen the President of the United States is tried, the Chief Justice shall preside ...." And third, a super-majority of two-thirds is required to convict. U.S. Const. art. I, § 3, cl. 6.

1090  Nixon, 506 U.S. at 238.

1091  See Gerhardt, supra note 687, at 40-42, 112-13.

1092  Proceedings of the U.S. Senate in the Impeachment Trial of Harry E. Claiborne, a Judge of the U.S. Dist. Court for the Dist. of Nev., S. Doc. No. 99-48, at 47, 105-08 (1986).

1093  Senator Sam Ervin, Jr.: "In a case of this kind, if we are called upon to try an impeachment, I would not hope for conviction on any charge unless I was satisfied beyond a reasonable doubt of the truth of the charges." Id. Senator Strom Thurmond: "The penalty of impeachment is severe. It is not a criminal penalty, but I know of no penalty that would be more severe than to remove once again a President from office. And therefore I believe the evidence should be beyond

APPENDIX - 456

a reasonable doubt." Id. Senator John C. Stennis: "Where any party is charged with an impeachment offense, and is tried by the Senate..., be it a so-called minor official on up to the highest official under our Constitution, then I think the proof required ought to be beyond a reasonable doubt...." Id. The fourth Senator, Robert A. Taft, Jr., was quoted only indirectly and only in a somewhat confusing way in oral argument. Id. at 107. Citations for these statements were not provided in the motion or in oral argument, and it is impossible to tell whether they were made on the Senate floor, to reporters, or in some other setting.

1094    Id. at 107-08.

1095    Id. at 150.

1096    Id. (Thurmond and Stennis).

1097    Id. (Thurmond voted nay, and Stennis did not vote.)

1098    Gerhardt, supra note 687, at 42.

1099    Id. at 209 n.69.

1100    Michael J. Gerhardt, The Impeachment and Acquittal of William Jefferson Clinton, in The Clinton Scandal and the Future of American Government, supra note 933, at 142, 146.

1101    Id.

1102    Id.

1103    Popular votes for President were not tabulated before 1824. Since then, only one presidential candidate has won a larger percentage of the popular vote than Roosevelt's 60.80%. In 1964, Lyndon Johnson received 61.05%. But Roosevelt carried more states and received more electoral votes than Johnson did. (The most respected and accessible source of presidential election statistics is Dave Leip's Atlas of U.S. Presidential Elections, http://www.uselectionatlas.org (last visited Apr. 21, 2007)). More importantly, as a result of the 1936 elections, the Democrats controlled the Senate and House by much greater margins than after the 1964 elections, or at any other time since the early 1820s, when there was only one real political party.

1104    See infra tbl. 5.

1105    Clerk of the House of Representatives, Statistics of the Presidential and Congressional Election of Nov. 2, 2004, at 38, 65 (2005) (including, in New York, minor party votes for major party candidates) [herinafter Nov. 2, 2004 Presidential Statistics]; Clerk of the House of Representatives, Statistics of the Presidential and Congressional Election of Nov. 5, 2002, at 53 (2003); Clerk of the House of Representatives, Statistics of the Presidential and Congressional Election of Nov. 7, 2000, at 43, 76 (2001) [herinafter Nov. 7, 2000 Presidential Statistics] (including, in New York, minor party votes for major party candidates, but not including the Missouri vote because the successful 2000 candidate was deceased on election day, resulting in an appointed Senator who was defeated in a 2002 special election).

1106    Population by State based on 2000 Census, at http:// factfinder.census.gov/servlet/GCTTable?_bm=y&-geo_id=01000US&-_box_head_ nbr=GCT-PH1-R&-ds_name=DEC_2000_SF1_U&-format=US-9S (last visited Apr. 21, 2007).

In a state legislature, this would violate the Equal Protection Clause of the Fourteenth Amendment. Baker v. Carr, 369 U.S. 186 (1962) (unconstitutional for a voter in one Tennessee county to have 23 times as much power in choosing legislators as a voter in another county). The Senate is exempt from the Equal Protection Clause in this respect because of a compromise at the Constitutional Convention that created an upper house of Congress, the Senate, as an assembly of states in which all states were equal, regardless of size. This compromise was considered necessary to induce the smaller of the original thirteen states to ratify the Constitution. But of those original small states, only three are still small. The others have since become medium-sized states and are now hurt by the compromise intended to benefit them. The states that now benefit from it were almost entirely admitted to the Union later, most of them more than a century after the Constitutional Convention. A Senate apportioned this way is not an essential feature of a federal form of government. In Canada, provinces are more autonomous than U.S. states are, but in the Canadian Senate provinces are represented in proportion to their populations. To a lesser extent, so are German states in the German federal parliament.

APPENDIX - 457

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 459 of 553 PageID #:  864

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

1107 Senate Party Divisions, supra note 198.

1108 1 Historical Statistics, supra note 439, at 5-194.

1109 Senate Party Divisions, supra note 198.

1110 Id.

1111 House Party Divisions, supra note 199.

1112 Id.

1113 1 Historical Statistics, supra note 439, at 5-193 (for 1970 through 2000 elections); Clerk of the House of Representatives, Statistics of the Presidential and Congressional Election of Nov. 5, 2002, at 31-33, 51-52 (2003) (for 2002 election) (including, in New York, minor party votes for major party candidates); Clerk of the House of Representatives, Statistics of the Presidential and Congressional Election of Nov. 2, 2004, at 39-41, 66-67 (2005) (for 2004 election) (including, in New York, minor party votes for major party candidates).

For elections before the late 1960s, aggregating popular votes nationally for the House is of limited statistical validity because most affected states were not yet in compliance with the Voting Rights Act of 1965, 42 U.S.C. §§ 1971-1973i, which greatly increased voting in the South, and with Baker v. Carr, 369 U.S. 186 (1962), which required legislative districts (other than those of the U.S. Senate) to be of equal size.

1114 369 U.S. 186 (1962).

1115 See supra tbl. 6.

1116 Ralph Blumenthal, After Bitter Fight, Texas Senate Redraws Congressional Districts, N.Y. Times, Oct. 13, 2003, at A1.

1117 Grace York, Comparison of House of Representatives, 109th and 108th Congresses (2004), http://www.lib.umich.edu/govdocs/congress/hou05c.pdf.

1118 87th Congress, 1st Session.

1119 Senators Harry Byrd (Virginia), James Eastland (Mississippi), Allen Ellender (Louisiana), Spessard Holland (Florida), Olin Johnston (South Carolina), Everett Jordan (North Carolina), John McClellan (Arkansas), Willis Robertson (South Carolina), Richard Russell (Georgia), George Smathers (Florida), John Sparkman (Alabama), John Stennis (Mississippi), Herman Talmadge (Georgia), and Strom Thurmond (South Carolina). If the Representatives who fit this description were listed here, this footnote would fill the page and continue onto the next one.

1120 Senators George Aiken (Vermont), J. Glenn Beall (Maryland), J. Caleb Boggs (Delaware), John Butler (Maryland), Clifford Case (New Jersey), John Cooper (Kentucky), Jacob Javits (New York), Kenneth Keating (New York), Thomas Kuchel (California), Winston Prouty (Vermont), Leverett Saltonstall (Massachusetts), Hugh Scott (Pennsylvania), and Margaret Chase Smith (Maine). For why it is impractical to list here the Representatives who fit this description, see the last sentence of the preceding note. After long careers in elective office, Case, Javits, and Kuchel were defeated not in general elections, but in Republican primaries by right-wing opponents as their party shifted to the right.

1121 See infra tbl. 7.

1122 Nov. 2, 2004 Presidential Statics, supra note 1105, at 64; Nov. 7, 2000 Presidential Statistics, supra note 1105, at 74 (2001); Clerk of the House of Representatives, Statistics of the Presidential and Congressional Election of Nov. 5, 1996, at 79 (1997); Clerk of the House of Representatives, Statistics of the Presidential and Congressional Election of Nov. 3, 1992, at 83 (1993).

1123 Gerhardt, supra note 1100, at 144.

1124 See supra text accompanying notes 8-12.

APPENDIX - 458

Case 6:20-cv-00660-JDK   Document 33   Filed 01/01/21   Page 460 of 553 PageID #:  865

THE REVIVAL OF IMPEACHMENT AS A PARTISAN..., 34 Hastings Const....

34 HSTCLQ 161

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

56 Fla. L. Rev. 541

Florida Law Review
July, 2004

Article

Stephen A. Siegel [a1]

Copyright (c) 2004 Florida Law Review; Stephen A. Siegel

# THE CONSCIENTIOUS CONGRESSMAN'S GUIDE TO THE ELECTORAL COUNT ACT OF 1887

**\*542  I. Introduction**

Electoral vote counting is the oldest activity of the national government and among the oldest questions of constitutional law. [1] It was Congress's first task when a quorum appeared in the nation's new legislature on April 6, 1789. [2] It has happened every four years since then. Yet, electoral vote counting remains one of the least understood aspects of our constitutional order.

The Electoral Count Act of 1887 (ECA) lies at the heart of this confusion. In enacting the ECA, Congress drew on lessons learned from its twenty-five previous electoral counts; [3] it sorted through innumerable **\*543** proposals [4] floated before and after the disastrous presidential election of 1876; [5] and it thrashed out the ECA's specific provisions over fourteen years of sustained debate. [6] Still, the law invites misinterpretation. The ECA is turgid and repetitious. Its central provisions seem contradictory. [7] Many of its substantive rules are set out in a single sentence that is 275 words long. [8] Proponents of the law admitted it was "not perfect." [9] Contemporary commentators were less charitable. John Burgess, a leading political scientist in the late nineteenth century, pronounced the law unwise, incomplete, premised on contradictory principles, and expressed in language that was "very confused, almost unintelligible." [10] At least he thought the law was constitutional; [11] others did not. [12]

**\*544**  Over the nearly 120 years since the ECA's adoption, the criticisms faded, only to be renewed whenever there was a close presidential election. [13] Our ability to misunderstand the ECA has grown over time. During the 2000 presidential election dispute, politicians, lawyers, commentators, and Supreme Court justices seemed prone to misstate or misinterpret the provisions of the law, even those provisions which were clear to the generation that wrote them. The Supreme Court, for example, mistakenly believed that the Supreme Court of Florida's erroneous construction of its election code would deny Florida's electors the ECA's "safe harbor" protection; [14] Florida Governor Jeb Bush's hasty submission of his state's Certificate of Ascertainment was untimely under the Act; [15] and Democratic members of Congress framed their objections to accepting Florida's electoral vote on the wrong grounds. [16] Even Al Gore, the **\*545**  presidential candidate contesting the election's outcome, misread the federal deadline for seating Florida's electors. [17]

The purpose of this Article is to explain the provisions of the Electoral Count Act of 1887 as it was understood by the Congresses that debated and enacted it. Although the ECA has been the subject of scholarly interpretation, [18] no prior work has studied the Act by embedding it in a comprehensive exploration of its legislative history, the history and theory of electoral vote counting, and the legal and political assumptions of the Congresses that framed it. No prior study has focused on the interplay between the ECA's various sections and its substantive and procedural provisions. Indeed, the ECA's procedural provisions have never before been subject to sustained analysis.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    1

As a foundation for interpreting the ECA, Part II of this Article sets forth the background assumptions and experiences of the Congresses that struggled, for fourteen years, with electoral count reform.[19] Part III then, explicates the ECA in light of its legislative history, its underlying assumptions, and the history of Congress's previous electoral counts.

In undertaking this analysis, the Article does not discuss whether the ECA is constitutional[20] or whether congressional action under it is subject to judicial review.[21] Neither does it discuss the related question of whether the ECA is a statute that binds Congress or simply a joint rule adopted in statutory form to give it greater prominence and political, but not legal, permanence.[22] This Article does discuss the complex views the framers of **546** the ECA had on these subjects to the extent they impact the Act's interpretation.

The focus of this Article is on what the ECA's framers meant by its various provisions. This issue is preliminary to assessing many questions concerning the ECA's constitutionality and whether there is judicial review. Determining whether the ECA is unconstitutional because it purports to bind Congress, for example, turns on whether the Act does in fact bind Congress on any issue.[23] How the ECA's framers understood the Act is also preliminary to any instance of judicial review because it helps determine whether Congress's application of the ECA complies with its mandates.[24]

The issue of whether the Act is a binding statute or only a joint rule enacted in statutory form matters, of course, if Congress or either House wishes to alter or rescind it. If the ECA is a binding statute, altering or rescinding it requires a majority vote in both houses of Congress and the President's approval, or passage over his veto.[25] If the ECA is a joint rule, it can be altered by congressional action without presidential presentment, or it can be rescinded by unilateral action of one house.[26] But whether Congress, or one of its houses, should amend or rescind the ECA turns, in part, on what it provides.

Moreover, to members of Congress, until a majority of at least one house wishes to amend or rescind the ECA, the issue of whether it is a statute or a joint rule does not matter. Whether the ECA is a statute or a joint rule, it provides the regulations that currently govern Congress when it is called upon to count electoral votes. Until a majority of at least one house votes to rescind it, members of Congress are bound by it as they are bound by any other rule of congressional practice.

Consequently, this Article is written for the conscientious congressman who wishes to know what the ECA provides for purposes of applying it, should the occasion arise. Members of Congress can implement the ECA only if they understand its provisions. The interested public, as well as the judiciary, can assess Congress's compliance only if they too understand its terms. Assuming the ECA is constitutional, this Article provides a guide **547** to the current rules that govern Congress when, every four years, it is called upon to count electoral votes in a presidential election.

## II. The Premises of the Electoral Count Act

The Congresses that debated and passed the ECA appreciated that few matters of statecraft were more important than public "confidence"[27] in the "legitima[cy]"[28] of the "transmission of the supreme executive authority from one person to another."[29] Yet, in enacting a statute for "a quiet, orderly, accepted, lawful method of deciding [the] vexed and troublesome question" of electoral vote counting,[30] Congress faced a fundamental dilemma. On the one hand, in determining the outcome of a closely contested presidential election, Congress knew that there had to be a final decision-maker, be it a person, tribunal, or institution. As Senator Thomas Bayard reminded his colleagues near the outset of Congress's long struggle to enact the ECA, "[e]very human dispute, every human right, however important, must reach a finality to be controlled by human methods."[31] On the other hand, Congress also knew that in a close presidential election, no decision-maker, be it a person, tribunal, or institution, could be trusted to render a neutral decision according to rules laid down in advance.[32]

Fundamental to the difficulty in framing the ECA was the knowledge that:

> It has been demonstrated time and again that the political conscience is a flexible and elastic rule of action that readily yields to the slightest pressure of party exigencies . . . . When **548** the great office of President is at stake, with the immense patronage at its disposal, it would be expecting too much of human nature, under the

APPENDIX - 461

tyranny of party, to omit any opportunity to accomplish its ends, more especially under that loose code of morals which teaches that all is fair in politics, as in war or in love. [33]

From recent, firsthand experience, Congress knew that when the presidency hung in the balance, all were partisan. Senator Benjamin Hill, a Democrat from Georgia, reminded his colleagues that during the Hayes-Tilden election dispute of 1876-77:

[Rather than] rise above party and remember [their] country and only [their] country, . . . [a]ble men, learned men, distinguished men, great men in the eyes of the nation, seemed intent only on accomplishing a party triumph, without regard to the consequences to the country. That is human nature. That is, unfortunately, party nature. [34]

Representative Thomas Browne, a Republican from Indiana, was equally convinced that whether final authority was held by state or federal legislators, judges, executive officials, or administrators, when a presidential election was disputed, all were affected by party spirit. [35] When the issue was "the title to the Presidential office, the incumbent of which holds within his grasp more than 100,000 offices, with hundreds of millions of patronage," Browne

assum[ed] the fact to have been demonstrated that, whether in a legislative body or in a judicial tribunal, we shall find judges and legislators on the side of their party-not always; but it is tendency of human nature. I am not attacking anybody; I am not attacking the providence or wisdom of almighty God that has created us with our feelings of prejudice and sympathy. [36]

Browne concluded that he would even "fear myself . . . if I were supreme judge upon such a question. I should fear to take upon myself the responsibility of settling a question of this character; I should fear that my judgment might be found in the line of my political convictions and party prejudices." [37]

**\*549**  Resolving this dilemma took Congress fourteen years of sustained effort. [38]  During that time, the Senate passed five bills and one proposed joint rule, only to see them die in the House of Representatives. [39]  Congressmen from both houses and both parties universally described the ultimately successful law as a bipartisan measure [40]  and as a matter in  **\*550**  which all sides compromised on deeply held principles. [41]  Those compromises, and the ECA as enacted, rely on a network of premises about the role and powers of Congress in relation to the electoral system-premises which are useful to review before exploring the ECA in detail. In addition, the compromises and the ECA as enacted reflect certain preconceptions about election law and administrative law that were widely shared by nineteenth-century lawyers and politicians. As these nineteenth-century views are not widely known to modern legal commentators, it is useful to review them as well.

## A. Congress's Role in the Presidential Electoral System

In enacting the ECA, Congress relied on three fundamental premises concerning its role in presidential elections: Congress, organized as two independent houses, has the right to count electoral votes; Congress's right to count votes includes the right to settle disputes over whether a vote is entitled to be counted; and Congress can regulate how it counts electoral votes through legislation, concurrent rule, or joint rule. [42]  Throughout the nineteenth century, these premises were quite controversial. Many nineteenth-century congressmen doubted them, including some who voted for the ECA. [43]

### \*551  1. Congress's Power to Count Electoral Votes

That Congress, organized as two independent houses, has the right to count the states' electoral votes was the subject of intense controversy and debate throughout the nation's first century. [44]  The Constitution treats several aspects of the presidential election

APPENDIX - 462

system with clarity and detail. For example, the Constitution clearly commits the power to appoint presidential electors to "Each State" to be exercised "in such Manner as the Legislature thereof may direct." [45] It specifies the electors' qualifications [46] and narrates at length when, where, and how they are to exercise their office, [47] including the requirement that each state's electors "transmit" the result of their balloting "sealed to the seat of the government of the United States, directed to the President of the Senate." [48] But when it comes to collating and counting the electors' votes, the Constitution turns remarkably cryptic: "The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted." [49]

Over the course of the nation's first century, five strongly defended interpretations developed around this enigmatic provision. According to these varying views, the power to count electoral votes was lodged in: (1) the President of the Senate; [50] (2) the House of Representatives (for presidential electoral votes) and the Senate (for vice-presidential electoral votes); [51] (3) the House and Senate with each congressman having one vote; [52] (4) the House and Senate with each chamber having one vote; [53] and **552** (5) no one, until Congress designates a vote counter by concurrent rule or legislation. [54]

The standard history of electoral vote counting is that the "President of the Senate" theory [55] prevailed in the early years of the Republic, that the "casus omissis" theory [56] prevailed from 1821 to 1861, and that the "Congress organized as two separate houses" theory [57] has prevailed since 1865. [58] I believe that Congress asserted control and the right to count electoral votes from very early on, certainly by 1800. [59] But whatever the history of the dominant theory, two points are clear. First, all of the theories had staunch defenders in and out of Congress until the passage of the ECA in 1887. [60] The proponents of the ECA had to contend with advocates of all of these theories and their many variants.

Second, although each theory had substantial arguments in its favor, by the 1880s, history and politics had awarded the palm of victory to the theory that Congress, organized as two independent houses, had ultimate vote counting authority. [61] In 1865, Congress had swept aside all ambiguity about the locus of the counting power with the passage of the 22d Joint **553** Rule. [62] The 22d Joint Rule provided that "no [electoral] vote objected to shall be counted, except by the concurrent votes of the two houses [of Congress]." [63] With the 22d Joint Rule, the two houses of Congress unmistakably asserted their power to determine all questions regarding electoral votes.

Congress adopted the 22d Joint Rule specifically to allow itself to refuse to count electoral votes which might be proffered by the southern states that were just then ending their rebellion. [64] Although Louisiana and Tennessee submitted packets of electoral votes, Vice President Hannibal Hamlin did not present them to Congress when it met to count the vote. [65] Thus, Congress did not have occasion to use the 22d Joint Rule to exclude any votes in the year of its adoption. But in 1873, with the 22d Joint Rule still in effect, the two houses did reject electoral votes from the fully reconstructed states of Georgia, Louisiana, and Arkansas on the following **554** grounds: Georgia's electors had voted for a constitutionally disqualified candidate; the Louisiana electors' credentials were not based on a canvass by the state's lawful returning board; and there had been no lawful election in Arkansas. [66]

The Senate unilaterally rescinded the 22d Joint Rule in early 1876, well before that year's close and controverted election. [67] After the election, Congress was faced with multiple sets of returns from Florida, Louisiana, South Carolina, and Oregon, and objections to a number of electoral votes from other states. [68] In response, Congress not only reasserted its right to determine which votes were proper, but also created a bipartisan Electoral Commission, composed of five senators, five representatives, and five Supreme Court justices, to help settle the multiple-return disputes. [69] By the 1880s, congressmen who located the counting power somewhere other than in Congress (organized as two independent houses) were a noisy and persistent lot, albeit a distinct minority. [70]

Proponents of the "Congress organized as two separate houses" theory knew the practical shortcomings of their approach. The theory Congress adopted was problematic because of the frequency in which a final tribunal composed of two decision-makers might disagree and, therefore, produce a tie result. [71] The effect of a tie, or how to avoid a tie, became one of the major issues

APPENDIX - 463

of the ECA debate. [72] Bicameralism was a blessing in the slow  **\*555**  and deliberate process of law creation, but it was a curse in electoral vote counting when dispatch and clear results were needed.

Also troubling was the effect of giving final decision-making authority to an institution with insufficient time and organizational capacity for exacting inquiry into the many factual and legal matters on which the legality of an electoral vote might turn. This problem, too, shaped the ECA debate. [73] Indeed, it is unclear whether the failure to legislate some tribunal other than Congress as the ultimate arbiter of the electoral count was because Congress believed, as a matter of policy, it should not move it elsewhere, or because Congress believed that in the absence of a constitutional amendment, it could not move the responsibility elsewhere.

In light of Congress's institutional shortcomings, many of the ECA's proponents longed for an arbiter armed with "judicial" procedures and powers to referee disagreements between the houses. [74] Others did not want an arbiter, believing that the nation's two ultimate representative political bodies were the appropriate forum of last resort for contested presidential elections. [75] They regarded the only arbiter that had ever been appointed-the Electoral Commission of 1877 on which five Supreme Court justices held the deciding votes-as a dismal failure never to be repeated. [76] As Senator George Hoar, one of the ECA's main proponents, concluded: "[I]n the present state of political and public sentiment," it was "impossible to expect an agreement on . . . an arbiter between the two branches" of Congress. [77] There was simply no person or institution that could be trusted. [78]

 **\*556**  In sum, despite prudential concerns, the theory that the Constitution designated Congress, organized as two independent houses, to count the states' electoral votes predominated by the 1860s, if not much earlier. That theory was a premise of the ECA. [79]

## 2. Congress's Power to Determine Which Electoral Votes to Count

Closely related to the issue of who had the power to count electoral votes, and even more contentious, was the issue of the scope of the vote-counting power. [80] That the power to count electoral votes included the power to determine whether a vote ought to be counted was a subject of sharp dispute during the nation's first century. Throughout that time, some congressmen claimed that Congress had to count whatever electoral votes came in from the states with the appropriate authenticating documentation. [81] These congressmen argued that the electors would authenticate their own acts and the states' right to appoint electors included the power to determine all questions regarding the legality of their vote. [82] Congress's duty as vote counter was ministerial; [83] it was simply an arithmetical endeavor.

Throughout the same period, there were other congressmen with a more nationalist perspective who conceived presidential elections as a federal matter. [84] According to these congressmen, Congress properly had a role in  **\*557**  assessing the legality of the electoral votes that came before it, even to the extent of going behind the returns to ensure that the true voice of the people of a state was properly heard, and to prevent fraud in one state from marring or determining an election where all the states were concerned. [85] Some congressmen went so far as to assert that in all cases "it was the intention of the framers . . . to leave it to the discretion of the two Houses, who represent the States and the people, to count the vote at every election in such manner as they may think accords with justice on the particular occasion." [86] Still other congressmen were more circumspect, arguing that Congress's power varied with the type of objection raised against the reception of a particular electoral vote. [87]

Because the question implicated controversial issues of states' rights and national power, Congress spent the larger part of the nineteenth century avoiding taking a stand on the scope of its vote counting power. [88] Up until 1865, Congress governed electoral counts by passing concurrent resolutions for each count. [89] Frequently framed with the anticipated problems of each count in mind, the resolutions sought to sidestep problems rather than resolve them. [90] In 1865, with the adoption of the 22d Joint Rule, Congress asserted unfettered discretion to reject electoral votes when only one house of Congress objected to receiving the votes. [91] In the  **\*558**  mid-1870s, however, Congress drew back from the prudence, if not the constitutionality, of the 22d Joint Rule's approach. [92] Post-Reconstruction congressmen saw themselves as attempting to strike the proper balance between the states' right to appoint electors and have their electoral votes counted, and the federal interest in counting only "legal votes." [93] The ECA debates show Congress struggling to flesh out a more nuanced approach to its power to reject electoral votes. [94]

APPENDIX - 464

That approach turned on whether Congress received single or multiple sets of electoral votes from a state, on whether the state had attempted to resolve any controversy over its electors' election, and on the type of objection made to the acceptance of electoral votes by Congress. [95]

Thus, understanding the ECA turns on differentiating among the different types of disputes that might arise when Congress meets to count electoral votes. The Congresses that debated the ECA were familiar with the full range of electoral vote counting disputes because they all had arisen either during the twenty-five vote counts that preceded the ECA's adoption or were anticipated by congressmen debating the Act. [96]  Generically, there are four types of disputes:

> 1) whether the electoral votes come from individuals entitled to hold the office of presidential and vice-presidential elector;

> 2) whether the individuals entitled to the office of elector have properly performed their duties;

> 3) the consequences of rejecting an electoral vote on the number of votes required to elect a President or Vice-President; and

> 4) the procedures of the joint meeting that counts the electoral vote. [97]

 **\*559**  More specifically, disputes over an individual's title to the elector's office might involve questions concerning: (1) whether the territory he or she represents was a state of the American union entitled to participate in presidential elections; [98] (2) whether the individual elector was actually elected to that position according to the laws of the state in a free and fair election; [99] and (3) whether the individual, even though appointed according to the laws of the state, was constitutionally qualified to hold the electoral office. [100]

Disputes over whether electors have properly exercised their office include issues as to whether the electors conducted themselves as the Constitution or federal statute requires, [101] and whether they acted free from monetary corruption or physical intimidation. [102]  Controversies over the consequences of rejecting an electoral vote involve the issue of whether the number of votes required to elect a President or Vice President is reduced when Congress rejects an electoral vote. [103]  Conflict over the procedures of  **\*560**  the meeting involve the President of the Senate's conduct of the meeting, parliamentary practice when the houses separate to discuss an objection to receiving an elector's vote, and the meaning of the result of the houses' decisions. [104]

The ECA provides clear answers to some of these types of disputes, while it responds to others ambiguously or not at all. [105] Appreciating the ECA's elements of clarity and ambiguity involves, however, appreciating two more premises of the Congress that adopted that law.

### 3. Congress's Power to Regulate How It Counts Electoral Votes Through Legislation, Joint Rule, or Concurrent Rule, and the Consequences of Equality Between the House of Representatives and the Senate

It is a postulate of constitutional law that one Congress cannot bind another. [106]  An application of this maxim is that Congress's internal rules are not binding, even when expressed in legislation that has received presidential approval. [107]  The difference between binding legislation and a nonbinding internal rule given statutory form is not always distinct, [108] and it was less clear to nineteenth-century legislators. Nevertheless, it was clear enough to provoke wide-ranging discussion in the Congresses that debated the ECA. Many congressmen spoke in opposition to the ECA on the grounds that legislating the matter was

APPENDIX - 465

an unconstitutional attempt to bind Congress's discretion. [109] It was unconstitutional, they said, because **\*561** enacting and amending legislation required presidential approval (or an extraordinary majority in Congress), and thus improperly involved the President in implementing the rules for determining presidential elections. [110] In addition, one Congress could never bind another in this matter. [111] Congress could govern itself, they reasoned, by enacting concurrent rules for each vote count, or a continuing joint rule which the houses could amend at any time. [112]

Many other congressmen believed that electoral vote counting was a proper subject for binding legislation. Congress's rule-making authority governed its own proceedings, and the ECA was properly legislative because through it the two houses adopted rules to govern each other's actions. [113] Moreover, the power to count electoral votes was a power vested in the national government, [114] and the Sweeping Clause allows Congress to "make all Laws which shall be necessary and proper for carrying into Execution . . . all . . . Powers vested by this Constitution in the Government of the United States, or in any Department . . . thereof." [115] These congressmen pointed to how Congress might properly pass laws determining, for example, what credentials would be acceptable to establish that someone was a foreign ambassador and thus amenable to the Supreme Court's original jurisdiction under Article III, [116] or how the **\*562** judicial branch was to govern itself. [117] The ECA, properly understood, was similar because it established the evidence by which Congress would govern its actions when it met not in legislative conclave, but rather to count electoral votes. [118]

A final argument supporting the ECA's status as binding legislation was tied to the constitutional postulate of equality between the House of Representatives and the Senate. Recognizing the equality of the houses of Congress, the authors of the ECA presumed that, under the Constitution, Congress could not count an electoral vote unless both the House and the Senate agreed that it should be counted. [119] Given the frequency of houses of Congress being controlled by different political parties, [120] frequent tie votes and the inability to decide questions raised during the count were ever-present threats when Congress met to count electoral votes. The inherent delays of bicameralism may be a benefit to the thoughtful enactment of legislation, but it is a searing problem for deciding questions regarding presidential elections: "The failure of the Constitution, the casus **\*563** omissus, is the failure to provide an arbiter when [the houses of Congress] disagree. The provision for such an arbiter . . . comes within the legislative power committed to Congress" by the Sweeping Clause. [121] The ECA, in effect, arbitrated differences between the houses by "reduc[ing] to a minimum the cases where any difference [between the houses] can properly arise." [122]

Other congressmen did not go this far. They believed that Congress's legislative power was wholly confined to resolving disagreement between the House and the Senate. [123] They approved the legislation governing electoral vote counting only "so far as it was necessary to meet the contingency of a divided vote of the two houses." [124]

Most interesting was the position of congressmen, including some who assumed leading positions in the ECA's passage, [125] who voted for the law, and urged others to do so, even though they believed the Act was not binding on Congress. These congressmen assumed that Congress's electoral count decisions were not subject to judicial review. [126] Because they believed that "[n]o power in this Government can or ever will set aside and annul the declaration of who is elected President . . . when that declaration is made in the presence of the two Houses of Congress," [127] their view was that a "law will be as a cobweb . . . as against the power of [Congress to] . . . wilfully violate[] . . . destroy[] . . . and trample[] it under foot." [128] As Senator John Morgan explained to his colleagues, as the ECA proceeded to its final passage:

> **\*564** There is a power in this country existing in most of the tribunals which no one has a right to question or disregard. A decision of the Supreme Court of the United States might be made as a result of bribery, yet there is no power in the country that can set it aside; that is the supreme tribunal. . . . So [Congress when met as] this joint tribunal may vote down the voice of the State's electors, or it may sustain one set of certified votes in preference to another, and after the act has been done the power to revoke it, even the power to question it, has passed beyond human control; the only answer is, in such a case, ita lex scripta est. [129]

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   7

Yet, to these congressmen, an unenforceable law was better than no agreement at all. [130]  In addition, they believed an unenforceable law was better than a joint rule because of the law's greater ability to bind Congress's conscience and create a moral obligation to abide by its terms: "[W]hatever law we may pass . . . we do no more than to impose upon the consciences of members a sentiment of obedience to law." [131]  Senator Morgan concluded:

> I will vote for this bill . . . I vote for it for the sake of quietude and peace and reconciliation in this country, believing that perhaps when the bill has passed and been signed by the President, if it should be so signed, it will be a little harder to get rid of than even a concurrent resolution; that there will be men to be found in the two Houses when the count . . . shall take place . . . who will be more reluctant to part with a rule which in itself I conceive to be entirely wise than they would be if it had only received the sanction of the two Houses. [132]

It is important to appreciate that the Congresses that debated the ECA struggled with the binding law/internal rule dichotomy and chose to set forth their handiwork in the form of law because of that form's greater (though perhaps ultimately limited) ability to bind. Congress understood that even if the ECA enacted rules of only moral obligation, it nonetheless would constrain behavior both outside [133] and inside [134] Congress.

 **\*565**  In addition, knowing that some supporters of the ECA considered its provisions as only binding on Congress's conscience may affect our understanding of congressional debate, and therefore, of the ECA's various provisions. It is important to know that some congressmen conceived the ECA as a joint rule, and therefore, that a majority vote in Congress could implicitly set it aside because those sentiments sometimes get entwined with their discussion of what the ECA rules were supposed to mean. [135] At all times, we must be sensitive to separate whether a particular provision was meant to be binding, if only as an internal rule, from whether it was meant to be entirely discretionary. [136]

It is, of course, impossible to know how many congressmen voted for the ECA believing they were enacting binding law as compared to the number of members who accepted the "rules of moral obligation" approach. [137]  Whether the ECA is a statute or a joint rule enacted in statutory form is ambiguous. In truth, both theories underlay its enactment.

The difference between the two theories disappears, however, to the extent that the ECA involves political questions not subject to judicial review. [138]  The difference between the two theories also disappears to the extent that Congress self-enforces its own internal rules. [139]  The houses of  **\*566**  Congress do take their in-house rules seriously, if only because it is in the long-term interest of the individual members and the leadership to do so. [140]  Perhaps the uniqueness, the stress, and the enormous prize involved in the outcome of a contested presidential election presents an exceptional situation in which the traditional norms of congressional behavior will be suspended. Traditional norms of judicial behavior seem to have constrained neither the justices who sat on the 1877 Electoral Commission, [141] nor the Court that decided Bush v. Gore. [142]  If so, with or without judicial review, the ECA may not bind. [143]

The congressmen who debated and enacted the ECA, by living through the contested Hayes-Tilden election, knew the pressures of close presidential elections. Their opinion was that putting the ECA in statutory form would give it more binding force than adopting it as a joint rule. [144]  But whether the ECA is a statute or a joint rule, it contains the regulations Congress adopted to govern its vote counting sessions and is Congress's last word on the subject. As with all of Congress's internal rules, let alone obligatory statutes, the ECA has the capacity to influence and guide, if not govern, the conduct of the two houses. [145]  Even if it does not bind, Congress needs to understand the ECA's provisions.

### **\*567  B. Relevant Premises of Nineteenth-Century Election Law and Administrative Law**

Congress's debates and committee reports make it evident that enacting the ECA required congressmen to take positions on Congress's power to count electoral votes, the scope of that power, and whether that power was subject to legislative control. Frequently, these were the subjects under discussion. In contrast, it is less evident that enacting the ECA required congressmen to draw from their understanding of nineteenth-century election and administrative law. As compared to the ECA's other premises,

APPENDIX - 467

nineteenth-century election and administrative law were the overt subjects of discussion far less often. [146] Rather, Congress's understanding of nineteenth-century election and administrative law influenced the ECA debates by providing the concepts and terms for analyzing important aspects of the subject with which Congress was dealing. Nineteenth-century election and administrative law's influence is reflected less in what Congress talked about than in what Congress assumed when it was debating.

Nineteenth-century election and administrative law did not determine the content of the ECA. Presidential elections have so many unique aspects that Congress, at least to some extent, decided to govern them with sui generis rules. Congress certainly decided that, even when it is counting electoral votes, it is not an administrative tribunal entirely subject to administrative norms. [147] In counting electoral votes, Congress considered itself the nation's ultimate political tribunal canvassing both the sovereign states' appointment of presidential electors and the electors' exercise of their unique office. [148] To be sure, some congressmen considered Congress's role in electoral vote counting as a ministerial administrative function. [149] Others deemed it wholly political, subject to no rule other than the "justice [of] the particular occasion." [150] Most congressmen fell **568 somewhere in between and crafted an electoral vote counting regime influenced by diverse norms. [151]

Nevertheless, Congress's understanding of nineteenth-century election and administrative law shaped Congress's imagination of what it might do. It also shaped Congress's understanding of the regulations it enacted. Recovering the premises of nineteenth-century election and administrative law is necessary to interpret various ECA provisions.

It is, for example, frequently said that in the nineteenth century, as in the modern era, elections were administrative proceedings with no right to judicial review. [152] That is true, but misleadingly so. In the nineteenth century, the executive branch's administration of elections almost invariably was subject to judicial review at the behest of interested parties, be they executive branch officials, defeated candidates, or even voters. [153] Knowing the broad outlines of nineteenth-century election law and administrative law is fundamental to recovering Congress's understanding of the ECA.

### 1. Nineteenth-Century Election Law

A simplified version of an uncontested nineteenth-century election is that the voters balloted at local polling stations where administrative officials determined if they were qualified and, if they were, accepted their ballots. [154] After the polls closed, the local election officials tallied the votes, [155] which sometimes involved discretionary judgments as to the legality of the ballot [156] and for whom it was cast. [157] The local officials then forwarded the results of their tally to the county canvassing officials, who **569 added the various local tallies together when a race covered multiple polling precincts. [158] The county returning board forwarded the results of their canvass to the state canvassing board. [159] That board checked the county returns for proper form and added the county returns together when a race was statewide or covered multiple counties. [160] When all the tallies were complete, the state canvassing board certified the outcome of each race. [161] Based on that certification, the state's governor [162] issued certificates of election to the candidates that the administrative canvass showed to have a plurality of the votes, or a majority when that was required. [163]

Should the result of the election as certified by the administrative apparatus be challenged, the fundamental rule of nineteenth-century election law was that the voters' ballots entitled someone to elective office, not the governor's certificate. [164] In the nineteenth century, election outcomes as declared by election administrators, and as certified by the governor, almost always were subject to challenge in court. [165]

**570 In England, the writ of quo warranto was used to subject elections to judicial review. [166] In the early nineteenth century, American courts adapted quo warranto into a proceeding where state attorneys general, unsuccessful candidates, or any voter could challenge the right of a candidate to exercise the office to which the governor's certificate of election said he was entitled. [167] In several celebrated cases, even the governor's claim to office was held subject to challenge through quo warranto proceedings. [168] Following English practice, the only exception was legislative office because, by common-law tradition, the legislature itself is the appropriate tribunal for determining the elections and qualifications of its own members. [169]

APPENDIX - 468

The courts' jurisdiction to try an officeholder's right to the position through quo warranto had a common law, not a constitutional, basis. Legislatures could deny their courts quo warranto jurisdiction without enacting any substitute. [170] Typically this was not done. [171] Rather, throughout the nineteenth century, legislatures sought to modernize election challenges by creating election contest laws to supplement quo **\*571** warranto actions. [172] Legislatures could make the streamlined election contest proceedings the exclusive means to challenge election outcomes. Typically, they chose not to. [173] When courts addressed the issue of whether a legislature intended its election contest law to entirely supplant quo warranto proceedings, they created the general rule that "ousting" the courts' quo warranto jurisdiction required a clear legislative statement. [174] Generally, then, unsuccessful candidates (other than candidates for legislative office) had two avenues for judicial review of the election administrators' decisions and the propriety of the governor's certificate of election: quo warranto and election contest proceedings. [175]

For the purposes of this Article, it would not matter if legislatures had entirely supplanted quo warranto proceedings with election contest laws. Although they did not have to be, election contests, like quo warranto, were judicial proceedings. [176] The point is that nineteenth-century elections were not merely administrative affairs entirely governed by the executive branch. [177]

That the governor's certificate of election was not conclusive did not mean that it was of no value. The governor's certificate gave its holder a prima facie right to office. [178] Until any challenge to that right was successfully completed, the candidate was entitled to hold office, exercise its powers, and receive its emoluments. [179] The candidate with the prima facie right was an officer de facto. [180] His acts in office could not be attacked on the grounds that he was not, in fact, entitled to the office. [181] A public official's right to office could be questioned only in a direct challenge to his title to office through quo warranto or election contest proceedings. [182]

**\*572** The important lessons to draw from this sketch of nineteenth-century election law is that the governor's certificate of election, issued as the official statement of an election's outcome after completion of the administrative process, did not give the successful candidate a conclusive right to office. A perfected title to office, so to speak, required judicial proceedings that reviewed all aspects of the underlying election and administrative process. [183] However, the governor's certificate did entitle the candidate who possessed that credential to hold office until a successful challenge to his title had been completed.

What these precepts meant for presidential elections when electoral votes were received and challenged before Congress was a subject of contentious debate in the Congresses that developed the ECA. The contending positions will be reviewed in Part III when the ECA is analyzed in detail. [184] On one point, however, the congressmen debating the ECA were in general agreement: that the only people entitled to exercise the electors' office and have their electoral votes counted by Congress were the people who were electors de facto on the date the electors balloted for President. [185] In other words, only the people who had the governor's certificate of election were entitled to cast electoral votes unless a successful challenge had been completed by elector balloting day. [186] An unsuccessful candidate for the elector's office who had not completed his challenge could not possibly cast an electoral ballot that would be counted. This was because, in Congress's view, in order to do an official act, one had to be (at least) an officer de facto on the date that act needed to be done. [187]

For nineteenth-century presidential elections, Congress's view of the "officer de facto" doctrine gave unusual electoral significance to the outcome of the state's administrative process. Until the passage of the **\*573** ECA, there were only twenty-nine days between election day and elector balloting day. [188] In the turbulent elections of 1872 and 1876, twenty-nine days had proven insufficient time to complete even the trial phase of an election challenge. [189] Part of the problem, Congress was quick to note, was that although the states could have extended their expeditious election contest laws to presidential elections, they had not done so. [190] Prior to the ECA, presidential elections were subject to judicial scrutiny, but only through the procedurally less efficient writ of quo warranto. In 1872 and 1876, quo warranto proceedings had been brought to review the presidential election in various states, but none of them even had their trial phase completed before the electors balloted. [191]

Congress's understanding of the officer de facto doctrine did not mean that the candidate who had the appropriate credentials on elector balloting day was entitled to have his vote counted by Congress. Although Congress felt it could not retroactively

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.            10

seat another candidate and count his vote, the heart of the ECA debate concerned under what conditions Congress could reject the vote of a credentialed elector when Congress believed he had been seated improperly. [192]

From an election law perspective, then, in debating the ECA, the issues before Congress included whether (and how) Congress should encourage the states to extend their election contest laws to presidential elections, and the extent to which Congress had (or should have) the power to reject electoral votes that had been cast by credentialed electors, who were officers de facto, on elector balloting day.

## 2. Nineteenth-Century Administrative Law

In many ways, when Congress debated its power to reject electoral votes cast by credentialed electors, it did so with a mindset framed by the norms of nineteenth-century administrative law. Most important was the fundamental principle that ministerial administrative acts were subject to judicial review, but discretionary administrative acts generally were not. [193] *574  There was an exception to this principle: discretionary administrative decisions made by administrators who were acting on matters outside their jurisdiction, or whose decisions were tainted by fraud or corruption, could always be set aside in a court of law. [194] A fraudulent decision, or a decision made without jurisdiction, was no decision at all and could be ignored. Stated another way, when a tribunal or decision-maker made a discretionary decision within his jurisdiction, that decision was not subject to judicial revision for mere error, gross error, or any error that did not support a finding of corruption, fraud, or lack of jurisdiction.

If these norms of administrative law applied without translation to Congress's counting of electoral votes, it would mean that Congress could go behind the governor's certificate, the state returning board, and the local returning boards because, typically, they acted ministerially. It also meant that Congress could not challenge the conduct of the election at the precinct level because, absent fraud, the decisions made there were discretionary judgments about voter qualification and ballot reading.

But Congress was not a court reviewing the administrative process of an election. Congress was a political body reviewing, on behalf of the nation and all the states, the states' appointment of their electors under constitutional provisions that firmly and exclusively delegated the power of appointment to the states. Some nationalistic congressmen took this difference to mean that Congress was not bound by the norms of administrative law and could go behind both ministerial and discretionary decisions of state officials to police the purity of national elections. [195]  Other trenchantly states' rights congressmen took this difference to mean that Congress could not even go behind the ministerial action of the states' administrative officials. [196]  The states spoke to Congress through the credentials issued by their duly-constituted officials. For Congress to challenge the officials' decisions was to intrude improperly into the states' right to appoint electors. [197]

 *575  There were, of course, various positions in between. The play of these norms in the Hayes-Tilden election controversy of 1876 shows how many different ways they could be elaborated and applied in complex disputes. Consider, as one example, the analysis given by Justice Joseph Bradley in casting the votes that decided all the controversies before the Electoral Commission of 1877. [198]

To resolve the disputed election of 1876, Congress created an Electoral Commission with the "same powers, if any, now possessed" by Congress to accept or reject electoral votes from the four states that submitted multiple packets of electoral votes from competing slates of electors. [199]  To Justice Bradley, this meant that only the electors who had the governor's certificate of election on elector balloting day plausibly had a right to have their ballots counted. [200]  In Florida, Louisiana, and South Carolina, the Republican electors had the governor's certificate of election, meaning that they had a prima facie right to have their ballots counted, not that they should have their ballots counted. [201]  In every case, Justice Bradley went behind the governor's certificate because it was ministerial to determine whether the governor properly acted at the direction of the state returning board. [202]  In the cases of Florida, Louisiana, and South Carolina, the  *576  governor had issued certificates to the electors that the returning boards determined had won. [203]  So, that is where the matter ended.

For Justice Bradley, the matter ended with the determination of the state returning boards even though, in Florida and Louisiana, the decisions of the state boards were themselves subject to challenge. [204]  The state returning boards were charged with having produced a Republican majority by fraudulently rejecting local returns favorable to the Democratic electors. [205]  Justice Bradley,

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

however, refused to go behind the actions of the state returning boards because he determined that those boards, under the unique laws of their states, exercised discretionary powers in determining whether to accept returns from the county canvassing authorities. [206] In Florida and Louisiana, rejecting local returns was a discretionary decision which Justice Bradley, representing Congress, would not overturn in the absence of fraud. [207]

In responding to the fraud allegation, Justice Bradley did not say that fraud never vitiated a returning boards' discretionary decisions. Nor did he say that fraud always did. Rather, Justice Bradley took a middle course and acknowledged that Congress was in a unique position. Without having enacted legislation to aid itself, Congress had limited time and institutional capacity to conduct a quasi-judicial investigation into the facts of the alleged frauds. [208] Therefore, under the Constitution, Congress's inherent power was limited to setting aside returns only for "manifest fraud." [209] "Manifest fraud" was fraud that was so notorious that it "did not require an  **577**  investigation on the part of the [Congress] to ascertain by the taking of evidence the truth of the case." [210] In Bradley's view, if the Florida and Louisiana returning boards had erred at all, it was that their "proceedings . . . were . . . based on erroneous principles and findings." [211] A discretionary administrative decision could not be set aside for mere error.

However, Justice Bradley determined that the governor of Oregon had not issued his certificate of election as directed by the state canvassing authority. [212] Oregon's canvassing authority had determined that the Republican electors had the most votes and certified them. [213] One of the Republican electors, however, was constitutionally ineligible because he was a United States postmaster. [214] For that reason, Oregon's governor, who was a Democrat, refused to issue a certificate of election to the ineligible elector. [215] Instead, the governor gave his certificate to a Democratic elector on the grounds that that elector had received the next highest number of votes. [216]

Responding to these facts, Justice Bradley ruled that under Oregon law the governor had no authority to make such a decision. [217] In credentialing the Democratic elector, Oregon's governor was acting beyond his jurisdiction. [218] The governor's only power was ministerial, to credential whomever the state canvassing authority anointed. [219] Therefore, Justice Bradley concluded, the Democratic elector was never properly seated; his vote was not to be counted. [220] The Republican elector who filled the vacancy created when the ineligible elector resigned was properly in office on elector balloting day; that elector's vote was the one to receive. [221] With all disputed electoral votes awarded to Republican electors, Rutherford Hayes won the Presidency by one electoral vote. [222]

 **578**  Of course, the Democrats on the Election Commission had opposing analyses that deployed the norms of nineteenth-century election law and administrative law to argue their respective positions. Justice Stephen Field, for example, held that the Florida board had no discretion, as their "duty . . . was ministerial, involving only the exercise of such judgment as was required to determine whether the papers returned were genuine." [223] Justice Field also believed that Oregon law did clothe its governor with authority to refuse to issue a certificate of election to a candidate whose ineligibility was "a fact of public notoriety." [224] While the governor had no right to grant a certificate of election to the next runner-up, [225] neither did the remaining Republican electors have the right to fill the vacancy created by their colleague's ineligibility. [226] Oregon, therefore, had validly appointed only two electors, rather than three. [227]

Obviously, there was no single perspective on what the norms of nineteenth-century election law and administrative law suggested about Congress's power to count electoral votes. The importance of these norms is that they were part of the world view with which Congress, from 1873 to 1887, discussed the various bills that finally emerged as the ==Electoral Count Act== of 1887. The norms of election law and administrative law neither determined Congress's view of its electoral vote counting power, nor settled what the ECA should provide. The norms did, however, help frame the debate. Having them in mind will help to understand the debate's outcome.

### III. The ==Electoral Count Act== of 1887

The seven sections of the ==Electoral Count Act== of 1887 attempt to do five things. They are (with the relevant section indicated):

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.          12

1) give the states enough time between election day and elector balloting day to settle controversies over the appointment of their presidential electors (Section 1);

**\*579**  2) encourage the states to establish mechanisms for resolving contests over the appointment of presidential electors prior to the day of elector balloting (Section 2);

3) publicize and place on the record the states' determination of the outcome of their elector appointment process (Section 3);

4) minimize congressional involvement in resolving controversies over elector appointment not authoritatively resolved by the states (Section 4); and

5) settle procedural issues for conducting the joint session at which Congress counts the states' electoral votes (Sections 4-7).

## A. Section 1: Giving the States Enough Time to Settle Controversies over the Appointment of Their Presidential Electors [228]

When Congress, in 1792, first exercised its authority to "determine the Time of chusing [sic] the Electors, and the Day on which they shall give their Votes,"[229] it selected the first Wednesday in December as the day for the electors to ballot,[230] and allowed the states to appoint their electors at any time "within thirty-four days preceding" that date.[231] Not anticipating controversies over who had been selected as an elector, Congress was concerned with minimizing the time between elector appointment and elector balloting. Its concern, paralleling the Framers', was in minimizing the chance that the citizens selected for the responsibility of electing the President would be subject to corrupting influences after their identities were known.[232] Some congressmen wanted an even shorter time frame, but they recognized that Congress had to allow sufficient time for the electors to be notified of their appointment and assemble in an era and at a time of year when communications and travel were difficult.[233]

In 1845, Congress shifted to having the states appoint electors on a uniform day.[234] It selected "the Tuesday next after the first Monday in the month of November" as election day[235] but did not change the date for elector balloting.[236] This left twenty-nine days between the date for elector  **\*580**  appointment, which almost universally was by popular election, and the date the electors would ballot. Congress's decision to leave only twenty-nine days between election day and the day the electors balloted reflected a failure to focus on the problems of resolving elector election disputes, probably because of a lack of experience with such disputes. Prior to 1845, the main controversies that had arisen during Congress's electoral vote counting sessions concerned exogenous factors, such as whether the appointed slate came from a territory that had been admitted to the Union as a state.[237] These problems did not raise issues whose resolution involved time-consuming factual determinations that had to be settled to determine who the proper electors were.

From 1845 until 1872, there were bitter controversies, but none involved conflicting claims as to who had title to the electors' office. Rather, they continued to involve exogenous problems.[238]

In 1872, Congress's good fortune ended. There were a series of controversies, most of which did not raise questions of the identity of a state's elector.[239] However, one dispute, involving Louisiana's electoral vote, did present a dispute between competing slates, each claiming to be the state's authentic electors.[240]

**\*581**  In the controversy over Louisiana's 1872 electoral vote, Congress immediately perceived that a new problem had arisen and part of the problem was that the states had insufficient time to resolve controversies over elector selection. In 1872, the results of Louisiana's November 5 election were tied up in litigation over which of several contending state canvassing boards was the legal one.[241] A federal judge asserted jurisdiction under Reconstruction-era legislation and enjoined counting the popular vote because of claims of racial discrimination.[242] The federal judge took until December 6 to determine the proper returning board.[243] Unfortunately, elector balloting day in 1872 was Wednesday, December 4.[244] On that day, no slate of

APPENDIX - 472

electors had been certified as elected by a legal canvass of Louisiana's election. [245] Consequently, although two different slates of Louisiana electors submitted electoral votes to Congress, one of which was certified by the governor and the other by the secretary of state, both houses of Congress agreed that neither of the competing slates held office as presidential electors as a result of a "lawful" canvass on December 4, the date elector ballots had to be cast. [246]

The problem of multiple elector slates, each claiming to be the lawful electors, was repeated in 1876. This time there were controversies in three states over the identity of the elector slate that had received the most votes, [247] and unlike the 1872 election, the presidential election turned on the disputes' outcome. [248] Once again, the short time between election day **\*582** and elector balloting day was at the heart of the problem. Twenty-nine days had once again proved too short for the states to sort out whether the Republican or Democratic electors had garnered the most votes even though timely quo warranto actions were filed in Florida and South Carolina. [249]

In 1876, election day was Tuesday, November 7 and elector balloting day was Wednesday, December 6. Perhaps for strategic reasons, Florida's administrative canvass of the election results was not completed until early morning on Wednesday, December 6, the day the electors balloted. [250] That canvass, by a Republican-controlled board, refused to count various returns favoring Democratic electors and ruled that the Republican electors had carried the state by 924 votes. [251] The defeated Democratic electors immediately commenced a quo warranto proceeding. [252] The quo warranto was not resolved at the trial level until January 25. [253] Although the trial court, presided over by Judge Pleasant White, a Democratic partisan, ruled in favor of the Democratic electors and overturned the returning board's action, [254] the Republican electors filed an appeal which the Florida Supreme Court set for argument at its regular session in June 1877. [255] That was about four months after Congress had counted Florida's electoral votes for Hayes. [256] Prominent among the reasons given by the Republican-dominated Electoral Commission for counting Florida's Republican **\*583** electors was that they were the certified electors on December 6, which was elector balloting day. [257]

South Carolina's administrative canvass, which like Florida's favored the Republican electors, was also subject to a quo warranto proceeding. [258] The South Carolina canvassing board finished its work, and the governor certified the Republican electors on November 22. [259] On December 2, the Democratic electors commenced a quo warranto proceeding directly in the Supreme Court of South Carolina. [260] The court did not decide the case until January 26, at which time it dismissed the action for a pleading error which the court, not the Republican electors, raised. [261] Probably sensing futility, the Democratic electors never refiled.

Drawing from this experience and wanting to enable the states to settle controversies over their own elector elections through judicial processes, Senator George Edmunds wrote an article suggesting that Congress move election day to September 1 and elector balloting day to January 1, a separation of 122 days. [262] The following year he submitted a bill to reform Congress's electoral vote counting process. [263] It was the first version of what eventually became the ECA. [264] The bill's first and third sections moved election day to "the first Tuesday in October" and set elector balloting for "the second Monday in January," [265] a separation of ninety-seven to 104 days depending on how the calendar broke. As Edmunds explained: "The object of . . . sections 1 and 3 is to produce a longer period of time between the choice of electors . . . and the meeting of the electors, **\*584** in order to dispose of any dispute or question that may arise in respect of who have been chosen as the electors." [266]

Edmunds's 1878 bill passed the Senate but never came to a vote in the House. [267] Without further commentary, all subsequent predecessors of the ECA left election day on "the Tuesday next after the first Monday in the month of November" [268] but set elector balloting, as Edmunds had suggested, on "the second Monday in January." [269] That is what the ECA provided when it finally passed in 1887. [270]

Due to differences in how the calendar breaks, in four out of seven presidential elections, the ECA allowed sixty-nine days between election day and elector balloting; in the other three elections the spacing reduced to sixty-two days. Thus, the first step

APPENDIX - 473

in the ECA's reformation of the electoral vote counting process was to more than double the time the states had to determine the outcome of their elector elections. [271]

## B. Section 2: Encouraging the States to Establish Mechanisms for Resolving Contests over the Appointment of Presidential Electors Prior to Elector Balloting Day [272]

Having increased the time available for settling presidential election controversies, Congress sought in section 2 of the ECA to encourage the states to use the time to settle any controversy over their appointment of **585** presidential electors before the day for elector balloting. In the late nineteenth century, clearly established law in almost all states permitted the state judiciary to review election results through quo warranto proceedings. [273] Experience showed, however, that those proceedings were too time-consuming for the short deadline required by presidential elections. Even with the extended calendar adopted by the ECA, courts would have difficulty completing quo warranto proceedings in time. [274] What Congress wanted was for the states to develop, or apply, their existing, more streamlined election contest laws to presidential elections. [275] As Senator Oliver Morton observed at the outset of the fourteen-year campaign to enact the ECA, the fundamental problem was that although:

> [e]very State provides by law for contesting the elections for governor and other State officers and members of the legislature, . . . no provision is made for contesting the election of electors; and whatever returns shall be made up, although produced in whole or in part by fraud or violence, must stand and the vote be counted upon them if returned in time. [276]

The ECA's sponsors hoped that "[i]f the disputes touching the constitution of the Electoral Colleges in the States could be disposed of in advance of their action, the counting of the electoral votes at the seat of government . . . would usually be little more than a formal ceremony." [277]

In urging the states to develop or apply their election contest procedures to presidential election disputes, Congress felt it was trenching all that it could on states' rights. On the one hand, Congress felt that, absent a constitutional amendment, it could not command the states to adopt such **586** mechanisms. [278] Some states' rights-oriented congressmen bristled even at the idea that Congress might legislate an incentive to encourage the states to enact presidential election contest laws. [279] On the other hand, Congress felt it was either unconstitutional or simply unwise to try presidential elector contests before Congress or the federal courts. [280] Consequently, to encourage the states to develop procedures for settling their own elector election disputes, Congress offered a momentous incentive, "a concession never before offered to the States in the matter of electing the Chief Executive of the United States": [281] that Congress would be "conclusive[ly]" bound by a state's "final determination" of any controversy concerning the identity of its presidential electors. [282]

Prior to 1887, Congress debated, but never abjured, its discretion to reject electoral votes due to underlying defects in the electors' appointment to office. [283] In 1873, Congress had rejected Louisiana's and Arkansas's electoral votes due to qualms about their electors' election. [284] Although **587** both houses joined in rejecting Louisiana's and Arkansas's votes, the fact is that from 1865 to 1876, Congress's 22d Joint Rule allowed a majority vote of a single house to reject any state's electoral vote. [285] Now, in what was to be "the groundwork . . . of the whole system of the [electoral] count," [286] Congress adopted a law "framed upon the proposition that the power to adjudge and to decide upon the validity of the appointment of electors resides in the States, and may be completely and finally exercised through tribunals created by State laws and regulated in their procedure by State laws." [287]

As finally enacted, section 2 reads:

> If any State shall have provided, by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such State, by judicial or other methods or procedures, and such determination shall have been made at least six days before the time fixed for the meeting of the electors, such determinations made pursuant to such law so existing

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   15

on said day, and made at least six days prior to said time of meeting of the electors, shall be conclusive, and shall govern in the counting of the electoral votes as provided in the Constitution, and as hereinafter regulated, so far as the ascertainment of the electors appointed by such State is concerned. [288]

The meaning of section 2 was explained by Senator Hoar, floor leader during much of the fight for the ECA and Chairman of the Senate committee managing its final passage: [289] "The bill provides that where the State has created a tribunal for the determination of [elector appointment controversies,] the proceedings of that tribunal shall be conclusive . . . ." [290] **588** The thought that justifies section 2 was also straightforwardly set out by Senator James Pugh, floor leader during the unsuccessful effort to pass the ECA in 1882: [291] "[I]t is better and safer to trust the States with the settlement of their own contests and disputes, according to their own laws to ascertain what was really done by the State itself . . . and for the two Houses to accept the proof of the result . . . as conclusive," than to leave "the whole field . . . open as it is now," entirely subject to congressional discretion. [292]

The ECA debates are replete with comments like Hoar's and Pugh's in every session where the bill was discussed, from its initial proposal in 1878 to final passage in 1887. They make it quite clear that the theory of section 2 is that the states are the proper locus of authority to determine elector election controversies and, for that reason, the final determination by a state's duly appointed tribunal should bind Congress. [293] This was the centerpiece of the ECA's solution to the quagmire that elector election disputes presented for Congress's electoral vote counting.

There were, of course, many congressmen who objected to section 2's solution to the problems of electoral vote counting. Congressmen who held strong nationalist tenets objected to section 2 and proposed amendments to allow a concurrent vote of both houses of Congress to set aside a state's final elector determination. [294] Their amendments did not pass. Other congressmen with strong states' rights convictions objected to section 2 for the opposite reason: the bill's recognition of conclusive authority in a state **589** was not broad enough. These congressmen felt the state should bind the national government whenever the state presented but one return, even if it had not been subject to a section 2 final determination process. [295] The House, in 1886, adopted this view endorsing states' rights, but receded from it in conference with the Senate. [296]

In the end, the idea that Senator Edmunds had suggested as far back as 1877 prevailed. Giving state determinations of elector election contests conclusive effect was the key to his hope of disposing of elector appointment controversies before Congress met, rendering the joint session "little more than a formal ceremony." [297] The debate engendered by the objectors to section 2 only served to create an extensive legislative record supporting section 2's textual commitment.

Thus, section 2's text and legislative history are clear. In section 2, Congress precommitted not to review an elector's election. Nevertheless, Congress's commitment to accept electoral votes submitted by electors who claim section 2 status is not unlimited. It is subjected to express and implied limitations that substantially hedge section 2's overt promise. An exploration of section 2's limitations gives us a more nuanced understanding of the ECA's solution to the problems of electoral vote counting.

In overview, the express and implied limitations of section 2 frame the grounds for Congress, consistent with the ECA, to refuse counting electoral votes that claim section 2 status. Claiming section 2 status is different from having it. Congress may, consistent with section 2's commitment, refuse to count an electoral vote that claims section 2 status when that claim is invalid. [298] Section 2 also contains grounds for refusing to count votes even when the claim is meritorious. Some grounds for denying section 2 status, or refusing to count an electoral vote that merits it, follow from conditions that are expressed in the text of section 2. Others follow from assumptions underlying the ECA. I first review section 2's express limitations and then turn to those that are implicit in the ECA's assumptions.

Obviously, one condition is that the tribunal issuing the final determination of the elector election contest must have been granted such **590** authority under the state's law. [299] Another is that the tribunal's ruling was "final." [300]

Section 2's text expressly states that Congress will be bound only if the state's law designating the "final determination" tribunal and establishing its presidential election contest process was enacted "prior" to the presidential election. [301] Congress specified

APPENDIX - 475

this limitation for two reasons. First, the limitation was designed to prevent states from creating electoral commissions "for a particular election or a particular purpose to aid the friends of one candidate rather than another according to the political disposition of the Legislature." [302] Second, Congress believed that:

> Unless you provide beforehand that State laws establishing these tribunals or conferring jurisdiction on tribunals already established shall be passed in advance of the election, no State will take the trouble to pass such laws. If the States know that they can, whenever a case arises, convene the legislature and pass a bill to dispose of each electoral question, you remove all probability of the passage of such laws. [303]

**\*591** Requiring states to designate their final electoral authority prior to the election is an obvious protective measure, although it is one that the minority of the House committee tried unsuccessfully to remove as an undue intrusion on the states' plenary power to appoint electors as their legislatures saw fit. [304]

Less obvious as a protective measure is section 2's stipulation that the final settlement of any elector appointment controversy be made "at least six days before" the day set for elector balloting. [305] The origin of the six-day limit is mysterious. Senator Edmunds's original 1878 bill allowed a state's final determination process to bind Congress even if it took up to the "time fixed for the meeting of the electors." [306] So did his 1880 and 1882 proposals. [307] When Senator Hoar reintroduced the measure in the forty-eighth Congress in 1884, he described it as verbatim to what was passed in the last Congress. [308] Yet Hoar's 1884 bill had the six-day provision in it. [309] Even though the six-day provision cut down the time that the states could settle election contests and conclusively bind Congress by almost a full week, the reason for the change was never discussed. [310]

In 1886, as the ECA approached final passage, the six-day provision was the subject of some discussion when the minority on the House committee guiding its passage moved to delete that particular proviso. [311] Their cogent argument was that:

> **\*592** [I]f there is any fraud or any neglect of duty, if there is any hiatus, any unforeseen occurrence whereby the vote of a State is likely to be lost by reason of conflict, we contend that the State should have the full period up to the time of the casting of the electoral vote in order to repair that difficulty, to make that determination, to save her vote. As [we] have already shown, the State has complete control of the matter. It is a field into which Congress has no right to enter. That being the case, the State should have until that time to repair any disaster which may interfere with or interrupt the casting of her vote by the proper electors. [312]

Unfortunately, the minority's complaint was never answered because it was mixed in with the minority's protest against forcing the states to enact their contest procedures before the presidential election had taken place. [313] The ECA's proponents preferred to refute the more outlandish part of the minority's protest and never addressed the minority's other, sounder critique. [314] Had they done so, they might have revealed their reasons for enacting the six-day proviso.

Most likely, the six-day provision was understood as a measure encouraging "fair and orderly" electoral procedures. [315] As will be discussed, the ECA's third section requires every state's governor to give the appointed electors a certificate of their election "on or before" the day on which they ballot. [316] The six-day provision allows time for communicating the result of any election contest to the victorious electors, for the governor to execute the necessary paperwork, and for the duly appointed electors to gather and receive their credentials before balloting. [317]

**\*593** Whatever the origins [318] and purpose of the six-day provision, it was meant as a "safe harbor" and not as the end point for state-conducted election contests. [319] As Representative John Eden explained in refuting the minority of the House committee's objections to the six-day provision:

APPENDIX - 476

If any State neglects to use the means within its power to identify who are its legally appointed electors, the two Houses of Congress . . . are to resort to other provisions of the bill to determine who are the legally appointed electors of the State. The bill contemplates no exclusion of electoral votes from the count because of the failure of a State to settle disputes as to the lawful vote of the State. [320]

The only consequence of settling election disputes less than six days before elector balloting day was that Congress would not be conclusively bound by the state tribunal's decision of the identity of the electors. Should a state not subject its electors to a section 2 process, or should that process be concluded less than six days before the electors' ballot, Congress had more discretion, under section 4 of the ECA, to reject the electors' vote. [321]

Section 2's final express limitation is that it is conclusive only as to the "ascertainment of the electors." [322]  Controversies over how the electors **\*594** exercise their office, or whether the electors were qualified under the Constitution to hold the electors' office, remain subject to congressional review. [323]  The ECA envisions presidential elections as consisting of three stages: appointing electors; casting electoral ballots; and aggregating and counting electoral votes at the seat of government. In general, the Congresses that debated and passed the ECA regarded the appointment stage as wholly committed to the states; the aggregation and counting stage as wholly committed to the federal government; and the ballot casting stage as a period of mixed state and federal jurisdiction. [324]

As a consequence, although the states may well have had jurisdiction to police how their electors conduct themselves in office, [325]  in passing the ECA Congress retained its authority to scrutinize and reject electoral ballots cast corruptly [326]  or in violation of constitutional rules. [327]  Because a section 2 determination preceded the casting of electoral ballots, it could not preclude Congress from rejecting electoral votes that were not cast by ballot; not cast on the day required by federal law; cast for a President and Vice President who were both citizens of the same state as the elector; cast for a constitutionally ineligible candidate; or cast as a result of elector bribery or corruption. [328]

 **\*595**  Neither did Congress mean to preclude itself from rejecting votes cast by individuals who were not constitutionally qualified to hold the elector's office. [329]  This was a more controverted decision because the facts involved in determining whether an individual appointed to the elector's office suffered a constitutional disqualification preceded the section 2 determination and could have already been adjudicated. It does, to some extent, countermand the state's final determination of who is entitled to the elector's office (though it does not directly countermand the determination of who won the election). Although this exception may be textually supported by saying that constitutional disqualifications are outside the scope of the word "ascertained" as used in the ECA, it may also be supported as the first implied limitation to section 2.

Whether expressed in the text or not, the ECA's legislative history and its underlying assumptions support the notion that Congress, under section 2, retained power to reject votes submitted by electors who were not constitutionally eligible to hold the elector's office. In contrast to the language ultimately adopted, earlier versions of section 2 extended the conclusive effect of the state's final determination to the electors' lawful title to office. [330]  Determining the electors' "lawful title to office" arguably encompassed a decision on whether the electors suffered from any constitutional disabilities. [331]  But the ECA proponents always intended to recognize only the state's right to identify who it selected to cast its electoral votes. [332]  The electors' qualifications for office were constitutional requirements, not matters committed to state discretion. As Senator Morgan argued in 1878, "The Constitution expressly declares certain grounds of ineligibility which operate ex proprio vigore so as to annul any appointment of such persons." [333]  Eventually, in 1886, the Senate committee changed section 2 to read that a "final determination" was  **\*596**  "conclusive" only as to the "ascertainment" of the electors. [334]  Substituting "ascertainment" for "lawful title to office" stated more clearly the understanding that a section 2 determination established the electors' identity under state law, not their eligibility under the federal Constitution.

Indeed, in the view of the Congresses that debated and passed the ECA, constitutional ineligibilities were more encompassing than the personal disqualifications listed in Article II, section 1 of the Constitution. It included, for example, the judgment that the votes came from a territory that was a state of the American union entitled to electoral votes. [335]  It included, in the

APPENDIX - 477

view of Representative Andrew Caldwell, Chairman of the House committee managing the bill's final passage, the judgment that the state had a republican form of government or that the state's electoral vote total should not be reduced, under the Fourteenth Amendment, "in proportion as that State shall have denied the right to vote to its citizens of color." [336] Constitutional prerequisites were the foundation of the elector's (or the state's) right to vote. Congress's grant of conclusive effect to section 2 determinations was not meant to bar Congress from rejecting votes that lacked the basic predicate for the votes' constitutional status as electoral votes. Constitutional infirmities may be said to be the second implied limitation to Congress's section 2 commitment. [337]

The third implied exception to Congress's section 2 commitment involves the nature of the section 2 authority. Senator Edmunds's original bill, and the bill as resubmitted in succeeding Congresses, required the states to designate judicial tribunals for the "trial and determination" of elector appointment controversies if they wanted the final determination to bind Congress. [338] During the 1886 floor debate, however, Senator William Evarts objected to requiring judicial proceedings. Presidential elections, he said, were "from the beginning to the end, . . . a political transaction to be governed by" the political branches. [339] The Framers, he **597** believed, preferred certainty and efficiency in presidential elections and wanted the process to be "as little impeded and as little interrupted as possible." [340] Because Evarts's objection built on concerns that other senators had about any judicial involvement in electoral processes, [341] or about dictating anything to the states on elector appointment matters, [342] the ECA's managers thought it best to recommit the bill. [343] The bill emerged from committee with language to meet Senator Evarts's concern. Now, the bill gave conclusive effect to a state's final determination made "by judicial or other methods or procedures." [344]

With that change, the bill allowed the states to designate any "State functionar[y]" as its section 2 "authority." [345] At the states' option, contests over elector elections could be conclusively settled by judicial, executive, or legislative officers. The final authority might be the legislature, the governor, or the very returning board that canvassed the election in the first place. Yet, as an analysis of the ultimate wording of section 2 shows, it is likely that the ECA's leadership was reconciled to the change because, even as amended, the ECA still required that, whatever state functionary was designated, its final determination had to involve at least a quasi-judicial process. [346]

The bill that emerged after recommittal in the Senate required that, in order to bind Congress, the state's "final determination" authority had to address "any controversy or contest" concerning the electors' election. [347] Addressing "any controversy or contest" implies more than merely declaring that the original canvass is final. It implies more than merely recounting the accepted ballots. These ministerial tasks frequently precede an election controversy or conflict. What responding to any controversy or conflict requires is a re-evaluation of the facts of the election in light of the applicable law. [348] Even if not carried out by the judiciary with the full panoply of courtroom due process, this re-evaluation is inherently a judicial or quasi-judicial proceeding. As Senator Hoar explained earlier in the 1886 ECA debates (though not in response to Evarts's criticism):

> [W]hoever is taken, it is a person who is taken for the purpose of exercising a judicial function. I do not mean by "a judicial **598** function" one of the functions usually assigned to courts, but I mean judicial in regard to the nature and character of the act to be performed; that is, you are to have a tribunal which is to determine the existing fact and the existing law, in contradistinction from determining the law or creating the fact according to his own desire. [349]

In agreeing to modify section 2 to allow states to bind Congress without having a judicial settlement of elector election controversies or contests, Hoar was not abandoning the ECA's bedrock principle that whoever or whatever the state designated as it final authority, that authority had to respond with at least quasi-judicial review processes that could review and redetermine the factual and legal judgments made by election administrators. [350]

Perhaps the point can be made most clearly if we imagine a state designating as its final authority the very same returning board that canvassed the election in the first place. In the original canvass, that board typically acts ministerially: it receives the returns from the various local boards, checks their formal regularity, and adds them together. In contrast, in responding to any controversy or contest brought about by the election, the returning board must then critically review what it and the local

APPENDIX - 478

election boards and officials have done. It may be called upon to make complex factual determinations and apply ambiguous law to them. It might find itself reviewing the propriety not only of all of its own original actions, but also all the actions and decisions of the local boards and election judges. Unless the state authorizes its final authority to engage in some irreducible minimum of discretionary fact finding and law application, the state has not, in any fair sense of the phrase, "provided . . . for [the] . . . determination of any controversy or contest concerning the appointment of all or any of the electors of such State."[351] All it does is repeat the original ministerial canvass.[352]

**\*599**  As Senator Edmunds indicated just before submitting his original bill to Congress, in the presidential election process, ministerial decisions should be prima facie binding; only judicial determinations may bind "finally."[353]  Congress, however, was ill-prepared to perform the quasi-judicial function, and section 2 of the ECA encourages the states to do it. Edmunds's belief was that "[t]he experience of governments seems to have proved that, on the whole, judicial tribunals are best calculated to hear and decide disputed questions of law and fact, although they may involve inquiries extending into the domain of politics and the decision of the fact of an election."[354]  His preference was for the states to "provide by law for the immediate decision, by [their] own highest court[s], of all contests touching the choice of Electors."[355]  Ten years later, in securing passage of the ECA, Edmunds was willing to compromise on the form, but not the essence of his belief. He would accept any state-designated authority, so long as it was empowered to hear and decide "disputed questions of law and fact"[356] concerning elector election contests.

Given that section 2 final determination tribunals had to employ at least quasi-judicial methods, Congress may be empowered to ensure that the tribunals did not act fraudulently-the fourth implied exception to Congress's section 2 commitment.

What if there were no election in the state, but a corrupt tribunal, as part of the conspiracy, nonetheless gave a section 2 validation to certain individuals as electors? Would Congress be bound by such enormities? Senator Bayard answered in the negative because

> [A] fraudulent judgment is no judgment. Prove fraud, and you have proved that which is a universal solvent and which absolutely destroys the form of fact which it has set up. Therefore there is nothing to prevent the two Houses of Congress from penetrating a judgment obtained by fraud, because that would be no judgment at all, and so far from  **\*600**  invading the right of the State it would be a direct decision in favor of the State.[357]

In this, Bayard echoed Senator Morgan, who had earlier argued that the benefit of section 2 was that "[e]very State can save its vote, if it will do so, against the power of [Congress] lawfully to exclude it for any cause except for the constitutional disability of the electors or for fraud in the action of the State tribunal that determines the validity of its appointment."[358]  No one in the Senate ever countered Bayard's and Morgan's remarks.[359]  The power of fraud to undo otherwise-binding transactions was a fundamental assumption of Anglo-American law that permeated late nineteenth-century political/legal culture.[360]

The House of Representatives, however, had a different understanding of section 2. In 1884, when House opponents of the Senate bill attacked it for requiring Congress to accept section 2 determinations even when rendered by a "bribe[]"[361] or a "venal"[362] tribunal, none of the bill's proponents responded that section 2 countenanced a fraud exception.[363]

In 1886, as the ECA proceeded to final passage, the House more clearly indicated its understanding that there was no fraud exception to section 2's conclusivity principle. The 1886 House debate opened with Representative Caldwell, Chairman of the House committee in charge of the legislation, presenting the Senate bill with amendments proposed by the House committee.[364]  Among the committee's amendments was one drafted to prevent Congress from rejecting any "electoral vote or votes from any State from which but one . . . return has been received"-even when there had  **\*601**  been no section 2 final determination.[365]  Speaking in support of the amendment, Representative William Cooper, a member of the House committee,[366] praised it for going

> [T]o the utmost verge of safety in providing against any possible invasion of the right of a State, for [it provides] that, where there is but one certificate from a State, no matter whether every single member of each House

considering it may believe, or may know, that not one of the men named in that certificate has been duly elected, yet they shall have no right to throw it out, but it must be counted. [367]

Cooper's remarks provoked a telling response from Representative George Adams, who favored the Senate bill:

> The conclusive presumption of validity established by the provision of the Senate bill . . . is established in a case where the question at issue has been submitted to and decided by the State tribunal provided for in section 2 of the bill. The decision of this State tribunal may be regarded as a judicial determination of the question by a court of last resort. To give conclusive effect to such a judicial determination is . . . a very different thing from the provision of the proposed amendment, since the latter gives the same conclusive presumption in favor of a mere alleged return which has never been judicially passed upon and may be known to be a forgery by every member of each House.

> . . . [T]he provision of the Senate bill . . . is not . . . so dangerous as the provision of the House amendment that a single return, or a paper purporting to be a return, shall be conclusively presumed to be the legal and valid vote of a State, even though all the members of both Houses (to use the  *602  illustration of my friend [Rep. Cooper]) are firmly convinced that the return is a rank forgery. [368]

Adams's remarks clearly reveal an expectation that there was no fraud exception to both the House committee's proposal and section 2, as it then stood, and as it eventually passed into law. [369]

From this legislative history it is possible to conclude that the Congress that adopted the ECA did not intend a fraud exception to section 2's conclusivity principle. Senator Morgan's and Senator Bayard's remarks were made in 1878. [370] Morgan and Bayard were both Democrats, and their remarks reflected the Democratic position on how to deal with the Republican returning boards that had, they thought, improperly certified Republican electors in the 1876 election. [371] It is possible that as the 1876 conflict receded, all parties began to appreciate the importance of making no exception to the principle of keeping elector election disputes out of Congress, especially when there had been a determination of the matter by quasi-judicial procedures. There always had been an undercurrent of opinion in Congress that the power of elector appointment was so completely vested in the states that Congress had to accept whatever returns came from the states' duly designated authorities. [372] That opinion had never dominated. But, as Representative Adams's remarks suggest, perhaps it reflected majority sentiment when combined with section 2's  *603  novel suggestion of interposing a state quasi-judicial tribunal to review the state's election.

It is also possible to conclude that the Senate and House simply disagreed on whether there was a fraud exception to Congress's section 2 commitment. Throughout the ECA's long gestational period, the House was more inclined towards states' rights than the Senate. [373] It is plausible that the two chambers' differing views on the balance of national interest and states' rights in electoral vote counting created differing views on the implied fraud exception to section 2. If so, the ECA is ambiguous on whether there is an implied fraud exception to section 2's promise that state "final determinations" would be "conclusive." [374]

Finally, it is also possible to conclude that section 2 contemplates a fraud exception, but is ambiguous as to how extensive the fraud must be before Congress may appropriately decide to deny that a proper section 2 final determination was rendered. Section 2 was designed to prevent Congress from having to revisit and review troubled elections, but there may well be implied limits to that commitment. There was, after all, a strong sentiment in Congress that ultimately the ECA could not constitutionally bind a Senate and House that concurred in refusing to count particular electoral votes. [375] Many proponents of the ECA voted for it intending to give the ECA's approach to electoral vote counting as much binding moral force as possible, but acknowledging that it could be set aside when appropriate. [376]

Recall also that the discussion of nineteenth-century administrative law showed that some nineteenth-century constitutionalists distinguished between degrees of fraud. [377] Justice Bradley's rulings while on the Election Commission illustrate that there

APPENDIX - 480

were some constitutionalists who held that Congress could not overturn state discretionary judgments for mere fraud, yet felt Congress could do so when confronted with "manifest fraud." [378] Indeed, Justice Bradley felt that some fraud might be so extensive as to undermine the existence of the constitutional facts that were necessary to support the state tribunals' assertion of jurisdiction. [379] That would be a  **604**  species of constitutional infirmity, and Congress clearly intended an implied exception to section 2 for constitutional infirmity. [380] Under this view, it would be appropriate to conclude that fraud did vitiate section 2 final determinations, though perhaps not in all instances of fraud.

In the end, in light of section 2's text and the legislative history, what is certain is that Congress meant section 2's conclusivity principle to encompass and protect final determinations that were merely erroneous. [381] In the Anglo-American tradition, errors in judgment did not vitiate discretionary decisions made by tribunals acting within their jurisdiction. [382] If there is an implied fraud exception to section 2's conclusivity principle, it was not intended to impugn this fundamental understanding.

In addition to section 2's implied exceptions, section 2's conclusivity principle is limited by an implicit understanding that underlies every application of section 2 when Congress meets to count electoral votes. When Congress receives an electoral vote, or set of electoral votes, claiming to have section 2 status, Congress decides whether the claim is meritorious. [383] Since "Congress" means the Senate and the House of Representatives acting concurrently, deciding that an electoral vote merits section 2 status requires both houses of Congress to agree that it does. Each house might manifest its agreement through acquiescence. However, should an objection be made to counting an electoral vote that claims section 2 status, [384] the electoral vote would not be received as conclusive  **605**  if either the Senate or the House of Representatives sustains the objection. There is, in effect, a one-house veto over an electoral vote achieving section 2 status. [385]

The "Congress decides/one house veto" understanding follows from the constitutional postulate of equality between the House of Representatives and the Senate and its corollary that Congress acts only when its two chambers concur. [386] For the Congresses that debated and passed the ECA, this postulate meant that counting an electoral vote required the assent of both houses of Congress. [387] Congress could provide otherwise through statute or joint or concurrent rule. [388] But unless Congress did, [389] no electoral vote could be counted if one house objected to its reception. [390]

The ECA's theory, then, is that under the Constitution, without supplemental legislation, no electoral vote may be counted unless both  **606**  houses of Congress agree to count it. [391] In the ECA, Congress granted away much of that power, leaving, in Senator Hoar's view, "only [a] remnant." [392] As we shall see, the Senate and House of Representatives agreed in section 4 that when a state submitted one set of electoral votes, those votes would be counted unless both chambers concurred in rejecting it. [393] In section 2, the Senate and House of Representatives agreed that if the states designated tribunals to determine elector election contests, both chambers would be conclusively bound by those tribunals' decision. [394] But in the ECA, Congress nowhere limited its power to determine whether a return truly deserved section 2 status.

In other words, under the terms of the ECA, when a return comes before Congress, even if it is the only return from that state, the most it can do is claim to have section 2 authentication. It does not have section 2 authentication until Congress agrees that it does. Only if both houses agree that a return merits section 2 status will the return be entitled to it.

Of course, if there is judicial review of Congress's electoral vote counting, a court might reverse Congress for blatantly incorrect rulings on whether a return was validly authenticated by the state's final determination authority. [395] But absent judicial review, the ECA requires the concurrent vote of both houses for a return to obtain (or be recognized as having) section 2 status. [396]

In short, unlike other provisions of the ECA, section 2 does not alter Congress's normal voting rule. That Congress's normal voting rule applies to the determination of whether an electoral vote merits section 2 status is critically important to understanding the ECA's structure and coherence. This principle solves the problem that section 2's grant of "conclusive" effect to a state's "final determination" [397] is unconstitutional as an instance  **607**  of "one Congress binding another." [398] The present Congress, by agreeing to give an electoral vote section 2 status, manifests its view that the state's determination is conclusive. [399] This principle also, as will be discussed, reconciles an otherwise irreconcilable conflict with the voting rules set out in section 4 of the ECA that apply to a state that submits one set of electoral returns. [400] It helps us understand the voting

APPENDIX - 481

rules set out in section 4 that apply to a state that submits multiple sets of returns. [401] Finally, it is the bedrock for understanding the ECA's procedural provisions, particularly the role of the President of the Senate as presiding officer of the electoral vote counting session. [402]

To sum up this long discussion of section 2: section 2 essentially encourages the states to craft post-election contest procedures for their presidential elections by pledging Congress to accept the states' identification of their duly appointed electors. Congress's commitment is subject to express and implied limitations. Those limitations frame the grounds that Congress, consistent with section 2's pledge, may refuse to grant section 2 status to electoral votes that claim it, and may refuse to count electoral votes that have it.

When electors claim section 2 status, Congress is not to ask, at least initially, "Are these the electors who won the election?" Rather, Congress should ask: (1) Have these electors been confirmed by the state's final determination process?; (2) Was the state law creating that process enacted prior to election day?; (3) Did the process use quasi-judicial methods?; (4) Was the determination final at least six days before the day set for elector balloting?; and, perhaps, (5) Was the determination nonfraudulent?

Electors who claim section 2 status have it only when all these questions are answered affirmatively. In answering these questions affirmatively, Congress acts bicamerally. The questions can be answered affirmatively only if both the House and Senate concur. Absent judicial review, electors claiming section 2 status receive it only when both chambers of Congress agree that they merit it.

If either chamber answers negatively to any of the questions, the electors' votes may still be the appropriate votes to count and they may be  **\*608**  counted, but not because of section 2's conclusivity principle. Section 2 is a "safe harbor," not the only ground for accepting and counting electoral ballots. [403]

If both Houses answer affirmatively to all of these questions, Congress may still refuse to count the votes of any electors who (1) represent a territory not entitled to participate in the Electoral College; (2) suffer a personal constitutional disqualification from holding the elector's office; (3) voted in violation of constitutional requirements; or (4) voted corruptly. Thus, section 2's pledge is inherently limited. It was not meant to cover anything beyond the state's determination of the identity of the electors it appointed to cast its electoral votes.

In deciding to accept or reject the votes of electors who merit section 2 status, Congress is governed by section 4 of the ECA. [404] Section 4's provisions, and their relation to section 2, are discussed later. [405] The analysis thus far has dealt only with the decision to accord electoral votes section 2 status and the conditions and limitations of that decision. Section 2 is, as Professor Burgess said, "the groundwork . . . of the whole system of the [electoral] count." [406] Still, it is preliminary to a consideration of the rules set out in section 4 by which electoral votes are actually counted.

## C. Section 3: Authenticating and Publicizing the States' Appointment [407]

Focused as it was on resolving problems concerning the identity of the states' electors, Congress in section 3 of the ECA extended federal requirements for authenticating and publicizing the states' choice of electors. The Constitution originally required the electors to authenticate their own acts: After balloting and making a list of the persons voted for and the number of votes each person received, the Constitution directed the electors to "sign and certify" the list and "transmit" it "sealed to the Seat of the Government, directed to the President of the Senate." [408] In 1792, in the only legislation enacted before 1887 affecting the electoral ballot counting process, Congress set further requirements for authenticating the  **\*609**  electors' status as electors and their vote tallies. [409] Congress's 1792 statute required the electors to make out their certified lists in triplicate and certify on the outside of each of the sealed packets that the packet contained their state's list of electoral votes. [410] The statute also required the electors to appoint a messenger to hand-deliver one packet to the Senate President, send one packet by mail to the Senate President, and deliver the third packet to the local federal district judge. [411]

In addition, the Act of 1792 directed the governor of each state to "cause three lists of the names of the electors of such state to be made and certified and . . . delivered to the electors on or before" the day set for elector balloting. [412] The electors

were to "annex" one of the governor's lists "to each of the lists of their votes." [413]  With this provision, Congress shifted the authentication of who were the state's electors from the electors themselves to the governor of the state.

Some congressmen were troubled by the provision requiring the governor to execute certificates naming his state's electors. It was "degrading" to require him to participate, and there was nothing that could be done should the governor refuse to comply. [414] However, most congressmen thought the provision was an appropriate method for regulating how the states "exercis[ed] this privilege" of casting electoral ballots. [415]

In all probability, Congress viewed the requirement as an exercise of its authority under Article IV of the Constitution to prescribe the manner in which state "Acts, Records and Proceedings shall be proved." [416]  That is how later Congresses saw it. [417]  The governor is the officer who speaks for the state to the rest of the Union. He seems to be the appropriate person to inform Congress as to the identity of his states' presidential electors.

The ECA, as originally proposed by Edmunds and as reintroduced in subsequent Congresses, carried forward the 1792 certification requirements, making clear that the governor was to make out the  **\*610**  certificate after the electors' final determination. [418]  During the 1886 debates, Senator Evarts proposed additional safeguards: "After the final act of the State in the process of elections," the governor should execute a certificate "under the seal of State" setting forth "who had been appointed and what votes had been given or cast for every person voted for for that place." [419]  This certificate, "as soon as practicable after the final act of the State in the electoral appointment," should be sent to the United States Secretary of State to "publish[] to the whole world what was declared by each State as the result, and not merely a certificate of a conclusion, but a statement of the final act of election itself-that is, the canvass and declaration of the polls." [420]  Senator Evarts also suggested that three copies of this enlarged gubernatorial certificate should be given to the electors to be annexed to their list of votes. [421]

What Evarts wanted, "neither more nor less than [what] is required for the security of elections in our own States," was "an open and public declaration under the authority of high official duty of the result." [422]  He thought that this more complete official statement of the electors' election might justify section 2's conclusive effect. The certificate required by the 1792 law was only "a certificate of a conclusion." [423]  Evarts saw his certificate as "a statement of the final act of election itself" that gave a certainty of knowledge on the subject. [424]  With this certainty of knowledge published to the world and communicated openly to Congress well before  **\*611**  it counted the electoral vote, Evarts thought giving conclusive effect to a section 2 final determination might be justified.

> Perhaps, then, it would be considered entirely right that no vote that was communicated under these sanctions and with this ascertainment could properly be challenged by either House or brought into question unless both Houses should concur in some grave, some post hoc occurrence that should disparage the absolute control given to this ascertainment. [425]

In truth, Evarts's proposal accomplished nothing, given that by 1887 the result of every state's election was publically known as it was reached. [426]  Accordingly, Senator Hoar at first resisted it. [427]  His mind began to change, though, when Senator Edmunds spoke on its behalf. In Senator Edmunds's view:

> [T]he two Houses of Congress would be informed as to who it appeared from this certificate of the governor had been elected electors . . . and who it appeared if a tribunal in that State-which is the great security, after all-had decided, if there was any doubt or dispute, was the true electoral college of that State. That would enable the two Houses of Congress to be advised in advance of the state of the official circumstances that had taken place in that State. [428]

With Senator Edmunds's support, Senator Evarts's proposed expansion of the governor's certificate was drafted into section 3 by the Senate committee during the bill's recommittal. [429]

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

In adding a more elaborate gubernatorial certification to the states' electoral vote packets, Congress did not mean to make any substantive change in the law of the electoral count. [430] Over the course of the **\*612** nineteenth century, a few congressmen had argued that the governor's certification should be definitive as to the identity of the state's electors. [431] However, that never was the sentiment of the vast majority of Congress. In 1801, 1809, and 1873, Congress accepted electoral votes transmitted by electors without any gubernatorial certification. [432] Conversely, in 1873 and 1877, Congress rejected votes backed by the governor's formal certificate. [433] For most congressmen, the presence or absence of the governor's certificate was a factor to be considered, but because the governor's certification of an elector's appointment to office was a ministerial act, it was not conclusive. [434]

In making his proposal for an expanded gubernatorial certificate, Senator Evarts clearly focused on the fact that, under the ECA, the governor's certificate might be authenticating the state's section 2 final determination. [435] He wanted to give that fact more publicity, and he wanted Congress to have earlier notice of it. [436] But he was not altering the legal effect of the governor's certificate per se. We will see that ECA section 4 does, under certain circumstances, give the governor's certificate legal import. [437] The point here is that historically the governor's certification had little or no effect on an electoral vote's validity and section 3 did not alter that tradition.

### \*613  D. Section 4: The Substantive Electoral Count Provisions [438]

In adopting the 22d Joint Rule in 1865, Congress made its position on the Constitution's default rules for electoral vote counting crystal clear: When the Senate and House concurred in counting an electoral vote, it would be counted; when they concurred in not counting an electoral vote, it would not be counted; when they disagreed in counting an electoral vote, it would not be counted. [439] There was, in effect, a one-house veto over counting an electoral vote. Also, in 1865, in adopting the joint resolution barring Congress from counting electoral votes submitted from states that had joined the Confederacy, Congress made clear its view that it had the power to alter the default vote counting rules by concurrent rule, joint rule, or statute. [440]

In section 2 of the ECA, Congress used its power to commit itself to accepting the state's determination of the identity of its electors whenever the Senate and House agreed that the electors' appointment had been adjudicated by a proper section 2 final determination process. [441] Given the conditions that hedged whether electors merited section 2 status, Congress knew section 2 did not guarantee that every state would always submit electoral votes that merited section 2 treatment. [442] In addition, given section 2's limitations, Senate and House agreement that certain electors deserved section 2 status did not mandate counting their votes. [443]

Congress saw section 2 as a great aid, but not as a complete solution, to the problems of the electoral count. In section 4, Congress addressed the rules which, while meshing with section 2, would actually determine whether or not to count an electoral vote. [444]

**\*614**  Section 4 is a rather long and turgid provision that covers some of the procedures of Congress's vote counting session and the substantive counting rules. [445] The substantive rules themselves require 394 words and are communicated, in part, with a sentence that is 275 words in length. This nightmare for interpretation breaks the situations confronting Congress into four generic situations and provides vote counting rules for each one. The generic situations are:

(1) when Congress receives only one set of electoral votes from a state;

(2) when Congress receives two or more sets of electoral votes from a state and one of them claims to have been authenticated by a section 2 proceeding;

APPENDIX - 484

(3) when Congress receives two or more sets of electoral votes from a state and two or more of them claim to have been authenticated by a section 2 proceeding; and

(4) when Congress receives two or more sets of electoral votes from a state and none of them have been authenticated by a section 2 proceeding.

The remainder of this Part explores section 4's treatment of the four generic situations. After discussing section 4's approach to single submissions from a state, this Part groups the problem of multiple submissions and analyzes them together.

### 1. When Congress Receives Only One Set of Electoral Votes from a State

From 1865 to 1876, Congress's sentiment for states' rights was at an historic low ebb. In those years, Congress governed electoral vote counts through the 22d Joint Rule which allowed Congress to reject any electoral vote, even if a state had submitted only one return, when a single house of Congress voted to reject it. [446] By the mid-1870s, there was general dissatisfaction with this approach, which some congressional leaders began to describe as unconstitutional. [447] In 1875, the Senate began passing bills that cabined Congress's power to reject electoral votes when a state submitted only one return. Under the Senate bills, Congress retained unfettered discretion to reject electoral votes from a state that submitted  **\*615**  one set of returns but only "by the affirmative vote of the two houses." [448] And beginning in 1878, the Senate bills further qualified Congress's discretion by requiring Congress to accept electors authenticated by a section 2 proceeding as the states' true electors. [449]

From 1875 until 1886, all of the Senate bills died in the House. [450] In 1886, however, the House responded to the Senate bill with a counter-proposal that was more deferential to states' rights. The House agreed with the Senate that section 2 determinations conclusively bound Congress as to the electors' identity. [451] But the House also wanted Congress, in the absence of a section 2 determination, to be conclusively bound as to the electors' identity when a state presented only one set of returns and the electors' appointment to office was attested to by the governor's certificate called for by section 3. [452] The House provision read: "[N]o electoral vote or votes from any State which shall have been regularly given by electors whose appointment has been certified to according to section 3 of this act, from which but one return has been received, shall be rejected." [453] At conference, the Senate and House of Representatives compromised. The conference accepted the House's amendment, but conditioned it on the requirement that electors have been "lawfully certified" by the governor. [454]

As compared to the provision that passed the House, the provision that emerged from conference, and passed into law, was lengthier and more repetitious than might be expected for such a slight change. Representative Caldwell, the Chairman of the House committee, attributed the extra length to the desire "to express in words what is of clear implication . . . thus leaving nothing to doubtful construction" about the extent of Congress's commitment to accept electoral returns when a state presented only one set of electors. [455] As enacted, the relevant part of section 4 provided:

> [N]o electoral vote or votes from any State which shall have been regularly given by electors whose appointment has been lawfully certified to according to section three of this act from which but one return has been received shall be rejected, but  **\*616**  the two Houses concurrently may reject the vote or votes when they agree that such vote or votes have not been so regularly given by electors whose appointment has been so certified. [456]

In the end, then, Congress reserved for itself the power to reject, by concurrent vote, the electoral vote of a state that presented one set of electors. However, Congress limited its power to do so to when: (1) the electors' votes were not "regularly given;" or (2) the governor had not "lawfully certified" the electors' appointment.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    26

### a. When the Single Set of Electoral Votes Claims Authentication by a Section 2 Process

Since this part of section 4 literally applies to all instances where a state submits one set of electoral votes, it seems to apply regardless of whether the state's return has been authenticated by a section 2 final determination proceeding. In covering the submission of section 2 authenticated returns, this part of section 4 seems to contradict section 2's pledge to give "conclusive" effect to a state's "ascertainment" of its electors. [457] By allowing a concurrent vote of the houses of Congress to reject a state's single set of electoral votes, section 4 seems to conflict with section 2's pledge.

The conflict, however, is more apparent than real. Section 2's pledge does not extend to the electors' post-ascertainment conduct, nor to any constitutional infirmities in their status as electors or in the votes they cast. [458] It applies only to the identity of the electors the state appointed. As to all those matters not within the scope of section 2's conclusivity principle, section 4 complements, rather than contradicts, section 2 by providing the rule that governs whether some defect properly bars counting the votes of the duly ascertained electors.

Still, section 2 does have some scope. In section 2, Congress committed itself to not reject electoral votes merely because it thought that the electors authenticated by a proper section 2 process had not actually won the state's presidential election. [459] With this in mind, it is possible to see how section 4 both meshes with, and controls, section 2. [460]

 **\*617**  On the one hand, given that electors claiming section 2 status do not, in fact, have section 2 status unless both the Senate and the House of Representatives concur, both houses of Congress voting against counting an electoral vote expresses the view that the elector casting that vote either:

(1) merits section 2 status but for some valid reason beyond section 2's scope does not merit having his vote counted; [461]  or

(2) does not merit section 2 status, and for some valid reason, to be discussed in our analysis of section 4, does not merit having his vote counted. In either situation, section 2's pledge and section 4's rule for counting electoral votes from states that submit only one set of returns work together and do not conflict.

On the other hand, it is always possible that the elector whose vote was rejected under section 4 by Congress's concurrent vote did in fact qualify for section 2 status and there was no valid reason for rejecting that vote. It is possible that both the Senate and the House of Representatives adopted option (1) or (2) pretextually, or merely erroneously. [462] In that case, as Senator Edmunds told the Senate when submitting his original bill in 1878, Congress's action would not be "rightful." [463] Edmunds thought that if Congress shirked its section 2 commitment, the courts might intervene. [464] Most congressmen disagreed, thinking that in electoral vote counting, Congress was the nation's ultimate tribunal. [465] In their view, when the  **\*618**  presidency was closely contested, judges, even Supreme Court justices, might succumb to party spirit. [466] Electoral vote counting was a political, not judicial, affair. Yet, thinking of the judiciary was useful because, as Senator Morgan reminded his colleagues when the ECA debate drew to a close:

> Senator [Edmunds] from Vermont remarked recently in debate that there is a point beyond which you can not bind the human conscience. . . . A decision of the Supreme Court of the United States might be made as a result of bribery, yet there is no power in the country that can set it aside; that is the supreme tribunal. . . . So [Congress] may vote down the voice of the State's electors, . . . and after the act has been done the power to revoke it, even the power to question it, has passed beyond human control. [467]

The Congresses that debated and passed the ECA believed that: in all governmental arrangements, there was no escaping the problem of human fallibility; in electoral vote counting, the Constitution made Congress the nation's tribunal of last resort; and, absent judicial review, section 4's voting rule controlled section 2's conclusivity principle. [468]

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.        27

### b. When the Single Set of Electoral Votes Does Not Claim Authentication by a Section 2 Process

In debating section 4's voting rule for situations where a state submitted one set of electoral votes, Congress generally assumed that it would faithfully self-enforce section 2's pledge. [469] Consequently, most of the discussion of this part of section 4 focused on counting returns from a state **\*619** that submitted one set of electoral votes that did not claim authentication by a section 2 procedure. [470] In that situation, without any potential conflict with section 2's conclusivity principle, the Senate and House of Representatives agreed to count a state's single set of electoral votes unless both houses concurred in rejecting them. [471] In addition, the Houses of Congress agreed to limit the rightful grounds for rejecting a state's single set of electoral votes to when the votes were not "regularly given by electors whose appointment has been lawfully certified to according to section three." [472]

In preserving its right to reject non-section 2 authenticated electoral returns that were not regularly given or lawfully certified, Congress meant to encompass all the express and implied exceptions to counting electoral votes that were discussed as part of section 2. [473] A vote not "regularly given" included all improprieties in the electors' conduct in office. [474] A vote not "lawfully certified" included Congress's power to reject electoral votes due to preexisting constitutional infirmities. [475] All of the prior analyses of constitutional infirmities that justify rejecting section 2 authenticated returns apply here with even greater force since we are discussing returns that have not been subject to quasi-judicial scrutiny. [476] In addition, in 1886, when Representative Caldwell explained section 4 to the House of Representatives, his illustrations of a return that was not lawful were instances of constitutional infirmity. [477] It was, he said, **\*620** "certainly absurd to try to deny to Congress the power to remedy an unlawful return, although it might be the only return." [478]

In other words, in limiting its discretion to reject electoral returns under section 4, Congress sensibly intended non-section 2 authenticated returns to be at least as vulnerable to congressional rejection as a return that had section 2's additional stamp of authenticity. In fact, Congress intended non-section 2 authenticated returns to be more vulnerable to congressional rejection. [479] Finding a vote to be "lawfully certified" encompasses additional grounds for rightful rejection: that the governor issued his section 3 certificate to electors who were not entitled to it under state law; or that state election officials had acted fraudulently. [480]

Congress's power, when both Houses concurred, to reject votes from electors whose gubernatorial certification was not authorized by state law is well supported by section 4's legislative history and the ECA's assumptions. Recall that in 1873 and 1877, Congress had rejected votes given by electors whose appointment was certified by their state governor. [481] Congress in one case, and the Electoral Commission on behalf of Congress in the other, had done so because they had determined that the governors had issued their certificates to electors who were not entitled to them under state law. [482] In 1886, Senator Sherman reminded Congress why these decisions were proper. A governor's certificate, he said, "is only prima facie evidence of the facts contained in it; it is not at all conclusive." [483]

The propriety of Congress's action in 1873 and 1877, and the support for Sherman's remark, lie in the nineteenth-century legal culture's assumptions about administrative law and election law. In particular, Congress's action and Sherman's remarks rely on the view that a state governor acts ministerially, not discretionarily, when he certifies the outcome of an election. [484] A governor's "ministerial" certificate gives its recipient a "prima facie" right to office and makes him an officer de **\*621** facto. [485] The governor's certificate was evidence of office that, by the norms of administrative law and election law, could be reviewed, shown to be erroneous, and overturned. [486] In short, the governor's certificate issued under section 3 of the ECA was like any other ministerially issued credential: Congress could set aside the governor's action for mere error. [487]

In reserving power under section 4 to reject a state's single set of electors when those electors' only authentication is the governor's section 3 certificate, Congress clearly retained power to review the bonafides of the governor's ministerial decision to favor one set of electors over another. Unfortunately, section 4's legislative history is ambiguous on how far behind the governor's certificate Congress could go. Could Congress "go to the bottom of everything" [488] and reverse the entire election based on mere error in any part of its administration?

APPENDIX - 487

To appreciate the issue, recall the simplified sketch of election administration set out earlier in the Article. [489] In that sketch, precinct-level administrative officials first made discretionary decisions about voter qualification, the legality of ballots, and for whom they were cast, and then made ministerial decisions in tallying the votes. Drawing from the precinct officials' tally sheets, the county and state returning boards made ministerial decisions in aggregating the precinct and county returns and forwarding them to the governor with an indication of the victorious candidate.

In debating the ECA, Congress focused on the governor's actions but not on the other boards in the election administration hierarchy. [490] Consequently, although the ECA debates define Congress's oversight of the governor's role in presidential elections, they provide scant insight regarding Congress's oversight of the state, county, and precinct election boards and officials.

If we attempt historically informed speculation, two positions seem the most plausible. [491] On the one hand, there is the position that Justice *622 Bradley elaborated in deciding the Electoral Commission cases in 1877. [492] This position is grounded in the constitutional principle that the Constitution vests the power of elector appointment entirely in the states. [493] According to Justice Bradley, because the state boards were "part of the machinery for ascertaining the result of the election," [494] they were part of the state's plenary appointment power and immune from congressional intrusion. [495] Although Justice Bradley countenanced Congress's "go[ing] behind the governor's certificate," he thought Congress "can only do so for the purpose of ascertaining whether he has truly certified the results to which the board arrived. [Congress] cannot sit as a court of appeals on the action of that board." [496]

On the other hand, there is the position grounded in the principles of nineteenth-century administrative law and election law that pervaded late nineteenth-century legal-political culture. [497] Under those principles, which allowed erroneous ministerial decisions, but not erroneous discretionary decisions, to be overturned, Congress, in deciding on the lawfulness of the governor's certificate, could review administrative acts back to the last decision that required discretionary judgment. [498] If so, Congress could review the ministerial decisions of all the state returning boards and overturn them for erroneous applications of state law. But Congress could not similarly review and overturn the discretionary decisions of the local precinct administrators, nor could it reject presidential electors based on other erroneous discretionary election decisions, like ballot design or voter roll purging. [499]

Of course, to stay true to nineteenth-century norms, we have to add a fraud exception to both Justice Bradley's and the administrative-election law approaches. [500] At some point, the conduct of a state's election may be sufficiently heinous to be disqualified on the grounds of fraud. This raises, as it did in our discussion of section 2, the ambiguous scope of the fraud *623 exception. Did it encompass all acts of fraud, or only "manifest fraud?" [501] The ECA's legislative history provides no clear answer.

Nevertheless, in one important regard section 4's fraud exception is more settled than section 2's. Here, because we are not dealing with a congressional pledge that a state's determination is conclusive, there is no legislative history questioning whether the fraud exception should exist. Indeed, Representative Adams's protest against the House committee's proposal to extend section 2's conclusivity principle to all situations in which a state submitted a single set of electoral votes implies that, should the House recede from that proposal (as it eventually did), all non-section 2 authenticated electoral votes were subject to a fraud exception. [502] The ambiguous issue for section 4's treatment of non-section 2 authenticated returns is not the existence of the fraud exception, but solely its scope.

Still, even with a fraud exception added in the mix, Congress's power to determine whether the governor lawfully certified the state's single set of electors does not go very far into probing the validity of most elector elections. [503] Either Justice Bradley's approach, which limits Congress to scrutinizing only the governor's action, or the administrative-election law approach, which allows congressional review to penetrate further into the chain of ministerial decisions, may be adopted and stay true to the purposes of section 4's treatment of electoral votes submitted by a state that returned one slate of electors authenticated only by a governor's section 3 certificate and not by a section 2 final determination. Congress itself struggled over whether the word "lawful" should appear in this part of section 4, fearing that including it "'may afford a pretext for usurpation by Congress of the power to disfranchise a State.'" [504] Although Congress eventually decided to include the word, by doing so it did not intend to give Congress "arbitrary power" to accept or reject electoral votes "where but one return was received from a State." [505]

APPENDIX - 488

In sum, when a state submits one set of electoral votes, section 4 specifies that Congress may reject any or all of them only by a concurrent vote of its two chambers. In addition, while section 2 provides the proper grounds for rejecting electoral votes that Congress thinks validly claim section 2 authentication, section 4 provides the proper grounds for  **\*624**  rejecting electoral votes that do not claim, or incorrectly claim, section 2 status. [506]

When a state submits a single set of electoral votes that are not entitled to section 2 status, the proper grounds for rejecting any or all of them include all the proper grounds for rejecting electoral votes that merit section 2 status. [507]  In addition, Congress can go behind the electors' section 3 certification and, by concurrent vote, reject any or all of their votes based on improprieties or mistakes in the governor's administrative decision to issue his certificate. Arguably, Congress may also reject the electors' votes because of errors by other election officials in making the ministerial decisions on which the governor relied. Regardless of whether Congress may review the ministerial decisions of election officials below the gubernatorial level, Congress may review all election decisions, whether ministerial or discretionary, for fraud. Whether the fraud exception applies to all acts that amount to fraud, or only those that are so notorious to qualify as manifest fraud is not clear. In the end, judging whether the governor lawfully certified his state's electors should not "afford a pretext for usurpation by Congress of the very power which the [ECA] intends to repudiate;" [508]  that is, the power to reopen all aspects of the elector's election.

In short, when a state submits one set of electoral returns, this part of section 4, in conjunction with section 2, provides the rules for counting electoral votes and frames and guides Congress's discussion of whether the votes ought to be counted. [509]

### **\*625  2. When Congress Receives Multiple Sets of Electoral Votes from a State**

The ECA provisions providing congressional rules for counting electoral votes from states which submit a single packet of returns reflect Congress's decision to accord those single packets a presumption of regularity. [510]  That is why, when Congress deals with a state that has submitted a single return, the ECA requires the House and Senate to concur before any vote from a single-return state is rejected. [511]

The ECA provisions providing congressional rules for counting electoral votes from states which submit multiple packets of returns reflect a different presumption. Underlying the ECA is the view that when multiple returns are submitted from a state, no return can enjoy a presumption of regularity. [512]  In the abstract, when there are multiple returns from a state, any of them may be the state's "true return," [513]  reflecting the state's "true voice." [514]

 **\*626**  Accordingly, when the Senate first began addressing electoral count reform in the mid-1870s, it passed bills, submitted by Senator Morton, that refused to count any electoral vote from a state submitting multiple returns unless the House and Senate concurred as to which packet of electoral votes was the "true and valid return." [515]

When Senator Edmunds assumed leadership of the electoral count reform movement, he modified Senator Morton's approach to reflect his interest in encouraging the states to resolve presidential election disputes through their own contest procedures. [516]  Senator Edmunds's 1878 bill, and all subsequent drafts through 1884, addressed the problem of multiple returns from a state through a three-step process that turned on whether any of the returns had been authenticated through the state's section 2 "final determination" process. [517]  First, the bills provided that if there were multiple returns, Congress should count the votes cast "by the electors who are shown by the determination mentioned in section 2 of this act to have been appointed, if the determination in said section provided for shall have been made." [518]  Second, the bills anticipated that multiple tribunals might claim to be the state's final determination authority and have authenticated different sets of electors. In that instance, the bills directed Congress to count the votes cast by the electors credentialed by the tribunal that the two houses concurred was "the tribunal of such State so authorized by its laws." [519]  Third, if no set of electors claimed to have been credentialed by  **\*627**  the state's final determination process, or if the houses did not concur as to the identity of the final determination tribunal, the bills instructed Congress to count the votes cast by the electors "which the two Houses, acting separately, shall concurrently decide to be the lawful votes of the legally appointed electors of such State." [520]

APPENDIX - 489

In each instance, the bills conditioned Congress's obligation to count the electors' votes on their having been regularly given, which allowed Congress to reject electoral votes when the electors' conduct in office violated constitutional or statutory requirements. [521] Though it was never discussed, it can be inferred that Congress also retained the power to reject the vote of any properly elected elector that both houses agreed was not eligible to hold the elector's office, or, perhaps, if the section 2 authentication was fraudulent. [522]

Thus Senator Edmunds's approach to addressing the problems of multiple returns from a single state directed Congress away from an open-ended search for the proper return, and towards the simpler issues of identifying the state's final determination authority and whether that institution had reached its decision according to the terms and conditions of section 2. [523] Only when the state had no identifiable authority, or when that authority did not comply with section 2's limitations, was Congress to face the messy problem of determining for itself which set, if any, of dueling electors had been duly elected. [524]

After years of debate, Congress eventually adopted Senator Edmunds's approach to the problem of multiple returns, with one exception. In this part of section 4, as elsewhere in the ECA, Congress adopted Senator Edmunds's preference for deferring to the state's section 2 authority when it was identifiable and when it had complied with section 2 requirements. [525] But when (1) none of the multiple sets of electors claimed authentication by a section 2 process, (2) the Senate and House disagreed as to the identity of the state's section 2 authority, or (3) the Senate and House disagreed on whether the authority's decision complied with section **628** 2's conditions, Congress ultimately decided to allow the state's governor to determine the identity of the state's proper set of electors. [526]

In the view of many congressmen, Senator Edmunds's third step for handling the electoral votes from states that submitted multiple returns was problematic. Multiple returns, they noted, could easily be "manufactur[ed]," [527] allowing one house of Congress, for partisan advantage, to pretextually disagree with the other house on the identity of a state's true electors. [528] This disagreement would be fatal to counting any return. These congressmen were concerned that, in the presence of multiple returns, a single chamber of Congress might block the counting of a state's entire vote, altering the result of an election. [529]

With this ploy in mind, some congressmen voiced fears that the House, in particular, had an incentive to reject votes because it might, by rejecting enough votes to reduce all candidates below the constitutionally required majority, throw the election to itself for final resolution. [530] In addition, states' rights oriented congressmen objected to Senator Edmunds's system allowing a sovereign state to be entirely disfranchised by the vote of a single house of Congress. In their view, Senator Edmunds's third step to the problem of multiple returns from a single state allowed Congress too much discretionary involvement in the state's choice of electors. [531]

Accordingly, as the bill approached final passage, Senator Hoar suggested a change in the ECA's ultimate provision for handling multiple returns. From the floor, Senator Hoar proposed that when there was no proper section 2 determination, or when the House and Senate could not agree, the electors to whom the governor had given his section 3 certificate should be accepted as "the truly chosen board" unless "rejected . . . by the **629** concurrent vote of the two Houses." [532] Senator Hoar's proposal provoked substantial opposition in the Senate. Senator Sherman, for example, objected passionately that Senator Hoar was

> [S]eek[ing] to avoid the difficulty . . . which is manifest to every one, the danger of allowing either of the two great political bodies [i.e., either House of Congress] to reject the vote of a State; and he now proposes to leave that question to be finally settled by the governor of the State.

> . . . It seems to me he is jumping out of the frying-pan into the fire. Are we willing to leave to one man, who, being the governor of a State, and therefore necessarily a party in the contest that has occurred in the State, to decide this question in which he probably from political feeling or otherwise is more interested than any other mortal man?

> . . . [T]o leave the question in dispute to be decided by the governor of a State, it seems to me only involves this matter in greater difficulty. In cases which may arise where honesty of opinion and sincerity of conviction may

APPENDIX - 490

exist in both parties, where there is a real dispute as to who have been elected electors for a particular State, it seems to me to select the governor of the State to decide the question is . . . not a remedy at all, but only aggravates the disease. [533]

**\*630** The Senate, apparently agreeing with Senator Sherman, never put Senator Hoar's proposal to a vote, preferring to pass the bill as it originally stood. [534]

Nonetheless, when the Senate bill came to the floor of the House, the committee responsible for the bill suggested amending it to include Senator Hoar's proposal. [535] To maintain that position, the House of Representatives had to beat back a proposal from a substantial minority of the Committee to make the governor's certificate control absolutely, even over the concurrent objection of both houses. [536] After debate, the House of Representatives adopted the Committee majority's proposal. [537] At conference, Senator Hoar accepted it on behalf of the Senate. [538] Although the conferees adopted the House's amendment, they "remodel[led] . . . the language . . . so as to clear up any ambiguity . . . and define accurately the meaning of Congress . . . when there has been no determination of the question in the States by making certain the counting of votes cast by lawful electors appointed by the laws of the State." [539] The Conference Committee's rewritten provision, which passed into law, read:

> [A]nd in such case of more than one return or paper purporting to be a return from a State, if there shall have been no such determination of the question in the State aforesaid, then those votes, and those only, shall be counted which the two Houses shall concurrently decide were cast by lawful electors appointed in accordance with the laws of the State, unless the two Houses, acting separately, shall concurrently decide such votes not to be the lawful votes of the legally appointed electors of such State. But if the two Houses shall disagree in respect of the counting of such votes, then, and in that case, the votes of the electors whose appointment shall **\*631** have been certified by the Executive of the State, under the seal thereof, shall be counted. [540]

As summarized by the Conference Committee, this provision meant that when there are multiple returns and "there has been no determination of the question in the State[] . . . in the case of the two Houses disagreeing, then the electors whose appointment has been certified by the executive of the State shall be counted." [541]

According to this part of section 4, then, when there are multiple returns, one of them will be accepted as the state's true return unless both the Senate and the House of Representatives agree that none of them are valid, or the houses disagree and none of the electors have been certified by the governor, [542] or multiple governors have certified different returns. [543] In addition, once a return is accepted as the state's true return, it takes a concurrent vote of both houses to reject a vote based on the electors' post-appointment behavior. [544]

Under this system, the ECA gives the state governor extraordinary power when there are multiple returns. That position was controversial in **\*632** its time. Senator Sherman condemned it, [545] as did Professor Burgess. [546] Nevertheless, it had defenders who felt that the decision was more appropriately and safely made in the states and by state officials. [547] Maybe, modern Americans are less concerned about disfranchising a state. Yet in 1886, Congress's debates focused on it and passing the ECA turned on it. [548]

In the 2000 election, we witnessed the problem of giving this tie-breaking power to the state's usually partisan governor when Jeb Bush signed and forwarded his section 3 certification to the President of the Senate even as his state's election contest was still proceeding. [549] One wonders what Jeb Bush would have done had his state supreme court been permitted to finish its work outside the safe harbor time period but still before the electors balloted. [550]

In giving this power to the states' governors, the congressmen who adopted the ECA cannot be said to have been insensitive to such concerns. They had before them the warnings of Senator Sherman and others. They also had the historical experience of the

APPENDIX - 491

fraudulent certification granted by Governor Warmoth of Louisiana in 1872, which both houses agreed to reject. [551] Moreover, they had the experience of their most recent presidential election, the election of 1884. That election turned on the outcome of the New York vote, which was very close and subject to contest. [552] Ultimately, the New York election was settled by 1149 votes, [553] and Governor Grover Cleveland certified the Democratic electors, awarding the presidential election to himself. [554] As everyone in Congress **\*633** that passed the ECA knew, sometimes the governor of a state might not only be partisan, but he might also be the candidate. [555]

In sum, the governor's certificate as a fail-safe to prevent state disfranchisement was a very conscious, if controversial, choice. Without it, the ECA would not have been passed. [556] Perhaps nineteenth-century views about whether presidential elections were national or state concerns are different from late twentieth-century views; perhaps concerns about congressional or House aggrandizement were different; perhaps Congress wanted to remove itself as much as possible from ultimate responsibility. Whatever the reason, granting the state governor his tie-breaking authority clearly was the choice Congress made. [557]

The end result of this analysis of the substantive provisions of the ECA is that the ECA specifies the Senate and House's agreement on the proper grounds for refusing to count electoral votes. In addition, the ECA provides that whenever Congress's two houses concur in counting a vote, it will be counted, and whenever they concur in not counting a vote, it will not be counted. When the two chambers disagree on whether or not to count a vote, the ECA provides a set of bright-line rules that determine whether or not the vote should be counted. These bright-line rules are the Senate and House of Representatives' agreement as to how to handle instances where the branches of Congress disagree. They vary the Constitution's default rule of bicameral concurrence for electoral vote counting. At least until one house withdraws from the ECA, they govern the electoral count. [558]

**\*634** Given the strength of states' rights sentiment in the Congresses that debated and passed the ECA, a necessary feature of the ECA's electoral vote counting system is that when the chambers of Congress disagree about whether to count a state's electoral vote, the only time a state is excluded from the Electoral College is when the state's governor does not certify any slate of electors. [559]

### E. Sections 4-7: The Procedural Provisions [560]

Having dispensed substantive guidance to itself in sections 1-4, Congress, in the remainder of section 4 and in sections 5-7, settled the procedures for the electoral count sessions. These provisions were not the subject of any discussion during the fourteen years the ECA was debated. This is unfortunate given the potential for procedural issues to affect not only the substantive outcome of Congress's electoral vote counting, but the public perception of the count's regularity. As the Congresses that debated and adopted the ECA knew, it was procedural concerns, centered on the Senate President's [561] conduct of Congress's vote counting sessions, that in 1857 and 1869 led to "unseemly scene[s]," [562] "great uproar," [563] and days of acrimonious debate. [564] And in those years, the presidential election outcomes were entirely lopsided and not at all in doubt. [565]

The ECA's procedural provisions have two purposes. The first is to facilitate an expeditious meeting so that difficulties in electoral vote counts can be resolved, and a new President elected, before the current President's term ends. [566] The second is to drain away as much power as possible from **\*635** the Senate President, whom the ECA appoints to preside at the joint session when Congress counts the votes. [567]

When the ECA was passed, the President's term ended on March 4. [568] To ensure a timely electoral count, section 4 of the ECA sets Congress's vote counting session for "the second Wednesday in February," [569] approximately two to three weeks before the new President's term begins. [570] Section 4 also called for the electoral returns from the states to be presented in alphabetical order. [571] No debate is allowed in, and no question may be put to, the joint session. [572] If there are any objections to a state's vote, section 4 requires that it "be made in writing" and "be signed by at least one Senator and one Member of the House of Representatives." [573] After all the objections to the vote of a particular state are received, the Senate returns to its own chamber and the two houses independently debate and rule on the objections. [574] Section 6 of the ECA limits debate at the separate meetings. Each congressman may speak only once, for up to five minutes, and the entire debate must end after

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works. 33

two hours. [575] Section 7 of the ECA limits recesses. No recess is allowed unless the houses are meeting separately to decide an objection. [576] At that time, each house may decide to recess, but must be back in session the following day by 10:00 A.M. (Sundays excepted). [577] If the vote counting session lasts five days, no further recesses are permitted. [578]

Most of the ECA provisions governing the timeliness of the meeting were taken from earlier concurrent or joint rules or from the 1877 Electoral Commission law. [579] Commentators have pronounced them satisfactory for allowing Congress to conclude its work in time to inaugurate a President or elect one in the House of Representatives if it becomes necessary. [580]

**\*636**  The provisions governing the President of the Senate's conduct of the meeting are another matter. Some of greatest acrimony in Congress's nineteenth-century vote counting sessions concerned the Senate President's conduct of the meeting. [581] Jack Maskell's observation that "[t]here are questions . . . as to the role and authority of the presiding officer in making any initial determinations, rulings or 'instructions' in the joint session, and . . . how any final determination or ruling is implemented" is a masterpiece of studied understatement. [582]

Given the history of some support for the proposition that the Constitution granted the Senate President total power to count electoral votes, one goal of the ECA was to "settle" that "the power to count the vote" is held by Congress, organized as two separate houses, and "is not in the President of the Senate." [583] Congress could have accomplished this goal by confining the Senate President's participation in the joint session to the constitutional minimum. The Constitution designates the President of the Senate as the person to whom the electors should send the sealed packets containing their electoral votes, and it specifies that he is to "open" them "in the presence of the Senate and House of Representatives." [584] What happens after the Senate President opens the votes is, under the theory of the ECA, a subject of legislative discretion. With the opening of the votes, the Senate President has reached the end of his constitutional role in the presidential election process. [585]

Yet, following tradition, the ECA designated the Senate President as the "presiding officer" of the joint session at which the Senate and House count the electoral vote. [586] The question left open in the ECA is how much  **\*637**  substantive power over electoral vote counting the Senate President acquired because of that statutorily conferred role. [587]

Sketching an answer requires separating the Senate President's role as custodian of the returns from his role as presiding officer of the joint session. As custodian of the returns, the Senate President plays a crucial gatekeeping function. He is instructed by the Constitution to "open all the certificates," [588] which section 4 of the ECA describes as "all the certificates and papers purporting to be certificates of the electoral votes." [589] Prior to the ECA, on three occasions the Senate President received papers relating to the electoral count that he did not present to the joint session. In 1865, the Senate President did not present electoral returns from Louisiana and Tennessee on the grounds that Congress had adopted a joint resolution, which President Lincoln had signed but not yet promulgated, excluding the Confederate states from participating in the Electoral College. [590] In 1873, the Senate President did not present one packet of returns from Arkansas on the ground that they "did not in any respect comply with the requirements of the law on the subject." [591] He explained:

> The informal returns were signed by three out of the six electors, and they stated that they could not obtain the certificate of the governor . . . . They were not sealed or indorsed on the back. The Chair opened them on the distinct understanding that they were informal, because they were directed to him as any other letter might be. [592]

In 1877, the Senate President refused to receive a supposed second packet of electoral returns from Vermont on the grounds that it had been presented to him after the date specified by law for all packets to be received. [593]

**\*638**  On other occasions, the Senate President has presented questionable returns. In 1801, the Senate President presented the only packet of returns from Georgia even though they clearly did not comply with formal federal requirements. [594] In 1877, he presented a clearly "burlesque" [595] certificate from Louisiana because its envelope specified that it was the "Vote of electoral college of the State of Louisiana." [596] And in 1889, at the first electoral count after the ECA's enactment, the Senate President

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

presented a second set of returns from Oregon [597] that, apparently as a practical joke, had been sent in by Samuel MacDowell, claiming to be Oregon's "Governor de jure." [598]

In two of these situations, the presentation of the certificates mattered. In 1801, the return from Georgia, which was presented by Vice President Jefferson, gave Jefferson four electoral votes. Without those votes, Jefferson would not have had sufficient votes to be elected President; the election would have been thrown into the Federalist-dominated House; and Adams would have been re-elected President. [599] In 1877, if the Senate **639** President had presented the second set of returns from Vermont, Vermont's multiple returns would have been sent to the Electoral Commission for initial consideration, a move which could have postponed concluding Congress's vote counting session-and electing the President-to past the inauguration date. Under the law at the time, the House Speaker would have become acting President and a special election would have been held in the Fall. [600]

Thus, the Senate President's role as gatekeeper does matter. His decision to present a return affects whether there are one or multiple returns before Congress, which affects certain decisional rules under the ECA. [601] Whether the Senate President, as presiding officer, can be required by a concurrent vote of both houses to present, or not present, some paper is an open question. I think he can be so required. The Constitution makes the Senate President the custodian of papers. [602] Pre-ECA electoral count precedent supports the proposition that Congress governs what papers are submitted to it for consideration. [603] On the other hand, I think it is also clear that the Senate President's decision to present, or not present, material cannot be reversed if the houses disagree. [604] When the houses disagree, Congress has not spoken.

Aware of the inherent power lodged in gatekeepers, Congress, in section 4 of the ECA, instructed the Senate President to present not only "all the certificates," but also "all . . . papers purporting to be certificates of the electoral votes." [605] Clearly, the authors of the ECA were attempting to make the Senate President's constitutional role of custodian and presenter of electoral certificates a ministerial function. However, even ministerial officials have an irreducible amount of discretionary or interpretive authority. The ECA's goal was to reduce the Senate President's discretionary power as gatekeeper to the absolute minimum, by specifying his obligation to present "all . . . papers purporting to be certificates of the electoral votes." [606] Phrasing the Senate President's **640** obligation this way removes most of his discretion to affect whether Congress receives one or multiple returns from a state. [607]

The ECA had the same goal in mind with regard to the Senate President's role as presiding officer. Presiding officers of parliamentary bodies traditionally have a fair amount of discretionary power. They recognize speakers, rule on points of order, rule motions in or out of order, interpret rules (with the help of a parliamentarian), and keep order. [608] Procedural rules inevitably have gaps and ambiguities requiring interpretation. [609] It is impossible to divine all the scenarios that might occur in close presidential elections and how the Senate President may utilize his power as presiding officer to affect the outcome of Congress's vote counting session. But the ECA's procedural rules seem designed to drain as much power as possible away from the Chair and give it to the two houses.

Under the ECA, the House of Representatives and Senate each appoint two tellers. The Senate President is instructed to proceed through the states in "alphabetical order," and to "hand[] . . . all the . . . papers" to the tellers "as they are opened." [610] Most crucially, it is the tellers who "make a list of the votes as they shall appear from the said certificates." [611]

The ECA also requires the House and Senate to consider one state at a time. [612] Although the ECA is not free from ambiguity on this point, electoral count precedent, both before and after the ECA's passage, is that the Senate President submits all the papers pertaining to the state under consideration to Congress before he "call[s] for objections" to any of that state's returns. [613] All objections to counting a state's electoral vote must be **641** made when that state is under consideration, not after the joint session has moved on to counting another state. [614] Objections must be "made in writing" and "signed by at least one Senator and one [House] Member." [615] When all objections to the papers pertaining to one state have been submitted, the ECA instructs the Senate President to entertain a motion to withdraw so that the houses may separately consider and respond to the objections. [616] The ECA specifies that no debate is allowed in Congress's joint session. [617] The Senate President may only "put" questions to the two houses "on a motion to withdraw." [618] After the House and Senate reach their separate decisions, the joint session reconvenes and the ECA authorizes the Senate President "to announce the decision of the questions submitted." [619]

APPENDIX - 494

As proposed by Senator Edmunds in 1878, at the conclusion of the vote counting session, the tellers were to "deliver[]" their tally to the Senate President who was empowered to "thereupon announce the state of the vote, and the names of the persons, if any, elected, which announcement shall be deemed a sufficient declaration of the persons elected President and Vice President." [620] As the bill approached final passage in 1886, the House deleted the words that allowed the Senate President to declare "the **\*642** names of the person, if any, elected." [621] At conference, the Senate accepted the change, and the Conference Report explained that:

> [T]he effect of [the amendment] is to prevent the President of the Senate from doing more than announcing the state of the vote as ascertained and delivered to him by the tellers; and such announcement shall be deemed a sufficient declaration of the persons, if any, elected President and Vice-President. [622]

Two things about the House of Representatives's change should be noted. First, Congress was unwilling to allow the Senate President any minimal ability to interpret the outcome of the vote count. Second, the Conference Committee Report asserts that it is the tellers-mere minions of the two houses-who ascertain the vote. The Conference Report confirms that the Senate President is meant to be something of an automaton.

If the Senate President's role as presiding officer gives him power to influence the outcome of Congress's electoral count, it flows from two sources: (1) his ability to announce, when the joint session reconvenes, the decision reached by the House of Representatives and the Senate in their separate sessions; and (2) his ability to declare substantive objections and procedural motions out of order. [623]

Does the Senate President's power to "announce the decision of the questions submitted" [624] to the Senate and House of Representatives when they separate to consider objections made to a state's electoral vote give him power to influence the outcome of the proceedings? In the House and the Senate, the presiding officer has the power to announce not only the vote totals, but also whether the question carries. [625] Before the ECA, **\*643** Senate Presidents announced both the way the Senate and House had ruled on objections and the import of those decisions for whether a vote was to be counted under the existing rules. [626] On one occasion, the Senate President's power to declare the import of the Senate and House's decision gave him power to determine how certain electoral votes would be counted. [627] That was in 1869, and, exacerbated by other rulings, it led to that year's "uproar[ious]" electoral count session. [628]

Does the Senate President retain this power under the ECA? In the only precedent since the ECA's passage, the 1969 debate on North Carolina's "faithless elector," Senator Richard Russell, presiding as Senate President pro tempore, [629] continued the pre-ECA tradition. After the Senate and House of Representatives considered the objection to counting the "faithless elector's" vote, the joint session reconvened, and the Secretary of the Senate and Clerk of the House reported that each house had rejected the objection, [630] Senator Russell then said:

> Under the statute in this case made and provided, the two Houses having rejected the objection that was duly filed, the original certificate submitted by the State of North Carolina will be counted as provided therein.

> Tellers will now record and announce the vote of the State of North Carolina . . . in accordance with the action of the two Houses referred to and pursuant to the law. [631]

Russell's actions set the precedent that the Senate President's pre-ECA tradition of announcing the legal effect of the separate House of Representatives and Senate decisions continues. It is not left for the tellers, who, being from different houses and perhaps differing parties, might disagree on the legal import of the two houses's disposition of the objection. This tradition

APPENDIX - 495

gives the Senate President power to interpret the import of the House and Senate's disposition of objections when the houses disagree.[632]

 **\*644**  Russell's precedent is fully consistent with the ECA's purposes. If the substantive provisions of the ECA are interpreted as this Article suggests, the Senate President's power to declare the import of the Senate and House of Representatives's separate decisions should not, as it was in 1869, be the cause of dissension. In 1869, the problem was that Congress's electoral vote counting session was governed by both the 22d Joint Rule and another concurrent rule adopted that year for handling expected problems with Georgia's electoral vote.[633] When Representative Benjamin Butler objected to counting Georgia's vote on grounds different from those that had been expected,[634] the interpretive problem was whether the 22d Joint Rule or the specially adopted concurrent rule applied to this complex situation.[635] The Senate President first allowed Butler's objection, implying that the 22d Joint Rule applied.[636] But when the House of Representatives sustained Butler's objection, and the Senate overruled it, the Senate President decided to count Georgia's vote according to the terms of the specially adopted concurrent rule.[637] Since under the 22d Joint Rule, a state's electoral vote should not have been counted if one house sustained an objection to it, Butler and many other congressmen were outraged.[638] Of course, the ensuing debate showed that other congressmen would have been outraged by the opposite decision.[639]

Under the ECA, however, an 1869-type problem should not arise because the Senate President, in deciding on the import of the Senate and House's separate decisions, has only the modicum of interpretive authority, which even the most ministerial officials always have. When the Senate and House separate to consider objections to counting a state's electoral vote, they have many difficult and ambiguous questions to resolve, both of law and of the law's application to the situation at hand.[640] In contrast to  **\*645**  the discretionary decisions made by Congress's two chambers, the legal import of the Senate and House's separate votes are entirely bright-line and almost self-applicable. Once the Senate President has performed his gatekeeping function, it is clear whether a state has submitted one or multiple returns. If there is one return, the House and Senate must concur to reject it.[641] If there are multiple returns, the houses must concur to accept one of them.[642] If the houses disagree in their disposition of a state's multiple return, it should be clear if one of the returns reasonably purports to be certified by the state governor under the state's great seal, and whether the Senate and the House of Representatives concurred in rejecting it. Thus, interpreting the legal import of the Senate and House of Representatives's decisions is rather straightforward.[643]

If the Senate President's power to declare the import of the Senate and House of Representatives's separate votes does not give him the ability to influence the outcome of Congress's electoral count, does his power to rule substantive objections and procedural motions out of order give him that capacity?[644] Before the ECA, Senate Presidents, on several occasions, prevented substantive objections and procedural motions by ruling them out of order.[645] Two of these occasions involved substantive objections made to a state's vote after that state had already been counted and the joint session had moved on to other states. The Senate President, on both occasions, ruled that the objections were not timely.[646] Those rulings  **\*646**  involved an exercise of interpretive discretion. On both occasions, the objectors supported their motions with minimally rational arguments as to why they were not time-barred.[647] Another occasion involved the Senate President's refusal to allow an appeal from his ruling interpreting the legal import of Congress's disposition to an objection to a state's electoral vote.[648] Does the Senate President continue to have the power, under the ECA, to rule objections and other motions out of order?

To some extent he does, but substantive objections and procedural motions need to be considered separately because of their differing textual bases. With regard to substantive objections, section 4 of the ECA expressly imposes two bright-line requirements on congressmen who wish to object to counting a state's electoral vote. The first is that the substantive objection must be in writing and signed by at least one senator and one member of the House of Representatives.[649] The second is that all objections to counting a state's electoral vote must be presented when the state is under consideration, not before or after.[650]

Beyond the bright-line requirements of form and timing, the ECA imposes one requirement on substantive objections that is not expressed in the ECA text. As in all parliamentary assemblies, efficiency requires that the Senate President have authority to disallow all motions that are merely dilatory. Discretion to rule dilatory motions out of order must be implied from necessity. Otherwise, a persistent minority, even as small as one senator and one representative, could hamstring Congress's entire  **\*647**

APPENDIX - 496

proceeding. [651] But if an objection is timely, presented in proper form, and not dilatory, the Senate President must allow it, and the Senate and House must separate to consider it.

This conclusion applies not only to substantive objections to a state's electoral vote, but also to procedural questions concerning the Senate President's conduct of the meeting. Admittedly, it is not entirely clear that the ECA's framers intended to allow procedural motions, including appeals from the Senate President's rulings. The ECA's only textual support for procedural motions and appeals is section 6's passing remark:

> That when the two Houses separate to decide upon an objection that may have been made to the counting of any electoral vote or votes from any State, or other question arising in the matter, each Senator and Representative may speak to such objection or question five minutes, and not more than once . . . . [652]

Procedural motions and appeals from the presiding officer's rulings are a normal part of parliamentary procedure. [653] However, pre-ECA vote counting precedent is mixed regarding whether procedural motions and appeals from the Senate President's rulings are permitted at Congress's electoral vote counting sessions. [654] Two of these precedents were set in 1849 and 1857 when the concurrent rule typically adopted for each vote counting session made no provision for substantive objections or procedural motions of any kind. [655] The third pre-ECA precedent was set in 1865 under the newly adopted 22d Joint Rule. That rule contained **648** language that allowed procedural motions, [656] and the Senate President relied on it to rule that procedural motions were in order. [657] Nonetheless, during the "uproar [ious]" 1869 vote counting session, [658] which was also governed by the 22d Joint Rule, the Senate President refused-without explanation-to allow appeals from his ruling interpreting the legal import of the Senate and House's split over whether to count Georgia's electoral vote. [659] In the contentious debate that followed, House Speaker Schuyler Colfax supported the Senate President's refusal to allow appeals from his rulings. His reason, which seems plainly incorrect, was that allowing appeals would require a vote to be taken in the joint session on a per capita basis, and this was impermissible. [660]

In the only post-ECA precedent, Vice President Al Gore, presiding as Senate President at the 2001 electoral vote counting session, ruled out of order a slew of procedural motions, including an appeal of his rulings, on the grounds that, although they were in writing and signed by members of the House of Representatives, they were not also signed by a senator as the ECA requires. [661] In making these rulings, Vice President Gore, relying on the advice of the Senate and House Parliamentarians, extended the ECA's formal requirements for substantive objections to procedural motions and appeals. "[R]eading" the ECA substantive and procedural provisions "as a coherent whole," he said, requires "the Chair [to] hold[] that no procedural question . . . is to be recognized by the presiding officer in the joint session unless presented in writing and signed by both a **649** Representative and a Senator." [662] Gore's reasoning implies that if the procedural motions and appeals [663] met the ECA's formal requirements, they would be allowed, and the Senate and House of Representatives would have to separate to consider them. [664]

To require the Senate President to allow procedural motions and appeals to his rulings when they are (1) timely, (2) meet the ECA's formal requirements, and (3) not dilatory, helps to effectuate the ECA's basic tenet that Congress, not the Senate President, counts the state's electoral votes. [665] Allowing appeals of the Senate President's rulings is an especially important means to limit the Senate President's influence over the outcome of Congress's vote counting. But, allowing appeals does not eliminate the Senate President's influence. Sustaining an appeal requires a concurrent vote by the Senate and House. If the houses do not agree, the Senate President's ruling stands. [666] Nevertheless, allowing appeals constrains the **650** Senate President's power, while, at the same time, vindicates the principle that when the Senate and House of Representatives are in agreement, they govern the vote count.

The spirit of the ECA, if not its letter, mandates that the Senate President's substantive and procedural rulings be subject to review and reversal by a united Congress. This is especially important with regard to the Senate President's interpretation of the legal import of the Senate and House of Representatives's separate decisions on substantive objections to counting a state's electoral vote. As ministerial as the Senate President's ruling may be, the ECA's basic principles require that the Senate

APPENDIX - 497

President's substantive and procedural rulings be subject to appeal. Otherwise, the Senate President's views may determine the outcome of an electoral count even when both the Senate and House oppose his decision.

That the Senate President's rulings, if subject to an appeal, are sustained whenever the Senate and House of Representatives disagree, highlights the importance of this Article's conclusion that the Senate President has no power to rule a congressman's objection to counting a state's electoral vote out of order on substantive grounds. [667] It is for the Senate and House of Representatives to determine which objections are good or bad, and it is section 4's vote counting rules that determine whether a state's electoral vote will be received; the Senate President is not supposed to exert any influence.

In sum, it is likely that the Congresses that debated and adopted the ECA intended to require the Senate President to accept all substantive objections to counting a state's electoral vote, procedural motions, and appeals to his rulings that were timely, in writing, signed by a senator and a member of the House of Representatives, and not dilatory. This approach may, on occasion, delay the proceedings because only a few substantive objections and procedural motions should fail the ECA's general bright- **\*651** line requirements. But the problem of lengthier proceedings is more than offset by the Senate President's diminished ability to influence the outcome of Congress's electoral vote counting session. The ECA's fundamental principles require this trade-off. [668]

Thus the Senate President's power to interpret the import of the Senate and House of Representatives's separate decisions on objections to counting a state's electoral votes, and his power to rule substantive objections, procedural motions, and appeals out of order, give him only minimal, and reviewable, power to influence the outcome of Congress's electoral vote counting. As Representative Caldwell, Chairman of the House committee managing the ECA, said when he introduced the bill to the House of Representatives in 1886:

> [The bill] will decide, first, that the power to count the vote is not in the President of the Senate.

> Second, that it is in the two Houses of Congress, not ministerially merely, not as witnesses, . . . but with power to count, and the consequent power to decide upon the legality of the votes to be counted.

> Third, that the action of the two Houses shall be separate and concurrent upon all questions of contest arising under the count, but joint as to results, thus preserving the dignity and rights of the two bodies by conceding to each equal and concurrent powers in counting and judging of the validity of electoral votes without merger of the lesser body into the numerically greater. [669]

The ECA was written to allow Congress, not the Senate President, to count the state's electoral votes.

## IV. Conclusion

The ECA provides a framework for Congress's consideration of the states' electoral votes, specifies the proper grounds for members of Congress who wish to object to counting any or all votes from a state, and provides decisional rules for cases where the Senate and House of Representatives disagree about whether to count a vote. Under the ECA, whenever the Senate and House agree on counting or rejecting a vote, their **\*652** concurrence governs. When the Senate and House disagree, the ECA specifies the votes, if any, that will be counted. The ECA minimizes the ability of the Senate President to influence the outcome of Congress's vote counting session because of his constitutional role as custodian of the states' electoral packets, or because of his statutory role as presiding officer at the vote counting session.

The ECA requires that if a state submits one set of electoral votes, it will be counted unless both the Senate and the House of Representatives agree to reject them, or some part of them. If a state submits multiple sets of electoral votes, the set that the

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Senate and House agree to count will be counted. [670] If the houses of Congress cannot agree to accept a particular set, the votes that were certified by the state's governor will be counted, unless the houses agree to reject them. [671]

The ECA's delimitation of the grounds for rejecting electoral votes revolves around whether any of the returns submitted by the state were contested before the state's final determination authority in a process that meets the requirements of section 2. In all cases Congress may reject the votes of electors who were constitutionally ineligible to hold the elector's office, who balloted corruptly, or who balloted in a way that violated post-appointment constitutional or statutory requirements. The votes of electors whose appointment is authenticated only by their governor's section 3 certificate may be rejected on two additional grounds: that the electors' gubernatorial certification resulted from ministerial error; [672] or that the electors' election was itself so irregular as to be fraudulent or violate constitutional norms.

The votes of electors whose appointment is authenticated by a section 2 process are more secure. In section 2, Congress pledged itself to be "conclusively" bound to regard electors authenticated by the state's final determination process as duly appointed under state law. Their underlying election may not be inquired into, and Congress may not disregard the section 2 tribunal's decision because of mere error. Whether section 2's conclusivity principle is subject to a fraud exception is unclear, as is the scope of that exception, if it exists. [673] However, it is clear that not every **\*653** electoral slate that claims section 2 status actually merits it. Section 2 establishes conditions that must be met if Congress is to accept electors authenticated by that process as conclusively determined. It is for Congress to decide whether the state's section 2 "final determination" process meets the ECA's requirements. And Congress can acknowledge section 2 status only through bicameral concurrence.

As interpreted by this Article, the ECA is a coherent enactment. The ECA's coherence does not mean that it is a complete response to the problems of Congress's electoral vote counting. [674] The ECA's sponsors said it was. [675] Nevertheless, should Congress reject an electoral vote, the ECA does not address whether, or under what circumstances, the number of electoral votes required for the President's election is reduced. To be elected President, the Constitution requires a candidate to receive "a majority of the whole number of Electors appointed." [676] The provision was adopted to prevent states from hamstringing the federal government by simply not participating in the presidential election. [677] When Congress rejects an electoral vote, the effect that decision has on the denominator that determines whether a candidate has more than fifty percent of the electoral vote is an entirely open issue, and congressional precedent is split. Should the number always remain the same? Should it always be reduced pro tanto? Should the effect on the number vary with the reason for Congress's exclusion? [678]

Senate leaders raised this issue while the ECA was under consideration, and they gave differing answers to the question. [679] Good arguments were raised on all sides of the question. Perhaps because the diversity of strongly held views might imperil the delicate web of compromises supporting the **\*654** ECA, Congress avoided addressing the issue in the ECA. If a future Congress were to exclude votes under the ECA, it is possible that one chamber of Congress would conclude that the leading candidate did not receive a majority of the relevant pool of electoral votes, while the other chamber will conclude that he or she did. [680] The Senate President's role is limited by the ECA to receiving the tellers' lists and "announc[ing] the state of the vote." [681] According to the ECA, the Senate President's announcement "shall be deemed a sufficient declaration of the persons, if any, elected President and Vice-President of the United States." [682] Well, not always.

If the ECA's coherent treatment of Congress's electoral vote counting is not entirely comprehensive, neither is it entirely wise. [683] Whether the governor's certificate should play its crucial tie-breaking role was, and still is, questionable policy. The decision not to run election contests in the federal courts is also debatable. The time frame for election contests may always have been too short. It certainly is too short now that the period between election day and elector balloting day has been reduced to only forty-one days. [684]

In addition, the rule that section 2's safe harbor provision disappears six days before the electors ballot may no longer serve any purpose, if it ever did. The existence and scope of the fraud exceptions to section 2 final determinations, and to the electors' election when it is authenticated only by the governor's section 3 certification, may be questionable from the perspective of jurists who value certainty and minimal congressional **\*655** interference with presidential elections, and from the opposite perspective of jurists who value electoral integrity and national oversight.

APPENDIX - 499

Among the ECA's other problems is the question of whether it is a statute or a joint rule enacted in statutory form. Fundamental questions beyond the scope of statutory interpretation turn on this issue, potentially embracing the ECA's constitutionality, whether Congress's application of it is subject to judicial review, or simply, how it can be amended or rescinded.

In addition, the ECA's coherence does not tell us whether it should be applied as its framers intended. Statutory meaning is as much a matter of jurisprudence as historical analysis.[685] Communications in the modern world are far faster and better than they were in the nineteenth century. Principles of federalism and the balance of federal and state interests in national elections have evolved since the Gilded Age. The world, not just the nation, is vitally interested in the outcome of America's presidential elections. Modern Congresses, armed with new technologies, motivated by different vital principles, and responding to new historical circumstances, may sensibly and rightfully act as nineteenth-century Congresses could not, or would not.

Perhaps fidelity to the rule of law requires that the ECA's bright-line rules be applied as they were intended. These rules include the use of the governor's certificate as the ultimate tie-breaker when the houses of Congress cannot agree to reject the votes they certify. However, fidelity to the rule of law does not mean that modern Congresses are bound to apply the ECA as its framers intended in every specific instance. Modern Congresses might not be bound by nineteenth-century views about whether an electoral vote is regularly given when it is cast for a candidate to whom the elector is not pledged.[686] Maybe modern Congresses should not be bound by nineteenth-century views of whether electors are lawfully certified when their title to office is first established by an election contest that ended after elector balloting day.[687] Neither are modern Congresses **\*656** necessarily bound by nineteenth-century views about how far Congress may go behind the governor's ministerial certificate and about the scope of the fraud exception to an elector's election when the electors' appointment is authenticated only by the governor's lawful certification. For similar reasons, the existence and scope of a fraud exception to section 2's conclusivity principle may not be settled by historical analysis alone.

Still, even if historical analysis of the views of the ECA's framers does not bind, it does matter. Historical analysis sheds light on the problems the Senate and the House of Representatives confront when they meet to count electoral votes, and it provides a fuller understanding of the agreement they reached over a century ago to frame and implement their response. Historical analysis provides a starting point, but not an end point. According to some scholars, the value of historical analysis is not to bind contemporary decision-makers to the framers' specific intent, but to ensure that in departing from that intent, they evolve the law knowingly, thoughtfully, and with due regard to the limits of their rightful creativity (as that scholar defines it).[688]

Whatever the value of historical analysis, this Article has studied the views of the framers of the ECA so that modern members of Congress and informed citizens can understand the law (or joint rule) as the Senate and House of Representatives understood it over 100 years ago. That is a step towards clarifying, changing, or simply not being afraid to utilize the ECA next time a presidential election is close and partisanship runs rampant-as the ECA authors knew it would-when the presidency of the United States turns on a few votes cast somewhere in America's far-flung domain.

Unfortunately, clarifying, changing, and implementing the ECA can never remedy the electoral count's most fundamental problem: When Congress counts the states' electoral votes, the results of the electors' voting are already known. No matter what substantive criteria and processes Congress adopts for judging the propriety of each state's electoral vote, in a close presidential election, when each state's vote is known beforehand, partisans on every side will usually be able to game the system to figure out grounds to reach the result they want. Because the basic facts and decisional standards of the electoral count are known before the count begins, any electoral count system that works within the present constitutional structure can be manipulated by partisans earnestly asserting colorable claims.

 **\*657** Think back to the 2000 election. Suppose the Florida Supreme Court finished its work within the safe harbor period and ruled in favor of the Democratic electors. As a slate of electors claiming safe harbor status, the Democratic electors would have been entitled to have their votes counted unless there were sufficient grounds (e.g. fraud) for denying them section 2 status. Surely the history of the electoral count shows that partisan commitments may decisively influence whether a member of Congress or the interested public argues for or against the existence of the fraud exception and whether the Supreme Court of Florida's decision was so flawed as to be within it.[689] Surely, partisan considerations would influence, and perhaps even dictate, the earnestly asserted positions that members of Congress and the interested public would take on these questions.

The problem that the results of the electors' balloting are known before the electoral count occurs is one of the inherent weaknesses of the Constitution's presidential election system. It is possible to believe that the framers did not anticipate the

APPENDIX - 500

difficulty because they expected the electors to exercise an independent vote by secret ballot. In such circumstances, when the electors forwarded the results of their balloting in sealed packets to Congress, the packets' contents would not be known beforehand. In this scenario, the rise of political parties derailed the framers' presidential election system because political parties selected electors based on their known support for particular candidates.

It is also plausible that the framers anticipated the problem and that the rise of political parties only exacerbated it. Even if the electors exercised an independent choice by secret ballot, the constitutional system still contemplated each state's electors counting their own electoral votes and sending only the certified totals to Congress. Inevitably, even in the earliest elections, word of how each state's electors voted reached the nation's capital before the packets were opened. [690] A neutral counting of unknown results at the seat of government was doomed from the start.

The ECA's framers knew all this. In 1876, they experienced firsthand the strife and posturing that follows a close presidential election. Their response was to create an electoral count system that sought to minimize the conflicts that would reach Congress, to confine and define Congress's discretion to reject what the states had done, and to resolve disagreements between the Senate and the House of Representatives through bright-line vote counting rules. Unable to agree on any constitutional amendment, **\*658** Congress attempted, through the ECA, "to remove, as far as it is possible to be done by legislation . . ., a difficulty which grows out of an imperfection in the Constitution itself." [691]

## Footnotes

a1    Distinguished Research Professor and Associate Dean for Research and Scholarship, DePaul University College of Law. B.A. 1967, Columbia College; J.D. 1971, LL.M. 1972, Harvard Law School. I thank Lawrence Arendt, Mark **Siegel** and Professors Robert Bennett, David Rabban, John Roberts, and Mark Weber for reading drafts of this Article. They improved it immensely. I am indebted beyond measure to the librarians at the DePaul University College of Law, particularly Mark Giangrande and Maria Wilmer. I also thank the DePaul University College of Law Summer Research program for its generous support.

1    Given how states' rights influenced the eighteenth- and nineteenth-century Congresses' approach to electoral vote counting, see infra text accompanying notes 196, 278-79, 710, we might say that electoral vote counting is the specific instance of Justice O'Connor's claim that federalism is "perhaps our oldest question of constitutional law." New York v. United States, 505 U.S. 144, 149 (1992).

2    1 Annals of Cong. 15-18 (Joseph Gales & William W. Seaton eds., 1789).

3    See, e.g., 18 Cong. Rec. 48 (1886) (statement of Rep. Cooper) (discussing previous electoral vote counts); 15 id. at 5453 (1884) (statement of Rep. Hart) (same); 13 id. at app. 539 (1882) (statement of Rep. Updegraff) (same); see also Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 521-22, 533 (1877) (statement of Sens. Bayard and Morton). H.R. Misc. Doc. No. 44-13 is a compendium of all congressional floor debates and action involving electoral counts and electoral count reform proposals up to early 1876. Id. at VII-VIII. It is drawn verbatim from the Annals of Congress, the Register of Debates, the Congressional Globe, and the Congressional Record. It was produced by order of Congress to help it approach the task of counting the 1876 electoral vote. Id. Congress's interest in publishing and distributing this volume indicates a substantial degree of interest in the history of electoral vote counting. For convenience, this Article cites to H.R. Misc. Doc. No. 44-13 rather than the Annals, Register, Globe, and Record when discussing congressional electoral vote counting activity prior to 1877.

4    See, e.g., H.R. Rep. No. 47-1207 (1882)H.R. Rep. No. 47-1207 (1882) (discussing alternate legislative proposal); 13 Cong. Rec. 5143-49 (1882) (same); 10 id. at 3652-63, 3682-704, 4386-507, 4540-41 (1880) (discussing joint rule proposal); Herman Ames, The Proposed Amendments to the Constitution of the United States During the First Century of its History 88-89, 91, 94-98, 104-05, 110-11, 113, 118-22, 123-25, 128 (photo. reprint 1970) (1897) (discussing proposed constitutional amendments). Of the many constitutional and statutory proposals, the **Electoral Count Act** (ECA) was the only one enacted into law. See **Electoral Count Act** of 1887, ch. 90, 24 Stat. 373 (current version at 3 U.S.C. §§ 5- 6, 15-18 (2000)).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                42

5    In the 1876 presidential election, Samuel Tilden and Rutherford Hayes were separated by one electoral vote. See Charles Fairman, Five Justices and the Electoral Commission of 1877 xv-xvi (1988). Four states sent Congress multiple electoral returns. Id. at xvi; Paul Haworth, The Hayes-Tilden Disputed Presidential Election of 1876 at 57-168 (1906). Congress created an Electoral Commission, composed of five senators, five representatives, and five Supreme Court justices, to help sort through the mess. Fairman, supra, at xv; Haworth, supra, at 220-21. The election was not resolved until March 2, 1877, two days before Inauguration Day. Haworth, supra, at 280-82. For recent discussions, see Roy Morris, Jr., Fraud of the Century: Rutherford B. Hayes, Samuel Tilden, and the Stolen Election of 1876 (2003); William Rehnquist, Centennial Crisis: The Disputed Election of 1876 (2004).

6    See infra notes 38-39 (tracing the effort to pass the ECA).

7    Compare **Electoral Count Act** of 1887 § 2 (a state's "final determination" of its electors binds Congress), with **Electoral Count Act** of 1887 § 4 (Congress may reject any state's electoral vote).

8    See section 4 of the ECA, which is a mammoth section some 814 words in length.

9    17 Cong. Rec. 1060 (1886) (statement of Sen. Teller); see also 18 id. at 50 (statement of Rep. Eden); 17 id. at 1019 (statement of Sen. Hoar).

10    John W. Burgess, The Law of the Electoral Count, 5 Pol. Sci. Q. 633, 643 (1888). For Burgess's other criticisms, see id. at 637-39, 645-46, 648, 650-51. For another contemporary commentator's criticisms, see J. Hampden Dougherty, The Electoral System of the United States 214-49 (1906) (mixing description with criticism). Judge Richard Posner recently described the ECA as "maddeningly complex." Richard A. Posner, Breaking the Deadlock: The 2000 Election, the Constitution, and the Courts 141 n.88 (2001).

11    Burgess, supra note 10, at 634.

12    See, e.g., 18 Cong. Rec. 828 (1887) (statement of Sen. Wilson); 17 id. at 1058-59 (1886) (statement of Sen. Wilson); Dougherty, supra note 10, at 241, 246.

13    See Vasan Kesavan, Is the **Electoral Count Act** Unconstitutional?, 80 N.C. L. Rev. 1653, 1694-1792 (2003) (finding that the ECA is unconstitutional); L. Kinvin Wroth, Election Contests and the Electoral Vote, 65 Dick. L. Rev. 321 & n.2, 344-53 (1961) (finding that the ECA is constitutional, but defective). Viewed empirically, the ECA seems to be a complete success. During the hundred years before enacting the ECA, Congress frequently faced problems with electoral vote counting which, at times, dissolved into bitter wrangling and expedient solutions. These controversies occurred not only when the vote was close, as in 1877, but, more often, when the outcome did not matter in the slightest. See infra text accompanying notes 66, 69, 198, 562 (discussing the 1857, 1869, 1873, and 1877 vote counts). Since the ECA's adoption, Congress's electoral vote counts have been smooth and free from conflict. Objections to counting particular votes have been dealt with in an orderly fashion and there have been no controversies over the counts. Jack Maskell, et al., Cong. Research Serv., Electoral Vote Counts in Congress: Survey of Certain Congressional Practices 23-29 (2000) (surveying all electoral vote counts from 1889 to 1997); Kesavan, supra, at 1691-94 (describing smooth handling of electoral vote objections in 1961 and 1969); Wroth, supra, at 337 (noting no objections to electoral votes from 1887 to 1961). Underneath the surface, all is different. Perhaps there have been no disputes in Congress because no election has turned on Congress's electoral vote counting. One wonders what would have happened had the 2000 presidential election not been settled by the Supreme Court before it went to Congress. One of the few compliments for the Supreme Court's intervention and opinion in Bush v. Gore, 531 U.S. 98 (2000), is that the Court took a bullet by preventing Congress from embarrassing itself. See, e.g., Posner, supra note 10, at 4, 137-45, 184; Michael J. Glennon, Nine Ways to Avoid a Train Wreck: How Title 3 Should Be Changed, 23 Cardozo L. Rev. 1159, 1160 (2002).

14    See Bush, 531 U.S. at 120-21; Bush v. Palm Beach County Canvassing Bd., 531 U.S. 70, 77-78 (2000); see also infra note 303 (discussing effect of mistakes in judicial conduct of election contests). This assumes the Supreme Court of Florida was incorrectly interpreting the state's election code. I take no position on that question.

15    See infra notes 420, 549 (discussing Governor Bush's action and the time for submitting certificates of ascertainment).

16    See infra note 462 (discussing the objections of members of Congress to counting Florida's electoral votes).

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    43

17    See Contesting the Vote: Comments from Gore on the Florida Election, N.Y. Times, Nov. 29, 2000, at A28 (Vice President Gore saying December 12 was the "deadline for seating electors"); infra notes 319, 687 (discussing the federal deadline); see also Jack Maskell, Cong. Research Serv., Counting Electoral Votes in Congress-Multiple Lists of Electors from One State 8-11 (2001) (mistaking, as discussed infra in Appendix II, when to turn to the governor's certificate); Contesting the Vote: Update; Matter of Dates and Disputes, N.Y. Times, Nov. 29, 2000, at A25 (New York Times's editors saying "Mr. Gore . . . is facing a Dec. 12 federal deadline for selecting Florida's 25 electors"); Jeffrey Rosen, The Supreme Court Puts Itself in Harm's Way, New Republic, Dec. 11, 2000, at 16 (mistaking 3 U.S.C. § 2 (2000) for part of the ECA).

18    See Burgess, supra note 10, and Wroth, supra note 13, for particularly insightful explorations and critiques.

19    These Congresses also experienced and settled the most fractious presidential election this country has ever witnessed, the 1876 Hayes-Tilden election. See Haworth, supra note 5 (discussing the Hayes-Tilden election dispute).

20    For an extensive analysis of the ECA's constitutionality, see Kesavan, supra note 13. Kesavan says the Act is unconstitutional, while admitting that the "prevailing wisdom, in the Supreme Court and elsewhere, is that the Electoral Count Act is constitutional." Id. at 1660.

21    It may well be a "political question" committed to Congress's discretion. See Erwin Chemerinsky, Federal Jurisdiction 143-67 (4th ed. 2003) (discussing the political question doctrine). This Article does not discuss issues dependent on the political question doctrine, like who might have standing to bring these questions into court and when it might be ripe to do so. See id.at 56-125 (discussing standing and ripeness doctrines).

22    See infra text accompanying notes 42, 107 (defining "joint rule" and discussing congressional rules adopted in statutory form).

23    See, e.g., infra text accompanying notes 383, 644 (discussing whether section 2 of the ECA binds Congress to accept a state's slate of electors and discussing the Senate President's power to rule objections and motions out of order).

24    This Article does not assert that the framers' intent determines its current meaning. See infra text accompanying note 685 (discussing statutory interpretation).

25    U.S. Const. art. I, § 7, cl. 2.

26    Maskell, supra note 17, at 3 (explaining the Senate's and House's ability to depart from various aspects of the ECA); infra text accompanying notes 67, 92 (discussing the Senate's unilateral rescission of Congress's 22d Joint Rule).

27    8 Cong. Rec. 161 (1878) (statement of Sen. Bayard).

28    Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. 44-13, at 346 (1877) (statement of Sen. Morton).

29    8 Cong. Rec. 72 (1878) (statement of Sen. Morgan); see also H.R. Misc. Doc. No. 44-13, at 346 (statement of Sen. Morton); 17 Cong. Rec. 1058 (1886) (statement of Sen. Evarts); 15 id. at 5462 (1884) (statement of Rep. Springer); id. at 5076 (statement of Rep. Eaton); 8 id. at 161 (1878) (statement of Sen. Bayard).

30    8 Cong. Rec. 161 (1878) (statement of Sen. Bayard).

31    Id. at 159; see also id. ("We must have finality at some point or time, and in some human hand and some human heart and brain the power of decision must ultimately be reposed."); id. at 73 (statement of Sen. Edmunds) ("You must elect a President; you must count the vote; and if the question arises on counting of the vote somebody must decide it."); George Edmunds, Presidential Elections, 12 Am. L. Rev. 1, 9 (1877).

32    See 17 Cong. Rec. 1022 (1886) (statement of Sen. Sherman) (governors); id. (statement of Sen. Hoar) (President of the Senate); 15 id. at app. 311 (1884) (statement of Rep. Findlay); id. at 5462 (statement of Rep. Springer) (state tribunals); id. at 5079 (statement of Rep. Browne) (Congress); id. at 5078 (statement of Rep. Eaton) (state judges); 13 id. at 5144 (1882) (statement of Rep. Bowman) (judiciary); id. 2646-47 (statement of Sen. Pugh) (state legislatures and Congress); 8 id. at 168 (1878) (statement of Sen. Hoar) (Congress); id. at 167 (statement of Sen. Hill) (state judiciary).

APPENDIX - 503

33    15 id. at app. 311 (1884) (statement of Rep. Findlay).

34    8 id. at 168 (1878) (statement of Sen. Hill).

35    13 id. at 5145 (1882) (statement of Rep. Browne).

36    Id.

37    Id.

38    The effort to pass the ECA dates from January 6, 1873, when, in response to the various problems stemming from the 1872 election, Senator Oliver Morton offered a resolution "[t]hat the Committee on Privileges and Elections be instructed to examine and report . . . upon the best and most practicable mode of electing the President . . . and providing a tribunal to adjust and decide all contested questions connected therewith." Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 335 (1877). Senator Morton gave a lengthy speech on the subject eleven days later. Id. at 345-55. The proposals that Morton guided through the Senate in 1875 and 1876 contained many aspects of the eventually successful law. Wroth, supra note 13, at 334-35. When Morton died in 1877, leadership on the issue passed to Senator George Edmunds. See, e.g., 17 Cong. Rec. at 122 (1885) (Edmunds introducing the bill that was enacted into law); 8 id. at 51 (1878) (Sen. Edmunds introducing electoral count legislation). Edmunds's 1878 bill was in most respects the proposal that passed the Senate in 1878, 1882, 1884, and 1886. See, e.g., 15 id. at 430 (1884) (Sen. Hoar saying the bill is the same as passed by the Senate in the last Congress); 13 id. at 859 (Sen. Hoar saying "this bill is the one originally . . . reported by the Senator from Vermont [Edmonds] . . . in 1878"). In guiding the ECA through the Senate, Edmunds eventually shared leadership with Senator George Hoar, with whom he had a widespread political and personal affinity. 18 id. at 133 (1886) (Sen. Edmunds and Sen. Hoar appointed two of the three Senate conferees on the bill); 17 id. at 863 (1886) (Sen. Morgan saying that Sens. Edmunds and Hoar are in charge of the bill); 15 id. at 430 (1884) (Sen. Hoar introduces bill).

39    Bills passed the Republican Senate in 1876, 1878, 1882, and 1884, only to die in the Democratic House of Representatives. Wroth, supra note 13, at 330-31, 334 n.58. In 1875 and 1884, both houses were Republican, but still, Senate bills failed to pass in the House. Id. In 1880, both houses were Democratic, but a Democratic joint rule that passed the Senate was filibustered by House Republicans. 10 Cong. Rec. at 4386-99, 4487-4507, 4540-41 (1880) (House debates joint rule, which is eventually tabled); id 3052 (Sen. Morgan introducing joint rule); Wroth, supra note 13, at 334 n.58. All during this time, there were proposed constitutional amendments, none of which passed either House. See Ames, supra note 4, at 106-11. The effort to pass a law to govern electoral vote counting actually dates back to 1800 when different measures passed both houses of Congress but could not be reconciled. H.R. Misc. Doc. No. 44-13, at 16-29, 691-702. In 1824, a Senate bill died in the house. Id. at 57-60. A consequence of Congress's failure to pass legislation was that from the founding until 1865, Congress governed electoral counts by adopting a concurrent rule for each count. See, e.g., id. at 44-46, 65-66, 86-87 (the concurrent rules for 1817, 1829, and 1857). In 1865, Congress adopted a joint rule that continued to govern electoral counts until it was unilaterally rescinded by the Senate in early 1876. Id. at 223-38, 782-94. The electoral count in 1877 was governed by a statute enacted for just that year. See Act of Jan. 29, 1877, ch. 37, 19 Stat. 227. From 1880 until 1887, Congress reverted to the practice of adopting a concurrent rule for each count. See 16 Cong. Rec. 622, 1037, 1052, 1073, 1220 (1885); 11 id. at 1129-41, 1257-62 (1881).

40    See, e.g., 18 Cong. Rec. 75 (1886) (statement of Rep. Herbert) (commenting on near-unanimity in the Senate); id. at 47 (statement of Rep. Dibble) (commenting on unanimity of House committee on most aspects of the bill); 17 id. at 1019 (statement of Sen. Hoar) (commenting that the bill has passed Senate three times almost unanimously); id. at 867 (statement of Sen. Morgan) (commenting that electoral count bills have passed the Senate in both Democratic and Republican hands, and have "never been a party question"); 15 id. at 5547 (1884) (statement of Rep. Herbert) (commenting on bipartisan genesis of bill). When the bill finally passed, the House was Democratic and the Senate was Republican. Wroth, supra note 13, at 334.

41    17 Cong. Rec. 868 (1886) (statement of Sen. Morgan); 15 id. at 5077 (1884) (statement of Rep. Eaton); 13 id. at 2650 (1882) (statement of Sen. Morgan).

42    By concurrent rule, this Article means a rule that is passed by each house of Congress under the Constitution's Rule Making Clause, U.S. Const. art. I, § 5, cl. 2, for the particular Congress in which it is adopted. A concurrent rule is distinct from a concurrent resolution which, according to the Constitution, is a form of statute requiring presidential approval. Id. art. II, § 7, cl. 3. When this Article refers to a rule adopted by both houses, which is intended to continue

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    45

from Congress to Congress until amended or repealed, it will be called a joint rule because that is how nineteenth-century Congresses denominated it. See, e.g., H.R. Misc. Doc. No. 44-13, at 223-25 (adopting the 22d Joint Rule); 10 Cong. Rec. 3052 (1880) (Sen. Morgan introducing a proposed joint rule to govern the electoral counts). A joint rule is, in effect, a continuing concurrent rule. When this Article refers to an enactment that requires presidential presentment, it will be called a statute or concurrent resolution. That comports with constitutional usage. See U.S. Const. art. I, § 7, cls. 2-3. In conventional parlance, a concurrent resolution is also called a joint resolution, but the use of this latter term will be avoided to prevent confusing it with a joint rule, as the term is used in this Article.

[43] 18 Cong. Rec. 51 (1886) (statement of Rep. Adams); 17 id. at 868 (statement of Sen. Morgan); 13 id. at 2650 (1882) (statement of Sen. Morgan).

[44] It still is subject to dispute. See Kesavan, supra note 13, at 1709-10, 1723-29 (arguing that the Constitution requires Congress to count electoral votes organized as a unicameral legislature with each senator and congressman having one vote).

[45] U.S. Const. art. II, § 1, cl. 2.

[46] Id. ("[N]o Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.").

[47] Id. art. II, § 1, cls. 2-4.

[48] Id. art. II, § 1, cls. 2-4; id. amend. XII.

[49] Id. amend. XII. The text of the original Constitution was identical. See id. art. II, § 1, cl. 3.

[50] See Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 694 (1877) (statement of Sen. Pinckney); 18 Cong. Rec. 74 (1886) (statement of Rep. Baker); 17 id. at 1058 (statement of Sen. Wilson); id. at 1057 (statement of Sen. Evarts); id. at 1025 (statement of Sen. Ingalls); 15 id. at 5465-68 (1884) (statement of Rep. Browne).

[51] See, e.g., 17 Cong. Rec. 817 (1886) (statement of Sen. Sherman); 15 id. at 5076-79, 5548 (1884) (statement of Rep. Eaton). This theory is my favorite-not that I agree with it-because of the surprising force of its argument and logic: The House is there to witness whether it needs to elect a President because no one received an electoral college majority. Similarly, the Senate's power to elect a Vice President arises whenever no one has a majority of the vice-presidential electoral vote.

[52] See, e.g., 17 id. at 1063, 2428-29 (1886) (statement of Sen. George); 15 id. at app. 311 (1884) (statement of Rep. Findlay) (citing 2 George Bancroft, History of the Formation of the Constitution of the United States of America 184 (New York, D. Appleton & Co. 1882)); id. at 5096 (statement of Rep. Pryor); Alexander H. Stephens, The Count of the Electoral Vote for President and Vice-President, 5 Int'l Rev. 102, 107 (1878). Stephens was a congressman from Georgia before and after the Civil War, and the Vice President of the Confederacy during that War. eHistory.com, Alexander Hamilton Stevens, at www.ehistory.com/world/PeopleView.cfm?PID=69 (last visited Feb. 15, 2004).

[53] 18 Cong. Rec. 75 (1886) (statement of Rep. Herbert); id. at 50 (statement of Rep. Adams); id. at 46 (statement of Rep. Dibble); 15 id. at 5547 (1884) (statement of Rep. Herbert). This is the ECA's theory.

[54] See, e.g., H.R. Misc. Doc. No. 44-13, at 52 (statement of Rep. Clay). This theory originates with Henry Clay's analysis of electoral vote counting in 1821 when there was a dispute over whether Missouri was a state entitled to participate in presidential elections at the time of the 1820 election. See id. at 51-56 (reporting the debate).

[55] See supra text accompanying note 50.

[56] See supra text accompanying note 54.

[57] See supra text accompanying note 53.

[58] See Dougherty, supra note 10, at 58, 76-77.

APPENDIX - 505

59  The Presidential Counts ix-xliii (New York, D. Appleton & Co. 1877) presents a good summary of the evidence; see also Dougherty, supra note 10, at 61-62 (quoting The Presidential Counts, supra, at xl). Congress asserted its authority by 1800 because both houses passed different versions of the "Grand Committee" bill. See David P. Currie, The Constitution in Congress: The Federalist Period, 1789-1801 at 288-91 (1997) (providing an overview of the bill); see also 18 Cong. Rec. 50 (1886) (statement of Rep. Adams) (stating that within a decade of the adoption of the Constitution the "President of the Senate" theory was supplanted).

60  Electoral vote counting is a remarkably important and sustained example of nonjudicial, constitutional interpretation.

61  13 Cong. Rec. 2645 (1882) (statement of Sen. Pugh).

62  Wroth, supra note 13, at 328.

63  Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 148 (1877) (House of Representatives); id. at 224 (Senate).

64  Wroth, supra note 13, at 328 n.34.

65  Vice President Hamlin's refusal to submit the electoral votes of Louisiana and Tennessee relied on a Joint Resolution which President Lincoln had just signed (giving it the force of law) stating that the Confederate states were "not entitled to representation in the electoral college . . . and no electoral votes shall be received or counted from said States." H.R. Misc. Doc. No. 44-13, at 149. President Lincoln's comments are also set out in 10 Cong. Rec. 3654 (1880). When questioned by Congressman Yeaman, Vice President Hamlin said he would submit the Louisiana and Tennessee votes if "either branch of Congress shall be disposed." H.R. Misc. Doc. No. 44-13, at 228. In the end, no one objected to Vice President Hamlin's decision because it would have unnecessarily prolonged the meeting by requiring a separation of the two houses to discuss and vote on the issue. Id. at 228.

In light of the Joint Resolution on which Vice President Hamlin relied, Congress enacted the 22d Joint Rule as a backup measure to ensure that no Confederate states participated in the 1864 presidential election. See id. at 416. Congress's concern was that President Lincoln might not sign the Joint Resolution, or might not sign it in time for that year's electoral count. Id. at 229-30 (message from Pres. Lincoln discussing his qualms about signing the Joint Resolution). President Lincoln did sign it at the very last minute, so late that his action had not been officially promulgated. Id. at 228. Vice President Hamlin knew about the President's action on his own knowledge. Id. at 228.

This is significant for the question of whether Congress regulates its electoral vote counting by law (and therefore whether the ECA is a binding statute). In signing the Joint Resolution, Lincoln stated his view:

[T]he two houses of Congress . . . have complete power to exclude from counting all electoral votes deemed by them to be illegal; and it is not competent for the Executive to defeat or obstruct that power by a veto, as would be the case if his action were at all essential in the matter.

Id. at 229-30. Lincoln indicated that he signed the Joint Resolution "in deference" to Congress and he denied "any opinion" on whether his signature was required. Id.

66  H.R. Misc. Doc. No. 44-13, at 335-408. Georgia's electors had voted for Horace Greeley who had died after election day but before elector balloting day. Id. at 365-67. Later Congresses, wishing to minimize the import of Congress's action in the 1873 Arkansas dispute, claimed that its action was predicated on an alternative ground: the mistaken claim that the Arkansas vote was certified with an improper seal. Id. at 395-95, 399-406.

67  Id. at 782-94.

68  5 Cong. Rec. 1195-98, 1503-05, 1703-04, 1720-23, 1728-31, 1917-19, 1938-39, 1945-46, 2021-22, 2055 (1877) (counting objections raised to electoral votes from Florida, Louisiana, Michigan, Nevada, Oregon, Pennsylvania, Rhode Island, South Carolina, Vermont, and Wisconsin, respectively). It should be mentioned that Congress dealt with the multiple-return states with the help of a statutorily created Electoral Commission, and that in dealing with objections to votes from the single-return states, Congress always decided to count the vote. See Burgess, supra note 10, at 642.

69  See Act of Jan. 29, 1877, ch. 37, 19 Stat. 227. The Electoral Commission is recounted in Haworth, supra note 5, at 220-84.

70  In 1881, the Senate adopted a joint resolution officially rejecting the "President of the Senate" theory. 11 Cong. Rec. 1160-74, 1205-11 (1881); see also 17 id. at 1019 (1886) (statement of Sen. Hoar) (stating that it is "settled for this

APPENDIX - 506

generation . . . that the President of the Senate is not clothed by the Constitution with the power to count the electoral vote"); 13 id. at 2645 (1882) (statement of Sen. Pugh).

[71] 17 id. at 2427 (1886) (statement of Sen. Hoar); id. at 1063 (statement of Sen. George); id. at 818 (statement of Sen. Sherman) (pointing out that more than half the time Congress's two Houses have been controlled by different political parties); Edmunds, supra note 31, at 16.

[72] See 18 Cong. Rec. 50 (1886) (statement of Rep. Eden); 17 id. at 867 (statement of Sen. Morgan); 15 id. at 5547 (1884) (statement of Rep. Herbert); Edmunds, supra note 31, at 16; Wroth, supra note 13, at 344-45.

[73] See 18 Cong. Rec. 50 (1886) (statement of Rep. Eden) (commenting on problem of Congress making "spur of the moment" decisions about electors "amid the excitement of party contests"); Edmunds, supra note 31, at 18 (commenting on Congress's inability to fairly adjudicate the elections of its own members).

[74] See, e.g., 17 Cong. Rec. 1019 (1886) (statement of Sen. Hoar); Edmunds, supra note 31, at 17-18, 19-20.

[75] See, e.g., 17 Cong. Rec. 864-68 (1886) (statement of Sen. Morgan); 15 id. at 5455 (1884) (statement of Rep. Hart).

[76] 17 id. at 1024 (1886) (statement of Sen. Ingalls) (describing the Electoral Commission of 1877 as "a contrivance that will never be repeated in our politics. It was a device that was favored by each party in the belief that it would cheat the other, and it resulted, as I once before said, in defrauding both."); 13 id. at 5144 (statement of Rep. Browne) (describing the party-line vote); 13 id. at 2647 (1882) (statement of Sen. Pugh); 8 id. at 69 (1878) (statement of Sen. Morgan).

[77] 17 id. at 1020 (1886). Hoar's comments were against his interest as he personally favored designating the senior Supreme Court justice as arbiter, and his comments were made in that context. Id.

[78] See id. at 2647 (statement of Sen. Pugh) (observing that Congress could find no uncorruptible institution); 13 id. at 5145 (1882) (statement of Rep. Browne).

[79] This premise of the ECA has been disputed recently by Kesavan, supra note 13, at 1709-10, 1723-29 (arguing for unicameralism with each congressman having one vote). If the "Congress organized as two separate houses" theory is wrong, the ECA may be unconstitutional and of no effect. Id. at 1723-29. I say "may" be unconstitutional because it is possible that the Constitution ab initio lodges the vote counting power somewhere else-for example, with the President of the Senate-but allows Congress to move it elsewhere by subsequent legislation. See 1 James Kent, Commentaries on American Law 258-59 (photo reprint 1971) (1826). As stated, supra text accompanying note 20, this Article does not explore whether the ECA is constitutional. It assumes the post-Civil War Congresses' view was correct and that the Constitution does lodge, or permits subsequent legislation to lodge, the electoral vote counting power in Congress organized as two separate houses.

[80] The two questions are quite integrated because concerns about who counts electoral votes might well depend on the scope of that power. For example, one might allow the President of the Senate to count the vote if the power is purely ministerial.

[81] See, e.g., Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 691-702 (statement of Sens. Baldwin and Pinckney in 1800); 18 Cong. Rec. 46-47 (1886) (statement of Rep. Dibble); 10 id. at 4390 (1880) (statement of Rep. Updegraff); id. at 3683 (statement of Rep. Teller); 8 id. at 72-73 (1878) (statement of Sen. Jones).

[82] See sources cited supra note 81.

[83] Even under the "ministerial" theory, Congress still had the power to determine: (1) whether a submitted vote came from a state rather than from some other entity not entitled to vote; and (2) whether the person certifying the vote actually was the state's governor. See 18 Cong. Rec. 47 (1886) (statement of Rep. Dibble); Kesavan, supra note 13, at 1795-96.

[84] See, e.g., 18 Cong. Rec. 30 (1886) (statement of Rep. Caldell); 15 id. at 5461 (1884) (statement of Rep. Springer); id. at 5099 (statement of Sen. Pryor).

[85] See, e.g., 18 id. at 48 (1886) (statement of Rep. Cooper); 13 id. at 2650 (1882) (statement of Sen. Morgan); id. at 2645 (statement of Sen. Pugh); 10 id. at 4492 (1880) (Rep. Hutton).

APPENDIX - 507

86    13 id. at 2650 (1882) (statement of Sen. Morgan); see also 15 id. at 5099-101, 5105 (1884) (statement of Sen. Pryor).

87    See, e.g., 18 id. at 50-51 (1886) (statement of Rep. Adams) (discussing various types of objections). See infra text accompanying note 97, for a discussion of the types of objections.

88    Twice, Congress almost took a stand. In 1800, substantially similar bills passed the House of Representatives and the Senate, but failed to be reconciled over the issue of whether rejecting electoral votes should require the vote of one or both houses. See Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 16-28, 691-702 (1877); Currie, supra note 59, at 288-91; Dougherty, supra note 10, at 62-73. In 1824, a bill that allowed the rejection of electoral votes only when both houses agreed passed the Senate, but was not acted upon in the House. H.R. Misc. Doc. No. 44-13, at 65-68; Dougherty, supra note 10, at 73.

89    See, e.g., H.R. Misc. Doc. No. 44-13, at 35, 76 (reprinting the resolutions for 1805 and 1841).

90    See, e.g., id. at 71-75 (avoiding the issue of whether Michigan was entitled to electoral votes by providing an alternate count); id. at 49-56 (avoiding the same issue for Missouri). The Houses also chose to ignore various problems entirely. Id. at 73 (ignoring whether some Michigan electors were disqualified); id. at 46-47 (ignoring whether Indiana was entitled to electoral votes); id. at 37-38 (ignoring whether electors from Massachusetts were properly elected).

91    Id. at 223-25. In 1872, Congress had asserted its authority under the 22d Joint Rule by rejecting votes from Georgia, Louisiana, and Arkansas. Id. at 357-406. In each instance, however, both houses concurred in rejecting the votes. See id., for a recount of Congress's proceedings during the 1873 electoral count.

92    In 1876, the Senate refused to renew the 22d Joint Rule, effectively repealing it. See id. at 444-58, 782-94. Senator Morton described the Rule's approach as unconstitutional. Id. at 444 (statement of Sen. Morton). He thought that rejecting single returns from a state required a concurrent vote of both houses. Id. Only in the presence of multiple returns was Congress required to accept a return by concurrent vote. Id. at 527.

93    18 Cong. Rec. 30 (1886) (statement of Rep. Caldwell); see also 10 id. at 4388 (1880) (statement of Rep. Bicknell); 8 id. at 70-71 (1878) (statement of Sen. Morgan).

94    See sources cited supra note 93.

95    See infra text following notes 402, 445.

96    Twelve of the twenty-five electoral counts had some problem that was either addressed or ignored. See Maskell et al., supra note 13, at 7-23; infra note 599 and accompanying text (discussing 1797 and 1801 electoral count). Only four vote counts since the adoption of the ECA had similar problems. Maskell et al., supra note 13, at 23-29; infra text accompanying notes 661-64 (discussing the 2001 electoral count).

97    See 18 Cong. Rec. 50-51 (1886) (statement of Rep. Adams) (mentioning all of these types of disputes except the last because he was talking about receiving electoral votes). The latter two types of disputes do not involve the issue of accepting electoral votes, per se. But they are disputes that may arise during the joint session counting the votes. Disputes over the consequences of rejecting a vote were anticipated by Congress, but never resolved. See infra text accompanying note 678. In contrast, disputes over procedures were quite notorious, as some of the sharpest prior controversies had involved the President of the Senate's conduct of the joint meeting. See H.R. Misc. Doc. No. 44-13, at 237-334 (recounting a three-day debate on the conduct of the 1869 vote count); id. at 87-144 (a two-day debate over the conduct of the 1857 vote count); infra text accompanying notes 561-65, 633-39 (discussing procedural conflicts).

98    See, e.g., H.R. Misc. Doc. No. 44-13, at 230-36, 244-63 (questioning Georgia's status in 1869); id. at 149-228 (questioning same for the Confederate states in 1864); id. at 70-75 (questioning same for Michigan in 1836); id. at 49-56 (questioning same for Missouri in 1820); id. at 46-47 (questioning same for Indiana in 1816).

99    See, e.g., id. at 357-407 (questioning the appointment of electors in Louisiana and Arkansas in 1872); id. at 237-44 (questioning the validity of the electors' election in Louisiana in 1868); id. at 37-38 (questioning the appointment of electors from Massachusetts in 1808); 5 Cong. Rec., pt. 4 (1877) (questioning the same for Florida, Louisiana, South Carolina, and Oregon in 1876).

100    See, e.g., H.R. Misc. Doc. No. 44-13, at 72-73 (questioning constitutional eligibility of a Michigan elector in 1836); 5 Cong. Rec., pt. 4, 249-51, 264-66 (1877) (questioning same of an Oregon elector in 1876).

101    See H.R. Misc. Doc. No. 44-13, at 395-401 (discussing the failure of governor to certify Arkansas's certificate); id. at 87-144 (questioning whether Wisconsin's electors balloted on the proper day in 1856); id. at 63-65 (questioning the certificates submitted by electors in 1824); 10 Cong. Rec. 1386-87 (1880) (discussing the same for Georgia in 1880); see also 115 id. at 145-71, 197-246 (1969) (recounting the debate on whether to count the vote of a "faithless elector").

102    See 8 Cong. Rec. 163 (1878) (statement of Sen. Merrimon) (raising the possibilities of bribery, intimidation, fraud, material irregularity, and ineligibility); see also 10 id. at 3691 (1880) (colloquy between Sens. Morgan and Edmunds debating whether majority requirement was reduced when three electors died before balloting in 1820).

103    See 18 id. at 49 (1886) (statement of Rep. Cooper); 17 id. at 820, 1057, 1061, 2428 (1886) (statement of Sens. Evarts, Hoar, and George); see also infra text accompanying note 678 (discussing the denominator problem).

104    See, e.g., H.R. Misc. Doc. No. 44-13, at 367-80 (documenting procedural wrangling in the houses when meeting separately to discuss objections to the vote of several states); id. at 237-334 (discussing conduct of 1869 electoral count session, including the presiding officer's refusal to allow an appeal from his ruling that a motion was out of order).

105    See Electoral Count Act of 1887, ch. 90, 24 Stat. 373 (current version at  3 U.S.C. §§ 5- 6, 15-18 (2000)).

106    See Kesavan, supra note 13, at 1779; John C. Roberts & Erwin Chemerinsky, Entrenchment of Ordinary Legislation, 91 Cal. L. Rev. 1773, 1775 (2003).

107    Examples of such "legislation" are: Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-344, 88 Stat. 297 (1974); Legislative Reorganization Act of 1946, Pub. L. No. 79-601, 60 Stat. 812. See Stanley Bach, The Nature of Congressional Rules, 5 J.L. & Pol. 725, 731 n.26 (1989); Roberts & Chemerinsky, supra note 106, at 1793-94.

108    See generally  Metzenbaum v. Fed. Energy Regulatory Comm'n, 675 F.2d 1282 (D.C. Cir. 1982) (noting that certain provisions of the Alaska Natural Gas Transportation Act are rules of procedure that do not grant private rights).

109    See, e.g., 17 Cong. Rec. 1024 (1886) (statement of Sen. Ingalls); 13 id. at 2652 (1882) (statement of Sen. Blair) (stating that future Congresses cannot be bound by this law); id. at 2648 (statement of Sen. Garland) (stating that although he approves the substance of the bill, Congress cannot bind itself); 8 id. at 164 (1878) (statement of Sen. Garland) ("[A]n act passed by a previous Congress assuming to bind . . . a succeeding Congress need not be repealed because it is void; and for that reason I oppose this bill."). In 1880, when the Democrats controlled both houses of Congress, they attempted to pass a joint rule governing the count. See, e.g., 10 id. at 3652-63 (1880). This led to extended debate on the propriety of relying on the houses' rule-making power rather than on their legislative power. See, e.g., id. Some congressmen argued against the propriety of legislation on the related ground that the Constitution vested the electoral vote counting power in the President of the Senate and that Congress lacked legislative power to move it elsewhere. See 18 id. at 74-75 (1886) (statement of Rep. Baker); 17 id. at 1059 (statement of Sen. Wilson); 10 id. at 4389 (1880) (statement of Rep. Updegraff); id. at 3685 (statement of Rep. Ingalls).

110    See, e.g., 17 id. at 867 (1886) (statement of Sen. Morgan); 10 id. at 3685 (1880) (statement of Rep. Ingalls). President Lincoln stated this view when he reluctantly signed legislation (framed as a joint resolution) excluding the Confederate states from the electoral count in 1865. See Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 229-30 (1877).

111    See supra notes 106-07.

112    In 1880, when the Democrats controlled both houses of Congress, the Senate leadership refused to consider a bill. 10 Cong. Rec. 3052 (1880). Instead, the Senate proposed (and passed) a joint rule on the subject that failed in the House due to strong Republican objections. Id. at 3704.

113    Id. at 3694 (statement of Sen. Edmunds).

114    Specifically, this power was vested in the two houses of Congress while meeting in joint session. U.S. Const. amend. XII.

APPENDIX - 509

115 U.S. Const. art. I, § 8, cl. 18. This is the "horizontal" component of the Sweeping Clause, which extends to any power vested in the federal government by the Constitution. But see Kesavan, supra note 13, at 1731-43 (arguing against the breadth of this component of the Sweeping Clause).

116 See U.S. Const. art. III, § 2, cl. 2 (granting the Supreme Court jurisdiction over all cases that affect public ambassadors).

117 See 8 Cong. Rec. 54 (1878) (statement of Sen. Edmunds).

118 See 18 id. at 46 (1886) (statement of Rep. Dibble) (arguing for a very limited scope of power); 17 id. at 1019 (statement of Sen. Hoar); 15 id. at 5547 (1884) (statement of Rep. Herbert); 8 id. at 54 (1878) (statement of Sen. Edmunds); id. at 70 (statement of Sen. Morgan) (claiming Congress had assumed this understanding in regulating the submission of electoral votes in 1792. Congress may well have adopted this interpretation when, in 1792, it required the state governors to issue certificates to the electors, and when, in 1800, the two houses passed, but could not reconcile, versions of the Grand Committee Bill. See Currie, supra note 59, at 136-39, 288-91 (discussing the 1792 law and Grand Committee Bill); infra text accompanying note 410 (discussing the 1792 statute). Other congressmen may have held the more limited position that Congress's legislative power is confined to specifying the consequences that follow when the two houses disagree during the count. No power, they felt, could bind the houses when they were in agreement. See 17 Cong. Rec. 867 (1886) (statement of Sen. Morgan).

119 Some congressmen believed this position was unconstitutional when a state submitted only one set of properly certified electoral returns. See, e.g., Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 452-55 (statement of Sen. Morton); id. at 416-18 (recounting a Senate Report written by Sen. Morton). They argued that when a state submitted only one electoral return, it was constitutionally entitled to a presumption of validity and it required a concurrent vote of both houses to reject the electors. Id. at 416-18, 452-55. But since the ECA adopted the rule they wanted, whether for constitutional or prudential reasons, this objection need not detain us. Other congressmen believed that when a state submitted a single set of electoral votes, the Constitution compelled Congress to accept it. See 18 Cong. Rec. 45 (1886) (statement of Rep. Dibble); infra text accompanying note 453. The congressmen who adopted the ECA clearly spurned this position. See infra text accompanying note 295. So it, too, need not detain us here.

120 17 Cong. Rec. 2427 (1886) (statement of Sen. Hoar); id. at 1063 (statement of Sen. George); id. at 818 (statement of Sen. Sherman) (pointing out that more than half the time Congress's two houses have been controlled by different political parties); Edmunds, supra note 31, at 16.

121 17 Cong. Rec. 1019-20 (1886) (statement of Sen. Hoar).

122 Id.

123 See, e.g., 18 id. at 51 (statement of Rep. Adams).

124 Id. Adams was speaking against the House committee's attempt to give conclusive effect to any state that submitted one set of electoral returns. See infra text accompanying note 368. Adams begrudgingly accepted this provision in the Senate bill. 18 Cong. Rec. 52 (1886). Those decisions, he said, "may be regarded as a judicial determination of the question by a court of last resort," and that might justify congressional deference. Id.

125 See, e.g., 18 Cong. Rec. 31 (1886) (statement of Rep. Caldwell); 17 id. at 867 (statement of Sen. Morgan).

126 These congressmen understood electoral vote counting as a paradigmatic political question. See, e.g., 17 id. at 1058 (statement of Sen. Evarts); id. at 1024 (statement of Sen. Ingalls) (describing electoral vote counting as a political function); id. at 817, 1020 (statement of Sen. Sherman); 10 id. at 3700 (1880) (statement of Sens. Edmunds and Morgan). But see 17 id. at 1064 (1886) (statement of Sen. Edmunds) (implying availability of quo warranto proceeding for the losing candidate).

127 17 id. at 867 (1886) (statement of Sen. Morgan).

128 Id.; see also 18 id. at 51-52 (statement of Rep. Adams) (speaking in favor of the Senate bill); id. at 31 (statement of Rep. Caldwell); 15 id. at 5547 (1884) (statement of Rep. Herbert); 10 id. at 3700 (1880) (statement of Sens. Morgan and Edmunds).

APPENDIX - 510

129    17 id. at 867 (1886) (statement of Sen. Morgan); cf. 15 id. at 5547 (1884) (statement of Rep. Herbert) (discussing the power of the final decision-maker).

130    Senator Morgan, for example, preferred adopting a joint rule. 17 id. at 867-68 (1886) (statement of Sen. Morgan).

131    Id. at 867; cf. 18 id. at 75 (statement of Rep. Herbert) (speaking of the "law-abiding" sentiment of the American people).

132    13 id. at 2651 (1882) (statement of Sen. Morgan).

133    The ECA certainly impacted the litigation surrounding the 2000 presidential election. See, e.g., Bush v. Gore, 531 U.S. 98, 110 (2000) (refusing to remand case because "safe harbor" provision of the ECA was about to expire).

134    See 18 Cong. Rec. 75 (1886) (statement of Rep. Herbert) (commenting on how the ECA's ability to bind Congress's conscience would be amplified by the American people's desire for application of preexisting law to close elections).

135    See, e.g., id. at 30-31 (statement of Rep. Caldwell).

136    An illustration is the statement by Representative Caldwell, Chairman of the House committee managing the ECA on final passage, on why removing the word "lawful" from a particular clause was of no moment and whether section 2 of the ECA was meant to control against a concurrent vote of the two houses. Id.

137    Neither house of Congress recorded most of its votes on the bill, including the final vote. It is difficult to estimate how many colleagues each senator spoke for or persuaded. In addition, some congressmen made remarks, probably predicated on the view that Congress's electoral vote counting was not judicially reviewable, which indicates that they did not think the statute/rule issue was critical. See, e.g., id. at 30. ("Congress may provide by law or joint rule the manner of counting the [electoral] vote.").

138    Most congressmen during the years the ECA was debated assumed there would be no judicial review of Congress's electoral vote counting decisions. See, e.g., 17 id. at 1058 (statement of Sen. Evarts); id. at 867 (statement of Sen. Morgan); 15 id. at 5455 (1884) (statement of Rep. Hart); Eric Schickler et al., Safe at Any Speed: Legislative Intent, The Electoral Court Act of 1887, and Bush v. Gore, 16 J.L. & Pol. 717, 750-54 (2000) (Congress rejected federal court involvement in the electoral count).

139    The difference between the two theories may be muted for another reason: In theory the courts will enforce Congress's in-house rules when the rights of a third party, perhaps a losing presidential candidate, are affected. See Bach, supra note 107, at 730-31 (noting that courts are reluctant to oversee enforcement of in-house rules); John C. Roberts, Are Congressional Committees Constitutional?: Radical Textualism, Separation of Powers, and the Enactment Process, 52 Case W. Res. L. Rev. 489, 530-42 (2001) (stating that lower courts reserve the power to intervene but have never done so). But see Gregory Frederick Van Tatenhove, Comment, A Question of Power: Judicial Review of Congressional Rules of Procedure, 76 Ky. L.J. 597, 605-15 (1987) (finding that courts are more willing to intervene).

140    Bach, supra note 107, at 732-42 (noting that the Senate is more flexible in this regard than the House).

141    They all voted along party lines. See 13 Cong. Rec. 5144 (1882) (statement of Rep. Browne); Haworth, supra note 5, at 236, 243, 260, 335-36. For contemporary congressional reaction to the Electoral Commission, see supra text accompanying note 76.

142    See Richard D. Friedman, Trying to Make Peace with Bush v. Gore, 29 Fla. St. U. L. Rev. 811, 866 (2001); Michael J. Klarman, Bush v. Gore Through the Lens of Constitutional History, 89 Cal. L. Rev. 1721, 1724-47 (2001); Harold J. Krent, Judging Judging: The Problem of Second-Guessing State Judges' Interpretation of State Law in Bush v. Gore, 29 Fla. St. U. L. Rev. 493, 496 (2001); Randall Kennedy, Contempt of Court, 12 Am. Prospect 15 (2001), reprinted in Bush v. Gore:The Court Cases and the Commentary 336 (E.J. Dionne, Jr. and William Kristol eds., 2001); Cass Sunstein, What We'll Remember in 2050, Chron. Higher Educ. (2001), reprinted in Bush v. Gore: The Court Cases and the Commentary, supra, at 339; Jeffrey Rosen, The Supreme Court Commits Suicide, New Republic, Dec. 25, 2000 at 18, reprinted in Bush v. Gore: The Court Cases and the Commentary, supra, at 311.

143    It should be noted, however, that in 1877, the House, which was controlled by Democrats, did abide by the Electoral Commission statute even though it failed to work in the Democrats' favor. Haworth, supra note 5, at 278-83.

144    See supra text accompanying note 132.

145    The ECA matters until it is amended or rescinded. As previously discussed, whether the ECA is a statute or an internal rule matters for how it may be amended or rescinded. See supra text accompanying notes 25-26.

146    For examples of congressmen drawing from administrative law and election law, see 17 Cong. Rec. 1064 (1886) (statement of Sen. Edmunds); 15 id. at app. 305-06 (1884) (statement of Rep. Broadhead).

147    Neither did Congress consider itself a judicial body governed by judicial norms.

148    See, e.g., 18 Cong. Rec. 30 (1886) (statement of Rep. Caldwell); 13 id. at 2651-52 (1882) (statement of Sen. Blair); id. at 2650 (statement of Sen. Morgan).

149    See, e.g., 18 id. at 45-47 (1886) (statement of Rep. Dibble); 8 id. at 72-73 (1878) (statement of Sen. Jones); see also Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 691-702 (1877) (statement of Sens. Baldwin and Pinckney on the Grand Committee Bill of 1800).

150    13 Cong. Rec. 2650 (1882) (statement of Sen. Morgan); see also 15 id. at 5099-5101, 5105 (1884) (statement of Rep. Pryor).

151    See, e.g., 18 id. at 51-52 (1886) (statement of Rep. Adams) (Congress may legislate only for the case where its houses disagree); id. at 49 (statement of Rep. Eden) (Congress may act only when a state presents multiple returns). It is impossible to determine the extent these congressmen did so from constitutional or prudential considerations.

152    See, e.g., Thomas Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 623 (photo reprint 1972) (1868) (statutes may make the canvass "conclusive" or establish a "special . . . board . . . with powers of final decision"); George W. McCrary, A Treatise on the American Law of Elections 286-87 (Chicago, 4th ed., Callaghan & Co. 1897) (observing that "exclusive jurisdiction" to review elections may be committed to administrative boards or municipal legislatures); Edmunds, supra note 31, at 17.

153    See infra text accompanying notes 167-68.

154    See, e.g., Ill. Rev. Stat. ch. 46 (1880); Ill. Rev. Stat. ch. 37 (1845); 1822 N.Y. Laws 268; Cooley, supra note 152, at 617-23; McCrary, supra note 152, at 196-226, 387-406. I use the term "ballot," but the same was true in the early part of the century when voting was by voice, and, in the latter part of the century when voting, in some jurisdictions, was by machine.

155    Cooley, supra note 152, at 934.

156    McCrary, supra note 152, at 107.

157    See Cooley, supra note 152, at 606-14, 616-17, 620-21; McCrary, supra note 152, at 387-406.

158    Cooley, supra note 152, at 934.

159    Id.

160    Id. at 934-35.

161    Id. at 934.

162    State law might provide that the certificate be issued by the state returning board or the secretary of state. McCrary, supra note 152, at 228-29. Frequently, the duty was placed on the governor, see, e.g., Ill. Rev. St. ch. 46, § 78 (1880), and, for simplicity, I will refer only to his certificate.

163    Cooley, supra note 152, at 619-20, 621-22; McCrary, supra note 152, at 228-30.

164    People v. Cook, 8 N.Y. 67, 83 (1853) ("[I]t is the election, and not the certificate of the canvassers that gives the right to an office."); Att'y Gen. ex rel. Bashford v. Barstow, 4 Wis. 567, 826 (1855) ("[I]t is the election to an office, and

APPENDIX - 512

not the canvass of the votes, which determines the right to the office."); see also Cooley, supra note 152, at 623-24; McCrary, supra note 152, at 279-336. Thomas McIntyre Cooley, doyen of nineteenth-century constitutional scholars, put the matter this way:

As the election officers perform for the most part ministerial functions only, their returns, and the certificates of election which are issued upon them, are not conclusive in favor of the officers who would thereby appear to be chosen, but the final decision must rest with the courts. This is the general rule, and the exceptions are of those cases where the law under which the canvass is made declares the decision conclusive, or where a special statutory board is established with powers of final decision. Whatever may be the office, an election to it is made only by the candidate receiving the requisite plurality of the legal votes cast; and if any one, without having received such a plurality, intrudes into an office, whether with or without a certificate of election, the courts have jurisdiction to oust, as well as to punish him for such intrusion. Cooley, supra note 152, 623-24.

165    See infra text accompanying notes 166-77.

166    James L. High, A Treatise on Extraordinary Legal Remedies, Embracing Mandamus, Quo Warranto and Prohibition 544, 557, 580, 634-35 (Chicago, 3d ed., Callaghan & Co. 1896); McCrary, supra note 152, at 294.

167    See, e.g., People ex rel. Budd v. Holden, 28 Cal. 123, 129 (1865); People ex rel. Smith v. Pease, 27 N.Y. 45, 54 (1863); People ex rel. Van Voast v. Van Slyck, 4 Cow. 297, 323, 325 (N.Y. Sup. Ct. 1825); Barstow, 4 Wis. at 584; Cooley, supra note 152, at 623-24; McCrary, supra note 152, at 279-36.

168    State ex rel. Drew v. McLin, 16 Fla. 17, 62, 65 (1876); Barstow, 4 Wis. at 602; 17 Cong. Rec. 1064 (1886) (statement of Sen. Edmunds) (mentioning the availability of quo warranto proceedings to review gubernatorial elections). But see State v. Baxter, 28 Ark. 129, 139 (1873) (state constitution vests contest over governor's office exclusively in state legislature). Senators Edmunds and Sherman suggested that even the Presidency might be subject to quo warranto proceedings. See Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 481 (1877) (statement of Sen. Edmund) (stating that quo warranto available for presidential elections); 17 Cong. Rec. 817 (1886) (statement of Sen. Sherman). But other senators strongly disagreed. See, e.g., id. (statement of Sen. Hoar). In 1882, the House committee's substitute for the Senate bill provided for quo warranto proceedings after Congress counted the electoral votes. 13 id. at 5143 (1882). The substitute bill never passed.

169    The Constitution expressly vests this authority in Congress. See, e.g., U.S. Const. art. I, § 5, cl. 1. Some state constitutions vested authority to determine challenges to gubernatorial elections in the legislature also. See, McCrary, supra note 152, at 281 (citing Baxter, 28 Ark. at 129).

170    Cooley, supra note 152, at 623. But see id. at 624 n.1 (citing People v. Cicott, 16 Mich. 283 (1868)) (indicating that the person receiving the requisite number of votes has a constitutional right to have his claim tried by a jury).

171    See H.R. Misc. Doc. No. 44-13, at 481 (statement of Sen. Edmunds) (stating that presidential elections are subject to judicial proceedings); 17 Cong. Rec. 1064 (1886) (statement of Sen. Edmunds) (commenting that all states subject election administration to judicial oversight); infra text accompanying notes 172-75.

172    Legislatures also sought to modify quo warranto actions by enacting Actions in the Nature of Quo Warranto. See McCrary, supra note 152, at 236-37.

173    See infra text accompanying notes 175-77.

174    McCrary, supra note 152, at 281.

175    Defeated legislative candidates, and high executive officials, when they did not have recourse to the courts, could contest their (non)elections before the legislature. Nineteenth-century election contest laws may not have extended to presidential electors, and they may have only had recourse through quo warranto proceedings. See infra text accompanying notes 241-56, 214 (discussing quo warranto in 1870s elections and the absence of contest laws for presidential elections).

176    See Cooley, supra note 152, at 624-26; McCrary, supra note 152, at 280, 311-16, 339.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.        54

177    This is generally true under modern law also. An exception may be presidential elector contest states-like Texas-which are brought only before the governor. Tex. Elec. Code Ann. § 221.002 (Vernon 2003).

178    See Cooley, supra note 152, at 624-25; McCrary, supra note 152, at 227-42.

179    McCrary, supra note 152, at 189.

180    Id. at 191.

181    Id. at 149.

182    Id. at 199.

183    See, e.g., Edmunds, supra note 31, at 9 (equating prima facie determinations with the political branches and equating finality with judicial determination).

184    See, e.g., infra text accompanying notes 353-62, 431-37; see also infra text accompanying notes 198-227 (discussing the views of Justice Bradley and Field while on the Election Commission).

185    See, e.g., Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 362 (1877) (detailing the Senate Committee Report on the effect of Louisiana quo warranto proceeding in 1872); 5 Cong. Rec., pt. 4, 261 (1877) (statement of Justice Bradley, as an Electoral Commission member). Senator Morton indicated some disagreement with the 1872 Committee Report, but later changed his mind. See id. at 196 (discussing the Florida case in 1876); Dougherty, supra note 10, at 86. But see 5 Cong. Rec., pt. 4, 250 (statement of Justice Field, as an Electoral Commission member) (arguing that the quo warranto proceeding, which was filed before but decided after the electors balloted, related back to the date of filing and controlled who were the proper electors).

186    Congress could refuse to count the vote of the certified person. See infra text accompanying notes 212, 433 (discussing 1873 dispute over Louisiana's vote).

187    See H.R. Misc. Doc. No. 44-13, at 362 (addendum by Sen. Morton).

188    See infra text following note 236.

189    See infra text accompanying notes 240-60.

190    See infra text accompanying note 276.

191    See infra text accompanying notes 241-61. The quo warranto proceedings were completed before Congress met to count electoral votes, but Congress ignored the results of the quo warranto actions because they were not concluded before elector balloting day. H.R. Misc. Doc. No. 44-13, at 362 (1877) (addendum by Sen. Morton); 5 Cong. Rec., pt. 4, 261 (statement of Justice Bradley).

192    See, e.g., infra text accompanying note 365, 536 (discussing attempts to broaden the conclusive effect of state certification).

193    See 8 Cong. Rec. 70-72 (1878) (statement of Sen. Morgan); Frank J. Goodnow, The Writ of Certiorari, 6 Pol. Sci. Q. 493, 512-14 (1891); Louis L. Jaffe, Judicial Review: Constitutional and Jurisdictional Fact, 70 Harv. L. Rev. 953, 970-71 (1957) [hereinafter Jaffe, Judicial Review]; Louis L. Jaffe, The Right to Judicial Review I, 71 Harv. L. Rev. 401, 419 (1958); Frederic P. Lee, The Origins of Judicial Control of Federal Executive Action, 36 Geo. L.J. 287, 305 (1948).

194    See H.R. Misc. Doc. No. 44-13, at 691 (statement of Sen. Baldwin); McCrary, supra note 152, at 423-29 (discussing fraud by election officials); infra text accompanying notes 208-11, 357-59.

195    See, e.g., 18 Cong. Rec. 50-51 (1886) (statement of Rep. Adams); id. at 31 (statement of Rep. Caldwell); 15 id. at 5461-62 (1884) (statement of Rep. Springer); id. at 5547 (statement of Rep. Herbert); 13 id. at 2651-52 (1882) (statement of Sen. Blair).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.    

196 See, e.g., 18 id. at 45-47 (1886) (statement of Rep. Dibble); 8 id. at 72-73 (1878) (statement of Sen. Jones); see also H.R. Misc. Doc. No. 44-13, at 691-702 (statements of Sens. Baldwin and Pickney).

197 According to the proponents of this view, the remedy for fraudulently issued credentials was punishment at the state level. See H.R. Misc. Doc. No. 44-13, at 696 (statement of Sen. Pickney); 18 Cong. Rec. 45 (1886) (statement of Rep. Dibble).

198 See 5 Cong. Rec., pt. 4 (1877). I use Justice Bradley as my example even though he was not a member of Congress because: (1) while on the Electoral Commission he was charged with applying Congress's powers; (2) he was regarded as the most nonpartisan member of the Commission; and (3) he analyzed all the disputed cases (while other members of the Commission did not). At this point, I am not analyzing how Congress necessarily used the norms of election and administrative law. Instead, I am showing how the norms could be used, and that they were used, by contemporaries to think about Congress's electoral vote counting powers. These norms informed the arguments of all the members of the Electoral Commission and the advocates arguing before them, whether they were congressmen or justices. See id.

199 Act of Jan. 29, 1877, ch. 37, § 2, 19 Stat. 277, 229; see also 5 Cong. Rec., pt. 4, 259 (1877) (statement of Justice Bradley) ("[T]he powers of the Commission are precisely those . . . Congress possess[es in counting electoral votes]."). Bradley's remarks left open whether Congress could amplify its powers through legislation. Id. at 264. No power enhancing legislation had been enacted, however. For a review of the various disputes before the 1877 Electoral Commission, see Dougherty, supra note 10, at 136-213; Fairman, supra note 5, at 56-122; Haworth, supra note 5, at 57-167, 220-84.

200 5 Cong. Rec., pt. 4, 261 (1877) (statement of Justice Bradley) (discussing the Florida case). In Florida, a quo warranto proceeding was commenced before the electors balloted and was concluded, at the trial level, before Congress met to count the electoral votes. Haworth, supra note 5, at 78-80. Applying the officer de facto doctrine, Justice Bradley refused to consider the outcome of the quo warranto action. 5 Cong. Rec., pt. 4, 261 (1877). Justice Field disagreed with him on this point. Id. at 247 (statement of Justice Field).

201 5 Cong. Rec., pt. 4, 263, 265, 266 (1877) (statement of Justice Bradley).

202 Id.

203 Id.

204 The objection to the South Carolina returns focused on the entire conduct of the election and the presence of federal troops, not on any decision of the state canvassing board. Id. at 266. Bradley ruled that Congress, when meeting to count electoral votes, could take "notice" of disorder "of such a public character" as "secession and the late civil war" but not of lesser disorders. Id. Without a law providing for investigation, Congress had to assume the election was conducted properly. Id.; see also infra text accompanying note 209 (discussing "manifest fraud").

205 5 Cong. Rec., pt. 4, 261, 262-63 (1877).

206 Id. Justice Bradley was correct that the Louisiana statute was unique in giving its returning board discretionary power. See State ex rel. Bonner v. Lynch, 25 La. Ann. 267 (1873) (finding that the Supreme Court of Louisiana cannot go behind state returning board because the board exercises discretionary functions). However, Justice Bradley's view of the Florida returning board was not correct. In saying the Florida board also had discretionary power, Bradley pointedly did not follow the Supreme Court of Florida's determination that the Florida state canvassing board exercised only ministerial authority. 5 Cong. Rec., pt. 4, 261 (1877) (statement of Justice Bradley); State ex rel. Drew v. McLin, 16 Fla. 17 (1876). Bradley said simply, "I do not concur" with the Florida court; the court's ruling that the canvassing board exceeded its jurisdiction "was not necessary to the judgment." 5 Cong. Rec., pt. 4, 261 (1877). In doing this, he presaged the treatment of the Supreme Court of Florida by the United States Supreme Court in Bush v. Gore, 531 U.S. 98 (2000).

207 5 Cong. Rec., pt. 4, 261, 263 (1877) (statement of Justice Bradley).

208 Id. at 260, 263-64 (statement of Justice Bradley).

209 Id. at 263 (statement of Justice Bradley); see also id. at 260, 261.

210 Id. at 263.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.    56

211   Id. at 261.

212   Id. at 265. The state canvassing authority was the secretary of state, not a board. Id.

213   See id. at 264-66.

214   David A. McKnight, The Electoral System of the United States 419 (F.B. Rothman 1993) (1878).

215   Haworth, supra note 5, at 158, 162-63; Morris, supra note 5, 183-85.

216   Haworth, supra note 5, at 163; Morris, supra note 5, at 184.

217   See 5 Cong. Rec., pt. 4, 265 (1877) (statement of Justice Bradley).

218   Id. at 265.

219   Id.

220   Id.

221   The ineligible elector who resigned, and the elector who the remaining Republican electors had appointed to fill the vacancy, were the same person. Haworth, supra note 5, at 165.

222   See Harp Week, Finding Precedent: Hayes vs. Tilden, at http:// elections.harpweek.com/9Controversy/bio-Controversy-Full.asp? UniqueID=2&Year=1876 (last visited Feb. 15, 2004).

223   5 Cong. Rec., pt. 4, 245 (1877) (statement of Justice Field).

224   Id. at 250.

225   Justice Field held that the weight of American precedent was that when the victorious candidate is ineligible, it is unfair to "elect to office a man whose pretensions the people had designed to reject." Id. at 250; Cooley, supra note 152, at 620 (stating the American rule); McCrary, supra note 152, at 248-50 (same). English precedent was to the contrary. 5 Cong. Rec., pt. 4, 250 (statement of Justice Field); McCrary, supra note 152, at 247.

226   5 Cong. Rec., pt. 4, 251 (1877) (statement of Justice Field).

227   Id. The consequence of Justice Field's logic, had it prevailed, is that Hayes and Tilden would have tied, and the House, controlled by Democrats, presumably would have elected Tilden. Justice Field gave no opinion on the Louisiana and South Carolina controversies.

228   **Electoral Count Act** of 1887, ch. 90, § 1, 24 Stat. 373, 373 (current version at 3 U.S.C. § 7 (2000)).

229   U.S. Const. art. I, § 1, cl. 3.

230   Act of Mar. 1, 1792, ch. 8, § 2, 1 Stat. 239, 239.

231   Id. § 1.

232   2 Annals of Cong. 278-79 (1792).

233   Id. (statement of Reps. White, Dayton, and Baldwin). Representative White felt that "[i]f it had been possible, he could have wished that the Electors should meet and give in their votes on the very day of their being chosen." Id. at 278.

234   Act of Jan. 23, 1845, ch. 1, 5 Stat 721 (codified at 3 U.S.C. § 1 (2000)).

235   Id.

236    What is popularly known as election day is really "appointment" day, the time when electors are appointed. The states determine how electors are appointed; a popular election is one of the ways they may select electors. See U.S. Const. art. II, § 1, cl. 2. By 1845, popular elections had become the near-universal method for selecting electors, but even then, as well as later, states used other methods. See Friedman, supra note 142, at 817 n.18. In this Article, I will refer to "appointment" day as election day in deference to modern usage.

237    Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 72-75 (1877) (discussing whether Michigan was entitled to electoral votes); id. at 49-56 (discussing whether Missouri was entitled to electoral votes); id. at 46-47 (discussing whether Indiana was entitled to electoral votes). In 1837, there was also a potential controversy, which Congress chose to overlook, over whether appointed electors were constitutionally unqualified because they held federal office. See id. at 71. In 1809, there had been a potential controversy, which Congress also ignored, over whether Massachusetts had followed the proper appointment process. See id. at 37-42.

238    See id. at 246-47 (stating that Georgia electors voted on the wrong day); id. at 231-36 (discussing the dispute over votes from Georgia, which arguably had not yet complied with Congress's terms for readmission after the Civil War); id. at 86-144 (stating that Wisconsin electors voted on the wrong day); infra text accompanying note 590 (discussing 1865 problem of votes submitted by Confederate states).

239    See H.R. Misc. Doc. No. 44-13, at 363-407 (discussing the objection to three Georgia electoral votes cast for Horace Greeley, who had died after election day but before elector balloting day; discussing the objection to Mississippi, Texas, and Arkansas electoral votes for improper certification; and discussing the objection to Arkansas electoral votes because there had been no valid election).

240    There could have been a second dispute over multiple slates of electors: Two slates of electors claimed to have carried Arkansas, but in the end, only one set of Arkansas's electoral votes was presented when the other slate did not press its case. Id. at 389-91; Electoral College, Ark. Gazette, Dec. 5, 1872, at 4:3. Arkansas's electoral vote was still rejected by Congress on the grounds that no valid election had occurred and that there had been no proper certification. See H.R. Misc. Doc. No. 44-13, at 406-07.

241    Althea D. Pitre, The Collapse of the Warmoth Regime, 1870-72, 6 La. Hist. 161, 180-82 (1965).

242    Kellogg v. Warmoth, 14 Fed. Cas. 157 (C.C.D. La. 1872) (No. 7667) (Governor Warmoth's name is misspelled in the case); H.R. Misc. Doc. No. 44-13, at 359 (Senate Report on the Electoral Vote of Louisiana).

243    Kellogg, 14 Fed. Cas. at 157; H.R. Misc. Doc. No. 44-13, at 359 (Senate Report on the Electoral Vote of Louisiana).

244    H.R. Misc. Doc. No. 44-13, at 391-94 (Certificates of Louisiana electors indicating the date they cast their ballots).

245    Id. at 394 (statements of Reps. Sheldon and Stevenson, and Sen. Carpenter); id. at 361 (statement in Senate Report).

246    See Kellogg, 14 Fed. Cas. at 157; H.R. Misc. Doc. No. 44-13, at 358-63, 391-94, 396-99, 402-05; Pitre, supra note 241, at 178-82. The action filed in Louisiana on November 14, 1872 to determine the proper composition of the canvassing board was not resolved until January 1873. See State v. Wharton, 25 La. Ann. 2 (1873); H.R. Misc. Doc. No. 44-13, at 362.

247    See supra notes 201-21 and accompanying text. Oregon also sent in multiple slates of electors. In Oregon, however, the problem did not involve who won the election. One of the Republican electors held a federal appointment and was, therefore, ineligible to be a presidential elector. The controversy turned on the governor's power to make a substitute appointment. See supra text accompanying note 218. Because the Oregon dispute did not involve an election contest, it will not be discussed at this point.

248    Hayes and Tilden were separated by one electoral vote. See supra note 222.

249    See 5 Cong. Rec., pt. 4, 261 (1877) (statement of Justice Bradley) (concerning Florida); Dougherty, supra note 10, at 202 (discussing South Carolina). An action was probably not filed in the third state, Louisiana, because the Supreme Court of Louisiana in 1873 had ruled that its canvassing board exercised discretionary authority and, therefore, was not subject to judicial revision; its determination was final. See State ex rel. Bonner v. Lynch, 25 La. Ann. 267 (1873); supra text accompanying note 206.

APPENDIX - 517

250   See 5 Cong. Rec., pt. 4, 287 (1877) (reprinting Florida's certificates which are dated December 6); Haworth, supra note 5, at 76 (stating that the canvass was completed on the night of December 5). The story of the Florida count is detailed in Jerrell H. Shofner, Florida in the Balance: The Electoral Count of 1876, 47 Fla. Hist. Q. 122 (1968). Florida law allowed the returning board thirty-five days to complete its work, even though federal law required the electors to ballot on the twenty-ninth day. Id. at 130.

251   Shofner, supra note 250, at 146.

252   Id. at 147. It could not have been started any earlier, as quo warranto proceedings require that someone be in office in order to be challenged.

253   See Haworth, supra note 5, at 78-79.

254   See id. at 79.

255   Id.

256   Jerrell H. Shofner, Florida Courts and the Disputed Election of 1876, 48 Fla. Hist. Q. 26, 43 (1969). With the election settled, the Republican electors apparently never prosecuted their appeal. Id. at 42. The Supreme Court of Florida was composed of two Republicans and one Democrat, and that may explain why the Court did not expedite its consideration of the quo warranto appeal.

257   See, e.g., 5 Cong. Rec., pt. 4, 239 (1877) (statement of Sen. Hoar); id., 196-97 (statement of Sen. Morton).

258   See Haworth, supra note 5, at 154.

259   5 Cong. Rec., pt. 4, 180 (1877).

260   State ex rel. Barker v. Bowen, 8 S.C. 382 (1876) (refusing removal to the federal courts, but mentioning the date the action was commenced).

261   Bowen, 8 S.C.at 403, 408. The error was that the Democratic electors had brought the case in the name of the state rather than in the name of the United States. Id. at 407. I am unaware of any other court with a similar pleading rule. It should be noted that the Bowen court was composed of Judges Moses, Willard, and Wright, all of whom were Republicans. See Ernest McPherson Lander, Jr., A History of South Carolina, 1865-1910 26 (1960) (on Willard); William C. Hine, Jonathan Jasper Wright, in 24 Am. Nat'l Biography 34 (John A. Garraty & Mark C. Carnes eds., 1999) (on Wright); R. H. Woody, Franklin J. Moses, Jr., Scalawag Governor of South Carolina, 1872-74, 10 N.C. Hist. Rev. 111, 112 (1933) (on Moses).

262   Edmunds, supra note 31, at 18.

263   8 Cong. Rec. 51 (1878) (statement of Sen. Edwawrds); 7 id at 3738 (statement of Sen. Edwards).

264   Compare 8 id. at 51 (citing S. 1308, 45th Cong. (1878)), with **Electoral Count Act** of 1887, ch. 90, 24 Stat. 373 (current version at 3 U.S.C. §§ 5- 6, 15-18 (2000)) (the ECA); 13 Cong. Rec. 859 (1882) (Sen. Hoar saying the 1882 bill is "the one originally . . . reported by the Senator from Vermont [Edwards] . . . in 1878").

265   8 Cong. Rec. 51 (1878) (citing S. 1308, 45th Cong. (1878)).

266   Id. (statement of Sen. Edmunds).

267   Id. at 197 (describing S. 1308, 45th Cong. (1878) as passing the Senate, being introduced in the House, and being referred to a committee from which it never emerged).

268   See supra note 235 and accompanying text.

269   See, e.g., 15 Cong. Rec. 5076 (1884) (citing S. 25, 48th Cong. (1884)); 13 id. at 859 (1882) (citing S. 613, 47th Cong. (1882)).

270    17 id. at 2387 (1886) (citing S. 9, 49th Cong. (1886)).

271    In 1934, in the only substantive change to the ECA since its adoption, Congress moved elector balloting day to "the First Monday after the second Wednesday in December," only forty-one days after election day. The change was made to conform with the newly adopted Twentieth Amendment which moved the presidential inauguration day to January 20. U.S. Const. amend. XX. At the time, Representative Sumners observed that the time between election day and elector balloting was too short "to allow a reasonable time for settling contests over the election of presidential electors" and that the general election should be moved to early October. 78 Cong. Rec. 9900 (1934) (statement of Rep. Sumners). Sumners' suggestion was never acted on and the current spacing remains three to four weeks less than the authors of the ECA thought appropriate. On two occasions, the time allowed by the 1934 amendment has proven insufficient. After the 1960 election, Hawaii took until December 30 to decide (at the trial level) the outcome of its election. 107 Cong. Rec. 290 (1961) (setting forth the Hawaii judgment). After the 2000 election, Florida was still attempting to resolve its election when the United States Supreme Court halted the process six days before the electors balloted. See infoplease, 2000 Election Chronology, at http:// infoplease.com/ipa/A0884144.html (last visited on Feb. 16, 2004).

272    **Electoral Count Act** of 1887, ch. 90, § 2, 24 Stat. 373 (current version at ⬜ 3 U.S.C § 5 (2000)).

273    See supra text accompanying note 167 (discussing quo warranto).

274    In 1876, for example, the Florida trial court reached its decision in late January. See 5 Cong. Rec., pt. 4, 288 (1877) (stating that Florida Certificate No. 3 mentioned the date the quo warranto was completed); supra text following note 250.

275    Election contest laws are statutorily authorized in nearly all states and expedite post-election relief procedures beyond mere recounting of ballots. See Developments in the Law-Elections, 88 Harv. L. Rev. 1114, 1298, 1302 (1975). Although quo warranto was the common law method for trying an office holder's title to office, election contest laws was an alternative proceeding date to the early nineteenth century. See, e.g., 1821 Ill. Laws 74.

276    Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 346 (1877); see also id. at 408, 414; 13 Cong. Rec. 2647 (1882) (statement of Sen. Pugh) (commenting on state election contest laws); 5 id. at 24 (1876) (President Grant, in the Annual Message he sent to Congress during the Hayes-Tilden contest stated that "[t]he attention of Congress cannot be too earnestly called to the necessity of throwing some greater safeguard over the method of choosing and declaring the election of a President. Under the present system there seems to be no provided remedy for contesting the election in any one State.").

277    Edmunds, supra note 31, at 18.

278    In 1877, just after the disastrous Hayes-Tilden election, Senator Eaton, a Democrat, proposed an amendment commanding that "[a] tribunal for the decision of all contested issues arising in the choice of the electors of President and Vice-President shall be appointed in each State" by the state's governor and senate "not less than twelve months prior to the time fixed by law for the choice of electors." 6 Cong. Rec. 415 (1877) (describing S.R. Res. No. 7). Eaton's proposal never made it out of committee. Ames, supra note 4, at 121, 401.

279    See Samuel Dibble, Views of the Minority to Accompany Bill S. 9, H.R. Rep. 49-1638, pt. 2, at 1-2 (1886)9, H.R. Rep. 49-1638, pt. 2, at 1-2 (1886); 18 Cong. Rec. 45 (1886) (statement of Rep. Dibble); 17 id. at 1061 (statement of Sen. Teller); 15 id. at 5546 (1884) (statement of Rep. Hammond); id. at 5078 (statement of Rep. Eaton), discussed in Burgess, supra note 10, at 635-37.

280    See 17 Cong. Rec. 1020 (1886) (statement of Sen. Hoar) (preferring to appoint the senior Justice of the Supreme Court as arbiter); Edmunds, supra note 31, at 18; Schickler et al., supra note 138, at 750-54. In 1873, when the problem of contending elector slates first arose, Senator Frelinghuysen, a Republican, proposed a constitutional amendment ordaining that "[d]isputes arising with regard to the persons chosen as electors of President and Vice-President shall . . . be decided by the Supreme Court of the United States." H.R. Misc. Doc. No. 44-13, at 345. Frelinghuysen's amendment, like Eaton's proposal, see supra note 278, never made it out of committee. Ames, supra note 4, at 119, 394.

281    13 Cong. Rec. 2646 (1882) (statement of Sen. Pugh).

282    ⬜ 3 U.S.C. § 5 (2000).

**APPENDIX - 519**

283     See, e.g., H.R. Misc. Doc. No. 44-13, at 452-55 (statement of Sen. Morton) (discussing the 22d Joint Rule); 10 Annals of Cong. 27-32, 126-46 (1800) (recounting the debate on the Grand Committee bill).

284     See supra text accompanying note 66. In regard to Arkansas, some Congressmen pointed to a formal defect in the electors' certification: it was impressed with the seal of the secretary of state, not the seal of the State. H.R. Misc. Doc. No. 44-13, at 431 (statement of Sen. Morton). But also among the objections were protests to the validity of the electors' election and the canvass of the state vote. Id. at 394-95 (statement of Sen. Rice); see also id. at 389-91 (statement of the Vice President on presence of other Arkansas returns that were too informal to be presented); id. at 335 (statement of Sen. Sherman establishing a committee to inquire into the Arkansas election). In subsequent years, some congressmen unfairly characterized Congress's rejection of Arkansas's vote as entirely due to the absence of the seal. See, e.g., id. at 431 (statement of Sen. Morton). In 1869, Congress had questioned Louisiana's electoral vote based on the electors' underlying election, but both houses voted to admit the votes. Id. at 238-46.

285     The single house veto was allowed by the 22d Joint Rule, the then-current regulation for Congress's electoral counts. See supra text accompanying notes 63, 91 (discussing the 22d Joint Rule).

286     Burgess, supra note 10, at 635.

287     8 Cong. Rec. 70 (1878) (statement of Sen. Morgan).

288     **Electoral Count Act** of 1887, ch. 90, § 2, 24 Stat. 373, 373 (current version at  3 U.S.C. § 5 (2000)).

289     See Biographical Directory of the United States Congress, George Frisbie Hoar, at http://bioguide.Congress.gov/scripts/biodisplay.pl? index=H000654 (last visited Feb. 15, 2004).

290     17 Cong. Rec. 1020 (1886) (statement of Sen. Hoar); see also 18 id. at 49 (statement of Rep. Eden) (describing the Senate bill and opposing it on behalf of the House substitute); 17 id. at 867 (statement of Sen. Morgan) ("In this bill there is but one sentiment, and that is to secure to each State its full electoral power, to be expressed and exercised, as far as may be, under the Constitution, through its own laws and through the final and conclusive judgment of its own tribunals.").

291     13 id. at 2645 (1882) (statement of Sen. Pugh, as Chair of the committee reporting on the bill, introducing the bill).

292     13 id. at 2646 (statement of Sen. Pugh).

293     See, e.g., 18 id. at 50 (1886) (statement of Rep. Eden); 17 id. at 867 (statement of Sen. Morgan); 15 id. at 5461 (1884) (statement of Rep. Springer) (opposing the ECA for this reason); id. at 5459 (statement of Rep. Parker); id. at 5078-79 (statement of Rep. Browne); 13 id. at 2651 (1882) (statement of Sen. Blair) (opposing the ECA for this reason); id. at 2651 (statement of Sen. Hoar); 8 id. at 158-59 (1878) (statement of Sen. Bayard); id. 52-53 (statement of Sen. Edmunds). The only indication in the legislative history that a section 2 determination is not meant to be conclusive is from congressmen who supported both the bill and Congress's moral obligation to be bound by a section 2 determination, but thought that one Congress could not constitutionally bind another. See, e.g., 18 id. at 31 (1886) (statement of Rep. Caldwell); 17 id. at 867-68 (statement of Sen. Morgan) (stating that for this reason he prefers a joint resolution, but will vote for the bill); 13 id. at 2650-51 (1882) (statement of Sen. Morgan) (same). The difference between these two positions matters only if there is judicial review of Congress's determination that the requirements for meriting section 2 status have not been met.

294     See, e.g., 15 id. at 5547, 5550 (1884) (statement of Rep. Herbert) (showing that the House adopted Rep. Herbert's amendment to the Senate bill only to immediately vote the whole bill down in favor of a House substitute that enlarged the scope of conclusive state action); 13 id. at 2651-52 (1882) (statement of Sen. Blair). But see 15 id. at 5459 (1884) (statement of Rep. Parker) (stating, as an ardent nationalist, support for state power in this area).

295     See, e.g., Samuel Dibble, Views of the Minority: To Accompany Bill S.9, H.R. Rep. 49-1638, pt. 2, at 1-2 (1886)9, H.R. Rep. 49-1638, pt. 2, at 1-2 (1886); 18 Cong. Rec. 48 (1886) (statement of Rep. Cooper).

296     18 Cong. Rec. 668 (1887); id. at 74-77 (1886).

297     Edmunds, supra note 31, at 18.

APPENDIX - 520

298    See infra text accompanying notes 299-317.

299    The subtleties of whether a tribunal is the state's designated section 2 authority are discussed in Wroth, supra note 13, at 338-40.

300    The ECA does not define, and Congress never discussed, what it meant by a "final determination." Would a judgement of a trial court be final if subject to appellate review? Would a judgment of a court of last resort be final if subject to a motion for rehearing?

301    **Electoral Count Act** of 1887, ch. 90, § 2, 24 Stat. 373, 373 (current version at 3 U.S.C. § 5 (2000)).

302    8 Cong. Rec. 52 (1878) (statement of Sen. Edmunds); see also 18 id. at 75 (1886) (statement of Rep. Herbert); id. at 47 (statement of Rep. Cooper). In 1872, the governor of Louisiana had signed a bill into law after the election for the express purpose of constituting the returning board as he wanted it. Pitre, supra note 241, at 181. The law had passed the legislature two years before the election, but the governor delayed signing it. Id. at 177, 181.

303    18 Cong. Rec. 75 (1886) (statement of Rep. Herbert). Note that the focus in the remarks quoted in the text is on procedure, such as establishing commissions and their jurisdiction. This indicates that the section 2 limitation we are discussing extends to the legislative designation of the section 2 authority and all post-election day legislation concerning an election's final determination. It does not encompass the designated authority's use of its power. In other words, during the 2000 presidential election, had the Supreme Court of Florida finished its work within section 2's "safe harbor" provision, and ruled for the Democratic electors, the Republican charge that it had "changed the law," see Andrew Ferguson, Who Are You Calling Angry?, Time, Dec. 18, 2000, at 50; Thomas Ulen, Book Review, 2001 U. Ill. J.L. Tech. & Pol'y, 317, 326 (2001) (quoting Cass Sunstein, Echo Chambers: Bush v. Gore, Impeachment, and Beyond 4 (2001)), would not have been a proper ground for claiming a violation of this part of section 2. The bonafides of the section 2 tribunal's use of its authority may be a violation of section 2's putative fraud exception. See infra text accompanying notes 357-81. But if every disputable application of substantive law came within the section 2 limitation under discussion here, it would allow Congress to deny the tribunal's decision regarding section 2 status based on "mere error." That is something the ECA did not intend.

304    See Samuel Dibble, Views of the Minority: To Accompany Bill S. 9, H.R. Rep. 49-1638, pt. 2, at 2 (1886)9, H.R. Rep. 49-1638, pt. 2, at 2 (1886). Specifically, Representative Dibble wrote:
[I]n case a contention shall arise in a State as to who are its lawfully-chosen electors, and it should happen that no State law exists which will meet the emergency thus arising, we contend that Congress has no Constitutional power to prescribe that such State may not provide for the determination of such contention at any time prior to the day for casting the electoral vote.
Id.; see also 18 Cong. Rec. 46 (1886) (statement of Rep. Dibble). The vociferously pro-states' rights committee minority really meant it when they said that the states' elector appointment power was plenary, and that "up to . . . the day when the electors are to cast their votes, the State power as to appointment can not be interfered with in any manner, shape, or form by the Congress of the United States, or by any other power." Id.

305    **Electoral Count Act** of 1887 § 2.

306    8 Cong. Rec. 51 (1878) (citing S. 1308, 45th Cong. § 4 (1878)).

307    13 id. at 859 (1882) (citing S. 613, 47th Cong. § 2 (1882)); 10 id. at 3656 (1880) (citing S. 1485, 46th Cong. § 2 (1880)). The 1882 bill was introduced as "the Edmunds bill." 13 id. at 2645 (1882) (statement of Sen. Pugh); see also id. at 186 (statement of Sen. Hoar).

308    15 id. at 430 (1884) (statement of Sen. Hoar).

309    Id. at 5076 (citing S. 25, 48th Cong. § 2 (1884)).

310    The bill cut the time from sixty-nine or sixty-two days, depending on how the calendar breaks, to sixty-three or fifty-six days, respectively. See supra text accompanying note 271. Current law allows only forty-one days due to the changes introduced in 1934. See supra note 271.

APPENDIX - 521

311    18 Cong. Rec. 46 (1886) (statement of Rep. Dibble).

312    Id.; see also Samuel Dibble, Views of the Minority: To Accompany Bill S. 9, H.R. Rep. 49-1638, pt. 2, at 1-2 (1886)9, H.R. Rep. 49-1638, pt. 2, at 1-2 (1886) ("[U]p to the time of casting the votes in the electoral colleges, each State has the right, in cases of contest, of determining which are its lawfully chosen electors.").

313    See supra text accompanying note 304.

314    18 Cong. Rec. 50 (1886) (statement of Rep. Eden) (rejecting the minority's view that the bill "dictate[s] to the States the mode of appointing electors"); id. at 47 (statement of Rep. Cooper) (eventually misreading the provision as allowing the law to be passed six days before the electors meet).

315    Id. at 50 (statement of Rep. Eden) (after discussing the minority's view, describing his understanding of the general purpose of the bill).

316    **Electoral** **Count** **Act** of 1887, ch. 90, § 3, 24 Stat. 373, 373 (current version at 3 U.S.C. § 6 (2000)).

317    Whether with modern communications the six-day proviso is still as helpful as it was under nineteenth-century conditions, and whether it is worth the collateral problems it creates, are certainly open questions.

318    I have traced the notion of providing a decent interval between elector ascertainment and elector balloting to Senator Eaton's proposed constitutional amendment in 1877 requiring the states to create "[a] tribunal for the decision of all contested issues arising in the choice of [presidential] electors." 6 Cong. Rec. 415 (1877). The proposed amendment required the tribunals to be constituted a year before the election and to render their decisions a month before the electors balloted. Id. Eaton's proposal never emerged from committee. Ames, supra note 4, at 121, 401. The only other appearance of a suggestion for an interval between elector ascertainment and elector balloting was in Representative Updegraff's 1882 House substitute for Senator Edmunds's bill. That substitute bill directed the governor to provide his certificate "five days before the day fixed for their meeting, or as soon as a final judicial determination shall be made." 13 Cong. Rec. 5143 (1882) (discussing section 4 of the House substitute). However, under the House substitute, the tribunal rendering the decision was allowed conclusive effect even if its decision was reached on elector balloting day. Id. (discussing section 3 of the House substitute). Yet Updegraff's 1882 idea that it would be good for the governor to have the certificates prepared five days before the day for casting electoral ballots so nicely anticipates having the tribunal's decision rendered six days before the electors' ballot, that it is hard not to imagine a connection between it and the six-day provision's initial appearance in 1884.

319    Commentators temporarily lost sight of this during the 2000 election dispute. See, e.g., Contesting the Vote: Comments from Gore on the Florida Election, N.Y. Times, Nov. 29, 2000, at A1 (noting that Vice President Gore said December 12 is the "deadline for seating electors"); Contesting the Vote: Update-Matter of Dates and Disputes, N.Y. Times, Nov. 29, 2000, at A25 ("Mr. Gore . . . is facing a Dec. 12 federal deadline for selecting Florida's 25 electors.").

320    18 Cong. Rec. 50 (1886) (statement of Rep. Eden).

321    See infra text accompanying notes 477-80 (discussing section 4 of the ECA).

322    **Electoral** **Count** **Act** of 1887, ch. 90, § 2, 24 Stat. 373, 373 (current version at 3 U.S.C. § 5 (2000)). That is, it is conclusive only to the identity of the electors appointed to cast the states' electoral votes. For simplicity, I have made a bit of an understatement here. I will argue that requiring Congress to accept a section 2 declaration as to who are the state's electors covers errors in their underlying election but, perhaps, does not cover either a total failure to have an election or an election so rife with impropriety that the state tribunal's decision upholding it is fraudulent. See infra text accompanying notes 357-81.

323    See **Electoral** **Count** **Act** of 1887 § 2.

324    See, e.g., 18 Cong. Rec. 45 (1886) (statement of Rep. Dibble); 8 id. at 162-63 (1878) (statement of Sen. Merrimon).

325     They are, after all, state officers, performing a federal function. See Ray v. Blair, 343 U.S. 214, 224 (1952) (explaining that the electors are not federal officers, even though they perform a federal function); 18 Cong. Rec. 45 (1886) (statement of Rep. Dibble).

326     8 Cong. Rec. 163 (1878) (statement of Sen. Merrimon) (mentioning bribery, intimidation, and fraud); id. at 70; (statement of Sen. Morgan) (mentioning "corruption through bribery").

327     See U.S. Const. art. II, § 1, cls. 3-5.

328     Congress has never had a case where an elector voted corruptly. Congress's exercise of its jurisdiction to scrutinize the constitutional qualifications of electors dates to 1837, and its jurisdiction to scrutinize other constitutional norms to 1817. Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 44-48, 70-76 (1877); Kesavan, supra note 13, at 1680, 1683-85. None of these episodes resulted in the rejection of a vote. In 1872, three votes from Georgia were rejected for violation of the constitutional norm of voting for a qualified presidential candidate-the disqualification was that the candidate had died after election day. See text accompanying note 66 (discussing Greeley). Congress exercised its power to consider whether electors complied with constitutional norms most recently in 1969 in discussing whether to reject a vote cast by an elector who did not vote for his party's presidential candidate. See Kesavan, supra note 13, at 1692-94.

329     U.S. Const. art. II, § 1, cl. 2 (prohibiting federal officials from being electors).

330     15 Cong. Rec. 5076 (1884) (citing S. 25, 48th Cong. § 2 (1884)); 13 id. at 859 (1882) (citing S. 613, 47th Cong. § 2 (1882)); 8 id. at 51 (1878) (citing S. 1308, 45th Cong. § 4 1878)).

331     Disqualifications usually require factual determinations. See, e.g., H.R. Misc. Doc. No. 44-13, at 71 (statement of Sen. Grundy) (discussing difficulty of determining if certain electors were constitutionally disqualified). If Congress was willing to defer to state adjudication of other factual matters, the deference reasonably could be extended to the determination of whether electors held federal offices.

332     8 Cong. Rec. 163 (1878) (statement of Sen. Merrimon); id. at 158-59 (statement of Sen. Bayard); id. at 70 (statement of Sen. Morgan); see also 18 id. at 31 (1886) (statement of Rep. Caldwell) (discussing other constitutional objections to the elector's vote).

333     8 id. at 70 (1878) (statement of Sen. Morgan); see also id. at 158 (statement of Sen. Bayard). Senator Morgan, who was speaking about the statute when it contained the "lawful title to office" language, would have extended section 2's conclusivity principle to include an elector's constitutional eligibility if it had been specifically addressed in a section 2 determination. See id. at 70-71.

334     The change apparently was made in committee and no comment was made about it on the Senate floor.

335     See Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 46-47, 49-56, 70-75 (discussing Indiana, Missouri, and Michigan).

336     18 Cong. Rec. 31 (1886) (statement of Rep. Caldwell) (citing U.S. Const. art. IV, § 4).

337     I treat constitutional infirmities as implied limitations separate from the electors' constitutional qualifications because they deal with matters-statehood and compliance with the Fourteenth Amendment, for example-which normally would not be raised before the state's tribunal because they might impugn the title of all the contending slates of electors.

338     15 id. at 5076 (1884) (citing S. 25, 48th Cong. § 2 (1884)) ("try and determine"); 13 id. at 859 (1882) (citing S. 613, 47th Cong. § 2 (1882)) ("try and determine"); 8 id. at 51 (1878) (citing S. 1308, 45th Cong. § 4 (1878)); see also Edmunds, supra note 31, at 18 ("[I]t would be safer . . . to have [elector election] disputes settled by honest judicial means in the States in which they may occur . . . .").

339     17 Cong. Rec. 1058 (1886) (statement of Sen. Evarts).

340     Id.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.      

341    See, e.g., id. at 1062 (statement of Sen. Saulsbury).

342    See, e.g., id. at 1061 (statement of Sen. Teller).

343    Id. at 1063-64.

344    Id. at 2387 (citing S. 9, 49th Cong. § 2 (1886), after recommittal); see also id. at 2427 (statement of Sen. Hoar) (explaining the change).

345    Id. at 2427 (statement of Sen. Hoar).

346    See infra text accompanying notes 347-56.

347    See supra text accompanying note 288 (quoting section 2 of the ECA).

348    See infra text accompanying notes 349-52.

349    17 Cong. Rec. 1020 (1886) (statement of Sen. Hoar); see also Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 481 (1877) (statement of Sen. Edmunds) (stating that presidential elections are subject to judicial proceedings); 17 Cong. Rec. 1064 (1886) (statement of Sen. Edmunds) (commenting that all states supply election administration to judicial oversight).

350    17 Cong. Rec. 1759 (1886) (remarks of Sen. Hoar) (saying the "substance" of the bill that reemerged from the Committee was "unchanged"); id. at 2386 (same).

351    **Electoral Count Act** of 1877, ch. 90, § 2, 24 Stat. 373, 373 (current version at 3 U.S.C. § 5 (2000)).

352    To illustrate what the ECA requires: Until 1989, Texas's election contest law designated its State Board of Canvassers as the authority to hear presidential elector election contests. Tex. Elec. Code Ann. § 221.002 (Vernon 1985), amended by Tex. Elec. Code Ann. § 221.002 (Vernon 1989). It also authorized the Board, when hearing an elector contest, to adjudicate the issue of whether illegal votes were counted or legal votes refused. Id. § 221.002 (Vernon 2004). Incidentally, in 1989, Texas substituted the Governor as the final arbiter of presidential election contests. See id. Thus, in the 2000 election, we might have seen George Bush authorized to determine an elector election contest involving Al Gore and himself.

353    Edmunds, supra note 31, at 9; see also 17 Cong. Rec. 1063-64 (1886) (statement of Sen. Edmunds) (stating that the initial determination of elections is an administrative function everywhere subject to judicial review).

354    Edmunds, supra note 31, at 19-20.

355    Id. at 18-19. Edmunds also preferred that there be "prompt review of the decisions of the State courts by the Supreme Court of the United States." Id. at 19. He never incorporated this latter preference into any proposed legislation, probably in deference to the politics of the matter and his own doubts about whether federal jurisdiction was constitutional. The Supreme Court had only just begun to hint at federal interest in presidential elections. See Ex parte Yarbrough, 110 U.S. 651 (1884); cf. Ex parte Siebold, 100 U.S. 371 (1879) (federal interest in congressional elections).

356    Edmunds, supra note 31, at 19.

357    8 Cong. Rec. 159 (1878) (statement of Sen. Bayard).

358    Id. at 70-71 (statement of Sen. Morgan).

359    Senator Morgan was an active proponent of the ECA throughout its extended consideration, serving as a member of the Senate committee that drafted the ECA and as a floor debater. See 17 Cong. Rec. 863-68, 1063 (1886) (statements of Sen. Morgan); 15 id. at 2650-51 (1882) (statement of Sen. Morgan); 10 id. at 3052, 3658, 3662, 3691, 3700 (statements of Sen. Morgan); 9 id. at 15 (1879) (committee assignments); 8 id. at 68-72 (1878) (statement of Sen. Morgan). He never indicated a different view, and his view complements his position that ultimately the ECA bound only Congress's

APPENDIX - 524

conscience. See 17 id. at 867 (1886) (statement of Sen. Morgan). In other words, even under the ECA, Congress retained sufficient flexibility to respond appropriately to any situation. See id.

360    See supra text accompanying notes 194, 207-11.

361    15 Cong. Rec. 5078 (1884) (statement of Rep. Eaton).

362    Id. at 5547 (statement of Rep. Herbert); see also id. at 5105 (statement of Rep. Pryor) (discussing fraudulent votes).

363    Rather, in 1884, the House heard only Representative Browne's overstated response that the states ought to have "absolute power to determine every question concerning the appointment of its electors." Id. at 5079. The response is overstated because it did not even allow Congress to reject votes based on constitutional infirmities. See id.

364    18 Cong. Rec. 29-31 (1886).

365    Id. at 29 (citing S. 9, 49th Cong. § 4 (1886), as amended by the House committee). I have removed the word "lawful" from the quoted language. In the original it appears just before the word "return." I have done this because Representative Caldwell, in his remarks, stated that the committee had decided to remove that word. Id. at 31.

366    17 id. at 538 (list of members of Select Committee on the Election of the President and Vice President).

367    18 id. at 48 (statement of Rep. Cooper); see also id. at 50 (statement of Rep. Eden) (stating that the bill "absolutely requires" accepting the state return when only one slate of electors appears); id. at 49 (statement of Rep. Cooper). Representative Cooper is listed as a member of the House Select Committee on the Election of the President and Vice President. 17 id. at 538.

368    18 id. at 52 (statement of Rep. Adams). Rep. Adams, it should be noted, thought the Senate provision might be unconstitutional because Congress could not bind itself. Id. at 51-52. In his view, legislation could properly provide only for instances of disagreement between the two houses. Id.

369    Rep. Adams's remarks are a bit overwrought. It is difficult to imagine that either the House committee's proposal or the unamended Senate bill meant to compel Congress to accept forged documents. Even the most vociferous states' rights advocates admitted Congress's power to check the regularity of electors' credentials. See, e.g., id. at 47 (statement of Rep. Dibble). Given the acknowledged power to check credentials, it should be pointed out that a true fraud exception lies somewhere between the literal remarks of Representatives Cooper and Adams. Representative Cooper claimed that Congress would have to accept credentials "knowing" that the electors were not elected. Supra text accompanying note 367. Not all erroneous elections are fraudulent. Thus, just as Adams's remarks overstate the absence of a fraud exception, Rep. Cooper's remarks do not literally deny its presence. The Senate proposal successfully passed into law as it stood because although the House adopted the committee's proposal, the House receded from the proposal in the conference with the Senate. See infra text accompanying note 454.

370    See supra material cited in notes 357-58.

371    See 5 Cong. Rec., pt. 4, 247 (1877) (statement of Justice Field); id. at 229 (statement of Rep. Hunton); id. 211-12, 215-16 (statement of Sen. Bayard).

372    See Samuel Dibble, Views of the Minority: To Accompany Bill S. 9, H.R. Rep. 49-1638, pt. 2, at 1 (1886)9, H.R. Rep. 49-1638, pt. 2, at 1 (1886); Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 690-702 (1877) (statements of Sens. Baldwin and Pickney); 18 Cong. Rec. 46-47 (1886) (statement of Rep. Dibble).

373    See supra text accompanying note 365 (discussing the House committee proposal); supra text accompanying note 304 (discussing House Committee minority); infra text accompanying note 536 (same).

374    See **Electoral Count Act** of 1887, ch. 90, § 2, 24 Stat. 373, 373 (current version at 3 U.S.C. § 5 (2000)).

375    See supra text accompanying notes 126-28.

376 See supra text accompanying note 128. This, in fact, was Representative Adams's actual position in the 1886 House debate just discussed. 18 Cong. Rec. 51-52 (1886).

377 See supra text accompanying notes 193-211 (discussing administrative law).

378 See supra text accompanying note 209 (discussing Justice Bradley's position that Congress's inherent power was limited to setting aside returns only for "manifest fraud").

379 5 Cong. Rec., pt. 4, 263 (1877) (statement of Justice Bradley); see also id. at 260-61 (statement of Justice Bradley) (arguing that, at least without further legislation, the want of jurisdiction must be based on facts that are manifest without further investigation); cf. Bell v. Southwell, 376 F.2d 659, 662, 664 (5th Cir. 1967) (explaining that the federal voiding of state elections is "drastic" and "guardedly exercised," but is appropriate for "gross, spectacular, [and] completely indefensible" unconstitutional state action). The "constitutional facts" doctrine is discussed in Jaffe, Judicial Review, supra note 193, at 953; Henry P. Monaghan, Constitutional Fact Review, 85 Colum. L. Rev. 229 (1985).

380 See supra text accompanying note 337. The specific illustration Senator Bayard gave of evidence of fraud as an exception to section 2, was when there was no constitutional fact supporting the tribunal's judgment. See 8 Cong. Rec. 158-59 (1878) (statement of Sen. Bayard).

381 For example, in the 2000 election, had the Supreme Court of Florida been allowed to reach a final determination by December 12, its ruling would have been unimpeachable in Congress, even if erroneous. See supra note 303. Or, given what happened, the final determination the Supreme Court of Florida did reach, though compelled to do so by an arguably erroneous United States Supreme Court decision, was equally conclusive because all courts were acting honestly.

382 See supra text accompanying notes 193-94.

383 If Congress's electoral vote counting under the ECA is subject to judicial review, then the courts ultimately will determine whether an electoral vote merits section 2 status. See infra note 396. Still, Congress must make the decision, at least in the first instance. See Stanley Bach & Jack Meskell, Cong. Research Serv., Counting Electoral Votes in Congress-Multiple Lists of Electors From One State 6 (2001) (suggesting the Joint Session may decide the lawfulness of a section 2 determination).

384 The ECA requires that objections be in writing and signed by at least one senator and one representative. See infra text accompanying note 615.

385 To avoid confusion, let me state now that I am not discussing whether the vote will be counted. Section 4 of the ECA contains the rules which govern whether a return is counted. Electoral Count Act of 1887, ch. 90, § 4, 24 Stat. 373, 373-74 (current version at 3 U.S.C. § 15 (2000)). A return that does not have section 2 status can still be counted under that provision. See id. Also, the vote of an elector that does have section 2 status may nonetheless not be counted because Congress, consistent with both section 2 and section 4, may find there is a supervening defect, like a constitutional infirmity, disqualification, or, perhaps, fraud. See infra text accompanying notes 458-68.

386 See supra text accompanying note 119 (discussing the equality postulate).

387 Some congressmen believed that the Constitution compelled Congress to accept electoral votes whenever: (1) a state submitted a single set of electoral votes; or (2) a state's governor certified one of a state's multiple submissions. See, e.g., Subcomm. on Compilation of Precedents, Counting Electoral votes, H.R. Misc. Doc. No. 44-13, at 504-05 (1877) (statement of Sen. Morton); sources cited supra note 372 (describing the view of Representative Dibble and of the House Committee minority). The congressmen who voted for the ECA clearly spurned this position. Other congressmen believed that when a state submitted a single set of electoral votes, the Constitution required that Congress treat the votes as presumptively valid. See, e.g., H.R. Misc. Doc. No. 44-13, at 444, 527 (statement of Sen. Morton). This meant that the votes could be rejected, but only if both houses concurred in rejecting them. Since the ECA adopted this rule, whether for constitutional or prudential reasons, see infra text accompanying notes 506, 510, it requires no further discussion.

388 Some congressmen believed that the Constitution only allowed Congress to provide rules for situations where the houses disagreed about whether a vote should be counted. See, e.g., 18 Cong. Rec. 51-52 (1886) (statement of Rep. Adams).

APPENDIX - 526

389     As we have seen, congressmen debated whether statutes, joint rules, or concurrent rules were the proper vehicle for "providing otherwise." See supra text accompanying notes 106-40. But most congressmen agreed it could be done by some means.

390     See, e.g., 18 Cong. Rec. 75 (1886) (statement of Rep. Herbert); id. at 52 (statement of Rep. Adams); id. at 51 (statement of Rep. Eden); id. at 47 (statement of Rep. Dibble); 17 id. at 1021, 2427 (statement of Sen. Hoar) (implying, by his comments of what the "remnant" is, that no vote could be counted unless both houses assented); id. at 865, 867 (statement of Sen. Morgan); 13 id. at 5148 (1882) (statement of Rep. Hewitt).

391     See infra text accompanying note 439 (discussing the 22d Joint Rule).

392     17 Cong. Rec. 1021 (1886) (statement of Sen. Hoar).

393     See infra text accompanying notes 447-56.

394     See supra text accompanying notes 338-44.

395     Also, if the President of the Senate, as presiding officer at Congress's vote counting session, rules an objection out of order because he thinks the return is conclusive under section 2, section 2 will have some binding effect. I shall argue, however, that the Senate President has no such power. See infra text accompanying note 665.

396     Even if there is judicial review, Congress will have initial say in whether a return merits section 2 status, and reviewing courts are likely to accord Congress's decision great deference. See Bach, supra note 107, at 730-31 (noting that courts are reluctant to oversee enforcement of Congress's in-house rules); Roberts, supra note 139, at 530-42 (observing that despite power to do so, courts have not intervened to enforce congressional rules); cf. Bush v. Gore, 508 U.S. 98, 113 (2000) (review of state court decisions on state law that have unconstitutional implications is "independent, if still deferential") (Rehnquist, C.J., concurring); Chevron U.S.A. Inc. v. Natural Res. Def. Council Inc., 467 U.S. 837, 843 (deference accorded the reasonable construction of a statutory provision made by the administrator of an agency).

397     **Electoral Count Act** of 1887, ch. 90, § 2, 24 Stat. 373, 373 (current version at 3 U.S.C. § 5 (2000)).

398     See supra note 106 and accompanying text.

399     If judicial review allowed a court to accept a vote after both houses voted to reject the return because the court found the return to clearly deserve section 2 status, then the ECA would be binding on a future Congress.

400     See infra text accompanying notes 701-02.

401     Conversely, section 4's voting rules for grappling with situations in which a state submits multiple slates of electors and multiple slates claiming section 2 status will make it clearer that both houses must agree a particular set of electoral votes merits section 2 status in order for that set to have it.

402     See infra text accompanying notes 587-669 (discussing procedural provisions).

403     See infra text accompanying notes 438-559 (discussing section 4 of the ECA).

404     See infra text accompanying notes 509.

405     See infra text accompanying note 458-68 (discussing the relationship between section 4 and section 2).

406     Burgess, supra note 10, at 635.

407     **Electoral Count Act** of 1887, ch. 90, § 3, 24 Stat. 373, 373 (current version at 3 U.S.C. § 6 (2000)).

408     U.S. Const. art. II, § 3. The Twelfth Amendment directed the electors to make distinct lists for President and Vice President, but made no change in the certification and delivery process. Id. amend. XII.

APPENDIX - 527

409    See Act of Mar. 1, 1792, ch. 8, § 2, ▯ 1 Stat. 239, 239-40 (providing the duties of electors in presidential elections).

410    Id.

411    Id.

412    Id. § 3 (providing the duties of the executive of each state).

413    Id.

414    See, e.g., 3 Annals of Cong. 279-80 (1791) (statement of Reps. Niles and Hillhouse).

415    See, e.g., id. at 279 (statement of Rep. Clark).

416    U.S. Const. art. IV, § 1. A draft of the Constitution contained a clause authorizing Congress to determine "'the manner of certifying and transmitting"' electoral votes, but it was deleted by the Committee on Style. Currie, supra note 59, at 137 & n.54.

417    18 Cong. Rec. 45 (1886) (statement of Rep. Dibble) (an ultra-states' rights congressman saying federal legislation may be predicted on Article IV, Section 1 to regulate the certification of the states' electoral process).

418    See, e.g., 15 id. at 5076 (1884) (citing S. 25, 45th Cong. § 3 (1884)); 13 id. at 859 (1882) (citing S. 613, 47th Cong. § 3 (1882)).

419    17 id. at 1057 (1886) (statement of Sen. Evarts).

420    Id. The text of section 3 of the ECA as finally adopted is ambiguous as to whether, when the state's initial administrative ascertainment of electors is subject to a contest that results in a section 2 final determination, the governor should send in a section 3 certificate after both the administrative ascertainment and the final determination, or only after the final determination. See **Electoral Count Act** of 1887, ch. 90, § 3, 24 Stat. 373, 373 (current version at ▯ 3 U.S.C. § 6 (2000)). Senator Evarts's comments, and in the legislative history, make it clear that the governor should wait until the end of his or her state's election determination process. 17 Cong. Rec. 2427 (1886) (statement of Sen. Hoar). Thus, Governor Jeb Bush acted prematurely when he sent in his certificate of ascertainment to the federal government on November 26, 2000, and followed that one up with a second certificate of final determination on December 13. See Exec. Dep't, State of Fla., Certificate of Ascertainment of Presidential Electors (Nov. 26, 2000), available at http://www.archives.gov/federal_register/electoral_ college/2000_certificates/ascertainment_florida.html (last visited Feb. 14, 2004); Exec. Dep't, State of Fla., Certificate of Final Determination of Contests Concerning the Appointment of Presidential Electors (Dec. 13, 2000) [hereinafter Certificate of Final Determination, available at http:// www.archives.gov/federal_register/electoral_college/2000_ certificates/ascertainment_florida.html (last visited Feb. 14, 2004).

421    17 Cong. Rec. 1057 (1886) (statement of Sen. Evarts).

422    Id. (statement of Sen. Evarts).

423    Id.

424    Id.

425    Id. at 1058.

426    See 19 id. at 1062 (1886) (statement of Sen. Hoar) (commenting that election results are public knowledge); Fairman, supra note 5, at 40-41; Haworth, supra note 5, at 45-56 (discussing that on the morning after the 1876 election it was known that Hayes and Tilden were separated by only a few contestable electoral votes); Letter from Thomas Jefferson to James Madison (Dec. 19, 1800), reprinted in 2 Matthew Davis, Memoirs of Aaron Burr 69-70 (photo reprint 1971) (stating Jefferson's expectation that he and Burr would tie for the presidency).

427    17 Cong. Rec. 1062 (1886) (statement of Sen. Hoar).

APPENDIX - 528

428    Id. (statement of Sen. Edmunds); see also id. at 2386 (statement of Sen. Hoar) (commenting on Senator Edmunds's role).

429    See id. at 2427 (statement of Sen. Hoar); id. at 2387 (S. 9, 49th Cong. § 3 (1886), after recommittal).

430    See, e.g., id. 2427 (statement of Sen. Hoar) (indicating that the provision for a more elaborate gubernatorial certification is not a significant change).

431    See, e.g., Samuel Dibble, Views of the Minority: To Accompany Bill S. 9, H.R. Rep. 49-1638, pt. 2, at 1 (1886)9, H.R. Rep. 49-1638, pt. 2, at 1 (1886); Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 690-702 (1877) (statements of Sens. Baldwin and Pickney); 18 Cong. Rec. 46-47 (1886) (statement of Rep. Dibble).

432    See H.R. Misc. Doc. No. 44-13, at 381-89 (discussing Texas's 1872 electoral certificate and vote); id. at 41 (statement of Rep. Hillhouse) (discussing returns of one of the states, which he does not name); 13 Cong. Rec. app. 539 (1882) (statement of Rep. Updegraff) (describing Georgia's vote in 1800); Gov. Packson, Executive Dep't, State of Ga., Certificate of 1800 Georgia Election (1800). Certificate of Georgia vote 1800 (photocopy on file with the author).

433    H.R. Misc. Doc. No. 44-13, at 357-63, 390-98, 403-05 (discussing and rejecting Louisiana's electoral votes, even those certified by Governor Warmoth); 5 Cong. Rec., pt. 4, 178-79, 264-66 (1877) (transcript of Electoral Commission meeting) (discussing and rejecting a vote from an elector certified by Oregon Governor Grover); supra text accompanying notes 212-21 (discussing Justice Bradley's rejection of Oregon's 1877 vote).

434    See, e.g., 17 Cong. Rec. 1023 (1886) (statement of Sen. Sherman); infra text accompanying notes 480-87 (discussing governor's certification); supra text accompanying notes 212-21 (relating Justice Bradley's discussion of the Oregon electoral vote in 1877).

435    17 Cong. Rec. 1057 (1886) (statement of Sen. Evarts).

436    Id.

437    See infra text accompanying notes 532-57 (discussing the governor's certification under section 4 when there are multiple slates of electors).

438    **Electoral Count Act** of 1887, ch. 90, § 4, 24 Stat. 373, 373-74 (current version at 3 U.S.C. § 15 (2000)).

439    See supra text accompanying note 63. I believe Congress's 1865 view reflects dominant congressional opinion since the founding, although there is scholarly commentary that claims otherwise. See supra notes 61-63 (noting that some historians claim Congress adopted this position for the first time in the 1860s).

440    See supra text accompanying notes 63, 69 (discussing the 22d Joint Rule and the 1865 Joint Resolution). A joint resolution has the same constitutional status as a statute because it requires bicameral passage and presidential presentment. See U.S. Const. art. I, § 7, cl. 3. That Congress had power to alter the Constitution's default voting rules by statute was subject to greater diversity of opinion in Congress. See supra text accompanying notes 128-32.

441    See supra text accompanying note 287 (discussing section 2 of the ECA).

442    In fact, almost none of the electoral votes that have been submitted since the ECA's adoption have been adjudicated by a section 2 process. Florida's electoral vote in 2000 is the only instance of which I am aware. See Wroth, supra note 13, at 337 (A 1961 "survey" of electoral counts under the ECA shows no submission of section 2 validated returns.); Maskell et al., supra note 13, at 23-29 (describing electoral counts from 1889 to 1997 and not mentioning any § 2 determinations).

443    See supra text accompanying notes 403-06.

444    See infra text accompanying note 509.

445    For a discussion of the procedural rules, see infra text Part III.E.

446    See supra text accompanying note 63.

APPENDIX - 529

447    Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 453-54 (1877) (statement of Sen. Morton); id. at 416-18. The Senate voided the joint rule in 1876. H.R. Misc. Doc. No. 44-13, at 444-58, 782-94 (1877); Wroth, supra note 13, at 330.

448    H.R. Misc. Doc. No. 44-13, at 687 (citing ⬛ S. 1, 44th Cong. ⬛ § 1 (1876)); id. at 459 (citing S. 1251, 43rd Cong. ⬛ § 1 (1875)); In the Electoral Commission Law of 1877, Congress also provided that it required the concurrent vote of both houses to reject electoral votes from a state that presented only one return. See Act of Jan. 29, 1877, ch. 37, § 1, 19 Stat. 227, 227-28.

449    See supra text accompanying note 428.

450    Wroth, supra note 13, at 330-31, 334.

451    Andrew Caldwell, Report: To Accompany Bill S. 9, H.R. Rep. No. 49-1638 (1886)9, H.R. Rep. No. 49-1638 (1886); 18 Cong. Rec. 29-30 (1886).

452    18 Cong. Rec. 77 (1886).

453    Id. (citing adopted amendment).

454    Id. at 668, 713.

455    Id. at 668.

456    **Electoral Count Act** of 1887, ch. 90, § 4, 24 Stat. 373, 373-74 (current version at 3 U.S.C. § 15 (2000)).

457    See id. § 2.

458    See supra text accompanying notes 322-37.

459    If there is no fraud exception, Congress's commitment is even larger.

460    This is an initial assessment. The final understanding must await an analysis of the procedural provisions which affect how section 2 and section 4 work together procedurally.

461    Of course, if only one house of Congress manifests its view that the electors do not merit section 2 status by voting against counting their votes, the votes would still be counted under section 4 if those votes were the only set of electors the state submitted.

462    Given the complexity of the ECA, mistakes in application are easy to make, even unintentionally. During the 2001 vote count, some House members objected to counting Florida's electoral votes on the ground that they were not "regularly given." 147 Cong. Rec. H52 (daily ed. Jan. 6, 2001) (statements of Reps. Jackson-Lee, Meek, Johnson, and Cummings). Since there was no post-appointment misbehavior by Florida's electors, this was an inappropriate ground for objecting. It would have been more plausible to object to Florida's electoral votes by arguing they were not lawfully certified. But this position would require a showing that Florida's election was fraudulent and that Florida's electoral votes were not entitled to section 2 status. See infra text accompanying notes 400-502.

463    8 Cong. Rec. 52 (1878) (statement of Sen. Edmunds). The situation is actually more complex than Senator Edmunds thought. If the ECA is really a joint rule adopted in statutory form, then the Senate's and House's concurrence expresses their intent to change the rule. Even if the ECA is a statute, it cannot constitutionally bind Congress, and Congress rightfully may ignore it. Only if the ECA is a statute that binds Congress would Congress's action not be rightful. Even then, there may be no power to correct it.

464    Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 481 (statement of Sen. Edmunds) (stating that presidential elections are subject to quo warranto proceedings); 8 Cong. Rec. 52 (1878) (statement of Sen. Edmunds); Edmunds, supra note 31, at 20 (stating that Congress should pass a law subjecting disputed presidential elections to the judiciary).

465   See, e.g., 17 Cong. Rec. 867 (1886) (statement of Sen. Morgan); discussion supra Part II.A.1.

466   See, e.g., 17 Cong. Rec. 866 (1886) (statement of Sen. Morgan) (recognizing the possibility of political bias in Supreme Court justices); 13 id. at 5144-45 (1882) (statement of Reps. Bowman and Browne) (recognizing the possibility of bias in all judges); supra text accompanying note 35.

467   17 Cong. Rec. 867 (1886) (statement of Sen. Morgan); see also 8 id. at 70 (1878) (statement of Sen. Morgan) (stating that Congress's "power could be abused so that the people would refuse submission to the persons so declared elected; but such refusal would be revolution, however much it might be justified in morals or by the right to demand redress for governmental abuse").

468   Once again, I postpone discussing the possible influence of the President of the Senate in his role as presiding officer of Congress's vote counting session. For that discussion, see infra Part III.E.

469   Congress seemed to think that the answer to the question whether a state return merited section 2 status would be readily apparent. Congress ignored Representative Updegraff's warning that law can never define two classes of cases with total clarity. See 13 Cong. Rec. app. 539 (1882) (statement of Rep. Updegraff).

470   See, e.g., 18 id. at 49 (1886) (statement of Rep. Eden) (discussing Congress as responding to electoral returns that either have or do not have section 2 authentication); 17 id. at 2427 (statement of Sen. Hoar) (same).

471   18 id. at 668, 713 (1887) (Conference Report). In other words, if the chambers of Congress disagreed, the votes would be counted. There was no one-house veto.

472   **Electoral Count Act** of 1887, ch. 90, § 3, 24 Stat. 373, 373 (current version at 3 U.S.C. § 6 (2000)) (emphasis added).

473   See supra text accompanying notes 403-06 (summarizing analysis of section 2 of the ECA).

474   18 Cong. Rec. 52 (1886) (statement of Rep. Adams) (discussing phrase "regularly given" as it appears in another section). As discussed, these defects include failing to comply with constitutional requisites for elector voting, such as not voting on the correct day, voting for a constitutionally disqualified candidate, or corruption in office.

475   Constitutional infirmities include defects resulting from the constitutional ineligiblity of the elector and from the state's inability to participate in the Electoral College. See supra text accompanying notes 322-37.

476   See 18 Cong. Rec. 52 (1886) (statement of Rep. Adams) (discussing returns authenticated by the section 2 procedure as entitled to more protection than returns that have not been through that process).

477   Id. at 31 (statement of Rep. Caldwell) (referring to violations of the Republican Guarantee Clause and of the Fourteenth Amendment's mandate to decrease state electoral votes as a penalty for denying the vote to African-American citizens).

478   Id.

479   17 id. 2427 (statement of Sen. Hoar).

480   Fraud was discussed as a possible ground for rejecting section 2 authenticated returns. See supra notes 357-82 and accompanying text. The difference is that for section 4, there is no doubt that fraud is a permissible ground. See infra text accompanying notes 500-02.

481   Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 357-63, 390-98, 403-05 (1877) (discussing and rejecting Louisiana's electoral votes, even those certified by Governor Warmoth); 5 Cong. Rec., pt. 4, 264-66 (1877) (statement of Justice Bradley) (discussing and rejecting a vote from an elector certified by Oregon Governor Grover).

482   See supra material cited note 481.

483   17 Cong. Rec. 1023 (1886) (statement of Sherman) (speaking of a governor's certification of Senate and House elections).

APPENDIX - 531

484     See discussion supra Part II.B.1 (discussing election law).

485     See, e.g., 5 Cong. Rec., pt. 4, 261 (1877) (statement of Justice Bradley).

486     See, e.g., id. at 265 (discussing the Oregon Governor's certification of the 1877 election).

487     See supra text accompanying note 193 (discussing administrative review). Errors could include issuing the certificate to electors that the state's Election Board had not declared to be the winners.

488     8 Cong. Rec. 55 (1878) (statement of Sen. Edmunds).

489     See supra text accompanying notes 154-62.

490     See, e.g., 18 Cong. Rec. 45 (1886) (statement of Rep. Dibble) (discussing import of governor's certificate but not any other administrator); 17 id. at 2427-28 (colloquy between Sens. Hoar and George on failure of Governor to abide by the Act, but not other officials); id. at 1022 (statement of Sen. Hoar) (same).

491     I do not consider a third position that the Constitution denied Congress the ability to go behind the governor's certificate. That minority position clearly was rejected by the decision to allow Congress to question the governor's ministerial decisions.

492     5 Cong. Rec., pt. 4, 260-66 (1877) (statement of Justice Bradley).

493     See id.

494     Id. at 265.

495     Id. at 260.

496     Id. at 261. Justice Bradley's differing treatment of the state governor and state returning board is hard to fathom. It rested on Justice Bradley's view that the board is part of the machinery for determining who the state appointed while the governor is a conduit for reporting the board-determined result. See id. at 265.

497     See discussion supra Part II.B.

498     See supra text accompanying note 193 (discussing administrative review).

499     However, these defects could be grounds for rejecting an elector if they amounted to a constitutional infirmity.

500     See 5 Cong. Rec., pt. 4, 261, 263 (1877) (statement of Justice Bradley) (acknowledging and defining a manifest fraud exception to his general principle not to review the decisions of state returning boards); supra text accompanying note 193 (discussing the administrative-election law fraud exception).

501     See supra text accompanying note 209 (discussing manifest fraud).

502     See supra text accompanying note 368 (discussing Representative Adams's complaint).

503     Even under the broader rule, none of the problems of the 2000 Florida presidential election would be proper grounds for objecting to the lawfulness of the governor's certificate. The problems with the Florida election did not rise to the level of fraud.

504     18 Cong. Rec. 31 (1886) (statement of Rep. Caldwell) (quoting the minority report); see also id. at 668 (citing the Conference Report); id. at 30-31 (statement of Rep. Caldwell).

505     Id. at 31 (statement of Rep. Caldwell).

506     In other words, when a state submits one set of elector votes that do not claim, or do not merit, section 2 status, section 4 frames and guides the discussion of whether to count any or all of them by providing the Senate and House's agreement on the proper grounds for rejecting such electoral votes.

APPENDIX - 532

507   See supra text accompanying notes 403-06 (summarizing section 2).

508   Samuel Dibble, Views of the Minority: To Accompany Bill S. 9, H.R. Rep. 49-1638, pt. 2, at 1 (1886)9, H.R. Rep. 49-1638, pt. 2, at 1 (1886) (referring to "lawful" in another section); see also 18 Cong. Rec. 50 (1886) (statement of Rep. Edens); id. at 31 (statement of Rep. Caldwell).

509   The ECA never directly speaks to the case of a state's single set of non-section 2 authenticated electors that also do not have a section 3 certification. Congress assumed that state governors would always carry out their federally imposed obligation to certify their state's return. See 17 Cong. Rec. 2427-28 (1886) (statements of Sens. George and Hoar). Should Congress receive one set of electoral votes from a state that lacked the governor's section 3 certificate, the implication of the ECA is that Congress may accept those votes, though it is not bound to. More importantly, my reading of the ECA is that a vote by either house to reject any or all of the electoral votes would suffice. In principle, this outcome seems appropriate because lacking a section 2 or a section 3 certification means electors lack the credential that would give them their prima facie claim to office. This is true even though they are the only electors presenting themselves. A counterargument to this position is that the Constitution does not require electors to have any certification other than their own. See U.S. Const. art. II, § 1. However, if we limit ourselves to interpreting the ECA, the ECA presumes as a baseline that both houses must concur to accept an electoral vote and changes that default rule in specified situations. The default rule is premised on the view that the two houses are the judges of what votes count and nothing can be counted without both houses saying it should be.

510   Subcomm. on Compilation of Precedents, Counting Electoral Votes, Misc. H.R. Doc. No. 44-13, at 417 (1877); id. at 349 (statement of Sen. Morton); 17 Cong. Rec. 816 (1886) (statement of Sen. Hoar).

511   See Electoral Count Act of 1887, ch. 90, § 4, 24 Stat. 373, 373-74 (current version at 3 U.S.C. § 15 (2000)).

512   See, e.g., 17 Cong. Rec. 866-67 (1886) (Sen. Morgan); id. at 816 (Sen. Hoar). In the ECA, Congress obviously decided to accord a presumption of regularity to the electors backed up by a section 2 determination. But, as has been argued, it requires a concurrent vote of both houses to determine which return, if any, has that backing. See supra text accompanying notes 383-96. Some congressmen always argued that the packet backed up by the governor's certificate ought to be deemed the regular packet, see, e.g., H.R. Misc. Doc. No. 44-13, at 693-94, 696 (statement of Sen. Pinckney), but Congress refused to adopt that position and the ECA does not reflect this presumption. See Electoral Count Act of 1887 § 4. 18 Cong. Rec. 45-46 (1886) (statement of Rep. Dibble). The ECA does, however, turn to the governor's certificate as a last resort. See infra text accompanying note 542.

513   17 Cong. Rec. 867 (1886) (statement of Sen. Morgan).

514   Id.; see also id. at 869 (statement of Sen. Sherman); 8 id. at 164 (1878) (statement of Sen. Merrimon). As Representative Broadhead said:
When there is but one return, it being the act of a public officer, it is prima facie correct, and requires, therefore, the concurrent action of both bodies to overturn it. When there are two returns, the two prima facie cases offset and destroy each other, and it requires the affirmative action of both bodies to determine which is the true return.
15 id. at app. 306 (1884) (statement of Rep. Broadhead).

515   H.R. Misc. Doc. No. 44-13, at 459 (citing S. 1251, 43d Cong. § 2 (1875)); see also id. at 687 (citing ⬜ S. 1, 44th Cong. § 2 (1876)). Senator Morton's bills also provided that when there was but one return from a state, it required a concurrent vote of both houses to reject. See id. (citing S. 1, 44th Cong. ⬜ § 1 (1876)).

516   Wroth, supra note 13, at 334-35.

517   See infra text accompanying notes 518-24.

518   Electoral Count Act of 1887, ch. 90, § 4, 24 Stat. 373, 373-74 (current version at 3 U.S.C. § 15 (2000)). For simplicity, I use the ECA's final language. To compare the language of the bills, see, for example, 13 Cong. Rec. 859 (1882) (citing S. 613, 47th Cong. § 4 (1882)); and 8 id. at 51 (1878) (citing S. 1308, 45th Cong. ⬜ § 6 (1878)). The ECA also provided for counting votes of the electors appointed to fill any vacancies in the electoral college that arose after an elector's initial

APPENDIX - 533

appointment. See **Electoral Count Act** of 1887 § 4. That provision was not in Senator Edmunds's original bill, but was added in 1886. 17 Cong. Rec. 966 (1886) (statement of Sen. Hoar) (submitting amendments).

519   15 Cong. Rec. 5076 (1884) (citing S. 25, 48th Cong. § 4 (1884)); see also, e.g., 13 id. at 859 (1882) (citing S. 613, 47th Cong. § 4 (1882)). I use the bills' language because it is clearer than the language of section 4 of the ECA. The language in this part of the ECA was subject to a non-substantive change when the bill's sponsors accepted Senator Evarts's view that section 2 authorities need not be judicial tribunals. 17 id. at 2387 (1886) (citing S. 9, 49th Cong. § 4 (1886), after recommittal). After the change, the bill directed Congress to accept the votes of the electors supported by "the decision of such State so authorized by its laws," id., which is how the law read on final passage. See **Electoral Count Act** of 1887 § 4. Except for indicating that the "final determination" authority need not be a judicial tribunal, Senator Hoar described his deletion of the word "tribunals" as non-substantive. 17 Cong. Rec. 2387 (1886) (statement of Sen. Hoar).

520   15 Cong. Rec. 5076 (1884) (citing S. 25, 48th Cong. § 4 (1884)); see also, e.g., 13 id. at 859 (1882) (citing S. 613, 47th Cong. § 4 (1882)). I use the bills' language because this part of Senator Edmunds's proposal was subject to a substantive change as the ECA approached final passage. See infra text accompanying notes 532-42 (discussing the role of the governor's certificate).

521   See supra text accompanying note 473 (discussing "regularly given").

522   See supra text accompanying notes 473-80 (discussing these defects for electors who lack section 2 status).

523   See supra text accompanying notes 299-406 (discussing section 2' s conditions and limitations).

524   See, e.g., 18 Cong. Rec. 49 (1886) (statement of Rep. Eden).

525   See **Electoral Count Act** of 1887, ch. 90, § 4, 24 Stat. 373, 373-74 (current version at 3 U.S.C. § 15 (2000)).

526   See infra text accompanying notes 542-43 (discussing import of governor's certificate when the houses disagree).

527   17 Cong. Rec. 815 (1886) (statement of Sen. Sherman) (stating that the single/double return distinction "is a distinction without a difference, because in any case of a dispute that may arise the manufacturing or creating of double returns is the easiest possible process"). John Burgess agreed with the ease of creating conflicting returns, Burgess, supra note 10, at 649, and it was, in fact, done in 1889. See 20 Cong. Rec. 1860 (1889) (discussing Oregon's vote). In 1877, there was an attempt to manufacture a dual return from Vermont, which the Senate President refused to put before the joint session. See Haworth, supra note 5, at 274-79.

528   See, e.g., 17 Cong. Rec. 1058 (1886) (statement of Sen. Evarts); id. at 816, 819 (statement of Sen. Sherman); see also 18 id. at 46 (statement of Rep. Dibble).

529   See, e.g., 18 id. at 46 (statement of Rep. Dibble); 17 id. at 1060 (statement of Sen. Teller); id. at 1059 (statement of Sen. Wilson); id. at 816, 819 (statement of Sen. Sherman).

530   17 id. at 867 (statement of Sen. Morgan).

531   See, e.g., id. 1023 (statement of Sen. Hoar); id. at 816 (statement of Sen. Sherman) (describing the bill as giving one house of Congress the ability to "exclude the vote of any State" when it "was one chief object of the framers . . . to separate as wide as the poles the election of electors from the power of the legislative branch").

532   Id. at 1020 (statement of Sen. Hoar). The amendment that Senator Hoar submitted read as if it denied Congress power to reject the electors certified by the governor under any circumstances, see id. at 966, 1019, and that is how Senator John Sherman understood it. Id. at 1021 (statement of Sen. Sherman). When introducing his proposed amendment, Senator Hoar described it as I have described it in the text. Id. at 1020. His later discussions are ambiguous, but are consistent with the interpretation I have given. Id. at 1022-24.

533   Id. at 1021 (statement of Sen. Sherman); see also id. at 1062 (statement of Sen. Saulsbury). John Burgess also thought giving power to the state governors was unwise. Burgess, supra note 10, at 649. Senator Sherman was reading Senator Hoar's amendment as if a governor's certificate would conclude the matter, even over the opposition of both houses of Congress. See 17 Cong. Rec. 1021 (1886) (statement of Sen. Sherman).

**APPENDIX - 534**

Senators Hoar and Teller attempted to answer Senator Sherman's concerns. Senator Hoar argued that the states implicitly left the decision to their governor whenever they did not establish a different tribunal. Id. at 1022, 1024 (statement of Sen. Hoar). Senator Teller argued:

Where can you leave that, in the absence of a judicial inquiry, better than with the governor of a State? I know in times of high partisan excitement there may be danger that the governor of a State will outrage the people of his State by not expressing the voice that they have expressed at the polls; but it is much safer to leave it with him, who is answerable to the people for any outrage he may commit, than to intrust it to hands foreign to the State and having no connection with the State.

Id. at 1060 (statement of Sen. Teller).

534    Specifically, on Senator Sherman's suggestion, the bill was recommitted for further study, and when it reemerged from the Committee, Senator Hoar's proposal had been forgotten. 17 Cong. Rec. 1023-26 (1886) (statement of Senator Sherman).

535    18 id. at 30.

536    Samuel Dibble, Views of the Minority: To Accompany Bill S. 9., H.R. Rep. 49-1638, pt. 2, at 2 (1886)9., H.R. Rep. 49-1638, pt. 2, at 2 (1886); 18 Cong. Rec. 76 (1886) (voting down minority amendment); id. at 45, 47 (statement of Rep. Dibble).

537    18 Cong. Rec. 77 (1886).

538    Id. at 668 (1887). It is not surprising Senator Hoar accepted the proposal considering that it was his own idea.

539    Id.

540    **Electoral Count Act** of 1887, ch. 90, § 4, 24 Stat. 373, 374 (current version at 3 U.S.C. § 15 (2000)).

541    18 Cong. Rec. 668 (1887).

542    17 id. at 2427-28 (1886) (statements of Sens. George and Hoar) (discussing the problem of a governor refusing to issue a certificate).

543    See Wroth, supra note 13, at 344. Or, stated another way, there are multiple returns certified by different claimants to the governor's office and Congress cannot agree as to the identity of the true governor. See 18 Cong. Rec. 47 (1886) (statement of Rep. Dibble). Multiple returns certified by different claimants to the governor's office were submitted to Congress by Florida in 1877. See 5 id., pt. 4, at 287-88 (1877). In 1961, Hawaii submitted multiple returns certified by different governors, and interestingly, each certifying governor was the legitimate governor at the time he certified the return. See 107 id. at 288-91 (1961). The question may be asked whether, when there are multiple returns and one of them claims certification by the state's section 2 authority, that return should be assumed to be prima facie valid and require a concurrent vote of both houses to reject it. I think not. Section 4 of the ECA states that in the presence of multiple returns, the return authenticated by the state's section 2 authority is to be counted. But until the houses agree that a return has been so authenticated, it is only a return that purports to have that status. **Electoral Count Act** of 1887 § 4. Stated another way, the basic theory of the ECA is that no votes are to be counted unless both houses agree to count them or the ECA expressly provides otherwise. As stated previously, the rule about counting the section 2 authenticated return can only come into effect when the houses agree that they have a section 2 return before them. See supra text accompanying notes 383-402.

544    This is the meaning I draw from the Conference Committee's language that "lawful votes of the legally appointed **electors**," **Electoral Count Act** of 1887 § 4 (emphasis added), could be rejected by a concurrent vote. The Conference Committee Report confirms this by stating: "It takes the concurrent votes of both Houses, deciding that the votes are not lawful votes, in order to reject them." 18 Cong. Rec. 668 (1887).

545    See 17 Cong. Rec. 1021 (1886) (statement of Sen. Sherman).

546    Burgess, supra note 10, at 649. On Professor John Burgess's status, see supra text accompanying note 10.

547    See 17 Cong. Rec. 1060 (1886) (quoting statement of Sen. Teller); id. at 1022, 1024 (statement of Sen. Hoar).

APPENDIX - 535

548    Burgess described the provision on the governor's certificate as a "conditio sine qua non" of acceptance by the House. Burgess, supra note 10, at 649.

549    Certificate of Final Determination, supra note 420; David Barstow & Somini Sengupta, Contesting the Vote: The Florida Legislature, N.Y. Times, Nov. 28, 2000, at A25 (stating that Jeb Bush signed Florida's Certificate of Ascertainment the night of November 26, "barely an hour after the state canvassing commission declared George W. Bush the winner" of the state's election, a move which was unusually hasty compared to other states).

550    One also wonders what Governor Bush would have done had the Supreme Court of Florida finished after the electors had balloted. Modern norms may countenance post-elector balloting certifications. See 107 Cong. Rec. 288-91 (1961) (accepting the votes of Democratic electors from Hawaii despite post-elector balloting certification).

551    See Subcomm. on Compilation of Precedents, Count Electoral Votes, H.R. Misc. Doc. No. 44-13, at 359, 362, 393-94, 407 (1877); Pitre, supra note 241, at 181.

552    See 1 Edward Stanwood, A History of the Presidency 447-49 (2d ed. 1975).

553    Id. at 449.

554    See 16 Cong. Rec. 1532 (1885) (describing the reading of Governor Cleveland's certificate attesting to the results of the New York election to applause on the House floor and in the galleries).

555    Let alone the brother of the candidate, as he was in the 2000 election in Florida. Unlike Jeb Bush, who sent in his initial certification before the election contest was determined, Grover Cleveland waited until after the contest in his state was settled. See supra notes 549-53. One complication that Congress in the 1880s did not anticipate, perhaps, is that the presidential candidate would not only be the certifying governor, but also the section 2 authority determining the outcome of any presidential election contest. Nonetheless, that is what Texas law, absent a recusal, provides. See Tex. Elec. Code Ann. § 221.002 (Vernon 2004).

556    Burgess, supra note 10, at 649. Consider the substantial minority of the House committee who wanted to amend the ECA so that the governor's certificate was conclusive and could not be rejected even by a concurrent vote of the House and Senate. See supra text accompanying note 536.

557    If there is judicial review of Congress's vote counting, one can speculate whether a court might set aside the counting of those votes based on a governor's fraudulently issued tie-breaking certificate. A fraudulent certification is, after all, no certification at all. Indeed, since the governor in issuing his section 3 certificate acts ministerially, one wonders whether it might be set aside for mere error. The counterargument is that the ultimate provision in section 4 does not provide that the governor's certificate be "lawful" as it does elsewhere in the ECA. The implication is that all the ECA requires is the "fact" of gubernatorial certification, not its bona fides.

558    If the ECA is a binding statute, its provisions govern until a statute is passed authorizing a change.

559    L. Kinvin Wroth and Jack Maskell suggest an additional instance in which a state would be entirely disenfranchised. See Maskell, supra note 17, at 6-11; Wroth, supra note 13, at 343. I discuss their suggestion in Appendix II.

560    **Electoral Count Act** of 1887, ch. 90, §§ 4- 7, 24 Stat. 373, 373-74 (current version at 3 U.S.C. §§ 15-18 (2000)).

561    The Senate President usually is the Vice President, though he may be the senator who has been elected President pro tempore. In writing about Congress's past electoral vote counting sessions, I generally will not distinguish whether the Senate President was the Vice President or a President pro tempore who presided at the meeting.

562    Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 263 (1877) (statement of Rep. Butler); see also id. at 273 (statement of Speaker Colfax) (recalling the "scene" in 1857 but not describing it); id. at 264 (statement of Rep. Callis) (describing the session as "undignified").

563    Id. at 264-65.

564    See id. at 78-143 (recounting the debate during and after the 1857 and 1869 electoral counts).

APPENDIX - 536

565    In 1857, James Buchanan defeated John Fremont and Millard Fillmore by 174 votes to 114 and 8, respectively, even if we count Wisconsin's five disputed votes for Fremont. See id. at 88. In 1869, Ulysses Grant beat Horatio Seymour by the margin of 214 electoral votes to 80, even if we include Georgia's nine disputed votes for Seymour. Id. at 265.

566    Burgess, supra note 10, at 651-52.

567    See infra text accompanying note 586.

568    R.S. tit. 3, ch. 2, § 152 (1873); Wroth, supra note 13, at 341 (inauguration day moved from March 4 to January 20 in 1934). Now it ends on January 20. See U.S. Const. amend. XX, § 1.

569    **Electoral Count Act** of 1887, ch. 90, § 4, 24 Stat. 373, 373 (current version 3 U.S.C. § 15 (2000)).

570    Now it is set for January 6, fourteen days before Inauguration Day. 3 U.S.C. § 15 (2000).

571    **Electoral Count Act** of 1887 § 4.

572    Id. § 5.

573    Id. § 4.

574    Id.

575    Id. § 6.

576    Id. § 7.

577    Id.

578    Id.

579    See, e.g., Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 224 (1877) (stating that the 22d Joint Rule allowed no debate when the Senate and House separated to consider an objection to receiving an electoral vote).

580    John Burgess, who is very critical of the ECA's substantive provisions, pronounced the procedural provisions "exhaustive" and as good "as human wit can divine." Burgess, supra note 10, at 652.

581    See supra notes 561-64 and accompanying text (discussing 1857 and 1869 meetings); infra note 633 and accompanying text (discussing 1869 meeting).

582    Maskell, supra note 17, at 3-4. The ECA's procedural provisions have not previously been the subject of sustained study.

583    18 Cong. Rec. 30-31 (1886) (statement of Rep. Caldwell).

584    U.S. Const. amend. XII.

585    17 Cong. Rec. 865 (1886) (statement of Sen. Morgan) (stating that the Senate President presides "only by reason of some rule or agreement between the two Houses. The Constitution is silent upon that point. The Constitution speaks of no officer who is to preside over the joint meeting."). The first time an objection was made to counting a state's vote during Congress's vote counting session was in 1817. Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 46 (1877) (statement of Rep. Taylor). The objector was a House member. Id. He addressed his remarks to the Speaker of the House. Id. A Senator who spoke in support of the House member's objection spoke to the President of the Senate. Id. (statement of Sen. Vernon).

586    **Electoral Count Act** of 1887, ch. 90, § 4, 24 Stat. 373, 373 (current version at 3 U.S.C. § 15 (2000)).

APPENDIX - 537

587   I do not consider the power that the Senate President may exercise as presiding officer of the Senate when the Senate meets separately to consider objections raised at the joint session.

588   U.S. Const. amend. XII.

589   **Electoral Count Act** of 1887 § 4.

590   See H.R. Misc. Doc. No. 44-13, at 227-28. The Senate President also said he would present them if instructed to by either house. Id. at 228.

591   Id. at 390.

592   Id. at 390-91.

593   Haworth, supra note 5, at 275. The Senate President's ruling involved some interpretive discretion. No law expressly specified a date for all packets to be in. The Senate President held that the law required him to submit all packets he had on the date that Congress began its vote counting session. Id. Needless to say, the Senate President was a Republican and the supposed late-arriving packet of Vermont electoral votes was being proferred by Representative Hewitt of New York, a Democratic leader. Id. at 274-75. In 1961, Vice President Nixon presented returns that arrived on the morning of Congress's electoral count session. Bush v. Gore, 531 U.S. 98, 127 (2000) (Stevens, J., dissenting); 107 Cong. Rec. 288-91 (1961); A. A. Smyser, How Kennedy Won 1960 Recount in Hawaii, Honolulu Star-Bull., June 8, 1963, at 5.

594   The returns from Georgia lacked the governor's certificate and simply listed the names of the four electors who declared they were voting for Thomas Jefferson and Aaron Burr. See 13 Cong. Rec. app. 539 (1882) (statement of Rep. Updegraff) (describing Georgia's vote in 1800); Gov. Packson, Executive Dep't, State of Ga., supra note 432.

595   5 Cong. Rec. 1504 (1877) (statement of Rep. Mills) (referring to the certificate); see also McKnight, supra note 214, at 419 (referring to a "burlesque certificate").

596   5 Cong. Rec. 1503 (1877) (statement of Rep. Stone) (reading the envelope address). The Senate President, in presenting this paper, said it was his "duty . . . to submit all papers coming into his hands and purporting to be certificates." Id. Given the envelope's designation, he "had no discretion in respect of laying the paper before the two Houses." Id. After receiving objections to all of Louisiana's returns, the Senate President asked for and received unanimous consent that the burlesque certificate should not be considered further. Id. at 1505.

597   20 id. at 1860 (1889).

598   See Sam W. MacDowell, State of Or., Governor Certificate of the Legal Election and Appointment of the Legal Electors of the Lawful President and Vice-President of the United States of N. America (1888). The Senate President then asked for unanimous consent to count the Oregon return that had a certificate from the person recognized as Oregon's governor. Id. As Congress knew, Oregon's governor in 1889 was Sylvester Pennoyer, who is still famous among American law students as the defendant in Pennoyer v. Neff, 95 U.S. 714 (1878). Samuel MacDowell is not mentioned in any history of Oregon that I have been able to locate.

599   Jefferson needed seventy electoral votes to be elected President. With Georgia's four votes, he had seventy-three. See Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 30-31 (1877). In 1797, Vice President Adams presented Vermont's electoral votes even though they were not entirely free from doubt. Vermont's four electoral votes were necessary for Adams to have been elected President. 1 Stanwood, supra note 552, at 51-52. Their defect, if any, was that the Vermont legislature had appointed the electors without previously enacting a law authorizing themselves to do it. Id. Since the Vermont return was formally correct, the issue was not whether the votes should have been presented, but whether they should have been counted. For that reason, I do not consider them here.

600   R.S. tit. 3, ch. 2, §§ 146-48 (1873).

601   See supra text accompanying notes 510-15 (discussing section 4).

602   See U.S. Const. amend. XII.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.  79

603   H.R. Misc. Doc. No. 44-13, at 227-28. The Senate President, in saying that a motion to require him to present papers in his possession was in order, relied on language in the 22d Joint Rule. See id. Similar language is in 📑 section 6 of the ECA.

604   See supra text accompanying notes 119, 383 (discussing bicameralism). But see H.R. Misc. Doc. No. 44-13, at 228 (statement of Senate President in 1865, explaining that "in the opinion of the Chair, if either branch of Congress shall be disposed to order the [withheld] returns to be read, it is within their power to do so").

605   **Electoral Count Act** of 1887, ch. 90, § 4, 24 Stat. 373, 373 (current version at 3 U.S.C. § 15 (2000)).

606   Id.; see also 18 Cong. Rec. 46 (1886) (statement of Rep. Dibble) (discussing residual interpretive authority of ministerial officials).

607   Coincidentally, it increases the discretionary power of the two houses and, if they disagree, makes it more frequent that the tie-breaking certificate of the state governor will decide the issue, because it promotes placing multiple electoral returns before Congress. See discussion supra Part III.D.2 (discussing multiple returns).

608   Robert's Rules of Order Revised § 58, at 236-37 (75th Anniversary ed. 1951); see also id. at § 21, at 78-83 (questions of order and appeal); id. at § 40, at 174-75 (dilatory, absurd, or frivolous motions).

609   See H.R. Misc. Doc. No. 44-13, at 246-47, 263-65 (providing different interpretations of the 1869 rules); id. at 87-93 (providing differing interpretations of the 1869 rules); supra text accompanying note 596 (discussing interpretation of rule that barred second Vermont certificate in 1877); infra text accompanying note 661 (discussing interpretation of ECA in the 2001 joint session).

610   **Electoral Count Act** of 1887 § 4.

611   Id.

612   Id.

613   Id. The text is ambiguous, but precedent is clear that all papers from a state are presented before objections are in order. This has happened every time the Senate President has received and presented multiple returns. See H.R. Misc. Doc. No. 44-13, at 391-95 (presenting multiple returns from Louisiana); 107 Cong. Rec. 288-91 (1961) (presenting multiple returns from Hawaii); 20 id. at 1860 (1889) (presenting multiple returns from Oregon); 17 id. at 817 (1886) (statement of Sen. Sherman) (stating that the Senate President simply hands the certificates to the tellers); 5 id. at 1195-98, 1503-06, 1728-31, 1945-46 (1877) (presenting multiple returns from Florida, Louisiana, Oregon, and South Carolina respectively); 3 Dreschler's Precedents of the United States House of Representatives, ch. 10, § 1.2, at 7 (1977) (when there are multiple returns, the Vice President hands them to the tellers in the order in which they were received). Thus the Senate President cannot influence the process by controlling the order in which returns are considered. I thank Professor Jack Balkin for drawing my attention to this problem.

614   **Electoral Count Act** of 1887 § 4 (providing that objections may be made "upon such reading of any such certificate or paper"). This provision is backed up by electoral vote counting precedent. See H.R. Misc. Doc. No. 44-13, at 227, 246 (statement of Senate President) (ruling objections out of order as not timely).

615   **Electoral Count Act** of 1887 § 4. Section 4 also requires that the objection "shall state clearly and concisely, and without argument, the ground thereof." Id. For simplicity, I will not refer to this requirement, but will simply speak of the ECA's formal requirements for objections as involving a writing signed by a senator and a member of the House.

616   Id.

617   Id. 📑 § 5.

618   Id.

619   Id. § 4.

620 8 Cong. Rec. 51 (1878) (citing S. 1308, 45th Cong. 📑 § 6 (1878)).

621 18 id. at 76 (1886) (statement of Rep. Oates). Between 1878 and 1886, only two changes were made to the procedural provisions in Senator Edmunds's original bill, and this was one of them. The other change dealt with the date set for starting Congress's electoral count session. Senator Edmunds's original bill selected the second Monday in February rather than the second Wednesday. Compare 8 id. at 51 (1878) (citing S. 1308, 45th Cong. 📑 § 6 (1878)), with **Electoral Count Act** of 1887 § 4. That change has no effect on the Senate President's power.

622 18 Cong. Rec. 668 (1886).

623 By "substantive objections," I mean objections to counting a state's electoral vote. By "procedural motions," I mean all motions questioning the Senate President's conduct of the meeting, including appeals from any of his rulings on substantive objections and other procedural motions.

624 **Electoral Count Act** of 1887 § 4.

625 The Senate's precedents script the presiding officer's comments. See Floyd M. Riddick & Alan S. Frumin, Riddick's Senate Procedure, S. Doc. No. 101-28, at 1441 (1992). In the House, the presiding officer announces the vote totals and whether the bill passes. See Proceedings of the House of Representatives (C-SPAN1 television broadcast, Nov. 20, 2003) (statement of Speaker pro tempore Bass). The Congressional Record does not reflect this practice; the editor indicates the import of a vote. See, e.g., 142 Cong. Rec. 25482, 25576 (1996). In this regard, the Congressional Record is not a verbatim transcript of House proceedings. Compare Proceedings of the House of Representatives, supra, with 149 Cong. Rec. H11665-67 (daily ed. Nov. 20, 2003) (statement of Speaker pro tempore Bass) (Congressional Record reporting the same votes).

626 Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 389 (1877) (statement of the Vice President).

627 Id. at 263 (statement of Senate President).

628 Id. at 264-65.

629 115 Cong. Rec. 196-97 (1969) (Sen. Russell elected President pro tempore); id. at 145, 171 (President pro tempore presiding at electoral count session).

630 Id. at 171 (statement of Senate President pro tempore).

631 Id.

632 If the houses are in agreement, they can always overrule the Senate President or instruct their tellers what to record. See infra text accompanying notes 653-67 (discussing appeals). This assumes that appeals of the Senate President's rulings are in order. Id.

633 H.R. Misc. Doc. No. 44-13, at 230-35, 246-47.

634 Id. at 246-47.

635 See id.

636 Id. at 247.

637 Id. at 263.

638 Id. at 263-64.

639 Id. at 273 (statement of Speaker Colfax) (explaining that "there is nothing clearer" than the applicability of the special concurrent rule on Georgia).

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works. 81

640  Is there, for example, a fraud exception to a section 2 tribunal's final determination? If so, does it cover only manifest fraud? What operative facts meet whatever standard is imposed? See supra text accompanying notes 372-81. To take instances that have arisen: when an elector votes for a candidate different from the one he is pledged to vote for, is that an example of a vote that is not regularly given?, 115 Cong. Rec. 171 (1969) (answering "no"); should Congress consider electors whose right to that office was determined by an election contest that concluded after the day set for elector balloting? 107 id. at 290 (1961) (answering "yes," by unanimous consent at the suggestion of the Vice President, but without meaning to set a precedent).

641  See **Electoral Count Act** of 1887, ch. 90, § 4, 24 Stat. 373, 373-74 (current version at 3 U.S.C. § 15 (2000)).

642  In addition, if there are multiple returns, but the houses agree that one of them was authenticated by the state's section 2 authority, the counting rule is that both houses must concur to reject the votes because of elector ineligibility or post-appointment behavior. See supra note 544. But determining if the situation arises is a bright-line determination requiring only a ministerial decision.

643  This is one of the reasons why it was important to assert that when a slate of electors claim section 2 status, they do not have it unless the Senate and the House agree that they do. This argument helps clarify that the Senate President has no role in deciding if section 2's conditions and limitations have been met. If section 2's conclusivity principle imposed a separate voting rule in competition with section 4, then the Senate President would be in the position he was in with regard to the two rules governing the 1869 electoral count. He would be in a position, after Congress voted to reject the slate claiming section 2 status, to rule that the case came within the terms of section 2 and not section 4.

644  See infra text accompanying notes 649, 652 (distinguishing the ECA's textual basis for allowing substantive objections and procedural motions).

645  Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 246 (1877) (statement of 1869 Senate President and Sen. Drake); id. at 227 (statement of 1865 Senate President and Rep. Pruyn); id. at 89 (statement of 1857 presiding officer and Rep. Letcher); id. at 82 (statement of 1849 Senate President and Sen. Stevens). These were substantive objections to counting votes.

646  Id. at 246 (statement of 1869 Senate President and Sen. Drake); id. at 227 (statement of Senate President and Rep. Pruyn).

647  Id. at 246; id. at 227. Senator Drake's argument, for example, was that the "vote of Nevada has been reported, but has not yet been decided on." Id. at 246. Apparently, Senator Drake believed that the decisive moment for counting votes is when the tellers make their report, not when each state is individually dealt with. See id. Representative Pruyn's argument was substantially the same. See id. at 227.

648  Id. at 263 (statement of Senate President and Sen. Butler). This was part of the 1869 fracas. See supra notes 562-64 and accompanying text. House Speaker Colfax supported the Senate President's refusal to allow appeals from his ruling. H.R. Misc. Doc. No. 44-13, at 273 (discussing the conduct of the 1869 vote counting session); see also id. at 89 (statement of 1857 presiding officer) (ignoring appeal made by Senator Toombs); id. at 82 (statement of 1849 Senate President) ("[N]o motion was in order.").

649  **Electoral Count Act** of 1887, ch. 90, § 4, 24 Stat. 373, 373-74 (current version at 3 U.S.C. § 15 (2000)). Vice President Gore, in his role as Senate President, enforced this requirement during the 2001 electoral count, ruling out of order a series of objections to Florida's certificate because they were signed by a House member but no Senator. See 147 Cong. Rec. H34-36 (daily ed. Jan. 6, 2001). This provision also requires that the objection be without argument. **Electoral Count Act** of 1887 § 4.

650  See supra text accompanying note 648 (discussing statements of Representative Pruyn and Senator Drake). Although the ECA text is not wholly unambiguous, pre-ECA electoral vote counting precedent and considerations of efficient administration counsel that the Senate President have the power to supervise the timeliness of objections.

651  See Robert's Rules of Order (Newly Revised) § 39, at 331 (10th ed. 2000) ("[E]very deliberative assembly has the right to protect itself from the use of [parliamentary] forms for the opposite purpose."). This is especially true because the Senate President must entertain procedural motions, like appeals from his rulings. See infra text accompanying notes 662-64. Dilatory motions that present substantive objections to counting a state's electoral vote present little danger of undue delay because of the ECA's provisions that make for expeditious consideration of substantive objections. See

APPENDIX - 541

supra text accompanying notes 482-88, 513, 572-74. But procedural motions, like quorum calls and appeals of the Senate President's rulings, can unduly delay substantive consideration of any state.

652    **Electoral Count Act** of 1887 📙 § 6 (emphasis added).

653    See, e.g., Robert's Rules of Order (Newly Revised), supra note 651, at 240-52.

654    See, e.g., Subcomm. on Compilation of Precedents, Counting Electoral Votes, H.R. Misc. Doc. No. 44-13, at 273 (1877) (statement of Speaker Colfax) (discussing the conduct of the 1869 vote counting session); id. at 226-28 (statement of Senate President) (discussing procedural motions); id. at 89 (statement of 1857 Senate President) (ignoring appeal made by Senator Toombs); id. at 82 (statement of 1849 Senate President) ("[N]o motion was in order.").

655    Id. at 86, 89-90 (1857 rule and Senate President ruling); id. at 81-82 (1849 rule and Senate President ruling).

656    The 22d Joint Rule, after setting out the procedure of Senate and House separation to decide objections to counting a state's electoral vote, stated: "And any other question pertinent to the object for which the two houses are assembled may be submitted and determined in like manner." Id. at 224 (citing S.J. Res. 22, 38th Cong. (1865)); see also id. at 462 (statement of Sen. Morton) (commenting on 22d Joint Rule).

657    Id. at 227-28 (statement of Senate President) (discussing motion to submit the Confederate certificates); id. at 226 (statement of 1865 Senate President) (indicating he could receive procedural motions, even for something as insignificant as dispensing with reading the electoral certificates in their entirety, if the houses are willing to "separate in order to pass upon the question").

658    Id. at 264-65.

659    Id. at 263-64.

660    Id. at 273. Speaker Colfax also said the 22d Joint Rule did not provide for it, and no appeal had ever been taken. Id. But he seems to have forgotten the 1865 incident, the Senate President's explanation of how the 22d Joint Rule provided for it, and how it could be handled by the same procedure for deciding substantive objections to counting a state's electoral vote. See supra text accompanying note 657. It should be noted, however, that Speaker Colfax was correct in saying no appeal had ever been taken. In 1865, after the Senate President ruled that the appeal was in order, the House member who made the appeal withdrew it rather than force a separation of the two houses. H.R. Misc. Doc. 44-13, at 227-28 (statements of the Vice-President and Sen. Yeaman).

661    147 Cong. Rec. H35-36 (daily ed. Jan. 6, 2001).

662    Id. at H35. Vice President Gore said this a number of times in response to different motions. Id. at H35-36. Gore's reference was to 3 U.S.C. §§ 15-18 (2000), where sections 4-7 of the ECA are codified.

663    Vice President Gore specifically responded to an appeal with this analysis. 147 Cong. Rec. H36 (daily ed. Jan. 6, 2001) (statement of Vice President and Rep. Hastings).

664    This assumes the procedural motions were also timely, not argumentative, and not dilatory. These facets of proper substantive objections and procedural motions were not in issue at this point. Vice President Gore also subjected a request for unanimous consent to the requirement that the appeal be in writing with the appropriate two signatures. Id. (statement of Vice President and Rep. Waters) (noting also that an objection was heard). This seems to go too far and counters over a century of precedent. Since 1865, Senate Presidents have expedited the proceedings by accepting, or suggesting, unanimous consent motions. The tradition, which began under the 22d Joint Rule, was immediately adopted under the ECA and has continued ever since. H.R. Misc Doc. No. 44-13, at 226 (statement of 1865 Vice President); 107 Cong. Rec. 290 (1961) (accepting and counting one of Hawaii's multiple returns as the appropriate return); 43 id. at 2149 (1913) (correcting a clerical error); 20 id. at 1859-60 (1889) (disposing of facetious electoral return from Oregon).

665    See supra text accompanying note 583 (discussing role of the Senate President). Allowing procedural motions and appeals does lengthen Congress's vote counting session. To some extent this is undesirable, as dispatch is a virtue in electoral vote counting. Still, the ECA provides rules that limit delay by requiring that all objections to counting a state's vote be submitted while the state is under consideration, that all objections be considered together, and that time limits

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

for the Senate and House's separate consideration of the objections and recesses be enforced. See supra note 647 and accompanying text. I also note that most of the procedural motions and appeals during the 2001 vote counting session were because the Senate President had ruled out of order substantive objections that did not have a senatorial signature. See supra note 649. Had there been a senatorial signature, the substantive objection would have been in order, and no procedural motions, which threatened delay, would have needed to be made.

666    That it would take a concurrent vote of both houses to overrule a substantive or procedural ruling of the Senate President should be added to the reasons why the ECA should be read to give the Senate President as few opportunities as possible to exert influence through ruling substantive objections and procedural motions out of order. This supports the view that the Senate President should review objections, motions, and appeals only for whether they are in proper form, timely, and not dilatory.

667    See, for example, supra text accompanying notes 383-402, where it is argued that when electors claim section 2 status, it is for Congress to decide whether they merit it. Even if the Senate President is certain that the electors deserve section 2 status, the Senate President cannot tilt towards that outcome by ruling out of order objections to counting their votes. The Senate President can only act when the objections are formally insufficient, not timely, or dilatory. For similar reasons, should members of Congress object to receiving a state's vote on the ground that the vote was not regularly given because of concerns about the way the votes in the presidential election were recounted by county canvassing boards, the Senate President may not rule the objection out of order even though the objection that the vote was not regularly given applies only to the electors' post-appointment behavior. See supra text accompanying note 474. Although the Senate President might refuse to accept the objection on the grounds that it was argumentative, once the argument was removed, the Senate President would have to receive it. **Electoral Count Act** of 1887, ch. 90, § 4, 24 Stat. 373, 373-74 (current version at 3 U.S.C. § 15 (2000)).

668    In addition, the ECA has built-in safeguards that limit delay. See supra text accompanying notes 570-80. When Rep. Caldwell, in the second paragraph of his remarks, referred to the votes' "legality," he meant a judgment of whether the votes suffered constitutional infirmities, not whether there were mistakes in state law. 18 Cong. Rec. 31 (1886) (statement of Rep. Caldwell). This is shown by the examples he gave. See supra text accompanying note 336 (discussing constitutional infirmities).

669    18 Cong. Rec. 31 (1886).

670    If Congress accepts one slate of electors as properly elected under state law, then the Senate and House must concur in rejecting the votes of some of them because of other defects. See supra text accompanying note 544.

671    If there are multiple claimants to the governor's office, and they certify multiple returns with copies of the state's seal, the state's electoral votes cannot be counted unless the two houses agree on the identity of the legitimate governor. See supra text accompanying notes 542-43.

672    It is unclear whether ministerial error is limited to the governor's actions or may be traced back to the ministerial errors of the canvassing boards on which the governor relied.

673    If the fraud exception does exist, Congress may inquire into fraud in the section 2 process. Fraud in the underlying election may be evidence of the section 2 tribunal's fraud, but it does not necessarily establish it.

674    By not "complete," this Article means that the ECA does not provide a uniquely correct solution for every dispute that might arise when Congress counts electoral votes. This notion of "completeness" is drawn from Thomas C. Grey, Langdell's Orthodoxy, 45 U. Pitt. L. Rev. 1, 7 (1983).

675    See, e.g., 18 Cong. Rec. 668 (1887) (excepting instances of dual governments in a state); 17 id. at 1019, 1020 (1886) (statement of Sen. Hoar) (same).

676    U.S. Const. amend. XII.

677    Wroth, supra note 13, at 324-25.

678    If the problem were in an elector's appointment, that may differ from the problem with the way an appointed elector behaved in office. The ECA also leaves open many minute procedural issues. See Maskell, supra note 17, at 3-4 (mentioning, for example, "form . . . of question[s] . . . presented"). Although these problems are perhaps too minute

APPENDIX - 543

to be dealt with in the ECA (or in this Article), partisan squabbling over them could diminish the public's perception of regularity.

679 See, e.g., 17 Cong. Rec. 2428 (1886) (statement of Sen. George); id. at 1061 (statement of Sen. Call); id. at 820-21 (statement of Sen. Hoar); id. at 820, 1057 (statement of Sen. Evarts); 17 id. at 819 (statement of Sen. Edmunds); see also 18 id. at 49 (statement of Rep. Cooper); Maskell et al., supra note 13, at 2-3; Burgess, supra note 10, at 650; Wroth, supra note 13, at 345.

680 In 1873, when Congress rejected Arkansas's and Louisiana's electoral vote, and when it rejected three votes from Georgia, the Senate's and House's journals recorded the required majority for election differently. Journal of the House of Representatives of the United States 354 (1873) (stating that 177 electoral votes are required); Journal of the Senate of the United States of America 348 (1873) (stating that 184 electoral votes are required); Maskell et al., supra note 13, at 4-5. The Senate's and House's disparity in treatment raises the problem noted in the text. It is a troubling precedent, particularly because it is the only occasion on which Congress rejected a state's electoral vote, rather than giving alternate counts or choosing between competing slates. In addition, Congress's precedents are not consistent on diminishing the majority required for election when electoral votes are not cast because an elector died or was not appointed. See id. at 3-5; Wroth, supra note 13, at 345 n.95. On these occasions, however, the Senate and House have recorded the required majority the same way. The point is, however, that Congress's action shows no consistent pattern.

681 **Electoral Count Act** of 1887, ch. 90, § 4, 24 Stat. 373, 374 (current version at 3 U.S.C. § 15 (2000)).

682 Id.

683 For cogent critiques of the ECA's policy choices, see Burgess, supra note 10, at 637-38, 645-50; Wroth, supra note 13, at 334-52. See also Glennon, supra note 13 (suggesting a thorough overhaul of the electoral vote counting system).

684 The period is actually thirty-five days if we limit the time to the "safe harbor" period.

685 See generally Guido Calabresi, A Common Law for the Age of Statutes (1982); William N. Eskridge, Jr., Dynamic Statutory Interpretation (1994).

686 In 1969, Congress addressed whether it should count a vote cast for a candidate other than the candidate to whom the elector was pledged. 115 Cong. Rec. 145-72, 209-47 (1969). The law of the state involved, however, did not bind electors to vote as they had pledged. See id. Consider also the argument, made in 1969, that Congress should not only disregard the "faithless electors" vote, but record it for the candidate for whom it should have been cast. Id. at 198-201 (statements of Sens. Muskie and Mundt). Nineteenth-century Congresses would not have considered doing that.

687 See 107 id. at 288-91 (1961) (counting the votes of Hawaii's Democratic electors based on a trial court's determination of an election contest two days before Congress met, although the ruling was still subject to appeal). Nineteenth-century Congresses would have not allowed this, based on their understanding of the officer de facto doctrine. See supra text accompanying note 185.

688 See generally Calabresi, supra note 685; Eskridge, supra note 685; Jack Balkin, Constitutional Interpretation and the Problem of History, 63 N.Y.U. L. Rev. 911, 953 (1988); Lawrence Lessig, Understanding Changed Readings: Fidelity and Theory, 47 Stan. L. Rev. 395, 401-43 (1995).

689 Or consider a variant of this hypothetical: If one supposes there was time for a rehearing petition to be filed under normal Florida Supreme Court rules, perhaps the earnestly asserted issue would be whether the Florida Supreme Court's decision was "final."

690 See Letter from Thomas Jefferson to James Madison, supra note 426 (stating Jefferson's expectation that he and Burr would tie for the presidency).

691 17 Cong. Rec. 1019 (1886) (statement of Sen. Hoar).

**\*659 APPENDIX I**

**The Electoral Count Act of 1887**

24 Stat. 373

Chap. 90.-An act to fix the day for the meeting of the electors of President and Vice-President, and to provide for and regulate the counting of the votes for President and Vice-President, and the decision of questions arising thereon.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the electors of each State shall meet and give their votes on the second Monday in January next following their appointment, at such place in each State as the legislature of such State shall direct.

SEC. 2. That if any State shall have provided, by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such State, by judicial or other methods or procedures, and such determination shall have been made at least six days before the time fixed for the meeting of the electors, such determination made pursuant to such law so existing on said day, and made at least six days prior to the said time of meeting of the electors, shall be conclusive, and shall govern in the counting of the electoral votes as provided in the Constitution, and as hereinafter regulated, so far as the ascertainment of the electors appointed by such State is concerned.

SEC. 3. That it shall be the duty of the executive of each State, as soon as practicable after the conclusion of the appointment of electors in such State, by the final ascertainment under and in pursuance of the laws of such State providing for such ascertainment, to communicate, under the seal of the State, to the Secretary of State of the United States, a certificate of such ascertainment of the electors appointed, setting forth the names of such electors and the canvass or other ascertainment under the laws of such State of the number of votes given or cast for each person for whose appointment any and all votes have been given or cast; and it shall also thereupon be the duty of the executive of each State to deliver to the electors of such State, on or before the day on which they are required by the preceding section to meet, the same certificate, in triplicate, under the seal of the State; and such certificate shall be inclosed [sic] and transmitted by the electors at the same time and in the same manner as is provided by law for transmitting by such electors to the seat of Government the lists of all persons voted for as President and of all persons voted for as Vice-President; and section one hundred and thirty-six of the Revised Statutes is hereby repealed; and if there shall have been any final determination in a State of a controversy or contest as provided for in section two of this act, it shall be the duty of the executive of such State, as soon as practicable  *660  after such determination, to communicate, under the seal of the State, to the Secretary of State of the United States, a certificate of such determination, in form and manner as the same shall have been made; and the Secretary of State of the United States, as soon as practicable after the receipt at the State Department of each of the certificates hereinbefore directed to be transmitted to the Secretary of State, shall publish, in such public newspaper as he shall designate, such certificates in full; and at the first meeting of Congress thereafter he shall transmit to the two Houses of Congress copies in full of each and every such certificate so received theretofore at the State Department.

SEC. 4. That Congress shall be in session on the second Wednesday in February succeeding every meeting of the electors. The Senate and House of Representatives shall meet in the Hall of the House of Representatives at the hour of one o'clock in the afternoon on that day, and the President of the Senate shall be their presiding officer. Two tellers shall be previously appointed on the part of the Senate and two on the part of the House of Representatives, to whom shall be handed, as they are opened by the President of the Senate, all the certificates and papers purporting to be certificates of the electoral votes, which certificates and papers shall be opened, presented, and acted upon in the alphabetical order of the States, beginning with the letter A; and said tellers, having then read the same in the presence and hearing of the two Houses, shall make a list of the votes as they appear from the said certificates; and the votes having been ascertained and counted in the manner and according to the rules in this act provided, the result of the same shall be delivered to the President of the Senate, who shall thereupon announce the state of the vote, which announcement shall be deemed a sufficient declaration of the persons, if any, elected President and Vice-President of the United States, and, together with a list of the votes, be entered on the Journals of the two Houses. Upon such reading of any such certificate or paper, the President of the Senate shall call for objections, if any. Every objection shall be made in writing, and shall state clearly and concisely, and without argument, the ground thereof, and shall be signed by at least one Senator and one Member of the House of Representatives before the same shall be received. When all objections so made to any vote or paper from a State shall have been received and read, the Senate shall thereupon withdraw, and such objections shall be submitted to the Senate for its decision; and the Speaker of the House of Representatives shall, in like manner, submit such objections to the House of Representatives for its decision; and no electoral vote or votes from any State which shall have been regularly given by electors whose appointment has been lawfully certified to according to section three of this act from which but one return has been received shall be rejected, but the two Houses concurrently may reject the vote or votes when they agree that such vote or votes have not been so regularly given  *661  by electors whose appointment has been so certified. If more than one return or paper purporting to be a return from a State shall have been received by the President of

APPENDIX - 545

the Senate, those votes, and those only, shall be counted which shall have been regularly given by the electors who are shown by the determination mentioned in section two of this act to have been appointed, if the determination in said section provided for shall have been made, or by such successors or substitutes, in case of a vacancy in the board of electors so ascertained, as have been appointed to fill such vacancy in the mode provided by the laws of the State; but in case there shall arise the question which of two or more of such State authorities determining what electors have been appointed, as mentioned in section two of this act, is the lawful tribunal of such State, the votes regularly given of those electors, and those only, of such State shall be counted whose title as electors the two Houses, acting separately, shall concurrently decide is supported by the decision of such State so authorized by its laws; and in such case of more than one return or paper purporting to be a return from a State, if there shall have been no such determination of the question in the State aforesaid, then those votes, and those only, shall be counted which the two Houses shall concurrently decide were cast by lawful electors appointed in accordance with the laws of the State, unless the two Houses, acting separately, shall concurrently decide such votes not to be the lawful votes of the legally appointed electors of such State. But if the two Houses shall disagree in respect of the counting of such votes, then, and in that case, the votes of the electors whose appointment shall have been certified by the Executive of the State, under the seal thereof, shall be counted. When the two Houses have voted, they shall immediately again meet, and the presiding officer shall then announce the decision of the questions submitted. No votes or papers from any other State shall be acted upon until the objections previously made to the votes or papers from any State shall have been finally disposed of.

SEC. 5. That while the two Houses shall be in meeting as provided in this act the President of the Senate shall have power to preserve order; and no debate shall be allowed and no question shall be put by the presiding officer except to either House on a motion to withdraw.

SEC. 6. That when the two Houses separate to decide upon an objection that may have been made to the counting of any electoral vote or votes from any State, or other question arising in the matter, each Senator and Representative may speak to such objection or question five minutes, and not more than once; but after such debate shall have lasted two hours it shall be the duty of the presiding officer of each House to put the main question without further debate.

SEC. 7. That at such joint meeting of the two Houses seats shall be provided as follows: For the President of the Senate, the Speaker's chair; for the Speaker, immediately upon his left; the Senators, in the body of the  **662**  Hall upon the right of the presiding officer; for the Representatives, in the body of the Hall not provided for the Senators; for the tellers, Secretary of the Senate, and Clerk of the House of Representatives, at the Clerk's desk; for the other officers of the two Houses, in front of the Clerk's desk and upon each side of the Speaker's platform. Such joint meeting shall not be dissolved until the count of electoral votes shall be completed and the result declared; and no recess shall be taken unless a question shall have arisen in regard to counting any such votes, or otherwise under this act, in which case it shall be competent for either House, acting separately, in the manner hereinbefore provided, to direct a recess of such House not beyond the next calendar day, Sunday excepted, at the hour of ten o'clock in the forenoon. But if the counting of the electoral votes and the declaration of the result shall not have been completed before the fifth calendar day next after such first meeting of the two Houses, no further or other recess shall be taken by either House.

Approved, February 3, 1887.

*663  APPENDIX II

Whether Section 4's Treatment of the "Multiple Return" Problems Is Disjunctive or Conjunctive

Jack Maskell and L. Kinvin Wroth read the ECA's three step process for grappling with multiple return problems as disjunctive. [692] Their analysis suggests a situation where a state would be entirely disfranchised beyond those that I have delimited. [693] According to Maskell and Wroth, when there are multiple sets of returns authenticated by different tribunals claiming to be the state's section 2 authority, should the House and Senate disagree as to which tribunal is the proper section 2 authority, no vote from the state is to be counted, and "[t]his result follows regardless of the governor's action." [694] As Wroth explains: "Congress in this case looks to the executive certificate only as evidence of the decision reached by a tribunal authorized by the state legislature. If the decision of the authorized tribunal cannot be made out, then there is no valid return for the governor to certify." [695]

APPENDIX - 546

There is evidence in the ECA's legislative history supporting Wroth's and Maskell's position. As they indicate, Senator Hoar, Representative Eden, and the Conference Committee Report specifically mention the governor's certificate only when discussing the situation "when there has been no determination of the question in the States." [696] I submit, however, that when more than one tribunal in a state asserts that it is the state's section 2 authority, if the houses of Congress disagree as to which tribunal is the proper one, then that is an instance when no determination of the question in the State has been made. [697]

**\*664** As passed, section 4's provision dealing with multiple returns is:

> If more than one return or paper purporting to be a return from a State shall have been received by the President of the Senate, those votes, and those only, shall be counted which shall have been regularly given by the electors who are shown by the determination mentioned in section two of this act to have been appointed, if the determination in said section provided for shall have been made . . . ; but in case there shall arise the question which of two or more of such State authorities determining what electors have been appointed, as mentioned in section two of this act, is the lawful tribunal of such State, the votes regularly given of those electors, and those only, of such State shall be counted whose title as electors the two Houses, acting separately, shall concurrently decide is supported by the decision of such State so authorized by its laws; and in such case of more than one return or paper purporting to be a return from a State, if there shall have been no such determination of the question in the State aforesaid, then those votes, and those only, shall be counted which the two Houses shall concurrently decide were cast by lawful electors appointed in accordance with the laws of the State, unless the two Houses, acting separately, shall concurrently decide such votes not to be the lawful votes of the legally appointed electors of such State. But if the two Houses shall disagree in respect of the counting of such votes, then, and in that case, the votes of the electors whose appointment shall have been certified by the Executive of the State, under the seal thereof, shall be counted. [698]

Textually, it is more plausible to read the final sentence, particularly the words "such votes," as relating to the entire prior sentence, not just to the clause after the final semicolon. [699]

In addition, the main purpose of the amendments that led to Congress turning to the governor's certificate as the ultimate tiebreaker-Hoar's floor amendment [700] and the House of Representatives' committee's substitute proposal [701] -was to respond to congressmen concerned about the power of one house of Congress to disfranchise a state when there were multiple returns. In reviving their proposals, and in crafting section 4's final language, the Conference Committee's view was that:

> **\*665** The general effect of all [the reconciling amendments], and of the bill as reported . . ., is to provide for the decision of all questions that may arise as to its electoral vote to the State itself; and where, for any reason, that fails, then the Houses circumscribe their power to the minimum under any circumstances to disfranchise a State, and such result can only happen when the State shall fail to provide the means for the final and conclusive decision of all controversies as to her vote. [702]

Under Wroth's and Maskell's reading, one house of Congress may disfranchise a state under more circumstances than under my reading. Under Wroth's and Maskell's reading, a state is disfranchised whenever there are multiple sets of returns authenticated by different tribunals claiming to be the state's section 2 authority and the House and Senate disagree on which board is the proper section 2 authority. [703] In addition, a state is disfranchised even if only one of the multiple returns claims to have been authenticated through a section 2 process but the House and Senate disagree about whether the determination met all the conditions section 2 imposes for being a proper final determination. [704] Under my reading, a state is disfranchised only when the houses concur in rejecting the return certified by its governor. [705]

In the legislative history of the provision, there is much evidence that supports reading the final sentence (the sentence about the governor's certificate) as applying to more than just the final clause of the preceding sentence. The provision that passed the House of Representatives was more likely to be read disjunctively because in that draft the provision on the governor's

APPENDIX - 547

certificate appeared as part of the final clause dealing with the situation when there was no tribunal determination.[706] Moving the **666** "governor's certificate" language to its own sentence seems to clarify that the provision on the governor's certificate applies to more than just the clause after the last semicolon. It may well have been part of what the Conference Committee meant when it said it "remodel[led] . . . the language of the House amendment so as to clear up any ambiguity in the section . . . when there has been no determination of the question in the States."[707]

Moreover, in introducing his amendment, Senator Hoar said: "[I]f the amendment which I have proposed shall be adopted no case can arise under this bill of rejecting the vote of any State except in the single case of dual State governments."[708] "Dual state governments" implies not just multiple tribunals claiming to be the state's section 2 authority, but multiple claimants to the governor's office. Similarly, the House of Representatives committee report did not limit its description of the role of the "governor's certificate" amendment to situations where the House of Representatives and the Senate disagreed about which tribunal was the state's proper section 2 authority. The House committee report merely paraphrased the Senate bill's provision on multiple returns and stated:

> Under the amendment, where there is but one State government and two sets of returns, purporting to be the vote of the State, then that return shall be counted which is supported by the certificate of the executive of the State, . . . unless both houses, acting separately, shall concur **667** in deciding that the vote so certified and returned is not the lawful vote of the State.[709]

The remarks of Representative Samuel Dibble, chief spokesman for the House committee minority, support reading the "governor's certificate" language as coming into play whenever the houses disagreed about which votes, if any, to count when a state submitted multiple sets of electoral votes. Dibble's states' rights position was that Congress's power in counting electoral votes was "a ministerial act"[710] of "count[ing], in the sense of enumeration."[711] Congress's power, he said, was "to recognize credentials"[712] and he "deni[ed] the existence of any authority in one House, or in both Houses of Congress combined, to set aside that prima facie case when it is certified and presented in regular form and manner."[713] To Dibble, the only legitimate time to disfranchise a state that submitted authenticated returns was when there was a "dual government" with "two persons claiming to hold the office of governor, two persons claiming to hold the State seal, two impressions of the seal which are facsimilies" on different returns, and each House recognizes a different government.[714] For these reasons, Dibble said he agreed with the Senate bill "in its general tenor and spirit," and with the House committee majority's proposed amendment to count, when all else failed, the return certified by the state's governor under the seal of the state.[715] Indeed, he led the House committee minority in insisting that the governor's certificate conclude the matter and not be subject to rejection by a concurrent vote of both houses.[716]

Dibble was, in short, extraordinary in his desire that Congress not have power to disfranchise a state, yet he never protested that under the House committee majority's bill that Congress had the power to disfranchise a state whenever the two houses received multiple returns that purported to **668** come from differing section 2 authorities simply by disagreeing as to which tribunal was the proper one. Silences are difficult to interpret, but I think it suggests that he did not read the committee's bill as disjunctive. Rather, I think that he thought the requirement to turn to the governor's certificate applied whenever the houses disagreed as to the identity of the state's proper section 2 authority because that was an instance of what the bill meant when it spoke of the state making no determination of the question.[717]

As a final argument, consider that before the amendment regarding the governor's certificate was added, section 4 was drafted in the same disjunctive style as it was after Hoar and the House committee added their amendment. The unamended section 4 read:

> If more than one return or paper purporting to be a return from a State shall have been received by the President of the Senate, those votes, and those only, shall be counted which shall have been regularly given by the electors who are shown by the evidence mentioned in section 2 of this act to have been appointed, if the determination in said section provided for shall have been made . . . . ; but in case there shall arise the question which of two or more of such State tribunals determining what electors have been appointed, as mentioned in section 2 of this act, is the lawful tribunal of such State, the votes regularly given of those electors, and those only, of such State shall be counted whose title as electors the two Houses, acting separately, shall concurrently decide is supported

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

by the decision of the tribunal of such State so authorized by its laws; and in such case of more than one return or paper purporting to be a return from a State, if there shall have been no such determination of the question in the State aforesaid, then those votes, and those only, shall be counted which the two Houses, acting separately, shall concurrently decide to be the lawful votes of the legally appointed electors of such State. [718]

If Wroth's and Maskell's argument about the implication of the disjunctive clauses is correct, then the meaning of the unamended provision is that if, under the first clause, the houses disagree on whether there has been a timely section 2 determination, or, under the second clause, the houses disagree on whether any of the multiple returns claiming section 2 authentication really have it, then the houses have no authority, as the third *669 clause allows when there is "no such determination," to attempt to agree that any return is the state's valid return regardless of whether it has a section 2 authentication. In other words, Wroth's and Maskell's reading means that once any return is received that purports to have a section 2 authentication, if the houses disagree about the bonafides of that authentication, they are precluded from counting another return, even when both houses agree that it is the valid return. Under Wroth's and Maskell's reading, a return that claims section 2 status may not trump all, but it does forestall all. This does not seem to be what Congress could possibly have intended. [719]

The implication I draw from this is that after the provision on the governor's certificate was added, even before the Conference Committee redrafted the provision to make it clearer, it applied generally to all instances of multiple returns. The Congress that wrote the ECA intended that when the Senate and House of Representatives disagreed about whether a return had section 2 status, that itself was an instance of "no such determination" made under the ECA. It is another example of the requirement that the Senate and House of Representatives must agree before a return can be accorded section 2 status. [720] In this situation, the houses have to agree not only that there was a section 2 determination, but also on the tribunal that made it.

## *670 APPENDIX III

**Summary of Grounds Under the ECA for Denying Electors Section 2 Status and for Not Counting Electoral Votes**

I. Grounds for Denying Electors Section 2 Status

A. The electors' status was not authenticated by the authority designated by state law to make the "final determination" of the identity of the state's electors

B. The state's final determination process was not established by a state law enacted prior to election day

C. The determination was not "final" six days or more before the day set for elector balloting

D. The state's "final determination" process did not use quasi-judicial methods

E. And perhaps: The "final determination" authority's decision was (1) fraudulent, or (2) "manifestly" fraudulent

II. Grounds for Rejecting Electoral Votes Submitted by an Elector Who Has Section 2 Status

A. Pre-appointment grounds

1. The elector is personally disqualified from holding the elector's office because he or she also holds federal office

2. Other constitutional infirmities, such as

a. The elector was appointed by a territory that is not entitled to participate in the presidential election

b. The state submitted more electoral votes than it is entitled to under the Constitution

APPENDIX - 549

B. Post-appointment grounds

1. The elector cast his or her vote in violation of constitutional and federal statutory requirements; for example, the elector did not vote

a. by ballot

b. for a President and Vice-President, one of whom is not an inhabitant of the elector's state

c. on the day set by federal law

d. for candidates who are constitutionally qualified to hold the President's and Vice-President's office

2. The elector cast his or her vote because of bribery or corruption

III. Grounds for Rejecting Electoral Votes Submitted by an Elector Who Does Not Have Section 2 Status

A. All the grounds mentioned in II above

B. The elector's Certificate of Election resulted from

 **\*671** 1. the governor's ministerial error, and perhaps, any ministerial error by election administrators on which the governor relied

2. a fraudulent appointment process, although it is arguable that the fraud must be so notorious that it is "manifest"

Another way of stating the grounds for objecting to counting electoral ballots is that section 4 of the ECA requires an elector's vote to be "regularly given" and "lawfully certified." "Regularly given" covers all post-appointment grounds. "Lawfully certified" covers all pre-appointment grounds. All the grounds in III above are pre-appointment. The grounds in II are pre-and post-appointment, as indicated.

The specific grounds mentioned here are drawn from the grounds discussed by the Congresses that framed the ECA. It is not meant to be exhaustive of the specific objections that members of Congress may raise. For example, members of Congress might object if electors voted for candidates other than the candidates state law bound them to vote for. If so, the objection, based on post-appointment conduct, would be that the electors' votes were not "regularly given." This would be the appropriate ground of objection regardless of whether the electors claimed section 2 status.

692     Maskell, supra note 17, at 8-11; Wroth, supra note 13, at 343.

693     My view is that when there are multiple submissions, a state will be disfranchised only when both the Senate and the House concur in rejecting all the state's submissions, or there is no submission certified by the governor, or there are two or more governors and Congress disagrees as to who the true governor is.

694     Wroth, supra note 13, at 343. Maskell points out that Burgess implicitly agrees with their position. Maskell, supra note 17, at 8 n.26 (citing Burgess, supra note 10, at 642-44).

695     Wroth, supra note 13, at 343. I treat Wroth and Maskell's analysis in Appendix II because: (1) it applies only to the rare instance when a state makes multiple submissions and two or more of them claim section 2 authentication; and (2) my response is so detailed that it would burden the text. The length of my response reflects the complexity of the subject and the wealth of material. It also reflects my great respect for Wroth's and Maskell's views on the ECA. I owe a great debt to Wroth's seminal and perceptive article. See Wroth, supra note 13. Jack Maskell, who works for the Congressional

APPENDIX - 550

Research Service, has enormous experience in divining the meaning of statutes for Congress. Differing from Wroth and Maskell is something that requires extensive support.

696    18 Cong. Rec. 668 (1886); see also id. at 49-50 (statement of Rep. Eden); 17 id. at 1020, 1022 (statement of Sen. Hoar).

697    Cf. supra text accompanying note 383 (discussing electors claims to have section 2 status).

698    **Electoral Count Act** of 1887, ch. 90, § 4, 24 Stat. 373, 374 (current version at 3 U.S.C. § 15 (2000)) (emphasis added).

699    Maskell implicitly admits this. Maskell, supra note 17, at 9-10.

700    See supra text accompanying note 532 (discussing Senator Hoar's amendment).

701    See supra text accompanying note 535 (discussing the House committee's proposal).

702    18 Cong. Rec. 668 (1886) (emphasis added).

703    See supra note 694 and accompanying text.

704    See supra text accompanying notes 299-381 (reviewing the conditions). If Wroth and Maskell are right, their reading should apply to the first and second step in the ECA's three-step process. In other words, I am arguing that, if (as Wroth and Maskell argue) the sentence on the governor's certificate does not relate to the second clause of the provision on multiple returns, it would seem to follow that it does not apply to the first clause either. The first clause is the one that deals with the case of multiple returns with only one of them purporting to be authenticated by a section 2 process.

705    I exclude from consideration whether disfranchisement might also occur if the governor refused to certify any return, or there are multiple governors certifying different returns. The point is that Wroth's and Maskell's reading would disfranchise a state under all the circumstances that mine does plus the additional occasions under discussion here.

706    As passed by the House, the provision read, in relevant part:
[B]ut in case there shall arise the question which of two or more of such State authorities determining what electors have been appointed, as mentioned in section 2 of this act, is the lawful tribunal of such State, the votes regularly given of those electors, and those only, of such State shall be counted whose title as electors the two Houses, acting separately, shall concurrently decide is supported by the decision of such State so authorized by its laws; and in such case of more than one return or paper purporting to be a return from a State, if there shall have been no such determination of the question in the State aforesaid, then those votes, and those only, shall be counted which were cast by electors whose appointment shall have been duly certified under the seal of the State by the executive thereof, in accordance with the law of the State, unless the two Houses, acting separately, shall concurrently decide such votes not to be the lawful votes of the legally appointed electors of such State.
18 Cong. Rec. 30 (1886) (emphasis added) (citing the bill with the House committee's proposed amendments, which were passed as proposed).

707    Id. at 668.

708    17 id. at 1020 (statement of Sen. Hoar); see also id. at 1021 (statement of Sen. Hoar) ("Now, I can not . . . think of any case which this bill does not cover, determine, or remand to the State to determine, any case in which any friction or difficulty can grow out of the mechanism here provided, except in the case of dual State governments.").

709    Andrew Caldwell, Report: To Accompany Bill S. 9, H.R. Rep. No. 49-1638, at 2 (1886)9, H.R. Rep. No. 49-1638, at 2 (1886).

710    18 Cong. Rec. 46 (1886) (statement of Rep. Dibble).

711    Id. at 45.

712    Id. at 47.

713    Id. at 46. Representative Dibble held that it was for the judiciary to "prevent grievous wrongs from being done" and that courts were the "places where hide-bound forms of credentials can be broken through." Id. at 46-47. He was such a states' rights enthusiast that he, along with the committee minority, argued that it was an unconstitutional infringement of

APPENDIX - 551

the states' plenary power to appoint electors for Congress to require the states' section 2 authorities (1) to conclude their work six days before the electors balloted in order to have conclusive effect, and (2) to be established before election day. See Samuel Dibble, Views of the Minority: To Accompany Bill S. 9, H.R. Rep. 49-1638, pt. 2, at 1-2 (1886)9, H.R. Rep. 49-1638, pt. 2, at 1-2 (1886); 18 Cong. Rec. 45-47 (1886) (statement of Rep. Dibble).

714     18 Cong. Rec. 47 (1886).

715     Id.

716     Id.; see also H.R. Rep. 49-1638, pt. 2H.R. Rep. 49-1638, pt. 2, at 1-2.

717     Dibble's own substitute bill was drafted in the same supposedly disjunctive form.

718     17 Cong. Rec. 2387 (1886) (citing S. 9, 49th Cong. § 4 (1886), after recommital); see also 15 id. at 5076 (1884) (citing S. 25, 48th Cong. § 4 (1884)).

719     This argument applies to the provisions that were ultimately passed, but it is clearer if one considers the bill's earlier versions.

720     See supra text accompanying notes 383-85 (discussing requirement for House and Senate concurrence).

56 FLLR 541

**End of Document**                  © 2020 Thomson Reuters. No claim to original U.S. Government Works.